## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-01974-WJM-KLM

DAVID MUELLER

      Plaintiff

v.

TAYLOR SWIFT;
FRANK BELL;
ANDREA SWIFT a/k/a ANDREA FINLAY;
SCOTT SWIFT; and
JOHN DOES 1 - 5

      Defendants

---

## SECOND AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff David Mueller, through counsel, M. Gabriel McFarland of Evans & McFarland, LLC, complains against Defendants Taylor Swift, Frank Bell, Andrea Swift, Scott Swift, and John Does 1-5 as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Mueller is an individual who is, and at all relevant times was, a resident of Douglas County, Colorado.

2.      Defendant Taylor Swift is an individual who, upon information and belief, resides in New York.

3.      Defendant Frank Bell is an individual who, upon information and belief, resides in Tennessee.

4.      Defendant Andrea Swift is an individual who, upon information and belief, resides in Tennessee.

5.     Defendant Scott Swift is an individual who, upon information and belief resides in Tennessee.

6.     John Does 1-5 are members of Taylor Swift's retinue yet to be individually identified.

7.     The named Defendants have submitted to the jurisdiction of this Court.

8.     Venue is proper in this Court pursuant to the removal of this action from state court by former Defendant Scott Borchetta.  (Doc. 1).

**GENERAL ALLEGATIONS**

9.     Mr. Mueller has been working in the radio industry for over twenty years, including work as a morning show on-air talent in the San Diego, Columbus (Ohio), Kansas City, Minneapolis, and Denver markets.  He is known by the professional pseudonym "Jackson."  As part of his normal job responsibilities, Mr. Mueller has often been required to meet and greet music superstars and other celebrities.  During his career, Mr. Mueller has met, interacted with, and been photographed with hundreds of celebrities, musical artists, sports figures, and TV and film actors, including, for example, Sheryl Crow, Gwen Stefani, Britney Spears, Christina Aguilera, Heidi Klum, Fergie, Mariah Carey, Beyonce, Jessica Simpson, and Jennifer Lopez.

10.    In January 2013, Mr. Mueller, along with his friend Ryan "Ryno" Kliesch, was hired by Lincoln Financial Media Company of Colorado ("Lincoln Financial Media") to co-host the "Ryno and Jackson" morning show on Lincoln Financial Media's popular country music radio station, 98.5 KYGO.

11.    Mr. Mueller's employment contract was for a term of two years (with an additional optional year).  His base annual salary was $150,000, with the potential for

2

significant additional compensation in the forms of performance bonuses, product endorsement fees, and public appearance fees.

12.     Mr. Mueller's position with Lincoln Financial Media required him to introduce musical artists at live performances, conduct interviews with artists backstage, and accompany KYGO listeners to meet-and-greet events.

13.     On May 30, 2013, Mr. Mueller and Mr. Kliesch were informed by KYGO Program Director Eddie Haskell that they were required to attend a backstage meet-and-greet with musical artist Taylor Swift on June 2, 2013 at the Pepsi Center in Denver, Colorado. At that time, Mr. Haskell also informed Mr. Mueller and Mr. Kliesch that they would each be allowed to bring one guest. Mr. Haskell made it clear he needed to send all the meet-and-greet visitors' names to Ms. Swift's security staff no later than 48 hours prior to the event to allow the security team time to conduct background checks. Mr. Haskell sent a meet-and-greet list to Ms. Swift's security team; the list included Mr. Mueller, his girlfriend and co-worker Shannon Melcher, and Mr. Kliesch and Mr. Kliesch's wife Alycia.

14.     Mr. Mueller and Ms. Melcher arrived at the main entrance of the Pepsi Center at approximately 5:00 p.m. on June 2, 2013, as instructed by Mr. Haskell.

15.     Upon arrival, Mr. Mueller and Ms. Melcher discovered that Mr. Kliesch, his wife, and Mr. Haskell had already gone backstage to meet Ms. Swift with the first of two groups. Mr. Mueller was informed that he and Ms. Melcher had passes with the second group, which would go backstage at the conclusion of the first meet-and-greet.

16.     Mr. Mueller and Ms. Melcher joined the second group of meet-and-greet visitors at the security checkpoint leading to the backstage area. This second group appeared to be fans who had won passes through contests, as it included small children, people

3

wearing Taylor Swift t-shirts, and people holding homemade signs.

17.     Mr. Mueller and Ms. Melcher waited in line with other members of the group. Eventually they were led to a small, curtained off area within the Pepsi Center. This curtained off enclosure measured approximately twelve feet by twelve feet. In the small, curtained off area, Ms. Swift was greeting the people in line, one small group at a time.

18.     Mr. Mueller and Ms. Melcher ultimately made it to the entrance of the enclosure and were invited inside by one of Ms. Swift's staff. Ms. Melcher entered first, followed by Mr. Mueller; they were greeted by Ms. Swift. Ms. Melcher introduced herself and Mr. Mueller. Mr. Mueller complimented Ms. Swift on her patience and sincerity with her fans. Ms. Melcher commented that she had enjoyed watching the little girls dance and sing while waiting in line, and that Ms. Swift was a great role model. Ms. Swift then complimented Ms. Melcher on the belt she was wearing.

19.     During this brief exchange, Mr. Mueller was standing a few feet away from Ms. Melcher and Ms. Swift. Ms. Swift suddenly announced it was picture time, quickly put her right arm around Ms. Melcher, and turned toward the photographer. Mr. Mueller jumped into the photograph at the last second.

20.     Ms. Swift then cordially thanked Mr. Mueller and Ms. Melcher for their visit. Ms. Swift gave Ms. Melcher a hug and shook Mr. Mueller's hand. One of Ms. Swift's assistants handed Mr. Mueller autographed head shots of Ms. Swift and handed Ms. Melcher a card with the code to allow downloading of their group photograph from Ms. Swift's website.

21.     Ms. Swift remained pleasant as she bid them goodbye.

22.     After exiting Ms. Swift's tent, Mr. Mueller and Ms. Melcher gathered their

belongings from the backstage area.  Ms. Melcher remained in the arena while Mr. Mueller went to the KYGO tent outside the Pepsi Center to confirm with Mr. Haskell that Mr. Mueller's duties to the station had been satisfied and to put the autographed photos of Ms. Swift in his car.

23.     Immediately upon exiting the arena, Mr. Mueller encountered Mr. Haskell. Before Mr. Mueller could speak, Mr. Haskell excitedly told him about his experience meeting Ms. Swift earlier that night.  Mr. Haskell stated that Ms. Swift had recognized him and yelled out, "Eddie!" and then had rushed to him and given him a big hug.  He described and demonstrated how he had put his arms around her, hands on her bottom, and then explained that he and one of his friends in the industry think Ms. Swift must wear bicycle shorts under her stage outfits.

24.     After his interaction with Mr. Haskell, Mr. Mueller gave one of the autographed photographs of Ms. Swift to Mr. Haskell's friend.  Then, Mr. Mueller went to his car to drop off the other photograph of Ms. Swift and his sun glasses.  He then returned to Ms. Melcher inside the Pepsi Center.  Together they proceeded to the walkway at the back of the main floor of the arena.

25.     There, they were approached by "Craig," who Mr. Mueller later learned was a member of Ms. Swift's security team.  Craig asked, "Do you want to tell me what happened earlier tonight?"  Mr. Mueller told Craig he did not know what Craig was talking about. Craig then accused Mr. Mueller of grabbing Ms. Swift's bottom while he and Ms. Melcher were being photographed with Ms. Swift.  Mr. Mueller immediately and consistently denied any inappropriate touching.  Ms. Melcher advised that she did not see any inappropriate touching or witness any reaction by Ms. Swift or anyone in the small, curtained off area that

would suggest there was any inappropriate touching. Craig told her, "Shut up!" Mr. Mueller told Craig, "Please call the police. I didn't do anything!" and told him that he worked for KYGO and that Craig should contact his boss, Mr. Haskell. Mr. Mueller made it clear that Mr. Haskell was in the arena, and most likely backstage. Craig ignored Mr. Mueller's request.

26.     Security personnel and other members of Ms. Swift's staff surrounded Mr. Mueller and Ms. Melcher, verbally abused them, and told them Ms. Swift did not want them to attend her concert. Craig threatened to call law enforcement. Mr. Mueller once again requested that Craig get the KYGO program director, Mr. Haskell. Ultimately, Craig refused to contact law enforcement or get Mr. Haskell. And, Mr. Mueller and Ms. Melcher were escorted to an exit door and left.

27.     Later that the same evening, prior to the start of Ms. Swift's concert, Mr. Haskell received a telephone call from Kris Lamb, director of promotions for Big Machine Label Group, the entity that records Ms. Swift. Mr. Lamb informed Mr. Haskell there had been "a possible incident" with a KYGO employee and he needed to talk to Mr. Haskell.

28.     Mr. Haskell and Mr. Lamb met and attempted to go backstage, but were denied access.

29.     Shortly thereafter, Frank Bell, a member of Ms. Swift's management staff, met with Mr. Haskell and showed him a photo of Ms. Swift, Ms. Melcher, and Mr. Mueller, and asked Mr. Haskell to identify Mr. Mueller. Mr. Bell informed Mr. Haskell that Mr. Mueller and Ms. Melcher were "banned for life" from Taylor Swift concerts. Mr. Bell also commented that the alleged incident "reflected negatively on KYGO and radio in general."

30.     Mr. Haskell reacted to Mr. Bell's complaint by leaving Mr. Mueller a

voicemail message informing him he would not appear on the air the following Monday, pending the radio station's investigation of Ms. Swift's allegations.

31.     Later in the evening of June 2, 2013, Mr. Haskell was contacted by Scott Borchetta, president of Big Machine Label Group, to complain about Mr. Mueller's alleged misconduct and to comment that Ms. Swift's mother "was livid." Mr. Haskell informed Mr. Borchetta that Mr. Mueller had been suspended.

32.     Early in the morning of June 3, 2013, Frank Bell contacted KYGO's general manager, Bob Call. Mr. Bell repeated Ms. Swift's charge of inappropriate physical contact by Mr. Mueller, specifically that Mr. Mueller had lifted Ms. Swift's skirt with his hand and grabbed her bottom. Mr. Bell told Mr. Call that Ms. Swift, her parents, and her staff were very upset. Mr. Bell threatened that KYGO "could be gravely impacted" by the incident. Mr. Bell indicated he would forward the subject photograph to Mr. Call and commented that the photo would be "damning."

33.     Mr. Bell telephoned Mr. Call again later in the morning of June 3 and reported that Ms. Swift and her parents were increasingly upset and "looking for specific action." Mr. Bell also threatened that if KYGO did not take action, the Swifts would do so.

34.     Also on June 3, 2013, Mr. Call and Mr. Haskell met with Mr. Mueller to discuss the accusations against him. Mr. Mueller adamantly and consistently maintained that Ms. Swift's accusations were false. Moreover, in the photograph, Ms. Swift is smiling and hugging Ms. Melcher. Although Mr. Mueller's hand is behind Ms. Swift and therefore not visible, it is clear her skirt is in place and is not being lifted by Mr. Mueller's hand. Similarly, Ms. Swift's hand is behind Mr. Mueller and therefore not visible.

35.     In the afternoon of June 3, Mr. Call telephoned Mr. Bell and was informed the

Swifts "were considering all their options" if KYGO did not "handle" Mr. Mueller.

36.     KYGO terminated Mr. Mueller's employment contract on June 4, 2013.

37.     On June 10, 2013, Mr. Call received a telephone call from a Westword newspaper reporter, Michael Roberts, seeking information about Mr. Mueller's termination. Although Mr. Call declined to comment, Mr. Roberts referenced Ms. Swift and "touching" and clearly suggested he had information about the allegations against Mr. Mueller.

38.     Mr. Mueller steadfastly maintains that no inappropriate contact of any kind occurred between him and Ms. Swift. At all relevant times, the tent was occupied by Mr. Mueller, Ms. Melcher, Ms. Swift, Ms. Swift's photographer, and at least one of Ms. Swift's professionally trained security guards. The contention that Mr. Mueller lifted up Ms. Swift's skirt and grabbed her bottom, while standing with his girlfriend, in front of Ms. Swift's photographer and Ms. Swift's highly trained security personnel, during a company sponsored, VIP, backstage meet-and-greet, is nonsense, particularly given that Ms. Swift's skirt is in place and is not being lifted by Mr. Mueller's hand in the photograph.

39.     On December 1, and again on December 11, 2014, Mr. Mueller underwent a polygraph examination, during which he responded "No" to questions about whether he had touched Ms. Swift or put his hand under her skirt. The unequivocal results of both polygraph tests were that Mr. Mueller was speaking truthfully when he denied inappropriate contact with Ms. Swift. Mr. Mueller invited Ms. Swift to undergo a similar polygraph examination. She declined.

### FIRST CLAIM FOR RELIEF
#### (Intentional Interference with Contractual Obligations)

40.     Plaintiff incorporates by reference all foregoing allegations.

41.     Plaintiff Mueller had an employment contract with Lincoln Financial Media

8

Company of Colorado.

42.     Defendants knew or reasonably should have known of the contract.

43.     Defendants, by words and conduct, intentionally caused Lincoln Financial

Media Company of Colorado to terminate its contract with Mr. Mueller.

44.     Defendants' interference with Mr. Mueller's contract was improper.

45.     Defendants' interference with Mr. Mueller's contract caused him to incur

damages and losses.

## SECOND CLAIM FOR RELIEF
### (Tortious Interference with Prospective Business Relations)

46.     Plaintiff incorporates by reference all foregoing allegations.

47.     At the time of Defendants' wrongful conduct as set forth above, there was a

reasonable likelihood that Plaintiff Mueller's employment contract with Lincoln Financial

Media Company of Colorado would be extended, and/or that he would continue to enjoy

employment by other radio stations for the remainder of his career.

48.     Defendants knew or reasonably should have known of these prospective

business opportunities.

49.     Defendants, by words and conduct, intentionally prevented Mr. Mueller from

realizing these prospective business opportunities.

50.     Defendants' interference with Mr. Mueller's prospective business

opportunities was improper.

51.     Defendants' interference with Mr. Mueller's prospective business

opportunities caused him to incur damages and losses.

### THIRD CLAIM FOR RELIEF
**(Slander *per se*)**

52.     Plaintiff incorporates by reference all foregoing allegations.

53.     Defendants orally published and/or caused to be orally published to third parties multiple statements that Plaintiff Mueller lifted Taylor Swift's skirt and grabbed her bottom during a photo session, or statements in substantially similar words.

54.     The statements were false at the time they were made.

55.     The statements were slanderous *per se* as they defamed Mr. Mueller in relation to his trade, business, or profession, and required no extrinsic evidence to show how they might be taken to concern Mueller and his professional status.

56.     At the time Defendants made the statements, they knew they were false or recklessly or negligently disregarded their falsity.

57.     The publication of the statements caused harm to Mr. Mueller's reputation and standing in the community and in his profession, including without limitation the loss of his employment, and caused him further damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
**(Slander *per quod*)**

58.     Plaintiff incorporates by reference all foregoing allegations.

59.     Defendants orally published and/or caused to be orally published to third parties multiple statements that Plaintiff Mueller lifted Taylor Swift's skirt and grabbed her bottom during a photo session, or statements in substantially similar words.

60.     The statements were false at the time they were made.

61.     The persons to whom Defendants made the statements understood the statements to be defamatory.

62.     At the time Defendants made the statements, they knew they were false or recklessly or negligently disregarded their falsity.

63.     The publication of the statements caused harm to Mr. Mueller's reputation and standing in the community and in his profession, including without limitation the loss of his employment, and caused him further damages in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
#### (*Respondeat Superior*)

64.     Plaintiff incorporates by reference all foregoing allegations.

65.     At all relevant times, Defendants Frank Bell and John Does 1-5 were acting within the scope of their employment by Defendant Taylor Swift.

66.     Defendant Taylor Swift is vicariously liable for the acts and omissions of these Defendants pursuant to the doctrine of *respondeat superior*.

### PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount that will compensate him for his damages, plus pre- and post-judgment interest, costs, attorney fees as allowed by law, and all other relief deemed just and proper by the Court.

Dated this 25 day of February, 2016.

Respectfully submitted,

EVANS & MCFARLAND, LLC

By: s/ M. Gabriel McFarland
    M. Gabriel McFarland
    Evans & McFarland, LLC
    910 13th St., #200
    Golden, CO 80401
    Telephone: 303.279.8300
    Facsimile: 303.277.1620
    Email: gmcfarland@emlawyers.com

    ATTORNEYS FOR PLAINTIFF