## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:15-cv-01974-WJM-KLM

DAVID MUELLER

<table>
<tr><td></td><td>Plaintiff,</td><td><strong>FILED AS</strong></td></tr>
<tr><td>v.</td><td></td><td><strong>RESTRICTED DOCUMENT</strong></td></tr>
</table>

TAYLOR SWIFT; FRANK BELL;
ANDREA SWIFT a/k/a ANDREA FINLAY;
and JOHN DOES 1-5

Defendants.


## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT OF MOTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

MOVANTS' STATEMENT OF MATERIAL FACTS .................................................... 3

STANDARD OF REVIEW ............................................................................................. 12

ARGUMENT .................................................................................................................. 14

I.  PLAINTIFF CANNOT ESTABLISH INTENTIONAL INTERFERENCE WITH
    CONTRACTUAL RELATIONS AGAINST ANY DEFENDANT ..................................... 14

    A.  Ms. Swift Did Not Have Knowledge of Plaintiff's Contract ............................................ 15

    B.  Defendants Did Not Intentionally or Improperly Interfere with Plaintiff's Contract ....... 15

        1.  Ms. Swift ................................................................................................................. 16

        2.  Andrea Swift ........................................................................................................... 18

        3.  Mr. Bell ................................................................................................................... 19

    C.  Defendants Were Not the Cause of Plaintiff's Termination ............................................. 20

        1.  KYGO's independent investigation extinguished any causal connection between
            Defendants' report of Plaintiff's inappropriate contact and his termination .............. 20

        2.  Plaintiff withheld information from KYGO ............................................................. 23

        3.  Plaintiff was likely to have been fired anyway ....................................................... 23

II.  DEFENDANTS DID NOT TORTIOUSLY INTERFERE WITH PLAINTIFF'S
     PROSPECTIVE BUSINESS RELATIONS .............................................................................. 24

    A.  Plaintiff Has Not Identified Any Prospective Business Relationships With Which He Had
        More than a Mere Hope of Forming a Contract ............................................................. 24

    B.  Defendants Had No Knowledge of Any Alleged Prospective Business Relations, And Did
        not Intentionally or Improperly Interfere ....................................................................... 26

    C.  Defendants Did Not Cause Plaintiff to Lose Any Prospective Business Relations .......... 27

III.  PLAINTIFF'S CLAIMS FOR SLANDER *PER SE* AND *SLANDER PER QUOD* ARE
      TIME-BARRED BY THE STATUTE OF LIMITATIONS ................................................. 28

IV.  BECAUSE ALL OF PLAINTIFF'S UNDERLYING TORT CLAIMS FAIL, SO TOO
     DOES HIS CLAIM OF *RESPONDEAT SUPERIOR* ....................................................... 29

CONCLUSION ............................................................................................................... 29

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants move for summary judgment on all of Plaintiff's claims.

## INTRODUCTION

On June 2, 2013, during the fan pre-concert meet and greet at Taylor Swift's concert at the Pepsi Center in Denver, Colorado, Plaintiff David Mueller groped Taylor Swift on her bottom. He was terminated by his employer, KYGO, after its own independent investigation of the incident. Mueller then filed this lawsuit against the Defendants (including Ms. Swift) after first claiming he did not do it, later claiming if he did it was an accident, and still later claiming his boss at KYGO confessed to doing it. The witnesses have identified Mueller as the man who groped Ms. Swift. The sole exception is Mueller himself (who stated that it is "possible" he touched her by "accident") and his ex-girlfriend who simply does not know if he did it. A photograph was taken during the meet and greet that every witness agrees is damning to Mueller—even Mueller admits it looks bad. Stated another way, no one has denied that someone touched Ms. Swift, not even Mueller, who says his boss did so.

Mueller's employer, KYGO, investigated the incident and independently determined Mueller was the wrongdoer and had lied about the incident. No less than seven KYGO personnel participated in the investigation, reviewing the photographic evidence, interviewing Mueller and his girlfriend, and discussing the incident with Defendant Frank Bell, a senior manager for Ms. Swift. Among other things, the KYGO investigators determined Mueller lied during the investigation by changing his story about what occurred—wholly independent of anything the Defendants are even alleged to have done. And, during the investigation, Mueller did not bother to tell investigators that his KYGO boss allegedly confessed to the wrongful act—again, an

omission wholly unrelated to the Defendants and for which Mueller can only blame himself. Thus, no one contests that an unauthorized touching was reported to KYGO, that KYGO did its own investigation, and that KYGO, solely, made the decision to terminate Mueller.

The absurd facts upon which Mueller has based his lawsuit are largely irrelevant to this motion for summary judgment. Specifically, the undisputed facts simply fail to support the essential elements of his claims for tortious interference and slander as follows:

- Ms. Swift did not have any knowledge of his contract with KYGO and no Defendant had knowledge of any prospective business relations;

- Defendants did not have any intent to interfere with Mueller's contract or prospective deals;

- Defendants did not act improperly in reporting Mueller's inappropriate conduct to KYGO;

- Defendants were not the cause of Mueller's termination;

- Even if Defendants acted as alleged (despite the complete lack of evidence), the extensive and independent investigation by KYGO breaks the chain of causation and Defendants cannot be liable for KYGO's action and decision;

- Plaintiff did not have any prospective business relations—only his "mere hope" that KYGO would exercise its one-year option and that other appearance and endorsement deals would materialize;

- Even if Plaintiff could identify some prospective business relations, Defendants were not the cause of Mueller's inability to realize the prospective business relations; and

- Plaintiff's slander claims are admittedly time-barred because he knew of the alleged facts underlying his claims by June 3, 2013, yet he did not file his Second Amended Complaint adding those claims until February 25, 2016—over two and a half years after the fact.

2

The factual and evidentiary deficiencies in Plaintiff's case are stark and voluminous. Summary Judgment is appropriate and should be granted in Defendants' favor.

## MOVANTS' STATEMENT OF MATERIAL FACTS

### Plaintiff's Contract with KYGO

1.     From January 2013 through June 4, 2013, Plaintiff worked at radio station KYGO in Denver, Colorado. (Jan. 4, 2013 Employment Contract at SWIFT_0000003 (Ex. 1)[1]; June 4, 2013 Termination Letter ("Termination Letter") at SWIFT_0000029 (Ex. 2)).

2.     Plaintiff had a contract with KYGO[2] for a term of two years. (Ex. 1 at SWIFT_0000004; July 13, 2016 Deposition of David J. Mueller at 154:12-155:25 (Ex. 3)).

3.     On June 4, 2013, KYGO terminated Plaintiff. (Ex. 2 at SWIFT_0000029).

4.     KYGO terminated Plaintiff for violating the morality clause of his contract.  (Ex. 2 at SWIFT_0000029; July 14, 2016 Deposition of Hershel Coomer P/K/A Eddie Haskell at 40:6-14 (Ex. 4); Investigation Notes of Bob Call at SWIFT_0000027 (Ex. 5); *see* Ex. 1 at SWIFT_0000011).

5.     KYGO terminated Plaintiff after conducting an investigation about reports of an incident involving Plaintiff and Ms. Swift on June 2, 2013. (July 14, 2016 Deposition of Bob Call at 34:8-34:19 (Ex. 6); Ex. 4 at 26:17-28:7-16).

---

[1]     All Exhibits referenced herein are attached to the September 30, 2016 Declaration of Katherine Wright in Support of Defendants' Motion for Summary Judgment, which is being filed contemporaneously herewith.

[2]     Plaintiff's contract was with Lincoln Financial Media Company of Colorado, the entity that owned radio station KYGO at the time. (*See* Feb. 25, 2016 Second Am. Compl. ¶ 10 [Dkt. 72]). Unless the distinction is material, for ease of reference, Defendants use the term "KYGO" when referring to Plaintiff's employer in this Motion.

**The Events of June 2, 2013**

6.      Ms. Swift is certain that Plaintiff David Mueller inappropriately touched her during a fan pre-concert meet and greet at her concert in Denver, Colorado on June 2, 2013. (July 26, 2016 Deposition of Taylor Swift at 6:8-8:12 (Ex. 7); *id.* at 15:19-23; *id.* at 16:17-20; *id.* at 24:5-12; *id.* at 26:5-20; *id.* at 53:7-22).

7.      Specifically, Ms. Swift testified that Plaintiff "put his hand under [her] dress and grabbed [her] bare ass." (Ex. 7 at 7:21-8:1).

8.      Plaintiff admits it was "possible" that he touched "her skirt or somewhere behind her." (Ex. 3. at 72:1-13).

9.      The witnesses have identified Mueller as the man who inappropriately touched Ms. Swift at the fan pre-concert meet and greet (*see, e.g.*, Ex. 7 at 6:8-8:1; June 28, 2016 Deposition of Stephanie Simbeck at 39:10-25 (Ex. 8); *id.* at 42:3-14; *id.* at 48:8-14; June 28, 2016 Deposition of Erica Worden at 20:8-23 (Ex. 9); *id.* at 22:23-23:5; July 28, 2016 Deposition of Gregory Dent at 41:7-21 (Ex. 10); *id.* at 45:10-47:1; July 20, 2016 Declaration of Gregory W. Dent ¶ 6 (Ex. 11)), with two exceptions: (1) Mueller who testified it is "possible" he touched "her skirt or somewhere behind her" and also said if he did so, it was accidental, (Ex. 3 at 72:1-13; Ex. 6 at 9:17-22: Ex. 5 at SWIFT_0000025-26; Transcript of Recorded Conversations[3] at 5:13-6:1 (Attached as Ex. A to Ex. 12); Ex. 4 at 34:2-19) and (2) his ex-girlfriend, Shannon Melcher, who testified she did not

---

[3]      This transcript is a certified transcription of recordings Plaintiff made of his conversation with Bob Call and Eddie Haskell on June 3, 2013 and which Plaintiff produced in discovery. (Ex. 3 at 27:24-28:11; September 29, 2016 Decl. of J. Douglas Baldridge (Ex. 12), attaching Transcript of Recorded Conversations as Exhibit A). Plaintiff only provided excerpts of the recordings and claims full recordings were on devices that he has since destroyed. (Ex. 3 at 27:24-28:20; *id.* at 42:7-49:10). Given Mueller's spoliation of relevant evidence (*see id.* at 43:3-49:19; *id.* at 52:13-67:6), the Court should, in its discretion, infer that the destroyed portions of the recordings and other relevant documents contain evidence that undermines Mueller's position.

know if he did so. (August 30, 2016 Deposition of Shannon Melcher at 22:20-23:11 (Ex. 13); *id.* at 32:9-17).

10.     During the fan pre-concert meet and greet, a photograph was taken of Mueller, Shannon Melcher, and Ms. Swift. (Photograph at SWIFT_0000076 (Ex. 14); Ex. 8 at 35:23-36:7).

11.     Plaintiff admits he appears "awkward" and that the "picture looked bad." (Ex. 3 at 215:16-21; Ex. 4 at 34:2-16).

12.     The photographer who took the picture saw Plaintiff's hand on Ms. Swift's bottom. (Ex. 8 at 48:8-14).

13.     A security guard in the fan meet and greet room, Greg Dent, saw Mueller lift up Ms. Swift's skirt. (Ex. 10 at 41:7-21; *id.* at 45:10-47:1; Ex. 11 ¶¶ 6, 14).

14.     Every witness has testified, or otherwise described, that the photograph is "damning" (or materially similar descriptions) of Mueller and his conduct at the meet and greet. (Ex. 5 at SWIFT_0000024; Ex. 6 at 9:4-9; *id.* at 24:11-25:2; *id.* at 34:9-11; Ex. 4 at 34:2-15; June 29, 2016 Deposition of Francis Bell at 32:23-33:8 (Ex. 15); Ex. 9 at 28:9-17; *id.* at 29:19-30:15; Ex. 8 at 54:7-55:6; June 28, 2016 Deposition of Andrea Swift at 26:8-24 (Ex. 16); Ex. 7 at 28:4-31:16; Ex. 3 at 215:16-21).

15.      Plaintiff testified that he cannot identify any facts to suggest that Ms. Swift had a motive or incentive to "fabricate a story" that he touched her inappropriately and he "can't imagine why [Ms. Swift] would fabricate a story." (Ex. 3 at 23:17-23).

16.     After leaving the meet and greet area, Ms. Swift met her mother, Andrea Swift, in Ms. Swift's dressing room and told her that she had been inappropriately touched by a man she did not know. (Ex. 7 at 37:14-39:16; Ex. 16 at 12:5-13:23).

17.     Ms. Swift was visibly upset as she explained this to her mother. (Ex. 16 at 12:18-20; *id.* at 14:20-24; Ex. 7 at 38:10-39:16).

18.     Andrea Swift then relayed what she had learned to Ms. Swift's senior management team to determine how to move forward. (Ex. 16 at 14:25-15:15; *id.* at 19:15-20:12; *id.* at 24:12-26:3; Ex. 15 at 23:3-23).

19.     Andrea Swift never spoke to anyone at KYGO about Plaintiff. (Ex. 16 at 37:14-15; Ex. 4 at 18:16-18; *id.* at 26:4-7).

20.     One of Ms. Swift's senior managers, Frank Bell, contacted KYGO to let the station investigate what Mueller had done and make its own decision about what to do about it. (Ex. 16 at 25:4-26:7; *id.* at 30:10-15; Ex. 15 at 36:5-37:18;  Ex. 4 at 18:16-18).

21.     Andrea Swift had no expectation regarding what action KYGO might pursue against Mueller, including whether he would be fired. (Ex. 16 at 29:14-23).

22.     Ms. Swift never spoke to anyone at KYGO about Plaintiff and never asked anyone to take any specific action about the incident. (Ex. 3 at 14:5-14; Ex. 4 at 18:16-18; *id.* at 26:4-7; Ex. 7 at 19:15-17; *id.* at 39:6-8; Ex. 16 at 43:12-14; Ex. 15 at 37:15-18; Ex. 5 at SWIFT_0000024-27).

23.     Ms. Swift was not involved in the decision to contact KYGO. (Ex. 16 at 28:24-29:6; Ex. 7 at 40:9-22; *id.* at 41:8-14; Ex. 15 at 37:15-18).

24.     Prior to June 2, 2013, neither Ms. Swift, Andrea Swift, nor Mr. Bell had ever met Plaintiff and knew nothing about him, his relationship with KYGO, or his contractual arrangement. (Ex. 7 at 20:5-19; Ex. 16 at 9:16-19; *id.* at 13:4-23; Ex. 15 at 7:8-13; Ex. 3 at 85:8-87:1; *id.* at 225:15-21; Ex. 5 at SWIFT_0000026).

**KYGO's Investigation of the Incident**

25.     KYGO's investigation of the incident involved a minimum of seven KYGO and its parent company's (Lincoln Financial) senior management and counsel, including the President of the company, Don Benson, Senior Vice President for Programming and Operations, John Dimick, Vice President Market Manager, Bob Call, Plaintiff's direct boss and KYGO Program Director, Eddie Haskell, the company's attorney, KYGO's Human Resources Manager, Maureen Marsh, and the company's corporate Vice President of Human Resources, Kercea Beckwith. (Ex. 6 at 15:20-16:20; *id.* at 17:6-22; *id.* at 26:2-11; *id.* at 40:24-42:19; Ex. 4 at 16:14-17:14; *id.* at 27:1-16; *id.* at 38:14-24; Ex. 5 at SWIFT_0000024-27).

26.     The investigation also involved interviews by KYGO of Mueller and his then-girlfriend, Shannon Melcher, a KYGO employee who accompanied him to the June 2 concert. (Ex. 6 at 28:11-21; *id.* at 31:6-23; Ex. 4 at 34:2-35:6; *id.* at 36:24-37:17; Ex. 5 at SWIFT_0000025-27).

27.     On June 3, 2013, Mr. Call and Mr. Bell spoke to discuss the incident. (Ex. 6 at 18:10-19:4; Ex. 5 at SWIFT_0000024; Ex. 15 at 24:14-27:1).

28.     Mr. Bell informed Mr. Call that there was a photograph from the incident. (Ex. 15 at 26:21-27:3).

29.     Mr. Call requested that Mr. Bell send him the picture for KYGO's investigation. (Ex. 6 at 18:10-19:10; Ex. 15 at 26:24-27:1).

30.     On June 3, 2013, Mr. Bell sent the photograph to Mr. Call with strict instructions to keep it confidential. (Ex. 6 at 18:10-19:10; *id.* at 37:15-19; Ex. 15 at 32:1-22; Ex. 5 at SWIFT_0000024).

31.     Mr. Bell relayed other information in response to follow-up questions from Mr. Call. (Ex. 6 at 23:16-24:2; *id.* at 26:12-17; Ex. 5 at SWIFT_0000025, 27).

32.     Mr. Bell "never" requested that KYGO terminate Mueller or take any other specific action with respect to Mueller. (Ex. 15 at 24:23-26:10; Ex. 6 at 20:3-14).

33.     During the investigation, Plaintiff initially denied the incident. (Ex. 6 at 9:17-22; Ex. 4 at 34:2-7).

34.     Later, Plaintiff told Mr. Call and Mr. Haskell that if he inappropriately touched Ms. Swift, it was an accident. (Ex. 6 at 9:17-22; *id.* at 34:8-23; Ex. 5 at SWIFT_0000025-26; Ex. 4 at 34:2-19).

35.     Mr. Call viewed Plaintiff's later statement as a clear change from the story Plaintiff originally told. (Ex. 6 at 9:17-22: *id.* at 34:8-23).

36.     During its investigation, KYGO evaluated the photograph of Ms. Swift, Plaintiff, and Ms. Melcher and determined that the photograph "represented [Plaintiff] in a very uncomfortable place with [Ms. Swift]" and "appeared very inappropriate." (Ex. 6 at 9:4-9; *id.* at 24:11-25:2; *id.* at 34:9-11).

37.     Mr. Haskell and Mr. Dimick described the photograph as "damning." (Ex. 5 at SWIFT_0000025).

38.     Based on its investigation, KYGO determined that Plaintiff was lying, had changed his story, and had inappropriately touched Ms. Swift. (Ex. 4 at 39:6-23; Ex. 6 at 9:4-24: *id.* at 34:9-23).

39.      In this lawsuit, Plaintiff has alleged Mr. Haskell "described and demonstrated how he had put his arms around [Ms. Swift], hands on her bottom, and then explained that he and one

8

of his friends in the industry think Ms. Swift must wear bicycle shorts under her stage outfits." (Dkt. 72 ¶ 23; *see* Ex. 3 at 26:7-27:7; *id.* at 28:12-30:3).

40.    Plaintiff did not report to anyone in KYGO management his claim that Mr. Haskell had confessed to having touched Ms. Swift inappropriately at the June 2, 2013 concert before he was fired. (Ex. 3 at 30:18-30:23; *id.* at 166:9-18; *see generally* Exhibit A to Ex. 12).

41.    Plaintiff first raised the idea that it was Mr. Haskell who had inappropriately touched Ms. Swift in February 2015—over a year and a half after the incident occurred. (Feb. 2015 Draft Complaint ¶ 18 at SWIFT_0000114 (Ex. 17)).

42.    Plaintiff did not mention Mr. Haskell's alleged actions in the first draft complaint he sent Ms. Swift in July 2014. (July 16, 2014 Draft Complaint at SWIFT_0000087-90 (Ex. 18); *see* Ex. 3 at 73:11-75:2).[4]

**Plaintiff's Job at KYGO**

43.    Plaintiff's contract with KYGO provided for an additional option year at the expiration of its two-year term. (Ex. 1 at SWIFT_0000004; Ex. 3 at 155:4-12; *id.* at 157:17-158:1).

44.    The option in Plaintiff's contract was electable solely at the discretion of KYGO. (Ex. 1 at SWIFT_0000004; Ex. 3 at 157:17-158:1; *id.* at 159:18-160:2).

45.    KYGO had no legal obligation to employ Plaintiff after January 2015. (Ex. 1 at SWIFT_0000004; Ex. 3 at 157:10-16).

46.    Prior to his termination, Mueller had no notice from KYGO that it wanted to extend or exercise the one-year option on his contract. (Ex. 3 at 159:12-17).

---

[4]    Mr. Haskell and Ms. Swift have both denied that Mr. Haskell acted inappropriately at any time. (Ex. 7 at 18:12-20; *id.* at 22:2-17; Ex. 4 at 42:21-43:3; *id.* at 45:15-22).

47.     Prior to June 2, 2013, Mueller's on-air show was not doing well and was struggling with ratings. (Ex. 4 at 38:4-13).

48.     Prior to June 2, 2013, Plaintiff and his boss, Mr. Haskell, had difficulties getting along, and Plaintiff believed that Mr. Haskell was not happy with his performance and wanted to fire him. (Ex. 3 at 31:19-32:21; Ex. 13 at 38:13-20).

49.     Plaintiff's belief was furthered by Mr. Haskell asking Plaintiff and his co-host "have you guys had enough?" and encouraging them to "go down to Bob [Call]'s office" so he could "see if we can get you guys out of your contracts." (Ex. 3 at 107:16-21).

50.     Plaintiff also testified to several "instances" between himself and Mr. Haskell including Mr. Haskell telling Plaintiff he "didn't like our show." (Ex. 3 at 105:8-109:6; *id.* at 109:21-110:3).

51.     According to Plaintiff, as of May 29, 2013, KYGO was "ready to 'terminate [Mueller and his on-air partner] WITH CAUSE, for insubordination.'" (May 29, 2013 Notes from Conference Call with Talent Agent (Ex. 19)).

**Plaintiff's Lawsuit**

52.     Plaintiff filed his initial complaint in this action on May 29, 2015. (May 29, 2015 Compl. at SWIFT_0000276-282 (Ex. 20)).

53.     Plaintiff first asserted claims for slander *per se* and slander *per quod* in his February 25, 2016 Second Amended Complaint. (*Compare* Ex. 20 at SWIFT_0000276-282, *and* June 1, 2015 Amended Compl. at SWIFT_0000121-128 (Ex. 21), *with* Dkt. 72).

54.     Plaintiff included those slander claims in his first draft complaint sent to Ms. Swift in July 2014, but he did not raise the claims in litigation until 2016. (*See* Ex. 18 at SWIFT_0000087-90).

55.     Plaintiff alleges defamatory statements about him were made on June 2 and 3, 2013. (*See generally* Dkt. 72; June 16, 2016 Pl.'s Resp. to Defs.' First Set of Interrogs., at Answer to Interrog. 2 (Ex. 22)).

56.     Plaintiff was aware of the alleged defamatory statements, at the latest, on June 3, 2013 "for sure." (Ex. 3 at 77:16-25).

57.     Plaintiff admits that he has no information to suggest that any of the Defendants knew about any prospective appearances or endorsements he may have had at the time of his termination. (Ex. 3 at 224:24-225:6).

58.     Plaintiff is unaware of any communications any Defendant had with any prospective third-party business Mueller claims to have had a prospective business opportunity with, other than KYGO. (Ex. 3 at 235:6-13).

59.     Plaintiff has offered several different versions of what he contends happened on June 2, 2013.  For example, Plaintiff has on occasion denied any contact occurred; on other occasions has said that if it happened, it was an accident; other times said his boss, Eddie Haskell, confessed to doing it; and, most recently, said that his hand jostled with Ms. Swift's and admitted it was "possible" he touched her "skirt or somewhere behind her." (Ex. 3 at 36:3-21; *id.* at 37:6-10; *id.* at 42:16-21; *id.* at 72:1-13; Ex. 6 at 9:17-22; *id.* at 34:8-23; Ex. 4 at 34:2-19; Ex. 5 at SWIFT_0000025-26; Ex. 17 ¶ 18 at SWIFT_0000114; Dkt. 72 ¶¶ 23, 38).

**STANDARD OF REVIEW**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Mesa Oil, Inc. v. Ins. Co. of N. Am.*, 123 F.3d 1333, 1337 (10th Cir. 1997). Where, as here, movants will not bear the burden of persuasion at trial, the movants need not negate the nonmovant's claim. *See* C*elotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Allen v. Muskogee, Okla.*, 119 F.3d 837, 840 (10th Cir. 1997). Rather, movants may make their prima facie demonstration simply by showing a lack of evidence on an essential element of the nonmovant's claim. *Celotex*, 477 U.S. at 323. If Plaintiff "does not come forward with sufficient evidence on all essential elements of [his] prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial." *Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1299 (D. Colo. 1998). Plaintiff must come forward with "more than a mere scintilla of evidence" and must show more than "some metaphysical doubt as to the material facts." *Orback v. Hewlitt-Packard, Co.*, 909 F. Supp. 804, 807 (D. Colo. 1995); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

While generally on summary judgment reasonable inferences are drawn in favor of the non-movant (*see, e.g.*, *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)), the court need not draw all inferences in favor of the non-movant. *See Zamora v. Elite Logistics,* 478 F.3d 1160, 1180 (10th Cir. 2007). This is particularly true where, as here, Plaintiff spoliated relevant evidence. *See, e.g.*, *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir.

2009) (recognizing the array of sanctions available, "including an adverse inference," on spoliation claim raised on summary judgment).

In this case, as a sanction for Plaintiff's spoliation, the Court should draw an adverse inference against Plaintiff. "A spoliation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007). "[T]he general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997); *see also Langley by Langley v. Union Elec. Co.*, 107 F.3d 510, 515 (7th Cir. 1997) (sanction for "losing a potentially crucial piece of evidence" can result in summary judgment).

Plaintiff admits he destroyed or lost five devices relevant to his claims in this lawsuit *after* he was contemplating legal action (and in some instances months after filing suit). SOF ¶ 9 n.3.[5] Specifically, the "lost" devices contained the full recordings of conversation between Plaintiff and his bosses, Mr. Call and Mr. Haskell. *Id.* Yet, in this litigation, Plaintiff only produced selected portions of the recordings. *Id.* He has disputed what was said during the conversation, but conveniently "lost" evidence undermining his claim. *Id.*

Defendants have never had the opportunity to hear the entirety of Plaintiff's interview with KYGO and Plaintiff has failed to produce other relevant evidence about the interview that could overcome the prejudice to Defendants of being deprived of such important information. In light of

---

[5]     All citations to "SOF" are to Movants' Statement of Material Facts.

Plaintiff's spoliation, the Court can reasonably infer that the missing parts of Plaintiff's recordings would have been unfavorable to Plaintiff. *See, e.g.*, *Aramburu*, 112 F.3d at 1407. For purposes of this Motion, the Court should, in its discretion, draw reasonable inferences against Plaintiff and enter judgment for Defendants.

## ARGUMENT

### I.   PLAINTIFF CANNOT ESTABLISH INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST ANY DEFENDANT

Count One of Plaintiff's Second Amended Complaint purports to allege a claim for intentional interference with contractual obligations. Under Colorado law, "one who intentionally and improperly interferes with the performance of a contract between another and a third party by causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc*., 311 F. Supp. 2d 1048, 1115 (D. Colo. 2004) (citing *Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc*., 690 P.2d 207, 210 (Colo. 1984)).[6] To prevail on this claim, a plaintiff must show: "(1) a contract existed; (2) the defendant had knowledge of the contract; (3) the defendant interfered and induced the other party to breach the contract; and (4) the plaintiff was injured as a result." *Id.* (citing *Westfield Dev. Co. v. Rifle Inv. Assoc*., 786 P.2d 1112, 1117 (Colo. 1990) (en banc)). "Most importantly, the interference must be intentional and improper." *Id.* (citing *Amoco Oil v. Ervin*, 908 P.2d 493, 501 (Colo. 1996) (en banc)). The record contains no evidence to support a claim for intentional interference with contractual relations against any of the Defendants.

---

[6]      Colorado follows Section 766 of the Restatement (Second) of Torts. *See, e.g.*, *Mem'l Gardens*, 690 P.2d at 210; *Caven v. Am. Fed. Sav. & Loan Ass'n of Colo.*, 837 F.2d 427, 431 (10th Cir. 1988).

### A. Ms. Swift Did Not Have Knowledge of Plaintiff's Contract

Plaintiff cannot establish one of the most basic elements of his claim against Ms. Swift. To be subject to liability for intentional interference with contract, an actor must have knowledge of the contract. *Nobody*, 311 F. Supp. at 1117-18; *see also* Restatement (Second) of Torts § 766 cmt. i. Where, as here, there is no evidence that a defendant knew of the plaintiff's contract with a third person, summary judgment should be entered in favor of the defendant. *See Gen. Steel Domestic Sales, LLC v. Chumley*, No. 10-cv-1398, 2012 WL 1459132, at *2 (D. Colo. Apr. 26, 2012); *Nobody*, 311 F. Supp. 2d at 1117-18.

As to Ms. Swift, the record is devoid of anything remotely supporting this element. The record is clear that Ms. Swift did not know that Plaintiff had a contract with KYGO at the time Plaintiff alleges she interfered with his contract. Ms. Swift never met Plaintiff until June 2, 2013, and knew nothing about him, his relationship with KYGO, or his contractual arrangement. SOF ¶ 24. Plaintiff concurs. During his deposition, Plaintiff unequivocally stated, "I didn't tell her that [I was from KYGO]" and "I definitely did not get the impression that she thought I was an on-air personality at KYGO or part of the morning show." *Id.* Plaintiff advanced similar sentiments during KYGO's investigation. *Id.* These facts, alone, warrant summary judgment on Plaintiff's claim for intentional interference with contract against Ms. Swift. *See Nobody*, 311 F. Supp. 2d at 1117-18; *Chumley*, 2012 WL 1459132, at *2.

### B. Defendants Did Not Intentionally or Improperly Interfere with Plaintiff's Contract

To be actionable, any interference with contractual relations must be both intentional and improper. *Nobody,* 311 F. Supp. 2d at 1115. In tortious interference claims, "intent" means that an actor "desires to bring it about or if he knows that the interference is certain or substantially certain

to occur as a result of his action." *Ryskin v. Banner Health, Inc.*, No. 09-cv-1864, 2010 WL 4818062, at *15 (D. Colo. Nov. 9, 2010). To determine whether an act is improper, a court considers the following factors: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the proximity or remoteness of the actor's conduct to the interference, and (6) the relations between the parties. *See, e.g., Jefferson Cnty. School Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 858 (10th Cir. 1999) (quoting Restatement (Second) of Torts § 767); *Caven*, 837 F.2d at 431 (noting that Colorado relies on Restatement (Second) of Torts §§ 766 and 767 for this tort). Here, there is no intentional or improper conduct by Defendants.

### 1. Ms. Swift[7]

No facts support Plaintiff's claim that Ms. Swift intentionally and improperly interfered with Plaintiff's contract. All of the evidence shows that after Mueller inappropriately touched her, Ms. Swift reported the incident to her mother. SOF ¶ 16. Ms. Swift herself did not speak to anyone at KYGO about the event, did not ask anyone to take any action against Mueller, and was not involved in the decision to report the incident to KYGO. SOF ¶¶ 22, 23. Such remote facts cannot show that Ms. Swift took any act that interfered with Plaintiff's contract. *See Nobody*, 311 F. Supp. 2d at 1115; Restatement (Second) of Torts § 767 cmt. h (indirect conduct is rarely improper).

Even assuming Ms. Swift's report to her mother could be deemed an interfering "act," there is no evidence that Ms. Swift had any motive or intent to interfere with Plaintiff's contract. *See Ryskin*, 2010 WL 4818062, at *15. Again, Ms. Swift never spoke to anyone at KYGO about

---

[7]     This section addresses Plaintiff's claim against Ms. Swift under Count One in his Second Amended Complaint.  Plaintiff's separate attempt to hold Ms. Swift liable under a theory of *respondent superior* (Count 5) is addressed in Section IV *infra*.

Plaintiff's inappropriate contact and did not ask anyone to take any action against him. SOF ¶ 22. She had no motive to interfere with Plaintiff's contract. Nor could she, as Ms. Swift never even met Plaintiff before June 2, 2013 and knew nothing about him. SOF ¶¶ 16, 24. Even Plaintiff admits that he cannot conceive of any motive Ms. Swift had to fabricate her report. SOF ¶ 15. There simply is no evidence of any intent or improper motive on Ms. Swift's part.

Finally, the evidence shows that there was nothing improper about Ms. Swift's conduct. Ms. Swift is certain that Plaintiff "put his hand under [her] dress and grabbed [her] bare ass." SOF ¶ 7. She has never equivocated on that fact, and the evidence overwhelmingly supports her. SOF ¶ 9. The picture of Ms. Swift and Plaintiff taken on June 2, 2013 shows Plaintiff's hand behind Ms. Swift, well below her waist, and Ms. Swift is leaning away from Plaintiff. *See, e.g.*, SOF ¶ 10. A security guard who witnessed Plaintiff's interactions with Ms. Swift testified that he saw Plaintiff lift Ms. Swift's skirt. SOF ¶ 13. The photographer who took the picture of Plaintiff and Ms. Swift testified that she saw Plaintiff's hand on Ms. Swift's bottom. SOF ¶ 12. Plaintiff, himself, now admits that it is "possible" he touched Ms. Swift's "skirt or somewhere behind her." SOF ¶ 8.[8] The fact that Ms. Swift relayed these facts to her mother and colleagues, but no one connected to Plaintiff, is not improper. *See Palmer v. First Transit*, No. 13-cv-2401, 2014 WL 3267306, at *4 (D. Colo. Oct. 2, 2014) (no improper conduct in communicating that plaintiff was "not rehirable" to plaintiff's prospective employer where video tape confirmed statement); *Haegart v. McMullan*, 953 N.E.2d 1223, 1227-28, 1233-35 (Ind. Ct. App. 2011) (supervising

---

[8]    Plaintiff's attempt to belatedly distance himself by claiming that it was not him, but was really Mr. Haskell who did it, strains credulity. Ms. Swift knew Mr. Haskell before June 2, 2013 and is clear that he was not the man who assaulted her. SOF ¶¶ 6, 42 n.4. Furthermore, despite numerous opportunities to do so (including in his interview with KYGO the day after the inappropriate touching), Plaintiff did not raise the idea that it was Mr. Haskell for more than a year and a half after the incident. SOF ¶¶ 39-42.

professor who reported plaintiff's harassment to university did not act improperly as her conduct was "fair and reasonable under the circumstances"); Restatement (Second) of Torts § 767, *id.* § 772 cmt. b ("There is of course no liability for . . .  one who merely gives truthful information to another.").[9] To hold otherwise would only further victimize the victim of an assault.  Judgment should be entered for Ms. Swift.

### 2.  Andrea Swift

Plaintiff's claim against Andrea Swift also fails.  Plaintiff cannot identify an interfering act she took.  She never spoke with anyone at KYGO and had no interactions with Plaintiff's employer regarding his inappropriate contact with Ms. Swift. SOF ¶¶ 19, 20. Regarding intent, she wanted the station to know what happened, but was clear that she wanted the station to make its own decision about what to do. SOF ¶¶ 20, 21. She explicitly testified that she had no expectation that Plaintiff would be fired after Mr. Bell contacted KYGO. SOF ¶ 21. Thus there was no "act" by Andrea Swift that interfered with Mueller's contract, and even if there was, she did not do so with the intention of interfering with Plaintiff's contract. *See Ryskin*, 2010 WL 4818062, at *15.

Moreover, Andrea Swift did not act improperly. She learned of the incident from her daughter, who was visibly upset and distraught about it. SOF ¶¶ 16, 17. She did what she could to comfort her daughter and worked with other members of Ms. Swift's management team to determine how best to move forward. SOF ¶ 18. That included the decision to have Frank Bell reach out and report the incident to KYGO, so that KYGO could make its own decision about what

---

[9]       Colorado has adopted Restatement (Second) of Torts § 767.  *See infra* footnote 12. It does not appear the Colorado Supreme Court has had occasion to consider whether to adopt section 772; however, considering section 772 is a complement to section 767, there is no indication that it would not do so. Other jurisdictions that have been expressly presented with the question of whether truthful information constitutes improper conduct have adopted section 772. S*ee Brule v. Blue Cross & Blue Shield of New Mexic*o, 455 Fed. App'x 836, 839 n.6 (10th Cir. 2011) (listing cases).

to do. SOF ¶ 20. There is nothing improper about Andrea Swift's conduct under these circumstances. *See Haegart*, 953 N.E.2d at 1234-35; *Palmer*, 2014 WL 3267306, at *4.

### 3. Mr. Bell

Mr. Bell is the only person who spoke directly with anyone at KYGO about Plaintiff's inappropriate conduct. SOF ¶¶ 19, 20, 22, 27-31. However, his interaction was neither improper nor made with intent to interfere with Plaintiff's contract.

Mr. Bell reported to KYGO what he understood transpired, complied with the request to send KYGO the photograph of Mueller with Ms. Swift, and responded to questions from Mr. Call. SOF ¶¶ 27-31. He did not ask KYGO to fire Plaintiff or take any specific action with regard to Plaintiff. SOF ¶ 32. Mr. Call confirmed that Mr. Bell did not ask him to terminate Plaintiff or take any specific action with respect to Plaintiff. *Id.* When asked, "Did Mr. Bell ask you to terminate Mr. Mueller ever?," Mr. Call testified: "Never." *Id.* Rather, Mr. Bell wanted to inform KYGO about the inappropriate contact so that the station could look into the situation and make its own decision on how to proceed. SOF ¶¶ 18, 20. Mr. Bell did not know, and could not know to a substantial certainty, that KYGO would fire Mueller as a result of Mr. Bell's report and Plaintiff therefore fails to satisfy the intent element of this claim. *See Ryskin*, 2010 WL 4818062, at *15.

Mr. Bell also did not act improperly. It is undisputed that someone from KYGO inappropriately touched Ms. Swift on June 2, 2013. SOF ¶¶ 6, 7, 9, 39-42. Ms. Swift was and is clear that it was Plaintiff. SOF ¶¶ 6-7. Mueller says it was his boss Mr. Haskell (SOF ¶¶ 39-42); everyone else says it was Mueller. SOF ¶ 9. Either way, the assailant was a KYGO employee. Mr. Bell, in communicating with KYGO, relayed what he understood from Ms. Swift and Andrea Swift—that Ms. Swift had reported Plaintiff had inappropriately touched her and there was a

19

photograph supporting that accusation. SOF ¶¶ 10, 18, 20, 27-31. At Mr. Call's request, he shared the photograph of the incident, which Mr. Call himself described as "represent[ing] [Plaintiff] in a very uncomfortable place with [Ms. Swift]" and "appear[ing] very inappropriate" and other KYGO employees described as "damning." SOF ¶¶ 29-30, 36. Under these circumstances, Mr. Bell's act of relaying facts of the incident to KYGO and allowing KYGO to make its own decision about how to proceed with Plaintiff cannot be considered improper. *See Haegart*, 953 N.E.2d at 1234-35; *Palmer*, 2014 WL 3267306, at *4; *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1122 (10th Cir. 2008); *Brule*, 455 Fed. App'x at 839. Plaintiff therefore cannot substantiate his claim of intentional interference against Mr. Bell.

### C. Defendants Were Not the Cause of Plaintiff's Termination

Even if Plaintiff could satisfy the other elements of his intentional interference claim, Defendants are still entitled to summary judgment because there is no evidence that Defendants' alleged conduct caused Plaintiff any harm. *See Van Osdol v. Vogt*, 908 P.2d 1122, 1126 n.6 (Colo. 1996) (en banc) (claims of intentional interference with contract and interference with prospective economic advantage "require[] a showing of causation"); *see also* Restatement (Second) of Torts § 766. Without a causal connection between Defendants' conduct and Plaintiff's alleged harm, there can be no liability for intentional interference with contractual relations.

### 1. KYGO's independent investigation extinguished any causal connection between Defendants' report of Plaintiff's inappropriate contact and his termination

Here, any causal connection between Defendants' alleged conduct and Plaintiff's termination was severed by KYGO's independent investigation and decision to terminate him based on that investigation. Courts have repeatedly held that an independent investigation

undertaken by an employer, in response to a complaint about an employee, that creates or verifies a basis for termination, "attenuates the legal nexus between the complaints instigating the investigation and the ultimate decision" to terminate. *Leach v. James*, 455 S.W.3d 171, 175 (Tex. App. 2014; *see Toy v. Int'l Business Machines*, No. CIV030860, 2005 WL 2412713, at \*4 (D. Ariz. Sept. 26, 2005); *Am. Cable Techs. Servs., Inc. v. AT&T Corp.*, 140 F. Supp. 2d 1026, 1031-32 (W.D. Mo. 2001). This is true even where the investigation is "instigated by inaccurate accusations of misconduct" against the employee. *Leach*, 455 S.W.3d at 175.

Leach v. James* is compelling. There, Mike Leach, the former head football coach of Texas Tech University, disciplined an injured player when he felt the player was distracting others at practice by forcing the player to stand in a dark room by himself for the remainder of practice. *Leach*, 455 S.W.3d at 175. That player's father was Craig James, an ESPN commentator. *Id.* Upon learning of his son's treatment, James contacted the University, lodged a complaint, and demanded that Leach be fired. *Id.* In response to James' complaint, the school instituted an investigation. *Id.* at 175-76. After its investigation, the school terminated Leach's employment. *Id.* at 176-177.

The Court entered summary judgment in favor of James and concluded that while James' complaint instigated the investigation, the school's "independent investigation . . . intervened to attenuate the causal link between the conduct deemed tortious interference and the employee's dismissal, as a matter of law." *Id.* at 177; *see also Bennett v. Computer Assocs. Int'l, Inc.*, 932 S.W.2d 197, 205 (Tex. App. 1996) (affirming summary judgment where employer independently investigated and confirmed allegations of illegally copying code from another product and terminated plaintiff on the basis of its confirmation of wrongdoing); *Toy*, 2005 WL 2412713, at \*3-4 (granting summary judgment for individual who reported plaintiff's direct competition to his

21

employer; a report confirmed during an investigation by the company and leading the company to fire plaintiff after it independently concluded the employee "violated the company's guidelines").

Here, even if Mr. Bell's report of Plaintiff's inappropriate touching of Ms. Swift to Plaintiff's employer instigated KYGO's investigation, it was not the cause of Plaintiff's termination.[10] KYGO interviewed Plaintiff and his girlfriend, Shannon Melcher, about the events. SOF ¶ 26, 33-35. KYGO procured and evaluated the photograph of Ms. Swift, Plaintiff, and Ms. Melcher; a photograph that Plaintiff himself describes as looking "bad" and "awkward." SOF ¶¶ 11, 36, 37. Surely, if even Mueller, the person now claiming he did not inappropriately touch Ms. Swift, thinks the picture looks bad, KYGO was justified in their conclusion that the photograph "represented [Plaintiff] in a very uncomfortable place with [Ms. Swift]" and "appeared very inappropriate." SOF ¶¶ 11, 36, 37.

After evaluating all of this information and conducting discussions and conferences about the alleged incident with a number of KYGO and Lincoln Financial personnel, KYGO independently determined that Plaintiff had lied about his encounter with Ms. Swift and had, in fact, inappropriately touched her. SOF ¶ 25, 38. KYGO decided to terminate him. SOF ¶¶ 3, 4. There is absolutely no evidence to dispute the existence of this independent investigation and independent decision by KYGO. KYGO's independent investigation and subsequent decision to terminate Plaintiff cut off any causal connection between Defendants reporting Plaintiff's inappropriate contact and his termination, and summary judgment is proper for this reason alone. *See Leach*, 455 S.W.3d at 177; *Toy*, 2005 WL 2412713, at *3-4.

---

[10]   This is true even if Mr. Bell's report was erroneous—which the record shows it was not. *See Leach*, 455 S.W.3d at 175; SOF ¶¶ 6-14.

### 2.   Plaintiff withheld information from KYGO

To the extent Plaintiff tries to claim KYGO's investigation was somehow inadequate, he has no one but himself to blame. Plaintiff admits that he knowingly withheld, by any stretch of imagination, the most vital factual claim in his defense: that Mr. Haskell admitted he was the person who inappropriately touched Ms. Swift. Nowhere in the excerpted recordings Plaintiff produced in this matter or in Mr. Call's notes of his interview with Mueller did Plaintiff inform KYGO of his claim that Mr. Haskell admitted to touching Ms. Swift's bottom. SOF ¶ 9 n.3; *see generally* Ex. 5. This is unsurprising given Plaintiff admitted at his deposition that he never informed KYGO management about Mr. Haskell's alleged comments. SOF ¶ 40. Thus, any alleged deficiency in KYGO's investigation can only be traced to Plaintiff's failure to provide pertinent information that, years later, he has decided to share with the world.

### 3.   Plaintiff was likely to have been fired anyway

Independent of Plaintiff's inappropriate contact with Ms. Swift, Plaintiff's job at KYGO was already in jeopardy. Plaintiff testified that prior to June 2, 2013 he believed Mr. Haskell wanted to get rid of him. SOF ¶ 48. There was undeniable tension between Plaintiff and Mr. Haskell.  According to Plaintiff, Mr. Haskell had asked Plaintiff and his co-host "have you guys had enough?" and encouraged them to "go down to Bob [Call]'s office" so he could "see if we can get you guys out of your contract." SOF ¶ 49. Plaintiff's own documents confirm his belief that his job was in jeopardy. A mere four days prior to Ms. Swift's concert, Plaintiff's agent, Heather Cohen, called Plaintiff and relayed a report she had received from KYGO's Senior Vice President for Programming and Operations, John Dimick, about Plaintiff's conduct. SOF ¶ 51. In direct quotes in Plaintiff's notes of this conversation, Plaintiff wrote that John Dimick was ready to

"terminate [him] WITH CAUSE, for insubordination." *Id.* Thus, prior to Plaintiff's inappropriate

contact and Defendants' report of that contact, Plaintiff was already likely to be fired by KYGO

due to conduct that, undeniably, had nothing to do with Defendants.[11]

## II.   DEFENDANTS DID NOT TORTIOUSLY INTERFERE WITH PLAINTIFF'S PROSPECTIVE BUSINESS RELATIONS

Count Two of Plaintiff's Second Amended Complaint purports to allege a claim for tortious

interference with prospective business relations. To recover, a plaintiff must show:  (1) the

existence of a prospective business relationship between plaintiff and another; (2) defendant's

knowledge of the existence of the prospective business relationship; (3) the defendant intentionally

and improperly induced another not to enter into a contractual relationship and, (4) resulting

damages to plaintiff. *Seidl*, 30 F. Supp. 2d at 1302.[12] The elements for this tort are essentially

identical to a claim for intentional interference with contract but involve intentional and improper

interference preventing a contract from being formed. *See Zimmer Spine, Inc. v. EBI, LLC*, No.

1:10-cv-3112, 2011 WL 4089535, at *2 (D. Colo. Sept. 14, 2011).  Plaintiff cannot support a claim

for tortious interference with prospective business relations against any of the Defendants.

### A.   Plaintiff Has Not Identified Any Prospective Business Relationships With Which He Had More than a Mere Hope of Forming a Contract

A prospective relationship "exists only if there is a reasonable likelihood or probability

that a contract would have resulted; there must be something beyond a mere hope." *Hertz v.*

---

[11]     To the extent the Court finds this claim survives, any damages must be limited to the amount Plaintiff would have earned under the remaining two-year term of his contract.  SOF ¶ 2; *Rywalt v. Writer Corp.*, 526 P.2d 316, 318 (Colo. App. 1974) (limiting damages for tortious interference claims to actual damages); CJI 24:7 n.4.

[12]     Colorado has adopted Sections 766B, 767, and 768 of the Restatement (Second) of Torts to determine liability for tortious interference with prospective business relations.  *Nobody*, 311 F. Supp. 2d at 1117; *Mem'l Gardens*, 690 P.2d at 210.

*Luzenac Group,* 576 F.3d 1103, 1119 (10th Cir. 2009); *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995). Plaintiff has identified (1) an optional one-year extension on his contract with KYGO, including potential bonuses, product endorsement fees, and public appearance fees per that option, and (2) appearances at Water World, Firestone Tire Center, Dickey's Barbeque, and Paula Homes as prospective business relations.[13] (Dkt. 72 ¶¶ 11, 47; Ex. 3 at 217:12-225:6). However, there is no evidence of a reasonable likelihood that a contract would have resulted from these relationships.

With respect to Mueller's one-year option, the evidence shows that it was unlikely that KYGO would have exercised, in its sole discretion, the one-year option. SOF ¶¶ 46-51. Plaintiff's morning show was not doing well in ratings. SOF ¶ 47. Less than a week prior to Plaintiff's termination, a senior vice president at KYGO had communicated to Plaintiff's talent agent that KYGO was ready to terminate Plaintiff with cause for insubordination. SOF ¶ 51. Moreover, Plaintiff admitted that, prior to June 2, 2013, his boss at KYGO, Eddie Haskell, wanted to terminate him and had offered to see if he could "get [Plaintiff] out of [his] contract[]." SOF ¶ 49. Given these undisputed facts, there is simply no reasonable likelihood that KYGO, in its sole discretion, would have exercised its one-year option in Plaintiff's contract.

Plaintiff also identified four advertisements or endorsements he allegedly had "lined up" at the time he was terminated from KYGO. However, no matter how much Plaintiff hoped to

---

[13]     In his Second Amended Complaint and Interrogatory responses, Plaintiff also identified the efforts he has made to find employment after his termination from KYGO, primarily as on-air talent in top 20 markets as recoverable prospective business relations.  (Ex. 22 at Answer to Interrog. 2; Dkt. 72 ¶ 47). However, these post-termination endeavors are not prospective business relations for which Plaintiff can properly claim liability as to the Defendants as they did not exist at the time of Defendants' alleged interference. *See, e.g.*, *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 411 (S.D.N.Y. 2009). Moreover, there is absolutely no evidence that any Defendants knew of, or could have known, of Mueller's efforts to pursue these opportunities at the time of the alleged conduct.

engage in these future endeavors, the most Plaintiff can show is that he had some conversations about possibly doing something with these entities in the future. *Id.* Such unspecified conversations are, at most, speculative and fail to rise to the level of a "reasonable likelihood or probability" that such endorsements would have taken place. *See Hertz*, 576 F.3d at 1119-20 ("while [plaintiff] certainly wanted to establish a continuing relationship with [third party], there is no evidence to suggest that [third party] shared [plaintiff's] desire").[14]

### B. Defendants Had No Knowledge of Any Alleged Prospective Business Relations, And Did not Intentionally or Improperly Interfere

Even if Plaintiff could establish he had some prospective business relations, he cannot show that any Defendant knowingly, intentionally, and improperly interfered with them.[15]

First, Plaintiff must show that Defendants had knowledge of the prospective relation at the time of Defendants' alleged interference. *See, e.g.*, *Zimmer Spine*, 2011 WL 4089535, at *2. There is not a shred of evidence showing any Defendant had any knowledge of Plaintiff's alleged prospective business relations. There is no evidence that Ms. Swift, Andrea Swift, or Mr. Bell had any knowledge of the one-year option in Plaintiff's contract. And, perhaps most telling, Plaintiff admits that he is unaware of any information to suggest that Defendants knew about the advertisements and endorsements he identified. SOF ¶ 57.

Second, for the same reasons discussed above, even if Defendants knew about the prospective business relations, there is no evidence that any Defendants intentionally and improperly interfered with those relationships.   *Supra* Section I.B. In particular, there is no

---

[14]   To the extent the Court determines that any specific prospective business relationship can proceed, damages must be capped at an amount corresponding to that specific relationship.

[15]   This section addresses Plaintiff's claim against Ms. Swift under Count Two in his Second Amended Complaint.  Plaintiff's separate attempt to hold Ms. Swift liable under a theory of *respondent superior* (Count 5) is addressed in Section IV *infra*.

evidence, testimonial or otherwise, that Ms. Swift, Andrea Swift, or Mr. Bell ever interacted with any alleged prospective business relation or affiliate of Plaintiff's other than KYGO. *See Ryskin*, 2010 WL 4818062, at *15; Restatement (Second) § 767 cmt. h.

Because Defendants did not act improperly toward any alleged prospective business relation of Plaintiff, summary judgment on this claim must be granted in their favor.

### C.   Defendants Did Not Cause Plaintiff to Lose Any Prospective Business Relations

Even if Plaintiff could make out the other required elements of tortious interference with prospective business relations (he cannot as shown above), to prevail on the claim he must show that Defendants were the cause of his inability to further his prospective business relations. *See, e.g.*, *Amoco Oil*, 908 P.2d at 500 (citing Restatement (Second) § 766B)). As stated above and incorporated herein, any alleged causal connection between Defendants' actions and Plaintiff's inability to obtain prospective business relations was severed by KYGO's independent investigation and by Plaintiff's pre-existing employment troubles. *See supra* Section I.C.

Additionally, to the extent the Court finds that Plaintiff has identified any prospective business relations beyond a mere hope (he has not), Plaintiff has failed to show how Defendants' conduct affected his ability to finalize those relationships. There is no allegation or evidence that any of the Defendants ever spoke, contacted, or otherwise interacted with any identified prospective entity other than KYGO and Plaintiff admitted that he was not aware of any communications by Defendants with any identified prospective relations. *See, e.g.*, SOF ¶¶ 56-57. Nor is there any evidence that any of the prospective entities had any knowledge of the Defendants' allegations against Plaintiff or the reasons for his separation from KYGO. *See Savant Homes, Inc. v. Collins*, No. 13-cv-2049, 2015 WL 899302, at *19 (D. Colo. Feb. 27, 2015) (granting summary

judgment on tortious interference with prospective business relations claim when defendant failed to name a single individual who was in the process of contracting with plaintiff but declined to do so <u>because of</u> action taken by defendants).  There is simply no causal connection between any alleged act by Defendants and Plaintiff's inability to realize any identified prospective business relation.

### III.   PLAINTIFF'S CLAIMS FOR SLANDER *PER SE* AND *SLANDER PER QUOD* ARE TIME-BARRED BY THE STATUTE OF LIMITATIONS

Plaintiff also alleges claims for slander *per se* and slander *per quod*.  In Colorado, slander claims must be filed within one year "of the date both the injury and its cause are known or should have been known." *Shepherd v. Am. Numismatic Ass'n*, No. 13-cv-3075, 2014 WL 4548724, at *1 (D. Colo. Aug. 27, 2014); C.R.S. § 13-80-103(1)(a) (slander claims "shall be commenced within one year after the cause of action accrues"). Slander claims accrue when the alleged "defamatory statements are published." *Shepherd*, 2014 WL 4548724, at *1.

There is no dispute that Plaintiff knew of the alleged claims long ago.  In the first draft complaint sent to Ms. Swift in July 2014, slander *per se* and *per quod* were the only claims alleged. SOF ¶ 54. And at his deposition, Plaintiff testified unequivocally that he knew about all of the alleged defamatory statements alleged in his Second Amended Complaint by "June 3, 2013, for sure." SOF ¶ 56. Despite this fact, he did not <u>file</u> his initial complaint in this action until May 29, 2015 – nearly two years later and almost a year after the one-year statute of limitations had expired—and he did not raise his slander claims until his Second Amended Complaint on February 25, 2016. SOF ¶¶ 52-53; C.R.S. § 13-80-103(1)(a); Dkt. 72. Because Plaintiff's slander claims are time-barred, summary judgment should be entered on each of those claims in favor of Defendants. *Russell v. McMillen*, 685 P.2d 255, 258 (Colo. App. 1984) (granting summary judgment for

statements published more than a year before the filing of plaintiff's complaint); *Kartiganer v. Newman*, No. 09-cv-50, 2010 WL 3779303, at *9 (D. Colo. Aug. 30, 2010) (same).

## IV.   BECAUSE ALL OF PLAINTIFF'S UNDERLYING TORT CLAIMS FAIL, SO TOO DOES HIS CLAIM OF *RESPONDEAT SUPERIOR*

Plaintiff's fifth and final claim for relief alleges a claim of *respondeat superior* against Ms. Swift arising from the allegedly tortious acts of Mr. Bell.  *Respondeat superior* is not a stand-alone cause of action or cognizable legal claim; it is a method to prove another claim, and must be based on an underlying tort. *Baker v. Baxa Corp.*, No. 09-cv-2034, 2011 WL 650002, at *1 (D. Colo. Feb. 11, 2011). When an underlying tort claim fails, so too does the *respondeat superior* claim upon which it is based. *Lymon v. Aramark Corp.*, 499 Fed. App'x 771, 774 (10th Cir. 2012). As shown throughout this Motion, all of Plaintiff's underlying tort claims asserted against Mr. Bell fail. Mr. Bell's actions therefore cannot serve as a basis for this claim and summary judgment must also be granted for Ms. Swift on Plaintiff's claim for *respondeat superior*.

**CONCLUSION**

For the reasons stated herein, the Court should enter summary judgment for Defendants.

September 30, 2016                              Respectfully Submitted,

                                               */s/ J. Douglas Baldridge*
                                               J. Douglas Baldridge
                                               Danielle R. Foley
                                               Courtney A. Sullivan
                                               Katherine M. Wright
                                               Venable LLP
                                               575 7th Street, NW
                                               Washington, D.C. 20004
                                               Telephone: (202) 344-4000
                                               FAX: (202) 344-8300
                                               E-mail: jdbaldridge@venable.com
                                               E-mail: drfoley@venable.com
                                               E-mail: casullivan@venable.com

E-mail: kmwright@venable.com

*Attorneys for Defendants Frank Bell,*
*Andrea Swift, and Taylor Swift*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on September 30, 2016 a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system and served on all counsel of record.


*/s/ J. Douglas Baldridge*
J. Douglas Baldridge