# EXHIBIT 3

In the Matter Of:

*MUELLER*

*vs.*

*SWIFT, ET AL.*

_____

*DAVID J. MUELLER*

*July 13, 2016*

_____

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 1:15-cv-019474-WJM-KLM
 3    _____

 4              CONFIDENTIAL ATTORNEY'S EYES ONLY
                AND SUBJECT TO PROTECTIVE ORDER
 5              VIDEOTAPE DEPOSITION OF:
                DAVID J. MUELLER - July 13, 2016
 6    _____

 7    DAVID MUELLER,

 8    Plaintiff,

 9    v.

10    TAYLOR SWIFT; FRANK BELL;
      ANDREA SWIFT a/k/a ANDREA FINLAY;
11    SCOTT SWIFT; and JOHN DOES 1-5

12    Defendants.
      _____
13

14              PURSUANT TO NOTICE, the videotape deposition
      of DAVID J. MUELLER was taken on behalf of the
15    Defendants at 1900 Grant Street, Suite 1025, Denver,
      Colorado 80203, on July 13, 2016, at 8:13 a.m., before
16    Jennifer Windham, Certified Shorthand Reporter and
      Notary Public within Colorado.
17

18

19

20

21

22

23

24    JOB NO.: WDC-090838

25
```

```
 1                    A P P E A R A N C E S

 2    For the Plaintiff:

 3                 M. GABRIEL McFARLAND, ESQ.
                   Evans & McFarland, LLC
 4                 910 13th Street
                   Suite 200
 5                 Golden, Colorado 80401

 6
      For the Defendants:
 7
                   J. DOUGLAS BALDRIDGE, ESQ.
 8                 KATHERINE M. WRIGHT, ESQ.
                   Venable, LLP
 9                 575 7th Street, NW
                   Washington, D.C. 20004
10

11    Also Present:

12                 Jay Schaudies
                   Adam Johnston, Videographer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 3

```
 1                        I N D E X

 2   EXAMINATION OF DAVID J. MUELLER:              PAGE
     July 13, 2016
 3
     By Mr. Baldridge                                 5
 4

 5

 6

 7                                               INITIAL
     DEPOSITION EXHIBITS:                       REFERENCE
 8
     Exhibit 1    Recorded Conversations -           33
 9                Attorney Work Product

10   Exhibit 2    Notes from Jackson conversations   37

11   Exhibit 3    RSA Polygraph, December 11, 2014   67

12   Exhibit 4    Complaint and Jury Demand          73

13   Exhibit 5    Complaint and Jury Demand - Draft  78

14   Exhibit 6    Plaintiff's Responses to Defendants' 82
                  First Set of Interrogatories
15
     Exhibit 7    Lincoln Financial Media Agreement 117
16
     Exhibit 8    Complaint and Jury Demand         175
17
     Exhibit 9    Jackson Radio Resume              186
18
     Exhibit 10   Photograph                        214
19
     Exhibit 11   Photographs                       215
20

21

22

23

24

25
```

DTI Court Reporting Solutions - Washington, DC

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                              Page 4

1                    WHEREUPON, the following proceedings were

2     taken pursuant to the Federal Rules of Civil

3     Procedure.

4                *        *        *        *        *

5                    THE VIDEOGRAPHER:  Here begins videotape

6     No. 1 in the deposition of David Mueller in the matter

7     of David Mueller versus Taylor Swift, et al., in the

8     U.S. District Court, District of Colorado, Case No.

9     1:15-cv-01974-WJM-KLM.

10                   Today's date is July 13, 2016.  The time

11    is 8:13.  The video operator is Adam Johnston.  This

12    video deposition is taking place at 1900 Grant Street,

13    Suite 1025, Denver, Colorado.  Will counsel please

14    identify themselves for the record.

15                   MR. McFARLAND:  Gabe McFarland for

16    Mr. Mueller.

17                   MR. BALDRIDGE:  Doug Baldridge on behalf

18    of the defendants/counterclaim plaintiffs.  Today with

19    me is Katie Wright and my client Jay Schaudies.

20                   THE VIDEOGRAPHER:  The court reporter

21    today is Jennifer Windham of DTI Court Reporting

22    Solutions.  She will now swear in the witness.

23                   DAVID J. MUELLER,

24    having been first duly sworn to state the whole truth,

25    testified as follows:

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 14

```
 1          A.    I've been told she did.

 2          Q.    By whom?

 3          A.    Craig, the security person, and Eddie

 4    Haskell and Bob Call.

 5          Q.    Are you aware of Taylor Swift, herself,

 6    ever speaking to anyone at KYGO about the incident

 7    that night?

 8          A.    I don't remember anyone telling me they

 9    spoke to her directly, not even Craig.

10          Q.    Are you aware of Taylor Swift, herself,

11    ever telling anyone on her team, for lack of a better

12    description, to contact KYGO about the incident that

13    night?

14          A.    I don't believe so.

15          Q.    Are you aware of Andrea Swift, Taylor's

16    mother, ever making the allegation that you

17    inappropriately touched Ms. Swift's rear end that

18    evening?

19          A.    Could you please run that by me one more

20    time?

21          Q.    Sure.  It's essentially the same set of

22    questions, but I'm going to Andrea Swift, who is

23    Taylor's mother.  Are you aware of Andrea Swift ever

24    making a statement that you inappropriately touched

25    her daughter's rear end that evening?
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 23

 1          A.   Please define who "somebody" is.

 2          Q.   Any -- any unknown man, a man that shows

 3   up in a public setting.  Would you be upset if

 4   somebody grabbed your mother's rear end without her

 5   authorizing it?

 6          A.   If I talked to her about the situation

 7   and discovered that it truly happened, I would be

 8   upset.

 9          Q.   Now, tell me every fact of which you're

10   aware that would show any incentive or motive of

11   Ms. Swift, Taylor Swift, to fabricate a story that you

12   grabbed her rear end.

13               MR. McFARLAND:  Objection to form.

14          A.   You're asking me if I know why she would

15   fabricate a story?

16          Q.   (BY MR. BALDRIDGE)  No.  I'm asking you

17   what the question asked.  Tell me every fact of which

18   you're aware that suggests she had any incentive to

19   fabricate a story that you grabbed her rear end.

20               MR. McFARLAND:  Objection to form.

21          Q.   (BY MR. BALDRIDGE)  Just facts.

22          A.   I can't imagine why she would fabricate a

23   story.

24          Q.   Now, isn't it true that if you improperly

25   touched her rear end -- and I understand that you

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 26

```
 1   Did the police arrest this person?  Is there a

 2   conviction?  Is there a videotape?

 3            Q.   We'll just take it that you're uncertain

 4   whether that's grounds for termination, then, since

 5   you're resisting the question.

 6            A.   I didn't --

 7            Q.   Now, Mr. Mueller, somewhere along the way

 8   you developed this story that Mr. Haskell claimed that

 9   he touched Ms. Swift's rear end.

10            MR. McFARLAND:  Objection to form.

11            Q.   (BY MR. BALDRIDGE)  Do you recall that?

12            MR. McFARLAND:  Objection to form.

13            Q.   (BY MR. BALDRIDGE)  Do you recall that?

14            A.   I had a conversation with Mr. Haskell,

15   and he was describing to me what his encounter with

16   her -- with Taylor Swift was like earlier that

17   evening.

18            Q.   And what did he say?

19            A.   He said she recognized him right away.

20   She yelled out, Eddie.  She ran toward him, gave him a

21   big hug, he had his arms wrapped around her.  And

22   while he -- and he told me, I -- you know, I had my

23   arms around her, and he indicated that his hand was on

24   her rear end.

25            Q.   Are you aware that Mr. Haskell denies
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 27

```
 1   having said that?

 2           A.   I am not.

 3           Q.   So you believe he will admit that he said

 4   that?

 5           A.   I don't know what Mr. Haskell will say.

 6   I can only tell you what he told me.  That's the

 7   truth.

 8           Q.   Just to be clear, you have no knowledge,

 9   one way or the other, as to whether Mr. Haskell denies

10   having told you that he touched Ms. Swift's rear end?

11           A.   Right now I don't, no.

12           Q.   Now, if Mr. Haskell denies that he

13   touched Ms. Swift's rear end, is he lying?

14                MR. McFARLAND:  Objection to form.

15           A.   I never said that -- I'm just telling you

16   what he told me.  That's what he told me.

17           Q.   (BY MR. BALDRIDGE)  And I'm asking you a

18   different question.  If he denies it --

19           A.   If he denies telling me.

20           Q.   -- that he touched Ms. Swift's rear end;

21   is he lying?

22                MR. McFARLAND:  Objection to form.

23           A.   I can only say that he told me.

24           Q.   (BY MR. BALDRIDGE)  Now, have you

25   reviewed -- strike that.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                     Page 28

1              You recorded, audio recorded,

2    conversations that you had with certain people,

3    including Mr. Call and Mr. Haskell, correct?

4         A.   I recorded the meeting that I attended by

5    myself with no representation.  And it was Eddie and

6    Bob, and whoever -- if there was somebody listening on

7    the phone while I was in the room, I don't know, but

8    I -- I suspect there was somebody listening through

9    the phone on Bob's desk.

10        Q.   Are you familiar with that recording?

11        A.   Yeah.

12        Q.   Is there anywhere in that recording where

13   you state to Mr. Call, or anyone else who was in that

14   meeting, that Mr. Haskell told you that he touched

15   Ms. Swift's rear end that evening?

16        A.   I don't believe it's on that recording.

17        Q.   Was it not important?

18        A.   The audio was not complete.

19        Q.   And you took the audio, right?

20        A.   Yes.

21        Q.   Do you believe that you told Mr. Call in

22   that meeting that Mr. Haskell said he had touched

23   Ms. Swift's rear end?

24        A.   I did not accuse Eddie of saying that.

25        Q.   It just wasn't important?

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                           Page 30

1    her bottom, and then he proceeded to describe that he

2    and a friend of his believed that she wears bicycle

3    shorts under her outfits.

4             Q.   Okay.  That's an answer to a different

5    question.  My question is:  In the discussion with

6    Mr. Call and the others --

7             A.   Yeah.

8             Q.   -- did you ever say the words,

9    Mr. Haskell confessed to me that evening that he

10   touched Ms. Swift's bottom?

11            A.   I did not say that when I met with Eddie

12   and Bob.

13            Q.   Did you ever say that to anyone else at

14   KYGO prior to your termination?

15            A.   Are you talking about management or --

16            Q.   Yeah, anyone.

17            A.   Anyone.

18            Q.   Yeah.  I can clear that up.  Did you ever

19   make that statement that Mr. Haskell had confessed to

20   having touched Ms. Swift to any person in management

21   at KYGO prior to your termination?

22            MR. McFARLAND:  Objection to form.

23            A.   I didn't tell anybody in KYGO management.

24            Q.   (BY MR. BALDRIDGE)  Did you tell anyone

25   else at KYGO that wasn't in management?

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                             Page 31

 1          A.    I told Shannon.

 2          Q.    Please state the last name.

 3          A.    Shannon Melcher.  I told her when we were

 4  still at the Pepsi Center in person.  And then I told

 5  Ryan Kliesch on the phone.

 6          Q.    That's Ryno, right?

 7          A.    Ryno.  The first time I talked to him on

 8  the phone, I told him.

 9          Q.    Is there a reason why you didn't tell

10  anyone in KYGO management that Mr. Haskell that

11  evening had stated he touched Ms. Swift's rear end?

12          A.    He was my direct supervisor, so I was

13  concerned about retaliation.

14          Q.    And that's the only reason?

15          A.    I was trying to keep my job.

16          Q.    Is that the only reason?

17          A.    That -- yes.  He was my direct

18  supervisor.

19          Q.    Did Mr. Haskell ever threaten you, like

20  don't -- don't tell anyone, or I'm going to fire you

21  if you tell --

22          A.    He had -- he had threatened me, not

23  regarding this specific incident, but prior to that

24  night, he had -- he made it clear to both Ryan Kliesch

25  and myself that he was not happy with us, and he

1   really wanted to get rid of both of us or one of us.

2          Q.   He wanted to get rid of both of you or

3   one of you unrelated to the events with Ms. Swift?

4          A.   Yeah.  Prior to the concert.

5          Q.   And he wanted to get -- did he ever state

6   why he wanted to get rid of you prior to the concert?

7          A.   It seemed like he was very upset about a

8   situation with a guy named Cadillac Jack.  And for

9   some reason he thought that Ryno and I had called

10  someone in upper management and given them information

11  about Cadillac Jack.

12          And Cadillac Jack was a very good friend

13  of Eddie's, and Eddie wanted to bring him there to

14  work.  And, apparently, someone in upper management

15  said, you can hire somebody, but you can't hire

16  Cadillac Jack.

17          Q.   So from your standpoint, sir, prior to

18  the events of June 2, 2013, with Ms. Swift, did you

19  believe Mr. Haskell already wanted to terminate your

20  employment with KYGO?

21          A.   I do.

22          Q.   And did you believe, prior to the

23  incident of June 2, 2013, with Ms. Swift, that anyone

24  affiliated with Ms. Swift had any knowledge that

25  Mr. Haskell already wanted to terminate your

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 35

1    know, there's a certain consistency in, you know, what

2    I know that security did, and they said that, you

3    know, you had indicated nothing happened, and that if

4    anything did happen, it was an accident or -- voice

5    two, absolutely.

6              And I'll represent that voice two was

7    your voice.  Was that your response to Mr. Call's

8    statement that you had stated that nothing happened,

9    but if something did happen, it was an accident?

10        A.    This -- if voice two is me, and this is

11   an accurate transcript, then I said -- that's what I

12   said.

13        Q.    Does that help you to recall that you had

14   said, I didn't do it, but if I did it was an accident?

15        A.    I never said I didn't do it, but if I did

16   it was an accident.

17        Q.    What did you say?

18        A.    Are you referring to my conversation with

19   Craig?

20        Q.    I'm referring to any conversation in

21   which you would have said words to the effect, I

22   didn't do it, but if I did it was an accident or

23   incidental.  Did you ever say that to anyone?

24        A.    If somebody suggested that I accidentally

25   touched Taylor Swift, I would have said that that is

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                              Page 36

```
 1    possible, because I did come into contact with her

 2    during the photo session.

 3              Q.    Okay.  Just to break that down.  So it is

 4    possible that you accidentally touched Ms. Swift

 5    inappropriately during the photo shoot?

 6              A.    No.

 7              Q.    No?

 8              A.    No.  Because I touched her, but

 9    inappropriately, no.  Our -- our hands came into

10    contact for sure.  And while our hands came into

11    contact, I'm not sure where my hand went, because she

12    was pushing my hand.  And I was trying to get my hand

13    behind her, and she was trying to get her hand behind

14    me, and for a while there was some jostling.

15              But I was looking at the photographer,

16    just as I'm looking at this gentleman here, while I

17    was trying to put my hand behind her, and her hand was

18    jostling is the only word I can come up with right

19    now.  And at that point, I don't know where my hand

20    went.  That's why I would say it would have been an

21    accident.

22              Q.    So it's possible, by accident, that you

23    touched Ms. Swift's rear end?

24              A.    No.

25              Q.    Not possible.  You didn't know where your
```

```
 1   hand was, but it's not possible?

 2          A.   I would know if I had on her rear end.

 3   But I do know that my hand was headed toward her side,

 4   and that's why she was -- she was trying to get my

 5   hand back, right?

 6          Q.   Away from her rear end, right?

 7          A.   From her side, from her rib cage.  My

 8   hand went in, her hand was jostling with my hand, and,

 9   eventually, my hand went back and her hand went back

10   behind me.

11          Q.   Just to be clear, it is possible that you

12   accidentally touched her rear end, isn't it?

13          MR. McFARLAND:   Objection to form.  Asked

14   and answered.

15          Q.   (BY MR. BALDRIDGE)  Yes or no?

16          A.   No.

17          (Deposition Exhibit 2 was marked.)

18          Q.   I'm going to have this marked as Mueller

19   Exhibit 2, please.  I put before you, sir, some

20   documents that, I think, all counsel have in this

21   case.  And what these are, are some interview notes of

22   discussions that people at KYGO had with you, and they

23   took notes and typed them up.  I'm representing to you

24   that that's what they are.  Have you seen these

25   before?
```

1    these interview notes of Mr. Call and Ms. Melcher and

2    others, correct?

3              A.    I've --

4              Q.    We just looked at some of them.

5              A.    Yeah.  I've seen notes that people made,

6    yeah.

7              Q.    And you have your audio recordings of

8    certain discussions you had, correct?

9              A.    Right.

10             Q.    And you've drafted -- well, your counsel

11   has drafted on your behalf a number of different

12   complaints in this lawsuit, correct?  The thing that

13   starts the lawsuit, your counsel takes the facts and

14   drafts it, right?

15             A.    Yes.

16             Q.    In any of those documents, or any other

17   document, can you point to anything in writing or on

18   the audio where you say my hands were intertwined with

19   Ms. Swift's and we were jostling behind her back?

20             MR. McFARLAND:  Objection to form.

21             A.    I didn't -- not that I know of.

22             Q.    (BY MR. BALDRIDGE)  Was that just not

23   important?

24             A.    No, it's very important.

25             Q.    It wasn't important enough to say to

1    anybody, though?

2              A.    I have said it to people.

3              Q.    Where is it in the audio recordings, sir?

4    They're right in front of you.

5              A.    I don't know if it was in the audio

6    recordings.  The audio I recorded was close to two

7    hours long.  And the audio that I could provide to

8    Mr. McFarland was a portion of the entire audio.

9              Q.    Where's the other portion?

10             A.    It was -- the full file was lost.

11             Q.    So it's an incomplete file?

12             A.    Yes.

13             Q.    So we don't have any record of what you

14   said in the parts that are no longer available to us,

15   do we?

16             A.    Well, we have -- Bob and Eddie were

17   there, and if they recorded it, we would have it

18   there.

19             Q.    Are you aware of any record of what you

20   said in the parts that are missing from your audio?

21             A.    Only my memory of it.

22             Q.    Did you delete those portions, sir?

23             A.    No, I did not.  They -- my laptop was

24   damaged, and I have an external backup hard drive that

25   I was using at the time.  And that is -- I can't -- I

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 44

```
 1   don't know how to describe it.  It's -- it either just

 2   died or it -- they don't last forever.

 3              Q.   Your audio recordings were on your

 4   laptop?

 5              A.   Yes.

 6              Q.   And do you still have that laptop?

 7              A.   No.  And now I have a different laptop.

 8              Q.   What did you do with the old laptop?

 9              A.   The people at Apple have it.  They had

10   it.  I don't know what they did with it.

11              Q.   When did you take it to the people at

12   Apple?

13              A.   I'd have to look back at my receipts.  I

14   don't know the exact date, but it was -- I know the

15   recording was on my laptop because I edited it on my

16   laptop.

17              Q.   You edited the recording?

18              A.   I -- it was so long, that I edited down

19   clips from the recording to provide to Gabe to give an

20   idea of what kind of questioning I went --

21              Q.   And -- oh, I'm sorry.

22              A.   -- I went through, yeah.

23              Q.   So you did the editing to the recording

24   after this lawsuit had been filed, correct?

25              A.   No, no.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 45

 1          Q.    So you already had Gabe on board before

 2    the lawsuit had been filed?  You said you edited the

 3    recordings to get to Gabe.

 4          A.    Yeah.  I met him before he filed the

 5    lawsuit.

 6          Q.    You were consulting counsel about the

 7    possibility of filing a lawsuit at the time you edited

 8    the recordings, correct?

 9          A.    I -- I didn't know about a lawsuit --

10          Q.    Sir, that's not my question.

11          MR. BALDRIDGE:  Can I have the question

12    read back, please.

13          THE DEPONENT:  Yeah.  Read back the

14    question.

15          (The last question was read back as

16    follows:  "You were consulting counsel about the

17    possibility of filing a lawsuit at the time you edited

18    the recordings, correct?")

19          A.    I was consulting with Gabe about legal

20    action, but there was no specific legal action in

21    mind.

22          Q.    (BY MR. BALDRIDGE)  And you edited the

23    recordings after the June 2, 2013, incident, correct?

24          A.    Yes.

25          Q.    And who at Apple has that laptop?

1        A.   I -- it was damaged by liquid.  I brought

2   it to the Apple Store on -- I believe it's the Aspen

3   Grove strip mall.  They told me they couldn't fix it.

4   The hard drive was shot, and they had to replace the

5   hard drive.  So essentially it's a new -- what I have

6   now is a new machine.

7        Q.   Someone spilled liquid on the laptop?

8        A.   Yes.

9        Q.   When did that occur?

10        A.   I would have to look.  I don't have an

11   exact date.

12        Q.   I -- I could tell you.  And the folks at

13   Apple told you that the spilling of liquid on the

14   laptop corrupted or damaged the hard drive?

15        A.   Yes.  Coffee got into the keyboard.

16        Q.   Were there -- did you store documents on

17   that laptop as well, not just --

18        A.   I had -- I had -- yeah.  I had all of my

19   business stuff.  Everything.

20        Q.   Everything, correct?

21        A.   Yeah.

22        Q.   Including every communication you had

23   regarding the alleged incident of June 2, 2013,

24   correct?

25        A.   Well, there -- I did have things on the

```
 1   backup -- I had a back external hard drive that I was

 2   using to store audio files and documents.  I had jump

 3   drives I used for some documents and other audio I had

 4   recorded previous to me getting to Denver.  And --

 5   yeah, that -- that would be --

 6           Q.    Pretty much everything.

 7           A.    I'm sorry.  What was the question?

 8           Q.    The question was:  Every communication,

 9   or almost every communication regarding the alleged

10   incident of June 2, 2013, was on that laptop, right?

11           A.    No.  Because most -- a lot of the

12   communication was done over the phone and by e-mail.

13           Q.    Every -- okay.  That's fair enough.

14   Every documented, in other words, written or recorded

15   communication regarding the June 2, 2013, incident was

16   on that laptop, correct?

17           A.    No.  Because some documents were on

18   e-mails.  Like the -- the clips that I sent him

19   were -- I e-mailed him the audio clips that he got.

20           Q.    But you e-mail from your laptop, right?

21           A.    Yeah, yeah.

22           Q.    Now, do you still have this back external

23   hard drive that you referred to?

24           A.    I may have that.

25           Q.    You may have it?
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 48

 1          A.    Yeah.

 2          Q.    You're not sure, though?

 3          A.    Well, it didn't work.  I tried it several

 4     times.  And I told Gabe, if I find it, I'll give it to

 5     you.

 6          Q.    And you haven't found it yet?

 7          A.    I haven't found it yet.

 8          Q.    And did you lose that or misplace it,

 9     whatever the case may be, after June 2, 2013?

10          A.    Yeah.  It would have been maybe a year

11     after.

12          Q.    Do you have any of those jump drives that

13     you referred to?

14          A.    I have jump drives, but they wouldn't

15     have that audio -- all of the audio was on the

16     external hard drive, and I don't know if I discarded

17     it because it was junk.  It was useless.  But if I

18     find it, I told Gabe I would bring it to him.

19          Q.    Just to be clear, your Apple laptop is at

20     the Apple store, right?

21          A.    It was.  Yes, it was.

22          Q.    Do you know where it is now?

23          A.    No.

24          Q.    The external hard drive, you may be able

25     to find it, but you can't locate it right now?

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 49

```
 1          A.    I may have kept it.

 2          Q.    But you're not sure?

 3          A.    I never had anybody -- I never had

 4   anybody try to get information off of it.

 5          Q.    But you're not sure whether you kept it,

 6   right?

 7          A.    I'm still in the process of going through

 8   and looking for it.

 9          Q.    So you haven't found it yet?

10          A.    I have not found it yet.

11          Q.    And the jump drives, for the reason

12   you've already testified, wouldn't show us anything

13   regarding the June 2, 2013, incident; is that right?

14          A.    The jump drives I referred to would have

15   documents relating to my business and other

16   radio-related things prior to me getting to Denver.

17          Q.    And you don't have your hands on those

18   either?

19          A.    Oh, I'm sure.  Yeah, because those work.

20          Q.    Now, you were -- and I don't know what

21   they call you -- a radio personality.  I was doing to

22   call you a disc jockey.

23          A.    An on-air personality.

24          Q.    An on-air personality in Kansas City; is

25   that correct?
```

1    there.

2           Q.    Now, did you keep any photos of other

3    meet-and-greets on the laptop that is now gone?

4           A.    Any other photos from another

5    meet-and-greet?

6           Q.    Yes, sir.

7           A.    They wouldn't be on my laptop, no.

8           Q.    Where would you keep them, if anywhere,

9    electronically?

10          A.    I wouldn't have any electronic copies.  I

11   would have had an actual photograph framed, something

12   like that.

13          Q.    Now, this -- the laptop that is missing,

14   the one that was turned in to the Apple Store, now

15   that we've taken a break, can you think of when you

16   last had it?  Has it come into your mind, like when

17   did you give it to Apple and it leave your possession?

18          A.    I think it was in 2015.

19          Q.    And in this period -- strike that.

20                Did you use that laptop, when you had it,

21   for business purposes?

22          A.    Yeah.  Yeah.

23          Q.    And during what time period did you use

24   it for business purposes?  And I'm looking for the

25   earlier date through the 2015 date when you turned it

```
 1    over to Apple.
 2           A.   Well, that machine was a replacement for
 3    another machine that I bought just before I came to
 4    Denver.
 5           Q.   So some time --
 6           A.   So you want to know how long that
 7    particular laptop --
 8           Q.   Based on what you just said, let me see
 9    if this is an accurate statement.  The laptop that was
10    turned in to Apple, you used just before you came to
11    Denver --
12           A.   No.
13           Q.   Okay.  Go ahead.  Tell me when you used
14    it.
15           A.   I got it after I got here, because I
16    bought one in Minneapolis, just before coming to
17    Denver.  And sometime in the early part of 2013, I was
18    with Shannon and she accidentally knocked over a
19    glass of water, and that one got fried.
20           Q.   That's Shannon Melcher?
21           A.   Yes.
22           Q.   Let me see if I can break that down.  You
23    have one laptop that is for your -- to use your words,
24    fried, because Ms. Melcher spilled water on it?
25           A.   Well, the hard drive, yes, which
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 54

```
 1   essentially is, you know --

 2           Q.    And this is my fault.  We're talking over

 3   each other.  Let me try this again.  You have one

 4   laptop where the hard drive is fried because

 5   Ms. Melcher spilled water on it, correct?

 6           A.    And it was replaced.

 7           Q.    Okay.  Let's just get the first point of

 8   this.

 9                 MR. McFARLAND:  Listen -- really listen

10   to Mr. Baldridge's questions, David.

11                 THE DEPONENT:  Okay.  Sorry.

12           Q.   (BY MR. BALDRIDGE)  You have one laptop

13   that was fried because Ms. Melcher spilled a glass of

14   water on it, correct?

15           A.    Correct.

16           Q.    Where is that laptop?

17           A.    I brought it to the Apple Store again

18   to -- also to the Aspen Grove location.  I don't know

19   the address, but it's pretty easy to find.  They tried

20   to repair it, and they had to replace -- I believe

21   they had to replace the hard drive and some other

22   stuff.  Maybe the keyboard, and I'm not sure.  But

23   then -- and I had my -- I had insurance for it.  I got

24   another machine.

25           Q.    Okay.  Don't go on.  Let's stop on the
```

```
 1   first machine.

 2            A.    All right.

 3            Q.    We're going to get to the second machine.

 4            A.    All right.  So they -- I don't -- what

 5   they do with the parts and -- I don't know.

 6            Q.    I'm not asking you that.  During what

 7   period of time did you use this first laptop that

 8   Ms. Melcher spilled the water on?

 9            A.    I already told you.  I purchased it just

10   before getting to Denver.  So it would have been the

11   end of 2012.  And in the early part of 2013, this

12   incident happened.  It might have been March; it could

13   have been April.  I don't know.  Once again, I have

14   receipts from the Apple Store.

15            Q.    So you -- and you used that laptop for

16   business communications, correct?

17            A.    To transmit e-mail?

18            Q.    Yes.

19            A.    Yes.

20            Q.    And you used that laptop, the first one

21   we're talking about, during your employment with KYGO,

22   correct?

23            A.    Yeah.

24            Q.    Then you got another laptop, right?

25            A.    They gave me basically a new machine,
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 56

```
 1   right.

 2          Q.   We're going to call that laptop two.

 3          A.   Yes.

 4          Q.   Laptop two, coffee was spilled on it,

 5   right?

 6          A.   Yes.

 7          Q.   And you used laptop two for business

 8   purposes, right?

 9          A.   Now, when you say "business" --

10          Q.   Withdrawn.  You use laptop -- do you have

11   any laptops other than laptop two during the period in

12   which --

13          A.   No.

14          Q.   -- in which you used laptop two?

15          A.   No.

16          Q.   So to the extent that you conveyed an

17   electronic communication in that time period, you used

18   laptop two?

19          A.   Or my iPad.

20          Q.   Okay.  We'll get to that next.

21          A.   Okay.

22          Q.   And laptop two is gone also, right?

23          A.   I brought it to the Apple Store and they

24   basically gave me a new machine again, and my

25   insurance paid for it.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 57

```
 1          Q.   We'll start over again.  Is laptop one

 2   the water-spilled Ms. Melcher laptop in your

 3   possession, custody, or control?

 4          A.   No.  I gave it to the Apple Store

 5          Q.   And you don't know where it is other than

 6   you gave it to the Apple Store?

 7          A.   I don't know what they do with them.  I

 8   don't.

 9          Q.   Is laptop two within your possession,

10   custody or control?

11          A.   No.  I brought it to the Apple Store, and

12   they gave me a new machine.

13          Q.   Okay.  So now we have laptop three.  Do

14   you still have the new machine they gave you after

15   laptop two?

16          A.   Yes

17          Q.   And you also have an iPad?

18          A.   Yes.

19          Q.   And in the period between receiving your

20   offer from KYGO, all of the way to present, have you

21   had one iPad?

22          A.   No.  It's the second one.

23          Q.   So you've had two iPads in that period?

24          A.   Yeah.  I dropped -- I bought one when I

25   came here, and I dropped it and it shattered, and I
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 58

```
 1   went to the Apple Store, and they gave me a new one

 2   because they can't really fix them.

 3        Q.   During what --

 4             MR. McFARLAND:  You've got to -- you've

 5   got to listen to his questions.

 6             THE DEPONENT:  Okay.

 7             MR. McFARLAND:  He's got material that he

 8   wants to get through.  He's got questions to ask.  So

 9   just take a deep breath and focus on his questions.

10             THE DEPONENT:  All right.

11        Q.   (BY MR. BALDRIDGE)  During what period

12   did you have shattered iPad, I'll call it?

13        A.   I bought it in Denver.  I had it until

14   2015, I want to say.

15        Q.   And do you have a new iPad?

16        A.   They gave me a new one, yeah.

17        Q.   And do you know where shattered iPad is?

18        A.   Now Apple has it.

19        Q.   And you then got a new iPad, correct?

20        A.   From Apple.

21        Q.   Are you still using that iPad?

22        A.   I am.

23        Q.   And you still have it in your possession?

24        A.   Yes.

25        Q.   Now, between the time period you received
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 59

```
 1   your offer from KYGO all of the way to present, have

 2   you had any cell phones?

 3           A.   Yeah, two.

 4           Q.   Let's start with cell phone one.  Where

 5   is cell phone one?

 6           A.   Cell phone one is in the trash.

 7           Q.   And when did it go in the trash?

 8           A.   November of last year.

 9           Q.   So November of 2015, cell phone one no

10   longer existed, right?

11           A.   I threw it in the trash.

12           Q.   And how far back in time did you use cell

13   phone one?

14           A.   That's a good question.  Maybe back to --

15   well, can I clarify that there were different versions

16   of cell phone one --

17           Q.   Please.

18           A.   -- because I had to have it fixed several

19   times, because I would drop it and it would get

20   shattered.  As far as I know, that phone, regardless

21   of the components or whatever, probably started using

22   it in 2010, maybe.  2011.

23           Q.   I understand.

24           A.   I've had a lot of cell phones.

25           Q.   I get it.  I couldn't tell you when I
```

1    started mine, but approximately 2010 or '11?

2             A.   Yeah, yeah.

3             Q.   Did you use that cell phone one to text

4    people?

5             A.   I did.

6             Q.   Did you use any other cell phone in the

7    time period you had cell phone one to text people?

8             A.   That was my only phone.  Are you asking

9    did I text someone else's phone?

10            Q.   I'll promise you, you can ask for

11   clarity.  It really is simple.  Did you use any other

12   phone --

13            A.   Right.

14            Q.   -- during that time period to text

15   people?

16            A.   Well, I --

17            Q.   I mean, it's possible --

18            A.   There's -- it's possible that I used

19   Shannon's

20            Q.   -- you grabbed your friend's phone once.

21            A.   -- phone --

22            Q.   I understand.

23            A.   -- and I texted -- I sent a text on her

24   phone when mine was broken or not charged.  I don't

25   know.

1        Q.   Did you receive or send e-mails on cell

2   phone one?

3        A.   Yes.  Yeah.

4        Q.   And then you got cell phone two

5   approximately last fall?

6        A.   It was definitely in November of 2015.

7        Q.   And do you still have cell phone two?

8        A.   Yes.

9        Q.   Okay.  Now, I'm going to try to summarize

10  this, if I can.  So I'm trying to go back over what

11  you told me, just so I understand.

12        A.   Okay.

13        Q.   You had laptop one during your employment

14  with KYGO, correct?

15        A.   Yes.

16        Q.   You no longer have possession, custody or

17  control of laptop one, correct?

18        A.   No.

19        Q.   And you don't know where laptop one is

20  beyond having given it to the Apple Store, correct?

21        A.   Correct.

22        Q.   And you used laptop one as your only

23  laptop during that time period?

24        A.   Yes.

25        Q.   Laptop two, you used laptop two during

 1   the period of this lawsuit, correct?

 2          A.   Yes.

 3          Q.   And refresh my recollection when you --

 4   well, we'll back up.  I'll let you withdraw that

 5   answer.  When did you get laptop two?

 6          A.   It was the early part of 2013, the first

 7   half of 2013.  So it might -- it was either April or

 8   May.

 9          Q.   So you used laptop two during your

10   employment with KYGO, correct?

11          A.   Yes.

12          Q.   And laptop two, you have no idea where it

13   is beyond having given it to Apple, correct?

14          A.   Correct.

15          Q.   And you used laptop two for business

16   communications, correct?

17          A.   Yes.

18          Q.   You still have laptop three?

19          A.   I do.

20          Q.   Cell phone one, you had cell phone one

21   during your employment with KYGO, correct?

22          A.   Yes.

23          Q.   And you used cell phone one for texts and

24   e-mails, correct?

25          A.   Yes.

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 63

```
 1          Q.   And some of those texts and e-mails were
 2    business related, correct?
 3          A.   Yes.
 4          Q.   And cell phone one was thrown in the
 5    garbage, correct?
 6          A.   Yes.
 7          Q.   And when did that occur?
 8          A.   I'm guessing it was in November of 2015.
 9    I maybe threw it away in December, I can't give you
10    an exact date.
11          Q.   And you're still using cell phone two?
12          A.   The one I bought in November of 2015, I
13    am still using, yes.
14          Q.   Now, in this time period, and I'm talking
15    it's a rough start date, let's say 2011 to present,
16    have you had any other computers, whether they be
17    desktops, laptops, iPads, phones that have e-mail
18    texting capacity?
19          A.   I did have a desktop computer when I was
20    in Minnesota.
21          Q.   And did that desktop come with you to
22    Denver?
23          A.   No.
24          Q.   Are there any communications on that
25    desktop with KYGO?
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 64

1          A.   Oh, no.  Check that.  It did come with

2    me.  I brought it to a computer expert and he told me

3    he could not retrieve anything off of it.  It was my

4    old desktop.  It was very old.

5          Q.   Okay.  Let me back it up.  So desktop

6    one, I'll call it, is kaput, for lack of a better

7    word.  It doesn't work.

8          A.   Right.  It didn't work, and I couldn't

9    get an expert to get anything off of it.  I wanted the

10   material that was on it, and they couldn't help me.

11         Q.   And you brought that desktop to a

12   computer specialist in the Denver area?

13         A.   Yes.

14         Q.   And when did you do that?

15         A.   I think it was the first part of 2013.

16   And he kept it.

17         Q.   So I was going to ask you, where is that

18   desktop now?

19         A.   He asked me if he could keep it to

20   recycle it, and I said sure.

21         Q.   And what's his name?

22         A.   I couldn't tell you that.  I'm sure I

23   have a receipt for that business.

24         Q.   But beyond that, you just dropped it off

25   and he kept it?

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 65

1         A.   I talked to him.  I was there.  I don't

2    remember his name.

3         Q.   And did you use that desktop for business

4    purposes at times?

5         A.   In Minnesota I did, yes.

6         Q.   And when you were sitting in Minnesota --

7    strike that.

8              Were you first contacted by KYGO while

9    you were living in Minnesota?

10        A.   Uh-huh.  Yes.

11        Q.   Did you communicate with them via e-mail?

12        A.   Yes.

13        Q.   Now, of the missing computer items --

14   I'll call them, desktop, laptop one, laptop two,

15   shattered IP -- is there any backup storage of what

16   was on those materials?  I mean, on those computers.

17        A.   I had a backup external hard drive that I

18   purchased in Minnesota in -- it might have been 2010.

19   It was well before I moved to Denver.  And I used it

20   after I moved to Denver.  And at some point, it

21   stopped -- yeah, it stopped working.

22        Q.   And where is that backup external hard

23   drive?

24        A.   Right now I don't know.

25        Q.   And when was the last time you saw the

1    backup external hard drive, approximately.

2            A.   It -- it might have been -- I think --

3    well, I saw it last year, I believe.  Whenever I

4    bought my new external hard drive.  I had to buy

5    another external hard drive.  So whenever I bought

6    that is certainly the last time I saw the bad one.

7            Q.   Okay.  So you saw bad backup external

8    hard drive number one sometime in 2015?

9            A.   I think that's when I brought my new

10   external hard drive.

11           Q.   And do you still have the new external

12   hard drive?

13           A.   Yes.

14           Q.   Are there any other devices you're using

15   to back up your -- any of your computers, phones,

16   et cetera, at this point, other than new external hard

17   drive?

18           A.   At the present time?

19           Q.   Yes, sir.

20           A.   That's the only -- that's the only thing

21   I'm using to back up.

22           Q.   And in between, approximately, 2011 to

23   present, have you ever used anything to back up your

24   computers, cell phones, et cetera, other than these

25   two external hard drives you told me about?

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 67

```
 1          A.    Yeah.  Like I said earlier, I would use

 2   jump drives for my work in Minnesota.

 3          Q.    You mentioned that.  Other than the jump

 4   drives?

 5          A.    No.  I've only -- I've only had two

 6   external hard drives in my entire life.

 7          Q.    Now, Mr. Mueller, isn't it true that

 8   you're not really sure if you touched or rubbed

 9   against Ms. Swift's buttocks?

10          A.    You're asking me if I'm -- can you -- can

11   you -- I'm sorry.  Can you repeat that again?

12          Q.    Isn't it true that you are not sure if

13   you touched or rubbed against Ms. Taylor Swift's

14   buttocks?

15                MR. McFARLAND:  Objection to form.

16          A.    I am sure that I did not.

17                (Deposition Exhibit 3 was marked.)

18                MR. BALDRIDGE:  For the record, we are

19   going to use the RSA Polygraph for examination

20   purposes only, although I don't have to do this,

21   reserving evidentiary objections to it.  Because last

22   I checked, polygraphs are not admissible in evidence,

23   but we're reserving that right.  If you could mark

24   this as Exhibit 3, please.

25          Q.    (BY MR. BALDRIDGE)  Can you identify this
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 72

1          Q.   (BY MR. BALDRIDGE)   Sir, I'm going to

2    just keep asking the question.   And the question is

3    different than the one you're answering.   Is it your

4    testimony, based upon the facts you have already

5    testified to, that it is not possible that you touched

6    Ms. Swift's rear end?

7          A.   I would say it's possible that my hand

8    came into contact with her skirt or somewhere behind

9    her.  But as I sated earlier, she was moving my hand;

10   I was moving her hand.  I did not think I touched her

11   inappropriately, which is why I did not apologize to

12   her.  I would have apologized had I thought I did

13   something inappropriate.

14         Q.   Now, you previously testified that you

15   believe Mr. Frank Bell spoke to people at KYGO; is

16   that correct?

17         A.   I was told that he did.

18         Q.   And you were told that by Mr. Call and

19   Mr. Haskell, correct?

20         A.   Yes.

21         Q.   Did anyone else tell you that Mr. Bell

22   had spoken to KYGO?

23         A.   Anyone else from --

24         Q.   Other than Mr. Call or Mr. Haskell?

25         A.   No.

1        Q.   And you never heard anything Mr. Bell

2   said to KYGO yourself, did you?

3        A.   I did not.

4        Q.   So you don't know what he said or did not

5   say beyond that which Mr. Call and Mr. Haskell told

6   you, correct?

7        A.   No.

8        Q.   I'd like to have this marked as Mueller

9   Exhibit 4, please.

10            (Deposition Exhibit 4 was marked.)

11        Q.   I put before you - or madam court

12   reporter has put before you, Exhibit 4, sir.  It

13   purports to be a draft complaint in the District Court

14   for Denver, David Mueller versus Taylor Swift.  Have

15   you seen this document before?

16        A.   I have.

17        Q.   And if you turn to the last page of it,

18   the one ending in Bates No. 90, the date is July 16,

19   2014.  Do you see that?

20        A.   Yes.

21        Q.   And July 16, 2014, was after you had been

22   terminated by KYGO, correct?

23        A.   Yes.

24        Q.   So this was at a point when Mr. Haskell

25   no longer was your superior and had control over your

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                        Page 74

```
 1   work life, for lack of a better description, correct?

 2   Because you were gone?  Haskell was longer your boss

 3   at this point, correct?

 4        A.   He was no longer my boss.

 5        Q.   And did you authorize counsel to prepare

 6   this document?

 7        A.   I did.

 8        Q.   Can you read the document, sir, and tell

 9   me if anywhere in this document dated July 16, 2014,

10   there is any reference whatsoever to Mr. Haskell

11   telling you the night of June 3, 2013, that he touched

12   Ms. Swift's buttocks?

13        A.   I don't see it.

14        Q.   Wasn't important enough, is that why it's

15   not there?

16             MR. McFARLAND:  Objection to form.  And,

17   David, I just want to --

18             MR. BALDRIDGE:  I'll withdraw that

19   question.

20        Q.   (BY MR. BALDRIDGE)  Isn't it true,

21   Mr. Mueller, that it's not in this document because it

22   didn't happen?

23        A.   It did happen.

24        Q.   Are you sure about that?

25        A.   I am positive that it happened.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 75

1        Q.    And if he says it didn't; is he lying?

2        A.    If he says it didn't, he's inaccurate.

3        Q.    And it just so happens that Mr. Haskell,

4    the fellow that was out to terminate you for the

5    Cadillac Jack incident, confessed to the assault.  Is

6    that your testimony?

7              MR. McFARLAND:  Objection to form.

8        A.    I would call it bragging.

9        Q.    (BY MR. BALDRIDGE)  Bragging?

10       A.    Yeah.

11       Q.    And it's just at a time when you already

12   knew that Mr. Haskell supposedly was looking to

13   terminate you, correct?

14       A.    Yes.

15             MR. McFARLAND:  Objection to form.

16       Q.    (BY MR. BALDRIDGE)  Convenient, huh?

17             MR. McFARLAND:  I don't think there was a

18   question.

19       Q.    (BY MR. BALDRIDGE)  Now, let's look at

20   the complaint dated July 16, 2014.  If you'll turn to

21   the Bates ending in 89.  Are you there?

22       A.    Yes.

23       Q.    And the first claim is slander per se.

24   Do you see that?

25       A.    Yes.

1  told my attorney, that is the conclusion he came to.

2          Q.   Well, I'm a little more general, and I'm

3  not trying to trip you up, if you will, between what

4  your attorney wrote and legalese.

5          A.   Yeah.

6          Q.   What I'm just asking you is as of

7  July 16, 2014, from a layman's standpoint, you knew

8  the facts about the false things that you believed the

9  Swift defendants were saying about you, correct?

10          A.   I knew of false statements that were made

11  about me.

12          Q.   And the false statements that you have

13  set forth in this document, Mueller 4, were known to

14  you, at latest, the date of the document, July 16,

15  2014, correct?

16          A.   I knew before that date.

17          Q.   How much before it?

18          A.   June 3, 2013, for sure.  I would even go

19  as far as to say whoever told Craig to go find me was

20  told inaccurate statements, because he indicated to me

21  that I did something I didn't do.

22          Q.   So you knew of the inaccurate statements,

23  upon which these slander claims are based, at least as

24  early as June 3, 2013, correct?

25          A.   Correct.

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 85

```
 1          A.    Are we on page 3?

 2          Q.    The Bates number that ends in 26.

 3          A.    Okay.

 4          Q.    About an inch to an inch and a half down.

 5          A.    In our meeting with Jackson.

 6          Q.    And Jackson is you, correct?

 7          A.    Uh-huh.

 8          Q.    Okay.  So let me read that whole

 9    sentence.  Quote, In our meeting with Jackson that

10    lasted over half an hour, he repeatedly said Taylor

11    did not know he was in radio, could not have known,

12    closed quote.  Did I read that accurately?

13          A.    You did.

14          Q.    Is that a true statement?

15          A.    I got the impression that she didn't know

16    or realize that I was from KYGO's morning show.

17          Q.    In Exhibit 6, though, it's still your

18    testimony that you explicitly told her you were from

19    KYGO, correct?

20          A.    I -- no, I didn't tell her that.  This

21    No. 6, when it says, Plaintiff explicitly identified

22    himself as a KYGO personality and employee at the

23    subject meet-and-greet with Ms. Swift.  I'm assuming

24    the meet-and-greet started when we had to check in

25    with security.
```

1       Q.    Okay.  Well, let me back up.  Do you

2   believe Ms. Taylor Swift knew June 2, 2013 --

3       A.    If she -- if she --

4       Q.    Let me finish my question.  Do you

5   believe that Ms. Taylor Swift knew, as of June 2,

6   2013, that you were a KYGA -- GO personality or

7   employee?

8       A.    I definitely did not get the impression

9   that she thought I was an on-air personality at KYGO

10  or part of the morning show.

11      Q.    Do you think, had she known, that somehow

12  this situation would have come out differently?

13            MR. McFARLAND:  Objection to form.

14      Q.    (BY MR. BALDRIDGE)  Why is that important

15  is what I'm getting at.  There are many documents

16  where you say, she didn't know I was with KYGO.  If

17  she had only known I was with KYGO -- what I'm

18  driving at is, why does that matter?

19            MR. McFARLAND:  Objection to form.

20      Q.    (BY MR. BALDRIDGE)  Strike that.  Let's

21  break it down.  Do you agree that there are a number

22  of instances where it's reported that you had

23  questioned whether she you knew you were with KYGO?

24      A.    I did question her knowledge of who I

25  was, where I worked, what my status was at the radio

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                              Page 87

1   station, yes.

2          Q.   Why did that matter?

3               MR. McFARLAND:  Objection to form.

4          A.   When you go backstage as a media person,

5   you get treated differently than if you're a listener.

6   I was with a group of listeners.  I was not with Eddie

7   and Ryno and Ryno's wife, with the media people.  I

8   was with listeners.

9          Q.   (BY MR. BALDRIDGE)  You were in a line

10  with little girls and --

11         A.   Moms and all sorts of people that were

12  clearly not in broadcasting.

13         Q.   Were you angry about that?

14         A.   No, I wasn't angry, no.  Because we were

15  told that we were going to be in the second group.  It

16  was -- I was alarmed.  I was -- I didn't understand

17  it.  I was confused why I was with listeners.

18         Q.   But why would it matter that you were

19  with listeners in that line, as opposed to with, as

20  you said, Ryno and Eddie and the others in the VIP

21  group?

22              MR. McFARLAND:  Objection to form.

23         Q.   (BY MR. BALDRIDGE)  Why does it matter?

24              MR. McFARLAND:  Same objection.

25         A.   There's a clear difference between how

```
 1    encounter with him on June 2, 2013?

 2              MR. McFARLAND:  Objection to form.

 3         Q.   (BY MR. BALDRIDGE)  Is he somehow

 4    incentivize to lie about that that you're aware of?

 5              MR. McFARLAND:  Objection to form.

 6         A.   I don't know what Mr. Haskell is

 7    thinking, or why he does what he does.

 8         Q.   (BY MR. BALDRIDGE)  Do you like

 9    Mr. Haskell?

10         A.   I respect him as a radio person.  I did

11    not feel like he treated me with respect.  And my time

12    working with him was -- there were several incident --

13    I'll say instances, not incidents -- there were

14    incidents, but there were instances where he made it

15    very hard -- he made it difficult for me to like him.

16         Q.   Okay.  I'm going to put those together,

17    and you let me know if there's a real distinction, and

18    I'll accept that.  Can you tell me what incidents and

19    instances there were with Mr. Haskell?

20         A.   There were several.

21         Q.   Can you tell me about them.

22         A.   There was the one with --

23         Q.   Cadillac Jack.

24         A.   -- regarding Cadillac Jack.

25         Q.   Got that one.  Any others?
```

```
 1          A.    There was -- there was a time when he was

 2    telling -- in a meeting with the morning show, so it

 3    was Eddie, Ryan and myself, and he told us that he

 4    didn't like our show, he didn't like what we were

 5    doing.  And we said we're doing what the consultant

 6    wants us to do.  And he told us that he doesn't agree

 7    with the consultant, and he had worked with another

 8    consultant, and he preferred the strategy the previous

 9    consultant utilized at a previous station where he was

10    a program director.

11          Q.    Anything else?  Any other incident or

12    instance?

13          A.    There was a time when he -- Ryan was

14    trying to put together a promotion, and it involved

15    giving away a watch for Mother's Day.  And he

16    suggested that if we just gave away one watch, it

17    wouldn't sound very good on the radio.  So what he

18    wanted to do was come up with a qualifying prize.  And

19    then one of the women that won a qualifying prize

20    would also win the watch at the end of the week.  And

21    everyone agreed that that would be better radio.

22                And Ryno's idea was for us to get purses,

23    nice purses, to give away, and he asked Eddie if we

24    could give them away all during the -- every -- every

25    day part, morning, midday, afternoon, night.  Eddie
```

1    said yes.  He liked the idea.  People in the sales

2    department arranged to have purses -- I believe it was

3    Shannon -- arranged to get purses for us to give away

4    throughout the day.

5              Somehow from that day, when everything

6    was fine, to the next morning, there was a problem

7    with this, and Eddie was telling the people in sales,

8    and he told Bob, that he never told us we could do

9    that.

10             And we -- honestly, it didn't matter that

11   much to us.  We just thought it would sound better on

12   the radio, and we couldn't understand why all of a

13   sudden he was saying that he didn't ever give us

14   permission to do that.  And it was upsetting to Ryan;

15   it was upsetting to me and to Shannon.

16             And there was also a time when after that

17   purse/watch giveaway debacle where he essentially

18   looked at us, Ryan -- Ryan and me, and he said, have

19   you guys had enough, because we can go down to Bob's

20   office, and I can see if we can get you guys out of

21   your contracts.

22             And we said, we don't want to get out of

23   our contracts.  We came here to do a morning show

24   together.  We moved -- we gave up jobs to take this

25   job and move here.  We relocated to Denver to do this.

1   And that was -- you know, that was the end of that.

2            And I'm sure there are -- I'm sure there

3   are other things, but those were all very big events

4   for radio people.  Usually program directors and

5   morning personnel don't have any encounters like that,

6   zero.

7        Q.   Was -- and I want you to use your words.

8   I'm going to use my words just to try to describe the

9   situation, and if you disagree with those words, let

10  me know.  Did you feel like Mr. Haskell was, for lack

11  of a better word, out to get you professionally?

12       A.   No.

13       Q.   Why do you

14       A.   Although -- although he did one time tell

15  us that he's -- I am the most vindictive person you

16  will ever meet.  And he gave us an example of some

17  musical artist that had rubbed him the wrong way or

18  their management rubbed him the wrong way, and he

19  claimed that he never played one of their songs again

20  on any station after that time that they disrespected

21  him or whatever it was.  I can't recall the name of

22  the artist.  I'm sure Ryan would remember that.  Did I

23  just answer your question?

24       Q.   Yeah, I think you did.  When he told you,

25  I'm the most vindictive person you'll ever meet, do

```
 1   you remember the context -- you know, what was going

 2   on when he told you that?

 3           A.   It was during the Cadillac Jack drama

 4   when he accused us of it, and we told him we didn't do

 5   it, and he just -- that was his way of letting us

 6   know, well, you know, just be warned.

 7           Q.   Now, as a layman, not as a lawyer, but as

 8   a layman, did KYGO or its corporate entity have the

 9   right to cancel your show?

10           A.   I -- yeah, I believe they can cancel any

11   show they want.

12           Q.   And when they cancel your show, would

13   they have to pay out for the term of your contract?

14               MR. McFARLAND:  Objection to form.

15           Q.   (BY MR. BALDRIDGE)  Or do you know?  Pay

16   out the compensation of the term of your contract.

17               MR. McFARLAND:  Objection to form.

18           A.   Yeah.  Under certain circumstances, they

19   have to pay the talent, regardless if the show is on

20   the air or not.

21           Q.   (BY MR. BALDRIDGE)  Now, this incident

22   where Mr. Haskell said, have you guys had enough, walk

23   down the hall and get you out of your contracts or

24   whatever --

25           A.   Right, yeah.
```

1        Q.    -- when did that occur, approximately?

2        A.    I want to say it was less than two weeks

3   before the Taylor Swift concert at the Pepsi Center.

4        Q.    But it was before that, right?

5        A.    Well, yeah, because I got fired after the

6   Pepsi Center.

7        Q.    That's what I'm trying to figure out.  It

8   was not at the time of those events at the Pepsi

9   Center?

10        A.    Oh, no.  It was -- it was after the purse

11   thing, I believe.

12        Q.    Well, let me ask you this:  Given this,

13   what you've described as an unusual relationship with

14   Mr. Haskell and that you were terminated by KYGO,

15   without revealing discussions with counsel, I don't

16   want that, why didn't you file a lawsuit against KYGO?

17        A.    That would entail me discussing

18   privileged conversations with my attorney.

19        Q.    Is there any reason that you did not file

20   a lawsuit against KYGO or its parent other than based

21   on reasons that you've discussed and had advice from

22   your counsel on?

23        A.    I discuss everything with my counsel.

24        Q.    But I'm asking you about that trigger

25   decision, whether or not to sue KYGO.  Was there any

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                               Page 154

```
 1            A.    No.  I had -- as a morning show cohost, I
 2   had no say as to the music.  And, honestly, anything
 3   they played was fine with me.  I -- I liked it all.
 4            Q.    And you didn't --
 5            A.    But there was somebody else in the KYGO
 6   hierarchy that had made that decision, and I got the
 7   impression that that decision was superseding any
 8   decision that Eddie could make with music.
 9            Q.    You didn't know who that person was,
10   though?
11            A.    I'm sorry.  I don't.
12            Q.    Now, let's go back, and let's take a
13   deeper dive into your employment contract, which I
14   think is Mueller 7.  Do you have that in front you?
15            A.    Yeah, I do.
16            Q.    I want you to turn, if you would, to
17   section 3, which says term.  Are you there?
18            A.    Could you give me a page number?
19            Q.    I'm sorry.  The Bates at the bottom is
20   Swift 0004, bottom right.
21            A.    Okay.
22            Q.    Do you see section 3, it says "Term"?
23            A.    Yes.
24            Q.    Were you familiar with this provision
25   when you signed this agreement?
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 155

```
 1          A.    I was.

 2          Q.    And you agreed to it, right?

 3          A.    Yes.

 4          Q.    Now, looking at it, is it fair to say

 5   that it provides you with a contract to work for KYGO

 6   for two years, through and including January 20, 2015,

 7   with an option in KYGO sole's discretion to extend

 8   that period for an additional year?

 9          A.    Through January 20, 2015, and then there

10   was an option for a third year.

11          Q.    That's -- that's fair.

12          A.    Yes.

13          Q.    Did you have any right, as a matter of

14   contract, to expect to work for KYGO beyond

15   January 20, 2015?

16                MR. McFARLAND:  Objection to form.

17          A.    I'm sorry, Doug, one more time.

18          Q.    (BY MR. BALDRIDGE)  Okay.  Let's start

19   with the first paragraph of the term before we get to

20   the option paragraph.  It says, quote, The term of

21   this agreement shall begin on January 21, 2013, and

22   shall continue for a period of two years, through and

23   including January 20, 2015, closed quotes.  Did I read

24   that correctly?

25          A.    Yes.
```

1    apparently, yeah.

2          Q.    Did you have -- strike that.

3                Did KYOG (sic) have any obligation to

4    employ you after January 20, 2015?

5                MR. McFARLAND:   Objection to form.

6          A.    A legal obligation?

7          Q.    (BY MR. BALDRIDGE)   Any obligation.  You

8    cast it however you want.

9          A.    I think they had a moral obligation.

10         Q.    Okay.  Let's put that there.  We'll come

11   to that.  As a matter of contract, your contract that

12   you read and agreed to, did KYOG have any obligation

13   to employ you after January 20, 2015?

14               MR. McFARLAND:   Objection to form.

15         A.    Legally, they did not have an obligation.

16   KYGO did not have an obligation.

17         Q.    (BY MR. BALDRIDGE)   Now, the second part

18   of this, this option year, it says, quote, Employer

19   shall have the option in its sole discretion to extend

20   this agreement for one additional year term, correct?

21         A.    Right.

22         Q.    And so if employer, that being KYGO, in

23   its sole discretion decided to extend, that would

24   cause the contract to go on until January 20, 2016,

25   approximately, right?

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 158

```
 1          A.   Yes, sir.

 2          Q.   Did KYOG ever give you notice that they

 3   were going to extend for the additional year?

 4               MR. McFARLAND:  Doug, for this record,

 5    it's KYGO.

 6               MR. BALDRIDGE:  What am I saying?

 7               MS. WRIGHT:  You're saying OG.

 8          Q.   (BY MR. BALDRIDGE)  Okay.  Do you

 9   understand every time I misspoke --

10          A.   I do, I do, yeah.

11          Q.   I apologize for that.

12          A.   That's okay.

13          Q.   And the question is:  Did KYGO ever give

14   you notice that they intended to extend the contract

15   for the additional option year?

16          A.   When Ryno and I talked to Heather, we

17   were essentially getting information about her

18   discussions with management.  And as I understand it,

19   the reason they wanted to have this option here is

20   because sometimes you get a two-year deal and the

21   option isn't put in writing.  They wanted that.  That

22   would benefit them because that was a pretty good

23   deal.  After two years, we were only going to get

24   20,000 additional dollars a year salary.

25               Now -- and the reason I bring this up,
```

1    and I hope I'm not going too far, but radio contracts,

2    you know, they -- if we work together and then went

3    across the street, that would damage KYGO, right?

4           Q.   And that's why there's a noncompete in

5    this agreement?

6           A.   And that's why there's a noncompete, and

7    that's why they -- and, you know, they're -- if they

8    think you're going to be successful, they want to put

9    in an option, because then they can grab you for a

10   third year and there's -- the negotiation is already

11   done.

12          Q.   What I'm trying to drive at is really a

13   more specific question.  Did you ever receive the

14   contractual notice that KYGO was going to extend your

15   contract for the additional option year?

16          A.   I never did, because I got fired for

17   something I didn't do.

18          Q.   Now, in the option year period it says,

19   "in its sole discretion."  Do you see that?

20          A.   Yes.

21          Q.   Did you have an understanding as to what

22   in its sole discretion meant at this time you signed

23   the contract?

24          A.   It was -- it was their option, yeah.

25          Q.   They could do whatever they wanted,

```
 1   right?

 2            A.    They could.

 3            Q.    Now, there's -- the compensation

 4   provision is the very following one after that

 5   section 4.  Do you see that?

 6            A.    Yes.

 7            Q.    And then, generally -- and I'm just

 8   summarizing -- I understand the language says whatever

 9   it says.  You'd get 150,000 a year for each of the two

10   years.  And if they exercised the option, you'd get

11   170, plus you'd get bonuses and additional

12   compensation as set forth herein, right?

13            A.    Right.

14            Q.    Now, you were employed by KYGO for

15   approximately four; is that right, four or

16   five months?

17            A.    It was around -- yeah, five, yeah -- four

18   and a half.

19            Q.    Did you receive any compensation other

20   than the salaried compensation during that four- or

21   five-month period?

22            A.    I did.

23            Q.    Do you recall how much it was?

24            A.    Not off of top of my head.

25            Q.    Do you recall, you know, a matter of
```

1   might be true and might not be true.  But later, after

2   the security people left Shannon and us outside alone,

3   I told her while -- one of the reasons I kept asking

4   for Eddie Haskell, is because I wanted him to come

5   there, and then I was going to ask him about it with

6   the security team, but he never showed up.  So I told

7   Shannon about it, and then later that night I told

8   Ryno.

9           Q.   But you never told Bob Call when he

10   interviewed you, correct?

11           A.   Well, when I talked to Bob Call the next

12   day, it was a very different situation, because --

13           Q.   It's a simple question.  Did you tell Bob

14   Call?

15           A.   I told him about -- I told him part of

16   when Eddie described to me when he met, but I did not

17   give him -- I didn't say everything that Eddie told me

18   on the concourse outside of the Pepsi Center.

19           Q.   Let me ask you if you made up the story

20   about what Mr. Haskell said -- if you made it up --

21   and I understand that you don't think you did --

22           A.   I didn't.

23           Q.   If you made it up, would that be a

24   violation of the material dishonesty clause --

25                MR. McFARLAND:  Objection to form.

1   Swift?  With people in meet-and-greets, excuse me.

2          A.   I have, yeah.

3          Q.   Have you ever seen her pull away from

4   anyone?

5          A.   I don't know if I have or not.

6          Q.   Do you recall having seen her ever pull

7   away from anyone?

8          A.   When I was looking at photos, I wasn't

9   looking for that.

10          Q.   Now, I realize you dispute what happened.

11   I understand that.  I'm not -- but would you agree

12   that your hand is directly behind her rear end in this

13   photo?

14          A.   It appears to be behind Taylor Swift

15   around her waist, or below her waist.

16          Q.   Now, as you look at this photo, just

17   looking at the photo and understanding you dispute

18   what happened, do you agree that it looks like

19   something is going on in this photo?

20          A.   It looks awkward, and I've always said it

21   was an awkward photograph.

22          Q.   Now, I'm going to show you what's going

23   to be marked as Exhibit 11, previously marked as

24   Simbeck 6.

25              (Deposition Exhibit 11 was marked.)

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 217

```
 1   Mr. Schaudies and Ms. Wright to see whether I forgot

 2   something.

 3              THE VIDEOGRAPHER:  Off the record at

 4   2:52.

 5              (Recess taken at 2:52 p.m. to 3:03 p.m.)

 6              THE VIDEOGRAPHER:  Back on the record at

 7   3:03.

 8         Q.   (BY MR. BALDRIDGE)  Mr. Mueller, on the

 9   day -- well, let me -- let me back up.  You were

10   terminated June 4, 2013, from KYGO?

11         A.   Yes, sir.

12         Q.   On the day you were terminated, did you

13   have any of these -- I call them special appearances

14   or additional opportunities you would get as an on-air

15   personality actually lined up, you know, whether it be

16   visit this place, do that?

17         A.   Yes.

18         Q.   Which ones?

19         A.   Ryno and I were scheduled to be at a

20   water park, and I believe it was for the end of June.

21   Somewhere in the -- it was a three-hour appearance at

22   the end of June.  There's only one big water park here

23   in Denver.  I think it's called Water World.  I was

24   only there once to meet with the people on the

25   marketing staff.
```

1        Q.   Were there any other firmly lined up

2   opportunities --

3        A.   There were --

4        Q.   -- as of June 4?

5        A.   We were -- we had already done an

6   appearance at a Firestone Tire Center or auto center.

7   And when we were there, they told us that we -- in the

8   future we'd be going to other Firestones.  We did an

9   appearance at a Dickey's Barbecue.

10       Q.   I'm asking you as of June 4 --

11       A.   Yeah, yeah.

12       Q.   Okay.  Good.

13       A.   And we were told when we did an

14  appearance there that there would be other Dickey's

15  Barbecue locations that they would want to have us be

16  there for two hours.

17            And there's a company that goes by the

18  name of Paul's Homes, and they're out in -- we were

19  doing live commercials for them, and we went out there

20  a couple of times to meet with the guys that did

21  the -- owned it, and also the marketing head.

22            And they told us that they wanted us to

23  come out and do a weekend, like maybe two or

24  three hours on a Saturday, and possibly a live

25  broadcast, because it's way out on -- it's sort of out

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 219

```
 1   towards Kansas, and they wanted us to be there so

 2   people would come out to meet us and then they would

 3   look at homes.

 4            Q.   Any others?

 5            A.   Not that I know of, other than those.

 6            Q.   Let's start with the water park.

 7            A.   Yeah.

 8            Q.   Did you go through with that appearance?

 9            A.   No.  You just reminded me of -- because

10   you said did you go through with it.  I did go through

11   an appearance that I was committed to, and that was a

12   rodeo.  That was a rodeo in -- it's a little town to

13   the --

14            Q.   It's a rodeo.  That's fine.

15            A.   Yeah.  It's a little rodeo out to the

16   east of Denver in a little -- it's Elizabeth.  It's

17   the Elizabeth Rodeo.  I was there with Shannon and

18   Ryan, and Ryan's wife, because I had committed to

19   doing that before I was terminated.

20            Q.   Okay.  Let's start with the water park.

21   Did you do that appearance?

22            A.   I did not.

23            Q.   Were you paid anything for that

24   appearance?

25            A.   I was not.
```

 1          Q.   Were you told why we didn't go through

 2   with the appearance?  Did they tell you, we don't want

 3   you anymore?

 4          A.   It wasn't discussed with me.

 5          Q.   Who informed you that you would not go

 6   through with that appearance?

 7          A.   Honestly, I just assumed that I wouldn't

 8   be doing any more appearances or endorsements, and no

 9   one ever had to come out and officially tell me or put

10   it in writing.  I just assumed, because of what

11   happened.

12          Q.   First Store Auto or Firestone Auto.

13          A.   Firestone.

14          Q.   Firestone.  I can't read my own damn

15   writing.

16          A.   Firestone, yeah.

17          Q.   Firestone Auto.

18          A.   Yeah.

19          Q.   You were told there might be additional

20   appearances; is that right?

21          A.   We were told there would be at other

22   locations.

23          Q.   Did you ever receive a contract for

24   additional appearances?

25          A.   No.  We never -- we never got contracts

1    from the advertisers.

2           Q.   Was it ever discussed with you how much

3    you would be paid for those potential future

4    appearances with Firestone?

5           A.   It was an established -- well, there was

6    an established rate that the station actually put in

7    writing for various -- for endorsements and for -- but

8    other than that, it was all -- it seemed like every

9    one was different.  But there was supposed to be a

10   standard rate, and I'm not -- I think we got the

11   standard rate for Firestone and for Dickey's, but I

12   don't think any of it had been discussed about -- for

13   Paul's or for -- well, actually we did discuss it for

14   WaterWorks (sic), and they wanted us to do three

15   hours, but only get paid as if it was two hours.

16          Q.   Okay.  As to Firestone --

17          A.   Yeah.

18          Q.   -- did you have an appearance at a

19   Firestone store after June 2, 2013?

20          A.   Did not.

21          Q.   Were you told by Firestone they didn't

22   want you, or did you assume, again, they didn't want

23   you?

24          A.   Yeah.  We -- we would deal with the

25   account executive, and she didn't contact me.

1          Q.    Whenever you say "we," I'm always

2    confused.  I'm asking about you.

3          A.    Right.

4          Q.    When you say, "we," do you mean you and

5    Ryno as a group?

6          A.    We -- we -- we did all appearances

7    together, yeah.

8          Q.    Okay.  So with Firestone you did not do

9    an appearance after June 2, 2013, right?

10         A.    No.

11         Q.    You had no contract to do an appearance,

12   correct?

13         A.    I had no contract, no.

14         Q.    Dickey's Barbecue, did you do any

15   appearances for Dickey's Barbecue after June 2, 2013?

16         A.    Not after June 2.

17         Q.    Were you ever told that you would not --

18   a reason why?

19         A.    No.

20         Q.    Did you ever have a contract to do any

21   appearances with Dickey's Barbecue after June 2,

22   2013 --

23         A.    No contract.

24         Q.    I should ask you for Firestone and

25   Dickey's both, did you do any appearances before

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                      Page 223

1    June 2, 2013?

2              A.    Yes.

3              Q.    How many for Firestone?

4              A.    One each.

5              Q.    One each?

6              A.    Yeah.

7              Q.    And when were those?

8              A.    I want to say May, but one of them might

9    have been the end of April.

10             Q.    Did you ever do any appearances or

11   provide advertising, or whatever it may be, for Paul's

12   Homes?

13             A.    We did endorsements for -- endorsement

14   commercials for them every week.

15             Q.    And did those appear on television?

16             A.    No.  When I -- commercials on the radio

17   so they were -- we did them live.

18             Q.    So like when you're doing your morning

19   show, you'll say, oh, Paul's Homes --

20             A.    Right.

21             Q.    -- is a great place or whatever?

22             A.    Right.  When we run commercials, we would

23   just do one live and we'd have a little script and we

24   would make it sound like we were, you know . . .

25             Q.    How much were you paid for that?

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 224

```
 1          A.   You know, I -- all of our endorsements
 2    were different.   I think we were supposed to get paid
 3    $250 each per commercial.   So if you did five -- one a
 4    day for a week, you'd get, you know, five times 250.
 5    But sometimes they would negotiate a lower rate.   And
 6    I -- I think I -- we provided you with that.   I
 7    remember putting it together, and now I can't remember
 8    because there were so many different values.   There
 9    was no consistency, and I'm sorry, I wish I could
10    give you . . .
11          Q.   Elizabeth Rodeo.  You actually did that
12    appearance?
13          A.   Yes.   And that would have been considered
14    a station event, technically, which is where you go
15    and it benefits the station as well as the advertiser,
16    because it's a community type thing, and you don't get
17    paid for station events.
18          Q.   And when did you do that?
19          A.   I want to say it was within a week after
20    I was terminated.   It was right -- it seemed like it
21    was right after.
22          Q.   But as you said, that's a nonpaid event?
23          A.   It would have been nonpaid , yeah.
24          Q.   Now, I'm going to ask these all together
25    just to try to speed things up.   A water park,
```

1    Firestone Auto, Dickey's Barbecue, Paul's Home, and

2    even Elizabeth Rodeo, do you have any information to

3    suggest that any of the defendants you've sued in this

4    action had any knowledge at all of your relationships

5    with any of those five organizations?

6           A.    I have no knowledge.

7           Q.    Now, Mr. Frank Bell, he -- do you know

8    who he is?

9           A.    I do now, yeah.

10          Q.    Who is he?

11          A.    As I understand it, he was and is Taylor

12   Swift's manager, and was a very good friend of Bob

13   Call.

14          Q.    Now, did you know Mr. Bell prior to

15   June 2, 2013?

16          A.    I did not.

17          Q.    Have you ever seen Mr. Bell?

18          A.    That night I did, yes.

19          Q.    Did you know of Mr. Bell prior to June 2,

20   2013, through the industry?

21          A.    I did not.

22          Q.    Are you aware of any information that

23   would suggest Mr. Bell had any personal animus against

24   you?

25                MR. McFARLAND:   Objection to form.

1          A.    Right.   In San Diego we talked about me

2   being on the air with him.   And then when I -- in

3   Philadelphia, he talked to me about promotions.

4          Q.    And you didn't want to do promotions?

5          A.    I did not.

6          Q.    Okay.   Of all of these places we've just

7   mentioned, which is a comprehensive list of where

8   you've applied since June 2, 2013, right --

9          A.    Uh-huh.

10          Q.    -- are you aware of any communications

11   from any of the defendants you've sued in this action,

12   including Frank Bell, with any of those stations?

13          A.    I am not aware of any communication.

14               MR. BALDRIDGE:   I think that's all I have

15   today.   We're going to look into some of this computer

16   stuff, and I don't need to state it on the record, so

17   I'll leave it open for that reason, but otherwise I'm

18   concluded.

19               MR. McFARLAND:   Thank you.

20               MR. BALDRIDGE:   Thank you, sir.

21               THE VIDEOGRAPHER:   This is the end of

22   Media Unit 3 of 3 of the video deposition of David

23   Mueller.   Going off the record at 3:27.

24

25

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                                    Page 236

1              WHEREUPON, the within proceedings were

2    concluded at the approximate hour of 3:27 p.m. on the

3    13th day of July, 2016.

4                    *      *      *      *      *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25