# EXHIBIT 4

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

1

1              IN THE UNITED STATES DISTRICT COURT
                        for the
2                     District of Colorado
3            Civil Action No. 1:15-CV-01974-WJM-KLM
4    ============================================================
5
     DAVID MUELLER,                              Plaintiff,
6
7    v.
8
     TAYLOR SWIFT; FRANK BELL;
9
     ANDREA SWIFT, A/K/A ANDREA FINLAY;
10
     SCOTT SWIFT; ET AL.                        Defendants.
11
12   ============================================================
13
14       PURSUANT TO SUBPOENA AND THE COLORADO AND THE FEDERAL

     RULES OF CIVIL PROCEDURE, the deposition of HERSHEL COOMER
15
     P/K/A EDDIE HASKELL, was taken by Plaintiff David Mueller
16
     by and through his attorney, M. Gabriel McFarland, Esq. at
17
     the offices of Evans & McFarland, LLC, 910 Thirteenth
18
     Street, Suite 200, Golden, Colorado 80401, beginning at
19
     the hour of 11:01 a.m. MDT on Thursday, July 14, 2016,
20
     recorded by Merry P. Boslough, a/k/a Pat Boslough,
21
     Professional Court Reporter and Notary Public in and for
22
     the State of Colorado.
23
24                    *   *   *   *   *
25

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

2

```
 1                      APPEARANCES

 2   For the Plaintiff:

 3           M. Gabriel McFarland, Esq.
             EVANS & McFARLAND, LLC
 4           910 Thirteenth Street
             Suite 200
 5           Golden, Colorado  80401
             gmcfarland@emlawyers.com
 6           (303)279-8300 x 2

 7   For the Defendants Taylor Swift, Frank Bell, Scott Swift,
                                       and Andrea Swift:
 8
             J. Douglas Baldridge, Esq. and
 9           Katherine M. Wright, Esq.
             VENABLE LLP
10           575 Seventh Street, NW
             Washington, D.C.  20004
11           jdbaldridge@venable.com
             kmwright@venable.com
12           (202)344-8300

13   For Bonneville International/Deponent:

14           Michael L. Dowdle, Esq.
             SVP Business Affairs and General Counsel
15           BONNEVILLE INTERNATIONAL
             55 North 300 West
16           Salt Lake City, Utah  84180
             mdowdle@bonneville.com
17           (801)575-5874

18   For Entercom Communications Corporation/Deponent:

19           Michael E. Dash, Esq.
             Deputy General Counsel
20           ENTERCOM COMMUNICATIONS CORPORATION
             401 City Avenue, Suite 809
21           Bala Cynwyd, Pennsylvania  19004
             mdash@entercom.com
22           (610)660-5610

23   Also Present:

24           Jessie P. Schaudies, Jr. (Present during part
                                     of the deposition.)
25
```

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

3

1                        EXHIBIT INDEX

2
                                                    Initial
3   Exhibit              Description              Reference

4
       1    Color photograph of Taylor Swift and        71
5           Eddie Haskell, June 2, 2013

6
       2    Packet of documents containing the          73
7           subpoena to appear, subpoena to produce
            information and records with attach-
8           ments

9
       3    E-mail from Olaf Lund to Maureen Marsh      77
10          forwarded to Eddie Haskell relating to
            Jackson's e-mail account passwords,
11          voice mail, et cetera

12
       4    E-mail with Lincoln Financial Media        79
13          letterhead from Eddie Haskell to "All
            Denver Users" June 4, 2013, announcing
14          Jackson's departure from the morning
            show

15

16

17                     EXAMINATION INDEX

18
            Examination by Mr. McFarland                 4
19
            Examination by Mr. Dowdle                   --
20
            Examination by Mr. Dash                     --
21
            Examination by Mr. Baldridge                --
22
            Examination by Ms. Wright                   --
23

24

25

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

4

```
 1                  P R O C E E D I N G S

 2              (Conference call telephone contact established

 3      with Michael E. Dash, Esq. prior to deposition.)

 4              MR. MCFARLAND:  Let's go ahead and swear the

 5      witness in.

 6                          HERSHEL COOMER,

 7                      P/K/A EDDIE HASKELL,

 8      being first duly sworn to the above cause, to which he

 9      answered, "Yes," was examined and testified as follows:

10                          EXAMINATION

11      BY MR. McFARLAND:

12          Q    Would you state your full name for the record,

13      please?

14          A    Actually --

15              THE WITNESS:  Am I Eddie?

16              MR. DOWDLE:  No.  It needs to be --

17          A    Hershel Keith Coomer.

18              MR. DOWDLE:  -- your actual name.

19              THE DEPONENT:  Because all the paperwork so far

20      has been for Eddie.

21          A    C-o-o-m-e-r.

22          Q    (By Mr. McFarland)  And do you go by any

23      aliases?

24          A    Yes.  Eddie Haskell.

25          Q    Okay.  And for purposes of this deposition, is
```

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

16

1    problems with Mr. Mueller?

2        A    No.

3        Q    Prior to June 2, 2013, did you document any

4    problems with Mr. Kliesch?

5        A    No.

6        Q    Mr. Mueller was ultimately fired, correct?

7        A    Correct.

8        Q    Do you recall when he was terminated?

9        A    June 4th, probably -- 4th or 5th.

10       Q    June 4th or 5th, 2013?

11       A    Yes.

12       Q    Did you make the decision to fire Mr. Mueller?

13       A    No.

14       Q    Did you participate in the decision to fire

15   Mr. Mueller?

16       A    Yes.

17       Q    Who made the decision to terminate Mr. Mueller?

18       A    I believe it was Bob Call.

19       Q    Was there anybody else, other than yourself,

20   that participated in that decision?

21       A    Yes.

22       Q    And who was that?

23       A    John Dimick, our vice president of programming;

24   Maureen Marsh, our HR manager; our corporate HR manager,

25   whose name I can't recall; and I believe that's it.

17

1      **Q      Tell me about the process that KYGO went through**

2   **in determining to terminate Mr. Mueller.**

3      A      We met -- Bob, Maureen and I -- in Bob's office.

4   We got John Dimick, our corporate HR, and our legal

5   counsel on a conference call and went through the events

6   that were relayed to me and Bob and discussed them; that

7   the negative impact it would make on the station if this

8   were to become public.  And then at the end of that call,

9   we tabled any action until after we were able to talk to

10  Mueller.

11     **Q      When did the phone call take place or the**

12  **meeting, slash, call take place?**

13     A      That was the Monday morning, so that would have

14  been June 3rd, probably 10:00 a.m.

15     **Q      Now, was there any discussion during that**

16  **meeting about whether Mr. Mueller inappropriately touched**

17  **Ms. Swift?**

18     A      Yes.

19     **Q      And was there any commentary -- well, tell me**

20  **what you can recall about that.**

21            MR. DASH:  I'm going to jump in really quickly

22  before you answer that, Mr. Haskell.

23            This is Mike Dash that's on the conference call

24  from Entercom.  I just want to make sure that Mr. Haskell

25  understands that he is not to be speaking about any

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

18

1   consultation from counsel or disclosing any advice that he

2   or any of the other members of the group received that he

3   has outlined previously.

4            So that was the instruction, Eddie.

5            THE DEPONENT:  Okay.

6   A    The conversation was that -- so you want to know

7   about the conversation --

8   **Q   (By Mr. McFarland)  Yeah.**

9   A    -- not the -- that we had been made aware by

10  Taylor's management company that he had touched her

11  inappropriately; that they supplied a photograph; that we

12  needed to act on this quickly and appropriately; that we

13  had her complaint as well as photographic evidence; and

14  that we would call him in and get his side of the story

15  before we made any more decisions.

16  **Q   Do you know who with Taylor Swift's management**

17  **company contacted KYGO?**

18  A    Yeah.  That was Frank Bell.

19  **Q   And do you know who Mr. Bell spoke with?**

20  A    He spoke with me initially at the venue.

21  **Q   So this was face-to-face --**

22  A    Yes.

23  **Q   -- on June 2nd?**

24  A    Correct.

25  **Q   And what did Mr. Bell say to you?**

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

19

1     A    He asked if -- he showed me a photo of Mueller

2   and asked if that was one of my employees.  And I said

3   that, yes, it was one of my morning guys.  And he told me

4   that he, during his photo, had inappropriately touched

5   Taylor and he had been removed from the venue and banned

6   from Taylor's shows.

7     **Q    Were those words "touched inappropriately" used**

8   **by him?  Or did he use different language?**

9     A    He probably said "grabbed her butt."

10    **Q    Did he indicate whether Mr. Mueller grabbed**

11  **Ms. Swift outside her clothing or underneath her clothing?**

12    A    He did not, I don't believe.  Yeah, I think that

13  was it.

14    **Q    Mr. Haskell, do you recall anything else about**

15  **your conversation with Mr. Bell on June 2nd, 2013?**

16    A    Not really.  At that point, I called Bob Call to

17  get him in the loop, but I believe that was the last

18  conversation I had with Frank.

19    **Q    Do you know what time that conversation took**

20  **place?**

21    A    Probably 7:00 -- between 7:00 and 7:30.

22    **Q    And did Mr. Bell call you in advance of your**

23  **meeting and say, Hey I'd like to meet?**

24    A    No.  I was in the backstage area.  I was going

25  to meet one of the opening acts, and I was with that

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

26

1    **June 2, 2013, did you subsequently talk to him about the**

2    **alleged incident?**

3         A    No.

4         **Q    After you learned of the alleged incident from**

5    **Frank Bell on June 2nd, 2013, did you talk with anybody**

6    **else associated with Ms. Swift's management team?**

7         A    No.

8         **Q    After you learned of the alleged incident from**

9    **Frank Bell on June 2, 2013, did you text or e-mail anybody**

10   **associated with Ms. Swift's management team anything about**

11   **Mr. Mueller?**

12        A    No.

13        **Q    June 2, that was a Saturday?**

14             **MR. BALDRIDGE:  No.**

15        A    Sunday.

16             MR. BALDRIDGE:   Sunday.  I'm not under oath yet.

17        **Q    (By Mr. McFarland)  So what, if anything, did**

18   **you do with respect to the alleged incident on Monday,**

19   **June 3rd?**

20        A    We had a meeting that morning.  I believe that

21   that was the only meeting we had that day.  I don't know

22   if we met with Mueller later that day or -- memory makes

23   me think it was actually on Tuesday.  But that was the

24   -- the only meeting we had -- then we met with Mueller,

25   then we had another meeting.  So those were the three.

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

27

1      Q    So the meeting on June 3rd, that took place in

2    the morning sometime?

3      A    Yes.

4      Q    And was that the meeting that you previously

5    talked about with John Dimick, Maureen Marsh, the

6    corporate HR manager and Bob Call?

7      A    Yes.

8      Q    Okay.  So that could have happened -- I think

9    your testimony was before you thought that that happened

10   on the 4th or the 5th?

11     A    No.  That was his termination.

12     Q    Okay.

13     A    That meeting absolutely happened Monday morning

14   first thing.

15     Q    Okay.  June 3rd?

16     A    Yes.

17     Q    And then was it later the same day that you met

18   with Mr. Mueller?

19     A    I don't recall.

20     Q    Between your meeting on June 3rd, 2001, (sic)

21   and your meeting with Mr. Mueller, did you talk to anybody

22   about Mr. Mueller or the alleged incident?

23     A    No.

24     Q    Did you exchange texts or e-mails with anyone

25   regarding Mr. Mueller or the alleged incident between your

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

28

1    June 3rd meeting and your meeting with Mr. Mueller?

2         A    No.

3         Q    Did you exchange e-mails with anyone during that

4    same period of time regarding Mr. Mueller or the alleged

5    incident?

6         A    No.

7         Q    You mentioned an investigation earlier this

8    morning.  Did KYGO investigate the alleged inappropriate

9    touching?

10        A    Yes.  We -- Bob and Frank Bell had several

11   conversations.  Frank was reluctant to supply the picture

12   initially.  And Bob, I believe, told him that we would

13   need that for the investigation.  And to my knowledge, it

14   was supplied and -- but that's, to my knowledge, the

15   extent of the investigation -- was hearing his side of the

16   story; hearing Frank and management's side of the story.

17        Q    So you obtained the photograph, and you spoke to

18   Mr. Mueller about the incident?

19        A    Yes.

20        Q    Was that part of the investigation as well?

21        A    Yes.

22        Q    To the best of your knowledge, that was the

23   extent of the investigation?

24        A    To my knowledge, yes.

25        Q    Do you know who was -- did you know where the

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

34

1      A    I don't know.

2      **Q    Can you tell me about the meeting that you had**

3  **with Mr. Mueller at some point after your June 3rd, 2001**

4  **(sic) meeting with KYGO management personnel?**

5      A    We -- Bob Call and I met with him; told him what

6  we had been told happened.  He was very adamant that he

7  did not do it.  He wanted to know, Surely there are video

8  cameras from different angles we could look at.  There

9  aren't.

10          He maintained that while the picture looked bad,

11  that he was merely jumping in for a last-minute picture;

12  that there was no -- it was a two-dimensional picture, and

13  that while heighth-wise and horizontally it looked

14  condemning, there was no depth.  So he could have had his

15  hand far behind her.  Then he said that he absolutely

16  didn't do it.

17          And as we continued to discuss, he said "if" he

18  did it, it was incidental and perhaps he had brushed

19  against her or something along those lines.  But he was

20  very adamant that he didn't do it.

21          We listened more than we talked during that

22  meeting and told him that we would keep him off the air an

23  additional day and would continue to gather information

24  that we could and let him know what the result of that

25  would be.

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

35

1      Q      What, if any, additional information did you

2   gather after your meeting with Mr. Mueller?

3      A      I don't believe any.  I think it was more of a

4   regrouping to share his story with everyone else.

5      Q      And was his story shared with everyone else?

6      A      Yes.

7      Q      And by "everyone else," you mean --

8      A      The initial people on the first call.

9      Q      Do you remember what time of day your meeting

10  with Mr. Mueller took place?

11     A      My recollection is it was around lunch, either

12  11 or 1, but sometime in the middle of the day.

13     Q      Do you recall how long the meeting lasted?

14     A      Probably 20 minutes.

15     Q      Did anybody else attend or listen in by

16  telephone or by any other device?

17     A      I don't recall.

18     Q      Has anybody told you at any time since the

19  meeting that somebody else participated or listened in?

20     A      Just his i-Phone.

21     Q      Mr. Mueller's?

22     A      Yes.

23     Q      Did you record your meeting with Mr. Mueller?

24     A      No.

25     Q      Do you know whether Mr. Call recorded the

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

36

1    meeting with Mr. Mueller?

2         A    Not to my knowledge.

3         Q    Do you know if anybody else was listening on the

4    telephone?

5         A    No.

6         Q    Did you take notes of the meeting?

7         A    I did not; Bob did.

8         Q    How did Mr. Call take notes?

9         A    On paper.

10        Q    Have you seen Bob's notes from the meeting --

11        A    No.

12        Q    -- since the meeting?

13        A    No.

14        Q    Did you know that Mr. Mueller was recording the

15   meeting with you and Mr. Call?

16        A    No.

17        Q    You indicated in your previous testimony that

18   Mr. Mueller was inquiring whether there was video?

19        A    Yes.

20        Q    And I think you indicated that there wasn't any

21   video; is that right?

22        A    Per Frank Bell, that area of the Pepsi Center

23   was not covered by any cameras.

24        Q    Okay.  So then did anyone at KYGO speak with

25   Shannon Melcher about the alleged incident?

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

37

1      A      Yes.

2      **Q      Do you know who?**

3      A      Maureen Marsh.

4      **Q      Did Ms. Marsh report to you on her conversation**

5      **with Ms. Melcher?**

6      A      Yes.

7      **Q      And what did Ms. Marsh report?**

8      A      That she had the same story; that she and Taylor

9      were discussing clothing, having a friendly conversation.

10     The photographer walks up; they decide to quickly take a

11     picture; that Taylor pulled her close; Mueller was jumping

12     into the picture.  And as he dived in, they took a picture

13     just while he was leaning, and it appeared that his hand

14     was behind her.

15             She also told Maureen that I never liked Mueller

16     and implied in some way that I set this whole circus into

17     play, just so I could get him fired.

18     **Q      Is it true that you didn't like Mr. Mueller?**

19     A      No.

20     **Q      How would you describe your relationship with**

21     **Mr. Mueller?**

22     A      Business-like.

23     **Q      As of June 2, 2013, were there any problems**

24     **between you and Mr. Mueller?**

25     A      No.

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

38

 1      Q    As of June 2, 2013, were there any problems

 2   between you and Mr. Kliesch?

 3      A    No.

 4      Q    As of June 2, 2013, how was the morning show

 5   doing?

 6           MR. BALDRIDGE:  Objection, form.

 7      A    Not well.

 8      Q    (By Mr. McFarland)  How do you measure

 9   performance?

10      A    We get ratings from Nielson and look at a lot of

11   factors.  But with ratings we take into account how new

12   the show is and things like that.  And at that point, the

13   show was growing slowly.

14      Q    Okay.  So now, after you and Mr. Call met with

15   Mr. Mueller, you relayed -- or you and Mr. Call relayed

16   the contents of that meeting to the KYGO management group?

17      A    Yes.

18      Q    And did you do that via a meeting where you

19   conferenced in some of the people who were out of town?

20      A    Yes.

21      Q    Just like the first meeting?

22      A    Exactly.

23      Q    And was that done in Mr. Call's office?

24      A    Yes.

25      Q    Okay.  And when did that meeting take place?

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

39

1      A    I don't recall if it was the following morning

2    or if -- it was in the morning, so it would have -- if we

3    met with him on June 3rd, it would have been the morning

4    of the 4th, June 4th.  If his meeting was on the -- I

5    believe the meeting was on the 4th in the morning.

6      **Q    And what do you recall about that meeting --**

7    **about the communications during that meeting?**

8           MR. DASH:  Eddie, I'm going to object again and

9    just give you the same instructions that I gave you

10   previously, that you are not to discuss any communications

11   that we had or any advice that you received or was

12   circulated during that meeting from counsel.

13     A    We went through the -- basically discussed that

14   we had heard his side of the story; that we had heard

15   Taylor's people's side of the story; and that based on the

16   photographic evidence and our belief in who was telling

17   the truth, that we should terminate.

18     **Q    (By Mr. McFarland)  So did you think that**

19   **Mr. Mueller was lying?**

20     A    Yes.

21     **Q    And you thought the allegation that Mr. Mueller**

22   **inappropriately touched Ms. Swift was truthful?**

23     A    Yes.

24     **Q    And based on that allegation, did KYGO terminate**

25   **Mr. Mueller?**

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

40

1          MR. BALDRIDGE:  Objection, form and foundation.

2          DOWDLE:  Objection to the extend it may be

3    privileged.

4          MR. DASH:  Same objection.

5     A    Yes.

6     **Q    (By Mr. McFarland)  In your words, why did KYGO**

7    **fire Mr. Mueller?**

8     A    He violated the morality clause contained in his

9    employment agreement.

10    **Q    By?**

11    A    By displaying behavior that was inappropriate.

12    **Q    And the inappropriate behavior was touching**

13   **Ms. Swift?**

14    A    Exactly.

15    **Q    In the manner that Mr. Frank Bell described to**

16   **you?**

17         MR. BALDRIDGE:  Objection, form.

18    A    Correct.

19    **Q    (By Mr. McFarland)  And so as of the day of**

20   **Mr. Mueller's termination, you were not aware of any other**

21   **reason to terminate Mr. Mueller?**

22         MR. BALDRIDGE:  Objection form, foundation.

23    A    No.

24    **Q    (By Mr. McFarland)  When was Mr. Mueller**

25   **terminated?**

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

42

1     A    Five percent, maybe.

2     **Q    Do you have an estimate of the number of people**

3  **you've hired?**

4     A    Thirty.

5     **Q    And you've been in radio basically your entire**

6  **professional career?**

7     A    Correct.

8     **Q    And you're very well connected in the radio**

9  **industry?**

10         MR. BALDRIDGE:  Objection form and foundation.

11    A    Yes.

12    **Q    (By Mr. McFarland)  You know a ton of people in**

13  **the industry?**

14         MR. BALDRIDGE:  Objection, form and foundation.

15    A    Yes.

16    **Q    (By Mr. McFarland)  You have a good reputation**

17  **in the industry?**

18         DOWDLE:  Objection, form and foundation.

19         MR. BALDRIDGE:  Objection, form and foundation.

20    A    I would say yes.

21    **Q    (By Mr. McFarland)  Would you ever consider**

22  **rehiring Mr. Mueller?**

23    A    Absolutely not.

24    **Q    Why not?**

25    A    He lied.

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

43

1    Q    When?

2    A    When he manufactured the story that I actually

3  did it.

4    Q    Any other reasons that you would never rehire

5  Mr. Mueller?

6    A    No.

7    Q    Given your knowledge and experience in the

8  industry, do you think it's reasonably likely that

9  Mr. Mueller could get hired on by another radio station?

10         DOWDLE:  Object to form and foundation and calls

11  for a legal conclusion.

12         MR. BALDRIDGE:  And form, foundation, legal

13  conclusion and calls for speculation.

14    A    I don't know.

15    Q    (By Mr. McFarland)  Have you talked to any other

16  program directors about Mr. Mueller?

17    A    Yes.

18    Q    And so what can you tell me about those

19  conversations?

20    A    They want to know why he would make up such a

21  ridiculous story.

22    Q    In terms of --

23    A    That I did it instead of him.

24    Q    Has anyone contacted you with respect to -- with

25  questions about hiring Mr. Mueller?

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

45

1     **Q    Yes.**

2     A    Yes.

3     **Q    And so what can you tell me about those**

4   **conversations?**

5     A    Specifically -- I mean, since this has hit the

6   media, I've had numerous conversations with every person I

7   know, including every person I work with.

8     **Q    And what's been the substance of those**

9   **communications?**

10     MR. BALDRIDGE:  Objection, vague, form.

11    A    "I read this story.  Holy crap, what an idiot."

12   The gambit.  I could burn another three hours telling you

13   every question I've been asked, including from my

14   81-year-old mother.

15     **Q    (By Mr. McFarland)  What did your mother ask**

16   **you?**

17    A    "It makes you look bad, son."  I said, "I know.

18   And thankfully Taylor took up for me."  And, "I know, but

19   people just don't read that."

20     **Q    How did Taylor take up for you?**

21    A    In the countersuit she says that it absolutely

22   was not me that did it.

23     **Q    You did hug Taylor on June 2, 2013?**

24    A    Yes.

25     **Q    Once or more than once?**

80

 1   **retention and storage?**

 2        A    Yes.  I delete deleted e-mails after 90 days.

 3        **Q    And do you know whether that is consistent with**

 4   **KYGO's policies and procedures?**

 5        A    I'm not aware of a policy.

 6        **Q    Are you aware of anybody in radio who might be**

 7   **willing to hire David Mueller?**

 8             MR. DOWDLE:  Objection, speculation.

 9             MR. BALDRIDGE:  Objection, form, foundation,

10   asked and answered very clearly previously.

11        A    I don't know.

12             MR. MCFARLAND:  That's all the questions I have.

13        A    Thank you.

14        **Q    (By Mr. McFarland)  Thanks.**

15             MR. BALDRIDGE:  Mr. Haskell, I have no

16   questions.  Thank you.

17             THE DEPONENT:  Thank you.

18             MR. DOWDLE:  I have no questions.

19             (The deposition concluded at 1:30 p.m. this 14th

20   day of July, 2016, after having been on the record

21   approximately 2 hours and 28 minutes.)

22

23

24   Signature/review requested; to be handled by Mr. Dowdle.

25