# EXHIBIT 6

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

1

1                    IN THE UNITED STATES DISTRICT COURT
                              for the
2                         District of Colorado

3            Civil Action No. 1:15-CV-01974-WJM-KLM

4
     ============================================================
5

6    DAVID MUELLER,                                  Plaintiff,

7
     v.
8

9    TAYLOR SWIFT; FRANK BELL;

10   ANDREA SWIFT, A/K/A ANDREA FINLAY;

11   SCOTT SWIFT; ET AL.                           Defendants.

12
     ============================================================
13

14        PURSUANT TO SUBPOENA AND THE COLORADO AND FEDERAL

15   RULES OF CIVIL PROCEDURE, the deposition of ROBERT CALL

16   was taken by Plaintiff David Mueller by and through his

17   attorney, M. Gabriel McFarland, Esq. at the offices of

18   Evans & McFarland, LLC, 910 Thirteenth Street, Suite 200,

19   Golden, Colorado, beginning at the hour of 2:28 p.m. MDT

20   on Thursday, July 14, 2016, recorded stenographically by

21   Merry P. Boslough, A/K/A Pat Boslough, Professional Court

22   Reporter and Notary Public for the State of Colorado.

23

24                          *   *   *   *   *

25

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

2

```
 1                    APPEARANCES
 2   For the Plaintiff:
 3          M. Gabriel McFarland, Esq.
            EVANS & McFARLAND, LLC
 4          910 Thirteenth Street
            Suite 200
 5          Golden, Colorado  80401
            gmcfarland@emlawyers.com
 6          (303)279-8300 x 2
 7   For the Defendants Taylor Swift, Frank Bell, Scott Swift
                                    and Andrea Swift:
 8
            J. Douglas Baldridge, Esq. &
 9          Katherine M. Wright, Esq.
            VENABLE LLP
10          575 Seventh Street, NW
            Washington, D.C.  20004
11          jdbaldridge@venable.com
            kmwright@venable.com
12          (202)344-8300
13   For Bonneville International/Deponent:
14          Michael L. Dowdle, Esq.
            SVP Business Affairs and General Counsel
15          BONNEVILLE INTERNATIONAL
            55 North 300 West
16          Salt Lake City, Utah  84180
            mdowdle@bonneville.com
17          (801)575-5874
18   For Entercom Communications Corporation/Deponent:
19          Michael E. Dash, Esq.
            Deputy General Counsel
20          ENTERCOM COMMUNICATIONS CORPORATION
            401 City Avenue, Suite 809
21          Bala Cynwyd, Pennsylvania  19004
            mdash@enternet.com
22          (610)660-5610
23
     Also Present:  None
24
                       *   *   *   *   *
25
```

Thomas T. Tomko & Associates (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

3

1                          EXHIBIT INDEX

2

   Exhibit No.              Description          Initial Mention
3                                                      Page

4

      1     "Notes from Jackson conversations."        59
5
            Typewritten notes produced by
6
            Robert Call detailing the sequence of
7
            events following alleged incident
8

9

10

11
                         EXAMINATION INDEX
12

13          Examination by Mr. McFarland:            4

14
            Examination by Mr. Baldridge:           --
15

16          Examination by Mr. Dowdle:              --

17
            Examination by Mr. Dash:                --
18

19          Examination by Ms. Wright:              --

20

21

22

23                     *   *   *   *   *

24

25

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

4

1                    P R O C E E D I N G S

2                         ROBERT CALL,

3    being first duly sworn to the above cause to which he

4    answered, "I do," was examined and testified as follows:

5                         EXAMINATION

6    BY MR. McFARLAND:

7        Q    **Good afternoon.  Would you state your full name**

8    **for the record, please?**

9        A    Robert Bradford Call.

10           MR. BALDRIDGE:  We'll go ahead and do our usual,

11   Gabe, and mark this as confidential and under protected

12   order until further notice.

13           MR. MCFARLAND:  Gotcha.

14           MR. BALDRIDGE:  Thank you.

15       Q    **(By Mr. McFarland)  Have you ever been deposed**

16   **before?**

17       A    I just had that conversation last night.  I

18   don't think so.  And the reason is there may be a

19   situation with a tower site here on Lookout Mountain back

20   in the early 80s -- maybe.

21       Q    **Okay.**

22       A    It wasn't as formal as this seems to be.

23       Q    **Okay.  You understand that you're testifying**

24   **under oath today?**

25       A    Yes.

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

9

1      A    Yes.

2      **Q    So when did you terminate Mr. Mueller?**

3      A    June 4th, 2013.

4      **Q    2013?  Why did you fire Mr. Mueller on June 4th,**

5    **2013?**

6      A    I fired him based on the fact that I had a

7    picture that Taylor Swift's promotion people had sent

8    that -- at least in my opinion -- represented him in a

9    very uncomfortable place with Taylor.

10         I had direct feedback from her radio management

11   group, Frank Bell, whom I've known for many years, who

12   indicated that Mr. Mueller had during a photo session

13   touched her inappropriately, I believe, raised her dress

14   or skirt and that she was very clear on what had happened.

15   And it was related to me that her mother felt the same

16   way.

17         And in talking to -- I was going to call him

18   Jackson, I'm sorry -- Mr. Mueller on Monday the third in

19   the afternoon through a lot of conversation, he certainly

20   indicated that he did not do it; however -- and I believe

21   this is a direct quote -- if I had, it was incidental or

22   accidental.  The combination of those three elements put

23   me in a position where I felt comfortable making the

24   decision.

25     **Q    Any other reasons why you terminated Mr. Mueller**

Thomas T. Tomko & Associates (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

15

1    **Mr. Haskell about the alleged incident, what did you**

2    **understand the allegation to be?**

3        A    That he had touched Taylor inappropriately.

4    From Taylor's perspective, there was no question what had

5    happened and the family and Taylor were understandably

6    very upset.

7        **Q    Did you have an understanding at that time as to**

8    **what part of Ms. Swift's body was allegedly touched?**

9        A    I believe so, yes.

10       **Q    What part of her body was allegedly touched?**

11       A    He touched her on her rear.

12       **Q    Did you have an understanding as to the**

13   **allegation that he touched Ms. Swift's rear outside of her**

14   **clothing or underneath her clothing?**

15       A    Not at that time.

16       **Q    Did Mr. Haskell show you a copy of the**

17   **photograph or send you a copy of the photograph at that**

18   **time?**

19       A    No.

20       **Q    What did you do after receiving information on**

21   **the alleged incident from Mr. Haskell?**

22       A    I processed what he had said, called our vice

23   president of programming from Lincoln Financial Media,

24   John Dimick, D-i-m-i-c-k.

25       **Q    Did you do anything else?**

16

1     A     Told him about -- and later that night I talked

2  to the president of our company, Don Benson.  And I'm not

3  sure I recall whether John had informed him and Don called

4  me or if Don called me, I don't remember.  But maybe by

5  about eleven o'clock that night, I did talk to Don, who

6  was in Atlanta.

7     **Q     And did you relay to both Don and John**

8  **essentially what Mr. Haskell had related to you?**

9     A     Correct.

10    **Q     And what was John's reaction?**

11    A     Shock.  "Are you serious?  What information do

12 we have?  What supporting information?  What do we know?"

13    **Q     What kind of reaction did Don have?**

14    A     Pretty similar.

15    **Q     And I'm sorry, is it Don or --**

16    A     Don Benson, B-e-n-s-o-n.  Don did say that he

17 considered this a very serious matter in terms of our

18 station, our company, our parent company, and that we

19 would need to get together the next morning and gather the

20 information and look at this very carefully.

21    **Q     And the conversation with John and the**

22 **conversation with Don, did those happen on June 2nd?**

23    A     Yes.

24    **Q     Okay.  Did you call anybody else about the**

25 **alleged incident between Mueller and Ms. Swift on**

17

1    **June 2nd?**

2         A    No.

3         **Q    Did you talk to anybody else about the alleged**

4    **incident between Mr. Mueller and Ms. Swift on June 2nd?**

5         A    No.

6         **Q    Did you take any other action with respect to**

7    **the alleged incident the evening of June 2nd, 2013?**

8         A    In one of my last phone conversations with

9    Eddie, we decided to suspend with pay so we could begin an

10   investigation.  We just didn't feel it was appropriate

11   that he be on the air, both knowing all this was going on

12   and the potential possibility that the press could find

13   out or would find out.

14        **Q    Do you know who notified Mr. Mueller of that**

15   **decision?**

16        A    Eddie did.

17        **Q    Was there any question in your mind as of the**

18   **evening of June 2nd, 2013, that Mr. Mueller had**

19   **inappropriately touched Ms. Swift?**

20        A    Yes, there was a question.

21        **Q    You had not yet made up your mind?**

22        A    No.

23        **Q    What happened next with respect to the alleged**

24   **incident between Mr. Mueller and Ms. Swift?**

25        A    I'm not sure whether in one of my conversations

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

18

1    with Eddie that I didn't have him give my cell phone

2    information to Frank Bell.  I don't think he had it prior

3    to that.  And I believe that evening Eddie said that Frank

4    would call me in the morning or -- I'm not sure whether I

5    called Frank or he called me, but it was sometime early in

6    the morning before I left for work.  So we arranged the

7    opportunity that we would talk the next morning.

8         Q    **So that was Monday?**

9         A    That was Monday morning.

10        Q    **Okay.  And so whether you called Mr. Bell or he**

11   **called you, you spoke to Mr. Bell early on June 3rd?**

12        A    On June 3rd.

13        Q    **And what do you recall about that conversation?**

14        A    Well, I recall very vividly that there was a

15   picture.  And I asked him could I get a copy of the

16   picture.  And he said that he would send it to me, but

17   that it basically was for my eyes only.  It's not a

18   picture he wanted to get out.

19             He relayed the incident, the fact that Taylor's

20   mom was very upset, and that when I saw the picture, it

21   would be clear what had happened.  And I told Frank that

22   we had suspended Mueller for the day; that we take this

23   type of thing very seriously; and that we would begin an

24   investigation right away.

25             And I said that I knew I had more questions, but

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

19

1   I didn't really know what questions I had at that moment

2   beyond -- I hadn't even seen the picture.  And he

3   understood, said he knew, you know, we would give the

4   situation a fair consideration and do the right thing.

5        He was going to be traveling, I believe, back to

6   Nashville, and he probably would not be available Denver

7   time until maybe very late morning or early afternoon.

8   And I told him that I would have some questions, that I

9   would definitely have some questions for him at that time

10  and please send the photo, which he e-mailed to me.

11       Q    What did you think Mr. Bell meant when he said,

12  "I'm sure you'll do the right thing"?

13       A    Well, I believe that they were obviously -- from

14  what I could tell -- embarrassed, upset, angry over the

15  incident.  And my belief would be that probably would run

16  the gambit of some type of disciplinary action, maybe a

17  suspension, maybe up to and including termination.  We

18  never discussed what "the right thing" was.

19       Q    Was there any doubt in your mind that what

20  Mr. Bell wanted you to do is to fire Mr. Mueller?

21            MR. BALDRIDGE:  Objection, form and foundation.

22            MR. DOWDLE:  Objection, form, foundation and

23  speculation.

24       Q    (By Mr. McFarland)  You can answer.

25            THE DEPONENT:  I can answer?

20

1          MR. BALDRIDGE:  Yes.

2     A    Would you ask me the question one more time?

3     **Q    (By Mr. McFarland)  Yes.  Was there any doubt in**

4  **your mind that what Mr. Bell wanted you to do was to**

5  **terminate Mr. Mueller?**

6          MR. BALDRIDGE:  Same objections.

7          MR. DOWDLE:  Objection, form and foundation,

8  speculation.

9     A    Yes, there was doubt in my mind.

10    **Q    (By Mr. McFarland)  Did Mr. Bell ask you to**

11 **terminate Mr. Mueller ever?**

12    A    Never.

13    **Q    Did he ask you to take any specific action?**

14    A    Never.

15    **Q    How did he describe the alleged incident to you?**

16    A    I'm sure he described it in our early morning

17 call and then at length late morning when he had arrived

18 in Nashville.  He indicated that Mueller had gone in a

19 tented area where Taylor was taking photos.  Shannon

20 Melcher, at the time Mueller's girlfriend, was there.

21 Taylor was in the room.

22          And this was just a small group coming in, I

23 guess the standard kind of backstage meet and greet photo

24 session.  And maybe there was a security person and a

25 photographer and that there wasn't -- I don't recall any

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

23

1      A    Well, we talked quite a bit about the fact

2    that -- I asked the question, "Did Taylor say anything

3    about what happened when this occurred?"  And he said that

4    Taylor did not want to make a big incident out of it and

5    that as soon as Mueller had left the meet and greet tent,

6    she informed security.

7           And that's when the process started.  Security

8    tracked Mueller and Melcher down, and I guess according to

9    Frank there were words and David indicated that it's all

10   wrong.  I think he made a comment of, "Well, let's get the

11   police involved," or something like that I remember.

12     **Q    Mr. Mueller made a comment that he wanted the**

13   **police involved?**

14     A    I think according to Frank, "Let them come and

15   investigate this."

16     **Q    Okay.  Anything else that you can recall about**

17   **that initial conversation with Mr. Bell?**

18     A    There were two conversations:  The first one

19   early in the morning; and the next one late morning.  And

20   I think the late morning one I probably had a few

21   questions at that point for -- you know, Were there any

22   other cameras?  Was there anyone else in there -- no, I

23   take that back.

24          I did not ask the camera question at that

25   moment.  That was after meeting later with Mueller.  I

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

24

1   think it was just pretty much me stating the facts as

2   Frank knew them.

3       **Q     Is there anything else that you can recall about**

4   **your initial two communications?  Well, let me ask this:**

5   **Is your first conversation with Frank Bell distinct in**

6   **your mind from your second conversation with him regarding**

7   **the incident?**

8       A    It's distinct in that he was going to send me

9   the photo.  And by the time the second conversation took

10  place, I had the photo.

11      **Q     Okay.  And what was your impression of what the**

12  **photo showed?**

13      A    My impression?  He had his hand in a pretty

14  inappropriate place.

15      **Q     You believe that in that photograph**

16  **Mr. Mueller's hand is touching Ms. Swift's rear?**

17      A    I couldn't conclude from that photograph because

18  it does not have a dimensional aspect to it that he's

19  touching her, is about to touch her or has just touched

20  her.  I concluded his hand is at a place that is

21  inconsistent with -- in my experience -- most artist's

22  photos that I've seen.

23          And I also concluded that it's pretty clear when

24  you look at the picture, to me, that Taylor is trying to

25  edge herself away from or orient herself more physically

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

25

1   to Shannon.  So if you're looking at the two, it just

2   feels, to me, very odd.

3        Q    Did Mr. Bell communicate to you that Ms. Swift

4   pulled away in any form or fashion from Mr. Mueller?

5        A    Yes.

6        Q    Did you note -- well, Ms. Melcher is in the

7   photograph as well?

8        A    Yes.

9        Q    Did you note where her hands were in the

10  photograph?

11       A    No.

12       Q    What about Ms. Swift's hands?  Did you see where

13  Ms. Swift's hands were?

14       A    I'm sure I did.  I don't recall anything about

15  them being in an inappro- -- I mean, it looked just like

16  standard people who put their arms around each other

17  trying to get a photo.

18       Q    What did you do after your second conversation

19  with Mr. Bell on June 3rd?

20       A    We set up a meeting.  Eddie set that up for

21  David to come in early in the afternoon.

22       Q    That would have been early afternoon on Monday

23  the third?

24       A    The third.  Right.

25       Q    Okay.  And did that happen?

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

26

 1     A     Yes.

 2     **Q     Before you met with Mr. Mueller, did you have a**

 3  **meeting with Mr. Haskell, Mr. Dimick and perhaps others to**

 4  **discuss Mr. Mueller?**

 5     A     Yes.  It was a telephone conference call for at

 6  least half of the parties.  Eddie was in my office and

 7  Maureen Marsh, our HR manager, was in my office.

 8     **Q     And who was on the phone?**

 9     A     Phil Bonomo, our attorney; Kercea Beckwith, our

10  Lincoln Financial VP of HR; I think Don was on the call

11  and John.

12     **Q     And when did that meeting, slash, conference**

13  **call take place?**

14     A     That would have been late morning, prior to my

15  second conversation with Frank.

16     **Q     Before your second conversation?**

17     A     Yes.

18     **Q     Without disclosing communications with your**

19  **counsel, what do you recall about the communications in**

20  **that meeting with Mr. Haskell and the other KYGO people?**

21          MR. DOWDLE:  Objection --

22          MR. DASH:  Objection --

23          MR. DOWDLE:  -- to the extent it's privileged.

24          MR. DASH:  Sorry, Mike, go ahead.

25          MR. DOWDLE:  I just said objection to the extent

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

28

1      A    Then I either waited for Frank to call me or I

2  called him.

3      **Q    Okay.**

4      A    And so I want to say that was 11 or 12-ish my

5  time -- Denver time.

6      **Q    And you've already told me what you can remember**

7  **about --**

8      A    Right.

9      **Q    -- that second conversation?**

10      A    Correct.

11      **Q    And then you met with Mr. Mueller?**

12      A    Eddie set up the meeting for two o'clock.

13      **Q    Okay.  And Mr. Mueller arrived at the designated**

14  **time?**

15      A    Yes.

16      **Q    And he met with you and Mr. Haskell?**

17      A    Yes.

18      **Q    How long did you meet?**

19      A    Oh, at least an hour.

20      **Q    And did that meeting take place in your office?**

21      A    Yes, it did.

22      **Q    What do you recall about the -- well, did**

23  **anybody else participate in that meeting?**

24      A    No.

25      **Q    Was there anybody on the phone listening in?**

31

1    **photographer?**

2         A    No.

3         **Q    Did you make any effort to talk to the security**

4    **person?**

5         A    No.

6         **Q    Did you make any effort to talk to Ms. Melcher?**

7         A    I did not.  I recall that our HR manager,

8    Maureen Marsh, did.

9         **Q    Did you ask Ms. Marsh to discuss the incident or**

10   **the alleged incident with Ms. Melcher?**

11        A    I'm not sure who asked her to do it.  I think

12   that was just part of the nature of our protocol that she

13   had been in the picture and we were trying to evaluate

14   that.  And I'm not sure what time that took place.

15        **Q    As part of your investigation -- you did conduct**

16   **an investigation?**

17        A    Yes.

18        **Q    As a part of that investigation, did you come to**

19   **understand Ms. Melcher's recollection of the alleged**

20   **incident?**

21        A    My understanding is she didn't recall him

22   touching her at all.  I don't recall her saying he didn't,

23   she just didn't recall.

24        **Q    And I'm sort of going back to your conversations**

25   **with Frank Bell.  I think you testified that Mr. Bell**

33

1    **Q    Did you ever ask Mr. Bell whether he had**

2    **personally talked to any of the other people who were in**

3    **the room at the time of the alleged incident?**

4        A    No.

5    **Q    Did he indicate to you that he had talked to any**

6    **of the other people in the room at the time of the alleged**

7    **incident?**

8        A    I don't recall.

9    **Q    Would you agree that as a part of your**

10   **investigation into the alleged incident, you should have**

11   **talked to the people in the room at the time of the**

12   **alleged incident?**

13           MR. DOWDLE:  Objection --

14           MR. BALDRIDGE:  Objection -- go ahead.

15           MR. DOWDLE:  Objections to form, speculative,

16   argumentative.

17           MR. BALDRIDGE:  I will join those three and add

18   foundation.

19           MR. DASH:  Same objections.

20   **Q    (By Mr. McFarland)  You can answer it.**

21       A    No, I never considered talking to him --

22   **Q    Why?**

23       A    -- as a part of my investigation.  I didn't need

24   that information.

25   **Q    You didn't need to know what the other people in**

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

34

1    **the room saw with respect to Mr. Mueller's interactions**

2    **with Ms. Swift?**

3            MR. DOWDLE:  Objection, argumentative,

4    foundation and form.

5            MR. BALDRIDGE:  And I join those three.

6            MR. DASH:  Same objections.

7    A    No.

8    **Q    (By Mr. McFarland)  Why?**

9    A    In my meeting with Mr. Mueller, I had three

10   components in my decision.  I had a picture that appeared

11   very inappropriate, but a picture only.  Secondly, I had

12   feedback from a person that I've known for many years,

13   trusted, had no reason to tell me anything that was

14   incorrect that had occurred.

15           And third, Mueller said to me, "I didn't do it;

16   but if I did, it was incidental."  So I had a picture, I

17   had Taylor's comments through Frank and he changed his

18   story that it couldn't have occurred, then that it was

19   incidental.

20   **Q    How did he change his story?**

21   A    He said he didn't do it numerous times, and then

22   he said, "If I had, it was incidental."  And I thought

23   that's very different from "I didn't do it."

24   **Q    And if, in fact, it had been incidental contact,**

25   **you still would have fired Mr. Mueller?**

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

37

1      Q     And if word got out, what was your position

2   going to be?

3             MR. BALDRIDGE:  Objection, speculation.

4             MR. DOWDLE:  Same objection.

5      A     We would have had no comment on employee

6   matters.

7      Q     (By Mr. McFarland)  And what were your

8   conversations with Maureen about Mr. Mueller?  What did

9   they involve?

10     A     I think our conversations through this process

11  with Maureen were primarily making sure, you know, we had

12  things documented.  We went through whatever proper

13  protocol for HR, those kinds of things.  She was, I think,

14  certainly advisory, but she was not a decision maker.

15     Q     Did you send the -- how did you receive the

16  photograph of Ms. Swift, Ms. Melcher and Mr. Mueller?

17     A     I received it by e-mail.  It came in on my

18  phone.  I was at C-470 and Broadway, so I pulled off to

19  the side of the road to look at it.

20     Q     Okay.  And did you provide a copy of that to

21  anyone?

22     A     I forwarded a copy to John Dimick.

23     Q     Anybody else?

24     A     I don't know that I forwarded it to Phil Bonomo,

25  our attorney, or John did -- and to Jen Petruccelli, the

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

40

1    **after you typed up your notes?**

2        A    I had one more conversation with Frank, I

3    recall, fairly late that evening and asked questions about

4    security, the possibility of other cameras, things like

5    that.  And he said there wasn't anything there in the

6    tent.

7        **Q    And during that conversation, did you ask him**

8    **whether there were any witnesses or whether any other**

9    **witnesses happened to see the alleged incident?**

10            MR. BALDRIDGE:  Objection, form.

11            MR. DOWDLE:  Same objection.

12       A    I wanted to know who was in there at the time on

13   several occasions and was consistently told that is was a

14   photographer, a security-type person, Taylor, Shannon and

15   Mueller.

16       **Q    Did you ask what those persons saw in terms of**

17   **--**

18            MR. BALDRIDGE:  Objection, asked and answered.

19       **Q    (By Mr. McFarland) -- the related incident?**

20            MR. BALDRIDGE:  Objection, asked and answered

21   multiple times.

22            MR. DOWDLE:  And speculation.

23       A    No.

24       **Q    (By Mr. McFarland)  Who was in charge of KYGO's**

25   **investigation?**

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

41

1      A      Principally me.

2      **Q      Was there anybody else working on the**

3  **investigation under your direction?**

4            MR. BALDRIDGE:  Other than the five he already

5  mentioned?  Or who, Gabe?

6            MR. MCFARLAND:  Well, I don't think he's

7  mentioned anybody else who helped him --

8            MR. BALDRIDGE:  He has too.  The lawyers, the HR

9  director --

10            MR. MCFARLAND:  -- with the investigation.

11            MR. BALDRIDGE:  -- in fact, he's mentioned them

12  numerous people.

13            MR. MCFARLAND:  I don't know that any of those

14  people participated in the investigation.

15            MR. BALDRIDGE:  Oh, he did.  I thought -- that's

16  clearly what he said, I just don't know if he's trying to

17  change that it actually.

18            MR. DOWDLE:  You can go ahead and answer it.

19      A      I discussed with Eddie what he knew, where he

20  was.  Eddie was in a different area, so I realized fairly

21  quickly that he did not witness any of it; although, I

22  talked to Eddie several times about how quickly Frank got

23  to him and the label person had gotten to him and the

24  sequence of events as Eddie was finding out.  So that was

25  part of the evaluation process.

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

42

1      **Q      (By Mr. McFarland)  Well, did anybody else**

2   **participate in the investigation?**

3              MR. BALDRIDGE:  Objection, asked and answered.

4              MR. DOWDLE:  Same objection.

5      A    No.

6      **Q    Were any KYGO lawyers part of the investigation**

7   **and the termination?**

8              MR. DOWDLE:  Objection, privileged.

9              MR. BALDRIDGE:  Objection, asked and answered.

10             MR. DASH:  Objection.

11     A    A lot was discussed on the call.

12     **Q    (By Mr. McFarland)  Well, I don't want to know**

13  **what was discussed in the call, but I want to know if the**

14  **lawyers at KYGO were involved in the factual investigation**

15  **into the alleged incident involving Mr. Mueller and**

16  **Ms. Swift.**

17             MR. DOWDLE:  You can answer that.

18     A    I recall them asking a couple of questions about

19  the facts, what I knew.

20             MR. DASH:  Yeah, Mr. Call, I'm just going to

21  direct you.  I think that's a yes no question, Were they

22  involved?

23             THE DEPONENT:  Okay.

24             MR. DASH:  I don't think you need to go beyond

25  that.  You're talking about the extent of the call.  I'm

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

61

1    in today.

2              (The deposition concluded at approximately 3:53

3    p.m. MDT this 14th day of July, 2016, after having been on

4    the record for approximately 1 hour and 23 minutes.)

5

6

7

8

9

10   Signature/review requested; Mr. Dowdle to handle.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25