# EXHIBIT 15

In the Matter Of:

*MUELLER*

*vs.*

*SWIFT, ET AL.*

———————————————————————

*FRANCIS BELL*

*June 29, 2016*

———————————————————————

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

```
                CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
                        FRANCIS BELL - 06/29/2016                    Page 1

 1                              *  *  *  *  *

 2                 DEPOSITION DESIGNATED CONFIDENTIAL

 3                 PURSUANT TO THE PROTECTIVE ORDER

 4                              *  *  *  *  *

 5

 6              IN THE UNITED STATES DISTRICT COURT

 7                  FOR THE DISTRICT OF COLORADO

 8

 9    DAVID MUELLER,                            )
                                                )
10                  Plaintiff,                  )
                                                )
11    vs.                                       )NO. 1:15-cv-01974-
                                                )    WJM-KLM
12    TAYLOR SWIFT; FRANK BELL;                 )
      ANDREA SWIFT a/k/a ANDREA                 )
13    FINLAY; SCOTT SWIFT; and JOHN             )
      DOES 1 - 5,                               )
14                                              )
                    Defendants.                 )
15                                              )
      ---------------------------------
16

17             Deposition of:

18
               FRANCIS BELL
19

20             Taken on behalf of the Plaintiff

21
               June 29, 2016
22

23             Reported by:   Martha B. Davis, RMR, RDR, CRR
                              LCR No. 152
24

25    Job No.: WDC-090836
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER

FRANCIS BELL - 06/29/2016                              Page 2

```
 1    APPEARANCES:

 2    For the Plaintiff:      M. Gabriel McFarland, Esq.
                              Evans & McFarland, LLC
 3                            910 13th Street
                              Suite 200
 4                            Golden, CO 80401
                              303-279-8300
 5                            gmcfarland@emlawyers.com

 6    For the Defendants:     J. Douglas Baldridge, Esq.
                              Courtney A. Sullivan, Esq.
 7                            Katherine M. Knight, Esq.
                              Venable, LLP
 8                            575 7th Street NW
                              Washington, D.C. 20004-1601
 9                            202-344-4703
                              jdbaldridge@venable.com
10                            casullivan@venable.com
                              kmwright@venable.com
11
      Also Present:           Jesse Schaudies
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
                      FRANCIS BELL - 06/29/2016                          Page 3
```

 1                              I N D E X

 2   Questions by Mr. McFarland                                    5

 3

 4

 5

 6

 7

 8      P R E V I O U S L Y   M A R K E D   E X H I B I T

 9   DEPOSITION OF STEPHANIE SIMBECK

10   No. 1:      Sketch prepared by Stephane Simbeck              11

11

12

13                           E X H I B I T S

14   No. 7:      AT&T records, Firefly Entertainment
                 (SWIFT 0000183 - 0000188)                         44
15
     No. 8:      Telephone call logs for Frank Bell
16               (SWIFT 0000160 - 0000182)                         46

17   No. 9:      E-mail string, Frank Bell to Mark
                 Panetta, September 15, 2015
18               (SWIFT 0000156)                                   47

19   No. 10:     E-mail string, Frank Bell to Joel
                 Burke, September 14, 2015
20               (SWIFT 0000153 - 0000155)                         48

21   No. 11:     Mr. Bell's handwritten notes
                 (SWIFT 0000077 - 0000078)                         52
22

23

24

25

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 06/29/2016                                    Page 4

```
 1              The deposition of FRANK BELL was taken by
 2   counsel for the Plaintiff, pursuant to notice, at the
 3   offices of Cleeton Davis Court Reporters, LLC, 402 BNA
 4   Drive, Suite 108, Nashville, Tennessee, on
 5   June 29, 2016, for all purposes under the Federal Rules
 6   of Civil Procedure.
 7              The formalities as to notice, caption,
 8   certificate, et cetera, are waived.  All objections,
 9   except as to the form of the questions, are reserved to
10   the hearing.
11              It is agreed that Martha B. Davis, being a
12   licensed court reporter and notary public for the State
13   of Tennessee, may swear the witness, and that the
14   reading and signing of the completed deposition by the
15   witness are not waived.
16
17
18                         * * *
19
20
21              MR. BALDRIDGE:  Before we start, I just
22   want to make it clear that the prior deposition also is
23   designated confidential under the protective order, as
24   I think we omitted doing that, and we will go ahead and
25   prospectively designate the entirety of Mr. Bell's
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 06/29/2016                                     Page 7

```
 1   Q.       Where did you go to college?
 2   A.       American University, Washington, D.C.
 3   Q.       And what kind of degree did you graduate with?
 4   A.       Interdisciplinary studies with an emphasis on
 5   broadcasting.
 6   Q.       Any other education or degrees?
 7   A.       No.
 8   Q.       Prior to June of 2013, did you know of David
 9   Mueller?
10   A.       No.
11   Q.       Had you ever heard his radio program?
12            MR. BALDRIDGE:  Objection to form.
13            THE WITNESS:  No.
14            MR. BALDRIDGE:  Slow down just a slight
15   degree.
16   BY MR. MCFARLAND:
17   Q.       Do you attend most of Taylor Swift's concerts?
18   A.       Yes.  Since I started this job, three world
19   tours at this point.  Not every show, but I would say
20   maybe 85 to 90 percent.
21   Q.       And you attended her show in Denver on June
22   2nd, 2013?
23   A.       Yes.
24   Q.       And do you remember the venue that that show
25   was at?
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 06/29/2016                                Page 23

```
 1   regarding Mr. Mueller on June 2nd, 2013?
 2   A.      Yes.
 3   Q.      What was the next -- after the meeting that we
 4   just talked about concluded, what was your next
 5   communication regarding Mr. Mueller?
 6   A.      I was summoned into another meeting somewhere
 7   backstage.
 8   Q.      And who attended that meeting?
 9   A.      To the best of my recollection, that would
10   have been Robert Allen, Andrea Swift.  I don't want to
11   use the word "possibly" because he'll yell at me so I'm
12   just going to stop.  I remember those, and it's very
13   possible there was someone else there, but I don't
14   recall.
15   Q.      Okay.  What was the -- what can you recall
16   about those conversations?
17   A.      Obviously everyone was very upset.  Everyone
18   felt violated and disappointed.  I can't -- I -- just
19   really, really disappointed that something like this
20   happened with a radio person.  And, understandably, her
21   mother was very upset and angry and she wanted me to
22   make sure that I communicated with the radio station
23   the next day.
24   Q.      Did she express why she wanted you to
25   communicate with the radio station?
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 06/29/2016                          Page 24

```
 1   A.        Yes.
 2             MR. BALDRIDGE:  Object to the form.  Go
 3   ahead.
 4   BY MR. MCFARLAND:
 5   Q.        And why was that?
 6   A.        She wanted Mr. Mueller to be -- to not be in
 7   radio anymore, to be fired.
 8   Q.        And is that the same thing that you wanted?
 9   A.        That I wanted?
10   Q.        Yes.
11   A.        No, in the sense that I wanted, for lack of a
12   better term, justice to be served in the sense that I
13   wanted his employer to be aware of what had happened.
14   Q.        And did you call his -- Mr. Mueller's employer
15   the next day?
16   A.        The next morning.
17   Q.        Who did you call?
18   A.        Bob Call.
19   Q.        And how did you determine to contact Bob Call?
20   A.        Because I knew him to be the general manager
21   of the radio station and the executive who would be in
22   a position to deal with a matter of this nature.
23   Q.        Did you have a conversation with Mr. Call on
24   June 3rd about Mr. Mueller?
25   A.        Yes.
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 06/29/2016
Page 25

```
 1   Q.        And what did you tell Mr. Call?
 2   A.        I asked him if he was aware of what had
 3   happened at the show the previous night, and my
 4   recollection is that he said he was aware, he had heard
 5   from Eddie, his program director.  They had
 6   communicated.  And I expressed to him great
 7   disappointment that we had that this happened,
 8   especially a representative of KYGO, and that -- you
 9   know, I said, "I know what type of person you are, I
10   know what kind of company Lincoln Financial is, and I
11   know that you all will do your homework and make your
12   own independent determination of what to do here."
13   Q.        Did you tell Mr. Call that you and Taylor's
14   mother and Taylor and the management team expected
15   Mr. Call to take appropriate action?
16             MR. BALDRIDGE:  Objection.
17   Mischaracterizes his testimony.  Go ahead.
18             THE WITNESS:  Oh, okay.  Sorry.
19             MR. BALDRIDGE:  Yeah, I'll tell you if
20   there is an instruction not to answer.  Why don't we
21   ask the question again so it's fresh in your mind or
22   have it reread.
23             MR. MCFARLAND:  Would you reread that for
24   us?
25             THE COURT REPORTER:  "Question:  Did you
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 06/29/2016                                          Page 26

```
 1   tell Mr. Call that you and Taylor's mother and Taylor
 2   and the management team expected Mr. Call to take
 3   appropriate action?"
 4             MR. BALDRIDGE:  Same objection.  Form.
 5             THE WITNESS:  Yes.
 6   BY MR. MCFARLAND:
 7   Q.        And what did you mean by "appropriate action"?
 8   A.        I meant that they should investigate, do their
 9   homework, and based on whatever they found, whatever
10   they learned, to take the appropriate action.
11   Q.        Did you tell Mr. Call that Mr. Mueller had
12   groped Ms. Swift?
13   A.        I don't know if I used the term "groped" or
14   not, but I certainly would have characterized what had
15   happened.
16   Q.        Do you remember how you characterized it?
17   A.        No.
18   Q.        Do you recall how long that phone call lasted?
19   A.        Maybe -- I mean, there would be phone records
20   to verify, but I -- five to ten minutes.
21   Q.        Can you recall anything else about the
22   conversation that you had with Mr. Call during that
23   telephone call?
24   A.        Yes.  I told him that there was photographic
25   evidence, and Mr. Call requested that I send him that
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 06/29/2016

Page 27

```
 1   photograph.  And I explained I could not do that, I
 2   needed to secure permission from my superiors in order
 3   to do that but I would check on it.
 4   Q.      Can you recall anything else about your
 5   conversation with Mr. Call during that telephone call?
 6   A.      No.
 7   Q.      Before you made that phone call to Mr. Call at
 8   KYGO, did you talk to Gabby Liddicoat about what she
 9   saw during the alleged incident?
10           MR. BALDRIDGE:  Objection.  Form.
11           THE WITNESS:  I don't recall.
12   BY MR. MCFARLAND:
13   Q.      Before you made that phone call, did you talk
14   to Stephanie Simbeck about what she saw during the
15   alleged incident?
16           MR. BALDRIDGE:  Objection.  Form.
17           THE WITNESS:  Any conversation with
18   Stephanie would have taken place in that earlier
19   meeting.
20   BY MR. MCFARLAND:
21   Q.      Do you recall talking to Stephanie about what
22   she saw at the time of the alleged incident?
23           MR. BALDRIDGE:  Objection.  Form.
24           THE WITNESS:  Yes.
25   BY MR. MCFARLAND:
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 06/29/2016                          Page 32

```
 1              THE COURT REPORTER:  "Question:  Can you
 2   recall taking any other action after your June 3rd,
 3   2013, call with Bob Call?"
 4              MR. BALDRIDGE:  Objection.  Form.
 5              THE WITNESS:  The only other action I
 6   recall is I sent Mr. Call the photograph.
 7   BY MR. MCFARLAND:
 8   Q.     Do you remember when you did that?
 9   A.     I don't remember the time.  I'm sure that's
10   available somewhere.
11   Q.     Okay.  And prior to sending that photograph,
12   did you get any kind of promise that it wouldn't be
13   disseminated?
14              MR. BALDRIDGE:  Objection.  Form.
15              THE WITNESS:  Yes.
16   BY MR. MCFARLAND:
17   Q.     And who did that come from?
18   A.     When I spoke to Bob Call, I explained it's
19   very sensitive, we don't want this photograph following
20   her for the rest of her life, and he agreed to keep it
21   private within their company and not to post it
22   publicly or anything like that.
23   Q.     Do you believe that the photograph shows that
24   Mr. Mueller is actually inappropriately touching
25   Ms. Swift at the time the photograph was taken?
```

DTI Court Reporting Solutions - Washington, DC
1-800-292-4789              www.deposition.com/washington-dc.htm

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 06/29/2016 Page 33

```
 1   A.        What I see in that photograph is Taylor
 2   withdrawing from Mr. Mueller, which is, by my
 3   experience, really unusual.  I have seen her meet
 4   hundreds, if not thousands of people, and she just --
 5   she loves everybody, and what was distinctive about
 6   that photograph to me was in addition to where his hand
 7   appeared to be, she was trying to get away from him.
 8   It was very unusual.  It was -- it got my attention.
 9   Q.        Do you recall having any conversations with
10   Mr. Mueller -- about Mr. Mueller after your June 3rd,
11   2013, phone call with Bob Call?
12   A.        I'm trying to rattle my brain here.  Not
13   really, I mean, other than internal, you know, there
14   may have been a conversation, you know, did you talk to
15   Bob Call, yes, thank you, that sort of thing with her
16   mother, something like that.
17   Q.        Okay.  Why didn't you call the police?
18             MR. BALDRIDGE:  Objection.  Form.
19   Foundation.
20             THE WITNESS:  That would not have been my
21   role in that situation.
22   BY MR. MCFARLAND:
23   Q.        Did you ever contemplate whether the police
24   should be called?
25             MR. BALDRIDGE:  Objection.  Form.
```

```
 1   sure.
 2   BY MR. MCFARLAND:
 3   Q.       But nobody else?
 4   A.       Not that I recall, no.
 5   Q.       Who told you or instructed you to contact KYGO
 6   about the incident with Mr. Mueller?
 7            MR. BALDRIDGE:  Objection.  Asked and
 8   answered.
 9            THE WITNESS:  I don't think anyone
10   specifically told me to call KYGO.  I mean, I knew to
11   call.  I knew who his supervisor was and that's -- but
12   I don't think anyone would have known his name.
13            THE COURT REPORTER:  I'm sorry?
14            THE WITNESS:  I don't think anyone else
15   there would have known Bob Call's name, would have
16   known to say call him, that sort of thing.
17   BY MR. MCFARLAND:
18   Q.       Who instructed you to contact KYGO about the
19   alleged incident with Mr. Mueller?
20            MR. BALDRIDGE:  Objection.  Asked and
21   answered.
22            THE WITNESS:  I don't recall.
23   BY MR. MCFARLAND:
24   Q.       Was that a decision you made on your own?
25            MR. BALDRIDGE:  Objection.  Asked and
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 06/29/2016                                    Page 37

 1    answered.
 2              THE WITNESS:  No.  My recollection is
 3    that we wanted to -- that we wanted to bring the events
 4    of that night to the attention of the radio station.  I
 5    knew to call Bob Call.
 6    BY MR. MCFARLAND:
 7    Q.      And who is "we"?
 8    A.      We would be the -- I guess the management
 9    team, which would include her mother and anyone else
10    who would have been there.
11    Q.      Robert Allen?
12    A.      Sure.
13    Q.      Anybody else?
14    A.      I don't -- I don't think so.
15    Q.      How about Taylor?  Before you called Bob Call,
16    did you talk to Taylor about what she wanted?
17              MR. BALDRIDGE:  Objection.  Form.
18              THE WITNESS:  No.
19    BY MR. MCFARLAND:
20    Q.      Did anybody relay to you what Taylor wanted to
21    see happen before you reached out to KYGO?
22              MR. BALDRIDGE:  Objection.  Form.
23              THE WITNESS:  No.
24    BY MR. MCFARLAND:
25    Q.      When you called Bob Call, were you calling on

```
                CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
                       FRANCIS BELL - 06/29/2016                    Page 54
```

  1    Jackson was going to the media?

  2              MR. BALDRIDGE:  Objection.  Form.  Calls

  3    for speculation.

  4              THE WITNESS:  I don't know.

  5    BY MR. MCFARLAND:

  6    Q.     Did you do anything with that information?

  7    A.     I don't recall.

  8              MR. MCFARLAND:  That's all I've got.

  9              MR. BALDRIDGE:  Really?

 10              MR. MCFARLAND:  Yes.

 11              MR. BALDRIDGE:  All right, man.

 12              MR. MCFARLAND:  Easy.

 13              MR. BALDRIDGE:  You're an efficient man.

 14              MR. MCFARLAND:  Easy, easy.

 15              MR. BALDRIDGE:  I don't have any

 16    questions.  We're closed and off to the races.

 17              (Deposition concluded at 11:52 p.m.)

 18

 19

 20

 21

 22

 23

 24

 25