# EXHIBIT 16

# In The Matter of:

*MUELLER*
*vs.*
*SWIFT, ET AL.*

_____

*ANDREA SWIFT*
*June 28, 2016*

_____

*CONFIDENTIAL*

*PURSUANT TO THE PROTECTIVE ORDER*

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 1

```
                    * * * * *

          DEPOSITION DESIGNATED CONFIDENTIAL

        PURSUANT TO THE PROTECTIVE ORDER

                 * * * * *


        IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF COLORADO


DAVID MUELLER,                 )
                               )
          Plaintiff,           )
                               )
vs.                            )NO. 1:15-cv-01974-
                               )   WJM-KLM
TAYLOR SWIFT; FRANK BELL;      )
ANDREA SWIFT a/k/a ANDREA      )
FINLAY; SCOTT SWIFT; and JOHN  )
DOES 1 - 5,                    )
                               )
          Defendants.          )
                               )
------------------------------

        Deposition of:

        ANDREA SWIFT

        Taken on behalf of the Plaintiff

        June 28, 2016

        Reported by:  Martha B. Davis, RMR, RDR, CRR
                       LCR No. 152

     Job No.: WDC-090551
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 2

```
1    APPEARANCES:

2    For the Plaintiff:     M. Gabriel McFarland, Esq.
                            Evans & McFarland, LLC
3                           910 13th Street
                            Suite 200
4                           Golden, CO 80401
                            303-279-8300
5                           gmcfarland@emlawyers.com

6    For the Defendants:    J. Douglas Baldridge, Esq.
                            Courtney A. Sullivan, Esq.
7                           Katherine M. Knight, Esq.
                            Venable, LLP
8                           575 7th Street NW
                            Washington, D.C. 20004-1601
9                           202-344-4703
                            jdbaldridge@venable.com
10                          casullivan@venable.com
                            kmwright@venable.com
11
     Also Present:          Jesse Schaudies
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 3

```
 1                        I N D E X

 2    Questions by Mr. McFarland                        5

 3

 4

 5

 6

 7      P R E V I O U S L Y   M A R K E D   E X H I B I T S

 8    DEPOSITION OF STEPHANIE SIMBECK:

 9    No. 3:       Color photograph of Taylor Swift,
                   Gary Mueller and his girlfriend
10                 (SWIFT 0000076)                      41

11    No. 5:       Color photograph of Taylor Swift and
                   Eddie Haskell
12                 (SWIFT 000075)                       42

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

```
 1              The deposition of ANDREA SWIFT was taken by

 2    counsel for the Plaintiff, pursuant to notice, at the

 3    offices of Cleeton Davis Court Reporters, LLC, 402 BNA

 4    Drive, Suite 108, Nashville, Tennessee, on

 5    June 28, 2016, for all purposes under the Federal Rules

 6    of Civil Procedure.

 7              The formalities as to notice, caption,

 8    certificate, et cetera, are waived.  All objections,

 9    except as to the form of the questions, are reserved to

10    the hearing.

11              It is agreed that Martha B. Davis, being a

12    licensed court reporter and notary public for the State

13    of Tennessee, may swear the witness, and that the

14    reading and signing of the completed deposition by the

15    witness are not waived.

16

17

18                           * * *

19

20

21              MR. BALDRIDGE:  Gabe, I'll go ahead and

22    make the same statement we made previously, that just

23    for the sake of clarity, we will mark the entire

24    transcript as confidential under the existing

25    protective order for the reasons previously stated.
```

```
 1                THE COURT REPORTER:  "Answer:  We are."

 2    BY MR. MCFARLAND:

 3    Q.       And what are your duties and responsibilities

 4    generally as part of the senior management team for

 5    Taylor?

 6    A.       Varied.  So many I probably couldn't list them

 7    all, but because we're a team, we handle everything

 8    that you can imagine comes through the door, whether

 9    it's working with partnerships, planning and executing

10    tours, promotion of her albums that come out, travel,

11    security, assistance.  Everything.  Everything that

12    goes along with the management of an artist.

13    Q.       Okay.  Do you recall Taylor's concert in

14    Denver on June 2nd, 2013.

15    A.       Yes, I do.

16    Q.       And prior to that concert, you had never heard

17    of or had any contact with David Mueller; is that

18    correct?

19    A.       That's correct.

20    Q.       You -- well, prior to that concert, did you

21    have any contact with Eddie Haskell?

22    A.       Yes.

23    Q.       Can you tell me about your contact with

24    Mr. Haskell before June 2nd, 2013?

25    A.       My contact would have been through the
```

Page 12

```
 1   BY MR. MCFARLAND:

 2   Q.      Do you know when Taylor first met Eddie

 3   Haskell?

 4   A.      I do not.

 5   Q.      When did you first learn that there had been

 6   an incident involving David Mueller?

 7   A.      As soon as I walked back into Taylor's

 8   dressing room and I saw her.

 9   Q.      And that was on the day of the concert, June

10   2nd?

11   A.      It was the evening, yes.

12   Q.      And was that before or after she had gone on

13   stage?

14   A.      Before.

15   Q.      Was there -- was it just you and Taylor in the

16   dressing room?

17   A.      Yes.

18   Q.      And what did she say?

19   A.      Well, when I walked in, she was devastated.

20   She was horrified.  She was upset.  And I said, "What

21   happened?  What's going on?"

22           And she said, "Mom, I was just at a

23   meet-and-greet and this man grabbed my ass."

24               MR. BALDRIDGE:  Are you okay?

25               THE WITNESS:  No, I think I need a break.
```

```
 1                  MR. BALDRIDGE:  Sure.

 2                  (Recess, 1:12 to 1:14 p.m.)

 3    BY MR. MCFARLAND:

 4    Q.        We were talking about your conversation with

 5    Taylor where you learned about the alleged incident

 6    with Mr. Mueller.  Do you recall Taylor saying anything

 7    else to you about the alleged incident?

 8    A.        Yes.

 9    Q.        And what else do you recall?

10    A.        Well, I started to -- you know, I mean,

11    obviously I started to ask her questions like, "What

12    are you talking about?  What happened?"

13              And she said -- well, of course, you know, the

14    first thing is we -- I ran over and hugged her and we

15    were -- I -- I don't know the order of things because I

16    think we were both absolutely in shock, but I know that

17    there were things that came out like it was in the

18    regular meet-and-greet.

19              "Who was this person?"

20              "I don't know.  I have never met him before."

21              "How did he grab you?"

22              And she said, "He grabbed my entire butt

23    cheek."

24    Q.        Did she mention whether Mr. Mueller went under

25    or over her skirt?
```

1   A.        He was under her skirt grabbing her bare butt

2   cheek.  Bare.

3   Q.        Have there ever been any other incidents at

4   any other meet-and-greets that you're aware of?

5   A.        Never.

6   Q.        What happens next or what do you do next?

7   A.        I was nauseous.  I felt like I wanted to cry

8   and throw up at the same time.  But I wanted to find

9   out more about it and who was this person.  So I went

10  outside and I told her, "I'll be right back.  I need to

11  go find out more about this."

12  Q.        How long do you think your meeting with Taylor

13  lasted?

14  A.        I don't recall.

15  Q.        More or less than five minutes?

16            MR. BALDRIDGE:  Objection.  Speculation.

17            THE WITNESS:  I don't -- I really don't

18  recall.

19  BY MR. MCFARLAND:

20  Q.        Okay.  And what was Taylor's demeanor while

21  you're having this conversation with her?

22  A.        Humiliated.  Embarrassed.  Horrified.  She was

23  upset.  She cried.  We cried.  It was -- it was just

24  inconceivable.

25  Q.        So you -- you meet with Taylor, you learn

```
 1   about the alleged incident, and then you go -- you

 2   leave the dressing room to find out more.  What happens

 3   next?

 4   A.       I went -- I asked to see anyone who knew

 5   anything about it.  Robert.  It ended up that we went

 6   into a side room with Robert, some of the security

 7   people, Erica, Frank, and started to discuss it and try

 8   to figure out what happened.

 9   Q.       And what did you learn?

10   A.       I learned that there had been a picture taken

11   of it happening and they were, I believe, in the

12   process of printing it out, getting it, or they had it

13   on a -- I don't recall.  They were getting it and we

14   were trying to figure out where this person was in the

15   building.

16   Q.       Okay.  And Erica, you recall, was there for

17   this portion?

18   A.       Yes.

19   Q.       And some security people?

20   A.       Yes.

21   Q.       Do you know the names of the security people

22   out there?

23   A.       I believe it was Greg Dent and Craig -- what's

24   Craig's last name?

25   Q.       Thomas?  Thomas?
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 19

```
 1    finding this person and getting him -- locating him.

 2    BY MR. MCFARLAND:

 3    Q.        Was there any indication during this meeting

 4    that Mr. Mueller was affiliated with KYGO?

 5    A.        Yes.

 6    Q.        And do you know where that information came

 7    from?

 8    A.        I believe it was Frank Bell.

 9    Q.        So Frank Bell was at the meeting as well?

10    A.        Yes, he was.

11    Q.        So Erica, Greg Dent, Craig Thomas, Robert

12    Allen, Frank Bell.  Anybody else that you can recall at

13    that meeting?

14    A.        No.

15    Q.        Can you recall anything else about that

16    meeting that we haven't talked about?

17              MR. BALDRIDGE:  Objection.  Form.  Go

18    ahead.

19              THE WITNESS:  We were all very upset.

20    This is something that had never happened to us before.

21    We didn't know necessarily what to do in that moment,

22    and when you asked me about do I recall what so-and-so

23    said, we were, all of us, devastated and desperately

24    trying to figure out what to do next.  I didn't want

25    him in the building watching her show.  He had just
```

```
 1    molested her.  I didn't want him to be able to watch

 2    her in that show.

 3    BY MR. MCFARLAND:

 4    Q.       Okay.  Was there a plan of action formulated

 5    at that meeting?

 6    A.       Yes.

 7    Q.       And what was the plan?

 8    A.       To locate him and escort him from the

 9    building.

10    Q.       And that task was given to the security

11    personnel?

12    A.       Yes.

13    Q.       What did you do next?

14    A.       I went back into the dressing room where

15    Taylor was.

16    Q.       And at this point in time, we're how far

17    before the start of the show?

18    A.       We were -- I don't -- I don't remember

19    specifically, but it was within a half an hour of the

20    start of the show.

21    Q.       Did you have any further conversation about

22    the alleged incident?

23              MR. BALDRIDGE:  With whom?  Objection.

24    Form.

25    BY MR. MCFARLAND:
```

```
 1    Q.       Yeah.  What -- after the concert finished on

 2    June 2nd, 2013, did you have additional conversations

 3    relating to Mr. Mueller?

 4              MR. BALDRIDGE:  On that same day, Andrea,

 5    on June 2.

 6              THE WITNESS:  I'm sure I did.

 7    BY MR. MCFARLAND:

 8    Q.       Who do you recall talking to after the concert

 9    about Mr. Mueller?

10    A.       Everyone in our camp.  Absolutely everyone in

11    our camp.  The people that have already been mentioned.

12    Q.       Okay.  So after the concert, the same sort of

13    group gathered?

14    A.       Yes.  We were trying to figure out what to do.

15    Q.       So tell me about -- where did that meeting

16    take place?

17    A.       It wasn't a meeting.  I don't -- I'm sorry if

18    I represented that as a meeting.  It wasn't.  We were

19    all in different places, all talking about the same

20    thing, sometimes two of us, sometimes three of us,

21    sometimes -- it was -- it was bedlam.  We were in panic

22    mode.  We have never had this happen before.  I wasn't

23    keeping track of, okay, I spoke to this guy for two

24    minutes and then I spoke to this person for one minute.

25    I was in shock.  My daughter was molested.  I wasn't
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 25

```
 1    keeping track of who I spoke to when.
 2    Q.        I'm not being critical for what it's worth.  I
 3    can't remember what I did yesterday sometimes, so . . .
 4              Was there a plan of action developed?
 5    A.        We wanted to let the radio station know.  We
 6    didn't want this to happen to anybody else.
 7    Q.        In the back-and-forth conversations that you
 8    had after the show about Mr. Mueller, was Taylor
 9    involved in any of those?
10    A.        No.  I mean, we really didn't want to just
11    keep her -- we were trying to let her recover from it.
12    We were keeping her -- I was keeping her apprised of
13    things that we were doing.
14    Q.        You said we wanted -- something to -- I'm not
15    trying to quote you here but something to the effect of
16    we wanted the radio station to know.  Who is "we"?
17                   MR. BALDRIDGE:  Objection.
18                   THE WITNESS:  All of us.
19                   MR. BALDRIDGE:  Objection.  Form.  Wait.
20                   THE WITNESS:  Sorry.
21                   MR. BALDRIDGE:  That's okay.
22    BY MR. MCFARLAND:
23    Q.        So you wanted to let the radio station know
24    what Mr. Mueller had done?
25                   MR. BALDRIDGE:  Objection.  Form.
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 26

```
 1                    THE WITNESS:  I wanted the radio station

 2     to get the picture and to decide on their own what

 3     Mr. Mueller had done.

 4     BY MR. MCFARLAND:

 5     Q.        And Mr. Bell wanted the same thing?

 6     A.        He agreed it was important to send the picture

 7     to them.

 8     Q.        So the picture that we have been talking about

 9     that was taken -- at least your understanding is that

10     was taken at the precise moment that Mr. Mueller

11     inappropriately touched Taylor?

12                    MR. BALDRIDGE:  Objection.  Form.

13                    THE WITNESS:  No, I don't think.  I think

14     it could -- I think it was an action that we could have

15     gotten 100 shots of and it would have shown what

16     happened.  I think this is one frozen moment in time of

17     what could have taken several shots to capture, so no,

18     I don't think this is the exact moment, but I think

19     there is something very wrong going on in that picture

20     and I think you can see it.

21     BY MR. MCFARLAND:

22     Q.        What do you think is going on in that picture?

23     A.        I think she is pulling away from him and I

24     think he has his hand on her bare buttocks squeezing.

25     Q.        Okay.  Who was in the room at the time
```

1    Mr. Dent or other security personnel were doing?

2              MR. BALDRIDGE:  Objection.  Form.

3              THE WITNESS:  No.

4    BY MR. MCFARLAND:

5    Q.      Did you ever talk to anybody else who claims

6    to have seen Mr. Mueller grab Taylor?

7    A.      No.

8    Q.      Have you ever inquired as to whether there

9    were other witnesses to the alleged grabbing?

10   A.      No.

11   Q.      Was Mr. Dent fired over his failure to act

12   quickly in response to the alleged grabbing?

13   A.      No.

14             MR. BALDRIDGE:  Objection.  Form.

15             THE WITNESS:  No.

16   BY MR. MCFARLAND:

17   Q.      Have you ever talked to Mr. Dent about what he

18   saw during the alleged incident?

19   A.      No.

20             MR. BALDRIDGE:  Objection.  Asked and

21   answered.  Just a little slower, Andrea.

22             THE WITNESS:  Okay.

23   BY MR. MCFARLAND:

24   Q.      Who made the decision to notify the radio

25   station of the alleged incident?

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 29

```
 1   A.        As a group we did.

 2   Q.        And that group would have been you, Robert

 3   Allen, Frank Bell?

 4   A.        Yes.

 5   Q.        Is there anybody else?

 6   A.        No.

 7   Q.        And at that point you knew Mr. Mueller was

 8   employed by KYGO radio?

 9   A.        Yes.

10   Q.        And you wanted him fired for the incident?

11             MR. BALDRIDGE:  Objection.  Form.

12             THE WITNESS:  Absolutely.

13   BY MR. MCFARLAND:

14   Q.        And you expected him to get fired as a result

15   of being notified of the alleged incident?

16             MR. BALDRIDGE:  Objection.  Form.

17             THE WITNESS:  No.  That was their

18   discussion to make.  You asked me if I wanted.

19   BY MR. MCFARLAND:

20   Q.        You didn't think he would get fired?

21             MR. BALDRIDGE:  Objection.  Form.

22             THE WITNESS:  I didn't know if he would

23   get fired.

24   BY MR. MCFARLAND:

25   Q.        Did you know Bob Call before June 2nd, 2013?
```

```
 1    A.         Name again?

 2    Q.         Bob Call.

 3    A.         No.  I may have.  I don't -- if he's in radio,

 4    I may have met him, but I don't --

 5    Q.         You didn't recognize Bob Call as the manager

 6    for the KYGO Radio Station?

 7    A.         I may have met him, but, no, I didn't know who

 8    was -- who was on the other end of the phone at KYGO.

 9    I didn't -- don't know.  I mean, I may know him.

10    Q.         Was there a decision made as to who would

11    contact KYGO?

12    A.         Yes.

13    Q.         And who was the person that was to contact

14    KYGO?

15    A.         Frank Bell.

16    Q.         Do you know when Mr. Bell first contacted KYGO

17    about the alleged incident with Mr. Mueller?

18    A.         I believe it was as soon or within a pretty

19    close time after it happened.

20    Q.         Do you know whether it was the night of the

21    concert or some period of time after that?

22               MR. BALDRIDGE:  Objection.  Speculation.

23               THE WITNESS:  I believe it was the night

24    of the concert.

25    BY MR. MCFARLAND:
```

```
 1                  THE WITNESS:  No.

 2     BY MR. MCFARLAND:

 3     Q.        Did you talk -- other than in the few days

 4     following the June 2nd, 2013, concert, did you talk to

 5     anybody other than Taylor about the alleged incident

 6     with Mr. Mueller?

 7                  MR. BALDRIDGE:  Or counsel.  That

 8     excludes any conversations with counsel, including

 9     Mr. Schaudies.

10                  THE WITNESS:  Her father.

11     BY MR. MCFARLAND:

12     Q.        Anyone else?

13     A.        No.

14     Q.        Did you ever call anyone at KYGO?

15     A.        No.

16     Q.        When did you speak with Scott?

17                  MR. BALDRIDGE:  That would be Scott

18     Swift?

19                  MR. MCFARLAND:  Yes.

20                  THE WITNESS:  That evening.

21     BY MR. MCFARLAND:

22     Q.        The evening of June 2nd?

23     A.        From the show.

24     Q.        And what do you recall from that conversation?

25     A.        A father who . . .
```

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 43

1    Q.        Do you know how photographs taken at the

2    various meet-and-greets are maintained or stored?

3    A.        No.

4    Q.        Let me ask you to look at Deposition Exhibit 5

5    as well.  Do you know who the male in that picture is?

6    A.        Yes.

7    Q.        Who is that?

8    A.        That is Eddie Haskell.

9    Q.        And do you know when that photograph was

10   taken?

11   A.        No.

12   Q.        Did -- when Taylor told you about the alleged

13   incident, did she ask you to do anything?

14   A.        No.

15   Q.        Did you talk to her about contacting the

16   police?

17   A.        No.

18   Q.        Did you talk to her about sending the

19   photograph to KYGO?

20   A.        Yes.

21   Q.        And what was her reaction to that?

22   A.        She felt it was the appropriate thing to do.

23   Q.        Did you have any -- exchange any e-mails with

24   Frank Bell about Mr. Mueller?

25   A.        Not that I'm aware of.

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 49

```
 1    where you're going, what appointments you have,

 2    different things like that?

 3                 MR. BALDRIDGE:  Objection.  Form.

 4                 THE WITNESS:  No, I do not.

 5    BY MR. MCFARLAND:

 6    Q.       Do you have someone that keeps your calendar

 7    for you?

 8    A.       There is -- no, I don't.  My assistant tells

 9    me birthdays.

10    Q.       Did you ever see any of David Mueller's text

11    messages?

12                 MR. BALDRIDGE:  Objection to form.

13    Foundation.  Overly broad.

14                 THE WITNESS:  No.

15                 MR. MCFARLAND:  That's all the questions

16    I have.

17                 THE WITNESS:  Thank you.

18                 (Deposition concluded at 2:17 p.m.)

19

20

21

22

23

24

25
```