# EXHIBIT 17

DRAFT

| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street, Room 256<br>Denver, Colorado 80202 | |
|---|---|
| **DAVID MUELLER,**<br>**Plaintiff**<br>**v.**<br>**TAYLOR SWIFT,**<br>**Defendant** | ▲ **COURT USE ONLY**<br>Case No.:<br>Division: |
| Attorneys for Plaintiff:<br>M. Gabriel McFarland, No. 26167<br>**EVANS & MCFARLAND, LLC**<br>910 13th St., Suite 200<br>Golden, Colorado 80401<br>tel 303.279.8300<br>fax 303.277.1620<br>email: gmcfarland@emlawyers.com | |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff David Mueller, through counsel, M. Gabriel McFarland of Evans & McFarland, LLC, complains against Defendant Taylor Swift as follows:

**PARTIES AND VENUE**

1. Plaintiff Mueller is an individual who is, and at all relevant times was, a resident of Douglas County, Colorado.

2. Defendant is an individual who, upon information and belief, resides in New York. Defendant is subject to the jurisdiction of this Court pursuant to C.R.S. § 13-1-124.

3. Venue is proper pursuant to C.R.C.P. 98(c), as some of the tortious conduct occurred within the City and County of Denver, Colorado, and as Defendant is a nonresident of this state, and Plaintiff designates the City and County of Denver, Colorado as his venue of choice.

Exhibit No.: 5
Deponent: Mueller
Date/RPR: 7/13/16
Hunter + Geist, Inc.

**GENERAL ALLEGATIONS**

4. Mr. Mueller has been a professional on-air radio personality for over 30 years. He is known by the professional pseudonym "Jackson." During his career, Mr. Mueller has met,

DRAFT

interacted with, and been photographed with hundreds of celebrities, including, for example, Sheryl Crow, Gwen Stefani, Britney Spears, Christina Aguilera, Heidi Klum, Fergie, Mariah Carey, Beyonce, Jessica Simpson, and Jennifer Lopez.

5. In January 2013, Mr. Mueller, along with his friend, Ryan "Ryno" Kliesch, was hired by Lincoln Financial Media Company of Colorado ("Lincoln Financial Media") to co-host the "Ryno and Jackson" morning show on Lincoln Financial Media's popular country music radio station, 98.5 KYGO.

6. Mr. Mueller's employment contract was for a term of two years (with an additional optional year), and his base annual salary was $150,000, with the potential for significant additional compensation in the forms of performance bonuses, product endorsement fees, and public appearance fees.

7. Mr. Mueller's position with Lincoln Financial Media required him to introduce musical artists at live performances, conduct interviews with artists backstage, and accompany KYGO listeners to meet-and-greet events.

8. On May 30, 2013, Mr. Mueller and Mr. Kliesch were informed by KYGO Program Director Eddie Haskell that they were required to attend a backstage meet-and-greet with musical artist Taylor Swift on June 2, 2013 at the Pepsi Center in Denver, CO. At that time, Mr. Haskell also informed Mr. Mueller and Mr. Kliesch that they would each be allowed to bring one guest. Mr. Haskell made it clear that he needed to send all the meet-and-greet visitors' names to Ms. Swift's security staff no later than 48 hours prior to the event to allow the security team time to conduct background checks. Mr. Haskell sent a meet-and-greet list to Ms. Swift's security team, including Mr. Mueller, his girlfriend and co-worker Shannon Melcher, and Ryan Kliesch and his wife Alycia.

9. Mr. Mueller and Ms. Melcher arrived at the main entrance of the Pepsi Center at approximately 5:00 p.m. on June 2, 2013, as instructed by Mr. Haskell.

10. Upon arrival, Mr. Mueller and Ms. Melcher discovered that Ryan and Alycia Kliesch and Mr. Haskell were already headed backstage to meet Ms. Swift for the first of two meet-and-greet events. Mr. Mueller was informed that he and Ms. Melcher had passes for the second event, which would begin at the conclusion of the first meet-and-greet.

11. Mr. Mueller and Ms. Melcher joined the second group of meet-and-greet visitors at the security checkpoint leading to the backstage area. This second group appeared to be fans who had won passes through contests, as it included small children, people wearing Taylor Swift t-shirts, and people holding homemade signs.

12. After waiting in line with this group, Mr. Mueller and Ms. Melcher entered a large promotional tent, in which they saw several display cases containing some of Ms. Swift's



stage costumes, and an exit from the large tent that led to a small curtained off area, where Ms. Swift was greeting the people in line, one group at a time. This curtained off enclosure measured approximately twelve feet by twelve feet.

13. Mr. Mueller and Ms. Melcher eventually made it to the entrance of the enclosure and were invited inside by one of Ms. Swift's staff. Ms. Melcher entered first, followed by Mr. Mueller, and was greeted by Ms. Swift. Ms. Melcher showed Ms. Swift a business card and explained that both she and Mr. Mueller were KYGO employees. Ms. Melcher commented that she had enjoyed watching the little girls dance and sing while waiting in line, and that Ms. Swift was a great role model. Ms. Swift complimented Ms. Melcher on the belt she was wearing.

14. During this brief exchange between the two women, Mr. Mueller was standing several feet away. Ms. Swift abruptly announced that it was time to pose for a photo, put her right arm around Ms. Melcher, and turned the two of them toward the photographer. Mr. Mueller was caught off guard by the suddenness of Ms. Swift's actions, but attempted to join the two women for the photo. He took a step toward them, while looking at the photographer, and leaned into the shot just as the photo was snapped; the resulting photo is of Ms. Swift flanked by Ms. Melcher and Mr. Mueller.

15. Ms. Swift then cordially thanked Mr. Mueller and Ms. Melcher for their visit. Ms. Swift gave Ms. Melcher a hug and shook Mr. Mueller's hand. One of Ms. Swift's assistants handed Mr. Mueller and Ms. Melcher autographed head shots of Ms. Swift. In addition, Ms. Melcher was given a card with the code to allow downloading of their group photograph from Ms. Swift's website.

16. Ms. Swift remained pleasant as she bid them goodbye.

17. After exiting Ms. Swift's tent, Mr. Mueller and Ms. Melcher gathered their belongs from the backstage area, and Ms. Melcher remained in the arena while Mr. Mueller went to the KYGO tent outside the Pepsi Center to confirm with Mr. Haskell that Mr. Mueller's duties to the station had been satisfied and to then proceed to the parking lot to put the autographed photos of Ms. Swift in his car.

18. Immediately upon exiting the arena, Mr. Mueller encountered Mr. Haskell. Before Mr. Mueller could speak, Mr. Haskell excitedly told him about his experience meeting Ms. Swift earlier that night. Mr. Haskell stated that Ms. Swift had recognized him and yelled out, "Eddie!" and then had rushed to him and given him a big hug. He then described how he had put his arms around her waist and placed his hands on her buttocks. Mr. Haskell concluded his story by mentioning that, based on how Ms. Swift's buttocks felt, it was likely she wore bicycle shorts under her stage outfits.

19. After his interaction with Mr. Haskell and his trip to the parking lot, Mr. Mueller returned to Ms. Melcher inside the Pepsi Center, and the two proceeded to the walkway at the



back of the main floor of the arena, where they were approached by "Craig," a member of Ms. Swift's security team. Craig stopped Mr. Mueller and accused him of lifting Ms. Swift's skirt with his hand and grabbing her bottom while he and Ms. Melcher were being photographed with Ms. Swift.

20. Security personnel and other members of Ms. Swift's staff surrounded Mr. Mueller and Ms. Melcher, continued verbally abusing them, and informed them Ms. Swift did not want them to attend her concert. Mr. Mueller requested that law enforcement be summoned, but the security personnel refused his request. Mr. Mueller and Ms. Melcher were escorted to an exit door and directed to depart the concert venue.

21. Later that the same evening, prior to the start of Ms. Swift's concert, Mr. Haskell received a telephone call from Kris Lamb, director of promotion for Big Machine Label Group, the entity that records Ms. Swift. Mr. Lamb informed Mr. Haskell there had been "a possible incident" with a KYGO employee and he needed to talk to Mr. Haskell.

22. Mr. Haskell and Mr. Lamb attempted to go backstage and were denied access.

23. Shortly thereafter, Frank Bell, a member of Ms. Swift's management staff, met with Mr. Haskell and showed him the photo of Ms. Swift, Ms. Melcher, and Mr. Mueller, and asked Mr. Haskell to identify Mr. Mueller. Mr. Bell informed Mr. Haskell that Mr. Mueller and Ms. Melcher were "banned for life" from Taylor Swift concerts. Mr. Bell also commented that the alleged incident "reflected negatively on KYGO and radio in general."

24. Mr. Haskell reacted to Mr. Bell's complaint by leaving Mr. Mueller a voice mail informing him he would not appear on the air the following Monday, pending the radio station's investigation of Ms. Swift's allegations.

25. Later in the evening of June 2, 2013, Mr. Haskell was contacted by Scott Borchetta, president of Big Machine Label Group, to complain about Mr. Mueller's alleged misconduct and to comment that Ms. Swift's mother "was livid." Mr. Haskell informed Mr. Borchetta that Mr. Mueller had been suspended.

26. Early in the morning of June 3, 2013, Frank Bell contacted KYGO's general manager, Bob Call. Mr. Bell repeated Ms. Swift's charge of inappropriate physical contact by Mr. Mueller, specifically that Mr. Mueller had lifted Ms. Swift's skirt with his hand and grabbed her bottom. Mr. Bell told Mr. Call that Ms. Swift, her parents, and her staff were very upset. Mr. Bell threatened that KYGO "could be gravely impacted" by the incident. Mr. Bell indicated he would forward the subject photograph to Mr. Call and commented that the photo would be "damning."

27. Mr. Bell telephoned Mr. Call again later in the morning of June 3 and reported that Ms. Swift and her parents were increasingly upset and "looking for specific action." Mr.

DRAFT

Bell also threatened that if KYGO did not take action, the Swifts would do so.

28. Also on June 3, 2013, Mr. Call and Mr. Haskell met with Mr. Mueller to discuss the accusations against him. Mr. Mueller adamantly and consistently maintained that Ms. Swift's accusations were false. Moreover, in the photograph, Ms. Swift is smiling and hugging Ms. Melcher. Although Mr. Mueller's hand is behind Ms. Swift and therefore not visible, it is clear her skirt is in place and is not being lifted by Mr. Mueller's hand. Similarly, Ms. Swift's hand is behind Mr. Mueller and therefore not visible.

29. In the afternoon of June 3, Mr. Call telephoned Mr. Bell and was informed the Swifts "were considering all their options" if KYGO did not "handle" Mr. Mueller.

30. KYGO terminated Mr. Mueller's employment contract on June 4, 2013.

31. On June 10, 2013, Mr. Call received a telephone call from a Westward newspaper reporter, Michael Roberts, seeking information about Mr. Mueller's termination. Although Mr. Call declined to comment, Mr. Roberts referenced Ms. Swift and "touching" and clearly suggested he had information about the allegations against Mr. Mueller.

32. Mr. Mueller steadfastly maintains that no inappropriate contact of any kind occurred between him and Ms. Swift. At all relevant times, the tent was occupied by Mr. Mueller, Ms. Melcher, Ms. Swift, Ms. Swift's photographer, and at least one of Ms. Swift's professionally trained security guards. The contention that Mr. Mueller lifted up Ms. Swift's skirt and grabbed her bottom, while standing with his girlfriend, in front of Ms. Swift's photographer and Ms. Swift's highly trained security personnel, during a company sponsored, VIP, backstage meet-and-greet, is nonsense, particular given that Ms. Swift's skirt is in place and is not being lifted by Mr. Mueller's hand in the photograph.

33. On December 1, and again on December 11, 2014, Mr. Mueller underwent a polygraph examination, during which he responded "No" to questions about whether he had touched Ms. Swift or put his hand under her skirt. The unequivocal results of both polygraph tests were that Mr. Mueller was speaking truthfully when he denied inappropriate contact with Ms. Swift. Mr. Mueller has invited Ms. Swift to undergo a similar polygraph examination. She has declined to do so.

## FIRST CLAIM FOR RELIEF
**(Intentional Interference with Contractual Obligations)**

34. Plaintiff incorporates by reference all foregoing allegations.

35. Plaintiff Mueller had an employment contract with Lincoln Financial Media Company of Colorado.



36. Defendant Swift knew or reasonably should have known of the contract.

37. Defendant Swift, and/or her agents at her direction, by words and conduct intentionally caused Lincoln Financial Media Company of Colorado to terminate its contract with Mr. Mueller.

38. Ms. Swift's interference with Mr. Mueller's contract was improper.

39. Ms. Swift's interference with Mr. Mueller's contract caused him to incur damages and losses.

## SECOND CLAIM FOR RELIEF
**(Tortious Interference with Prospective Business Relations)**

40. Plaintiff incorporates by reference all foregoing allegations.

41. At the time of Defendant Swift's wrongful conduct as set forth above, there was a reasonable likelihood that Plaintiff Mueller's employment contract with Lincoln Financial Media Company of Colorado would be extended, and/or that he would continue to enjoy employment by other radio stations for the remainder of his career.

42. Defendant Swift knew or reasonably should have known of these prospective business opportunities.

43. Defendant Swift, and/or her agents at her direction, by words and conduct intentionally prevented Mr. Mueller from realizing these prospective business opportunities.

44. Ms. Swift's interference with Mr. Mueller's prospective business opportunities was improper.

45. Ms. Swift's interference with Mr. Mueller's prospective business opportunities caused him to incur damages and losses.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

WHEREFORE, Plaintiff demands judgment against Defendant in an amount that will compensate him for his damages, plus pre- and post-judgment interest, costs, attorney fees as allowed by law, and all other relief deemed just and proper by the Court.



Confidential 

DATED this ____ day of February, 2015.

EVANS & MCFARLAND, LLC

*The original signature is on file at Evans & McFarland, LLC*

DRAFT

By: /s/ M. Gabriel McFarland
M. Gabriel McFarland

ATTORNEYS FOR PLAINTIFF

**Plaintiff's Address:**
8801 Creekside Way, #1313
Highlands Ranch, Colorado 80129