## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-01974-WJM-KLM

DAVID MUELLER

      Plaintiff

v.

TAYLOR SWIFT;
FRANK BELL;
ANDREA SWIFT a/k/a ANDREA FINLAY; and
JOHN DOES 1 - 5

      Defendants

---

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
### FOR SUMMARY JUDGMENT

---

Plaintiff David Mueller, through his counsel, M. Gabriel McFarland of Evans & McFarland, LLC, respectfully submits Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment.

### I.    INTRODUCTION

Defendants' motion seeks summary judgment on each of Plaintiff's four claims for relief. There is a fundamental genuine issue of material fact, however, that precludes summary judgment. In short, Ms. Swift contends that during a June 2, 2013 meet-and-greet at the Pepsi Center, Mr. Mueller "put his hand under [her] dress and grabbed [her] bare ass."

Mr. Mueller denies that he put his hand under Ms. Swift's dress or that he grabbed her bare ass, and he steadfastly maintains that no inappropriate contact of any kind occurred. At all relevant times, the tent was occupied by Mr. Mueller, Ms. Swift,

Shannon Melcher, Ms. Swift's photographer, at least two of Ms. Swift's assistants, and at least one of Ms. Swift's professionally trained security guards. Contrary to Defendants' representations, none of the witnesses reported seeing Mr. Mueller put his hand under Ms. Swift's dress and/or grab her bare ass. The contention that Mr. Mueller lifted up Ms. Swift's skirt and grabbed her bare ass (while standing with his girlfriend, in front of Ms. Swift's photographer and other staff, as well as Ms. Swift's highly trained security personnel, during an employer sponsored, VIP, backstage meet-and-greet) defies credibility. This is particularly true given that Ms. Swift's skirt is in place and is not being lifted by Mr. Mueller's hand in the alleged photograph of the incident, and given that Ms. Swift acknowledged in her deposition that Mr. Mueller is not touching her inappropriately in the photograph.

Respectfully, the summary judgment motion should be denied.

## II.     RESPONSE TO MOVANT'S MATERIAL FACTS

1.     Admitted.

2.     Admitted.

3.     Admitted.

4.     Denied. Although the program director at KYGO, testified in his deposition that KYGO terminated Mr. Mueller for violating the morality clause of his contract, he later clarified that statement. More specifically, Mr. Haskell thought the allegation that Mr. Mueller inappropriately touched Ms. Swift was truthful, and KYGO terminated Mr. Mueller for that reason. **Ex. 1** (Haskell deposition at 39:6-37:18.). In addition, Robert Call, Vice-President Marketing Manager for KYGO radio and the person who made the decision to terminate Mr. Mueller, testified that KYGO fired Mr.

2

Mueller based on a combination of three factors: (1) the photograph provided by Frank Bell; (2) comments from Frank Bell, Ms. Swift's manager, to the effect that Mr. Mueller grabbed Ms. Swift ass under her skirt; and (3) Mr. Mueller told Mr. Call that he did not touch Ms. Swift but, if he did, it was incidental or accidental. **Ex. 2** (Call deposition at 6:2-14; 8:20-9:3; 9:4-10:2; 33:9; 33:9-35:22). In other words, KYGO terminated Mr. Mueller because Ms. Swift and her team claimed he "put his hand under [her] dress and grabbed [her] bare ass."

5.    Denied, for the reasons set forth in paragraph 4 above. Moreover, KYGO's so-called investigation was a sham. Mr. Call acknowledged in his deposition that he made no effort to talk to any witness to the alleged incident, including the photographer (Ms. Simbeck) or Ms. Swift's bodyguard (Mr. Dent). **Ex. 2** (Call deposition at 30:16-31-5). Similarly, Mr. Call did not ask Mr. Bell whether he had personally talked to any of the witnesses to the alleged incident. **Ex. 2** (Call deposition at 33:1-4). Mr. Haskell did not know the physical location where the alleged incident took place or the names of the persons who witnessed the alleged incident. **Ex. 1** (Haskell deposition at 29:5-17; 32-14). Mr. Haskell agreed in his deposition that identifying potential witnesses as part of KYGO's so-called investigation would have been a good idea. **Ex. 1** (Haskell deposition at 32:20-33:7).

6.    Ms. Swift contends that during a June 2, 2013 meet-and-greet at the Pepsi Center, Mr. Mueller inappropriately touched her once, by putting his hand under her dress and grabbing her bare ass. (Movants' Ex. 7 at 7:21-8:1). Mr. Mueller denies that he put his hand under Ms. Swift's dress or that he grabbed her bare ass, and he steadfastly maintains that no inappropriate contact of any kind occurred. At all relevant

3

times, the meet-and-greet room was occupied by Mr. Mueller, Ms. Swift, Shannon

Melcher, Ms. Swift's photographer, at least two of Ms. Swift's assistants, and at least

one of Ms. Swift's professionally trained security guards. **Ex. 3** (Swift deposition at

11:20-12:19). Contrary to Defendants' representations, none of the witnesses reported

seeing Mr. Mueller put his hand under Ms. Swift's dress and/or grab her bare ass. *See*

the citations in paragraph 9 below. At the time of the alleged incident, Mr. Mueller was

standing with his girlfriend, in front of Ms. Swift's photographer and other staff, as well

as Ms. Swift's highly trained security personnel. **Ex. 4** (Simbeck deposition at 29:6-

34:11). In the alleged photograph of the incident Ms. Swift's skirt is in place and is not

being lifted by Mr. Mueller's hand. (Movants' **Ex. 14**). In Ms. Swift's deposition, she

acknowledged she cannot tell from the photograph whether Mr. Mueller is touching

bare ass or not, albeit Mr. Mueller's hand is clearly not under her skirt in the

photograph. **Ex. 3** (Swift deposition at 27:4-31:16).

       8.     Admitted. Almost anything is possible. But, again Mr. Mueller denies

that he put his hand under Ms. Swift's dress or that he grabbed her bare ass, and he

steadfastly maintains that no inappropriate contact of any kind occurred.

       9.     Denied.

**Stephanie Simbeck**

     9(a)     Stephanie Simbeck was hired by Taylor Swift's management company,

Firefly Entertainment, Inc., on May 1, 2013. **Ex. 4** (Simbeck deposition at 8:11-21).

     9(b)     When Ms. Swift is on tour, Ms. Simbeck basically runs the meet-and-

greet sessions. **Ex. 4** (Simbeck deposition at 9:4-14).

9(c)    Mr. Mueller and his then girlfriend, Shannon Melcher, attended a meet-and-greet session at Ms. Swift's June 2, 2013 concert at the Pepsi Center in Denver, Colorado. **Ex. 4** (Simbeck deposition at 24:2-12).

9(d)    Ms. Simbeck was present while Mr. Mueller and Ms. Melcher met with Ms. Swift on June 2, 2013. **Ex. 4** (Simbeck deposition at 29:6-11).

9(e)    Ms. Simbeck's role at the meet-and-greet was to take photographs. **Ex. 4** (Simbeck deposition at 34:10-11).

9(f)    She took the photograph of Mr. Mueller, Ms. Melcher, and Ms. Swift. **Ex. 4** (Simbeck deposition at 35:23-36-8).

9(g)    Ms. Swift did not tell Ms. Simbeck that Mr. Mueller put his hand underneath her skirt and Ms. Simbeck did not see Mr. Mueller "put his hand under [her] dress and grabbed [her] bare ass." **Ex. 4** (Simbeck deposition at 39:2-44:5). According to Ms. Simbeck:

> They entered. They had a conversation, very briefly, and then they went to pose for photo. And I remember looking through the lens and seeing Taylor kind of have an uncomfortable, shocked look on her fact and she fell into the female. And I saw a hand behind her butt. And I thought maybe she just kind of had tripped or – you know, on her heels, but my intuition said that it wasn't the case based on the photo.

**Ex. 4** (Simbeck deposition at 39:2-40-2).

9(h)    After Ms. Simbeck checked that eyes were open in the photograph, Mr. Mueller and Ms. Melcher left the meet-and-greet room. *Id.*

9(i)    During the 15-20 minutes after the photograph was taken until the third meet-and-greet concluded, Ms. Swift said nothing about Mr. Mueller or any alleged touching to anyone in the meet-and-greet room including her personal security guard and otherwise gave no indication that there was any problem whatsoever. **Ex. 4** (Simbeck deposition at 40:3-42-2).

9(j)    In the photograph, Mr. Mueller's hand is not under Ms. Swift's skirt and her skirt is not ruffled in any manner. **Ex. 4** (Simbeck deposition at 55:11-17).

**Erica Worden**

9(k)    At the time of the alleged inappropriate touching, Ms. Worden was the road manager for Ms. Swift. **Ex. 5** (Worden deposition at 5:13-23; 6:16-18).

9(l)    Ms. Worden was in at times and out at times while Mr. Mueller and Ms. Melcher met with Ms. Swift on June 2, 2013. **Ex. 5** (Worden deposition at 17:9-23).

9(m)    Ms. Swift did not tell Ms. Worden that Mr. Mueller put his hand underneath her skirt and Ms. Simbeck did not see Mr. Mueller "put his hand under [her] dress and grabbed [her] bare ass." **Ex. 5** (Worden deposition at 20:3-22:13). According to Ms. Worden:

> I invited them in and then I pop[ped] back out to see how many people were in the next group and to let them know about the signed photos, that they couldn't, you know, receive any autographs because we were going to give them a signed photo that Taylor had done earlier in the day for them.
>
> And then as soon as I did that, I popped back in and when I popped back in, Stephanie was taking the photo. I saw that

> Taylor had shifted a little, which looked very odd to me
> because I've done nearly every meet-and-greet since '09 with
> her. And I looked at Stephanie, I asked them to leave, and I let
> the next group come in.

*Id.*

9(m)    After Mr. Mueller and Ms. Melcher left the meet-and-greet room, the meet-and-greet continued as normal. **Ex. 5** (Worden deposition at 20:24-25).

9(n)    Ms. Swift said nothing about Mr. Mueller or any alleged touching to anyone in the meet-and-greet room including her personal security guard and otherwise gave no indication that there was any problem whatsoever until the meet-and-greet had concluded. **Ex. 5** (Worden deposition at 21:1-22:13).

9(o)    "She [Ms. Swift] was completely normal for the rest of them [meeting with other guests.]" **Ex. 5** (Worden deposition at 22:11-13).

9(p)    Ms. Swift told Ms. Worden that Mr. Mueller grabbed her butt, but did not convey that he had put his hand underneath her skirt. **Ex. 5** (Worden deposition at 28:2-8).

**Gabrielle Liddicoat**

9(q)    On June 2, 2013, Ms. Liddicoat worked as Ms. Swift's personal assistant. **Ex. 6** (Liddicoat deposition at 5:8-6:13).

9(r)    Ms. Liddicoat was present while Mr. Mueller and Ms. Melcher met with Ms. Swift on June 2, 2013. **Ex. 6** (Liddicoat deposition at 9:18-20; 11:18-17:21).

9(s)    Her job was mostly to usher people out of the meet-and-greet. **Ex. 6** (Liddicoat deposition at 11:4-11).

9(t)    Ms. Liddicoat did not see Mr. Mueller inappropriate touch Ms. Swift:

Q.    Did you see Mr. Mueller inappropriately touch Ms.

Swift?

A.    No.

Q.    Did you see Mr. Mueller lift her skirt in any manner?

A.    No.

**Ex. 6** (Liddicoat deposition at 16:13-18).

9(u)    Ms. Liddicoat was about seven feet away from Mr. Mueller, Ms. Melcher, and Ms. Swift at the time the photograph was taken. **Ex. 6** (Liddicoat deposition at 16:19-25).

9(v)    During the 20-30 minutes after the photograph was taken until the meet-and-greet concluded, Ms. Swift said nothing about Mr. Mueller or any alleged touching to anyone in the meet-and-greet room including her personal security guard and otherwise gave no indication that there was any problem whatsoever. **Ex. 6** (Liddicoat deposition at 14:24-15:24).

9(w)    At the conclusion of the meet-and-greet, Ms. Swift told everyone in the room something like, "That guy touched my butt." **Ex. 6** (Liddicoat deposition at 15:19-16:7).

9(x)    Ms. Swift did not convey that Mr. Mueller put his hand under her skirt. **Ex. 6** (Liddicoat deposition at 16:8-11).

**Greg Dent**

9(y)    Mr. Dent was Ms. Swift's personal bodyguard at Ms. Swift's June 2, 2013 concert at the Pepsi Center. **Ex. 7** (Dent deposition at 15:18-16:24; 18:21-19:2; 21:4-7).

9(z)    Mr. Dent attended the meet-and-greet with Ms. Swift and was by her side at all pertinent times. **Ex. 7** (Dent deposition at 24:21-25:6; 30:8-31:3; 40:2-41:6).

9(aa)    Mr. Dent was no more than six feet away from Ms. Swift during the meet-and-greet. **Ex. 7** (Dent deposition at 25:7-26:5).

9(bb)    Mr. Dent did not see Mr. Mueller touch any part of Ms. Swift's body other than her back. **Ex. 7** (Dent deposition at 45:10-46:8).

9(cc)    Mr. Dent did not see Mr. Mueller touch Ms. Swift's bottom under her skirt. **Ex. 7** (Dent deposition at 45:22-25).

9(dd)    Mr. Dent did not see Mr. Mueller touch Ms. Swift's bottom. **Ex. 7** (Dent deposition at 47:25-48:2).

9(ee)    Mr. Dent did not do anything in response to his observations while Mr. Mueller and Ms. Melcher were in the meet-and-greet room with Ms. Swift. **Ex. 7** (Dent deposition at 47:2-19).

10.    Admitted.

11.    Admitted.

12.    Denied. The photographer who took the photograph of Mr. Mueller, Ms. Melcher, and Ms. Swift did not see Mr. Mueller's had on Ms. Swift's bottom. See paragraph 9.

13.    Denied. Mr. Dent contends that he saw Mr. Mueller lift up her skirt, but that he did not see any inappropriate touching. Moreover, the other people in the meet-and-greet room did not report seeing Mr. Mueller lift up Ms. Swift's skirt.[1]

14.    Denied. Neither Mr. Mueller nor Ms. Melcher described the photograph as damning or by using a similar term. Moreover, in the alleged photograph of the incident Ms. Swift's skirt is in place and is not being lifted by Mr. Mueller's hand. (Movants' Ex. 14). And, in Ms. Swift's deposition, she acknowledged she cannot tell from the photograph whether Mr. Mueller is touching bare ass or not, albeit it is clear from the picture that his hand in not under her skirt. Ex. 3 (Swift deposition at 27:4-31:16).

15.    Admitted.

16.    Denied. Mr. Mueller was not present and thus does not know about the conversation between her and her mother, but he did not inappropriately touch her. Moreover, the statement in paragraph 16 appears to be inadmissible hearsay evidence.

17.    Denied. Mr. Mueller was not present and thus does not know how Ms. Swift appeared as she purported explained things, if she did, to her mother.

18.    Denied. Mr. Mueller was not present and thus does not know what, if anything, Ms. Andrea Swift relayed to Ms. Swift's senior management team.

19.    Admitted.

20.    Mr. Mueller admits that Mr. Bell contacted his employer, KYGO. Otherwise, the statement in paragraph 20 is denied. Mr. Bell called KYGO to make sure Mr. Mueller was fired. Mr. Bell told Mr. Call that Ms. Swift's mom was very

---

[1] Upon request, Mr. Mueller will supply complete copies of any and all depositions.

upset, and that when he saw the photograph, it would be clear what had happened. **Ex. 2** (Call deposition at 18:13-19-10). Apparently, Mr. Bell did not first talk with Ms. Swift, as she confirmed in her deposition that Mr. Mueller inappropriately touched her on just one occasion, on June 2, 2016, at a meet-and-greet prior to her concert at the Pepsi Center in Denver, Colorado (**Ex. 3** (Swift deposition at 6:8-7:3)); that Mr. Mueller put his hand under her skirt and grabbed her bare ass; there was no inappropriate touching outside of her clothing (**Ex. 3** (Swift deposition at 7:9-20)); and in the photograph Mr. Mueller's hand is clearly not under Ms. Swift's skirt. (Movant's **Ex. 14**).

21.    Denied. Albeit Ms. Andrea Swift said something to the effect that she had no expectation as to what KYGO would do, that position denies logic and common sense. Based on all of the facts and circumstances, the trier of fact could certain conclude that Ms. Andrea Swift expected Mr. Mueller would be fired, which is what she wanted. Ms. Swift's mother, Andrea Swift, testified during her deposition that she (as wanted KYGO to know that Mr. Mueller grabbed Ms. Swift's bottom. **Ex. 8** (Andrea Swift deposition at 24:15-25:6). Ms. Andrea Swift, Frank Bell, and another Swift team member, Robert Allen, made the decision to notify KYGO of the alleged incident. **Ex. 8** (Andrea Swift deposition at 28:24-29:6) At that point, Ms. Andrea Swift knew Mr. Mueller was employed at KYGO and wanted KYGO to fire him. **Ex. 8** (Andrea Swift deposition at 29:7-12).

22.    Mr. Mueller admits that Ms. Swift did not speak to anyone at KYGO about the incident, but otherwise denies that statements in paragraph 22. Based on all of the facts and circumstances, the trier of fact could certain conclude that Ms. Swift's

management team would not contact KYGO without her express or implied permission to do so.

23.     Denied.  Based on all of the facts and circumstances, the trier of fact could certain conclude that Ms. Swift's management team would not contact KYGO without her express or implied permission to do so.

24.     Admitted.

25.     Denied.  Regardless of the number of people at KYGO that were consulted, KYGO did not conduct any meaningful investigation.  See citations at paragraphs 4 and 5 above.

27      Admitted, albeit the statement in paragraph 27 may be inadmissible hearsay evidence.

28      Admitted, albeit the statement in paragraph 28 may be inadmissible hearsay evidence.

29      Denied.  Again, KYGO did not conduct a meaningful investigation into the alleged incident.

30.     Admitted.

31.     Admitted, albeit the statement in paragraph 31 may be inadmissible hearsay.

32.     Denied.  Mr. Bell testified in his deposition that Ms. Andrea Swift was very upset and angry and she wanted him to make sure that he communicated with KYGO the next day.  **Ex. 9** (Bell deposition at 23:15-23).  Per Mr. Bell, Ms. Andrea Swift wanted him to contact KYGO because she wanted Mr. Mueller to be fired.  **Ex. 9** (Bell deposition at 23:24-7).  And, prior to contacting KYGO, Mr. Bell did not bother

to discuss the alleged incident with potential witnesses – i.e., Ms. Liddicoat, Mr. Dent, or Ms. Swift. **Ex. 9** (Bell deposition at 27:7-18). In fact, Mr. Bell did not conduct any investigation into the alleged incident. **Ex. 9** (Bell deposition at 29:20-25). Moreover, Mr. Bell told Mr. Call that he was sure KYGO would do the right thing. **Ex. 2** (Call deposition 18:13-19:18.) Mr. Call took that to mean that Mr. Bell expected KYGO to take "some form of disciplinary action, maybe a suspension, maybe up to and including termination." *Id.*

33.    Admitted. Mr. Mueller has consistently denied that he put his hand under Ms. Swift's skirt and grabbed her bare ass or that any inappropriate touching occurred.

34.    Denied. Mr. Mueller's position has been that he consistently denied that he put his hand under Ms. Swift's skirt and grabbed her bare ass, which is the only inappropriate contact alleged by Ms. Swift, or that any inappropriate touching occurred.

35.    Admitted.

36.    Denied. KYGO did not evaluate the photograph of Ms. Swift – it looked at it and determined that it looked bad, without ever bothering to determine whether any other witness to the alleged incident saw the alleged inappropriate touching or talking to Ms. Swift about the incident. Had KYGO made a reasonable inquiry, it would have learned that she alleges that Mr. Mueller inappropriately touched her on just one occasion, on June 2, 2016, at a meet-and-greet prior to her concert at the Pepsi Center in Denver, Colorado (**Ex. 3** (Swift deposition at 6:8-7:3)); that Mr. Mueller put his hand under her skirt and grabbed her bare ass; there was no inappropriate touching outside of

her clothing (**Ex. 3** (Swift deposition at 7:9-20)); and in the photograph Mr. Mueller's
hand is clearly not under Ms. Swift's skirt.  (Movant's **Ex. 14**).

37.    Admitted.

38.    Denied.  Again, KYGO did not conduct a reasonable investigation into
the alleged incident.

39.    Admitted.

40.    Denied.  Mr. Mueller has not and does not contend that Mr. Haskell
confessed to having inappropriately touched Ms. Swift.

41.    Denied.  Mr. Mueller has not and does not contend that Mr. Haskell
confessed to having inappropriately touched Ms. Swift.

42.    Denied.  Mr. Mueller has not and does not contend that Mr. Haskell
confessed to having inappropriately touched Ms. Swift.

43.    Admitted.

44.    Admitted.

45.    Denied, in that the statement in paragraph 45 is a legal conclusion.

46.    Denied.  He also had no notice from KYGO that they did not want to
extend or exercise the one-year option on his contract.

47.    Denied.  Mr. Call testified in his deposition as follows:

Q    Did you have any intentions of terminating Mr. Mueller
prior to June 2nd, 2013?

A.    No.

Q.    How was he doing as part of the KYGO morning show?

A.      It was a team show.  They came together, and the
evaluation is sort of the sum of the parts.  We had made it very
clear to both Ryan and to David that this was an 18-month
process.  We wanted them to go slowly in terms of developing
their personalities on KYGO.

KYGO had a long-standing morning show in there for decades.
And this was quite a change, one that we felt both was
appropriate at the time and would be good for the radio station.
I am confident that we never discussed any sort of benchmarks
at six months.  I do believe the station morning show improved
a couple of rank positions between maybe January when they
started and June – not substantially, but we weren't expecting
that.  It was longer-term evaluation.

**Ex. 2** (Call deposition at 10:18-11:12)

48.      Denied.  Prior to June 2, 2013, Mr. Haskell did not want to fire Mr.
Mueller or Mr. Kliesch, and he did not lobby the company to fire them.  **Ex. 1** (Haskell
deposition at 15:11-16:7).  Prior to June 2, 2013, Mr. Haskell did not document any
problems with Mr. Mueller.  *Id.*

49.      Denied.

50.      Admitted.

51.      Denied.

52.      Admitted.

53.      Admitted.

54.    Admitted.

55.    Admitted.

56.    Admitted.

57.    Denied.  Surely, Defendants understood that as an on-air personality there were consistently endorsement opportunities.

58.    Admitted.

59.    Denied.  Again, Mr. Mueller's position has been that he consistently denied that he put his hand under Ms. Swift's skirt and grabbed her bare ass, which is the only inappropriate contact alleged by Ms. Swift, or that any inappropriate touching occurred.

## III.    STATEMENT OF ADDITIONAL DISPUTED FACTS

1.    Ms. Simbeck testified at her deposition that she saw Mr. Mueller's hand on Ms. Swift's ass (over her clothing) and that the photograph shows Mr. Mueller's hand touching Ms. Swift's ass (again, over her clothing).  **Ex. 4** (Simbeck deposition at 47:23-25; 54:7-16).  Ms. Swift, however, made clear in her deposition that Mr. Mueller did not touch her bottom over, or outside, of her clothing.  **Ex 3** (Swift deposition at 7:9-20).

2.    Ms. Simbeck signed a written employment contact with Firefly Entertainment, Inc. on April 16, 21013.  **Ex. 4** (Simbeck deposition at Depo. Ex. 2)

2.    Ms. Worden testified at her deposition that the photograph shows Mr. Mueller's hand touching Ms. Swift's ass (again, over her clothing).  **Ex. 5** (Worden deposition at 27:11-17.  This is contrary to Ms. Swift's testimony, that that Mr. Mueller did not touch her bottom over, or outside, of her clothing.  **Ex. 3** (Swift deposition at

7:9-20). Ms. Swift also acknowledged she does not know whether Mr. Mueller is touching her bottom in the photograph, albeit her skirt is clear not ruffled in the photograph and, again, she admits Mr. Mueller did not touch her bottom over here clothes. **Ex ___** (Swift deposition at 28:14-31:16).

    3.    Prior to talking to Frank Bell about the June 2, 2013 incident, Mr. Bell had no intention of terminating Mr. Mueller or Mr. Kliesch. **Ex. 2** (Call deposition at 10:18-20; 12:8-21). Prior to June 2, 2013, Eddie Haskell, the program director for KYGO, had not voiced any concerns about Mr. Mueller's performance as part of the KYGO morning show. **Ex. 2** (Call deposition at 11:13-12:4).

    4.    During Mr. Call's meeting with Mr. Mueller, Mr. Mueller denied the incident occurred; indicated that if there were cameras it would vindicate him; that his hand was not near Ms. Swift's body; and that the picture looks the way it does because he was drawn in at the last second. **Ex. 2** (Call deposition at 29:10-23).

    5.    Eddie Haskell was hired as the program director for KYGO radio in February 2013. **Ex. 1** (Haskell deposition at 13:14-23). He was in charge of the morning show and Mr. Mueller's and Mr. Kliesch's boss? *Id.*

    6.    KYGO's so-called investigation consisted of talking to Frank Bell, looking at the photograph, and talking to Mr. Mueller. **Ex. 1** (Haskell deposition at 28:7-24).

    7.    In his deposition, Mr. Haskell admitted that he hugged Ms. Swift on June 2, 2013 and that he later commented to Mr. Mueller that Ms. Swift "must wear bike shorts or something under her dress. . . ." **Ex. 1** (Haskell deposition at 60:23-61:10.)

8.    Ms. Andrea Swift never talked to Ms. Swift's personal body guard about what he saw or did not see during the alleged incident.  **Ex. 8** (Andrea Swift deposition at 27:23-28:13).

9.    Frank Bell is employed by 13 Management, LLC, which is owned 100% by Ms. Swift; he works as her radio guy.  **Ex. 9** (Bell deposition at 5:16-6:3; 37:25-38:10 ).

10.    Ms. Swift's management team, including Mr. Bell, Mr. Allen, and Ms. Andrea Swift, made the decision to contact KYGO about the alleged incident.  **Ex. 9** (Bell deposition at 36:18-37-18).

11.    Ms. Swift also acknowledges that in the 15-30 minutes between the time Mr. Mueller and his girlfriend left the meet-and-greet area, she did nothing to suggest to her body guard or the other members of her team that there had been any problem.  **Ex. 3** (Swift deposition at 10:3-11:22).

12    At all times while Mr. Mueller was in the meet-and-greet room with Ms. Swift, at least four members of her team remained in the room, including her private body guard; after Mr. Mueller and his girlfriend left the meet-and-greet room; at least four members of Ms. Swift's team remained in the room, including her private body guard.  **Ex. 3** (Swift deposition at 11:20-12:19).

## IV.    STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *See* C.R.C.P. 56(c); *Aspen Wilderness Workshop, Inc. v. Colorado Water Conservation Board*, 901 P.2d 1251 (Colo. 1995).  Whenever summary judgment is sought, the moving party

must establish the basis for the motion and identify the portions of the pleadings, the

exhibits, and the affidavits, if any, that demonstrate the absence of a genuine issue of

material fact.

The evidence must be viewed in the light most favorable to the party opposing

the motion. *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 712-13 (Colo. 1987).

Any doubt as to the existence of a triable question of fact must be resolved in favor of

the nonmoving party. *Greenwood Trust Co. v. Conley*, 938 P.2d 1141, 1149 (Colo.

1997). Summary judgment is to be granted only if there is a complete absence of any

genuine fact, and a litigant should not be denied a trial if there is the slightest doubt as

to the facts. *Pioneer Sav. & Trust, F.A. v. Ben-Shoshan*, 826 P.2d 421, 425 (Colo. App.

1992).

## V.    DISCUSSION

### A.    Sufficient facts exist to establish Mr. Mueller's' tortious interference claims.

The elements of a tortious interference with contract claim are: (1) the plaintiff

had a contract; (2) defendant knew or reasonably should have known of the contract;

(3) defendant by words or conduct, or both, intentionally the contracting party to

terminate the contract; (4) defendant's interference with the contract was improper; and

(5) the defendant's interference with the contract caused the plaintiff damages. CJI-Civ.

24:1. The elements of a tortious interference with prospective business relations claim

are nearly identical. *Zimmer Spine, Inc. v. EBI, LLC*, 2011 WL 4089535, at * 2 (D.

Colo. Sept. 14, 2011). In an effort to avoid resolution on the merits, Defendants make

several insupportable arguments.

First, Ms. Swift claims she did not have knowledge of Mr. Mueller's contact

with KYGO. If Ms. Swift did not know of the contract, certainly she should have

reasonably known that Mr. Mueller's relationship with KYGO was governed by an

employment contract. Ms. Swift is in charge of multi-million dollar business

enterprise, owns her own management company, Firefly Entertainment, LLC, and hires

people via written contracts to work for her. In addition, basic common sense allows

the trier of fact to make reasonable inferences to satisfy this element. Really, Ms. Swift

and the other Defendants did not understand that Mr. Mueller had an employment

contract, even though they repeatedly telephoned the station to advise that "the Swifts

'were considering all their options' if KYGO did not 'handle' Mr. Mueller?"

Moreover, consistent with the general rule, the knowledge of Ms. Swift's agents,

including her mother and Mr. Bell, are imputed to her.

Second, Ms. Swift contends that she did not intentionally or improperly

interfere with Mr. Mueller's contract. Assuming the trier of fact determines, as Mr.

Mueller maintains, that he did not put his hand under Ms. Swift's skirt and grab her

bare ass, as she alleges, certainly contacting Mr. Mueller's employer to falsely accuse

him of inappropriately touching her is improper. As Ms. Swift has testified, she

contacted her management, who she trusted to handle the situation appropriately. **Ex. 3**

(Swift deposition at 46:3-12).

Third, Ms. Andrea Swift and Mr. Bell contend that they did nothing improper

and did not intend to interfere with Mr. Mueller's contact. The evidence suggests

otherwise. Mr. Bell and Ms. Andrea Swift were part of the management team that

decided to contact Mr. Mueller's employer. Mr. Bell testified in his deposition that Ms.

Andrea Swift was very upset and angry and she wanted him to make sure that he communicated with KYGO the next day. **Ex. 9** (Bell deposition at 23:15-23). Per Mr. Bell, Ms. Andrea Swift wanted him to contact KYGO because she wanted Mr. Mueller to be fired. **Ex. 9** (Bell deposition at 23:24-7). And, prior to contacting KYGO, Mr. Bell did not bother to discuss the alleged incident with potential witnesses – i.e., Ms. Liddicoat, Mr. Dent, or Ms. Swift. **Ex. 9** (Bell deposition at 27:7-18). In fact, Mr. Bell did not conduct any investigation into the alleged incident. **Ex. 9** (Bell deposition at 29:20-25). Moreover, Mr. Bell told Mr. Call that he was sure KYGO would do the right thing. **Ex. 2** (Call deposition 18:13-19:18.) Mr. Call took that to mean that Mr. Bell expected KYGO to take "some form of disciplinary action, maybe a suspension, maybe up to and including termination." *Id.*

Moreover, Mr. Call decided to terminate Mr. Mueller based on a combination of three factors: (1) the photograph provided by Frank Bell; (2) comments from Frank Bell, Ms. Swift's manager, to the effect that Mr. Mueller grabbed Ms. Swift ass under her skirt; and (3) Mr. Mueller told Mr. Call that he did not touch Ms. Swift but, if he did, it was incidental or accidental. **Ex. 2** (Call deposition at 6:2-14; 8:20-9:3; 9:4-10:2; 33:9; 33:9-35:22). In other words, KYGO terminated Mr. Mueller because Ms. Swift and her team claimed he "put his hand under [her] dress and grabbed [her] bare ass."[2]

Further, Defendants argue that Mr. Mueller's prospective relationship claim must fail because: (1) there is no reasonable likelihood that a contract would have resulted; (2) Defendants did not know of the prospective relationships. As to the former, Mr. Mueller identified an optional one-year extension of his contract with KYGO, and appearance with

---

[2] As an aside, again, Mr. Mueller does not contend that Mr. Haskell inappropriately touch Ms. Swift or acknowledge that someone inappropriately touched her.

certain vendors. Mr. Mueller will testify at trial that he believes KYGO would have exercised the one year option given the shows improving performance and that he would have had appearances with the identified vendors. And, of course, Mr. Call and Mr. Haskell testified in their depositions that they had no problems or issues with Mr. Mueller prior to June 2, 2013. With respect to the later, again, Defendants knew or certainly should have known that Mr. Mueller was operating under an employment contract that could be impacted by the false accusations of inappropriately touching Ms. Swift and that making such false allegations could impact endorsement deals typically for on-air radio personalities.

**B.    Plaintiff's Slander Per Se and Slander Per Quod claims are not time barred.**

On June 2, 2013, Plaintiff attended a backstage meet-and-greet with Taylor Swift at the Pepsi Center in Denver, Colorado. Later than same evening, Ms. Swift accused Mr. Mueller of inappropriately touching her, and in the days that followed, Ms. Swift and the other Defendants intentionally caused Lincoln Financial Media Company of Colorado to terminate its contract with Plaintiff.

Plaintiff filed his initial complaint in District Court for the City and County of Denver against Ms. Swift on May 29, 2015, almost two years later. Plaintiff's initial complaint included just two claims, tortious interference with contract and tortious interference with prospective business advantage. The statute of limitations in Colorado for both tortious interference claims is two years. C.R.S. § 13-80-102(1)(a).

Plaintiff filed an amended complaint in District Court for the City and County of Denver on June 1, 2015.[3] Generally, the amended complaint named additional Defendants

---

[3] Plaintiff added the other Defendants, in part, to avoid the scenario where Ms. Swift denied knowledge of her parents', managers', and handlers' actions after the statute of limitations to bring claims against the other Defendants had run.

and added related allegations against them. Again, it included just the two tortious interference claims.

On October 28, 2015, Defendants answered Plaintiff's amended complaint, and Ms. Swift asserted counterclaims for assault and battery. The statute of limitations in Colorado for both assault and battery claims is one year. C.R.S. § 13-80-103(1)(a).

Initially, Plaintiff thought Ms. Swift's counterclaims were barred by the one-year statute of limitations, as she failed to bring the claims until more than two years after she knew or should have known of her assault and battery claims.

Colorado, however, has a claim revival statute. *See* C.R.S. § 13-80-109. The claim revival statute allows a party to revive a stale claim in response to a complaint or counterclaim:

> Except for causes of action arising out of the transaction or occurrence which is the subject matter of the opposing party's claim, the limitation provisions of this article shall apply to the case of any debt, contract, obligation, injury, or liability alleged by a defending party as a counterclaim or setoff. A counterclaim or setoff arising out of the transaction or occurrence which is the subject matter of the opposing party's claim shall be commenced within one year after service of the complaint by the opposing party and not thereafter.

C.R.S. § 13-80-109.

Just as a plaintiff may be exposed to the assertion of a stale claim by initially filing a complaint, a defendant may be exposed to a stale claim by asserting a counterclaim in a responsive pleading. Thus, just as Plaintiff revived Ms. Swift's ability to bring stale assault and battery counterclaims, Ms. Swift revived Plaintiff's ability to bring stale defamation claims.

## VI.    CONCLUSION

At the very least, there are genuine issues of material fact that preclude summary judgment as a matter of law on Mr. Mueller's claims for relief.  Accordingly, Defendants' motion for summary judgment should be denied.

WHEREFORE, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss.

Dated this 31st day of October, 2016.

Respectfully submitted,

EVANS & MCFARLAND, LLC

By: s/ M. Gabriel McFarland
M. Gabriel McFarland
Evans & McFarland, LLC
910 13th St., #200
Golden, CO 80401
Telephone: 303.279.8300
Facsimile: 303.277.1620
Email: gmcfarland@emlawyers.com

ATTORNEYS FOR PLAINTIFF

**Declaration Under Penalty of Perjury**

I, David Mueller, declare under penalty of perjury that the foregoing is true and correct as of today's date.

Dated: _____          _____
David Mueller

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2016, **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS; MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of Court using the CM/ECF system and the same served via e-mail upon at least the following:

J. Douglas Baldridge (jbaldridge@venable.com)
Courtney A. Sullivan (casullivan@venable.com)
Katherine M. Wright (kmwright@venable.com)

s/M. Gabriel McFarland
M. Gabriel McFarland