**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
for the
District of Colorado

Civil Action No. 1:15-CV-01974-WJM-KLM

===============================================================

DAVID MUELLER,

                         Plaintiff,

v.

TAYLOR SWIFT; FRANK BELL;
ANDREA SWIFT, A/K/A ANDREA FINLAY;
SCOTT SWIFT; ET AL.

                         Defendants.

===============================================================

PURSUANT TO SUBPOENA AND THE COLORADO AND FEDERAL RULES OF CIVIL PROCEDURE, the deposition of ROBERT CALL was taken by Plaintiff David Mueller by and through his attorney, M. Gabriel McFarland, Esq. at the offices of Evans & McFarland, LLC, 910 Thirteenth Street, Suite 200, Golden, Colorado, beginning at the hour of 2:28 p.m. MDT on Thursday, July 14, 2016, recorded stenographically by Merry P. Boslough, A/K/A Pat Boslough, Professional Court Reporter and Notary Public for the State of Colorado.

                    * * * * *

2

APPEARANCES

For the Plaintiff:

    M. Gabriel McFarland, Esq.
    EVANS & McFARLAND, LLC
    910 Thirteenth Street
    Suite 200
    Golden, Colorado  80401
    gmcfarland@emlawyers.com
    (303)279-8300 x 2

For the Defendants Taylor Swift, Frank Bell, Scott Swift and Andrea Swift:

    J. Douglas Baldridge, Esq. &
    Katherine M. Wright, Esq.
    VENABLE LLP
    575 Seventh Street, NW
    Washington, D.C.  20004
    jdbaldridge@venable.com
    kmwright@venable.com
    (202)344-8300

For Bonneville International/Deponent:

    Michael L. Dowdle, Esq.
    SVP Business Affairs and General Counsel
    BONNEVILLE INTERNATIONAL
    55 North 300 West
    Salt Lake City, Utah  84180
    mdowdle@bonneville.com
    (801)575-5874

For Entercom Communications Corporation/Deponent:

    Michael E. Dash, Esq.
    Deputy General Counsel
    ENTERCOM COMMUNICATIONS CORPORATION
    401 City Avenue, Suite 809
    Bala Cynwyd, Pennsylvania  19004
    mdash@enternet.com
    (610)660-5610

Also Present:  None

            *   *   *   *   *

3

1                           EXHIBIT INDEX
2
       Exhibit No.          Description              Initial Mention
3                                                         Page
4
           1      "Notes from Jackson conversations."        59
5
                  Typewritten notes produced by
6
                  Robert Call detailing the sequence of
7
                  events following alleged incident
8
9
10
11
                            EXAMINATION INDEX
12
13         Examination by Mr. McFarland:                     4
14
           Examination by Mr. Baldridge:                    --
15
16         Examination by Mr. Dowdle:                       --
17
           Examination by Mr. Dash:                         --
18
19         Examination by Ms. Wright:                       --
20
21
22
23                          *  *  *  *  *
24
25

**Page 4**

PROCEEDINGS

ROBERT CALL, being first duly sworn to the above cause to which he answered, "I do," was examined and testified as follows:

EXAMINATION

BY MR. McFARLAND:

Q  Good afternoon. Would you state your full name for the record, please?

A  Robert Bradford Call.

MR. BALDRIDGE: We'll go ahead and do our usual, Gabe, and mark this as confidential and under protected order until further notice.

MR. MCFARLAND: Gotcha.

MR. BALDRIDGE: Thank you.

Q  (By Mr. McFarland) Have you ever been deposed before?

A  I just had that conversation last night. I don't think so. And the reason is there may be a situation with a tower site here on Lookout Mountain back in the early 80s -- maybe.

Q  Okay.

A  It wasn't as formal as this seems to be.

Q  Okay. You understand that you're testifying under oath today?

A  Yes.

**Page 5**

Q  And you understand that the court reporter is writing down my questions and your answers?

MR. DOWDLE: Oh, we need to get Mike Dash back on the line.

MR. MCFARLAND: Oh, I'm sorry. Let's go off the record for a minute.

(Telephone contact was established with Michael Dash, Esq. Off-the-record discussion disclosing what questions had already been asked during the deposition prior to telephone contact being established. Time off the record approximately 2 minutes.)

MR. MCFARLAND: Back on the record.

Q  (By Mr. McFarland) You understand that the court reporter is capturing, writing down, my questions and your answers?

A  Yes.

Q  And for that reason, it's important that you and I try not to talk over each other. If you would do your best to let me finish my question, then I'll do my best to let you finish your answer before I ask the next one. Is that okay?

A  That is okay.

Q  Where do you work?

A  I work at KYGO, a cluster of radio stations now known as Bonneville Denver. And those stations include

**Page 6**

KYGO, KOSI, KKFN The Fan, KEPN-ESPN.

Q  And how long have you been employed by KYGO?

A  Thirty-six years and three weeks.

Q  And your current position?

A  Vice president market manager.

Q  Market manager?

A  Market manager, yes.

Q  And what are your duties and responsibilities in that position?

A  I have overall responsibility for programming, sales, engineering, promotions, making sure that we adhere to all FCC policies, rules, protect the license, overall direction, brand imaging for the radio stations in the community.

Q  How long have you been in that position?

A  I've been in that position since 1989 to do the math real quick on that.

Q  Did you hire Mr. Mueller and Mr. Kliesch?

A  No.

Q  Who hired Mr. Mueller and Mr. Kliesch for the KYGO morning show?

A  Probably -- it was a lengthy process that included our previous program director, John Thomas, and our vice president of programming, John Dimick.

Q  Were you involved in the hiring process in any

**Page 7**

form?

A  Yes.

Q  What was your role?

A  I negotiated with Heather Cohen, Mr. Kliesch' and Mr. Mueller's agent.

Q  When is the last time you spoke with Heather Cohen?

A  It's been some time. I would just take a guess and say at least a year and a half or more.

Q  Did that conversation you had with Ms. Cohen relate to Mr. Mueller?

A  No.

Q  When is the last time you had a conversation with Ms. Cohen regarding Mr. Mueller?

A  I believe that was Tuesday, I want to say the 4th of June, maybe in the late afternoon, possibly into Wednesday morning.

Q  What was the substance of your conversation?

A  I think she called to see if there was anything that could be resolved in terms of the decision. And I think she also intimated that he would be seeking counsel.

Q  Did you talk to her before or after his termination from KYGO?

A  After.

Q  Okay. What was your response to her inquiry

8

1  whether or not anything could be salvaged?
2      A   I don't recall the conversation specifically. I
3  have talked to Heather several times since then, as she
4  has other talent that she represents. I'm sure I told her
5  the answer was no.
6      Q   From your perspective, is Ms. Cohen a good
7  agent?
8      A   I believe so.
9      Q   Do you work well with her? Do you have any
10 problems with her?
11     A   I only worked with her on Ryan Kliesch and
12 David. She has called with opportunities for other talent
13 on our various stations that we might consider that she
14 has. And most recently has sent an e-mail audio to both
15 Eddie Haskell and to me with some possible candidates for
16 a current opening at KYGO.
17     Q   Did you approve the hiring of Mr. Mueller and
18 Mr. Kliesch?
19     A   Yes.
20     Q   Did you make the decision to fire Mr. Mueller?
21     A   Yes.
22     Q   Did you make the decision to fire Mr. Kliesch --
23 I should back up. Was Mr. Kliesch fired?
24     A   No.
25     Q   Did he resign?

9

1      A   Yes.
2      Q   So when did you terminate Mr. Mueller?
3      A   June 4th, 2013.
4      Q   2013? Why did you fire Mr. Mueller on June 4th,
5  2013?
6      A   I fired him based on the fact that I had a
7  picture that Taylor Swift's promotion people had sent
8  that -- at least in my opinion -- represented him in a
9  very uncomfortable place with Taylor.
10         I had direct feedback from her radio management
11 group, Frank Bell, whom I've known for many years, who
12 indicated that Mr. Mueller had during a photo session
13 touched her inappropriately, I believe, raised her dress
14 or skirt and that she was very clear on what had happened.
15 And it was related to me that her mother felt the same
16 way.
17         And in talking to -- I was going to call him
18 Jackson, I'm sorry -- Mr. Mueller on Monday the third in
19 the afternoon through a lot of conversation, he certainly
20 indicated that he did not do it; however -- and I believe
21 this is a direct quote -- if I had, it was incidental or
22 accidental. The combination of those three elements put
23 me in a position where I felt comfortable making the
24 decision.
25     Q   Any other reasons why you terminated Mr. Mueller

10

1  on June 4th, 2013?
2      A   No.
3      Q   How do you know Frank Bell?
4      A   I've known Frank Bell -- I can't say the date I
5  first met Frank Bell. I've known him since the mid 80s.
6  He was in radio for a number of years for Key Market
7  Media. And at one point he actually supervised my
8  previous boss. And so I think we met at a seminar or
9  something; we had similar last names, both last names --
10 Bell and Call. And we kind of hooked up, and we were
11 industry friends, not personal friends.
12         But he was somebody you see over the years at
13 various events and radio happenings and record label
14 events. And it was somebody you got to know. He was a
15 well-respected -- in radio -- a well-respected program
16 director and executive for many years and had done
17 programming in a lot of markets.
18     Q   Did you have any intentions of terminating
19 Mr. Mueller prior to June 2nd, 2013?
20     A   No.
21     Q   How was he doing as part of the KYGO morning
22 show?
23     A   It was a team show. They came together, and the
24 evaluation is sort of the sum of the parts. We had made
25 it very clear to both Ryan and to David that this was an

11

1  18-month process. We wanted them to go slowly in terms of
2  developing their personalities on KYGO.
3         KYGO had had a long-standing morning show in
4  there for decades. And this was quite a change, one that
5  we felt both was appropriate at the time and would be good
6  for the radio station.
7         I am confident that we never discussed any sort
8  of benchmarks at six months. I do believe the station
9  morning show improved a couple of rank positions between
10 maybe in January when they started and June -- not
11 substantially, but we weren't expecting that. It was a
12 longer-term evaluation.
13     Q   Prior to June 2nd, 2013, had Mr. Haskell voiced
14 any concerns to you about Mr. Mueller's performance as a
15 part of the KYGO morning show?
16     A   I don't recall any specific performance issues
17 there. From the time we hired both Mueller and Kliesch,
18 we indicated that we were going to bring on board a third
19 person. The hope was to find some sort of counterbalance
20 talent that we could put in there. You know, we looked at
21 both men and women, and they knew that there was a third
22 person going to come in to have a role.
23         We were trying to figure out what that role
24 would be built around the primary personalities of Ryno
25 and Jackson. We had a lot of conversations. They had

**Page 12**

1  chances to interview people. And so I know we had
2  conversations over that, but nothing, no specific
3  performance issues or disagreements or anything like that
4  that I recall.
5  Q  Okay. Before Ryno -- before Mr. Kliesch
6  resigned -- now, you've got me doing it.
7  A  Yeah, I know.
8  Q  Before Mr. Kliesch resigned, did KYGO have any
9  plans to terminate him?
10  A  No.
11  Q  Was it considering terminating him?
12  A  Mr. Kliesch had had several issues in terms of
13  his off-air performance that we were concerned about. The
14  challenge had been a counterbalance of making another
15  change and the fact that we were confident in talking to
16  him that we could count on his contribution going forward
17  and be a reliable person. His issues were off the air,
18  not on the air.
19  Q  So as of June 2, 2013, was KYGO considering
20  terminating Mr. Kliesch?
21  A  No, no.
22  Q  How did -- let me ask this first: When did you
23  first learn that there has been an alleged incident
24  between Mr. Mueller and Ms. Swift?
25  A  That was Sunday night. I believe it was the

**Page 13**

1  2nd. I can't tell you exactly what time that Sunday
2  evening, but I want to say maybe in the seven o'clock
3  hour, 7:35, something like that.
4  Q  Okay. And how did you learn that there was an
5  alleged incident involving Mr. Mueller and Ms. Swift?
6  A  Eddie informed me; however, the cell service in
7  the Pepsi Center, particularly deep in the Pepsi Center,
8  was pretty iffy. And I get a phone call from Eddie and
9  there was no voice there. And so it took us a while. I
10  could get some cryptic bits of information, and we tried
11  texting.
12      So between the two, I started to pull together
13  what was going on and tried to persuade him to get out of
14  that cell phone zone so we could talk and we could have a
15  conversation. So that probably went on for maybe 45
16  minutes; so I was really in the dark at first, but knowing
17  that something had happened.
18  Q  Where were you when you received that call from
19  Mr. Haskell?
20  A  I was home.
21  Q  And did you have a chance to speak with Eddie
22  the evening of June 2nd where you could communicate
23  effectively?
24  A  Yes.
25  Q  Was that about 45 minutes after your initial

**Page 14**

1  phone call?
2  A  You know, what? I just don't recall. I just
3  realized we had communication problems and I just needed
4  to get maybe a text to him to get out of the building.
5  And I'm sure there were a lot of things going on at that
6  point with him. And I'd say within 45 minutes to an hour
7  is probably fair.
8  Q  What did Mr. Haskell convey to you?
9  A  He conveyed that the incident has occurred. I
10  believe he had gotten that information from Frank Bell,
11  and I think by that time, Mueller had already been
12  escorted from the Pepsi Center. And I was told that there
13  was a photo of the incident.
14  Q  Can you recall anything else that he relayed to
15  you during that conversation or those conversations?
16  A  Not specifically, no.
17  Q  How did -- what words did he use to convey the
18  alleged incident? What did he tell you?
19  A  Honestly, I don't remember how he framed it,
20  because we had been sort of communicating in pieces. I
21  had known something was going on with who we called
22  "Jackson" and Taylor, but I didn't know what it was. So I
23  don't recall any particular tone in his voice or use of
24  words.
25  Q  After having those initial communications with

**Page 15**

1  Mr. Haskell about the alleged incident, what did you
2  understand the allegation to be?
3  A  That he had touched Taylor inappropriately.
4  From Taylor's perspective, there was no question what had
5  happened and the family and Taylor were understandably
6  very upset.
7  Q  Did you have an understanding at that time as to
8  what part of Ms. Swift's body was allegedly touched?
9  A  I believe so, yes.
10  Q  What part of her body was allegedly touched?
11  A  He touched her on her rear.
12  Q  Did you have an understanding as to the
13  allegation that he touched Ms. Swift's rear outside of her
14  clothing or underneath her clothing?
15  A  Not at that time.
16  Q  Did Mr. Haskell show you a copy of the
17  photograph or send you a copy of the photograph at that
18  time?
19  A  No.
20  Q  What did you do after receiving information on
21  the alleged incident from Mr. Haskell?
22  A  I processed what he had said, called our vice
23  president of programming from Lincoln Financial Media,
24  John Dimick, D-i-m-i-c-k.
25  Q  Did you do anything else?

```
                                            16
 1.    A   Told him about -- and later that night I talked
 2   to the president of our company, Don Benson. And I'm not
 3   sure I recall whether John had informed him and Don called
 4   me or if Don called me, I don't remember. But maybe by
 5   about eleven o'clock that night, I did talk to Don, who
 6   was in Atlanta.
 7     Q   And did you relay to both Don and John
 8   essentially what Mr. Haskell had related to you?
 9     A   Correct.
10     Q   And what was John's reaction?
11     A   Shock. "Are you serious? What information do
12   we have? What supporting information? What do we know?"
13     Q   What kind of reaction did Don have?
14     A   Pretty similar.
15     Q   And I'm sorry, is it Don or --
16     A   Don Benson, B-e-n-s-o-n. Don did say that he
17   considered this a very serious matter in terms of our
18   station, our company, our parent company, and that we
19   would need to get together the next morning and gather the
20   information and look at this very carefully.
21     Q   And the conversation with John and the
22   conversation with Don, did those happen on June 2nd?
23     A   Yes.
24     Q   Okay. Did you call anybody else about the
25   alleged incident between Mueller and Ms. Swift on

                                            17
 1   June 2nd?
 2     A   No.
 3     Q   Did you talk to anybody else about the alleged
 4   incident between Mr. Mueller and Ms. Swift on June 2nd?
 5     A   No.
 6     Q   Did you take any other action with respect to
 7   the alleged incident the evening of June 2nd, 2013?
 8     A   In one of my last phone conversations with
 9   Eddie, we decided to suspend with pay so we could begin an
10   investigation. We just didn't feel it was appropriate
11   that he be on the air, both knowing all this was going on
12   and the potential possibility that the press could find
13   out or would find out.
14     Q   Do you know who notified Mr. Mueller of that
15   decision?
16     A   Eddie did.
17     Q   Was there any question in your mind as of the
18   evening of June 2nd, 2013, that Mr. Mueller had
19   inappropriately touched Ms. Swift?
20     A   Yes, there was a question.
21     Q   You had not yet made up your mind?
22     A   No.
23     Q   What happened next with respect to the alleged
24   incident between Mr. Mueller and Ms. Swift?
25     A   I'm not sure whether in one of my conversations

                                            18
 1   with Eddie that I didn't have him give my cell phone
 2   information to Frank Bell. I don't think he had it prior
 3   to that. And I believe that evening Eddie said that Frank
 4   would call me in the morning or -- I'm not sure whether I
 5   called Frank or he called me, but it was sometime early in
 6   the morning before I left for work. So we arranged the
 7   opportunity that we would talk the next morning.
 8     Q   So that was Monday?
 9     A   That was Monday morning.
10     Q   Okay. And so whether you called Mr. Bell or he
11   called you, you spoke to Mr. Bell early on June 3rd?
12     A   On June 3rd.
13     Q   And what do you recall about that conversation?
14     A   Well, I recall very vividly that there was a
15   picture. And I asked him could I get a copy of the
16   picture. And he said that he would send it to me, but
17   that it basically was for my eyes only. It's not a
18   picture he wanted to get out.
19         He relayed the incident, the fact that Taylor's
20   mom was very upset, and that when I saw the picture, it
21   would be clear what had happened. And I told Frank that
22   we had suspended Mueller for the day; that we take this
23   type of thing very seriously; and that we would begin an
24   investigation right away.
25         And I said that I knew I had more questions, but

                                            19
 1   I didn't really know what questions I had at that moment
 2   beyond -- I hadn't even seen the picture. And he
 3   understood, said he knew, you know, we would give the
 4   situation a fair consideration and do the right thing.
 5         He was going to be traveling, I believe, back to
 6   Nashville, and he probably would not be available Denver
 7   time until maybe very late morning or early afternoon.
 8   And I told him that I would have some questions, that I
 9   would definitely have some questions for him at that time
10   and please send the photo, which he e-mailed to me.
11     Q   What did you think Mr. Bell meant when he said,
12   "I'm sure you'll do the right thing"?
13     A   Well, I believe that they were obviously -- from
14   what I could tell -- embarrassed, upset, angry over the
15   incident. And my belief would be that probably would run
16   the gambit of some type of disciplinary action, maybe a
17   suspension, maybe up to and including termination. We
18   never discussed what "the right thing" was.
19     Q   Was there any doubt in your mind that what
20   Mr. Bell wanted you to do is to fire Mr. Mueller?
21         MR. BALDRIDGE: Objection, form and foundation.
22         MR. DOWDLE: Objection, form, foundation and
23   speculation.
24     Q   (By Mr. McFarland) You can answer.
25         THE DEPONENT: I can answer?
```

## Page 20

```
 1         MR. BALDRIDGE: Yes.
 2    A    Would you ask me the question one more time?
 3    Q    (By Mr. McFarland) Yes. Was there any doubt in
 4  your mind that what Mr. Bell wanted you to do was to
 5  terminate Mr. Mueller?
 6         MR. BALDRIDGE: Same objections.
 7         MR. DOWDLE: Objection, form and foundation,
 8  speculation.
 9    A    Yes, there was doubt in my mind.
10    Q    (By Mr. McFarland) Did Mr. Bell ask you to
11  terminate Mr. Mueller ever?
12    A    Never.
13    Q    Did he ask you to take any specific action?
14    A    Never.
15    Q    How did he describe the alleged incident to you?
16    A    I'm sure he described it in our early morning
17  call and then at length late morning when he had arrived
18  in Nashville. He indicated that Mueller had gone in a
19  tented area where Taylor was taking photos. Shannon
20  Melcher, at the time Mueller's girlfriend, was there.
21  Taylor was in the room.
22         And this was just a small group coming in, I
23  guess the standard kind of backstage meet and greet photo
24  session. And maybe there was a security person and a
25  photographer and that there wasn't -- I don't recall any
```

## Page 21

```
 1  information leading up to it, maybe small talk or
 2  something. But when the picture was taken, he had his
 3  hand in an inappropriate place.
 4    Q    Did Mr. Bell tell you that Mr. Mueller had
 5  grabbed Ms. Swift's rear with his hand?
 6    A    I'm not sure. I recall "lifting the dress."
 7  I'm not sure what the action of touching was. But lifting
 8  the dress or skirt was very much a part of his explanation
 9  of what he had done.
10    Q    Did Mr. Bell tell you -- so Mr. Bell told you
11  that Mr. Mueller had put his hand under Ms. Swift's dress
12  and lifted it up?
13    A    Yes.
14    Q    So did Mr. Bell tell you that Mr. Mueller had
15  inappropriately touched Ms. Swift's rear?
16    A    Yes.
17    Q    Did he tell you whether that touching occurred
18  over her clothing or underneath her clothing?
19    A    No. I suppose "lifting up a dress" made it
20  clear it wasn't over the clothing.
21    Q    Your impression after talking to Mr. Bell was
22  that Mr. Mueller -- the touching happened underneath
23  Ms. Swift's clothing?
24    A    Yes.
25    Q    During that conversation, did you -- well,
```

## Page 22

```
 1  during that conversation, Mr. Bell also relayed to you the
 2  people that were in the room when the alleged incident
 3  took place?
 4    A    Yes.
 5    Q    Did Mr. Bell indicate whether he had talked to
 6  any of those people?
 7    A    I don't recall.
 8    Q    Did Mr. Bell relate to you whether he spoke with
 9  Ms. Swift about the incident?
10    A    I don't recall.
11    Q    Do you know where Mr. Bell was getting his
12  information with respect to the alleged incident?
13    A    I do know, because he made it very clear that he
14  had talked to Taylor's mother. And I probably presumed he
15  also talked to the security person, which I should
16  remember his name, which I think I've got in some of my
17  notes, Craig, with an Australian or British accent and
18  maybe a photographer.
19    Q    But he didn't tell you and you don't otherwise
20  know whether he talked to anybody other than Ms. Swift's
21  mom?
22    A    No.
23    Q    Do you recall anything else about your initial
24  conversation with Frank Bell about the alleged incident
25  between Mr. Mueller and Ms. Swift?
```

## Page 23

```
 1    A    Well, we talked quite a bit about the fact
 2  that -- I asked the question, "Did Taylor say anything
 3  about what happened when this occurred?" And he said that
 4  Taylor did not want to make a big incident out of it and
 5  that as soon as Mueller had left the meet and greet tent,
 6  she informed security.
 7         And that's when the process started. Security
 8  tracked Mueller and Melcher down, and I guess according to
 9  Frank there were words and David indicated that it's all
10  wrong. I think he made a comment of, "Well, let's get the
11  police involved," or something like that I remember.
12    Q    Mr. Mueller made a comment that he wanted the
13  police involved?
14    A    I think according to Frank, "Let them come and
15  investigate this."
16    Q    Okay. Anything else that you can recall about
17  that initial conversation with Mr. Bell?
18    A    There were two conversations: The first one
19  early in the morning; and the next one late morning. And
20  I think the late morning one I probably had a few
21  questions at that point for -- you know, Were there any
22  other cameras? Was there anyone else in there -- no, I
23  take that back.
24         I did not ask the camera question at that
25  moment. That was after meeting later with Mueller. I
```

**24**

1. think it was just pretty much me stating the facts as
2. Frank knew them.
3.    Q  Is there anything else that you can recall about
4. your initial two communications? Well, let me ask this:
5. Is your first conversation with Frank Bell distinct in
6. your mind from your second conversation with him regarding
7. the incident?
8.    A  It's distinct in that he was going to send me
9. the photo. And by the time the second conversation took
10. place, I had the photo.
11.    Q  Okay. And what was your impression of what the
12. photo showed?
13.    A  My impression? He had his hand in a pretty
14. inappropriate place.
15.    Q  You believe that in that photograph
16. Mr. Mueller's hand is touching Ms. Swift's rear?
17.    A  I couldn't conclude from that photograph because
18. it does not have a dimensional aspect to it that he's
19. touching her, is about to touch her or has just touched
20. her. I concluded his hand is at a place that is
21. inconsistent with -- in my experience -- most artist's
22. photos that I've seen.
23.     And I also concluded that it's pretty clear when
24. you look at the picture, to me, that Taylor is trying to
25. edge herself away from or orient herself more physically

**25**

1. to Shannon. So if you're looking at the two, it just
2. feels, to me, very odd.
3.    Q  Did Mr. Bell communicate to you that Ms. Swift
4. pulled away in any form or fashion from Mr. Mueller?
5.    A  Yes.
6.    Q  Did you note -- well, Ms. Melcher is in the
7. photograph as well?
8.    A  Yes.
9.    Q  Did you note where her hands were in the
10. photograph?
11.    A  No.
12.    Q  What about Ms. Swift's hands? Did you see where
13. Ms. Swift's hands were?
14.    A  I'm sure I did. I don't recall anything about
15. them being in an inappro- -- I mean, it looked just like
16. standard people who put their arms around each other
17. trying to get a photo.
18.    Q  What did you do after your second conversation
19. with Mr. Bell on June 3rd?
20.    A  We set up a meeting. Eddie set that up for
21. David to come in early in the afternoon.
22.    Q  That would have been early afternoon on Monday
23. the third?
24.    A  The third. Right.
25.    Q  Okay. And did that happen?

**26**

1.    A  Yes.
2.    Q  Before you met with Mr. Mueller, did you have a
3. meeting with Mr. Haskell, Mr. Dimick and perhaps others to
4. discuss Mr. Mueller?
5.    A  Yes. It was a telephone conference call for at
6. least half of the parties. Eddie was in my office and
7. Maureen Marsh, our HR manager, was in my office.
8.    Q  And who was on the phone?
9.    A  Phil Bonomo, our attorney; Kercea Beckwith, our
10. Lincoln Financial VP of HR; I think Don was on the call
11. and John.
12.    Q  And when did that meeting, slash, conference
13. call take place?
14.    A  That would have been late morning, prior to my
15. second conversation with Frank.
16.    Q  Before your second conversation?
17.    A  Yes.
18.    Q  Without disclosing communications with your
19. counsel, what do you recall about the communications in
20. that meeting with Mr. Haskell and the other KYGO people?
21.     MR. DOWDLE: Objection --
22.     MR. DASH: Objection --
23.     MR. DOWDLE: -- to the extent it's privileged.
24.     MR. DASH: Sorry, Mike, go ahead.
25.     MR. DOWDLE: I just said objection to the extent

**27**

1. it's privileged.
2.     MR. DASH: Yeah, Mr. Call, I just want to object
3. and just caution you. I think Mr. McFarland is trying to
4. be careful here, but I don't want you to discuss any
5. conversations that you had directly with counsel or any
6. advice that counsel might have given during this
7. conference call.
8.     You're not to be discussing any communications
9. directly with counsel or information provided by counsel
10. for the purpose of them giving advice.
11.     THE DEPONENT: Understood.
12.    Q  (By Mr. McFarland) With that instruction or
13. limitation, what can you tell me about the communications
14. that occurred during that meeting of the KYGO folks in the
15. late morning of June 3rd?
16.    A  Nothing.
17.    Q  All of your communications were directed at or
18. with counsel?
19.    A  Yes.
20.    Q  Did anybody else say anything that was not
21. directed to counsel?
22.    A  Not that I recall.
23.    Q  Were decisions made as a result of that meeting?
24.    A  No.
25.    Q  What did you do next?

Page 28

1  A  Then I either waited for Frank to call me or I
2  called him.
3  Q  Okay.
4  A  And so I want to say that was 11 or 12-ish my
5  time -- Denver time.
6  Q  And you've already told me what you can remember
7  about --
8  A  Right.
9  Q  -- that second conversation?
10 A  Correct.
11 Q  And then you met with Mr. Mueller?
12 A  Eddie set up the meeting for two o'clock.
13 Q  Okay.  And Mr. Mueller arrived at the designated
14 time?
15 A  Yes.
16 Q  And he met with you and Mr. Haskell?
17 A  Yes.
18 Q  How long did you meet?
19 A  Oh, at least an hour.
20 Q  And did that meeting take place in your office?
21 A  Yes, it did.
22 Q  What do you recall about the -- well, did
23 anybody else participate in that meeting?
24 A  No.
25 Q  Was there anybody on the phone listening in?

Page 29

1  A  No.
2  Q  Was there any -- did you make any recording of
3  that conversation?
4  A  No, I did not make a recording.
5  Q  Do you know whether Mr. Haskell did?
6  A  I don't believe Mr. Haskell made a recording.
7  Q  And you understand now that Mr. Mueller did
8  record the meeting?
9  A  Yes.
10 Q  What do you recall about the communications at
11 that meeting?
12 A  The communications back and forth?
13 Q  Yeah.
14 A  They were cordial.  He denied the incident
15 occurring; indicated that if there were more cameras or
16 other camera angles, it would vindicate him; that I could
17 see that wherever his hand was, it wasn't near her body;
18 and that he had been was distracted.
19    I'm not sure what the distraction was, but that
20 they were moved along very quickly and that he was drawn
21 into the picture at the last minute.  And he said the
22 picture looks the way the picture looked because it was a
23 last-minute thing to get in the picture and smile.
24 Q  Okay.  Do you recall anything else about the
25 communications during that meeting?

Page 30

1  A  He spoke about how disrespectful the security
2  people were.  He indicated over and over that this
3  wouldn't have happened if Taylor had known he worked for
4  KYGO.  And I recall probing that to try and understand
5  what that had to do with her story.
6     And we had a conversation that Shannon had
7  identified herself as being with KYGO.  And I recall
8  asking, "Well, wouldn't she assume that you were with
9  KYGO?"  And he didn't think that was necessarily the case
10 and continually discussed and brought up the fact that
11 this would not have happened if she had known he worked
12 for KYGO.
13    And I continually asked him, "Why?  What
14 difference does that make?  Help me understand the
15 relevance of that."  And I never got an answer.
16 Q  Did you inquire of Mr. Mueller about who else
17 was in the room at the time of the alleged incident?
18 A  Yes.
19 Q  And who was in the room?
20 A  He confirmed obviously Taylor, Shannon, at least
21 a security person he presumed and a photographer.  And he
22 didn't believe there was anyone else maybe behind the
23 photographer.  He pretty much identified the numbers that
24 I had been given earlier.
25 Q  Did you make any effort to talk to the

Page 31

1  photographer?
2  A  No.
3  Q  Did you make any effort to talk to the security
4  person?
5  A  No.
6  Q  Did you make any effort to talk to Ms. Melcher?
7  A  I did not.  I recall that our HR manager,
8  Maureen Marsh, did.
9  Q  Did you ask Ms. Marsh to discuss the incident or
10 the alleged incident with Ms. Melcher?
11 A  I'm not sure who asked her to do it.  I think
12 that was just part of the nature of our protocol that she
13 had been in the picture and we were trying to evaluate
14 that.  And I'm not sure what time that took place.
15 Q  As part of your investigation -- you did conduct
16 an investigation?
17 A  Yes.
18 Q  As a part of that investigation, did you come to
19 understand Ms. Melcher's recollection of the alleged
20 incident?
21 A  My understanding is she didn't recall him
22 touching her at all.  I don't recall her saying he didn't,
23 she just didn't recall.
24 Q  And I'm sort of going back to your conversations
25 with Frank Bell.  I think you testified that Mr. Bell

**Page 32**

```
 1  indicated to you that as soon as Mr. Mueller left this
 2  little area, this little room where the photograph was
 3  being taken, Ms. Swift contacted security; is that right?
 4        MR. BALDRIDGE: Objection, form and foundation.
 5        MR. DOWDLE: Same objections.
 6     Q  (By Mr. McFarland) You can answer it.
 7     A  I don't recall.
 8     Q  (By Mr. McFarland) You don't recall whether
 9  Mr. Bell told you at what point in time Ms. Swift advised
10  anyone that she had been inappropriately touched?
11        MR. BALDRIDGE: Same objections.
12        MR. DOWDLE: Same objections. You can answer
13  it.
14     A  I believe he and Shannon had left -- as I
15  understand -- the photo situation wherever they were set
16  up. And I'm not sure where in the Pepsi Center they were,
17  where this tent was, but it was set up. They had already
18  left and that she had then informed security what had
19  happened.
20     Q  (By Mr. McFarland) Do you know what the
21  security person's name is that was in the room at the time
22  of the alleged incident?
23     A  Not in the room. I recall a Craig -- someone
24  with a British or an Australian accent. And I think in my
25  notes I had his name or his first name. I don't know.
```

**Page 33**

```
 1     Q  Did you ever ask Mr. Bell whether he had
 2  personally talked to any of the other people who were in
 3  the room at the time of the alleged incident?
 4     A  No.
 5     Q  Did he indicate to you that he had talked to any
 6  of the other people in the room at the time of the alleged
 7  incident?
 8     A  I don't recall.
 9     Q  Would you agree that as a part of your
10  investigation into the alleged incident, you should have
11  talked to the people in the room at the time of the
12  alleged incident?
13        MR. DOWDLE: Objection --
14        MR. BALDRIDGE: Objection -- go ahead.
15        MR. DOWDLE: Objections to form, speculative,
16  argumentative.
17        MR. BALDRIDGE: I will join those three and add
18  foundation.
19        MR. DASH: Same objections.
20     Q  (By Mr. McFarland) You can answer it.
21     A  No, I never considered talking to him --
22     Q  Why?
23     A  -- as a part of my investigation. I didn't need
24  that information.
25     Q  You didn't need to know what the other people in
```

**Page 34**

```
 1  the room saw with respect to Mr. Mueller's interactions
 2  with Ms. Swift?
 3        MR. DOWDLE: Objection, argumentative,
 4  foundation and form.
 5        MR. BALDRIDGE: And I join those three.
 6        MR. DASH: Same objections.
 7     A  No.
 8     Q  (By Mr. McFarland) Why?
 9     A  In my meeting with Mr. Mueller, I had three
10  components in my decision. I had a picture that appeared
11  very inappropriate, but a picture only. Secondly, I had
12  feedback from a person that I've known for many years,
13  trusted, had no reason to tell me anything that was
14  incorrect that had occurred.
15        And third, Mueller said to me, "I didn't do it;
16  but if I did, it was incidental." So I had a picture, I
17  had Taylor's comments through Frank and he changed his
18  story that it couldn't have occurred, then that it was
19  incidental.
20     Q  How did he change his story?
21     A  He said he didn't do it numerous times, and then
22  he said, "If I had, it was incidental." And I thought
23  that's very different from "I didn't do it."
24     Q  And if, in fact, it had been incidental contact,
25  you still would have fired Mr. Mueller?
```

**Page 35**

```
 1     A  It wasn't just the incidental contact. I had
 2  the feedback from Frank Bell, from what I consider both a
 3  good source and a reputable source, and the picture.
 4     Q  Is it fair to say that you relied heavily on
 5  what Mr. Bell told you?
 6        MR. BALDRIDGE: Objection, form.
 7     A  I looked at all the facts.
 8     Q  (By Mr. McFarland) But you relied on the
 9  picture, what Mr. Bell told you and Mr. Mueller's
10  statement that if he did touch her, it was incidental?
11        MR. DOWDLE: Objection, asked and answered
12  multiple times.
13        MR. BALDRIDGE: The same and argumentative, in
14  fact, at this point.
15        MR. DASH: Same objections.
16     Q  (By Mr. McFarland) Those were the three factors
17  you relied on in making your decision?
18        MR. BALDRIDGE: Same objections.
19        MR. DOWDLE: Same objections.
20        MR. DASH: Same objections.
21        MR. DOWDLE: You can go ahead.
22     A  Yes.
23     Q  (By Mr. McFarland) Did you ask any professional
24  to evaluate the picture, the photograph of Mr. Mueller and
25  Ms. Swift and Ms. Melcher?
```

**Page 36**

1. A   No.
2. Q   Since Mr. Mueller's termination, have you had
3. other communications with KYGO personnel about
4. Mr. Mueller?
5. A   Eddie. Maureen. I think that would be the
6. extent of it up until the press back in the Fall.
7. Q   Okay. What do you recall about your
8. conversations with Mr. Haskell after Mr. Mueller's
9. termination about Mr. Mueller?
10. A   We talked mostly about the next move. We had
11. just hired Tracy Dixon to be the third member in the show
12. and would she be capable of being a two-person show?
13.      In the contract for both Ryno and Jackson it had
14. a clause that if one left, we could terminate the other.
15. We had a brief conversation regarding Ryno -- I'm sorry,
16. Ryan Kliesch -- and decided that we wanted to keep Ryan.
17.      And we actually had a meeting with him to convey
18. that to him. We didn't talk about the incident -- he was
19. just worried that this could cost him his job as well --
20. and that we were going to go forward with Ryno and Tracy
21. subsequent to the termination.
22.      That was really about the radio station, what
23. we're going to do with the mornings; if this gets out,
24. damage control; what our position needs to be; those kinds
25. of things.

**Page 37**

1. Q   And if word got out, what was your position
2. going to be?
3.      MR. BALDRIDGE: Objection, speculation.
4.      MR. DOWDLE: Same objection.
5. A   We would have had no comment on employee
6. matters.
7. Q   (By Mr. McFarland) And what were your
8. conversations with Maureen about Mr. Mueller? What did
9. they involve?
10. A   I think our conversations through this process
11. with Maureen were primarily making sure, you know, we had
12. things documented. We went through whatever proper
13. protocol for HR, those kinds of things. She was, I think,
14. certainly advisory, but she was not a decision maker.
15. Q   Did you send the -- how did you receive the
16. photograph of Ms. Swift, Ms. Melcher and Mr. Mueller?
17. A   I received it by e-mail. It came in on my
18. phone. I was at C-470 and Broadway, so I pulled off to
19. the side of the road to look at it.
20. Q   Okay. And did you provide a copy of that to
21. anyone?
22. A   I forwarded a copy to John Dimick.
23. Q   Anybody else?
24. A   I don't know that I forwarded it to Phil Bonomo,
25. our attorney, or John did -- and to Jen Petruccelli, the

**Page 38**

1. legal counsel for Lincoln National in Philadelphia.
2. Q   Did you send a copy to Eddie Haskell?
3. A   I don't recall.
4. Q   Did you send the photograph to Maureen?
5. A   Yes.
6. Q   Did you send it to anybody else that you can
7. think of at KYGO?
8. A   Only John, possibly Don, Kercea -- no, no one
9. else.
10. Q   Did you send that photograph to anyone else
11. outside of KYGO?
12. A   No.
13. Q   Did you take notes during your meeting with
14. Mr. Mueller?
15. A   Yes.
16. Q   And how did you record your notes?
17. A   Handwritten.
18. Q   Had a pad of paper, probably not unlike this?
19. (Indicating legal pad.)
20. A   Had a pad of paper. Had a handful of questions,
21. jotted down key points or his answers.
22. Q   Where are those notes now?
23. A   I think you have them. I transcribed them from
24. my nearly impossible handwriting to something that could
25. be readable. And ultimately, I think the first place they

**Page 39**

1. went -- the only place they went beyond Maureen was to Jen
2. Petruccelli.
3. Q   What did you do with the handwritten version of
4. your notes?
5. A   Shredded them. Got rid of them.
6. Q   Why did you do that?
7. A   Because I thought and believed the notes I
8. transcribed from the meeting were fully accurate, and I
9. was comfortable with having something that was legible.
10. Q   Did you transcribe the notes to a computerized
11. version yourself?
12. A   Yes.
13. Q   You sat there at the machine and typed them in?
14. A   I was -- it was up in here in my head. So I
15. didn't have it transcribed by anyone. I just went through
16. my notes and the meeting as it occurred as I recalled, as
17. freshly as I could. It was that afternoon.
18. Q   Okay. So that was my next question. So you
19. went through that process later that day in the afternoon
20. that you met with Mr. Mueller?
21. A   I would say it probably started within an hour.
22. Q   When did you make the decision to terminate
23. Mr. Mueller?
24. A   Tuesday morning.
25. Q   Okay. So that was the day after the meeting and

**Page 40**

1. after you typed up your notes?
2. A  I had one more conversation with Frank, I
3. recall, fairly late that evening and asked questions about
4. security, the possibility of other cameras, things like
5. that. And he said there wasn't anything there in the
6. tent.
7. Q  And during that conversation, did you ask him
8. whether there were any witnesses or whether any other
9. witnesses happened to see the alleged incident?
10. MR. BALDRIDGE: Objection, form.
11. MR. DOWDLE: Same objection.
12. A  I wanted to know who was in there at the time on
13. several occasions and was consistently told that is was a
14. photographer, a security-type person, Taylor, Shannon and
15. Mueller.
16. Q  Did you ask what those persons saw in terms of
17. --
18. MR. BALDRIDGE: Objection, asked and answered.
19. Q  (By Mr. McFarland) -- the related incident?
20. MR. BALDRIDGE: Objection, asked and answered
21. multiple times.
22. MR. DOWDLE: And speculation.
23. A  No.
24. Q  (By Mr. McFarland) Who was in charge of KYGO's
25. investigation?

**Page 41**

1. A  Principally me.
2. Q  Was there anybody else working on the
3. investigation under your direction?
4. MR. BALDRIDGE: Other than the five he already
5. mentioned? Or who, Gabe?
6. MR. MCFARLAND: Well, I don't think he's
7. mentioned anybody else who helped him --
8. MR. BALDRIDGE: He has too. The lawyers, the HR
9. director --
10. MR. MCFARLAND: -- with the investigation.
11. MR. BALDRIDGE: -- in fact, he's mentioned them
12. numerous people.
13. MR. MCFARLAND: I don't know that any of those
14. people participated in the investigation.
15. MR. BALDRIDGE: Oh, he did. I thought -- that's
16. clearly what he said, I just don't know if he's trying to
17. change that it actually.
18. MR. DOWDLE: You can go ahead and answer it.
19. A  I discussed with Eddie what he knew, where he
20. was. Eddie was in a different area, so I realized fairly
21. quickly that he did not witness any of it; although, I
22. talked to Eddie several times about how quickly Frank got
23. to him and the label person had gotten to him and the
24. sequence of events as Eddie was finding out. So that was
25. part of the evaluation process.

**Page 42**

1. Q  (By Mr. McFarland) Well, did anybody else
2. participate in the investigation?
3. MR. BALDRIDGE: Objection, asked and answered.
4. MR. DOWDLE: Same objection.
5. A  No.
6. Q  Were any KYGO lawyers part of the investigation
7. and the termination?
8. MR. DOWDLE: Objection, privileged.
9. MR. BALDRIDGE: Objection, asked and answered.
10. MR. DASH: Objection.
11. A  A lot was discussed on the call.
12. Q  (By Mr. McFarland) Well, I don't want to know
13. what was discussed in the call, but I want to know if the
14. lawyers at KYGO were involved in the factual investigation
15. into the alleged incident involving Mr. Mueller and
16. Ms. Swift.
17. MR. DOWDLE: You can answer that.
18. A  I recall them asking a couple of questions about
19. the facts, what I knew.
20. MR. DASH: Yeah, Mr. Call, I'm just going to
21. direct you. I think that's a yes no question, Were they
22. involved?
23. THE DEPONENT: Okay.
24. MR. DASH: I don't think you need to go beyond
25. that. You're talking about the extent of the call. I'm

**Page 43**

1. objecting on privilege grounds and so you probably
2. shouldn't go beyond that.
3. Q  (By Mr. McFarland) Do you know whether those
4. attorneys had any communications with anybody else outside
5. of KYGO about the alleged incident between Mr. Mueller and
6. Ms. Swift?
7. MR. DOWDLE: Objection, to the extent it's
8. privileged.
9. MR. MCFARLAND: That's a yes or no.
10. A  No.
11. MR. DOWDLE: No.
12. MR. DASH: Gabe, look, I think you're getting
13. into the attorney/client privilege when you're asking to
14. the extent the lawyers were involved. You're asking what
15. they might have done, what they might have communicated to
16. Mr. Call. So I'm going to object. And I'm not going to
17. have Mr. Call any of those questions.
18. MR. MCFARLAND: Well, just to be clear, Mike,
19. the question was: Did they talk to anybody outside of
20. KYGO about the alleged incident? And that's clearly not
21. privileged.
22. MR. DOWDLE: It's clearly privileged.
23. MR. DASH: Actually, it's --
24. MR. DOWDLE: It's privileged because the --
25. MR. MCFARLAND: Hold on. I can't have both you