# EXHIBIT 8

# In The Matter of:

*MUELLER*

*vs.*

*SWIFT, ET AL.*

*ANDREA SWIFT*

*June 28, 2016*

*CONFIDENTIAL*

*PURSUANT TO THE PROTECTIVE ORDER*

Page 1

\* \* \* \* \*

DEPOSITION DESIGNATED CONFIDENTIAL

PURSUANT TO THE PROTECTIVE ORDER

\* \* \* \* \*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

DAVID MUELLER,   )
        )
    Plaintiff,  )
        )
vs.    ) NO. 1:15-cv-01974-
    )     WJM-KLM
TAYLOR SWIFT; FRANK BELL;  )
ANDREA SWIFT a/k/a ANDREA  )
FINLAY; SCOTT SWIFT; and JOHN )
DOES 1 - 5,   )
    )
    Defendants.  )
    )

----------------------------------

Deposition of:

ANDREA SWIFT

Taken on behalf of the Plaintiff

June 28, 2016

Reported by:  Martha B. Davis, RMR, RDR, CRR
    LCR No. 152

Job No.: WDC-090551

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 2

```
 1  APPEARANCES:
 2  For the Plaintiff:   M. Gabriel McFarland, Esq.
                         Evans & McFarland, LLC
 3                       910 13th Street
                         Suite 200
 4                       Golden, CO 80401
                         303-279-8300
 5                       gmcfarland@emlawyers.com
 6  For the Defendants:  J. Douglas Baldridge, Esq.
                         Courtney A. Sullivan, Esq.
 7                       Katherine M. Knight, Esq.
                         Venable, LLP
 8                       575 7th Street NW
                         Washington, D.C. 20004-1601
 9                       202-344-4703
                         jdbaldridge@venable.com
10                       casullivan@venable.com
                         kmwright@venable.com
11
        Also Present:    Jesse Schaudies
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  Questions by Mr. McFarland              5
 3
 4
 5
 6
 7       PREVIOUSLY MARKED EXHIBITS
 8  DEPOSITION OF STEPHANIE SIMBECK:
 9  No. 3:   Color photograph of Taylor Swift,
             Gary Mueller and his girlfriend
10           (SWIFT 0000076)                41
11  No. 5:   Color photograph of Taylor Swift and
             Eddie Haskell
12           (SWIFT 000075)                 42
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1           The deposition of ANDREA SWIFT was taken by
 2  counsel for the Plaintiff, pursuant to notice, at the
 3  offices of Cleeton Davis Court Reporters, LLC, 402 BNA
 4  Drive, Suite 108, Nashville, Tennessee, on
 5  June 28, 2016, for all purposes under the Federal Rules
 6  of Civil Procedure.
 7           The formalities as to notice, caption,
 8  certificate, et cetera, are waived. All objections,
 9  except as to the form of the questions, are reserved to
10  the hearing.
11           It is agreed that Martha B. Davis, being a
12  licensed court reporter and notary public for the State
13  of Tennessee, may swear the witness, and that the
14  reading and signing of the completed deposition by the
15  witness are not waived.
16
17
18                      * * *
19
20
21           MR. BALDRIDGE: Gabe, I'll go ahead and
22  make the same statement we made previously, that just
23  for the sake of clarity, we will mark the entire
24  transcript as confidential under the existing
25  protective order for the reasons previously stated.
```

Page 5

```
 1  Thank you.
 2           MR. MCFARLAND: I understand.
 3
 4                  ANDREA SWIFT
 5  was called as a witness, and after having been first
 6  duly sworn, testified as follows:
 7                  EXAMINATION
 8  QUESTIONS BY MR. MCFARLAND:
 9  Q.   Would you state your full name for the record,
10  please.
11  A.   Andrea Swift.
12  Q.   And, Mrs. Swift, have you been deposed before?
13  A.   Yes, I have.
14  Q.   How many times?
15  A.   Once.
16  Q.   And what was that in relation to?
17  A.   I -- I'm not sure that I --
18           MR. BALDRIDGE: Yeah, let me -- let me
19  preface that this is -- it was a prior deposition,
20  wholly unrelated to anything even similar to this
21  matter, and the settlement and the proceedings therein
22  are subject to a confidentiality order. And I'm not
23  going to have her breach the confidentiality order on
24  that.
25           But I think it is sufficient, Mrs. Swift,
```

2 (Pages 2 to 5)

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 6

1  to -- you could say it is, for example, a contract
2  dispute or a --
3         THE WITNESS: It was.
4  BY MR. MCFARLAND:
5  Q.    Involving your daughter Taylor or involving
6  one of her companies?
7  A.    Involving Taylor.
8  Q.    How long ago was that?
9  A.    That was -- I don't remember the exact date.
10 It was -- I believe it was 2005. Could have been 2006.
11 Roughly ten years ago.
12 Q.    Okay. Is your daughter currently involved in
13 any other litigation?
14 A.    No.
15 Q.    Tell me just briefly a little bit about
16 yourself. Where did you grow up?
17 A.    I grew up all around the world. I was born in
18 Venezuela. I lived in Puerto Rico for six years, in
19 Thailand for a couple years, Singapore for a couple of
20 years, Texas --
21 Q.    Where did you --
22 A.    -- Pennsylvania. A lot of different places.
23 Q.    Where did you go to high school?
24 A.    I went to high school in Houston.
25 Q.    And you graduated from high school?

Page 7

1  A.    I did.
2  Q.    Did you go to college?
3  A.    I did.
4  Q.    And where did you do that?
5  A.    A couple of places. Texas A & M and
6  University of Houston.
7  Q.    And did you graduate?
8  A.    I did.
9  Q.    With a degree in?
10 A.    Marketing.
11 Q.    Any further education?
12 A.    No.
13 Q.    Okay. Were you -- what did you do after
14 college?
15 A.    Pardon?
16 Q.    What did you do after college?
17 A.    I went to work for a company called American
18 Capital.
19 Q.    Where was that?
20 A.    In Houston.
21 Q.    And what did you do for American Capital?
22 A.    I was a mutual fund wholesaler.
23 Q.    And how long were you with American Capital?
24 A.    Seven years.
25 Q.    What did you do after that?

Page 8

1  A.    I became a mom.
2  Q.    Okay. Do you -- are you formally employed by
3  Taylor Swift?
4  A.    Was I formerly employed?
5  Q.    Are you formally employed?
6  A.    I am.
7  Q.    And what's your -- do you have a title or a --
8  A.    I'm part of the senior management team. We
9  have a team.
10 Q.    Who else is on that team?
11 A.    Jay Schaudies, Robert Allen, Scott Swift, and
12 Taylor Swift.
13 Q.    And I should know the answer to this, but are
14 you and Scott still married?
15 A.    We are.
16        MR. BALDRIDGE: Objection. Objection.
17 Form, completely irrelevant, and I will instruct her
18 not to answer that question. It has nothing to do with
19 this proceeding.
20        THE COURT REPORTER: I have an answer on
21 the record.
22        MR. BALDRIDGE: Slow down.
23        THE WITNESS: Okay. Sorry.
24        MR. BALDRIDGE: What was it? Would you
25 read it back?

Page 9

1         THE COURT REPORTER: "Answer: We are."
2  BY MR. MCFARLAND:
3  Q.    And what are your duties and responsibilities
4  generally as part of the senior management team for
5  Taylor?
6  A.    Varied. So many I probably couldn't list them
7  all, but because we're a team, we handle everything
8  that you can imagine comes through the door, whether
9  it's working with partnerships, planning and executing
10 tours, promotion of her albums that come out, travel,
11 security, assistance. Everything. Everything that
12 goes along with the management of an artist.
13 Q.    Okay. Do you recall Taylor's concert in
14 Denver on June 2nd, 2013.
15 A.    Yes, I do.
16 Q.    And prior to that concert, you had never heard
17 of or had any contact with David Mueller; is that
18 correct?
19 A.    That's correct.
20 Q.    You -- well, prior to that concert, did you
21 have any contact with Eddie Haskell?
22 A.    Yes.
23 Q.    Can you tell me about your contact with
24 Mr. Haskell before June 2nd, 2013?
25 A.    My contact would have been through the

3 (Pages 6 to 9)

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 10

1  meet-and-greets that Taylor provides for the radio
2  programmers, music programmers, music directors, radio
3  programmers. And they come into a vibe room and meet
4  before the show, and I -- quite a few -- you know,
5  probably almost every time come in there and say hello
6  to the families and greet them, help greet them, so it
7  would have been along those lines virtually every time
8  we toured in that area.
9      Prior that it would have been going into the
10 radio station, which we did when Taylor was 16, 17, 18,
11 19 years old.
12 Q.   How many times before June 2nd, 2013, do you
13 think you met with Eddie Haskell?
14 A.   I don't recall. I truly don't know a number.
15 Q.   Less than six? More than six?
16      MR. BALDRIDGE: Objection. Speculation.
17 BY MR. MCFARLAND:
18 Q.   Can you get that close or you just have no
19 idea?
20      MR. BALDRIDGE: Same objection. You can
21 go ahead and answer.
22      THE WITNESS: I have no idea.
23 BY MR. MCFARLAND:
24 Q.   Have you met with Eddie Haskell since June
25 2nd, 2013?

Page 11

1  A.   No. Not to my knowledge, no.
2  Q.   Do you know whether Taylor has?
3  A.   No.
4  Q.   What's the relationship, if any, between Eddie
5  Haskell and Taylor?
6       MR. BALDRIDGE: Objection. Vague.
7  BY MR. MCFARLAND:
8  Q.   You can still answer if you understand the
9  question.
10      MR. BALDRIDGE: That's correct.
11      THE WITNESS: Okay. Like any other
12 program director or music director that she has met,
13 she has a wonderful relationship with her radio
14 programmers. They -- she did her first radio interview
15 when she was 12 years old, and she has learned to trust
16 them, to love them, to remember their names and their
17 wives' names and their children's names. And to this
18 day she writes notes for coming -- a thank you note for
19 coming to her show.
20      And from what I hear from all of them is
21 that no one else does this. No one else shows them the
22 gratitude and respect that she shows them because she
23 cares about them and she has known them since she was
24 so young that many of them look at her like she's their
25 little sister or their daughter.

Page 12

1  BY MR. MCFARLAND:
2  Q.   Do you know when Taylor first met Eddie
3  Haskell?
4  A.   I do not.
5  Q.   When did you first learn that there had been
6  an incident involving David Mueller?
7  A.   As soon as I walked back into Taylor's
8  dressing room and I saw her.
9  Q.   And that was on the day of the concert, June
10 2nd?
11 A.   It was the evening, yes.
12 Q.   And was that before or after she had gone on
13 stage?
14 A.   Before.
15 Q.   Was there -- was it just you and Taylor in the
16 dressing room?
17 A.   Yes.
18 Q.   And what did she say?
19 A.   Well, when I walked in, she was devastated.
20 She was horrified. She was upset. And I said, "What
21 happened? What's going on?"
22      And she said, "Mom, I was just at a
23 meet-and-greet and this man grabbed my ass."
24      MR. BALDRIDGE: Are you okay?
25      THE WITNESS: No, I think I need a break.

Page 13

1       MR. BALDRIDGE: Sure.
2       (Recess, 1:12 to 1:14 p.m.)
3  BY MR. MCFARLAND:
4  Q.   We were talking about your conversation with
5  Taylor where you learned about the alleged incident
6  with Mr. Mueller. Do you recall Taylor saying anything
7  else to you about the alleged incident?
8  A.   Yes.
9  Q.   And what else do you recall?
10 A.   Well, I started to -- you know, I mean,
11 obviously I started to ask her questions like, "What
12 are you talking about? What happened?"
13      And she said -- well, of course, you know, the
14 first thing is we -- I ran over and hugged her and we
15 were -- I -- I don't know the order of things because I
16 think we were both absolutely in shock, but I know that
17 there were things that came out like it was in the
18 regular meet-and-greet.
19      "Who was this person?"
20      "I don't know. I have never met him before."
21      "How did he grab you?"
22      And she said, "He grabbed my entire butt
23 cheek."
24 Q.   Did she mention whether Mr. Mueller went under
25 or over her skirt?

Page 14

1  A.   He was under her skirt grabbing her bare butt
2  cheek. Bare.
3  Q.   Have there ever been any other incidents at
4  any other meet-and-greets that you're aware of?
5  A.   Never.
6  Q.   What happens next or what do you do next?
7  A.   I was nauseous. I felt like I wanted to cry
8  and throw up at the same time. But I wanted to find
9  out more about it and who was this person. So I went
10 outside and I told her, "I'll be right back. I need to
11 go find out more about this."
12 Q.   How long do you think your meeting with Taylor
13 lasted?
14 A.   I don't recall.
15 Q.   More or less than five minutes?
16      MR. BALDRIDGE: Objection. Speculation.
17      THE WITNESS: I don't -- I really don't
18 recall.
19 BY MR. MCFARLAND:
20 Q.   Okay. And what was Taylor's demeanor while
21 you're having this conversation with her?
22 A.   Humiliated. Embarrassed. Horrified. She was
23 upset. She cried. We cried. It was -- it was just
24 inconceivable.
25 Q.   So you -- you meet with Taylor, you learn

Page 15

1  about the alleged incident, and then you go -- you
2  leave the dressing room to find out more. What happens
3  next?
4  A.   I went -- I asked to see anyone who knew
5  anything about it. Robert. It ended up that we went
6  into a side room with Robert, some of the security
7  people, Erica, Frank, and started to discuss it and try
8  to figure out what happened.
9  Q.   And what did you learn?
10 A.   I learned that there had been a picture taken
11 of it happening and they were, I believe, in the
12 process of printing it out, getting it, or they had it
13 on a -- I don't recall. They were getting it and we
14 were trying to figure out where this person was in the
15 building.
16 Q.   Okay. And Erica, you recall, was there for
17 this portion?
18 A.   Yes.
19 Q.   And some security people?
20 A.   Yes.
21 Q.   Do you know the names of the security people
22 out there?
23 A.   I believe it was Greg Dent and Craig -- what's
24 Craig's last name?
25 Q.   Thomas? Thomas?

Page 16

1  A.   Craig Thomas.
2       MR. BALDRIDGE: I'm not allowed to say.
3  I would help you, but I just --
4       THE WITNESS: Oh, okay.
5       MR. BALDRIDGE: Just say what you
6  remember.
7  BY MR. MCFARLAND:
8  Q.   Mr. Allen, he was there as well?
9  A.   Yes.
10 Q.   All right. Was there anybody else involved in
11 that meeting that you can remember?
12 A.   Not that I recall.
13 Q.   Do you recall anything that Mr. Dent said or
14 did during that meeting?
15 A.   Well, not in particular.
16 Q.   Did you know that Mr. Dent was in the room
17 with Taylor Swift at the time of the alleged incident?
18      MR. BALDRIDGE: Objection. Form.
19      THE WITNESS: I heard, but I didn't see
20 it, so I don't -- I'm assuming he was somewhere in that
21 vicinity when it happened.
22 BY MR. MCFARLAND:
23 Q.   Do you recall Mr. Dent advising the group of
24 you that, hey, I was there, anything like that?
25 A.   I don't remember that.

Page 17

1  Q.   Do you remember anything that Craig Thomas
2  said or did during that meeting?
3  A.   I'm not sure what you're --
4  Q.   I'm just wondering -- I'm just trying to get a
5  sense of what was talked about, what happened at that
6  meeting, so I'm just asking you for what you can recall
7  about --
8  A.   Well, we were all pretty --
9       MR. BALDRIDGE: Wait.
10 BY MR. MCFARLAND:
11 Q.   -- what was said during that meeting and, more
12 specifically, whether Mr. Thomas, you recall anything
13 that he specifically said or did.
14      MR. BALDRIDGE: Objection. Form.
15      THE WITNESS: I do -- I am pretty sure
16 that Craig was the one who was trying to locate him.
17 He had people out with the picture trying to find him.
18 BY MR. MCFARLAND:
19 Q.   Did you realize at this point in time that
20 Mr. -- well, did you know Mr. -- did you know of
21 Mr. Mueller's name during this time?
22      MR. BALDRIDGE: Objection. Form.
23      THE WITNESS: They made have said it, but
24 I didn't -- I wasn't hinged on his name. I was hinged
25 on that picture.

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 18

1  BY MR. MCFARLAND:
2  Q.   And so you saw the picture during this
3  meeting? It could have been a picture of a picture.
4  We have had testimony earlier today that maybe somebody
5  took a picture of the picture.
6  A.   I don't --
7       MR. BALDRIDGE: Always wait. Always
8  wait. Let me -- first of all, objection. Form.
9       And I'll go ahead and instruct you in
10 front of him what we have here is not a conversation.
11 It's a question-and-answer session, so let him finish
12 his question --
13      THE WITNESS: Yeah, I'm not going to
14 guess.
15      MR. BALDRIDGE: -- she'll take it down,
16 I'll raise an objection if need be, and then you
17 answer. It's all good.
18 BY MR. MCFARLAND:
19 Q.   I think your testimony was you were focused on
20 the picture, and so my follow-up question was, did you
21 actually see the picture during this meeting?
22      MR. BALDRIDGE: Objection. Form. Go
23 ahead.
24      THE WITNESS: I was focused on getting
25 the picture, making sure we were getting the picture,

Page 19

1  finding this person and getting him -- locating him.
2  BY MR. MCFARLAND:
3  Q.   Was there any indication during this meeting
4  that Mr. Mueller was affiliated with KYGO?
5  A.   Yes.
6  Q.   And do you know where that information came
7  from?
8  A.   I believe it was Frank Bell.
9  Q.   So Frank Bell was at the meeting as well?
10 A.   Yes, he was.
11 Q.   So Erica, Greg Dent, Craig Thomas, Robert
12 Allen, Frank Bell. Anybody else that you can recall at
13 that meeting?
14 A.   No.
15 Q.   Can you recall anything else about that
16 meeting that we haven't talked about?
17      MR. BALDRIDGE: Objection. Form. Go
18 ahead.
19      THE WITNESS: We were all very upset.
20 This is something that had never happened to us before.
21 We didn't know necessarily what to do in that moment,
22 and when you asked me about do I recall what so-and-so
23 said, we were, all of us, devastated and desperately
24 trying to figure out what to do next. I didn't want
25 him in the building watching her show. He had just

Page 20

1  molested her. I didn't want him to be able to watch
2  her in that show.
3  BY MR. MCFARLAND:
4  Q.   Okay. Was there a plan of action formulated
5  at that meeting?
6  A.   Yes.
7  Q.   And what was the plan?
8  A.   To locate him and escort him from the
9  building.
10 Q.   And that task was given to the security
11 personnel?
12 A.   Yes.
13 Q.   What did you do next?
14 A.   I went back into the dressing room where
15 Taylor was.
16 Q.   And at this point in time, we're how far
17 before the start of the show?
18 A.   We were -- I don't -- I don't remember
19 specifically, but it was within a half an hour of the
20 start of the show.
21 Q.   Did you have any further conversation about
22 the alleged incident?
23      MR. BALDRIDGE: With whom? Objection.
24 Form.
25 BY MR. MCFARLAND:

Page 21

1  Q.   With Mr. Mueller.
2  A.   Absolutely.
3  Q.   And what can you recall about those
4  communications?
5  A.   Trying to get her in a head space to go out
6  and put on a show. She didn't want to disappoint
7  thousands and thousands and thousands of fans because
8  of what this person did.
9  Q.   Okay. Do you have any other communications
10 regarding Mr. Mueller?
11 A.   With her?
12 Q.   Yes.
13 A.   I'm not sure you -- I'm not sure I understand
14 what you are asking me.
15 Q.   I just want to understand the best that I can
16 the communications that you had with Taylor after you
17 went back into the dressing room. Was there anything
18 else that you can specifically recall talking about?
19      MR. BALDRIDGE: Objection to form. Go
20 ahead.
21      THE WITNESS: I told her that we were --
22 what we were trying to do, that we were going to locate
23 him, that he wouldn't be in the building. I was trying
24 to assure her that he -- this person who had just put
25 his hand on her was not going to be allowed to stand

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 22

1  there and watch her show and watch her and stare at
2  her.
3  BY MR. MCFARLAND:
4  Q.     Can you remember any other communications from
5  that time with Taylor?
6  A.     I know that we -- we talked about everything
7  that everyone else was doing.
8  Q.     Such as?
9         MR. BALDRIDGE: Objection. Form.
10        THE WITNESS: The security trying to find
11 him, reaching out -- Frank Bell reaching out to the
12 radio station.
13 BY MR. MCFARLAND:
14 Q.     Anything else you can remember about your
15 conversation with Taylor at that time?
16 A.     No. Only -- no. I -- no.
17 Q.     And shortly after that, Taylor went on stage?
18 A.     Yes.
19 Q.     And what did you do at that point?
20 A.     I stayed backstage for a while and went out
21 into the audience to keep an eye on things and see how
22 she was doing.
23 Q.     And how was she doing?
24 A.     She put on her show.
25 Q.     Did you have any further conversation with

Page 23

1  anyone the night of June 2nd, 2013, about Mr. Mueller?
2  A.     The night.
3  Q.     The evening. The night of the concert.
4  A.     Are you asking me about after the show?
5  Q.     Well, during the show, did you talk to anybody
6  about Mr. Mueller?
7  A.     I had -- I think I had Frank Bell coming up to
8  me and telling me -- in other words, I was getting
9  updates throughout the show. I don't recall when they
10 were, necessarily who they were. I was getting updates
11 on where this individual was. And I was told that he
12 had been escorted out of the building.
13 Q.     So sometime during the concert you learned
14 that Mr. Mueller had been removed from the building?
15 A.     Yes.
16 Q.     Other than getting updates from Mr. Bell, do
17 you recall having any other conversations with anyone
18 about Mr. Mueller during the concert?
19 A.     No.
20 Q.     What happened after the concert?
21        MR. BALDRIDGE: Are we talking still June
22 2 or at any point after the concert?
23 BY MR. MCFARLAND:
24 Q.     Still on June 2.
25 A.     I'm sorry, could you repeat that?

Page 24

1  Q.     Yeah. What -- after the concert finished on
2  June 2nd, 2013, did you have additional conversations
3  relating to Mr. Mueller?
4         MR. BALDRIDGE: On that same day, Andrea,
5  on June 2.
6         THE WITNESS: I'm sure I did.
7  BY MR. MCFARLAND:
8  Q.     Who do you recall talking to after the concert
9  about Mr. Mueller?
10 A.     Everyone in our camp. Absolutely everyone in
11 our camp. The people that have already been mentioned.
12 Q.     Okay. So after the concert, the same sort of
13 group gathered?
14 A.     Yes. We were trying to figure out what to do.
15 Q.     So tell me about -- where did that meeting
16 take place?
17 A.     It wasn't a meeting. I don't -- I'm sorry if
18 I represented that as a meeting. It wasn't. We were
19 all in different places, all talking about the same
20 thing, sometimes two of us, sometimes three of us,
21 sometimes -- it was -- it was bedlam. We were in panic
22 mode. We have never had this happen before. I wasn't
23 keeping track of, okay, I spoke to this guy for two
24 minutes and then I spoke to this person for one minute.
25 I was in shock. My daughter was molested. I wasn't

Page 25

1  keeping track of who I spoke to when.
2  Q.     I'm not being critical for what it's worth. I
3  can't remember what I did yesterday sometimes, so ..
4         Was there a plan of action developed?
5  A.     We wanted to let the radio station know. We
6  didn't want this to happen to anybody else.
7  Q.     In the back-and-forth conversations that you
8  had after the show about Mr. Mueller, was Taylor
9  involved in any of those?
10 A.     No. I mean, we really didn't want to just
11 keep her -- we were trying to let her recover from it.
12 We were keeping her -- I was keeping her apprised of
13 things that we were doing.
14 Q.     You said we wanted -- something to -- I'm not
15 trying to quote you here but something to the effect of
16 we wanted the radio station to know. Who is "we"?
17        MR. BALDRIDGE: Objection.
18        THE WITNESS: All of us.
19        MR. BALDRIDGE: Objection. Form. Wait.
20        THE WITNESS: Sorry.
21        MR. BALDRIDGE: That's okay.
22 BY MR. MCFARLAND:
23 Q.     So you wanted to let the radio station know
24 what Mr. Mueller had done?
25        MR. BALDRIDGE: Objection. Form.

7 (Pages 22 to 25)

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 26

1    THE WITNESS: I wanted the radio station
2 to get the picture and to decide on their own what
3 Mr. Mueller had done.
4 BY MR. MCFARLAND:
5 Q.   And Mr. Bell wanted the same thing?
6 A.   He agreed it was important to send the picture
7 to them.
8 Q.   So the picture that we have been talking about
9 that was taken -- at least your understanding is that
10 was taken at the precise moment that Mr. Mueller
11 inappropriately touched Taylor?
12    MR. BALDRIDGE: Objection. Form.
13    THE WITNESS: No, I don't think. I think
14 it could -- I think it was an action that we could have
15 gotten 100 shots of and it would have shown what
16 happened. I think this is one frozen moment in time of
17 what could have taken several shots to capture, so no,
18 I don't think this is the exact moment, but I think
19 there is something very wrong going on in that picture
20 and I think you can see it.
21 BY MR. MCFARLAND:
22 Q.   What do you think is going on in that picture?
23 A.   I think she is pulling away from him and I
24 think he has his hand on her bare buttocks squeezing.
25 Q.   Okay. Who was in the room at the time

Page 27

1 Mr. Mueller allegedly touched Taylor?
2    MR. BALDRIDGE: Objection. Foundation.
3    THE WITNESS: I know that there would
4 have been Stephanie taking pictures. Erica. I don't
5 know if Frank was there. I know that those two people
6 were there.
7 BY MR. MCFARLAND:
8 Q.   Did -- do you know whether there was security
9 personnel in the room itself?
10 A.   I do not.
11 Q.   Did you ever ask Stephanie what she saw, if
12 anything?
13 A.   Yes.
14 Q.   And what did she tell you?
15 A.   She said she knew it the second it happened.
16 She could tell something was wrong.
17 Q.   Did she tell you that she knew something was
18 wrong or that she saw Mr. Mueller grab Taylor?
19    MR. BALDRIDGE: Objection. Form.
20    THE WITNESS: She said she knew he
21 grabbed her, absolutely.
22 BY MR. MCFARLAND:
23 Q.   Did you ask Erica what she saw?
24 A.   No, I didn't.
25 Q.   Did you ever inquire with security as to what

Page 28

1 Mr. Dent or other security personnel were doing?
2    MR. BALDRIDGE: Objection. Form.
3    THE WITNESS: No.
4 BY MR. MCFARLAND:
5 Q.   Did you ever talk to anybody else who claims
6 to have seen Mr. Mueller grab Taylor?
7 A.   No.
8 Q.   Have you ever inquired as to whether there
9 were other witnesses to the alleged grabbing?
10 A.   No.
11 Q.   Was Mr. Dent fired over his failure to act
12 quickly in response to the alleged grabbing?
13 A.   No.
14    MR. BALDRIDGE: Objection. Form.
15    THE WITNESS: No.
16 BY MR. MCFARLAND:
17 Q.   Have you ever talked to Mr. Dent about what he
18 saw during the alleged incident?
19 A.   No.
20    MR. BALDRIDGE: Objection. Asked and
21 answered. Just a little slower, Andrea.
22    THE WITNESS: Okay.
23 BY MR. MCFARLAND:
24 Q.   Who made the decision to notify the radio
25 station of the alleged incident?

Page 29

1 A.   As a group we did.
2 Q.   And that group would have been you, Robert
3 Allen, Frank Bell?
4 A.   Yes.
5 Q.   Is there anybody else?
6 A.   No.
7 Q.   And at that point you knew Mr. Mueller was
8 employed by KYGO radio?
9 A.   Yes.
10 Q.   And you wanted him fired for the incident?
11    MR. BALDRIDGE: Objection. Form.
12    THE WITNESS: Absolutely.
13 BY MR. MCFARLAND:
14 Q.   And you expected him to get fired as a result
15 of being notified of the alleged incident?
16    MR. BALDRIDGE: Objection. Form.
17    THE WITNESS: No. That was their
18 discussion to make. You asked me if I wanted.
19 BY MR. MCFARLAND:
20 Q.   You didn't think he would get fired?
21    MR. BALDRIDGE: Objection. Form.
22    THE WITNESS: I didn't know if he would
23 get fired.
24 BY MR. MCFARLAND:
25 Q.   Did you know Bob Call before June 2nd, 2013?

8 (Pages 26 to 29)

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
ANDREA SWIFT - 6/28/2016

Page 30

1  A.    Name again?
2  Q.    Bob Call.
3  A.    No. I may have. I don't -- if he's in radio,
4  I may have met him, but I don't --
5  Q.    You didn't recognize Bob Call as the manager
6  for the KYGO Radio Station?
7  A.    I may have met him, but, no, I didn't know who
8  was -- who was on the other end of the phone at KYGO.
9  I didn't -- don't know. I mean, I may know him.
10 Q.    Was there a decision made as to who would
11 contact KYGO?
12 A.    Yes.
13 Q.    And who was the person that was to contact
14 KYGO?
15 A.    Frank Bell.
16 Q.    Do you know when Mr. Bell first contacted KYGO
17 about the alleged incident with Mr. Mueller?
18 A.    I believe it was as soon or within a pretty
19 close time after it happened.
20 Q.    Do you know whether it was the night of the
21 concert or some period of time after that?
22        MR. BALDRIDGE: Objection. Speculation.
23        THE WITNESS: I believe it was the night
24 of the concert.
25 BY MR. MCFARLAND:

Page 31

1  Q.    Were you present when Mr. Bell called KYGO --
2  A.    No --
3  Q.    -- about Mr. Mueller?
4  A.    No, I was not.
5  Q.    After you and Mr. Bell and Mr. Allen made the
6  decision to notify KYGO of the alleged incident and
7  then decided that Mr. Bell was the one who would reach
8  out to KYGO, did anything -- did you have any other
9  communication or discussion about Mr. Mueller that
10 night?
11 A.    Yes.
12 Q.    And what was that?
13 A.    Quite a bit of discussion about how to safely
14 get the picture to them.
15 Q.    How to safely get the picture to KYGO?
16 A.    Yes.
17 Q.    And what do you mean by "safely"?
18 A.    So that it wouldn't leak and be all over the
19 Internet.
20 Q.    And did the conversations regarding getting
21 the picture safely to KYGO, did that happen at the
22 Pepsi Center as well?
23 A.    I believe so.
24 Q.    Okay. Do you recall any other conversations
25 about Mr. Mueller at the Pepsi Center the evening or

Page 32

1  the night of June 2nd, 2013?
2  A.    No.
3  Q.    Did you have any other conversations with
4  Taylor the evening or the night of June 2nd, 2013,
5  about Mr. Mueller?
6  A.    Yes.
7  Q.    Okay. Tell me about those conversations.
8  A.    They were very emotional conversations
9  about -- about how -- you know, feeling very out of
10 control of a situation, trying to feel that we were
11 doing everything we could to make sure that this didn't
12 happen to another young artist.
13        I think she was very concerned about knowing
14 how many times that we have been in situations with
15 radio DJs, how many young artists come through those
16 doors and could be victimized by a man like him and
17 that for him to have done this in front of -- in front
18 of all these people, what might he do privately with a
19 young girl? It was horrifying. It was horrifying to
20 think that this person was just walking around, and we
21 were horrified.
22 Q.    Did you contemplate calling the police?
23 A.    We wanted to -- this was in the workplace.
24 This was her -- this is a person who she views as one
25 of her bosses, and she felt, we all felt, that

Page 33

1  reporting it directly to the radio station -- but we
2  were contemplating all kinds of options at that point.
3  We didn't know what to do, what the right thing to do
4  was.
5  Q.    Why didn't you call the police?
6  A.    Because we didn't -- I didn't want her life
7  defined by that moment. I didn't want to bear the days
8  and weeks and months of Internet sensationalism and
9  gifts and mimes to absolutely violate her more than she
10 already had been. And we wanted to handle it with the
11 radio station, and that is where we wanted him to feel
12 that he couldn't get away with that.
13 Q.    But you didn't think it was appropriate to get
14 the police involved?
15        MR. BALDRIDGE: Objection. Form. Asked
16 and answered.
17        THE WITNESS: I'm not saying I didn't
18 think it was appropriate. I think -- I think we were
19 contemplating all options at that point.
20 BY MR. MCFARLAND:
21 Q.    But you didn't call the police because of the
22 impact it might have on Taylor?
23        MR. BALDRIDGE: Objection. Asked and
24 answered.
25 BY MR. MCFARLAND: