**EXHIBIT 9**

# In The Matter of:

*MUELLER*

*vs.*

*SWIFT, ET AL.*

*FRANCIS BELL*

*June 29, 2016*

*CONFIDENTIAL*

*PURSUANT TO THE PROTECTIVE ORDER*

Page 1

\* \* \* \* \*

DEPOSITION DESIGNATED CONFIDENTIAL

PURSUANT TO THE PROTECTIVE ORDER

\* \* \* \* \*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

```
DAVID MUELLER,                      )
                                    )
         Plaintiff,                 )
                                    )
vs.                                 ) NO. 1:15-cv-01974-
                                    )     WJM-KLM
TAYLOR SWIFT; FRANK BELL;           )
ANDREA SWIFT a/k/a ANDREA           )
FINLAY; SCOTT SWIFT; and JOHN       )
DOES 1 - 5,                         )
                                    )
         Defendants.                )
                                    )
```

Deposition of:

FRANCIS BELL

Taken on behalf of the Plaintiff

June 29, 2016

Reported by: Martha B. Davis, RMR, RDR, CRR
             LCR No. 152

Job No.: WDC-090836

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 6/29/2016

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiff:   M. Gabriel McFarland, Esq.
                          Evans & McFarland, LLC
 3                        910 13th Street
                          Suite 200
 4                        Golden, CO 80401
                          303-279-8300
 5                        gmcfarland@emlawyers.com
 6   For the Defendants:  J. Douglas Baldridge, Esq.
                          Courtney A. Sullivan, Esq.
 7                        Katherine M. Knight, Esq.
                          Venable, LLP
 8                        575 7th Street NW
                          Washington, D.C. 20004-1601
 9                        202-344-4703
                          jdbaldridge@venable.com
10                        casullivan@venable.com
                          kmwright@venable.com
11
        Also Present:     Jesse Schaudies
12
```

Page 3

```
 1                    I N D E X
 2   Questions by Mr. McFarland                5
 ...
 8     PREVIOUSLY MARKED EXHIBIT
 9   DEPOSITION OF STEPHANIE SIMBECK
10   No. 1:   Sketch prepared by Stephane Simbeck   11
11
13                    EXHIBITS
14   No. 7:   AT&T records, Firefly Entertainment
              (SWIFT 0000183 - 0000188)          44
15
     No. 8:   Telephone call logs for Frank Bell
16            (SWIFT 0000160 - 0000182)          46
17   No. 9:   E-mail string, Frank Bell to Mark
              Panetta, September 15, 2015
18            (SWIFT 0000156)                    47
19   No. 10:  E-mail string, Frank Bell to Joel
              Burke, September 14, 2015
20            (SWIFT 0000153 - 0000155)          48
21   No. 11:  Mr. Bell's handwritten notes
              (SWIFT 0000077 - 0000078)          52
```

Page 4

 1        The deposition of FRANK BELL was taken by
 2   counsel for the Plaintiff, pursuant to notice, at the
 3   offices of Cleeton Davis Court Reporters, LLC, 402 BNA
 4   Drive, Suite 108, Nashville, Tennessee, on
 5   June 29, 2016, for all purposes under the Federal Rules
 6   of Civil Procedure.
 7        The formalities as to notice, caption,
 8   certificate, et cetera, are waived.  All objections,
 9   except as to the form of the questions, are reserved to
10   the hearing.
11        It is agreed that Martha B. Davis, being a
12   licensed court reporter and notary public for the State
13   of Tennessee, may swear the witness, and that the
14   reading and signing of the completed deposition by the
15   witness are not waived.
16
17
18                    * * *
19
20
21        MR. BALDRIDGE:  Before we start, I just
22   want to make it clear that the prior deposition also is
23   designated confidential under the protective order, as
24   I think we omitted doing that, and we will go ahead and
25   prospectively designate the entirety of Mr. Bell's

Page 5

 1   deposition as confidential under the protective order.
 2   Thank you.
 3        MR. MCFARLAND:  Thanks.
 4
 5             FRANCIS BELL
 6   was called as a witness, and after having been first
 7   duly sworn, testified as follows:
 8             EXAMINATION
 9   QUESTIONS BY MR. MCFARLAND:
10   Q.   Would you state your full name for the record,
11   please.
12   A.   Legal or professional?  Legal name is Francis
13   Bell.  Professional name is Frank Bell.
14   Q.   Mr. Bell, you're currently employed?
15   A.   Yes.
16   Q.   And who are you employed by?
17   A.   By 13 Management, LLC.
18   Q.   And what's your position for 13 Management?
19   A.   I am Taylor Swift's radio guy for lack of a
20   more formal designation.
21   Q.   And what do you do as Taylor Swift's radio
22   guy?
23   A.   I follow her around the world and act as the
24   go-between between Taylor and management and radio
25   stations, both pop and country, domestically and

2 (Pages 2 to 5)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 6/29/2016

Page 6

1 internationally.
2 Q. And how long have you served in that position?
3 A. Since December of 2010.
4 Q. What did you do before that?
5 A. I was in radio 30 something years. I was in
6 Pittsburgh for -- I mean, the previous ten years I was
7 in Pittsburgh.
8 Q. Working for a radio station?
9 A. Yes, working for Key Market -- I don't know
10 what the corporate name is, but it was known as Key
11 Market, the Froggy radio stations.
12 Q. And what were you doing for them?
13 A. Vice -- excuse me. Vice president of
14 programming. Oversaw the programming. It was a small
15 privately owned group and -- about 13 stations, 13 or
16 14.
17 Q. Okay. And you have been -- you were in radio
18 for another 20 years prior to that?
19 A. Yes, sir.
20 Q. Did you ever work in Denver?
21 A. No. No. Never worked or consulted any
22 stations in Denver.
23 Q. Have you spent your entire professional career
24 in radio?
25 A. For all intents and purposes, yes.

Page 7

1 Q. Where did you go to college?
2 A. American University, Washington, D.C.
3 Q. And what kind of degree did you graduate with?
4 A. Interdisciplinary studies with an emphasis on
5 broadcasting.
6 Q. Any other education or degrees?
7 A. No.
8 Q. Prior to June of 2013, did you know of David
9 Mueller?
10 A. No.
11 Q. Had you ever heard his radio program?
12     MR. BALDRIDGE: Objection to form.
13     THE WITNESS: No.
14     MR. BALDRIDGE: Slow down just a slight
15 degree.
16 BY MR. MCFARLAND:
17 Q. Do you attend most of Taylor Swift's concerts?
18 A. Yes. Since I started this job, three world
19 tours at this point. Not every show, but I would say
20 maybe 85 to 90 percent.
21 Q. And you attended her show in Denver on June
22 2nd, 2013?
23 A. Yes.
24 Q. And do you remember the venue that that show
25 was at?

Page 8

1 A. The Pepsi Arena?
2 Q. When did you -- well, at some point on June
3 2nd, 2013, did you become aware that there had been an
4 incident or there was a problem?
5     MR. BALDRIDGE: Objection. Form. You
6 may answer.
7     THE WITNESS: Okay. Yes.
8 BY MR. MCFARLAND:
9 Q. And when did you learn that there was a
10 problem?
11     MR. BALDRIDGE: Same objection.
12     THE WITNESS: At the conclusion of what
13 we call the regular meet-and-greet.
14 BY MR. MCFARLAND:
15 Q. What's the regular meet-and-greet?
16 A. The form for Taylor's shows, we begin with
17 what we call the country vibe room, which is program
18 directors and their families from country radio
19 stations. Then the regular meet-and-greet is usually
20 comprised of fans who have won contests or who are
21 affiliated with brand partners. Occasionally there
22 might be a lower level radio staffer included in the
23 meet-and-greet. And then that's followed by what we
24 call the pop vibe room, which is generally program
25 directors, executives for the pop music stations in

Page 9

1 that market.
2 Q. Do you know who determined which meet-and-
3 greet Mr. Mueller would attend?
4 A. That would have been Kris Lamb, who was the
5 Big Machine records representative for that area at
6 that time. He would have placed -- he would have made
7 the determination as to who -- which individuals would
8 go into say the country vibe room versus the regular
9 meet-and-greet.
10 Q. Do you know Eddie Haskell?
11 A. I do.
12 Q. And who is Eddie Haskell?
13 A. Eddie is currently the program director of
14 KYGO, and prior to that time he was in Albuquerque,
15 although I don't recall the exact call letters.
16 Q. How do you know Mr. Haskell?
17 A. Mainly by reputation. I don't know if -- I
18 have had virtually no interaction with him over the
19 years. That was probably more geographical than
20 anything if he was in Albuquerque. May I shut this
21 off?
22     MR. SCHAUDIES: That was probably mine.
23     THE WITNESS: No, it was mine.
24 So I had very little interaction with
25 him. I never, for example, went to Albuquerque on a

3 (Pages 6 to 9)

Page 10

1  Taylor Swift tour or anything like that. I may have
2  met him at a convention at a record company affair or
3  something like that but really no real connection or
4  relationship per se.
5  BY MR. MCFARLAND:
6  Q.    Do you know Mr. Haskell's relationship with
7  Kris Lamb?
8  A.    Not really other than the traditional just
9  record rep, program director, and what that usually
10 means is they talk to each other every week on the
11 phone about music and what songs to play.
12       MR. BALDRIDGE: Mr. Bell, you're
13 absolutely free to answer the question any way you
14 think best, but if you know -- knew the relationship
15 between Mr. Lamb and Mr. Haskell, if any, it's
16 perfectly appropriate to say yes or no and not -- or we
17 could be here a very long time.
18       THE WITNESS: Okay.
19 BY MR. MCFARLAND:
20 Q.    How did you first learn that there was an
21 issue on June 2nd, 2013?
22       MR. BALDRIDGE: Objection. Form.
23       THE WITNESS: I was in the outer area
24 where we normally gather program directors for the vibe
25 room, and I believe it was Erica Worden opened the

Page 11

1  curtain in the little space where the meet-and-greet
2  took place and said, "Come over here. We have a
3  problem." And I didn't know what it was, so I went
4  back there and learned what had happened.
5  BY MR. MCFARLAND:
6  Q.    Let me show you what's been previously marked
7  Deposition Exhibit 1. This was a diagram of the
8  meet-and-greet area --
9  A.    Okay.
10 Q.    -- that Stephanie Simbeck was nice enough to
11 draw for us.
12 A.    Okay. Yeah.
13 Q.    Does it look accurate to you?
14       MR. BALDRIDGE: Objection. Form.
15       THE WITNESS: It does in the sense that
16 there is a separate area here where Taylor meets the
17 regular meet-and-greet people, and this area here is
18 where Taylor would normally meet the program directors
19 and any VIPs that were attending.
20 BY MR. MCFARLAND:
21 Q.    And when Erica Worden -- well, I should say
22 Gabby Liddicoat indicated or called this the photo
23 booth. Is that a fair way to refer to this room?
24       MR. BALDRIDGE: Objection. Form.
25       THE WITNESS: Yeah. Photo booth or photo

Page 12

1  space. Step and repeat would be another term.
2  BY MR. MCFARLAND:
3  Q.    Okay. And what do we call this larger area
4  outside the photo booth area?
5  A.    For this tour at that time it was termed Club
6  Red.
7  Q.    Okay. And when Erica Worden approached you to
8  advise you that there was a situation, where were you,
9  approximately?
10 A.    Yeah. I probably would have been here. I
11 would have been staying away from whatever -- if there
12 were still anybody in line, I don't recall, but I
13 probably would have been over here getting ready to
14 bring in the pop program directors, just waiting for
15 everything to wrap up.
16 Q.    Okay. So you were in the Club Red area but
17 not in the photo booth?
18 A.    Correct.
19 Q.    Were you in the photo booth at any time during
20 the regular meet-and-greet?
21       MR. BALDRIDGE: Objection. Form.
22       THE WITNESS: No.
23 BY MR. MCFARLAND:
24 Q.    So Erica tells you there is a situation,
25 you -- I believe you testified that you followed her

Page 13

1  into the photo booth; is that right?
2        MR. BALDRIDGE: Object to the form.
3        THE WITNESS: Yes.
4  BY MR. MCFARLAND:
5  Q.    And what happened there?
6  A.    To the best of my recollection, they explained
7  that Taylor had been groped by someone that they
8  believed was affiliated with a radio station. I had no
9  idea at the time that there were any KYGO personnel in
10 the regular meet-and-greet. I know someone had worn a
11 radio station T-shirt, but that happens all the time in
12 every city. You always have fans wearing T-shirts.
13       So it was very clear at that time that Taylor
14 was very upset, that she felt she had been violated and
15 that we needed to find out who this person was that did
16 this, because at this point, by the time I got in the
17 room, all the other fans, meet-and-greet people, had
18 already left.
19 Q.    Who was in the room when you entered?
20 A.    As nearly as I can recall, it would have been
21 Stephanie who took the pictures, Erica, Greg Dent, the
22 security guy at the time, and Gabby. She would have
23 probably been the one distributing the 8-by-10s to the
24 people in the meet-and-greet.
25 Q.    Was Taylor in the room?

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 6/29/2016

Page 14

1  A.   Oh, I'm sorry. Yes, of course. Yes. Yes.
2  Q.   And do you recall from whom you heard that
3  someone affiliated with a radio station or perhaps
4  affiliated with a radio station had inappropriately
5  touched Ms. Swift?
6       MR. BALDRIDGE: Objection. Form.
7       THE WITNESS: I'm -- to the best of my
8  recollection, it was Taylor herself, said it was a --
9  she identified him as a radio guy, and not using that
10 term but as a radio employee.
11 BY MR. MCFARLAND:
12 Q.   Do you recall the words that Taylor actually
13 used to describe the incident?
14 A.   I don't recall the actual words. To the best
15 of my recollection, she said, "This guy stuck his hand
16 up my skirt and grabbed my bare ass."
17 Q.   At that point, did you ask anyone else in the
18 room what they had seen?
19 A.   I don't recall in the sense that the -- I
20 don't recall quizzing, for instance, Greg, the security
21 guy or Stephanie. I think my immediate reaction was
22 who is this person and I was very concerned because it
23 was a radio person. I take the radio stuff very
24 seriously in terms of just representing radio.
25 Q.   Was there any conversation or did you hear any

Page 15

1  conversation about what any of the other people saw?
2  A.   The only thing I recall is that there was
3  confirmation that he was a radio person, that he was
4  affiliated with a radio station.
5  Q.   Was there any conversation about why people in
6  the room thought Mr. Mueller was affiliated with the
7  radio station?
8  A.   I believe it was -- there was -- I believe he
9  was wearing a shirt or Taylor had had a conversation
10 with him that involved radio, but I have no idea what
11 that conversation entailed.
12 Q.   What did you do next?
13 A.   I believe the first real action I took would
14 have been to call Kris Lamb, who -- because we were
15 trying to find where this person was. We were trying
16 to identify him and then find out where his seats were
17 located because we really did not want this person in
18 the building for the concert.
19      And I think other people may have been trying
20 to contact Kris Lamb also. I don't know if he
21 responded right away. I mean, we talked, you know,
22 around that time, but I don't recall if I was the first
23 one to say to him who was this guy or whatever.
24 Someone else may have.
25 Q.   Okay. Did you make that call from the photo

Page 16

1  booth?
2       MR. BALDRIDGE: Objection. Form.
3       THE WITNESS: I don't recall. I doubt
4  it. I can't imagine -- I probably would have stepped
5  outside to make the call because there would have been
6  other, you know --
7  BY MR. MCFARLAND:
8  Q.   How long after you entered the photo booth
9  room, how long was it before Taylor left?
10 A.   I would say less than five minutes. I don't
11 think she -- and keep in mind, if I may, we had another
12 group of people coming into this area that she would
13 have to meet.
14 Q.   Okay.
15      MR. BALDRIDGE: Excuse me. I have got to
16 take a very quick break. It will be very quick.
17      (Recess, 10:26 to 10:30 a.m.)
18 BY MR. MCFARLAND:
19 Q.   Do you know where Taylor went when she left
20 the photo booth?
21 A.   No.
22 Q.   But your recollection is that there was
23 another meet-and-greet group coming into the Club Red
24 area?
25 A.   Yes.

Page 17

1  Q.   Did you attend or were you present for the
2  subsequent meet-and-greet on June 2nd, 2013?
3  A.   Yes.
4  Q.   And Taylor was present?
5  A.   Yes.
6  Q.   How long after you made the call to Kris Lamb
7  did you attend the subsequent meet-and-greet? I'm just
8  trying to get a sense of the timing.
9  A.   I don't know. I -- I just don't know. I
10 don't have it in my head the time lapse between one and
11 the other.
12 Q.   It was only a couple of years ago.
13 A.   No, I --
14      MR. BALDRIDGE: Making fun of us old
15 people again, are you?
16      MR. SCHAUDIES: The anger is just
17 boiling.
18 BY MR. MCFARLAND:
19 Q.   So you called Kris Lamb?
20 A.   (Witness moves head up and down.)
21 Q.   What do you recall about that conversation?
22 A.   To the best of my knowledge, I asked him if
23 there were any radio personnel in the meet-and-greet
24 list, okay, because up to that point I had not been
25 aware that there were any radio employees in that.

5 (Pages 14 to 17)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 6/29/2016

Page 18

1 Q. And what was Mr. Lamb's response?
2 A. I don't recall. My sense is we were trying to
3 get visual photos or a photo to identify who he was.
4 Q. Do you recall whether you saw a photograph of
5 Mr. Mueller while you were in the photo booth?
6 A. I believe I did.
7 Q. And do you recall whether Ms. Swift identified
8 him as the person who allegedly inappropriately touched
9 her?
10     MR. BALDRIDGE: Objection. Form.
11     THE WITNESS: I answer?
12     MR. BALDRIDGE: Oh, yeah.
13     THE WITNESS: Yeah, I -- yes.
14 BY MR. MCFARLAND:
15 Q. Do you recall anything else about your
16 conversation, your telephone conversation with
17 Mr. Lamb?
18 A. I don't.
19 Q. Okay.
20 A. Sorry.
21 Q. What do you recall doing next in relation to
22 Mr. Mueller?
23 A. It's difficult to recall because I would have
24 gone into the room with the pop PDs and had a series of
25 10 or 15 conversations with them that obviously had

Page 19

1 nothing to do with any of this, so I don't really --
2 could you ask the question again, just because I'm not
3 sure.
4 Q. Okay. So as you recall, and I know it was
5 sometime ago, you found out that there was an issue,
6 you made a call to Kris Lamb, you had a conversation
7 with Kris Lamb, and it sounds like after that you went
8 into the Club Red for the pop meet-and-greet.
9     MR. BALDRIDGE: Objection. Form.
10 BY MR. MCFARLAND:
11 Q. Is that accurate?
12     MR. BALDRIDGE: Form.
13     THE WITNESS: I don't know because the
14 call could have taken place to Kris Lamb -- or the
15 conversation. Pardon me. The call is one thing, but I
16 don't think he picked up the first time. So it's
17 possible the conversation with Kris Lamb took place
18 after the pop vibe.
19 BY MR. MCFARLAND:
20 Q. Okay. What's the next thing that you can
21 remember doing relating to Mr. Mueller?
22 A. Once he was located in the crowd or wherever
23 he was -- I don't know where they located him; I had
24 nothing to do with that -- there was a meeting
25 backstage with Mueller, with the woman he was with,

Page 20

1 whose name escapes me, sorry, and some security people.
2 Q. And you were there at that meeting?
3 A. Not the entire meeting. I was there -- they
4 were already assembled when I was summoned and by the
5 time I got there, but I was there for part of the
6 meeting.
7 Q. Do you recall the security personnel that were
8 there?
9 A. I want to say Craig. I don't know Craig's
10 last name. There was probably someone from the venue,
11 a security person, who I don't know what that person's
12 name was.
13 Q. Do you recall how you found out that they
14 had -- that security had located Mr. Mueller?
15 A. No.
16 Q. Between your phone call to Mr. Lamb and
17 arriving at what I'll loosely call a meeting, did you
18 have any conversations with anybody else about
19 Mr. Mueller?
20     MR. BALDRIDGE: Objection. Form.
21     THE WITNESS: I don't recall. I can't
22 recall a specific conversation.
23 BY MR. MCFARLAND:
24 Q. Okay. What do you recall about this meeting
25 backstage with Mr. Mueller?

Page 21

1 A. I recall that Mr. Mueller was there with his
2 female guest and he was told that he had been
3 identified as grabbing Taylor inappropriately, groping
4 her. He -- I really don't recall too much more what
5 transpired other than he was asked or he was told he
6 was going to be escorted from the building, that they
7 would not be allowed to attend the concert.
8 Q. Did you say anything to Mr. Mueller?
9 A. I'm sure I spoke at the meeting, but I don't
10 recall in terms -- in what terms or specifics. There
11 were other people talking. It was . . .
12 Q. Do you recall anything that Mr. Mueller said
13 to you?
14 A. Not really. He -- I'm sure he did speak, but
15 I don't recall what he would have said. He appeared to
16 me to be sheepish for lack of a better word.
17 Q. Did you have any conversations with
18 Mr. Mueller's female friend?
19 A. Not that I recall.
20 Q. Is there anything else you can -- well, were
21 you there -- did they subsequently escort Mr. Mueller
22 out of the building?
23     MR. BALDRIDGE: Object to the form.
24     THE WITNESS: I assume that happened. I
25 did not personally witness it.

6 (Pages 18 to 21)

DTI Court Reporting Solutions - Washington, DC
1-800-292-4789                                  www.deposition.com

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 6/29/2016

Page 22

1  BY MR. MCFARLAND:
2  Q.  Okay. You left the area before Mr. Mueller
3  was escorted out?
4       MR. BALDRIDGE: Objection. Form.
5       THE WITNESS: I don't know. I don't
6  recall the time.
7  BY MR. MCFARLAND:
8  Q.  Did you see security escorting -- well, let me
9  ask. When did you leave the venue?
10      MR. BALDRIDGE: Objection. Form.
11      THE WITNESS: I don't know. I guess when
12  it was over.
13      MR. BALDRIDGE: Let me just -- for Gabe
14  and I, both of our benefit, when you answer the
15  question "I guess," it's probably not an answer.
16      THE WITNESS: It probably doesn't help
17  one way or the other.
18      MR. BALDRIDGE: That's all right. For
19  both of us, we're just trying to find out what you
20  remember, man.
21  BY MR. MCFARLAND:
22  Q.  Do you remember if you left before Mr. Mueller
23  did?
24  A.  I do not recall that.
25  Q.  Did you have any further communications

Page 23

1  regarding Mr. Mueller on June 2nd, 2013?
2  A.  Yes.
3  Q.  What was the next -- after the meeting that we
4  just talked about concluded, what was your next
5  communication regarding Mr. Mueller?
6  A.  I was summoned into another meeting somewhere
7  backstage.
8  Q.  And who attended that meeting?
9  A.  To the best of my recollection, that would
10  have been Robert Allen, Andrea Swift. I don't want to
11  use the word "possibly" because he'll yell at me so I'm
12  just going to stop. I remember those, and it's very
13  possible there was someone else there, but I don't
14  recall.
15  Q.  Okay. What was the -- what can you recall
16  about those conversations?
17  A.  Obviously everyone was very upset. Everyone
18  felt violated and disappointed. I can't -- I -- just
19  really, really disappointed that something like this
20  happened with a radio person. And, understandably, her
21  mother was very upset and angry and she wanted me to
22  make sure that I communicated with the radio station
23  the next day.
24  Q.  Did she express why she wanted you to
25  communicate with the radio station?

Page 24

1  A.  Yes.
2       MR. BALDRIDGE: Object to the form. Go
3  ahead.
4  BY MR. MCFARLAND:
5  Q.  And why was that?
6  A.  She wanted Mr. Mueller to be -- to not be in
7  radio anymore, to be fired.
8  Q.  And is that the same thing that you wanted?
9  A.  That I wanted?
10 Q.  Yes.
11 A.  No, in the sense that I wanted, for lack of a
12 better term, justice to be served in the sense that I
13 wanted his employer to be aware of what had happened.
14 Q.  And did you call his -- Mr. Mueller's employer
15 the next day?
16 A.  The next morning.
17 Q.  Who did you call?
18 A.  Bob Call.
19 Q.  And how did you determine to contact Bob Call?
20 A.  Because I knew him to be the general manager
21 of the radio station and the executive who would be in
22 a position to deal with a matter of this nature.
23 Q.  Did you have a conversation with Mr. Call on
24 June 3rd about Mr. Mueller?
25 A.  Yes.

Page 25

1  Q.  And what did you tell Mr. Call?
2  A.  I asked him if he was aware of what had
3  happened at the show the previous night, and my
4  recollection is that he said he was aware, he had heard
5  from Eddie, his program director. They had
6  communicated. And I expressed to him great
7  disappointment that we had that this happened,
8  especially a representative of KYGO, and that -- you
9  know, I said, "I know what type of person you are, I
10 know what kind of company Lincoln Financial is, and I
11 know that you all will do your homework and make your
12 own independent determination of what to do here."
13 Q.  Did you tell Mr. Call that you and Taylor's
14 mother and Taylor and the management team expected
15 Mr. Call to take appropriate action?
16      MR. BALDRIDGE: Objection.
17 Mischaracterizes his testimony. Go ahead.
18      THE WITNESS: Oh, okay. Sorry.
19      MR. BALDRIDGE: Yeah, I'll tell you if
20 there is an instruction not to answer. Why don't we
21 ask the question again so it's fresh in your mind or
22 have it reread.
23      MR. MCFARLAND: Would you reread that for
24 us?
25      THE COURT REPORTER: "Question: Did you

7 (Pages 22 to 25)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 6/29/2016

Page 26

1 tell Mr. Call that you and Taylor's mother and Taylor
2 and the management team expected Mr. Call to take
3 appropriate action?"
4     MR. BALDRIDGE: Same objection. Form.
5     THE WITNESS: Yes.
6 BY MR. MCFARLAND:
7 Q. And what did you mean by "appropriate action"?
8 A. I meant that they should investigate, do their
9 homework, and based on whatever they found, whatever
10 they learned, to take the appropriate action.
11 Q. Did you tell Mr. Call that Mr. Mueller had
12 groped Ms. Swift?
13 A. I don't know if I used the term "groped" or
14 not, but I certainly would have characterized what had
15 happened.
16 Q. Do you remember how you characterized it?
17 A. No.
18 Q. Do you recall how long that phone call lasted?
19 A. Maybe -- I mean, there would be phone records
20 to verify, but I -- five to ten minutes.
21 Q. Can you recall anything else about the
22 conversation that you had with Mr. Call during that
23 telephone call?
24 A. Yes. I told him that there was photographic
25 evidence, and Mr. Call requested that I send him that

Page 27

1 photograph. And I explained I could not do that, I
2 needed to secure permission from my superiors in order
3 to do that but I would check on it.
4 Q. Can you recall anything else about your
5 conversation with Mr. Call during that telephone call?
6 A. No.
7 Q. Before you made that phone call to Mr. Call at
8 KYGO, did you talk to Gabby Liddicoat about what she
9 saw during the alleged incident?
10     MR. BALDRIDGE: Objection. Form.
11     THE WITNESS: I don't recall.
12 BY MR. MCFARLAND:
13 Q. Before you made that phone call, did you talk
14 to Stephanie Simbeck about what she saw during the
15 alleged incident?
16     MR. BALDRIDGE: Objection. Form.
17     THE WITNESS: Any conversation with
18 Stephanie would have taken place in that earlier
19 meeting.
20 BY MR. MCFARLAND:
21 Q. Do you recall talking to Stephanie about what
22 she saw at the time of the alleged incident?
23     MR. BALDRIDGE: Objection. Form.
24     THE WITNESS: Yes.
25 BY MR. MCFARLAND:

Page 28

1 Q. And what did she tell you about what she saw?
2 A. She said she took the guy's picture.
3 Q. Did she tell you that she saw Mr. Mueller
4 inappropriately touch Taylor?
5 A. I believe she did, yes.
6 Q. Did she tell you that she saw Mr. Mueller lift
7 Taylor's skirt in any form or fashion?
8     MR. BALDRIDGE: Objection. Form.
9     THE WITNESS: I don't recall any specific
10 like that that she would have said.
11 BY MR. MCFARLAND:
12 Q. Did you talk to Abby about what she saw during
13 the alleged incident before you called Mr. Call --
14 A. She --
15     MR. BALDRIDGE: Hold on. Let him finish.
16 BY MR. MCFARLAND:
17 Q. -- before you called Mr. Call?
18     MR. BALDRIDGE: Objection. Form and
19 asked and answered.
20     THE WITNESS: I tripped up on the name
21 you were asking. Did you say Gabby or Abby, because we
22 had one of each on that tour.
23 BY MR. MCFARLAND:
24 Q. Most recently I said Abby with an "A."
25 A. Okay. I don't recall any conversation with

Page 29

1 Abby, A-B-B-Y.
2 Q. Do you recall any conversation with Gabby
3 before you spoke to Mr. Call at KYGO?
4 A. The only conversation -- only in that little
5 area right there as it all happened.
6 Q. And did she -- did Gabby with a "G" indicate
7 to you that she saw Mr. Mueller inappropriately touch
8 Taylor?
9     MR. BALDRIDGE: Objection. Form and
10 foundation.
11     THE WITNESS: I don't recall Gabby -- any
12 specifics of the conversation with Gabby.
13 BY MR. MCFARLAND:
14 Q. Before you called Mr. Call at KYGO for the
15 first time on June 3rd, 2013, did you talk to Greg Dent
16 about what he saw during the alleged incident?
17     MR. BALDRIDGE: Objection. Form.
18     THE WITNESS: No.
19 BY MR. MCFARLAND:
20 Q. What investigation did you conduct, if any,
21 before contacting Bob Call at KYGO?
22     MR. BALDRIDGE: Objection. Form.
23     THE WITNESS: I did not conduct any
24 investigation that would have -- I did not conduct any
25 investigation.

8 (Pages 26 to 29)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 6/29/2016

### Page 30

1  BY MR. MCFARLAND:
2  Q.    To the best of your knowledge, did anyone
3  conduct an investigation into what happened before you
4  made your initial phone call to Bob Call?
5         MR. BALDRIDGE: Objection. Form.
6         THE WITNESS: No formal investigation
7  that I'm aware of.
8  BY MR. MCFARLAND:
9  Q.    Before you called Bob Call on June 2nd, 2013,
10 did anybody report to you any results of any
11 investigation into the alleged incident?
12        MR. BALDRIDGE: Objection. Form.
13 Foundation.
14        THE WITNESS: I called Bob Call on June
15 3rd. I didn't talk to him on the 2nd. I think you may
16 have --
17 BY MR. MCFARLAND:
18 Q.    Okay. Let me --
19 A.    All right, yeah. So can you please repeat the
20 question, because I got tripped up on that date.
21        THE COURT REPORTER: "Question: Before
22 you called Bob Call on June 2nd, 2013, did anybody
23 report to you any results of any investigation into the
24 alleged incident?"
25 BY MR. MCFARLAND:

### Page 31

1  Q.    So let me rephrase that.
2  A.    Okay.
3  Q.    Before you called Bob Call on June 3rd, 2013,
4  did anybody report to you the results of any
5  investigation into the alleged incident?
6         MR. BALDRIDGE: Objection. Form.
7         THE WITNESS: Okay. No.
8  BY MR. MCFARLAND:
9  Q.    What did you do with respect to Mr. Mueller or
10 the incident after you called Bob Call on June 3rd?
11        MR. BALDRIDGE: Objection. Form.
12        THE WITNESS: What did I do in regard --
13 BY MR. MCFARLAND:
14 Q.    Yeah. What did you do next?
15 A.    Really, I think we were -- we had shows coming
16 up, we had big stadium shows, so I would have been
17 involved with setting up the next -- the next group of
18 shows with the next cities and promotional people, et
19 cetera.
20 Q.    Okay. Can you recall taking any other action
21 after your June 3rd, 2013, call with Bob Call?
22        I think that's my --
23        MR. BALDRIDGE: Let me just -- somebody
24 is beeping bad. That means it's time to go.
25        (Discussion off the record.)

### Page 32

1         THE COURT REPORTER: "Question: Can you
2  recall taking any other action after your June 3rd,
3  2013, call with Bob Call?"
4         MR. BALDRIDGE: Objection. Form.
5         THE WITNESS: The only other action I
6  recall is I sent Mr. Call the photograph.
7  BY MR. MCFARLAND:
8  Q.    Do you remember when you did that?
9  A.    I don't remember the time. I'm sure that's
10 available somewhere.
11 Q.    Okay. And prior to sending that photograph,
12 did you get any kind of promise that it wouldn't be
13 disseminated?
14        MR. BALDRIDGE: Objection. Form.
15        THE WITNESS: Yes.
16 BY MR. MCFARLAND:
17 Q.    And who did that come from?
18 A.    When I spoke to Bob Call, I explained it's
19 very sensitive, we don't want this photograph following
20 her for the rest of her life, and he agreed to keep it
21 private within their company and not to post it
22 publicly or anything like that.
23 Q.    Do you believe that the photograph shows that
24 Mr. Mueller is actually inappropriately touching
25 Ms. Swift at the time the photograph was taken?

### Page 33

1  A.    What I see in that photograph is Taylor
2  withdrawing from Mr. Mueller, which is, by my
3  experience, really unusual. I have seen her meet
4  hundreds, if not thousands of people, and she just --
5  she loves everybody, and what was distinctive about
6  that photograph to me was in addition to where his hand
7  appeared to be, she was trying to get away from him.
8  It was very unusual. It was -- it got my attention.
9  Q.    Do you recall having any conversations with
10 Mr. Mueller -- about Mr. Mueller after your June 3rd,
11 2013, phone call with Bob Call?
12 A.    I'm trying to rattle my brain here. Not
13 really, I mean, other than internal, you know, there
14 may have been a conversation, you know, did you talk to
15 Bob Call, yes, thank you, that sort of thing with her
16 mother, something like that.
17 Q.    Okay. Why didn't you call the police?
18        MR. BALDRIDGE: Objection. Form.
19 Foundation.
20        THE WITNESS: That would not have been my
21 role in that situation.
22 BY MR. MCFARLAND:
23 Q.    Did you ever contemplate whether the police
24 should be called?
25        MR. BALDRIDGE: Objection. Form.

9 (Pages 30 to 33)

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 6/29/2016

Page 34

1  THE WITNESS: Yes.
2  BY MR. MCFARLAND:
3  Q.  And what were your thoughts?
4  A.  My thought was, based on my limited
5  understanding of the law, that a sexual assault had
6  taken place and there would be grounds to file charges.
7  And what I had to do was weigh that -- we're just
8  talking about my opinion. I would not be the one to do
9  any of this, but in my opinion, you have to weigh that
10  against the incredible onslaught of negative publicity
11  that would subject her to reliving this awful
12  experience over and over again.
13  Q.  Did you at any point suggest to anybody else
14  that perhaps the police should be called?
15  A.  No. I did not interject myself into any sort
16  of law enforcement investigation.
17  Q.  Were you ever part of any conversation where
18  somebody else suggested that perhaps the police should
19  be called?
20  A.  May I ask a question?
21  Q.  Sure.
22    MR. BALDRIDGE: No, you may not. He
23  asks the questions; you answer. If you have a
24  question, confusion, you can ask him to clarify his
25  question --

Page 35

1    THE WITNESS: Yes, that's --
2    MR. BALDRIDGE: -- or if you want to
3  confer with me about a privileged issue, you may, but
4  you may ask him to clarify the question only.
5    THE WITNESS: Okay. Could you just read
6  it back to me, please?
7    THE COURT REPORTER: "Question: Were you
8  ever part of any conversation where somebody else
9  suggested that perhaps the police should be called?"
10    THE WITNESS: Is that the -- not -- I
11  don't recall having any conversation that night about
12  that.
13  BY MR. MCFARLAND:
14  Q.  Do you recall having a conversation about
15  whether to call the police regarding the incident with
16  Mr. Mueller at some other point?
17    MR. BALDRIDGE: I'm going to be -- we're
18  going to be careful here and here is why we're going to
19  be careful. He's not asking for any conversations that
20  may have involved counsel, including Mr. Schaudies.
21  That is a privileged communication. I'm instructing
22  you not to answer that question. You may answer it to
23  the extent it does not fall within that privilege.
24    THE WITNESS: Okay. No, I would have had
25  a conversation with Jay at some point about that, I'm

Page 36

1  sure.
2  BY MR. MCFARLAND:
3  Q.  But nobody else?
4  A.  Not that I recall, no.
5  Q.  Who told you or instructed you to contact KYGO
6  about the incident with Mr. Mueller?
7    MR. BALDRIDGE: Objection. Asked and
8  answered.
9    THE WITNESS: I don't think anyone
10  specifically told me to call KYGO. I mean, I knew to
11  call. I knew who his supervisor was and that's -- but
12  I don't think anyone would have known his name.
13    THE COURT REPORTER: I'm sorry?
14    THE WITNESS: I don't think anyone else
15  there would have known Bob Call's name, would have
16  known to say call him, that sort of thing.
17  BY MR. MCFARLAND:
18  Q.  Who instructed you to contact KYGO about the
19  alleged incident with Mr. Mueller?
20    MR. BALDRIDGE: Objection. Asked and
21  answered.
22    THE WITNESS: I don't recall.
23  BY MR. MCFARLAND:
24  Q.  Was that a decision you made on your own?
25    MR. BALDRIDGE: Objection. Asked and

Page 37

1  answered.
2    THE WITNESS: No. My recollection is
3  that we wanted to -- that we wanted to bring the events
4  of that night to the attention of the radio station. I
5  knew to call Bob Call.
6  BY MR. MCFARLAND:
7  Q.  And who is "we"?
8  A.  We would be the -- I guess the management
9  team, which would include her mother and anyone else
10  who would have been there.
11  Q.  Robert Allen?
12  A.  Sure.
13  Q.  Anybody else?
14  A.  I don't -- I don't think so.
15  Q.  How about Taylor? Before you called Bob Call,
16  did you talk to Taylor about what she wanted?
17    MR. BALDRIDGE: Objection. Form.
18    THE WITNESS: No.
19  BY MR. MCFARLAND:
20  Q.  Did anybody relay to you what Taylor wanted to
21  see happen before you reached out to KYGO?
22    MR. BALDRIDGE: Objection. Form.
23    THE WITNESS: No.
24  BY MR. MCFARLAND:
25  Q.  When you called Bob Call, were you calling on

10 (Pages 34 to 37)

DTI Court Reporting Solutions - Washington, DC
1-800-292-4789                                              www.deposition.com

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER
FRANCIS BELL - 6/29/2016

Page 38

1  your own behalf or on behalf of Taylor Swift?
2       MR. BALDRIDGE: Objection. Form.
3       THE WITNESS: I was calling on behalf of
4  13 Management.
5  BY MR. MCFARLAND:
6  Q.   Including Taylor Swift?
7       MR. BALDRIDGE: Objection. Form and
8  asked and answered.
9       THE WITNESS: It's an LLC. She's the
10 sole member.
11 BY MR. MCFARLAND:
12 Q.   So is that yes?
13 A.   Yes.
14      MR. BALDRIDGE: Objection. Form. Slow
15 down.
16      MR. MCFARLAND: Did you get his answer?
17      THE COURT REPORTER: "Answer: Yes."
18 BY MR. MCFARLAND:
19 Q.   Has Taylor Swift or anybody associated with
20 her management team since told you that you should not
21 have contacted KYGO about the alleged incident with
22 Mr. Mueller?
23      MR. BALDRIDGE: Objection. Form.
24      THE WITNESS: No.
25 BY MR. MCFARLAND:

Page 39

1  Q.   Did you ever hear of Mr. Mueller ask security
2  to call the police?
3       MR. BALDRIDGE: Objection. Asked and
4  answered.
5       THE WITNESS: No.
6  BY MR. MCFARLAND:
7  Q.   What's your relationship with Taylor Swift's
8  father?
9       MR. BALDRIDGE: Objection. Form.
10      THE WITNESS: I have known Mr. Swift
11 since 1977. We're old friends.
12 BY MR. MCFARLAND:
13 Q.   Have you sent any e-mails regarding the
14 alleged incident with Mr. Mueller?
15 A.   Not that I can recall, no. I would have
16 possibly --
17      MR. BALDRIDGE: Stop. For the record,
18 he's pointing to counsel. He means -- he's not asking
19 you for communications with counselor --
20      THE WITNESS: Okay.
21      MR. BALDRIDGE: -- so I need to clarify
22 that, unless he asks you specifically that.
23 BY MR. MCFARLAND:
24 Q.   Did you look through your e-mail messages to
25 see whether there were any e-mails that related to

Page 40

1  Mr. Mueller?
2  A.   Yes.
3  Q.   And you didn't find any?
4       MR. BALDRIDGE: Asked and answered.
5       THE WITNESS: With counsel.
6  BY MR. MCFARLAND:
7  Q.   You worked with counsel?
8  A.   Yeah, exactly, so you have it all as far as I
9  can tell.
10 Q.   Who is Brian Burns?
11 A.   Good question. Brian Burns is a former radio
12 program director who I knew for a short time in the
13 1990s. And he, I don't know, several years ago married
14 a woman and moved to Costa Rica, and I have had no
15 contact with him until -- other than by Facebook.
16 Q.   Do you know a Charlie Bradley Security?
17 A.   Yes.
18 Q.   And Security, that's his last name?
19 A.   Oh, I'm sorry, no. Charlie Bradley was --
20 Q.   Charlie Bradley?
21 A.   Yes. Sorry.
22 Q.   Who is Mr. Bradley?
23 A.   Charlie was employed at that time and whenever
24 we had questions about persons of interest, he was my
25 contact to say do we have any information on this

Page 41

1  person, have they created problems before, et cetera,
2  et cetera. He would do background checks.
3  Q.   Did you ask Mr. Bradley to do a background
4  check on Mr. Mueller?
5  A.   Yes.
6  Q.   And did he do -- do you know whether he did a
7  background check on Mr. Mueller?
8  A.   I never heard a result one way or the other.
9  Q.   Did you ever follow up with Mr. Bradley?
10 A.   No. I don't recall.
11 Q.   Who is Jack Purcell?
12 A.   Jack is the vice president of promotion at Big
13 Machine records, which is Taylor's country music label.
14 Q.   And did you talk to Mr. Purcell about
15 Mr. Mueller's alleged sexual assault on Ms. Swift?
16 A.   Yes. The night of the concert, at some point
17 I believe he called me.
18 Q.   Do you know why he called you?
19 A.   My understanding is that Kris Lamb, who is his
20 employee, had contacted him to make him aware of what
21 had happened, so he called me.
22 Q.   And what do you recall of that conversation?
23 A.   All I recall is just basically communicating
24 the facts as I knew them as they transpired that night,
25 that we had a problem in the meet-and-greet and that he

11 (Pages 38 to 41)

DTI Court Reporting Solutions - Washington, DC
1-800-292-4789                                    www.deposition.com