# EXHIBIT 3



In the Matter Of:

*MUELLER*

*vs.*

*SWIFT, ET AL.*

_____

*JEFFREY B. OPP*

*July 15, 2016*

_____

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                                    Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
        Civil Action No. 1:15-cv-01974-WJM-KLM
 3      _____

 4      VIDEOTAPE DEPOSITION OF:   JEFFREY B. OPP
                                   July 15, 2016
 5      _____

 6      DAVID MUELLER,

 7      Plaintiff,

 8      v.

 9      TAYLOR SWIFT; FRANK BELL; ANDREA SWIFT a/k/a ANDREA
        FINLAY; SCOTT SWIFT; and JOHN DOES 1-5,
10
        Defendants.
11      _____

12
                    PURSUANT TO NOTICE, the videotape
13      deposition of JEFFREY B. OPP was taken on behalf of
        the Defendants at 1900 Grant Street, Suite 1025,
14      Denver, Colorado 80203, on July 15, 2016, at
        8:54 a.m., before Barbara Birger, Registered Merit
15      Reporter, Certified Realtime Reporter and Notary
        Public within Colorado.
16

17

18          CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER

19

20

21

22

23

24      Job No.: WDC-092945

25
```



```
 1                A P P E A R A N C E S

 2    For the Plaintiff:

 3             M. GABRIEL McFARLAND, ESQ.
               Evans & McFarland, LLC
 4             910 13th Street, Suite 200
               Golden, Colorado 80401
 5

 6    For the Defendants:

 7             J. DOUGLAS BALDRIDGE, ESQ.
               KATHERINE M. WRIGHT, ESQ.
 8             Venable LLP
               575 7th Street, NW
 9             Washington, D.C. 20004

10

      Also Present:
11
               Adam Johnston, Videographer
12

13

14

15

16

17

18

19

20

21

22

23

24
25
```

1          A.   Well, I mean, from testimony, not very

2    much.  From actually doing litigation support work?

3          Q.   We'll define it however you want.

4          A.   Okay.

5          Q.   How much of a percentage of your income

6    over the last 20 years has come from

7    litigation-related services?

8          A.   Absolutely.  About 98 percent, sir.

9    Clearly the vast, vast majority.

10         Q.   Now, in these multiple times you

11   testified, have you ever been excluded by a court of

12   law as an expert?

13         A.   Not as an expert due to my

14   qualifications.  There have been three times when my

15   testimony has either been limited or excluded based

16   upon my reliance upon other experts who in one case

17   didn't show up to trial, in one case was struck, and

18   another case had changed their opinion in between when

19   I got their report and when we got to trial, and thus

20   my report was not allowed because it was based upon a

21   changed opinion.  In all three cases they were

22   vocational experts.

23         Q.   And you are not a vocational expert?

24         A.   That is correct.

25         Q.   So you do not have the expertise to

1    determine whether someone, in this case Mr. Mueller,

2    would be employable or how they would be employed

3    going into the future, correct?

4         A.    That is exactly correct.  And that's why

5    in my report we have the multiple different methods

6    acknowledging that fact.

7         Q.    So to the extent there is no support for

8    the proposition that Mr. Mueller would be employable

9    in the future, your report is irrelevant --

10              MR. McFARLAND:  Objection to form.

11        Q.    (BY MR. BALDRIDGE)  -- correct?

12              MR. McFARLAND:  Objection to form.

13        A.    I do apologize.  You need to be more

14   specific.  Would be employable in the future, in what

15   regard?  After the alleged incident, before the

16   alleged incident?

17        Q.    (BY MR. BALDRIDGE)  One of your

18   conclusions is based upon Mr. Mueller being employable

19   15 years going forward from the date of termination,

20   correct?

21        A.    Beyond -- I mean, had the incident not

22   occurred?

23        Q.    Yes.

24        A.    You need to put that in the hypothetical,

25   right?  Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                    Page 9

```
 1          Q.   And you do not have the vocational

 2   expertise to determine whether or not Mr. Mueller

 3   would, in fact, be employable 15 years going into the

 4   future, correct?

 5          A.   That is correct.  It is an assumption

 6   that I've made.  It's an assumption that's spelled out

 7   in the report.  That's why it says it's an assumption.

 8               Obviously the assumption is based upon

 9   the fact he had the contract and was working under the

10   contract before this incident occurred.  I will not

11   tell you, nor will I try to tell the trier of fact

12   that I know for a fact that this would have occurred.

13               Rather what I'm saying is that if you

14   assume that Mr. Mueller could have worked at the same

15   level as he had at the time of the incident through

16   10, 15 years, one or two years into the future, these

17   are the numbers.

18          Q.   Okay.  And just to be clear -- I

19   understand the explanation -- you do not have the

20   expertise to determine whether he would be employable

21   or employed even a minute after the end of his

22   contract, do you?

23          A.   No.  It's an assumption.

24          Q.   Okay.  And that assumption is based upon

25   his desire and his intent to be employed in the
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                    Page 10

```
 1   future, correct?

 2        A.   Correct.  And understand, we just need to

 3   make sure when we're talking about this hypothetical,

 4   that this is barring the incident that is at issue

 5   here.

 6        Q.   Okay.  And you don't have any firsthand

 7   knowledge about that incident at all, do you?

 8        A.   Not at all, sir.

 9        Q.   Now, you went to University of Denver?

10        A.   Yes, sir.

11        Q.   And you got a BA in economics?

12        A.   Correct.

13        Q.   Did you attend graduate school?

14        A.   No, sir.

15        Q.   Do you have any post-BA certifications,

16   degrees?

17        A.   No.

18        Q.   Is there any certification program to be

19   an economist, as it states in your resume that you

20   are?

21        A.   No, sir.

22        Q.   In your view, what is an economist?

23        A.   Well, an economist is many different

24   things.  What I am is a forensic economist, which

25   means I'm one of those economists without the crystal
```

 1    in evaluating anything in this case?

 2          A.    No.

 3          Q.    Now, you said Mr. Mueller read to you a

 4    401(k) statement?

 5          A.    Correct.

 6          Q.    Have you ever seen that 401(k) statement?

 7          A.    I have not, and that's why I have the

 8    caveat in my report.

 9          Q.    Where is the caveat in your report?

10          A.    It's on page 3 here, sir, where I say,

11    footnote 1, "It is important to note that this rate of

12    employer-paid contributions is significantly higher

13    than what I would have expected.  However," and,

14    again, this is based on what he read to me, "KYGO did

15    in fact contribute at this rate on Mr. Mueller's

16    behalf prior to his termination and, according to

17    Mr. Mueller, KYGO's plan was exceedingly generous.  I

18    will supplement these calculations if I receive

19    additional information concerning this issue.

20          Q.    And so it's fair to say in that footnote

21    you just read there is no indication you did not see

22    the actual paper about the 401(k), is there?

23          A.    No.  There is the footnote on the very --

24    second to last page, and I did note there is a typo,

25    where under W-2 earnings comparison it says, "Source

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                     Page 20

```
 1   Mr. Mueller's 2003 W-2 and verbally," it should say

 2   provided, it says some other word, "provided employer

 3   401(k) contributions from statement."

 4          Q.    So to be clear, you have not confirmed

 5   what those 401(k) confirmations are, correct?

 6          A.    What those 401(k) confirmations?

 7          Q.    Contributions, excuse me.

 8          A.    Contribution.  No, I have not seen it.  I

 9   trusted what Mr. Mueller read to me over the

10   telephone.  Obviously, if he read it to me

11   incorrectly, I will supplement it accordingly, sir.

12          Q.    Or if he made it up, right?

13          A.    Or if he made it up, you bet.

14          Q.    Or if he read you less than its entirety?

15          A.    Could be, sure.

16          Q.    And do you think it's a better practice

17   to confirm things like that as an expert?

18          A.    Sir, you know, my report is based upon

19   the information relied upon.  I've told you exactly

20   what I relied upon.  Obviously, if it's different for

21   any reason, either through fault or no fault of

22   Mr. Mueller's or my being unclear, that would

23   certainly change things, but I don't have an issue

24   with it, just him providing it to me orally.

25                MR. BALDRIDGE:  I would like to have this
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                           Page 21

```
 1    marked as Exhibit 2, please.

 2              (Deposition Exhibit 2 was marked.)

 3         Q.   (BY MR. BALDRIDGE)  A simple preliminary

 4    question, sir.  Is that your expert report in this

 5    case?

 6         A.   It is, sir.

 7         Q.   And at the time you prepared the expert

 8    report, can you identify for me the documents you had

 9    in possession that you relied upon?

10         A.   Absolutely.  I had the Nineball stock

11    purchase agreement which we just talked about, which

12    again did not come to play.  I had Mr. Mueller's pay

13    stubs from Lincoln Financial Media for the period of

14    time 1/31/13 through -- even though he wasn't paid --

15    paid it -- well, actually, I'm sorry, I should say

16    1/11/13, even though he hadn't started that was his

17    sign-on bonus, through 7/31/13.

18              There is a document, it doesn't have a

19    Bates stamp, looks like somebody from -- I don't know

20    who it was, a person named Maureen said, Dave, here is

21    the detail on your talent fees and check, and lists

22    several endorsement amounts.

23              Mr. Mueller's 2013 W-2 from Lincoln

24    Financial Media.  Mr. Mueller's Lincoln Financial

25    Media contract.  And the second amended complaint and
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                          Page 22

```
 1    jury demand, and as well the information I gleaned

 2    from Mr. Mueller on the telephone that we just

 3    previously discussed.

 4              MR. BALDRIDGE:  And, Gabe, is that what

 5    you provided Katie with this morning, the stack of

 6    documents?

 7              MR. McFARLAND:  What I provided Katie

 8    with was Mr. Opp's file, including the documents that

 9    he just referred, and with the exception of

10    communications between Mr. Opp and myself and my

11    office.

12              MR. BALDRIDGE:  I just want to be clear.

13    As a testifying expert, you're asserting work product

14    as to your communications with him?

15              MR. McFARLAND:  That's correct.

16         Q.   (BY MR. BALDRIDGE)  Did you write your

17    report?

18         A.   I did.

19         Q.   Did anybody provide a word in it other

20    than yourself, change a word, put in a word?

21         A.   You know, it got reviewed by Nicholas Opp

22    in my office.

23         Q.   Is that your son?

24         A.   No, it's my brother.

25         Q.   Okay.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                              Page 26

```
 1   believe they might change, at least as of this date?

 2        A.    No, sir.

 3        Q.    Now, looking at your report, in that same

 4   sentence, there's a reference to economic losses of

 5   Mr. Mueller that resulted from the issues associated

 6   with the claims made against him on June 2; do you see

 7   that?

 8        A.    Yes, sir.

 9        Q.    Do you know what causation is?

10        A.    I mean, just from a very lay perspective.

11   It's a legal issue.  Certain legal question.

12        Q.    Let me just -- what I'm trying to clarify

13   is this:  Are you providing any opinion as to what

14   caused Mr. Mueller's losses?

15        A.    Absolutely not.

16        Q.    So when you say that resulted from the

17   issues, that's not an opinion that any particular fact

18   caused him to lose his earning potential going

19   forward?

20        A.    That's correct.

21        Q.    Now, you reviewed the lawsuit, right?

22        A.    I reviewed the complaint from a lay

23   perspective.  Again, it's a legal document.

24        Q.    Did you review one copy of the complaint,

25   or did you see different versions?
```

 1    four months of employment.  It wasn't just his four

 2    months of employment, it was also the contract.

 3            Q.    The contract being the contract for a

 4    two-year term, plus potentially one-year option,

 5    right?

 6            A.    Exactly right.

 7            Q.    What I'm really driving at, Mr. Opp, is

 8    this:  Did you look at his employment history prior to

 9    his employment with KYGO?

10            A.    No, sir, not at the time I wrote my

11    report.

12            Q.    How about as of today?

13            A.    Well, the only thing I got was what we

14    talked about that I received yesterday that said that

15    he may made just over 45,000 a year for a 2.7-year

16    period between 2003 and 2006 at PeopleSoft, Inc.

17            Q.    Do you know -- can you name anywhere he

18    was employed in the ten years prior to coming to KYGO?

19            A.    Looks like PeopleSoft, Inc.

20            Q.    Other than PeopleSoft, Inc.?

21            A.    No, sir.

22            Q.    Do you know what he did at PeopleSoft,

23    Inc.?

24            A.    I don't.

25            Q.    Do you know whether Mr. Mueller was ever

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                    Page 31

```
 1    employed as what I'll call on-air talent in the ten
 2    years prior to coming to KYGO?
 3         A.   No, sir.
 4         Q.   Do you know whether he had ever been
 5    terminated from prior employment?
 6         A.   Don't know, sir.
 7         Q.   Do you know what Nineball is?
 8         A.   No, sir.  I mean, other than it was a
 9    company that he had with some other partners, that's
10    it.
11         Q.   Do you know what Nineball does?
12         A.   No, sir.
13         Q.   Would any of this information prior to
14    coming to KYGO about his employment be material to
15    your opinions?
16         A.   Not that I can think of, sir, given the
17    fact that what we have upon the establishment of a
18    contract is the clear definition of market value,
19    i.e., what a willing buyer and willing seller will
20    transact for, which established the value that KYGO
21    put on Mr. Mueller's on-air talent.
22         Q.   And that value put on his on-air talent
23    was for a two-year period, correct?
24         A.   Correct.  Plus a one-year option.
25         Q.   And nothing beyond that, right?
```

```
 1    garner work consistent with the amounts in the

 2    contract until he chose to retire, that's the

 3    assumption.  And so whether or not he was an at-will

 4    employee doesn't matter.

 5            Q.   So the contract really doesn't matter

 6    beyond the compensation in it?

 7            A.   The compensation, exactly right.

 8            Q.   So the fact that it was only a two-year

 9    term is irrelevant to you?

10            A.   Correct.  For purposes of my analysis,

11    yes, sir, based upon the assumptions that I just

12    stipulated to, correct.  Not stipulated to, that I

13    just talked about.

14            Q.   You sound like a lawyer.

15            A.   No.  No.  That's why I needed to change

16    it.

17            Q.   Now, looking at assumption A1 on page 2

18    of your report, you refer to an extensive job search

19    effort of Mr. Mueller; do you see that?

20            A.   Yes, sir.

21            Q.   What do you know about his job search

22    effort?

23            A.   Only what he told me, that he has looked

24    everywhere, and the only thing he could find was maybe

25    he might be able to make $20,000 a year doing a
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016

Page 35

```
 1   podcast, but that had not occurred yet.

 2           Q.   Did he say he looked everywhere?  Were

 3   those his words?

 4           A.   Absolutely.

 5           Q.   Did he tell you that he only concentrated

 6   on top 20 radio markets?

 7           A.   No.  But given the fact that he told me

 8   that the place he was going to do a podcast was

 9   somewhere in the middle of Montana, I would suspect

10   that's not a top 20 radio market.  But beyond that, I

11   don't know.

12           Q.   So you are not aware that he focused on

13   top 20 radio markets, are you?

14           A.   No, with the exception of the fact that

15   he was talking about a place in the middle of Montana,

16   which I would suspect, again, was not a top 20 radio

17   market.

18           Q.   That's all you know about that?

19           A.   That's correct, sir.

20           Q.   Okay.  Are you aware that -- well, let me

21   ask you, have you ever heard of a guy named Tony

22   Casazza?

23           A.   No.

24           Q.   Have you aware of employment discussions

25   between Mr. Mueller and a man in Melborne, Florida?
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                    Page 36

```
 1        A.    No, sir.
 2        Q.    Are you aware whether or not Mr. Mueller
 3   looked for jobs outside of the radio industry?
 4        A.    The only thing he told me is that he
 5   thought that given the situation, he's probably going
 6   to have to go outside of the radio industry.
 7        Q.    Okay.  Do you have any knowledge as to
 8   whether to this date he has looked for employment
 9   outside of the radio industry?
10        A.    I don't know, sir.
11        Q.    Do you have any knowledge as of this date
12   whether he has looked for employment in the radio
13   industry but not as on-air talent?
14        A.    I don't know, sir.
15        Q.    So to the extent Mr. Mueller's job search
16   was extensive, as you write, that's based purely on
17   what he said, right?
18        A.    Absolutely.
19        Q.    You don't know whether he had an
20   extensive job search at all, do you?
21        A.    Obviously, I don't have firsthand
22   knowledge.  Clearly, I wasn't there.  I'm basing it
23   upon what he told me.
24              That's why we have the different methods,
25   sir.  I'm not going to try to tell you, or try to tell
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                          Page 43

```
 1          Q.    I don't have it in front of me.

 2          A.    On -- yeah, it's Swift 04.

 3          Q.    And look at Section 3.  That's the "Term"

 4   provision, right?

 5          A.    Yes, sir.

 6          Q.    And the term of the contract is two

 7   years, plus potentially an option year in the sole

 8   discretion of KYGO, correct?

 9          A.    Correct.

10          Q.    Now, do you have any opinion as to

11   whether Mr. Mueller had any reasonable expectation of

12   being employed by KYGO after that two-year period?

13          A.    No.  He certainly thought he would, but I

14   don't have an opinion as to that.

15          Q.    And are you aware of any facts that would

16   support a belief by Mr. Mueller that he would be

17   employed by KYGO beyond that two-year period?

18          A.    Not facts.  Certainly when he was talking

19   to his buddy, obviously, it was a partner deal, as

20   Mr. Mueller described it to me, that they wanted this

21   to be, as Mr. Mueller said, their last gig.

22          Q.    And that was their desire, right?

23          A.    Absolutely.

24          Q.    Beyond his desire to have a relationship

25   with KYGO past that two-year term, are you aware of
```

```
 1    any facts to suggest that might, in fact, occur?

 2            A.    No, sir.

 3            Q.    Do you have any opinion as to whether

 4    KYGO in its sole discretion would have exercised the

 5    one-year option period?

 6            A.    Don't know, sir.

 7            Q.    And from a layman's' standpoint, a guy

 8    that does litigation services, do you have any

 9    understanding what in its sole discretion means?

10            A.    No, other than I think it would be up to

11    them.

12            Q.    Up to the radio station?

13            A.    That's right.

14            Q.    Okay.  How many contracts have you

15    reviewed for on-air talent prior to Mr. Mueller's?

16            A.    We're counting all on-air talent, like

17    TV?

18            Q.    Let's say radio first.

19            A.    Oh, radio?  I think I've only done one

20    other one as far as radio.

21            Q.    What was that?

22            A.    It was about ten years ago.  It was

23    for -- it was the Mountain.  I don't even know if it

24    was the Mountain back then.

25            Q.    Is that a local radio station?
```

 1          Q.   Do you consider yourself an expert in the

 2    radio industry?

 3          A.   Absolutely not.

 4          Q.   Do you consider yourself an expert

 5    regarding on-air talent in radio?

 6          A.   No, sir.

 7          Q.   Do you consider yourself an expert as far

 8    as on-air talent in any field, whether it be TV,

 9    radio?

10          A.   Not at all.

11          Q.   Do you stay on top of reports about

12    industry trends in radio?

13          A.   No.

14          Q.   Do you have any knowledge about whether

15    the industry trend is away from on-air talent and more

16    towards a format where there's not a speaking person?

17               MR. McFARLAND:  Object to form.

18          A.   No idea.

19          Q.   (BY MR. BALDRIDGE)  Do you know what XM

20    Radio is?

21          A.   What?

22          Q.   XM.

23          A.   Oh, XM?

24          Q.   Yes, sir?

25          A.   Oh, yeah, yeah, I've got XM.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                    Page 48

```
 1   see that?

 2         A.   Yes, sir.

 3         Q.   What does that term mean?

 4         A.   As it relates to Mr. Mueller, as I

 5   previously testified, he and I think it's Ryno.

 6         Q.   Ryno?

 7         A.   Ryno.

 8         Q.   Ryan Kliesch or Ryno.

 9         A.   Got it.  He and Ryno wanted this, as

10   Mr. Mueller said, to be their last gig.  So they were

11   going to do it, he thought, before 10 to 15 years.  So

12   his planned work-life expectancy, at least as on-air

13   talent was 10 to 15 years from the onset of the

14   contract.

15         Q.   And was that Mueller's plan?

16         A.   Well, that was Mueller's plan, he said,

17   in conjunction with his conversations with his buddy

18   Ryno.

19         Q.   Okay.  So it was Mueller's joint plan

20   with Ryno to be on air for the period of time you just

21   mentioned?

22         A.   As Mr. Mueller described it to me, yes,

23   sir.

24         Q.   Did you evaluate at all whether that plan

25   was reasonable?
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                    Page 49

```
 1          A.   No, other than they had the contract, and

 2   other than certainly that doesn't put him beyond any,

 3   you know, normal work-life expectancy.

 4          Q.   And you are not an expert on work-life

 5   expectancy, are you?

 6          A.   I'm not an expert on work-life expectancy

 7   for -- for radio folks.  I'm certainly an expert on

 8   work-life expectancy in general, absolutely.

 9          Q.   Are you rendering any opinion in this

10   case regarding Mr. Mueller's work-life expectancy?

11          A.   No.  It's my assumption, based upon what

12   he told me.

13          Q.   Go down to footnote 1.

14          A.   Yes, sir.

15          Q.   And that's -- I'm just generally speaking

16   there, I'm not trying to put words in your mouth, you

17   tell me if I say it wrong.  You're basically saying

18   that he didn't receive bonuses because its Arbitron

19   PPM survey ratings did not reach a certain level; is

20   that right?

21          A.   Correct.

22          Q.   Did you ever look at any of his ratings,

23   Arbitron or otherwise?

24          A.   No, sir.  So what he told me was that

25   they hadn't reached that level yet, and thus, you
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016

                                                        Page 52

1    9:59.

2              Q.   (BY MR. BALDRIDGE)  Sir, going to your

3    report, page 4 at the top, the B, and I think

4    that's -- if I'm looking at this right, yeah, Section

5    B.  Are you there?

6              A.   I am, sir.

7              Q.   You state in here that -- I'll just read

8    it.  "Mr. Mueller's future work-life expectancy-life

9    expectancy as of June 14, 2016 is assumed to be

10   between approximately 6.54 and 11.54 years."  Do you

11   see that?

12             A.   Yes, sir.

13             Q.   How did you come up with those years?

14             A.   You have to do the next sentence.  "Both

15   of these two work-life expectancies are based upon

16   Mr. Mueller's desire at the time he signed his KYGO

17   contract to have this be his last job in radio before

18   retiring and moving on to some other pursuit."

19             Q.   That line you just read, is that the

20   complete basis for the number 6.54 and 11.54?

21             A.   From the date of the contract, yes, sir.

22   Well, no, no, no, no.  No.  No.  No.  Then we have to

23   do the next sentence, I apologize.  "According to

24   Mr. Mueller, he had intended to work for KYGO for

25   between ten and 15 years before leaving radio."  So

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                    Page 53

```
 1   those two combined are the 6.54 and 11.54, sir.

 2        Q.   Those two combined, being the two

 3   sentences, set forth the complete basis for this

 4   assumption of 6.54 to 11.54 years?

 5        A.   Exactly right.

 6        Q.   C, same page.  Paragraph C.

 7        A.   Yes, sir.

 8        Q.   First sentence, quote, Mr. Mueller's

 9   ability to secure employment, let alone his

10   anticipated earnings from said employment in the

11   future is currently unknown, close quotes.

12             What did you mean by that?

13        A.   Exactly what it says.  And as we

14   previously established correctly, I'm not a vocational

15   expert.  I can't say what Mr. Mueller's current

16   earnings ability is.  Thus, what I know is what's

17   happened in the past, or what I have been informed has

18   happened in the past is he has not gotten a job.  And

19   so the point here is that I don't know when he's going

20   to get a job, and I don't know how much he's going to

21   earn once he gets a job.

22             Absent that information and absent my

23   expertise as a vocational counselor, because I'm not,

24   I've run four different scenarios into the future.

25   One year, and after -- what that means is that after
```

1    the trier of fact why I used those four scenarios and

2    leave it up to them to determine whether or not they

3    believe any one of those four, if at all.

4         Q.   (BY MR. BALDRIDGE)  Do you know whether

5    or not a vocational expert could provide greater

6    certainty as to future scenarios?

7         A.   Not being a vocational expert myself, I

8    don't know.

9         Q.   Now, if you'll turn to the last page of

10   your report, you've got your discount rate of

11   5 percent; do you see that?

12        A.   Yes, sir.

13        Q.   And 6 percent on social security?

14        A.   Yes, sir.

15        Q.   How did you come up with those discount

16   rates?

17        A.   Sure.  If we go back to the very

18   beginning of the deposition, when I said I'm one of

19   those economists without a crystal ball.  When an

20   economist realizes they don't have a crystal ball,

21   what they do is use what's called the look-back

22   approach.

23             And so in this case if we are going to

24   project forward for earnings losses between -- you

25   know, rounding 7 to 12 years, we look back 7 to 12

1    years.  And if we look back 7 to 12 years, the average

2    rate of US government bonds has been about 5 percent

3    per year.

4                Now, to be very clear, there is no way

5    you can go out today and get a bond that's paying

6    5 percent.  They are currently paying about 3.9, just

7    shy of 4, but we have to be consistent.  I've used the

8    look-back approach for inflation, which is what I've

9    adjusted these amounts by, and I've used the look-back

10   approach for the interest rate, thus our differential

11   of 2 percent per year remains fairly constant.

12               Same thing happens with inflation.

13   Currently inflation isn't running at 3 percent per

14   year, it's just shy of 2.  But still, you have a

15   differential of about 2 percent per year.

16        Q.   Now, the rate you're using is a risk-free

17   rate, right?

18        A.   That's right.

19        Q.   What does that mean?

20        A.   That means we're going to guarantee those

21   amounts are going to be there.  We're not going to put

22   it in the stock market where it could absolutely grow

23   at a far higher rate than 5 percent, but you could

24   lose half of it.  We're guaranteeing those amounts are

25   there.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                    Page 57

```
 1          Q.    You're guaranteeing it's coming?

 2          A.    We're guaranteeing the amounts based upon

 3     the full faith and credit of the US government.

 4          Q.    Do you know whether or not Mr. Mueller

 5     had an agent?

 6          A.    I don't.

 7          Q.    Do you know whether he paid that agent

 8     part of his compensation?

 9          A.    I don't.  But that's a great question.

10     If he --

11          Q.    I'm glad you liked that.

12          A.    That's a great question.  If he had an

13     agent and if his agent was due a portion of his

14     earnings, those would have to be subtracted from

15     these.

16          Q.    Thank you, I have nothing further.

17          A.    Thank you, sir.

18                MR. McFARLAND:  Thank you.  Appreciate

19     it.

20                MR. BALDRIDGE:  I appreciate it.

21                THE DEPONENT:  And I will waive

22     signature.

23                THE VIDEOGRAPHER:  This is the end of

24     media unit 1 of the video deposition of Jeffrey Opp.

25     Going off the record at 10:05.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
JEFFREY B. OPP - 07/15/2016                    Page 58

1               WHEREUPON, the within proceedings were

2    concluded at the approximate hour of 10:05 a.m. on the

3    15th day of July, 2016.

4               (It was stipulated and agreed by counsel,

5    with the consent of the deponent, that the reading and

6    signing of the within deposition is waived.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25