**EXHIBIT 1**

Case No. 1:15-cv-01974-WJM-KLM   Document 136-1   filed 05/12/17   USDC Colorado
pg 1 of 20

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

## Lorraine Bayard de Volo, PhD
701 Nighthawk Circle, Louisville, CO 80027
(720) 530-6208 • LBDV@colorado.edu

July 27, 2016

J. Douglas Baldridge, Esquire
Venable LLP
575 7th Street, N.W.
Washington, DC 20004

Dear Mr. Baldridge,
At your request, I have analyzed the facts and materials in the case of Mueller vs. Swift, et al. and have reached certain opinions regarding the consistency between the evidence in this case with the emotional and psychological traits associated with the perpetrators and victims of sexual assault and sexual harassment. Below, I provide a report stating my opinions and findings as well as the basis and reasoning for those findings and the facts and data upon which I relied to form them. I also submit a statement as to my qualifications, publications, previous testimony, and compensation for my work on this matter.

**I. Qualifications**
I am Chair and Associate Professor of Women and Gender Studies at the University of Colorado Boulder. I have a Ph.D. in Political Science (1996) with a graduate certificate in Women's Studies from the University of Michigan, and I have 20 years of research and teaching experience in the field of gender and violence. I conduct research and teach on the subject of violence against women, including sexual harassment and assault. Specifically, I conduct research examining the relationship between various forms of violence present in institutional and societally enforced norms and the perpetuation of violence against women. My curriculum vitae, attached to the report, describes my expertise in greater detail and includes a list of all my publications.

My compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in, or the use of, this report. I am being compensated at an hourly rate of $275.

I have never served as an expert witness prior to this case.

The opinions I express in this report are offered with a reasonable degree of professional certainty and are based on my education, training, experience, and the information specific to this case provided to me to date.

**II. Summary of Opinions**
1. Sexual harassment and assault are fundamentally motivated by the perpetrator's perceived need to assert power and to protect the perpetrator's status. Throughout David Mueller's pleadings in this lawsuit and his deposition testimony, he

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

> indicated that even before he met Ms. Swift, he felt his job security was threatened, his identity as a radio personality was threatened, and his masculinity was threatened. This perfect storm of threats to Mr. Mueller's perceived status is consistent with the well-settled, academically-accepted, perceived threats to status that motivate a man to commit sexual harassment or assault.
>
> 2. Victims of sexual harassment and assault typically do not report the event immediately but rather delay or do not report it at all. The time between Mr. Mueller's unwanted sexual contact and Ms. Swift's full verbal reporting of that contact is entirely consistent with the conduct identified in professional literature and studies of someone who has been sexually assaulted.[1]

In the report that follows, I explore these two opinions in turn, first laying out the relevant professional community's research findings on sexual harassment and assault, then examining the details of this case to determine whether and the extent to which these details are consistent with the professionally accepted findings about what motivates men to commit acts of sexual aggression, and how and why women react in a particular manner to such acts. I reserve the right to supplement this report and modify my opinions in the future if additional relevant documents or information become available prior to trial.

### III. Sexual harassment and assault is about power, protection of status

**A. Research findings overview:**
Professionals in the field of sexual harassment and assault widely agree that sexual harassment and sexual assault (including inappropriate physical contact) are fundamentally motivated by power and protection or enhancement of the aggressor's status.[2] In cases of men targeting women, it is an assertion of men's gender-based social power and most typically targets women who challenge men's status in some manner.[3]

Most people take threats to their social status very seriously. From one's social status follows social esteem, respect, approval, and admiration; and, the need for these is a basic and primary human motive.[4] Just as social status is a primary social motive, gender (masculinity/femininity) is a primary social organizer. Gender, more than any other social trait, is used by individuals and society as a basis to differentiate individuals, to assign social roles, and to accord status.[5] A man's status in many ways depends upon his degree of masculinity relative to other men (for example, his physical strength, career success,

---

[1] I note that Ms. Swift also had additional reasons for not immediately advising those present of Mr. Mueller's sexual assault in addition to the psychological factors that make assault victims typically delay or forego reporting, to which she testified in her deposition.
[2] Berdahl 2007a; Wilson and Thompson 2001; Goleman 1991.
[3] Berdahl 2007a, 649.
[4] Berdahl 2007a.
[5] Connell 1987.

2

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

height, social dominance). Some men perceive sexual harassment and assault as a means to enhance their masculine status by derogating a woman's: "By sexually objectifying or dominating her, the man may increase his sense of masculinity by being heterosexually dominant. By being sexually objectified and dominated, the woman is relegated to the low status of being a means to a man's sexual ends."[6]

Motives for sexual harassment and sexual assault boil down to protection or assertion of status, including efforts to boost or repair an ego, get retribution, humiliate, intimidate, or (in cases of high-status women) invert a power imbalance between target and harasser. The accepted academic literature and studies firmly recognize that a man can be motivated to sexually harass and assault a woman who appears more powerful or higher status as a means to assert his own status.[7] Regardless of how warm or feminine a woman might be, a woman who is ambitious, dominant, assertive, independent, defending her own beliefs, and/or acting as a leader is at higher risk for experiencing sexual aggression.[8]

In addition, men's physical access to women's bodies is socially normalized such that it is often minimalized (just a joke; not a big deal) or excused ("she should be flattered;" "men can't help themselves;" or "what would she expect when she's wearing that?"). This social normalization has the effect of encouraging sexual assault and discouraging reporting of assault.

**B. Analysis and Findings in this Case**

Mr. Mueller's pleadings and deposition testimony show that on the evening of June 2, 2013, Mr. Mueller faced an accumulation of perceived threats to his status consistent with the threats to status that, according to well-accepted academic research and studies, motivates sexual harassment and sexual assault.

These threats to status revolved around his job and identity as a radio personality, both of which were also closely tied to his sense of masculinity. The threats to Mr. Mueller's status based upon his job and radio identity that are documented in the evidence include: Mr. Mueller's tension with his immediate superior Eddie Haskell; his assignment to the mostly fan-based, meet-and-greet group at Ms. Swift's concert, which he perceived to be "lower status" than the first meet-and-greet group comprised mostly of radio executives; the attendance by Mr. Haskell and Mueller's on-air partner, Mr. Kliesch, at that first meet-and-greet, which Mr. Mueller perceived to be reserved for "VIPs" and more suited to his stature; and failure (in his view) to appropriately acknowledge and respect his radio host identity by tour personnel and ultimately Ms. Swift.

Mr. Mueller's masculinity was also directly threatened. Shannon Melcher, described as his relatively new "girlfriend," bore witness to his separation from his colleagues and demotion to the second meet-and-greet group and, according to Mr. Mueller's deposition

---

[6] Berdahl 2007a; Franke 1997
[7] DeSouza and Fansler 2003; Berdahl 2007a.
[8] Berdahl 2007a; Gruber and Bjorn 1986.

3

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

testimony, Ms. Melcher took it upon herself to get them into the "VIP group," likely compounding Mr. Mueller's sense of embarrassment and emasculation. Though she was Mr. Mueller's guest, Ms. Melcher took the lead in the introductions and conversation with Ms. Swift once they finally did get to see her. Not only did Mr. Mueller testify that Ms. Swift failed to acknowledge his radio status and give him the "respect" and "warmth" that he felt he warranted during this brief encounter, she also embodies criteria associated with women at higher risk of sexual aggression: ambitious, assertive, independent, in a leadership role, and willing to defend her beliefs. Furthermore, it is reasonable to conclude that Mr. Mueller viewed Ms. Swift, the star of the tour, as ultimately responsible for his perceived humiliating placement in the second meet-and-greet, which Mr. Mueller testified was comprised predominately of very young female fans. I expand on these conclusions below, first detailing the threats that Mr. Mueller perceived to his employment status, then those he perceived to his status as a radio personality and his masculinity.

**Threats to job status:** Mr. Mueller, having begun his job just five months prior, perceived significant tensions with his superior at KYGO, Eddie Haskell. Mr. Mueller states that prior to Ms. Swift's June 2, 2013 concert, Mr. Haskell was not happy with Mueller and his partner Ryan Kliesch and wanted to get rid of one or both of them.[9] Mr. Mueller further noted that he did not feel Mr. Haskell treated him with respect and alluded to "instances where…he made it difficult for me to like him."[10] Indeed, according to Mr. Mueller, Mr. Haskell told him that he didn't like Mueller and Kliesch's show,[11] and less than two weeks prior to the Swift concert, offered (or threatened) to "see if we can get you guys out of your contract."[12] Mr. Mueller further explained that incidents like this tension with Mr. Haskell "were all very big events for radio people. Usually program directors and morning personnel don't have any encounters like that."[13] He and his partner Kliesch "couldn't figure out why we were being treated the way we were being treated."[14]

**Threats to status as a radio personality:** Mr. Mueller expressed in his Second Amended Complaint and throughout his deposition that he was significantly, if not entirely, focused on and concerned with his status as a radio personality. And, he perceived that he did not receive from Ms. Swift and the Swift tour personnel the professional respect he thought he deserved as a result of his status. He states repeatedly that he feels he would have been treated differently had his status with the radio station been recognized. So central was Mr. Mueller's radio identity to his sense of self on the evening of June 2, 2013, that he "felt naked" when he was unable to prove he worked at a

---

[9] Mueller deposition 31:22-25; 32:1.
[10] Mueller deposition 105:10-15.
[11] Mueller deposition 106:3-5.
[12] Mueller deposition 107:19-21.
[13] Mueller deposition 108:3-6.
[14] Mueller deposition 113:16-19.

4

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

radio station.[15] Mr. Mueller's deposition contains numerous statements that indicate the centrality of his radio status to his sense of self and the importance he placed on the fact that he was not recognized as a radio personality during the meet-and-greet event.[16] This status, for Mr. Mueller, should have brought recognition, respect, and familiarity: "There's a clear difference between how artists respond to radio personalities and listeners."[17] Also, "When you go backstage as a media person, you get treated differently than if you're a listener. I was with a group of listeners."[18] He testified that he was with little girls and "Moms and all sorts of people that were clearly not in broadcasting."[19] Amidst moms and little girls, people with signs and Taylor Swift shirts, he described that he felt that he and Ms. Melcher stood out as an adult couple.[20]

Mr. Mueller asserts that Ms. Swift, in particular, did not treat him in the manner he was "accustomed to as a radio personality": "She struck me as being cold and standoffish, considering I was working as a morning co-host at KYGO."[21] Indeed, as Ms. Melcher mentioned their KYGO affiliation to Ms. Swift, Mr. Mueller believed that Ms. Swift was trying move them along: "[Swift] was just thinking, you know, come on, let's go."[22] Regarding how he believes he would have been treated had Ms. Swift realized that he was a KYGO radio personality, he explains: "There's a clear difference when an artist meets a broadcaster and a listener. There's a certain amount of professional respect."[23] He elaborates further, "There's a certain amount of professional respect when you receive somebody who works on a morning show at a station that you're very familiar with. The morning show is the most prominent day part. That is usually something that's acknowledged with oh, wow, I love your station....There was nothing like that."[24]

Mr. Mueller's perception of the differences between first and second meet-and-greet groups that were invited back stage on June 2, 2013 are key to the threats that Mr. Mueller reports occurred to his status as a radio personality and accordingly call for some elaboration. Ms. Swift's concerts typically have two or more different types of meet-and-greets. The first type is generally comprised of radio executives, program directors, and other media and music representatives.[25] People in the first meet-and-greet group are brought into an area reflecting the tour's theme, mingle with each other, are offered food and beverages, take photos in a photobooth, and meet Ms. Swift, who socializes openly

---

[15] Partial recordings of David Mueller-Bob Call phone conversation June 3, 2013, "Eddie was there."
[16] Mueller deposition 82:7-9; 83:22-25; 84:1-14; 85:9-16; 86:4-25; 87:1-25; 88:11-14; 89:6-10,24-25; 90:1,11-20.
[17] Mueller deposition 87:25-88:1.
[18] Mueller deposition 87:4-8.
[19] Mueller deposition 87:10-12; 94:2-7.
[20] Mueller deposition 94:20-22.
[21] Mueller deposition 88:6-14; repeated 103:23-25-104:1.
[22] Mueller deposition 91:2-3.
[23] Mueller deposition 89:24-25 – 90:1.
[24] Mueller deposition 90:8-20.
[25] Worden deposition 12:16-17; Simbeck deposition 23:14-15; 24:13-14.

5

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

with the group. The second group does not participate in these activities. In his Complaint, Mueller describes the second group as comprised of "fans who had won passes" and included "small children, people wearing Taylor Swift t-shirts, and people holding homemade signs."[26]

Mueller's Complaint includes a series of details that indicate that he felt indignation towards Ms. Swift and her team based on his placement in the second meet-and-greet. He states that he "has often been *required* to meet and greet music superstars" and was "*required* to attend a backstage meet-and-greet with musical artist Taylor Swift."[27] As instructed, he submitted his name and that of his guest in advance of the concert and showed up on time.[28] Despite following directions, Mr. Mueller "discovered" upon arrival that his partner Kliesch and boss Haskell had already been admitted with the radio executive group, which Mr. Mueller perceived as the more exclusive group.[29] Mr. Mueller and Ms. Melcher "*ultimately* made it to the entrance" and were admitted.[30] Having briefly met Ms. Swift, Mr. Mueller went to the KYGO tent "to confirm with [his boss] that Mr. Mueller's duties to the station had been satisfied."[31] Mr. Mueller paints himself as a man who sees himself as decidedly not star-struck by celebrities but rather, if not celebrities' equal, at least a professional and local personality who attends meet-and-greets because it is his job. Indeed, his complaint and testimony show that because he routinely meets celebrities, Mr. Mueller expected a certain level of treatment from Ms. Swift and her tour personnel. Despite his perceived high status and his care to follow instructions, he has stated that he did not receive the treatment he expected and thought he deserved. He did not receive the same treatment that his partner and boss received. He indicates that his partner and boss were treated as VIPs while he was treated as a fan (in his mind, a lower status designation). On top of that, he was with his girlfriend, who bore witness to his described humiliation.

His pleadings and deposition testimony show that relegation to the second meet and greet impacted Mr. Mueller's state of mind. Mr. Mueller states that he was not angry but was "alarmed" and "confused why I was with listeners."[32] He maintains, "It didn't bother me," but thought it "odd" that "she didn't connect."[33]

**Threats to masculine status:** Based on his Complaint and testimony, Mr. Mueller indicates that dynamics with his girlfriend, Shannon Melcher, exacerbated his annoyance and perception of emasculation. Ms. Melcher herself tried to establish the pair's identity as "radio people" with Ms. Swift and her team when the pair was brought into a curtained enclosure to meet Ms. Swift during the second meet-and-greet. In addition, Mr. Mueller

---

[26] Second Amended Complaint, paragraph 16.
[27] Second Amended Complaint, paragraphs 9,13.
[28] Second Amended Complaint, paragraphs 13,14.
[29] Second Amended Complaint, paragraphs 15,16.
[30] Second Amended Complaint, paragraph 17.
[31] Second Amended Complaint, paragraph 22.
[32] Mueller deposition 87:13-17.
[33] Mueller deposition 90:21-25.

6

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

recalls Ms. Melcher asking him to text his partner, Mr. Kliesch, to request "can you guys come and get us and bring us to where you are" (i.e. the VIP meet-and-greet).[34] According to Mr. Mueller, though Ms. Melcher wasn't "disappointed" to be in the second group, "she was definitely making an effort to get in with that other group" and she "tried to identify [herself and Mueller] as employees of KYGO," even holding up to Ms. Swift "a [KYGO] business card that [Ms. Melcher] had hanging on her neck."[35]

Ms. Melcher entered the curtained enclosure in which Ms. Swift posed for photographs with fans before Mr. Mueller and introduced herself and Mueller to Ms. Swift.[36] Both Mr. Mueller and Ms. Melcher complimented Ms. Swift; Ms. Swift complimented (only) Melcher. Mr. Mueller believed that Ms. Swift treated him in a "cold and standoffish" manner but notes, in contrast, that Ms. Swift complimented Ms. Melcher, hugged her, and put her arm around her.[37] When asked whether Ms. Melcher had a more positive rapport with Ms. Swift, Mr. Mueller responds, "She had almost all of the rapport. I---I complimented Taylor, and I don't even remember her really, you know, responding to it. And then Shannon expanded on my compliment."[38] He elaborates: Ms. Swift "was really excited about Shannon.... I was standing behind them, and I felt like I was invisible. When she initiated the photograph, she didn't say, hey, come over here. She just pulled Shannon in, and I was on my own, so that's why I'm saying she seemed cold and standoffish."[39] In his Complaint, Mr. Mueller alleges that suddenly it was picture time, and Ms. Swift "put her right arm around Ms. Melcher, and turned toward the photographer."[40] In order to not be left out, Mueller claims that he had to jump in to the photograph "at the last second."[41] Thus, Mr. Mueller alleged and testified that Ms. Melcher received positive and near exclusive attention from Ms. Swift. Mr. Mueller maintains that it did not bother him that Ms. Melcher had all the rapport with Ms. Swift, and he was happy for her.[42] But, the allegations in his Complaint and his sworn deposition testimony clearly indicate that he nonetheless felt that Ms. Swift slighted and ignored him.

Thus, Mr. Mueller, already relegated to what he described as the line filled with "little girls and moms," and suffering that perceived blow to his status, he states that he was then made to feel inessential to the meeting with Ms. Swift, as his assertive girlfriend took the lead in this encounter and Ms. Swift responded positively to her initiative. In Mr. Mueller's description of events, though Ms. Swift was cold and standoffish with him, she had a positive rapport with Ms. Melcher that included hugging and compliments. Mr.

---

[34] Mueller deposition 210:21-25.
[35] Mueller deposition 99:16-18; 89:6-12; 90:24-25-91:1-3.
[36] Second Amended Complaint, paragraph 18.
[37] Mueller deposition 88:11-12; 91:4-9.
[38] Mueller deposition 91:14-25.
[39] Mueller deposition 104:12-19.
[40] Second Amended Complaint, paragraph 19.
[41] Second Amended Complaint, paragraph 19.
[42] Mueller deposition 91:21-25-92:1.

7

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

Mueller said that he felt "invisible" in the shadow of his girlfriend.[43] He said that he felt excluded and was "standing a few feet away from" the two women.[44] Mr. Mueller testified and alleges that he had been demoted from what he believed to be a VIP to fan to tag-along—an appendage rather than the center of the celebrity's attention—then he was ignored completely in favor of Ms. Melcher. Given that idealized masculinity entails dominance, leadership, authority, and assertiveness, this encounter would register as a blow to his sense of masculinity.

**In sum:** Mr. Mueller describes himself in his deposition as a man who, by the time he arrived at the Swift meet-and-greet, already felt threatened by his boss and at risk of losing his job. Then, to his surprise, he was placed in what he believed was the "non-VIP" meet-and-greet group to wait in line while his boss and partner mingled in the VIP group with Ms. Swift. After a long wait in a line that he repeatedly described as filled with moms and little girls, rather than feeling like a respected radio show host and a special guest, he testified that he felt himself "invisible" next to his girlfriend, who, according to Mr. Mueller, behaved more assertively. He did not receive the status and professional respect that he thought he deserved. Moreover, his testimony reveals that he was frustrated at the time, as neither his boss, the Swift team, or in the end, Ms. Swift herself, would acknowledge him in a way that would confirm his perceived elevated status as a radio show host.

Mr. Mueller's repeated emphasis on his radio identity and his stated belief that events would have unfolded differently (in his favor) had Ms. Swift and her associates known that he was in radio further point to the importance he placed on this identity for his sense of self and status and his expectation that Ms. Swift should have consciously granted him an added level of respect, warmth, and familiarity. In my opinion, his stated perception of events and his view of his own status is consistent with the circumstances under which sexual aggressors would commit unwanted sexual contact, such as grabbing a woman's bottom. His testimony and pleadings also indicate his belief that unwanted sexual contact is something that men in radio can get away with even if other men cannot for one or a combination of reasons, including the following: because Ms. Swift's staff would be more likely to believe a man who is in radio; because he thought KYGO would defend him against Ms. Swift's accusation; or because such groping, if done by a man in radio, could be excused as a joke, a misunderstanding, part of the business, or his prerogative as a radio host who regularly met with famous women.

### IV. Timing of the Disclosure of Sexual Assault
Victims of sexual assault typically do not report the event immediately but rather delay or do not report it at all. Such delays are recognized by professionals in the field as a common reaction to sexual harassment and assault and are not regarded in the academic literature and studies as undermining the veracity of the victim's claim.[45]

---

[43] Mueller deposition 104:14.
[44] Second Amended Complaint, paragraph 19.
[45] Campbell and Townsend 2011.

8

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

For example, a 2015 University of Colorado Boulder anonymous survey of students found that, among those students who reported having experienced sexual misconduct, only slightly more than half told anyone about it.[46] Among those who *did* tell someone, the great majority (87-93%) told a friend or roommate and only 8% made an official report to police or the university. Among all forms of sexual assault in this CU-Boulder study, including nonconsensual sexual touching, one of the top reasons for not reporting was embarrassment/shame. Additional factors that explain delayed disclosure include a desire for professionalism in workplace settings, initial shock, and social normalization. "Normalization" means that even though an act such as unwanted sexual contact or groping is legally a form of sexual assault, our society downplays the severity of the act and its consequences by viewing it as a joke or "just one of those things" that happens to women. Women with higher status than the harasser are not found to respond differently to sexual harassment compared to women with lower status.[47] Consensus among professionals in the field of sexual assault and harassment and the related literature is that women often feel shame and blame themselves at least partially for sexualized crimes committed against them. Shaming and blaming the victim in sexual crimes is socially reinforced through such practices as asking, for example, what a woman was wearing when assaulted.

**Evidence and Discussion:**
According to the materials I reviewed, Ms. Swift physically reacted to the alleged sexual assault but did not verbally report the assault until the meet-and-greet ended, perhaps 15-20 minutes after Mr. Mueller allegedly groped her.[48] And Mr. Mueller repeatedly raises the question of why Ms. Swift did not immediately react to being groped by Mr. Mueller. The Complaint notes that Ms. Swift thanked Mr. Mueller and Ms. Melcher "cordially" after the photo, and Ms. Melcher got a hug while Mueller got a handshake.[49] Ms. Swift allegedly "remained pleasant as she bid them goodbye."[50] According to notes taken by Bob Call, the KYGO station manager, memorializing his 6/3/2013 interview with Mr. Mueller, Mr. Mueller stressed "there was no reaction from Taylor" at the time of the photo, and Call notes that Mr. Mueller "was puzzled why she didn't say something at the time it happened."[51] Ms. Melcher similarly noted to KYGO human resources director Maureen Marsh that Ms. Swift "said nothing at the time about inappropriate touching" and wondered "why Taylor wouldn't have said something right there."[52]

According to Bob Call, Frank Bell of 13 Management (Ms. Swift's management company) explained to him that Ms. Swift "chose not to scream, say anything or even slap him because she knew he was in radio with KGYO [sic] and didn't want to make a

---

[46] University of Colorado Boulder 2016.
[47] Gruber and Bjorn 1986, 823.
[48] Worden p21, 1-3, 18-21; Simbeck p40, lines 24-5; p41, lines 1-7, 19-24; p42, lines 1-2.
[49] Second Amended Complaint, paragraph 20.
[50] Second Amended Complaint, paragraph 21.
[51] Call notes, June 3, 2013.
[52] Marsh notes, June 3, 2013.

9

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

huge scene" and so waited until after Mr. Mueller and Ms. Melcher left.[53] However, photographer Stephanie Simbeck, while taking the Mueller-Swift photo, noticed Ms. Swift had an uncomfortable, shocked look on her face and fell into Ms. Melcher, away from Mr. Mueller.[54] Road Manager Erica Worden, who has "been to nearly every meet-and-greet with [Ms. Swift] since 2009" reports Ms. Swift's demeanor with Mr. Mueller was unusual, because she is "always very professional and friendly with all the guests."[55]

Ms. Swift asserts, and members of her staff confirm in deposition testimony, that groping by anyone (fans, guests, dignitaries) was unprecedented before Mr. Mueller grabbed her bottom. Ms. Swift explains, "I have done thousands of meet-and-greets over my career, and I have never had anything like that happen to me before or since."[56] Photographer Simbeck and Road Manager Worden have never before witnessed such an incident at a Swift meet-and-greet.[57] Photos of guests from the second meet-and-greet (during which Mr. Mueller and Ms. Melcher met Ms. Swift) consistently show Ms. Swift smiling and embracing guests. They are markedly different than the Melcher-Mueller-Swift photo in terms of the distance between Ms. Swift and guest (Mueller) and enthusiasm registered on Ms. Swift's face (a subdued expression).

Ms. Swift's immediate response to the alleged groping captured in the Mueller-Melcher-Swift photo and observed by her photographer indicates both discomfort on Ms. Swift's part and an attempt to physically move away from Mr. Mueller.[58]

Erica Worden indicates the fast pace of the second meet-and-greet line and Ms. Swift's practice of remaining "very professional throughout the whole time" as reasons why Ms. Swift did not report a problem immediately when Mr. Mueller grabbed her during the meet-and-greet.[59] An accusation of sexual assault in front of the young girls who, with their mothers, Mr. Mueller describes as the majority of meet-and-greet guests in the second group, likely would have been particularly upsetting to those fans, thus possibly reinforcing Ms. Swift's suppression of an immediate report to others of the alleged assault. Once the meet-and-greet ended, Ms. Swift immediately disclosed the alleged nonconsensual sexual contact to her staff.[60]

In sum, judging from the professional literature and studies on disclosure of sexual harassment and assault, my own professional experience, and the accumulated evidence for this case, my expert opinion is that Ms. Swift's delayed verbal reporting of unwanted sexual contact is entirely consistent with the reaction displayed by someone who has been

---

[53] Call notes, June 3, 2013; see also Call deposition 23:2-6.
[54] Simbeck deposition 39:15-17; see also Worden deposition 20:19-21; 28:12-17; 30:11-15.
[55] Worden deposition 27:8-10.
[56] Swift deposition 11:7-9.
[57] Simbeck deposition 47:2-9; Worden deposition 27:5-10.
[58] Simbeck deposition 39:15-17; Worden deposition 20:19-21.
[59] Worden deposition 22:1-3.
[60] Simbeck deposition 42:6-9; 43:6-7; see also Worden deposition 23:2-3, 8-9.

10

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

sexually assaulted.

Executed this 29th day of July, 2016

*[signature]*

Lorraine Bayard de Volo

### Resources

Berdahl, Jennifer L. 2007a. "Harassment Based on Sex: Protecting Social Status in the Context of Gender Hierarchy." *Academy of Management Review* 32:2, 641–658.

_____. 2007b. The Sexual Harassment of Uppity Women. *Journal of Applied Psychology* 92:2, 425–437.

Breiding, Matthew J., Sharon G. Smith, Kathleen C. Basile, Mikel L. Walters, Jieru Chen, and Melissa T. Merrick. 2014. "Prevalence and Characteristics of Sexual Violence, Stalking, and Intimate Partner Violence Victimization—National Intimate Partner and Sexual Violence Survey, United States, 2011." *Morbidity and Mortality Weekly Report: Surveillance Summaries*, Center for Disease Control and Prevention (CDC), September 5, 2014/63(SS08);1-18.

Campbell, Rebecca and Stephanie M. Townsend. 2011. "Defining the Scope of Sexual Violence against Women." In *Sourcebook on Violence Against Women*. Thousand Oaks, CA: Sage Publications.

Connell, Raewyn. 1987. *Gender and Power*. Stanford, CA: Stanford University Press.

DeSouza, Eros and A. Gigi Fansler. 2003. "Contrapower Sexual Harassment: A Survey of Students and Faculty Members". *Sex Roles* 48:11/12, 529-542.

Franke, K. M. 1997. What's wrong with sexual harassment? *Stanford Law Review* 49: 691–772.

Goleman, Daniel. 1991. "Sexual Harassment: About Power, Not Lust." *The New York Times* October 22, C1.

Gruber, James E. and Lars Bjorn. 1986. "Women's Responses to Sexual Harassment: An Analysis of Sociocultural, Organizational, and Personal Resource Models" Social Science Quarterly 67:4, 814-826.

11

Morgan, Phoebe and James E. Gruber. 2001. "Sexual Harassment: Violence against Women at Work and in Schools" In *Sourcebook on Violence Against Women*. Thousand Oaks, CA: Sage Publications.

University of Colorado Boulder. July 2016. "Summary of Sexual Assault and Perpetrator Characteristics." http://www.colorado.edu/studentsuccess/sexual-misconduct/phase-two-data-summary (Accessed 7/21/16).

The White House Council on Women and Girls. January 2014. "Rape and Sexual Assault: A Renewed Call to Action." https://www.whitehouse.gov/sites/default/files/docs/sexual_assault_report_1-21-14.pdf (Accessed 7/21/16).

Wiener, Richard L., Sarah J. Gervais, Jill Allen, and Allissa Marquez. 2013. "Eye of the Beholder: Effects of Perspective and Sexual Objectification on Harassment Judgments." *Psychology, Public Policy, and Law* 19:2, 206–221.

Wilson, Fiona and Paul Thompson. 2001. *Sexual Harassment as an Exercise of Power Gender, Work and Organization* 8:1, 61-83.

**Case Documents Reviewed:**
**Complaints**
- Demand Letter (Cyd Hunt) and Draft Complaint, July 16, 2014.
- Draft Complaint, February 2015.
- Complaint and Jury Demand, May 29, 2015.
- Amended Complaint and Jury Demand, June 1, 2015.
- Second Amended Complaint and Jury Demand, February 25, 2016.

**Depositions**
- Call, Robert deposition July 14, 2016.
- Coomer, Hershell (p/k/a Eddie Haskell) deposition July 14, 2016.
- Mueller, David deposition July 13, 2016.
- Simbeck, Stephanie deposition June 28, 2016.
- Swift, Taylor deposition July 26, 2016.
- Worden, Erica Ann deposition June 28, 2016.

**Notes**
- Eddie Haskell notes
- Bob Call notes
- Marsh notes on Melcher conversation

**Photos**
- Photos of rest of meet-and-greet attended by Mueller.
- Photo of Swift and Haskell at VIP Club Red meet-and-greet.
- Photo of Mueller, Melcher, and Swift at meet-and-greet.

**Partial recordings of Mueller-Bob Call phone conversation June 3, 2013:**
- "Eddie was there"

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

- "Bad cell service"
- "Trouble communicating"
- "Their story"
- "Taylor made formal complaint"
- "What if they knew"

CURRICULUM VITAE
**Lorraine Bayard de Volo**
University of Colorado Boulder

Department of Women and Gender Studies
UCB 246
Boulder, CO 80309-0246
LBDV@colorado.edu ; 303-492-8923

**EMPLOYMENT**
*Associate Professor*, Women and Gender Studies and Political Science, University of Colorado Boulder, 2006 - date.
*Chair, Women and Gender Studies Department*, University of Colorado Boulder, Fall 2014 - date.
*Director, Latin American Studies Center*, University of Colorado Boulder, Fall 2011 - Spring 2014.
*Associate Professor*, Departments of Political Science and Women's Studies, University of Kansas, Lawrence, Kansas, 2005-2006.
*Assistant Professor*, Departments of Political Science and Women's Studies, University of Kansas, Lawrence, Kansas, 1998-2005.
*Assistant Professor,* Department of Political Science, Franklin Pierce College. 1997-1998.
*Visiting Assistant Professor*, Department of Political Science, Whitman College. 1996-1997.

**EDUCATION**
*Ph.D.*:  Political Science, **University of Michigan**, 1996.
*Graduate Certificate*: Women's Studies, **University of Michigan**, 1995.
*BA*:  Political Science and Economics, with Honors, **University of California, Santa Barbara**, 1987.

**RESEARCH**
**MAJOR GRANTS & AWARDS**
*United States Institute of Peace*, "Women's Nonviolent Action in Latin America," May 2003-August 2004, $35,000.
*National Science Foundation*, "Women Waging War and Peace in Latin America," (SES-0242269) 3/15/03-2/28/05 (extended one year to 2006), $49,475.
*1997 Best Dissertation in Women and Politics*, American Political Science Association, August 1997.

**PUBLISHED WORK:**
**Books:**
Bayard de Volo, Lorraine. Forthcoming. *Gendered Rebels: What a Gender Lens Tells Us about the Cuban Insurrection*, Cambridge University Press.

13

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

Bayard de Volo, Lorraine. 2001. *Mothers of Heroes and Martyrs: Gender Identity Politics in Nicaragua, 1979-1999,* Johns Hopkins University Press.

**Journal Articles**

Bayard de Volo, Lorraine. 2016. "Unmanned?: Gender Recalibrations and the Rise of Drone Warfare." *Politics & Gender* 12:01 (March), 50-77.

Bayard de Volo, Lorraine and Lynn K. Hall. 2015. "'I Wish All the Ladies Were Holes in the Road': The U.S. Air Force Academy and the Gendered Continuum of Violence," *Signs: Journal of Women in Culture and Society* 40:4 (Summer), 865-889.

Bayard de Volo, Lorraine. 2012. "Revolution in the Binary?: Gender and the Oxymoron of Revolutionary War in Nicaragua and Cuba," *Signs: Journal of Women in Culture and Society* 37:2 (Winter), 413-39.

Bayard de Volo, Lorraine. 2011. "Heroines with Friends in High Places: Cuba's Damas de Blanco," *NACLA Report on the Americas* 44:5, (September-October), 19-22.

Bayard de Volo, Lorraine. 2009. "Women and War in Latin America, 1950-2000," *History Compass* 7:4, 1181-1200.

Reed, Jean-Pierre and Lorraine Bayard de Volo. 2007. "Cultural Practices in the Making of Oppositional Politics," *Critical Sociology* 33:4, 619-625.

Bayard de Volo, Lorraine. 2006. "The Dynamics of Emotion and Activism: Grief, Gender, and Collective Identity in Revolutionary Nicaragua," *Mobilization* 11:3, 461-474.

Bayard de Volo, Lorraine. 2006. "The Nonmaterial Long-Term Benefits of Collective Action: Empowerment and Social Capital in a Nicaraguan Women's Organization," *Comparative Politics* 38:2, 149-167.

Bayard de Volo, Lorraine. 2004. "Mobilizing Mothers for War: Cross-National Framing Strategies in Nicaragua's Contra War," *Gender & Society* 18:6, 715-734.

Bayard de Volo, Lorraine and Edward Schatz. April 2004. "From the Inside Out: Ethnographic Methods in Political Research," *PS: Political Science and Politics*, 267-271.
- reprinted in *Interpretive Political Science*, ed. Mark Bevir. Sage 2010.
- Reprinted in Japanese, *Interpretive Political Science*, ed. Mark Bevir. Sage 2010.

Bayard de Volo, Lorraine. 2003. "Service and Surveillance: Micro-Politics at Work among Casino Cocktail Waitresses," *Social Politics* 10:3, 346-376.
- reprinted in *Ethnography in Context*, edited by Richard Hobbs, Sage 2011.

Bayard de Volo, Lorraine. 2003. "Analyzing Politics and Change in Women's Organizations: Nicaraguan Mothers' Voice and Identity," *International Feminist Journal of Politics* 5:1, 92-115.

**Book chapters**

Bayard de Volo, Lorraine. 2015. "Comparative Politics." *Routledge Handbook of Interpretive Political Science*, edited by Mark Bevir and R.A.W. Rhodes, Abingdon: Routledge.

14

Bayard de Volo, Lorraine. 2009. "Participant-observation, Politics, and Power Relations: Nicaraguan Mothers and U.S. Casino Waitresses" in *Political Ethnography*, edited by Ed Schatz, Chicago: University of Chicago Press.

Bayard de Volo, Lorraine. 2000. "The Global and Local Framing of Maternal Identity: Obligation and Agency Within the Mothers' Committee of Matagalpa, Nicaragua," in *Globalization and Social Movements*, edited by John Guidry, Michael Kennedy, and Mayer Zald, University of Michigan Press, 127-146.

Bayard de Volo, Lorraine. 1998. "Drafting Motherhood: A Comparative Analysis of Maternal Mobilization in W.W.II and the Nicaraguan Revolution," in *The Women and War Reader*, edited by Jennifer Turpin and Lois Lorentzen, NYU Press, 240-253.

**Review Essays:**

Bayard de Volo, Lorraine. 2015. Review of *Women in War: The Micro-Processes of Mobilization in El Salvador*, by Jocelyn Viterna. New York, NY: Oxford University Press, 2013. In *Journal of World-Systems Research*.

Bayard de Volo, Lorraine. 2007. Review of *The U.S. Women's Movement in Global Perspective*, edited by Lee Ann Banaszak. Lanham, MD: Rowman and Littlefield, 2005. In *Perspectives on Politics* 5:1, March 2007, 162-3.

Bayard de Volo, Lorraine. 2006. "Feminists Question Revolution" Review essay of *Feminism and the Legacy of Revolution: Nicaragua, El Salvador, Chiapas*, by Karen Kampwirth and *The Revolution Question: Feminisms in El Salvador, Chile*, and Cuba, by Julie D. Shayne. In *Contemporary Sociology* 35:2, 115-118.

Bayard de Volo, Lorraine. 2005. Review of *Human Rights in Cuba, El Salvador and Nicaragua: A Sociological Perspective on Human Rights Abuse*, by Mayra Gómez, (New York: Routledge, 2003), *Contemporary Sociology*.

Bayard de Volo, Lorraine. 2004. Review of Ilja Luciak, *After the Revolution: Gender and Democracy in El Salvador, Nicaragua, and Guatemala* (Baltimore: Johns Hopkins University, 2001) *Journal of Latin American Studies* 36:2, 397-9.

Bayard de Volo, Lorraine. 2003. Review of *Radical Women in Latin America: Left and Right*. Edited by Victoria González and Karen Kampwirth, (University Park, PA: The Pennsylvania State University Press, 2001), *Journal of Politics* 65:4, 1285-8.

Bayard de Volo, Lorraine. 2003. Review Essay "Engendering Revolution: Explaining Women's Increased Participation in Guerrilla Movements" of Karen Kampwirth, *Women and Guerrilla Movements: Nicaragua, El Salvador, Chiapas, Cuba* (University Park, PA: The Pennsylvania State University Press, 2002), *Contemporary Sociology* 32:5, 553-556.

Bayard de Volo, Lorraine. 2002. Review of *After Revolution: Mapping Gender and Cultural Politics in Neoliberal Nicaragua* by Florence Babb (Austin: University of Texas Press, 2001), *Journal of Political Ecology: Case Studies in History and the Social Sciences* 9.

Bayard de Volo, Lorraine. 2000. "Women and Politics in Latin America: Recent Research," *International Feminist Journal of Politics*, 140-146.

Bayard de Volo, Lorraine. 1996-97. "Engendering World Politics and Caribbean Studies: A Review Essay." *Journal of InterAmerican Studies and World Affairs*, 38:4, Winter, 179-188.

**INVITED LECTURES**

"Examining drone technology with a gender lens: how gender affects drone warfare, and vice versa," Gender Based Analysis in the STEM Fields, Status of Women Canada, an agency of the Government of Canada, Ottawa, Ontario, November 22, 2013.

"Gendered Rebels: The Cuban Insurrection 1952-58," Center for Latin American & Caribbean Studies, University of Kansas, September 27, 2013.

"'Before It Was a War of Bullets; Now It Is a War of the Stomach'": Gender and the Continuum of Violence in Latin America," Center for Women's Studies and Gender Research, Colorado State University, April 2012.

Guest faculty, M.A. Programme in Peace and Conflict Studies, lecture series on "Gender, War, and Peace," European University Center for Peace Studies (EPU), Stadtschlaining, Austria, November 1-5, 2010.

Guest faculty, M.A. Programme in Peace and Conflict Studies, lecture series on "Gender, War, and Peace," European University Center for Peace Studies (EPU), Stadtschlaining, Austria, October 26-30, 2009.

"Women's Hearts and Minds: Training a Gendered Lens on Latin America Wars," invited lecture at University of North Carolina-Chapel Hill, Consortium in Latin American and Caribbean Studies: Gender and Feminist Theory in Latin America Working Group, April 10, 2008.

"Capturing Women's Hearts and Minds: Gender and War in Latin America and Beyond," invited lecture at Marshall University, Huntington, West Virginia, May 2007.

"Mobilizing Women for War: Cuba and Nicaragua Compared," invited lecture at California State University, San Marcos, March 2006.

"Motherhood and War in Nicaragua." Invited lecture, Latin American Studies and Women's Studies at the University of Arkansas, Oct. 3, 2002.

"Women, War, and Afghanistan," Invited lecture for the Bi-Weekly Forum, Kansas State University, February 27, 2002.

"Media, Patriotism, and America's New War." Invited lecture for the Phi Beta Kappa awards reception, Baker University, Baldwin City, Kansas, Oct. 24, 2001.

"Comparative Maternal Politics in Nicaragua, El Salvador, and Argentina." Invited Lecture, Women's Studies and Latin American Studies, Central Missouri State University, 1999.

"When Mothers Rebel: Maternal Mobilizing in Nicaragua, El Salvador, and Argentina," Invited lecture, Women's Studies Program, University of New Hampshire, April 1998.

**RESEARCH WORKSHOPS**

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

Invited participant, USIP-Praxis Workshop, "Lessons Learned and Challenges Ahead: Gender, Conflict and Peacebuilding," United States Institute of Peace, Washington, DC, November 19-20, 2009.

Invited participant, University of Toronto Workshop on Political Ethnography, October 2006.

Invited participant, Conference on the Comparative Study of Deputy "Hill Style" in Latin American Legislatures, Program in the Cross-National Study of Politics, Texas A&M, February 23-24, 2001.

**Internal Grants:**
*University of Colorado Center to Advance Research and Teaching in the Social Sciences* (CARTSS), research grant Summer 2010, $4000.
*KU Hall Center Faculty Research Fellowship*, Spring 2004.
*KU General Research Fund*, Summer 2002, $6000.
*Hall Center for the Humanities Faculty Travel Grant*, Chiapas fieldwork, Summer 2001, $1875.
*KU General Research Fund*, 2001, $6000.
*KU New Faculty Research Grant*, Summer 2000, $5400.
*Hall Center Travel Grant* for Nicaraguan fieldwork, Summer 1999, $1,200.

## II. TEACHING
### Teaching Awards
- *Silver Anniversary Award for Excellence in Teaching*, university statewide award (Kansas), 2003.
- *Teaching Excellence Award* from University of Kansas Center for Teaching Excellence, 2001-2002.

### Courses Taught in the Last Ten Years
Undergraduate Courses
- Study Abroad: Gender, Race, and Sexuality in Revolutionary Cuba (Global Seminar)
- Gender and US Politics
- Gender, Race, and Class in the Global Context
- Gender and Politics in Latin America
- Gender and War
- Feminist Theory

Graduate Courses
- Gender and the Continuum of Violence
- Feminist Theory
- Social Politics (political science)
- Feminist Theory and Methods (women's studies)

## III. SERVICE
### University of Colorado
- Director, Women and Gender Studies Program, Fall 2014-to date.
- CU Grand Challenge, Integrated Remote & In Situ Sensing (IRISS), Steering Committee, Summer 2015 – to date.
    - Associate Director, Policy
    - Co-Primary Investigator, Project Society: Navigating the Politics and Ethics of Drones

17

Case No. 1:15-cv-01974-WJM-KLM   Document 136-1   filed 05/12/17   USDC Colorado
pg 19 of 20

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

- Internal Review Committee, Program for Writing and Rhetoric, Fall 2015-Spring 2016.
- Director, Latin American Studies Center, Fall 2011-Spring 2014.
- Latin American Studies Center Faculty Advisory Committee, Fall 2014 - to date.
- Peace and Conflict Studies Program, Faculty Steering Committee, Fall 2014 - to date.
- International Affairs Executive Committee, 2011-Spring 2014.
- International Affairs Faculty Committee, 2009-to date.
- CARTSS Faculty Committee, 2012 – Fall 2014.
- WGST Executive Committee member 2006-to date.
- Chair of Undergraduate Curriculum, WGST, Fall 2007-Fall 2014.
- Internal Reviewer, Humanities Department, 2008-09.
- ASC representative for WGST 2006-2010.
- ASC Grievance Committee, Fall 2007-Spr 2010.
- ASC Diversity Committee, Fall 2006-Spr 2007.
- Search Committee member, WGST search in Global Feminism, Fall 2007-Spr 2008.
- Chair of Search Committee, WGST search in Gender and Hemispheric Studies, Fall 2006-Spr 2007.
- Chair of Search Committee, WGST Strategic Hiring Initiative Search in Gender and Global Ethics and Justice, Spring 2007.

**SERVICE--PROFESSION**
- *United States Institute of Peace Grant Review Panel*, Washington DC, December 2012.
- Member, Evaluation Site Visit Team, CIEE Valparaiso-Viña de Mar, Chile, Study Abroad Program, October 2012.
- *Committee Chair, 2004-2005 Alice Paul Award* for best prospectus on women and politics, awarded by the APSA Women's Caucus.
- *United States Institute of Peace Grant Review Panel*, Washington DC, May 2004.
- *Women Waging Peace*, Working Group participant, Colombian women's delegation, Washington, DC, May 11, 2004.
- Co-Editor, *Critical Sociology* Special Issue, 2004.
- *Section Chair*, Comparative Politics, Western Political Science Association annual conference, Las Vegas, NV March 15-17, 2001.
- *Fulbright Awards Screening Committee* for Central America fellowships, Denver, CO. December 1999.
- *Manuscript reviewer*:
  - Books: Westview; McGraw-Hill; Allyn & Bacon; Lynne Rienner Press; Houghton-Mifflin; Lexington Books; Palgrave-MacMillan; Princeton University Press; Oxford University Press (2); University of Florida Press; Penn State University Press (3); Rutgers University Press.
  - Journals: *International Feminist Journal of Politics* (3); *Political Research Quarterly, Journal of Politics* (2), *Politics & Gender* (4), *Journal of Contemporary Ethnography* (2), *Comparative Political Studies; Women and Politics; The Sociological Quarterly* (2); *Cambridge Review of International Affairs* (2); *Comparative Politics* (2); *Mobilization* (5); *Latin American Research Review* (2); *Gender & Society* (2); *Sociological Forum*;

18

*American Sociological Review; Hypatia* (2); *Polity* (2); *GLQ-Gay and Lesbian Quarterly; AlterNative: An International Journal of Indigenous Peoples; Bulletin for Latin American Research* (3); *Social Politics; English Language Notes; Social Movement Studies; Polity; American Political Science Review; Feminist Theory* (3); *Journal of Human Trafficking*.