**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 15-cv-1974-WJM-KLM

DAVID MUELLER,

      Plaintiff,

v.

TAYLOR SWIFT,

      Defendant and CounterClaimant,

      and

FRANK BELL, and
ANDREA SWIFT a/k/a Andrea Finlay,

      Defendants.

---

## ORDER GRANTING SUMMARY JUDGMENT IN PART

---

In this action pending under the Court's diversity jurisdiction, 28 U.S.C. § 1332,

Plaintiff David Mueller ("Plaintiff" or "Mueller") brings tort claims for intentional

interference with contract, tortious interference with prospective business relations,

slander *per se*, and slander *per quod* against Defendants Taylor Swift ("Swift", or

"Taylor Swift"), Frank Bell ("Bell"), and Andrea Swift ("Andrea Swift") (together,

"Defendants").  (*See generally* ECF No. 72; ECF No. 126 at 2.)  Swift in turn brings

counterclaims against Mueller for the torts of assault and battery.  (*See* ECF No. 36 at

13–14; ECF No. 126 at 5–6.)

Now before the Court is Defendants' Motion for Summary Judgment.  (ECF No.

108 (Defendants' "Motion").)  For the reasons explained below, that Motion is granted in

part and denied in part.  Mueller has not moved for summary judgment against Swift's

counterclaims, and as a consequence all such counterclaims will proceed to trial.

## I.  BACKGROUND

The following facts are undisputed where not attributed to a party or witness.

Beginning in January 2013, Mueller was employed by a Denver-based country

format radio station, KYGO, where he worked as one of the on-air hosts of a morning

radio show.  (ECF No. 108 at 3, ¶ 1.)[1]  He had an employment contract dated January

4, 2013, for a term of two years, with an option for KYGO to add a third year, in its sole

discretion.  (ECF No. 126 at 7, ¶ 6.)

On June 2, 2013, Mueller attended a backstage "meet-and-greet" event

preceding a concert performed at the Pepsi Center in Denver by Swift, who is a famous

musician.  (*See id.* at 4, ¶ 6; ECF No. 126 at 7, ¶ 15.)  After waiting in a line, Mueller

and non-party Shannon Melcher (Mueller's then-girlfriend, and a co-worker at KYGO

("Melcher")) went to a location where they posed for a photo with Swift.

The central factual dispute in this case is as follows:  Swift contends, with great

certainty, that while posing for this photograph, Mueller inappropriately touched her

buttocks, but  Mueller adamantly denies doing so.  In deposition testimony taken in this

case, Swift described the relevant conduct more specifically as follows:

> Mr. Mueller and his friend, girlfriend—he and a woman
> walked in.  I said "Hi, thank you for coming to my show,"
> introduced myself.  He was very adamant in letting me know
> that he was with KYGO and that he was with radio.  And I

---

[1] Mueller's actual employer was Lincoln Financial Media Group of Colorado, the owner of KYGO.  (ECF No. 126 at 6–7, ¶¶ 3–4.)  Neither entity is a party and for simplicity here the Court simply uses the term "KYGO."

said, "Well, thank you so much for coming.  Thanks for everything.  Would you guys like to get a photo?"  And so then we get in a photo formation with me in the middle, and that's when right as the moment came for us to pose for the photo, he took his hand and put it up my dress and grabbed onto my ass cheek, and no matter how much I scooted over it was still there.  It was not an accident, it was completely intentional, and I have never been so sure of anything in my life.

(ECF No. 108-9 at 16–17.)[2]

Mueller denies putting his hand under Swift's dress, denies that he grabbed her buttocks, and has testified unequivocally that "I am sure that I did not."  (ECF No. 119 at 3–4, ¶¶ 6 & 8; ECF No. 108-3 at 41.)  Other witnesses, including KYGO's program director, and Mueller's "boss," Hershel Coomer (a/k/a Eddie Haskell) ("Haskell"), confirm that Mueller has all along been "very adamant that he did not do it" (*see, e.g.*, ECF No. 108-6 at 13), and Mueller told KYGO officials at the time that Swift's accusation was "absolutely inaccurate, 100 percent incorrect" (ECF No. 108-14 at 10).

The exact series of events following the meet-and-greet is not well established by the parties' present filings, but the record generally reflects the following.  As reported by Swift and her mother, immediately after the meet-and-greet ended, Swift walked to her dressing room, where she told her mother, Andrea Swift, about the alleged incident with Mueller.  (ECF No. 108 at 7–8, ¶¶ 16–17.)[3]  Thereafter, Bell,

---

[2] All citations to docketed materials are to the page number found in the ECF header, which frequently differs from the internal pagination, as is true with transcript excerpts.

[3] Mueller's opposition brief denies Defendants' factual allegations regarding the communications between Swift, Andrea Swift, and Swift's "senior management team" following the meet and greet, stating that he "was not present and thus does not know" what occurred. (ECF No. 119 at 10, ¶¶ 16–18.)  However, absent any contradictory evidence, Mueller's mere lack of knowledge does not raise a genuine dispute of fact at the summary judgment stage. *See* Fed. R. Civ. P. 56(c)(1).  Mueller also suggests the deposition testimony cited by

Andrea Smith, and others in Swift's "management team" report having met somewhere backstage.  (*See, e.g.*, ECF No. 108-17 at 8.)  Thereafter, before the concert started, Mueller was approached by members of Swift's security staff, who accused him of improperly touching Swift and informed him that he could not attend the concert.  (*See generally* ECF No. 2 ¶¶ 26–27; ECF No. 36, ¶¶ 26–27.)  Several accounts of this interaction, including Melcher's testimony and Mueller's pleadings, reflect that he denied having touched Swift inappropriately, and made statements to Swift's security staff to the effect that he wanted to involve the police to investigate the accusation against him.  (*See, e.g.*, ECF No. 108-15 at 10; ECF No. 72 ¶ 25.)

The record also shows that KYGO personnel and executives were made aware of the incident that same evening, evidently after Bell communicated in person with Haskell at the concert venue.  (ECF No. 108-6 at 9; ECF No.119-2 at 7–8.)  KYGO then suspended Mueller with pay.  (ECF No. 108-8 at 9.)  According to KYGO's vice president/market manager, Robert Call ("Call") this was "so we could begin an investigation.  We just didn't feel it was appropriate that he be on the air, both knowing all this was going on and the potential possibility that the press could find out or would find out."  (*Id.*)

The following morning, Defendant Bell (who describes himself as Swift's "radio guy," and whom Swift now describes as a "senior manager") contacted Call, who Bell

---

Defendants regarding these conversations is hearsay.  However, both of the Swifts are expected to testify at trial (*see* ECF No. 126 at 8–9, 11), and the Court concludes that Defendants will be able to present the relevant facts regarding these conversations through admissible evidence, as is required at this stage of litigation.  *See* Fed. R. Civ. P. 56(c)(2); *see also, e.g.*, Fed. R. Evid. 801(c)(2) & (d)(1)(B), 801(1)–(3).

knew, and also understood to be "the executive who would be in a position to deal with a matter of this nature." (*See* ECF No.119-2 at 5, 6; ECF No. 119-9 at 24.) According to his own testimony, Bell "did not conduct any investigation" before contacting Call. (ECF No. 119-9 at 10.) Bell has described his communications to Call, in part, as follows: "I know what type of person you are, I know what kind of company [KYGO] is, and I know that you all will do your homework and make your own independent determination of what to do here." (ECF No. 119-9 at 9.) However, Bell also acknowledged that he told Mr. Call that "[Bell] and Taylor's mother and Taylor and the management team expected Mr. Call to take appropriate action." (*Id.* at 10.)

Call's notes regarding his communications corroborate that Bell communicated that "he was disappointed, Taylor's family was upset and they were looking to us to do the right thing." (ECF No. 108-7 at 2.) Call's notes state, in part:

> [Bell] reminded me of the fact he and I have known each other a long time, he would not be calling me if it were not extremely serious and that they are considering all their options. The relationship with KYGO is important and unless we act could be gravely impacted and that he had assured all of the Taylor team that I would handle it appropriately.

(ECF No. 108-7 at 2.) Call's deposition testimony also corroborates communication from Bell to the effect that "he knew, you know, we would give the situation a fair consideration and do the right thing." (*Id.*) Call has testified that Bell never asked him to terminate Mueller (ECF No. 119-2 at 9), but when asked what he understood Bell to mean by KYGO doing "the right thing," Call testified that "my belief would be that probably would run the gambit [*sic*] of some type of disciplinary action, maybe a suspension, maybe up to and including termination." (ECF No. 119-2 at 8.)

5

Bell then sent Call the photograph taken at the meet-and-greet of Mueller, Melcher, and Swift.  (ECF No. 119-9 at 11.)   Call's impression of the photograph is that Mueller "had his hand in a pretty inappropriate place," and that it is "inconsistent with . . . most [recording] artist's [*sic*] photos."  (ECF No. 119-2 at 10.)  But he also testified that he "couldn't conclude from that photograph" whether Mueller's hand was touching Swift.  (ECF No. 119-2 at 10.)

Later the same day, after meeting with Haskell, KYGO's attorney, and other KYGO executives, Call spoke again with Bell, and then he and Haskell met in person with Mueller.  (ECF No. 19-2 at 10–11.)   At that meeting, Mueller denied inappropriately touching Swift and expressed that "if there were more cameras or other camera angles, it would vindicate him," and also explained that "the picture looks the way the picture looked because it was a last-minute thing," suggesting the photo captured him in motion as he moved quickly to pose for the photograph, but does not show not that his hand was in contact with Swift.  (ECF No. 119-2 at 11.)

Call did not speak to either the photographer or the security person who had been in the room with Mueller and Swift at the meet-and-greet.  (ECF No. 119-2 at 11.) He has testified that he "never considered" talking with the other people in the room at the time and that he "didn't need that information" as a part of his investigation.  (ECF No. 119-2 at 12.)

The next morning, Call made the decision to terminate Mueller and sent him a letter via courier indicating that KYGO was terminating Mueller's employment agreement for cause.  (ECF No. 108-4.)  The letter indicated that KYGO was acting pursuant to its "rights under Section 16(b) of [Mueller's] Employment Agreement," which

6

Haskell describes as a "morality clause," and provided, in part, as follows:

> If Employee should commit any act or become involved in any situation or occurrence which, in Employer's reasonable opinion, will bring Employee into public disrepute, contempt, scandal or ridicule, will provoke, insult, or offend the community, or will reflect unfavorably upon [KYGO] or any of its sponsors, Employer shall have the right to terminate this Agreement and Employee's employment hereunder for cause.

(ECF No. 108-3 at 10, ¶ 16(b); *see also* ECF No. 108-6 at 19.)

When asked in deposition testimony why he made the decision to fire Mueller, Call has summarized three components leading to his decision:

> I fired him based on the fact that I had a picture that Taylor Swift's promotion people had sent that—at least in my opinion—represented him in a very uncomfortable place with Taylor.  I had direct feedback from her radio management group, including Frank Bell, whom I've known for many years, who indicated that Mr. Mueller had during a photo session touched her inappropriately, I believe, raised her dress or skirt and that she was very clear on what had happened.  And it was related to me that her mother felt the same way.  And in talking to [Mueller] on Monday [June 3, 2013], he certainly indicated that he did not do it; however—and I believe this is a direct quote—if I had, it was incidental or accidental.  The combination of those three elements put me in a position where I felt comfortable making the decision.

(ECF No. 108-8 at 6; *see also* ECF No. 108-8 at 20.)  Regarding Mueller's comment that any contact had been "incidental or accidental," Call has also described this as reflecting, in his view, that Mueller "changed his story that it couldn't have occured, then that it was incidental."  (ECF No. 108-8 at 20.)

Mueller initiated this lawsuit on May 29, 2015 in Denver District Court, asserting claims of intentional interference with contract and intentional interference with

7

prospective business relations.  (ECF No. 108-22.)  Invoking this Court's diversity

jurisdiction, on September 10, 2015 Defendants removed this action to federal court.

(ECF No. 1.)  Plaintiff subsequently amended his pleadings to add claims for slander

*per se* and slander *per quod*, and to hold Swift liable for Bell's actions under a theory of

vicarious liability or *respondeat superior*.  (ECF No. 72.)  Defendants' instant Motion for

Summary Judgment seeks judgment as a matter of law against all of those claims.

(ECF No. 108.)

## II.  LEGAL STANDARD

### A.    Summary Judgment

Summary judgment is appropriate only if there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem*

*Coal Co., Inc*., 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine dispute

as to a material fact depends upon whether the evidence presents a sufficient

disagreement to require submission to a jury or, conversely, is so one-sided that one

party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49

(1986); *Stone v. Autoliv ASP, Inc*., 210 F.3d 1132 (10th Cir. 2000).

A fact is "material" if it pertains to an element of a claim or defense; a factual

dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a

reasonable jury could return a verdict for either party.  *Anderson*, 477 U.S. at 248.  The

Court must resolve factual ambiguities against the moving party, thus favoring the right

to a trial.  *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).  "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge"; therefore, in ruling on summary

judgment, "[t]he evidence of the non-movant [here, Mueller] is to be believed, and all

justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## B.   Adverse Inference

Defendants acknowledge that in this posture the Court must view all facts and

evidence in the light most favorable to Mueller, and must also draw all reasonable

inferences in his favor.  Nevertheless, Defendants ask the Court to "draw an adverse

inference against [Mueller]," as a sanction for alleged spoliation of evidence.  (ECF No.

108 at 14–15.)

Specifically, as described in Mueller's deposition testimony, he made audio

recordings of his conversations with Call and Haskell at the time of his termination.

However, he then "edited down clips" from those recordings, and provided only those

edited clips to his attorney, rather than the full audio files.  (*See* ECF No. 108-5 at 19,

20.)  At some point, "the full file was lost."  (*Id.* at 19.)  Thus only "a portion of the entire

audio" has been produced in litigation and thus made available for Defendants to

review.  (ECF No. 108 at 4, ¶ 9 & n.3; *id.* at 13.)

Defendants argue that "the Court should, in its discretion, draw reasonable

inferences against Plaintiff" regarding what the missing portions of these recordings

might have contained.  (*See id.* at 14.)  However, under Tenth Circuit precedent, the

Court does not have such discretion, because an adverse inference is only available if

there is proof that the party who lost or destroyed evidence did so in bad faith.  *Turner*

*v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009). "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Id.* (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997)).[4] Defendants cite this controlling precedent but do not candidly acknowledge that it forecloses their request, since they have not claimed or proven that Mueller acted in bad faith. (*See* ECF No. 108 at 12–13 (citing *Turner* and *Aramburu*).)

The record before the Court—specifically, Mueller's testimony—reflects that the unedited audio files became unavailable because water or coffee spilled on Mueller's laptop (*see* ECF No. 108-5 at 22, 53–54), and because an external drive on which he might have had backup copies was lost or misplaced "maybe a year" after he was terminated, and before this suit was filed (*see id.* at 24). These facts reflect a too-common cautionary tale about file security, and perhaps negligence, but they do not, at least on the record presently before the Court, reflect bad faith. The law does not permit the Court to draw conclusions about disputed facts bearing on the merits of an action as the result of spilled coffee. *See Turner*, 563 F.3d at 1149. Defendants' request for an adverse inference is therefore rejected and the Court reviews the evidentiary record under the usual summary judgment standard.[5]

_____

[4] Parties proceed at their own peril in choosing not to seek lesser discovery-related sanctions at an earlier phase of litigation, then later requesting an adverse inference, as Defendants did here. *See Turner* 563 F.3d at 1149 (parties "must be diligent in the defense of their own interests, and should seek sanctions under Federal Rule of Civil Procedure 37 to remedy any prejudice caused by spoliation. When a [party] fails to seek sanctions under Rule 37 and thus forecloses access to the substantial weaponry in the district court's arsenal, the [party's] only remaining option is to seek sanctions under a spoliation of evidence theory." (internal quotation marks omitted)).

[5] To be clear, the Court is dismayed to learn that contemporaneously-created evidence regarding the central disputed events in this case was lost in entirely preventable

10

## III.  ANALYSIS

**A.      The Central Factual Dispute is Genuine**

The Court begins its analysis by emphasizing what should be obvious from the

background set forth above, namely, that the parties' claims center on an intractable

factual dispute between the two irreconcilable versions of the facts offered by the sworn

testimony of Mueller and Swift, both with great certainty.

Initially, the Court concludes that this dispute is "genuine" as that term is meant

under the summary judgment standard, meaning the factual dispute is sufficiently

contested that resolving it requires submission to a jury.  *See Anderson,* 477 U.S. at

248–49.  The Court need look no further than the respective testimony of Mueller and

of Swift to determinate that the evidence is sufficiently contradictory that a reasonable

jury could decide for either party.  *See Anderson,* 477 U.S. at 248–49.

The parties spend significant effort summarizing their differing characterizations

of what facts should be drawn from the testimony of other witnesses, and the

photograph taken of Mueller, Melcher, and Swift.  (*See* ECF No. 108 at 4–5, ¶¶ 9–14;

ECF No. 119 at 4–10, ¶¶ 9(a)–(ee) & 14.)  But, in the Court's summary judgment

analysis, the parties' differing views of this evidence only confirm that the facts are in

circumstances.  This is especially troubling because it appears that Mueller was already
consulting with his lawyer about possible legal action at the time the audio files were edited and
lost.  (*See* ECF No. 108-5 at 21.)  It is surprising that the present record suggests Mueller's
lawyer did not obtain and listen to the complete audio files for himself.  But it is more troubling
that counsel failed to assure this evidence was preserved.  *See, e.g.*, *United Med. Supply Co. v.
United States*, 77 Fed. Cl. 257, 258–59 (2007) ("Aside perhaps from perjury, no act serves to
threaten the integrity of the judicial process more than the spoliation of evidence. * * * To guard
against this, each party in litigation is solemnly bound to preserve potentially relevant
evidence.")  However, since the only related dispute now pending is Defendants' request for an
adverse inference, the Court does not further address the matter here.

dispute.  Having reviewed these evidentiary materials, the Court finds that the central

and genuine dispute remains.  Certain witnesses' testimony tends to corroborate Swift's

version of events, and Mueller points to other evidence that he argues shows

inconsistencies in Swift's story.  None of this changes the reality that if a jury accepts

Mueller's version of the facts, then it must substantially reject Swift's version, and vice

versa.  In ruling on summary judgment, it is not the Court's role to resolve this dispute.

Moreover, while the evidence inherently raises questions of credibility, the Court may

not, and does not, make determinations regarding the credibility of any witnesses.

Those determinations are left solely for the jury.  *Anderson*, 477 U.S. at 255.

To belabor the standard set out above, in ruling on Defendants' Motion for

summary judgment against Mueller's claims, the Court treats the evidence supporting

Mueller's factual claims as true, and also draws all reasonable inferences in Mueller's

favor.  *See id.*; *Houston*, 817 F.2d at 85.  The implications of faithfully applying that rule

are more stark in this case than in most, and correspondingly affect virtually every

aspect of the Court's analysis below.  In short, since the Court must treat Mueller's

testimony as true, the analysis here proceeds from the point of view that Mueller did *not*

inappropriately touch Swift and that he was wrongly accused.  The Court also presumes

for present purposes that the jury will find that Mueller's testimony is credible and that

Swift's is not, and therefore proceeds by treating Swift's version of the facts as, at the

least, mistaken.  Likewise, the Court's analysis proceeds by assuming that Mueller

honestly denied the accusations against him, but that KYGO wrongly concluded that he

was lying.  This standard of review is required at this stage of litigation to protect parties'

rights under the Seventh Amendment to have a jury, rather than a judge, ultimately

decide the facts of their case.  *Houston*, 817 F.2d at 85.

**B.      Intentional Interference With Contract**

Plaintiff's first claim is for intentional interference with contract.  (*See* ECF No. 72

¶¶ 40–45; ECF No. 126 at 2.) "Colorado recognizes the tort of intentional interference

with contractual relations" (or, more simply, "intentional interference with contract").

*Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210

(Colo. 1984).  "The tortious conduct occurs when the defendant, not a party to the

contract, induces the third party to breach the contract, or interferes with the third

party's performance of the contract."  *Colo. Nat. Bank of Denver v. Friedman*, 846 P.2d

159, 170 (Colo. 1993).  Moreover, it has long been actionable in Colorado "to induce

without justification an employer to break his contract of employment with his

employee."  *Order of Ry. Conductors v. Jones*, 239 P. 882, 883–84 (Colo. 1925).  This

is true even where a plaintiff alleges interference with an at-will employment contract, in

which the employer has the right to fire the employee at any time.  *See Watson v.

Settlemeyer*, 372 P.2d 453, 456 (Colo. 1962); *Zappa v. Seiver*, 706 P.2d 440, 442

(Colo. App. 1985).

The elements that a plaintiff must prove to prevail on this tort claim are:

(1) existence of a contractual relationship between the plaintiff and a third party; (2) the

defendant knew or reasonably should have known of the contract; (3) the defendant

intentionally and improperly interfered with that contract; (4) defendant's conduct

caused the breach or non-performance of the contract by the third party; and (5) plaintiff

suffered damages as a result.  *See Arapahoe Surgery Ctr., LLC v. Cigna Healthcare,*

*Inc.*, 171 F. Supp. 3d 1092, 1120 (D. Colo. 2016) (citing *Friedman*, 846 P.2d at 170);

*see also* Colo. Jury Instr.-Civil § 24:1 (4th ed., Apr. 2016 update) ("CJI-Civ.").  Here,

Defendants' arguments are directed to the second, third, and fourth of those elements,

which the Court addresses in turn.[6]

    1.  <u>Knowledge of Contract</u>

Defendants first argue that Mueller has no evidence to show that Swift knew of

Mueller's contract with KYGO.  (ECF No. 108 at 17.)  However, under Colorado law it is

sufficient to show the defendant reasonably should have known of the existence of a

contract.  *Lutfi v. Brighton Cmty. Hosp. Ass'n*, 40 P.3d 51, 58 (Colo. App. 2001);

*Telluride Real Estate Co. v. Penthouse Affiliates, LLC*, 996 P.2d 151, 155 (Colo. App.

1999); *see also Carman v. Heber*, 601 P.2d 646, 648 (Colo. App. 1979) (liability may be

based on "knowledge [by the defendant] of facts which would lead him to inquire as to

the existence of the contract").

Here, evidence which the jury could accept reflects that Mueller attended the

pre-concert "meet-and-greet" while employed by KYGO, that he and/or Melcher told

Swift that they worked for KYGO, and that Swift's "management team" was familiar with

KYGO.  Moreover, by the time Bell called KYGO on June 3, he and other members of

Swift's "management team" were obviously aware that Mueller was a KYGO employee.

Viewing this evidence in the light most favorable to Mueller, a reasonable jury could

conclude that each of the Defendants reasonably should have known at the time of the

---

[6] Regarding the first and fifth elements of this claim, it is undisputed that Mueller had a written employment contract with KYGO at the time he was terminated.  (*See* ECF No. 108-3.) Likewise, Defendants make no specific argument that Mueller did not suffer at least some damages as a result of his termination.

14

allegedly tortious conduct that Mueller had some form of an employment contract with KYGO, even if nothing more than an employment at will contract.  Accordingly, summary judgment is not warranted on this element.

      2.    <u>Improper & Intentional Interference</u>

"A plaintiff cannot be entitled to relief on a claim of intentional interference with contract unless he alleges and proves that the defendant intentionally and improperly induced a party to breach the contract or improperly made it impossible for a party to perform." *Warne v. Hall*, 373 P.3d 588, 595 (Colo. 2016).  Rather, for liability to exist, the interference "must be both intentional and improper." *Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1124 (Colo. 1990).  The issues of whether Defendants' conduct was both intentional and improper are related but distinct, and the Court addresses them in turn.

      a.    *Intentional*

As to whether the Defendants' conduct was intentional, the relevant inquiry is whether they spoke or acted "for the purpose, in whole or in part, of bringing about a particular result, or if a person knows his or her acts or words are likely to bring about that result," namely, to bring about the breach or non-performance of the contract.  CJI-Civ. § 24:2; *Sherman Agency v. Carey*, 568 P.2d 75, 78 (Colo. App. 1977) ("Tortious interference requires as one of its elements an intent by the defendant to induce breach of the contractual relationship"), *aff'd*, 577 P.2d 759 (Colo. 1978); *see also* Restatement (Second) of Torts § 766 cmt. j (requiring, as a predicate for liability, that "the actor acts

for the primary purpose of interfering with the performance of the contract").[7]

Here, the evidence before the Court reflects that Bell and Andrea Swift spoke before Bell called KYGO on June 3, 2013.  According to Bell's testimony, Andrea Swift wanted him to communicate with KYGO because "[s]he wanted Mr. Mueller to be—to not be in radio anymore, to be fired."  (ECF No. 108-17 at 9.)  Relying on this evidence, the jury could readily conclude that Andrea Swift intended to have Mueller's employment contract terminated.

As to Bell, the evidence can be viewed to show that Andrea Swift told Bell she wanted him to contact KYGO to have Mueller fired, and that very soon after, Bell *did* contact KYGO, and Mueller *was* fired.  A jury could reasonably infer from this chronology that Bell was implementing Andrea Swift's request.  Bell's own testimony regarding his motives was somewhat circumspect, stating only that his intention was for "justice to be served in the sense that I wanted his employer to be aware of what had happened."  (ECF No. 108-17 at 9.)  Nevertheless, the jury could infer from other evidence that he was acting with intent to interfere with Mueller's employment relationship.  Specifically, from the evidence reflecting that Bell communicated an expectation that KYGO would "do the right thing," the jury might understand that as a euphemistic phrase which thinly veiled Defendants' intent that Mueller's employment with KYGO be terminated.  Such a conclusion would be consistent with Call's testimony that he understood "doing the right thing" likely meant some form of discipline, including

---

[7] *See also generally* Restatement (Second) of Torts § 8A ("intent" means that "the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it").

termination.  (*See* ECF No. 108-8 at 11.)

As to Taylor Swift, the evidence regarding her intent is more circumstantial. However, the record reflects that both Andrea Swift and Bell are described as part of Swift's "senior management" or "management team."  (*See* ECF No. 108 at 8, ¶ 18; ECF No. 108-9 at 26; ECF No. 108-18 at 7.)  The jury may therefore infer, based on the parties' relationships and general communications, that Swift shared the same intentions as Bell and Andrea Swift.  This is particularly true here where Andrea Swift and Taylor Swift are mother and daughter, and a jury could reasonably infer that especially intimate and detailed knowledge and communications were exchanged between these two women in regards to the ensuing conduct in question.  Moreover, taking Mueller's version of the facts as true, a jury that rejects Swift's testimony might also infer from the conclusion that she incorrectly accused Mueller that she likely did so with an intent to harm his interests, or at least that she "knew . . . her acts or words [were] likely to bring about" his termination.  *See* CJI-Civ. § 24:2.

To be certain, the jury might well reach very different inferences.  Even assuming that Mueller did not inappropriately touch Swift, the jury might still conclude that she and the other Defendants acted without an intent to cause his termination.  However, when an actor's motive is disputed at summary judgment, the Court gives particular deference to the non-moving party, in favor of submitting questions of motive to the jury, because in most cases "proof of motive depends upon inferences drawn from circumstantial evidence."  *Corcoran v. Land O'Lakes, Inc.*, 39 F. Supp. 2d 1139, 1147 (N.D. Iowa 1999); *see also Zappa*, 706 P.2d at 442 (reversing grant of summary judgment because "a trial [was] necessary to resolve the issue of whether defendant's

17

action in terminating plaintiff's employment contract was motivated by improper

personal reasons"). Applying that principle here, treating Mueller's testimony as true,

and viewing all of the other evidence in Mueller's favor, the Court finds that the jury

could reach a permissible inference that each of the Defendants acted with intent to

interfere with Mueller's contract or knowing his termination was likely to result.

Accordingly, summary judgment is not warranted on this issue.

        b.    *Improper*

     To establish liability a plaintiff must also prove the defendant's interference with

a contract was "improper." *See Warne*, 373 P.3d at 595. However, the Colorado

Supreme Court has "never attempted to rigidly define 'improper' for all purposes of

interference with contract," *id.* at 596, and the question "depends on the facts of each

case," *Watson*, 372 P.2d at 456. Nevertheless, "[i]n determining whether the

interference is improper . . . the court must weigh the factors contained in section 767

["§ 767"] of the Restatement (Second) of Torts":

> In determining whether an actor's conduct in intentionally
> interfering with a contract or a prospective contractual
> relation of another is improper or not, consideration is given
> to the following factors:
>
> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct
> interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of
> the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Westfield*, 786 P.2d at 1117–18 (quoting § 767); *see also Warne*, 373 P.3d at 596 ("we have favorably referenced [§ 767] . . . and its enumeration of potentially relevant factors"). The question of whether or not a defendant's conduct was improper in light of these factors is a determination properly submitted to the jury. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 501 (Colo. 1995); CJI-Civ. § 24.3.

Here, viewing all the evidence in Mueller's favor, and accepting his version of the facts as true, the Court concludes that a genuine dispute remains for trial as to whether Defendants acted improperly. Several considerations lead to this conclusion.

First, relevant authorities establish that a plaintiff may prove a defendant improperly interfered with a contract by application of economic pressure on a third party (or "economic duress"). *See Ervin*, 908 P.2d at 501 (citing § 767 cmt. c). In such cases, the Court may consider "a variety of behavior which may establish that the nature of the actor's conduct [was] improper and, as a consequence, actionable." *Id.* For example, economic pressure may be improperly applied as a "means of inducing persons not to deal with another." *Id.*

The question of whether economic pressure was improper should be "answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a

19

means of accomplishing the actor's objective." *Id.*; *see also Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1119 (D. Colo. 2004) (denying summary judgment where evidence could support a finding that large radio conglomerate would lessen radio air play for artists who did business with plaintiff, a local concert promoter; noting application of such economic pressure "may be permissible under some circumstances and wrongful under others"); *see generally* Dan B. Dobbs *et al.*, *The Law of Torts* § 633 (2d ed., June 2016 update) ("*Dobbs*") (discussing actionable theories of economic duress and coercive refusal to deal).

Here, the record contains evidence which, when viewed in the light most favorable to Mueller, could support the conclusion that Defendants improperly applied economic pressure on KYGO to cause Mueller's termination. Call's notes reflect that Bell emphasized to him the importance of the relationship between KYGO and "the Taylor team," which Call noted "could be gravely impacted" if KYGO did not act against Mueller. (*See* ECF No. 108-7 at 2.) Call also noted more than once that Defendants were considering "all options," from which the jury could infer that KYGO feared action against KYGO by Defendants. Melcher's deposition testimony likewise reflects that Call "was poignant about the fact that he had no other choice but to terminate [Mueller]." (ECF No. 108-15 at 9.) A jury could reasonably infer from this evidence that Defendants' conduct was an improper application of economic pressure, such as an implicit threat that if Mueller was not terminated, Swift and her team would withdraw from their relationship with KYGO or take other action against KYGO.

Second, treating Mueller's testimony as true, a jury that found he was wrongly accused might, as a consequence, also conclude that Defendants acted with reckless

20

disregard for the veracity of their accusations, or based on a grossly inadequate investigation.[8]  Notwithstanding the statute of limitations analysis below, such findings could be tantamount to a conclusion that Defendants had committed acts of slander or defamation.  *See Kuhn v. Tribune-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981) ("Actual malice may be inferred by the finder of fact if an investigation is grossly inadequate."); *see also McIntyre v. Jones*, 194 P.3d 519, 530 (Colo. App. 2008).  This would also tend to support a conclusion that Defendants' actions were improper.  *See Dobbs* § 627 ("An act of knowing interference that is independently tortious without reference to the interference is an improper act that makes interference actionable.").

Finally, one of the significant § 767 factors is a defendant's motive.  As noted above, in resolving issues of motive, the Court is particularly deferential to the non-moving party's inferences and to the jury's role, and disfavors resolving these issues on summary judgment.  *See Corcoran*, 39 F. Supp. 2d at 1147.

Given the considerations above, treating Mueller's version of the facts as true, and therefore assuming the jury would view all other evidence from the perspective that he was wrongly accused, the Court concludes that a genuine dispute remains as to whether Defendants' conduct was improper, and that the jury could resolve this issue in

---

[8] Bell candidly acknowledges he did not conduct any investigation before contacting KYGO.  (ECF No. 119-9 at 10.)  Evidence in the record also reflects that Mueller adamantly denied the accusations from the outset, calling for police involvement and insisting that any other camera angles, video, or photographic documentation would vindicate him.  (*See* ECF No. 108-15 at 10; ECF No. 108-6 at 13.)  Treating Mueller's version of the facts as true, and assuming the jury will resolve issues of credibility in Mueller's favor, the jury might also conclude that Defendants should have done more to confirm the facts of Swift's accusation before acting.

Mueller's favor.  Accordingly, summary judgment is not warranted on this issue.[9]

To be clear, the Court views this as a close question.  There would appear to be nothing improper about Swift—or any other person—making an honest report to an entity with which she does business that one of its employees assaulted or harassed her.  Indeed, in the undersigned's view, the policy of the law should encourage the reporting of actual assaults, not attach liability to it.  *See generally* § 767(d)–(e) (consideration of impropriety should include "the interests sought to be advanced by the actor" and "the social interests in protecting the freedom of action of the actor and the contractual interest of the other").

Nevertheless, in considering the present record, the law requires the Court to treat Mueller's version of the facts as true at this stage of litigation, and therefore to view the entire record from a standpoint that views Mueller as having been wrongly

---

[9] Defendants cite several cases on this issue.  None are controlling, all arose on distinct facts, and Defendants give little explanation of why they support summary judgment here. (*See* ECF No. 108 at 16–20.)  Having reviewed these cases, the Court finds that none call for granting summary judgment given the record here.  *See Brule v. Blue Cross and Blue Shield of N.M.*, 455 F. App'x 836, 839–40 (10th Cir. 2011) (no liability where defendant disclosed only truthful information); *Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1122 (10th Cir. 2008) (no improper action absent evidence that statements were made knowing their falsity or with reckless disregard for truth, in claim of unfair trade practices regarding maximum length of windshield cracks that can be repaired); *Palmer v. First Transit, Inc.*, 2014 WL 3267306, at *4 (D. Colo. Oct. 2, 2014) (no improper interference where video footage corroborated accusations leading to plaintiff's resignation and employer "simply pass[ed] along requested information," specifically, the fact plaintiff had been classified as "not rehirable"); *Ryskin v. Banner Health, Inc.*, 2010 WL 4818062, at *13–14 (D. Colo. Nov. 9, 2010) (denying summary judgment where facts could support finding of improper action); *Haegert v. McMullan*, 953 N.E.2d 1223, 1235 (Ind. App. 2011) (no improper or unjustified act in turning over record of previous anecdotal complaints during formal investigation of sexual harassment).  Defendants' reliance on the protection found in Restatement (Second) of Torts § 772 for conveying only truthful information is also unavailing in the present posture, since in ruling on summary judgment the Court must take Mueller's testimony as true and therefore analyzes his claims assuming that Defendants' accusations were untruthful, or at least without a factual basis.

accused.  In that light, and recognizing that credibility determinations are likely central to resolving this case, the Court concludes that if Mueller's testimony is credited, the record as a whole reflects a genuine and material dispute as to whether Defendants acted improperly when they communicated that accusation to KYGO. Because other inferences are also possible, a genuine dispute regarding highly material and central facts remains for trial on this issue.

      3.    <u>Causation</u>

Defendants argue for several reasons that they were not the cause of Mueller's termination, and therefore cannot be held liable.  (*See* ECF No. 108 at 22–24.)  The Court addresses each argument in turn.

      a.    *Effect of KYGO's Investigation*

Defendants' first argument is that they cannot be held liable for Mueller's termination because "any causal connection between Defendants' alleged conduct and [Mueller's] termination was severed by KYGO's independent investigation and decision to terminate him based on that investigation."  (ECF No. 108 at 20.)

In support, Defendants rely principally on *Leach v. James*, 455 S.W.3d 171, 175 (Tex. App. 2014).  (*See* ECF No. 108 at 20–22.)  Leach, the football coach of Texas Tech University, directed that one of his students be required to stand inside a dark shed to punish him for sitting out practice after suffering a concussion.  *Id.* at 175.  The athlete's father, ESPN commentator Craig James, lodged a complaint with the university, which in turn conducted an investigation, *id.*, and eventually terminated Leach, *see id.* at 176.  Leach sued James for tortious interference with contract, but this

claim failed because "an independent investigation coupled with University action responding thereto intervened to attenuate the causal link between [James's] conduct and [Leach's] dismissal, as a matter of law."  *Id.* at 177.  *Leach* does not support entry of summary judgment in this case for two significant reasons.

First, viewing the evidence in the light most favorable to Mueller, the record does not reflect a truly independent investigation as called for summary judgment as in *Leach*.  *Leach* held that to foreclose liability, "the record must establish that the decision to terminate was based upon considerations or circumstances arising from the independent investigation.  In a summary judgment setting, [the] evidence . . . must be of sufficient ilk to permit such an inference as a matter of law."  455 S.W. 3d at 175.

The facts supporting summary judgment in *Leach*, however, reflected an investigation that created a truly independent basis for termination.  The investigation was headed by an attorney who counseled the university to act "based on what we believed had happened," rather than on the defendant's statements.  *See id.* at 175–76. Moreover, the investigation found there was "not a lot in dispute," and that Leach had "agreed with everything that was said."  *Id.* at 176.  In other words, "[t]he investigation revealed material or substantial aspects of the [defendant's] allegation to be accurate." *Id.* at 177.  Even then, the university did not terminate Leach until further grounds arose, specifically, after he refused to sign an apology to "pacify" the Jameses and also "got on the news media disparaging [the university]."  *Id.*

A similar record is not present here.  Unlike the lack of dispute on the essential facts in *Leach*, Mueller has always denied accusations against him.  Also unlike *Leach*,

KYGO explicitly relied on Bell's reports as a component of its termination decision, with Call relying on Bell's second-hand reports as "a person that I've known for many years." (ECF No. 108-8 at 20.)  KYGO also acted without interviewing the other witnesses to the incident, as was done in *Leach*, and Call indicated that he "didn't need that information."  Viewing all evidence in the light most favorable to Mueller, and taking his own testimony as true, the record is not so one-sided that a jury could draw only one conclusion from it, and Defendants would not be entitled to summary judgment under the standard articulated in *Leach* (even if it were controlling, which it is not).

Second, the analysis of Texas law in *Leach* does not correspond to the relevant principles of Colorado law applicable to Mueller's claim here.  Under Texas law, an element of Leach's claim was "proof that the interference in question *proximately caused* the injury of which [the plaintiff] complains."  *Id.* at 174 n.4 (emphasis added) (citing *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998)).  It is this "proximate cause" analysis that foreclosed Leach's claims under Texas law, as the court held that the university's "independent investigation . . . attenuate[d] the legal nexus between [James's] complaints instigating the investigation and the ultimate decision [to terminate Leach]."  *Id.* at 175.

Under Colorado law, however, intentional interference with contract is an intentional tort, just as the name suggests.  *See Carman*, 601 P.2d at 648.  This distinguishes it from a negligence claim, and, consistent with the majority rule, "the Colorado courts have not recognized the tort of negligent interference with contractual relations."  *Mares v. Conagra Poultry Co.*, 773 F. Supp. 248, 254 (D. Colo. 1991), *aff'd*,

25

971 F.2d 492 (10th Cir. 1992).[10]

Ordinarily, at least in Colorado, "proximate cause" is a central analysis in a negligence claim.  *See Boulders at Escalante LLC v. Otten Johnson Robinson Neff & Ragonetti PC*, ___ P.3d ___, ___, 2015 WL 3776866, at *4, ¶ 30 (Colo. App. Feb. 8, 2016) (a negligence claim "requires two separate determinations," of causation, including "whether the defendant's negligence was the proximate (or 'legal') cause of the plaintiff's injury," and also "a determination of causation in fact (or 'actual' cause)."). The "touchstone" inquiry of proximate cause is "whether the damages sustained were a 'reasonably foreseeable' consequence of the defendant's negligence." *Id.* ¶ 51.

In contrast, in the case of intentional torts, "the actor intends to produce the harm that ensues," and the "person who commits a tort against another for the purpose of causing a particular harm to the other is liable for such harm if it results, *whether or not it is expectable*." *Moore v. W. Forge Corp.*, 192 P.3d 427, 432 (Colo. App. 2007) (quoting  Restatement (Second) of Torts §§ 435A & 870 cmt. b) (emphasis added). Consistent with these general principles, and unlike the Texas cases cited by Defendants, Colorado courts have never articulated that a separate "proximate cause" analysis is a prerequisite to liability for *intentional* interference with contract, in addition to a finding of "actual cause." *See, e.g.*, *Van Osdol v. Vogt*, 908 P.2d 1122, 1126 n.6 (Colo. 1996) ("intentional interference with contract . . . . requires a showing of causation of harm"); *see also* CJI-Civ. § 24:1.  In short, the proximate cause holding in

---

[10] *See also generally Dobbs* § 645 ("Intentional interference is required to establish a claim for interference with contract or for interference with economic prospects. Correspondingly, negligent interference is no ground for recovery[.]"); 1B Stephen A. Hess & Steven Gutierrez, *Colorado Employment Law* § 19:16 (6th ed., March 2017 update).

*Leach* is not clearly applicable to the tort of intentional interference as it exists in

Colorado law, and *Leach* does not on its own support Defendants' argument for

summary judgment.[11]

The other cases cited by Defendants on this issue are similarly not controlling,

do not apply Colorado law, and do not support summary judgment here.  Defendant

cites *American Cable Technologies Services v. AT&T*, 140 F. Supp. 2d 1026, 1031

(W.D. Mo. 2001), which applied Missouri law and concluded that plaintiff's claims failed

on several elements, including causation, since it was undisputed the third party there

had completed an independent internal investigation finding grounds for termination,

and testimony showed that entity would never terminate its contracts based only on an

external complaint.  *See id.* at 1032.  As explained above, the record here, viewed in

the light most favorable to Mueller, can be read to show that reliance on Bell's

statements was an integral part of KYGO's decision-making.  Defendants also cite *Toy*

*v. IBM Corporation*, 2005 WL 2412713, at *3–4 (D. Ariz. Sept. 26, 2005), in which,

similar to *Leach*, the court analyzed the issue as one of proximate cause, and held that

"[t]he legal cause of [plaintiff's] termination was the fact that he had violated the

---

[11] The analysis in *Leach* might also be understood as tantamount to holding that the university's completion of an independent investigation constituted a "superseding cause" of Leach's termination.  In Colorado negligence cases, a superseding cause "relieves the original actor of liability when 'the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct."  *Ireland v. Jefferson Cty. Sheriff's Dep't*, 193 F. Supp. 2d 1201, 1229–30 (D. Colo. 2002) (citing *Webb v. Dessert Seed Co.*, 718 P.2d 1057, 1062–63 (Colo. 1986) (quoting Restatement (Second) of Torts § 442B)).  As with proximate cause, the "touchstone" of the superseding cause doctrine is foreseeability. *Ireland*, 193 F. Supp. 2d at 1229.  Here, the same evidence that could support a finding that Defendants acted with intent to cause Mueller's termination could also support a finding that his termination was a reasonably foreseeable result.  Therefore, even if the law called for a superseding cause analysis, summary judgment would not be appropriate.  *Cf. id.* at 1230 ("An intentionally tortious or criminal act of a third party does not break the causal chain if it is reasonably foreseeable.").

company's guidelines," as established following "two thorough investigations,"

constituting "considerable process and independent deliberation and fact-finding." *Id.* at

*4.  Neither the facts nor the law in *Toy* are on all fours with the case here.

To the extent that *Leach* and Defendants' other cases on this point have bearing

here, the analysis must fit under the substantive requirements of Colorado law.  The

relevant causation question at the summary judgment phase in this case is whether

there is evidence in the record from which a reasonable jury could find that Defendants'

intentional and improper interference caused KYGO to breach or not perform Mueller's

employment contract.  At trial, Defendants may be able to convince the trier of fact that

the evidence of KYGO's investigation prevents Mueller from carrying his burden on this

issue.  However, that is a factual determination on which genuine disputes require

submission to a jury.

b.    *Information Allegedly Withheld from KYGO*

Defendants next argue that "any alleged deficiency in KYGO's investigation can

only be traced to Plaintiff's failure to provide pertinent information," specifically, that

Mueller did not inform KYGO of his allegation that Haskell had told him that he (Haskell)

had touched Swift's bottom.  (ECF No. 108 at 25.)  As addressed above, a dispute

remains for trial as to whether Defendants' conduct caused KYGO to terminate or not

perform Mueller's contract.  Evidence of what Mueller did or did not report to KYGO

might support competing inferences, but does not defeat summary judgment.

c.    *Whether Mueller Would Otherwise Have Been Terminated*

Defendants also argue that even before the incident at issue here, Mueller's

position at KYGO "was already in jeopardy," and that their conduct therefore was not

28

the cause of his termination.  (ECF No. 108 at 25.)  However, Call testified that he had

no intention to terminate Mueller before the events in dispute here.  (ECF No. 119-2

at 6.)  As above, a reasonable jury, crediting this evidence, could conclude that Mueller

has proved that it was Defendants' conduct that caused his termination.  Evidence as to

other grounds for his termination only confirms that the issue is in dispute, and

summary judgment is therefore inappropriate.

### 4.   Acts by Individual Defendants

Defendants' Motion also argues that Taylor Swift and Andrea Swift cannot be

liable for interfering with Mueller's employment contract because, unlike Bell, they did

not personally communicate with KYGO.  (*See generally* ECF No. 108 at 18–21.)

Defendants' also argue that Bell cannot be liable because he only "relayed what he

understood from Ms. Swift and Andrea Swift," including what Swift "had reported."

(ECF No. 108 at 21.)  At a certain point, this line of argument resembles a classic shell

game, inasmuch as Defendants argue the Swifts cannot be liable because they were

the source of the accusation, but not the ones who communicated it, while Bell cannot

be liable because he only relayed the accusation, but was not its source.

To the extent Defendants challenge the requirements of acting intentionally and

improperly, the Court's analysis above addresses those issues.   To the extent

Defendants argue that Andrea and Taylor Swift did not perform any actions which could

form the basis for liability, the Court finds that this remains a genuine factual dispute for

determination by the jury.  Significantly, Defendants do not cite authority holding that in

order to be liable for interference with contract each defendant must have personally

had communications with the third party (here, KYGO).  As to Andrea Swift, the

29

evidence reflects that she told Bell "she wanted [Bell] to make sure that [he] communicated with [KYGO] and wanted Mueller "to be fired."  (ECF No. 108-17 at 8–9.) Because she and Bell were part of Swift's management team, the jury may reasonably infer that as a matter of fact all three Defendants participated in the actions taken by this "team" which allegedly caused KYGO to breach or not perform under Mueller's contract, including raising and corroborating the accusation against Mueller, deciding to contact KYGO, and directing such contact.  While it remains Plaintiff's burden to show that each Defendant actually committed intentional acts subjecting her or him to liability, the Court finds this remains an issue in genuine dispute for trial.[12]

## C.    Intentional Interference With Prospective Business Relations

Mueller also brings a claim for intentional interference with prospective business relations.  This tort is actionable in Colorado and has the same elements as intentional interference with contract, but "does not require a showing of an underlying contract; rather, the plaintiff must show intentional and improper interference such that a particular contract is prevented from being formed."  *Shell v. Am. Family Rights Ass'n*, 899 F. Supp. 2d 1035, 1060 (D. Colo. 2012).  To prove that there is a protected prospective business relationship, "the plaintiff must show that there is 'a reasonable likelihood or probability that a contract would have resulted; there must be something beyond a mere hope.'"  *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1119 (10th Cir. 2009).

In addition to the two year term of employment in which Mueller had a contractual interest, his written employment agreement included an option by which

---

[12] In addition, Mueller proceeds on a claim that Swift is vicariously liable for Bell's actions under the doctrine of *respondeat superior*, addressed below.

KYGO could, in its "sole discretion," add a third year to the contract, with salary and other terms already specified by the existing agreement.  (ECF No. 108-3.)  This option agreement is one basis for Mueller's prospective economic advantage claim.

Defendants argue that "the evidence shows that it was unlikely that KYGO would have exercised . . . the one-year option."  (ECF No. 108 at 27.)  They point out that before Mueller was terminated, KYGO had not informed him it would exercise its option (ECF No. 108-5 at 60), and they cite evidence regarding ratings for the show Mueller co-hosted, instances of friction between himself and Haskell, and certain reported personnel issues.  (*See* ECF No. 108 at 9–10, ¶¶ 46–50; ECF No. 108-21.)

The Court finds that a genuine dispute remains as to whether the option agreement reflects a "reasonable likelihood or probability" that Mueller would have formed a contract for a third year.  The agreement itself provides evidence of considerably more than "a mere hope" of a future contract, since it included specific terms contemplating a third year's employment.  Other evidence includes Haskell's testimony that "the show was growing slowly," and Call's testimony that he had no intention of terminating Mueller and does not recall any specific issues with Mueller's job performance.  (ECF No. 108-6 at 17; ECF No. 119-2 at 6.)

While it remains Mueller's burden to prove a reasonable likelihood that he would have obtained a future contractual right, the Court finds that a jury could find for either side on this issue, and therefore summary judgment is not appropriate.  Since Mueller's claim can proceed on the basis of the option contract, the Court need not address whether any additional evidence (including Mueller's claims regarding various promotional appearances or other anticipated contracts) might allow him to prove

additional damages on this claim.

**D.**    ***Respondeat Superior***

In addition to his direct tort claims, Mueller seeks *respondeat superior* or vicarious liability against Taylor Swift for Bell's actions taken within the scope of his employment by her.  (ECF No. 72 at 11; ECF No. 126.)  "Under the *respondeat superior* doctrine, an employer is liable for torts of an employee acting within the scope of employment.  The employer is liable if the employee's conduct was motivated by an intent to serve the employer's interests and connected to acts the employee was authorized to perform.  Thus, if the tort is committed during the service of an employer's business, it is within the scope of employment."  *Stokes v. Denver Newspaper Agency, LLP*, 159 P.3d 691, 693 (Colo. App. 2006).

Defendants' only argument against this theory is that is must fail for lack of a predicate tort if the Court grants summary judgment against Mueller's underlying tort claims.  (*See* ECF No. 108 at 31.)  Since the Court is denying summary judgment on Mueller's intentional interference claims, including against Bell, and Defendant makes no other argument, summary judgment must also be denied as to *respondeat superior* liability.

**E.**    **Slander Claims**

Mueller also brought tort claims for slander *per se* and slander *per quod*. Defendants argue these claims are time-barred under the relevant one-year statute of limitations.  The Court agrees.

Mueller does not dispute that his claims are governed by the one-year statute of

limitations set out by Colorado Revised Statutes § 13-80-103(1)(a) or that the relevant conduct giving rise to these claims occurred on June 2–4, 2013.  (*See* ECF No. 119 at 22.)  The procedural history is also not in dispute.  Mueller's attorney sent a draft complaint to Defendants in July 2014 (already more than a year after the underlying incident) which included only the slander claims.  (ECF No. 108 at 13, ¶ 54; ECF No. 108-20.)  He then initiated this litigation by filing a complaint in state court on May 29, 2015, which included only the intentional interference claims.  (ECF No.108 at 12, ¶ 52; ECF No. 108-22.)  He first filed the slander claims on February 25, 2016, long after the statute of limitations had run.  (ECF No. 108 at 10, ¶ 53; ECF No. 72.)

Mueller now argues that his slander claims were revived by operation of Colorado's claim revival statute, which provides as follows:

> Except for causes of action arising out of the transaction or occurrence which is the subject matter of the opposing party's claim, the limitation provisions of this article shall apply to the case of any debt, contract, obligation, injury, or liability alleged by a defending party as a counterclaim or setoff.  A counterclaim or setoff arising out of the transaction or occurrence which is the subject matter of the opposing party's claim shall be commenced within one year after service of the complaint by the opposing party and not thereafter.

Colo. Rev. Stat.§ 13-80-109.  Mueller argues that because Swift's counterclaims for assault and battery—which are also governed by the one-year limitation of § 13-80-103(1)—were revived by this statute, his otherwise stale defamation claims were then also revived, as a consequence of Swift filing her counterclaims.  Put another way, Mueller asks the Court to treat his slander claims as "counter-counterclaims," responsive to Swift's assault and battery claims.

33

The Court concludes that the revival statute does not apply to Mueller's slander claims in this posture.  Initially, the express language of the statute applies only to "counterclaim[s] or setoff[s]."  Mueller does not explain why his slander claims should be viewed as counterclaims or setoffs to Swift's assault and battery claims, rather than simply as untimely claims which were not included in his initial pleading.

Most importantly, the case law interpreting the revival statute effectively defeats Mueller's position.  In *Duell v. United Bank of Pueblo*, 892 P.2d 336, 340 (Colo. App. 1994), the court considered an analogous circumstance in which plaintiffs had filed numerous time-barred tort claims, the defendants answered and counterclaimed, and the plaintiffs then re-filed their claims, arguing they were revived by § 13-80-109, in response to the defendants' filing of counterclaims. The court rejected this argument, holding that time-barred claims that had already been asserted in the lawsuit were not "counterclaims" or "setoffs" subject to revival.  *Duell* held that the statute "cannot have [the] effect" of "allow[ing] a plaintiff, who has instituted litigation by asserting time-barred claims, to revive those same claims simply by re-pleading them as counterclaims in a reply to a defendant's counterclaim that is compulsory."  *Id.*

As was true in *Duell*, Mueller's slander claims were time-barred when he filed suit.  If he had included them in his initial pleading, they would have been subject to dismissal and also barred from later "revival" under the exact holding of *Duell*.  It would be a bizarre result if time-barred claims that are included in an initial pleading are foreclosed under *Duell*, but a clever lawyer could evade that rule by deliberately omitting such claims from an initial pleading, only to then reassert them later in

34

litigation, when they had become even more stale.  The Court concludes that just as the revival statute did not revive plaintiffs' asserted but untimely claims in *Duell*, it also does not revive Mueller's unasserted and untimely claims here.

Further supporting this conclusion, the Colorado Court of Appeals has indicated that the claim revival statute applies to parties in a "defensive" posture and that its "evident 'purpose' . . . 'is to allow a party against whom a claim has initially been asserted to plead a stale claim' as a counterclaim." *Plains Metro. Dist. v. Ken-Caryl Ranch Metro. Dist.*, 250 P.3d 697, 702 (Colo. App. 2010) (citing *Duell*, 892 P.2d at 340–41).  Here, Mueller is not a party "against whom a claim has initially been asserted," and he is not in the "defensive" role, since he is the party who initiated litigation, but did so after the statute of limitations had run on certain of his claims. Mueller's invocation of the revival statute in this posture is therefore contrary to the statute's "evident purpose" as interpreted by the Colorado courts.  *Accord* 5A Stephen A. Hess, *Colorado Practice, Handbook On Civil Litigation* § 3:5 (2016 ed., Oct. 2016 update) (citing *Duell* for the proposition that § 13-80-109 "does not apply to allow a plaintiff to bring time-barred claims as 'counterclaims' to a defendant's counterclaims").

Finally, the Court rejects Mueller's interpretation because it would invite undue litigation gamesmanship, allowing parties to file successive rounds of "revived" counter-claims, counter-counterclaims, counter-counter-counterclaims, etc., even they were asserted further and further outside the applicable limitations period.  That perverse result would be contrary to the recognized purposes of enforcing limitations periods. *See Hickerson v. Vessels,* 316 P.3d 620, 623–24 (Colo. 2014) ("The purpose of a

statute of limitations is to promote justice, discourage unnecessary delay, and forestall

the prosecution of stale claims."); *Alden v. Kirchhefer*, 764 F.3d 1268, 1274–75 (10th

Cir. 2014) ("Barring actions after a fixed time . . . serves the basic policies of repose,

elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and

a defendant's potential liabilities." (internal quotation marks omitted; alterations

incorporated)).  Indeed, the orderly and timely administration of justice in the District of

Colorado would be poorly served by the adoption of the ill-advised pleading practice

Plaintiff argues for here.

Accordingly, the Court concludes that Mueller's claims for slander *per se* and for

slander *per quod* are time-barred, and summary judgment is granted against Mueller on

these claims.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Defendants' Motion for Summary Judgment (ECF No. 108) is GRANTED IN

PART and DENIED IN PART as follows:

   a.      Summary Judgment is GRANTED against Plaintiff and in favor of all

   Defendants as to Plaintiff's claims for slander *per se* and slander *per

   quod*; and

   b.      Summary Judgment is in all other respects DENIED;

2.      This case remains set for a nine-day jury trial commencing at 8:30 a.m. on

Monday August 7, 2017, and a Final Trial Preparation Conference at 2:00 p.m.

on Friday, July 21, 2017.

3.    **As previously ordered, all parties are required to be present for the entirety of the jury trial,** although the parties' attendance is not required at the Final Trial Preparation Conference.  (*See* ECF No. 131.)

Dated this 31st day of May, 2017.

                                        BY THE COURT:


                                        _____
                                        William J. Martinez
                                        United States District Judge