# EXHIBIT 3

In the Matter Of:

*MUELLER*

*vs.*

*SWIFT, ET AL.*

_____

*DAVID J. MUELLER*

*July 13, 2016*

_____

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
       Civil Action No. 1:15-cv-019474-WJM-KLM
 3     ───────────────────────────────────────────────
 4              CONFIDENTIAL ATTORNEY'S EYES ONLY
                 AND SUBJECT TO PROTECTIVE ORDER
 5                  VIDEOTAPE DEPOSITION OF:
                  DAVID J. MUELLER - July 13, 2016
 6     ───────────────────────────────────────────────
 7     DAVID MUELLER,

 8     Plaintiff,

 9     v.

10     TAYLOR SWIFT; FRANK BELL;
       ANDREA SWIFT a/k/a ANDREA FINLAY;
11     SCOTT SWIFT; and JOHN DOES 1-5,

12     Defendants.
       ───────────────────────────────────────────────
13

14              PURSUANT TO NOTICE, the videotape deposition
       of DAVID J. MUELLER was taken on behalf of the
15     Defendants at 1900 Grant Street, Suite 1025, Denver,
       Colorado 80203, on July 13, 2016, at 8:13 a.m., before
16     Jennifer Windham, Certified Shorthand Reporter and
       Notary Public within Colorado.
17

18

19

20

21

22

23

24     JOB NO.: WDC-090838

25
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                              Page 2



```
 1                  A P P E A R A N C E S

 2    For the Plaintiff:

 3              M. GABRIEL McFARLAND, ESQ.
                Evans & McFarland, LLC
 4              910 13th Street
                Suite 200
 5              Golden, Colorado 80401

 6

      For the Defendants:
 7
                J. DOUGLAS BALDRIDGE, ESQ.
 8              KATHERINE M. WRIGHT, ESQ.
                Venable, LLP
 9              575 7th Street, NW
                Washington, D.C. 20004
10

11    Also Present:

12              Jay Schaudies
                Adam Johnston, Videographer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                           Page 28

1              You recorded, audio recorded,

2    conversations that you had with certain people,

3    including Mr. Call and Mr. Haskell, correct?

4         A.   I recorded the meeting that I attended by

5    myself with no representation.  And it was Eddie and

6    Bob, and whoever -- if there was somebody listening on

7    the phone while I was in the room, I don't know, but

8    I -- I suspect there was somebody listening through

9    the phone on Bob's desk.

10        Q.   Are you familiar with that recording?

11        A.   Yeah.

12        Q.   Is there anywhere in that recording where

13   you state to Mr. Call, or anyone else who was in that

14   meeting, that Mr. Haskell told you that he touched

15   Ms. Swift's rear end that evening?

16        A.   I don't believe it's on that recording.

17        Q.   Was it not important?

18        A.   The audio was not complete.

19        Q.   And you took the audio, right?

20        A.   Yes.

21        Q.   Do you believe that you told Mr. Call in

22   that meeting that Mr. Haskell said he had touched

23   Ms. Swift's rear end?

24        A.   I did not accuse Eddie of saying that.

25        Q.   It just wasn't important?

1       A.    I have seen them.

2       Q.    Now, if you turn to -- I'm going to call

3    it Bates number, which are these numbers in the bottom

4    right-hand corner that start with Swift.  The one that

5    is Swift, a number of zeros, and 24.  Do you see that?

6       A.    First page, yeah.

7       Q.    No, sir.  I think it's -- yeah, it is the

8    first page.  There you go.  That is -- these are notes

9    taken by Bob Call.  Okay?

10      A.    Okay.

11      Q.    Now, if you turn to the second page of

12   Mr. Call's notes at the bottom of that page, which is

13   Swift 25, to get the Bates number.  Go to the

14   second-to-last line.  Are you with me?  Right here,

15   sir.

16      A.    Second-to-the-last line, yes.  Yes.

17      Q.    Okay.  I'm going to read into the record,

18   and tell me if I read this correctly.  Quote, He

19   indicated he did not touch Taylor inappropriately, did

20   not grab her or raise her skirt up in any way.  And if

21   he did touch her at all, it was accidental and

22   incidental, closed quotes.  Did I read that correctly?

23      A.    You read it correctly.

24      Q.    Is that what you told Mr. Call?

25      A.    I don't know.  That's what Mr. Call wrote

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 39

```
 1   in his notes.

 2          Q.   Do you have any reason to dispute that

 3   that's what you told Mr. Call?

 4          A.   I don't remember saying that.

 5          Q.   But as you sit here today, can you

 6   suggest any fact, other than your lack of memory, that

 7   would suggest you didn't say that to Mr. Call?

 8             MR. McFARLAND:  Objection to form.

 9          A.   I don't have a fact.

10          Q.   (BY MR. BALDRIDGE)  Now, if you'll go to

11   the next page, Swift 26, a little farther than halfway

12   down that page, if you're looking at the left-hand

13   margin, you'll see a margin or at the end of a

14   sentence that says "after taking the photo."  Do you

15   see that?

16          A.   Yes.

17          Q.   I'm going to read the next sentence into

18   the record.  Quote, Jackson said Taylor's story is

19   absolutely inaccurate.  And if it did occur, was

20   accidental and incidental, closed quotes.  Did I read

21   that correctly?

22          A.   You read it correctly.

23          Q.   Do you have any reason to dispute that

24   Mr. Call took that note inaccurately of what you had

25   said?
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                           Page 40

1    A.   I don't remember saying that.

2    Q.   Beyond --

3    A.   I -- I -- as far as I'm concerned, this

4  is just his note.

5    Q.   Do you think Mr. Call is inaccurate in

6  taking this note?

7    A.   I think the way he's phrasing things

8  is -- it's vague.

9    Q.   Do you --

10   A.   I never denied that my hand came into

11  contact with her.  My hand did come into contact with

12  her, but it was mostly her hand.

13   Q.   What else was it?

14   A.   I don't know because she was moving it

15  around.

16   Q.   You don't know, correct?

17   A.   Well, I -- I told you that it was on the

18  side of her.

19   Q.   Now, how long have you known Mr. Call?

20   A.   I met him in September of 2012, I

21  believe.

22   Q.   Have you ever known him to be untruthful?

23        MR. McFARLAND:  Objection to form.

24   A.   At this time, I can't think of any time

25  he was untruthful with me.

DTI Court Reporting Solutions - Washington, DC
1-800-292-4789          www.deposition.com/washington-dc.htm

```
 1          Q.   (BY MR. BALDRIDGE)  Now, if, and the word

 2    is if, you accidentally touched Ms. Swift's bottom

 3    from her standpoint, can you think of any reason why

 4    an accidental touching would be any less offensive

 5    than an intentional touching?

 6               MR. McFARLAND:  Objection to form.

 7          A.   In the context of posing for a photograph

 8    when you're jostling somebody's hand with your hand,

 9    they're trying to get their hand behind you and you're

10    trying to get your hand behind them, I don't think

11    that that would be alarming to the average person, to

12    a reasonable person.

13          Q.   (BY MR. BALDRIDGE)  So if it was an

14    accidental touching of her rear end, that would not be

15    alarming to the average person?

16               MR. McFARLAND:  Objection to form.  Asked

17    and answered.

18          A.   If her hand was directing my hand -- this

19    is what I mean by accidental.  Our hands were

20    intertwined.  So if she's saying that my hand came

21    into contact with her derriere after she was jostling

22    with my hand, I would say that that's incidental,

23    accidental, and I would be alarmed that she would be

24    upset about it.

25          Q.   (BY MR. BALDRIDGE)  Now, you've seen
```

 1    these interview notes of Mr. Call and Ms. Melcher and

 2    others, correct?

 3         A.    I've --

 4         Q.    We just looked at some of them.

 5         A.    Yeah.  I've seen notes that people made,

 6    yeah.

 7         Q.    And you have your audio recordings of

 8    certain discussions you had, correct?

 9         A.    Right.

10         Q.    And you've drafted -- well, your counsel

11    has drafted on your behalf a number of different

12    complaints in this lawsuit, correct?  The thing that

13    starts the lawsuit, your counsel takes the facts and

14    drafts it, right?

15         A.    Yes.

16         Q.    In any of those documents, or any other

17    document, can you point to anything in writing or on

18    the audio where you say my hands were intertwined with

19    Ms. Swift's and we were jostling behind her back?

20               MR. McFARLAND:  Objection to form.

21         A.    I didn't -- not that I know of.

22         Q.    (BY MR. BALDRIDGE)  Was that just not

23    important?

24         A.    No, it's very important.

25         Q.    It wasn't important enough to say to

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                           Page 43

```
 1   anybody, though?

 2          A.    I have said it to people.

 3          Q.    Where is it in the audio recordings, sir?

 4   They're right in front of you.

 5          A.    I don't know if it was in the audio

 6   recordings.  The audio I recorded was close to two

 7   hours long.  And the audio that I could provide to

 8   Mr. McFarland was a portion of the entire audio.

 9          Q.    Where's the other portion?

10          A.    It was -- the full file was lost.

11          Q.    So it's an incomplete file?

12          A.    Yes.

13          Q.    So we don't have any record of what you

14   said in the parts that are no longer available to us,

15   do we?

16          A.    Well, we have -- Bob and Eddie were

17   there, and if they recorded it, we would have it

18   there.

19          Q.    Are you aware of any record of what you

20   said in the parts that are missing from your audio?

21          A.    Only my memory of it.

22          Q.    Did you delete those portions, sir?

23          A.    No, I did not.  They -- my laptop was

24   damaged, and I have an external backup hard drive that

25   I was using at the time.  And that is -- I can't -- I
```

```
 1   don't know how to describe it.  It's -- it either just

 2   died or it -- they don't last forever.

 3           Q.   Your audio recordings were on your

 4   laptop?

 5           A.   Yes.

 6           Q.   And do you still have that laptop?

 7           A.   No.  And now I have a different laptop.

 8           Q.   What did you do with the old laptop?

 9           A.   The people at Apple have it.  They had

10   it.  I don't know what they did with it.

11           Q.   When did you take it to the people at

12   Apple?

13           A.   I'd have to look back at my receipts.  I

14   don't know the exact date, but it was -- I know the

15   recording was on my laptop because I edited it on my

16   laptop.

17           Q.   You edited the recording?

18           A.   I -- it was so long, that I edited down

19   clips from the recording to provide to Gabe to give an

20   idea of what kind of questioning I went --

21           Q.   And -- oh, I'm sorry.

22           A.   -- I went through, yeah.

23           Q.   So you did the editing to the recording

24   after this lawsuit had been filed, correct?

25           A.   No, no.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 45

```
 1          Q.   So you already had Gabe on board before
 2   the lawsuit had been filed?  You said you edited the
 3   recordings to get to Gabe.
 4          A.   Yeah.  I met him before he filed the
 5   lawsuit.
 6          Q.   You were consulting counsel about the
 7   possibility of filing a lawsuit at the time you edited
 8   the recordings, correct?
 9          A.   I -- I didn't know about a lawsuit --
10          Q.   Sir, that's not my question.
11          MR. BALDRIDGE:  Can I have the question
12   read back, please.
13          THE DEPONENT:  Yeah.  Read back the
14   question.
15          (The last question was read back as
16   follows:  "You were consulting counsel about the
17   possibility of filing a lawsuit at the time you edited
18   the recordings, correct?")
19          A.   I was consulting with Gabe about legal
20   action, but there was no specific legal action in
21   mind.
22          Q.   (BY MR. BALDRIDGE)  And you edited the
23   recordings after the June 2, 2013, incident, correct?
24          A.   Yes.
25          Q.   And who at Apple has that laptop?
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                              Page 46

1          A.   I -- it was damaged by liquid.  I brought

2     it to the Apple Store on -- I believe it's the Aspen

3     Grove strip mall.  They told me they couldn't fix it.

4     The hard drive was shot, and they had to replace the

5     hard drive.  So essentially it's a new -- what I have

6     now is a new machine.

7          Q.   Someone spilled liquid on the laptop?

8          A.   Yes.

9          Q.   When did that occur?

10         A.   I would have to look.  I don't have an

11    exact date.

12         Q.   I -- I could tell you.  And the folks at

13    Apple told you that the spilling of liquid on the

14    laptop corrupted or damaged the hard drive?

15         A.   Yes.  Coffee got into the keyboard.

16         Q.   Were there -- did you store documents on

17    that laptop as well, not just --

18         A.   I had -- I had -- yeah.  I had all of my

19    business stuff.  Everything.

20         Q.   Everything, correct?

21         A.   Yeah.

22         Q.   Including every communication you had

23    regarding the alleged incident of June 2, 2013,

24    correct?

25         A.   Well, there -- I did have things on the

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 47

```
 1   backup -- I had a back external hard drive that I was

 2   using to store audio files and documents.  I had jump

 3   drives I used for some documents and other audio I had

 4   recorded previous to me getting to Denver.  And --

 5   yeah, that -- that would be --

 6        Q.    Pretty much everything.

 7        A.    I'm sorry.  What was the question?

 8        Q.    The question was:  Every communication,

 9   or almost every communication regarding the alleged

10   incident of June 2, 2013, was on that laptop, right?

11        A.    No.  Because most -- a lot of the

12   communication was done over the phone and by e-mail.

13        Q.    Every -- okay.  That's fair enough.

14   Every documented, in other words, written or recorded

15   communication regarding the June 2, 2013, incident was

16   on that laptop, correct?

17        A.    No.  Because some documents were on

18   e-mails.  Like the -- the clips that I sent him

19   were -- I e-mailed him the audio clips that he got.

20        Q.    But you e-mail from your laptop, right?

21        A.    Yeah, yeah.

22        Q.    Now, do you still have this back external

23   hard drive that you referred to?

24        A.    I may have that.

25        Q.    You may have it?
```

1          A.    Yeah.

2          Q.    You're not sure, though?

3          A.    Well, it didn't work.  I tried it several

4    times.  And I told Gabe, if I find it, I'll give it to

5    you.

6          Q.    And you haven't found it yet?

7          A.    I haven't found it yet.

8          Q.    And did you lose that or misplace it,

9    whatever the case may be, after June 2, 2013?

10          A.    Yeah.  It would have been maybe a year

11    after.

12          Q.    Do you have any of those jump drives that

13    you referred to?

14          A.    I have jump drives, but they wouldn't

15    have that audio -- all of the audio was on the

16    external hard drive, and I don't know if I discarded

17    it because it was junk.  It was useless.  But if I

18    find it, I told Gabe I would bring it to him.

19          Q.    Just to be clear, your Apple laptop is at

20    the Apple store, right?

21          A.    It was.  Yes, it was.

22          Q.    Do you know where it is now?

23          A.    No.

24          Q.    The external hard drive, you may be able

25    to find it, but you can't locate it right now?

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                      Page 49

```
 1          A.   I may have kept it.

 2          Q.   But you're not sure?

 3          A.   I never had anybody -- I never had

 4   anybody try to get information off of it.

 5          Q.   But you're not sure whether you kept it,

 6   right?

 7          A.   I'm still in the process of going through

 8   and looking for it.

 9          Q.   So you haven't found it yet?

10          A.   I have not found it yet.

11          Q.   And the jump drives, for the reason

12   you've already testified, wouldn't show us anything

13   regarding the June 2, 2013, incident; is that right?

14          A.   The jump drives I referred to would have

15   documents relating to my business and other

16   radio-related things prior to me getting to Denver.

17          Q.   And you don't have your hands on those

18   either?

19          A.   Oh, I'm sure.  Yeah, because those work.

20          Q.   Now, you were -- and I don't know what

21   they call you -- a radio personality.  I was doing to

22   call you a disc jockey.

23          A.   An on-air personality.

24          Q.   An on-air personality in Kansas City; is

25   that correct?
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 52

1    there.

2            Q.   Now, did you keep any photos of other

3    meet-and-greets on the laptop that is now gone?

4            A.   Any other photos from another

5    meet-and-greet?

6            Q.   Yes, sir.

7            A.   They wouldn't be on my laptop, no.

8            Q.   Where would you keep them, if anywhere,

9    electronically?

10           A.   I wouldn't have any electronic copies.  I

11   would have had an actual photograph framed, something

12   like that.

13           Q.   Now, this -- the laptop that is missing,

14   the one that was turned in to the Apple Store, now

15   that we've taken a break, can you think of when you

16   last had it?  Has it come into your mind, like when

17   did you give it to Apple and it leave your possession?

18           A.   I think it was in 2015.

19           Q.   And in this period -- strike that.

20           Did you use that laptop, when you had it,

21   for business purposes?

22           A.   Yeah.  Yeah.

23           Q.   And during what time period did you use

24   it for business purposes?  And I'm looking for the

25   earlier date through the 2015 date when you turned it

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                                  Page 53

```
 1    over to Apple.

 2            A.   Well, that machine was a replacement for

 3    another machine that I bought just before I came to

 4    Denver.

 5            Q.   So some time --

 6            A.   So you want to know how long that

 7    particular laptop --

 8            Q.   Based on what you just said, let me see

 9    if this is an accurate statement.  The laptop that was

10    turned in to Apple, you used just before you came to

11    Denver --

12            A.   No.

13            Q.   Okay.  Go ahead.  Tell me when you used

14    it.

15            A.   I got it after I got here, because I

16    bought one in Minneapolis, just before coming to

17    Denver.  And sometime in the early part of 2013, I was

18    with Shannon, and she accidentally knocked over a

19    glass of water, and that one got fried.

20            Q.   That's Shannon Melcher?

21            A.   Yes.

22            Q.   Let me see if I can break that down.  You

23    have one laptop that is for your -- to use your words,

24    fried, because Ms. Melcher spilled water on it?

25            A.   Well, the hard drive, yes, which
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 54

```
 1   essentially is, you know --

 2             Q.   And this is my fault.  We're talking over

 3   each other.  Let me try this again.  You have one

 4   laptop where the hard drive is fried because

 5   Ms. Melcher spilled water on it, correct?

 6             A.   And it was replaced.

 7             Q.   Okay.  Let's just get the first point of

 8   this.

 9             MR. McFARLAND:  Listen -- really listen

10   to Mr. Baldridge's questions, David.

11             THE DEPONENT:  Okay.  Sorry.

12             Q.   (BY MR. BALDRIDGE)  You have one laptop

13   that was fried because Ms. Melcher spilled a glass of

14   water on it, correct?

15             A.   Correct.

16             Q.   Where is that laptop?

17             A.   I brought it to the Apple Store again

18   to -- also to the Aspen Grove location.  I don't know

19   the address, but it's pretty easy to find.  They tried

20   to repair it, and they had to replace -- I believe

21   they had to replace the hard drive and some other

22   stuff.  Maybe the keyboard, and I'm not sure.  But

23   then -- and I had my -- I had insurance for it.  I got

24   another machine.

25             Q.   Okay.  Don't go on.  Let's stop on the
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 55

1    first machine.

2            A.    All right.

3            Q.    We're going to get to the second machine.

4            A.    All right.  So they -- I don't -- what

5    they do with the parts and -- I don't know.

6            Q.    I'm not asking you that.  During what

7    period of time did you use this first laptop that

8    Ms. Melcher spilled the water on?

9            A.    I already told you.  I purchased it just

10   before getting to Denver.  So it would have been the

11   end of 2012.  And in the early part of 2013, this

12   incident happened.  It might have been March; it could

13   have been April.  I don't know.  Once again, I have

14   receipts from the Apple Store.

15           Q.    So you -- and you used that laptop for

16   business communications, correct?

17           A.    To transmit e-mail?

18           Q.    Yes.

19           A.    Yes.

20           Q.    And you used that laptop, the first one

21   we're talking about, during your employment with KYGO,

22   correct?

23           A.    Yeah.

24           Q.    Then you got another laptop, right?

25           A.    They gave me basically a new machine,

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 56

```
 1   right.

 2           Q.    We're going to call that laptop two.

 3           A.    Yes.

 4           Q.    Laptop two, coffee was spilled on it,

 5   right?

 6           A.    Yes.

 7           Q.    And you used laptop two for business

 8   purposes, right?

 9           A.    Now, when you say "business" --

10           Q.    Withdrawn.  You use laptop -- do you have

11   any laptops other than laptop two during the period in

12   which --

13           A.    No.

14           Q.    -- in which you used laptop two?

15           A.    No.

16           Q.    So to the extent that you conveyed an

17   electronic communication in that time period, you used

18   laptop two?

19           A.    Or my iPad.

20           Q.    Okay.  We'll get to that next.

21           A.    Okay.

22           Q.    And laptop two is gone also, right?

23           A.    I brought it to the Apple Store and they

24   basically gave me a new machine again, and my

25   insurance paid for it.
```

 1        Q.   We'll start over again.  Is laptop one

 2   the water-spilled Ms. Melcher laptop in your

 3   possession, custody, or control?

 4        A.   No.  I gave it to the Apple Store.

 5        Q.   And you don't know where it is other than

 6   you gave it to the Apple Store?

 7        A.   I don't know what they do with them.  I

 8   don't.

 9        Q.   Is laptop two within your possession,

10   custody or control?

11        A.   No.  I brought it to the Apple Store, and

12   they gave me a new machine.

13        Q.   Okay.  So now we have laptop three.  Do

14   you still have the new machine they gave you after

15   laptop two?

16        A.   Yes.

17        Q.   And you also have an iPad?

18        A.   Yes.

19        Q.   And in the period between receiving your

20   offer from KYGO, all of the way to present, have you

21   had one iPad?

22        A.   No.  It's the second one.

23        Q.   So you've had two iPads in that period?

24        A.   Yeah.  I dropped -- I bought one when I

25   came here, and I dropped it and it shattered, and I

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 58

```
 1   went to the Apple Store, and they gave me a new one
 2   because they can't really fix them.
 3        Q.   During what --
 4             MR. McFARLAND:  You've got to -- you've
 5   got to listen to his questions.
 6             THE DEPONENT:  Okay.
 7             MR. McFARLAND:  He's got material that he
 8   wants to get through.  He's got questions to ask.  So
 9   just take a deep breath and focus on his questions.
10             THE DEPONENT:  All right.
11        Q.   (BY MR. BALDRIDGE)  During what period
12   did you have shattered iPad, I'll call it?
13        A.   I bought it in Denver.  I had it until
14   2015, I want to say.
15        Q.   And do you have a new iPad?
16        A.   They gave me a new one, yeah.
17        Q.   And do you know where shattered iPad is?
18        A.   Now Apple has it.
19        Q.   And you then got a new iPad, correct?
20        A.   From Apple.
21        Q.   Are you still using that iPad?
22        A.   I am.
23        Q.   And you still have it in your possession?
24        A.   Yes.
25        Q.   Now, between the time period you received
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 59

```
1    your offer from KYGO all of the way to present, have

2    you had any cell phones?

3            A.    Yeah, two.

4            Q.    Let's start with cell phone one.  Where

5    is cell phone one?

6            A.    Cell phone one is in the trash.

7            Q.    And when did it go in the trash?

8            A.    November of last year.

9            Q.    So November of 2015, cell phone one no

10   longer existed, right?

11           A.    I threw it in the trash.

12           Q.    And how far back in time did you use cell

13   phone one?

14           A.    That's a good question.  Maybe back to --

15   well, can I clarify that there were different versions

16   of cell phone one --

17           Q.    Please.

18           A.    -- because I had to have it fixed several

19   times, because I would drop it and it would get

20   shattered.  As far as I know, that phone, regardless

21   of the components or whatever, probably started using

22   it in 2010, maybe.  2011.

23           Q.    I understand.

24           A.    I've had a lot of cell phones.

25           Q.    I get it.  I couldn't tell you when I
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                           Page 60

```
 1   started mine, but approximately 2010 or '11?

 2          A.   Yeah, yeah.

 3          Q.   Did you use that cell phone one to text

 4   people?

 5          A.   I did.

 6          Q.   Did you use any other cell phone in the

 7   time period you had cell phone one to text people?

 8          A.   That was my only phone.  Are you asking

 9   did I text someone else's phone?

10          Q.   I'll promise you, you can ask for

11   clarity.  It really is simple.  Did you use any other

12   phone --

13          A.   Right.

14          Q.   -- during that time period to text

15   people?

16          A.   Well, I --

17          Q.   I mean, it's possible --

18          A.   There's -- it's possible that I used

19   Shannon's

20          Q.   -- you grabbed your friend's phone once.

21          A.   -- phone --

22          Q.   I understand.

23          A.   -- and I texted -- I sent a text on her

24   phone when mine was broken or not charged.  I don't

25   know.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                              Page 61

```
 1          Q.    Did you receive or send e-mails on cell

 2    phone one?

 3          A.    Yes.  Yeah.

 4          Q.    And then you got cell phone two

 5    approximately last fall?

 6          A.    It was definitely in November of 2015.

 7          Q.    And do you still have cell phone two?

 8          A.    Yes.

 9          Q.    Okay.  Now, I'm going to try to summarize

10    this, if I can.  So I'm trying to go back over what

11    you told me, just so I understand.

12          A.    Okay.

13          Q.    You had laptop one during your employment

14    with KYGO, correct?

15          A.    Yes.

16          Q.    You no longer have possession, custody or

17    control of laptop one, correct?

18          A.    No.

19          Q.    And you don't know where laptop one is

20    beyond having given it to the Apple Store, correct?

21          A.    Correct.

22          Q.    And you used laptop one as your only

23    laptop during that time period?

24          A.    Yes.

25          Q.    Laptop two, you used laptop two during
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                                    Page 62

```
 1   the period of this lawsuit, correct?

 2        A.   Yes.

 3        Q.   And refresh my recollection when you --

 4   well, we'll back up.  I'll let you withdraw that

 5   answer.  When did you get laptop two?

 6        A.   It was the early part of 2013, the first

 7   half of 2013.  So it might -- it was either April or

 8   May.

 9        Q.   So you used laptop two during your

10   employment with KYGO, correct?

11        A.   Yes.

12        Q.   And laptop two, you have no idea where it

13   is beyond having given it to Apple, correct?

14        A.   Correct.

15        Q.   And you used laptop two for business

16   communications, correct?

17        A.   Yes.

18        Q.   You still have laptop three?

19        A.   I do.

20        Q.   Cell phone one, you had cell phone one

21   during your employment with KYGO, correct?

22        A.   Yes.

23        Q.   And you used cell phone one for texts and

24   e-mails, correct?

25        A.   Yes.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 63

```
 1          Q.   And some of those texts and e-mails were
 2   business related, correct?
 3          A.   Yes.
 4          Q.   And cell phone one was thrown in the
 5   garbage, correct?
 6          A.   Yes.
 7          Q.   And when did that occur?
 8          A.   I'm guessing it was in November of 2015.
 9   I maybe threw it away in December, I can't give you
10   an exact date.
11          Q.   And you're still using cell phone two?
12          A.   The one I bought in November of 2015, I
13   am still using, yes.
14          Q.   Now, in this time period, and I'm talking
15   it's a rough start date, let's say 2011 to present,
16   have you had any other computers, whether they be
17   desktops, laptops, iPads, phones that have e-mail
18   texting capacity?
19          A.   I did have a desktop computer when I was
20   in Minnesota.
21          Q.   And did that desktop come with you to
22   Denver?
23          A.   No.
24          Q.   Are there any communications on that
25   desktop with KYGO?
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 64

```
 1            A.   Oh, no.  Check that.  It did come with

 2   me.  I brought it to a computer expert and he told me

 3   he could not retrieve anything off of it.  It was my

 4   old desktop.  It was very old.

 5            Q.   Okay.  Let me back it up.  So desktop

 6   one, I'll call it, is kaput, for lack of a better

 7   word.  It doesn't work.

 8            A.   Right.  It didn't work, and I couldn't

 9   get an expert to get anything off of it.  I wanted the

10   material that was on it, and they couldn't help me.

11            Q.   And you brought that desktop to a

12   computer specialist in the Denver area?

13            A.   Yes.

14            Q.   And when did you do that?

15            A.   I think it was the first part of 2013.

16   And he kept it.

17            Q.   So I was going to ask you, where is that

18   desktop now?

19            A.   He asked me if he could keep it to

20   recycle it, and I said sure.

21            Q.   And what's his name?

22            A.   I couldn't tell you that.  I'm sure I

23   have a receipt for that business.

24            Q.   But beyond that, you just dropped it off

25   and he kept it?
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                              Page 65

1          A.    I talked to him.  I was there.  I don't

2    remember his name.

3          Q.    And did you use that desktop for business

4    purposes at times?

5          A.    In Minnesota I did, yes.

6          Q.    And when you were sitting in Minnesota --

7    strike that.

8                Were you first contacted by KYGO while

9    you were living in Minnesota?

10         A.    Uh-huh.  Yes.

11         Q.    Did you communicate with them via e-mail?

12         A.    Yes.

13         Q.    Now, of the missing computer items --

14   I'll call them, desktop, laptop one, laptop two,

15   shattered IP -- is there any backup storage of what

16   was on those materials?  I mean, on those computers.

17         A.    I had a backup external hard drive that I

18   purchased in Minnesota in -- it might have been 2010.

19   It was well before I moved to Denver.  And I used it

20   after I moved to Denver.  And at some point, it

21   stopped -- yeah, it stopped working.

22         Q.    And where is that backup external hard

23   drive?

24         A.    Right now I don't know.

25         Q.    And when was the last time you saw the

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 66

```
 1   backup external hard drive, approximately.
 2           A.    It -- it might have been -- I think --
 3   well, I saw it last year, I believe.  Whenever I
 4   bought my new external hard drive.  I had to buy
 5   another external hard drive.  So whenever I bought
 6   that is certainly the last time I saw the bad one.
 7           Q.    Okay.  So you saw bad backup external
 8   hard drive number one sometime in 2015?
 9           A.    I think that's when I brought my new
10   external hard drive.
11           Q.    And do you still have the new external
12   hard drive?
13           A.    Yes.
14           Q.    Are there any other devices you're using
15   to back up your -- any of your computers, phones,
16   et cetera, at this point, other than new external hard
17   drive?
18           A.    At the present time?
19           Q.    Yes, sir.
20           A.    That's the only -- that's the only thing
21   I'm using to back up.
22           Q.    And in between, approximately, 2011 to
23   present, have you ever used anything to back up your
24   computers, cell phones, et cetera, other than these
25   two external hard drives you told me about?
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                      Page 111

```
 1   reason you didn't sue KYGO, independent of what your

 2   counsel might have advised you?

 3              MR. McFARLAND:  Objection to form.  Asked

 4   and answered.

 5        A.   I may be wrong, but I feel like I

 6   shouldn't discuss that with you because it's part of

 7   privileged conversations I've had with my attorney.

 8        Q.   (BY MR. BALDRIDGE)  When did you first

 9   speak to an attorney about this incident that occurred

10   June 2, 2013?

11        A.   Shortly after I was thrown out of the

12   Pepsi Center.

13        Q.   So was it before you were terminated on

14   June 4, 2013?

15        A.   Yes.

16        Q.   And what attorney did you speak to about

17   it?

18        A.   I talked to -- I asked Shannon if she

19   knew of any criminal attorneys, because I was being

20   accused of committing a crime, so I talked to that

21   gentleman, his name is Greg.  Off the top of my head,

22   I couldn't tell you his last name, but I just talked

23   to him on the phone briefly, and I explained what

24   happened.

25        Q.   Ah, ah, ah.  I'm not trying to get into
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 112

1    your privileged stuff.

2            MR. McFARLAND:  Don't get into the

3    communications and stuff.

4            Q.   (BY MR. BALDRIDGE)  But you spoke to a

5    criminal attorney named Greg right around the time it

6    all happened.  I don't want to know what you said.

7    You just spoke to him?

8            A.   Yeah.  I contacted him the night of --

9            Q.   That's all I need, man.  You spoke to

10   him.

11           A.   All right.

12           Q.   Did you ever consult any counsel prior to

13   June 2, 2013, about ongoing issues with Mr. Haskell

14   or --

15           A.   If you consider the talent agency that I

16   had hired to represent me, they do have -- there is an

17   attorney, Eric Weiss.  So I did -- we had lengthy

18   conversations with our agent, Heather Cohen, and we

19   assumed she was sharing all of our concerns with Eric,

20   the attorney who ran the Weiss Agency.

21           Q.   What did you discuss specifically with

22   Heather Cohen, your agent, prior to June 2, 2013,

23   about either Mr. Haskell or KYGO?

24           A.   Everything I've told you.

25           Q.   At that point --

```
 1          A.   And other things.

 2          Q.   Well, what other things?

 3          A.   We would be here -- we would be here all

 4   day just talking about all of the times that we talked

 5   to Heather.

 6          Q.   And is "we" you and Mr. Kliesch?

 7          A.   Yes.

 8          Q.   Is it fair to say that prior to June 2,

 9   2013, you were considering leaving KYGO yourself

10   voluntarily?

11          A.   Prior to June 2?

12          Q.   Yes.

13          A.   Absolutely not.

14          Q.   Well, what were you complaining to

15   Heather Cohen about then?

16          A.   I wouldn't say we were complaining.  We

17   were concerned.  We couldn't figure out what was going

18   on.  We couldn't figure why we were being treated the

19   way we were being treated, and we thought maybe she

20   could shed some -- share, you know, some kind of

21   insight with us.  She, essentially, told us, Bob Call

22   let me know that he doesn't want to talk to me.

23          Q.   Bob Call does not want to talk to Heather

24   Cohen?

25          A.   Didn't want to talk to Heather Cohen.
```

1    Q.   Did she give you any light or insight on

2    why you were being treated the way you thought you

3    were being treated?

4    A.   As far as I remember, Heather Cohen told

5    us that, you know, things happen in radio, something

6    to that effect.  Like, you know, this is just radio.

7    Q.   And what did she mean by "things happen

8    in radio"?

9    A.   I don't -- I don't really -- honestly, I

10   don't really know what -- I could never figure out

11   what her stance was, because she was supposed to be --

12   she was our agent.  She was supposed to be

13   representing us.

14   Q.   Do you feel like she represented you

15   properly with respect to KYGO?

16   A.   As far as I know, she did.  It sounds

17   like Bob said, I'm not going to talk to you.  If the

18   guys want to talk to me, tell them to come down to my

19   office.

20   Q.   Generally, in radio, is there a lot of

21   turnover in on-air personalities?

22   A.   There can be.  But most radio stations

23   don't want a turnover.

24   Q.   No.  But when she says, "it's radio" or

25   whatever the word -- I'm trying to probe into what she

1    meant.

2          A.    You'd have to ask her.

3          Q.    Now, you've mentioned Mr. Kliesch a

4    number of times.

5          A.    Yeah.

6          Q.    Have you spoken to Mr. Kliesch since you

7    filed this lawsuit?

8          A.    Yes.

9          Q.    On how many occasions?

10         A.    That would be -- dozens.

11         Q.    And in each of those dozens of

12   conversations were you speaking to him about this

13   lawsuit or the incident that happened June 2, 2013?

14         A.    We talked about a lot of stuff, but, I

15   mean, it would come up.

16         Q.    He's your friend, right?

17         A.    He's been my friend since the '90s.

18         Q.    Where does he live now?

19         A.    He lives in Austin, Texas.

20         Q.    Is he an on-air personality in Austin?

21         A.    Yes, he is.

22         Q.    Was he terminated by KYGO?

23         A.    I honestly don't know the specifics about

24   his departure.  He told me some stuff, but I shouldn't

25   say anything, because I'm not a hundred percent sure.

1      Q.   Do you know when he left KYGO?

2      A.   I want to say March of this year.

3      Q.   March of 2016?

4      A.   Yeah.

5      Q.   Did he ever state any reason why he left?

6      A.   He -- well, he was having difficulties

7   doing his job.

8      Q.   Why?

9      A.   He was having -- there were certain

10   things going on between Ryan and the female that he

11   worked with on the morning show and also with Eddie

12   Haskell.  And, in general, it just -- he was -- what

13   he told me, in essence, was that he was miserable, and

14   they were making him -- making him feel -- he

15   wasn't enjoying -- he didn't enjoy what he loves to

16   do, which is, you know, a radio show.

17      Q.   What was the female's name that was on

18   the radio show?

19      A.   I think her name is Tracy Dixon, but that

20   might just be her radio name.  I don't know.

21      Q.   Did Mr. Kliesch, Ryno, Ryan -- all the

22   same name for the record -- did he say what the

23   problems were with her that he was experiencing?

24      A.   If he gave me specifics, I don't remember

25   them right now.  We didn't talk about it that much.

1   He did talk about that.  We talked about a lot of

2   stuff.  You know, usually just what's going on, how

3   are you doing, you know.  We talked about his

4   motorcycle.

5          Q.   Did he give you any specifics of the

6   problems at that time that he was experiencing with

7   Mr. Haskell?

8          A.   I don't remember any specifics.

9               (Deposition Exhibit 7 was marked.)

10              THE DEPONENT:  Can I ask to take a short

11  break just so I can go to the men's room?

12              MR. BALDRIDGE:  You can always take a

13  break.  Yes, let's take a break -- yeah.

14              THE VIDEOGRAPHER:  Off the record at

15  11:24.

16              (Recess taken 11:24 a.m. to 12:34 p.m.)

17              THE VIDEOGRAPHER:  Back on the record at

18  12:34.

19          Q.   (BY MR. BALDRIDGE)  Mr. Mueller, I asked

20  you some questions this morning about a restraining

21  order in Kansas City.  Do you recall that, generally?

22          A.   I remember you asking me.

23          Q.   Over the last several hours since those

24  questions, has anything else come to your mind about

25  that potential situation?

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                           Page 118

```
 1          A.   No.
 2          Q.   I've noticed, periodically during the
 3    day, that you've taken notes at times.  I don't want
 4    notes if you're sending a note to your lawyer.  Are
 5    you taking notes in this deposition of what's going
 6    on?
 7          A.   No.
 8          Q.   I saw you take a note on the pad and give
 9    it to Mr. McFarland.  I don't want to know about your
10    communications with him.
11          A.   Oh.
12          Q.   But otherwise, are you taking --
13          A.   Am I writing anything down?
14          Q.   Yes.  Are you taking notes?
15          A.   No.
16          Q.   Okay.  By the way, your counsel will tell
17    you there's nothing wrong with that, I just have a
18    right to see them.
19               Now, back to where we were.  To clear the
20    record up just to make sure it's clear.  Mr. Kliesch,
21    Ryan and Ryno are all the same guy.
22          A.   Yes, sir.
23          Q.   And Shannon is always Shannon Melcher at
24    this point, right?
25          A.   Yes, sir.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 119

```
 1          Q.   Do you know why Mr. Kliesch left KYGO?

 2          A.   From what I understand, it had something

 3   to do with him being off the air to go to take care of

 4   some sort of a medical issue.

 5          Q.   Are you aware of Mr. Kliesch, perhaps,

 6   having a chemical dependency issue, whether it be

 7   alcohol or drugs?

 8          A.   Yes.  That's the medical issue.

 9          Q.   And so he was off the air to address that

10   medical issue?

11          A.   That's what I was told.

12          Q.   Now, Mr. Kliesch also has a wife named

13   Alycia, right?

14          A.   Yes.

15          Q.   Now, are you aware of Alycia making any

16   allegations against Mr. Kliesch's on-air co-host on

17   the morning show after you left?

18          A.   I rarely talked to Alycia, and I don't --

19   are you asking me if somebody shared --

20          Q.   If you know any information -- and I'll

21   just cut right to it --

22          A.   I had heard that there was -- they didn't

23   get along.

24          Q.   Alycia and --

25          A.   And Tracy Dixon.
```

1        Q.    Now do you have any knowledge of Alycia

2   accusing Tracy of having an affair with Mr. Kliesch?

3        A.    No, that I've never heard.

4        Q.    Now, do you know what, in particular,

5   Mr. Kliesch was having a chemical dependency issue

6   with, what drug?

7        A.    I don't.

8        Q.    Do you know where he went to treat that

9   issue?

10        A.    I didn't get any name, but I think he

11   went to Colorado Springs.

12        Q.    Are you familiar with any allegations

13   against Mr. Kliesch for having an affair with -- what

14   is her name? -- Stacy.

15        A.    Tracy

16        Q.    Tracy?

17        A.    -- Dixon.  No.

18        Q.    You never heard that?

19        A.    No.

20        Q.    All right.  I want you to go back and

21   look at your employment contract, which I think is

22   Exhibit 7, Mueller 7.  Do you have that?

23        A.    Yes.

24        Q.    If you would turn to page 5, which is the

25   Bates No. Swift 7.  Do you see that?

```
 1              A.    Swift 7.  Yes.

 2              Q.    And at the bottom of the page is

 3    paragraph 8(c).  Have you seen that section before?

 4              A.    Yes.

 5              Q.    And you're familiar with it?

 6              A.    Yes.  Heather Cohen explained it to us.

 7              Q.    And what did Ms. Cohen explain to you?

 8              A.    That we were connected at the hip,

 9    essentially.

10              Q.    And just what does that mean, connected

11    at the hip?

12              A.    That we were a team, and that if they

13    tried to get rid of one, then her -- if they were

14    going to fire one, they could fire the other for

15    the -- just because.

16              Q.    And so let's -- let me read this first

17    sentence into the record.  Quote, Employer may

18    terminate this agreement in the event that employee's

19    morning show partner, Ryan Kliesch, is terminated for

20    cause by employer, in which event employee shall be

21    immediately terminated, and following employee's

22    termination receive the lump sum amount equal to

23    employee's base salary for the following 90 days,

24    closed quotes.  Did I read that correctly?

25              A.    Yes.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 122

```
 1          Q.   And from a layman's standpoint, that
 2   means that if Mr. Kliesch is terminated for cause,
 3   they could terminate you and they had to give you
 4   90 days' pay, right?
 5          A.   (Deponent nodded head up and down.)
 6          Q.   You have to speak audibly.
 7          A.   Yes, yes.
 8          Q.   And you would be entitled to nothing in
 9   addition to that 90 days' pay if Mr. Kliesch was
10   terminated for cause?
11          A.   I don't know about that.
12          Q.   As you sit here today under oath, are you
13   aware of any other monetary amounts you would be
14   entitled to if Mr. Kliesch was terminated for cause,
15   and then subsequently you were terminated?
16          A.   If it was -- if it was a wrongful
17   termination, I would think that there would be
18   something you could do to remedy that.
19          Q.   That's a fair point.  Under the contract.
20          A.   Okay.
21          Q.   Not as a matter of wrongful termination
22   law or whatever that is.  If Mr. Kliesch was
23   terminated, you would be entitled to --
24          A.   90 days.
25          Q.   -- 90 days' base salary, correct?
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 123

```
 1          A.   Yes.

 2          Q.   And nothing more as a matter of contract?

 3          A.   That's what it says, yes.

 4          Q.   And you read that before you signed this

 5   agreement?

 6          A.   Yeah, we both did, yeah.

 7          Q.   And you agreed to it, right?

 8          A.   Yeah.

 9          Q.   And do you know whether or not

10   Mr. Kliesch was terminated for cause?

11          A.   No, he wasn't.

12          Q.   How do you know that?

13          A.   Because he mentioned that he was -- there

14   was some back and forth between him and Lincoln

15   Financial.  Well, I don't even know who it was with,

16   because I don't know who owned the station then.  It

17   might have been Bonneville; it might have been

18   Entercom.  I can't -- I think it was Bonneville.

19          Q.   So the source of your belief that

20   Mr. Kliesch was not terminated for cause is

21   Mr. Kliesch himself?

22          A.   Yeah.  He -- he told me he had an

23   attorney, and his attorney was negotiating with

24   attorneys at Bonneville.

25          Q.   Speaking of his attorney, do you know
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 124

```
 1   that attorney's name?

 2            A.   I don't.

 3            Q.   Do you know whether Mr. Kliesch ever

 4   threatened a lawsuit against whoever the owner was at

 5   that time, whether it be Bonneville or Lincoln or --

 6            A.   I wouldn't know that.

 7            Q.   Now, previously, you mentioned that very

 8   close to the June 2, 2013, incident you contacted a

 9   criminal lawyer.  Do you recall that, generally?

10            A.   I do recall that.

11            Q.   On the break, have you thought of that

12   person's name?

13            A.   I think his name is Greg Robinson.

14            Q.   A Denver guy?

15            A.   Yeah, yeah.  Yep, Denver guy.

16            Q.   And a little bit different question.

17   When did you first contact, I'll call it a civil

18   lawyer, such as Cyd Hunt or Mr. McFarland about the

19   June 2, 2013, event?

20            A.   I believe it was June 4.  But I -- are

21   you asking me if I personally contacted them, or if I

22   was in contact with an attorney?

23            Q.   Well, were you in contact with a civil

24   lawyer?

25            A.   Heather Cohen arranged for me to talk to
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                    Page 125

```
 1   an attorney, and it was a civil situation.

 2          Q.    And what's the name of that attorney?

 3          A.    His name is Paul Godec.  And I think I'm

 4   pronouncing that correctly.  It's G-o-d-e-c.

 5          Q.    And where does Mr. Godec practice?

 6          A.    Somewhere in Cherry Creek.

 7          Q.    Is that in Colorado, sir?

 8          A.    Yeah, yeah.  I keep forgetting you guys

 9   aren't from here.  Yeah, Cherry Creek is a community

10   within Denver.

11          Q.    Did you ever retain Mr. Godec as your

12   counsel?

13          A.    No.

14          Q.    What did you tell Mr. Godec?

15          A.    I told him what -- you know, he was

16   asking me questions.  I answered all of his questions.

17   I cannot remember everything we talked about.

18          Q.    Let me see if I can speed this up.  Is it

19   fair to say you talked to him generally about the

20   things alleged in your complaint?

21          A.    Well, Heather talked to him.  Heather

22   talked to him and was -- she wanted me to pursue some

23   sort of litigation against Lincoln Financial Media.

24   And I went there because she was my agent, and that's

25   what she wanted me to do.  And I -- and he had
```