# EXHIBIT 12

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

# EXPERT REPORT
## OF JASON T. BRIODY

## ATLANTIC DATA FORENSICS, INC.

*Submitted*
**July 28, 2016**



7310 Esquire Ct, Suite 5B // Elkridge, MD 21075 // Phone: 410-540-9000 // Fax: 410-540-9006

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................2
BACKGROUND ...................................................................................................................3
QUALIFICATIONS ..............................................................................................................4
SUMMARY OF OPINIONS..................................................................................................5
DETAILED RELEVANT FINDINGS ...................................................................................6
   Mr. Mueller's Testimony Regarding His Electronic Devices ................................................ 6
   Liquid Spills and Hard Drive Data Integrity......................................................................... 7
   Dropped iPads and Flash Memory Data Integrity ................................................................ 7
   Conclusion ........................................................................................................................... 8
LISTING OF APPENDICES .................................................................................................9

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

# BACKGROUND

I, Jason T. Briody, through Atlantic Data Forensics, Inc. ("ADF"), have been retained by Counsel for Taylor Swift, Andrea Swift, Scott Swift, and Frank Bell ("Counsel") in the matter captioned David Mueller v. Taylor Swift et al. in the United States District Court for the District of Colorado *(Case No. 1:15-cv-01974-WJM-KLM)*.

I am familiar with the facts of this case, and as part of the services requested by Counsel, I was asked to review documents and information, including the deposition of David J. Mueller that was taken on July 13th, 2016 (hereafter, "Mueller Dep.").

I have completed Counsel's requested examination tasks by analyzing the data and information provided, and this report details my findings in these regards. I have incorporated into this report additional materials that I considered or relied upon in performing my analysis, and these are attached hereto as Appendices 3 through 5. I reserve the right to supplement this report in the future if additional information, technology, devices, or data is made available to me, or if I am asked to perform additional analysis.



_____

**Jason T. Briody**, CISSP, CCE, ACE, CBE, CCFP
**Director of Forensic Services**, Atlantic Data Forensics, Inc.
Report Submitted: July 28, 2016

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

# QUALIFICATIONS

I am the Director of Forensic Services at Atlantic Data Forensics, Inc. ("ADF"), a specialized services company that provides computer forensics, electronic data discovery, litigation support, training, and computer security services for commercial, educational, and governmental clients.  I have performed on-site data acquisitions, data culling, and forensic analysis for clients that range from businesses on the Fortune 50, to the nation's leading universities, to local and national businesses and law firms.  I have forensically acquired data from media devices such as laptops and desktops, optical discs, file servers, RAIDs, mail servers, tapes, cell phones, web servers, smart phones, and tablets.  I specialize in in-depth forensic analysis and reporting, and have personally collected, processed, and examined electronic devices and data for hundreds of investigative cases.

Having worked on matters involving homicide; intellectual property theft; patent interference; employment disputes; allegations set forth by the Securities and Exchange Commission; industrial espionage; research integrity and misconduct; hacker and data breach scenarios involving HIPAA data; employment disputes; insurance fraud; antitrust allegations; vehicular manslaughter; search and seizures executed in conjunction with the U.S. Marshals Service; and more, I have experience in performing defensible forensic collections and analyses on a wide range of media and systems that have existed in various states of functionality.

Aside from my hands-on technical experience in the industry, I have authored content for organizations such as Law.com, the American Bar Association (ABA), and more.  Along with these authorships, I held the position of Co-Editor in Chief of an award-winning publication in the ABA's Section of Litigation's Technology for the Litigator Committee for over three years, during which time I was also honored by the ABA as an Outstanding Subcommittee Chair.  Aside from my written work, I have moderated panels or presented original lectures for organizations such as Today's General Counsel Institute, the American Bar Association, and Lawline.com.  Various other speaking roles include presentations at the Association of Research Integrity Officers (ARIO) Conference, local colleges and universities, and the Maryland State Bar Association, and I was interviewed on WBAL News Radio regarding data forensic investigative avenues related to the Boston Marathon bombing.

I am a Certified Computer Examiner (CCE) recognized by the International Society of Forensic Computer Examiners, an AccessData Certified Examiner (ACE) recognized by AccessData Group, a Certified BlackLight Examiner (CBE) recognized by BlackBag Technologies, and both a Certified Information Security Systems Professional (CISSP) and Certified Cyber Forensics Professional (CCFP) recognized by the International Information Systems Security Certification Consortium.  Prior to earning these credentials, I graduated Summa Cum Laude from Champlain College, earning a Bachelor of Science degree in Computer and Digital Forensics, along with a Professional Certificate in Information Security.  Along with the College's designation by the NSA and the Department of Homeland Security (DHS) as a National Center of Academic Excellence in Information Assurance Education, Champlain's Computer and Digital Forensics program is recognized as "a model electronic crime and digital investigation curriculum" by the National Institute of Justice (NIJ).

My full CV has been attached hereto as Appendix 1, and a complete list of publications has been attached hereto as Appendix 2.

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

## SUMMARY OF OPINIONS

In his deposition, Mr. Mueller enumerates a number of electronic devices, describes how these devices were damaged, and states, with respect to each device, whether or not it is still within his possession. In all but one instance, Mr. Mueller disposed of or voluntarily and permanently surrendered the device and the potentially relevant data each device contained. And in nearly all of these cases, Mr. Mueller claims that he disposed of or permanently surrendered the devices after each one, separately, reportedly sustained damage or stopped functioning.

In my professional opinion, given and despite the damage and deficiencies described by Mr. Mueller and based on Mr. Mueller's testimony, there is a high likelihood that all of the data stored on each of these devices was still fully recoverable at the time Mr. Mueller disposed of or voluntarily and permanently surrendered each device.

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

# DETAILED RELEVANT FINDINGS

**Mr. Mueller's Testimony Regarding His Electronic Devices**

Mr. Mueller testifies that he used a laptop ("Laptop 1") for business activities during his employment at KYGO, including sending business e-mails (Mueller Dep. 55:6-23, 61:13-24). Mr. Mueller states that Shannon Melcher, his former girlfriend, spilled water onto this laptop, at which time he brought the laptop to an Apple store for repair or replacement (Mueller Dep. 54:12-24). Mr. Mueller states that this laptop is no longer in his possession, custody, or control (Mueller Dep. 57:1-8).

Mr. Mueller testifies that he saved the complete audio recording of a business meeting during which he was interviewed about groping Ms. Swift by his KYGO supervisors, Eddie Haskell and Bob Call, and which is directly relevant to the subject matter of this case, on a *different* laptop than the laptop noted above ("Laptop 2") (Mueller Dep. 43:3-44:16). Mr. Mueller testifies that he stored on Laptop 2 "…all of my business stuff. Everything." (Mueller Dep. 46:16-19). Mr. Mueller testifies with regard to this laptop that "coffee got into the keyboard" (Mueller Dep. 45:25-46:15), at which time he brought the laptop to an Apple store for repair or replacement (Mueller Dep. 46:1-15). Mr. Mueller states that this laptop is also no longer in his possession, custody, or control (Mueller Dep. 44:6-10, 57:1-12).

Mr. Mueller testifies that he used an iPad ("iPad 1") to communicate during his employment with KYGO (Mueller Dep. 56:16-19, 57:13-22, 58:11-14). Mr. Mueller states that he dropped this iPad, and describes the iPad as "shattered" after this drop; Mr. Mueller states that he then brought this iPad to an Apple store for repair or replacement (Mueller Dep. 57:19-58:2). Mr. Mueller states that this iPad is also no longer in his possession, custody, or control (Mueller Dep. 58:15-20).

Mr. Mueller states that he used a desktop computer for business purposes in Minnesota during a time period in which he was communicating with KYGO via email (Mueller Dep. 65:3-12), and that he brought this computer with him to Denver when he moved there to begin working for KYGO (Mueller Dep. 63:14-64:16). Mr. Mueller further states that this computer was "very old", "didn't work", and was left with another individual — whom Mr. Mueller described as a "computer expert" (but could not further identify when asked) — and "recycled" after that unknown individual reportedly told Mr. Mueller that the individual "could not retrieve anything off of it." (Mueller Dep. 63:14-65:12). Mr. Mueller states that this desktop is also no longer in his possession, custody, or control (Mueller Dep. 64:17-23).

Mr. Mueller testifies that he used a cell phone ("Cell Phone 1") for business-related texts and emails during his employment with KYGO, and that he threw this phone "in the trash" in approximately November or December of 2015 (Mueller Dep. 58:25-59:8, 62:20-63:10). Mr. Mueller states that this cell phone is no longer in his possession, custody, or control (Mueller Dep. 63:4-6).

Mr. Mueller testifies that he used an external hard drive ("External Hard Drive 1") as a backup for the aforementioned Laptops 1 and 2, desktop, and/or iPad (Mueller Dep. 65:13-21). Mr. Mueller then states, however, that, "at some point" this external hard drive "stopped working"; that the last time he believes he saw it was sometime in 2015; and that he is unsure of this hard drive's current location (Mueller Dep.

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

65:13-66:10).

**Liquid Spills and Hard Drive Data Integrity**

A laptop or desktop computer may be rendered unusable after suffering a liquid spill, power supply failure, motherboard short or corrosion, sudden drop or impact, or other type of damage or failure. However, the integrity and recoverability of a computer's data storage media is not typically related to the device's ability to function after such damage is inflicted. Even when a computer or laptop (or a "very old" or non-working hard drive or external drive itself) fails to appear to power on or work properly, the data storage media can most often be successfully accessed using methods such as a functional host device, a hardware capture tool, the repair or replacement of components (such as external printed circuit boards), or numerous other lower-level techniques that directly access the data storage medium.

Further, with regard to liquid damage specifically, storage media — such as internal hard drives in laptop computers — typically reside in closed or sealed compartments or shells, further protecting them from any liquid damage that enters the computer via the keyboard, external ports, fan slots, and other openings. And even in cases where liquid *does* physically reach the internal hard drive or storage media — or further, *even if the entire hard drive is submerged in liquid* — data is still typically retrievable. At least one research study, performed by members of The Senator Patrick Leahy Center for Digital Investigation (LCDI) at Champlain College, concluded that *completely submerging* hard drives in 5.68 liters of water for varying time periods — including full, underwater submersion for 60 minutes — resulted in 100% of the data on the hard drive remaining *hash-algorithmically identical* (that is, completely intact and unchanged) to the drive's pre-submersion data. It is notable that no lower-level hard drive recovery techniques that involve removing the data storage sub-elements themselves (such as platter swaps, wherein an examiner completely disassembles the hard drive in a dust- and contaminant-free room, extracts the data-storing hard drive platters from the damaged drive, and transplants them into a working "host" drive) were necessary in this submersion study. Instead, the researchers found that the data was extractable quite easily via a standard, commercially-available hard drive data-reading device. (Murdock, Andrew, and Hanah Leo. *HDD in Water.* (2013))

**Dropped iPads and Flash Memory Data Integrity**

As many users who have dropped an iPad or iPhone can attest, it's possible to crack or shatter the devices' screens due to accidental drops and impacts. The integrity and recoverability of the flash memory modules that store the iPad or iPhone's *data*, however, is completely unrelated to the state of the device's screen. Though a cracked or shattered iPad's screen may not respond to touch or may stop displaying content entirely, simply replacing and reconnecting the device's screen and display elements (and any other failing or fractured components) — or in certain cases directly accessing the flash memory itself — is typically all that is needed to access the data that the device still stores.

Further, since iPads use flash memory for their internal storage media rather than traditional "spinning disk" hard disk drives (Apple, Inc. "iPad - Technical Specifications." N.p., 5 Aug. 2013. Web. 28 July

2016.), the data saved on this storage media is much more resistant to impact or shock damage than traditional hard disk drives. Flash memory (as used in iPads) has no moving parts that could, for instance, collide with and damage data-storing elements in an impact scenario (known as "head crashes" in hard drives). These solid state flash memory disks are widely regarded as highly shock resistant by computer professionals. One researcher, for example, states in his doctoral dissertation titled *Performance Analysis of NAND Flash Memory Solid-State Disks*, "…solid-state disks are much more reliable and more resistant to shocks compared to hard disk drives", and repeatedly lists "shock resistance" (among other benefits) as a reason that flash-based memory is "becoming a viable data storage solution for portable computer systems". (Dirik, Cagdas. *Performance Analysis of NAND Flash Memory Solid-State Disks.* Diss. U of Maryland, College Park, 2009. Pages 1, 23, 27.)

**Conclusion**

All this is not to say, of course, that individuals who are determined to maliciously damage devices and willfully destroy data can't successfully do so. In my professional experience, however, partial or total data recovery is the appropriate assumption, and not the exception. For example — and corroborated by independent research papers, along with my specialized training and formal education on the subject of data storage and recovery — I have firsthand investigative experience with devices that were crushed and shattered during high-speed car accidents; in computers that have caught fire; exposed to extreme heat and humidity; in contact with corrosive battery acid; subjected to printed circuit board electrical shorts, fractures, and clean breaks; suffering from "head crashes" (i.e., the read-write head of the hard drive has collided with the drive's data-storing platter); doused in spilled water, coffee, soda, and numerous other drinks; completely submerged and battered after running through entire washing machine cycles; and intentionally subjected to drops and impact damage by individuals purposefully attempting to destroy data, and the predictable outcome in each of these cases has been the same: successful data recovery.

In my professional opinion, given and despite the damage and deficiencies described by Mr. Mueller and based on Mr. Mueller's testimony, there is a high likelihood that all of the data stored on each of these devices was still fully recoverable at the time Mr. Mueller disposed of or voluntarily and permanently surrendered each device.

STRICTLY CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

---

# LISTING OF APPENDICES

---

**Appendix 1:** CV of Jason T. Briody

**Appendix 2:** Full Publication List of Jason T. Briody (Addendum to CV)

**Appendix 3:** iPad – Technical Specifications

**Appendix 4:** Hard Disk Drive Water Damage Study (*HDD in Water*)

**Appendix 5:** Performance Analysis of NAND Flash Memory Solid-State Disks