# EXHIBIT 2

In the Matter Of:

*MUELLER*

*vs.*

*SWIFT, ET AL.*

---

*DAVID J. MUELLER*

*July 13, 2016*

---

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 1:15-cv-019474-WJM-KLM
 3   _____

 4            CONFIDENTIAL ATTORNEY'S EYES ONLY
              AND SUBJECT TO PROTECTIVE ORDER
 5                 VIDEOTAPE DEPOSITION OF:
                DAVID J. MUELLER - July 13, 2016
 6   _____

 7   DAVID MUELLER,

 8   Plaintiff,

 9   v.

10   TAYLOR SWIFT; FRANK BELL;
     ANDREA SWIFT a/k/a ANDREA FINLAY;
11   SCOTT SWIFT; and JOHN DOES 1-5,

12   Defendants.
     _____
13

14         PURSUANT TO NOTICE, the videotape deposition
     of DAVID J. MUELLER was taken on behalf of the
15   Defendants at 1900 Grant Street, Suite 1025, Denver,
     Colorado 80203, on July 13, 2016, at 8:13 a.m., before
16   Jennifer Windham, Certified Shorthand Reporter and
     Notary Public within Colorado.
17

18

19

20

21

22

23

24   JOB NO.: WDC-090838

25
```

         DTI Court Reporting Solutions - Washington, DC
1-800-292-4789              www.deposition.com/washington-dc.htm

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                                   Page 2

```
 1                  A P P E A R A N C E S

 2   For the Plaintiff:

 3              M. GABRIEL McFARLAND, ESQ.
                Evans & McFarland, LLC
 4              910 13th Street
                Suite 200
 5              Golden, Colorado 80401

 6
     For the Defendants:
 7
                J. DOUGLAS BALDRIDGE, ESQ.
 8              KATHERINE M. WRIGHT, ESQ.
                Venable, LLP
 9              575 7th Street, NW
                Washington, D.C. 20004
10

11   Also Present:

12              Jay Schaudies
                Adam Johnston, Videographer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                               Page 4

1          WHEREUPON, the following proceedings were
2   taken pursuant to the Federal Rules of Civil
3   Procedure.
4              *     *     *     *     *
5          THE VIDEOGRAPHER:  Here begins videotape
6   No. 1 in the deposition of David Mueller in the matter
7   of David Mueller versus Taylor Swift, et al., in the
8   U.S. District Court, District of Colorado, Case No.
9   1:15-cv-01974-WJM-KLM.
10         Today's date is July 13, 2016.  The time
11  is 8:13.  The video operator is Adam Johnston.  This
12  video deposition is taking place at 1900 Grant Street,
13  Suite 1025, Denver, Colorado.  Will counsel please
14  identify themselves for the record.
15         MR. McFARLAND:  Gabe McFarland for
16  Mr. Mueller.
17         MR. BALDRIDGE:  Doug Baldridge on behalf
18  of the defendants/counterclaim plaintiffs.  Today with
19  me is Katie Wright and my client Jay Schaudies.
20         THE VIDEOGRAPHER:  The court reporter
21  today is Jennifer Windham of DTI Court Reporting
22  Solutions.  She will now swear in the witness.
23              DAVID J. MUELLER,
24  having been first duly sworn to state the whole truth,
25  testified as follows:

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

DAVID J. MUELLER - 07/13/2016                                    Page 132

```
 1   there's a conspiracy, I'd like to know about it.
 2                  This is -- my life was ruined.  I want to
 3   find out who is responsible.  I had a -- I had a nice
 4   career with a good reputation.  I used to go to radio
 5   conventions and people would want to buy me drinks and
 6   spend time with me.  This is the worst thing that's
 7   ever happened in my life.
 8                  And this -- my radio career was all I
 9   had.  That was -- that's all I had.  And it's --
10   hopefully it's not gone, but I have a suspicion that
11   maybe it is.  It will never be the way it was, I can
12   tell you that.
13          Q.   Prior to you taking the job in 2013 with
14   KYGO, when was the last time prior to that that you
15   had an on-air radio job?
16          A.   In 2005, 2006 with KDWB in Minneapolis.
17          Q.   So you were eight years where you didn't
18   have an on-air job, correct?
19          A.   I did not have an on-air job at that
20   time, no.
21          Q.   Did somebody blackball you from it during
22   that period?  Is there some reason why?
23          A.   No.  I was -- I was talking to people on
24   a regular basis about jobs.  I would turn them down.
25          Q.   And you had a job at the Minnesota
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

DAVID J. MUELLER - 07/13/2016                                    Page 156

```
 1         Q.   As a matter of contract, after
 2   January 20, 2015, KYGO could let you go, right?
 3              MR. McFARLAND:  Objection to form.
 4         A.   There was a stipulation when they had to
 5   notify us if they were going to pick up the option,
 6   but yes, I think . . .
 7         Q.   (BY MR. BALDRIDGE)  Subject to the
 8   requirements to pick up the additional one-year
 9   option, subject to meeting that, as of January 20,
10   2015, once that day passed, you no longer had a right
11   to expect future employment with KYGO, correct?
12              MR. McFARLAND:  Objection to form.
13         A.   Technically speaking.  But we were led to
14   believe that we were the morning show of the future,
15   and they had had a lot of turnover with morning shows,
16   and they wanted -- they had been in a morning show
17   search, their consultant found us, brought us to their
18   attention.
19              We -- and Ryno was -- heard everything I
20   heard.  They indicated that they wanted us around
21   for -- they were going to build the show bigger around
22   us.
23         Q.   (BY MR. BALDRIDGE)  And they had a lot of
24   turnover on the morning show , right?
25         A.   They had turnover with cohosts,
```

1   apparently, yeah.
2           Q.   Did you have -- strike that.
3                Did KYOG (sic) have any obligation to
4   employ you after January 20, 2015?
5                MR. McFARLAND:  Objection to form.
6           A.   A legal obligation?
7           Q.   (BY MR. BALDRIDGE)  Any obligation.  You
8   cast it however you want.
9           A.   I think they had a moral obligation.
10          Q.   Okay.  Let's put that there.  We'll come
11  to that.  As a matter of contract, your contract that
12  you read and agreed to, did KYOG have any obligation
13  to employ you after January 20, 2015?
14               MR. McFARLAND:  Objection to form.
15          A.   Legally, they did not have an obligation.
16  KYGO did not have an obligation.
17          Q.   (BY MR. BALDRIDGE)  Now, the second part
18  of this, this option year, it says, quote, Employer
19  shall have the option in its sole discretion to extend
20  this agreement for one additional year term, correct?
21          A.   Right.
22          Q.   And so if employer, that being KYGO, in
23  its sole discretion decided to extend, that would
24  cause the contract to go on until January 20, 2016,
25  approximately, right?

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                                   Page 217

```
 1   Mr. Schaudies and Ms. Wright to see whether I forgot
 2   something.
 3                 THE VIDEOGRAPHER:  Off the record at
 4   2:52.
 5                 (Recess taken at 2:52 p.m. to 3:03 p.m.)
 6                 THE VIDEOGRAPHER:  Back on the record at
 7   3:03.
 8          Q.   (BY MR. BALDRIDGE)  Mr. Mueller, on the
 9   day -- well, let me -- let me back up.  You were
10   terminated June 4, 2013, from KYGO?
11          A.   Yes, sir.
12          Q.   On the day you were terminated, did you
13   have any of these -- I call them special appearances
14   or additional opportunities you would get as an on-air
15   personality actually lined up, you know, whether it be
16   visit this place, do that?
17          A.   Yes.
18          Q.   Which ones?
19          A.   Ryno and I were scheduled to be at a
20   water park, and I believe it was for the end of June.
21   Somewhere in the -- it was a three-hour appearance at
22   the end of June.  There's only one big water park here
23   in Denver.  I think it's called Water World.  I was
24   only there once to meet with the people on the
25   marketing staff.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                                    Page 218

```
 1           Q.    Were there any other firmly lined up
 2   opportunities --
 3           A.    There were --
 4           Q.    -- as of June 4?
 5           A.    We were -- we had already done an
 6   appearance at a Firestone Tire Center or auto center.
 7   And when we were there, they told us that we -- in the
 8   future we'd be going to other Firestones.  We did an
 9   appearance at a Dickey's Barbecue.
10           Q.    I'm asking you as of June 4 --
11           A.    Yeah, yeah.
12           Q.    Okay.  Good.
13           A.    And we were told when we did an
14   appearance there that there would be other Dickey's
15   Barbecue locations that they would want to have us be
16   there for two hours.
17                 And there's a company that goes by the
18   name of Paul's Homes, and they're out in -- we were
19   doing live commercials for them, and we went out there
20   a couple of times to meet with the guys that did
21   the -- owned it, and also the marketing head.
22                 And they told us that they wanted us to
23   come out and do a weekend, like maybe two or
24   three hours on a Saturday, and possibly a live
25   broadcast, because it's way out on -- it's sort of out
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016   Page 219

```
 1   towards Kansas, and they wanted us to be there so
 2   people would come out to meet us and then they would
 3   look at homes.
 4        Q.   Any others?
 5        A.   Not that I know of, other than those.
 6        Q.   Let's start with the water park.
 7        A.   Yeah.
 8        Q.   Did you go through with that appearance?
 9        A.   No.  You just reminded me of -- because
10   you said did you go through with it.  I did go through
11   an appearance that I was committed to, and that was a
12   rodeo.  That was a rodeo in -- it's a little town to
13   the --
14        Q.   It's a rodeo.  That's fine.
15        A.   Yeah.  It's a little rodeo out to the
16   east of Denver in a little -- it's Elizabeth.  It's
17   the Elizabeth Rodeo.  I was there with Shannon and
18   Ryan, and Ryan's wife, because I had committed to
19   doing that before I was terminated.
20        Q.   Okay.  Let's start with the water park.
21   Did you do that appearance?
22        A.   I did not.
23        Q.   Were you paid anything for that
24   appearance?
25        A.   I was not.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                                    Page 220

```
 1        Q.   Were you told why we didn't go through
 2   with the appearance?  Did they tell you, we don't want
 3   you anymore?
 4        A.   It wasn't discussed with me.
 5        Q.   Who informed you that you would not go
 6   through with that appearance?
 7        A.   Honestly, I just assumed that I wouldn't
 8   be doing any more appearances or endorsements, and no
 9   one ever had to come out and officially tell me or put
10   it in writing.  I just assumed, because of what
11   happened.
12        Q.   First Store Auto or Firestone Auto.
13        A.   Firestone.
14        Q.   Firestone.  I can't read my own damn
15   writing.
16        A.   Firestone, yeah.
17        Q.   Firestone Auto.
18        A.   Yeah.
19        Q.   You were told there might be additional
20   appearances; is that right?
21        A.   We were told there would be at other
22   locations.
23        Q.   Did you ever receive a contract for
24   additional appearances?
25        A.   No.  We never -- we never got contracts
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

DAVID J. MUELLER - 07/13/2016                              Page 221

```
 1   from the advertisers.
 2          Q.   Was it ever discussed with you how much
 3   you would be paid for those potential future
 4   appearances with Firestone?
 5          A.   It was an established -- well, there was
 6   an established rate that the station actually put in
 7   writing for various -- for endorsements and for -- but
 8   other than that, it was all -- it seemed like every
 9   one was different.  But there was supposed to be a
10   standard rate, and I'm not -- I think we got the
11   standard rate for Firestone and for Dickey's, but I
12   don't think any of it had been discussed about -- for
13   Paul's or for -- well, actually we did discuss it for
14   WaterWorks (sic), and they wanted us to do three
15   hours, but only get paid as if it was two hours.
16          Q.   Okay.  As to Firestone --
17          A.   Yeah.
18          Q.   -- did you have an appearance at a
19   Firestone store after June 2, 2013?
20          A.   Did not.
21          Q.   Were you told by Firestone they didn't
22   want you, or did you assume, again, they didn't want
23   you?
24          A.   Yeah.  We -- we would deal with the
25   account executive, and she didn't contact me.
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 222

```
 1        Q.   Whenever you say "we," I'm always
 2   confused.  I'm asking about you.
 3        A.   Right.
 4        Q.   When you say, "we," do you mean you and
 5   Ryno as a group?
 6        A.   We -- we -- we did all appearances
 7   together, yeah.
 8        Q.   Okay.  So with Firestone you did not do
 9   an appearance after June 2, 2013, right?
10        A.   No.
11        Q.   You had no contract to do an appearance,
12   correct?
13        A.   I had no contract, no.
14        Q.   Dickey's Barbecue, did you do any
15   appearances for Dickey's Barbecue after June 2, 2013?
16        A.   Not after June 2.
17        Q.   Were you ever told that you would not --
18   a reason why?
19        A.   No.
20        Q.   Did you ever have a contract to do any
21   appearances with Dickey's Barbecue after June 2,
22   2013 --
23        A.   No contract.
24        Q.   I should ask you for Firestone and
25   Dickey's both, did you do any appearances before
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                                    Page 223

```
 1   June 2, 2013?
 2          A.    Yes.
 3          Q.    How many for Firestone?
 4          A.    One each.
 5          Q.    One each?
 6          A.    Yeah.
 7          Q.    And when were those?
 8          A.    I want to say May, but one of them might
 9   have been the end of April.
10          Q.    Did you ever do any appearances or
11   provide advertising, or whatever it may be, for Paul's
12   Homes?
13          A.    We did endorsements for -- endorsement
14   commercials for them every week.
15          Q.    And did those appear on television?
16          A.    No.  When I -- commercials on the radio
17   so they were -- we did them live.
18          Q.    So like when you're doing your morning
19   show, you'll say, oh, Paul's Homes --
20          A.    Right.
21          Q.    -- is a great place or whatever?
22          A.    Right.  When we run commercials, we would
23   just do one live and we'd have a little script and we
24   would make it sound like we were, you know . . .
25          Q.    How much were you paid for that?
```

```
 1            A.   You know, I -- all of our endorsements
 2   were different.  I think we were supposed to get paid
 3   $250 each per commercial.  So if you did five -- one a
 4   day for a week, you'd get, you know, five times 250.
 5   But sometimes they would negotiate a lower rate.  And
 6   I -- I think I -- we provided you with that.  I
 7   remember putting it together, and now I can't remember
 8   because there were so many different values.  There
 9   was no consistency, and I'm sorry.  I wish I could
10   give you . . .
11            Q.   Elizabeth Rodeo.  You actually did that
12   appearance?
13            A.   Yes.  And that would have been considered
14   a station event, technically, which is where you go
15   and it benefits the station as well as the advertiser,
16   because it's a community type thing, and you don't get
17   paid for station events.
18            Q.   And when did you do that?
19            A.   I want to say it was within a week after
20   I was terminated.  It was right -- it seemed like it
21   was right after.
22            Q.   But as you said, that's a nonpaid event?
23            A.   It would have been nonpaid , yeah.
24            Q.   Now, I'm going to ask these all together
25   just to try to speed things up.  A water park,
```

CONFIDENTIAL - ATTORNEY'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER
DAVID J. MUELLER - 07/13/2016                          Page 225

```
 1   Firestone Auto, Dickey's Barbecue, Paul's Home, and
 2   even Elizabeth Rodeo, do you have any information to
 3   suggest that any of the defendants you've sued in this
 4   action had any knowledge at all of your relationships
 5   with any of those five organizations?
 6           A.   I have no knowledge.
 7           Q.   Now, Mr. Frank Bell, he -- do you know
 8   who he is?
 9           A.   I do now, yeah.
10           Q.   Who is he?
11           A.   As I understand it, he was and is Taylor
12   Swift's manager, and was a very good friend of Bob
13   Call.
14           Q.   Now, did you know Mr. Bell prior to
15   June 2, 2013?
16           A.   I did not.
17           Q.   Have you ever seen Mr. Bell?
18           A.   That night I did, yes.
19           Q.   Did you know of Mr. Bell prior to June 2,
20   2013, through the industry?
21           A.   I did not.
22           Q.   Are you aware of any information that
23   would suggest Mr. Bell had any personal animus against
24   you?
25                MR. McFARLAND:  Objection to form.
```