**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 15-cv-1974-WJM-KLM

DAVID MUELLER,

      Plaintiff,

v.

TAYLOR SWIFT,

      Defendant and CounterClaimant,

      and

FRANK BELL, and
ANDREA SWIFT a/k/a Andrea Finlay,

      Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION TO EXCLUDE PORTIONS OF THE
TESTIMONY OF DR. LORRAINE BAYARD DE VOLO**

---

In this tort action pending under the Court's diversity jurisdiction, 28 U.S.C.

§ 1332, Plaintiff pursues claims against all Defendants for tortious interference with his

employment contract and with related business opportunities, while Defendant-

CounterClaimant Taylor Swift ("Ms. Swift") pursues counterclaims for the torts of assault

and battery.  Now before the Court is Plaintiff's Motion to Exclude Testimony of [Dr.]

Lorraine Bayard de Volo.  (ECF No. 136 (Plaintiff's "Motion").)  For the reasons

explained below, Plaintiff's Motion is granted to exclude portions of Dr. Bayard de

Volo's proposed expert testimony.

## I.  BACKGROUND

The Court set forth the factual background and allegations in this case in some detail in its Order Granting Summary Judgment in Part.  (ECF No. 137 ("summary judgment order")), and familiarity with that factual background is presumed.  In summary, Plaintiff worked as an on-air radio personality for a Denver area radio station, KYGO.  On June 2, 2013, he attended a backstage "meet and greet" preceding a concert performed at Denver's Pepsi Center by Ms. Swift.  Ms. Swift alleges that during a staged photo opportunity at that event, Plaintiff purposefully and inappropriately touched her buttocks, while Plaintiff denies having done so.  (*See* ECF No. 137 at 2–3.) After KYGO was informed of Ms. Swift's accusation, Plaintiff was terminated from his job, and this lawsuit followed.

In the course of litigation, Swift and her co-defendants have disclosed Dr. Lorraine Bayard de Volo to testify as an expert witness pursuant to Federal Rule of Civil Procedure 26(a)(2) and Federal Rule of Evidence 702.  Plaintiff's present Motion seeks to exclude portions of her proposed testimony pursuant to Rule 702 and other evidentiary authorities.

As set out in her written disclosure, Dr. Bayard de Volo is the Chair and Associate Professor of Women and Gender Studies at the University of Colorado–Boulder.  (ECF No. 136-1 at 2 (Dr. Bayard de Volo's "Report").)[1]  She has a Ph.D. in political science and a graduate certificate in women's studies, and has had 20 years of teaching and research experience in the field of gender and violence.  (*Id.*)

---

[1]  All citations to docketed materials are to the page number in the CM/ECF header, which often differs from the documents' internal pagination, as in deposition transcripts.

Her Report discloses the following two summary opinions related to this case:

> 1.  Sexual harassment and assault are fundamentally motivated by the perpetrator's perceived need to assert power and to protect the perpetrator's status.  Throughout David Mueller's pleadings in this lawsuit and his deposition testimony, he indicated that even before he met Ms. Swift, he felt his job security was threatened, his identity as a radio personality was threatened, and his masculinity was threatened.  This perfect storm of threats to Mr. Mueller's perceived status is consistent with the well-settled, academically-accepted, perceived threats to status that motivate a man to commit sexual harassment or assault.
>
> [and]
>
> 2.  Victims of sexual harassment and assault typically do not report the event immediately but rather delay or do not report it at all.  The time between Mr. Mueller's unwanted sexual contact and Ms. Swift's full verbal reporting of that contact is entirely consistent with the conduct identified in professional literature and studies of someone who has been sexually assaulted.

(*Id.* at 3.)  Plaintiff's Motion challenges only Opinion #1 above, so the Court will not further address Opinion #2 here.  The remainder of this Order addresses only "Opinion #1" and the analysis in the Report which supports it, and this Order does nothing to alter Dr. Bayard de Volo's ability to testify at trial consistent with her offered Opinion #2 and her analysis supporting same.[2]

Dr. Bayard de Volo's Report sets out in some detail her reasons for reaching her opinion. (*See generally id.* at 2–9.)  She explains, in part, that in her view there is a professional or research consensus "that sexual harassment and sexual assault

---

[2] Plaintiff's Reply seems to explicitly concede that authority cited by Defendants, *United States v. Charley*, 189 F.3d 1251 (10th Cir. 1999), allows for the admission of "Opinion #2." (*See* ECF No. 151 at 3.)  Since the issue is not disputed, the Court takes no position on it.

(including inappropriate physical contact) are fundamentally motivated by power and protection or enhancement of the aggressor's status.  In cases of men targeting women, it is an assertion of men's gender-based social power and most typically targets women who challenge men's status in some manner." (*Id.* at 3.)

Dr. Bayard de Volo's Report goes on to discuss materials that she reviewed in this case, primarily Plaintiff's own deposition testimony and Plaintiff's Second Amended Complaint.  (*See id.* at 3–8.)  She concludes that on June 2, 2013,  Plaintiff "faced an accumulation of perceived threats to his status" that were consistent with the kinds of "threats to status that . . . motivat[e] sexual harassment and sexual assault." (*Id.* at 4.) Describing this "accumulation of threats" in greater detail, her Report describes, for example:

- "Threats to job status," describing evidence that, in Dr. Bayard de Volo's opinion, shows that Plaintiff "perceived significant tensions with his [boss] at KYGO, Eddie Haskell" (*id*. at 5);

- "Threats to status as a radio personality," describing Dr. Bayard de Volo's opinion that Plaintiff "perceived that he did not receive from Ms. Swift and the Swift tour personnel the professional respect he thought he deserved," because he "was not recognized as a radio personality during the meet-and-greet event" and "expected a certain level of treatment from Ms. Swift . . . that he did not receive" (*id*. at 5–6, 7);

- "Threats to masculine status," offering Dr. Bayard de Volo's opinion that "dynamics with [Plaintiff's] girlfriend . . . exacerbated his annoyance and perception of emasculation," in part based on Plaintiff's testimony suggesting that when they met at the "meet and greet," Ms. Swift "was really excited about [his girlfriend]," while Plaintiff "felt like [he] was invisible" (*id*. at 8–9).

In sum, Dr. Bayard de Volo opines that Plaintiff's "testimony reveals that he was frustrated . . . as neither his boss, the Swift team, or in the end, Ms. Swift herself, would acknowledge him in a way that would confirm his perceived elevated status as a radio

show host," and that "his stated perception of events and his view of his own status is consistent with the circumstances under which sexual aggressors would commit unwanted sexual contact, such as grabbing a woman's bottom." (*Id.* at 9.)  She also opines that Plaintiff's "testimony and pleadings . . . indicate his belief that unwanted sexual contact is something that men in radio can get away with," for several reasons, including that improper touching might be viewed as "his prerogative as a radio host who regularly met with famous women." (*Id.*)

## II.  LEGAL STANDARD

A district court must act as a "gatekeeper" in admitting or excluding expert testimony.  *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004).  Admission of expert testimony is governed by Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence.  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

While an expert witness's testimony must assist the jury to be deemed admissible, Fed. R. Evid. 702(a), it may not usurp the jury's fact-finding function.  *See Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988).  The line between what is helpful

to the jury and what intrudes on the jury's role as the finder of fact is not always clear, but it is well-settled that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704.

Ultimately, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note. "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. . . . Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)).

However, in addition to analysis under Rule 702, an expert's proposed testimony still must be relevant and otherwise admissible. *See Adamscheck v. Am. Family Mut. Ins. Co.*, 818 F.3d 576, 588 n.7 (10th Cir. 2016) ("[A] district court must decide first, whether the expert testimony is reliable, and second, whether it is relevant."). To be relevant, expert testimony must "logically advance[ ] a material aspect of the case" and be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011).

Furthermore, "[e]xpert testimony, like any other evidence, is subject to exclusion if it fails the Fed. R. Evid. 403 balancing test" *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994), that is, if the probative value of the expert's testimony would be "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403.

6

### III.  ANALYSIS

Plaintiff's Motion asserts that Dr. Bayard de Volo's Opinion #1 is inadmissible under Rule 702 because it is "not based on sufficient facts or data," and is "not otherwise credible or reliable."  (ECF No. 16 at 2.)  Plaintiff also argues that Dr. Bayard de Volo's opinions are inadmissible under Federal Rule of Evidence 403 because of the "danger of unfair prejudice."  (*Id.*)

### A.    "Profile Evidence"

However, Plaintiff's main argument (and his only cited authorities) do not relate to Dr. Bayard's qualifications or the bases or reliability of her opinions.  Rather, Plaintiff argues that Dr. Bayard de Volo's first opinion is inadmissible because it is improper "profile evidence."  In support, Plaintiff cites mainly California state court cases.  (*See* ECF No. 136 at 5–6 (citing, *inter alia*, *People v. Prince*, 150 P.3d 1015 (Cal. 2007); *People v. Castaneda*, 64 Cal. Rptr. 2d 395 (Cal. Ct. App. 1997); *People v. Robbie*, 112 Cal. Rptr. 2d 479 (Cal. Ct. App. 2001); *People v. Martínez*, 10 12 Cal. Rptr. 2d 838 (Cal. Ct. App. 1992); *and Salcedo v. People*, 999 P.3d 833 (Colo. 2000).).

The only federal law Plaintiff cites is *Reid v. Georgia*, 448 U.S. 438, 440 (1980), where the Supreme Court described the concept of a "drug courier profile" as "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics," relevant in the context of an alleged Fourth Amendment violation, the Supreme Court held that a law enforcement officer could not have lawfully seized the defendant based on observing only this "profile."   "A more tailored definition was offered in *Florida v. Royer*, [460 U.S. 491, 493 (1983)], where drug courier profile

was described as an abstract of characteristics found to be typical of persons transporting illegal drugs." *United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1251 (D.N.M. 2015) (quoting *United States v. Robinson*, 978 F.2d 1554, 1563 (10th Cir. 1992)).  These definitions reflect the law enforcement context in which the concept of "profile evidence" arose, which is consistent with the observation that "profile evidence is primarily a concern when a court is reviewing Fourth Amendment issues and deciding whether the police's actions complied with the Fourth Amendment." *United States v. Goxcon-Chagal*, 886 F. Supp. 2d 1222, 125 (D.N.M. 2012).

In other criminal cases, another "profile evidence" issue has arisen that is more relevant here, analyzing the admissibility of a prosecution expert who testifies about the typical conduct or behavior of certain types of criminals—typically gang members or drug dealers.  For instance, the Tenth Circuit has generally allowed law enforcement experts to testify on such topics as explaining the mechanics of the drug trade, identifying the "tools of the trade" of drug dealers, explaining the "meaning of physical evidence" such as scales, razors, large amounts of cash and/or food stamps which are commonly carried by drug dealers, and discussing gang members' use of colored clothing, and this expert testimony is admissible against defendants proven to have possessed such materials or engaged in such behaviors.  *See United States v. Becker*, 230 F.3d 1224, 1231 (10th Cir. 2000);  *Robinson*, 978 F.2d at 15; *McDonald*, 933 F.2d 1519, 1521–22 (10th Cir. 1991).[3]

---

[3] *See also Salcedo*, 999 P.2d at 840 (holding "before drug courier profile evidence can be considered logically relevant . . . the prosecution must demonstrate that the behavior and characteristics that constitute the profile are relatively unique to drug couriers," and reversing where this had not been shown).

Thus, although the facts and context of these cases are far removed from the facts here, as a general statement, this type of "profile evidence," it is not categorically inadmissible in the Tenth Circuit, at least in such drug- and gang-related cases.  The Tenth Circuit has held that "[a] profile is simply an investigative technique.  It is nothing more than a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity."  *McDonald*, 933 F.2d at 1521 (10th Cir. 1991).

**B.    Rule 702(a) Analysis**

Notwithstanding the label of "profile evidence," the Tenth Circuit has held that:

> Rather than focusing upon defining and classifying evidence into categories of profile or non-profile, we believe the better approach is to commence our inquiry with an examination of the applicable rules of evidence.  Fed. R. Evid. 702 instructs us to admit specialized knowledge if it will assist the trier of fact in understanding the evidence.  Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject.

*Id.* at 1522; *Becker*, 230 F.3d at 1231 (same).

Defendants argue that the Tenth Circuit law discussed above amounts to a "binding" holding that Dr. Bayard de Volo's opinion is not "profile evidence" and is admissible.  (ECF No. 144 at 10–12.)  The Court disagrees.  Following *McDonald* and *Becker*, it does not matter whether Dr. Bayard de Volo's testimony is labeled as "profile evidence."  The relevant inquiry is more properly the "common-sense inquiry" under Rule 702(a) as to whether her testimony would help the jury to understand evidence which it otherwise could not.  *See McDonald*, 933 F.2d at 1522 (evidence admissible

given that "[a jury could not understand the significance of [drug related] evidence without the particular background knowledge of how a drug dealer works."). This approach quite clearly directs a case-specific inquiry, one which cannot be understood to mandate the conclusion that Dr. Bayard de Volo's opinion testimony *must* be admissible. *See Becker*, 230 F.3d at 1231. To the extent the cases cited reflect a history in the Tenth Circuit of a comparatively permissive treatment of law enforcement expert testimony in drug and gang cases, those cases, and those expert opinions, are so fundamentally unlike the case at hand that they provide little useful guidance in this case.

To the contrary, Dr. Bayard de Volo's opinion testimony not only relates to a wholly different type of expertise, but it serves an entirely different purpose in this case. Her opinions do not explain evidence which will be before the jury that it otherwise could not understand, such as drug paraphernalia, gang practices, or some technical matter. The jury will have ample direct and readily comprehensible evidence from which to resolve the central factual question of whether Plaintiff did or did not improperly touch Ms. Swift. The jury will have a much better opportunity than Dr. Bayard de Volo herself has had to draw their own conclusions of whether Plaintiff actually perceived the kinds of threats to his masculinity that her Report describes and, if so, how he responded in the event.

Thus, applying the common sense inquiry required under Rule 702(a), *McDonald*, and *Becker*, the Court concludes that Dr. Bayard de Volo's opinion would do little, if anything, to assist the jury in understanding the case and the evidence material to the central factual dispute in these proceedings. Whether the jury finds, based on

10

the testimony and other evidence, that Plaintiff did improperly touch Ms. Swift, or finds

that he did not, the questions of what motivated him to do so, including any perceived

threats to his purported status as a powerful male, will be beside the point.  If anything,

this testimony would be unhelpful to the jury because it would tend to complicate the

otherwise straightforward question of "*what* happened" with issues of *why* it happened,

and whether what occurred in this case was or was not consistent with alleged broader

societal patterns of men reacting in physically threatening ways to powerful women who

threaten their masculinity.  Thus the Court finds that Dr. Bayard de Volo's opinion would

do little to assist the jury in resolving the disputed issues in this case.

**C.     Rule 403 Analysis**

Even more conclusively, however, the Court finds that the probative value of Dr.

Bayard de Volo's opinion would be substantially outweighed by the significant risks of

prejudice, confusion of the issues, and misleading the jury.  As a consequence, the

professor's Opinion #1 must be excluded under Federal Rule of Evidence 403,

irrespective of whether or not it would otherwise be admissible under Rule 702.

The explanation of the unduly prejudicial nature and the limited probative value

of the expert testimony at issue in *Robbie*, 12 Cal. Rptr. 2d at 484–88 is persuasive on

this point.  In *Robbie,* the defendant was charged with acts of sexual assault and

contested, essentially, whether the sexual contact had been consensual.  *See id.* at

481.  The prosecution called an expert witness to testify, in effect, that the "defendant's

conduct was consistent with being a rapist."  *Id.* at 482.  The expert "was never directly

asked to opine whether defendant was a sex offender," but did opine that specific

11

aspects of his alleged conduct were common in instances of rape, and that the combined circumstances of the case reflected "the most common type of behavior pattern" in sex offenses. *Id.* at 484–85.

On appeal, the conviction was reversed because admission of this expert testimony was held to constitute reversible error, given the degree of prejudice it created. *See id.* at 485–88. The Court explained the problems with this testimony, in part, as follows:

> [P]rofile evidence is inherently prejudicial because it requires the jury to accept an erroneous starting point in its consideration of the evidence. We illustrate the problem by examining the syllogism underlying profile evidence: criminals act in a certain way; the defendant acted that way; therefore, the defendant is a criminal. Guilt flows ineluctably from the major premise through the minor one to the conclusion. The problem is the major premise is faulty. It implies that criminals, and only criminals, act in a given way. In fact, certain behavior may be consistent with both innocent and illegal behavior, as the People's expert conceded here. * * * The jury was invited to conclude that if defendant engaged in the conduct described, he was indeed a sex offender.

*Id. at* 485.

The *Robbie* court also later reiterated that such evidence should be excluded when it "improperly invite[s the jury] to conclude that, because the defendant manifested some characteristics, he committed a crime," and is "offered to establish a stereotype then condemn the defendant for fitting it." *Id.* at 487. The Court finds that the facts and analysis in *Robbie* to be more analogous here than are the drug and gang cases discussed above. To be sure, the California courts appear to take a different and

more categorical approach to "profile evidence" than does the Tenth Circuit.[4]   But the Court need not follow the California approach as to "profile evidence" to conclude that Dr. Bayard de Volo's opinion would be substantially more prejudicial than probative for reasons similar to those explained in *Robbie*.

Dr. Bayard de Volo's opinion—in effect that she believes Plaintiff felt threatened and that committing an act of assault because of that perception would be consistent with broader patterns of assault—creates a very substantial risk of prejudice against Plaintiff and of confusing the issues at trial.  Her opinion would be tantamount to characterizing Plaintiff as someone who had the motives and characteristics typical of a perpetrator of sexual assault.[5]   Her testimony on this topic would also risk creating tangential and prejudicial disputes at trial, such as whether Plaintiff did or did not feel "threats to his masculinity," and raising inflammatory and emotional issues regarding the extent and patterns of sexual assault and violence against women as a whole.

All of this would lead the trial astray from its central purpose, that is, resolving an individual dispute between individual parties, based on the facts and evidence of that

---

[4] *Compare Robbie,* 92 Cal. App. 4th at 1084 ("Profile evidence is generally inadmissible to prove guilt.") *with Becker*, 230 F.3d at 1231 ("[r]ather than focusing . . . upon defining and classifying evidence [as] profile or non-profile . . . the better approach is to commence the inquiry with an examination of the applicable rules of evidence . . . .").

[5] The Court has some doubts that Dr. Bayard de Volo had sufficient basis and qualifications to reach the conclusions she did regarding what threats Plaintiff perceived.  She is not trained in psychology and has not interviewed Plaintiff.  She relied on assorted excerpts from his deposition testimony but also very substantially on a pleading written by Plaintiff's lawyer and crafted to advance his legal claims in this litigation.  Plaintiff's pleadings of course are not evidence and do not establish any facts, and it is doubtful what conclusions regarding Plaintiff's perceived threats can be fairly drawn from materials prepared in litigation by his lawyer years after the events in question.  Since Plaintiff does not argue this issue, the Court does not further address it.

dispute. *Cf.* Fed. R. Evid. 404, Advisory Committee Notes to 1972 Proposed Rule ("Character evidence is of slight probative value and may be very prejudicial.  It tends to distract the trier of fact from the main question of what actually happened on the particular occasion.  It subtly permits the trier of fact to reward the good man and to punish the bad . . . despite what the evidence in the case shows actually happened.").

On the other hand, in part for the reasons explained in *Robbie*, the potential probative value of Dr. Bayard de Volo's opinion as to matters actually in dispute (i.e., "what actually happened") is slight.  Coming from an expert with no personal knowledge of whether Plaintiff did or did not improperly touch Ms. Swift, it would add very little to the other evidence which the jury will hear.  Ultimately, the existence of broader social patterns has little to do with how the parties actually acted, or failed to act, on the date in question.  C*f. Robbie*, 92 Cal. App. 4th at 1085 (expert's testimony "implie[d] that criminals, and only criminals, act in a given way.  In fact, certain behavior may be consistent with both innocent and illegal behavior.").

In sum, the Court holds that Ms. Bayard de Volo's "Opinion #1" (including with the analysis underlying it, (*see* ECF No. 136-1 at 2–9) is also inadmissible under Rule 403, because its limited probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and/or misleading the jury.

Finally, while Defendants cite cases in which they argue that testimony like Dr. Bayard de Volo's has been "routinely deemed admissible," the circumstances of those cases are wholly distinct from those here and so these authorities do not support admission.  (*See* ECF No. 144 at 8–10.)  The cases cited by Defendants are discrimination and sexual harassment cases, in which experts have been permitted to

14

opine regarding hostile conditions that existed in a workplace or other institutions. But in such cases, the expert's opinion is typically offered to explain that certain conditions actually existed in a specific institution, and/or the general circumstances in which stereotypes and a hostile work environment may arise and persist. In these discrimination cases, such opinions were allowed where the existence (or not) of the conditions on which the experts opined was a matter disputed in the case.[6]

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's Motion to Exclude (ECF No. 136) is GRANTED. Dr. Bayard de Volo will not be permitted to testify at trial consistent with her Opinion # 1. Her ability to testify consistent with her Opinion # 2 and related analysis, as disclosed in her Report, is not limited in any manner by this Order.

---

[6] *See, e.g.*, *Hnot v. Willis Grp. Holdings Ltd.*, 2007 WL 1599154, at *2 (S.D.N.Y. June 1, 2007) (in employment discrimination case, expert allowed to testify regarding "the operation of gender stereotyping and the kinds of conditions in which such stereotyping most commonly flourishes"); *Beck v. Boeing Co.*, 2004 WL 5495670, at *2 (W.D. Wash. May 14, 2004) (expert permitted to "explain stereotyping and what conditions make it more or less likely to occur")*; Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1264 (N.D. Cal. 1997) (in gender discrimination suit, expert in social psychology and stereotyping permitted to opine regarding stereotypes that advanced plaintiff's disparate treatment claim and circumstances that "allowed stereotypes to flourish"); *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 880–81 (D. Minn. 1993) ( in sexual discrimination class action, expert testified "on the subject of sexual stereotyping and its relationship to acts of sexual harassment which occurred at [the workplace]"); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1505 (M.D. Fla. 1991) (in hostile work environment claim, experts opined that sexually harassing conditions existed in workplace and "provided a sound . . . framework from which to conclude that the presence of pictures of nude and partially nude women, sexual comments, sexual joking, and other behaviors . . . creates and contributes to a sexually hostile work environment").

Dated this 21st day of July, 2017.

BY THE COURT:

_____
William J. Martínez
United States District Judge