1

1          IN THE UNITED STATES DISTRICT COURT
                      for the
2               District of Colorado

3          Civil Action No. 1:15-CV-01974-WJM-KLM

4    ============================================================

5

6    DAVID MUELLER,                          Plaintiff,

7    v.

8

9    TAYLOR SWIFT; FRANK BELL;

10   ANDREA SWIFT, A/K/A ANDREA FINLAY;

11   SCOTT SWIFT; ET AL.                     Defendants.

12   ============================================================

13

14       PURSUANT TO SUBPOENA AND THE COLORADO AND FEDERAL

15   RULES OF CIVIL PROCEDURE, the deposition of ROBERT CALL

16   was taken by Plaintiff David Mueller by and through his

17   attorney, M. Gabriel McFarland, Esq. at the offices of

18   Evans & McFarland, LLC, 910 Thirteenth Street, Suite 200,

19   Golden, Colorado, beginning at the hour of 2:28 p.m. MDT

20   on Thursday, July 14, 2016, recorded stenographically by

21   Merry P. Boslough, A/K/A Pat Boslough, Professional Court

22   Reporter and Notary Public for the State of Colorado.

23

24                    *   *   *   *   *

25

2

```
 1                           APPEARANCES

 2    For the Plaintiff:

 3              M. Gabriel McFarland, Esq.
               EVANS & McFARLAND, LLC
 4             910 Thirteenth Street
               Suite 200
 5             Golden, Colorado  80401
               gmcfarland@emlawyers.com
 6             (303)279-8300 x 2

 7    For the Defendants Taylor Swift, Frank Bell, Scott Swift
                                     and Andrea Swift:
 8
               J. Douglas Baldridge, Esq. &
 9             Katherine M. Wright, Esq.
               VENABLE LLP
10             575 Seventh Street, NW
               Washington, D.C.  20004
11             jdbaldridge@venable.com
               kmwright@venable.com
12             (202)344-8300

13    For Bonneville International/Deponent:

14             Michael L. Dowdle, Esq.
               SVP Business Affairs and General Counsel
15             BONNEVILLE INTERNATIONAL
               55 North 300 West
16             Salt Lake City, Utah  84180
               mdowdle@bonneville.com
17             (801)575-5874

18    For Entercom Communications Corporation/Deponent:

19             Michael E. Dash, Esq.
               Deputy General Counsel
20             ENTERCOM COMMUNICATIONS CORPORATION
               401 City Avenue, Suite 809
21             Bala Cynwyd, Pennsylvania  19004
               mdash@enternet.com
22             (610)660-5610

23
      Also Present:  None
24
                          *   *   *   *   *
25
```

3

1                         EXHIBIT INDEX

2

   Exhibit No.              Description        Initial Mention
3                                                  Page

4

      1     "Notes from Jackson conversations."         59
5
            Typewritten notes produced by
6
            Robert Call detailing the sequence of
7
            events following alleged incident
8

9

10

11                     EXAMINATION INDEX

12

13          Examination by Mr. McFarland:             4

14
            Examination by Mr. Baldridge:            --
15

16          Examination by Mr. Dowdle:               --

17
            Examination by Mr. Dash:                 --
18

19          Examination by Ms. Wright:               --

20

21

22

23                  *   *   *   *   *

24

25

4

```
1              P R O C E E D I N G S
2                         ROBERT CALL,
3   being first duly sworn to the above cause to which he
4   answered, "I do," was examined and testified as follows:
5                         EXAMINATION
6   BY MR. McFARLAND:
7        Q    Good afternoon.  Would you state your full name
8   for the record, please?
9        A    Robert Bradford Call.
10            MR. BALDRIDGE:  We'll go ahead and do our usual,
11  Gabe, and mark this as confidential and under protected
12  order until further notice.
13            MR. McFARLAND:  Gotcha.
14            MR. BALDRIDGE:  Thank you.
15       Q    (By Mr. McFarland)  Have you ever been deposed
16  before?
17       A    I just had that conversation last night.  I
18  don't think so.  And the reason is there may be a
19  situation with a tower site here on Lookout Mountain back
20  in the early 80s -- maybe.
21       Q    Okay.
22       A    It wasn't as formal as this seems to be.
23       Q    Okay.  You understand that you're testifying
24  under oath today?
25       A    Yes.
```

1          Q     And you understand that the court reporter is

2     writing down my questions and your answers?

3               MR. DOWDLE:  Oh, we need to get Mike Dash back

4     on the line.

5               MR. MCFARLAND:  Oh, I'm sorry.

6               Let's go off the record for a minute.

7               (Telephone contact was established with Michael

8     Dash, Esq.  Off-the-record discussion disclosing what

9     questions had already been asked during the deposition

10    prior to telephone contact being established.  Time off

11    the record approximately 2 minutes.)

12              MR. MCFARLAND:  Back on the record.

13         Q    (By Mr. McFarland)  You understand that the

14    court reporter is capturing, writing down, my questions

15    and your answers?

16         A    Yes.

17         Q    And for that reason, it's important that you and

18    I try not to talk over each other.  If you would do your

19    best to let me finish my question, then I'll do my best to

20    let you finish your answer before I ask the next one.  Is

21    that okay?

22         A    That is okay.

23         Q    Where do you work?

24         A    I work at KYGO, a cluster of radio stations now

25    known as Bonneville Denver.  And those stations include

6

1    KYGO, KOSI, KKFN The Fan, KEPN-ESPN.

2         Q    And how long have you been employed by KYGO?

3         A    Thirty-six years and three weeks.

4         Q    And your current position?

5         A    Vice president market manager.

6         Q    Market manager?

7         A    Market manager, yes.

8         Q    And what are your duties and responsibilities in

9    that position?

10        A    I have overall responsibility for programming,

11   sales, engineering, promotions, making sure that we adhere

12   to all FCC policies, rules, protect the license, overall

13   direction, brand imaging for the radio stations in the

14   community.

15        Q    How long have you been in that position?

16        A    I've been in that position since 1989 to do the

17   math real quick on that.

18        Q    Did you hire Mr. Mueller and Mr. Kliesch?

19        A    No.

20        Q    Who hired Mr. Mueller and Mr. Kliesch for the

21   KYGO morning show?

22        A    Probably -- it was a lengthy process that

23   included our previous program director, John Thomas, and

24   our vice president of programming, John Dimick.

25        Q    Were you involved in the hiring process in any

8

 1    whether or not anything could be salvaged?

 2         A    I don't recall the conversation specifically.  I

 3    have talked to Heather several times since then, as she

 4    has other talent that she represents.  I'm sure I told her

 5    the answer was no.

 6         Q    From your perspective, is Ms. Cohen a good

 7    agent?

 8         A    I believe so.

 9         Q    Do you work well with her?  Do you have any

10    problems with her?

11         A    I only worked with her on Ryan Kliesch and

12    David.  She has called with opportunities for other talent

13    on our various stations that we might consider that she

14    has.  And most recently has sent an e-mail audio to both

15    Eddie Haskell and to me with some possible candidates for

16    a current opening at KYGO.

17         Q    Did you approve the hiring of Mr. Mueller and

18    Mr. Kliesch?

19         A    Yes.

20         Q    Did you make the decision to fire Mr. Mueller?

21         A    Yes.

22         Q    Did you make the decision to fire Mr. Kliesch --

23    I should back up.  Was Mr. Kliesch fired?

24         A    No.

25         Q    Did he resign?

9

1        A     Yes.

2        Q     So when did you terminate Mr. Mueller?

3        A     June 4th, 2013.

4        Q     2013?  Why did you fire Mr. Mueller on June 4th,

5   2013?

6        A     I fired him based on the fact that I had a

7   picture that Taylor Swift's promotion people had sent

8   that -- at least in my opinion -- represented him in a

9   very uncomfortable place with Taylor.

10          I had direct feedback from her radio management

11   group, Frank Bell, whom I've known for many years, who

12   indicated that Mr. Mueller had during a photo session

13   touched her inappropriately, I believe, raised her dress

14   or skirt and that she was very clear on what had happened.

15   And it was related to me that her mother felt the same

16   way.

17          And in talking to -- I was going to call him

18   Jackson, I'm sorry -- Mr. Mueller on Monday the third in

19   the afternoon through a lot of conversation, he certainly

20   indicated that he did not do it; however -- and I believe

21   this is a direct quote -- if I had, it was incidental or

22   accidental.  The combination of those three elements put

23   me in a position where I felt comfortable making the

24   decision.

25        Q     Any other reasons why you terminated Mr. Mueller

Call, Robert 20160714

10

1   on June 4th, 2013?

2       A    No.

3       Q    How do you know Frank Bell?

4       A    I've known Frank Bell -- I can't say the date I

5   first met Frank Bell.  I've known him since the mid 80s.

6   He was in radio for a number of years for Key Market

7   Media.  And at one point he actually supervised my

8   previous boss.  And so I think we met at a seminar or

9   something; we had similar last names, both last names --

10  Bell and Call.  And we kind of hooked up, and we were

11  industry friends, not personal friends.

12          But he was somebody you see over the years at

13  various events and radio happenings and record label

14  events.  And it was somebody you got to know.  He was a

15  well-respected -- in radio -- a well-respected program

16  director and executive for many years and had done

17  programming in a lot of markets.

18      Q    Did you have any intentions of terminating

19  Mr. Mueller prior to June 2nd, 2013?

20      A    No.

21      Q    How was he doing as part of the KYGO morning

22  show?

23      A    It was a team show.  They came together, and the

24  evaluation is sort of the sum of the parts.  We had made

25  it very clear to both Ryan and to David that this was an

12

1    chances to interview people.  And so I know we had

2    conversations over that, but nothing, no specific

3    performance issues or disagreements or anything like that

4    that I recall.

5         Q    Okay.  Before Ryno -- before Mr. Kliesch

6    resigned -- now, you've got me doing it.

7         A    Yeah, I know.

8         Q    Before Mr. Kliesch resigned, did KYGO have any

9    plans to terminate him?

10        A    No.

11        Q    Was it considering terminating him?

12        A    Mr. Kliesch had had several issues in terms of

13   his off-air performance that we were concerned about.  The

14   challenge had been a counterbalance of making another

15   change and the fact that we were confident in talking to

16   him that we could count on his contribution going forward

17   and be a reliable person.  His issues were off the air,

18   not on the air.

19        Q    So as of June 2, 2013, was KYGO considering

20   terminating Mr. Kliesch?

21        A    No, no.

22        Q    How did -- let me ask this first:  When did you

23   first learn that there has been an alleged incident

24   between Mr. Mueller and Ms. Swift?

25        A    That was Sunday night.  I believe it was the

13

1    2nd.  I can't tell you exactly what time that Sunday

2    evening, but I want to say maybe in the seven o'clock

3    hour, 7:35, something like that.

4        Q    Okay.  And how did you learn that there was an

5    alleged incident involving Mr. Mueller and Ms. Swift?

6        A    Eddie informed me; however, the cell service in

7    the Pepsi Center, particularly deep in the Pepsi Center,

8    was pretty iffy.  And I get a phone call from Eddie and

9    there was no voice there.  And so it took us a while.  I

10   could get some cryptic bits of information, and we tried

11   texting.

12           So between the two, I started to pull together

13   what was going on and tried to persuade him to get out of

14   that cell phone zone so we could talk and we could have a

15   conversation.  So that probably went on for maybe 45

16   minutes; so I was really in the dark at first, but knowing

17   that something had happened.

18       Q    Where were you when you received that call from

19   Mr. Haskell?

20       A    I was home.

21       Q    And did you have a chance to speak with Eddie

22   the evening of June 2nd where you could communicate

23   effectively?

24       A    Yes.

25       Q    Was that about 45 minutes after your initial

14

```
 1    phone call?

 2         A    You know, what?  I just don't recall.  I just

 3    realized we had communication problems and I just needed

 4    to get maybe a text to him to get out of the building.

 5    And I'm sure there were a lot of things going on at that

 6    point with him.  And I'd say within 45 minutes to an hour

 7    is probably fair.

 8         Q    What did Mr. Haskell convey to you?

 9         A    He conveyed that the incident has occurred.  I

10    believe he had gotten that information from Frank Bell,

11    and I think by that time, Mueller had already been

12    escorted from the Pepsi Center.  And I was told that there

13    was a photo of the incident.

14         Q    Can you recall anything else that he relayed to

15    you during that conversation or those conversations?

16         A    Not specifically, no.

17         Q    How did -- what words did he use to convey the

18    alleged incident?  What did he tell you?

19         A    Honestly, I don't remember how he framed it,

20    because we had been sort of communicating in pieces.  I

21    had known something was going on with who we called

22    "Jackson" and Taylor, but I didn't know what it was.  So I

23    don't recall any particular tone in his voice or use of

24    words.

25         Q    After having those initial communications with
```

15

1    Mr. Haskell about the alleged incident, what did you

2    understand the allegation to be?

3         A    That he had touched Taylor inappropriately.

4    From Taylor's perspective, there was no question what had

5    happened and the family and Taylor were understandably

6    very upset.

7         Q    Did you have an understanding at that time as to

8    what part of Ms. Swift's body was allegedly touched?

9         A    I believe so, yes.

10        Q    What part of her body was allegedly touched?

11        A    He touched her on her rear.

12        Q    Did you have an understanding as to the

13   allegation that he touched Ms. Swift's rear outside of her

14   clothing or underneath her clothing?

15        A    Not at that time.

16        Q    Did Mr. Haskell show you a copy of the

17   photograph or send you a copy of the photograph at that

18   time?

19        A    No.

20        Q    What did you do after receiving information on

21   the alleged incident from Mr. Haskell?

22        A    I processed what he had said, called our vice

23   president of programming from Lincoln Financial Media,

24   John Dimick, D-i-m-i-c-k.

25        Q    Did you do anything else?

16

1    A    Told him about -- and later that night I talked

2  to the president of our company, Don Benson.  And I'm not

3  sure I recall whether John had informed him and Don called

4  me or if Don called me, I don't remember.  But maybe by

5  about eleven o'clock that night, I did talk to Don, who

6  was in Atlanta.

7    Q    And did you relay to both Don and John

8  essentially what Mr. Haskell had related to you?

9    A    Correct.

10    Q    And what was John's reaction?

11    A    Shock.  "Are you serious?  What information do

12  we have?  What supporting information?  What do we know?"

13    Q    What kind of reaction did Don have?

14    A    Pretty similar.

15    Q    And I'm sorry, is it Don or --

16    A    Don Benson, B-e-n-s-o-n.  Don did say that he

17  considered this a very serious matter in terms of our

18  station, our company, our parent company, and that we

19  would need to get together the next morning and gather the

20  information and look at this very carefully.

21    Q    And the conversation with John and the

22  conversation with Don, did those happen on June 2nd?

23    A    Yes.

24    Q    Okay.  Did you call anybody else about the

25  alleged incident between Mueller and Ms. Swift on

17

1  June 2nd?

2       A    No.

3       Q    Did you talk to anybody else about the alleged

4  incident between Mr. Mueller and Ms. Swift on June 2nd?

5       A    No.

6       Q    Did you take any other action with respect to

7  the alleged incident the evening of June 2nd, 2013?

8       A    In one of my last phone conversations with

9  Eddie, we decided to suspend with pay so we could begin an

10 investigation.  We just didn't feel it was appropriate

11 that he be on the air, both knowing all this was going on

12 and the potential possibility that the press could find

13 out or would find out.

14      Q    Do you know who notified Mr. Mueller of that

15 decision?

16      A    Eddie did.

17      Q    Was there any question in your mind as of the

18 evening of June 2nd, 2013, that Mr. Mueller had

19 inappropriately touched Ms. Swift?

20      A    Yes, there was a question.

21      Q    You had not yet made up your mind?

22      A    No.

23      Q    What happened next with respect to the alleged

24 incident between Mr. Mueller and Ms. Swift?

25      A    I'm not sure whether in one of my conversations

18

1    with Eddie that I didn't have him give my cell phone

2    information to Frank Bell.  I don't think he had it prior

3    to that.  And I believe that evening Eddie said that Frank

4    would call me in the morning or -- I'm not sure whether I

5    called Frank or he called me, but it was sometime early in

6    the morning before I left for work.  So we arranged the

7    opportunity that we would talk the next morning.

8         Q    So that was Monday?

9         A    That was Monday morning.

10        Q    Okay.  And so whether you called Mr. Bell or he

11   called you, you spoke to Mr. Bell early on June 3rd?

12        A    On June 3rd.

13        Q    And what do you recall about that conversation?

14        A    Well, I recall very vividly that there was a

15   picture.  And I asked him could I get a copy of the

16   picture.  And he said that he would send it to me, but

17   that it basically was for my eyes only.  It's not a

18   picture he wanted to get out.

19             He relayed the incident, the fact that Taylor's

20   mom was very upset, and that when I saw the picture, it

21   would be clear what had happened.  And I told Frank that

22   we had suspended Mueller for the day; that we take this

23   type of thing very seriously; and that we would begin an

24   investigation right away.

25             And I said that I knew I had more questions, but

19

1   I didn't really know what questions I had at that moment

2   beyond -- I hadn't even seen the picture.  And he

3   understood, said he knew, you know, we would give the

4   situation a fair consideration and do the right thing.

5               He was going to be traveling, I believe, back to

6   Nashville, and he probably would not be available Denver

7   time until maybe very late morning or early afternoon.

8   And I told him that I would have some questions, that I

9   would definitely have some questions for him at that time

10  and please send the photo, which he e-mailed to me.

11      Q    What did you think Mr. Bell meant when he said,

12  "I'm sure you'll do the right thing"?

13      A    Well, I believe that they were obviously -- from

14  what I could tell -- embarrassed, upset, angry over the

15  incident.  And my belief would be that probably would run

16  the gambit of some type of disciplinary action, maybe a

17  suspension, maybe up to and including termination.  We

18  never discussed what "the right thing" was.

19      Q    Was there any doubt in your mind that what

20  Mr. Bell wanted you to do is to fire Mr. Mueller?

21              MR. BALDRIDGE:  Objection, form and foundation.

22              MR. DOWDLE:  Objection, form, foundation and

23  speculation.

24      Q    (By Mr. McFarland)  You can answer.

25              THE DEPONENT:  I can answer?

1           MR. BALDRIDGE:  Yes.

2       A    Would you ask me the question one more time?

3       Q    (By Mr. McFarland)  Yes.  Was there any doubt in

4   your mind that what Mr. Bell wanted you to do was to

5   terminate Mr. Mueller?

6           MR. BALDRIDGE:  Same objections.

7           MR. DOWDLE:  Objection, form and foundation,

8   speculation.

9       A    Yes, there was doubt in my mind.

10       Q    (By Mr. McFarland)  Did Mr. Bell ask you to

11   terminate Mr. Mueller ever?

12       A    Never.

13       Q    Did he ask you to take any specific action?

14       A    Never.

15       Q    How did he describe the alleged incident to you?

16       A    I'm sure he described it in our early morning

17   call and then at length late morning when he had arrived

18   in Nashville.  He indicated that Mueller had gone in a

19   tented area where Taylor was taking photos.  Shannon

20   Melcher, at the time Mueller's girlfriend, was there.

21   Taylor was in the room.

22           And this was just a small group coming in, I

23   guess the standard kind of backstage meet and greet photo

24   session.  And maybe there was a security person and a

25   photographer and that there wasn't -- I don't recall any

21

```
 1    information leading up to it, maybe small talk or
 2    something.  But when the picture was taken, he had his
 3    hand in an inappropriate place.
 4         Q    Did Mr. Bell tell you that Mr. Mueller had
 5    grabbed Ms. Swift's rear with his hand?
 6         A    I'm not sure.  I recall "lifting the dress."
 7    I'm not sure what the action of touching was.  But lifting
 8    the dress or skirt was very much a part of his explanation
 9    of what he had done.
10         Q    Did Mr. Bell tell you -- so Mr. Bell told you
11    that Mr. Mueller had put his hand under Ms. Swift's dress
12    and lifted it up?
13         A    Yes.
14         Q    So did Mr. Bell tell you that Mr. Mueller had
15    inappropriately touched Ms. Swift's rear?
16         A    Yes.
17         Q    Did he tell you whether that touching occurred
18    over her clothing or underneath her clothing?
19         A    No.  I suppose "lifting up a dress" made it
20    clear it wasn't over the clothing.
21         Q    Your impression after talking to Mr. Bell was
22    that Mr. Mueller -- the touching happened underneath
23    Ms. Swift's clothing?
24         A    Yes.
25         Q    During that conversation, did you -- well,
```

22

```
 1    during that conversation, Mr. Bell also relayed to you the

 2    people that were in the room when the alleged incident

 3    took place?

 4         A    Yes.

 5         Q    Did Mr. Bell indicate whether he had talked to

 6    any of those people?

 7         A    I don't recall.

 8         Q    Did Mr. Bell relate to you whether he spoke with

 9    Ms. Swift about the incident?

10         A    I don't recall.

11         Q    Do you know where Mr. Bell was getting his

12    information with respect to the alleged incident?

13         A    I do know, because he made it very clear that he

14    had talked to Taylor's mother.  And I probably presumed he

15    also talked to the security person, which I should

16    remember his name, which I think I've got in some of my

17    notes, Craig, with an Australian or British accent and

18    maybe a photographer.

19         Q    But he didn't tell you and you don't otherwise

20    know whether he talked to anybody other than Ms. Swift's

21    mom?

22         A    No.

23         Q    Do you recall anything else about your initial

24    conversation with Frank Bell about the alleged incident

25    between Mr. Mueller and Ms. Swift?
```

23

1    A    Well, we talked quite a bit about the fact

2    that -- I asked the question, "Did Taylor say anything

3    about what happened when this occurred?"   And he said that

4    Taylor did not want to make a big incident out of it and

5    that as soon as Mueller had left the meet and greet tent,

6    she informed security.

7         And that's when the process started.   Security

8    tracked Mueller and Melcher down, and I guess according to

9    Frank there were words and David indicated that it's all

10   wrong.   I think he made a comment of, "Well, let's get the

11   police involved," or something like that I remember.

12   Q    Mr. Mueller made a comment that he wanted the

13   police involved?

14   A    I think according to Frank, "Let them come and

15   investigate this."

16   Q    Okay.   Anything else that you can recall about

17   that initial conversation with Mr. Bell?

18   A    There were two conversations:   The first one

19   early in the morning; and the next one late morning.   And

20   I think the late morning one I probably had a few

21   questions at that point for -- you know, Were there any

22   other cameras?   Was there anyone else in there -- no, I

23   take that back.

24        I did not ask the camera question at that

25   moment.   That was after meeting later with Mueller.   I

24

1    think it was just pretty much me stating the facts as

2    Frank knew them.

3        Q    Is there anything else that you can recall about

4    your initial two communications?  Well, let me ask this:

5    Is your first conversation with Frank Bell distinct in

6    your mind from your second conversation with him regarding

7    the incident?

8        A    It's distinct in that he was going to send me

9    the photo.  And by the time the second conversation took

10   place, I had the photo.

11       Q    Okay.  And what was your impression of what the

12   photo showed?

13       A    My impression?  He had his hand in a pretty

14   inappropriate place.

15       Q    You believe that in that photograph

16   Mr. Mueller's hand is touching Ms. Swift's rear?

17       A    I couldn't conclude from that photograph because

18   it does not have a dimensional aspect to it that he's

19   touching her, is about to touch her or has just touched

20   her.  I concluded his hand is at a place that is

21   inconsistent with -- in my experience -- most artist's

22   photos that I've seen.

23            And I also concluded that it's pretty clear when

24   you look at the picture, to me, that Taylor is trying to

25   edge herself away from or orient herself more physically

25

1    to Shannon.  So if you're looking at the two, it just

2    feels, to me, very odd.

3          Q    Did Mr. Bell communicate to you that Ms. Swift

4    pulled away in any form or fashion from Mr. Mueller?

5          A    Yes.

6          Q    Did you note -- well, Ms. Melcher is in the

7    photograph as well?

8          A    Yes.

9          Q    Did you note where her hands were in the

10   photograph?

11         A    No.

12         Q    What about Ms. Swift's hands?  Did you see where

13   Ms. Swift's hands were?

14         A    I'm sure I did.  I don't recall anything about

15   them being in an inappro- -- I mean, it looked just like

16   standard people who put their arms around each other

17   trying to get a photo.

18         Q    What did you do after your second conversation

19   with Mr. Bell on June 3rd?

20         A    We set up a meeting.  Eddie set that up for

21   David to come in early in the afternoon.

22         Q    That would have been early afternoon on Monday

23   the third?

24         A    The third.  Right.

25         Q    Okay.  And did that happen?

1        A     Yes.

2        Q     Before you met with Mr. Mueller, did you have a

3    meeting with Mr. Haskell, Mr. Dimick and perhaps others to

4    discuss Mr. Mueller?

5        A     Yes.  It was a telephone conference call for at

6    least half of the parties.  Eddie was in my office and

7    Maureen Marsh, our HR manager, was in my office.

8        Q     And who was on the phone?

9        A     Phil Bonomo, our attorney; Kercea Beckwith, our

10   Lincoln Financial VP of HR; I think Don was on the call

11   and John.

12       Q     And when did that meeting, slash, conference

13   call take place?

14       A     That would have been late morning, prior to my

15   second conversation with Frank.

16       Q     Before your second conversation?

17       A     Yes.

18       Q     Without disclosing communications with your

19   counsel, what do you recall about the communications in

20   that meeting with Mr. Haskell and the other KYGO people?

21              MR. DOWDLE:  Objection --

22              MR. DASH:  Objection --

23              MR. DOWDLE:  -- to the extent it's privileged.

24              MR. DASH:  Sorry, Mike, go ahead.

25              MR. DOWDLE:  I just said objection to the extent

1          A    Then I either waited for Frank to call me or I

2     called him.

3          Q    Okay.

4          A    And so I want to say that was 11 or 12-ish my

5     time -- Denver time.

6          Q    And you've already told me what you can remember

7     about --

8          A    Right.

9          Q    -- that second conversation?

10         A    Correct.

11         Q    And then you met with Mr. Mueller?

12         A    Eddie set up the meeting for two o'clock.

13         Q    Okay.  And Mr. Mueller arrived at the designated

14    time?

15         A    Yes.

16         Q    And he met with you and Mr. Haskell?

17         A    Yes.

18         Q    How long did you meet?

19         A    Oh, at least an hour.

20         Q    And did that meeting take place in your office?

21         A    Yes, it did.

22         Q    What do you recall about the -- well, did

23    anybody else participate in that meeting?

24         A    No.

25         Q    Was there anybody on the phone listening in?

29

1        A    No.

2        Q    Was there any -- did you make any recording of

3   that conversation?

4        A    No, I did not make a recording.

5        Q    Do you know whether Mr. Haskell did?

6        A    I don't believe Mr. Haskell made a recording.

7        Q    And you understand now that Mr. Mueller did

8   record the meeting?

9        A    Yes.

10        Q    What do you recall about the communications at

11   that meeting?

12        A    The communications back and forth?

13        Q    Yeah.

14        A    They were cordial.  He denied the incident

15   occurring; indicated that if there were more cameras or

16   other camera angles, it would vindicate him; that I could

17   see that wherever his hand was, it wasn't near her body;

18   and that he had been was distracted.

19             I'm not sure what the distraction was, but that

20   they were moved along very quickly and that he was drawn

21   into the picture at the last minute.  And he said the

22   picture looks the way the picture looked because it was a

23   last-minute thing to get in the picture and smile.

24        Q    Okay.  Do you recall anything else about the

25   communications during that meeting?

30

1     A     He spoke about how disrespectful the security

2   people were.  He indicated over and over that this

3   wouldn't have happened if Taylor had known he worked for

4   KYGO.  And I recall probing that to try and understand

5   what that had to do with her story.

6           And we had a conversation that Shannon had

7   identified herself as being with KYGO.  And I recall

8   asking, "Well, wouldn't she assume that you were with

9   KYGO?"  And he didn't think that was necessarily the case

10  and continually discussed and brought up the fact that

11  this would not have happened if she had known he worked

12  for KYGO.

13          And I continually asked him, "Why?  What

14  difference does that make?  Help me understand the

15  relevance of that."  And I never got an answer.

16    Q     Did you inquire of Mr. Mueller about who else

17  was in the room at the time of the alleged incident?

18    A     Yes.

19    Q     And who was in the room?

20    A     He confirmed obviously Taylor, Shannon, at least

21  a security person he presumed and a photographer.  And he

22  didn't believe there was anyone else maybe behind the

23  photographer.  He pretty much identified the numbers that

24  I had been given earlier.

25    Q     Did you make any effort to talk to the

31

1    photographer?

2         A    No.

3         Q    Did you make any effort to talk to the security

4    person?

5         A    No.

6         Q    Did you make any effort to talk to Ms. Melcher?

7         A    I did not.  I recall that our HR manager,

8    Maureen Marsh, did.

9         Q    Did you ask Ms. Marsh to discuss the incident or

10   the alleged incident with Ms. Melcher?

11        A    I'm not sure who asked her to do it.  I think

12   that was just part of the nature of our protocol that she

13   had been in the picture and we were trying to evaluate

14   that.  And I'm not sure what time that took place.

15        Q    As part of your investigation -- you did conduct

16   an investigation?

17        A    Yes.

18        Q    As a part of that investigation, did you come to

19   understand Ms. Melcher's recollection of the alleged

20   incident?

21        A    My understanding is she didn't recall him

22   touching her at all.  I don't recall her saying he didn't,

23   she just didn't recall.

24        Q    And I'm sort of going back to your conversations

25   with Frank Bell.  I think you testified that Mr. Bell

33

1        Q    Did you ever ask Mr. Bell whether he had

2   personally talked to any of the other people who were in

3   the room at the time of the alleged incident?

4        A    No.

5        Q    Did he indicate to you that he had talked to any

6   of the other people in the room at the time of the alleged

7   incident?

8        A    I don't recall.

9        Q    Would you agree that as a part of your

10  investigation into the alleged incident, you should have

11  talked to the people in the room at the time of the

12  alleged incident?

13            MR. DOWDLE:  Objection --

14            MR. BALDRIDGE:  Objection -- go ahead.

15            MR. DOWDLE:  Objections to form, speculative,

16  argumentative.

17            MR. BALDRIDGE:  I will join those three and add

18  foundation.

19            MR. DASH:  Same objections.

20        Q    (By Mr. McFarland)  You can answer it.

21        A    No, I never considered talking to him --

22        Q    Why?

23        A    -- as a part of my investigation.  I didn't need

24  that information.

25        Q    You didn't need to know what the other people in

34

1    the room saw with respect to Mr. Mueller's interactions

2    with Ms. Swift?

3              MR. DOWDLE:  Objection, argumentative,

4    foundation and form.

5              MR. BALDRIDGE:  And I join those three.

6              MR. DASH:  Same objections.

7         A    No.

8         Q    (By Mr. McFarland)  Why?

9         A    In my meeting with Mr. Mueller, I had three

10   components in my decision.  I had a picture that appeared

11   very inappropriate, but a picture only.  Secondly, I had

12   feedback from a person that I've known for many years,

13   trusted, had no reason to tell me anything that was

14   incorrect that had occurred.

15             And third, Mueller said to me, "I didn't do it;

16   but if I did, it was incidental."  So I had a picture, I

17   had Taylor's comments through Frank and he changed his

18   story that it couldn't have occurred, then that it was

19   incidental.

20        Q    How did he change his story?

21        A    He said he didn't do it numerous times, and then

22   he said, "If I had, it was incidental."  And I thought

23   that's very different from "I didn't do it."

24        Q    And if, in fact, it had been incidental contact,

25   you still would have fired Mr. Mueller?

1        A    It wasn't just the incidental contact.  I had

2    the feedback from Frank Bell, from what I consider both a

3    good source and a reputable source, and the picture.

4        Q    Is it fair to say that you relied heavily on

5    what Mr. Bell told you?

6            MR. BALDRIDGE:  Objection, form.

7        A    I looked at all the facts.

8        Q    (By Mr. McFarland)  But you relied on the

9    picture, what Mr. Bell told you and Mr. Mueller's

10   statement that if he did touch her, it was incidental?

11           MR. DOWDLE:  Objection, asked and answered

12   multiple times.

13           MR. BALDRIDGE:  The same and argumentative, in

14   fact, at this point.

15           MR. DASH:  Same objections.

16       Q    (By Mr. McFarland)  Those were the three factors

17   you relied on in making your decision?

18           MR. BALDRIDGE:  Same objections.

19           MR. DOWDLE:  Same objections.

20           MR. DASH:  Same objections.

21           MR. DOWDLE:  You can go ahead.

22       A    Yes.

23       Q    (By Mr. McFarland)  Did you ask any professional

24   to evaluate the picture, the photograph of Mr. Mueller and

25   Ms. Swift and Ms. Melcher?

                                                                    38

1    legal counsel for Lincoln National in Philadelphia.

2         Q    Did you send a copy to Eddie Haskell?

3         A    I don't recall.

4         Q    Did you send the photograph to Maureen?

5         A    Yes.

6         Q    Did you send it to anybody else that you can

7    think of at KYGO?

8         A    Only John, possibly Don, Kercea -- no, no one

9    else.

10        Q    Did you send that photograph to anyone else

11   outside of KYGO?

12        A    No.

13        Q    Did you take notes during your meeting with

14   Mr. Mueller?

15        A    Yes.

16        Q    And how did you record your notes?

17        A    Handwritten.

18        Q    Had a pad of paper, probably not unlike this?

19   (Indicating legal pad.)

20        A    Had a pad of paper.  Had a handful of questions,

21   jotted down key points or his answers.

22        Q    Where are those notes now?

23        A    I think you have them.  I transcribed them from

24   my nearly impossible handwriting to something that could

25   be readable.  And ultimately, I think the first place they

39

1    went -- the only place they went beyond Maureen was to Jen

2    Petruccelli.

3        Q    What did you do with the handwritten version of

4    your notes?

5        A    Shredded them.  Got rid of them.

6        Q    Why did you do that?

7        A    Because I thought and believed the notes I

8    transcribed from the meeting were fully accurate, and I

9    was comfortable with having something that was legible.

10       Q    Did you transcribe the notes to a computerized

11   version yourself?

12       A    Yes.

13       Q    You sat there at the machine and typed them in?

14       A    I was -- it was up in here in my head.  So I

15   didn't have it transcribed by anyone.  I just went through

16   my notes and the meeting as it occurred as I recalled, as

17   freshly as I could.  It was that afternoon.

18       Q    Okay.  So that was my next question.  So you

19   went through that process later that day in the afternoon

20   that you met with Mr. Mueller?

21       A    I would say it probably started within an hour.

22       Q    When did you make the decision to terminate

23   Mr. Mueller?

24       A    Tuesday morning.

25       Q    Okay.  So that was the day after the meeting and

40

1    after you typed up your notes?

2        A    I had one more conversation with Frank, I

3    recall, fairly late that evening and asked questions about

4    security, the possibility of other cameras, things like

5    that.  And he said there wasn't anything there in the

6    tent.

7        Q    And during that conversation, did you ask him

8    whether there were any witnesses or whether any other

9    witnesses happened to see the alleged incident?

10            MR. BALDRIDGE:  Objection, form.

11            MR. DOWDLE:  Same objection.

12       A    I wanted to know who was in there at the time on

13   several occasions and was consistently told that is was a

14   photographer, a security-type person, Taylor, Shannon and

15   Mueller.

16       Q    Did you ask what those persons saw in terms of

17   --

18            MR. BALDRIDGE:  Objection, asked and answered.

19       Q    (By Mr. McFarland) -- the related incident?

20            MR. BALDRIDGE:  Objection, asked and answered

21   multiple times.

22            MR. DOWDLE:  And speculation.

23       A    No.

24       Q    (By Mr. McFarland)  Who was in charge of KYGO's

25   investigation?

1        A      Principally me.

2        Q      Was there anybody else working on the

3   investigation under your direction?

4            MR. BALDRIDGE:  Other than the five he already

5   mentioned?  Or who, Gabe?

6            MR. MCFARLAND:  Well, I don't think he's

7   mentioned anybody else who helped him --

8            MR. BALDRIDGE:  He has too.  The lawyers, the HR

9   director --

10           MR. MCFARLAND:  -- with the investigation.

11           MR. BALDRIDGE:  -- in fact, he's mentioned them

12   numerous people.

13           MR. MCFARLAND:  I don't know that any of those

14   people participated in the investigation.

15           MR. BALDRIDGE:  Oh, he did.  I thought -- that's

16   clearly what he said, I just don't know if he's trying to

17   change that it actually.

18           MR. DOWDLE:  You can go ahead and answer it.

19       A      I discussed with Eddie what he knew, where he

20   was.  Eddie was in a different area, so I realized fairly

21   quickly that he did not witness any of it; although, I

22   talked to Eddie several times about how quickly Frank got

23   to him and the label person had gotten to him and the

24   sequence of events as Eddie was finding out.  So that was

25   part of the evaluation process.

42

```
 1        Q    (By Mr. McFarland)  Well, did anybody else

 2    participate in the investigation?

 3              MR. BALDRIDGE:  Objection, asked and answered.

 4              MR. DOWDLE:  Same objection.

 5        A    No.

 6        Q    Were any KYGO lawyers part of the investigation

 7    and the termination?

 8              MR. DOWDLE:  Objection, privileged.

 9              MR. BALDRIDGE:  Objection, asked and answered.

10              MR. DASH:  Objection.

11        A    A lot was discussed on the call.

12        Q    (By Mr. McFarland)  Well, I don't want to know

13    what was discussed in the call, but I want to know if the

14    lawyers at KYGO were involved in the factual investigation

15    into the alleged incident involving Mr. Mueller and

16    Ms. Swift.

17              MR. DOWDLE:  You can answer that.

18        A    I recall them asking a couple of questions about

19    the facts, what I knew.

20              MR. DASH:  Yeah, Mr. Call, I'm just going to

21    direct you.  I think that's a yes no question, Were they

22    involved?

23              THE DEPONENT:  Okay.

24              MR. DASH:  I don't think you need to go beyond

25    that.  You're talking about the extent of the call.  I'm
```

1          (Deposition Exhibit Call No. 1 was marked for

2     identification.)

3          Q    (By Mr. McFarland)  Mr. Call, let me hand you

4     what's been marked as Deposition Exhibit 1.

5          A    Okay.

6          Q    Do you recognize Deposition Exhibit 1?

7          A    Yes.

8          Q    And that's a document that you created?

9          A    Yes.

10         Q    Following your meeting with Mr. Mueller on

11     June 3rd?

12         A    Yes.

13              MR. DOWDLE:  Except for the last page.  Sorry.

14         A    That's correct.  The last page occurred several

15     days later as the call from the press.

16              MR. DOWDLE:  I'm sorry, I didn't mean to

17     interrupt your ...

18              MR. MCFARLAND:  That's all right.

19         Q    (By Mr. McFarland)  Have you had a chance to

20     recently review the contents of Deposition Exhibit No. 1?

21         A    Yes.

22         Q    To the best of your knowledge and information,

23     are your notes there accurate in this?

24         A    They are accurate.

25         Q    Is there anything that you're aware of that is