IN THE UNITED STATES DISTRICT COURT
for the
District of Colorado

Civil Action No. 1:15-CV-01974-WJM-KLM

==========================================================

DAVID MUELLER, Plaintiff,

v.

TAYLOR SWIFT; FRANK BELL;
ANDREA SWIFT, A/K/A ANDREA FINLAY;
SCOTT SWIFT; ET AL. Defendants.

==========================================================

PURSUANT TO SUBPOENA AND THE COLORADO AND FEDERAL RULES OF CIVIL PROCEDURE, the deposition of ROBERT CALL was taken by Plaintiff David Mueller by and through his attorney, M. Gabriel McFarland, Esq. at the offices of Evans & McFarland, LLC, 910 Thirteenth Street, Suite 200, Golden, Colorado, beginning at the hour of 2:28 p.m. MDT on Thursday, July 14, 2016, recorded stenographically by Merry P. Boslough, A/K/A Pat Boslough, Professional Court Reporter and Notary Public for the State of Colorado.

* * * * *

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

2

APPEARANCES

For the Plaintiff:

M. Gabriel McFarland, Esq.
EVANS & McFARLAND, LLC
910 Thirteenth Street
Suite 200
Golden, Colorado 80401
gmcfarland@cmlawyers.com
(303)279-8300 x 2

For the Defendants Taylor Swift, Frank Bell, Scott Swift and Andrea Swift:

J. Douglas Baldridge, Esq. &
Katherine M. Wright, Esq.
VENABLE LLP
575 Seventh Street, NW
Washington, D.C. 20004
jdbaldridge@venable.com
kmwright@venable.com
(202)344-8300

For Bonneville International/Deponent:

Michael L. Dowdle, Esq.
SVP Business Affairs and General Counsel
BONNEVILLE INTERNATIONAL
55 North 300 West
Salt Lake City, Utah 84180
mdowdle@bonneville.com
(801)575-5874

For Entercom Communications Corporation/Deponent:

Michael E. Dash, Esq.
Deputy General Counsel
ENTERCOM COMMUNICATIONS CORPORATION
401 City Avenue, Suite 809
Bala Cynwyd, Pennsylvania 19004
mdash@enternet.com
(610)660-5610

Also Present: None

* * * * *

Thomas T. Tomko & Associates (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

PROCEEDINGS

ROBERT CALL,

being first duly sworn to the above cause to which he answered, "I do," was examined and testified as follows:

EXAMINATION

BY MR. McFARLAND:

**Q Good afternoon. Would you state your full name for the record, please?**

A Robert Bradford Call.

MR. BALDRIDGE: We'll go ahead and do our usual, Gabe, and mark this as confidential and under protected order until further notice.

MR. MCFARLAND: Gotcha.

MR. BALDRIDGE: Thank you.

**Q (By Mr. McFarland) Have you ever been deposed before?**

A I just had that conversation last night. I don't think so. And the reason is there may be a situation with a tower site here on Lookout Mountain back in the early 80s -- maybe.

**Q Okay.**

A It wasn't as formal as this seems to be.

**Q Okay. You understand that you're testifying under oath today?**

A Yes.

**Q And you understand that the court reporter is writing down my questions and your answers?**

MR. DOWDLE: Oh, we need to get Mike Dash back on the line.

MR. MCFARLAND: Oh, I'm sorry.

Let's go off the record for a minute.

(Telephone contact was established with Michael Dash, Esq. Off-the-record discussion disclosing what questions had already been asked during the deposition prior to telephone contact being established. Time off the record approximately 2 minutes.)

MR. MCFARLAND: Back on the record.

**Q (By Mr. McFarland) You understand that the court reporter is capturing, writing down, my questions and your answers?**

A Yes.

**Q And for that reason, it's important that you and I try not to talk over each other. If you would do your best to let me finish my question, then I'll do my best to let you finish your answer before I ask the next one. Is that okay?**

A That is okay.

**Q Where do you work?**

A I work at KYGO, a cluster of radio stations now known as Bonneville Denver. And those stations include KYGO, KOSI, KKFN The Fan, KEPN-ESPN.

**Q And how long have you been employed by KYGO?**

A Thirty-six years and three weeks.

**Q And your current position?**

A Vice president market manager.

**Q Market manager?**

A Market manager, yes.

**Q And what are your duties and responsibilities in that position?**

A I have overall responsibility for programming, sales, engineering, promotions, making sure that we adhere to all FCC policies, rules, protect the license, overall direction, brand imaging for the radio stations in the community.

**Q How long have you been in that position?**

A I've been in that position since 1989 to do the math real quick on that.

**Q Did you hire Mr. Mueller and Mr. Kliesch?**

A No.

**Q Who hired Mr. Mueller and Mr. Kliesch for the KYGO morning show?**

A Probably -- it was a lengthy process that included our previous program director, John Thomas, and our vice president of programming, John Dimick.

**Q Were you involved in the hiring process in any form?**

A Yes.

**Q What was your role?**

A I negotiated with Heather Cohen, Mr. Kliesch' and Mr. Mueller's agent.

**Q When is the last time you spoke with Heather Cohen?**

A It's been some time. I would just take a guess and say at least a year and a half or more.

**Q Did that conversation you had with Ms. Cohen relate to Mr. Mueller?**

A No.

**Q When is the last time you had a conversation with Ms. Cohen regarding Mr. Mueller?**

A I believe that was Tuesday, I want to say the 4th of June, maybe in the late afternoon, possibly into Wednesday morning.

**Q What was the substance of your conversation?**

A I think she called to see if there was anything that could be resolved in terms of the decision. And I think she also intimated that he would be seeking counsel.

**Q Did you talk to her before or after his termination from KYGO?**

A After.

**Q Okay. What was your response to her inquiry**

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

8

whether or not anything could be salvaged?
A I don't recall the conversation specifically. I have talked to Heather several times since then, as she has other talent that she represents. I'm sure I told her the answer was no.
Q From your perspective, is Ms. Cohen a good agent?
A I believe so.
Q Do you work well with her? Do you have any problems with her?
A I only worked with her on Ryan Kliesch and David. She has called with opportunities for other talent on our various stations that we might consider that she has. And most recently has sent an e-mail audio to both Eddie Haskell and to me with some possible candidates for a current opening at KYGO.
Q Did you approve the hiring of Mr. Mueller and Mr. Kliesch?
A Yes.
Q Did you make the decision to fire Mr. Mueller?
A Yes.
Q Did you make the decision to fire Mr. Kliesch -- I should back up. Was Mr. Kliesch fired?
A No.
Q Did he resign?

Relevance
Improper Opinion Testimony

9

A Yes.
Q So when did you terminate Mr. Mueller?
A June 4th, 2013.
Q 2013? Why did you fire Mr. Mueller on June 4th, 2013?
A I fired him based on the fact that I had a picture that Taylor Swift's promotion people had sent that -- at least in my opinion -- represented him in a very uncomfortable place with Taylor.
I had direct feedback from her radio management group, Frank Bell, whom I've known for many years, who indicated that Mr. Mueller had during a photo session touched her inappropriately, I believe, raised her dress or skirt and that she was very clear on what had happened. And it was related to me that her mother felt the same way.
And in talking to -- I was going to call him Jackson, I'm sorry -- Mr. Mueller on Monday the third in the afternoon through a lot of conversation, he certainly indicated that he did not do it; however -- and I believe this is a direct quote -- if I had, it was incidental or accidental. The combination of those three elements put me in a position where I felt comfortable making the decision.
Q Any other reasons why you terminated Mr. Mueller

10

on June 4th, 2013?
A No.
Q How do you know Frank Bell?
A I've known Frank Bell -- I can't say the date I first met Frank Bell. I've known him since the mid 80s. He was in radio for a number of years for Key Market Media. And at one point he actually supervised my previous boss. And so I think we met at a seminar or something; we had similar last names, both last names -- Bell and Call. And we kind of hooked up, and we were industry friends, not personal friends.
But he was somebody you see over the years at various events and radio happenings and record label events. And it was somebody you got to know. He was a well-respected -- in radio -- a well-respected program director and executive for many years and had done programming in a lot of markets.
Q Did you have any intentions of terminating Mr. Mueller prior to June 2nd, 2013?
A No.
Q How was he doing as part of the KYGO morning show?
A It was a team show. They came together, and the evaluation is sort of the sum of the parts. We had made it very clear to both Ryan and to David that this was an

11

18-month process. We wanted them to go slowly in terms of developing their personalities on KYGO.
KYGO had had a long-standing morning show in there for decades. And this was quite a change, one that we felt both was appropriate at the time and would be good for the radio station.
I am confident that we never discussed any sort of benchmarks at six months. I do believe the station morning show improved a couple of rank positions between maybe in January when they started and June -- not substantially, but we weren't expecting that. It was a longer-term evaluation.
Q Prior to June 2nd, 2013, had Mr. Haskell voiced any concerns to you about Mr. Mueller's performance as a part of the KYGO morning show?
A I don't recall any specific performance issues there. From the time we hired both Mueller and Kliesch, we indicated that we were going to bring on board a third person. The hope was to find some sort of counterbalance talent that we could put in there. You know, we looked at both men and women, and they knew that there was a third person going to come in to have a role.
We were trying to figure out what that role would be built around the primary personalities of Ryan and Jackson. We had a lot of conversations. They had

Hearsay
Foundation

5 (Pages 8 to 11)

Thomas T. Tomko & Associates (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

Hearsay; Foundation

Foundation Speculation

12

chances to interview people. And so I know we had conversations over that, but nothing, no specific performance issues or disagreements or anything like that that I recall.

Q Okay. Before Ryno -- before Mr. Kliesch resigned -- now, you've got me doing it.

A Yeah, I know.

Q Before Mr. Kliesch resigned, did KYGO have any plans to terminate him?

A No.

Q Was it considering terminating him?

A Mr. Kliesch had had several issues in terms of his off-air performance that we were concerned about. The challenge had been a counterbalance of making another change and the fact that we were confident in talking to him that we could count on his contribution going forward and be a reliable person. His issues were off the air, not on the air.

Q So as of June 2, 2013, was KYGO considering terminating Mr. Kliesch?

A No, no.

Q How did -- let me ask this first: When did you first learn that there has been an alleged incident between Mr. Mueller and Ms. Swift?

A That was Sunday night. I believe it was the

13

2nd. I can't tell you exactly what time that Sunday evening, but I want to say maybe in the seven o'clock hour, 7:35, something like that.

Q Okay. And how did you learn that there was an alleged incident involving Mr. Mueller and Ms. Swift?

A Eddie informed me; however, the cell service in the Pepsi Center, particularly deep in the Pepsi Center, was pretty iffy. And I get a phone call from Eddie and there was no voice there. And so it took us a while. I could get some cryptic bits of information, and we tried texting.

So between the two, I started to pull together what was going on and tried to persuade him to get out of that cell phone zone so we could talk and we could have a conversation. So that probably went on for maybe 45 minutes; so I was really in the dark at first, but knowing that something had happened.

Q Where were you when you received that call from Mr. Haskell?

A I was home.

Q And did you have a chance to speak with Eddie the evening of June 2nd where you could communicate effectively?

A Yes.

Q Was that about 45 minutes after your initial

Foundation Speculation

14

phone call?

A You know, what? I just don't recall. I just realized we had communication problems and I just needed to get maybe a text to him to get out of the building. And I'm sure there were a lot of things going on at that point with him. And I'd say within 45 minutes to an hour is probably fair.

Q What did Mr. Haskell convey to you?

A He conveyed that the incident has occurred. I believe he had gotten that information from Frank Bell, and I think by that time, Mueller had already been escorted from the Pepsi Center. And I was told that there was a photo of the incident.

Q Can you recall anything else that he relayed to you during that conversation or those conversations?

A Not specifically, no.

Q How did -- what words did he use to convey the alleged incident? What did he tell you?

A Honestly, I don't remember how he framed it, because we had been sort of communicating in pieces. I had known something was going on with who we called "Jackson" and Taylor, but I didn't know what it was. So I don't recall any particular tone in his voice or use of words.

Q After having those initial communications with

Hearsay

15

Mr. Haskell about the alleged incident, what did you understand the allegation to be?

A That he had touched Taylor inappropriately. From Taylor's perspective, there was no question what had happened and the family and Taylor were understandably very upset.

Q Did you have an understanding at that time as to what part of Ms. Swift's body was allegedly touched?

A I believe so, yes.

Q What part of her body was allegedly touched?

A He touched her on her rear.

Q Did you have an understanding as to the allegation that he touched Ms. Swift's rear outside of her clothing or underneath her clothing?

A Not at that time.

Q Did Mr. Haskell show you a copy of the photograph or send you a copy of the photograph at that time?

A No.

Q What did you do after receiving information on the alleged incident from Mr. Haskell?

A I processed what he had said, called our vice president of programming from Lincoln Financial Media, John Dimick, D-i-m-i-c-k.

Q Did you do anything else?

Foundation Compound Question

6 (Pages 12 to 15)

Thomas T. Tomko & Associates (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

A Told him about -- and later that night I talked to the president of our company, Don Benson. And I'm not sure I recall whether John had informed him and Don called me or if Don called me, I don't remember. But maybe by about eleven o'clock that night, I did talk to Don, who was in Atlanta.

**Q And did you relay to both Don and John essentially what Mr. Haskell had related to you?**

A Correct.

**Q And what was John's reaction?**

A Shock. "Are you serious? What information do we have? What supporting information? What do we know?"

**Q What kind of reaction did Don have?**

A Pretty similar.

**Q And I'm sorry, is it Don or --**

A Don Benson, B-e-n-s-o-n. Don did say that he considered this a very serious matter in terms of our station, our company, our parent company, and that we would need to get together the next morning and gather the information and look at this very carefully.

**Q And the conversation with John and the conversation with Don, did those happen on June 2nd?**

A Yes.

**Q Okay. Did you call anybody else about the alleged incident between Mueller and Ms. Swift on**

**June 2nd?**

A No.

**Q Did you talk to anybody else about the alleged incident between Mr. Mueller and Ms. Swift on June 2nd?**

A No.

**Q Did you take any other action with respect to the alleged incident the evening of June 2nd, 2013?**

A In one of my last phone conversations with Eddie, we decided to suspend with pay so we could begin an investigation. We just didn't feel it was appropriate that he be on the air, both knowing all this was going on and the potential possibility that the press could find out or would find out.

**Q Do you know who notified Mr. Mueller of that decision?**

A Eddie did.

**Q Was there any question in your mind as of the evening of June 2nd, 2013, that Mr. Mueller had inappropriately touched Ms. Swift?**

A Yes, there was a question.

**Q You had not yet made up your mind?**

A No.

**Q What happened next with respect to the alleged incident between Mr. Mueller and Ms. Swift?**

A I'm not sure whether in one of my conversations

with Eddie that I didn't have him give my cell phone information to Frank Bell. I don't think he had it prior to that. And I believe that evening Eddie said that Frank would call me in the morning or -- I'm not sure whether I called Frank or he called me, but it was sometime early in the morning before I left for work. So we arranged the opportunity that we would talk the next morning.

**Q So that was Monday?**

A That was Monday morning.

**Q Okay. And so whether you called Mr. Bell or he called you, you spoke to Mr. Bell early on June 3rd?**

A On June 3rd.

**Q And what do you recall about that conversation?**

A Well, I recall very vividly that there was a picture. And I asked him could I get a copy of the picture. And he said that he would send it to me, but that it basically was for my eyes only. It's not a picture he wanted to get out.

He relayed the incident, the fact that Taylor's mom was very upset, and that when I saw the picture, it would be clear what had happened. And I told Frank that we had suspended Mueller for the day; that we take this type of thing very seriously; and that we would begin an investigation right away.

And I said that I knew I had more questions, but

I didn't really know what questions I had at that moment beyond -- I hadn't even seen the picture. And he understood, said he knew, you know, we would give the situation a fair consideration and do the right thing.

He was going to be traveling, I believe, back to Nashville, and he probably would not be available Denver time until maybe very late morning or early afternoon. And I told him that I would have some questions, that I would definitely have some questions for him at that time and please send the photo, which he e-mailed to me.

**Q What did you think Mr. Bell meant when he said, "I'm sure you'll do the right thing"?**

A Well, I believe that they were obviously -- from what I could tell -- embarrassed, upset, angry over the incident. And my belief would be that probably would run the gambit of some type of disciplinary action, maybe a suspension, maybe up to and including termination. We never discussed what "the right thing" was.

**Q Was there any doubt in your mind that what Mr. Bell wanted you to do is to fire Mr. Mueller?**

MR. BALDRIDGE: Objection, form and foundation.

MR. DOWDLE: Objection, form, foundation and speculation.

**Q (By Mr. McFarland) You can answer.**

THE DEPONENT: I can answer?

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

MR. BALDRIDGE: Yes.
A Would you ask me the question one more time?
**Q (By Mr. McFarland) Yes. Was there any doubt in your mind that what Mr. Bell wanted you to do was to terminate Mr. Mueller?**
MR. BALDRIDGE: Same objections.
MR. DOWDLE: Objection, form and foundation, speculation.
A Yes, there was doubt in my mind.
**Q (By Mr. McFarland) Did Mr. Bell ask you to terminate Mr. Mueller ever?**
A Never.
**Q Did he ask you to take any specific action?**
A Never.
**Q How did he describe the alleged incident to you?**
A I'm sure he described it in our early morning call and then at length late morning when he had arrived in Nashville. He indicated that Mueller had gone in a tented area where Taylor was taking photos. Shannon Melcher, at the time Mueller's girlfriend, was there. Taylor was in the room.
And this was just a small group coming in, I guess the standard kind of backstage meet and greet photo session. And maybe there was a security person and a photographer and that there wasn't -- I don't recall any

information leading up to it, maybe small talk or something. But when the picture was taken, he had his hand in an inappropriate place.
**Q Did Mr. Bell tell you that Mr. Mueller had grabbed Ms. Swift's rear with his hand?**
A I'm not sure. I recall "lifting the dress." I'm not sure what the action of touching was. But lifting the dress or skirt was very much a part of his explanation of what he had done.
**Q Did Mr. Bell tell you -- so Mr. Bell told you that Mr. Mueller had put his hand under Ms. Swift's dress and lifted it up?**
A Yes.
**Q So did Mr. Bell tell you that Mr. Mueller had inappropriately touched Ms. Swift's rear?**
A Yes.
**Q Did he tell you whether that touching occurred over her clothing or underneath her clothing?**
A No. I suppose "lifting up a dress" made it clear it wasn't over the clothing.
**Q Your impression after talking to Mr. Bell was that Mr. Mueller -- the touching happened underneath Ms. Swift's clothing?**
A Yes.
**Q During that conversation, did you -- well,**

Foundation

**during that conversation, Mr. Bell also relayed to you the people that were in the room when the alleged incident took place?**
A Yes.
**Q Did Mr. Bell indicate whether he had talked to any of those people?**
A I don't recall.
**Q Did Mr. Bell relate to you whether he spoke with Ms. Swift about the incident?**
A I don't recall.
**Q Do you know where Mr. Bell was getting his information with respect to the alleged incident?**
A I do know, because he made it very clear that he had talked to Taylor's mother. And I probably presumed he also talked to the security person, which I should remember his name, which I think I've got in some of my notes, Craig, with an Australian or British accent and maybe a photographer.
**Q But he didn't tell you and you don't otherwise know whether he talked to anybody other than Ms. Swift's mom?**
A No.
**Q Do you recall anything else about your initial conversation with Frank Bell about the alleged incident between Mr. Mueller and Ms. Swift?**

Misstates Testimony; Compound Question

A Well, we talked quite a bit about the fact that -- I asked the question, "Did Taylor say anything about what happened when this occurred?" And he said that Taylor did not want to make a big incident out of it and that as soon as Mueller had left the meet and greet tent, she informed security.
And that's when the process started. Security tracked Mueller and Melcher down, and I guess according to Frank there were words and David indicated that it's all wrong. I think he made a comment of, "Well, let's get the police involved," or something like that I remember.
**Q Mr. Mueller made a comment that he wanted the police involved?**
A I think according to Frank, "Let them come and investigate this."
**Q Okay. Anything else that you can recall about that initial conversation with Mr. Bell?**
A There were two conversations: The first one early in the morning; and the next one late morning. And I think the late morning one I probably had a few questions at that point for -- you know, Were there any other cameras? Was there anyone else in there -- no, I take that back.
I did not ask the camera question at that moment. That was after meeting later with Mueller. I

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

Incomplete

think it was just pretty much me stating the facts as Frank knew them.

Q Is there anything else that you can recall about your initial two communications? Well, let me ask this: Is your first conversation with Frank Bell distinct in your mind from your second conversation with him regarding the incident?

A It's distinct in that he was going to send me the photo. And by the time the second conversation took place, I had the photo.

Q Okay. And what was your impression of what the photo showed?

A My impression? He had his hand in a pretty inappropriate place.

Q You believe that in that photograph Mr. Mueller's hand is touching Ms. Swift's rear?

A I couldn't conclude from that photograph because it does not have a dimensional aspect to it that he's touching her, is about to touch her or has just touched her. I concluded his hand is at a place that is inconsistent with -- in my experience -- most artist's photos that I've seen.

And I also concluded that it's pretty clear when you look at the picture, to me, that Taylor is trying to edge herself away from or orient herself more physically

to Shannon. So if you're looking at the two, it just feels, to me, very odd.

Q Did Mr. Bell communicate to you that Ms. Swift pulled away in any form or fashion from Mr. Mueller?

A Yes.

Q Did you note -- well, Ms. Melcher is in the photograph as well?

A Yes.

Q Did you note where her hands were in the photograph?

A No.

Q What about Ms. Swift's hands? Did you see where Ms. Swift's hands were?

A I'm sure I did. I don't recall anything about them being in an inappro- -- I mean, it looked just like standard people who put their arms around each other trying to get a photo.

Q What did you do after your second conversation with Mr. Bell on June 3rd?

A We set up a meeting. Eddie set that up for David to come in early in the afternoon.

Q That would have been early afternoon on Monday the third?

A The third. Right.

Q Okay. And did that happen?

A Yes.

Q Before you met with Mr. Mueller, did you have a meeting with Mr. Haskell, Mr. Dimick and perhaps others to discuss Mr. Mueller?

A Yes. It was a telephone conference call for at least half of the parties. Eddie was in my office and Maureen Marsh, our HR manager, was in my office.

Q And who was on the phone?

A Phil Bonomo, our attorney; Kereen Beckwith, our Lincoln Financial VP of HR; I think Don was on the call and John.

Q And when did that meeting, slash, conference call take place?

A That would have been late morning, prior to my second conversation with Frank.

Q Before your second conversation?

A Yes.

Q Without disclosing communications with your counsel, what do you recall about the communications in that meeting with Mr. Haskell and the other KYGO people?

MR. DOWDLE: Objection --

MR. DASH: Objection --

MR. DOWDLE: -- to the extent it's privileged.

MR. DASH: Sorry, Mike, go ahead.

MR. DOWDLE: I just said objection to the extent

Relevance

it's privileged.

MR. DASH: Yeah, Mr. Call, I just want to object and just caution you. I think Mr. McFarland is trying to be careful here, but I don't want you to discuss any conversations that you had directly with counsel or any advice that counsel might have given during this conference call.

You're not to be discussing any communications directly with counsel or information provided by counsel for the purpose of them giving advice.

THE DEPONENT: Understood.

Q (By Mr. McFarland) With that instruction or limitation, what can you tell me about the communications that occurred during that meeting of the KYGO folks in the late morning of June 3rd?

A Nothing.

Q All of your communications were directed at or with counsel?

A Yes.

Q Did anybody else say anything that was not directed to counsel?

A Not that I recall.

Q Were decisions made as a result of that meeting?

A No.

Q What did you do next?

Improperly draws attn to jury of lawyer discussion & instruc re: att-client privilege. First sentence should not be presented to jury

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

28

A Then I either waited for Frank to call me or I called him.
Q Okay.
A And so I want to say that was 11 or 12-ish my time -- Denver time.
Q And you've already told me what you can remember about --
A Right.
Q -- that second conversation?
A Correct.
Q And then you met with Mr. Mueller?
A Eddie set up the meeting for two o'clock.
Q Okay. And Mr. Mueller arrived at the designated time?
A Yes.
Q And he met with you and Mr. Haskell?
A Yes.
Q How long did you meet?
A Oh, at least an hour.
Q And did that meeting take place in your office?
A Yes, it did.
Q What do you recall about the -- well, did anybody else participate in that meeting?
A No.
Q Was there anybody on the phone listening in?

29

A No.
Q Was there any -- did you make any recording of that conversation?
A No, I did not make a recording.
Q Do you know whether Mr. Haskell did?
A I don't believe Mr. Haskell made a recording.
Q And you understand now that Mr. Mueller did record the meeting?
A Yes.
Q What do you recall about the communications at that meeting?
A The communications back and forth?
Q Yeah.
A They were cordial. He denied the incident occurring; indicated that if there were more cameras or other camera angles, it would vindicate him; that I could see that wherever his hand was, it wasn't near her body; and that he had been was distracted.
I'm not sure what the distraction was, but that they were moved along very quickly and that he was drawn into the picture at the last minute. And he said the picture looks the way the picture looked because it was a last-minute thing to get in the picture and smile.
Q Okay. Do you recall anything else about the communications during that meeting?

30

A He spoke about how disrespectful the security people were. He indicated over and over that this wouldn't have happened if Taylor had known he worked for KYGO. And I recall probing that to try and understand what that had to do with her story.
And we had a conversation that Shannon had identified herself as being with KYGO. And I recall asking, "Well, wouldn't she assume that you were with KYGO?" And he didn't think that was necessarily the case and continually discussed and brought up the fact that this would not have happened if she had known he worked for KYGO.
And I continually asked him, "Why? What difference does that make? Help me understand the relevance of that." And I never got an answer.
Q Did you inquire of Mr. Mueller about who else was in the room at the time of the alleged incident?
A Yes.
Q And who was in the room?
A He confirmed obviously Taylor, Shannon, at least a security person he presumed and a photographer. And he didn't believe there was anyone else maybe behind the photographer. He pretty much identified the numbers that I had been given earlier.
Q Did you make any effort to talk to the

31

photographer?
A No.
Q Did you make any effort to talk to the security person?
A No.
Q Did you make any effort to talk to Ms. Melcher?
A I did not. I recall that our HR manager, Maureen Marsh, did.
Q Did you ask Ms. Marsh to discuss the incident or the alleged incident with Ms. Melcher?
A I'm not sure who asked her to do it. I think that was just part of the nature of our protocol that she had been in the picture and we were trying to evaluate that. And I'm not sure what time that took place.
Q As part of your investigation -- you did conduct an investigation?
A Yes.
Q As a part of that investigation, did you come to understand Ms. Melcher's recollection of the alleged incident?
A My understanding is she didn't recall him touching her at all. I don't recall her saying he didn't, she just didn't recall.
Q And I'm sort of going back to your conversations with Frank Bell. I think you testified that Mr. Bell

10 (Pages 28 to 31)

Thomas T. Tomko & Associates (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

32

indicated to you that as soon as Mr. Mueller left this little area, this little room where the photograph was being taken, Ms. Swift contacted security; is that right?
MR. BALDRIDGE: Objection, form and foundation.
MR. DOWDLE: Same objections.
Q (By Mr. McFarland) You can answer it.
A I don't recall.
Q (By Mr. McFarland) You don't recall whether Mr. Bell told you at what point in time Ms. Swift advised anyone that she had been inappropriately touched?
MR. BALDRIDGE: Same objections.
MR. DOWDLE: Same objections. You can answer it.
A I believe he and Shannon had left -- as I understand -- the photo situation wherever they were set up. And I'm not sure where in the Pepsi Center they were, where this tent was, but it was set up. They had already left and that she had then informed security what had happened.
Q (By Mr. McFarland) Do you know what the security person's name is that was in the room at the time of the alleged incident?
A Not in the room. I recall a Craig -- someone with a British or an Australian accent. And I think in my notes I had his name or his first name. I don't know.

33

Q Did you ever ask Mr. Bell whether he had personally talked to any of the other people who were in the room at the time of the alleged incident?
A No.
Q Did he indicate to you that he had talked to any of the other people in the room at the time of the alleged incident?
A I don't recall.
Q Would you agree that as a part of your investigation into the alleged incident, you should have talked to the people in the room at the time of the alleged incident?
MR. DOWDLE: Objection --
MR. BALDRIDGE: Objection -- go ahead.
MR. DOWDLE: Objections to form, speculative, argumentative.
MR. BALDRIDGE: I will join those three and add foundation.
MR. DASH: Same objections.
Q (By Mr. McFarland) You can answer it.
A No, I never considered talking to him --
Q Why?
A -- as a part of my investigation. I didn't need that information.
Q You didn't need to know what the other people in

Speculative
Argumentative

34

the room saw with respect to Mr. Mueller's interactions with Ms. Swift?
MR. DOWDLE: Objection, argumentative, foundation and form.
MR. BALDRIDGE: And I join those three.
MR. DASH: Same objections.
A No.
Q (By Mr. McFarland) Why?
A In my meeting with Mr. Mueller, I had three components in my decision. I had a picture that appeared very inappropriate, but a picture only. Secondly, I had feedback from a person that I've known for many years, trusted, had no reason to tell me anything that was incorrect that had occurred.
And third, Mueller said to me, "I didn't do it; but if I did, it was incidental." So I had a picture, I had Taylor's comments through Frank and he changed his story that it couldn't have occurred, then that it was incidental.
Q How did he change his story?
A He said he didn't do it numerous times, and then he said, "If I had, it was incidental." And I thought that's very different from "I didn't do it."
Q And if, in fact, it had been incidental contact, you still would have fired Mr. Mueller?

35

A It wasn't just the incidental contact. I had the feedback from Frank Bell, from what I consider both a good source and a reputable source, and the picture.
Q Is it fair to say that you relied heavily on what Mr. Bell told you?
MR. BALDRIDGE: Objection, form.
A I looked at all the facts.
Q (By Mr. McFarland) But you relied on the picture, what Mr. Bell told you and Mr. Mueller's statement that if he did touch her, it was incidental?
MR. DOWDLE: Objection, asked and answered multiple times.
MR. BALDRIDGE: The same and argumentative, in fact, at this point.
MR. DASH: Same objections.
Q (By Mr. McFarland) Those were the three factors you relied on in making your decision?
MR. BALDRIDGE: Same objections.
MR. DOWDLE: Same objections.
MR. DASH: Same objections.
MR. DOWDLE: You can go ahead.
A Yes.
Q (By Mr. McFarland) Did you ask any professional to evaluate the picture, the photograph of Mr. Mueller and Ms. Swift and Ms. Melcher?

Misstates testimony
Argumentative

11 (Pages 32 to 35)

Thomas T. Tomko & Associates (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

36

A No.

**Q Since Mr. Mueller's termination, have you had other communications with KYGO personnel about Mr. Mueller?**

A Eddie. Maureen. I think that would be the extent of it up until the press hack in the Fall.

**Q Okay. What do you recall about your conversations with Mr. Haskell after Mr. Mueller's termination about Mr. Mueller?**

A We talked mostly about the next move. We had just hired Tracy Dixon to be the third member in the show and would she be capable of being a two-person show?

In the contract for both Ryno and Jackson it had a clause that if one left, we could terminate the other. We had a brief conversation regarding Ryno -- I'm sorry, Ryan Kliesch -- and decided that we wanted to keep Ryan.

And we actually had a meeting with him to convey that to him. We didn't talk about the incident -- he was just worried that this could cost him his job as well -- and that we were going to go forward with Ryno and Tracy subsequent to the termination.

That was really about the radio station, what we're going to do with the mornings; if this gets out, damage control; what our position needs to be; those kinds of things.

37

**Q And if word got out, what was your position going to be?**

MR. BALDRIDGE: Objection, speculation.

MR. DOWDLE: Same objection.

A We would have had no comment on employee matters.

**Q (By Mr. McFarland) And what were your conversations with Maureen about Mr. Mueller? What did they involve?**

A I think our conversations through this process with Maureen were primarily making sure, you know, we had things documented. We went through whatever proper protocol for HR, those kinds of things. She was, I think, certainly advisory, but she was not a decision maker.

**Q Did you send the -- how did you receive the photograph of Ms. Swift, Ms. Melcher and Mr. Mueller?**

A I received it by e-mail. It came in on my phone. I was at C-470 and Broadway, so I pulled off to the side of the road to look at it.

**Q Okay. And did you provide a copy of that to anyone?**

A I forwarded a copy to John Dimick.

**Q Anybody else?**

A I don't know that I forwarded it to Phil Bonanno, our attorney, or John did -- and to Jen Petruccelli, the

38

legal counsel for Lincoln National in Philadelphia.

**Q Did you send a copy to Eddie Haskell?**

A I don't recall.

**Q Did you send the photograph to Maureen?**

A Yes.

**Q Did you send it to anybody else that you can think of at KYGO?**

A Only John, possibly Don, Kereca -- no, no one else.

**Q Did you send that photograph to anyone else outside of KYGO?**

A No.

**Q Did you take notes during your meeting with Mr. Mueller?**

A Yes.

**Q And how did you record your notes?**

A Handwritten.

**Q Had a pad of paper, probably not unlike this? (Indicating legal pad.)**

A Had a pad of paper. Had a handful of questions, jotted down key points or his answers.

**Q Where are those notes now?**

A I think you have them. I transcribed them from my nearly impossible handwriting to something that could be readable. And ultimately, I think the first place they

39

went -- the only place they went beyond Maureen was to Jen Petruccelli.

**Q What did you do with the handwritten version of your notes?**

A Shredded them. Got rid of them.

**Q Why did you do that?**

A Because I thought and believed the notes I transcribed from the meeting were fully accurate, and I was comfortable with having something that was legible.

**Q Did you transcribe the notes to a computerized version yourself?**

A Yes.

**Q You sat there at the machine and typed them in?**

A I was -- it was up in here in my head. So I didn't have it transcribed by anyone. I just went through my notes and the meeting as it occurred as I recalled, as freshly as I could. It was that afternoon.

**Q Okay. So that was my next question. So you went through that process later that day in the afternoon that you met with Mr. Mueller?**

A I would say it probably started within an hour.

**Q When did you make the decision to terminate Mr. Mueller?**

A Tuesday morning.

**Q Okay. So that was the day after the meeting and**

Relevance

12 (Pages 36 to 39)

Thomas T. Tomko & Associates (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

40

after you typed up your notes?
A I had one more conversation with Frank, I recall, fairly late that evening and asked questions about security, the possibility of other cameras, things like that. And he said there wasn't anything there in the tent.
Q And during that conversation, did you ask him whether there were any witnesses or whether any other witnesses happened to see the alleged incident?
MR. BALDRIDGE: Objection, form.
MR. DOWDLE: Same objection.
A I wanted to know who was in there at the time on several occasions and was consistently told that is was a photographer, a security-type person, Taylor, Shannon and Mueller.
Q Did you ask what those persons saw in terms of --
MR. BALDRIDGE: Objection, asked and answered.
Q (By Mr. McFarland) -- the related incident?
MR. BALDRIDGE: Objection, asked and answered multiple times.
MR. DOWDLE: And speculation.
A No.
Q (By Mr. McFarland) Who was in charge of KYGO's investigation?

41

A Principally me.
Q Was there anybody else working on the investigation under your direction?
MR. BALDRIDGE: Other than the five he already mentioned? Or who, Gabe?
MR. MCFARLAND: Well, I don't think he's mentioned anybody else who helped him --
MR. BALDRIDGE: He has too. The lawyers, the HR director --
MR. MCFARLAND: -- with the investigation.
MR. BALDRIDGE: -- in fact, he's mentioned them numerous people.
MR. MCFARLAND: I don't know that any of those people participated in the investigation.
MR. BALDRIDGE: Oh, he did. I thought -- that's clearly what he said, I just don't know if he's trying to change that it actually.
MR. DOWDLE: You can go ahead and answer it.
A I discussed with Eddie what he knew, where he was. Eddie was in a different area, so I realized fairly quickly that he did not witness any of it; although, I talked to Eddie several times about how quickly Frank got to him and the label person had gotten to him and the sequence of events as Eddie was finding out. So that was part of the evaluation process.

42

Q (By Mr. McFarland) Well, did anybody else participate in the investigation?
MR. BALDRIDGE: Objection, asked and answered.
MR. DOWDLE: Same objection.
A No.
Q Were any KYGO lawyers part of the investigation and the termination?
MR. DOWDLE: Objection, privileged.
MR. BALDRIDGE: Objection, asked and answered.
MR. DASH: Objection.
A A lot was discussed on the call.
Q (By Mr. McFarland) Well, I don't want to know what was discussed in the call, but I want to know if the lawyers at KYGO were involved in the factual investigation into the alleged incident involving Mr. Mueller and Ms. Swift.
MR. DOWDLE: You can answer that.
A I recall them asking a couple of questions about the facts, what I knew.
MR. DASH: Yeah, Mr. Call, I'm just going to direct you. I think that's a yes no question. Were they involved?
THE DEPONENT: Okay.
MR. DASH: I don't think you need to go beyond that. You're talking about the extent of the call. I'm

43

objecting on privilege grounds and so you probably shouldn't go beyond that.
Q (By Mr. McFarland) Do you know whether those attorneys had any communications with anybody else outside of KYGO about the alleged incident between Mr. Mueller and Ms. Swift?
MR. DOWDLE: Objection, to the extent it's privileged.
MR. MCFARLAND: That's a yes or no.
A No.
MR. DOWDLE: No.
MR. DASH: Gabe, look, I think you're getting into the attorney/client privilege when you're asking to the extent the lawyers were involved. You're asking what they might have done, what they might have communicated to Mr. Call. So I'm going to object. And I'm not going to have Mr. Call any of those questions.
MR. MCFARLAND: Well, just to be clear, Mike, the question was: Did they talk to anybody outside of KYGO about the alleged incident? And that's clearly not privileged.
MR. DOWDLE: It's clearly privileged.
MR. DASH: Actually, it's --
MR. DOWDLE: It's privileged because the --
MR. MCFARLAND: Hold on. I can't have both you

13 (Pages 40 to 43)

Thomas T. Tomko & Associates (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

guys talking at one time.

MR. DOWDLE: Go ahead, Mike. I apologize.

MR. MCFARLAND: So there's the Mike here. There's Mike on the phone. Go ahead.

MR. DOWDLE: I'll jump in after you, Mike.

MR. DASH: Mr. McFarland, the only way that Mr. Call would be aware of any communications that somebody outside of KYGO that were conducted by attorneys would be from those attorneys. So I don't understand how we can answer that question without invading the attorney-client privilege. And I'm going to instruct him not to answer it.

MR. MCFARLAND: Well, Mr. Baldridge just testified that --

MR. BALDRIDGE: I did not testify.

MR. MCFARLAND: -- they were not a part of the investigation.

MR. BALDRIDGE: I did not testify to anything. I'm not under oath here or anything. So I can you assure with absolute certainty that I testified to nothing.

MR. MCFARLAND: Did you have --

MR. DASH: Gabe, Gabe --

MR. MCFARLAND: -- anything you want to say, Mike?

MR. DOWDLE: I will object and instruct the

client, Mr. Call, not to answer if that question asks him about any activities involving counsel.

**Q (By Mr. McFarland) Do you intend to follow your attorney's advice and not answer this question?**

A Yes.

**Q Were you involved in any communications with KYGO attorneys and persons outside of KYGO regarding the alleged incident?**

MR. BALDRIDGE: At the same time? Or is that a compound question? Am I needing to object to form, compound or are you meaning one at a time?

MR. MCFARLAND: At one time.

MR. BALDRIDGE: Okay.

MR. DOWDLE: You can answer that. You may want to restate the question.

MR. BALDRIDGE: Yeah. You may have to restate it. It seems like you're asking the same question over and over.

MR. MCFARLAND: Well, it's a different question.

MR. BALDRIDGE: Okay. Help me to understand the distinction.

MR. DOWDLE: You can answer it. You can restate it. (Facing Mr. McFarland.) And you can answer it. (Facing the deponent.)

(Last question read.)

A Can I ask a question?

MR. BALDRIDGE: What did he ask? No. You can only give answers.

MR. DOWDLE: No.

**Q (By Mr. McFarland) What's your confusion?**

A I don't understand the question "outside of KYGO."

**Q People who are not employed or affiliated with KYGO.**

A There was no discussion with unaffiliated people.

**Q How about between the KYGO lawyers and Mr. Bell and you? Did any of those communications take place?**

MR. DOWDLE: Objection as to form. I think it's vague. I'm not sure -- I'm sorry, Gabe, I'm not sure what you're asking either right now.

**Q (By Mr. McFarland) Were there any conversations between you, Mr. Bell and any lawyer for KYGO?**

MR. BALDRIDGE: Objection, form.

A Concurrent conversations --

MR. DOWDLE: Yeah. That's the problem.

A -- or separate conversations?

**Q (By Mr. McFarland) I'm talking about a conversation where you're, for example, on a phone call together, all three of you talking about the alleged**

**incident.**

A Frank Bell was never on the phone with any of our attorneys or other KYGO employees.

**Q Have you ever met Mr. Baldridge before today?**

A Yes.

**Q When did you meet him?**

A Earlier this year he had come in.

**Q Do you remember when?**

A No, I don't recall the date. I'm sure I've got it somewhere.

**Q What do you recall about meeting?**

MR. DOWDLE: Objection as to the extent that it's privileged in the sense that other counsel may have been there.

MR. DASH: Yeah. I'm sorry, can I have the question back? Was it just simply did they meet?

MR. MCFARLAND: Yeah.

A Yes.

MR. DASH: Mr. Call, you're allowed to answer yes, no. You're not allowed to give substantive answers about any of those communications that you might have had.

THE DEPONENT: I answered yes.

**Q (By Mr. McFarland) Who attended that meeting?**

A Eddie Haskell and Maureen Marsh.

**Q Anybody else?**

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

48

A No.
MR. DOWDLE: Other than counsel?
You were there. (Facing Mr. Baldridge.)
MR. BALDRIDGE: Yeah.
MR. DOWDLE: Counsel was there.
A I'm sorry, I assume you understood that counsel was there.
MR. MCFARLAND: I take it that was testimony?
MR. BALDRIDGE: That was testimony.
MR. MCFARLAND: Okay. That was testimony. We've got it on the record.
A Those two gentlemen were there.
**Q (By Mr. McFarland) So Mr. Baldridge was there?**
A Mr. Dowdle.
**Q And your counsel, Mike, Mr. Dowdle, was there as well?**
A Yes.
**Q Was Kate?**
A I don't think -- maybe Mr. Dash was on the phone for part of that, I recall.
**Q Can you tell me about the substance of the communications during that meeting?**
MR. BALDRIDGE: I'm going to have to ask you a question, Gabe, to ascertain the applicability of the privilege. There is clearly a joint defense privilege to

Relevance Argumentative Lawyer Discussion

Improper Design of question to which the witness didn't answer

49

the extent you are maintaining any right whatsoever to assert claims against KYGO or its parents.
We are both under the threat of litigation from the identical set of circumstances. Unless you're going to waive that, there is a joint defense privilege.
MR. DOWDLE: I would assert the same privilege.
MR. MCFARLAND: Has a joint defense agreement been entered into?
MR. BALDRIDGE: There's no requirement that a joint defense agreement be entered into. I ...
MR. MCFARLAND: But has one been entered into?
MR. BALDRIDGE: None of your business.
MR. DOWDLE: The existence or nonexistence of that agreement is also privileged.
MR. MCFARLAND: I disagree with that.
MR. BALDRIDGE: It's good that you disagree.
MR. MCFARLAND: Would you read my last question?
MR. BALDRIDGE: That's okay, you can read it, but he's going to be instructed not to answer unless Mr. McFarland waives the right that I've referred to. Otherwise, it's clearly a joint defense privilege situation.
(Last question read.)
MR. DOWDLE: Objection, that's privileged information and I instruct you not to answer.

50

MR. DASH: I join in the objection and the instruction.
**Q (By Mr. McFarland) Are you going to follow your attorney's advice and not answer that question?**
A Yes, I am.
**Q How long did that meeting last?**
A Two hours, maybe.
**Q And it took place in your office?**
A Yes.
**Q Did you look at any documents during the meeting?**
MR. DASH: Objection -- objection, don't answer that question.
MR. DOWDLE: Objection, privilege.
MR. DASH: I'm sorry, if you want to ask him did he look at any documents? Yes. And the next follow-up question is: What documents did he look at? I'm objecting to that.
MR. DOWDLE: And I'm instructing him not to answer.
MR. MCFARLAND: Well, let's just take it one at a time.
**Q (By Mr. McFarland) Did you look at documents during the meeting?**
A Yes.

51

**Q How many?**
A I don't recall.
**Q Do you recall what they were?**
MR. DASH: Objection, don't answer that question, privileged.
MR. DOWDLE: Same objection, same instruction.
**Q (By Mr. McFarland) Do you intend to follow your counsel's instruction and not answer that question?**
A Yes.
**Q (By Mr. McFarland) What documents did you review during your meeting?**
MR. DOWDLE: Objection, privileged. I instruct you not to answer.
MR. DASH: The same objection and instruction.
**Q (By Mr. McFarland) Are you going to follow your attorneys' advice and not answer that question?**
A Yes.
MR. DOWDLE: Where are you going with this, Gabe? I mean, I think a judge is going to sanction you if you take this in front of him. I really do.
MR. MCFARLAND: You do?
MR. DOWDLE: These are communications between counsel and privileged.
MR. MCFARLAND: I'm going to tell you what. I don't think you've practiced here in Colorado --

15 (Pages 48 to 51)

Thomas T. Tomko & Associates (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

he's going to follow my instructions. I assume he's a big boy and he'll be able to do that. But as to whether or not communications between counsel is a privileged matter, I think it's very clear you've found your case law here in the great state of Colorado.

MR. MCFARLAND: Okay.

**Q (By Mr. McFarland) Have you had any other meetings with Mr. Baldridge?**

A That was the only -- there's been only one meeting with Mr. Baldridge.

**Q And so have you met with anybody else at Mr. Baldridge's office?**

A Katie.

**Q When did you meet with Katie?**

A Late in May.

**Q Where did you meet with Katie?**

A At the Doubletree across the street from the radio station.

**Q Did anybody else attend that meeting?**

A There was another attorney from the firm. I can't recall her name.

**Q Would it be Courtney Sullivan?**

A Yes, it was Courtney. Courtney was there. And Mike was there as well, Mike Dowdle.

**Q How long did that meeting last?**

*Cumulative; Asked & Answered - Redundant*

A A couple of hours. That was late afternoon into early evening.

**Q What was the substance of your communications?**

MR. DOWDLE: Objection, privileged. I instruct you not to answer.

MR. DASH: The same objection; the same instruction.

**Q (By Mr. McFarland) Mr. Call, do you intend to follow your attorneys' advice in not answering that question?**

A Yes.

**Q Did you look at documents as well during that meeting?**

A I don't recall looking at documents.

**Q Did you have any other meetings with Mr. Baldridge or anyone at his office?**

A No.

**Q Did you have any telephone conversations with Mr. Baldridge or anybody at his office?**

A There was a telephone conversation maybe ten days ago after I got the subpoena and Eddie received the subpoena.

**Q Was anybody -- who was the conversation with?**

A Mr. Baldridge. Katie may have been on the phone. Mike, I think was on the phone. And Mike Dowdle

*Cumulative; Asked & Answered; Redundant*

joined in the conversation at some point. Eddie Haskell was already -- was also on the call.

**Q What was the substance of those communications?**

MR. DOWDLE: Same objection; same instruction.

MR. DASH: Same objection; same instruction.

**Q (By Mr. McFarland) And I assume you're going to follow your attorneys' advice and not answer that question?**

A Yes, I will follow their advice.

**Q Okay. Any other telephone conversations with Mr. Baldridge or anybody at his office?**

A I believe there may have been one or two conversations with Courtney or Katie coordinating the visit.

**Q Other than your notes, which you've produced in this case, did you create any other document or records of interviews, anything like that?**

A No.

*Cumulative Asked & Answered; Redundant; Relevance*

MR. BALDRIDGE: Is it hot in here? It's not really humid in Colorado, is it? Is anybody else hot?

MR. MCFARLAND: Let's go off the record for a minute.

(Discussion off the record.)

MR. MCFARLAND: Back on the record. Let's go ahead and mark this as Call No. 1.

(Deposition Exhibit Call No. 1 was marked for identification.)

**Q (By Mr. McFarland) Mr. Call, let me hand you what's been marked as Deposition Exhibit 1.**

A Okay.

**Q Do you recognize Deposition Exhibit 1?**

A Yes.

**Q And that's a document that you created?**

A Yes.

**Q Following your meeting with Mr. Mueller on June 3rd?**

A Yes.

MR. DOWDLE: Except for the last page. Sorry.

A That's correct. The last page occurred several days later as the call from the press.

MR. DOWDLE: I'm sorry, I didn't mean to interrupt your ...

MR. MCFARLAND: That's all right.

**Q (By Mr. McFarland) Have you had a chance to recently review the contents of Deposition Exhibit No. 1?**

A Yes.

**Q To the best of your knowledge and information, are your notes there accurate in this?**

A They are accurate.

**Q Is there anything that you're aware of that is**

*Vague & Ambiguous; Asked & Answered*

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Robert Call, July 14, 2016

60

inaccurate?
A No.
Q During the course of today's deposition, we've referred to Mr. Haskell as Eddie and maybe by other names -- Eddie, Mr. Haskell. We understand when you use those terms, you were referring to Mr. Haskell the program director at KYGO?
A Yes.
Q And you've also referred to a Mr. Ryan Kliesch as Ryan or Ryno at times. Are we on the same page that we're talking about Mr. Ryan Kliesch who was an on-air talent for KYGO?
A Yes.
Q Okay. And whether we say David or Jackson or Mr. Mueller, we understand that we're talking about Mr. Mueller, who was also the on-air personality at KYGO; is that right?
A That's right.
Q I don't have any more questions for you. Thank you.
A Okay.
MR. DOWDLE: I have no questions.
MR. BALDRIDGE: I have no questions.
MR. DASH: I have no questions.
MR. MCFARLAND: You're done. Thanks for coming

61

in today.
(The deposition concluded at approximately 3:53 p.m. MDT this 14th day of July, 2016, after having been on the record for approximately 1 hour and 23 minutes.)

Signature/review requested; Mr. Dowdle to handle.

62

I, ROBERT CALL, do hereby certify that I have read the foregoing transcript and that the same and accompanying corrections sheets, if any, constitute a true and complete record of my testimony.

____________________
Robert Call

( ) No Changes ( ) Changes attached

Subscribed and sworn to before me this _____ day of __________, 2016.

____________________
(Notary Public)

My commission expires: __________
Address: __________
__________

63

STATE OF COLORADO)
) ss. REPORTER'S CERTIFICATE
COUNTY OF ADAMS )

I, Merry P. Boslough, a/k/a Pat Boslough, do hereby certify that I am a Shorthand Reporter and Notary Public within the State of Colorado; that previous to the commencement of this deposition, the Deponent was sworn by me to state the truth.

I further certify that this deposition was taken in machine shorthand by me at the time and place herein set forth; that it was thereafter reduced to typewritten form; and that the foregoing constitutes a true and correct transcription to the best of my ability.

I further certify that I am not related to, employed by, nor counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In WITNESS WHEREOF, I have affixed my signature and seal, Dated: 7/23/2016.

____________________
Merry P. Boslough
Stenographic Reporter

The Deposition of Robert Call, 7/14/16

18 (Pages 60 to 63)

Thomas T. Tomko & Associates (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY