# In The Matter of:

*MUELLER*

*vs.*

*SWIFT, ET AL.*

---

*STEPHANIE SIMBECK*

*June 28, 2016*

---

*CONFIDENTIAL*

*PURSUANT TO THE PROTECTIVE ORDER*

* * * * *

DEPOSITION DESIGNATED CONFIDENTIAL

PURSUANT TO THE PROTECTIVE ORDER

* * * * *

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

DAVID MUELLER,

Plaintiff,

vs.

TAYLOR SWIFT; FRANK BELL; ANDREA SWIFT a/k/a ANDREA FINLAY; SCOTT SWIFT; and JOHN DOES 1 - 5,

Defendants.

NO. 1:15-cv-01974-WJM-KLM

--------------------------------

Deposition of:

STEPHANIE SIMBECK

Taken on behalf of the Plaintiff

June 28, 2016

Reported by: Martha B. Davis, RMR, RDR, CRR
LCR No. 152

Job No.: WDC-090551

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
STEPHANIE SIMBECK - 6/28/2016

Page 2

APPEARANCES:

For the Plaintiff: M. Gabriel McFarland, Esq.
Evans & McFarland, LLC
910 13th Street
Suite 200
Golden, CO 80401
303-279-8300
gmcfarland@emlawyers.com

For the Defendants: J. Douglas Baldridge, Esq.
Courtney A. Sullivan, Esq.
Katherine M. Knight, Esq.
Venable, LLP
575 7th Street NW
Washington, D.C. 20004-1601
202-344-4703
jdbaldridge@venable.com
casullivan@venable.com
kmwright@venable.com

Also Present: Jesse Schaudies, Esq.

Page 3

INDEX

Questions by Mr. McFarland 5

EXHIBITS

No. 1: Sketch prepared by Stephanie Simbeck 50
No. 2: Letter, April 16, 2013, from Jay Schaudies to Stephanie Simbeck (SWIFT 0000256) 52
No. 3: Color photograph of Taylor Swift, Gary Mueller and his girlfriend (SWIFT 0000076) 54
No. 4: E-mail, June 2, 2013, from Gabby Liddicoat to Craig Thomas, Daryl Dixon, Erica Worden, Subject: Creep picture (SWIFT 0000074) 55
No. 5: Color photograph of Taylor Swift and Eddie Haskell (SWIFT 000075) 57
No. 6: Color photographs from meet-and-greet (SWIFT 0000194 - 0000211) 57

Page 4

The deposition of STEPHANIE SIMBECK was taken by counsel for the Plaintiff, pursuant to notice, at the offices of Cleeton Davis Court Reporters, LLC, 402 BNA Drive, Suite 108, Nashville, Tennessee, on June 28, 2016, for all purposes under the Federal Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing.

It is agreed that Martha B. Davis, being a licensed court reporter and notary public for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are not waived.

* * *

STEPHANIE SIMBECK

was called as a witness, and after having been first duly sworn, testified as follows:

Page 5

EXAMINATION

QUESTIONS BY MR. MCFARLAND:

Q. Would you state your full name for us, please.
A. Stephanie Simbeck.

MR. BALDRIDGE: And, Gabe, I would like to make a very brief statement just to be clear. To make sure I don't forget to do so, for all of the depositions over the next two days, I want to designate them confidential under the existing protective order. I understand you reserve rights with respect thereto.

We have security issues, locational issues, the-way-we-do-business issues that all impact the health and safety of certain people involved in the case, so I want to keep matters confidential.

MR. MCFARLAND: Understood.

MR. BALDRIDGE: Thank you.

BY MR. MCFARLAND:

Q. Do you live here in Nashville?
A. I do.
Q. What's your address?
A. 121 Shadow Creek Cove, Mt. Juliet, Tennessee.
Q. How far away is that from where we're at today?
A. 20 minutes.
Q. Okay. Did you grow up here as well?

2 (Pages 2 to 5)

DTI Court Reporting Solutions - Washington, DC
1-800-292-4789 www.deposition.com

Page 6

A. No. I grew up in Michigan.
Q. What part of Michigan?
A. A small place called Commerce Township, 30 minutes northeast of Detroit.
Q. I have grandparents in Mt. Pleasant. I don't think that's too far away, is it?
A. No.
Q. A couple of hours?
A. Yeah. It's not very far.
Q. Did you go to high school there?
A. Yes.
Q. Graduated from high school?
A. Yes.
Q. And did you go to college?
A. Yes.
Q. Where did you go to college?
A. Middle Tennessee State University.
Q. Did you graduate?
A. Yes.
Q. And what did you graduate --
A. A bachelor in music business.
Q. Any other education?
A. No.
Q. And what did you do after college?
A. I got a job at a management company as an assistant to a manager.

Page 7

Q. What management company?
A. Do I need to say that?
MR. SCHAUDIES: Yes. Sorry.
THE WITNESS: ROAR.
BY MR. MCFARLAND:
Q. R-O-A-R?
A. Uh-huh.
Q. And where was that located?
A. In Nashville. Downtown.
Q. And what did you do for ROAR?
A. I was an assistant to the manager, and then I became a manager and a tour manager.
Q. And how long did you work for ROAR?
A. Three years.
Q. What year did you graduate college?
A. 2006.
Q. So you worked at ROAR until about 2009?
A. 2010. Beginning of 2010.
Q. Okay. And then what did you do?
A. I went to a business management company.
Q. And what was the name of that company?
A. Flood, Bumstead, McCready & McCarthy, Inc.
Q. And why did you leave ROAR and go to Flood?
A. I was touring a lot and I just was kind of exhausted and wanted to try something different.

Page 8

Q. And what did you do at Flood?
A. I was an account assistant.
Q. And what kind of things were you doing on a daily basis? I'm just trying to get a sense of what you were doing.
A. Gosh, I don't know. Recons, billing, paying commissions. Anything accounting related really.
Q. Okay. And how long were you at Flood?
A. Until 2013.
Q. And where did you go then?
A. Here.
Q. And what is "here"?
A. Firefly Entertainment.
Q. And what were you hired to do for Firefly in 2013?
A. Run Club Red.
Q. What's Club Red?
A. It is her meet-and-greet.
Q. Do you remember when you started in 2013?
A. May 1st.
Q. And are you still in that position today?
A. Yes and no. When a tour happens, that's what I do. I'm currently doing security logistics and archiving.

Page 9

Q. So your job changes when you're on tour versus when you're not on tour?
A. Correct.
Q. And tell me what you're doing when you're on tour.
A. Okay. She -- I basically run her meet-and-greet area. We create a room from scratch, set it up, get it ready, and then I also take photographs for the meet-and-greets.
Q. So is there a creative aspect to setting up those rooms and doing that stuff?
A. Yes.
Q. And you handle that?
A. Correct.
Q. Okay. And then are you also in charge of the logistics of getting it built or set up or whatever is done at each of the venues?
A. Yeah. I physically set it up and tear it down.
Q. And then during the meet-and-greet you actually take photographs?
A. Uh-huh.
Q. Okay.
A. Yes.
Q. Any other I'll just say primary

Page 10

responsibilities when Taylor is on tour?
A. Not really, no.
Q. Okay. And it's -- your job is a full-time job?
A. Yeah. Oh, yeah.
Q. And you're on a salary?
A. Yes.
MS. SULLIVAN: Gabe, could I ask you to phrase them in the form of questions more than -- they're a little leading for her. Just if you would. That's all right.
MR. MCFARLAND: I'll give it a shot.
BY MR. MCFARLAND:
Q. Have your responsibilities while Taylor is on tour remained basically the same since you started in 2013?
A. Yes.
Q. Okay. And what kind of things are you doing while Taylor is not on tour? What are your job responsibilities when she's not on tour?
MS. SULLIVAN: Asked and answered.
THE WITNESS: I'm sorry?
MS. SULLIVAN: You can answer. He already asked you, but you can answer again.
THE WITNESS: I do security logistics and

Page 11

archiving.
BY MR. MCFARLAND:
Q. What does security logistics entail?
A. Scheduling our security team and then scheduling their travel, coordinating with her road manager.
Q. Is that for -- are you dealing with future events, future concerts, or just sort of the daily security that's required for Ms. Swift?
A. Daily. I mean, depending on what she's doing, it's daily.
Q. And what is the archiving function?
A. We have an archive of her items, her clothing, her instruments, awards.
Q. And what do you do in terms of the archiving, just collect those items and --
A. Yeah. I collect them. I put them in a database. Some of the stuff is sent out to museums, so it's checked in and checked out. Basically just making sure that what we have is what we have and is in good condition before it's sent out.
Q. Have you performed other functions while you have been employed by Firefly other than the security logistics and archiving?
A. I still deal with the fans when she does fan

Page 12

events. I mean, that hasn't changed.
Q. And what does that entail?
A. It depends on what she's doing with them. I mean, I still -- I'll take photographs if she's doing a meet-and-greet with them again or has an event. I'll be taking photographs of her and her fans. I help coordinate getting the fans there, whatever they need me to do as far as getting that taken care of and set up.
Q. When Ms. Swift is not touring, how much time are you spending with her?
A. Hardly any.
Q. Okay. And when she is touring, how much time are you spending with her?
A. I would probably say two and a half, three hours a show.
Q. Okay. Do you have any sense of the number of shows you have done with Ms. Swift?
A. I have done two tours. 80 plus shows a tour, so . . .
Q. Okay. Do you remember Taylor's June 2nd, 2014, concert in Denver?
A. Yes.
Q. Okay.
MS. SULLIVAN: Can I object to that,

Page 13

Gabe? That was -- are you asking about the concert at issue?
MR. MCFARLAND: Yes.
MS. SULLIVAN: Because I believe it was the 13th. I believe you misspoke and said June 2014.
MR. MCFARLAND: Oh, I'm sorry.
MS. SULLIVAN: So just for the record, is your question about the June 2nd, 2013, concert?
MR. MCFARLAND: 2013 concert, yeah.
MS. SULLIVAN: Thank you.
BY MR. MCFARLAND:
Q. So you remember the June 2nd, 2013, concert?
A. Yes.
Q. And that would have been your first tour?
A. Yes.
Q. Okay. And do you remember what show that was for you? It wasn't the first?
A. No. It was maybe my tenth show, tenth or eleventh show.
Q. When did you -- you came to Denver for that show?
A. Yes.
Q. Do you remember when you arrived?
A. Early morning.
Q. The day of the concert?

Page 14

A. Yes.
Q. Okay. Let's just kind of walk through that day. Do you remember what time you got to the -- do you remember where the concert was?
A. It was in an arena.
Q. Do you remember it being at the Pepsi Center? Does that mean anything to you?
A. It sounds familiar. If that's in Denver, then yes.
Q. What time did you get to the venue?
A. I can't recall an exact time.
Q. Early in the morning?
A. Early morning.
Q. Okay. And just kind of walk me through what you can -- what you do when you get to the Pepsi Center on that day or you get to the venue on that day.
A. The first thing we do is get up and go to catering and get breakfast and wait for -- I wait for my stuff to be unloaded off the trucks. And sometimes that's two hours after call time as to when I need to be in the venue, sometimes longer.
And then stuff rolls out and I start setting up the room. And that can take anywhere from an hour to two hours, sometimes longer, depending on what space we have.

Page 15

And then once it's all set up, I make sure that catering has our food ready and it's scheduled to be delivered on time. I make sure that the camera is set up, batteries are charged. What else? Make sure that we have enough signed photos.
And then at that point I think maybe -- in between there there is lunch and then there is dinner and then the meet-and-greet happens maybe an hour and a half before show time.
Q. Okay.
A. And then I think it's like 6:00 p.m. depending on when doors open. And then I'm in there waiting for the fans to arrive. And then when she's in there, I walk around the room, take photographs of her and the fans or VIPs and then that's pretty much it. And then during the show is a whole other story.
Q. Okay. What are you doing during the show?
A. During the show her mother and I are out in the crowd picking out 20 to 30 kids to come back after the show to do another meet-and-greet. Those fans are just selected randomly, so we're running around the arena picking out the fans.
Q. Do you recall the setup for the meet-and-greet in Denver?
A. Yes.

Page 16

Q. Do you recall what part of the arena --
A. No.
Q. -- the meet-and-greet was held in?
A. (Witness moves head from side to side.)
Q. You have to answer verbally.
A. No. Sorry.
Q. What was the -- describe the setup for me.
A. Well, the theme of the room was like a fifties diner, so the room is built with pipe and drape. It's a 30-by-30 room depending on the size of what room we had. And then inside that room is another separate room that's maybe 10 foot by 10 foot, so there is a square inside of the big square.
And then we had booths like diner booths and then a bar set up with a television. A photo booth was somewhere in the room. And then we have like this huge pillar that's in the middle of the room where our ceiling -- that's kind of like parachute material that comes down and flows to make a ceiling. I think that's all that was in there.
Q. Okay. So we have one sort of 30-by-30 room?
A. Correct.
Q. And the walls of that room are fabric?
A. Correct.
Q. And that's hung from some sort of pipe or wire

Page 17

or something around the outside?
A. Correct.
Q. And then within that 30-by-30 enclosure there is another 10-by-10 room?
A. Correct.
Q. And the 10-by-10 room is where Taylor typically is and where the photographs take place?
A. Yes.
Q. Okay. And all the booths and the photo booth and the pillar and those things, was all of that in the bigger room or in the smaller 10-by-10 room?
A. In the larger part of the room, the main part of the room.
Q. Okay. And what's the function of the larger area, the bigger part of the room?
A. It's kind of an area for people to come and hang out and eat and kind of socialize before she gets in there and when she's actually in there. It makes it more of a relaxed environment.
Q. Okay. Do you think -- can you just like sketch out like an overview --
A. Yeah.
Q. -- of that room?
A. Sure.
Q. Do you want a pen or a pencil?

Page 18

A. It doesn't matter.
MS. SULLIVAN: Here is another one if you want. Girl after my own heart. Can't use ballpoint.
THE WITNESS: That's the entryway. And then here -- let's say this is the door. We'll probably have booths here. The pillar is here. There are probably forms say here and there is like a television back here. The photo booth was probably over here and then there is like a -- there is a slit here in this curtain and a slit here in this curtain. And then there is like the additional fluff of lights and plants just to make it homey.
BY MR. MCFARLAND:
Q. And this is -- again, this is created somewhere inside the venue in Denver?
A. Correct.
Q. Where do -- well, who's allowed or invited to these meet-and-greets?
A. Fans, contest winners, VIPs from our sponsors and then radio.
Q. Okay. And so how do they get from -- how do they get to this room at the Pepsi Center?
MS. SULLIVAN: Objection. Vague.
BY MR. MCFARLAND:
Q. They come to the venue. They have some

Page 19

special ticket or pass or --
A. Yeah. They go to will call and they have instructions on where they need to go and meet and what time.
Q. Okay. On June 2nd, 2013, do you know whether there was security anywhere in or around this area?
A. There is always security in the venue.
Q. And would there -- was there any security in the bigger room here on June 2nd, 2013?
A. Well, we have a security person here at the door that sits there once the room is up.
Q. Okay. So there is one person outside the door?
A. Correct, that sits there once it's up and running. That way I don't have to stand in there and make sure no one vandalizes the room while I'm not in it.
Q. Okay. And do you know -- do you know who sat by the door June 2nd, 2013?
A. No.
Q. Was it somebody that you knew?
A. No.
Q. Is this typically the same person or is this typically a different person in each venue?
A. Different at every venue.

Asked and answered

Page 20

Q. Is this person -- do you know whether this person is typically employed by Taylor Swift or employed by the venue?
A. The venue.
Q. To the best of your knowledge, on June 2nd, 2014, was there any security personnel inside the bigger 30-by-30 area?
MS. SULLIVAN: Objection. Vague. Do you know timing? Can you put a timeframe on it?
BY MR. MCFARLAND:
Q. At any time on June 2nd.
A. Yes.
Q. Was that -- was it a person or more than one person?
A. More than one person.
MS. SULLIVAN: Gabe, maybe if you could narrow down a timeframe that you're talking about because they open the venue long before, so I think she's having difficulty trying to hone in on what you're asking because that's set up long before the concert starts.
BY MR. MCFARLAND:
Q. Is there security posted at -- this is the exit over here?
A. Yes, and entrance.

Page 21

Q. Can you just mark that as the exit, please?
A. Sure. (Witness complies.)
Q. And is there any security posted at the exit?
MS. SULLIVAN: Objection as to time.
BY MR. MCFARLAND:
Q. I think your testimony was after this gets set up, somebody comes and sits at what I'll just call the front door or the entrance?
A. Correct.
Q. All right. Does anybody sit at -- did anyone sit at the back door after this room was set up?
A. No.
Q. Okay.
A. Because this is not -- it's not an actual door. It's just pipe and drape. It's inside a room itself. Like, here would be the room. So then this space -- so the kids can come out and walk out and actually exit the room physically itself.
Q. Okay. But to the best of your knowledge, there wasn't somebody posted at the exit after the room was set up like there was at the entrance?
A. No.
Q. Within this larger room, is there -- is there a line to -- a line that forms to get into the room with Taylor Swift?

Asked and Answered

A. Yes.
Q. And do you remember where that line formed or how it formed at this particular venue?
MS. SULLIVAN: Objection. Vague. There is a lot that goes on in that room. Maybe you can break it down into small pieces for her.
BY MR. MCFARLAND:
Q. Why don't you explain what goes on in this room for me?
A. This is where she meets her fans and takes pictures.
Q. Okay. Does Taylor Swift spend time in this room, the bigger part of the room?
A. Yes.
Q. Okay. And what's going on? I mean, just sort of explain what's happening.
A. Sure. She -- we'll bring in the first meet-and-greet and they will be hanging out in here. There will be food for them to eat and drink, so they will be mingling amongst themselves while they wait for her to come in.
And then once she comes in, she kind of is walked around the room in no particular order but in an order if that makes sense. Like, there is no one way that she has to go around the room because everyone is

just kind of mingling, but she will be taken to each person in order.
Q. Okay.
A. And then she'll chat with them and take photographs and then at the end she'll make a little announcement. Her mom takes them on a backstage tour, so then that whole meet-and-greet group will leave and then the next one will be brought in.
Q. Okay.
A. And that happens kind of again.
Q. So that typically happens twice?
A. She does three.
Q. Three? Okay.
A. Uh-huh. So she will do that twice. The first two are radio people. So she'll do that twice. The second group will leave to do another backstage tour. And then the third meet-and-greet is when they come in and they're lined up, so they can be lined up this way to go into the room or they could have been lined up this way to go in the room, but it's single file. They don't mingle in this room. They don't eat. They don't drink. It's literally for them to just come in, into this room, talk to her for a minute or two, take a picture and exit.
Q. Okay. Do you know who Eddie Haskell is?

A. I don't recall that name.
Q. Okay. Do you know David Mueller? I should say do you know who he is?
A. Yes.
Q. Okay. He was in the third meet-and-greet; is that right?
A. Yes.
Q. So he was part of the group that didn't mingle out here but rather part of the group that came in, got in the line and then was ushered into this smaller room?
A. Yes.
Q. Okay. And the first two meet-and-greets are typically any radio personalities? Those are typically in the first -- one of the first two meet-and-greets?
A. Correct.
Q. Do you know why Mr. Mueller wasn't included in one of the first two meet-and-greets?
A. No.
Q. And before this concert, you didn't know David Mueller? You never heard of him?
A. No.
Q. On June 2nd, 2013, do you know whether there was additional security anywhere in this room, sort of the room around the 30-by-30 meet-and-greet room?

[Handwritten margin note: Misleading Compound Question Vague and Ambiguous Unintelligible]

A. Can you repeat that?
Q. Yeah. On June 2nd, 2013, do you know whether there was any security personnel in this -- I'll call it the main room where the 30-by-30 room was set up, the 30-by-30 tented area was set up?
A. Yeah. Yes.
Q. Do you know how many security or where they were?
MS. SULLIVAN: Objection. Compound.
THE WITNESS: It depends what time of day it is.
BY MR. MCFARLAND:
Q. Okay. So there is security going in and out and around all through here at various times of the day?
MS. SULLIVAN: Objection. Leading.
THE WITNESS: No.
BY MR. MCFARLAND:
Q. When was security personnel in this larger room?
A. Probably they were put there once the meet-and-greet started.
Q. And do you know approximately where they were positioned?
A. No.

[Handwritten margin note: Compound Question, Vague and Ambiguous]

Asked and Answered

Speculation Relevance

Page 26

Q. Or were they kind of walking around?
A. They're positioned.
Q. But you don't know where?
A. Correct.
Q. And do you know where -- whether any of those security personnel were Taylor Swift's security or whether -- were they provided by the venue?
A. Venue.
Q. Okay. On June 2nd, 2013, do you know approximately what time the third meet-and-greet group assembled in the meet-and-greet room?
A. I don't recall.
Q. Normally that would be how long before the show?
MS. SULLIVAN: Objection. Calls for speculation. You can answer.
THE WITNESS: Two hours?
BY MR. MCFARLAND:
Q. And do you recall what time the show started on June 2nd?
A. No.
Q. Where is -- well, let's focus on the third meet-and-greet for a minute. How does it -- how does it work? At a designated time the people who are invited assemble in this room?

Foundation Assumes facts not in evidence Vague and ambiguous

Misstates Testimony Speculation

Page 27

A. Correct.
Q. And it's set up in a way that they're either told or they're -- or it's set up in a way where they know to line up?
MS. SULLIVAN: Objection. Leading.
BY MR. MCFARLAND:
Q. Is that right?
A. Yes.
MS. SULLIVAN: Same objection.
BY MR. MCFARLAND:
Q. Do you know about how many people were invited to the third meet-and-greet in Denver on June 2nd?
A. I don't have an exact number.
Q. Do you have an estimate?
A. 80? I don't know for sure.
Q. And so those 80 people or so, they come in at the designated time and they line up in this larger 30-by-30 room?
A. Yes.
MS. SULLIVAN: Sorry. Go ahead.
BY MR. MCFARLAND:
Q. And at that time, is there security personnel -- is there still security personnel by the front door?
A. Yes.

Page 28

Q. Is there any security at the exit?
A. Yes.
Q. Is there security at the entrance to the smaller 10-by-10 room within the 30-by-30 room?
A. No.
Q. Is there any other security within the 30-by-30 room?
A. Yes.
Q. Are those -- that security personnel in specific locations?
A. Yes.
Q. And do you recall where those security personnel were positioned?
A. They're usually positioned in front of the food and/or the photo booth so the kids don't use those while they're in line.
Q. Is there anybody -- is there any security personnel positioned at the entrance to the 10-by-10 room?
A. No.
Q. Can you mark the entrance to the 10-by-10 room for us?
A. (Witness complies.)
Q. And during this third meet-and-greet, Taylor Swift is not in the larger area?

Vague and Ambiguous

Page 29

A. Correct.
MS. SULLIVAN: Objection. Leading.
BY MR. MCFARLAND:
Q. She's in this smaller 10-by-10 room?
A. Correct.
Q. And on June 2nd, 2013, during the meet-and-greet, who else is in this 10-by-10 room with Taylor?
A. Myself, the road managing assistant or tour manager assistant, her assistant and her road manager and security.
Q. Who was the tour manager that was in this room, this 10-by-10 room, on June 2nd?
A. Erica Worden.
Q. And who was Erica Worden's assistant?
A. Abby. I don't remember her last name.
Q. Okay. So you're in the room, Taylor is in the room, Erica Worden is in this 10-by-10 room and Abby is in the room --
A. Correct.
Q. -- correct?
MR. BALDRIDGE: She also said security just to be clear.
MR. MCFARLAND: Yeah. Yeah. Thanks.
BY MR. MCFARLAND:

Midstates Testimony, Relevance

Page 30

Q. The road manager is also in this room?
MS. SULLIVAN: Objection. Leading.
THE WITNESS: No. Erica Worden is -- and road manager and tour manager are the same thing. Sorry.
BY MR. MCFARLAND:
Q. And there was also security in the room?
A. Yes.
Q. And was that security personnel, was that a -- somebody hired by Ms. Swift or provided by the venue?
A. Ms. Swift.
Q. Is that a person that you knew or know?
A. Yes.
Q. Who was in that room?
A. Greg Dent.
Q. Was there anybody else in the 10-by-10 tented area at any time -- well, I shouldn't say -- was there anybody else associated with Ms. Swift in this 10-by-10 room during the third meet-and-greet?
A. Her assistant.
Q. Ms. Swift's assistant?
A. Yes.
Q. And that is?
A. Gabby.
Q. Liddicoat?

Page 31

A. Liddicoat, yeah.
Q. So Gabby and Abby were in this 10-by-10 room --
MS. SULLIVAN: Objection. Leading.
BY MR. MCFARLAND:
Q. -- on June 2nd?
A. Yes.
Q. Was there any particular -- well, did the people that we just talked about, did they have any particular place or position within that 10-by-10 room?
A. Yes.
Q. Okay. Where -- where were you typically located?
A. Here.
Q. Okay. Can you just maybe -- just write your name there for us.
A. Sure. (Witness complies.)
Q. Okay. And was Taylor generally in a spot or a position?
A. Yes.
Q. Where was she?
A. (Indicating)
Q. Okay. And how about Gabby and Abby? Where were they generally located?
A. (Indicating)

Page 32

Q. And how about Greg?
MS. SULLIVAN: Do you remember?
THE WITNESS: Specifically in this room?
BY MR. MCFARLAND:
Q. Yeah. Was he sitting or standing?
A. He was standing.
Q. Okay.
A. He was on either side of her, I believe.
Q. Okay. He was generally to the left or to the right of Taylor?
A. Correct.
Q. Okay. And how about Erica?
A. She was here (indicating).
Q. Did Erica have a specific function during this third meet-and-greet?
A. Yes.
Q. What was her job?
A. She would check in the next group of people and get them ready, so she would be in and out of this curtain. And so she would be out here checking in, seeing how many people are in their group, and once they were ready, she would step back in, letting me know that it was time to take a picture and trying to get the fans to actually, like, take a picture.
Q. Okay. Do you know what the check-in process

Vague

Page 33

is?
MS. SULLIVAN: Objection. Vague. At what point in time or where?
BY MR. MCFARLAND:
Q. The check-in process you just described here where the third meet-and-greet people are standing or lined up within the 30-by-30 room and they're waiting to go in and meet Taylor.
A. Yes. She -- they're standing here. She asks, "How many are in your group?" And then they're given a little card with information on how to retrieve their photo.
Q. Okay. Are they asked for, you know, what's your name? Is there a check-off on a list or anything like that?
A. I'm not a hundred percent.
Q. Okay. Did Abby have a specific function during this third meet-and-greet?
A. I believe so.
Q. Do you know what it was?
A. She either had signed photos or she was helping assisting Erica, would take gifts, I think, maybe. I don't remember.
Q. If one of the fans had a gift or something for Taylor, Abby might take that?

Improper characterization of testimony which the witness did not answer

Page 34

MS. SULLIVAN: Objection. Leading.
THE WITNESS: Correct.
BY MR. MCFARLAND:
Q. Okay. Did Gabby have a specific function?
A. Yes.
Q. And what was her function?
A. She would be the one giving the signed photos to the fans as they left and help kind of usher them out so the next group could come in.
Q. Okay. And your role was to take photographs?
A. Correct.
Q. What is -- is there anything going on in this sort of larger area where the 30-by-30 room is set up?
A. No.
Q. There is not a bar or there is not a --
A. No.
Q. Nothing in the immediate vicinity?
MS. SULLIVAN: Objection. Vague as to time.
BY MR. MCFARLAND:
Q. Are fans allowed to bring, you know, purses and phones and backpacks and that kind of stuff into this 10-by-10 area?
A. No.
Q. Okay. Is there a process or a place for, you

Page 35

know, here, put your purse over here or I'll take your purse or how does that work?
A. Yes. Everything is to be left outside the room on tables that are provided.
Q. And that's outside the 30-by-30 room or outside the 10-by-10 room?
A. Outside the room itself.
Q. Outside the 30-by-30 room?
A. Correct.
Q. And so there must be tables or something by this front door?
A. Correct.
Q. And you may have just answered this and I missed it. What -- are the fans allowed to bring anything into this 10-by-10 room?
A. No.
Q. So everything they have, whatever they have, goes out here on the tables?
MS. SULLIVAN: Objection. Asked and answered.
THE WITNESS: Correct.
BY MR. MCFARLAND:
Q. Do you recall taking David Mueller's photograph on June 3rd?
A. Yes.

Asked and Answered

Misleading

Page 36

MS. SULLIVAN: Objection. I think you got the date wrong again.
BY MR. MCFARLAND:
Q. I'm sorry, June 2nd. That's what you meant; right?
A. Yes. Yes.
Q. You and I both.
A. Sorry.
Q. Do you recall how -- was he at kind of the beginning or the middle or the end of the photographs?
MS. SULLIVAN: Objection. Vague as to the photographs. She testified she was taking photographs all night.
THE WITNESS: Middle end. Towards the end.
BY MR. MCFARLAND:
Q. He was towards the end of the third meet-and-greet?
A. Yes.
Q. Okay. Do you have an estimate of approximately how many people met with Taylor during the third meet-and-greet before Mr. Mueller?
A. No.
Q. Do you have an estimate of how many people met with Taylor after Mr. Mueller met with her?

Page 37

A. No.
Q. Tell me about the photographs that you take. What kind of equipment do you use?
A. It's just a Canon. I don't know the specific kind. I don't recall what specific Canon it was.
Q. Okay. Digital?
A. Digital.
Q. And what do you do -- well, let me -- what do you generally do with those photographs after the meet-and-greet is over?
A. The SD card that is in the camera is given to Gabby to upload.
Q. And do you know how she uploads those pictures?
MS. SULLIVAN: Objection. Calls for speculation.
THE WITNESS: I believe they're put into a Dropbox.
BY MR. MCFARLAND:
Q. Do you know whether she does that through a personal computer or where she goes to do that or what any of the logistics are?
A. I don't.
Q. After the third meet-and-greet on June 2nd, did you give the SD card to Gabby to upload?

Page 38

A. Yes.
Q. Do you know whether those pictures are still available?
A. I do not.
Q. Do you know who maintains those photographs?
A. No.
Q. That's not part of your archiving function?
A. No.
Q. Do you know who is in charge of the photographs that you take at the meet-and-greets, who is in charge of maintaining them?
A. No.
Q. If you wanted a picture from one of your previous meet-and-greets, who would you contact?
A. I don't know.
MS. SULLIVAN: Do you need a break or anything?
THE WITNESS: No.
BY MR. MCFARLAND:
Q. What do you -- tell me what you recall about David Mueller from June 2nd, 2013.
MS. SULLIVAN: Objection. Overly broad. You can answer.
THE WITNESS: He was a fan. I don't know. I don't know how to answer that.

Page 39

BY MR. MCFARLAND:
Q. Was there anything remarkable -- well, do you remember who he came into the room with?
A. A female.
Q. Do you remember him coming into the room?
A. No, not specifically.
Q. Was there anything remarkable about him or the female that he was with? Anything stand out to you?
A. No.
Q. Tell me what you can remember about -- well, what happened when Mr. Mueller and his female friend entered the 10-by-10 room on June 2nd, 2013?
A. They entered. They had a conversation, very briefly, and then they went to pose for a photo. And I remember looking through the lens and seeing Taylor kind of have an uncomfortable, shocked look on her face and she fell into the female. And I saw a hand behind her butt. And I thought maybe she just kind of had tripped or -- you know, on her heels, but my intuition said that it wasn't the case based on her face. And she smiled and I snapped the photo.
And before everyone leaves, I make sure all the eyes are open in the photograph, and at that point I realized what I thought happened or what I saw through the lens was actually correct. All their eyes

Compound Question

Page 40

were open, and they were quickly shoved out of the room.
Q. Okay. And then what happened?
A. Then before leaving the room, our next group of fans were pretty much entering.
Q. Okay. And then just sort of the normal course continued, the fans would come in, there would be a short conversation, you would take a picture?
A. Yes.
Q. They'd get their signed picture and then they would go out the door?
A. Correct.
Q. And you don't recall about how many people came into the room, had their photograph taken after Mr. Mueller?
MS. SULLIVAN: Objection. Asked and answered.
THE WITNESS: No.
BY MR. MCFARLAND:
Q. About how long was it from the time Mr. Mueller's photograph was taken until the third meet-and-greet concluded?
A. 15, 20 minutes. I don't remember.
Q. During that 15- or 20-minute time period, did Taylor say anything to you about Mr. Mueller?

Asked and Answered

Asked and Answered

Page 41

A. No.
Q. Did she have conversations with Gabby or Abby about Mr. Mueller, to the best of your knowledge?
A. No.
Q. Did she have conversations with Greg Dent during that period of time?
A. No.
Q. And after you took the photograph of Taylor and Mr. Mueller and Mr. Mueller's friend, female friend, did Mr. Dent remain in the room?
A. Yes.
Q. Did Ms. Swift give any indication to Mr. Dent that there was a problem or an issue or anything unusual?
A. No.
MS. SULLIVAN: Objection. You didn't put a timeframe on that.
BY MR. MCFARLAND:
Q. In the 15 or so minutes that passed after you photographed Mr. Mueller but before the meet-and-greet ended, did Taylor give any indication to -- did you see Taylor give any indication to Mr. Dent that there was any problem or issue?
A. No.
Q. Did you give any indication to Mr. Dent that

Misstated Testimony

Speculation

Compound Question, Vague/Ambiguous, Speculation

Page 42

there may have been a problem or issue?
A. No.
Q. What happens after the -- or what happened after the last person from the third meet-and-greet had finished?
A. Taylor immediately said, "Dude, that guy grabbed my ass."
Q. Were those her specific words?
A. To my knowledge, yes.
Q. And who did she say that to?
A. Everyone in the room. No one specifically.
Q. What was the response?
A. I responded, "I knew it. I have the photograph."
Q. And how did other people respond?
A. They just kind of were, "What?" I don't know. I mean, they were just kind of like, "What happened?"
Q. Do you recall Mr. Dent saying anything?
A. I don't recall.
Q. Do you recall him doing anything in response to that announcement from Ms. Swift?
A. Not specifically. I mean, he -- at that point everyone was trying to figure out who she was talking about, but her and I really were the only ones that knew who she was referring to.

Speculation

Page 43

Q. Did she -- well, what do you remember happening next?
A. I pulled up the photograph, and she said, "That's him." And then Greg Dent took a photograph on his phone of the photograph on the camera to circulate to her security team. And she said, "I don't want that pervert watching me."
Q. Okay. And then what happened?
A. They kind of decided that they were going to go find him and figure out who he was and escort him out of the building because she didn't want him there.
Q. Did Ms. Swift describe in any other detail how he touched her or where he touched her?
MS. SULLIVAN: Asked and answered.
THE WITNESS: She said that he grabbed her ass.
BY MR. MCFARLAND:
Q. She didn't mention at that time whether it was over her skirt or under her skirt?
A. No.
Q. Has anybody ever told you that -- well, did Ms. Swift ever tell you that David Mueller put his hand underneath her skirt and grabbed her ass?
A. No.
Q. Have you ever heard that from anybody else?

Foundation

Hearsay

Page 44

A. No.
Q. You haven't seen any photographs, have you, of Mr. Mueller with his hand underneath Taylor Swift's skirt?
A. No.
Q. What's the next -- so the meet-and-greet, the third meet-and-greet ends. There is a conversation with Taylor about having her ass grabbed. Mr. Dent takes the picture and there is that going on. What happens after that?
A. Her -- Taylor and her security and Gabby and Erica leave the room, and I continue to do my job and clean up and get it ready for the meet-and-greet after the show.
Q. Okay. The night of June 2nd, 2013, do you have any other conversations with anybody about David Mueller?
A. I just was told that he was found and was escorted off the property.
Q. Do you remember who told you that?
A. No.
Q. And on June 2nd, were you aware -- did you know Mr. Mueller's name at that time or did you learn that afterwards?
A. After.

Hearsay
Misleading Improper Atty Testimony
Misstates Testimony Misstates Facts in Record
Hearsay

Page 45

Q. Do you remember when you learned of Mr. Mueller's name?
A. Not specifically.
Q. Do you remember how?
A. No.
Q. After June 2nd, 2013, did you have -- have you had conversations with anyone about Mr. Mueller?
MS. SULLIVAN: Objection to the extent that it calls privileged information.
BY MR. MCFARLAND:
Q. Anyone other than counsel?
A. No.
Q. Have you discussed that incident with -- have you since discussed that incident with Taylor Swift?
A. No.
Q. Have you discussed it with her mom?
A. No.
Q. Did you discuss it with Frank Bell?
A. No.
Q. Anybody from KYGO call you and talk about the incident?
A. No.
Q. Did you ever talk to Eddie Haskell about it?
A. I don't know who that is.
Q. Is there anything else that we haven't talked

Page 46

about that you can recall from that evening relating to Mr. Mueller?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: No.
BY MR. MCFARLAND:
Q. Did you have any conversation with David Mueller on June 2nd?
A. No.
Q. Did you have any conversation with his female friend?
A. No.
Q. Did you have any alcohol on June 2nd?
A. No.
Q. Do you know whether Taylor Swift had any drinks or anything else?
MS. SULLIVAN: Objection. Relevance.
THE WITNESS: No.
BY MR. MCFARLAND:
Q. Did Taylor Swift seem to be herself on June 2nd?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Yes.
BY MR. MCFARLAND:
Q. Nothing out of the ordinary as far as you can tell?

Vague Ambiguous
Vague Ambiguous
Vague Ambiguous

Page 47

A. No.
Q. Have there been any other I'll just call them incidents at any of the meet-and-greets that you have participated in?
A. No.
Q. Has security ever had to escort anybody out or take any other action at any of the other meet-and-greets that you have participated in?
A. No.
Q. Do you know how the photo with Taylor, Mr. Mueller and his female friend was initiated?
MS. SULLIVAN: Objection. Vague.
BY MR. MCFARLAND:
Q. Like, did you say, "Let's take a photo," or do you remember any of that?
A. Not specifically. Either Taylor said, "Let's take a photo," or Erica or I would say, "Let's take a photo," depending on how long they were chatting because we have other people in line.
Q. Okay. Gotcha. But you don't remember who said that or how that specifically happened?
A. No.
Q. Did you see Mr. Mueller grab Taylor Swift's butt?
A. I saw his hand on her ass.

Page 48

Q. And was that through the -- well, the camera, do you put your eye to it when you take a picture or is it -- are you looking at a screen?
A. It was a screen.
Q. Okay. And so when you're taking the picture, you're looking at the screen as opposed to the people?
A. Correct.
Q. Okay. And you think that you saw on that screen David Mueller grab Taylor Swift's butt?
A. No, I saw it.
Q. You saw it on the screen? I mean, you were looking at the screen and you saw Mr. Mueller put his hand on Taylor Swift's butt?
A. Yes, I saw that his hand was on her butt.
Q. And you were standing directly in front of Taylor and Mr. Mueller and his female friend?
A. Yes.
Q. And approximately how far away were you?
A. 10 feet --
Q. Okay.
A. -- at the most.
Q. And how big is the display on the camera?
A. Approximately two inches by two inches. I don't recall exactly.
Q. Do you know whether there were -- was there

Page 49

anybody else taking photographs in this 10-by-10 room during the third meet-and-greet on June 2nd?
A. No.
Q. Do you know whether there were any security cameras in this 10-by-10 room on June 2nd?
A. No.
Q. Do you know whether there were any security cameras in this larger 30-by-30 area?
A. No cameras.
Q. Do you know whether there were any security cameras in this larger room?
A. I do not.
Q. Have you received any training on reacting to or dealing with incidents involving Taylor Swift at these meet-and-greets or potential incidents?
A. No.
Q. Okay. Do you know Kris Lamb? Kris Lamb.
A. No.
MR. MCFARLAND: Let's take just a few minute break and I'll look at my notes and we'll try and get you out of here.
(Recess, 10:03 to 10:12 a.m.)
BY MR. MCFARLAND:
Q. I just have a few more questions for you. Before I go on, though, let's go ahead and mark this as

CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER
STEPHANIE SIMBECK - 6/28/2016

Page 50

Deposition Exhibit 1.
A. It needs to be framed. It's a beautiful picture.
Q. It is, right.
(Document marked Exhibit No. 1.)
BY MR. MCFARLAND:
Q. And please confirm that Deposition Exhibit 1 is the sort of the diagram that you -- is the diagram that you have drawn and labeled today as we have been talking about the meet-and-greets?
A. Yes.
Q. Do you know Craig Thomas?
A. Yes.
Q. Who is he?
A. He was head of security on the tour.
Q. Did you talk to him about the alleged incident with Mr. Mueller?
A. I don't recall.
Q. Was he in the 10-by-10 room at any point during the third meet-and-greet?
A. No.
Q. Was he in the 30-by-30 room, to the best of your knowledge, at any time during the third meet-and-greet?
A. I can't recall because I was in the room.

Page 51

Q. Do you know Ryan Malutinok?
A. Yes.
Q. And who is he?
A. He is head of security.
Q. Was he in Denver --
A. No.
Q. -- on June 2nd?
A. No.
Q. Is Craig Thomas still with Taylor -- is he still part of Taylor Swift's security?
A. No.
Q. Do you know why?
A. No.
Q. How well did you know or do you know Greg Dent?
A. I mean, we worked together on tour.
Q. Was he typically the person sitting in the smaller room during the third meet-and-greets?
A. No. It rotated.
Q. He just was the one who happened to be sitting in there on January 2nd?
A. Yes.
MR. BALDRIDGE: It was not January, but --
MS. SULLIVAN: I'm sorry. I missed that

Page 52

one.
BY MR. MCFARLAND:
Q. June. June 2nd?
A. June 2nd, yes.
Q. And had Mr. Dent sat on these third meet-and-greets before or after the June 2nd meet-and-greet with Mr. Mueller in Denver? You said it rotated. I just wondered how many times or how often Mr. Dent was the security for Ms. Swift during these third meet-and-greets?
A. Yeah, he was rotated based on the security rotations on who was specifically assigned to Taylor for that rotation.
Q. How many people made up that rotation?
A. I don't recall.
Q. But he was one of the regulars?
A. Yes.
Q. Any reason to think that he wasn't alert and observant and focused on doing his job during the third meet-and-greet in Denver?
A. No.
MR. MCFARLAND: Let's mark this as Exhibit 2.
(Document marked Exhibit No. 2.)
MS. SULLIVAN: How many do you have here?

Composite question speculation foundation

Page 53

MR. MCFARLAND: You know, I just have two copies.
MS. SULLIVAN: Okay.
MR. MCFARLAND: You know, she can look at this one.
MS. SULLIVAN: Okay. There you go. I didn't know if you needed one. Go ahead.
BY MR. MCFARLAND:
Q. Ms. Simbeck, can you identify Deposition Exhibit 2?
A. Yes.
Q. What is it?
A. It's my explanation of my position and my pay.
Q. Have you received any raises since May of 2013?
A. Yes.
Q. What's your current pay?
A. 60,000.
Q. 60,000 per year?
A. Yes.
Q. Have you signed any subsequent employment or received any subsequent employment letters?
A. No, I don't believe so. I'm sorry, yes. When I got a raise.
Q. Okay. You got a letter that memorialized the

Relevance Testimony as to objected exhs

14 (Pages 50 to 53)

DTI Court Reporting Solutions - Washington, DC
1-800-292-4789 www.deposition.com

Relevance
Testimony as to
objected
to exhs

Page 54

raise?
A. The breakdown of what it was, yeah.
MR. MCFARLAND: Let's mark this as Exhibit 3.
(Document marked Exhibit No. 3.)
BY MR. MCFARLAND:
Q. Let me hand you what's been marked Deposition Exhibit 3. Do you recognize this photograph?
A. Yes.
Q. And what is it?
A. It is the picture of Mueller touching Ms. Swift's behind.
Q. So you think in this picture he's touching her behind?
A. No. I can see that he is and I know that he is.
Q. Okay. Is Ms. Swift touching Mr. Mueller's behind as well?
A. No.
Q. Is Ms. Swift touching Mr. Mueller's back?
A. Yes.
Q. How about Ms. Melcher? Is she touching anybody with her left hand?
A. I can't say yes or no. I don't know.
Q. Isn't it possible that Mr. Mueller's hand is

Page 55

just behind Ms. Swift, that it's not actually touching her?
A. No.
Q. You think that this photograph shows for sure that he's grabbing her butt?
A. Yes.
MR. MCFARLAND: Let's mark this as Exhibit 4.
(Document marked Exhibit No. 4.)
BY MR. MCFARLAND:
Q. And before I show you Exhibit 4, is Mr. Mueller's hand underneath Ms. Swift's skirt in this picture?
A. No.
Q. Does her skirt appear to be ruffled in any manner?
A. No.
Q. Let me hand you Exhibit 4. Exhibit 4 --
MS. SULLIVAN: Can I have a copy?
MR. MCFARLAND: Yes. Sorry.
BY MR. MCFARLAND:
Q. -- is an e-mail from Gabby Liddicoat to Greg Thomas, Daryl Dixon and Erica Worden. Do you see that?
A. Yes.
Q. Have you seen this e-mail before?

Vague and Ambiguous

Page 56

A. No.
Q. And it includes a copy of the same picture that we looked at in Deposition Exhibit 3; right?
A. Yes.
Q. Did you take -- at the time you took the photograph on Deposition Exhibit 3, did you take any other photographs of Mr. Mueller, Ms. Swift and his female friend?
A. No.
Q. Okay. Just one?
A. Just one.
Q. Going back to Exhibit 4, do you know why Ms. Liddicoat was not going to load the picture on Dropbox?
MS. SULLIVAN: Objection. Calls for speculation. Go ahead and answer.
THE WITNESS: No.
BY MR. MCFARLAND:
Q. Did you talk to anybody about whether the photograph would be uploaded onto Dropbox?
A. No.
Q. Did anybody ask you to do anything special with respect to the photograph in Exhibit 3?
A. No.
MR. MCFARLAND: Let's mark this Exhibit

Page 57

5.
(Document marked Exhibit No. 5.)
BY MR. MCFARLAND:
Q. Let me hand you Deposition Exhibit 5. Do you recognize that picture?
A. No.
Q. Can you tell whether this was a picture that you took?
A. No.
Q. Going back to Deposition Exhibit 3, can you tell where this picture was taken?
A. Yes.
Q. Where was it taken?
A. In the 10-by-10 room.
Q. Okay. Do you recognize the male in Deposition Exhibit 5?
A. Do I recognize -- I'm sorry?
Q. The male.
A. The male? No.
MR. MCFARLAND: Let's mark this as Exhibit 6.
(Document marked Exhibit No. 6.)
BY MR. MCFARLAND:
Q. Let me hand you what's been marked Deposition Exhibit 6. Do you recognize any of these photographs?

MR. BALDRIDGE: So I can avoid doing this, Gabe, are they sequentially Bates-numbered? Do you know?

MR. MCFARLAND: Yes.

MR. BALDRIDGE: They are? Thanks.

THE WITNESS: I mean, none of them specifically stand out.

BY MR. MCFARLAND:

Q. Do you know whether these are photographs that you took?

A. Yes, these are photographs I have taken.

Q. And they were photographs that you took on June 2nd, 2013?

A. Yes.

Q. Do you know whether they're from the third meet-and-greet?

A. They are from the third meet-and-greet.

Q. Do you know if they were taken before or after you took the photograph of Mr. Mueller?

A. No, I do not.

Q. Do you know where these photographs came from?

A. What do you mean where they came from?

Q. Well, did you I'll say more recently pull these photographs from any database that you have access to?

Vague and Ambiguous

Vague and Ambiguous Relevance Assumes facts not in Evidence

A. No.

MR. MCFARLAND: That's all the questions I have. Thank you.

MS. SULLIVAN: Thanks. Thanks, Gabe.

(Deposition concluded at 10:27 a.m.)

CERTIFICATE

I, STEPHANIE SIMBECK, having read the foregoing deposition, do hereby certify said testimony is a true and accurate transcript, with the following changes (if any):

PAGE LINE SHOULD HAVE BEEN

Reason for change:

Reason for change:

Reason for change:

Reason for change:

Reason for change:

Reason for change:

STEPHANIE SIMBECK

Notary Public

My Commission Expires:

CERTIFICATE

I, Martha B. Davis, Registered Diplomate Reporter and Notary Public, State of Tennessee at Large, do hereby certify that I recorded to the best of my skill and ability by machine shorthand the deposition contained herein, that same was reduced to computer transcription by myself, and that the foregoing is a true, accurate, and complete transcript of the deposition testimony heard in this cause.

I further certify that the witness was first duly sworn by me and that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

This 6th day of July, 2016.

------------------------------
Martha B. Davis, RMR, RDR, CRR
LCR No. 152

My Notary Commission Expires:
May 22, 2019