CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

1

IN THE UNITED STATES DISTRICT COURT
for the
District of Colorado

Civil Action No. 1:15-CV-01974-WJM-KLM

---

DAVID MUELLER, Plaintiff,

v.

TAYLOR SWIFT; FRANK BELL;

ANDREA SWIFT, A/K/A ANDREA FINLAY;

SCOTT SWIFT; ET AL. Defendants.

===

PURSUANT TO SUBPOENA AND THE COLORADO AND THE FEDERAL RULES OF CIVIL PROCEDURE, the deposition of HERSHEL COOMER P/K/A EDDIE HASKELL, was taken by Plaintiff David Mueller by and through his attorney, M. Gabriel McFarland, Esq. at the offices of Evans & McFarland, LLC, 910 Thirteenth Street, Suite 200, Golden, Colorado 80401, beginning at the hour of 11:01 a.m. MDT on Thursday, July 14, 2016, recorded by Merry P. Boslough, a/k/a Pat Boslough, Professional Court Reporter and Notary Public in and for the State of Colorado.

* * * * *

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

4

PROCEEDINGS

(Conference call telephone contact established with Michael E. Dash, Esq. prior to deposition.)

MR. MCFARLAND: Let's go ahead and swear the witness in.

HERSHEL COOMER,
P/K/A EDDIE HASKELL,

being first duly sworn to the above cause, to which he answered, "Yes," was examined and testified as follows:

EXAMINATION

BY MR. McFARLAND:

Q Would you state your full name for the record, please?
A Actually --
THE WITNESS: Am I Eddie?
MR. DOWDLE: No. It needs to be --
A Hershel Keith Coomer.
MR. DOWDLE: -- your actual name.
THE DEPONENT: Because all the paperwork so far has been for Eddie.
A C-o-o-m-e-r.
Q (By Mr. McFarland) And do you go by any aliases?
A Yes. Eddie Haskell.
Q Okay. And for purposes of this deposition, is

5

it okay if I call you Mr. Haskell?
A Sure.
Q Where do you live, Mr. Haskell?
A Centennial.
Q What's your address?
A It's 16545 East Hialeah Drive 80015.
Q And where do you work, Mr. Haskell?
A KYGO.
Q What's your position there?
A Program director.
Q How old are you?
A I'm 55.
Q Married?
A No.
Q Kids?
A No.
Q Are you under the influence of any drugs or alcohol today?
A No.
Q Are you taking any prescription medication?
A No.
Q Did you have any drinks on June 2nd, 2013?
A No.
Q Did you take any drugs on June 2, 2013?
A No.

Ln: 13-25 relevance

6

Q Did you take any prescription medications on June 2, 2013?
A I'm diabetic. Probably.
Q What kind of medication would you take?
A Metformin.
Q What's it called?
A Metformin, M-e-t-f-o-r-m-i-n.
Q Does that drug or that medication impact your thought processes or have any other, sort, of outward effects on you?
A No.
Q Have you ever had a drug or alcohol dependency issue?
A No.
Q Have you ever been in a drug or alcohol rehabilitation program?
A No.
Q Is there any reason you can't answer my questions today truthfully?
A No.
Q Have you been deposed before?
A Yes.
Q How many times?
A Once.
Q Under what circumstances?

Ln: 1-3 relevance

relevance

7

A A former employee contract issue.
Q Can you tell me a little bit more?
A Yeah. We had a morning person in Detroit that we chose not to renew his contract; paid him for the remainder of his contract; and he felt he was entitled to a severance in the contract.
Q Did he sue the radio station or --
A Yeah.
Q -- did he sue you personally?
A No. Just the company.
Q So you understand -- well, when was that deposition?
A It was late 90s, probably '97.
Q Let me just remind you of a few rules or parameters. You understand that you're under oath today?
A Yes.
Q And that you're testifying under the penalty of perjury?
A Yes.
Q And you understand that the court reporter is taking down my questions and your answers?
A Yes.
Q As a result of that, it's important that you let me finish my questions and I let you finish your answers before I ask the next question. And I'll work to do that;

4 (Pages 4 to 7)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

8

but if you would do the same?
A Yes.
Q And you understand that you need to vocalize your response so that the court reporter can capture it?
A Yes.
Q Where did you go to high school?
A Shawnee, Oklahoma.
Q Did you graduate?
A Yes.
Q What year did you graduate?
A 1978.
Q Did you go to college?
A No.
Q Did you have any other education after high school?
A No.
Q Did you start working right after high school?
A Yes.
Q And just kind of -- let's work through your employment history.
A Okay.
Q What was your first job?
A The first job was at the Shawnee -- well, the first job was washing dishes at a restaurant. Then I worked for Sears repairing TVs and radios and then started

9

doing part-time on-air at the radio station in Shawnee.
Q And about what year was that?
A It would have been late '78.
MR. BALDRIDGE: Gabe, let me interrupt you. I want to make it clear that as we've both done in prior depositions, we're going to declare everything confidential under the existing protective order until further notice.
MR. MCFARLAND: Understood.
MR. BALDRIDGE: I apologize for the interruption.
MR. MCFARLAND: No worries.
Q (By Mr. McFarland) How long were you with the radio station in Shawnee?
A Probably two years.
Q All right. And what did you do then?
A I moved to Oklahoma City to work at a radio station.
Q What was your position there?
A On-air.
Q And how long were you in Oklahoma City?
A About two years.
Q And what did you do then?
A I moved to Pine Bluff, Arkansas.
Q Did you work for a radio station there?

10

A Uh-huh. Radio station as program director.
Q How long were you in Pine Bluff?
A Too long -- two years.
Q And then what did you do?
A I went back to Oklahoma City for an on-air position. I was there two years.
Q Did you go back to the same radio station --
A No.
Q -- or a different one?
A A different one. Yeah.
Q And then you were in that back in Oklahoma City for about another two years?
A Two years, yes.
Q And then what did you do?
A Then went to Roanoke, Virginia, as a program director for five years.
Q And then?
A Then Buffalo, New York, as assistant program director for one winter -- we'll call it two years.
Q Okay. Then?
A Then to Detroit as program director for six years; then Denver as program director for two years; Salt Lake City program director for two years; Albuquerque as operations manager for nine years; and then to KYGO.
Q When did you start at KYGO?

11

A February of 2013.
Q And your position there was as a program director?
A Yes.
Q What radio station did you work for in your previous stint in Denver?
A It's call letters were KDJM.
Q Do you remember what the ...
A 92.5.
Q Okay. Was that country then?
A No. That was an oldies format.
Q Okay. Were you terminated from any of your prior employments?
A Roanoke.
Q Any others?
A No.
Q All of the other jobs you voluntarily resigned or left?
A Yes.
Q What was the basis for your termination in Roanoke?
A The position was eliminated. I was program director. They hired an operations manager, slash, program director.
Q Okay. Have your duties as -- you've had several

5 (Pages 8 to 11)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

12

program director positions over your career, correct?
A Correct.
Q Have your duties and responsibilities as a program director been generally the same?
A Generally.
Q Okay. Tell me about your duties and responsibilities as the program director at KYGO.
A I'm responsible for all of the programming, that is, selection of music, managing and directing the on-air talent and managing the promotions department.
Q Who owned KYGO when you started working for it in February 2013?
A Lincoln Financial Media.
Q And at some point, did Lincoln Financial Media sell the station?
A Yes.
Q Who did it sell to?
A The company was sold to Entercom. And then the station was subsequently sold to Bonneville.
Q So Bonneville currently owns the station, KYGO?
A Yes.
Q Okay. Have your duties and responsibilities as the program director at KYGO significantly changed since you started in February of 2013?
A No.

13

Q When you started with KYGO in February of 2013, who did you report to?
A Bob Call.
Q And do you continue to report to Bob Call today?
A Yes.
Q Do you know who Bob Call reports to?
A Darrell Brown.
Q What's Darrell Brown's position?
A President of Bonneville.
Q Is Bob Call employed by KYGO?
A Yes.
Q And what's his position?
A Market manager.
Q As the program director at KYGO when you started in February of 2013, you were in charge of the morning show?
A Yes.
Q And then you were essentially Mr. Mueller and -- is it "Kleesh" (phonetic)? Is that how you say that?
A Yes.
Q And you were Mr. Mueller's and Mr. Kliesch's boss?
A Yes.
Q Do you recall when Mr. Mueller and Mr. Kliesch were hired by KYGO?

relevance

14

A That would also be February of 2013 or late January.
Q Had Mr. Mueller and Mr. Kliesch been hired when you started with KYGO?
A Yes.
Q Were you aware of their hiring at the time that you accepted the position as the program director with KYGO?
A Yes.
Q At the time you started working for KYGO, did you know of Mr. Mueller?
A No.
Q Did you know of Mr. Kliesch?
A No.
Q Had you heard of either one of them?
A No.
Q Had you talked to either one of them?
A I had a phone call maybe a week before I started, but after I had been hired.
Q So you had a phone call with both Mr. Mueller and Mr. Kliesch?
A Yes.
Q What do you recall about that conversation?
A It was an introduction, just, Who are you guys? What have you done? Where are you from? See you in a week.

15

Q Okay. How did you think that initial phone call went?
A Fine.
Q Fine?
A Yeah.
Q Before you arrived, did you make any inquiries to anybody else about Mr. Mueller or Mr. Kliesch or their skills as on-air personalities?
A No.
Q Do you recall Taylor Swift's concert here in Denver on June 2, 2013?
A Yes.
Q Now, before that date, did you want to fire Mr. Mueller?
A No.
Q Did you lobby the company to fire Mr. Mueller?
A No.
Q Prior to June 2nd, 2013, did you want to fire Mr. Kliesch?
A No.
Q Prior to June 2, 2013, did you lobby the company to fire Mr. Kliesch?
A No.
Q Prior to June 2, 2013, did you document any

6 (Pages 12 to 15)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

16

problems with Mr. Mueller?
A No.
Q Prior to June 2, 2013, did you document any problems with Mr. Kliesch?
A No.
Q Mr. Mueller was ultimately fired, correct?
A Correct.
Q Do you recall when he was terminated?
A June 4th, probably -- 4th or 5th.
Q June 4th or 5th, 2013?
A Yes.
Q Did you make the decision to fire Mr. Mueller?
A No.
Q Did you participate in the decision to fire Mr. Mueller?
A Yes.
Q Who made the decision to terminate Mr. Mueller?
A I believe it was Bob Call.
Q Was there anybody else, other than yourself, that participated in that decision?
A Yes.
Q And who was that?
A John Dimick, our vice president of programming; Maureen Marsh, our HR manager; our corporate HR manager, whose name I can't recall; and I believe that's it.

17

Q Tell me about the process that KYGO went through in determining to terminate Mr. Mueller.
A We met -- Bob, Maureen and I -- in Bob's office. We got John Dimick, our corporate HR, and our legal counsel on a conference call and went through the events that were relayed to me and Bob and discussed them; that the negative impact it would make on the station if this were to become public. And then at the end of that call, we tabled any action until after we were able to talk to Mueller.
Q When did the phone call take place or the meeting, slash, call take place?
A That was the Monday morning, so that would have been June 3rd, probably 10:00 a.m.
Q Now, was there any discussion during that meeting about whether Mr. Mueller inappropriately touched Ms. Swift?
A Yes.
Q And was there any commentary -- well, tell me what you can recall about that.
MR. DASH: I'm going to jump in really quickly before you answer that, Mr. Haskell.
This is Mike Dash that's on the conference call from Entercom. I just want to make sure that Mr. Haskell understands that he is not to be speaking about any

18

consultation from counsel or disclosing any advice that he or any of the other members of the group received that he has outlined previously.
So that was the instruction, Eddie.
THE DEPONENT: Okay.
A The conversation was that -- so you want to know about the conversation --
Q (By Mr. McFarland) Yeah.
A -- not the -- that we had been made aware by Taylor's management company that he had touched her inappropriately; that they supplied a photograph; that we needed to act on this quickly and appropriately; that we had her complaint as well as photographic evidence; and that we would call him in and get his side of the story before we made any more decisions.
Q Do you know who with Taylor Swift's management company contacted KYGO?
A Yeah. That was Frank Bell.
Q And do you know who Mr. Bell spoke with?
A He spoke with me initially at the venue.
Q So this was face-to-face --
A Yes.
Q -- on June 2nd?
A Correct.
Q And what did Mr. Bell say to you?

19

A He asked if -- he showed me a photo of Mueller and asked if that was one of my employees. And I said that, yes, it was one of my morning guys. And he told me that he, during his photo, had inappropriately touched Taylor and he had been removed from the venue and banned from Taylor's shows.
Q Were those words "touched inappropriately" used by him? Or did he use different language?
A He probably said "grabbed her butt."
Q Did he indicate whether Mr. Mueller grabbed Ms. Swift outside her clothing or underneath her clothing?
A He did not, I don't believe. Yeah, I think that was it.
Q Mr. Haskell, do you recall anything else about your conversation with Mr. Bell on June 2nd, 2013?
A Not really. At that point, I called Bob Call to get him in the loop, but I believe that was the last conversation I had with Frank.
Q Do you know what time that conversation took place?
A Probably 7:00 -- between 7:00 and 7:30.
Q And did Mr. Bell call you in advance of your meeting and say, Hey I'd like to meet?
A No. I was in the backstage area. I was going to meet one of the opening acts, and I was with that

7 (Pages 16 to 19)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (F/K/A Eddie Haskell), July 14, 2016

20

artist's record rep. And they wouldn't allow us backstage to meet the artist, because they had tightened security because there had been an issue.

And probably within 30 seconds I got a phone call from Kris Lamb, who is with Big Machine. And he asked where I was and said there was a problem; stay right there; that he would come. And he brought Frank with him.

**Q So Kris Lamb called you?**

A Yes.

**Q And then Kris Lamb and Frank Bell met you in the backstage area?**

A Yes.

**Q So Mr. Lamb was present when Frank Bell said something to the effect that one of your employees had grabbed Ms. Swift's butt?**

A Correct.

**Q And Mr. Bell at that point had a photograph?**

A Yes.

**Q Was it on a piece of paper --**

A On his phone.

**Q Or was it on his --**

A It was on his phone, yes.

**Q Okay. Can you remember anything else about your conversation with Mr. Bell on June 2nd, 2013?**

A Not really.

Vague

21

**Q How did it end?**

A I don't remember.

**Q Do you recall thinking, Let's get David over here and figure out what happened --**

MR. BALDRIDGE: Objection, form.

**Q (By Mr. McFarland) -- or something to that effect?**

A No. He had been ejected from the venue and my assumption was sent home.

**Q Did you contact Mr. Mueller that -- well, what did you do next?**

A It would have been I called Bob.

**Q Was Bob at the concert?**

A No.

**Q Did you call Bob's cell phone?**

A Yes.

**Q By the way, what's your cell phone number?**

A It's (505)417-8692.

**Q Do you know what Mr. Call's cell phone number is?**

A I do not.

**Q What do you recall about your telephone conversation with Bob Call on June 2, 2013?**

A It was very protracted. I was in the lower level of the Pepsi Center. Reception was really spotty.

22

I know that we got cut off initially, but he understood that we had an issue. We communicated mainly via text from that point; but again, up to 10- to 15-minute delays in responses at times.

But basically, it was that we would pull Mueller off the show for Monday until we investigated and to let him know that and that Frank -- that I should let Frank know to reach out to Bob directly.

**Q Okay. And subsequently you did that?**

A Yes.

**Q And how did you do that?**

A I don't know. I don't remember. I don't remember having another conversation with Frank, but it may have been through Kris to have Frank call Bob. But at this point, I don't remember.

**Q And then did you subsequently call Mr. Mueller?**

A He texted me.

**Q Okay.**

A Again, calls were really difficult in the venue.

**Q So after you communicated with Mr. Call and decided that you would pull Mr. Mueller off the air on Monday, you texted Mr. Mueller to let him know?**

A Correct.

**Q And did that happen on the evening or night of June 2, 2013?**

23

A Yes.

**Q Did Mr. Mueller respond to that text?**

A Yes.

**Q And did he respond with a text? Or did he --**

A A text.

**Q After you learned of the alleged incident from Mr. Call, did you speak either in person or over the phone to Mr. Mueller?**

A No.

**Q And that was a bad -- I meant to say, did you talk to him that evening after you learned of the alleged incident?**

A No.

**Q Do you recall what Mr. Mueller's response was?**

A No.

**Q About what time did you text Mr. Mueller to let him know that he was not going to be on the air the following Monday?**

A It would have been between eight and nine, probably.

**Q Did you do anything else that we haven't already talked about since learning of the alleged incident from Frank Bell until the time that you traded text messages with Mr. Mueller in relation to this alleged incident?**

MR. BALDRIDGE: Objection, form.

8 (Pages 20 to 23)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY



CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

Vague and Ambiguous, Speculation
misstates testimony
Compound question, Vague and ambiguous
Vague and ambiguous
misleading, leading, improper designation of attorney discussion in line 14
misstates testimony, misleading

24

A I don't know what you're asking.
Q (By Mr. McFarland) Did you make any other phone calls that we -- any phone calls that we haven't talked about after you spoke with Frank Bell and he advised you of the alleged inappropriate touching?
A To anyone?
Q Right.
A I probably had another call with Bob.
Q Okay. So you had some phone calls with Bob?
A Right.
Q Did you send texts to anybody else?
A I don't know. It was three years ago -- not regarding this.
Q Okay. Did you tell anyone else that Mr. Mueller had inappropriately touched -- and I'm talking about -- let me start over.
On the evening of June 2, 2013, did you tell anyone else that Mr. Mueller had inappropriately touched Ms. Swift or been accused of inappropriately touching Ms. Swift?
MR. BALDRIDGE: Objection, form.
A No.
Q (By Mr. McFarland) Did you do anything else in relation to Mr. Mueller or Ms. Swift's allegation of inappropriate touching the evening of June 2, 2013?

25

A Do anything else? I don't understand the question.
Q Did you talk to anybody else?
A Yes. Scott Borchetta called me.
THE COURT REPORTER: Please say that name again.
THE DEPONENT: Scott Borchetta.
THE COURT REPORTER: Thank you.
THE DEPONENT: Yup.
A He's the president of Big Machine.
Q (By Mr. McFarland) So he works with Kris Lamb?
A He is Kris Lamb's boss, yes.
Q What do you recall about that conversation?
A He was at a wedding and had been made aware of the incident and wanted to know what I knew about what had happened. I told him only what I'd been told; I wasn't a witness. And I believe he asked me did I think he did it. And I said I have no way of knowing; I wasn't there. But that is what I was told by Frank and Kris through Frank.
Q Did you talk to Ms. Swift about the alleged incident?
A No.
Q Did you ever exchange texts or e-mails with her regarding the alleged incident?
A No.
Q After your conversation with Frank Bell on

26

June 2, 2013, did you subsequently talk to him about the alleged incident?
A No.
Q After you learned of the alleged incident from Frank Bell on June 2nd, 2013, did you talk with anybody else associated with Ms. Swift's management team?
A No.
Q After you learned of the alleged incident from Frank Bell on June 2, 2013, did you text or e-mail anybody associated with Ms. Swift's management team anything about Mr. Mueller?
A No.
Q June 2, that was a Saturday?
MR. BALDRIDGE: No.
A Sunday.
MR. BALDRIDGE: Sunday. I'm not under oath yet.
Q (By Mr. McFarland) So what, if anything, did you do with respect to the alleged incident on Monday, June 3rd?
A We had a meeting that morning. I believe that that was the only meeting we had that day. I don't know if we met with Mueller later that day or -- memory makes me think it was actually on Tuesday. But that was the -- the only meeting we had -- then we met with Mueller, then we had another meeting. So those were the three.

27

Q So the meeting on June 3rd, that took place in the morning sometime?
A Yes.
Q And was that the meeting that you previously talked about with John Dimick, Maureen Marsh, the corporate HR manager and Bob Call?
A Yes.
Q Okay. So that could have happened -- I think your testimony was before you thought that that happened on the 4th or the 5th?
A No. That was his termination.
Q Okay.
A That meeting absolutely happened Monday morning first thing.
Q Okay. June 3rd?
A Yes.
Q And then was it later the same day that you met with Mr. Mueller?
A I don't recall.
Q Between your meeting on June 3rd, 2001, (sic) and your meeting with Mr. Mueller, did you talk to anybody about Mr. Mueller or the alleged incident?
A No.
Q Did you exchange texts or e-mails with anyone regarding Mr. Mueller or the alleged incident between your

9 (Pages 24 to 27)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

28

June 3rd meeting and your meeting with Mr. Mueller?
A No.
Q Did you exchange e-mails with anyone during that same period of time regarding Mr. Mueller or the alleged incident?
A No.
Q You mentioned an investigation earlier this morning. Did KYGO investigate the alleged inappropriate touching?
A Yes. We -- Bob and Frank Bell had several conversations. Frank was reluctant to supply the picture initially. And Bob, I believe, told him that we would need that for the investigation. And to my knowledge, it was supplied and -- but that's, to my knowledge, the extent of the investigation -- was hearing his side of the story; hearing Frank and management's side of the story.
Q So you obtained the photograph, and you spoke to Mr. Mueller about the incident?
A Yes.
Q Was that part of the investigation as well?
A Yes.
Q To the best of your knowledge, that was the extent of the investigation?
A To my knowledge, yes.
Q Do you know who was -- did you know where the

misleading; assumes facts not in evidence

vague and ambiguous; improper designation of question to which witness did not answer

29

alleged inappropriate touching took place?
MR. BALDRIDGE: Objection, vague. The physical location, Gabe? Or the location on her body?
MR. MCFALAND: I'm sorry.
Q (By Mr. McFarland) Do you know the physical location of where the alleged incident took place?
A I do not.
Q Do you know who was in or at the location during the time of the alleged inappropriate touching?
A Only from who was in the photograph.
Q So you know that Mr. Mueller was there, and you know that his girlfriend Ms. Melcher was there?
A Yes.
Q And as of June 2, 2013, you understood or knew that Mr. Mueller and Ms. Melcher were girlfriend and boyfriend?
A Yes.
Q And there's nothing at KYGO to prohibit that kind of relationship among employees?
A No.
MR. BALDRIDGE: Form and foundation.
Q (By Mr. McFarland) Does KYGO have an employee handbook?
A Yes.
Q Have you seen it?

misstates testimony, compound question

foundation, speculation

relevance

30

A Yes.
Q Have you reviewed it?
A Yes.
Q Do you have to be -- as part of your job responsibilities as the program manager, do you have to be aware of the provisions in the employee handbook?
A Yes.
Q Does this employee handbook have any provisions with respect to documenting work-related issues or problems?
A I don't recall.
Q Did you ever talk to -- well, did you ever make efforts to find out whether other people were at the location where the alleged inappropriate touching took place?
A I didn't personally.
Q Do you know if anyone else at KYGO undertook efforts to determine whether other people were present at the location where the inappropriate touching allegedly took place?
A I believe that we did ask who was in the room.
Q Why do you believe that?
A Recollection of later discussions that I -- there was a photographer, and that -- that's really it. I just know that at some point we talked about who was there

relevance

31

and the photographer was -- I -- and I have a vague recollection of perhaps her mother was there, but that's just ...
Q Who is "we"? You said "we discussed."
A In the initial meeting of those people.
Q Okay. In this meeting of the morning of June 3rd, 2001 (sic).
A Correct.
Q Were you aware that one of Ms. Swift's security personnel were in or near the location of the alleged incident?
MR. BALDRIDGE: Object, form and foundation.
Q (By Mr. McFarland) You can still answer.
A I don't know.
Q Other than Mr. Mueller and Ms. Melcher, you don't really have any idea who was at the location where the alleged incident occurred when it occurred?
MR. BALDRIDGE: Objection, form.
MR. DOWDLE: Objection, argumentative.
Q (By Mr. McFarland) Is that fair?
A The photographer.
Q Okay. And you don't know whether anybody else was present?
A No.
Q And you never -- well, did you ever speak to

speculation, foundation

speculation, foundation

Ln: 15-17, 20-21: compound question, argumentative

10 (Pages 28 to 31)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

32

Ms. Melcher about the alleged incident?
A Not personally.
Q Did you ever speak to the photographer about the alleged incident?
A No.
Q Did you ever make attempts to talk to the photographer?
A No.
Q Do you know whether anyone else at KYGO made attempts to speak with the photographer?
A I don't know.
Q Did you ever suggest that KYGO ought to find out who was around at the time of the alleged incident?
A I didn't.

Argumentative, Improper Opinion Testimony, Improper hypothetical

Q Did you ever think that as part of its investigation KYGO should determine whether there were other witnesses to the alleged incident?
MR. BALDRIDGE: Objection, form.
A I didn't.

Foundation, Argumentative, Speculation

Q (By Mr. McFarland) Sitting here today, would you agree that as part of a reasonable investigation identifying potential witnesses would be a good idea?
DOWDLE: Objection, leading.
MR. BALDRIDGE: Objection, form, foundation, argumentative and speculation.

33

A I don't even remember the question now.
MR. MCFALAND: Can you read the question back for him, please?
THE COURT REPORTER: Sure.
(Last question read.)
MR. BALDRIDGE: The same four.
A Yes.

Foundation, Argumentative, Speculation, Improper Opinion testimony

Q (By Mr. McFarland) Would you agree that KYGO should have spoke to any potential witness before terminating Mr. Mueller?
MR. BALDRIDGE: Same four objections.
DOWDLE: Same four objections.
MR. DASH: Same objection.

Foundation, Argumentative, Speculation, Improper Opinion Testimony

A We would not have had access to those people. They were touring and employees that we would have no access to. So we counted on Frank Bell running that show as his word of who those people were and what they saw.
Q (By Mr. McFarland) Did you ask Frank Bell who was present at the time of the alleged incident?
A I did not.
Q Do you know whether anyone at KYGO did?
A I don't.
Q Do you know whether Frank Bell talked to other witnesses to determine what they saw in or around the time of the alleged incident?

34

A I don't know.
Q Can you tell me about the meeting that you had with Mr. Mueller at some point after your June 3rd, 2001 (sic) meeting with KYGO management personnel?
A We -- Bob Call and I met with him; told him what we had been told happened. He was very adamant that he did not do it. He wanted to know, Surely there are video cameras from different angles we could look at. There aren't.
He maintained that while the picture looked bad, that he was merely jumping in for a last-minute picture; that there was no -- it was a two-dimensional picture, and that while heighth-wise and horizontally it looked condemning, there was no depth. So he could have had his hand far behind her. Then he said that he absolutely didn't do it.
And as we continued to discuss, he said "if" he did it, it was incidental and perhaps he had brushed against her or something along those lines. But he was very adamant that he didn't do it.
We listened more than we talked during that meeting and told him that we would keep him off the air an additional day and would continue to gather information that we could and let him know what the result of that would be.

35

Q What, if any, additional information did you gather after your meeting with Mr. Mueller?
A I don't believe any. I think it was more of a regrouping to share his story with everyone else.
Q And was his story shared with everyone else?
A Yes.
Q And by "everyone else," you mean --
A The initial people on the first call.
Q Do you remember what time of day your meeting with Mr. Mueller took place?
A My recollection is it was around lunch, either 11 or 1, but sometime in the middle of the day.
Q Do you recall how long the meeting lasted?
A Probably 20 minutes.
Q Did anybody else attend or listen in by telephone or by any other device?
A I don't recall.
Q Has anybody told you at any time since the meeting that somebody else participated or listened in?
A Just his i-Phone.
Q Mr. Mueller's?
A Yes.
Q Did you record your meeting with Mr. Mueller?
A No.
Q Do you know whether Mr. Call recorded the

11 (Pages 32 to 35)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

36

meeting with Mr. Mueller?
A Not to my knowledge.
Q Do you know if anybody else was listening on the telephone?
A No.
Q Did you take notes of the meeting?
A I did not; Bob did.
Q How did Mr. Call take notes?
A On paper.
Q Have you seen Bob's notes from the meeting --
A No.
Q -- since the meeting?
A No.
Q Did you know that Mr. Mueller was recording the meeting with you and Mr. Call?
A No.
Q You indicated in your previous testimony that Mr. Mueller was inquiring whether there was video?
A Yes.
Q And I think you indicated that there wasn't any video; is that right?
A Per Frank Bell, that area of the Pepsi Center was not covered by any cameras.
Q Okay. So then did anyone at KYGO speak with Shannon Melcher about the alleged incident?

37

A Yes.
Q Do you know who?
A Maureen Marsh.
Q Did Ms. Marsh report to you on her conversation with Ms. Melcher?
A Yes.
Q And what did Ms. Marsh report?
A That she had the same story; that she and Taylor were discussing clothing, having a friendly conversation. The photographer walks up; they decide to quickly take a picture; that Taylor pulled her close; Mueller was jumping into the picture. And as he dived in, they took a picture just while he was leaning, and it appeared that his hand was behind her.

She also told Maureen that I never liked Mueller and implied in some way that I set this whole circus into play, just so I could get him fired.
Q Is it true that you didn't like Mr. Mueller?
A No.
Q How would you describe your relationship with Mr. Mueller?
A Business-like.
Q As of June 2, 2013, were there any problems between you and Mr. Mueller?
A No.

vague and ambiguous

38

vague and ambiguous

Q As of June 2, 2013, were there any problems between you and Mr. Kiesch?
A No.
Q As of June 2, 2013, how was the morning show doing?
MR. BALDRIDGE: Objection, form.

relevance

A Not well.
Q (By Mr. McFarland) How do you measure performance?
A We get ratings from Nielson and look at a lot of factors. But with ratings we take into account how new the show is and things like that. And at that point, the show was growing slowly.
Q Okay. So now, after you and Mr. Call met with Mr. Mueller, you relayed -- or you and Mr. Call relayed the contents of that meeting to the KYGO management group?
A Yes.
Q And did you do that via a meeting where you conferenced in some of the people who were out of town?
A Yes.
Q Just like the first meeting?
A Exactly.
Q And was that done in Mr. Call's office?
A Yes.
Q Okay. And when did that meeting take place?

39

A I don't recall if it was the following morning or if -- it was in the morning, so it would have -- if we met with him on June 3rd, it would have been the morning of the 4th, June 4th. If his meeting was on the -- I believe the meeting was on the 4th in the morning.
Q And what do you recall about that meeting -- about the communications during that meeting?
MR. DASH: Eddie, I'm going to object again and just give you the same instructions that I gave you previously, that you are not to discuss any communications that we had or any advice that you received or was circulated during that meeting from counsel.
A We went through the -- basically discussed that we had heard his side of the story; that we had heard Taylor's people's side of the story; and that based on the photographic evidence and our belief in who was telling the truth, that we should terminate.
Q (By Mr. McFarland) So did you think that Mr. Mueller was lying?
A Yes.
Q And you thought the allegation that Mr. Mueller inappropriately touched Ms. Swift was truthful?
A Yes.
Q And based on that allegation, did KYGO terminate Mr. Mueller?

foundation; speculation

12 (Pages 36 to 39)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

Foundation; Speculation

Foundation; Argumentative; Misstates testimony

Foundation; vague; ambiguous

40

MR. BALDRIDGE: Objection, form and foundation.
DOWDLE: Objection to the extend it may be privileged.
MR. DASH: Same objection.
A Yes.
Q (By Mr. McFarland) In your words, why did KYGO fire Mr. Mueller?
A He violated the morality clause contained in his employment agreement.
Q By?
A By displaying behavior that was inappropriate.
Q And the inappropriate behavior was touching Ms. Swift?
A Exactly.
Q In the manner that Mr. Frank Bell described to you?
MR. BALDRIDGE: Objection, form.
A Correct.
Q (By Mr. McFarland) And so as of the day of Mr. Mueller's termination, you were not aware of any other reason to terminate Mr. Mueller?
MR. BALDRIDGE: Objection form, foundation.
A No.
Q (By Mr. McFarland) When was Mr. Mueller terminated?

41

A June 4th or 5th.
Q Who broke the news to Mr. Mueller?
A I don't know.
Q Do you recall whether you --
A I did not.
Q You did not. Have you talked to Mr. Mueller since his termination?
A No.
Q Have you traded e-mails or text messages with him?
A No.
Q Have you talked to anyone else about Mr. Mueller since his termination?
A Of course.
Q Who have you talked to?
A Everybody that called me when they read about it and my name in People Magazine. I would put the number at hundreds.
Q As part of your duties and responsibilities as a program director over -- a long time, have you been involved in the hiring of on-air talent?
A Yes.
Q What percentage of your time as a program director do you think you've spent on hiring on-air talent?

42

A Five percent, maybe.
Q Do you have an estimate of the number of people you've hired?
A Thirty.
Q And you've been in radio basically your entire professional career?
A Correct.
Q And you're very well connected in the radio industry?
MR. BALDRIDGE: Objection form and foundation.
A Yes.
Q (By Mr. McFarland) You know a ton of people in the industry?
MR. BALDRIDGE: Objection, form and foundation.
A Yes.
Q (By Mr. McFarland) You have a good reputation in the industry?
DOWDLE: Objection, form and foundation.
MR. BALDRIDGE: Objection, form and foundation.
A I would say yes.
Q (By Mr. McFarland) Would you ever consider rehiring Mr. Mueller?
A Absolutely not.
Q Why not?
A He lied.

43

Q When?
A When he manufactured the story that I actually did it.
Q Any other reasons that you would never rehire Mr. Mueller?
A No.
Q Given your knowledge and experience in the industry, do you think it's reasonably likely that Mr. Mueller could get hired on by another radio station?
DOWDLE: Object to form and foundation and calls for a legal conclusion.
MR. BALDRIDGE: And form, foundation, legal conclusion and calls for speculation.
A I don't know.
Q (By Mr. McFarland) Have you talked to any other program directors about Mr. Mueller?
A Yes.
Q And so what can you tell me about those conversations?
A They want to know why he would make up such a ridiculous story.
Q In terms of --
A That I did it instead of him.
Q Has anyone contacted you with respect to -- with questions about hiring Mr. Mueller?

13 (Pages 40 to 43)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

44

A No.
Q Do you know whether anyone has contacted KYGO about hiring Mr. Mueller?
A I don't know.
Q Is there anybody that you know in the radio business who is not aware of the alleged incident with Mr. Mueller?
MR. BALDRIDGE: Object to form, foundation, speculation.
DOWDLE: Same objections.
A I don't know.
Q (By Mr. McFarland) But hundreds of people have contacted you with questions about Ms. Swift's lawsuit and Mr. Mueller's lawsuit?
MR. BALDRIDGE: Objection, form, foundation and mischaracterizes his prior testimony.
A It's a pop culture issue at this point, yes.
Q (By Mr. McFarland) And what does that mean?
A It means millions of people know about it. So, of course, hundreds would contact me.
Q Since Mr. Mueller's termination, have you had communications with other persons that are associated with KYGO? And I don't want to know about any meetings or conversations that you've had with lawyers.
A Regarding this?

relevance; foundation; misstates testimony

foundation; relevance

45

Q Yes.
A Yes.
Q And so what can you tell me about those conversations?
A Specifically -- I mean, since this has hit the media, I've had numerous conversations with every person I know, including every person I work with.
Q And what's been the substance of those communications?
MR. BALDRIDGE: Objection, vague, form.
A "I read this story. Holy crap, what an idiot." The gambit. I could burn another three hours telling you every question I've been asked, including from my 81-year-old mother.
Q (By Mr. McFarland) What did your mother ask you?
A "It makes you look bad, son." I said, "I know. And thankfully Taylor took up for me." And, "I know, but people just don't read that."
Q How did Taylor take up for you?
A In the countersuit she says that it absolutely was not me that did it.
Q You did hug Taylor on June 2, 2013?
A Yes.
Q Once or more than once?

46

A Just once -- I'm guessing.
Q You don't recall?
A Once.
Q And that was at the meet and greet prior to -- I'll say the meet and greet with media types?
A Correct.
Q Did you require that Mr. Mueller attend the Taylor Swift concert?
A I asked him to.
Q And why did you ask him to attend?
A To promote the radio station and meet listeners.
Q As of June 2, 2013, was KYGO playing Taylor Swift songs?
A Yes.
Q Was it playing the songs during the morning show?
A Yes.
Q Does KYGO still play Taylor Swift songs?
A Yes.
Q As of June 2, 2013, what type of play time were Taylor Swift songs being given?
A Moderate, but less. She had become a more -- had started to transition to pop.
MR. BALDRIDGE: Hey, Gabe?
MR. MCFALAND: Yeah?

relevance

47

MR. BALDRIDGE: If you're going to be a while longer, Mr. Schaudies is going to leave shortly and I'd like to talk to him before he leaves. And if you're almost done ...
MR. MCFALAND: Yeah. No, we can take a break now. I've got another half-hour maybe.
MR. BALDRIDGE: Thank you.
MR. MCFALAND: Yeah, no problem.
(Recess was taken from 12:30 p.m. until 12:41 p.m.)
MR. MCFALAND: Back on the record.
Q (By Mr. McFarland) Mr. Haskell, who decided which KYGO personnel were going to attend the Taylor Swift concert?
A I did.
Q And who did you decide would attend?
A Mueller, Kliesch -- I was very short-staffed at the time, and they volunteered to go.
Q Anybody else?
A I believe that's it, other than our promotions staff.
Q How many people from the promotions staff attended the concert?
A Two to four.
Q Did you decide which KYGO personnel would attend

14 (Pages 44 to 47)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

48

which meet and greet at the concert on June 2nd, 2013?
A I believe -- yes, I would have.
Q And you knew that there were two -- at least two meet and greets on June 2nd?
A Yes.
Q And it was you that decided that Mr. Mueller and Ms. Melcher would attend the second meet and greet?
A I don't know if I made that decision or they did.
Q If Mr. Mueller and Ms. Melcher testified that they didn't make the decision, then you wouldn't have any reason to argue --
A No.
Q -- that you were the one who made that decision?
A No.
Q Is there a particular reason why you wanted Mr. Mueller and Ms. Melcher to attend the second meet and greet?
A No.
Q Is there any particular reason that you didn't want Mr. Mueller and Ms. Melcher attending the first meet and greet?
A No.
Q Was there a difference between the first meet and greet and the second?

Foundation; Misstates Testimony; Assumes Facts not in evidence; Improper lawyer testimony

49

A Yes.
Q And what was the difference?
A The first was a radio room, which was a private reception for radio program directors and music directors. I didn't have a music director at the time, so I gave one of them admission to that and then the other meet and greet passes.
Q And Mr. Mueller and Ms. Melcher got the meet and greet passes?
A Correct.
Q And what type of persons typically attend the meet and greet portion?
A It depends by shows. Some shows only do a meet and greet and radio goes through the meet and greet. There are also fan club member contest winners. And again, for the tours that don't do a radio room, it's the opportunity to meet the artists.
Q Did anybody associated with Taylor Swift's management tell you that Mr. Mueller and Ms. Melcher could not attend the first meet and greet?
A No.
Q How did the meet and greet that you attended go?
MR. BALDRIDGE: Objection, vague.
A Well ...
Q (By Mr. McFarland) From KYGO, it was you,

50

Mr. Kliesch -- anybody else?
A His wife.
Q His wife. Did you have a guest with you?
A I don't believe I did. I can't recall taking anyone.
Q And did you meet Ms. Swift during the meet and greet that you attended?
A Yes.
Q What can you tell me about that meeting?
A Well, it's in a room. It's more of kind of a cocktail party vibe where all of the radio people are in the room socializing. And then at some point, she comes in and typically goes group to group, has a short conversation, takes a picture and moves on to the next group and then leaves the room.
Q And is that what happened at this particular meet and greet?
A Yes.
Q And who was in your group?
A Ryan, his wife and me. We probably were standing with another radio, maybe a Colorado Springs or Fort Collins station chatting. But that was our group, the three of us.
Q Did you meet Taylor Swift at any other time other than the meet and greet on June 2nd?

51

A No.
Q Had you met her before?
A Yes.
Q Did Ms. Swift recognize you at the meet and greet?
A Yes.
Q Did she refer to you by your name?
A Yes.
Q Did she call out to you across the room?
A She -- I wouldn't say across the room. Probably as she was walking up to our group.
Q What did she say to you?
A Eddie.
Q Okay. So she, kind of, called out to you?
A Yeah.
Q Seemed to be excited to see you?
A Yeah.
Q Then what happened?
A She came up, probably gave me a hug. I introduced her to Ryan and his wife; small talk; no idea what that would have been. And then fairly quickly a photographer -- no, actually it was Kris Lamb who was with her who took our picture.
Q And you know Kris Lamb?
A Yes.

15 (Pages 48 to 51)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

52

**Q And how do you know Kris?**
A He's our Big Machine -- was at the time -- our Big Machine rep. I had worked with him previously at other labels.
**Q Are you and Mr. Lamb friends?**
A Yes.
**Q Are you good friends?**
A Social friends.
**Q How long have you known Mr. Lamb?**
A Ten years.
**Q Anything else that you can remember saying to Ms. Swift during your meeting on June 2nd?**
A No. Again, it would have been small talk. How do you like Denver? That kind of thing. But no idea. Nothing of substance.
**Q When you hugged Ms. Swift, where were your hands?**
A Probably -- considering her heighth, probably right below the shoulder blades probably. It was a frontal hug, so wherever her heighth would put her, but it was her mid-back.
**Q How tall is she?**
A I'd guess she's 5, 11, probably.
**Q And so you definitely knew Ms. Swift prior to the June 2nd, 2013, concert?**

53

A Yes.
**Q And you had met her before?**
A Yes.
**Q When did you first meet her?**
A When she first got signed to the label, which was probably -- purely a guess -- 2004, 2005.
**Q And what were the circumstances surrounding your meeting?**
A We were at Nashville at a showcase where they were introducing new talent. And she was one of the artists that they were announcing.
**Q Do you recall what your interaction was?**
A Probably handshake. Nice to meet you, and posed for a picture.
**Q How many times have you met Ms. Swift since that initial meeting?**
A Probably six to eight.
**Q Have you ever talked to her over the phone?**
A No, not outside of an interview environment.
**Q Ever trade text messages with her?**
A No.
**Q Ever trade e-mails with her?**
A No.
**Q What's the interview process you just mentioned? What is that?**

54

A When I was on the air, I would interview her. And it would be a probably three- to four-minute window of time that would usually give you about 15 seconds of cordial time of: How have you been? How's it going? Love the new record. All right. Here we go.
**Q Have you ever seen Ms. Swift outside of a work environment?**
A No.
**Q When did you learn that you would be attending the June 2nd Taylor Swift concert?**
A When I took the job. February.
**Q And how did you learn that?**
A I go to every concert.
**Q Every country concert or --**
A Yes, yes. Every concert our station promotes.
**Q And KYGO was promoting the Taylor Swift concert?**
A Yes.
**Q When did you arrive -- the concert was at the Pepsi Center?**
A Correct.
**Q When did you arrive at the Pepsi Center on June 2nd?**
A Probably 5:30.
**Q What did you do?**
A We were having issues with where to park our

55

tour bus and were asked by the Pepsi Center to move it off the plaza. So I was strategizing a good, visible parking lot near Mile High where people could see our logo coming into the show. Then typically -- and that night -- I would have gone to will call, gotten our passes and tickets and then met up with Kris Lamb.
**Q What did you do after you met up with Kris Lamb on June 2, 2013?**
A I would have gone back and given everyone their passes, their instructions where to be and probably fairly quickly went to the radio room.
**Q And the radio room, that's where the meet and greet was conducted? Or is that something other than --**
A Correct.
**Q So shortly after you arrived, you get your passes, you meet with Kris and then you go to the meet and greet. Is that fair?**
A Yeah.
**Q How long did the meet and greet last?**
A Probably -- we were probably in the room 20 to 25 minutes.
**Q And what did you do -- well, let me ask you this: Was there any evidence at the meet and greet that you attended of any inappropriate touching?**
A No.

CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (F/K/A Eddie Haskell), July 14, 2016

56

MR. BALDRIDGE: Objection to form and foundation.

**Q (By Mr. McFarland) Was there any evidence of any incidents whatsoever?**

MR. DOWDLE: Objection to form and foundation.

MR. BALDRIDGE: Objection to form and foundation.

A Not at that point.

**Q (By Mr. McFarland) What was Ms. Swift's demeanor?**

A Cheerful.

**Q Ms. Swift didn't give any indication to you that there was any problem or any issues?**

A No.

**Q Given your relationship with Ms. Swift, are you surprised that she did not reach out to you to discuss the alleged incident with Mr. Mueller?**

MR. BALDRIDGE: Objection to form.

A No. She doesn't have my contact information.

**Q (By Mr. McFarland) What did you do at the conclusion of the meet and great that you attended?**

A Her mother gave us a tour of the backstage area. There were contest winners on that tour, and we came along. And they showed us where the video controller was and all the exciting things that this tour had and showed

57

us the stage areas, all the, kind of, tunnels in the back where Taylor goes during shows to get from one side of the stage to the other and that kind of thing.

**Q And who do you mean by "we"?**

A Me, Ryan, his wife and all the radio people.

**Q Was Mr. Mueller and Ms. Melcher with you?**

A No.

**Q Do you know why they were not with you?**

A No.

**Q Did you invite them to go along with you on that?**

A No. My understanding is they were at that point in the meet and greet.

**Q The second one?**

A Correct.

**Q How long did the tour last?**

A Probably 10 to 15 minutes.

**Q During that tour, did you have conversations with Ms. Swift's mom?**

A Yes.

**Q What did you guys talk about?**

A Again, superficial conversation, how neat the tour was and how fun the back stage is. But I don't even know if we actually had a direct conversation. If we did, it would be, "Thank you for the hospitality," and "We're

58

excited."

**Q Had you met Taylor's mother before?**

A Yes.

**Q And was that through some of your interactions with Taylor?**

A Yeah. Accompanying her at award shows and things like that.

**Q You accompanied Ms. Swift's mother to award shows?**

A No. She accompanied Taylor.

**Q Okay. So she was at award shows where you were also present?**

A Exactly.

**Q And you had some interaction with her at that time?**

A Correct.

**Q Do you have Ms. Swift's mother's contact information?**

A I do not.

**Q And you didn't talk to her about this incident?**

A No. I wouldn't say we were even acquaintances. She wouldn't even know my name.

**Q What did you do after the tour?**

A After the tour we went back out to drop our pictures that she had signed for us at the promotions area

59

where we had the tent set up. And so we dropped those off. And then fairly quickly after that, the opening act, who was Joel Crouse, his label rep wanted me to go meet Joel. And so she came out front and we met and then she took me back.

**Q And how long did that meeting last?**

A It didn't happen.

**Q Okay. It didn't happen because you got stopped at security?**

A Exactly.

**Q And then Frank Bell, that's when you met with Frank Bell?**

A Correct.

**Q Now, did you ever see David Mueller on June 2nd, 2013, at the Pepsi Center?**

A Yes.

**Q When did you encounter him?**

A I saw him first when I first arrived. They probably got there a half hour after I did, so in the six o'clock range as I gave them their passes and instructions where to go. And then when we came out to drop our pictures off at the tent, he and Shannon were there at that time.

**Q Were you trying to punish David by not allowing him to go to the first meet and greet?**

17 (Pages 56 to 59)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY

60

THE DEPONENT: Objection, argumentative.
A We had four passes for the station.
Q (By Mr. McFarland) So somebody had to go to the other one?
A Right.
Q So you saw him, gave him the passes. Then did you see him again at the Pepsi Center on June 2nd, 2013?
A Yes. When we came back from the backstage tour and dropped off our pictures, we, kind of, restaged there at our tent. So Ryan was there with his wife and Mueller was there with Shannon.
Q Did you have any communications with Mr. Mueller at that point?
A Yes.
Q Can you tell me what you recall about those communications?
A I -- we talked about getting to meet Taylor. He was in good spirits, seemed excited that he had gotten to meet her. We told him about the backstage tour and that it was cool that we got to meet her mom. And we talked about how it was really a neat thing that they did for the group of listeners that got to go on the tour as well.
Q Anything else that you can remember about that communication?
A No. The only -- as we talked about it, I do

61

recall we talked about the stage and that there was an area on the stage where Taylor would stand, the lights would go out, she would drop under the stage, do a complete wardrobe change and pop back up before the audience even stopped applauding.
And I found it odd that she would be changing clothes in front of all of the stage hands and made the comment that she's got to be wearing bike shorts or something under her dresses, because she's changing right there in public.
Q So when you were having this conversation with Mr. Mueller, was anybody else present?
A Ryan and his wife. I don't know if Shannon was there or not. I think she may have come back in at that point. She may have been.
Q So did you describe hugging Ms. Swift to Mr. Mueller?
A I probably told him that she came up and said hi and that we hugged.
Q Did you tell him that your hands were near her rear?
A No.
Q Did you tell him that your hands touched her rear?
A No.

62

Q Do you remember anything else about your communications with Mr. Mueller near the KYGO tent?
A No. It was fairly quick. It wasn't probably more than two to three minutes.
Q Do you recall posing for a photograph with some younger ladies?
A At the tent?
Q At the tent with Mr. Mueller?
A Probably, yes.
Q And do you know who those ladies were?
A Probably the daughter of one of my former coworkers and her friend. I don't know her friend.
Q Were they present when you and Mr. Mueller were having this communication?
A They wouldn't have been a part of the conversation. They may have been in the area, but I would have put them more likely at the tent while we talked.
Q Have you ever seen Mr. Mueller engaged in inappropriate behavior?
MR. BALDRIDGE: Objection, form and foundation.
A No.
Q (By Mr. McFarland) Are you aware of any other complaints about Mr. Mueller inappropriately touching anyone?
MR. BALDRIDGE: Objection, form and foundation.

63

MR. DOWDLE: Same.
A No.
Q (By Mr. McFarland) What did you do at the conclusion of your conversation with Mr. Mueller out by the KYGO tent?
A I met with Lisa Owen who was the Show Dog Records rep to go meet with Joel Crouse, one of the opening acts.
Q And then that takes us to the point where you were held up at security?
A Correct.
Q Do you know who Cadillac Jack is?
A I know a couple of Cadillac Jacks.
MR. BALDRIDGE: That's only in the radio business where you would know more than one Cadillac Jack.
Q (By Mr. McFarland) Were you upset with Mr. Mueller at any point because you thought he had contacted Cadillac Jack or done something with respect to Cadillac Jack?
A No.
Q Did Travis Tritt ever do anything to you in 1994?
MR. BALDRIDGE: Objection, form, foundation.
MR. DOWDLE: Objection, relevance.
A Not to me personally.

foundation, relevance
foundation, vague, ambiguous
speculation, relevance
foundation, argumentative


CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY
The Deposition of Hershel Coomer (P/K/A Eddie Haskell), July 14, 2016

64

Q (By Mr. McFarland) Did he do something to make you angry for any reason in 1994?
MR. DOWDLE: Same objection.
MR. BALDRIDGE: Same objections.
A He thanked my competitor's radio station on stage.
Q (By Mr. McFarland) During a show that you were promoting or just ...
A Yeah.
Q That was nice of him.
MR. BALDRIDGE: There's no question there, objection, form.
Q (By Mr. McFarland) Did you play Travis Tritt on KYGO?
A Yes.
Q Who is Tracy Dixon?
A She is the current morning show host at KYGO.
Q She's doing the show solo now?
A Correct.
Q Did KYGO terminate Mr. Kliesch?
A No.
Q Did Mr. Kliesch quit?
A Yes.
Q Do you know why?
A He got another job.

65

Q At the time he left, did KYGO have any plans to terminate Mr. Kliesch?
A Not to my knowledge.
Q At the time that Mr. Kliesch left KYGO radio, were you contemplating terminating his employment?
A No.
Q Did you ever tell Tracy Dixon that with one phone call to a record rep your hand could be on Taylor Swift's ass?
MR. DOWDLE: Objection to form and foundation.
MR. BALDRIDGE: Objection, form and foundation.
Q (By Mr. McFarland) So if Ms. Dixon said that, she'd be lying?
MR. BALDRIDGE: Objection, form and foundation.
MR. DOWDLE: Same objection.
A I didn't say it.
Q (By Mr. McFarland) Is it possible you said it as a joke?
MR. DOWDLE: Same objection.
MR. BALDRIDGE: Form and foundation and speculation.
A No. It's not funny.
Q (By Mr. McFarland) Do you know what "pulling a Jackson" is?
A Today I do.

Foundation; Answered; Vague; Ambiguous

Foundation, relevance, hearsay (cont. to pg 66 line 4)

66

Q What does it mean?
A It means grabbing somebody's butt.
Q And who have you heard use the term?
A Many people in the industry.
Q Have you ever used that term in that manner?
A I don't think so.
Q Who have you heard use the term, "Pulling a Jackson" in that manner?
A Other people in the radio industry.
Q Such as?
A I don't recall which ones at this point.
Q Have you seen that in writing as well? E-mails and texts?
A I don't know.
Q Did you ever tell Ryno that there's no one you hate more than David Mueller?
A I don't recall saying that.
Q Did you ever tell Ryno that you were going to hire a hit man?
A No.
Q Did you ever send a text to Bob Call to the effect that, "I want to kill him," David Mueller?
A No.
Q Do you use a cell phone? Do you have a cell phone?

67

A Yes.
Q How long have you had that phone?
A Twelve years -- well, this phone? One year.
Q And before that, you had a different cell phone?
A Yes.
Q And before that, how long did you have that phone?
A I buy about every two years.
Q Do you still have the phone that you were using in or around June of 2013?
A No.
Q Where is that phone?
A No idea.
Q Did you throw it away?
A Sold it.
Q Did you make any efforts to copy the data or information on that phone before you sold it?
A I don't keep data on the phone. I use cloud services typically.
Q Who is your service provider?
A T-Mobile.
Q You send e-mails and texts from your phone?
A Yes.
Q Who is your e-mail provider?
A I have several, but my primary is Bonneville.

19 (Pages 64 to 67)

Thomas T. Tomko & Associates, (303)825-1822
CONFIDENTIAL - UNDER PROTECTIVE ORDER - FOR AUTHORIZED USE ONLY