CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-01974-WJM-KLM

DEPOSITION OF

SHANNON MELCHER

============================================================

DAVID MUELLER, Plaintiff,

v.

TAYLOR SWIFT; FRANK BELL;
ANDREA SWIFT, A/K/A ANDREA FINLAY;
SCOTT SWIFT; ET AL. Defendants.

============================================================

PURSUANT TO SUBPOENA AND THE COLORADO AND THE FEDERAL RULES OF CIVIL PROCEDURE, the deposition of SHANNON MELCHER was taken by the Plaintiff at the offices of Evans & McFarland, 910 Thirteenth Street, Suite 200, Golden, Colorado 80401, beginning at the hour of 10:18 a.m. MDT, on Tuesday, August 30, 2016, recorded stenographically and electronically by Terry H. Edwards, Registered Professional Reporter and Notary Public, State of Colorado.

* * * * *

PROCEEDINGS

SHANNON MELCHER,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MCFARLAND:

Q Good morning, Ms. Melcher. Would you state your full name for the record, please.

A Shannon Frances Melcher.

MR. MCFARLAND: Just for the record, we're going to designate this entire transcript as confidential pursuant to the terms of the court's protective order.

Q (BY MR. MCFARLAND) With that said, are you currently employed?

A I am.

Q Who are you employed by?

A iHeart Media.

Q And what do you do for iHeart?

A I am the vice president of sales for southern Colorado, which entails Colorado Springs and Pueblo.

Q What generally do you do in that position?

A A variety of things. I work with the salespeople to help them get new business. I do

forecasting for the markets and for the station and report to the regional vice president up here in Denver.

But just, you know, mainly holding the ship down in Colorado Springs and Pueblo, help with production, work with the on-air jocks -- production work with our production director, work with clients and on-air staff to get advertisers on the air.

MS. SULLIVAN: Shannon, you're a little bit like me. You talk fast.

THE WITNESS: Yeah, I do. Sorry.

MS. SULLIVAN: -- whoever talks a lot talks fast. It will be easier for our phone participants and the reporter if you slow down just a bit.

THE WITNESS: I will.

MS. SULLIVAN: Thank you so much.

THE WITNESS: Sure.

Q (BY MR. MCFARLAND) How long have you been in your current position?

A It will be one year this September.

Q Have you been deposed before?

A No, I have not.

Q I will do my best to let you answer my question before I ask my next question.

A Okay.

Q And if you could try hard to let me finish my question before you answer, that will help the court reporter who is taking everything down.

A Uh-huh.

Q And the other thing is you need to answer verbally or audibly.

A Yeah.

Q She can't take down nods of the head and stuff like that. I'll try to remind you.

A Okay.

Q But those are just a couple of the ground rules to keep in mind. Does that make sense?

A Yes, it does.

Q Okay. What did you do before iHeart radio?

A Before iHeart radio, I was self-employed. I had a marketing agency up here in Denver.

Q What was the name of that agency?

A Right Angle Resource.

Q What did Right Angle Resource do?

A We were a full-service marketing agency, so we helped clients with all aspects of their marketing from digital, radio, TV, print, so all aspects.

Q And how long did you have or were you working with that company?

A I started Right Angle in July of 2013, and last August I was called by iHeart to interview for this VP of sales position that I currently have, and so that is when I moved down to Colorado Springs and started with iHeart.

Q Okay. What did you do before that?

A Before that I was at Lincoln Financial Media. I was mostly working for KYGO, although we were allowed to sell all stations in the building.

^ LISTEN - in the BUILDING????

Q And how long were you -- did you have a title at Lincoln?

A Account executive, yeah.

Q And how long were you with Lincoln Financial?

A I started with them in January of 2006 and left in July 2013.

Q While working at Lincoln Financial, did you meet Mr. Mueller?

A I did.

Q Do you remember when you met him, approximately?

A Well, approximately that would've been

January of -- I guess 2013. I think that's when he was hired, if I recall.

Q What was he -- what was his position?

A Sure. He was part of a morning show, Ryno and Jackson.

Q What was your interaction with Mr. Mueller in the few months after he joined the radio station in January of 2013?

A Sure. Mr. Mueller and I did begin dating and that was probably early March.

Q Do you know Eddie Haskell?

A I do.

Q How do you know Mr. Haskell?

A Eddie Haskell was our program director at KYGO. I worked with him just previously I think before Ryno and Jackson got there, yeah.

Q Your recollection is you met Mr. Haskell before you met Mr. Mueller?

A I believe he was there before, yes.

Q And did you know Mr. Haskell before he joined Lincoln Financial?

A I did not.

Q Did you know Mr. Mueller before he joined Lincoln Financial?

A I did not.

CONFIDENTIAL

Q When did you stop dating Mr. Mueller?

A We stopped dating at the end of 2013, November/December-ish.

Q Is there any particular reason or event that that relationship ended?

A There wasn't. We just grew apart and decided it was best to part ways.

Q Okay. In addition to dating, did you have a business relationship with Mr. Mueller?

A In regards to just working with him at the station?

Q Correct.

A Yes, we did. As typical with account executives, they work with on-air talent to work on promotions, endorsements, things of that nature. We had the same working relationship as he did with every account executive in the building from a business level, yes.

Q And from a work perspective, do you have an opinion about -- how was it working with Mr. Mueller?

A I believe that Mr. Mueller was very business oriented. His primary goal was to work with clients and have them, you know -- and create successful campaigns for them through endorsements

Vague & ambiguous; Improper Opinion testimony; compound question; relevance

vague; ambiguous; improper opinion testimony; compound question; relevance

vague; ambiguous; compound question; relevance

leading; vague; ambiguous; relevance

leading; vague; ambiguous; relevance

CONFIDENTIAL

and promotions. He was very active in the station events and promotional aspects.

Q How much time -- from January until you guys broke up towards the end of 2013 --

MS. SULLIVAN: Oh, January '13, I'm sorry.

Q (BY MR. MCFARLAND) -- how much time were you spending together? Well, you were working together and you were dating?

A Yes.

Q And you were spending a lot of time together?

MS. SULLIVAN: Objection to form. Go ahead and answer. We should tell you, since you haven't been deposed before, I'm going to object.

THE WITNESS: Okay.

MS. SULLIVAN: Wait until I state my objection, and then you can continue to answer. This is for technical stuff for court reasons.

THE WITNESS: Okay.

A So you know, when Mr. Mueller first started, it was a fairly typical working relationship. When we did start dating, yes, just typical -- spending more time together outside of the office.

I'm not really sure how to define that,

leading; vague; ambiguous; relevance

vague; ambiguous; relevance

vague; ambiguous; relevance

vague; ambiguous; relevance; Improper Opinion Testimony

CONFIDENTIAL

but we were dating.

Q (BY MR. MCFARLAND) How much -- can you estimate how much time you were spending together on a weekly basis?

MS. SULLIVAN: Objection. Form. There's a two-year time frame there.

A Mr. Mueller was obviously on the air. He was on the morning show, so we were working a lot, but we did spend time together most evenings and on weekends.

Q (BY MR. MCFARLAND) Did you ever witness Mr. Mueller act inappropriately towards women?

A I did not.

Q Did you ever observe him inappropriately touching anyone?

A No.

Q Was he disrespectful to women in any way --

MS. SULLIVAN: Objection. Form.

Q (BY MR. MCFARLAND) -- that you observed?

A Not that I observed, no.

Q Did you attend a Taylor Swift concert with Mr. Mueller on January 2nd, 2013?

A I do not believe that was the date of the concert.

Q I'm sorry, June 2nd, 2013.

A Yes.

Q Who asked you to attend that concert?

A It was a work function. Mr. Mueller was asked to -- as most DJs are -- to do a meet-and-greet and be a part of the concert, so we were there strictly on a work basis.

Q Did Mr. Mueller ask you to attend the concert with him, or did work request that you attend the concert?

A A lot of the account executives were there as well. Typically with concerts of this nature, a lot of the salespeople go, and they'll bring their families, their kids, so it was a work level that we were there. I had credentials on and it was with KYGO.

Q And you were going with Mr. Mueller, but it was at the request of KYGO.

A Right. Yes. If I had not have gone, I wouldn't have gotten in trouble, per se, but it was a request that we were there and attending the show.

Q Was that request made by Mr. Haskell or do you recall?

A I do not recall.

Q Do you recall what time you arrived at the

concert?

A I really don't. I'm sorry. I don't know what time we got there. Probably it would be around 5:00, depending on when the show started.

Q And who did you go to the concert with?

A Mr. Mueller.

Q Nobody else drove to the concert?

A No.

MS. SULLIVAN: Objection to form.

Q (BY MR. MCFARLAND) Did you guys drive to the concert?

A We did.

Q Did he drive; did you drive?

A He drove.

Q And the concert was at the Pepsi Center?

A It was.

MS. SULLIVAN: Objection to form.

Q (BY MR. MCFARLAND) Did you guys have dinner or drinks before the concert?

A We did not have dinner before the concert, and we did not have drinks before the concert.

Q Do you know whether Mr. Mueller consumed any alcohol before the Taylor Swift concert on June 2nd, 2013?

A I do recall after the meet-and-greet that

there was a small bar in the Pepsi Center where, if I remember correctly, he did have a cocktail.

Q Did you observe Mr. Mueller on June 2nd have any other alcoholic beverages?

A No.

Q Did Mr. Mueller do any drugs?

A Not that I'm aware of.

Q Was he on any medication that you're aware of?

A Not that I'm aware of.

Q Did you have any drinks, alcoholic beverages, the night of the concert?

A I did not.

Q You didn't do any drugs?

A No.

Q And you weren't on any medication?

A No.

Q Tell me what you recall -- what was the first thing you can recall doing after you arrived at the Pepsi Center?

A We arrived. And KYGO was set up outside, so we were directed by Eddie Haskell -- Ryno was off the air to go back and get in line to have a meet-and-greet with Taylor Swift.

At that time, Mr. Mueller did not have

KYGO credentials, so I gave him extra of mine and we went back. We were escorted down to the right side of the stage as you're looking at the stage --

Q You're in the Pepsi Center?

A We're in the Pepsi Center. Yes, I'm sorry.

We were not in the same line as Mr. Haskell and Ryno. To my recollection, there was a media line that's typical when you go to concerts, media with their credentials goes in one line to do a meet-and-greet, and the public goes in another.

So we signed our names in the line and went back to where the holding area -- where Taylor Swift was to wait in line with the public to have a meet-and-greet session.

Q Why did you go in the public line rather than the media line?

A I don't know. That is actually a question I don't know the answer to. That was odd.

Q Okay. Was -- were you upset at being in the public line rather than the media line?

A Not upset, just unusual.

Q Was Mr. Mueller upset about being in the public line rather than in the media line?

A Again, I don't think he was upset. I

think we were just wondering why we were in that line instead.

Q Did you try to get into the media line or with the media group?

A No. We were told to stay where we were.

Q And who told you that?

A Well, it was a very organized line, you know. I would suspect, as it is with most of our concerts, they have to protect. If your name is on a piece of paper and you're in this line, you don't move. So we stayed where we were supposed to be.

Q And you haven't -- nobody has told you why you were in the public line as opposed to the media line?

MS. SULLIVAN: Objection. Form.

A That is correct.

Q (BY MR. MCFARLAND) Okay. How long did you wait in line?

A It was a good hour, if I recall.

Q And do you recall about how many people were in the line with you?

A I would say maybe 40. It was a large waiting area. There was a line and then a waiting area before you were let in to see Taylor.

Q Do you recall where you and Mr. Mueller

foundation; speculation; relevance

relevance

foundation, speculation, relevance

were in the line? Were you at the beginning or at the end or the middle?

A We were towards the end because we were -- you know, we had just gotten there, and we were put in the line, and so we were towards the end. We had people behind us, but not very many.

Q Do you recall whether there were other men in the line in front of you?

A There were mostly women and children.

Q Do you recall whether there were any other men in front of you?

A I don't recall. There might have been.

Q Do you recall whether there were any men behind you?

A I don't.

Q Do you recall what you and Mr. Mueller did while you were waiting in line?

A The waiting area was kind of neat. There were old costumes that she had displayed, so people were looking at those. I believe it was a room sponsored by Coke, so I remember it being red with Coke paraphernalia. So we were just looking at her items. I think there was jewelry. It was kind of like a museum -- if I can describe it that way.

Q At the time of the concert, were you a

Taylor Swift fan?

A I am not in Taylor Swift's demographic, so I wouldn't call myself a fan, no. I go around her music just because of the nature of my job.

Q At the time of concert, do you know whether Mr. Mueller was a Taylor Swift fan?

A I don't know. Again, I think it's part of his job to be supportive of artists, so...

Q What happened next? You're waiting in line, looking at the different museum -- sort of in line, and then what happened?

relevance

MS. SULLIVAN: Objection. Form.

A I remember it moving quickly. We were kind of -- we were asked to come into a separate room, which was where I recall a photographer, and Taylor Swift was standing there. She was just finishing up. There was a lot of little girls, so she was just finishing up with a group of little girls.

She and I had a conversation. She was very sweet. I told her that she's a great role model to girls, which I did believe. And quickly she did reach over -- I was standing on her right side, and she grabbed me and said, It's time for a photo.

And that's what happened.

Q (BY MR. MCFARLAND) Do you recall the approximate size of the room you went into when you met Ms. Swift?

A It was a small tent area, so it wasn't very large. I would say 20 by 20.

Q Okay. Who let you -- well, did someone let you into the room or escort you into the room?

A I don't recall. There might've been someone standing at the front of the tent area guiding people in, but that I'm not sure of. I've got to be honest with you, I don't know. The only person I remember standing there was the camera...

Q And when you entered, did you enter with Mr. Mueller?

A I did.

Q Do you remember whether you went in first or he went in first?

A I think I went in first because I was on her right side so that's -- yeah.

Q And when you entered, you remembered the photographer.

A Uh-huh.

Q Do you remember what kind of camera or device the person taking the pictures was holding?

A I don't recall exactly.

Q Do you recall whether the photographer was male or female?
A Female.
Q And Ms. Swift was in the room when you entered?
A Uh-huh.
MS. SULLIVAN: Objection to form.
Q (BY MR. MCFARLAND) Do you recall anybody else being in the room?
A I don't.
Q Do you recall receiving any head shots or photographs before you left the room?
A There was a photograph taken --
Q Okay.
A -- but that was -- it seemed like the typical meet-and-greet photograph and that was it.
Q And you've been to other meet and greets?
A Multiple, yes.
Q Do you recall whether there was anyone at the exit sort of escorting you out?
A What I do recall at the exit were all of our purses where they asked us to put our purses before we went in, so there was a table of purses.
There were a lot of people back there. As we were out of the tent, I don't recall how many, but

leading; foundation; relevance

CONFIDENTIAL

foundation, assumes facts not in evidence; misleading

they were definitely her staff. We did not interact with any of them.

Q Do you recall any other large men being in the room where you took the photograph?

A I don't.

Q Do you remember seeing any security personnel inside the room?

A Outside.

Q But not inside?

A Not that I can recall, no.

Q How long do you think you were in the -- other people have called this the photo booth.

A Okay, yeah.

Q How long were you and Mr. Mueller --

A No longer than 5 to 8 minutes. It was a fairly quick interaction.

Q And did you leave at the same time?

A Yes.

Q So tell me what you can recall when you entered the photo booth. What's kind of the first thing that happens?

A She was saying good-bye to her last guests, which I remember were little girls, maybe 8 to 12 years old, and then she came right over and started talking to me.

She did mention that she liked my belt, and we had a nice interaction.

And then she said very quickly, Time for a photo.

Q Did she -- before the photograph, did she have any interaction with Mr. Mueller?

A Not very much. I recall -- I was the one doing a lot of the talking. We're girls and we just started talking fashion, and there was not much interaction with Mr. Mueller at that time.

Q Okay. What was Mr. Mueller doing? Just standing there?

A Yes.

Q And then after you have this initial conversation --

A Uh-huh.

Q -- Ms. Swift indicates it's time for a photograph?

A Uh-huh. Yes.

Q And then walk through what happens next.

A So Mr. Mueller was on her left side. I think I mentioned earlier that Taylor kind of gravitated toward my side, put her arm, I put my arm, and according to -- you know, David leaned over and the photo was taken.

CONFIDENTIAL

I wasn't -- I did not see. I wasn't looking over at David to see how he was leaning over, or what the interaction was. I was just strictly on my side of Taylor, so...

Q Did anything happen during the taking of the photograph that suggested to you that anything inappropriate had taken place?

MS. SULLIVAN: Objection.

A At that time, no. Again, I could not see what was going on behind me, so I was unaware of anything that would have gone on. I gave -- Taylor was having her arm wrapped on me, we took a photo, and that was the end of it.

Q (BY MR. MCFARLAND) Did Ms. Swift kind of, you know, gravitate towards you before the photo was taken, or was it, you know, while the picture was being taken?

MS. SULLIVAN: Objection to form.

A I think because she and I were the ones interacting, it was more natural, you know, just to -- okay. Let's take a photo. And that's just kind of the nature of how I recall the position being, yeah.

Q (BY MR. MCFARLAND) Did you see Mr. Mueller kind of lean into the picture?

Compound question; foundation; speculation; vague & ambiguous; Improper Opinion Testimony

A Again, I do recall there was a lean because he was trying to get into the photo. It was an awkward distance between the two of them. That is what I recall about his stance at that time.

Q Did anything happen during the taking of that photograph that suggested to you Ms. Swift had a problem, or there was any issue, or that any incident had taken place?

MS. SULLIVAN: Objection. Form.

A There was not. We walked out of the tent after the photo and that was that.

Q (BY MR. MCFARLAND) Okay. Did Mr. Mueller say anything to you after you exited the tent to suggest that he had touched Taylor Swift?

MS. SULLIVAN: Objection. Form.

A What Mr. Mueller said to me was that it was a very awkward photo. Those are the words he used after we were walking out.

Q (BY MR. MCFARLAND) Okay. Do you recall anything else about what he said after exiting the photo booth?

A He had told me that he had tried to lean in, which, of course, I just said I could see him trying to get in the photo, and that it just seemed awkward. The positioning was awkward. And the

Foundation; vague; ambiguous; compound question; speculation; improper opinion testimony

Hearsay

CONFIDENTIAL

quickness of the photo being taken was awkward for a photo shoot environment.

Q What did you guys do next?

A We went upstairs. We left the tent. I got my purse. We briefly saw Eddie and Ryno. And then we went upstairs and that is when Mr. Mueller went outside to the KYGO booth area where we were still broadcasting live. I stayed inside and was waiting for him to come back in so we could go into the show.

Q Did you hear any conversation between Mr. Mueller and Mr. Haskell as you saw him after exiting the photo booth?

A I saw them speaking outside by the KYGO tent. So when we went out, I stayed inside. He went out the glass doors. The booth was right there and Eddie and Ryno joined the team.

Q How long after Mr. Mueller left the Pepsi Center did he come back to meet with you?

A Approximately 15 minutes, I would say, yeah.

Q What happened next?

A Mr. Mueller was explaining to me a conversation that he had with Mr. Haskell, and he was a little disturbed by what he had heard. Again, I

Hearsay

CONFIDENTIAL

did not hear this conversation. He had told me that Eddie Haskell was kind of joking around, that he knew Taylor Swift wore biker shorts under her outfit.

Q Did he give any more detail on what Mr. Haskell told him that you can recall?

A Yeah, I don't recall. I just know that he felt it was an awkward conversation.

Q And Mr. Mueller shared that with you before --

A Uh-huh.

Q -- before anybody from Taylor Swift's security team approached?

MS. SULLIVAN: Objection. Form.

A That is correct.

Q (BY MR. MCFARLAND) Okay. What else do you -- what happened next?

A So while we were having that conversation, we were walking toward the inside of the Pepsi Center concert area. And we went through the entrance hallway. And we did not sit down. We were not going to stay very long.

Again, we didn't want to stay for the whole show. So we were standing there above -- kind of on the railing, you know, before the chairs go down into the area and just watching the first part.

Hearsay

Leading, Foundation, Improper Lawyer testimony, Assumes facts not in evidence, Answer to question not designated, Incomplete

Q Okay. And then what happened?
A And then someone -- I was looking forward. Someone came and took Dave away and another person came out and stood with me, yeah.
Q Was the other -- the person who stood with you security personnel?
A I believe so. At this time, I did not know.
Q Was it a male or a female?
A I believe female.
Q Did she say anything to you about what was going on?
A She asked me if I knew Mr. Mueller and was with him at the concert. And of course I said yes.
Q Do you recall whether she asked any other questions of you?
A Not at that time.
Q Okay. Could you -- after -- you were standing there, and now you've got security next to you.
Do you know where Mr. Mueller is at this point? Can you see him?
MS. SULLIVAN: Objection to form.
A At this time, Mr. Mueller was back more in the tunnel area where we had walked through with, as

Hearsay

Foundation; compound question; relevance; misstates testimony; improper lay testimony

Same objection for pg 27 Ln. 24-25, pg 28 Ln: 1

I recall, a gentleman.

Q (BY MR. MCFARLAND) Can you see him at this point?

A I can see him at this point.

Q Can you see what's going on?

A I can see there's an interaction that's not something that is good.

Q Can you hear what's being said?

A No, I cannot.

Q Okay. What happens next?

A We were then taken back to a back hallway and into an odd storage-like room. I don't know where we were. I don't recall exactly what the room was called. It was just in the back hallway.

Q And then what happened?

A And then we were -- well, David Mueller was asked multiple questions about an incident in the photo area with Taylor Swift.

Hearsay

Q So at this time you're close enough to Mr. Mueller, and whoever is asking the questions you can hear what's being said?

A Right.

Q Okay. Is there one person asking Mr. Mueller questions, or was it more than one person?

A There were more than one -- there was more than one there. There was one main gentleman, I recall. He had an Australian or some type of accent -- that was asking him pretty heated questions, yes.

Hearsay; Relevance

Q And what kind of questions was he asking?

A I remember things like are you happy with yourself. I remember things like this has never happened before. I've been working for Taylor Swift for a long period of time.

And at that point it was indicated that something had happened in the photo booth in regards to David's hand behind her.

Relevance; Speculation

Q Okay. What were you thinking at that time? Do you recall what was going through your mind?

MS. SULLIVAN: Objection to form.

Relevance; Speculation

A It was scary. I'm not going to lie. I didn't know what was going on. Yeah. I don't -- yeah.

Hearsay; Speculation

Q (BY MR. MCFARLAND) Could you -- how did Mr. Mueller respond to the questions that were being asked by the guy with the Australian accent?

A I could tell he was trying to stay calm. They had him kinda up against a wall in more of an

Hearsay; Speculation

CONFIDENTIAL

interrogation type of a stance. And he was -- just kept saying over and over he didn't know what they were talking about.

Hearsay; Foundation

Q Did Mr. -- did you hear anyone talk about contacting the police during this portion of the events?

A I don't recall at that time.

Q Did you hear Mr. Mueller ask security to call the police?

A Yes, I do remember that. I do remember that.

Hearsay

Q What do you recall about that?

A He was trying to get in touch with the authorities because I think he was afraid that he was being wrongly accused of something. So that was his first instinct, I would imagine. So I do remember him asking to have someone call the police, yeah.

Q Did the police ever ultimately show up?

A No.

Hearsay

Q Can you recall anything else about the conversation between Mr. Mueller and the security at this point?

A Not much more further at that point. I do remember he asked for Eddie Haskell.

Q Okay. Mr. Mueller did?

Hearsay

A Yes. I'm sorry.
Q And did Mr. Haskell show up?
A No, he did not.
Q What do you recall happening next?
A After that, we were escorted out of the Pepsi Center.
Q By the Australian man --

Foundation; Assumes facts not in evidence; vague; ambiguous

MS. SULLIVAN: Objection. Form.
Q (BY MR. MCFARLAND) -- or the man with the Australian accent?
A I'm not sure if he was one of them, but there were two of her team that walked us out.
Q What do you recall about your conversations with Mr. Mueller after you were kicked out of the Pepsi Center?
A Sure. We were in shock, to be honest. We got in his car. And at this point, Mr. Mueller was still trying to contact Eddie Haskell.
I don't recall if we had any interaction with him over the phone during the drive home, but at that juncture we went to Mr. Mueller's house and started making phone calls mainly to Mr. Haskell and to Joe Ryno.
Q And what was the point of making those phone calls?

Speculation

MS. SULLIVAN: Objection. Form.

A I believe that Mr. Mueller was trying to get some support from his team and trying to have a conversation with them about what just occurred.

Speculation

Q (BY MR. MCFARLAND) Do you recall anything else that we haven't talked about from that -- from that evening, June 2nd, 2013?

A That's really the gist of it.

Q Okay. Did you ever ask Mr. Mueller whether he inappropriately touched Ms. Swift?

A I absolutely did.

Q And what was his response?

A His response was, How could you ask me that?

I wondered because he did say it was an awkward photo, if something accidentally happened, you know. I was worried for him.

Q Given your relationship with Mr. Mueller and --

A Yeah.

Q -- the time that you spent with him and your interactions with him, do you think he intentionally grabbed Ms. -- intentionally inappropriately touched Ms. Swift in any way?

Speculation; Foundation; compound question; vague & ambiguous

MS. SULLIVAN: Objection. Form.

Speculation, foundation; compound question; vague; ambiguous

A From what I know about David Mueller from the time we spent together, it is hard for me to believe he would intentionally do something like that to a woman.

Again, I don't have eyes in the back of my head. I don't know for sure, but I would say that he -- from the time we spent together, he is not the type of man who would intentionally do something like that.

Q (BY MR. MCFARLAND) And why do you say that?

A Just because of the way he treated me, and the way he treated the women in my family and around us.

Q Okay. After the concert, did you -- did anybody from Lincoln Financial talk to you about the alleged incident with Ms. Swift?

A Our HR lady, Maureen Marsh, had a conversation with me, I believe, a couple of days after.

Q Okay. Anybody else from Lincoln Financial talk to you about the alleged incident with Ms. Swift?

A I don't believe so, not right after, no.

MR. MCFARLAND: Let's go ahead and mark

this Exhibit 1.

(Exhibit 1 marked for identification.)

Q (BY MR. MCFARLAND) I know you had a chance to review this before the deposition. Do you know what Exhibit 1 is?

A Exhibit 1, it looks to be a written summary of the conversation I had with Ms. Marsh.

Q And this indicates -- or at least there's a note at the top -- that that interview took place on June 3rd, 2013.

A Okay.

Q Does that sound about right, the day after?

A The day after, so it would have been Monday. I believe so.

Q Okay. Did you take any notes from your conversation with Ms. Marsh?

A I did not. Huh-uh.

Q Do you know whether that conversation was recorded in any manner?

A Not to my knowledge.

Q Is there anything in Ms. -- and this was -- your understanding is this was drafted by Ms. Marsh rather than you.

A Yes.

No question designated: incomplete

CONFIDENTIAL

MS. SULLIVAN: Objection to form.

A I did not draft it.

Q (BY MR. MCFARLAND) Is there anything in this dialogue that's on -- or these notes from Exhibit 1 that's inaccurate?

MS. SULLIVAN: Objection to form.

A This looks fairly accurate to me.

Q Nothing jumps out at you as being way off base?

A Not in the immediate moment.

Q Do you recall whether there were things that you talked to Ms. Marsh about that are not in her notes here?

A This is obviously a brief -- just a snapshot of what we discussed, but it sums it up fairly well.

Q Do you remember how long your conversation with Ms. Marsh was?

A It was a good half an hour, if I can recall.

Q Did she indicate to you what the purpose of the meeting was?

A It wasn't a formal meeting. I don't recall her calling me in necessarily to go over what happened. Mr. Mueller, obviously, was under scrutiny

A I did not.

Q After Mr. Mueller's termination, did you have any conversations with Bob Call about Mr. Mueller or his termination?

A I do recall that, yes.

Q What do you recall about that conversation?

A I believe -- again, I'm trying to recall that conversation. Bob Call was poignant about the fact that he had no other choice but to terminate him, and that basically I was to go on with my job, which I did.

Q Okay. Did Mr. Haskell ever say anything derogatory about Mr. Mueller?

MS. SULLIVAN: Objection. Form.

A I recall as Mr. Haskell and David Mueller and Ryno were working together, there were some struggles there between, you know -- since he's the program director and since they were on air, it wasn't -- it was a tough relationship for a while.

But again, that can happen when you're trying to manage new on-air shows and trying to merge new personalties together, yeah.

Q (BY MR. MCFARLAND) How did Mr. Mueller react to his termination?

Speculation; Improper Opinion Testimony

Speculation; Improper Opinion Testimony

Relevance; Speculation

Relevance; Speculation

CONFIDENTIAL

A He was devastated. This was really a big career opportunity for him that he took very seriously.

Q Were -- how did your friends and family react to the -- to Mr. Mueller's termination?

MS. SULLIVAN: Objection. Relevance.

A Sure. They were just as shocked as I was, I think. I think everyone in my inner circle, like myself, would like to say that he would not be capable of doing something of that nature.

Again, they weren't there. I was not able to see anything either way, but it was disappointing that he was going through this situation.

Q (BY MR. MCFARLAND) Have you ever been the subject of inappropriate touching? And I'll just let you know. I'm specifically wondering whether there was any incident with Nate Lundy.

MS. SULLIVAN: Objection to form.

Q (BY MR. MCFARLAND) Again, this is confidential. I don't want to embarrass you. If there's anything that we're getting into that you're not comfortable with --

A Yeah.

Q -- let me know and let's go off the record for a minute and talk.

CONFIDENTIAL

A Yeah. Yeah, that would be great.

MR. MCFARLAND: Okay. Let's go off the record.

(Discussion off the record.)

MR. MCFARLAND: Back on the record.

Q (BY MR. MCFARLAND) Have you ever been inappropriately touched?

A "Inappropriately touched" is a strong word for me. There have been instances of uncomfortable situations, yes.

Q And did those situations occur -- well, did one of those situations develop with a Nate Lundy?

MS. SULLIVAN: Objection to form.

A There was an incident with Nate Lundy, yeah.

Q (BY MR. MCFARLAND) Was Mr. Mueller around during that incident?

A Yes.

MS. SULLIVAN: Objection to form.

Q (BY MR. MCFARLAND) And how did Mr. Mueller react to that incident?

A He didn't like it, you know. I think Nate was out of line and thought he could get away with certain things. I think that frustrated David

Foundation

Speculation

CONFIDENTIAL

Speculation

Hearsay; Speculation

Mueller quite a bit, because I wasn't the only person that it was occurring with.

Q (BY MR. MCFARLAND) Do you know whether Mr. Mueller ever took any action or talked to anyone at Lincoln Financial about Nate's behavior?

A I believe he might have. I was against it because for me it's very serious when you accuse someone of something.

And we were in a public place. I believe Mr. Lundy was intoxicated, and I would have chosen to move on. But I do remember David and I having the discussion that he really wanted to push forward with pursuing Nate Lundy, and I wasn't as eager to do that as he was, so...

Q The incident with Mr. Lundy, did that take place before or after the Taylor Swift concert?

A Before.

MR. MCFARLAND: I think those are all the questions that I have. Thank you.

MS. SULLIVAN: If we could take a break, I would like to use the restroom and maybe call my virtual colleagues before we go back on the record.

MR. MCFARLAND: Sounds great.

(Recess taken from 11:09 a.m. to 11:25 a.m.)

MR. MCFARLAND: Impressive.

Q (BY MS. SULLIVAN) Going back to Exhibit 1 again, this morning before Ms. Wright and I arrived, did Mr. McFarland ask you any questions at all about this document?

A No, he did not.

Q Did he ask you if you recognized it?

A The only time I was asked if I recognized it was when we were already on the record, yeah.

Q Okay. And did he tell you what it was?

A He made reference that it was from Ms. Marsh, and again I was remembering, oh, it's probably Maureen.

Q And did he tell you why he was showing it to you before?

A No.

Q And he asked no other questions about it; is that correct?

A That's correct.

Q Did you volunteer any information to him about this?

A We had no conversation about it, yeah.

Q When was the last time you saw Mr. Mueller in person?

A Oh, goodness. Mr. -- let's see. That was

relevance

CONFIDENTIAL

back in, I believe, when I accepted the iHeart media job. I was thinking about accepting it. That would've been August of 2015 when we saw each other briefly and just checking in.

Q Did you arrange to see each other, or you bumped into each other? You said you saw each other briefly.

A He asked me to go to dinner, and I had not wanted to because we weren't dating anymore. I believe I was seeing someone at the time, but as friends we went to dinner, so...

Q Okay. Where did you go to?

A I believe it was McCormick & Schmick's in the Tech Center.

Q Did he pick you up?

A No. We walked there. He came to my house and we walked there because I lived right there.

Q Was that a pleasant reunion?

A I wouldn't say it was pleasant or unpleasant. It was just, hey, how are you. How are things type of a reunion.

Q Did he tell you why he wanted to see you again?

A No.

Q Did you discuss this lawsuit at all?

relevance

relevance

Was there some point in which you became aware he filed a lawsuit publicly?
A There was.
Q And when was that?
A That was briefly after I took the job at iHeart, I would say two weeks into it, so mid-September.
Q Of --
A 2015.
Q How did you become aware of it?
A I became aware of it through public -- on the news, yeah. I had someone contact me at iHeart, which I did not speak to them, but I figured at that point something was going on.
Q Okay. I want to unpack that a little bit.
A Sure.
Q Did you personally see it in the news media first, or did somebody contact you first, or was that -- can you explain that to me?
A Sure. That afternoon when I was at iHeart, I got a very strange text message from a media show -- I don't remember which one. And at that point, I went and talked to my marketing president and filled her in on what was going on just so -- obviously, my career is very important to me,

and I wanted them to be in the know of what was going on if my name was associated with it.

I do believe at that time, or shortly after that day, it was mentioned in InsideRadio and my name was used. And that night I got that text, I did see it on multiple shows on TV.

Q What did the text say? You described it as strange.

A Just unknown. I didn't know the number, you know.

It was some type of show saying, Can you comment?

I did not reply at all.

Q Okay. Did you ever tell Mr. Mueller you were upset with him for identifying you in a lawsuit?

A I did.

Q When did you do that?

A Probably the day I got that text because I had assumed -- I hadn't seen the TV yet. I assumed something had gone on.

Q So you contacted him sometime in September of 2015; is that correct?

A That would be -- yeah, that would be correct.

Q Okay. How did you contact him?

A I think via text message. I didn't talk to him.

Q Okay. And do you remember what you said?

A If my name is being used, I would've liked to have known in advance.

Q Did you reply?

A Did he reply?

Q Excuse me, yes. Did he reply?

A I don't believe he did. If anything, it was probably I'm sorry.

Q And I want to ask you a little bit more about when your relationship with Mr. Mueller began.

A Sure.

Q You testified you were aware that he started at KYGO in January 2013.

A Uh-huh.

Q And I think you said you started dating sometime in February 2013; is that correct?

A Yes. We went and watched the Super Bowl together, and that was when we had our first date -- I guess you could say.

Q How did you first actually physically meet him?

A He was brought into our KYGO sales meeting the first week of his job.

just, hey, the typical text message when you start to say, oh, you know, you're kinda cute.

Q And that was that?

A Yeah.

Q Okay. Great. And you said that you broke up in February 2013; is that correct?

A No. That's when we started dating.

Q November 2013?

A Yes, around that time frame.

Q And you testified that you kind of just went your separate ways?

A Uh-huh. Uh-huh.

Q Was there anything more to it than that?

A No.

Q Was it a mutual decision?

A It was. It really was. We again just kind of parted ways and life happens, uh-huh.

Q Do you know whether he was unfaithful to you?

A I don't think so. Not that I know of.

Q Give me a second. Sorry. I want to ask you about getting the backstage passes to the Taylor Swift concert.

A Sure.

Q When did you learn that Mr. Mueller had

relevance

A We were hanging out -- honestly, I almost didn't go, to be honest, because, again, that wasn't really something that -- it wasn't a show I would've wanted to go to typically. So we didn't do anything in particular that day that I can recall.

Q Was Mueller with you that day, during the day?

A Probably. I don't remember.

Q You testified that you didn't have any drinks at the concert.

A We went to that bar and I recall David buying a drink, and if I had a drink I didn't consume it, because we went outside right after that, and then we were taken away. So, no, there were not drinks consumed, which was the question that was asked of me, no.

Q Okay. Had you had anything to drink earlier that day?

A No.

Q Do you know whether Mr. Mueller had?

A I don't believe so. But, again, I don't recall.

Q How long were you in the KYGO area of the parking lot prior to going into the arena?

A It was very quick. I think I had

credentials?

A Again, they were there. I'm sure they looked to see if we had them. But no, we didn't have to point them out or do anything special, as I recall, yeah.

Q Okay. Okay. And did you show your credentials to anyone prior to seeing Taylor?

A No.

Q You testified that after the meet-and-greet, Mr. Mueller exited the Pepsi Center; is that correct?

A Yes. After we left the meet-and-greet room, we went back upstairs and he walked out of the Pepsi Center.

Q Okay. And you testified that you remained in the Pepsi Center?

A Correct.

Q Why didn't you walk out with him?

A I was just waiting for him. There was no reason for me to go out.

Q Okay. But you said that you could see him; is that correct?

A Uh-huh.

Q So you were standing --

A Inside the glass doors. The tent was

right outside, yeah.

Q Okay. And how long was he outside for?

A About 15, 20 minutes from what I can recall.

Q And you just stood there waiting in the vestibule the entire time?

A Yeah. I was on my phone. I was just inside.

Q You also testified that there was some -- I'm trying to remember the word you used -- some friction or tension between Eddie Haskell and Ryno and Mr. Mueller.

I think you described it as a struggle or a merge of personalties; is that correct?

A It is. Uh-huh.

Q At what point in the relationship between Mr. Haskell and Ryno and Jackson did those struggles emerge?

A At what point in time did they begin?

Q Uh-huh.

A You know, I don't recall, again, because that wasn't really my -- that's not my department. But I do know that there were just -- again, merging of personalties, trying to -- they're all three new trying to work together.

Q Uh-huh.

A And so as a staff we knew because we were doing promotions and things like that, so it just kinda comes out, you know.

Q And you testified you were dating Mr. Mueller by February of 2013.

A Uh-huh.

Q And you testified that you were spending most nights together and weekends; is that correct?

A Yeah. I mean, not right off the bat. It was a new relationship, and we were obviously being very careful to keep work and the relationship separate.

So March/April is when -- like with a natural relationship of how it grows, we would spend more time together, yeah.

Q Would you characterize yourself as in love with Mr. Mueller at that time?

A I was falling in love with him, I believe.

Q Was he in love with you?

A I think so.

Q Did he ever tell you that he was?

A Yes.

Q Did you tell him you were in love with him?

Cumulative

relevancy

CONFIDENTIAL

Relevance

A I did, yeah. I mentioned it.

Q So then outside what was happening with just the -- what you knew was kind of the bullpen as an account rep and the staff of the morning show --

A Uh-huh.

Q -- did you and Mr. Mueller talk about work when you were alone together?

A I'd say when two people work together in the same industry, and especially in the same office, it's normal to talk about work when you're at home sometimes.

Q Did you and Mr. Mueller talk about work when you were alone together?

A Every once in a while, yeah, we talked about our day just like any couple.

Relevance

Q And you testified that you are both pretty serious career people; is that correct?

A Yeah.

Q Did Mr. Mueller ever talk to you outside of the office about Eddie Haskell?

A We really tried not to do that. It was not a topic of conversation that was common, no.

Q So he never spoke to you about Eddie Haskell?

A Not that I can recall any specific time,

relevance

CONFIDENTIAL

no. The only things I knew were what went on in the office. And again, if it was mentioned, we tried to nip that before -- you know, we were at home and wanted to enjoy our evening. So we really tried not to, no.

Q Uh-huh. Do you know how Mr. Mueller felt about Mr. Haskell?

A Only from, again, them trying to work together on promotions and merging their personalities. Like I said, I don't know anything beyond that of any heightened nature.

Q Did Mr. Mueller like him?

A I don't know.

Q Did he dislike him?

A I don't know that either.

Q Did he think he was talented?

A Did Mr. Mueller think Eddie was talented? I would imagine. I would imagine, yeah.

Q But you don't know whether he did or not?

A No -- I mean, as his boss, you know, but there was never a conversation of was he talented, no.

Q Do you have a personal opinion about Eddie Haskell?

A My personal opinion when I worked with