1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLORADO

3       Civil Action No. 15-cv-1974-WJM

4       DAVID MUELLER,

5       Plaintiff and Counterclaim Defendant,

6       vs.

7       TAYLOR SWIFT,

8       Defendant and Counterclaimant,

9       and

10      FRANK BELL, and
        ANDREA SWIFT, a/k/a ANDREA FINLAY,
11
        Defendants.
12
        ------------------------------------------------------------
13
                        REPORTER'S PARTIAL TRANSCRIPT
14                          (Jury Trial - Day 2)
                                 VOLUME III
15
        ------------------------------------------------------------
16

17          Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

18      Judge, United States District Court for the District of

19      Colorado, commencing at 10:28 a.m., on the 8th day of

20      August, 2017, in Courtroom A801, United States Courthouse,

21      Denver, Colorado.

22

23

24

25

```
 1                             APPEARANCES

 2         M. GABRIEL McFARLAND and NEIDE GILLIAN COOLEY
      MORRISON, Evans & McFarland, LLC-Golden, 910 13th Street,
 3    Suite 200, Golden, Colorado 80401, appearing for the
      plaintiff and counterclaim defendant.
 4
           J. DOUGLAS BALDRIDGE, KATHERINE M. WRIGHT, DANIELLE R.
 5    FOLEY, Venable LLP-DC, 600 Massachusetts Avenue, NW,
      Washington, DC 20001       AND
 6         JESSE P. SCHAUDIES, JR., 13 Management LLC, 718
      Thompson Lane, Suite 108526, Nashville, Tenessee 37204,
 7    appearing for the defendants and counterclaimant.

 8                    MARY J. GEORGE, FCRR, CRR, RMR
                   901 19th Street, Denver, Colorado 80294
 9               Proceedings Reported by Mechanical Stenography
                     Transcription Produced via Computer
10

11                 P R O C E E D I N G S

12         (This transcript continues after jury voir dire was

13    completed)

14                   *       *       *       *       *

15         (In open court in the presence of the jury at 10:28

16    a.m.)

17              COURTROOM DEPUTY:  Your Honor, I need to pull a

18    monitor.

19              THE COURT:  Okay.

20              COURTROOM DEPUTY:  Or you can move down.

21              THE COURT:  All right, ladies and gentlemen of the

22    newly impaneled jury, we are now going to hear the opening

23    statements of counsel.  I remind you that the arguments of

24    the lawyers are not evidence.

25              All right.  Opening statement for the plaintiff.
```

1           MR. McFARLAND:  Thank you, Your Honor.

2           THE COURT:  Mr. McFarland.

3           MR. McFARLAND:  Ladies and gentlemen, let's be

4   clear about something from the onset:  Inappropriate

5   touching is offensive, it's wrong, and it should never be

6   tolerated.  Let's also be clear that falsely accusing

7   someone of inappropriate touching is equally offensive,

8   it's equally wrong, and it, too, should not be tolerated.

9           This case is not about whether inappropriately

10  touching someone or falsely accusing someone of

11  inappropriate touching is wrong.  We know that's wrong.

12  Both of those things are wrong.  This case is about whether

13  Mr. Mueller took his hand, put it underneath Ms. Swift's

14  skirt at a June 2d, 2013, meet-and-greet, and grabbed her

15  rear.  And he held on.  The question is did he hold on as

16  she tried to get away.  That's the question.  Did he do

17  that or not?

18          Second question:  If you determine, based on the

19  evidence, that he did not inappropriately touch Ms. Swift

20  in the way that she contends, was he fired as a result of

21  the accusations and what Ms. Swift's team relayed to his

22  employer, KYGO?  That's what this case is about in a

23  nutshell.

24          Let's get into the details of what the evidence is

25  going to show.  Mr. Mueller got into radio in 1994, after

1    working in other fields, after doing some college work.  He

2    got a work -- he got a job in radio for 5 bucks an hour and

3    he fell in love with it.  He's worked in radio ever since

4    1994, at least up until the time Ms. Swift made her

5    allegations.

6            He worked off air, doing production type stuff;

7    he's worked on air, over the years, and that's what he

8    really loved.  And he also created a company that provided

9    materials to other morning shows along the way.

10           In January of 2013, he was hired by KYGO, which is

11   a radio station here in Denver, owned at the time by

12   Lincoln Financial.  It was his dream job.  He got to come

13   to Denver, a city that he loves.  He was working on air

14   again, his real passion, on air.  He was part of a morning

15   show with one of his very best friends, a guy named Ryan,

16   a-k-a Ryno, Kliesch.  They'd known each other for a long

17   time.  They had been trying to work together for a long

18   time.  And it came together for them at KYGO in Denver.

19           In addition, KYGO paid him really well.  He got a

20   $25,000 signing bonus when he signed a contract.  The

21   contract was for $150,000 a year, and it provided some

22   additional ways of earning additional income through

23   promotions and those types of things.  The total package

24   was worth a couple hundred thousand dollars a year.  And

25   that was a lot of money to Mr. Mueller.

1              In late May of 2013, Mr. Mueller and Mr. Kliesch

2      were asked by their immediate supervisor, their immediate

3      boss, whose name is Hershel Coomer.  He goes by, at least

4      in the radio business, Eddie Haskell.  Mr. Haskell asked

5      Mr. Mueller and Mr. Kliesch to attend Taylor Swift's

6      concert on June 2d, 2013.  He asked them to go there and

7      promote the station and to attend a meet-and-greet to help

8      promote this station before the concert began.

9              June 2d was a Sunday and Mr. Mueller, as part of

10     the morning show, 5 a.m. show on Monday, he wasn't really

11     excited to go to that concert.  He's not really a country

12     western music fan.  Had nothing against Ms. Swift or her

13     music, but wasn't a big fan, but, moreover, he knew he had

14     to get up at 4:00 in the morning and go to work the next

15     day.

16             In any event, realizing that promotions like that

17     are part of the business, part of what's expected, part of

18     what is required, he had no problem going.  He's

19     participated in hundreds of other similar sorts of

20     meet-and-greets with other incredible music and

21     entertainment superstars.  Just to name a few, he's met

22     with Cheryl Crowe, Beyonce, Christina Aguilera, and the

23     list goes on and on.

24             On June 2d, 2013, Mr. Mueller picked up his

25     girlfriend.  His girlfriend's name is Shannon Melcher.  She

1    also worked at KYGO.  And they started dating around

2    Valentine's of 2013.  So by the time of the concert, they'd

3    been together as a couple for some time, and it was a

4    serious relationship for both of them.

5            They arrived at the Pepsi Center about 5:00 on the

6    2d.  They parked at the Pepsi Center.  They went to Will

7    Call and picked up their VIP passes to get into the

8    meet-and-greet and they made their way into the Pepsi

9    Center.

10           They were directed to a line.  They waited in line

11   for about 45 minutes.  And then they entered a larger room

12   underneath the Pepsi Center.  The room's about 30 by 30,

13   and it will be described as the VIP room.  This is a room

14   where certain guests get to mingle a little bit with Ms.

15   Swift before the concert.

16           When they entered the larger VIP room, Ms. Swift

17   was not in that room, and the line continued.  They waited

18   in line for another 15 minutes or so, and they came to the

19   entrance to a smaller room, a room that was about 10 feet

20   by 10 feet, small room.  It was made of fabric walls.

21           There was a representative of Ms. Swift's team at

22   that entrance, asking people, "How many people are in your

23   group?"  And kind of ushering people into this smaller

24   room, which is generally referred to as the photo booth.

25           And that's what happens in that room:  Short

1    introduction, photograph with Ms. Swift, you get a signed

2    autograph headshot, and you're out the door.  Moves along

3    pretty quickly.

4             When Mr. Mueller and Ms. Melcher entered the photo

5    booth, they see Ms. Swift.  Introductions are made, Ms.

6    Taylor Swift says hello and, "Nice to meet you," and Mr.

7    Mueller and Ms. Melcher say the same thing.

8             Ms. Melcher has a plastic sleeve that hangs on her

9    neck and it has a business card in there that says KYGO.

10   And, you know, they introduce themselves as, you know, "Hi,

11   we're with KYGO.  It's really nice to meet you," that kind

12   of thing.

13            After brief conversation, Ms. Swift says, "Let's

14   pose for a picture.  Let's get a photo."  And they get into

15   photograph position.

16            THE COURT:  Mr. McFarland, just if you start

17   moving from the mike, keep that in mind, either raise your

18   voice or stay closer to the mike.

19            MR. McFARLAND:  Thank you.

20            THE COURT:  All right.  I know you have the pipes

21   to do this.

22            MR. McFARLAND:  When Ms. Swift says that, she's

23   closer to Ms. Melcher; she's closer to Mr. Mueller's

24   girlfriend.  And it sort of takes Mr. Mueller by surprise.

25   He wasn't sure there was going to be a photograph, he

1    wasn't quite ready for it, and when she said that, he kind

2    of jumped in to get into the picture.

3            Then the photograph was taken.  And then Ms. Swift

4    shook Mr. Mueller's hand, she gave Ms. Melcher a hug, and

5    they walked casually out of the photo booth.

6            Once they were out, they picked up Ms. Melcher's

7    purse, and Mr. Mueller went to meet Eddie Haskell, check

8    in, see if there was anything else that the radio station

9    needed him to do.

10           He, in relatively short order, found Mr. Haskell,

11   had a brief conversation with him.  And it was during that

12   conversation that Mr. Haskell said something strange.  He

13   said, "You know, geez, you know, did you meet Taylor?  I

14   met her.  She gave me a big hug and she was happy to see

15   me, and I think she was wearing bike shorts."

16           And at the time, Mr. Mueller didn't think much

17   about it.  He pretty quickly went out -- left Eddie

18   Haskell.  Eddie said, "No, we don't need anything else for

19   you.  Enjoy the show."

20           Mr. Mueller went to his car, he put the signed

21   autograph headshot that he got in the car, and then he made

22   his way back to the stadium.  The entire time from the time

23   they left the photo booth until he returned to the venue

24   and found Ms. Melcher, and they were -- they headed back in

25   to catch some of the concert, was 15 to 30 minutes.

1              And it was as they were heading back into the

2    venue, into the concert area, that a security guard came up

3    to Mr. Mueller and said, "Are you happy with yourself?"

4              And otherwise accused him of inappropriately

5    touching Ms. Swift.

6              They were -- Mr. Melcher and -- I'm sorry, Mr.

7    Mueller and Ms. Melcher, shortly after that, were escorted

8    from the premises.  And the next day they met with Mr.

9    Mueller's supervisor, Eddie Haskell, and Eddie's superior,

10   Bob Call.

11             At the conclusion of that meeting, they said,

12   "We'll be back in touch."  The next day, he was fired.  Mr.

13   Mueller was fired.  That's January 4th.

14             So the meeting was Jan- -- I'm sorry, the meeting

15   was June 3d with Mr. Mueller, Mr. Haskell, and Mr. Call.

16   The next day Mr. Mueller was fired.

17             The reason he was given for his firing was that he

18   violated a morals clause that is in his contract.  And

19   generally that morals clause says:  If you do something

20   immoral, or if you're accused of doing something immoral,

21   we can fire you.

22             So Lincoln Financial slash KYGO, they had the

23   right to fire him because he had been accused of

24   inappropriately touching Ms. Swift.

25             Now, it's not surprising that one of -- when one

1    of the planet's most successful, powerful, popular

2    superstars or her team contact a radio station, contact Mr.

3    Mueller's radio station, that he was fired, particularly

4    where the team, and, in particular, the defendant, Mr.

5    Bell, told Bob Call, the decision-maker at KYGO the

6    following:

7         He told Mr. Bell that Mr. Mueller had groped Ms.

8    Swift.  He told Mr. Call that Taylor's family was upset.

9    He told Mr. Call that they wanted KYGO to do the right

10   thing; that they expected KYGO to do the right thing.

11        Mr. Call -- I'm sorry, Mr. Bell told Mr. Call that

12   Taylor's -- Ms. Swift's mom and dad were extremely upset,

13   especially mom.  Mr. Bell told Mr. Call that this was an

14   extremely serious situation.  He told Mr. Call that

15   Taylor's relationship with KYGO could be gravely impacted

16   and they are considering all their options.

17        That means:  We want you to fire him.  There's no

18   real dispute about that.

19        Mr. Bell also said, "There's photographic

20   evidence.  We'll send you a picture."  And we'll show you

21   the picture in just a minute.

22        It's important to note, though, that at that time,

23   when Mr. Bell was saying, "There's photographic evidence,"

24   he didn't talk to any witnesses.  There were other people

25   in the photo booth when this photograph was taken.  They

1    didn't see what Ms. Taylor Swift accuses Mr. Mueller of.

2    They didn't see Mr. Mueller take his hand, put it under her

3    skirt, and latch on to her rear.  Nobody saw that.

4            That was careless and it was reckless and it's

5    part of what has in many ways destroyed Mr. Mueller's life.

6            So that there's no misunderstandings here, David

7    Mueller absolutely and unequivocally denies that he put his

8    hand under Ms. Swift's skirt and grabbed her bottom.  He

9    unequivocally denies that he grabbed her rear outside of

10   her clothing.  He denies that he touched her

11   inappropriately in any way whatsoever.

12           He acknowledges that there was some contact,

13   physical contact, when they came together for the picture,

14   his hand may have brushed her rib as he -- as they went in

15   together.  He describes, and will describe, some jostling

16   of the hands and the coming together, but no inappropriate

17   conduct.  That's Mr. Mueller's position.

18           And it's interesting, Ms. Swift and Mr. Mueller's

19   versions are alike in many respects.  Ms. Swift agrees that

20   at the time of the alleged incident, she didn't have much

21   of a reaction.  She didn't say anything.  She didn't do

22   anything.  That she, you know, shook their hand and said

23   goodbye on the way out.

24           It's also critical to understand what Ms. Swift

25   acknowledges in this lawsuit.  She -- she acknowledges

1    that -- well, her position is that Mr. Mueller touched her

2    inappropriately just once.  And he never touched her

3    inappropriately outside of her clothing.  That's her

4    position.

5            Her position is that the only inappropriate

6    touching was done underneath the skirt when he grabbed her

7    rear, and it was at the time this photograph was being

8    taken.

9            Let's take a quick look at the photo.

10           THE COURT:  Counsel, is there a stipulation for

11   this admission of this exhibit?

12           MR. McFARLAND:  Yes, there is, Judge.

13           MR. BALDRIDGE:  No objection, Your Honor.

14           THE COURT:  Okay.

15           MR. McFARLAND:  This is the photo.  The contention

16   early on was that -- and this is by Ms. Swift's team -- was

17   that this is photographic evidence of Mr. Mueller's bad

18   behavior, his bad conduct.  And it's an awkward picture.

19   His hand, if you look just at the picture, it could be

20   behind Ms. Swift's rear, or it could be on it, if you just

21   look at the picture.

22           But, again, Ms. Swift testified in her deposition,

23   and she'll testify here in court, that Mr. Mueller never

24   touched her inappropriately outside of her clothing.  He

25   never grabbed her rear or touched her rear outside of her

1    clothing.  And if you look at that photograph, his hand is

2    not underneath Ms. Swift's skirt, and Ms. Swift's skirt is

3    not ruffled, it's not rumpled, it's not affected in any

4    form or any fashion.

5           So we've got here a situation of one of the

6    jurors -- or potential jurors said kind of a

7    he-said-she-said situation.  That's what we've got.

8           So what else is there?  What else is there for you

9    to look to to try to resolve who's telling the truth, whose

10   version makes the most sense?  I would ask you to consider

11   two things:

12          No. 1:  Mr. Mueller, he was 51 years old at the

13   time of this meet-and-greet.  He had a beautiful girlfriend

14   who he felt very, very strongly about, who he really liked,

15   who he had told that he loved.  He had a wonderful job.  He

16   had -- he had his dream job.  There was no job he wanted

17   more in his life.  And Ms. Swift's contention is that he

18   came in with Ms. Melcher, introduced himself as a KYGO

19   morning show host, and 30 seconds later had his hand up her

20   skirt.

21          I don't know what kind of person does something

22   like that, but it's not the person who's got a dream job,

23   who has a girlfriend that he loves, and just introduced

24   themselves in a way that identifies exactly who they are

25   and where they work.

1          Moreover, there were other people in that photo
2    booth.  Again, it's a 10 by 10 room.  And all of those
3    people are affiliated with the defendants.
4          COURTROOM DEPUTY:  You have two minutes.
5          MR. McFARLAND:  Thank you.
6          They all worked for Taylor Swift.  Erica Worden,
7    the tour manager, less than seven feet away the entire
8    time, never saw Mr. Mueller take his hand, put it
9    underneath Taylor Swift's skirt.
10          Gabby Liddicoat, Ms. Swift's personal assistant,
11    she never saw -- she was the same distance, never less than
12    seven feet away, focused on them the whole time.  Never saw
13    Mr. Mueller's hand go under her skirt and inappropriately
14    touch Taylor Swift.
15          Shannon Melcher, Mr. Mueller's girlfriend.  They
16    have since broken up.  She's going to testify she didn't
17    see anything.  Now she wasn't necessarily focused, she was
18    looking at the camera, but she didn't see anything or
19    observe anything that suggested anything inappropriate
20    happened.
21          Stephanie Simbeck.  She was Ms. Swift's
22    photographer.  She was focused on the group the entire
23    time.  She didn't see it.  And, most importantly, Greg Dent
24    was set up behind Mrs. Mueller, Ms. Swift and Ms. Melcher.
25    Mr. Greg Dent was Ms. Swift's personal professional

1     bodyguard and his job was to make sure that nothing

2     happened to Ms. Swift, and he was focused on the back of

3     these folks.  He didn't see that.  And he didn't do

4     anything.  If he had seen anything to suggest there was

5     inappropriate conduct, that Mr. Mueller had taken his hand

6     underneath her skirt and touched her, he would have acted.

7     And Mr. Mueller would have been hurt.

8          It's no surprise that the accusations and the

9     firing had been devastating to Mr. Mueller.  He wants

10    primarily his good -- or what was his good name back, his

11    reputation.  That's most important.

12         And if you think it's reasonable, if you think

13    we've met our burden, he also wants to be fairly

14    compensated for the income that he's lost and his ability

15    to income -- to earn income in the future.

16         Thanks for your time.  I very much appreciate it.

17         THE COURT:  Thank you, Mr. McFarland.

18         All right.  Opening statement for the defendants.

19         MR. BALDRIDGE:  Your Honor, may I first move the

20    easel into position, if it's acceptable to the Court?

21         THE COURT:  Sure.  You may.

22         MR. BALDRIDGE:  My preference would be right here

23    if I may.

24         THE COURT:  Your 20 minutes won't start until

25    you're ready.

1               MR. BALDRIDGE:  They're precious minutes, sir.

2          May I begin, sir?

3               THE COURT:  Yes.  Mr. Baldridge.

4               MR. BALDRIDGE:  Good morning -- or afternoon.

5     Whatever it is.  As you know, my name is Doug Baldridge.

6     And let me tell you, I'm real excited.  And you should be,

7     too.  And it's not because somebody famous is sitting in

8     this room.  It's because you, over the next couple of

9     weeks, are going to exercise something incredibly important

10    in our democracy and that is your rights under the Seventh

11    Amendment to the United States Constitution.  That gives

12    you the power in this room over everyone, except Judge

13    Martínez, with respect to the law, and with it comes

14    enormous responsibility to do what you're charged to do by

15    the Court, and to do your job.

16              And how do you do that?  He's already told you in

17    your pledge:  You follow his instructions, you leave your

18    bias at the door, and you listen to the evidence.  And,

19    boy, is the evidence overwhelming.

20              I'm honored here to represent Ms. Taylor Swift;

21    her mother, Andrea Swift; and Frank Bell.

22              What happened on June 2d, 2013?  Well, on June 2d,

23    2013, David Mueller, a 51-year-old disk jockey, grabbed my

24    23-year-old client's rear end at a pre-concert

25    meet-and-greet, plain and simple.  And Mr. McFarland called

1    it inappropriate touching.  It's an assault.  It's not

2    inappropriate touching, it was an assault and Ms. Swift

3    reported it.

4          And that is what is before you:  The reporting of

5    an assault in the workplace by that man right there, David

6    Mueller.

7          You know who Ms. Swift is, but let me tell you

8    about Ms. Swift and Mr. Mueller.  She had never met Mr.

9    Mueller.  She had never heard of Mr. Mueller.  She had

10   never heard of Mr. Mueller's radio show.  She had been in

11   probably tens of thousands of meet-and-greets, including

12   going out into the crowds during tours, and not once had

13   there been an incident like occurred on June 2d, 2013.

14         And the evidence will show, as you probably can

15   reach on your own, what possible motivation, what possible

16   motivation, would Taylor Swift have to make up a story that

17   someone she never knew, after years of interaction with her

18   precious fans, actually grabbed her in the rear end and

19   assaulted her?  There's no motivation.

20         What is certain here, and it's an absolute

21   certainty, is Ms. Swift.  And she will get on the stand and

22   tell you, Ms. Taylor Swift, that she is absolutely certain

23   that David Mueller grabbed her rear end at that

24   meet-and-greet and she was assaulted.

25         It wasn't Eddie Haskell, Hershel Coomer, as Mr.

1    McFarland said.  It was David Mueller.  And the evidence

2    will bear that out.  Now, that's the one and only story we

3    have to tell you, is that this man grabbed her rear end.

4            Mr. Mueller has six different stories about what

5    happened, and I just heard one today, a seventh story about

6    what happened.  Mr. Mueller's first story was that he

7    denied doing it.  His second story was that he said, "Well,

8    if I did do it, it was an accident or it was incidental."

9    That's what he said to his boss, Bob Call.

10           His third story came two years later in the filing

11   of a complaint with this Court where he said, "Well, my

12   boss, Eddie Haskell, confessed to doing it the night of the

13   concert.  He said he did it."  The boss that was about to

14   fire him, by the way, for other reasons unrelated.

15           Fourth, he said he couldn't have done it because

16   his fist was behind her back, therefore, there's no way he

17   could grab with a fist.

18           And, fifth, in his deposition under oath, he said,

19   "Well, my open hand was jostling" -- "was jostling," was

20   his word -- "with Ms. Swift's."  And he ended it with, "I

21   don't know where my hand went."  That's under oath, and

22   you'll hear it from his mouth when I cross-examine him.

23           Sixth, out on a PR mission, he goes on Mojo in the

24   Morning, Detroit radio, and he says, "Well, our arms

25   crossed, but I never touched her."

1          And then, seventh, as you heard today from Mr.

2    McFarland, he touched her rib, but didn't touch anything

3    else.

4          Spoliation.  Big lawyers' word.  I'll tell you

5    what it means in this case.  Since this incident on June

6    2d, 2013, that man, David Mueller, has lost or destroyed

7    five different computers or cell phones, gone.  Some or all

8    of them containing evidence of what occurred the night of

9    June 2d, 2013.  Not one of them is even physically

10   available to look at.  It's all gone.  He has made sure you

11   will never see all the evidence.  And you can rest assured

12   that when you lose every single one of your computer

13   devices and phones after an incident like this, that what

14   is on those devices would not favor his case.

15         And you know what the most incredible thing about

16   this fact pattern is:  He is the plaintiff.  He has sued my

17   client after grabbing her rear end in an assault, and

18   destroying every bit of computer evidence that existed

19   about it, and he wants you to give him a payday.

20         He's trying to make the victim pay the price,

21   seeking millions of dollars from you in this case.  And for

22   what the evidence will show his motivation is money,

23   calling attention to himself, and getting revenge on his

24   boss, Eddie Haskell, Hershel Coomer, and KYGO.

25         Now the evidence here is fairly simple, but the

1     evidence will also show that what is at stake is really,

2     really important.  And what is at stake is:  Will this man

3     be able to stifle any person's -- in this case, a young

4     woman's -- right to report a sexual assault in the

5     workplace to her management?  Don't we encourage that?  And

6     don't we encourage that management figure out what actually

7     happened, which is exactly what happened here when KYGO

8     determined what this man did?

9          What else is at stake is:  If this person, as Mr.

10    McFarland called her, an international superstar, cannot

11    stand up and serve as an example to other women and people

12    assaulted, who can?  And what will you say about that when

13    you look at the evidence?  What will you say is to be

14    tolerated and not to be tolerated to every other woman,

15    wife, daughter, whoever they may be?

16         And will you make her pay the price three times?

17    He grabbed her rear, he victimized her through this lawsuit

18    by blaming it; now he wants her to pay him.

19         I have every confidence that you will follow Judge

20    Martínez's instructions and you'll follow the evidence.

21    You'll divorce yourself from bias.  And I'm certain that

22    when you hear it all, you are going to return a verdict for

23    all three of my clients, the defendants in this case.

24         Now, let's back up.  Who's at this table?  Well,

25    first of all, you heard about Mr. Bell.  Mr. Bell's

1      employment -- is employed by 13 Management, which is a

2      legal entity.  And he is what we call Ms. Swift's radio

3      guy; the relationship guy with radios in her organization,

4      and radio stations.

5              This woman right here, is Andrea Swift.  Also a

6      defendant, and an employee of 13 Management.  She's a

7      brilliant person, but, most importantly, including at all

8      relevant times in this case, she was first and foremost Ms.

9      Taylor Swift's mother when this happened.  She's the one

10     that stood by her shoulder to shoulder and protected her

11     through every single meeting of thousands over the years,

12     with adults as she came into the industry, and made sure

13     what happened the night of June 2, 2013, wouldn't happen.

14             It finally happened that night.  And, of course,

15     you know Taylor Swift.  We all think we know her, we read

16     things about her.  I know her as a friend and a woman

17     that's taking a stand through this case for all women,

18     including my daughters.

19             She stands before you with all the risk and lies

20     and judgment for you to decide what's going to be

21     appropriate and inappropriate.

22             There's an additional person at this table, my

23     dear friend, Mr. Jay Schaudies, or Jesse Schaudies, who is

24     a senior management within the Swift's organization, and

25     also the general counsel and a lawyer that deals with the

1    daily things within that organization.

2            And our trial team, my partner of many years, who

3    I am never at trial without, Danielle Foley.  And our,

4    forgive me, prized associate, Katie Wright.  Terrific young

5    lawyer.  You'll hear from each of them in this proceeding.

6            What's an opening statement?  What is an opening

7    statement?  Well, it's a rare opportunity for me and Mr.

8    McFarland to speak directly to you.  But it's something

9    more to me.  It is a promise about what the evidence will

10   show.  I am making promises to you about what the evidence

11   will show.  Mr. McFarland made promises to you about what

12   the evidence will show.  Hold me accountable.  Hold him

13   accountable.  Add it all up in the end.  Remember what I

14   said, remember what he said, see what actually happens.

15           I make the following promise to you, and promises

16   to you about this case.  As I've already said on June 2d,

17   2013, Ms. Swift was assaulted when a 51-year-old man put

18   his hands -- his hand on her rear at a meet-and-greet.  She

19   was 23.

20           I'm not sure what Mr. McFarland was referring to,

21   because there were six people in the room, and he said no

22   one saw anything.  I promise to you -- and you listen to

23   the evidence -- that four people in that room either saw

24   him do it or saw something so unusual and so uncomfortable

25   in a reaction that they knew something had happened.

1          Now, Greg Dent -- I don't even know where that

2     statement came from, that Greg Dent didn't see anything.

3     Greg Dent is going to come on this stand -- a former NSA

4     security guy -- and tell you he saw the hand there.  I

5     don't know where the comment comes from that that man did

6     not see what happened.

7          And the others, you'll learn, saw various things,

8     from her pulling away, to her demeanor, and other actions

9     that showed something very seriously -- serious had

10    happened, and they had seen her in thousands of photos.

11         The fifth person in the room, other than those

12    four, which were Erica Worden, Greg Dent, Gabby Liddicoat,

13    and Stephanie Simbeck, was Shannon Melcher, an employee of

14    KYGO, who Mr. Mueller started dating after a few weeks on

15    the job, who accompanied him.

16         And to be fair, she says she believes Mr. Mueller.

17    But she's also very clear she doesn't know what happened.

18    She's right there in the room, as Mr. McFarland said.  She

19    didn't know what was going on behind her.  She was looking

20    at the photo.  She doesn't know.

21         And, really interestingly, Mr. Mueller himself

22    testified that she asked him right after the event, "Did

23    you do it?"  And his answer was really curious to me.  "I

24    can't believe you asked me that."  He didn't say no.  He

25    didn't say he didn't do it.  He expressed disbelief.

1    Perhaps that's a no.  What would you do if you were accused

2    of a criminal assault?  And, of course, the sixth person in

3    that room when that photo took place was David Mueller.

4          Like I said, and I don't need to go through it

5    again, he's changed his story, I thought six times, but now

6    I know seven times, since now he touched her rib.

7          His official in-writing position, though, when he

8    had to actually commit to the Court two years after this

9    incident, suing for millions of dollars, was that his boss,

10   Eddie Haskell, or Hershel Coomer, confessed, not that she

11   had bicycle shorts on, which is part of it, but he puts

12   right in his complaint that Mr. Coomer said he put his

13   hands on Ms. Swift's bottom, that he put his hands on Ms.

14   Swift's bottom.  That didn't come up for two years.

15         We had all these other stories before and then two

16   years when the case was filed, suddenly his boss did it.

17         Now, as an aside, Ms. Swift has worked the radio

18   stations for years.  They started out in the Ford Taurus

19   together driving from radio station to radio station.  And

20   she's known Eddie Haskell, slash Hershel Coomer, since she

21   was a younger person.  Professionally she's known him.

22   Eddie Haskell did not touch her.  She will -- is absolutely

23   certain of that.  And Eddie Haskell was not even in the

24   meet-and-greet.  Eddie Haskell spent most of the evening in

25   a separate VIP media situation with Ms. Swift's mom,

1    Andrea.

2          Mueller elaborated under oath at his deposition

3    that Eddie had bragged about it, two years after the

4    incident, keep in mind.  And you're going to hear from Mr.

5    Haskell, himself, who's coming in here and he's going to

6    say, "It's a lie," and I don't say that lightly.  He's

7    going to say David Mueller lied.

8          What's wrong with this picture?  Well, a woman is

9    assaulted, a woman reports it, and she gets sued.  It just

10   doesn't make any sense.  And she gets sued in a situation

11   where a plaintiff, himself, has put under oath in court

12   that someone at KYGO touched this woman's rear end.  He

13   says any number of seven different things, but he says, "It

14   wasn't me," but then he says, "KYGO employee Eddie Haskell

15   did it."

16         So she's defending a lawsuit where someone at KYGO

17   touched her rear end, according to the plaintiff, himself.

18         What happened next after the meet-and-greet?

19   Well, Ms. Swift reported what happened to the four people

20   in the room.  You're going to hear language like this.  She

21   said something to the effect, "Dude, that guy just grabbed

22   my ass."

23         Stephanie Simbeck, who you will hear from on the

24   stand, who is the photographer, is going to say, and

25   testify, that she said, "I knew immediately who it was,

1    Taylor.  I saw your reaction.  I've got the photo."  And

2    she pulled up the photo without Ms. Swift even identifying

3    who it was; the photo you've seen.  She said, "I knew

4    something happened."

5            And Erica Worden, a long-term good friend and

6    associate in the organization with Ms. Swift, who has seen

7    her in tens of thousands of photos is going to say, "I saw

8    Taylor react and I knew something weird happened.

9    Something happened when that guy was in here."

10           And she's going to say it right there on that

11   stand, and I promise it to you.

12           Gabby Liddicoat, in the room, is going to say,

13   "Taylor was -- something uncomfortable is going on," were

14   her words.  "Something happened."

15           And Greg Dent is, as I've already said, is going

16   to come here and he will say, "I saw it happened."

17           Now, Mr. McFarland said, Well, Mr. Dent didn't get

18   him, he's a bodyguard.  He should have done something.

19   Well, as you might imagine, it's not that simple.  And the

20   reason it's not that simple is this:  Every single move

21   this young woman makes, right or wrong, good or bad, the

22   media picks up.

23           There were little girls in the line right behind

24   Mr. Mueller, there were other fans in the line and an

25   immediate reaction did nothing but put her on the cover of

1    a magazine in a situation she didn't want to relive, and

2    she didn't want to have to deal with the way she's having

3    to deal with in this case, defending this lawsuit.

4         The other reason is this:  Mr. Dent will tell you

5    there are rules of the game in security.  He takes his cues

6    from Ms. Swift.  Upon signal, and only upon signal, is he

7    to take action.

8         She took the risk of waiting another few minutes

9    until Mueller got out and the young women -- young people

10   were out of the room to report the incident.  And you're

11   going to hear from University of Colorado esteemed

12   professor, Dr. Lorraine Bayard de Volo, that Ms. Swift's

13   reaction is the textbook reaction in this situation, and

14   there's nothing unusual about it.

15        What happened next?  Well, Ms. Swift was ushered

16   to her dressing room before the concert that night by Erica

17   Worden, and she had a private moment with her mother.  Her

18   mother, first and foremost, and a 13 Management senior

19   manager.

20        Andrea Swift wasn't happy.  Would you be if

21   somebody grabbed your daughter's rear end?  After years and

22   miles of protecting her daughter, it had finally happened.

23   Somebody old enough to be her father had touched her in

24   this industry in the wrong way, an assault.  And darn

25   straight, Andrea Swift was mad.  As would I be, as you

1    should be.

2            COURTROOM DEPUTY:  You have five minutes.

3            MR. BALDRIDGE:  What happened next?  Taylor turned

4    to her work obligations that night.  She had a concert to

5    put on.  That's the end of the story as to Taylor Swift.

6    She was assaulted, and she reported it, she went about her

7    duties and that's it.

8            She never spoke to anyone at KYGO.  She never

9    instructed anyone to take any action with respect to Mr.

10   Mueller, and on she went.

11           Ms. Andrea Swift met with Frank Bell.  They made

12   the decision that KYGO needed to know what happened.  And

13   why did they do that?  First of all, it's the right thing

14   to do.  An on-the-job assault had occurred.  Tell the

15   employer, let the employer deal with it, and to protect

16   others.  Other young women that will be going through this

17   process do not need to be subjected to this kind of

18   conduct.

19           So Mr. Bell, in a confidential manner, spoke to

20   Bob Call, a long-term friend, and delivered this photo, as

21   you know -- I'm going to tell you, keep a look on this

22   photo.  There's a mystery about this photo that you're

23   going to learn through the evidence.  Awkward as it looks,

24   bad as it looks there, there's a real mystery.

25           Mr. Call made a decision to terminate Mr. Mueller

1      and he made it on three reasons, and he's going to say it

2      under oath.  First of all, he's going to say Mr. Mueller

3      changed his story in the middle of a two-hour interview.

4      Changed it from, "I didn't do it," to, "If I did it, it was

5      an accident."

6              Secondly, he's going to say he independently

7      decided that photo showed something wrong was going on.  It

8      cast him in a very bad light, and, of course, third, he

9      took the credibility of his 25-year-long friend, Frank

10     Bell, that something had happened.

11             What happened next?  He fully investigated and he

12     interviewed Mr. Mueller and interviewed everyone in that

13     room that night.  And this is where Mr. Mueller changed his

14     story in that interview, but what happened in that

15     interview is very interesting.  Mr. Mueller snuck in a

16     recording device and secretly recorded it.  He had two

17     hours of recordings of what happened.

18             One hour, 45 minutes, 17 seconds he has destroyed

19     of those recordings by destroying those five electronic

20     devices I told you about.  He cherrypicked 14 minutes of

21     the investigation Bob Call conducted and now he says it was

22     a flawed investigation.

23             Every one of those devices has disappeared.  It's

24     not just broken, they disappeared.  I can't get a forensic

25     scientist to come in and see what was on them.  I can't

1     inspect as to whether his claims that water spilled on them

2     or coffee spilled on them actually ruined them.  He

3     destroyed the evidence.

4          Now, the interesting thing, though, is in that

5     recorded meeting, one thing he does admit is this:  He

6     never told anyone in the investigation on June 3d, 2013,

7     that Eddie Haskell confessed to it, but yet he claims the

8     investigation was flawed, an investigation not conducted by

9     my client, but KYGO.  So he never uses his alibi; the alibi

10    that the other guy did it.  Didn't come up until two years

11    later.

12         Now, we move on.  And I'm telling you, you're

13    going to see the evidence that this man did it.  And

14    there's two additional things I want you to think about.

15    Changes story seven times.  Don't need to go through that

16    again.

17         Ending in the last story of his deposition, "I

18    don't know where my hand was."  Changes story seven times.

19    This side of the table has never changed their story.

20         Second point I want to make is this:  I've already

21    said:  What possible motivation could Ms. Swift have to be

22    here for this and go through this, and go through this

23    expenditure, 10 days in court, years of costs and

24    depositions, defending and reliving an assault by this man?

25    It's ridiculous to think; ridiculous.

1          His motivation's clear.  You're going to learn

2     there were two meet-and-greet groups that night.  His

3     bosses were in the VIP group, he was in what he called the

4     little-girl line, showing off for his new girlfriend,

5     Shannon Melcher, who tried three to four different times to

6     try to get out of the line they were in to get in the VIP

7     group.  He was humiliated by the time he met Miss Swift.

8          The second motivation is pretty clear:  Eddie

9     Haskell had told him, along with other employees at KYGO,

10    that three days before this June 2d, 2013, event happened,

11    that he was about to get fired for cause because he was

12    doing all kinds of things to KYGO that they found

13    unacceptable.  Why not blame your boss, Eddie Haskell, at

14    some point if that's the guy that's about to fire you

15    before there's even a shred of an allegation about the --

16    about an assault?

17         And then, finally, money.  This man -- just

18    remember the number 15.  He had a two-year contract with

19    KYGO, he had about $200,000 left on it, he wants you to

20    give him 15 times the amount he had left on his contract.

21    15 times he wants Ms. Swift to pay him the amount of money

22    he was entitled to under his contract.

23         Finally, Ms. Swift has a counterclaim.  She has

24    countersued him, only after being sued, because she didn't

25    want this public, has countersued him for assault.  She

1    wants one dollar.  She's not trying to bankrupt this man.

2    She's trying to tell people out there that you can say no

3    when somebody puts their hands on you, no matter who you

4    are, and have the courage to do so.

5           Grabbing a woman's rear end without her permission

6    is an assault and it's always wrong.  As Mr. McFarland

7    said, any woman, rich, poor, famous or not, is entitled to

8    not allow that to happen.

9           I have absolute faith that you will follow the

10   evidence and listen to Judge Martinez's instructions, you

11   will return a verdict for each of these defendants.

12          Thank you for your time.  Let's go get them.

13          THE COURT:  Thank you, Mr. Baldridge.  Will you or

14   someone from your team please take down the easel.  It's --

15   and then we can turn the lectern back to its regular

16   position.

17          Thank you, Ms. Wright.

18          All right.  The plaintiff may call his first

19   witness.

20          MR. McFARLAND:  Thank you.  We call David Mueller.

21          COURTROOM DEPUTY:  Step up in the box and raise

22   your right hand, please.

23          DAVID MUELLER, PLAINTIFF'S WITNESS, SWORN

24          COURTROOM DEPUTY:  Please be seated.  State your

25   full name for the record and spell your first and last

Direct - Mueller

1    name.

2         THE WITNESS:  David Joseph Mueller.  D-a-v-i-d,

3    M-u-e-l-l-e-r.

4                      DIRECT EXAMINATION

5    BY MR. McFARLAND:

6    Q.   Good morning, Mr. Mueller.

7    A.   Good morning.

8    Q.   Mr. Baldridge, in his open, indicated that you were

9    asking for 15 times your salary.  Did you hear that?

10   A.   I did.

11   Q.   Is that true?

12   A.   No, it's not.

13   Q.   What are you asking for in this case?

14   A.   I am trying to clear my name and I am asking for the

15   lost earnings, whatever the jury sees fit.

16   Q.   You're not asking for any specific number from the

17   jury?

18   A.   I am not.

19   Q.   Let's -- with that question, let's start from the

20   beginning.

21   A.   Okay.

22   Q.   And let's tell the jury a little bit about yourself.

23   Where did you grow up?

24   A.   I grew up on the east side of St. Paul, Minnesota.

25   Q.   Did you go to high school there?

174

Direct - Mueller

1    A.    I did.

2    Q.    Did you graduate from high school?

3    A.    I did, with honors.

4    Q.    What did you do after high school?

5    A.    I applied to the University of Minnesota Institute of

6    Technology and I was accepted.  But I was only 17 and I

7    wasn't ready to go to a big campus, so I decided to start

8    working.  And I took a job working for the phone company

9    installing electronic equipment.

10   Q.    How long did you have that job?

11   A.    I did that for two years.

12   Q.    What did you do after that?

13   A.    Well, the first year I was in Minnesota and the second

14   year I was in California.  So after that, I was in

15   California and I got another job in California working for

16   an electronic parts distributorship.

17   Q.    And briefly what did you do for the electronic parts

18   distributorship?

19   A.    I was hired at Acacia Sales to be a cable assembler.

20   Acacia Sales worked primarily with military contractors --

21   this was in San Diego -- and all the components they were

22   providing to the -- for the military contracts.  And after

23   a short period of time, I was promoted to the warehouse

24   manager.

25   Q.    And what did you do after that?

Direct - Mueller

1    A.    While I was working at Acacia Sales, I decided I

2    wanted to go back and get more education.  So I applied to

3    the University of California - San Diego, and I also

4    attended one semester of school at Mesa Junior College in

5    San Diego.  And I got accepted at UCSD.

6    Q.    Did you attend full-time or part-time?

7    A.    I started out attending full-time and then switched to

8    part-time.

9    Q.    Did you graduate from UCSD?

10   A.    I did not graduate.

11   Q.    How long -- how long did you go?

12   A.    It was on and off from the fall of '82 until the early

13   '90s.

14   Q.    When did you get into radio?

15   A.    I got into radio in 1994 in San Diego.

16   Q.    What was your first job in radio?

17   A.    My first job in radio was answering the request line

18   for the KFMB FM night show.  I got paid $5 an hour.

19   Q.    How long did you do that job?

20   A.    I did that a few months.

21   Q.    And then what?

22   A.    The radio station manager, program director, wanted me

23   to talk to the head of the promotions department about a

24   position in promotions.  And I talked to them and they

25   offered me a promotions coordinator job and I took it.

Direct - Mueller

1    Q.    How long did you serve in that role?

2    A.    That would have been right around a year.

3    Q.    Then what did you do?

4    A.    I moved to another position at the same radio station,

5    KFMB FM, also known as Star 100.7.

6    Q.    What was the new position?

7    A.    My new position was on the morning show, working with

8    a man named Dave ^ Smiley.  It was his, so . . .

9    Q.    Was that an on-air position?

10   A.    It was -- sometimes I was on air.  Most of my duties

11   were behind the scenes.  And I was answering the phones for

12   Dave during the show, it was a live show, Monday through

13   Friday, from 5:00 a.m. until 10:00 a.m.

14   Q.    How long did you serve in that position?

15   A.    I -- well, at KFMB I worked with Dave until his show

16   was taken off the air.  And it wasn't because of ratings,

17   it was just a business decision.  They brought in a

18   different morning show and Dave and a couple other people

19   on the show left.  And I stayed there at Star, but then the

20   show was put back together again across the street with a

21   company named JACOR.

22         And they contact- -- JACOR contacted me and asked

23   me to come and rejoin the show and I did.

24   Q.    What did you do for JACOR?

25   A.    They gave me the title of morning show producer.

Direct - Mueller

1    Q.   And what time -- what period of time are we at this

2    point?  You started in 1994.

3    A.   Right.  We were at the JACOR station, KKLQ, in '9- --

4    until '97 or '98.

5    Q.   What did you do after that?

6    A.   Well, JACOR was bought up by a company named Clear

7    Channel, which is not -- which is now iHeart.  And when

8    Clear Channel bought up that station, it bought up other

9    stations as well in San Diego and throughout the country.

10         And so there was a lot of transition at that time

11   in the radio industry.  And I got moved from one Clear

12   Channel station to another Clear Channel station in San

13   Diego.  They transferred me, essentially.

14   Q.   What was your position or your role with the new

15   station in San Diego?

16   A.   My first duty was morning show producer for several of

17   the stations in a different building.  Station -- stations

18   I'd never been affiliated with.

19   Q.   And then you had a subsequent position?

20   A.   Then they -- what happened was they just made me the

21   executive producer of the KHTS morning show, Channel 933,

22   it was a Top 40 station.  And I was working with a -- a

23   gentleman named Chio.  He was the host of the show and I

24   was the second person on the show.

25   Q.   Was that on-air or off-air work?

Direct - Mueller

1    A.    I was on air and I was also doing a lot off air behind

2    the scenes.

3    Q.    What was your -- what was your next position?

4    A.    From there, the upper management in San Diego for

5    Clear Channel proposed to me that they had two

6    opportunities that would -- they'd like me to consider.

7    One or the other.  It was either go to Phoenix or go to the

8    Los Angeles market, and I chose the Los Angeles market.

9    Q.    And what -- what work did you do in Los Angeles?

10   A.    I was paired up with a man I knew from San Diego named

11   Randy, Randy DeWitt.  And we were the new morning show

12   for -- it was KXMX.  And it was -- it went by Mix.

13             And it was Ran Man and Dave.  And I was an on-air

14   personality, but I was also the promotions director for the

15   station and I was also the executive producer of the

16   morning show.

17   Q.    How -- how long did you serve in those capacities?

18   A.    I was there at Mix until they -- Clear Channel sold

19   the station to Salem Broadcasting and that was in -- the

20   news was made public at the end of -- toward the end of

21   1999.

22   Q.    What did you do then?

23   A.    I talked to several higher-ups with Clear Channel and

24   I told them that I wanted to stay -- I didn't want to work

25   with -- for Salem, I wanted to work for Clear Channel.  And

Direct - Mueller

1    I asked them if they had any opportunities for me.  And

2    they said, "Yes.  What do you want to do?"

3            And I said I want to work on a big morning show, I

4    don't care where it is, I want to work on a big morning

5    show.  And they told me that they had a big morning show in

6    Columbus, Ohio, 175,000 watts, and it was a legendary Top

7    40, Heritage Top 40, and I jumped at that and I moved to

8    Columbus, Ohio.

9    Q.   And how long did you work in Columbus?

10   A.   It was about one year.

11   Q.   And that was on air?

12   A.   I was the executive producer of the morning show and I

13   was on air every day.

14   Q.   What did you do after that?

15   A.   Well, I was -- I did not have a contract in Columbus

16   and I was -- people were approaching me about other morning

17   show opportunities around the country.  And the most

18   promising one was in Kansas City working with my friend,

19   Ryno.  I'd met him in San Diego when we -- we worked for

20   JACOR together.

21           And I -- I had an interest in staying with Clear

22   Channel in Columbus but, as I said earlier, there was a lot

23   of transition.  One of the things that was happening is

24   that people were leaving and the positions weren't being

25   full -- filled.  So when I was at WNCI in Columbus, Ohio,

Direct - Mueller

1    we lost our program director, our assistant program

2    director, and our promotions director within the course of

3    six months.  And none of those positions were filled.

4              And it -- we still had a lot of fun and we were

5    doing well, but it was just difficult not having a full

6    staff, and I had to take over the promotions department and

7    all my responsibilities with the morning show.  And I

8    talked to the market manager and I asked him, "Are you

9    going to fill these positions soon?"

10             And he said, "We don't know."

11             And I said, "Well, I'm going to have to" -- and I

12   gave -- I -- I resigned, I gave two weeks' notice, and I

13   took a job in Kansas City working with my friend, Ryno.

14   Q.   And what's Ryno's full name?

15   A.   His full name is Ryan Kliesch.

16   Q.   And that's the same individual that you subsequently

17   worked with here in Denver?

18   A.   Yes, sir.

19   Q.   In -- when -- what period of time are we talking about

20   when you're in Kansas City working with Ryno?

21   A.   We got to Kansas City at the end of 2000.

22   Q.   How long did you work with Ryno in Kansas City?

23   A.   We worked in Kansas City for about one year on the

24   air.

25   Q.   Where did you go after that?

Direct - Mueller

1    A.    After Kansas City, I decided to contact Clear Channel

2    again.   And I talked to Clear Channel Philadelphia and

3    Clear Channel Minneapolis, and I chose Minneapolis, which

4    is where I grew up, rough -- you know, basically.   And so I

5    took a job as the executive producer of the KDWB morning

6    show.

7    Q.    And how long were you in that position?

8    A.    I was on the air there for 3 1/2 years.

9    Q.    What did you do after that?

10   A.    After that, I was working full-time for a business I

11   had cofounded while I worked at KDWB.

12   Q.    What's the name of that business?

13   A.    The name of the business is Nine Ball Radio.

14   Q.    And what did Nine Ball Radio do?

15   A.    Nine Ball Radio was designed to provide content for

16   radio morning shows each morning, Monday through Friday.

17   It was a product that a morning show could access through

18   our website and use -- to use our material on their show.

19   And we had various products available on our website.

20   Q.    And how long did you work full-time for Nine Ball?

21   A.    Full-time would have been 2005 through when I resigned

22   at the very end of 2012, as I resigned as an employee at

23   the end of 2012.

24   Q.    Why did you resign from Nine Ball?

25   A.    Well, I had -- I was about to take a job at KYGO in

Direct - Mueller

1    Denver to work with Ryno and I couldn't do both.

2    There's -- both -- doing a morning show and all the duties

3    I had at Nine Ball would have been almost impossible.  And

4    I thought it would be -- I was co-owner of Nine Ball, so I

5    wanted to do what was best for Nine Ball, so I gave a two

6    weeks' notice and I trained people to take over my

7    responsibilities and then I left as an employee, but I

8    stayed a shareholder.

9    Q.   When were you hired by Nine Ball -- I'm sorry, when

10   were you hired by KYGO?

11   A.   I signed my contract on January 3d of 2013; however, I

12   knew that I was going to be hired.  I was in Denver in

13   December of 2012 looking at places to live.  And I actually

14   rented a place to live while I was in Denver in December of

15   2012, so it was -- we knew -- well, I knew that I was going

16   to have a contract offered to me and I would be able to

17   sign it in the first week of January.

18   Q.   How did that employment opportunity come about?

19   A.   When I was working with Nine Ball, I stayed in close

20   contact with Ryno, my good friend from -- originally from

21   San Diego.  He was working in Nashville.  He was doing a

22   top-rated afternoon show at the Heritage Top 40, the River,

23   in Nashville.

24        And from time to time, throughout his -- his

25   employment with the River, they would mention to him that,

Direct - Mueller

1    "We'd like you to do the morning show."  And he would

2    always tell his bosses, "Well, if you want me to do the

3    morning show, I'd like to have my friend, Jackson, come

4    down and do the show with me."

5           And he finally got the opportunity to do the

6    morning show.  It took a while, but they finally said,

7    "Yes, we want you to try this.  And yes, your friend can

8    come down."

9           And I took one week and I -- I talked to his boss,

10   Michael Bryan, he was the program director, and I said,

11   "I'll come down for one week and you guys can hear our show

12   and then you can decide what you wanted to do."

13          And that one week in Nashville created air chats

14   that were distributed by a radio consultant named Steve

15   Reynolds.  He got his hands on our air chats from that week

16   in Nashville and we very quickly heard from KYGO.

17   Q.   Why did you accept the -- the position with KYGO?  Was

18   that on air or off air?

19   A.   It was for the cohost of the morning show at KYGO, on

20   air.

21   Q.   And why did you accept that position at KYGO?

22   A.   It was a dream come true.  I -- I couldn't have asked

23   for anything -- a better situation.  I was going to be

24   reunited with my friend, Ryan.  And I always liked Denver,

25   and I wanted to live in Colorado for many years.  It was

Direct - Mueller

1   a -- Lincoln Financial Media was a good company to work

2   for.  They put together a very handsome offer.

3          I had been -- I came to Denver and I met with all

4   of the people I'd be working with except for Eddie Haskell.

5   And we -- we were just -- Ryno and I were both very excited

6   about the opportunity and we both resigned from -- he

7   resigned from his job and I resigned from my job to do this

8   dream job.

9   Q.   What was the term of your initial contract with KYGO?

10  A.   The contract I signed was guaranteed for two years

11  with some additional items and then there was a third year

12  that the company had us under control if they wanted us.

13  Q.   Okay.  And what was the -- what was the goal of the

14  show, or the format?  What -- what kind of morning show was

15  it supposed to be?

16  A.   Well, I'd have to base my answer on what I was told by

17  Steve Reynolds, who was going to be our consultant.  He's

18  the one who found us through the WSIX audio.  He told us to

19  just, you know, be ourselves.

20          MR. BALDRIDGE:  Objection.  Hearsay, Your Honor.

21  He can tell what it was, but he can't say what the man told

22  him it was.

23          THE COURT:  Sustained.

24          MR. BALDRIDGE:  Thank you.

25  BY MR. McFARLAND:

Direct - Mueller

1    Q.    Yeah, just describe your understanding of what this

2    morning show was supposed to be.

3    A.    It was supposed to be two guys being themselves, just

4    real guys, they're friends, we talk about life, everyday

5    events.  We make it interesting.  We take a lot of calls.

6    We do other radio station things like contesting,

7    promotions.  But it was going to be built around two guys

8    who knew each other for a while and were friends and just

9    being themselves on the radio.

10   Q.    Did -- once you went on air, were there, you know,

11   risque topics or sort of, you know, shock type of

12   materials?

13   A.    No.  We were told that that was something to avoid at

14   all cost.  We were told to -- we were told how much we

15   could talk and what to talk about --

16         MR. BALDRIDGE:  Your Honor, objection.  Hearsay.

17   It's what he did, not what he was told.

18         THE COURT:  Sustained.  Mr. Mueller, just let me

19   explain:  You know, you're not a lawyer so you don't know

20   the rules.  We generally try to stay away from what other

21   people told you.

22         You can give us your understanding, your

23   recollection, that -- what you have personal knowledge of,

24   but try to stay away from what other people told you.

25         THE WITNESS:  Okay.  So could you ask the question

Direct - Mueller

 1    again?  Sorry.

 2    BY MR. McFARLAND:

 3    Q.    So was it a shock type of show?

 4    A.    Absolutely not, no.

 5    Q.    Was it a family show?

 6    A.    I would say it was a family show.  That's my opinion.

 7    Q.    It will be okay for my kids to listen to that show?

 8    A.    It was okay for children to listen, yes.

 9    Q.    Let me have you turn to what's been marked Defendants'

10    Exhibit A.

11          MR. McFARLAND:  And, Judge, this is a stipulated

12    exhibit.

13          THE COURT:  Are you offering it into evidence?

14          MR. McFARLAND:  Yes, please.

15          THE COURT:  All right.  Given the stipulation,

16    Defendants' Exhibit A is admitted into evidence and may be

17    publish to the jury.

18        (Defendants' Exhibit A received)

19          THE WITNESS:  If you make it much smaller, I won't

20    be able to read it.

21    BY MR. McFARLAND:

22    Q.    I'll try to make it a little bigger for everybody.

23          COURTROOM DEPUTY:  Do you want me to give the

24    original?

25          MR. McFARLAND:  If you have the original

Direct - Mueller

1      available, I think that would be wonderful.

2              THE COURT:  But the jury can't read it.  What

3      you're seeing on your monitor is what the jury are seeing.

4      So they -- if I can't read it, you can't read it, they

5      can't read it.

6              MR. McFARLAND:  Understood.

7              THE COURT:  All right.

8      BY MR. McFARLAND:

9      Q.   So, Mr. Mueller, I just want you to take a second,

10     look at the Defendants' Exhibit A, and tell me if that is

11     your employment contract with KYGO.

12     A.   Yes.  This is my employment contract for KYGO.

13     Q.   And if you look at the 16th page --

14     A.   16th page.

15     Q.   -- of Deposition Exhibit A.  Do you see a signature

16     page?

17     A.   Yes, I do.

18     Q.   And do you recognize your signature on that page?

19     A.   I do.

20     Q.   And do you recognize the other signature on that page?

21     A.   Yes, I do.

22     Q.   Whose signature is the other signature?

23     A.   Robert Call.

24     Q.   And he was the boss of your boss, Mr. Haskell?

25     A.   Yes, sir.

Direct - Mueller

1    Q.    Let's flip to the second page of Deposition [sic] A.

2    There's some salary information there; do you see that?

3    A.    I do.

4    Q.    Does that accurately reflect the contractually agreed

5    salary?

6    A.    Yes, it does.

7    Q.    Were there opportunities under this agreement to earn

8    additional income?

9    A.    Yes.

10   Q.    Can you tell us how that worked.

11   A.    Well, they were very generous with us and they gave

12   us -- I -- you mentioned the signing bonus, but they also

13   gave us a guaranteed $10,000 a year of endorsements.  So

14   that would be commercial endorsements where we voice ads

15   for clients, and you get extra money for that.

16         We also had opportunities to do events where a

17   client would pay to have us there, either to do a live

18   broadcast, or just to be there to meet their prospective

19   customers.  They would send us someplace and they would pay

20   us to be there.

21         THE COURT:  One second.  Do you want the jury to

22   be following along?  Because there's nothing on their

23   screens.

24         MR. McFARLAND:  Yeah, I think it's okay at this

25   point, Your Honor.

189
Direct - Mueller

1            THE COURT:  All right.

2    BY MR. McFARLAND:

3    Q.   Were there any other additional ways to contemplate,

4    in this agreement, to earn income?

5    A.   In this agreement.

6    Q.   That you can recall.  You don't need to look at that

7    agreement.

8    A.   Yeah, I -- that -- that would cover it.

9    Q.   Okay.

10   A.   Endorsements and getting paid to do promotions.

11   Q.   So let's talk about the period of time and now, from

12   the date you started with KYGO until June 1st, 2013.

13            How was the morning show doing?

14   A.   I think the morning show was doing great.  We were

15   doing what we were told to do.

16   Q.   And how do you measure whether the morning show's

17   doing good or bad?

18   A.   Well, normally, you have focus groups or research

19   groups and you look at ratings, but in this event -- or in

20   this case, we were -- it was our understanding that there

21   would be no mention or interest in ratings for 18 months

22   and possibly 24 months.

23            It was our understanding that --

24            MR. BALDRIDGE:  Objection, Your Honor.  Basis for

25   understanding could be hearsay.

Direct - Mueller

1          THE COURT:  Well, I'll overrule it.  He's

2     testifying what his understanding is.

3          Go ahead.

4          THE WITNESS:  So I can say --

5          THE COURT:  Go ahead, what your understanding was.

6          THE WITNESS:  It was our understanding -- it was

7     made clear to us that ratings wouldn't be a factor for 18,

8     possibly 24 months.  And they just wanted us to -- the

9     phrase that was used many times and was etched in my brain

10    was that, "You guys are thoroughbred race horses, but we're

11    going to keep you in the gate."

12         So they didn't let us do a full show, they knew

13    that, they -- they limited how much we could talk, and they

14    wanted us to just keep everything simple and be friendly

15    and fun and not do a traditional morning show, but just be

16    fun all the time.  And that's what we did.  And we did

17    short breaks.

18    BY MR. McFARLAND:

19    Q.   What were the show's ratings when you started?  High,

20    low, medium?

21    A.   They were horrendous.

22    Q.   And as of June 1st, 2013, were the ratings trending up

23    or trending down?

24    A.   They were trending up.

25    Q.   I want to take you back just a half step.  We talked

Direct - Mueller

1    about a lot of experience and different positions in radio.

2    A.    Right.

3    Q.    Were you ever terminated from any of those positions?

4    A.    I -- I had my contracts terminated, yeah.

5    Q.    And -- and why were -- how many of those contracts

6    were terminated?

7    A.    There were two times my contract was terminated or

8    bought out.  And the first time was in Kansas City, and

9    that was in 2001, right after 9/11; and the second time was

10   when I worked at KDWB, and that would have been in 2005.

11   Q.    Where was KDWB?

12   A.    KDWB is in Minneapolis, Minnesota.

13   Q.    Why was the Kansas City contract terminated?

14   A.    I believe that the -- well, I was never told, but I

15   believe that --

16         MR. BALDRIDGE:  Objection, Your Honor.

17   Foundation.  He doesn't know.

18         THE COURT:  Let's get some more foundation here.

19         THE WITNESS:  Okay.

20   BY MR. McFARLAND:

21   Q.    Do you have an understanding as to why you were

22   terminated from that job?

23   A.    I was on vacation --

24         MR. BALDRIDGE:  Your Honor, that doesn't lay

25   foundation by just changing, "Do you have an

Direct - Mueller

1    understanding."  I just --

2    BY MR. McFARLAND:

3    Q.   I just need a yes or no.

4    A.   Do --

5           THE COURT:  Hold on, hold on.  Let's get a little

6    bit more foundation so that we know he's testifying from

7    some type of personal knowledge.

8           MR. McFARLAND:  Yes.

9    BY MR. McFARLAND:

10   Q.   So I need you to listen carefully --

11   A.   Yes.

12   Q.   -- to these questions.

13   A.   Sorry.

14   Q.   Do you have an understanding as to why you were

15   terminated from the Kansas City job?

16   A.   Yes.

17   Q.   And what is that based on?

18   A.   It's -- it's based on a conversation I had with Ryan

19   Kliesch --

20          MR. BALDRIDGE:  Objection.  Hearsay.

21          THE COURT:  Well, I don't think he's going to go

22   into it.  I think he's just describing the conversation.

23          So don't go into what Mr. Kliesch told you, just

24   you can describe the conversation.

25   BY MR. McFARLAND:

Direct - Mueller

1   Q.   It was based on the conversation that you had with Mr.
2   Kliesch?
3   A.   Yes.
4   Q.   And Mr. Kliesch was -- did he remain at -- you were
5   working with him at the radio station.  Was he still there
6   when your contract was terminated?
7   A.   We -- our show was taken off the air and both of us
8   were bought out of our contracts.
9   Q.   Okay.  So do you have an understanding as to why you
10  were terminated from your Kansas City job?
11          MR. BALDRIDGE:  Objection.  No foundation at all.
12  And now it's purely hearsay; it's what he's had discussed
13  with Mr. Kliesch.
14          THE COURT:  I don't know.  I think enough
15  foundation has been laid.  Overruled.
16          You may answer.
17          THE WITNESS:  Could you refresh me on the
18  question?  I'm sorry.
19  BY MR. McFARLAND:
20  Q.   Yeah.  Do you know why, or do you have an
21  understanding, why you were terminated or your contract was
22  terminated in Kansas City?
23  A.   Yes.  The company, Entercom, was going to change
24  formats -- station formats, from a Rock 40, which is what
25  it was when we got there, to an alternative station and,

Direct - Mueller

1    subsequently, the entire staff was going to get

2    transitioned out.

3    Q.    Were -- are you accused of any inappropriate or

4    immoral behavior in Kansas City?

5    A.    No, I was not.

6    Q.    Do you have an understanding as to why you were

7    terminated or your contract was terminated in Minneapolis?

8    A.    I do.

9    Q.    What's that based on?

10   A.    My understanding is that there was --

11   Q.    What's your understanding based on?

12   A.    My understanding was based on what my program director

13   told me.

14   Q.    What was -- or what is your understanding of why you

15   were terminated?

16            MR. BALDRIDGE:  Objection.  Hearsay.

17            THE COURT:  Overruled.

18            THE WITNESS:  I was working -- I was putting

19   energy into my business, Nine Ball Radio, while I was a

20   full-time employee as executive producer of the KDBI

21   morning show.  And even though it was in my contract, it

22   was stated clearly that I could start a company called Nine

23   Ball Radio, and I could do it while I worked at KDBI, I had

24   my general manager's blessing, I -- my understanding was

25   that it was becoming an issue because they thought I was --

195
Direct - Mueller

1    I -- they wanted more energy focus towards the show.

2    Q.    In Minneapolis, were you accused of any inappropriate

3    or immoral or unethical behavior?

4    A.    I was not.

5    Q.    Going back to your time at KYGO --

6    A.    Yes.

7    Q.    -- when did you meet Eddie Haskell?

8    A.    We met Eddie Haskell -- Ryno and I -- over the phone

9    the day we found out he had been hired.  We called him and

10   welcomed him, and -- but if you mean in person?  In person,

11   it would have been in February some time.  I don't -- I

12   don't know the exact date.

13   Q.    February of 2013?

14   A.    Right.  There was a time when we introduced ourselves

15   and we met over the phone.  And then when he actually came

16   to Denver and was in the building, we met him.  And I

17   couldn't tell you either one of those dates.

18   Q.    Before meeting Mr. Haskell in February of 2013, did

19   you know him?

20   A.    No.  No, I -- no.

21   Q.    Did you know of him?

22   A.    No, I did not.

23   Q.    How did you get along with Mr. Haskell between the

24   time he was hired and before Ms. Swift's June 2d, 2013,

25   concert?

Direct - Mueller

1    A.    It was an unusual relationship.

2    Q.    In what way?

3    A.    It -- it could be difficult.  It was -- it could be

4    unprofessional.  I -- it -- you know, it was -- there were

5    difficulties that were un- -- that didn't need to be there.

6    That's the best way I can describe it.

7    Q.    Is it fair to say that at times you had trouble

8    working with Mr. Haskell?

9    A.    Yes, sir.

10   Q.    And do you think -- is it fair to say that there are

11   times when Mr. Haskell found it frustrating to work with

12   you?

13   A.    Yes.

14   Q.    How would you describe your relationship with Mr.

15   Haskell over all during that five-month period of time or

16   so?

17   A.    We -- we maintained a civil work relationship.  He was

18   my boss; I did what he -- I did whatever he wanted me to

19   do.

20   Q.    Prior to June 2d, 2013, did Mr. Haskell threaten your

21   employment?

22   A.    I believe he did.

23   Q.    Okay.  And how did he do that?

24   A.    There was one instance where he was rather upset

25   because the vice president of programming, John Dimick, had

Direct - Mueller

1    contacted him regarding a hire that Eddie wanted to do.  He

2    wanted to bring in a friend of his, and the man's name was

3    Cadillac Jack.  And we had heard about him, but Ryno and I

4    were not a part of that hiring.  That was not a decision we

5    made.  But we came to work one day and Eddie called us into

6    his office and he was very upset with us, Ryno and Jackson,

7    about Cadillac Jack.

8            And he -- he said, "Somebody called John Dimick

9    and then John Dimick called me and told me that I can't --

10   he's not going to tell me who to hire, but he can tell me

11   who I can't hire, and I can't hire Cadillac Jack."

12   Q.   And what about that conversation made you think that

13   he was threatening your employment?

14   A.   He followed up the Cadillac Jack story with a story

15   about how he's the most vindictive person we will ever

16   meet.  And then he proceeded to describe how vindictive he

17   can be.

18   Q.   When did that conversation take place?

19   A.   I want to say that was -- I'm going to guess April,

20   but I shouldn't guess.  I -- I could figure it out.

21   Q.   Can you estimate how far in advance of the June 2d,

22   2013, concert it was?

23   A.   It was less than -- I'd say less than two months

24   before the concert.

25   Q.   Anything else, other than the Cadillac Jack incident,

Direct - Mueller

1    that led you to believe -- or made you feel like Mr.

2    Haskell was threatening your employment?

3    A.    There was another situation where Eddie confronted

4    Ryno and Jackson, the two of us, in his office.  And it

5    was -- it was shortly after a -- a mix-up with the sales

6    department and the management, with -- Bob Call was

7    involved and the head of sales was involved.  And it was a

8    situation where they wanted us to give away a watch for

9    Mother's Day, so I'm guessing this happened in May of 2013,

10   because Mother's Day is in May.  And Ryan had had the idea

11   to have -- to give away smaller prizes throughout the week

12   and then one of those winners would get the watch as a

13   grand prize, because if you're just going to give away one

14   watch, it's hard to execute it on the air.

15          Eddie agreed with us.  And we asked if we could

16   give away watches during morning drive, during middays, and

17   afternoons, and he said absolutely.

18          So we proceeded to make arrangements to get some

19   nice designer purses to give away three times a day,

20   Monday, Tuesday, Wednesday, and Thursday, and then on

21   Friday morning, we were going to award one of the purse

22   winners this nice watch.

23          And we had it all -- one day we had it all under

24   control and the next day we came in and people were upset,

25   and Eddie claimed he didn't know anything about it.  And we

199
Direct - Mueller

1    got upset about that because it kind of made us look bad.

2            And so he called us this -- we were in his office

3    and he said, "Have you guys had about enough?  If you want,

4    we can go down to Bob's office and I will get you out of

5    your contracts."

6    Q.   Okay.  Did that ever happen?

7    A.   No.

8    Q.   Did Mr. Robert Call -- well, let me -- what was Mr.

9    Robert Call's position at KYGO?

10   A.   General manager.

11   Q.   Was he the supervisor for Mr. Haskell?

12   A.   Yes.

13   Q.   Who was your supervisor.

14   A.   Yes.

15   Q.   Did Mr. Call ever say anything to you or do anything

16   to suggest that your job was on the line prior to June 2d?

17   A.   No.

18   Q.   Did anybody else at KYGO give you any indication that

19   your job was on the line prior to June 2d, 2013?

20   A.   Not directly.

21   Q.   Okay.  When did you meet Ms. Melcher?

22   A.   I met Shannon Melcher my first week in the building,

23   which was January of 2013.

24   Q.   And did you and Ms. Melcher subsequently develop a

25   intimate relationship?

Direct - Mueller

1    A.    Yes, we did.

2    Q.    You considered yourselves boyfriend and girlfriend?

3    A.    Absolutely.

4    Q.    When did -- when did that happen?  What was the time

5    frame there?

6    A.    Well, there was a Super Bowl party that we were

7    invited to and I asked her if she'd go with me.  That was

8    kind of our first official date.  And then by -- I don't --

9    I can't remember each day and how it progressed, but on

10   Valentine's Day, she gave me a very nice gift and I

11   happened to give her a very nice gift.

12   Q.    Okay.

13   A.    And --

14   Q.    So you were a couple by at least Valentine.

15   A.    I would say so, yes.

16   Q.    And you guys were -- were you seeing each other

17   exclusively?

18   A.    I know I was exclusive.

19   Q.    Do you have any reason to think Ms. Melcher was not

20   exclusive?

21   A.    I do not.  No, I don't.

22   Q.    And how would you describe your feelings for her

23   between Valentine's and the concert?

24   A.    She was my best friend.  She was -- she was very

25   passionate about radio, which was attractive in me.  She

Direct - Mueller

1     was incredibly smart.  She -- she had a lot of positive

2     energy.  She was beautiful and she was really funny.

3     Q.   Did you -- prior to the concert, had you told Ms.

4     Melcher that you loved her?

5     A.   Yes.

6     Q.   And had she reciprocated that message?

7     A.   Yes, she did.

8     Q.   When did you first learn or hear about Taylor Swift's

9     June 2d, 2013, concert in Denver?

10    A.   It would have been within the week before the concert.

11    What I recall is that the first time I was aware of it was

12    when we received tickets to give away on the air.  They

13    wanted us to award -- to do a contest.

14    Q.   At some point, were you asked to attend the concert?

15    A.   Yeah, that would have been -- okay, the concert was on

16    June 2d, so I believe it was the -- it was the last day of

17    May, maybe.  It was just a few days before the concert when

18    we were told that, you know, Eddie told us he wanted us to

19    go.  And he said, "I need your names and the names of your

20    guests" -- that's what I meant -- he needed the names of

21    our guests.  And he assumed that I would take Shannon and

22    he assumed that Ryan would take his wife.  But he wanted

23    the spellings so he could send them to some security

24    people.

25    Q.   And that's who you ultimately -- you ultimately took

202

Direct - Mueller

Ms. Melcher?

1

2    A.    Absolutely, yeah.

3    Q.    Were you excited to go -- why were you asked to go, or

4    why did you go to the June 2d concert?

5    A.    Well, we went because Eddie wanted us to go.  And we

6    did whatever he wanted us to do.  He was our boss.

7    Q.    But what was -- what's the point?  Did you have a

8    function or a -- or a purpose?

9    A.    It didn't -- it didn't seem like it when it was

10   explained to me because typically morning shows go to a

11   venue -- they ask for tickets so they can go to a show or

12   they're told, "Hey, we want you to go to the venue and go

13   back stage and interview the artist."

14          Or they want you to take winners back stage, so

15   you would basically escort a group of listeners back stage

16   to meet an artist.

17   Q.    Did you want to go to the -- to the concert or did you

18   not want to go to the concert?

19   A.    I didn't really want to go because it was a Sunday

20   night and we had to get up early for Monday morning.  And

21   Mondays are always hard for morning radio people.

22   Q.    Were you a Taylor Swift -- a fan of Taylor Swift's

23   music prior to the June 2d concert?

24   A.    I wouldn't say I was a fan, but I liked her music.

25   The songs -- the songs I heard I thought were very good.

                              Direct - Mueller

1    Q.   And were -- was KYGO playing Ms. Swift's music at that

2    time?

3    A.    We were.  We were playing her older music.  I don't

4    think we played a lot of the new music that would have been

5    on the disk that she was promoting on that concert tour.

6    Q.    Okay.  All right.  That gets us to June 2d, 2013.

7    A.    Okay.

8              THE COURT:  How about before we go, it sounds like

9    a significant shift in focus here, why don't we take that

10   as our queue for our lunch break.  So we're going to take

11   our lunch recess.

12             Ladies and gentlemen of the jury, I have decided

13   that in an effort to help insulate you from some of the

14   attention that you might attract were you to walk out the

15   building every day for lunch, that we will be providing you

16   with lunch every day of the trial, that you can have in the

17   jury deliberation room.  So for at least these nine days,

18   there's such a thing as a free lunch.

19             We will -- I got a message here about -- do you

20   have your cell phones?  Or what are we doing with their

21   cell phones?

22             COURTROOM DEPUTY:  They're going to get their cell

23   phones during the lunch hour.

24             THE COURT:  Okay.  All right.  But you recall the

25   limitations, but you can call your loved ones or your

Direct - Mueller

1    family, let them know you're okay and you're still taken.

2            We will be in recess until 1:30.

3        (Recess at 12:14 p.m.)

4                        AFTERNOON SESSION

5        (Jury was present at 1:34 p.m.)

6            THE COURT:  All right, Mr. Mueller, I remind you

7    that you remain under oath.

8            Mr. McFarland, you may resume your direct

9    examination.

10           MR. McFARLAND:  Thank you, Your Honor.

11   BY MR. McFARLAND:

12   Q.   Mr. Mueller, before we broke, we were getting ready to

13   talk about June 2d, 2013.  Do you remember that date?

14   A.   I do.

15   Q.   Do you remember going to Taylor Swift's concert that

16   evening?

17   A.   I do.

18   Q.   What time did you leave for the conference -- or,

19   excuse me, the concert?

20   A.   I left Shannon Melcher's house for the Pepsi Center at

21   about 4:30 in the afternoon.

22   Q.   Did Ms. Melcher travel with you to the Pepsi Center?

23   A.   Yes, I drove her in my vehicle.

24   Q.   What time did you arrive at the Pepsi Center?

25   A.   It was 5:00 straight up.

Direct - Mueller

1    Q.    What do you do upon arrival?

2    A.    We pulled up to the curb next to the area where the K-

3    -- KYGO tent was set up.  It was a concourse area next to

4    the road.

5    Q.    And then what?

6    A.    We looked around to see if we could see anybody from

7    KYGO.  And we didn't see anybody so we proceeded to park

8    the car.

9    Q.    In the parking lot right close --

10   A.    Yup.

11   Q.    -- to the Pepsi Center?

12   A.    And we were in the front row.

13   Q.    Okay.  Then what?

14   A.    Then we walked up to where the KYGO tent was, and we

15   were looking -- we were supposed to meet people there.

16   Q.    Who were you supposed to meet?

17   A.    We worked -- we understood that we were meeting Eddie

18   and Ryno and Ryno's wife near the KYGO tent.

19   Q.    Okay.  Did you meet those people near the tent?

20   A.    We did not.

21   Q.    Okay.  So then what did you do?

22   A.    I tried to call Eddie.

23   Q.    Did you get ahold of --

24   A.    I did not.

25   Q.    -- Mr. Haskell?

Direct - Mueller

1    A.    I did not get ahold of him.

2    Q.    Then what did you do?

3    A.    I contacted Mr. Kliesch, Ryno.

4    Q.    Did you get ahold of him?

5    A.    I did.

6    Q.    Then what did you do?

7    A.    I asked Ryno what I was supposed to do and he told me

8    what he had been told.

9    Q.    Which was?

10   A.    Shannon and I had tickets waiting at a window.  We had

11   to walk around the side of the arena and pick up the

12   tickets.

13   Q.    Okay.  And did you do that?

14   A.    We did.

15   Q.    And then what did you do?

16   A.    We were -- we were given an envelope.  And when we

17   opened the envelope, there was an instruction sheet.  And

18   there were two tickets and two wristbands.

19   Q.    And ultimately you made your way into the Pepsi

20   Center?

21   A.    Yeah, we followed the directions on the piece of paper

22   and we ended up on the main floor of the Pepsi Center.

23   Q.    And where did you go?

24   A.    We went -- excuse me -- we went to what looked like a

25   security checkpoint.  It was a little podium, like the one

Direct - Mueller

1    you're standing next to.

2    Q.    Uhm-hum.

3    A.    And there was a man there with a clipboard.  And we

4    waited in line and when we got up to the podium, he checked

5    to see who we were.

6    Q.    Okay.  And then what?

7    A.    We -- we maintained our place in line and the line

8    kept moving towards the back stage area.

9    Q.    Approximately how many people were in the line that

10    you and Ms. Melcher were standing in?

11    A.    I would have to guess.  I would say 70 to 90, total.

12    Q.    Okay.  Where were you in -- in the line?  Were you at

13    the front of the line, the middle, the back?

14    A.    We were in the second half -- if you -- well, yeah.  I

15    would say there were more people in front of us than behind

16    us.

17    Q.    Okay.  How long did you wait in line?

18    A.    30 to 45 minutes.

19    Q.    Okay.  And then what happened at that point?

20    A.    The line eventually made it to a big red tent and it

21    entered the tent.

22    Q.    Was the big red tent within or inside the Pepsi

23    Center?

24    A.    It was.  It was back stage and it was -- I would say

25    directly back behind the stage.

1    Q.    About how big was that area?

2    A.    The round tent was probably 50 feet in diameter.

3    Q.    And what was in the red tent?

4    A.    It appeared to be an area where another group had been

5    eating or getting hors d'oeuvres or beverages.  There were

6    tables and chairs.  There were -- there was artwork, there

7    was some display cases.  There was a lot of photos posted

8    on the -- I think it was a pole, they looked like photos

9    you get at one of those booths where you sit with your

10   friends inside, pull the curtain, and put in money and it

11   takes a series of little pictures.

12   Q.    When you entered the red tent, could you see Ms.

13   Taylor Swift?

14   A.    No, I could not.

15   Q.    Was there -- when you entered the red tent, was there

16   still people in front of you in this line?

17   A.    Yes.

18   Q.    And how long did you wait -- how much longer did you

19   wait in line after you entered the red tented area?

20   A.    I'd have to approximate.  I would say 15 to 20

21   minutes.

22   Q.    Okay.  Then what happened?

23   A.    The line wrapped around the circular tent and came to

24   a curtain.  And you would stop there and there was a --

25   there was a female on the inside of the curtain.  And when

Direct - Mueller

1    we got to the curtain, that female was talking to

2    Shannon.

3    Q.    And what was the -- did you hear the conversation?

4    A.    It -- it was essentially, "How many in your group?"

5    Shannon said, "Two."

6            And then there was a pause.  And then she said --

7    she welcomed us in, she said, "You can go in."

8    Q.    Into this other room?

9    A.    Yes, into a different area.

10   Q.    What were the walls of this other room made out of?

11   Wood, fabric?

12   A.    Some kind of fabric.

13   Q.    Okay.  And about how big was this room?

14   A.    I would say maximum, 12 by 12.  It might have been

15   smaller.

16   Q.    Okay.  And have you heard that room referred to in

17   this case as the photo booth?

18   A.    Yes, I have.

19   Q.    And is it okay if we use that term going forward?

20   A.    Yes.

21   Q.    Okay.  So describe for us what you saw when you

22   entered the photo booth.

23   A.    I saw Taylor Swift.

24   Q.    Did you notice anybody else in the room?

25   A.    Well, the girl that opened the curtain for us, but I

Direct - Mueller

1    immediately -- you know, my attention was focused on

2    Taylor.  She was to the -- as we came in, she was to the

3    right, and Shannon was in front of me and I looked, you

4    know, right where she was looking at, and that was at

5    Taylor.

6    Q.   So what's the first thing you recall doing after you

7    entered the photo booth?

8    A.   Shannon had a plastic lanyard hanging from her neck

9    and she had a business card in it, and she was showing it

10   to Taylor and I was just observing from behind Shannon.

11   Q.   And then what happened?

12   A.   Shannon was trying to explain that the both of us were

13   from KYGO and that I was on the morning show.

14   Q.   Okay.  And -- and what happened then?

15   A.   Shannon -- Taylor shook our hands and said, "Hello."

16   Q.   Okay.

17   A.   And -- but I don't remember the order, but I do know

18   that after the handshaking, I complimented Taylor.

19   Q.   Okay.  And then what happened next?

20   A.   Then Shannon complimented Taylor.  And I remember that

21   she was -- my compliment was something about how she is so

22   good with her fans.  I was very impressed with what she did

23   for her fans.

24        And Shannon was describing how we had little girls

25   in front of us and they were dancing and singing and we --

Direct - Mueller

1    they were in front of us the entire way in the line, and

2    Shannon enjoyed watching the little girls.  Shannon likes

3    kids, so . . .

4    Q.    Okay.  So after -- after that exchange, what happens?

5    A.    Those two -- I stayed near the -- where the tent

6    opening was and they moved toward the right side -- from

7    me, to the right where the backdrop was, and Shannon was

8    facing me and Taylor was facing away from me, so the two

9    ladies were facing each other.

10   Q.    Okay.

11   A.    Several feet away from me.

12   Q.    And then what happened?

13   A.    They continued to talk.  Shannon was obviously -- to

14   me, Shannon was enjoying herself.  And at some point,

15   Taylor didn't interrupt her, but she sort of -- I got the

16   impression that she had to move things along and she said,

17   "Hey, how about a picture?"

18   Q.    Okay.

19   A.    Or a photo.

20   Q.    How long do you estimate you were in the photo booth

21   from the time that you entered until the time that you

22   heard Ms. Swift say something like, "Let's take a photo"?

23   A.    I would say 30 to 40 seconds.

24   Q.    Okay.  What happens after Ms. Swift says, "Let's take

25   a photo"?

Direct - Mueller

1    A.    At almost the same time she said, "Let's take a

2    photo," or "How about a photo," she put her right arm

3    around Shannon, pulled her close to her and turned -- the

4    two of them turned toward the photographer, which was to

5    Taylor's left.

6    Q.    Okay.

7    A.    And to my left.

8    Q.    And what did you do?

9    A.    I looked where they were turning and I saw the

10   photographer for the first time standing with an iPhone or

11   an iPad, something of that nature.

12   Q.    Then what did you do?

13   A.    I immediately started moving to get into the photo.

14   Q.    Okay.  What happened next?

15   A.    I turned toward the photographer, and I had my right

16   arm extended with my hand closed and my palm facing down --

17   Q.    Can you show us?

18   A.    (Indicated)

19   Q.    That's how you were moving towards Ms. Swift?

20   A.    I was reaching out and moving toward Taylor and

21   Shannon and looking directly at the photographer.

22   Q.    Okay.  Did -- did any part of your body come into

23   contact with Ms. Swift as you came together for -- or as

24   you moved towards her for the photograph?

25   A.    My hand came into contact with part of her body.

Direct - Mueller

1    Q.   What part of her body?

2    A.   I felt what appeared -- or seemed to be a rib cage, a

3    rib, or ribs.

4    Q.   Okay.  And what -- what part of your hand or arm

5    touched Ms. -- with what you thought was Ms. Swift's rib

6    cage area?

7    A.   It would have been maybe where my knuckles are.

8    Q.   Okay.  Is there any chance that what you thought was a

9    rib was actually Ms. Swift's rear?

10   A.   No.

11   Q.   Okay.  Was there any other touching or contact as you

12   moved towards Ms. Swift for the photograph?

13   A.   Our hands touched and our arms touched.

14   Q.   Okay.  And how did that happen?

15   A.   Her hand came in contact with my hand at the rib cage.

16   There was what I've described as jostling, that's the best

17   way I can describe it.  We -- I was trying to get my hand

18   behind her, she was trying to get her hand behind me.

19   Q.   Okay.

20   A.   And eventually my hand went inside of her arm and

21   behind her, and her hand went on the outside of my arm

22   behind me.

23   Q.   Okay.  Was Ms. Swift's arm touching your arm when the

24   photograph was taken?

25   A.   I know our arms crossed and touched.  I -- I don't

Direct - Mueller

1    know if they were touching in -- at the time of the

2    photograph.

3    Q.    Did Ms. Swift place her hand anywhere on your body

4    during the photograph?

5    A.    I don't remember her putting her hand on my body.

6    Q.    Do you know where Ms. Melcher's hands were during the

7    photograph?

8    A.    I -- just from what I can see in the photograph, but I

9    don't remember.  I -- I -- no.

10   Q.    Okay.  And at any point during the photograph, did you

11   take your hand and put it under Taylor Swift's skirt and

12   grab her butt?

13   A.    No.

14   Q.    Did you -- at any time during the photograph, did you

15   grab her butt outside of the clothing?

16   A.    I did not.

17   Q.    Did you touch her inappropriately in any manner at any

18   time while in the photo booth?

19   A.    No, I did not.

20   Q.    What happened after the photograph was taken?  You

21   know, let me back up half a step.  How was the photograph

22   taken?  Did the -- and, more specifically, did the

23   photographer, you know, say, "Cheese," or count down to

24   three or anything like that?

25   A.    I never heard anybody say anything after, "Hey, how

Direct - Mueller

1    about a picture."

2    Q.    Okay.  So what did you do after the photograph was

3    taken?

4    A.    We -- Taylor thanked us for coming.  I shook her hand.

5    I don't know if Shannon shook her hand or if they gave -- I

6    don't know if they embraced.  I don't know what they were

7    doing.  But somebody started talking to me from the area

8    near the photographer, who was somebody that was with the

9    Swift group.

10   Q.    And what did you do then?

11   A.    And I went -- I moved that way.  It was somebody

12   holding headshots.  They were presigned headshots.

13   Q.    And --

14   A.    And --

15   Q.    And were you and Ms. Melcher given the headshots?

16   A.    This person, it was a female, handed me two

17   autographed headshots, thanked me for coming, and then

18   Shannon came up next to me and somebody -- a different

19   person handed her a smaller card that looked to be -- it

20   had an image on it.

21   Q.    Do you know what that card was?

22   A.    Yeah.  Later I've -- she described it and she said,

23   "This -- if you go to the website on here and you punch in

24   this code, you will be able to get the photo that you just

25   were posing for now."

Direct - Mueller

1    Q.    Did anything else happen that you recall in the photo

2    booth before you and Ms. Melcher exited?

3    A.    No.

4    Q.    Okay.  Did -- how far from you and Ms. Swift and Ms.

5    Melcher was the photographer at the time the picture was

6    taken?

7    A.    Six to eight feet, maybe eight, nine.

8    Q.    How far was the person who was handing out the

9    headshots from you and Ms. Swift and Ms. Melcher?

10   A.    That person was either even with the photographer or

11   slightly behind the photographer.

12   Q.    So a little bit further away?

13   A.    A little bit further away from us.

14   Q.    Did you notice where the female that let you into the

15   tent was at the time the photograph was taken?

16   A.    No.

17   Q.    Did you notice any security in the photo booth at any

18   time that you were there?

19   A.    No.

20   Q.    On your way out of the photo booth, did anybody say

21   anything to you about not exiting, or not leaving the photo

22   booth?

23   A.    There was nobody outside the photo booth area.

24   Q.    Did anybody inside the photo booth say anything like,

25   "Hey, hold up a minute"?

217
Direct - Mueller

1    A.    No.

2    Q.    Did anybody say anything like, "Don't leave"?

3    A.    No.

4    Q.    Did you have any indication whatsoever when you left

5    the photo booth that there was anything -- there had been

6    any problem or any incident?

7    A.    No.

8    Q.    During the photo, did Ms. Swift react in any way that

9    suggested to you she was uncomfortable?

10   A.    No.

11   Q.    During the photograph, did she pull away from you and

12   try to get away from you and closer to Ms. Melcher?

13   A.    Not that I noticed.

14   Q.    Okay.  What did you do -- did you and Ms. Melcher exit

15   the photo booth at the same time?

16   A.    We did.  Shannon went first.

17   Q.    And what did you do after that?

18   A.    We immediately looked around to see if anyone was in

19   that area.  We didn't see anybody.  I was -- when we went

20   into the tent, we saw Ryno from a distance, but we weren't

21   allowed to go where he was.

22          And we looked in that direction and there was --

23   there were no people there by the time we got outside.  We

24   looked for Shannon's purse, because when we entered the

25   tent, security had taken her purse and -- so we wanted to

218
Direct - Mueller

1    locate that.

2    Q.   So were you allowed to take into the photo booth any

3    cameras or phones or anything like that?

4    A.   The only thing I know is that they asked Shannon for

5    her purse, and she handed it to a security person.

6    Q.   Did you take your phone or a camera or any kind of

7    recording device into the photo booth?

8    A.   I had my phone in my pocket.

9    Q.   Okay.  But did it come out of your pocket at any time?

10   A.   I -- it did come out when we were in the round tent.

11   I took --

12   Q.   Did it come out in the photo booth --

13   A.   In the photo booth, no, it did not.

14   Q.   Did Ms. Melcher have a phone out in the photo booth?

15   A.   No.

16   Q.   Okay.  Did you find Ms. Melcher's purse?

17   A.   We did.

18   Q.   Okay.  Then what did you do?

19   A.   We picked her purse up and we proceeded back the way

20   we had come in when we had been waiting in line.  And that

21   route led us back through a tunnel and out to the main

22   floor of the Pepsi Center.

23   Q.   Okay.  What did you do then?

24   A.   She asked me -- Shannon asked me, "What do you want to

25   do now?"

Direct - Mueller

1              And I told her that I want to find Eddie because I

2     need to make sure he doesn't want me to do anything else

3     connected to the radio station.  I wanted to make sure my

4     obligations to KYGO were in order and completed.

5     Q.    Did you find Mr. Haskell?

6     A.    I did later, yeah, outside.

7     Q.    How much later?

8     A.    A couple minutes.

9     Q.    Okay.  What happened then?

10    A.    Well, I -- when we walked out to where we came in, we

11    talked to a security person.  We asked them -- Shannon

12    asked, "If I get something to drink, can I take it

13    outside?"

14              They said, "No."

15              And I said, "Okay, if you want to get something to

16    drink, I will go out and you can stay in here and I'll come

17    right back."  And I went outside.

18    Q.    You left --

19    A.    Shannon --

20    Q.    -- the Pepsi Center?

21    A.    I left the Pepsi Center.

22    Q.    And you left Shannon in the Pepsi Center?

23    A.    I did, yes.

24    Q.    Okay.  And what did you do then?

25    A.    I was looking for Eddie Haskell.  And when I walked

Direct - Mueller

1    out the doors, I saw him almost immediately.  He was on the

2    concourse outside the main -- I think it's the main

3    entrance.  It's where the KYGO tent was, and he was out

4    there and I saw him.

5    Q.   Did you approach him?

6    A.   I immediately walked right to him.

7    Q.   What do you recall about your conversation with Mr.

8    Haskell?

9    A.   He was standing to my right up against the building in

10   that -- seemed like he was in the shade.  And he was making

11   a gesture to somebody across the concourse in the direction

12   of the KYGO tent.  And I walked up to him and the first

13   thing he said to me was, "Did you meet Taylor?"

14           And I said, "Yes."

15           And then he proceeded to tell me his -- about his

16   encounter with Taylor earlier that night.

17   Q.   And how did he describe that encounter?

18   A.   He said Taylor recognized me, she yelled out, "Eddie,"

19   she moved at him with excitement, basically jumped into his

20   arms.  He gave her a large hug, he motioned like this --

21   Q.   You can stand up.

22   A.   Like he had had his arms around her.  And he told me

23   that he had his hand on her butt.

24   Q.   Okay.  What else can you recall about that

25   conversation?

                          Direct - Mueller

 1    A.    He then told me that he had a conversation with one of

 2    his friends earlier that night and they were talking about

 3    how Taylor must wear bike shorts under her outfits because

 4    she does a lot of -- a lot of costume changes during the

 5    show.

 6    Q.    Okay.  Do you recall anything else about that

 7    conversation?

 8    A.    I was -- I then asked him if my duties to the station

 9    had been fulfilled and he said, "Yes."  And --

10    Q.    And what did you -- what did you think when Mr.

11    Haskell was talking about where his hands were and -- and

12    the bike shorts and that stuff?

13    A.    I thought he was just telling one of his stories.

14    He -- he told me a lot of stories during the time I worked

15    with him.

16    Q.    And you don't actually have any knowledge that Mr.

17    Haskell inappropriately touched Miss Taylor Swift?

18    A.    No.

19    Q.    And you don't have any actual knowledge that he

20    grabbed her -- or put his hand on Taylor Swift's rear?

21    A.    No.

22    Q.    And you thought that was just another story.

23    A.    Yeah, like a fishing tale.  He liked to brag and he

24    would tell silly stories or goofy stories all the time.

25    Q.    Do you allege that Mr. Haskell is the person, or is a

Direct - Mueller

1   person, who grabbed Ms. Swift's rear on June 2d, 2013?

2   A.    I do not.

3   Q.    And you are not claiming that Ms. Swift has Mr.

4   Haskell confused with you?

5   A.    I am not.

6   Q.    Do you look anything like Mr. Haskell?

7   A.    I do not.

8   Q.    What did you do after you met with Mr. Haskell?

9   A.    After I talked to him about fulfilling -- if my

10  obligations to the station had been fulfilled, two younger

11  women approached from our left and they walked up to Eddie

12  and were -- started talking about Taylor -- they were big

13  fans -- and one of them -- they obviously knew either one

14  or both of them knew Eddie, and I just stood there.  And

15  they -- one of the girls said, "I wish I would have been

16  able to meet her."

17         And I said, "Well, if you'd like, you can have one

18  of these autographed headshots."  And I handed it to her.

19  Q.    Okay.

20  A.    And she was very happy.

21  Q.    Then what?

22  A.    Then the girls wanted to pose for a photograph right

23  there on the concourse with Eddie and myself.

24  Q.    And did you do that?

25  A.    Yes.

                          Direct - Mueller

1    Q.    Okay.  And did you -- was the photograph taken on --

2    on your phone?

3    A.    No.

4    Q.    Did you ever get a copy of that photograph?

5    A.    No, I did not.

6    Q.    Okay.  What happened after that?

7    A.    After that, I reconfirmed with Eddie that I was going

8    to be leaving the venue in -- you know, I wasn't going to

9    stay the full night.

10   Q.    Did Mr. Haskell have any problem with that?

11   A.    No, not at all.

12   Q.    Okay.  So what happened then?

13   A.    Then I went to my car and I put the headshot that I

14   had and I -- and it was a pair of sunglasses in -- or they

15   were prescription glasses, I put them in my vehicle, which

16   was in the front row.  And then I immediately turned back

17   toward the Pepsi Center.

18   Q.    And did you make your way back to Ms. Melcher?

19   A.    I was making my way back to Ms. Melcher and I was

20   stopped by some staff members.  I remember Tony, he was the

21   afternoon personality.  And I liked him.  And we said,

22   "Hi."  And I can't remember what our conversation was, it

23   was short.

24         And then I proceeded to the -- to the doors and I

25   went back in and Shannon was right there.  She was right

                              Direct - Mueller

1    inside the door.

2    Q.   So at this point, how much time has elapsed from the

3    time you exited the photo booth until the time you've

4    reconnected now with Ms. Melcher?

5    A.   I would say that -- well, the first thing I remember

6    is that I felt bad because I left her alone too long, but

7    it was probably between five and 10 minutes.

8    Q.   From the time you exited the photo booth until the

9    time you reconnected with Ms. Melcher?

10   A.   Oh, when I left the photo booth.  That was --

11   Q.   Just to be clear, I'm asking you to give us your best

12   estimate of the time that elapsed from you -- the time you

13   exited the photo booth until you reconnected with Ms.

14   Melcher after going to your car and those things.

15   A.   That -- that was more like 20 or -- minutes or 25.

16   It's --

17   Q.   What did you and Ms. Melcher do once you reconnected?

18   A.   She had two beverages that she'd purchased and she

19   handed me one.

20   Q.   And they were alcoholic beverages?

21   A.   You know, I assumed it was, but I honestly don't know

22   because I didn't ever get to drink it.

23   Q.   Did you and Ms. Melcher go out for dinner prior to the

24   June 2d concert?

25   A.   We did not.

Direct - Mueller

1    Q.   Did you have any drinks before the June 2d concert?

2    A.   We did not.

3    Q.   Did you have any alcoholic drinks before the June 2d

4    concert?

5    A.   No.

6    Q.   Okay.  What happened next?

7    A.   We -- we talked about where should we go?  Do you want

8    to stay?  And I said, "We should go see where Ryan is.

9    Let's go say Hi to Ryno."

10        We hadn't seen him all night.  I'd only talked to

11   him on the phone.  And so we just went back the only way we

12   knew, which was back down to the main floor, the same way

13   we left.  And we saw the same security guard we talked to

14   on the way out.  And we talked to her again.  And she was

15   either in a wheelchair or on -- I remember she was

16   handicapped.  And she was very nice to us and we talked to

17   her.

18        And then we went out to the very back of the main

19   floor, so we were on the main floor, but the far -- almost

20   the farthest distance away from the stage, and we just

21   stopped there.

22   Q.   And what happened then?

23   A.   It seemed like the lights were off when we got down

24   there and then all -- and at some point the lights came on.

25   And a large man approached me and he -- I saw him coming

Direct - Mueller

1    from a ways off and he walked right up to me.

2    Q.    And -- and then what?

3    A.    He -- he said, "I need to talk to you."

4    Q.    And what did he want to talk to you about?

5    A.    I didn't know.  But he told me to put down my drink

6    and he moved me away from Shannon.

7    Q.    And did you ultimately learn what he wanted to talk to

8    you about?

9    A.    He -- his exact words were, "Do you want to tell me

10   about what happened earlier?"

11   Q.    And what did that mean to you?

12   A.    I -- I was confused.  I said, "I don't know what

13   you're talking about."

14   Q.    And then what happened?

15   A.    At that point, we went back and forth like that for a

16   little bit.  And I said, "I'm sorry, I don't know what

17   you're talking about."

18          And he said something about, "Listen, mate, this

19   is serious.  I can get the police involved."

20   Q.    What was your reaction?

21   A.    I said, "I'm all for it."  You know, essentially I

22   said, "I'm all for that.  Let's do that."  Because I could

23   tell he was security of some sort and he had a problem with

24   me.

25   Q.    What happened next?

227
Direct - Mueller

1   A.   Our conversation got to where he said -- he accused me

2   of grabbing Taylor.  And I told him I didn't grab anybody.

3            And then he pulled -- I believe it was some sort

4   of a smartphone, he held it up and said, "Is this you?"

5            Showed me a photograph.  And I said, "Yeah, that's

6   me.  I posed for a photograph with Taylor and my

7   girlfriend."

8   Q.   What happened next?

9   A.   Then he made a comment about where my hand -- you

10  know, that my hand looked like it was behind Taylor.

11  Q.   Then what happened?

12  A.   So this -- this conversation kept going on.  He kept

13  suggesting that I did something.  "You grabbed her."

14           I said, "I did not."

15           He said -- he asked me if I touched her.  I said,

16  "I did touch her because I was posing for a photograph with

17  Taylor and my girlfriend."

18           I kept telling him it's my girlfriend.  Then I

19  mentioned, "I'm not just some guy.  I work at a radio

20  station.  I'm here for work.  I do a morning show.  My boss

21  is here.  I just -- I know he just came back into the

22  arena.  His name is Eddie Haskell.  Please contact your

23  people back stage and, you know, have them come out here."

24  Q.   Did you ever see Eddie Haskell inside the Pepsi Center

25  after you were approached by security?

Direct - Mueller

1    A.    Never.

2    Q.    How did the conversation end?  How did it conclude?

3    A.    Well, it was sort of a stop-start conversation.  He

4    would talk to me and then he would back away.  I think he

5    was talking to some sort of a microphone -- I don't know if

6    he was talking on the phone or a walkie talkie, but he

7    would get several feet away from me, then he'd come back.

8    And Shannon was not allowed to be with me at the beginning,

9    I guess, but then she made her way over to me and she --

10   he -- Craig, the gentleman's name was Craig, I learned

11   later --

12   Q.    This is the security person?

13   A.    This is -- he was a security person.  I could tell he

14   was a security person.  And I just -- I reiterated that I

15   would like to have Eddie Haskell present and I would like

16   you to get the police because he continued to insist that I

17   grabbed Taylor Swift and I continued to insist that I did

18   not grab her.

19   Q.    Did the police ever arrive?

20   A.    The police never came to talk to me.

21   Q.    How did that interaction conclude?

22   A.    The -- other security personnel arrived and sort of

23   formed what I would say was a loose-knit circle around us

24   and then they -- they sort of migrated us back up this ramp

25   underneath -- sort of where we had come from when we came

Direct - Mueller

1    down.

2              But then they took us into a tunnel that was dark

3    and -- it must have been for personnel working at the

4    arena.  It was a cramped, dark tunnel.  And they closed the

5    door behind us and there were several security people in

6    there, Craig for sure, maybe three other people.  There

7    might have been -- there might have been a female, because

8    there was a female talking to Shannon earlier when Craig

9    was talking to me

10   Q.   At some point, were you escorted from the building?

11   A.   Yes.  From that secured area behind that door in that

12   dark corridor, Frank Bell came in.  He said some things and

13   then he said one -- one of the things he said that I'll

14   never forget was, that "Taylor doesn't want you here

15   tonight, you're not welcome here and you're not -- you've

16   been banned from all future Taylor Swift concerts."

17   Something to that effect.

18   Q.   Did you react to that?

19   A.   I -- I just remember telling anyone who approached me

20   that I didn't do anything.  And I -- and I kept asking for

21   Eddie.

22   Q.   Why were you asking for Eddie?

23   A.   I was asking for Eddie because he was my boss and when

24   you work in radio on air, the first thing you do when

25   there's any kind of problem, if you work on air or

Direct - Mueller

 1    promotions or sales, is you want to get the program

 2    director involved at an event because the program director

 3    is the point person 95 percent of the time, if it's an

 4    event that involves tickets.

 5              And I also wanted him there so I could -- I wanted

 6    to ask him about what he talked to me about on the

 7    concourse in front of Craig.

 8    Q.   Okay.  Is there anything else that happened during

 9    this period of time that you haven't already talked about

10    and the time that you were escorted from the Pepsi Center?

11    A.   Well, I remember being upset because on more than one

12    occasion security personnel were rude to Shannon and that

13    bothered me.

14    Q.   How -- how were they rude to her?

15    A.   They were dismissive.  And essentially whenever she

16    would try to interject, they would tell her to, you know,

17    stop talking or shut up, or I -- something to that

18    effect.

19    Q.   Anything else that you think is important that you

20    haven't told us about between that time and the time you

21    were escorted from the premises?

22    A.   There was a -- there was one -- one of the people was

23    taunting me and saying, "Are you proud of yourself?  Are

24    you proud about what you did?"

25              And kind of -- almost like trying to pick a fight

Direct - Mueller

1    with me.  And I didn't respond to that person.

2    Q.    Okay.  Anything else that you can think of?

3    A.    Not right now.

4    Q.    Okay.  After Ms. -- Ms. Melcher was also escorted from

5    the Pepsi Center; is that right?

6    A.    Yes.  There was one person walked us to a door

7    together, we were side-by-side.

8    Q.    And you left the Pepsi Center area, you went home?

9    A.    Yeah.  We went to the door, they cut off our

10   wristbands, and opened the door, and pushed us out, and

11   then the door shut, and we were outside.

12   Q.    Let's talk about June 3d.  What -- what happened on

13   June 3d as it relates to this case?

14   A.    On June 3d, I was supposed to meet with Eddie Haskell

15   and Bob Call in Bob Call's office at 10:00 a.m.

16   Q.    How did you find out that you were supposed to meet

17   with Mr. Call and Mr. Haskell at that time?

18   A.    Very late on June 2d, Sunday night, I was -- I talked

19   to Eddie on the phone, finally.  And he said that they were

20   trying to figure out what happened and, "Until we know the

21   details, we are going to suspend you with pay.  But we do

22   want to talk to you tomorrow morning, so can you be at the

23   station at 10:00 a.m.?"

24   Q.    So did you meet with Bob -- excuse me, Mr. Call and

25   Mr. Haskell at 10:00 a.m. --

Direct - Mueller

1    A.    I did not.

2    Q.    -- on the 3d?

3    A.    No, I did not.

4    Q.    Why not?

5    A.    I got -- it was either a phone call or a text message

6    from Eddie saying that there were some things that they

7    needed to do, some people they needed to talk to, and they

8    were going to need to push it back to 3:00.

9    Q.    Did you meet with Mr. Call and Mr. Haskell at 3:00?

10   A.    Yes.  I arrived at KYGO right at 3:00.

11   Q.    Was anybody else, other than Mr. Call, Mr. Haskell,

12   and yourself present at that meeting?

13   A.    No.

14   Q.    Where did that meeting take place?

15   A.    Mr. Call's office.

16   Q.    What do you recall about that meeting?

17   A.    I recall that they suggested that they had talked to

18   everybody at the show and they -- and they also said they

19   talked to everybody with the management team for Taylor and

20   the record label.  They mentioned the record label.  And I

21   didn't know exactly what they -- they talked about Big

22   Machine, and I wasn't -- I'm not -- I'm not as

23   knowledgeable about record labels and who owns them and --

24   as some radio people, but I figured out later that Big

25   Machine was the record label connected to Taylor Swift.

Direct - Mueller

1           And they told me they talked to everybody from the

2     bottom to the top.

3     Q.    What was your understanding of the purpose of the

4     meeting?

5     A.    They -- they want to talk to me about what happened.

6     Q.    And did you discuss what happened?

7     A.    We did.

8     Q.    And can you summarize the important parts that are --

9     or the parts that were important to you from that

10    conversation.

11    A.    Yeah.  I -- I wanted to find out what exactly I was

12    being accused of and who exactly had accused me of it.

13          And they kept telling me that -- they would --

14    they were telling me the various versions of that, what I

15    was accused of.  One time it would be, "You hiked up her

16    skirt, you -- there was an inappropriate touch, there

17    was -- you grabbed her, you had your hand under her skirt,

18    you" -- and then they would ask me, "Well, did you -- did

19    you, you know, grab her?"

20          "No, I did not grab her."

21          "Did you hike up her skirt?"

22          "No, I did not hike up her skirt."

23          And at one point, we talked about touching her and

24    I said, "I -- when we were posing for the photograph, I

25    touched her, she touched me, I'm guessing Shannon touched

Direct - Mueller

1    her and she touched Shannon."

2    Q.   Did you indicate to Mr. Call or Mr. Haskell at any

3    point that you had inappropriately touched Ms. Swift on

4    June 2d, 2013?

5    A.   Never.  I never said that.

6    Q.   Did you make it clear to them, to the best of your

7    ability, that you did not in any form or any fashion, touch

8    her inappropriately?

9    A.   I think I was 100 percent clear that I did not touch

10   her inappropriately.

11   Q.   Now, did you mention to Mr. Call and Mr. Haskell at

12   this meeting your prior conversation with Mr. Haskell about

13   his hug and the bike shorts?

14   A.   Yes.  I -- I did address the hug and how -- what I did

15   was I -- I reminded Eddie about him telling me the story on

16   the concourse.  And I -- I said, "Do you remember how you

17   told me she -- Taylor was super excited to see you, she

18   remembered you, she yelled out, 'Eddie,' she came toward

19   you, and gave you a big hug?"  And I did the same gesture

20   that he did, like that.

21   Q.   Did you -- did you tell Mr. Call that Mr. Haskell had

22   told you that he had his hand on Ms. Swift's rear?

23   A.   I didn't add that part.

24   Q.   Did you tell Mr. Call that Mr. Haskell had suggested

25   that Ms. Swift must wear bike shorts?

Direct - Mueller

1    A.    I don't believe I did.

2    Q.    Why didn't you say those things or tell Mr. Call about

3    those things?

4    A.    Well, once again, I -- in my mind, it wasn't as if

5    Eddie was confessing to doing something or admitting to

6    doing that.  I just thought he was telling me one of his

7    goofy stories.  And when I brought it up with Eddie and

8    Bob, I was trying to make a point about how the difference

9    between an artist meeting someone they've never met before

10    and an artist meeting someone from a radio station they

11    know, and how there's a difference when an artist even

12    meets someone who works at a radio station they've never

13    met.

14            If they know they're from a radio station and

15    they're familiar with the radio station, the artists are

16    very enthusiastic because there's a partnership between

17    record labels, artists, and radio stations.  It's

18    established since the first time they made records.

19    Q.    How long did the meeting with Mr. Call and Mr. Haskell

20    last?

21    A.    I would say the actual time we were -- the three of us

22    were in the office was about an hour.

23    Q.    Okay.  How did the meeting conclude?

24    A.    They indicated that they had more investigating to do.

25    They needed to talk to more people and they would get back

Direct - Mueller

1      to me the next morning.  And that, "Let's just say you're

2      suspended with pay again and then we'll contact you

3      tomorrow."

4      Q.   And then you left the meeting?

5      A.   And then I -- I thanked them -- you know, they thanked

6      me for coming by, I thanked them for their time and I left,

7      yeah, walked out.

8      Q.   Did you record the June 3d meeting with Mr. Call and

9      Mr. Haskell?

10     A.   I did.

11     Q.   And why did you do that?

12     A.   I did it because I wasn't comfortable going into a

13     meeting with them alone.  And when they pushed the meeting

14     from 10:00 to 3:00, and the way that it was relayed to me,

15     I got the impression that they were thinking about getting

16     rid of me, and so I wanted to record what they told me when

17     I was in that room and what they accused me of.

18     Q.   Did you try to get permission to have somebody in the

19     room with you during the meeting?

20     A.   I contacted my talent agent.  And her name's Heather

21     Cohen.  And I contacted her actually Sunday night, and then

22     I talked to her again on Monday morning, the 3d.  And I

23     made it clear that I wasn't comfortable going into a

24     meeting with two of my superior -- you know, bosses,

25     supervisors, and I'd like her to be on the phone by

237

Direct - Mueller

1    conference call, or have her and the person who ran the

2    talent agency, Eric Weiss, on the phone, one or both of

3    them.

4    Q.    Did that happen?

5    A.    It did not.

6    Q.    Do you know why?

7    A.    They chose not to.  I can't remember what their

8    reasoning was, but they made it clear that they were not

9    going to be participating in anything like that.

10   Q.    Okay.

11          THE COURT:  Mr. Mueller, I'm confused.  Who chose

12   not to participate?

13          THE WITNESS:  The talent agent, Heather Cohen,

14   and/or Eric Weiss, the man who ran the Weiss Agency, and

15   that was my talent agent -- the talent agency that I was

16   paying to represent me.

17          THE COURT:  All right.  It was not that Mr.

18   Haskell or Mr. Call told them they couldn't be there.

19          THE WITNESS:  I don't remember why they weren't

20   going to be on the phone while I was in there.  I just

21   remember it was made clear to me that they were not going

22   to be a part of it and I should go by myself and just tell

23   the truth.

24          THE COURT:  All right.  Counsel.

25          MR. McFARLAND:  Thank you.

Direct - Mueller

1    BY MR. McFARLAND:

2    Q.   Did anything else important to your claims here happen

3    on June 3d, 2013?

4    A.   At the same time I was being interviewed by Eddie and

5    Bob, in Bob's office, I found out later that the human

6    resources director, Maureen Marsh, somehow found Shannon

7    and took her into her -- the human resources office and was

8    questioning her about the events of -- at the concert on

9    June 2d.

10   Q.   Do you have an understanding as to whether Ms.

11   Melcher's version of events meshed with your version?

12            MR. BALDRIDGE:  Objection.  Foundation and

13   hearsay.  It wasn't -- he couldn't be in two rooms, Your

14   Honor.

15            THE COURT:  Sustained as to foundation.  Let's

16   rephrase and get more of a foundation here.

17   BY MR. McFARLAND:

18   Q.   Do you have an understanding -- this is a yes-or-no

19   question -- of whether Ms. Melcher's version of events

20   meshed with yours?

21   A.   Yes.

22            MR. BALDRIDGE:  Your Honor, may I inquire whether

23   he means in this separate meeting that he's not in or

24   whether he means generally?

25   BY MR. McFARLAND:

Direct - Mueller

1    Q.   Generally --

2         THE COURT:  Yeah, let's --

3    BY MR. McFARLAND:

4    Q.   At some later --

5         THE COURT:  Hold on, hold on.

6         MR. McFARLAND:  Sorry.

7         THE COURT:  Can I rule on the objection?

8    Sustained.  Let's clarify what we're talking about.

9    BY MR. McFARLAND:

10   Q.   At any time, did you learn whether Ms. Melcher's

11   version of events meshed with your version of events?

12   A.   I did.

13   Q.   How did you learn that?

14   A.   At some point, Shannon and I talked about --

15        MR. BALDRIDGE:  Objection.  Hearsay.  Ms. Melcher

16   will be here to testify as to what she knew and said.

17        MR. McFARLAND:  I --

18        THE COURT:  Mr. McFarland.

19        MR. McFARLAND:  I'm asking the witness for his

20   understanding of whether her version of events and his

21   version of events mesh.  That's -- that doesn't require

22   hearsay.  Whatever -- and we don't know yet what Ms.

23   Melcher told him, but it's not being offered to prove the

24   truth of the matter asserted.

25        THE COURT:  More of a verbal act?

240

Direct - Mueller

1            MR. McFARLAND:  That's right.

2            THE COURT:  All right.  Overruled.

3   BY MR. McFARLAND:

4   Q.   What did Ms. Melcher tell you?

5   A.   She told me that she got called into Maureen Marsh's

6   office.  Maureen asked her what happened.  She told her.

7   Her story was very similar to my story.  And later Maureen

8   Marsh produced her notes, Maureen's notes, of the

9   meeting.

10  Q.   Okay.  Did anything else that you can recall happen on

11  June 3d that relates to your claims here?

12  A.   Not that I can think of.

13  Q.   Do you know who, from Taylor Swift's team, Mr. Call

14  spoke to prior to your meeting with him and Mr. Haskell?

15  A.   I'm sorry, could you repeat the question?

16  Q.   Yeah.  Do you -- do you know who, from Taylor Swift's

17  team, if anyone, Mr. Call spoke to before your meeting with

18  him and Mr. Haskell?

19  A.   I know he talked to Frank Bell.

20  Q.   Do you know whether he talked to anybody else?

21  A.   I -- I don't know.  He told me he talked to Frank

22  Bell.

23  Q.   Do you know whether Mr. -- do you know who Mr. Bell

24  spoke with, if anyone, about the alleged incident before he

25  had conversations with Mr. Call?

241

Direct - Mueller

1          MR. BALDRIDGE:  Objection, Your Honor.  Double

2     hearsay on that one.

3          THE COURT:  Sustained.

4     BY MR. McFARLAND:

5     Q.   Do you know anything about any conversations that

6     might have taken place between Mr. Bell and Ms. Swift's

7     team?

8          MR. BALDRIDGE:  Hearsay.

9          THE COURT:  He's just asking if he knows any

10    conversations that took place.  Overruled.

11         THE WITNESS:  I personally don't know.

12    BY MR. McFARLAND:

13    Q.   Were you ultimately terminated from KYGO?

14    A.   Yes, I was.

15    Q.   When did that happen?

16    A.   That happened on the morning of June 4th.

17    Q.   How did it happen?

18    A.   I received a phone call from Eddie telling me that

19    they would be calling me back from Bob's office to talk to

20    me.  And the second call was Eddie, Bob Call, and Maureen

21    Marsh, all in Bob's office, and they -- and Bob notified me

22    that I was terminated.

23    Q.   Did he provide the grounds for termination?  Did he

24    tell you why you were being fired?

25    A.   I don't remember if he told me over the phone, but he

242
Direct - Mueller

1    did say, "A courier is going to deliver a package and it

2    will have information in it and your last paycheck."

3            MR. McFARLAND:  Judge, I'm going to move for the

4    admission of stipulated Exhibit C.  That's Defendants'

5    Exhibit C.

6            THE COURT:  Okay.  One second.

7            All right.  Given the stipulation, Defendants'

8    Exhibit C is admitted into evidence and may be published to

9    the jury.

10          (Defendants' Exhibit C received)

11          MR. McFARLAND:  Thank you, Your Honor.

12   BY MR. McFARLAND:

13   Q.   Mr. Mueller, would you look at Defendants' Exhibit C.

14   You can look at it on the screen or you can flip to it in

15   the notebook in front of you.

16   A.   A little bigger, please.

17   Q.   Why don't you look at the notebook that you have in

18   front of you.

19   A.   Oh, right.

20   Q.   That will be a little easier, and I'll --

21   A.   Okay.  That's perfect.

22   Q.   Can you read that okay?

23   A.   Yes.

24   Q.   What is Defendants' Exhibit C?

25   A.   It --

Direct - Mueller

1    Q.   It's a letter?

2    A.   I would describe it as a letter informing me of my

3    termination.

4    Q.   From KYGO?

5    A.   From KYGO.

6    Q.   And it's dated June 4th.

7    A.   June 4th.

8    Q.   2013.

9    A.   That's right.

10   Q.   Signed by Mr. Call?

11   A.   Bob Call.

12   Q.   In the middle, do you see where the letter says that

13   Lincoln Financial -- which owned and controlled KYGO,

14   right?

15   A.   Right.

16   Q.   -- intends to exercise its rights under Section 16(b)

17   of your employment agreement?

18   A.   I see that.

19   Q.   Do you know what Section 16(b) of your employment

20   agreement says generally?

21   A.   My contract can be terminated if I do anything immoral

22   or if I'm accused of doing anything immoral.

23   Q.   And is it -- is that -- is it your understanding that

24   you were terminated because you either did something

25   immoral or you were accused of doing something immoral?

244
Direct - Mueller

1    A.   That is my understanding.

2            MR. McFARLAND:   Judge, I'm also going to move for

3    the admission of stipulated Exhibit I.   That's Defendants'

4    Exhibit I.

5            THE COURT:   All right.   Given the stipulation,

6    Exhibit I is admitted into evidence and may be published to

7    the jury.

8         (Defendants' Exhibit I received)

9    BY MR. McFARLAND:

10   Q.   This is the photograph, right?

11   A.   Yes.

12   Q.   In this picture, is your hand touching Ms. Swift's

13   rear outside of her clothing?

14   A.   No.

15   Q.   Are you sure about that?

16   A.   Yes.

17   Q.   In this picture, is your hand underneath her skirt in

18   any form or fashion?

19   A.   Absolutely not.

20   Q.   Are you sure about that?

21   A.   I am 100 percent sure of that.

22   Q.   Does it appear to you that Ms. Swift's skirt or

23   hemline is ruffled or disturbed in any manner?

24   A.   It does not look like that to me.

25   Q.   During the taking of this photograph, did you touch

245

Direct - Mueller

1     Ms. Swift inappropriately at any time?

2     A.    No.   Inappropriately?

3     Q.    During your time in the photo booth, did you touch Ms.

4     Smith inappropriately at any time?

5     A.    No.

6     Q.    Can you tell from this photograph where Ms. Swift's

7     arm is?

8     A.    It's behind my arm.  And after that, I -- I can't

9     tell.

10    Q.    And you don't recall whether her hand was touching you

11    in any fashion?

12    A.    I don't recall her touching me.

13    Q.    In Mr. Baldridge's opening statement, you heard that,

14    right?

15    A.    I did.

16    Q.    And he accused you of changing your position from the

17    time of the incident through today seven times.  Did you

18    hear that?

19    A.    I did.

20    Q.    Okay.  Initially, Mr. Baldridge said that you denied

21    inappropriate touching.  Is that how you recall it?  What

22    Mr. Baldridge said first, your first version?

23    A.    I recall saying that I denied -- yeah, I denied

24    inappropriate touching.

25    Q.    And that's true, right --

246

Direct - Mueller

1    A.    That is true.

2    Q.    -- you denied that from the beginning?

3    A.    Denied it repeatedly.

4    Q.    Have you ever made an admission anywhere, any time, to

5    anybody, that you inappropriately touched Ms. Swift?

6    A.    No.

7    Q.    Mr. Baldridge said that your second version was, "If I

8    did it, it was accidental or incidental."  And that came

9    from Bob Call.  Do you remember that?

10   A.    Yes.

11   Q.    Did you tell Bob Call that if you did it, it was

12   accidental or incidental?

13   A.    No.

14   Q.    Are you sure?

15   A.    I'm sure that I -- I never admitted to inappropriate

16   contact.  The problem I have with my conversation with Bob

17   Call is that he kept changing what I did and there were

18   times when he did ask me, "Did you touch her?"

19          And I would say, "Yes, I did touch her."

20   Q.    And -- and did you believe, and do you believe, that

21   that contact was incidental or accidental?

22   A.    Absolutely.  It was in the process of posing for a

23   photograph.

24   Q.    The third version, according to Mr. Baldridge, was

25   Eddie Haskell did it.  Did you allege in your complaint, or

247

Direct - Mueller

1    have you alleged at any time since, that Eddie Haskell is

2    the one who touched Taylor Swift inappropriately on June

3    2d?

4    A.    No.

5    Q.    The fourth version that Mr. Baldridge talked about was

6    you said you couldn't have done it because you had your

7    fist closed.  Is it your position that you couldn't have

8    done it because your fist was closed?

9    A.    My hand was closed.  I -- I don't know what he was

10   referring to.  I couldn't have done it.  I don't know what

11   "it" is.  I don't know what he's referring to by "it."

12   Q.    Did you feel like that's fairly characterizing as you

13   changing your position?

14         MR. BALDRIDGE:  Objection, Your Honor.

15   Argumentative.  Fairly characterized --

16         THE COURT:  Overruled.  You may answer.

17         THE WITNESS:  Can you repeat the question?

18   BY MR. McFARLAND:

19   Q.    Yeah.  Is taking the position or stating that you

20   couldn't have done it because you had your hand closed in a

21   fist, do you think that's a change of position from your

22   original position of "I didn't do it"?

23   A.    I don't think it's a change in position.

24   Q.    The next version, version No. 5, according to Mr.

25   Baldridge, was you changed your position to:  You were

Direct - Mueller

1    jostling your arms with Ms. Swift.  Have you taken the

2    position that at some point your arm and Ms. Swift's arm

3    were jostling?

4    A.    I have taken that position.

5    Q.    Do you feel like that's a change from your original

6    position that you did not inappropriately -- you did not

7    inappropriately touch Ms. Swift?

8    A.    I do not feel that that is a change.

9    Q.    Mr. Baldridge's sixth alleged change or different --

10   version of events was that your arms crossed.  Did you

11   ever deny that your arms -- that your arm and Ms. Swift's

12   arm didn't cross?

13   A.    Never.

14   Q.    And we can see your arms are crossed in the

15   photograph, right?

16   A.    It's clear.  They're crossed.

17   Q.    And the seventh alleged change of position, according

18   to Mr. Baldridge, is -- came from me this morning in my

19   opening where I said you acknowledge that you touched Ms.

20   Swift's rib, but what you thought was her rib --

21   A.    Correct.

22   Q.    -- but was not her butt?

23   A.    Correct.

24   Q.    Have you ever taken the position in this litigation

25   that you touched what you believed to be Ms. Swift's rib?

249

Direct - Mueller

1    A.    I have.

2    Q.    And do you believe that that is different or a

3    material change from your original position that you did

4    not inappropriately touch Ms. Swift?

5    A.    I do not believe it's a change from my original

6    position.

7    Q.    Mr. Baldridge also accused you of destroying evidence

8    in his opening.  Do you remember that?

9    A.    I do.

10   Q.    Have you purposely destroyed any evidence in this

11   case?

12   A.    I have not.

13   Q.    Let's -- let's talk in a little bit more detail.  You

14   made an audio recording of your conversation on June 3d

15   with Mr. Call and Mr. Haskell.

16   A.    Yes.

17   Q.    What device was that information recorded on?

18   A.    It was recorded on my iPhone.

19   Q.    What kind -- do you remember what model that was?

20   A.    It was an older model.  It was a phone that was from

21   either 2000 or '-9 or '10.  It was an iPhone 4.

22   Q.    Okay.  So after you recorded the meeting on your

23   iPhone 4 -- or when you left that meeting, there was an

24   audio recording of the meeting on your phone.

25   A.    Correct.

Direct - Mueller

1    Q.    What did you do with that audio recording, if

2    anything, subsequently?

3    A.    I transferred it to my MacBook.

4    Q.    Why did you do that?

5    A.    I had to -- I had to get it off of my iPhone because

6    it was taking up so much space that the -- it was a very

7    small hard drive, this phone didn't have a lot of storage

8    space, and the -- this notification would tell me that your

9    storage is full.  So I couldn't really -- my phone wasn't

10   functioning properly, so I had to get it off and --

11   completely off of my phone.

12   Q.    When did you do that?

13   A.    I know that I needed to clear space on my phone right

14   away.  I don't know the exact date, but I do know that I

15   recorded videos within the next 10 days because I went to

16   Red Rocks to a concert and I was making videos with my

17   phone of the -- I think it was a John Mayer concert, and I

18   made videos of a couple of his songs for Shannon, because

19   it was sort of her birthday gift, so sometime -- it was

20   sometime between the 3d and the 13th of June.

21   Q.    And after that -- or not later than June 13th, 2013,

22   the only place where the audio from your meeting was stored

23   was on your MacBook?

24   A.    I know for sure it was on my MacBook.

25   Q.    And did you ever produce some or all of that audio to

251

Direct - Mueller

1    your lawyer, me?

2    A.    I did.

3    Q.    Do you recall when you did that?

4    A.    I do.  It was in September of 2013.

5    Q.    And did you send to your lawyer, me, the entire audio

6    or portions of the audio?

7    A.    I sent you portions of the audio.

8    Q.    What portions did you send me?

9    A.    I sent you 19 isolated clips.

10   Q.    How did you decide what clips to send to me?

11   A.    I was going through the full file and I was pulling

12   out -- I was isolating clips that I thought would be

13   helpful to you in order to understand what they were

14   accusing me of.

15   Q.    Did you purposely not include portions of that audio

16   that you thought were hurtful to you in some form or

17   fashion?

18   A.    I did not.

19   Q.    Were there any portions of that meeting that you

20   thought were harmful to you --

21   A.    No.

22   Q.    -- for any reason?

23   A.    No.

24   Q.    Did you send me anything other than the 19 clips that

25   were provided to defense counsel in the course of this

Direct - Mueller

1    litigation?

2    A.    I did not.

3         MR. BALDRIDGE:  Your Honor, may we approach?

4         THE COURT:  You may.

5         (Discussion at side bar)

6         MR. BALDRIDGE:  In the litigation -- in the

7    litigation, 11 clips were produced to us.  I'd ask for the

8    additional eight clips that have just been established by

9    the record, and the opportunity to evaluate what further

10   action should be taken if, indeed, 11 doesn't equal 19 and

11   there's no explanation for it.

12        MR. McFARLAND:  He has -- he's -- Mr. Baldridge is

13   welcome to question the defendant about that.  I will

14   represent to the Court that every clip I received was

15   produced to the defendant.

16        THE COURT:  Well, I'm confused.  Is it -- are

17   there 11 audio clips or 19 audio clips?

18        MR. McFARLAND:  I -- I -- I don't -- I don't --

19   I'm sorry, I'm not sure as I sit here, but I do know that

20   every clip was produced to the defendants.

21        THE COURT:  But your client just testified on the

22   stand that there were 19 clips.

23        MR. McFARLAND:  Yeah.

24        THE COURT:  And Mr. Baldridge just told me, as an

25   officer of the court, that he only received 11 clips, so --

Direct - Mueller

1          MR. McFARLAND:  I'll have to look -- I'll have to

2     look at my -- in my records to see exactly the number of

3     clips, but -- and I may be able to answer it by looking at

4     defendants' notebook.

5          THE COURT:  Well --

6          MR. BALDRIDGE:  Whatever he answers, the witness

7     has answered 19.  We received 11.

8          THE COURT:  Is there some way that any of the

9     clips were combined so that 19 --

10         MR. McFARLAND:  It's completely possible, yes.

11         THE COURT:  -- were collapsed into 11?

12         MR. McFARLAND:  Yeah.

13         THE COURT:  Do you have any reason to believe

14    that, regardless of how many different clips there was,

15    that there was any content that was not produced to the

16    defendant --

17         MR. McFARLAND:  None whatsoever.

18         MR. BALDRIDGE:  Your Honor --

19         THE COURT:  Yeah, but I don't -- I mean, the

20    problem is that we've got different numbers, so -- go

21    ahead.

22         MR. BALDRIDGE:  This is not an allegation against

23    Mr. McFarland.  I want to make that clear.  I don't have

24    any belief of that.  What I do have is a gentleman who is a

25    serial loser of computer devices, now has entered a number

                              Direct - Mueller

1    that is eight greater than what Mr. McFarland gave me.

2    There could be explanations for it, but I don't have the

3    ability to cross-examine it.  And there's been a lot of

4    monkey business with these devices in this case, as this

5    Court knows by its order.  I need to know to cross-examine

6    this guy.

7              THE COURT:  Do you have those clips here in the

8    courtroom?

9              MR. McFARLAND:  The defendants have those clips

10   here in the courtroom.

11             THE COURT:  Okay.  He has 11.

12             MR. McFARLAND:  And I have a transcript of those

13   clips.

14             THE COURT:  Okay.  Mr. Baldridge is saying he has

15   11.  So what about the other eight --

16             MR. McFARLAND:  Again, I produced to him

17   everything that I had.  There may have been some duplicates

18   in what was sent.  But as an officer of the court, I will

19   tell you that every piece of information on there that I

20   got was sent to Mr. Baldridge.

21             MR. BALDRIDGE:  And, I, again, am not questioning

22   the integrity of Mr. McFarland.  It's simply the number is

23   different.

24             THE COURT:  Okay.  What are you requesting or

25   suggesting that be done as a result?

Direct - Mueller

1          MR. BALDRIDGE:  I want to find out whether there's

2     eight more out there that I've never received and I don't

3     know how to do that in this current setting we're in.  It

4     could be -- like I said, there could be an explanation, but

5     I don't have that right now.  And that's not appropriate

6     cross.  I need to know what the material is.

7          THE COURT:  All right.  This is what we're going

8     to do.  You're going to need to make a copy of all of your

9     audio -- audiotapes that your client has produced to you

10    regardless of how many files they come in --

11         MR. McFARLAND:  Okay.

12         THE COURT:  -- and produce them to defense

13    counsel.  Can you do that tonight?

14         MR. McFARLAND:  Yes.

15         THE COURT:  All right.  What I'm going to do is

16    when you finish your cross-examination, it will be subject

17    to reopening later in the trial.  If we are moving on to

18    another witness, we'll do that.

19         MR. McFARLAND:  Yes.

20         THE COURT:  I will give you the opportunity to

21    review those audio files, and if there's additional

22    cross-examination to be made of this witness, we will bring

23    him back on the witness stand for further

24    cross-examination.

25         MR. McFARLAND:  Thank you, Your Honor.

Direct - Mueller

1         MR. BALDRIDGE:  May I ask for something further,

2   Your Honor?

3         THE COURT:  Sure.

4         MR. BALDRIDGE:  Can Mr. McFarland speak to his

5   client and find out whether there are additional clips that

6   were not sent, since he said 19?  I don't have any doubt

7   he's going to send me what he got.  I don't doubt Mr.

8   McFarland.

9         THE COURT:  You just said "video."

10         MR. BALDRIDGE:  I'm sorry, audio.  Forgive me.

11         THE COURT:  My God, they're missing video clips,

12   too.

13         Yes, I think that's appropriate.  I think you

14   should make -- do inquiry of your client as to whether he

15   has provided to you everything that -- it's my

16   understanding from the -- from the motions on the sanctions

17   is that the -- there were clips of the portions of the

18   audio recording of this January 3d meeting that were

19   produced to you prior to the destruction of the data -- or

20   the loss of the devices of the MacBook and the other

21   devices.

22         MR. McFARLAND:  Yes.

23         THE COURT:  So I think you need to ask your

24   client, is he, in his testimony, referring to some

25   additional audiotape -- or audio files that he's not

Direct - Mueller

1    already previously disclosed to you?

2         MR. McFARLAND:  Yeah, I could do that.

3         THE COURT:  And if he -- if there are such, that

4    he has to produce them to you and you have to produce them

5    to defense counsel.

6         MR. McFARLAND:  Yes, sir.

7         THE COURT:  All right?  You can make that

8    representation -- like I said, until that's resolved, we're

9    going to keep his cross-examination open.

10        MR. BALDRIDGE:  And I have said this five times,

11   but I do really think it's important in the civility:  Mr.

12   McFarland has been nothing but straightforward.  This is

13   not an allegation made against a lawyer at all.

14        THE COURT:  I appreciate you saying that and thank

15   you for that.

16        MR. McFARLAND:  I appreciate.

17        THE COURT:  One of the things we like to do in

18   Colorado is remain civil with the lawyers between each

19   other --

20        MR. BALDRIDGE:  Nice people.

21        THE COURT:  -- having litigated in Chicago, I know

22   it's not the same all over the country.

23        MR. McFARLAND:  Judge, just so I'm clear, that the

24   clarifying question about whether he's aware -- if Mr.

25   Mueller's aware of any additional audio that he hasn't sent

Direct - Mueller

1    to me, regardless of the number of clips, that's a question

2    you want me to ask on the record when we get back up here?

3              MR. BALDRIDGE:  No, I understood it to do the

4    investigation tonight.  Is that wrong?

5              MR. McFARLAND:  Because I wouldn't probably ask

6    that question unless you want me to ask the question.

7              THE COURT:  What's your view on that?

8              MR. BALDRIDGE:  He's already said he gave 19.  So

9    I'd just like him to run it down and, as an officer of the

10   court, let me know what the deal is.

11             THE COURT:  I think it's better that you not

12   continue on this --

13             MR. McFARLAND:  Yeah.

14             THE COURT:  -- on the record.

15             MR. McFARLAND:  Move on.

16             THE COURT:  Let's go into -- let's move on, but

17   when we're done today, pursue this with your client.

18             MR. McFARLAND:  Yeah.

19             THE COURT:  Find out if there are other audio

20   files that exist, No. 1; if they are, they have to be

21   produced.

22             MR. McFARLAND:  Yeah.

23             THE COURT:  And, secondly, whatever we do have, I

24   think you need to produce them again, a copy of it, so that

25   defense counsel could compare and contrast to what they

259

Direct - Mueller

1    have to see if there are other materials in there, and then

2    we'll hold the witness' cross open until then.

3              MR. McFARLAND:  Fair enough.

4              MR. BALDRIDGE:  Thank you, Your Honor.

5              MR. McFARLAND:  Thank you, Your Honor.

6         (End of discussion at side bar)

7              THE COURT:  All right.  Mr. McFarland, you may

8    resume your examination.

9              MR. McFARLAND:  Thank you, Your Honor.

10   BY MR. McFARLAND:

11   Q.   Are the audio files that you've produced to me in

12   September of 2013, are those still available on your

13   MacBook?

14   A.   No.

15   Q.   What happened to your MacBook -- or what happened to

16   the audio files on your MacBook?

17   A.   Everything on my MacBook was lost when I had an

18   accident at home.  I was using my computer in my living

19   room and I accidentally spilled coffee into the keyboard.

20   Q.   And when did that happen?

21   A.   That happened in August of 2014.

22   Q.   And did you try to repair the hard drive or recover

23   the information you lost?

24   A.   I did.  I immediately flipped over the laptop so the

25   keyboard was facing down.  I powered down the machine.  I

Direct - Mueller

1    let it dry.  I called Apple -- the nearest Apple by my --

2    where I was living.

3         I brought it in the next day.  They sent it to

4    their service center somewhere.  And they notified me that

5    there was nothing that could be done.  The only thing they

6    could do would be to replace the hard drive and the

7    keyboard and -- or I could just scrap it, and I had them

8    fix it.

9    Q.    Okay.  The iPhone 4, which originally had the audio,

10   but then didn't after you transferred it to the MacBook, is

11   there -- are there any audio files on -- well, do you still

12   have the iPhone 4?

13   A.    I do not.

14   Q.    What happened to that?

15   A.    In November of 2015, I damaged my iPhone 4 while I was

16   hiking in a state park.

17   Q.    As of November 2015, were there any of the audio

18   recordings from your meeting with Mr. Call and Mr. Haskell

19   on it?

20   A.    No.

21   Q.    Was there -- were there e-mails or voice mails, or

22   those sorts of things, on that phone that related to this

23   case as of November 2015?

24   A.    Not that I know of.

25   Q.    Did you also have a SuperDrive?

261

Direct - Mueller

1    A.    Yes.  I did.

2    Q.    What is a SuperDrive?

3    A.    A SuperDrive is something I purchased from Apple when

4    I bought my MacBook.  And I was hoping that it would be a

5    reliable way to back up my laptop in the event of an

6    accident.

7    Q.    Did you ever send to me audio files or any other

8    information that you pulled from your SuperDrive?

9    A.    I did not.

10   Q.    To the best of your knowledge, was there any -- were

11   the audio files or any other information pertinent to this

12   case on the SuperDrive?

13   A.    I know the SuperDrive had something on it, I don't

14   know what.

15   Q.    So -- something meaning what?

16   A.    I don't know if it had audio files pertaining to this

17   case, I don't know if it had -- I'm not sure exactly what

18   was on it.

19   Q.    Okay.  But you didn't send me anything from that

20   SuperDrive.

21   A.    I did not.

22   Q.    And is the SuperDrive still available today?

23   A.    It is not.

24   Q.    What happened to the SuperDrive?

25   A.    In July of 2015 -- it was either July or August of

262

Direct - Mueller

1    2015 -- I tried to access the contents of the SuperDrive

2    and I couldn't get it to work.

3    Q.    And what did you do then?

4    A.    I went to the Apple store, because it was one of their

5    products, and I gave it to them and I asked them to -- if

6    they could get it to work.

7    Q.    Could they get it to work?

8    A.    They could not.

9    Q.    Were you able to pull any information off the

10   SuperDrive --

11   A.    I -- I was not.

12   Q.    You also had an iPad?

13   A.    I did have an iPad.

14   Q.    Was there ever anything on your iPad that -- the audio

15   files or anything else that related to this case or

16   communications or e-mail with anybody about this case?

17   A.    There wouldn't have been anything on the iPad -- you

18   know, my e-mail was through gmail, and I didn't -- I mean,

19   you'd have to be more specific about what -- what was on

20   the iPad.  The -- I mean, the -- I used the iPad to surf

21   the internet.  I didn't use it for -- that wasn't my

22   primary piece of electronics.

23   Q.    Was there anything on your iPad that you sent to me as

24   materials pertinent to this case?

25   A.    Well, anything I sent to you that was pertinent to

263
Direct - Mueller

1    this case was sent through gmail.  So I still have it in my

2    gmail account.  And I can go into my gmail account and

3    search for it and we'll find it.

4    Q.   And to the best of your knowledge, you searched for

5    those e-mails, you produced those e-mails in this case?

6    A.   You have all -- anything that's been asked of me, I

7    have delivered.

8    Q.   Thank you.  Have you -- since June 2d, 2013, have you

9    lost or had any other electronic devices damaged?

10   A.   No.

11   Q.   We also heard in opening that this is about money for

12   you.

13         THE COURT:  You know, Mr. McFarland, it sounds

14   like you're shifting to a new subject matter.  Why don't we

15   take a pause here for our afternoon break.

16         We will be -- members of the jury, we will be in

17   our afternoon recess for 20 minutes.

18      (Recess at 3:04 p.m. to 3:27 p.m.)

19         THE COURT:  Mr. Mueller, I remind you you remain

20   under oath.

21         Mr. McFarland, you may resume your direct

22   examination.

23         MR. McFARLAND:  Thank you, Your Honor.

24   BY MR. McFARLAND:

25   Q.   Just a few more questions, Mr. Mueller.  There were

264
Direct - Mueller

1      also comments in opening this morning to the effect that

2      you're motivated -- or this lawsuit is motivated by money.

3      Is that true?

4      A.    No, it's not true.

5      Q.    What is the most important reason that you brought

6      this litigation?

7      A.    I want to clear my name.

8      Q.    How has this -- this accusation and your termination

9      impacted you?

10     A.    Cost me my career.  The thing that I love to do, my

11     passion, radio.  It cost me my income.  It's -- it's been

12     hard on my family, it's been hard on my friends.

13          Now, in particular, my friend Ryan Kliesch moved

14     to Denver to do a morning show with me and when -- when I

15     left, he was stuck trying to do a show by himself.  He

16     wasn't happy.

17          It had an impact on my girlfriend, Shannon

18     Melcher.  It was hard for her.  It was hard for me to talk

19     to her family.  And it was difficult for them, I'm sure.

20     You know, it's a humiliating experience to be accused of

21     something that despicable.  It's -- it's a horrible thing

22     I'm accused of.  And I want to clear my name.

23     Q.    Do you have a specific dollar amount that you want

24     this jury to award you?

25     A.    I do not.

265

Direct - Mueller

 1   Q.   Do you want the jury to come up with a number that

 2   they believe is fair?

 3   A.   Yes.

 4   Q.   Have you looked for other employment since your

 5   termination from KYGO?

 6   A.   Yes, I have.

 7   Q.   Have you looked for employment in the radio arena?

 8   A.   Yes, I have.

 9   Q.   Tell us about that.

10   A.   Well, for starters, I -- I had worked with a talent

11   agency.  I had a talent agent who was trying to find me

12   opportunities.  And then on my own, I applied for jobs.  My

13   focus was primarily in top 20 radio markets.  That was my

14   background, for the most part.

15          And I contacted people I knew, either program

16   directors or morning show talent, and found out that

17   certain people were looking to expand a show, create a

18   show, and I sent my package out, which is standard in

19   radio.

20   Q.   What's your -- what's the package?

21   A.   The package is a resume, and a headshot, and an audio

22   sample.

23   Q.   How many resumes did you send out to radio stations?

24   A.   At least two dozen.

25   Q.   Did you receive any response?

266

Direct - Mueller

1    A.   Yeah, you know, I talked to several people about

2    this -- my situation and what their situation was.

3    Q.   Was that over the phone or in person or both?

4    A.   I'd say over the phone.

5    Q.   Did you -- did you get any formal interviews as a

6    result of that process?

7    A.   I did.

8    Q.   And did you receive any offers of employment?

9    A.   I did not.

10   Q.   Did you have an understanding of -- well, were you

11   told why you weren't being offered jobs at any of the

12   places that you applied?

13          MR. BALDRIDGE:   Objection.   Foundation and

14   hearsay.

15          THE COURT:   Let's rephrase it so we don't have a

16   hearsay.

17   BY MR. McFARLAND:

18   Q.   Do you have an understanding as to why you were not

19   offered employment?

20          MR. BALDRIDGE:   Same objection.   That

21   understanding could only be based on hearsay.

22          THE COURT:   It may not.   Overruled.

23   BY MR. McFARLAND:

24   Q.   Do you have an understanding as to why you were not

25   offered employment?

Direct - Mueller

1    A.    I do.

2    Q.    What's that based on?

3    A.    Conversations.

4    Q.    With?

5    A.    With people I was trying to establish a work

6    relationship with.

7    Q.    What is your understanding?

8    A.    My understanding is --

9            MR. BALDRIDGE:  Your Honor, objection.  Hearsay.

10   He's talking about out-of-court conversations with

11   potential employers and what they said.  They could have

12   been here.

13           THE COURT:  It's being introduced for the truth of

14   the matter?

15           MR. McFARLAND:  It is not, Your Honor.

16           MR. BALDRIDGE:  May I have an instruction, Your

17   Honor, so the jury understands what that means?

18           THE COURT:  Well, do you have another basis for

19   the -- for the response to your -- to the objection?

20           MR. McFARLAND:  No.  I'm just trying to elicit his

21   understanding of why he was not offered subsequent

22   employment.

23           THE COURT:  All right.  I agree it's not being

24   introduced for the truth of the matter asserted, so the

25   objection's overruled.

268

Cross - Mueller

1        I may give your requested instruction at a later

2   time.

3        MR. BALDRIDGE:  Thank you, sir.

4        THE COURT:  All right.  You may answer.

5        THE WITNESS:  During my discussions with these

6   radio people, I was forthright about my situation, I was

7   completely honest.  I told them that I was involved in this

8   alleged incident and I lost my job because of it.  And it's

9   my understanding that until -- and they -- they -- they

10  made it quite clear that I needed to get this behind me

11  before I could -- they could consider bringing me on board.

12       MR. McFARLAND:  Mr. Mueller, I don't have any

13  further questions for you.  Thank you very much.

14       THE COURT:  All right.  Cross-examination.

15                      CROSS-EXAMINATION

16  BY MR. BALDRIDGE:

17  Q.   Good afternoon, Mr. Mueller.  How are you?

18  A.   Good afternoon.  I'm fine.

19  Q.   Most important thing to you in this lawsuit was,

20  quote, I want to clear my name, correct?

21  A.   I just said that, yes.

22  Q.   And who's Jeffrey Opp?

23  A.   Jeffrey Opp is a -- is an expert on determining

24  damages.

25  Q.   And you've retained him, didn't you?

Cross - Mueller

1    A.    At one point, he was retained.

2    Q.    And he prepared a report where you sought, in this

3    case, $2,916,637, correct?

4    A.    I -- at the top of my head, I don't know.

5    Q.    About 3 million, right?

6    A.    I'll take your word for it.

7    Q.    Is that enough to clear your name, sir?  Yes or no.

8    A.    I -- I can clear my name --

9    Q.    Is that enough to clear your name?  Yes or no.

10   A.    I -- I don't understand the question.

11   Q.    We'll move on.

12          Sir, in your lawsuit, you allege -- or Ms. Swift

13   alleges in this case that you grabbed her rear end in the

14   manner described in a meet-and-greet at the Pepsi Center on

15   June 2, 2013; correct?

16   A.    Yes.

17   Q.    She says you assaulted her, right?

18   A.    Yes.

19   Q.    And you had meetings with Mr. Call and Mr. Haskell,

20   right?

21   A.    I did.

22   Q.    They don't work for Ms. Swift, do they?

23   A.    No.

24   Q.    And they looked at a photo, right?

25   A.    They did.

Cross - Mueller

1    Q.   When they looked at that photo, Ms. Swift wasn't

2    there, was she?

3    A.   I wasn't there when they looked at the photo.

4    Q.   Sir, were you there with them when you looked at the

5    photo?  You looked at it with Mr. Call and Mr. Haskell --

6    A.   I did not.  I -- I never -- they never showed me the

7    photo, sir.

8    Q.   Have you ever been present looking at that photo with

9    Ms. Swift?

10   A.   No, I have not.

11   Q.   Was anyone from the Swift organization on the phone

12   when you met with Mr. Haskell and Mr. Call in the interview

13   you described?

14   A.   I was not on the phone with them --

15   Q.   Sir, you're in an interview.  You're with Mr. Call and

16   Mr. Haskell.  Was anyone on the phone from the Swift

17   organization participating in that interview?

18   A.   Not that I know of.

19   Q.   And KYGO fired you, right?

20   A.   KYGO fired me.

21   Q.   Ms. Swift did not fire you, did she?

22   A.   Ms. Swift did not fire me.

23   Q.   But you've sued her, right?

24   A.   I did.

25   Q.   And you sued her mom, right?

271

Cross - Mueller

1    A.    I did.

2    Q.    And you sued Frank Bell, right?

3    A.    I did.

4    Q.    And you didn't sue KYGO, did you, sir?

5    A.    No, I did not.

6    Q.    And you didn't sue Eddie Haskell, did you, sir?

7    A.    No, sir.

8    Q.    And you didn't sue Mr. Call, did you, sir?

9    A.    No, sir.

10   Q.    And you filed the lawsuit in a public lawsuit, right,

11   sir?

12   A.    Yes.

13   Q.    Making all of the allegations against you public for

14   the whole world to see, right, sir?

15   A.    I did.

16   Q.    Making every radio station from which you sought

17   employment able to see what had been alleged against you,

18   correct, sir?

19   A.    Correct.

20   Q.    And Ms. Swift and her organization never made a shred

21   of what occurred the night of June 2, 2013, public until

22   this lawsuit, did they, sir?

23   A.    That I can't tell you.

24   Q.    You don't know, do you?

25   A.    I have reason to believe --

Cross - Mueller

1    Q.   Sir, I'm not asking for your reason to believe.  Do

2    you have any facts to suggest that Ms. Swift made public

3    the allegations against you June 2, 2013?

4    A.   No.  I don't.  Not that Ms. Swift did.

5    Q.   Thank you.  Thank you, sir.

6         You don't know Ms. Swift, do you?

7    A.   I do not know Ms. Swift.

8    Q.   You two had never communicated in any way, shape or

9    form prior to June 2d, 2013, had you?

10   A.   No, sir.

11   Q.   You're unaware of any facts to suggest Ms. Swift had

12   ever heard of you prior to the concert, correct?

13   A.   I am unaware.

14   Q.   And you're unaware of any facts to suggest that Ms.

15   Swift had -- even knew of you, right?

16   A.   Correct.

17   Q.   And prior to the events, you're unaware of anyone in

18   the Swift organization even knowing of your radio program,

19   correct?

20   A.   I am unaware of that.

21   Q.   You cannot imagine, can you, sir, why Ms. Swift would

22   make up a story that you grabbed her rear end?  Yes or no.

23   A.   I can think of many possibilities why somebody would

24   fabricate a story.

25   Q.   Sir, do you remember when I took your deposition a few

273
Cross - Mueller

1   years ago?

2   A.    Yes.

3         MR. BALDRIDGE:  And with the Court's permission,

4   Your Honor, I would like to put a copy of his deposition in

5   front of him.

6         THE COURT:  All right.  Is that the original?

7         MR. BALDRIDGE:  The original?  No, sir, it's a

8   copy.

9         THE COURT:  Are you going to attempt to impeach

10  the witness?

11        MR. BALDRIDGE:  Yes, sir.

12        THE COURT:  All right, then let Ms. Hansen grab

13  the original.

14        COURTROOM DEPUTY:  July 13th, 2016?

15        MR. BALDRIDGE:  Let me confirm for sure.  July --

16  yes.  Thank you.

17  BY MR. BALDRIDGE:

18  Q.    Do you have it in front of you, sir?

19  A.    Yes, sir.

20  Q.    Can I have you turn to page 23, please, sir.

21  A.    I'm here.

22  Q.    And I wanted you to go to line 17, sir, starting with

23  the second sentence.  Are you there?

24  A.    I am.

25  Q.    I'm going to read this and you tell me whether I read

274
Cross - Mueller

1    your under-oath testimony as of this date accurately.

2            Tell me every fact of which you're aware that

3    suggests she had any incentive to fabricate a story that

4    you grabbed her rear end.

5            Question:  Just facts.

6            Answer:  I can't imagine why she would fabricate a

7    story.

8            Did I read that correctly?

9    A.    You did.

10   Q.    And that was your testimony under penalty of perjury

11   as of the date indicated, correct?

12   A.    Yes.

13   Q.    Thank you.

14           Now, so you know of no facts either to suggest

15   that Ms. Swift would fabricate a story that you

16   inappropriately touched her, do you?

17   A.    No, sir.

18   Q.    And you know of no incentive from Ms. Swift to

19   fabricate a story that you allegedly touched her, do you?

20   A.    No, sir.

21   Q.    You cannot identify any reason, motive, or incentive,

22   sir, for why she would want to spend two years in

23   litigation with you, can you, sir?

24   A.    Can you repeat that, please?

25   Q.    You cannot identify any reason, incentive or motive

Cross - Mueller

1   for Ms. Swift to want to spend two years involved in
2   litigation with you, can you?
3   A.    I cannot.
4   Q.    You cannot identify any reason, motive or incentive
5   for Ms. Swift to want to incur the cost of this litigation,
6   can you?
7   A.    I cannot.
8   Q.    You cannot identify any reason, motive, incentive for
9   Ms. Swift to want to deal with the distraction of this
10  litigation, can you?
11  A.    I cannot.
12  Q.    You cannot identify any reason, motive or incentive
13  for Ms. Smith to want the media attention that's been
14  placed on this litigation, can you?
15  A.    I cannot.
16  Q.    You cannot identify any reason for Ms. Swift to want
17  to sit through depositions and a 10-day trial and relive
18  the day of June 2, 2013, can you?
19  A.    I cannot.
20  Q.    Shock jocks make a lot of money, don't they, sir?
21  A.    Some shock jocks do.
22  Q.    Yes or no, ever consider being a shock jock?
23  A.    You'd have to clarify what a shock jock is, sir.
24  Q.    I think we all know, sir.  Did you ever consider being
25  a shock jock?

Cross - Mueller

1     A.    Once again, could you define that for me, please?

2     Q.    It's just too confusing what a shock jock is?  For

3     you?  You're in the radio industry, aren't you?

4     A.    Mr. Baldridge, I'd like to know your definition of a

5     shock jock.

6     Q.    Let's just -- let's take an example rather than a

7     definition, sir.  Howard Stern, would you consider him a

8     shock jock?

9     A.    I would consider Howard Stern a shock jock.

10    Q.    A very famous guy, isn't he?

11    A.    He's very famous.

12    Q.    You would like to make his kind of money, wouldn't

13    you?

14    A.    Come again?

15    Q.    You'd like to make the kind of money Howard Stern

16    makes, wouldn't you?

17    A.    I'm not interested in Howard Stern money.

18    Q.    Now, Mr. Haskell, you said he told a fishing tale, a

19    silly, goofy story.  Do you recall that?

20    A.    Yes.

21    Q.    Do you consider a sexual assault to just be silly?

22    A.    The way he told --

23    Q.    Sir, that's not my question.  Your counsel will have

24    an opportunity.

25              Do you consider a sexual assault to be something

Cross - Mueller

1    that you would describe as silly?

2    A.    I --

3    Q.    Yes or no.

4    A.    I would not consider a story about sexual assault to

5    be silly.

6    Q.    Do you consider a story about sexual assault to be

7    goofy?

8    A.    I would not consider a story about sexual assault to

9    be goofy.

10   Q.    Do you believe, sir -- yes or no -- that when a fellow

11   employee at KYGO stated to you that he had placed his hands

12   supposedly on Ms. Swift's rear, that you did not have some

13   obligation to tell your employer?  Yes or no.

14   A.    I didn't feel like I had an obligation to tell my

15   employer.

16   Q.    Well, isn't it true, sir, that that very same time

17   period, you advised your girlfriend, Shannon Melcher, to

18   tell KYGO about someone at KYGO allegedly touching her rear

19   end, didn't you, sir?

20   A.    I did not advise --

21   Q.    Sir, did you advise your girlfriend, Mrs. Melcher, at

22   around the same time, to go to KYGO superiors and say

23   another employee had touched her rear end?  Yes or no.

24   A.    Okay.  I did not advise Ms. Melcher to tell anyone

25   anything.

278

Cross - Mueller

1    Q.    Are you sure of that?

2    A.    I am sure of it.

3    Q.    Are you aware of the incident with Ms. Melcher?

4    A.    I'm --

5    Q.    Yes or no.

6    A.    Can -- could you please stop interrupting me?

7    Q.    Are you aware of it --

8            THE COURT:  Counsel, let -- when you ask a

9    question, let the witness complete his answer.  Go ahead.

10   BY MR. BALDRIDGE:

11   Q.    Are you aware -- yes or no -- of Ms. Melcher making an

12   allegation that a KYGO employee touched her in an

13   inappropriate manner?

14   A.    I am aware of that.

15   Q.    And did you advise her or tell her she should report

16   it to superiors?

17   A.    I advised her to go to HR.

18   Q.    Now, you attended the Taylor Swift concert on June 2d,

19   2013, as part of your official employment duties.

20   A.    Yes, sir.

21   Q.    And you agree that it's possible that your hand came

22   into contact with Ms. Swift's skirt or somewhere behind

23   her, aren't you?

24   A.    It's possible.

25   Q.    And tell me this, sir:  If Ms. Swift believed -- the

Cross - Mueller

1   word "believed" -- if Ms. Swift believed you had touched

2   her on her rear end without her permission, you would agree

3   that your employer, KYGO, had a right to know, right?

4   A.   Yes.

5   Q.   And you agree, I would assume, that if any employee of

6   KYGO touched Ms. Swift on her rear end at a concert without

7   her permission, KYGO had a right to know, right?

8   A.   Yes.

9   Q.   And upon knowing, in that scenario, KYGO had a right

10  to look into and investigate what occurred, right?

11  A.   Yes.

12  Q.   And if KYGO concluded that a KYGO employee -- KYGO

13  employee had, in fact, touched Ms. Swift in an

14  inappropriate manner, they had a right to fire that

15  employee, right?

16  A.   Yes.

17  Q.   Now, I assume, sir, that you believe that if this jury

18  knew all the facts of this circumstance, they would see

19  that -- they would believe you, right?

20  A.   One more time.

21  Q.   If they knew all the facts of the circumstances in

22  this case, all the facts, I assume you believe that this

23  jury would believe you, right?

24  A.   Yes.

25  Q.   It's critical that they know the facts, right?

280
Cross - Mueller

1    A.    Yes.

2    Q.    They'll never know the facts, will they, sir?

3    A.    What do you mean by that?

4    Q.    Sir, you lost or destroyed five electronic devices,

5    didn't you?  Yes or no.

6    A.    I -- I had four electronic devices that were damaged,

7    yes.

8    Q.    And they are all gone, right?

9    A.    They are gone.

10   Q.    They'll never know what's on them, will we?

11   A.    No, we won't.  They're gone.

12   Q.    Let's take a look.  You first spoke to a lawyer

13   shortly after you were removed from the Pepsi Center that

14   evening of June 2d, 2013, correct?

15   A.    I did.

16   Q.    And you spoke to a lawyer, I would guess, because you

17   thought some legal situation existed?

18   A.    I thought that I was going to get arrested.

19   Q.    In fact, you called a criminal lawyer.

20   A.    I did.

21   Q.    And on June 3, 2013, I believe you testified that you

22   met with Mr. Call and Eddie Haskell about the incident; is

23   that correct?

24   A.    I did.

25   Q.    And I say "incident," I understand you have one view

Cross - Mueller

1     of it, Ms. Swift has another.  I just mean what occurred in

2     that meet-and-greet room; is that fair?

3     A.    That is fair.

4     Q.    And I think you testified that you recorded that

5     meeting, correct?

6     A.    I did.

7     Q.    And you did that in secret, right?

8     A.    I recorded it with my iPhone.

9     Q.    Well, did you ever tell Mr. Call or Mr. Haskell you

10    were recording this meeting?

11    A.    I did not.

12    Q.    And that's because you were considering the

13    possibility of legal action, right?

14    A.    I was considering the possibility that they were going

15    to terminate me.

16    Q.    And you were recording it to keep a good record for

17    the potential of legal action, right?

18    A.    Of what they told me, yup.

19    Q.    And it might lead to legal action by you, right?

20    A.    It might.

21    Q.    In fact, you contemplated suing KYGO, right?

22    A.    I con- -- I was concerned that I was going to be

23    arrested.

24    Q.    And you had contemplated legal action against KYGO,

25    correct?  You thought about it, you considered it.

282

Cross - Mueller

1   A.   On what date, sir?

2   Q.   Any date.

3   A.   Well, I have, of course.

4   Q.   Okay.  And in that meeting with Mr. Haskell and Mr.

5   Call, you discussed the events that occurred at the Pepsi

6   Center on June 2d, 2013, right?

7   A.   Yes.

8   Q.   And it was part of KYGO's investigation of what

9   occurred, correct?

10  A.   Yes.

11  Q.   And it was an important meeting, wasn't it?

12  A.   An important meeting?

13  Q.   Yes, sir.

14  A.   Yes.

15  Q.   And the recording you made of that meeting, we don't

16  have all of it, do we?

17  A.   We don't.

18  Q.   And that meeting lasted how long, sir?

19  A.   It was over an hour that I was in the office.

20  Q.   And you recorded some other calls that you had with

21  Mr. Eddie Haskell, right?

22  A.   No, I did not.

23  Q.   Altogether, sir, do you recall that the recording was

24  approximately two hours?

25  A.   No.

283
Cross - Mueller

1    Q.   If I could refresh your recollection, sir.  I believe

2    if you turn to page 43 of your deposition.  Let me know

3    when you're there, please.

4    A.   I'm here.

5    Q.   Page 43, lines 3 to 8, I'm asking the questions in

6    your deposition under oath.

7         Where is it in the audio recording, sir?  They're

8    right in front of you.

9         Answer:  I don't know if it was in the audio

10   recordings.  The audio I recorded was close to two

11   recordings, and the audio that I could provide to Mr.

12   McFarland was an -- a portion of the entire audio.

13        Do you see that?

14   A.   I do.

15   Q.   There were two recordings, right, sir?

16   A.   No.

17   Q.   Did you say that under oath?

18   A.   This is what I said under oath:  I don't know if it

19   was in the audio recordings.  The audio I recorded was

20   close to two hours long, and the audio that I could provide

21   to Mr. McFarland was a portion of the entire audio.

22   Q.   Let's back up.  The audio was close to two hours long,

23   right?

24   A.   Well, that's what I said, yes.

25   Q.   Under oath under penalty of perjury, right?

Cross - Mueller

1    A.    Yes.

2    Q.    All right.  Now, of that two-hour long, or close to

3    two-hour long audio recording, we have about 14 minutes of

4    it, don't we?

5    A.    I'll take your word for that.

6    Q.    Somewhere in that range, we would agree, right?

7    A.    Yeah.

8    Q.    So approximately an hour and 45 minutes of the audio

9    recording of a critically important meeting; we don't have

10   any more, do we?

11   A.    Well, the two hours, it doesn't represent the entire

12   time I was in the office with Bob Call and Eddie Haskell.

13   Q.    So there's still more, but I'm talking about the audio

14   that's two hours long, one hour and 45 minutes of that

15   audio's missing, right?

16   A.    Well, it would -- yeah.

17   Q.    So we have about 15 minutes of it, right?

18   A.    That -- yes.

19   Q.    And the audio recording of June 3 at that meeting, I

20   think you said you kept it on -- you called it a MacBook

21   laptop?

22   A.    Yeah --

23   Q.    After you downloaded it to it?

24   A.    It was a MacBook Retina.

25   Q.    And do you recall that you also kept it on your

Cross - Mueller

1    external hard drive?

2    A.    I'm not 100 percent sure it was on the external hard

3    drive.

4    Q.    Okay.

5    A.    I was hoping that it was.

6    Q.    Okay.  Now, if I could get you to turn to page 43 of

7    your deposition, again, sir.

8    A.    Yes, sir.

9    Q.    And if you go to the bottom, page 23 -- line 23, are

10   you with me?

11   A.    Yes.

12   Q.    This is you testifying.

13          No, I did not.  They -- my laptop was damaged and

14   I have an external backup hard drive that I was using at

15   the time.  And this is -- I can't -- I don't know how to

16   describe it.  It's -- it's either just died or they don't

17   last forever.

18          Do you see that?

19   A.    Yes.

20   Q.    Does that in any way refresh your recollection as to

21   whether the audio ever existed on your external hard drive?

22   A.    When I accessed my external hard drive, it didn't

23   function.

24   Q.    So I guess it does not refresh your recollection; is

25   that true, sir?

286

Cross - Mueller

1    A.    Please restate your question.

2    Q.    Okay.  Did the portion we just read from your

3    deposition in any way refresh your recollection, cause you

4    to remember, that you put the recording also on your

5    external hard drive backup?

6    A.    I am not 100 percent sure it made it onto the external

7    hard drive.

8    Q.    Okay.  Let's move on.  We no longer have the laptop,

9    right?  It's gone.

10   A.    The laptop was damaged.

11   Q.    The laptop's gone, right?

12   A.    Well, I have part of the laptop, I don't have the hard

13   drive.

14   Q.    Hard drive's where the information's kept?

15   A.    Yes, sir.

16   Q.    We don't have that, right?

17   A.    We don't.

18   Q.    And we don't have this external hard drive anymore, do

19   we?

20   A.    No, sir.

21   Q.    And you used the laptop during your employment with

22   KYGO, correct?

23   A.    I did.

24   Q.    And you used that laptop after June 2d, 2013, correct?

25   A.    Yes, sir.

287

Cross - Mueller

1    Q.    And you used it for business communications, didn't

2    you?

3    A.    Yes.

4    Q.    And I think you testified that you spilled coffee on

5    it; is that right?

6    A.    Yes, I splashed coffee into the keyboard.

7    Q.    Now, I -- coffee didn't make the physical device

8    disappear, of course, right?

9    A.    No.

10   Q.    But you don't have that laptop anymore, do you?

11   A.    No, Apple does.

12   Q.    Oh, Apple does?

13   A.    Yeah.

14   Q.    But is Apple going to come and tell us?

15   A.    I brought my computer to the Apple store --

16   Q.    Is Apple going to come and tell us and show us the

17   paperwork that they had of that computer?

18   A.    No, they won't.

19   Q.    And so no one can confirm that coffee was actually

20   spilled on it, right?

21   A.    I -- I brought it in there and I know they gave me a

22   receipt of the work order, and coffee was mentioned on the

23   work order.

24   Q.    Sir, my clients --

25   A.    Yes.

288
Cross - Mueller

1    Q.   -- and myself, with a suitable expert, cannot confirm

2    whether coffee was actually spilled on it, right?  Because

3    we don't have it.

4    A.   Your experts cannot confirm.

5    Q.   And this jury will never know, will they?

6    A.   If I spilled my coffee?

7    Q.   Correct.

8    A.   They won't.

9    Q.   And you had had that laptop until approximately 2015,

10   I believe, right?

11   A.   August of 2015.

12   Q.   You were well into the lawsuit by then, right?

13   A.   I wouldn't say that.

14   Q.   The lawsuit is under way, wasn't it?

15   A.   In 2000 --

16   Q.   '15?

17   A.   In August?

18   Q.   Yes.

19   A.   I -- I guess, because I'm not an attorney, I don't

20   have a legal background, I don't know if a lawsuit was well

21   on its way or not.

22   Q.   Okay.  Well, let's take another point of reference.

23   This is approximately two years after the June 2d, 2013,

24   incident, right?

25   A.   Yes, sir.

Cross - Mueller

1    Q.   And you still had the laptop then, right?

2    A.   Yes, sir.

3    Q.   And then you say you took it to an Apple store, right?

4    A.   Yup.

5    Q.   And you don't have any paper transaction that that

6    occurred, do you?

7    A.   I sure do.

8    Q.   You do?

9    A.   Yeah.

10   Q.   Did you produce it in this case?

11   A.   I -- yes, I did.

12   Q.   Oh, you did?

13   A.   Yeah.

14   Q.   And you're swearing under oath that you produced that

15   in this case?

16   A.   I -- I looked at an e-mail today that shows my

17   receipts as attachments.

18   Q.   Did you ever go back and get the laptop?

19   A.   When I went back to get my laptop, it had been

20   repaired.  So, yes, I did get the laptop.

21   Q.   And did your lawyer, or you, ever retain a forensic

22   computer expert to try to recover what was on the prior

23   guts, if you will, or hard drive of that laptop?

24   A.   No, we did not retain an expert.

25   Q.   And, of course, my client didn't have the opportunity

Cross - Mueller

 1   to do that, did they?

 2   A.    No.  No, sir.

 3   Q.    Now, this external hard drive, it's gone, too, right?

 4   A.    Yes.

 5   Q.    We don't know where it is, do we?

 6   A.    Well, I -- no, we don't.  I did bring it to the Apple

 7   store and I'm pretty sure I left it there because I bought

 8   a new one.

 9   Q.    So Apple has that one, too?

10   A.    I believe so, sir.

11   Q.    Did you ever go back to try to get it?

12   A.    I did not.

13   Q.    Have you ever employed a forensic expert, computer

14   experts, to try to recover what was on that external hard

15   drive?

16   A.    I did not employ --

17   Q.    Did you ever ask your lawyer to do so?

18   A.    Did I ask my lawyer to do so?

19   Q.    Yes, sir.

20   A.    No.

21   Q.    My client can't now, can they?

22   A.    No, sir.

23   Q.    Because it's gone, right?

24   A.    It is gone.

25   Q.    And this jury will have to take you at your word that

Cross - Mueller

1    that external hard drive fried, correct?

2    A.    Yes, they will.

3    Q.    So we have a laptop gone, Apple laptop, right?

4    A.    A MacBook, yes, Apple.

5    Q.    So expensive, right?

6    A.    About $3,000.

7    Q.    Just gone, right?

8    A.    Well, the hard drive, yeah.  The hard drive is gone.

9    Q.    And this external backup hard drive, gone, right?

10   A.    Yes.

11   Q.    Okay.

12   A.    I bought a new one.

13   Q.    Now, if we had the full recording that was on these

14   materials, it would have shown how thorough Mr. Call at

15   KYGO's investigation of this incident was, right?  At least

16   shed some light on that.

17   A.    I -- I wish we had the full recording, sir.

18   Q.    So the answer is we would know a lot more if we still

19   had that recording, wouldn't we?

20   A.    There would be more information to share, yes.

21   Q.    And that recording, if an hour and 45 minutes of it

22   wasn't gone, we would know the questions Mr. Call asked

23   you, right?

24   A.    I -- I'd like to address the fact that you keep saying

25   there's an hour and 45 minutes of audio from -- are you

Cross - Mueller

 1   saying that's from Mr. Call's office?

 2   Q.   Sir, there's a two-hour recording, right?

 3   A.   Yeah.  Well, I -- I don't know the exact time.

 4   Q.   At least you stated under oath two hours, close to two

 5   hours.

 6   A.   Close to two hours, correct.

 7   Q.   And 15 minutes of it's left, right?

 8   A.   We have 15 minutes, yes.

 9   Q.   And if I do my math right, that's about an hour and 45

10   minutes, right?

11   A.   Right.  But you're suggesting it all occurred in Mr.

12   Call's office.

13   Q.   It all related to this case, right?

14   A.   It -- it did.  Right.

15   Q.   Okay.  So an hour and 45 minutes of your two-hour

16   recording relating to this case is gone.

17   A.   Yes, sir.

18   Q.   So that recording would have revealed your answers to

19   Mr. Call's questions, right?

20   A.   Yeah -- yeah.

21   Q.   And would have shown whether you changed your story in

22   the middle of the interview, right?

23   A.   I did not change my story.

24   Q.   I said it would have shown whether or not you changed

25   your story --

Cross - Mueller

1    A.    It would -- it would have shown whether or not, yes,
2    sir.
3    Q.    And Mr. Call says you changed your story, didn't he?
4    A.    He did.
5    Q.    And you testified in your deposition, didn't you, that
6    you have never known Bob Call to do anything dishonest,
7    correct?
8    A.    At the time of my deposition, yes.
9    Q.    And since your deposition, you've taken no steps to
10    recover this first laptop we've talked about, or the
11    external hard drive, have you?
12    A.    To recover --
13    Q.    Yeah, find them, to go get them.
14    A.    From Apple?
15    Q.    From anywhere.  From anywhere.
16    A.    I have not contacted Apple regarding those items.
17    Q.    Now, you took your audio recording, the two hours
18    germane to this case, and you did -- I think you said in
19    your deposition described it as editing; is that right?
20    A.    I might have used the term "editing," yes, sir.
21    Q.    And that editing ultimately resulted in the 15 minutes
22    or so of clips that you sent to Mr. McFarland, right?
23    A.    19 separate isolated clips, yes.
24    Q.    19 separate isolated clips; is that right?
25    A.    Yes.  Yup.

Cross - Mueller

1    Q.    Are you aware that my client only received 11 clips in

2    this litigation?

3    A.    No, I'm not.

4    Q.    We should have gotten 19, right?

5    A.    There were 19, yes.

6    Q.    Now, the clips went to Mr. McFarland.  And what was

7    left, the hour and 45 minutes, what did you do with it

8    after you did those clips?  I'm talking about right away,

9    you know, before we lost everything.

10   A.    It was on my laptop as a -- it was a file.

11   Q.    This is the coffee-destroyed laptop?

12   A.    It was the -- it was on the laptop that was

13   accidentally damaged by coffee, yes, sir.

14   Q.    Now, I want to ask you a little bit more specifically

15   about Mr. Call's conclusion.

16   A.    Okay.

17   Q.    Have you reviewed the depositions in this case?

18   A.    Yes, sir.

19   Q.    And have you looked at Mr. Call, of KYGO's, testimony?

20   A.    I have.

21   Q.    And do you recall this testimony from Mr. Call?

22          "Mr. Mueller said to me, 'I didn't do it, but if I

23   did, it was incidental.' He changed his story that it

24   couldn't have occurred, then it was incidental.  He said he

25   didn't do it numerous times, and then he said, 'If I had,

Cross - Mueller

1    it was incidental.'  And I thought that's a very -- that's

2    very different from 'I didn't do it,' aren't you?"

3            Do you see that -- do you remember that testimony?

4    A.    I remember -- I remember reading Mr. Call's testimony,

5    yes.

6    Q.    But he said he thought you changed your story, right?

7    A.    Yes.

8    Q.    No one from the defendants sitting at this table made

9    Mr. Call, your boss, conclude that you had changed your

10   story, did they?

11   A.    No.

12   Q.    But you didn't sue Mr. Call.

13   A.    I did not.

14   Q.    And, again, you can't think of any time that he's been

15   untruthful, can you?

16   A.    Actually --

17   Q.    Yes or no, sir.

18   A.    Actually, I can.

19   Q.    Can you please turn to page 40 of your deposition,

20   sir.  And let me know when you're there, please.

21   A.    I'm there.

22   Q.    Page 40, I'm going to start at line 19 and read to

23   page 25 and -- of your sworn testimony and, let me know if

24   I read it accurately.

25   A.    Okay.

296
Cross - Mueller

1    Q.    I'm questioning:  Now, how long have you known Mr.

2    Call?

3            I met him in September of 2012, I believe.

4            Question:  Have you ever known him to be

5    untruthful?

6            Answer:  At this time, I can't think of any time

7    he was untruthful with me.

8            Did I read that correctly?

9    A.    You did.

10   Q.    Thank you.  Now, you're aware that your other boss,

11   your direct boss, Eddie Haskell, or Hershel Coomer,

12   testified that you lied about the incident.  Do you recall

13   that?

14   A.    Are you speaking of his deposition?

15   Q.    Yes, sir.

16   A.    I believe I read that in his deposition, yes.

17   Q.    And he said that -- and I'm reading:

18            Answer:  He lied.

19            Question, from Mr. McFarland:  When?

20            And Mr. Haskell says:  When he manufactured the

21   story that I actually did it.

22            Do you recall that?

23   A.    I do now that you reminded me.

24   Q.    So your direct boss --

25   A.    Yes.

297
Cross - Mueller

1   Q.   -- at KYGO testified under oath that you lied, right?

2   A.   He did.

3   Q.   And Ms. Swift, Ms. Andrea Swift, Mr. Frank Bell, they

4   didn't call you a liar like in that incident, did they?

5   A.   No.

6   Q.   It was KYGO, right?

7   A.   Yes.

8   Q.   You didn't sue KYGO or Mr. Haskell, did you?

9   A.   I did not.

10  Q.   Now, we're not done with these yet.  There were three

11  other devices that are gone, right?

12  A.   I -- I'm not sure, sir.  You --

13  Q.   Your cell phone's gone now, right?

14  A.   My cell phone, yes.

15  Q.   Is that the same cell phone you used to record

16  secretly the meeting with Mr. Call and Mr. Haskell?

17  A.   That was the cell phone I used, yes.

18  Q.   Okay.  Is -- it disappeared, too, right?

19  A.   It was damaged.

20  Q.   We don't have it, do we?

21  A.   We do not.

22  Q.   We physically can't have an expert look at it and see

23  what can be recovered, can we?

24  A.   No.

25  Q.   And you never attempted to do that, did you?

298

Cross - Mueller

1    A.    I did, actually.

2    Q.    You went to the Apple store, right?

3    A.    And another expert when it comes to phones and

4    recovering material.

5    Q.    And you didn't disclose that in this litigation, did

6    you, sir?

7    A.    I didn't?

8    Q.    I'm asking you, do you know?

9    A.    I -- I'm pretty sure I said that I brought it in and

10   had it examined.

11   Q.    So you knew that that cell phone was potentially

12   important or you wouldn't have had an expert look at it,

13   right?

14   A.    It was important to me, yes.

15   Q.    It's important, right?

16   A.    Yes.

17   Q.    Then why did you throw it in the garbage?

18   A.    Because I was told that it was irreparable.

19   Q.    Why did you throw it in the garbage before you gave us

20   an opportunity in this litigation to see what was on it?

21   A.    Well, to be perfectly frank, sir, I didn't know that

22   these items would be considered evidence.  I was never

23   informed that all of these items of mine were evidence.

24         And I kept using them on a daily basis, so if I

25   had been told to quarantine them or to make sure everything

Cross - Mueller

1    on them was saved and put in a safe location, I would have

2    done that.  But I was not.

3    Q.    So it was somebody else's fault?

4    A.    I didn't say that.

5    Q.    Well, you said it wasn't yours, right?

6    A.    I said I wasn't aware that these things were all going

7    to be considered evidence.

8    Q.    In any event, this jury will never know what was on

9    this cell phone, right?

10   A.    What was on my cell phone?  No, they won't.

11   Q.    And then you had had a second Apple laptop, right?

12   A.    You are going to have to refresh my memory on that.

13   Q.    On your deposition, you testified to a second Apple

14   laptop.  Was this the fixed Apple laptop with the new hard

15   drive?

16   A.    I had two Apple Mac tops in -- I've had --

17   Q.    I may be able to help you.  I don't want to cut you

18   off, but I may be able to help you.  Do you recall one that

19   was destroyed by water?

20   A.    Yes, I do.

21   Q.    That's a second Apple laptop --

22   A.    Yeah.

23   Q.    -- gone after June 2d, 2013?

24   A.    No, that was not after June 2d.  I need to correct you

25   there.  That was fixed in April of 2013.

Cross - Mueller

1    Q.   Do you recall testifying to it in your deposition,

2    though?

3    A.   Yeah.  Yes, you and I talked about it, yeah.

4    Q.   And that one's gone from water, right?

5    A.   Yeah, same, yeah.

6    Q.   And April 2013, you were already employed at KYGO,

7    right?

8    A.   I was, yes.

9    Q.   And you were already communicating with Mr. Haskell

10   and Mr. Call and others of your co-employees, right?

11   A.   I was.

12   Q.   And you used that laptop to do so, didn't you?

13   A.   I -- I'm sure I did.

14   Q.   Where's that?

15   A.   I brought that laptop to the Apple store in Aspen

16   Grove, which is near my house, and gave it to them and

17   said, "Please, you know, fix this."

18           They tried.  They told me that the best they could

19   do would be to replace the hard drive.

20   Q.   Okay.  And you never turned -- you don't have it

21   physically, do you, the --

22   A.   No, sir, no.

23   Q.   So we can't look at it, right?  My clients can't --

24   A.   The MacBook that I brought in April of 2013?

25   Q.   Yes, sir.

Cross - Mueller

1   A.   No, sir.

2   Q.   It's gone?

3   A.   It is.

4   Q.   And we can't have a computer expert try to resurrect

5   what was on it, can we?

6   A.   We can't, no.

7   Q.   So the jury will never know what was on it, will they?

8   A.   They won't know what was on that laptop.

9   Q.   So I just -- I just want to make sure I got it

10  straight.  Apple cell phone, expensive, right?

11  A.   Well, it -- it was -- when I lost it, it was over five

12  years old.  It was an iPhone 4.

13  Q.   So you considered it expensive or not?

14  A.   Not -- no, I would not consider an iPhone 4

15  expensive.

16  Q.   Gone, though, right?  Garbage.  In the garbage and

17  gone.

18  A.   I was told that it was irreparable.

19  Q.   You put it in the garbage and gone, right?

20  A.   Yes, sir.

21  Q.   First laptop.  Coffee, gone to Apple store, gone.

22  Right?

23  A.   First laptop, damaged by water at a restaurant when I

24  was with Shannon.  She accidentally spilled water on --

25  Q.   I didn't ask you that, if you spilled water on it.  I

302

Cross - Mueller

1    understand you say the water got spilled on it.

2    A.    Yes.

3    Q.    It's gone, right?

4    A.    I brought it into Apple, had -- asked them to repair

5    it.  They said they could only replace parts, they couldn't

6    actually fix what I had.  So they replaced the parts that

7    were damaged.  I filed an insurance claim --

8    Q.    Sir, we're getting way off track here.  It's a $3,000

9    laptop, approximately --

10   A.    Yes, sir.

11   Q.    And it's gone.

12   A.    Not -- the hard drive is gone and whatever parts they

13   replaced, yes, sir.

14   Q.    And we have the second -- the second laptop, that's

15   the coffee laptop, right?  Coffee-spilled laptop?

16   A.    Yes.

17   Q.    Another $3,000 laptop gone, right?

18   A.    Well, I got it repaired.

19   Q.    Okay.

20   A.    And I have insurance that I purchased in 2012.

21   Q.    But we can't resurrect what's on that one either?

22   A.    We can't, no.

23   Q.    And then we have an external hard drive.  Is that

24   expensive?

25   A.    70 something dollars.

303

Cross - Mueller

1   Q.   Okay.  So not a big expense for you?

2   A.   No.

3   Q.   But it's gone.  And then we have an iPad.  The iPad,

4   it's gone, too, right?

5   A.   No, I actually have my iPad.

6   Q.   I thought it shattered.

7   A.   It did.

8   Q.   Okay.  Does it still have data on it?

9   A.   No -- well, no, they gave me -- they repaired it, gave

10  me a new one.  I think they just replaced the iPads when

11  they're damaged, it --

12  Q.   So let's back up.  You had an Apple iPad that

13  shattered, correct?

14  A.   Yes.

15  Q.   And you took it to Apple, right?

16  A.   Yes.

17  Q.   And they kept it, right?

18  A.   Yes.

19  Q.   And they gave you a new one, right?

20  A.   Yes, sir.

21  Q.   And that one that shattered that you took to Apple,

22  you had after June 2d, 2013, right?

23  A.   I did.

24  Q.   And we don't have that one now either, do we?

25  A.   No, Apple has it.

Cross - Mueller

1    Q.   So my clients can't retain a computer expert to see

2    what's on it, can we?

3    A.   No, you can't.

4    Q.   And you never attempted to do so, did you?

5    A.   No, I didn't.

6    Q.   So did you -- tell me honestly, did you ever, on any

7    of these devices, write any of your buddies about what

8    happened the night of June 2d, 2013?

9    A.   You mean e-mail my buddies?

10   Q.   Text, e-mail, call?

11   A.   I'm -- I communicate with a lot of people after June

12   2d regarding what happened on June 2d.

13   Q.   Let's turn to Eddie Haskell, sir.

14   A.   Okay.

15   Q.   As of June 2d, 2013, Eddie Haskell, Hershel Coomer,

16   was your direct boss, right?

17   A.   He was my direct supervisor while I worked at KYGO,

18   yes, sir.

19   Q.   And I don't mean anything negative by "boss," I'm just

20   using the term generally.

21        He -- you reported to him, so to speak, right?

22   A.   Yes.

23   Q.   And, in turn, Mr. Haskell reported to Bob Call at

24   KYGO, right?

25   A.   Yes, sir.

Cross - Mueller

1    Q.    And to be clear, you're unaware of any facts to

2    suggest any of these defendants own or have ever owned

3    KYGO, right?

4    A.    I don't have any facts to support that.

5    Q.    In fact, you know at the relevant time, Lincoln

6    Financial owned KYGO, right?

7    A.    Lincoln Financial Media, yes, sir.

8    Q.    And you're unaware of any facts to suggest that any of

9    these defendants, the three of them, ever employed Mr. Call

10   or Mr. Haskell, right?

11   A.    I don't have any evidence of that, sir.

12   Q.    Now, prior to June 2d, 2013, is it fair to say you

13   didn't like Mr. Haskell?

14   A.    I had -- I had difficult times working with Mr.

15   Haskell.

16   Q.    Would you describe that as not liking him or not?

17   A.    I had a tremendous amount of respect for Mr. Haskell

18   as an on-air talent; I had difficulty with him as a manager

19   because he was inconsistent and, at times, was

20   unprofessional.

21   Q.    And you, sir, prior to June 2d, 2013, when this

22   occurred, already thought Mr. Haskell did not treat you

23   with respect, correct?

24   A.    I'd agree with that.  I think he treated a lot of

25   people with disrespect.

Cross - Mueller

1    Q.    But in your deposition, you very clearly testified

2    that Mr. Haskell did not treat you with respect, right?

3    A.    Yes, sir.

4    Q.    And you're absolutely certain, aren't you, sir, that

5    prior to any incident occurring involving any of these

6    defendants on June 2d, 2013, that Mr. Haskell already

7    wanted to terminate your employment with KYGO, right?

8    A.    He threatened to.

9    Q.    And you believe he meant it, don't you?

10   A.    You know, whenever Eddie said something, you took it

11   with a grain of salt.

12   Q.    Do you recall in your deposition saying very clearly

13   that you thought he wanted to terminate you prior to June

14   2d, 2013?

15   A.    Do I recall that in the deposition exactly?  No.

16   Q.    Do you have any doubt you said it?

17   A.    I might have said it.  I don't know.

18   Q.    And that was before you had ever laid an eye on any of

19   these defendants in person, right?

20   A.    Yes, sir.

21   Q.    And before you'd ever communicated with any of these

22   defendants, correct?

23   A.    Correct.

24   Q.    Before the incident of June 2d, 2013?

25   A.    It was before June 2d, yes.

Cross - Mueller

1    Q.    Now, so we can agree, can we not, sir, Mr. Haskell's

2    intention or desire to terminate you prior to June 2d,

3    2013, couldn't have anything to do with these defendants,

4    could it?

5    A.    I don't believe so, sir.

6    Q.    Meaning, you don't know any facts to support --

7    A.    I don't have any facts to suggest that, no.

8    Q.    And I think you already testified that Mr. Haskell had

9    said to you he was -- and I'm paraphrasing -- the most

10   vindictive person you will ever meet, or something like

11   that?

12   A.    He made that abundantly clear, yes.

13   Q.    And that occurred prior to June 2d --

14   A.    It did, yes, sir.

15   Q.    -- 2013.  Thank you.  I interrupt you, you interrupt

16   me.  It's getting late in the day.

17   A.    Sorry.

18   Q.    You've been on the stand for a long time here.

19          And you recall that prior to June 2d, 2013, there

20   were instances at KYGO where Mr. Haskell made it very hard

21   for you to even like him, right?

22   A.    He made it hard, yes, sir.

23   Q.    In fact, you testified to that in your deposition,

24   didn't you?

25   A.    Yeah.

Cross - Mueller

1    Q.    And prior to June 2d, 2013, your boss at KYGO, Mr.

2    Haskell, told you and Mr. Kliesch, Ryno --

3    A.    Ryno, yeah.

4    Q.    Quote, Have you guys had enough, because we can go

5    down to Bob Call's office and I can see if we can get you

6    guys out of your contracts with KYGO?

7          Didn't he say that?

8    A.    He did.

9    Q.    Before you'd ever laid an eye on any of these

10   defendants, right?

11   A.    That's right, sir.

12   Q.    And Mr. Haskell, prior to June 2d, 2013, had told you

13   he was not happy with you and Ryno's show, and that he

14   really wanted to get rid of one or both of you, right?

15   A.    He let us know that he was not happy with the style of

16   show that we did, and he also let it be known that he

17   looked at our contracts and he saw how much we made and

18   that he did not have enough room in his budget to hire the

19   people he needed for the afternoon drive and some other

20   position.

21   Q.    And his budget, or lack of budget, had nothing to do

22   with Taylor Swift, did it?

23   A.    It did not, sir.

24   Q.    And his lack of budget had nothing to do with Andrea

25   Swift, did it?

Cross - Mueller

1    A.    No, sir.

2    Q.    And it had nothing to do with Frank Bell, did it?

3    A.    No, sir.

4    Q.    Now, I think you discussed earlier that there was a

5    disagreement or some tension with Mr. Haskell about this

6    promotional give-away with the three purses and then the

7    watch on the last day; do you recall that?

8    A.    Yeah, I recall that, yeah.

9    Q.    And that involved the sales department, correct?

10   A.    It involved the sales department, yeah, and the sales

11   manager.

12   Q.    And Shannon Melcher, where did she work?

13   A.    She was an account executive.

14   Q.    And was that -- would that be in the sales department?

15   A.    Yes, sir.

16   Q.    And Mr. McFarland asked you a question about whether

17   anyone else at KYGO had ever said they wanted to terminate

18   you prior to June 2d.  And I wrote down your answer and you

19   said, "Directly, no."  Do you recall that?

20   A.    Yes, sir.

21   Q.    Because you knew indirectly there were discussions

22   about terminating you for cause prior to June 2d, 2013,

23   correct?

24   A.    Well, sir --

25   Q.    You can explain, but please answer that first.  You

1    knew indirectly --

2    A.    I did --

3    Q.    -- that discussions were going on between Lincoln

4    Financial's John Dimick and your agent, Ms. Cowen, about

5    terminating you for cause, correct?

6    A.    You would consider that hearsay.  I -- I -- you're

7    right, I did hear that John Dimick called Heather Cohen,

8    but I have no evidence of that.  I wasn't part of that

9    conversation.  I was told about it.

10   Q.    You were told from your agent, who took down notes --

11   A.    Yes.  Right.

12   Q.    -- that Mr. Dimick --

13   A.    Yes.

14   Q.    -- was considering the possibility of terminating you

15   for cause prior to June 2d, 2013, right?

16   A.    I --

17   Q.    You were told.

18   A.    Yes, I was told that Mr. Dimick said he would

19   terminate us with cause for insubordination if we did not

20   follow the directives from Eddie Haskell, and we need to --

21   he -- well, what I was told is that he suggested that we

22   considered our consultant to be our boss and we needed to

23   start -- we needed to understand that Eddie was our boss

24   and that Steve Reynolds was our consultant and not our

25   boss.

311

<center>Cross - Mueller</center>

1   Q.   And one of the -- but that situation, whatever --

2   however you describe it where you were already -- Mr.

3   Dimick was already communicating to the agent, that was

4   before you ever laid an eye on any of these defendants,

5   right?

6   A.   Before I did?

7   Q.   Yeah.

8   A.   Yes.  Just shortly before.  Yes, sir.

9   Q.   And you took down notes of that incident, didn't

10  you?

11  A.   I did, yes.

12          MR. BALDRIDGE:  Your Honor, by stipulation, I

13  would like to move into evidence Defendants' Exhibit A-1.

14          THE COURT:  All right.  Given the stipulation,

15  Exhibit A-1 is admitted into evidence and may be published

16  to the jury.

17      (Defendants' Exhibit A-1 received)

18  BY MR. BALDRIDGE:

19  Q.   I put before you, Mr. Mueller, for -- the screen

20  actually has Exhibit A-1.  And are these those notes that

21  we just discussed?

22  A.   Yes, sir.

23  Q.   And to be clear, these notes are dated May 29th, 2013,

24  right?

25  A.   Yes, sir.  Would you mind if I pull it up in the book?

Cross - Mueller

1    Q.   Oh, please do so.  If we can help --

2    A.   Is it in this book?

3    Q.   It should be A-1.  And maybe Ms. Wright or Foley can

4    direct you.

5    A.   Okay.  I found it.

6    Q.   And these are the notes of your discussion on May

7    29th, 2013, with your agent, Ms. Cohen, right?

8    A.   Yes, sir.

9    Q.   And if we look at the first sentence, it says it was

10   an emergency situation.  Do you see that?

11   A.   Yes, sir.

12   Q.   And then the next sentence says, "She" -- meaning Ms.

13   Cohen --

14   A.   Right.

15   Q.   -- "told us," meaning you and Ryan --

16   A.   Yes.

17   Q.   -- Ryno, excuse me -- "that she got a disturbing call

18   from John Dimick, senior vice president programming and

19   operations, Lincoln Financial Media, based out of Atlanta."

20           Do you see that?

21   A.   Yes, sir.

22   Q.   You -- that call had absolutely nothing to do with any

23   of the defendants in this lawsuit, correct?

24   A.   I have no evidence to prove that, no.

25   Q.   In fact, it happened on or before May 29th, 2013,

313

Cross - Mueller

1   correct?

2   A.   Yes, sir.

3   Q.   And then if you go to the next paragraph, your agent

4   informs you, quote, Dimick told Heather -- that being

5   Heather Cohen -- that he was getting bad reports from

6   Denver regarding Ryno and Jackson.  He suggested that we

7   were being difficult.  He made it clear to Heather that he

8   was ready to terminate us with cause for insubordination.

9        Did I read that correctly?

10  A.   Yes, sir.

11  Q.   And that has nothing to do with any of the defendants

12  you sued in this case, right?

13  A.   No, it does not.

14  Q.   And that happened prior to the June 2d, 2013,

15  incident, correct?

16  A.   Yes, sir.

17  Q.   And then your agent informed you that Mr. Dimick, in

18  making this evaluation, had listed off a couple of

19  concerns, right?

20  A.   Yes.

21  Q.   And the first one you wrote down was there was

22  complaints from the sales department regarding morning show

23  endorsement rates.  Do you see that?

24  A.   Yes, sir.

25  Q.   Are you familiar with that complaint being made?

Cross - Mueller

1    A.    That's what Heather told us, yes, sir.

2    Q.    Okay.  Do you know what that refers to?

3    A.    It -- nothing was specified at the time.

4    Q.    So you don't know?

5    A.    I -- anything I said would be a guess.

6    Q.    And then the second thing is that you were informed

7    that Mr. Dimick believed you and Ryno were being difficult

8    regarding the addition of a female cohost to the show.  Do

9    you see that?

10   A.    I do.

11   Q.    And it's fair to say that you were in disagreement, I

12   guess, already, with Mr. Haskell about the addition of a

13   female cohost?

14   A.    There was difficulty, I -- and that point, there's no

15   dispute where there was a lot of difficulty regarding a

16   female cohost position.

17   Q.    Yeah.  I mean, just to simplify, you and Ryno wanted a

18   certain person and Mr. Haskell wanted another, for example?

19   A.    Well, we actually told Mr. Haskell he could choose any

20   female he wanted, and he got upset when we told him that.

21   That was -- that was the major difficulty because at that

22   point, we -- just so I can clarify, sir --

23   Q.    Yeah, you may clarify.  Go ahead, sir.

24   A.    We were -- in our contract, I believe it states that

25   we had a right to be a part of that process, and it got to

315
Cross - Mueller

1    be contentious.  And we didn't want it to be contentious.

2    And we made it clear to Mr. Haskell, or Mr. Coomer, that

3    we -- we were happy with him picking any female cohost he'd

4    like and we would work with her and we would do a good job.

5    And he got upset.

6    Q.   I'm sorry.  I -- this contentiousness over the female

7    cohost, though, had nothing to do with the defendants you

8    sued in this action, right?

9    A.   No, it did not.

10   Q.   And then the third concern says:  Jackson is dating

11   one of the account executives and this is causing issues in

12   the sales department.  It is not against company policy to

13   date a coworker and there are even married coworkers in the

14   building, closed quote.

15       Did I read that correctly

16   A.   Yes, sir.

17   Q.   And you started dating Shannon Melcher, what, three or

18   four weeks after you got to KYGO?

19   A.   I would consider the Super Bowl party to be our first

20   date, so that's when we started dating.

21   Q.   Somewhere in February, right, the Super Bowl?

22   A.   It was like February 3d.

23   Q.   Because you knew you were closer if you -- in my

24   words, by Valentine's Day a couple of weeks late, right?

25   A.   Yeah, we -- yeah, we had a nice Valentine's Day.

Cross - Mueller

1    Q.    So about four weeks into your job at KYGO, you were

2    dating Ms. Melcher, a fellow employee?

3    A.    Yes, sir.

4    Q.    And according to Mr. Dimick, this was causing issues

5    in the sales department, correct?

6    A.    Mr. Dimick was getting reports.

7    Q.    I understand, according to him.  What --

8    A.    Yeah, yeah -- well, Heather said that Mr. Dimick said

9    he was getting reports, yes, that --

10   Q.    About issues in the sales department arising out of

11   you dating Ms. Melcher.

12   A.    Yes, sir.

13   Q.    And this all happened before June 2d, 2013?

14   A.    It did.

15   Q.    And it had nothing to do with these defendants,

16   right?

17   A.    It did not.

18   Q.    And then the next concern was:  Jackson is involved in

19   a human resources issue.

20          Do you see that?

21   A.    Yes, sir.

22   Q.    And this is what I was referring to earlier.  My

23   girlfriend, Shannon, filed an HR complaint after a mail

24   manager made unwanted sexual advances towards her at an NHL

25   game on 3-20, and then again at the Miranda Lambert concert

317

Cross - Mueller

1     on 5-18.

2               Did I read that correctly?

3     A.    You did.

4     Q.    How were you getting involved in that issue?

5     A.    Because I was with her at both of -- both of those

6     times.  The human resources director called me in and

7     questioned me about what I saw on those occasions.

8     Q.    And of course this had nothing to do with any of the

9     defendants you sued in this case.

10    A.    It had nothing to do with your clients, no, sir.

11    Q.    And this all happened before the June 2d, 2013,

12    incident?

13    A.    Absolutely, yeah.

14    Q.    And then the final thing is:  The guys need to work on

15    their relationship with program director Eddie Haskell.

16              Do you see that?

17    A.    Yes.

18    Q.    That's fair to say, you needed to work on the

19    relationship, isn't it?

20    A.    Just between you and I, and everybody listening, we

21    were trying to work on that relationship.

22    Q.    Wasn't working out, was it?

23    A.    I -- I don't know.  I don't know.

24    Q.    You don't --

25    A.    I mean, I don't know what to tell you, sir, about

Cross - Mueller

1    that.  That's a complicated matter.  But we -- we would ask

2    him to go to lunch with us and he refused every time.

3    Q.    And certainly the inability to work this out between

4    you and Mr. Haskell had nothing to do with the defendants

5    you've sued --

6    A.    It had nothing to do, no.

7    Q.    And under your written employment contract with KYGO,

8    you could be terminated for cause for failure to work in a

9    harmonious manner with management or other employees,

10   correct?

11   A.    Yes.

12          MR. BALDRIDGE:  Catching up here, Your Honor.

13   Forgive me.

14          THE COURT:  That's all right.

15          MR. BALDRIDGE:  Is there going -- have we had an

16   afternoon break yet?

17          THE COURT:  Yes, we did.  You've already forgotten

18   it.

19          MR. BALDRIDGE:  I don't even know what time of day

20   it is, truthfully.

21          THE COURT:  We're going to go to about 5:00.

22          MR. BALDRIDGE:  Okay.

23   BY MR. BALDRIDGE:

24   Q.    Now, Mr. Haskell stated to you, as you described with

25   Mr. McFarland, the night of June 2d, 2013, his belief --

319

Cross - Mueller

1    and I'm paraphrasing -- that Taylor Swift, wore bicycle

2    shorts, and he demonstrated this -- the way he hugged --

3    A.    Yeah.

4    Q.    -- and he stated that he put his hands on her bottom.

5    A.    Or hand.

6    Q.    Hand on her bottom, right?

7    A.    Yeah.

8    Q.    And that was said to you June 2d, 2013, right?

9    A.    It was.

10   Q.    And you even described it in your deposition that he

11   was bragging about it, right?

12   A.    That's the sense I got, yes.  He was -- yeah, he was

13   bragging.

14   Q.    Now, you were a KYG slash Lincoln Financial employee

15   as of June 2d, 2013, of course, right?

16   A.    Yes, sir.

17   Q.    And so was Mr. Haskell, right?

18   A.    Okay, yeah.

19   Q.    And Ms. Swift claims you, a KYGO employee, grabbed her

20   rear that night, right?

21   A.    She has, yes, sir.

22   Q.    And Eddie Haskell, according to you, bragged about

23   doing so that night, correct?

24   A.    Prior to -- yeah, yeah.  Prior to anyone talking to me

25   about it, he was talking to me about it.  That's why I

320

Cross - Mueller

1    thought it was relevant.

2    Q.   But you never told Mr. Call, as part of the

3    investigation, that Eddie had said he put his hand on Ms.

4    Swift's bottom, right?

5    A.   I did not say those words to Mr. Call.

6    Q.   And your belief in this lawsuit is that Mr. Call's

7    investigation wasn't -- was flawed or wasn't thorough

8    enough, right?  His investigation of the incident of June

9    2, 2013, you believe Mr. Call did not conduct a proper,

10   thorough investigation, right?

11   A.   I -- I guess I believed that Mr. Call could have done

12   a more thorough investigation, yes.

13   Q.   Do you think he would have been aided in his

14   investigation had you revealed to him that a fellow KYGO

15   employee had bragged that night that he had put his hands

16   on Ms. Swift's bottom?

17   A.   Would -- I'm sorry, one more time.  I --

18   Q.   Let me see if -- I'm getting tired here, too.

19   A.   Yeah, I'm sorry.

20   Q.   That's all right.  Let's try this again.  Do you

21   believe the thoroughness of Mr. Call's investigation would

22   have been enhanced or improved had you revealed to them

23   that fellow KYGO employee, Eddie Haskell, the night of June

24   2d, 2013, said he touched Ms. Swift's bottom?

25   A.   It might have been enhanced, yes.

Cross - Mueller

1    Q.    And, perhaps, isn't it true, sir, that the lack of

2    thoroughness of the investigation, in your view, has

3    something to do with your failure to disclose that?

4    A.    No, I don't believe that.

5    Q.    So your alibi would not have helped --

6    A.    I don't consider Eddie to be an alibi, sir.

7    Q.    You don't think the information conveyed to Mr. Call

8    that a fellow employee confessed to inappropriately

9    touching this woman's bottom wouldn't have in some way

10   impacted the investigation?

11   A.    I never took Eddie's story seriously.

12   Q.    Not my question.

13   A.    Okay.  Sorry.

14   Q.    You don't think revealing that information that Mr.

15   Haskell had bragged about touching her bottom, would not

16   have had some impact on the investigation of you?

17   A.    I -- could you -- could you restate that one more

18   time, please?  I apologize.

19   Q.    Let me try.  I'm trying to be clear.

20   A.    Okay.  I'm sorry.

21   Q.    If Mr. Call knew that Eddie Haskell had bragged,

22   himself, according to you, that he had touched Ms. Swift's

23   bottom, don't you think he would have considered it?

24   A.    He -- I think he would have asked me more about it,

25   yes, sir.

322
Cross - Mueller

1    Q.    And that might have influenced the ultimate outcome,

2    correct?

3    A.    Well, sir, I would have told him that I didn't take it

4    seriously.

5    Q.    And that might have influenced the outcome, right?

6    A.    I guess -- yes, it might have; yes, it might have.

7    Q.    And at some point, you took it seriously because you

8    put it in a federal lawsuit in a public record, right?

9    A.    I thought it was pertinent and relevant.

10   Q.    So it was serious when you sued these defendants,

11   right?

12   A.    I thought it was curious that he was talking about

13   something that I was later accused of, but I never thought

14   he did it.

15   Q.    Let me start again.  So it was serious when you sued

16   these defendants, wasn't it?

17   A.    Oh, yes, sir.  It was serious.

18   Q.    Now, let me -- I want to make sure I understand this.

19   Ms. Swift says you grabbed her rear end, right?

20   A.    Ms. Swift does say that, yes.

21   Q.    You work for KYGO.

22   A.    I work -- yes, I did.

23   Q.    You said that Mr. Haskell, though you didn't take it

24   seriously, bragged that he touched her rear end, right?

25   A.    He told me a story, yes.

Q. And he worked for KYGO, right?
A. Yes, sir.
Q. And you sued these people.
A. I did.
Q. Now, let's go to the actual incident of June 2d, 2013.
You said you arrived at the Pepsi Center on June 2d, 2013, around 5:00 p.m. Mountain Time.
A. I think it was 5:00 straight up.
Q. And, again, you were accompanied by your then-girlfriend, Ms. Melcher, right?
A. Yes, sir.
Q. And we've already said KYGO employee, account executive in the sales department.
A. Yes.
Q. And you were at that time, what -- I guess the correct term is an on-air personality at KYGO?
A. That's -- yeah, that's one term that works, yes, sir.
Q. You know, we have, I guess, a slang in our world, disk jockey. I know -- I don't want to offend you --
A. We don't use disks anymore, sir.
Q. Okay. You know what, they have --
A. It's all digital.
Q. Okay. But you're an on-air personality, you have a talent agent, and you're sort of an on-air guy that people

324

Cross - Mueller

1    like to listen to, and jokes and things of that nature?

2    A.    That's why they hired me, yes, sir.

3    Q.    And you had been assigned to this meet-and-greet at

4    the Pepsi Center at the concert June 2d, 2013.

5    A.    I -- yes.  I was given wristbands to be in that

6    meet-and-greet, yes, sir.

7    Q.    And there were, in fact, two meet-and-greets that

8    night, weren't there, sir?

9    A.    I -- I'm a little unclear on that because I -- I don't

10   know if there were two or three.

11   Q.    There were more than one, let's say that.

12   A.    Yeah, more than one, yes, sir.

13   Q.    And you were in the meet-and-greet for fans and

14   listeners, right?

15   A.    I believe so.

16   Q.    And you described that in your deposition, did you

17   not, as being a group mainly comprised of moms and little

18   girls, right?

19   A.    There were a lot of moms and there were some little

20   girls, yes, sir.

21   Q.    And then there was at least one other meet-and-greet

22   for media, radio personalities, and VIPs, right?

23   A.    Well, at the time we didn't know what the -- what that

24   group was designated.  We just knew there was a second

25   group.

325

Cross - Mueller

1    Q.    And you knew there was a second group because Mr.

2    Haskell and Mr. Kliesch and Mr. Kliesch's wife -- Ryno is

3    Kliesch -- were in that other group, right?

4    A.    Yes, sir.

5    Q.    And that other group was for media and VIPs, right?

6    A.    I -- I now know that, yes, sir.

7    Q.    Now, you say you now know that.  But in your

8    deposition, you've said you didn't understand, you couldn't

9    believe, that you weren't in the media group, right?

10   A.    We -- we were confused.  Shannon and I were both

11   confused --

12   Q.    So --

13   A.    -- because we work in media.

14   Q.    So you knew it that night.  You say "I now knew that."

15   You knew it that night that you weren't in the media group.

16   A.    Well, we were confused why we weren't with Eddie and

17   Ryno and Ryno's wife.

18   Q.    And you don't know who made the assignments to the two

19   groups, do you?

20   A.    We don't.

21   Q.    And --

22   A.    Although we know Eddie had something to do with

23   that.

24   Q.    And Eddie certainly has nothing to do -- his

25   assignment of you has nothing to do with these defendants,

326

Cross - Mueller

1    does it?

2    A.    No, sir.

3    Q.    And you testified in your deposition you were alarmed

4    and confused and did not understand why you were in a group

5    with listeners, correct?

6    A.    Well, in -- the entirety of my career, I'd only gone

7    back with listeners when I was leading them back to meet an

8    artist.  I never actually had been in line with the

9    listeners.

10   Q.    So to be clear, in your deposition, you said you were

11   alarmed, confused, and did not understand why you were in

12   the group with the little girls and the moms, right?

13   A.    Correct, yes, sir.

14   Q.    And as I think you just said, because in all your

15   career you had never gone back stage with a group of

16   listeners unless you were bringing the listeners to the

17   artist, correct?

18   A.    Yes, that's true, yes.

19   Q.    This was a first for you, right?

20   A.    Yes, it was.

21   Q.    So you were there, on-air personality, with your

22   girlfriend, in the line with little girls and moms, while

23   your cohost and boss were in the other group, right?

24   A.    Yes, sir.

25   Q.    And you felt like you stood out in that line, didn't

Cross - Mueller

1    you?

2    A.   I think we were the only adult couple, yeah.  That

3    I -- that I could see.  Now, keep in mind, I couldn't see

4    all the way to the front of the line and all the way to the

5    back of the line because the line was very long.

6    Q.   But you felt like you stood out, right?

7    A.   Yeah, I thought -- well, plus we're both tall.

8    Q.   And you were very much under the impression that Ms.

9    Melcher believed she belonged in the other group, the media

10   group, with Mr. Haskell and Mr. Kliesch, correct?

11   A.   She wanted to be in the other group if we could get

12   into it, yes.

13   Q.   And, in fact, you testified she was definitely making

14   an effort to get into the other group, right?

15   A.   Yeah, she was.

16   Q.   And she was asking you to text him to get her in the

17   other group, right?  Text your friends Ryno and Haskell?

18   A.   She wanted me to ask what we could do to get over

19   there, yes, sir.

20   Q.   And she wanted to get out of the group you were in,

21   right?

22   A.   I wouldn't say she wanted to get out of it; I think

23   she just wanted to go in the other group if we could get

24   over there.

25   Q.   And then all of these attempts, you know, whatever

Cross - Mueller

1    they were, to move from your group to the media group,

2    either guard or somebody else said, "No, get back in the

3    group you're in," right?

4    A.   They were polite, but they were firm, and they said

5    "You're in this group and you're going to stay in this

6    group."

7    Q.   So you couldn't get out of that group and get in

8    with Mr. --

9    A.   We were -- we had to stay in the group we were in,

10   yes.

11   Q.   And at this time, you had been dating Ms. Melcher for,

12   what, approximately three, four months, somewhere in there?

13   Three months?

14   A.   Well, let's see.  May, April, March, and February.

15   Because our first date was the Super Bowl.

16   Q.   And you considered yourself to be part of the most

17   prominent part of the day programming in radio, didn't you?

18   A.   Is your question that I think the morning show was the

19   most important day part on the -- at a radio station?

20   Q.   Yeah.  Did you think you were part of the most

21   prominent part of the day programming in radio?

22   A.   On most radio stations, the morning show is the most

23   prominent day part, yes, sir.

24   Q.   And you thought, sir, that you were entitled to

25   professional respect, didn't you?

Cross - Mueller

1    A.    I think everyone deserves professional respect.

2    Q.    You thought that night that you were entitled to

3    professional respect, didn't you?

4    A.    From -- are you referring to a specific person who was

5    disrespecting me?  I'm confused.

6    Q.    I'm asking you, sir, whether that night, June 2d,

7    2013 --

8    A.    Yeah.

9    Q.    -- do you believe you were entitled to a certain

10   amount of professional respect?

11   A.    I always believe that I deserve a certain amount of

12   professional respect, sir, yes.

13   Q.    And you believed Ms. Swift and her group owed you that

14   professional respect, don't you?

15   A.    Yeah.  Yeah.

16   Q.    You were embarrassed to be in --

17   A.    I was not embarrassed to be in that other group.

18   Q.    You never --

19   A.    Never.

20   Q.    Never been in it before?

21   A.    You're right.  I admit that.  I'd never been in that

22   situation, but I was not embarrassed.

23   Q.    Okay.  So you were part -- you were a part -- an

24   on-air personality --

25   A.    Yes.

330
Cross - Mueller

1    Q.    -- the most prominent part of the morning program with

2    your relatively new girlfriend --

3    A.    Yeah.

4    Q.    -- with your boss, who you can't stand, in the media

5    VIP group --

6    A.    I wouldn't go that far.

7    Q.    A boss, that you have trouble with, in the VIP media

8    group --

9    A.    Yes.

10    Q.    -- and you were just fine with that.

11    A.    I -- I already said I was confused, but I wasn't

12    upset.

13    Q.    It's all good by you, right?

14    A.    We were happy.  Actually, Shannon was having a great

15    time because --

16    Q.    Is that why she was trying to get out of the line and

17    get in the other group?

18    A.    If she could get in the other group, she would have.

19    Q.    She was texting, asking guards, doing other things to

20    try to get into the group -- the other group, right?

21    A.    She was interested in getting in that group, yes,

22    sir.

23    Q.    And your testimony to this jury is that's because she

24    was happy to be in the group she was in?

25    A.    She was not unhappy, sir.  She was -- she was having a

Cross - Mueller

1   good time.  We were having fun.

2   Q.   Now, let's get to the point where you enter what you

3   call the photo booth earlier, approximately 10 by 12 or 12

4   by 12 room, okay?

5   A.   Yeah.

6   Q.   You entered into a curtained off area, I guess it was,

7   right?

8   A.   The initial entrance?

9   Q.   Yes, sir.  It's curtained off, right, within the --

10  let me back up.

11         The photo booth, itself --

12  A.   Yes.

13  Q.   -- was curtained off, right?

14  A.   Yes, sir.

15  Q.   And I think you told the jury somewhere between 10 by

16  12 and 12 by 12, right?

17  A.   Maximum 12 by 12, yeah.

18  Q.   And Ms. Swift, when photos are taken, is against one

19  of the curtains, right?

20  A.   There's a backdrop --

21  Q.   Yeah.

22  A.   When you come through the curtain opening, the

23  backdrop is to the right.

24  Q.   But when you take the photo, behind her -- directly

25  behind her is that backdrop --

                        Cross - Mueller

1    A.   Yes, sir.  Yeah.

2    Q.   Okay.  So there's -- your hand's back there, wherever

3    it is.  When it's behind her, there's nobody further behind

4    Ms. Swift, is there?

5    A.   Yes.  You're right.  Yeah.

6    Q.   And there were four people in the room that night,

7    right?  I'm sorry, four people when you and Mrs. Melcher

8    entered, right?

9    A.   Other than Taylor and Shannon and myself?

10   Q.   Yes.

11   A.   Okay.

12   Q.   There was a photographer, right?

13   A.   And an assistant.

14   Q.   And a --

15   A.   And a tour manager and a bodyguard, yes, sir.

16   Q.   So we have what you call tour manager, the

17   photographer, bodyguard, you, Ms. Melcher, and Ms. Swift

18   are all in there at the same time, right?

19   A.   Yes.  Seven people total, yeah.

20   Q.   If I count that right, I thought it was six, but --

21   A.   I get seven.

22   Q.   Let's try this again.

23   A.   Yeah.

24   Q.   Tour manager, photographer, you, Ms. Melcher, Ms.

25   Swift, bodyguard.

333
Cross - Mueller

1   A.   And a personal assistant.

2   Q.   Plus a personal assistant.  So seven --

3   A.   That's how I understand it, yes, sir.

4   Q.   So you recall seven people being in the room, right?

5   A.   Yes, sir.

6   Q.   And just to clarify, you said a girl opened the --

7   A.   It was a female.

8   Q.   You said "girl," right, but it was a woman, right?

9   A.   Well, she was --

10  Q.   I'm not making any --

11  A.   Yeah, she was in her 20s.

12  Q.   I just want -- a person in their 20s, right?  I'm just

13  trying to clarify, we're not talking about a little girl,

14  right?

15  A.   Yes, sir.

16  Q.   And you had never known, met, heard of, shared air

17  with, anybody in that room before, right?

18  A.   No, sir.

19  Q.   And you can't come up with any facts to suggest that

20  anyone in that room disliked you, because they didn't know

21  you, right?

22  A.   Correct.

23  Q.   And you were in that room for a minute at most, I

24  think you said, right?

25  A.   Yeah, that's how I recall it, sir, yes.

Cross - Mueller

1    Q.   Now, the one thing -- in that minute at most that you

2    were in the room, you already concluded that Ms. Swift was

3    cold and stand-offish to you, correct?

4    A.   Are you referring to my deposition testimony?

5    Q.   Sir, did you conclude in that less than a minute that

6    Ms. Swift was cold and stand-offish to you?

7    A.   She -- I think I said that during my deposition.

8    Q.   Was it -- has your under-oath testimony changed since

9    your deposition?

10   A.   No.

11   Q.   Now, so you concluded in less than a minute that she

12   was cold and stand-offish to you, right?

13   A.   I -- I had reason for that opinion, sir.

14   Q.   And, in fact, you thought she was especially cold and

15   stand-offish considering that you were from a radio station

16   and considering that you were the cohost at the morning

17   show of KYGO, right?

18   A.   She was informed of that when we -- yes.

19   Q.   That's not what I asked you, sir.

20   A.   Yeah.  Sorry.

21   Q.   Isn't it true that in less than a minute, you

22   concluded that Ms. Swift was, quote, a little cold and

23   stand-offish, especially considering that you -- I'm adding

24   that word -- were from a radio station and considering that

25   you were the cohost at the morning show of KYGO, right?

                          Cross - Mueller

1    A.   Something happened that had me conclude that, yes,

2    sir.

3    Q.   In less than that minute --

4    A.   Yes.

5    Q.   -- you already decided she was cold and stand-offish,

6    especially considering you were a radio guy and a cohost of

7    that prominent morning show, right?

8    A.   Yes.  I had reason to conclude that.

9    Q.   It was obvious to you that she was cold and

10   stand-offish, right?

11   A.   When she didn't invite me over to pose for the

12   photograph, that was -- I considered that cold and

13   stand-offish towards me.  She wasn't that way towards

14   Shannon.

15   Q.   And you were entitled to some professional respect

16   when you saw her, right?

17   A.   I --

18   Q.   Right, sir?  You testified to that in your deposition,

19   didn't you?

20   A.   I -- yeah.  I think everyone deserves professional

21   respect.

22   Q.   And you weren't getting professional respect, in your

23   view, right?

24   A.   Well, it -- she didn't welcome me into the

25   photograph.

Cross - Mueller

1    Q.    She didn't welcome you, but she was really excited

2    about Shannon Melcher, right?

3    A.    Seemed to be drawn to Shannon, yes, sir.

4    Q.    In fact, all of the rapport in the room was between

5    Ms. Swift and Ms. Melcher, right?

6    A.    The majority of it, yeah.

7    Q.    And so, sir, after waiting in this line for an hour

8    with the moms and little girls and concluding in less than

9    a minute that Ms. Swift was being cold and stand-offish to

10   you, you felt like you were invisible, didn't you?

11   A.    She didn't acknowledge me when it was time to pose for

12   the photograph.

13   Q.    One more time, sir.  After waiting in this line with

14   your new girlfriend for an hour, and moms and little girls,

15   and concluding in less than a minute that Ms. Swift was

16   cold and stand-offish, you felt like you were invisible,

17   correct?

18   A.    I -- invisible, she forgot me.

19   Q.    Sir, could you please turn to your deposition,

20   page 104.

21   A.    Okay.

22   Q.    This is admittedly part of a longer answer I'm going

23   for, but I want to refer you to 14, under oath under

24   penalty of perjury, did you testify, quote, I felt like I

25   was invisible, closed quotes?

337

Cross - Mueller

1    A.    I see that, yes.

2    Q.    Well, that was your testimony under oath, wasn't it,

3    sir?

4    A.    Yes.

5    Q.    And you felt like you were completely on your own,

6    didn't you, sir?

7    A.    I didn't say that.

8    Q.    Okay.  Did you feel like you were on your own?

9    A.    I thought she forgot about me.

10   Q.    Did you feel like you were on your own?

11   A.    I did not feel like I was on my own.

12   Q.    Sir, can you look in this same answer, then, down to

13   line 16, under oath under penalty of perjury, tell me if I

14   read your testimony as of this date accurately.

15         Quote, She just pulled Shannon in and I was on my

16   own, so that's why I'm saying she seemed cold and

17   stand-offish.

18         Did I read that correctly?

19   A.    You did read it correctly, yes, sir.

20   Q.    So under penalty of perjury, you felt, after waiting

21   in the line for an hour with moms and little girls, while

22   your boss and cohost were in the media VIP group, and

23   concluding in less than a minute this woman, who never knew

24   you, was cold and stand-offish, that you were invisible and

25   on your own, right?

Cross - Mueller

1    A.    I was standing on my own, yes, sir.

2    Q.    And that's before a single thing happened that we're

3    here about, right?  Before you got in the picture, right?

4    A.    Yes, sir.

5    Q.    And you were just -- you were okay with her?

6    A.    I was a little alarmed by it.  I wasn't sure why I --

7    I mean, I was there to pose for a photograph.  I was

8    expected -- I --

9    Q.    You expected what, sir?

10   A.    Most people, when they're -- they go somewhere to pose

11   for a photograph, they expect to -- to get into the

12   photograph, you know, everybody gets together and --

13   Q.    Especially when they're part of a prominent morning

14   show, right?

15   A.    I don't think that has anything to do with it.

16   Q.    You didn't testify to that, sir?

17   A.    Being part of a prominent morning show?

18   Q.    That you're entitled to respect because of that?

19   A.    Well, everybody -- it doesn't matter if you're part of

20   a prominent morning show or if you're the night DJ, or if

21   you're the overnight person, everybody deserves

22   professional respect.

23        MR. BALDRIDGE:  Your Honor, I'm going to -- at

24   five of it's an excellent point to break for the day if

25   that works for the Court.  I can continue if you wish.

339
Cross - Mueller

1        THE COURT:  No, I think this is a good logical

2   time to take a break.

3        So we're going to call it a day, ladies and

4   gentlemen of the jury.  I need -- you're going to get tired

5   of me repeating this, but I have to.  I, again, remind you:

6   Please do not do any independent research into and do not

7   discuss with anyone the facts of this case, the lawyers,

8   the parties, or the witnesses.  Please be back in the jury

9   deliberation room by 8:35 tomorrow morning.  We will

10  endeavor to start promptly at 8:45.

11       We're in recess until 8:45 tomorrow morning.

12       (Proceedings concluded at 4:58 p.m.)

13                         **INDEX**

14  Item                                            PAGE

15  OPENING STATEMENTS

16  By Mr. McFarland                                143
    By Mr. Baldridge                                156
17

18                  PLAINTIFF'S WITNESSES

19      **DAVID MUELLER**
        Direct Examination by Mr. McFarland         172
20      Cross-examination by Mr. Baldridge          268

21

22                  DEFENDANTS' EXHIBITS

23  EXHIBITS:      Offered    Received  Refused   Stipulated

24  A              186        186

25  A-1            311        311

340

Cross - Mueller

```
 1              DEFENDANTS' EXHIBITS

 2   EXHIBITS:       Offered    Received  Refused   Stipulated

 3   C               242        242

 4   I               244        244

 5

 6

 7              *      *      *      *      *

 8              REPORTER'S CERTIFICATE

 9

10       I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled

12   matter.

13       Dated at Denver, Colorado, this 5th day of July, 2018.

14

15

16

17   _                                                       _

18              MARY J. GEORGE, FCRR, CRR, RMR

19

20

21

22

23

24

25
```