341

1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
2

      Civil Action No. 15-cv-1974-WJM
3

      DAVID MUELLER,
4

      Plaintiff and Counterclaim Defendant,
5

      vs.
6

      TAYLOR SWIFT,
7

      Defendant and Counterclaimant,
8

      and
9

      FRANK BELL, and
10    ANDREA SWIFT, a/k/a ANDREA FINLAY,

11    Defendants.

12    ------------------------------------------------------------

13                        REPORTER'S TRANSCRIPT
                          (Jury Trial - Day 3)
14                            VOLUME IV

15    ------------------------------------------------------------

16          Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

17    Judge, United States District Court for the District of

18    Colorado, commencing at 8:49 a.m., on the 9th day of

19    August, 2017, in Courtroom A801, United States Courthouse,

20    Denver, Colorado.

21

22

23

24

25

1                            APPEARANCES

2          M. GABRIEL McFARLAND and NEIDE GILLIAN COOLEY
     MORRISON, Evans & McFarland, LLC-Golden, 910 13th Street,
3    Suite 200, Golden, Colorado 80401, appearing for the
     plaintiff and counterclaim defendant.
4
           J. DOUGLAS BALDRIDGE, KATHERINE M. WRIGHT, DANIELLE R.
5    FOLEY, Venable LLP-DC, 600 Massachusetts Avenue, NW,
     Washington, DC 20001      AND
6          JESSE P. SCHAUDIES, JR., 13 Management LLC, 718
     Thompson Lane, Suite 108526, Nashville, Tenesse 37204,
7    appearing for the defendants and counterclaimant.

8                      MARY J. GEORGE, FCRR, CRR, RMR
                    901 19th Street, Denver, Colorado 80294
9               Proceedings Reported by Mechanical Stenography
                     Transcription Produced via Computer
10

11                       P R O C E E D I N G S

12          (In open court outside the presence of the jury at

13   8:49 a.m.)

14          THE COURT:  Yesterday evening at 8:42, I received

15   an e-mail from Mr. Baldridge advising me of a development

16   in the case that I think initially I need to discuss with

17   the parties and the lawyers at a sidebar.

18          (Discussion at sidebar)

19          THE COURT:  Okay.  What do you know?

20          MR. BALDRIDGE:  Yes, sir.

21          THE COURT:  Lower your voice.

22          MR. BALDRIDGE:  I'll tell you what we know and

23   then I'll tell you what I hope to do about it, with the

24   Court's permission.  We did learn promptly after court that

25   there were eight additional audio clips that had never been

1    produced.  Those clips necessarily would have led into

2    additional discovery by my client, namely involving Big

3    Machine Records, which is clearly referenced throughout the

4    clips as a possible party that applied the pressure that

5    Mr. McFarland and Mr. Mueller alleges was put on KYGO.

6              Big Machine was an initial defendant in this

7    case --

8              THE COURT:  Tell me who -- what Big Machine is.

9              MR. BALDRIDGE:  It's Taylor's record label, but it

10   is an independent company, it represents other artists.

11   And she is not an owner in that company, has no role in

12   that company other than it's her record label.

13             So what we learned in some of these clips was that

14   we believe possibly -- and I can't say it's true because I

15   didn't get the discovery -- that some of the complaints

16   that are being made against my client were, in fact -- in

17   fact involved conduct by Big Machine, not any of these

18   defendants.  We didn't take that discovery, we didn't

19   pursue that discovery, and we lost out on that.

20             Now there's a second issue.  Mr. Mueller testified

21   to a receipt that he had seen the night before last for

22   Apple --

23             THE COURT:  Right.

24             MR. BALDRIDGE:  He did not produce that receipt.

25   We checked everything.  It's not there.  I would have done

1    a lot more with Apple and -- I can tell you.  And so where

2    we are with this, Your Honor, is this -- and I'm not at all

3    pointing at counsel -- but you spoke of, in your sanctions

4    order, of a continuum of fault.  You already said it was

5    not innocence or mere negligence what had happened at that

6    point.

7              Since then we've received repeated assurances that

8    we have everything.  We learn well into the trial we

9    clearly not only don't have everything, we don't have

10   potentially critical evidence that has deprived my client

11   of the ability to have taken discovery to fully develop

12   this case.

13             So at this point, we would ask you to exercise

14   your authority and provide the adverse inference

15   instruction that we previously submitted to the Court

16   because we think on the continuum of fault, we're at the

17   level now where it doesn't really matter whether it was

18   intentional or not intentional, the prejudice has now swung

19   way out to the end of that continuum and we need -- we

20   can't talk about these recent discoveries with full

21   knowledge because we didn't take a discovery on it.  That's

22   where we are.

23             THE COURT:  Okay.  Mr. McFarland.

24             MR. McFARLAND:  Judge, consistent with Mr.

25   Mueller's testimony, I was able to confirm yesterday that

1    he did, in fact, produce to us 19 video clips.  I was also

2    able to confirm that, in fact, we only sent 11 of those 19

3    from Mr. Mueller.  The missing section -- and you guys may

4    have the time and -- correct me if I'm wrong, it's probably

5    eight minutes of --

6            MR. BALDRIDGE:  It's not a long -- it's not long.

7    I can agree with that.

8            MR. McFARLAND:  I listened to those tapes.  They

9    don't contain any of the types of admissions or alleged

10   admissions that can be discussed at trial to date.  I have

11   not focused any attention whatsoever in my case on Big

12   Machine.  I was -- I did hear mention of them in those --

13   in those tapes.

14           I also talked to my team about what happened with

15   those tapes.  The explanation was that they were inaudible.

16   They're not inaudible, I listened to them, and I --

17           THE COURT:  They're not inaudible?

18           MR. McFARLAND:  They are not.  I was told that at

19   the time they were not audible --

20           THE COURT:  Why -- why weren't thee produced to

21   the defendants when you produced the other 11 videotapes --

22   audio clips?

23           MR. McFARLAND:  Well, pursuant to my long-time

24   colleague, I've worked with her for 20 years, she's a

25   lawyer, she said that when she pulled those first six clips

1    up, they were not audible and that's why they were not

2    produced.

3              That doesn't make sense to me, to be honest with

4    the Court, because when I listened to them, they're short

5    clips, but they are clear.  You can understand what is

6    being said.

7              THE COURT:  Did your client produce those to you?

8              MR. McFARLAND:  Yes, he did.  My -- it's my

9    failure.  It's my fault.  It's my -- he produced 19 to me.

10   I produced 11 and that's my fault, and I'm embarrassed

11   about it.  And --

12             THE COURT:  Have you -- I assume you've listened

13   to these eight clips.

14             MR. BALDRIDGE:  With people with -- yes.

15             THE COURT:  Okay.  Have you told me everything

16   that's on those clips that you think are materially

17   relevant to your defense?

18             MR. BALDRIDGE:  Well, to the best of my knowledge,

19   yes.  The two lines of discovery we would have pursued --

20   and what I would add is that we didn't even know the

21   existence of the clips and, therefore, could not have

22   availed ourself of the forensic examiner to try to recover

23   the information if it was inaudible.

24             At this point -- I mean, you get to a point where

25   fault or innocence or not innocence doesn't really matter

1    any more because there's been a pattern, a pattern of

2    serious problems, both with client and -- mainly with

3    client, not, you know, Mr. Mueller, and there's a point at

4    which we have to be able to let this jury know through an

5    adverse instruction that there has been serious problems

6    with discovery.  Rule 37(c) gives you the full authority

7    and I think we're there now.

8            THE COURT:  All right.  Here's I think what I'm

9    going to have to do.  I think we're going to have to clear

10   the courtroom of all -- of everyone other than parties and

11   counsel of record, and that includes your folks in your

12   first row.  We're going to cut off the video feed to the

13   overflow rooms.  I'm going to have to take evidence, I'm

14   going to do -- have a quasi-evidentiary hearing where, Mr.

15   McFarland, I'm going to have to put you under oath --

16           MR. McFARLAND:  Okay.

17           THE COURT:  -- outside the jury.  So you're not a

18   fact witness in the trial, but for purposes for me in terms

19   of what sanction I'm going to enter, if at all, it depends

20   on the facts of the nondisclosure --

21           MR. McFARLAND:  Fair enough.

22           THE COURT:  -- and all the background, and why it

23   was not disclosed and the role your client had, if any, in

24   the delay of that production.  All right?

25           MR. McFARLAND:  Yes.

1                THE COURT:  Okay.

2                MR. BALDRIDGE:  I don't want to lose sight of the

3      Apple receipt either, which he clearly did not produce.

4                THE COURT:  Okay.  Then let me ask you about that.

5      Was -- did your client give you that Apple receipt that you

6      did not turn over or did he not --

7                MR. McFARLAND:  I got the Apple receipt more

8      recently.

9                MR. BALDRIDGE:  More recently.

10               THE COURT:  What does that --

11               MR. McFARLAND:  Like this week.

12               THE COURT:  Okay.  Well, then that might be --

13               MR. McFARLAND:  And I -- and I -- I don't believe

14     it was ever requested.  I -- I don't know whether those

15     receipts were requested.  A lot of this --

16               MR. BALDRIDGE:  They were.

17               THE COURT:  Well, I'd be surprised if there wasn't

18     a discovery request that encompassed that.

19               MR. BALDRIDGE:  I would add to it that in his

20     deposition, we requested it again.

21               THE COURT:  Okay.

22               MR. BALDRIDGE:  And didn't get it.

23               THE COURT:  Okay.  So --

24               MR. BALDRIDGE:  Not -- Mr. Mueller's deposition,

25     excuse me.

1          THE COURT:  Is everybody clear what we're going to

2     do?

3          MR. BALDRIDGE:  Yes, sir.

4          THE COURT:  Okay.

5       (End of discussion at sidebar)

6           MR. BALDRIDGE:  May I inform my client, Your

7     Honor, of what's happening?

8          THE COURT:  You'll have a chance after.

9          All right.  Based --

10         COURTROOM DEPUTY:  We've got them all off.  We've

11    got them all muted.

12         THE COURT:  Can you turn this back on so -- or

13    I'll just have to use my stage voice.

14         All right.  Based on the discussions with counsel,

15    I'm going to ask everyone who is not an attorney of record

16    or a party to leave the courtroom.  We are going to seal

17    the courtroom, we're going to cut off all video and audio

18    feed to the overflow rooms.

19          I'm going to conduct an evidentiary hearing with

20    respect to the matters that have been raised by Mr.

21    Baldridge in his e-mail to me yesterday evening.  And once

22    that's resolved, then everyone else can return to the

23    courtroom.

24          We will be in recess until I get notice from Mr.

25    Colwell and the marshals' office that the folks that are

```
1    waiting outside, the media, and the public, have been
2    accompanied to wherever you're going to take them and that
3    the video and audio feed have been cut off.  And at the
4    point where we're ready to resume, we will go back on the
5    record in the sealed courtroom.
6           And if -- Ms. Hansen, could you advise the jury
7    that it's going to be a while and explain to them the
8    reason for the delay.
9           All right.  We will be in recess.
10          (Recess 9:01 a.m.)
11          (In open court outside the presence of the jury and
12   all audience members at 9:19 a.m.)
13          THE COURT:  All right.  The record will reflect
14   that I have sealed the courtroom.  The only ones present,
15   beside my staff and assistant -- or deputy marshals, are
16   the parties and their counsel of record.
17          Mr. McFarland, I'm going to let you stay where you
18   are now, but I'm going to have Ms. Hansen administer an
19   oath to you.
20          (Mr. McFarland sworn)
21                         EXAMINATION
22   BY THE COURT:
23   Q.   All right.  Mr. McFarland, how many audio clips are we
24   talking about in terms of clips provided to you by your
25   client at any point during the discovery process?
```

1    A.    19.

2    Q.    All right.  What is the total length in minutes of

3    those 19 clips?

4    A.    Roughly 45 minutes.

5    Q.    45 minutes?

6    A.    Is that consistent with -- I'm not -- I am not sure.

7    Q.    All right.  Well, there were 11 -- the testimony

8    yesterday, as I recall, is there were 11 audio files

9    produced to the defendants that total approximately 14 or

10   15 minutes, which would make them about less than two

11   minutes each.  So if there's 19, it would be about 35

12   minutes -- 35 to 38 minutes, somewhere in there.

13          Does that comport with your understanding or

14   recollection?

15   A.    It does.

16   Q.    Okay.  What did you -- what was the request you made

17   to your client pursuant to which he produced those audio

18   files to you?

19   A.    When I learned that there were audio recordings, I

20   asked my client to produce the audio record in their

21   entirety.

22   Q.    All right.  So it's your testimony that he produced 19

23   to you?

24   A.    He produced 19 clips.

25   Q.    Okay.  How many of those did you produce to the

1    defendants prior to the commencement of this trial?

2    A.    11.

3    Q.    All right.  Did you decide which of those 19 to

4    produce?

5    A.    I did not.

6    Q.    Who made that decision?

7    A.    My colleague, long-time attorney, Cyd Hunt.  I asked

8    her to review the clips and to produce any and all relevant

9    portions and portions that weren't privileged, those types

10   of things.

11         And then my understanding was that all of the 19

12   clips were produced.

13   Q.    Has she ever entered an appearance in this case?

14   A.    She has not.

15   Q.    All right.  So in what capacity was she working for

16   you?

17   A.    As an attorney.

18         COURTROOM DEPUTY:  Your Honor, Mr. Foster cannot

19   hear Mr. McFarland.

20   BY THE COURT:

21   Q.    Oh, okay.  Why don't you take the lectern.

22   A.    As an attorney.

23   Q.    Okay.  It was -- is she an associate, or she had her

24   own office or firm, or what -- what was the professional

25   relationship?

1    A.    I've worked with Ms. Hunt for 22 years.  She has

2    worked for me at my firm for at least 10.

3    Q.    All right.  And so what you're telling me is you

4    delegated to her the responsibility of reviewing the 19

5    clips, deciding what was -- excising any privileged

6    matters -- although I don't see how any of it could have

7    been privileged -- but -- and that you let her make the

8    decision as to what was responsive to the defendants'

9    discovery request?

10   A.    You know, what I instructed is unless there's

11   something that is not relevant, all of -- everything should

12   be produced.

13   Q.    All right.  Were you aware -- who -- who was

14   responsible for the transmission of the 11 audiotapes to

15   the defendants?

16   A.    That was done by my staff, primarily my legal

17   secretary, Gina Bowermaster, who uploaded the files onto

18   Dropbox, and then shared those with the defendants.

19   Q.    Give me a sense of what level of involvement you had

20   in that whole process in terms of deciding what was to be

21   produced to the defendants and what was to be withheld.

22   A.    You know, my general rule is to produce everything.

23   And that's what I thought happened in this case.  Obviously

24   I was not as involved as I should have been and I was not

25   as involved as I needed to be.  But, ultimately, it was my

1    responsibility -- the way that our office operates, it was

2    my responsibility, it was not Cyd Hunt's responsibility to

3    make sure that the 19 clips were produced.  That was my

4    responsibility.

5         Similarly, I have no doubt that my fine legal

6    secretary was just following Ms. Hunt's instructions in

7    terms of what to produce and that she produced what was

8    identified for her to produce.

9         But, again, ultimately it's my responsibility to

10   make sure that what is being produced is complete and I

11   failed in that respect.

12   Q.   Well, I don't think anyone in this room is disagreeing

13   with you on that point.  You mean -- and I didn't hear you

14   trying to hide behind your staff.  You are the counsel of

15   record and you're ultimately responsible for what your

16   staff does or doesn't do.  What I'm trying to find out is

17   why approximately 40 percent of the volume -- of the

18   quantity of audio that was preserved on these clips was not

19   produced to the defendants.

20   A.   Judge, I don't think there -- I don't think there's a

21   good excuse or explanation for it.  I did communicate with

22   Ms. Hunt and it -- if you look at the way that we produced

23   those clips, we identified them by number in the

24   production.  So the first one that we produced is clip

25   007 -- I'm looking at the exhibit list here.

1              The way they're listed here on defendants'

2      final -- amended final exhibit list, starting with

3      Exhibit M, is the way that we produced them.  So we

4      produced 007, 008, 009, 10, 11, 12, and there's a gap, 15,

5      16, 17, 18, 19.

6              Ms. Hunt, in our communications, explained that

7      when she listened to the first six clips, which each one of

8      those is -- is very short, it's -- it's, you know,

9      sometimes just a few seconds, less than 10 seconds,

10     sometimes maybe even less than that.  But she -- she said,

11     "I did not produce those because when I went to play them,

12     they were inaudible.  There was no intelligible

13     conversation."

14     Q.   But you conceded in the sidebar we just had a few

15     minutes ago that's not accurate.

16     A.   When I pull them up on my machine and I listen to

17     them, they are clear, and I believe they were clear for the

18     defendants.  In response to what happened to clips 13 and

19     14, the response was I'm not sure.

20     Q.   Okay.  Did you at any point understand what was the

21     subject matter of the material that had not been produced?

22     A.   My -- my -- again, my understanding of what -- what I

23     thought I was getting was the complete audio.  When I got

24     the 19 clips, I thought to myself, okay, they had to be

25     broken down into smaller pieces.  I've got the full audio.

1          And I didn't realize I was mistaken until after

2     Mr. Mueller's laptop had been destroyed.

3          I generally understood, and I listened at various

4     times, to all or virtually all of those recordings.  My

5     understanding was they were all taken from Mr. Mueller's

6     meeting with Mr. Call and Mr. Haskell, and they all related

7     to, you know, the accusations and Mr. Mueller's explanation

8     of Ms. Swift's accusations.

9     Q.   Try -- help me understand what it is about the

10    division or the demarcation between the 11 and the eight

11    that caused you, as attorney of record, and responsible for

12    this case, to be satisfied that you had complied with your

13    discovery obligations under Rule 26 when you produced only

14    a portion of the audiotapes.

15    A.   Judge, all -- the only way I can respond to that is to

16    tell you -- well, I just -- I should -- all of those clips

17    should have been produced.  And because I didn't pay enough

18    attention, they weren't.  There's no good excuse for it.

19    Q.   All right.  Did your client in any way have any role

20    in the decision to withhold eight of the 19 audiotapes?

21    A.   Absolutely not.

22    Q.   Okay.

23    A.   And I just -- I think I've made it clear, but I did

24    not intentionally withhold these clips.  It was --

25    Q.   Was --

1    A.    It was a mistake, it was an accident on my part.  But

2    Mr. Mueller sent me the 19 clips and he had nothing to do

3    with the production of those.

4         Those -- I assumed I had everything, and then I

5    was in charge of the production, and eight of the 19 clips

6    were not produced.

7    Q.    Okay.  So, I mean, that's one of the reasons we're

8    going through this exercise.  I'm trying to determine to

9    what extent your client personally had any role or

10   culpability in what has transpired and I think you've made

11   it clear that he had none.

12   A.    He had absolutely none.

13   Q.    Okay.  You take exception to the use of -- by me of

14   the word "withhold" and I don't know that we really have

15   time to be concerned about the semantics of it.  I'm not,

16   by using that word, at this point attempting to imply that

17   there's some nefarious motive or intent on your part.  I'm

18   using the word basically to connote the fact that you

19   didn't produce eight audiotapes until yesterday evening.  I

20   mean, there's not a factual dispute about that, right?

21   A.    No, there's not.

22   Q.    And you're telling me that you have -- you did not

23   have -- you did not exercise enough supervisory review role

24   in this to have a meaningful understanding of what was

25   being produced and not being produced.

1    A.    I -- I was not involved enough to catch and recognize

2    that less than everything that should have been produced

3    was actually produced.

4    Q.    Did you -- at any time prior to Mr. Mueller's

5    testimony yesterday afternoon at trial, did you at any

6    point prior to that have -- form any conclusion in your

7    mind, as an officer of the court, that you had failed to

8    produce information that were subject to discovery requests

9    by the defendants?

10   A.    I did not, Judge.

11   Q.    All right.  You first realized that upon hearing your

12   client's responses to cross-examination?

13   A.    When Mr. Baldridge yesterday indicated he only had 11

14   of 19 clips.

15   Q.    Let me ask you a couple of questions about chain of

16   custody and preservation.  Who's had custody of these audio

17   clips since your office came into possession of them?

18   A.    Me.  My office.

19   Q.    All right.  And obviously this Cyd woman -- not your

20   cocounsel, your --

21   A.    Those clips -- those clips have been maintained on our

22   firm Dropbox, which we use for document production.

23   Q.    Okay.  Has anyone outside of your firm had access to

24   those clips?

25   A.    Absolutely not.

1    Q.    Okay.  Can you represent to me as an officer of the

2    court that you believe that those clips are -- have not

3    been tampered with or changed or altered in any way from

4    the form and state in which they were given to you by your

5    client?

6    A.    They have not been altered in any way.

7    Q.    All right.  Let me ask you about this Apple store

8    receipt.  When did you first learn that your client was in

9    possession of a receipt from an Apple store for one of his

10   devices?

11   A.    Earlier this week.

12   Q.    Most specifically when?

13   A.    Yesterday.

14   Q.    Okay.  So after the commencement of the trial?

15   A.    Yes.

16   Q.    Did you disclose that to defense counsel at the time

17   that you discovered it?

18   A.    I didn't even -- the short answer is no.

19   Q.    All right.  Have you since provided a copy to defense

20   counsel?

21   A.    My cocounsel has her finger on the e-mail right now

22   and will send it to them right now.

23   Q.    Okay.  Are you aware of any other -- any other

24   receipts, invoices, vouchers, anything having to do with

25   whatever was done or not done to any of the five electronic

1    devices that have been mentioned in the cross-exam --
2    direct and cross-examination of your client in this case?
3    A.    I am not.
4    Q.    All right.  So is it your testimony to me that this
5    receipt was not produced to the defendants because you were
6    not aware of its existence until yesterday?
7    A.    I hadn't -- to be honest, I -- I hadn't even thought
8    about receipts, and I was not aware that there were
9    receipts.  And when I learned that there was a receipt, I
10   again said, "I wish I had realized that earlier because
11   that's a good piece of evidence for Mr. Mueller."
12   Q.    Okay.  I don't know that you, though, have answered my
13   specific question.  When did you first come aware of the
14   existence of this receipt?
15   A.    Yesterday.
16   Q.    All right.  When you became aware of it, did you form
17   the conclusion that it was something that should have been
18   produced pursuant to a discovery request?
19   A.    Not -- no.  I was --
20   Q.    One second.  Ms. Morrison, please.
21   A.    Not immediately.  I asked myself:  Was there a request
22   for this information?  I don't -- I don't know.  It doesn't
23   really matter.  It --
24   Q.    In what sense doesn't it matter?
25   A.    Well, it should have been produced.  Whether it --

1    whether there's a specific request or response, I feel like

2    I should have produced it.

3    Q.    Did you ask your client to produce to you any

4    documents of a category that would include such a receipt?

5    A.    Until yesterday, no.

6    Q.    So it's your position that there was no discovery

7    request propounded on the plaintiff that would have

8    encompassed such a document?

9    A.    You know, Judge, I -- honestly, I don't remember.  If

10   the defendants say that there was a request that included

11   that, I don't have any reason to dispute that.

12   Q.    Okay.  Last thing I want to say to you is do you have

13   available a copy of the eight audio files that you can

14   provide to my law clerk sometime today?

15   A.    Yes.

16   Q.    All right.  If you could do that, maybe at lunchtime,

17   we'd appreciate that.

18   A.    I will.

19            THE COURT:  All right.  You can return to your

20   seat.

21            MR. McFARLAND:  Thank you.

22            THE COURT:  Mr. Baldridge, I'm going to let --

23   give you an opportunity again to put on the record what it

24   is -- how it is you believe that your client was prejudiced

25   by the nondisclosure of these audio clips and store receipt

1    until yesterday.  And to specifically put on the record

2    what kind of sanction or other relief you believe would be

3    appropriate at this time, and then I'll have Mr. McFarland

4    give his -- Mr. McFarland, are you listening?  I'm going to

5    give you an opportunity to respond to Mr. Baldridge's

6    request for sanctions.

7              MR. McFARLAND:  Thank you.

8              THE COURT:  All right.  Go ahead.

9              MR. BALDRIDGE:  Your Honor, before I do

10   specific -- before I do specifically what the Court has

11   asked, through the Court, may I ask a few additional

12   follow-up questions?  I don't want to cross-examine Mr.

13   McFarland, but there's some curiosity here that might be

14   relevant to the issue.

15             THE COURT:  Why don't you ask -- just ask the

16   questions generically and then I'll decide whether I'm

17   going to have Mr. McFarland answer it.

18             MR. BALDRIDGE:  The -- he just said that he asked

19   Mr. Mueller to produce the entirety of the recordings way

20   back when he was fulfilling his discovery obligations.  I'd

21   like to know whether Mr. Mueller told him he had produced

22   the entirety of the recordings back then.  I'm -- one of

23   the issues you're looking at is the fault of the client.

24             If the client told Mr. McFarland, "You have it

25   all," and we now know he didn't have anywhere near it all,

1    then Mr. Mueller is involved just beyond his joint duty to

2    produce, but he's directly involved.

3            THE COURT:  I'm not going to have Mr. McFarland

4    answer that, and the reason being is because now we're

5    going back, we're retracing ground that we've covered in

6    the prior sanction briefing with respect to the failure

7    to -- you've known, I've known, that not all of the two

8    hours of the cumulative recordings of the plaintiff's

9    discussions with his supervisor and second-level supervisor

10   were produced.  So I'm not going to go into that.

11           Your next question.

12           MR. BALDRIDGE:  For the record, we have -- I'm

13   doing that within this continuum of fault that you

14   identified in your sanctions --

15           THE COURT:  I understand.  We've already covered

16   that ground.

17           MR. BALDRIDGE:  Just to clarify for the record,

18   unless counsel has a dispute on this, there's 23 minutes in

19   total that have been produced now between all the clips,

20   which is roughly 25 percent or a little less than 25

21   percent of the total recording, not 40 percent.  I wanted

22   to correct that.

23           THE COURT:  Okay.

24           MR. BALDRIDGE:  And I don't think he has a reason

25   to dispute, I want to make sure.

1          MR. McFARLAND:  I don't dispute that.

2          MR. BALDRIDGE:  Hang on, Your Honor.  I'm trying

3     to be consistent with your initial ruling on my initial

4     question.

5          THE COURT:  Sure.

6          MR. BALDRIDGE:  And my question's this:  We used

7     the audio clips and the transcript of what audio clips we

8     had in Mr. Mueller's deposition.  Was there any knowledge

9     at that point that less than the entirety of the recording

10    had not been provided to me before we went into that

11    questioning?

12         THE COURT:  All right.  Mr. McFarland -- and if

13    you could use your mike so that Mr. Foster can hear you.  I

14    don't know why the -- why don't you pull it all the way to

15    the end of the table.  That's where it should be.  That's

16    where -- that's the purpose it serves instead of hiding

17    over here at the end of the table.

18         MR. McFARLAND:  Judge, the answer to that question

19    is no, I did not -- I realized at the deposition that less

20    than all of the audio had been produced.

21         THE COURT:  Did you -- once you realized that, did

22    you disclose that to defense counsel and offer to keep the

23    deposition open until the remaining audio files had been

24    produced?

25         MR. McFARLAND:  I -- Mr. Baldridge, in his

1       questions, in that -- in Mr. Mueller's testimony alerted

2       us, I think all of us, at least Mr. Baldridge and I, that

3       we did not have the complete audio.  And I --

4                THE COURT:  Hold on.  Are we talking about that

5       you didn't have the whole two hours?

6                MR. McFARLAND:  The whole two hours.

7                THE COURT:  Okay.  All right.  And then maybe I

8       misunderstood Mr. Baldridge's question.

9                Mr. Baldridge, were you asking whether, at the

10      deposition, he -- Mr. McFarland realized that he had not

11      produced eight of the 19 audio files?

12               MR. BALDRIDGE:  My question was articulated to be

13      far more broadly.  I just wanted to know what was known,

14      whether it be clips or total audio, before we spent the

15      money and time on this issue.

16               THE COURT:  All right.  I'm not going to have you

17      go back -- we've established that not all of the two

18      hours -- that was known before the trial started, that was

19      the subject of the briefing on the sanctions.  We've

20      covered that ground.  I've ruled on it.

21               I'm going -- I'm focusing now on at the

22      deposition, were you aware that eight of the 19 audio files

23      that your client had produced to you, understanding that

24      those 19 files were not the full two hours, were you aware

25      at the deposition that eight of the audio files of those 19

1    had not been produced to the defendants?

2           MR. McFARLAND:  No, I didn't realize that until

3    yesterday.

4           THE COURT:  Okay.

5           MR. BALDRIDGE:  Next one, Your Honor, is in the

6    sanctions motion -- and I'm going to tie it to this --

7    footnote 19, actually, of their opposition -- which is

8    document 153 -- there's a representation about the

9    seriousness with which all counsel take their obligations,

10   and that plaintiff's counsel has never had -- never had or

11   listened to any audio recording other than those portions

12   that have been produced to me.

13          My question there is:  When the first sanctions

14   motion was going on, what steps were taken by Mr. Mueller

15   to go back and ensure that we had looked for all the clips,

16   had looked for all the information before this

17   representation was made that everything had been produced.

18          THE COURT:  All right.  Mr. McFarland.  That's a

19   fair question.

20          MR. McFARLAND:  Judge, as I sit here, I don't

21   recall specifically what I did -- and I'm -- I'm trying to

22   think back -- the short answer is I -- I am not sure.  I --

23   I -- I don't -- to be honest with you, I'm not sure what

24   steps I took.

25          I know at the time that I responded, just like I

1    was before yesterday, I was confident that we had produced

2    every piece of audio clip that we received.

3              THE COURT:  All right.  Any more questions, Mr.

4    Baldridge?

5              MR. BALDRIDGE:  In this -- I have a few about the

6    specifics of what's on the tapes and --

7              THE COURT:  Have you -- I'm assuming -- well, you

8    reference in your e-mail that you listened to them.

9              MR. BALDRIDGE:  Yes, sir.

10             THE COURT:  Okay.  Oh, you want to follow up --

11             MR. BALDRIDGE:  Yes, sir.

12             THE COURT:  How would that be relevant to what

13   we're -- what we're referencing -- or what we're discussing

14   here in terms of possible sanction remedy?

15             MR. BALDRIDGE:  What I would like to do -- and it

16   may just be argument -- that the importance of some of the

17   issues that information on these clips --

18             THE COURT:  Let's do that by argument as opposed

19   to another question for counsel.

20             MR. BALDRIDGE:  Okay.

21             THE COURT:  All right.  So at this point, again,

22   I'd like you to state for the record, A, how you believe

23   your clients were prejudiced by the failure of the

24   plaintiff to produce the eight missing audio files and the

25   Apple store receipt until yesterday.  That's A.  And, B,

1    the specific sanction you want this Court to enter as a

2    remedy for what has occurred.

3              MR. BALDRIDGE:  Yes, sir.  And I'll address it

4    exactly in the order.  As to prejudice, one of the tapes is

5    a recording that we received last night, one of the clips

6    that we received last night includes some commentary by Mr.

7    Bob Call of KYGO radio about having heard from everyone

8    from top to the bottom, or something to that effect, at Big

9    Machine Records, which is Ms. Swift's record label.

10             Saying it's Ms. Swift's record label, however,

11   should not be confused that it's her company, it's not even

12   close.  It is an independent company run by Scott Borchetta

13   that represents multiple artists.

14             I think -- and here's one of the issues I wanted

15   to nail down -- I don't think there's any dispute that one

16   of the big issues being pursued by the plaintiff in this

17   case is that pressure was imposed upon KYGO in the

18   investigatory process, and all of that pressure in this

19   case to date has been attributed to my clients, when, in

20   fact, there was a whole line of discovery and possibilities

21   raised from that tape that this pressure was actually being

22   inflicted by somebody who was initially a party in this

23   case, because he did sue them, and then dismissed them

24   outright.  And in that regard, I think we have a whole line

25   of what I will call discovery of where the pressure came

1    from.

2            And that becomes very relevant because, as you

3    know, what's left as to Ms. Swift is generally a respondeat

4    superior claim which you dealt with on summary judgment,

5    and it really hits in the teeth of that summary judgment

6    claim.  And I will not get into the Court's mind, but in my

7    mind, it was a close call whether or not to let her out

8    altogether on summary judgment.

9            It might not have been, but this certainly would

10   have shed light on that and could have, could have -- we

11   don't know because we don't have the discovery -- provided

12   additional arguments.  That's No. 1.

13           No. 2, one of the clips we received last night

14   includes Bob Call's -- at KYGO's comments about the famous

15   photograph that we're seeing of Mr. Mueller at the

16   meet-and-greet.  It exposes some trickle of information --

17   and I don't want to overstate it because it's not much --

18   about his view of what that photo showed, and what he

19   thought about that photo, but, more importantly, it sheds

20   light on Mr. Mueller and what he says about the position he

21   was in in the room, which plaintiffs have made a big issue

22   of.

23           And it is arguable from that, and it is just

24   arguable, it is not ironclad, by any means, that what Mr.

25   Mueller said on that recording is inconsistent with his

1    view of jumping into the photo at the last minute and his

2    positioning in that photo.  So we didn't have that argument

3    either for summary judgment and are now learning about it

4    for the first time.

5            And then, finally, the Apple receipt.  I think Mr.

6    McFarland was very forthcoming and forthright about how

7    that went down, but I do remind the Court that Mr. Mueller

8    said under oath yesterday on the stand that it was

9    produced.

10           I don't know what he meant by that, he could have

11   meant "to my lawyers," I don't want to make the arguments

12   for him, but that is an untrue statement as to whether it

13   had been produced to me.  It had not been produced to me.

14   I was in front of the jury quibbling with him a little over

15   that issue because he said he saw it last night and it was

16   produced.  Well, it wasn't.

17           In that regard, I've already articulated our view

18   of the issue and the sanctions we want.  I do not think the

19   Court can divorce the initial sanctions motion from what's

20   going on here because we have a continuum of fault.  We

21   have no one in this room, no one in this room knows now

22   whether we have everything, whether more is going to come

23   out, whether more has been destroyed.  Where are the

24   documents -- you know, what documents we don't have.  It's

25   a mess.

|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  | And I'm not sitting here saying that Mr. Mueller                          |
| 2  | did anything other than what he said he did.  We -- I have               |
| 3  | high regard for Mr. Mueller -- Mr. McFarland --                           |
| 4  | THE COURT:  You mean Mr. McFarland.                                       |
| 5  | MR. BALDRIDGE:  Excuse me, Mr. McFarland.                                 |
| 6  | THE COURT:  Right.                                                        |
| 7  | MR. BALDRIDGE:  I quite frankly and very honestly,                       |
| 8  | Your Honor, cannot trust the party in this case who has                   |
| 9  | managed to lose so much information.  I don't know what I                 |
| 10 | don't know, and I do know each time we approach this issue,               |
| 11 | there seems to be more.  And so for that reason, we'd ask                 |
| 12 | for an adverse inference instruction in that -- that we                   |
| 13 | already submitted to the Court for the overall conduct                    |
| 14 | here.                                                                     |
| 15 | THE COURT:  So effectively you're renewing your                           |
| 16 | original sanctions request and an inference ad- -- adverse                |
| 17 | inference specifically as you set forth in your original                  |
| 18 | motion?                                                                   |
| 19 | MR. BALDRIDGE:  In those words, yes, sir.                                 |
| 20 | THE COURT:  Okay.  Let me ask you a couple of                            |
| 21 | things.  One is:  Did, at any point in time, the defendants               |
| 22 | consider seeking as a lesser sanction a reopened deposition               |
| 23 | of the -- of Mr. Mueller with respect to any missing,                     |
| 24 | omitted, or withheld audio files?                                         |
| 25 | MR. BALDRIDGE:  No, sir.  And there's two problems                        |

1    with that.  I learned of the first audio recording issue in

2    the middle of his deposition.  And I'm put in the position,

3    in a reopened deposition, of asking Mr. Mueller about an

4    hour and 45 minutes of destroyed information that I know

5    nothing about.  So what good would a deposition do asking

6    the destroyer, if you will, what was within that which he

7    destroyed five times over?

8         So, to me, it really was a fruitless exercise.  I

9    very carefully, in the deposition, established everything

10   that was gone.  Anybody can come in this court, and whether

11   they're honest or dishonest, and say, "Well, I destroyed it

12   innocently, and you take my word for it.  There's nothing

13   there."

14        And there's not a thing Your Honor can do about

15   that or I can do about that.  So the issue before this

16   Court, in taking another deposition, is it's setting a

17   precedent where dishonest people -- and that's not Mr.

18   McFarland -- can say, "Take my word for it, there was

19   nothing on it, take my word for it, it's my fault, it's not

20   my client's fault, so don't penalize my client, it's me."

21   And it creates a precedent that is not good and counsel

22   that is harmed and -- excuse me, parties that are harmed

23   here, the defendants, can't do anything about it because

24   they don't have the information.

25        So I don't see any benefit in questioning him

1     about that which I can't even impeach him on because he --

2     because he lost or destroyed it.

3          THE COURT:  Well, one of the things you referenced

4     in terms of what's on the missing eight audio files was the

5     reference to the alleged pressure that KYGO was receiving

6     from Big Machine.  Now, the -- it is true, would you

7     concede, that the defendants were aware generally of that

8     issue based on some of the early pleadings and filings in

9     this case where the plaintiff alleges as much?

10          MR. BALDRIDGE:  I can't say that we were aware

11    generally of any pressure, sir.  What I can say, we were

12    aware of factually was that Kris Lamb, who is of Big

13    Machine Records, knew of the incident.  I can say that.

14    And I can't cite line and verse from the discovery in this

15    case as to what other statements may have been made, but

16    generally we knew Big Machine was part of the overall

17    picture.

18          We think it's highly incredible, though, to make

19    the allegations that pressure came from these defendants, a

20    central issue of the case, when it appears that Mr. Call,

21    himself, was feeling pressure from an unaffiliated party.

22          THE COURT:  All right.  Thank you.

23          MR. BALDRIDGE:  Thank you.

24          THE COURT:  Mr. McFarland, I'll give you an

25    opportunity to respond to specifically -- and all I want

1      you to respond to -- is the request for sanctions relief

2      from the defendants.

3              MR. McFARLAND:  Judge, I don't think the requested

4      sanction is appropriate.  This one is not Mr. Mueller's

5      fault; this is my fault.  And I -- the adverse inference

6      instruction is so powerful, I think it's unfair to Mr.

7      Mueller to have it under these circumstances.

8              I would also note, you know, with respect to Big

9      Machine, I haven't thought about Big Machine since Scott

10     Borchetta was dismissed from the case.  We deposed Bob

11     Call.  Bob Call's going to be here.  In his deposition --

12     and I assume at trial -- Mr. Call said that Mr. Mueller was

13     fired for three reasons:  Based on his conversation with

14     Frank Bell, based on the photo of Frank Bell, and based on

15     the fact that he believed Mr. Mueller changed his story.

16             I would also note that that deposition indicates

17     that there would -- it was between Mr. Call and Mr. Haskell

18     and the defendants' counsel here.

19             THE COURT:  Did Mr. Call -- I confess to not

20     having memorized the depositions -- did Mr. Call testify in

21     his deposition that it was his decision to make -- to

22     terminate the plaintiff?

23             MR. McFARLAND:  He did.

24             THE COURT:  Okay.  Go ahead.

25             MR. McFARLAND:  So I -- I've expressed this to

1    defense counsel, I've expressed --

2              THE COURT:  Can you speak up, please.

3              MR. McFARLAND:  I've expressed to defense counsel

4    and I've expressed to the Court, I want to do -- I want a

5    fair trial.  I don't think on whole these -- these

6    additional eight clips, from my perspective, there's no

7    real new information.  I'm not trying to excuse the fact

8    that they should have been produced.

9              THE COURT:  Was that the test, new evidence or new

10   information or prejudice?

11             MR. McFARLAND:  Can you -- I'm sorry --

12             THE COURT:  I mean, is that -- is that the test in

13   terms of whether I'm going to grant the relief requested

14   that there's new information, or should we be arguing that

15   there's no prejudice?

16             MR. McFARLAND:  No, that was my point.  And I

17   don't think there's new information, unless there's no real

18   prejudice to the defendants as a result of the

19   nondisclosure.

20             So for those, you know, reasons -- and, again, I

21   take full responsibility -- but I think it's unfair to put

22   my failings on to Mr. Mueller under these circumstances.

23             THE COURT:  All right.  So you believe that the

24   adverse inference instruction, which as I stated in my

25   written order previously, is a very severe sanction, and I

1    have to decide whether with this additional development in

2    the trial it's warranted, you obviously take exception to

3    the appropriateness of it at this point.

4         What sanction, short of an adverse inference

5    instruction to the jury do you believe I should grant the

6    defendants, if any?

7         MR. McFARLAND:  You know, obviously allowing --

8    you know, vigorous cross-examination, as the Court did in

9    the other situation, I don't think that's unreasonable.  In

10    addition, you know, a stipulation to the effect that -- if

11    the defendants want it, to the effect that, you know, the

12    Apple receipt was not produced to them prior to trial, or

13    something along those lines.  That doesn't seem

14    unreasonable either.

15         And I also am happy to thoughtfully consider any

16    other lesser sanctions that the Court or that the

17    defendants think is appropriate.

18         THE COURT:  All right.  This is what I'm going to

19    do:  First of all, in terms of the general request for an

20    adverse inference instruction, I'm going to take that under

21    advisement.  My law clerk and I need to listen to the --

22    these eight audio files and make our own assessment, at

23    least in part, in terms of the possible prejudice, and take

24    a closer look at some of the cases that are involved given

25    the developments of the trial.  So I'm going to take the

1    adverse inference sanction request slash oral motion under

2    advisement.

3            What I am willing to do, as I mentioned yesterday

4    when this first came up, is that I'm willing to allow, if

5    Mr. Baldridge wants, to keep the cross-examination of the

6    plaintiff open to allow for cross-examination on the new

7    information that's been received and obtained from these

8    eight files.  But I do not, Mr. Baldridge, because it's

9    intertwined with the possible sanction that I may impose, I

10    do -- I do not want you to go in on cross-examination to

11    point out the fact that these were contained in new files,

12    new audio files that you just received.

13            In other words, if you -- you will be allowed to

14    cross-examine on these new materials that you received, but

15    I don't want you at this point, whenever you're going to

16    do, either now, if you're prepared to use that in the

17    cross-examination when we resume the cross-examination, or

18    whether you're going to request that we keep the

19    cross-examination open and that Mr. Mueller be recalled

20    later in the trial, unless I've made a decision at this

21    point which clarifies that point.

22            Did -- so I guess the question to you is:  Are you

23    prepared to cross-examine on the contents of the eight

24    audio files at this time or would you request that the

25    cross-examination be kept open for a recall of the

1      plaintiff later in the trial when you are prepared?

2                 MR. BALDRIDGE:  I would request that it be left

3      open --

4                 THE COURT:  All right.

5                 MR. BALDRIDGE:  -- for recall.

6            And if I may suggest something for an immediate

7      issue while the Court takes under advisement and considers

8      the adverse inference, not as a substitute for it, but

9      something --

10                THE COURT:  Go ahead.

11                MR. BALDRIDGE:  My suggestion would be that the

12     Court, while it's fresh in the jury's mind, in its own

13     language, advise the jury that it was not accurate

14     testimony that the Apple receipt had been provided to my

15     client.  No adverse inference, just let them know that

16     wasn't accurate, or it was a mistake or whatever.

17                The second thing I would ask --

18                THE COURT:  I'm not going to do that.

19                MR. BALDRIDGE:  Okay.  The second thing I would

20     ask is to tell the jury that the testimony that 19 clips

21     were provided is inaccurate; that eight were provided last

22     night.  It goes to this -- the credibility.

23                And then the third would be to tell the jury that

24     it is undisputed among the parties and must be taken as

25     true that approximately one hour and 45 minutes of the

1      recordings no longer exist and were destroyed.

2              THE COURT:  Well, as to that latter point, I think

3      as a factual matter, you've -- you've pretty well

4      established that in your cross-examination yesterday.  And

5      you're free to argue that to your heart's content in

6      closing argument.

7              With respect to the matter -- other matters, I'm

8      not going to do that now.  I think there are -- what you're

9      requesting is so intertwined with what I will ultimately

10     order in terms of the sanction that I'm not going to do

11     that now.

12             The only thing I'm willing to do now is grant your

13     request that the cross-examination of the plaintiff be kept

14     open until later in the trial when you're prepared to

15     cross-examine him on the materials in those eight audio

16     files.

17             But I want to be perfectly clear, though, on the

18     record, is that if I have not yet entered my sanction

19     order, the order on your oral motion, I do not want you to

20     bring up the fact that, let's say, questions about Big

21     Machine, that that information comes from eight audio files

22     that were produced to you Tuesday evening.

23             MR. BALDRIDGE:  Yes, sir.

24             THE COURT:  All right?  Is that understood?

25             MR. BALDRIDGE:  Understood.  Yes, sir.

1          THE COURT:  Okay.  All right.  All right.  We will
2     be in recess until we can reopen the courtroom.  We'll
3     allow the media and the public to come back in.
4          And, Ms. Hansen, if you'll allow -- if you tell
5     the jury that we're getting close to having them come back
6     in and we'll be in recess until that time.
7          (Recess at 10:04 a.m.)
8          (In open court outside the presence of the jury at
9     10:33 a.m.)
10          MR. BALDRIDGE:  Your Honor, a brief sidebar if we
11     may.
12          THE COURT:  After all we've been through this
13     morning?
14          MR. BALDRIDGE:  After all this.  It will be very
15     brief, I believe.  Thank you, sir.
16          THE COURT:  All right.
17          (Sidebar proceedings held)
18          MR. McFARLAND:  Judge, over the break, I had a
19     chance to chat with my client.  I wanted to make sure I was
20     being completely candid with the Court.  My client said,
21     "Mr. McFarland, my recollection is I sent those Apple
22     receipts to you in 2016."
23          I saw an e-mail which indicated that.  I don't
24     have any recollection of that and I haven't been able to
25     check.  And I told Mr. Baldridge that and I wanted to tell

1    you that.

2         THE COURT:  Okay.  All right.

3         MR. BALDRIDGE:  I wanted to make clear that from

4    the defendants' perspective, we are not seeking or

5    requesting any form of sanctions against counsel or his law

6    firm.

7         THE COURT:  Okay.

8         MR. BALDRIDGE:  Ours is related to the party

9    issues.

10         THE COURT:  I understand.  All right.  Thank you.

11         MR. McFARLAND:  Thank you, Your Honor.

12         (End of discussion at sidebar)

13         THE COURT:  All right.  Now everybody can stand

14    for the jury.

15         (In open court in the presence of the jury at

16    10:35 a.m.)

17         THE COURT:  Good morning, ladies and gentlemen of

18    the jury.  Welcome back to day 3 of our jury trial.  I'm

19    sorry that we kept you waiting so long.  I can assure you

20    we weren't playing backgammon over here.  We were dealing

21    with some important legal matters that the law requires to

22    be done outside your presence.  I need you to remember what

23    I told you that first day, that we need your patience

24    because sometimes it may be appearing to you that things

25    are progressing slowly and maybe, in fact, they are, but we

Cross - Mueller

1       want to get this done right and do justice for both sides.

2               All right.  Mr. Mueller, you may resume the

3       witness stand.  And I remind you, sir, that you remain

4       under oath.

5               Mr. Baldridge, you may resume your

6       cross-examination.

7               MR. BALDRIDGE:  Thank you, sir.

8                       CROSS-EXAMINATION (Continued)

9       BY MR. BALDRIDGE:

10      Q.   Good morning, Mr. Mueller.

11      A.   Good morning.

12      Q.   Mr. Mueller, do you remember in the opening statements

13      that your counsel described what was going on in the photo

14      booth, and he said that none of the people in the room --

15      he said none of them saw it, meaning "it," what Ms. Swift

16      described?

17      A.   I remember his opening.  I don't remember the

18      specifics.  But if -- I'll take your word for that.

19      Q.   But you've reviewed, you said yesterday, the

20      depositions in this case, correct?

21      A.   I have.

22      Q.   Isn't it, in fact, true, that someone did, in fact,

23      see the assault take place?

24      A.   The -- the assault?  Can you specify that?

25      Q.   Isn't it, in fact, true, sir, that someone in that

Cross - Mueller

1    photo booth saw you place your hand on Ms. Swift's rear

2    end?

3    A.    I believe somebody suggested that they did see that.

4    Q.    And you recall having read the deposition of Greg

5    Dent, right?

6    A.    I have read that deposition of Greg Dent.

7    Q.    Former man employed by the NSA, correct?

8    A.    I don't -- I didn't know that, but I'll take your word

9    for it.

10   Q.    And let me know:  Do you recall his testimony under

11   oath under penalty of perjury as follows:

12            Quote, Well, before the photo was taken is when I

13   saw him -- meaning you -- go to put his arm around her and

14   him lift up her skirt.  She reacted, pushed her skirt down,

15   and jumped to the side and went closer to the girl that was

16   with him, closed quotes.

17            Do you remember that testimony?

18   A.    I remember reading that in his deposition, yes.

19   Q.    So whether you agree with it or not, putting that

20   aside, there was someone in the room that said he saw you

21   inappropriately touch Ms. Swift, correct?

22   A.    He -- he stated that he saw me lift her skirt.

23   Q.    Now, do you recall there was also, sir, a photographer

24   in that booth?

25   A.    I do, yes, sir.

Cross - Mueller

1   Q.   And through this case, if -- have you learned that her

2   name is Stephanie Simbeck?

3   A.   Yes, sir.

4   Q.   And have you also, sir, read her deposition?

5   A.   I have.

6   Q.   And do you recall that -- what Ms. Simbeck testified

7   to was Ms. Swift turned to the group and said something to

8   the effect, quote, Dude, that guy grabbed my ass?  Do you

9   recall that?

10  A.   I remember her saying that after the photo session was

11  completed, Taylor approached her and talked to her, yes.

12  Q.   And do you recall Ms. Simbeck's testimony when she

13  said, quote, I knew it.  I have the photograph?

14  A.   I -- I do recall reading that.

15  Q.   And do you recall her testimony that she found -- this

16  is my word, not hers -- something highly unusual going on

17  between you and Ms. Swift in that room?

18  A.   That's your word, not hers?

19  Q.   Highly unusual is just my way of describing it.

20  A.   So could you restate that question?  I'm sorry.

21  Q.   Do you recall Ms. Simbeck saying there was a reaction

22  Ms. Swift had to you that she found to be unusual -- let's

23  just use it -- use it that way.

24  A.   I remember that she stated something about noticing

25  something.  I don't remember how it was described, sir.

Cross - Mueller

1    Q.    And you also, Mr. Mueller, remember, there was an

2    assistant to Ms. Swift in the room, and through this case,

3    learned her name was Gabby Liddicoat?

4    A.    Yes, sir.

5    Q.    And do you recall that Ms. Liddicoat testified that

6    she, quote, Saw Taylor lean to one side and look

7    uncomfortable?

8    A.    Yes, I read that in the deposition.

9    Q.    And then there was a person, the curtain handler, so

10   to speak -- do you know her through this case as being Ms.

11   Erica Worden?

12   A.    Yes, sir.

13   Q.    And do you recall Ms. Erica Worden saying that she

14   had, quote, Popped back in -- that's into the photo

15   booth -- and when she popped back in, Stephanie was taking

16   the photo.  I saw that Taylor had shifted a little, which

17   looked very odd to me because I've done nearly every

18   meet-and-greet since 2009 with her.

19           Do you recall that?

20   A.    I do recall that, sir.

21   Q.    Do you recall Ms. Worden also testifying that in the

22   thousands of meet-and-greet photos she had seen, she had

23   never seen Ms. Swift react to anyone the way she reacted to

24   you in that photo?

25   A.    You're asking if she said that in her deposition?

386

Cross - Mueller

1    Q.   Yes, sir.

2    A.   Yes.  I remember her saying something like that in her

3    deposition.

4    Q.   And you're unaware of any facts, sir, to suggest that

5    any of these people in the room are lying, correct?

6    A.   No, I have no facts.

7    Q.   And you also are aware that Ms. Swift, herself, said,

8    quote, He put his hand under my dress and grabbed my bare

9    ass.  Correct?

10   A.   Yes, sir.

11   Q.   And do you recall that Ms. Melcher also testified

12   about what occurred in that photo booth?

13   A.   I do know that Shannon Melcher testified, yes.

14   Q.   And, again, just in case the names aren't that

15   familiar to the jury, that was your then girlfriend,

16   correct?

17   A.   Yes, sir.

18   Q.   And you recall that Ms. Melcher said, quote, I could

19   not see what was going on behind me?

20   A.   Yes, sir.

21   Q.   And to your credit, I mean, I don't want -- Ms.

22   Melcher believes you, but she -- she can't tell what

23   actually happened, can she?

24   A.   She said she couldn't see what was happening in the

25   back.

Cross - Mueller

1    Q.   So it appears that almost everyone in the room had
2    something to say about what was going on, correct?
3    A.   Yes.   They were asked and they gave their opinion,
4    yes, sir.
5    Q.   And, sir, do you -- did Ms. Melcher tell Ms. Swift
6    that she believed Ms. Swift was a good role model?
7    A.   I -- yeah, I recall her telling her that, yes, sir.
8            THE COURT:   Now when -- so are we talking about
9    what was said in the deposition or at the time?
10   BY MR. BALDRIDGE:
11   Q.   At the time in the room, sir.   Do you recall that,
12   that in the room, that Ms. Melcher informed Ms. Swift, "Ms.
13   Swift, I believe you're a good role model," or words to
14   that effect?
15   A.   I recall it happening in realtime and I recall it --
16   reading it in her deposition, sir.
17   Q.   Thank you.   Now, do you recall, prior to filing your
18   lawsuit, that you authorized your counsel to send draft
19   complaints of this lawsuit to Ms. Swift and, in fact,
20   directly to me?
21   A.   I have to say that I didn't even know what a draft
22   lawsuit was.   I'd never sued anybody.   I -- I -- what I can
23   say is I just wanted to straighten it -- these matters out.
24   I wanted to clear my name.
25   Q.   But you do recall from your deposition, sir, that

1   there was a draft of a complaint sent to me around July 16,

2   2014?

3   A.   I know there were a lot of drafts and I wasn't -- I

4   wasn't 100 percent sure what they were.  I knew there were

5   documents being sent and being produced.  Some were

6   produced and never sent, some were produced and they were

7   sent.  I saw a lot of documents.

8   Q.   Do you recall drafts being sent to me between the time

9   of the June 2d, 2013, meet-and-greet and the time you

10  eventually filed an official lawsuit?

11  A.   I believe they were sent to you, yes, sir.  I know

12  they were being sent to the -- the people representing Ms.

13  Swift and I'm guessing they went to you.  I remember your

14  name.

15  Q.   And do you recall that those drafts sent to me in that

16  period between the incident of June 2d, 2013, and the

17  official lawsuit filing, did not make any reference

18  whatsoever to Mr. Haskell supposedly bragging about

19  touching Ms. Swift's bottom?

20          MR. McFARLAND:  Judge, can we sidebar?

21          THE COURT:  You need a sidebar?

22          MR. McFARLAND:  I think so.

23          THE COURT:  All right.

24      (Discussion at sidebar)

25          MR. McFARLAND:  Judge, I think we're getting into

1       an area that is really protected by Rule 408, complaints,

2       draft complaints, those types of things, that were sent to

3       Mr. Baldridge.  Those were done in conjunction with

4       settlement and offers of compromise.

5                THE COURT:  They were or were not?

6                MR. McFARLAND:  They were.  In addition to that,

7       I'm the one who drafted those.  I'm the only one who knows

8       who -- why they were sent that way and they reflect my

9       knowledge and understanding of the case and what I thought

10      was in the best interests of the client at the time.  Thus

11      the only way to explain why certain complaints did or did

12      not include portions of the ultimate story, I'm the only

13      witness to it.

14               MR. BALDRIDGE:  I first of all don't intend to ask

15      him anything about what falls within the scope of Rule 408.

16      Rule 408 protects communications, not paper.

17               Secondly, the point here is this:  Is that Mr.

18      Mueller in his deposition testified that he authorized

19      and -- reviewed and authorized the sending of these

20      documents.  The sole purpose I intend to use it for is that

21      it makes no reference whatsoever to this alleged story

22      about Mr. Haskell confessing.  That is obviously directly

23      relevant, and saying this was made up after the fact, you

24      know, and that's a big part of this case.

25               MR. McFARLAND:  And if we're just going to those

Cross - Mueller

1    complaints didn't include Mr. Haskell's story, that's fine,

2    but I'm just concerned about getting into --

3              MR. BALDRIDGE:  I don't ask --

4              MR. McFARLAND:  -- questions about what was done

5    and why it was done and, you know, who did it, because I'm

6    the one who drafted the complaints, I'm the one --

7              MR. BALDRIDGE:  It's very tight, truthfully.

8              THE COURT:  Okay.  I think Mr. McFarland has a

9    point in terms of if -- I think it will be inappropriate,

10   and you probably won't gain much benefit from it, is to go

11   into why was certain things kept out and why --

12             MR. BALDRIDGE:  Understood.

13             THE COURT:  He can confirm that he reviewed it,

14   that he authorized it and that it didn't contain X, Y and

15   Z, and the jury can draw whatever inferences, and you can

16   argue any inferences that they can draw from that, the

17   absence of the allegations.

18             MR. BALDRIDGE:  Yes, sir.  And while we're here --

19   I understand fully.

20             While we're here, I want to put in the draft

21   complaint, not the -- any kind of cover letter that

22   references anything potentially with 408; is that okay as

23   well?

24             MR. McFARLAND:  I think.  If I know what you're

25   referring to.  I think it was sent along with an e-mail

Cross - Mueller

1    from me that said, "Hey, you know, we -- here's a complaint

2    we would like to avoid filing.  Let's talk about, if you're

3    interested in talking about settlement" --

4                THE COURT:  Clearly anything like that --

5                MR. BALDRIDGE:  That's what I mean, I intend to

6    take that e-mail away.

7                MR. McFARLAND:  As I read -- you know, 408, it

8    applies to, you know, statements as well as the documents

9    that are produced in direct context with settlement.  This

10   was a draft complaint; it wasn't a final product.  And

11   we -- I said, "Look, we would like to avoid litigation if

12   we can.  Take a look at the draft complaint."

13               Again, if there needs to be an explanation more

14   than, you know, it's in there or it's not, I'm the one

15   who's got to stand up, I'm the only one to stand up and say

16   this was a draft complaint that I sent for purposes of

17   settlement.

18               It was before the factual -- the facts had been

19   developed, it's consistent --

20               THE COURT:  Okay.  So these draft complaints were

21   appended to a letter -- a cover letter or cover e-mail that

22   referenced settlement?

23               MR. McFARLAND:  Yes.

24               THE COURT:  All right, I wouldn't allow that.

25               MR. BALDRIDGE:  So I'll ask the narrow question.

Cross - Mueller

1          MR. McFARLAND:  Thank you, Your Honor.

2          MR. BALDRIDGE:  Thank you, sir.

3       (End of discussion at sidebar)

4          THE COURT:  All right.  You may resume, Mr.

5    Baldridge.

6    BY MR. BALDRIDGE:

7    Q.   Mr. Mueller, back where we were.  Do you recall that

8    those prior draft complaints sent to my clients or directly

9    to me, whichever the case may be, did not include any

10   allegation about Mr. Haskell bragging about touching Taylor

11   Swift's rear end the night of June 2d, 2013?

12   A.   I remember that some of the drafts I saw included the

13   piece about me bumping into Mr. Haskell outside the Pepsi

14   Center and some of them did not.  Yes.

15   Q.   So you do recall that, what was sent to me --

16   A.   Well --

17   Q.   -- did not include that allegation?

18   A.   I'll take your word for it, sir.  I -- I can't

19   remember which versions I saw were sent to you.

20   Q.   Okay.  Sir --

21   A.   I --

22   Q.   Let me help you, then.  If you could open your

23   deposition, please, to page 74.

24   A.   Is that the black book or the white book?  This book?

25          COURTROOM DEPUTY:  74?

Cross - Mueller

1           MR. BALDRIDGE:  Yes, please.

2           THE WITNESS:  Okay, I'm there.

3      BY MR. BALDRIDGE:

4      Q.   Yes, sir.  At page 74 of your under-oath deposition,

5      lines 5 to line 13, please let me know if I read this

6      correctly.

7           And did you authorize counsel to prepare this

8      document?

9           Answer:  I did.

10          Question:  Can you read the document, sir, and

11     tell me if anywhere in this document, dated July 16th,

12     2014, there is any reference whatsoever to Mr. Haskell

13     telling you the night of June 2d, 2013, that he touched Ms.

14     Swift's buttocks.

15          Answer by you:  I don't see it.

16          Did I read that correctly?

17     A.   Yes, sir.

18     Q.   And that refreshes your recollection, sir, that it was

19     not included in the prior drafts sent to me?

20     A.   Oh, I'm sorry, I -- I thought I told you earlier, I --

21     I have no doubt that you received various drafts, some of

22     which explained the Eddie Haskell encounter outside the

23     Pepsi Center, and some of them which did not include it.

24     Q.   Now, sir, you cannot point to a single draft in the

25     time frame we just reached, up to the time frame July of --

Cross - Mueller

1    let me get this right -- '14, where a draft had ever been

2    sent to my clients or me that explained what you claim

3    Eddie Haskell said, correct?

4    A.    I -- I think I need to maybe restate what I said

5    earlier.

6    Q.    Please do, sir.

7    A.    I saw so many drafts of -- you know, I don't know how

8    else to describe the paperwork, but you're calling them

9    drafts of a lawsuit.  So I saw many drafts, some of which

10   contained the story about Eddie on the concourse outside

11   the Pepsi Center, some of them did not include that story,

12   that encounter.  I don't know which ones you got and which

13   ones you didn't get.

14   Q.    Thank you.  So you don't know whether I received

15   drafts that included the Eddie Haskell story.  You don't

16   know either way.

17   A.    Well, I know there were a lot of drafts and I know --

18   I was assuming you got some of them, but some of them you

19   didn't get.

20   Q.    And you're assuming, right?

21   A.    I am -- well, I am assuming.

22   Q.    Now, I'm --

23   A.    I don't know for sure.

24   Q.    I'm going to ask you, sir, if you find the draft

25   complaint prior to July 16th, 2014, sent to me that

Cross - Mueller

1    references your story about Mr. Haskell claiming he touched

2    Ms. Swift's buttocks, you're going to bring it in court and

3    let this jury see it, right?  Right, sir?

4    A.    If I find one?

5    Q.    Yes, sir.

6    A.    Would I be willing to bring it in?

7    Q.    Are you willing to?  I'm telling you one doesn't

8    exist, sir.  Are you going to bring it in and show it to

9    this jury?

10   A.    If you say it doesn't exist, then I -- I will accept

11   that.

12   Q.    Thank you, sir.  And just to be clear, just July 16th,

13   2014, is over a year after the June 2013 incident of Ms.

14   Swift, correct?

15   A.    It is, sir, yes.

16   Q.    Now, in this lawsuit, have you seen the photograph

17   taken that night of Mr. Haskell and Ms. Swift?

18   A.    I -- I'm not sure I have.

19   Q.    Let me ask you this.

20   A.    If I saw it, I could tell you if I've seen it

21   before.

22         MR. BALDRIDGE:  By stipulation of counsel, Your

23   Honor, defendants would like to move into evidence

24   Plaintiff's Exhibit K -- I'm sorry, Defendants' Exhibit K,

25   forgive me.

Cross - Mueller

1          THE COURT:  All right.  Given the stipulation,

2    Exhibit K is admitted into evidence and may be published to

3    the jury.

4          (Defendants' Exhibit K received)

5    BY MR. BALDRIDGE:

6    Q.   Sparkles, can you display that to the jury, please?

7          Have you seen this photo before?

8    A.   I don't think I have.

9    Q.   Can you identify for the jury that that is at least

10   Mr. Haskell?

11   A.   I can identify both of the people in the photo.

12   Q.   You know, just for the record, please do --

13   A.   Right.  That's Eddie Haskell, yes, sir.

14   Q.   And, of course, that's Ms. Swift --

15   A.   Yes, that's Ms. Swift.

16   Q.   And do you see Mr. Haskell's fist above Ms. Swift's

17   rear end behind her?

18   A.   I see -- I do see his fist, yes, sir.

19   Q.   Thank you, sir.

20          Now, you said yesterday in your testimony that you

21   put your fist behind Ms. Swift and that your palm was down,

22   correct?

23   A.   Yes, sir.

24   Q.   And in the process you believe you touched her -- her

25   ribs, correct?

Cross - Mueller

1    A.    Yes, sir.

2    Q.    Are you telling the jury that you felt and knew it was

3    her ribs when your knuckles hit them?

4    A.    Yes, sir.

5    Q.    So your knuckles felt that and knew it was ribs.

6    A.    Yes, sir.

7    Q.    This part right here is what I'm talking about,

8    actually touched her ribs and you knew from that it was

9    ribs?

10   A.    Yes, I did.

11   Q.    And if I could put up the photo that's already in

12   evidence of the meet-and-greet, please.

13           And is it possible to zoom in on this for the

14   jury?

15           Do you see your hand, sir, approximately, let's

16   just say, a foot below her ribs, directly behind her rear

17   end there?

18   A.    It is below her ribs in the photograph, yes, sir.

19   Q.    And, sir, how is it that in this little part here, we

20   see the front of your wrist if your hand was facing

21   straight down?

22   A.    I -- I don't know that we can tell that's the front of

23   my wrist, sir.

24   Q.    So you deny that from your collar, the way it's turned

25   up -- if I roll up my collar, along with the skin --

Cross - Mueller

1    A.    Right.

2    Q.    -- that's right there --

3    A.    Yes.

4    Q.    -- you're telling the jury that you can't tell that

5    your palm is not facing straight down?

6    A.    I know my palm was facing down.  I do know that,

7    sir.

8    Q.    Now, my question again:  You can't tell from the

9    position of your collar rolled up -- or the sleeve rolled

10   up and the combination of that skin right there, that your

11   hand is, in fact -- the palm of your hand is facing Ms.

12   Swift's rear end?

13   A.    I don't believe that you can figure it out based on

14   that, sir.

15   Q.    Again, I want to understand -- let's go through this,

16   then.  Put the photo up.

17         You were -- you said -- and these are my words,

18   not yours -- something to the effect it was rushed and you

19   kind of jumped into the photo.

20   A.    Yes, that's exactly what happened.

21   Q.    So while you were rushing, you jumped into the photo

22   with your fist, right?

23   A.    I -- it was more like a slide, not a jump.  I mean --

24   Q.    You slid in.

25   A.    Yes, sir.

Cross - Mueller

1    Q.    And you hit her ribs with your fist, right?

2    A.    I wouldn't say I hit --

3    Q.    Touched her ribs --

4    A.    Yes, sir.

5    Q.    So in a touching, you knew with those knuckles you

6    have that that -- those are ribs, right?

7    A.    I could -- it felt just like a rib, yes, sir.

8    Q.    And then your hand slid down --

9    A.    Well, no, that -- that's the time when Ms. Swift --

10   her hand then interacted with my hand.

11   Q.    So you're interacting after the strike of the ribs,

12   right?

13   A.    Well, that's when her hand was on my hand, yes, sir.

14   Q.    Okay.  So we get this interaction.  Then your hand

15   somehow gets down 12 inches or so, we don't know exactly,

16   behind -- directly behind her rear end, right?  That

17   happened, we see that in the photo, don't we?

18   A.    I don't think that happened immediately.  But I --

19   what I describe --

20   Q.    Sir -- let me ask you:  So if it didn't happen

21   immediately, it wasn't really like a slide-in-quick thing,

22   there was time for all this to go on, hit the ribs, jostle,

23   then get the hand down there, so it actually took longer,

24   you said?

25   A.    No.  What I said was that our hands were in contact

1    and at some point, then, our hands crossed and our arms

2    crossed.  Her -- my arm went inside her arm, and her arm

3    went behind my arm.

4    Q.    In fact, what you said were your arms were jostling,

5    right?

6    A.    Hands -- yeah, hands and arms.

7    Q.    So I just want to make sure we understand what

8    happened.

9    A.    Okay.

10   Q.    In this quick-slide-in at the last minute, the fist

11   closed, hit the ribs, jostled for a while, hand ended up

12   behind the rear end; is that fair?

13   A.    That's very close to what I described, yes, sir.

14   Q.    And then we're not sure whether you think that shows

15   that your palm was not down in this photo, correct?

16   A.    I -- I know that my palm was down.  I -- I don't think

17   this shows it, but if you do, then I respect your opinion,

18   sir.

19   Q.    It certainly, in investigating this incident to

20   terminate you, Robert Call from KYGO could have concluded

21   that your palm was towards Ms. Swift's rear end, couldn't

22   he?

23   A.    He could have, yes, sir.

24   Q.    Now, and then when you're doing this -- and I keep

25   backing up because I'm a hyperactive guy --

Cross - Mueller

1    A.    Yeah.

2    Q.    -- you can bump in the ribs, your arm's going down,

3    you got all this jostling going on, you struck that smile,

4    right?

5    A.    I was smiling when I initiated my movement toward the

6    two ladies.

7    Q.    So there was -- it was a surprise, you slide in, but

8    it wasn't such a surprise you didn't have time to smile,

9    right?

10   A.    Well, when I knew a photograph was going to take

11   place, I just started moving toward where the photographer

12   was aiming the camera and I was smiling.

13   Q.    And then you also took your -- let's see, you're

14   sliding, bump, bump, bump, whatever, and you get your left

15   hand in the pocket, right?  Sort of -- did you do that,

16   too?

17   A.    I believe my hand was like that when I was standing

18   several feet away.

19   Q.    Okay.  So all this happened in that very quick moment,

20   right?

21   A.    It didn't take a long time, no, sir.  Our hands

22   weren't jostling for a long time, no.

23   Q.    And you agree, don't you, sir, that you don't know

24   where your hand went, do you?

25   A.    I -- I do not know because I was looking forward

Cross - Mueller

1    toward the photographer the entire time.  And I -- I -- I
2    know I touched her rib cage, or rib, I know that my hand
3    was touching her skirt and her hand and her arm and it went
4    behind her and her -- her hand and arm went behind my
5    arm.
6    Q.   And is it true, sir, that you don't know where your
7    hand went?
8    A.   I know it went behind her.
9    Q.   Now, can I get you to look at your deposition, page
10   36, please, sir.
11   A.   Yes.
12   Q.   Let me know when you're ready, sir.
13   A.   I'm here.
14   Q.   And when you see on line 19, your answer to my
15   question about this jostling, and you say:  Quote, And at
16   that point, I don't know where my hand went.  That's why I
17   would say it would have been an accident, closed quote.
18          Did you say that?
19   A.   I did, sir.
20   Q.   Now, sir, can we agree that if you accidentally
21   touched Ms. Swift's rear, that she had a right to not like
22   that?
23   A.   If anyone touched her rear, she would have a right to
24   not like that.
25   Q.   And accident or not, if she believed you touched her

Cross - Mueller

1    rear, of course your employer had a right to know, right?

2    A.   Yes, sir.

3          THE COURT:  Mr. Baldridge, I've been informed that

4    when you stray as far as you have been straying from the

5    microphone, the folks in the overflow room cannot hear your

6    dulcet tones, so --

7          MR. BALDRIDGE:  My --

8          THE COURT:  If you could stay closer to the mike,

9    I think those folks -- those good folks in that room would

10   appreciate it.

11         MR. BALDRIDGE:  And I'll try to have less coffee

12   tomorrow.  I apologize.

13         THE COURT:  All right.

14   BY MR. BALDRIDGE:

15   Q.   Okay, sir, you left the room, as Mr. McFarland

16   established with you yesterday -- and the room being the

17   photo booth, right?

18   A.   We did leave, yes.

19   Q.   And you described the events that occurred, but

20   eventually this security guard, Craig, that called you

21   mate --

22   A.   Yes, sir.

23   Q.   -- went up to you.  And they escorted you from the

24   building in a manner you've described yesterday.

25   A.   Yes, somebody from security did.

Cross - Mueller

1    Q.   And did you ever tell Craig or anything -- anything

2    about Mr. Haskell's revelation, or was this before that?

3    This was before that, wasn't it?

4    A.   I actually encountered Craig after I met with Eddie

5    Haskell out in the concourse.

6    Q.   Okay, good.  So let's ask that, then.

7         Did you ever say, "Craig, I -- I think I know what

8    you're talking about.  It could have been somebody else

9    because I heard something"?

10   A.   I -- I didn't tell him that, no, sir.  I asked for

11   Eddie to be present.

12   Q.   And when you -- you said when you went back into the

13   arena, Ms. Melcher had a drink waiting for you, correct?

14   A.   Yes, sir.

15   Q.   And it was an alcoholic drink, correct?

16   A.   I believe so.  I don't know what she ordered me,

17   but --

18   Q.   In fact -- go ahead, sir, I'm sorry.

19   A.   I believe it was.

20   Q.   In fact, in your deposition, you testified it was an

21   alcoholic drink, right?

22   A.   Yeah.

23   Q.   And you testified to -- to Mr. McFarland's questions

24   the other day that you'd had that one drink, I think, is

25   what you said, right?

Cross - Mueller

1      A.    I took one sip, yes.

2      Q.    And are you aware, sir, that some of the people in the

3      room where that photo was taken perceived you to have had

4      excessive alcohol that day?

5      A.    I remember somebody saying in their -- in their

6      deposition that they remembered me and they thought I was

7      inebriated, something to that effect, yes.

8      Q.    And do you recall the former NSA security guard, Greg

9      Dent, saying he thought you were drunk?

10     A.    I believe it was Greg Dent, yes, sir.

11     Q.    And he was fairly close to where the alleged incident

12     occurred, right?

13     A.    He was close -- he was close enough to believe that he

14     thought I had a drink in my hand when I walked into the

15     photo booth.

16     Q.    And do you have any idea as to what Ms. Swift's

17     perception was of your sobriety when you'd entered that

18     room?

19     A.    I do not, sir.

20     Q.    And you had been off of work all day that Sunday,

21     correct?

22     A.    Yes.  I spent most of the day at Shannon's house.

23     Q.    Now, in this photograph that we looked at, I think

24     you've already admitted it looks awkward, doesn't it, at

25     best?

Cross - Mueller

1    A.    It -- oh, I described it myself as being awkward,

2    yes.

3    Q.    I think you said weird and awkward, right?

4    A.    It was -- yeah.  I -- awkward is the best way to

5    describe the photograph.

6    Q.    So you would agree, sir, that in making his decisions

7    about what to do, Mr. Call, himself, too, could have viewed

8    the photo as weird and awkward, correct?

9    A.    Yeah.  Oh, yes, I believe that, sir.

10    Q.    And is it fair to say, sir, that you could have put

11    your hand behind Ms. Swift's shoulder, right?

12    A.    I -- I could have?  Are you --

13    Q.    Yes, sir.

14            Could we put up the photo, Sparkles?

15            Now, see -- you could have put your hand up around

16    the shoulder in the photo, right?

17    A.    Well, as I said earlier, I was sliding into the photo

18    and my hand was at rib cage level, and then it apparently

19    went down, so it was -- it was here and it went down, sir.

20    Q.    Can you slide with your hand up here, though?

21    A.    I guess I could have.  But I wasn't looking at her.  I

22    was looking at the photographer.  And it would have been a

23    little odd if I would have gone in with my fist like that.

24    Q.    So --

25    A.    I didn't want -- I didn't want to hurt Ms. Swift.

1    Q.   We would be agreed -- we would agree it's kind of odd

2    to slide last minute with a fist anywhere, right?

3    A.   That would be very unusual, yes, sir.

4    Q.   Yes, sir.  Now, why did you testify in your deposition

5    that it would not be possible for you to put your arms

6    behind her shoulder?

7    A.   Because I -- I -- I knew that I hit her rib cage, so

8    unless it -- my hand went after it hit her rib cage, it

9    wouldn't -- it wouldn't -- I thought it would go straight

10   across, but it ended up going down.

11   Q.   Well, let me ask you, sir:  You were 51 years old at

12   the time, right?

13   A.   Yes.

14   Q.   And she was 23, right?

15   A.   I -- I'll take your word for that, yes.

16   Q.   Would it have occurred to you to be a little more

17   careful with a younger woman, to maybe put your hand a

18   little higher than her rear end, no matter how fast the

19   events were --

20   A.   My hand didn't start out at rear-end level.  It

21   started out higher.

22   Q.   It started here and then it went down --

23   A.   It did -- no, it started at my waist.  I had my hand

24   at my waist where my other hand is, it was at my side, so

25   it would have been a little below my waist, and I reached

Cross - Mueller

1    out straight across, not up, and I slid across and it came

2    into contact with her ribs.

3    Q.    And you remember all this --

4    A.    I've described -- I've described it multiple times.

5    Q.    And just so the jury understands, would it have been

6    possible, possible, for you to have put your arm behind her

7    somewhere other than directly behind her rear end?

8    A.    If I had more time to -- if I would have been able to

9    walk over and get into the photo, that certainly would have

10   been possible, sir.

11   Q.    In fact, you've seen other photos in this case where

12   the man don't have their hand anywhere near their rear end,

13   do they?

14   A.    I've seen all the photos that were provided by you

15   that occurred after I was in the photo tent.  I haven't

16   seen any of the photos from before my being in the photo

17   tent.

18           MR. BALDRIDGE:  At this time, Your Honor, by

19   stipulation, I'd like to move into evidence Defendants'

20   Exhibit J.

21           THE COURT:  All right.  Given the stipulation,

22   Exhibit J is admitted into evidence and may be published to

23   the jury.

24       (Defendants' Exhibit J received)

25   BY MR. BALDRIDGE:

409
Cross - Mueller

1   Q.   Okay, sir, I'll represent to you from the discovery in

2   this case, this is a lineup of photos that occurred that

3   night in the meet-and-greet line with you.  Is that

4   acceptable to you?

5   A.   That looks like the same backdrop, sir, yes.

6   Q.   Okay.  Without going through questions for each of

7   them, could I ask you to, Mr. Sparks, to go through them,

8   just display them to the jury so they can see.

9        There's no separation between Ms. Swift and

10  virtually any fan.

11       THE COURT:  This is all one exhibit?

12       MR. BALDRIDGE:  Yes, sir.  And then I want you to

13  stop on page 15, Sparkles.  Right there.

14  BY MR. BALDRIDGE:

15  Q.   Now that's a gentleman, he might be younger than you

16  or me, but he's a man on the right, correct?

17  A.   That is a man on the right, yes, sir.

18  Q.   You see the flesh of his arm far above Ms. Swift's

19  rear end?

20  A.   I see his arm -- well, actually, do I -- it looks like

21  his arm is going in right where her arm's coming behind

22  him, yes.

23  Q.   Yes, so he's clearly above her rear end, right?

24  A.   His arm?  Yeah, his arm is, yes, sir.

25  Q.   Doesn't that seem like probably a more appropriate way

Cross - Mueller

1    to put your arm around a 23-year-old woman?

2    A.    Oh, absolutely.  That would -- that would be more

3    appropriate.

4    Q.    So let's keep going.

5           Just so the jury can see the rest of the photos,

6    Sparkles.

7           Okay.  In those photos, sir, did you see any

8    person photographed with Ms. Swift that was doing -- that

9    looked in the position that you're in with her?

10   A.    No.  None of those photos you just showed me are like

11   the photo that I took with Ms. Swift and Shannon.

12   Q.    Now, the jury -- we've heard your explanation, you

13   know, as to why it occurred that way, but can you agree

14   with me, sir, that it's possible a person could see your

15   photo with Ms. Swift and conclude she was trying to get

16   away from you?

17   A.    I can see how somebody would conclude that, yes,

18   sir.

19   Q.    And, in fact, Mr. Call, when he made his independent

20   decision to terminate you, could have reached that

21   conclusion, right?

22   A.    I -- I guess Mr. Call could have reached that

23   conclusion, yes, sir.

24   Q.    And if he reached that conclusion, that had nothing to

25   do with any of the defendants in this case, correct?

411

Cross - Mueller

1   A.   No, it wouldn't have had anything to do with any of

2   the defendants, no, sir.

3   Q.   Now, in your examination from Mr. McFarland, you

4   testified that -- about calling the police.  Do you recall

5   that, when you were first confronted?  You don't --

6   A.   Are you talking about Craig Thomas, sir?

7   Q.   Yeah.  Let me try to paraphrase.  He said something

8   like, "I might call the police," and you said, "Good, you

9   know, call the police," right?

10  A.   He -- I believe --

11  Q.   Something to that effect?

12  A.   I believe he said, "I could get the police involved."

13  Q.   And you welcomed him to do that?

14  A.   Yes, I did.  I did.  Multiple times, sir.

15  Q.   And you had your cell phone at the time, as you

16  testified, right?

17  A.   Yes, sir.

18  Q.   Cell phone is now missing, right?

19  A.   The cell phone I had that night?

20  Q.   Yeah.

21  A.   I -- I don't have that phone any longer, sir.

22  Q.   You could call the police, right?

23  A.   I -- yeah, I -- anybody can call the police.

24  Q.   That's right.  You didn't do it, did you?

25  A.   Well, I wasn't -- I never had been accused of

Cross - Mueller

1    anything.  I didn't think to call the police on myself or

2    I -- I didn't -- I just wanted him to get the police there

3    so we could get the thing straightened out.

4    Q.   So you thought of him calling the police, but you

5    didn't think of you calling the police?

6    A.   He was accusing me of something, sir.

7    Q.   Simple question --

8    A.   Yes, yes.

9    Q.   -- you -- but you didn't call the police and you had a

10   phone in your possession --

11              THE COURT:  Gentlemen, we've been through this

12   before.  One voice at a time, the court reporter can't do

13   both.

14              MR. BALDRIDGE:  Yes, sir.

15              THE COURT:  Okay.  Mr. Mueller, wait for the

16   question to be completed.  Mr. Baldridge, please wait for

17   the witness to complete his answer.

18              THE WITNESS:  Sorry.

19   BY MR. BALDRIDGE:

20   Q.   Yes, sir.  Let's just be clear.  You could have called

21   the police, right?

22   A.   I could have called the police that night, yes, sir.

23   Q.   And at any time between the incident of June 2d, 2013,

24   and 2014 -- I mean and June 4th, 2013, when you were

25   terminated, you never once said to Eddie Haskell, words to

413

Cross - Mueller

```
 1    the effect, "Hey, Eddie, you claimed that you grabbed Ms.

 2    Swift's rear end," did you?  You never said that to him?

 3    A.   From the night of the concert until --

 4    Q.   You were terminated.

 5    A.   I didn't -- I didn't say it in words, but I gestured

 6    to him when we were in Bob Call's office.

 7    Q.   And the gesture is this hugging motion --

 8    A.   Yes, sir.

 9    Q.   -- you said on the stand?

10    A.   Yes, sir.

11    Q.   You never even pulled him aside and said, "God, Eddie,

12    I'm in trouble here.  You said -- you said you touched her

13    bottom."  You never did that, did you?

14    A.   I didn't get a chance to pull him aside.

15    Q.   You spoke to him on the phone, didn't you?

16    A.   There was -- he called -- let's see.

17    Q.   Your testimony in your deposition is you spoke to him

18    on the phone, isn't it, sir?

19    A.   On the night of the -- of the --

20    Q.   In the period between June 2d, 2013, and the incident,

21    and the date you were terminated, you spoke to Mr. Haskell

22    on the phone, didn't you?

23    A.   I believe I -- yes, I talked to him on the phone the

24    night of the concert and the morning of the 4th, maybe on

25    the 3d.
```

Cross - Mueller

1    Q.    So none of those three calls with you and Mr. Haskell

2    did you say anything to the effect, "I am in trouble here.

3    You said you put your hands on her rear end."  You never

4    said anything of that fact, did you?

5    A.    I never said anything like it to Mr. Haskell, no.

6    Q.    Now, you described this concert you attended as being

7    a work event, generally, right?

8    A.    Yeah.  Oh, absolutely, yeah.

9    Q.    And you -- you had no dispute that this was Ms.

10   Swift's work as well, right?

11   A.    Yes.

12   Q.    Okay --

13   A.    It --

14   Q.    You were at a workplace, so to speak?

15   A.    That was her workplace, yes, sir.

16   Q.    And you, of course -- we all have heard of sexual

17   harassment and things of that nature, taking place in the

18   workplace in other instances, right?

19   A.    I'm familiar with that, yes, sir.

20   Q.    When a woman or person, any person, is sexually

21   harassed in the workplace, they tell their boss, right?

22   A.    Hopefully they would, yes, sir.

23   Q.    When a workplace instance of sexual harassment occurs,

24   are you familiar with any instance where the victim, so to

25   speak, called the police?

Cross - Mueller

1    A.    I -- I'm not aware of any.  I can't think of any right

2    now.  I'm sure it's happened.

3    Q.    You don't know, do you?

4    A.    I -- I can't state a case that involved the woman

5    calling the police right away.

6    Q.    And we certainly agree that the common practice is

7    tell the boss, right?

8    A.    I -- well, I would say that in this day and age,

9    people would be directed to the HR department.

10   Q.    Okay.  So somebody within the company, at least, not

11   the police, right?

12   A.    Well, I -- I mean, I think people have a right to call

13   the police when they want.

14   Q.    Sir, that's not my question.

15         The common practice, when incidents of workplace

16   discrimination or harassment occurs, is to go to HR, right?

17   A.    I think that's the -- that's what most companies

18   encourage, yes, sir.

19   Q.    Now, the police -- I think we all know this -- serve

20   the public, right?

21   A.    Yes, sir.

22   Q.    And what goes to the police is public, right?

23   A.    What goes to the police is public?  Is that what

24   you're saying?

25   Q.    Yeah, potentially public, right?

Cross - Mueller

1    A.    Yes, sir.

2    Q.    Wouldn't you agree that if anyone within the

3    defendants' group here --

4    A.    Yes.

5    Q.    -- had reported the June 2d, 2013, incident to the

6    police, that they ran a risk of it becoming public?

7    A.    A risk?

8    Q.    Yes, sir.

9    A.    I would think that there would be -- it could possibly

10   go public, yes.

11   Q.    And you can identify with why the people within the

12   Swift organization would not want what they claimed

13   occurred on June 2d, 2013, to become public, right?

14   A.    I could understand why they wouldn't?  Yes, I

15   wouldn't -- yes, I can understand.

16   Q.    And by not calling the police, the Swift defendants

17   also made that event not become public as to you, right?

18   A.    You're saying that I was included in not being public?

19   Q.    Well, if the event's not public, nobody knows the

20   allegation's made against you, correct?

21   A.    Yes, sir.

22   Q.    And you can agree that if that event became public,

23   there's probably a pretty good chance that members of the

24   media would have reported it, right?

25   A.    If it went public, it would probably go public through

417
Cross - Mueller

1    the media, yes, I agree with you.

2    Q.   So calling the police ran the risk of the event

3    becoming public both to your detriment and Ms. Swift's

4    detriment, right?

5    A.   Yes.

6    Q.   Now, the KYGO investigation that we talked about where

7    Mr. Call handled, I want to focus on that.  You're aware

8    that Mr. Call sort of led it, right?  Led the effort?

9    A.   I've learned that Mr. Call was in charge of the

10   investigation, yes, sir.

11   Q.   And he's, again, the individual that you had said in

12   your deposition you had no knowledge of him ever being

13   untruthful to you, correct?

14   A.   At that point, yes, sir, during the deposition.

15   Yes.

16   Q.   And Mr. Haskell, at least was heard on the issue --

17   I'll say he was involved in the investigation, but he was

18   involved at some level, right?

19   A.   Yes.  He was definitely involved on some level.

20   Q.   And KYGO HR director, Maureen Marsh, was involved,

21   right?

22   A.   I -- yeah, I assume that she was, yes, sir.

23   Q.   And Ms. Melcher was, in fact, interviewed by Maureen

24   Marsh, I think you said, correct?

25   A.   Yes, sir.

Cross - Mueller

1    Q.   So Mr. Call, the head of the investigation, had spoken

2    to every single KYGO employee that was in the photo booth

3    with you when that event happened, right?

4    A.   Did you say Mr. Call had?

5    Q.   Mr. Call or Ms. Marsh, forgive me.

6    A.   Okay.

7    Q.   Yes, sir.

8    A.   Yes.  Yes, right.

9    Q.   And to be exact, Mr. Call had spoken to you, Mr.

10   Haskell; and Ms. Marsh, who reported to Mr. Call, had

11   spoken to Ms. Melcher, right?

12   A.   Yes.

13   Q.   So Mr. Call in his investigation did not leave out

14   anyone that was employed by KYGO?

15   A.   He didn't leave out anybody who was employed by

16   KYGO.

17   Q.   And can you tell the jury who John Dimick is.

18   A.   John Dimick was the senior vice president of

19   programming for Lincoln Financial Media.  I'm not sure what

20   his title is now.

21   Q.   Are you aware that Mr. Dimick was spoken to as part of

22   the investigation of the June 2d incident?

23   A.   I remember being informed that John was brought into

24   the loop, yes, sir.

25   Q.   He came to be -- make it in regular terms, John Dimick

Cross - Mueller

1    is the boss of Mr. Call, basically, right?

2    A.   Actually, I didn't know that, but I'll take your word

3    for it.

4    Q.   And can you tell the jury who Don Benson is.

5    A.   I believe he was the president of Lincoln Financial

6    Media at the time.

7    Q.   And are you aware that Mr. Benson was brought into

8    this investigation?

9    A.   I was told that both of them were, yes.

10   Q.   And who is Curcia Beckwith?

11   A.   I'm not familiar with that name, sir.

12   Q.   Do you remember Ms. Beckwith, perhaps, as the vice

13   president of all human resources at Lincoln Financial?

14   A.   I don't recall that, sir.

15   Q.   Do you have any knowledge as to whether she was

16   involved in this investigation?

17   A.   I -- she might have been.  I can't remember that

18   name.

19   Q.   And who was Phil Banono?

20   A.   Phil Banono.  That name sounds familiar, but I -- I'm

21   guessing -- that -- I'm going to guess that's an

22   attorney.

23   Q.   Yes, sir.  Do you recall he was an attorney

24   representing Lincoln Financial?

25   A.   That sounds familiar, yes, sir.

Cross - Mueller

1    Q.    And you're aware that Mr. Call involved him in the

2    investigation as well, correct?

3    A.    I don't think -- I don't know if I was aware of that

4    or not.

5    Q.    Did you learn that at all through this case?

6    A.    I think -- I think along the way, I did learn that,

7    yeah.

8    Q.    Now, who else, sir, at KYGO -- at KYGO -- do you think

9    Mr. Call should have spoken to to investigate the incident

10   of June 2d, 2013?

11   A.    It would have been nice if he would have interviewed

12   Shannon, himself, and it would have been nice if he would

13   have interviewed Ryan Kliesch.

14   Q.    Now, let's be clear -- is that it, sir?  I want to --

15   those two?

16   A.    Yeah.  For starters, yes, sir.

17   Q.    But just to be clear, Ms. Melcher was interviewed by

18   the HR director who reported to Mr. Call, right?

19   A.    Uhm-hum.

20            THE COURT:  You have to say --

21            THE WITNESS:  Yes, sir.  Sorry.

22   BY MR. BALDRIDGE:

23   Q.    And you don't have any reason to believe that Ms.

24   Maureen Marsh didn't do her job in that interview, do you?

25   A.    I would have preferred it if Bob talked to Shannon

                            Cross - Mueller

 1    directly.

 2    Q.   Sir, I prefer a lot of things, but do you have any

 3    reason to believe that Maureen Marsh did not do her job

 4    when interviewing Ms. Melcher?

 5    A.   I'm not going to go that far, sir.

 6    Q.   And you agree that in a big organization, someone like

 7    Mr. Call is going to delegate responsibilities to people

 8    competent to perform those responsibilities like Ms. Marsh,

 9    right?

10    A.   I agree with that, yes, sir.

11    Q.   In fact, the head of HR she was at the time, right?

12    A.   Yes, she was.

13    Q.   And you say that you wished Mr. Call had spoken to

14    Ryan Kliesch, Ryno, right?

15    A.   Yes.  I wish Mr. Call had -- had a personal one-on-one

16    conversation with Ryan Kliesch and Shannon Melcher, yes.

17    Q.   Okay.  Let's just make it clear for the jury, Ryno was

18    never in the photo booth when you were there with Ms.

19    Swift, correct?

20    A.   Right.

21    Q.   So he wouldn't have anything he could say from

22    firsthand knowledge about what happened in that photo

23    booth, correct?

24    A.   He would have had no firsthand knowledge of the photo

25    booth, no, sir.

422
Cross - Mueller

1    Q.    Now, are you aware of the reasons stated by Mr. Call

2    for your termination in this lawsuit?

3    A.    I am.  Yes, sir.

4    Q.    So you're aware that Mr. Call testified under penalty

5    of perjury that you were terminated for three distinct

6    reasons, right?

7    A.    He listed three reasons, yes, sir.

8    Q.    And the first reason was the photograph we've all

9    seen, right?

10   A.    The photograph he got from Frank Bell, yes.

11   Q.    And that was his interpretation of that photograph,

12   right?

13   A.    Yes, sir.

14   Q.    And the second reason was he believed you had changed

15   your story while being interviewed, correct?

16   A.    He did mention that, yes.

17   Q.    And that was his interpretation of what you had done

18   in the interview, right?

19   A.    Well, actually, when I was talking to Mr. Call on June

20   3d, he told me that Craig Thomas talked about me changing

21   my story.  That's how he got on that line.

22   Q.    Now, that's how he got on that line.  Do you recall

23   that he said under oath that he believed you had changed

24   your story in the interview with him?

25   A.    He did say that, yes, sir.

Cross - Mueller

1    Q.    Craig Thomas wasn't in that interview, was he?

2    A.    No, but --

3    Q.    Thank you, sir.

4          Now -- and you also recall the third reason was

5    that Mr. Bell, the defendants' radio guy, if you will --

6    A.    Yes.

7    Q.    -- had had a 20- or 30-year relationship with Bob

8    Call, and they had great credibility among each other,

9    correct?

10   A.    He made it clear, yes, sir.

11   Q.    And he knows that -- at least he testified that if

12   Frank Bell was calling him, he knew it was going to be

13   conveyed to him in an accurate manner, right?

14   A.    That's what Bob Call said, yes, sir.

15   Q.    Now, you don't believe -- let me withdraw that.

16   That's a bad way to ask that question.

17          Mr. Call made the decision, right?

18   A.    That's what I was told, yes.

19   Q.    And, of course, none of these defendants fired you,

20   right?  They couldn't.

21   A.    They didn't fire me, no.

22   Q.    And, sir, you were unaware of Taylor Swift, herself,

23   ever telling anyone on her team to contact KYGO about the

24   incident at the concert, correct?

25   A.    I believe she -- she stated that she left it up to her

424

Cross - Mueller

1    management team.

2    Q.   Let me ask you again:  You're unaware of Taylor Swift

3    ever telling anyone on her team to contact KYGO about the

4    incident at the concert, correct?

5    A.   I -- I am unaware of that.

6    Q.   And, sir, you are unaware of Andrea Swift, the

7    defendant, ever speaking to anyone at KYGO, correct?

8    A.   I don't have proof of that, no.

9    Q.   So you're unaware of any contact by Andrea Swift with

10   KYGO about the June 2d incident, right?

11   A.   Yes, sir.

12   Q.   And the only person that you know spoke to KYGO among

13   the defendants' was Mr. Frank Bell, right?

14   A.   That's what I was told, yes, sir.

15   Q.   And you were told that, right?

16   A.   I was.

17   Q.   And you don't have any knowledge from firsthand as to

18   what was said by Mr. Bell, do you?

19   A.   I --

20   Q.   You don't have any firsthand knowledge because you --

21   A.   No, I wasn't a part of that conversation, no, sir.

22   Q.   Now, you work for KYGO from January 2013 until June

23   4th, 2013, right?

24   A.   Yes, sir.

25   Q.   About five months, correct?

Cross - Mueller

1    A.    Yeah.

2    Q.    And your KYGO contract expired January 20th, 2015, if

3    not extended, right?

4    A.    Did you say January 20 --

5    Q.    2015.

6    A.    Yes, sir.

7    Q.    So after January 22d, 2015, it was up to KYGO whether

8    they wanted to keep you on, correct?

9    A.    Right.  They had an option to add a third year or

10   decline that third year.

11   Q.    But that was completely within their discretion,

12   correct?

13   A.    Yes, sir.

14   Q.    And you were paid, I think, before any bonuses or

15   incidentals, $150,000 a year?

16   A.    Yes, sir.

17   Q.    And as of the time of your termination, were you paid

18   for, what, the first six months of the year or first five

19   months?  You were terminated early in June.  Did you get

20   all of June paid as well?

21   A.    I -- my -- I believe they sent my last paycheck and it

22   was right until -- up to June 4th.  Through June 4th of

23   2013.

24   Q.    So you got five months' pay, approximately.

25   A.    Yeah.

1    Q.    And I understand there may have been a few more days

2    or even a week, I can't --

3    A.    There was a signing bonus, yeah.

4    Q.    Now, the maximum amount you knew you would get, you

5    knew you would get, if not terminated by KYGO, under your

6    contract, would be the signing bonus plus 300,000, right?

7    A.    And the maximum for two years, yes, sir -- well --

8    well, unless you include the endorsements, which were

9    guaranteed as well.

10   Q.    What was that, sir?  How much?

11   A.    I think that we were guaranteed $10,000 each year for

12   the two years.

13   Q.    So the maximum amount over the two-year term of your

14   employment contract with KYGO would be about 320,000 if you

15   dealt with those monies?

16   A.    Yes, sir.

17   Q.    And you were already paid for five months of that,

18   right?

19   A.    Yes, sir.

20   Q.    So it's 300,000 -- 310-, whatever -- minus whatever

21   you had been paid through those five months?

22   A.    Yes, sir.

23   Q.    And we saw yesterday that your damages expert, Mr.

24   Opp, has concluded in his damages analysis that you should

25   get $3 million, right?

Cross - Mueller

1    A.    I -- I wouldn't call him my damages expert.

2    Q.    You hired him, didn't you?

3    A.    My attorney located him.

4    Q.    And you met with him, right?

5    A.    I talked to him on the phone one time, yes, sir.

6    Q.    Okay.  So whether it's your attorney or you, it -- it

7    wasn't me, I didn't hire him.

8    A.    Right, I understand.

9    Q.    He -- when you were paid 320,000 minus five months

10   pay, with that knowledge under a two-year contract, his

11   damages calculation totaled right at $3 million, right?  Is

12   that correct?

13   A.    I believe so, yes, sir.

14   Q.    And that's about 15 times what you had left to be

15   paid, right?

16   A.    Yeah, I'll take your word for that.

17   Q.    Yeah?

18   A.    I can't do that math in my head right now.

19   Q.    So when you started your examination yesterday with

20   Mr. McFarland --

21   A.    Uhm-hum.

22   Q.    -- you were mistaken when you said I was wrong in

23   opening to say it was 15 times, right?

24   A.    Could you -- I'm sorry, could you repeat that for me?

25   Q.    So when you started your examination yesterday with

428

Cross - Mueller

1    Mr. McFarland --

2    A.    Yeah --

3    Q.    -- you said I was wrong about 15 times; you were

4    mistaken, right?

5    A.    I -- can -- I -- I'm unclear about what you're

6    discussing, sir.  When I was talking to Mr. McFarland --

7    Q.    Yeah.  First question --

8    A.    Could you refresh my memory, please?

9    Q.    It went something like this, sir:

10         It said:  Mr. Baldridge, you heard him say in your

11   examination you received 15 times the amount you were being

12   paid from KYGO.  Did you hear that?  Is that true?

13         And you said no.

14         So you were mistaken when you gave that testimony,

15   right?

16   A.    Well, you're saying that my testimony -- I'm sorry,

17   I'm a little bit confused.

18   Q.    We'll move on, sir.  I think the point's been made.

19   A.    Yeah.

20   Q.    Now, sir, you started this job at KYGO -- I think the

21   official start date:  January 20th, 2013, right?

22   A.    I signed a contract on the first week of January,

23   yeah.

24   Q.    And you started somewhere in January.  I'm not trying

25   to pin you --

Cross - Mueller

1    A.    Yeah, we -- yeah, we -- we flew into town -- or we got

2    to town and then we -- I think at the first day they wanted

3    us in the building -- we -- they -- see, it's a little

4    confusing because they had us meeting with people all over

5    Denver --

6    Q.    It's all right.  I'm just saying in January 2013.

7    Somewhere in there you started your job.

8    A.    Yeah.  I can't remember the exact date.

9    Q.    That's fair.  And you were an on-air personality at

10   KYGO, right?

11   A.    Yes, sir.

12   Q.    And for almost seven years prior to starting at KYGO,

13   you had never been an on-air personality, right?

14   A.    That's not true.  I had been an on-air personality.

15   Q.    In the seven-year period prior to starting at KYGO,

16   you worked at Nine Ball, right?

17   A.    Oh, I'm sorry, yeah.  When I worked at Nine Ball, I

18   was not an on-air personality.  You're right.  I'm wrong,

19   sorry.

20   Q.    I understand.  It's a long process here.

21          So to be clear, for approximately seven years

22   prior to starting at KYGO, you had not been an on-air

23   personality.

24   A.    Yeah, for that gap of time, I had not been an on-air

25   personality.

Cross - Mueller

1    Q.   And the last job you'd had as an on-air personality

2    prior to KYGO was at KDWB Minneapolis, correct?

3    A.   Yes, sir.

4    Q.   And that was -- you left there about seven years prior

5    to joining KYGO, right?

6    A.   Yeah.  Seven years and change, yeah.

7    Q.   Seven, eight years.

8    A.   Yeah.

9    Q.   So you have been, for lack of a better word, out of

10   the on-air personality business for a fairly long time when

11   you came back to KYGO, right?

12   A.   Yeah, I'd been gone for a while.  Yes, sir.

13   Q.   And you testified yesterday, I believe, though you

14   explained it, that KDWB Minneapolis terminated you,

15   correct?

16   A.   Well, they bought me out of my contract, yeah.

17   Q.   They let you go, right?

18   A.   They took me off the air and they paid out my

19   contract.

20   Q.   And they were dissatisfied that you were conducting

21   Nine Ball while simultaneously being an on-air personality,

22   right?

23   A.   I -- something like that was stated to me, yeah.

24   Q.   And you testified they were just wrong because your

25   contract allowed you to do both?

Cross - Mueller

1    A.    No, I -- I just said that it was -- it was in my
2    contract that I could do Nine Ball, because when you work
3    for Clear Channel, it has to be in your contract or you --
4    you are not allowed to work anywhere; even do Uber.  You
5    can't do a thing unless you clear it through -- and that
6    was Clear Channel at the time.
7    Q.    Okay.  So you were under a noncompete; they wouldn't
8    allow you to do any other work while you were at KDWB?
9    A.    I wasn't; but, yeah, most people are, yes.
10   Q.    You weren't?
11   A.    No, because the general manager actually put Nine Ball
12   Radio into my contract.
13   Q.    Got it.  So you were allowed to do Nine Ball --
14   A.    Yes.
15   Q.    So that explains your testimony you thought KDWB was
16   wrong about the contract and what was allowed?
17   A.    Well, the -- I wouldn't -- somebody -- the person who
18   did the contract with me, the general manager at the time,
19   Dan Seemen, evidently didn't share that information with
20   everybody, because it's in my opinion there were people
21   that were surprised to hear that I owned -- I was a part
22   owner of Nine Ball Radio.
23   Q.    Now, do you agree, sir, that being let go, if you
24   will, by KDWB in Minneapolis might have hurt your
25   reputation in the radio industry?

Cross - Mueller

1    A.    I wouldn't agree with that, no, sir.

2    Q.    Sir, could I get you to turn to page 133 of your

3    under-oath deposition.

4    A.    Did you say 83?

5    Q.    133 --

6    A.    133.

7    Q.    -- please, sir.

8          Let me know when you're there, sir.

9    A.    Okay.  Yes, I'm here.

10   Q.    And if I could get you to look at line 7 to 10.  Let

11   me know if I read your under oath testimony accurately.

12          Question:  Okay.  Did the termination of your

13   contract without cause in Minneapolis hurt your reputation?

14          Answer:  It -- it might have.

15          Did I read that accurately?

16   A.    You did.

17   Q.    Thank you.  Now, prior to KDWB, you worked at, was it

18   KRBZ Kansas City?

19   A.    KRBZ, yes, sir.

20   Q.    And KRBZ terminated you, correct?

21   A.    They bought out my contract, yeah.  They terminated us

22   without cause.

23   Q.    And can you agree, sir, that being bought out or -- in

24   the manner that you were by KRBZ, in fact could have hurt

25   your reputation and employability in the radio industry?

Cross - Mueller

1    A.    Theoretically, it could hurt your reputation, yes.

2    Q.    And theoretically, if I can, can you stay on page of

3    your deposition.

4    A.    Yeah.

5    Q.    I'm going to read line 16 to 20 and you tell me if I

6    read it accurately.

7    A.    Okay.

8    Q.    Question:  When you got terminated without cause in

9    Kansas City, did it have an effect on your reputation?

10            Answer:  I can't imagine that it helped me.  I'll

11    put it that way.

12            Did I read that accurately?

13    A.    You did, sir, yeah.

14    Q.    Now let's be clear, the -- I don't want to say

15    "termination," I want to use your word -- the cessation of

16    relationship between you and the Minneapolis radio station

17    and the Kansas City radio station, not a single person in

18    the defendants' table had anything to do with that,

19    right?

20    A.    Not one thing to do with it, no, sir.

21    Q.    So to the extent your testimony is accurate that that

22    cessation of relationship might have hurt your reputation

23    in the industry, these people in the defendants' table had

24    nothing to do with that, right?

25    A.    They had nothing to do with KRBZ or KDWB, no, sir.

434
Cross - Mueller

1    Q.   Now, you founded Nine Ball, right?

2    A.   I did, yes.

3    Q.   And if I recall, Nine Ball is a prep service?

4    A.   Yes, sir.

5    Q.   And for a nonradio guy, prep service is you get four

6    hours in the morning and a prep service will help the

7    on-air guys find materials so they could fill up that four

8    hours, right?

9    A.   Yes.  And that's -- that's a -- one-way of describing

10   it.

11   Q.   And when you were terminated by Mr. Call on June 4th,

12   2013, you had only been away from Nine Ball for how long?

13   A.   It had been five months and four days.

14   Q.   And Mr. Stephan Jones was a co-owner with you,

15   correct?

16   A.   Yes, sir.

17   Q.   And you never went back to try to get a job with Nine

18   Ball, did you?

19   A.   I talked to Stephan on the phone.  I didn't -- you

20   mean like I -- I --

21   Q.   You never sought employment from Nine Ball, the

22   company you had been gone from about five months, after you

23   had been terminated by Mr. Call at KYGO, did you?

24   A.   When you say "sought," could we specify that?

25   Q.   Sir, I don't know any other way to phrase it.  Did you

435

Cross - Mueller

1    try -- did you apply for a job at --

2    A.   I didn't apply, but I talked to Stephan Jones on the

3    phone.

4    Q.   In fact, you made no attempt to go back to Nine Ball

5    when you were terminated by KYGO, correct?

6    A.   I believe I stated that when I resigned, I trained in

7    two people to take up the duties that I had been doing as

8    an employee.  And when I --

9    Q.   Let me -- I'm sorry, I don't want to cut you off.

10   A.   I'm done, sir.

11   Q.   Yeah, let me see if I could help you by referring you

12   to page 135 of your under-oath deposition, please, sir.

13   A.   135.  Okay.

14   Q.   Yes, sir.

15   A.   I'm here.

16   Q.   Looking -- beginning page 135, line 5, I'm

17   questioning:  Have you, since terminated from KYGO,

18   attempted to go back and work at Nine Ball?

19        Answer:  No.

20        Did I read that correct -- I mean correctly,

21   excuse me?

22   A.   That I answered no?

23   Q.   Yes.

24   A.   Yes, I answered no.

25   Q.   And that was your under-oath testimony on the date of

436

Cross - Mueller

1    your deposition, correct?

2    A.    I -- that I left on -- you said that I --

3    Q.    Sir, sir, let's stop.  Let me read it again.

4          Page 135.  Are you there?

5    A.    Yeah, I am.  Yeah.

6    Q.    Line 5 to 7.

7    A.    Okay.

8    Q.    Have you, since terminated from KYGO, attempted to go

9    back and work at Nine Ball?

10         Answer:  No.

11         Did I read that correctly?

12   A.    Yes, you did.  Yes, sir.

13   Q.    That was your under-oath testimony as of the date of

14   your deposition, correct?

15   A.    Yes.  Yeah.

16   Q.    So the company you've been gone from for five months

17   at the time you were terminated by Mr. Call, you didn't

18   attempt to go back and work there, did you?

19   A.    I did not attempt, no.  But I -- but -- you know.

20   Q.    And, Mr. Mueller, certainly none of the defendants at

21   this table had anything to do with your failure to attempt

22   to go back to Nine Ball, did they?

23   A.    No, they did not.  That was my decision and my

24   decision only.

25   Q.    Now, when you spoke to Stephan Jones, your co-founder

Cross - Mueller

1    at Nine Ball, you told Mr. Jones about the incident and the

2    allegations of June 2d, 2013, right?

3    A.    I told him that -- the reason I called him the first

4    time was to let him know that I would be leaving KYGO and

5    something had happened and I wasn't sure what was going to

6    make it into the radio trades, but I thought I should give

7    him a heads-up.

8    Q.    So you told him in so many words -- I am not asking

9    you to give me the specific words -- about the incident of

10   June 2d, 2013, right?

11   A.    I told him something happened, yeah, while I was

12   working.

13   Q.    And you have no idea whether Mr. Jones repeated what

14   you told him to anyone in the radio industry, do you?

15   A.    I -- I think he did.

16   Q.    Well, he did, in fact, repeat it?

17   A.    Well, I -- yeah, I think he repeated it to the other

18   shareholders of Nine Ball Radio.

19   Q.    And they are all in the radio industry, correct?

20   A.    Yeah, they would be, yeah.

21   Q.    So the knowledge of what was alleged against you

22   within the radio industry, at least in the instance of

23   Stephan Jones and the shareholders, had nothing to do with

24   any of the defendants at this table, correct?

25   A.    No, the Nine Ball Radio site had nothing to do with

438
Cross - Mueller

1    these defendants.

2    Q.   For all you know, the jobs you applied for and didn't

3    get was a result of Stephan Jones repeating what you told

4    him, right?

5    A.   For all I know?  I -- I would say it's possible that

6    Stephan -- I don't know who Stephan talked to.  I felt

7    obligated to tell him.

8    Q.   And you told Mr. Zazza at Cumulous about what was

9    being alleged, correct?

10   A.   I did talk to Tony Zazza, yes, sir.

11   Q.   And you don't know who or whether Mr. Zazza repeated

12   what you told him, right?

13   A.   I do not, no.

14   Q.   And same question:  None of these defendants revealed

15   the allegations against you to Mr. Zazza, did they?

16   A.   I'm -- no, I'm the one that talked to Mr. Zazza.

17   Q.   And, in fact, in your interrogatories, sir, you

18   identified 37 people that you told about the incident.  Do

19   you recall that?

20   A.   I don't recall that it was 37, but I'll take your word

21   for it.

22   Q.   It was several dozen, right?

23   A.   I remember I made a list and it was accurate.  I made

24   sure I got everybody on it.  I don't -- I didn't count

25   them, but I'll take your word for it, sir.

439
Cross - Mueller

1    Q.   Fair enough.  And you don't know whether any of those
2    37 people told other people about the allegations alleged
3    against you, do you?
4    A.   No, I don't know what those other people said, no.
5    Q.   And certainly these other people -- when I say "other
6    people," exclude the defendants at this table -- whether or
7    not they repeated what you told them and the fact that you
8    told them, has nothing to do with these defendants, does
9    it?
10   A.   No, I told those people on my own.  These folks had
11   nothing to do with that.
12   Q.   And so we had a situation where these defendants had
13   hoped to keep confidential this incident, correct?
14   A.   I -- I'll take your word for it.  I --
15   Q.   Let's go through the facts.  They didn't file a
16   lawsuit against you in the public record, did they?
17   A.   Well, that's not fair for you to say that.  I mean,
18   they did -- they talked to -- they told Bob Call --
19   Q.   Sir --
20   A.   Yeah.
21   Q.   -- did they file a lawsuit against you in the
22   public --
23   A.   No, they did not file a lawsuit against me.
24   Q.   Did they, to your knowledge, release the photograph
25   that we've seen in this case to the public?

440

Cross - Mueller

1   A.   Actually, I don't know who released that photograph,
2   so --
3   Q.   You have no basis to believe any of these defendants
4   released it, though, right?
5   A.   I have -- I don't have any proof as to how that got
6   released.
7   Q.   Now -- and you spoke to these 37 approximate people
8   about what happened, right?
9   A.   The listed people that I provided to you --
10  Q.   Yes.
11  A.   -- or to Gabe?  Yeah, I told them, you know -- I'm
12  not -- I can't tell you that I told the exact same amount
13  of information to each of those people, but, yes, I talked
14  to every one of those persons -- people I listed.
15  Q.   And so we can agree, sir, that it's possible that the
16  radio industry learned of the allegations against you
17  because you repeated it, right?
18  A.   It's possible that people working in the radio
19  community heard about it through me telling someone, yes,
20  sir.
21  Q.   And so you, sir, may have rendered yourself
22  unemployable in the radio industry, correct?
23  A.   I -- I can't go that far.
24  Q.   It's possible, isn't it?
25  A.   Well, can I ask you a question?

441

Cross - Mueller

1    Q.   No, it doesn't work that way.  I'm sorry.  It's a

2    great thing about being a lawyer, I guess.

3    A.   All right.  Well, can you ask --

4    Q.   Is it possible that you rendered yourself unemployable

5    by talking about the incident in the radio industry?

6    A.   I -- I don't think I can answer that question yes or

7    no.

8    Q.   Okay.  Fair enough.

9         You have never sought any jobs since your

10   termination outside of the radio industry, have you?

11   A.   When you say "sought" --

12   Q.   Applied for.

13   A.   I haven't applied for any jobs.  I have -- I have

14   sought some jobs, but I didn't fill out an application, no,

15   sir.

16   Q.   Okay.  And you -- but you are limiting your search

17   within the radio industry, correct?

18   A.   No.

19   Q.   As of your deposition, you had limited your search to

20   the radio industry, correct?

21   A.   Up until that point, I was focused on radio --

22   applying for positions at radio stations.  I was seeking --

23   how can I say this?  I was trying to create a new

24   occupation for myself.  I was trying to start a new

25   business that had something to do with radio, but it would

442

Cross - Mueller

1    have been behind the scenes and under the radar.

2    Q.   Okay.  And I think you testified both yesterday and

3    your deposition that you only sought on-air personality

4    jobs in Top 20 radio markets; is that correct?

5    A.   That was my primary focus, yes, sir.

6    Q.   How many radio markets are there in America?

7    A.   It's got -- it's in the 200s.

8    Q.   So accepting that as true, there are at least 180

9    other stations that have people on air that you never

10   sought to get a job from, correct?  Is that correct?

11   A.   It's -- actually, it's not correct because I had a

12   talent agent that was seeking opportunities for me.  I

13   personally was only targeting Top 20 markets, myself,

14   personally.

15   Q.   How many markets, sir, total, did you seek to find a

16   job?  20 markets, right?

17   A.   Well, I -- I did send out some packets to markets

18   outside of the Top 20.

19   Q.   How many markets did you not apply to?  A hundred,

20   150?  170?  How many?

21   A.   It was -- there were a lot of markets that I didn't

22   apply for.  I only -- I only applied for jobs with the --

23   that were posted, that were available.

24   Q.   So you don't know -- and you -- whether or not you

25   could have gotten a job in one of those other markets you

Cross - Mueller

1    did not apply to, right?

2    A.    I -- I -- I don't understand that question.

3    Q.    Well, if you didn't apply --

4    A.    Yeah.

5    Q.    -- to --

6    A.    For a very specific job?

7    Q.    You wouldn't know whether you would have gotten --

8    A.    Right, I don't know whether I would have ever gotten a

9    job I didn't apply for, yes.

10   Q.    And you testified yesterday that you didn't get the

11   jobs in these Top 20, but if I heard you correctly, you

12   didn't say that anyone ever said why, correct?

13   A.    I think I -- I think I did address that.

14   Q.    Which radio station gave you a reason why they would

15   not employ you when you applied?

16   A.    When I had discussions with KTWN, I was talking to

17   Michael Steel, he's an old friend of mine.  He told me this

18   would be difficult for anybody to hire me until I get this

19   legal thing behind me.

20   Q.    And this legal thing was the legal thing you had

21   released to the 37 people you had in your interrogatory

22   answer, right?

23   A.    Well, I didn't -- when I --

24   Q.    Sir -- sir, the legal thing we're talking about is

25   your lawsuit, right?

444

Cross - Mueller

1   A.    No.

2   Q.    The legal thing we're talking about is the June 2d,

3   2013, events, right?

4   A.    It was my termination, yes.

5   Q.    Now, you were offered a promotions position in

6   Philadelphia, correct?

7   A.    I wouldn't -- if -- if I said I was offered that job,

8   then that wasn't fully accurate.  I -- I had discussions

9   with my close friend, Tim Acosta, he goes by the name Chio.

10  He wanted to talk to his management on my behalf.  He

11  wanted me to come there and I actually told him I'm -- at

12  this time, I'm not interested in doing promotions.

13  Q.    Yeah, you were unwilling to follow up on that lead for

14  a radio promotions job, right?

15  A.    I -- at that point, I didn't think it would be a good

16  idea for me.

17  Q.    So you didn't reach out when he asked you to.  You

18  didn't go apply in Philadelphia.

19  A.    Well, there -- I don't even know if there was a job to

20  apply for.

21  Q.    Now, sir -- never mind.  Your cohost, Ryno --

22  A.    Yes.

23  Q.    -- Mr. Kliesch --

24  A.    Yes, sir.

25  Q.    -- left KYGO within the two-year term of your

Cross - Mueller

1    contract, right?

2    A.   I'll take your word for it.  I don't know exactly when

3    he left.  I'll take your word for it.

4    Q.   And just to be clear, in your contract with KYGO, if

5    one of you left --

6    A.   Right.

7    Q.   -- KYGO had the right to get rid of the other one,

8    right?  Because you were a tandem.

9    A.   Yeah -- I don't know for sure.  I know there was a

10   clause in -- that sort of tied us together at the hip.  I

11   can't remember the specific language.  It's been a long

12   time since I looked at that clause, but that sounds, you

13   know, close to what I remember reading.

14          I can't remember the exact specifics of -- I think

15   if one person gets terminated, the other person can be

16   terminated.

17   Q.   Sir, is it ever okay or acceptable to touch a woman's

18   rear end without her permission?

19   A.   No, sir.

20   Q.   Is it ever not okay, not acceptable, for a woman to

21   report her belief that she was touched in an inappropriate

22   manner -- in an inappropriate manner?

23   A.   Is it -- is it ever not acceptable?

24   Q.   Not proper for a woman to report her belief that she

25   had been touched in an inappropriate manner?

Cross - Mueller

1    A.   Is it okay for a woman to hold off on reporting

2    something?

3    Q.   No, sir.

4    A.   I --

5    Q.   No, try to listen to my words.

6    A.   I am.  I am.

7    Q.   Is it ever inappropriate for a woman to report her

8    belief --

9    A.   No, it's not --

10        THE COURT:  Hold on.

11   BY MR. BALDRIDGE:

12   Q.   -- that she had been touched in an improper manner?

13   Now go ahead.

14        THE COURT:  Counsel --

15   BY MR. BALDRIDGE:

16   Q.   Were you ever --

17        THE COURT:  Counsel, counsel.

18        Wait for the question to be completed, then start

19   your answer, and I'm sure that courtesy will be

20   reciprocated.

21        THE WITNESS:  Okay.

22   BY MR. BALDRIDGE:

23   Q.   Is it ever inappropriate for a woman to report her

24   belief that she had been touched in an inappropriate

25   manner?

447

REDIRECT - MUELLER

1    A.    No, sir.

2    Q.    Is it ever inappropriate for an employer to

3    investigate a report that one of its employees had touched

4    a woman in an inappropriate manner?

5    A.    No, sir.

6          MR. BALDRIDGE:    If I may confer with counsel, I

7    think I may --

8          THE COURT:    You may.

9          MR. BALDRIDGE:    I pass the witness, Your Honor,

10   and conclude cross-examination.

11         THE COURT:    All right.    Redirect.

12         MR. McFARLAND:    Thank you.

13                    REDIRECT EXAMINATION

14   BY MR. McFARLAND:

15   Q.    Mr. Mueller, you could have lied to potential

16   employers and not mentioned the alleged June 2d, 2013,

17   incident?

18   A.    I could have lied, yes.

19   Q.    And you felt compelled to be honest with those

20   potential employers.

21   A.    I did, yes.

22   Q.    And they were not interested in hiring you under the

23   circumstances, right?

24   A.    In some instances, yes.

25   Q.    Well, nobody offered you a job, right?

REDIRECT - MUELLER

1    A.    Nobody offered me a job, no, sir.

2    Q.    And your talent agent didn't call you and say, "Hey, I

3    got something for you"?

4    A.    My talent agent called me one time about a job that

5    was possibly going to be available in Atlanta and I never

6    heard another thing about it again.  And when I asked her

7    what the job was, she had a hard time explaining what the

8    job actually was.

9    Q.    Okay.  You didn't talk to -- well, after you were --

10   after Ms. Swift claimed that you had inappropriately

11   touched her, you had communications with what I'll call

12   sort of an inner circle, right?  You had conversations with

13   Ms. Melcher.

14   A.    Yes.

15   Q.    And you had some of conversations with your

16   employers --

17   A.    Yes.

18   Q.    -- right?

19          But you didn't tell the 36 or 37 people that you

20   discussed with Mr. Baldridge about the alleged incident

21   until after you were fired; is that right?

22   A.    The majority of the people found out after I was fired

23   by KYGO, yes.

24   Q.    And you told them after you were fired.

25   A.    Yes, sir.

449

REDIRECT - MUELLER

1    Q.    And you weren't fired until Ms. Swift's team contacted

2    KYGO about the incident.

3    A.    That's correct.

4    Q.    So it's fair, then, to say that the defendants had

5    something to do with what you were telling these other

6    people.

7                    MR. BALDRIDGE:  Objection.  Form.

8                    THE COURT:  Overruled.

9                    THE WITNESS:  That is fair, yes, they did have

10   something.

11   BY MR. McFARLAND:

12   Q.    But for the allegation, you wouldn't have told any of

13   these people because there wouldn't be anything to tell

14   them.

15                   MR. BALDRIDGE:  Objection.  Form.

16                   THE COURT:  You're on redirect so watch the

17   leading nature of the questions.

18                   MR. McFARLAND:  Thank you.

19                   THE WITNESS:  One more time.  Sorry.

20   BY MR. McFARLAND:

21   Q.    I'll move on.

22   A.    Okay.

23   Q.    Mr. Baldridge asked you what you were able to recall

24   about some of the witness testimony.  Do you recall any of

25   the people who were in the photo booth at the time of the

REDIRECT - MUELLER

1    alleged incident claiming at any point they saw you reach

2    your hand underneath Ms. Swift's skirt, grab her bottom,

3    and hold on as she tried to move away?

4    A.    I don't recall anyone saying that, sir.

5    Q.    Do you recall anyone saying that they saw your hand

6    underneath Ms. Swift's skirt on her bottom?

7    A.    No, sir.

8    Q.    Does that include Mr. Dent?

9    A.    That would include Mr. Dent.

10   Q.    Mr. Baldridge also indicated in going through some

11   prior deposition testimony that there was a point where you

12   testified in your deposition that you weren't sure where

13   your hand was, correct?

14   A.    Yes.

15   Q.    And that was the reference to a particular point in

16   the -- during the photo, correct?

17   A.    Yes.

18   Q.    I want to be really clear here.  Do you know where

19   your hand was not?

20   A.    Yes, I do.

21   Q.    And it was not where?

22   A.    It was not on Ms. Taylor Swift's rear end.

23   Q.    Over her clothing or under her clothing?

24   A.    Correct.

25   Q.    In any of the other deposition testimony that you are

451

REDIRECT - MUELLER

1    familiar with, did any witness, other than Mr. Dent,

2    contend that you had a drink in your hand?

3    A.    No.  He was the only one.

4    Q.    Did anyone, other than Mr. Dent, claim that you were

5    intoxicated?

6    A.    No, he was the only one.

7    Q.    Did anyone, other than Mr. Dent, indicate that when

8    you entered the photo booth, you were remarkable or there

9    was anything strange or different or notable about you or

10   your appearance?

11   A.    I believe he was the only one.

12   Q.    Did you see anyone enter the photo booth with any kind

13   of beverage?

14   A.    I didn't see anybody with a beverage until after I

15   left the photo booth and went out back to the -- near the

16   front door of the Pepsi Center.

17   Q.    Mr. Baldridge also asked you about where employees

18   typically report or to whom employees typically report

19   sexual harassment.  You remember that?

20   A.    I do.

21   Q.    And that's typically to the employer?

22   A.    Yes.

23   Q.    Who do you think -- or where do you think people who

24   are sexually assaulted by strangers typically go?  People

25   they don't know?  People they don't work with?

REDIRECT - MUELLER

1    A.   I would think they would contact the police.

2    Q.   Let's look at the photograph for just a sec.

3         This is Defense Exhibit I.  Now, I believe you

4    described this as -- this picture being taken after you

5    kind of slid into the frame.

6    A.   Yes.

7    Q.   And that as you were going in towards Ms. Swift with

8    your fist closed and your palm down, there was some

9    jostling, and you think you touched her rib?

10   A.   I do.

11   Q.   And then there was some jostling about -- with your

12   arms.

13   A.   Yes.

14   Q.   And this picture shows -- I guess I'm asking you:  Do

15   you agree that this picture shows that your arm is in front

16   of Ms. Swift's and Ms. Swift's arm is over top of yours?

17   A.   Yes.  That's how our arms ended up.

18   Q.   So the question I have is:  That at this point in time

19   with Ms. Swift's arm over yours, would it have been

20   possible to put your hand up on her shoulder or anywhere

21   high on her back?

22   A.   It would be tough without -- I -- I have to get by her

23   arm, I guess.

24   Q.   And -- and then just to be clear, before you got here,

25   obviously you could have -- you could have went in with

453

REDIRECT - MUELLER

1    your hands behind your back, correct?

2    A.    Yes, sir.

3    Q.    And you could have went with your hand high on the

4    shoulder or just high and behind Ms. Swift.  There's lots

5    of possibilities?

6    A.    There are a lot of possibilities, yeah.

7    Q.    And in your experience, is going in for a photo like

8    this one, sort of a standard position of -- or one of the

9    standard positions is sort of arms around waist level?

10   A.    Arms around waist level is very standard, yes, sir.

11   Q.    Nothing usual about this one little kid's hands are a

12   little higher.

13   A.    It looks nice to me.

14   Q.    And the -- the guests' picture -- or hands are

15   somewhere around Ms. Swift's waist?

16   A.    Yes, sir.

17   Q.    Again, we've got hands around Ms. Swift's waist,

18   that's not unusual?

19   A.    Doesn't look unusual to me.

20   Q.    Same thing, not unusual, right?

21   A.    No.  Not to me.

22   Q.    And, in fact, in most of these pictures, hands are --

23   at least the guest's hands are closer to Ms. Swift's waist

24   than they are to her shoulders, right?

25   A.    From the ones you're showing me right now, yes, sir.

454

REDIRECT - MUELLER

1    Yeah.

2    Q.    Same thing?

3    A.    Yes.

4    Q.    Around the waist?

5    A.    Yeah.

6    Q.    Around the waist?

7    A.    Yes.

8    Q.    And did you have any -- as you went to slide into this

9    photograph, did you consciously think about, Should I come

10   in with my hand higher or lower or -- did you have any

11   thought process about that?

12   A.    I was several feet away when I started to move toward

13   the girls -- I'm sorry, the ladies.  And because I am a

14   larger person, I did think that it would be a good idea if

15   I closed my hand to -- to not poke Taylor with my fingers.

16   Q.    Mr. Baldridge also talked to you about sort of this

17   reference to your rib in your deposition.

18          Can you turn to page 37 of your deposition.

19          MR. BALDRIDGE:  Your Honor, the -- objection.  No,

20   I didn't.  He's reading.  He's just going to read a

21   deposition --

22          THE COURT:  Right.

23          MR. BALDRIDGE:  There's no recollection --

24          THE COURT:  No, I get it.  I get it.  So we can't

25   just read from the deposition.  You need to -- are you

REDIRECT - MUELLER

1    using it to refresh his recollection, to do some type of

2    impeachment?  What are you trying to do here?

3            MR. McFARLAND:  I'm really using it to refresh his

4    recollection about what he said in his deposition.

5            THE COURT:  Okay, well, then, you need him to

6    review it, close it -- close the document, and then he can

7    only testify from his refreshed recollection.

8            MR. McFARLAND:  Thank you, Your Honor.

9    BY MR. McFARLAND:

10   Q.   Mr. Mueller, would you take a look at your deposition

11   transcript, page 37.

12   A.   Okay.

13   Q.   Actually, take a look at the top of page 36, line 25.

14   Read that question --

15           THE COURT:  To himself.

16   BY MR. McFARLAND:

17   Q.   To yourself down to page 37, line 10.

18           MR. BALDRIDGE:  Your Honor, there's no

19   recollection to be refreshed on this issue.  He's using a

20   prior consistent statement with a witness on the stand and

21   that's not allowed --

22           THE COURT:  I thought it's for -- well, you may

23   have a point.  I was just -- I was assuming it was relevant

24   and related to what you were just examining him on.

25           If we're in some new area, then, you know, you

456

REDIRECT - MUELLER

1      haven't set a predicate for --

2              MR. McFARLAND:  Fair enough.

3      BY MR. McFARLAND:

4      Q.   Let me ask the question:  Are you certain that in your

5      deposition -- in your sworn deposition testimony given on

6      July 13th, 2016, that you indicated that you thought your

7      hand touched Ms. Smith's rib?

8              MR. BALDRIDGE:  There's never been a suggestion

9      contrary to that.  It is a prior consistent statement with

10     what he's saying on the stand.  There's no evidence rule

11     that would allow that.

12             MR. McFARLAND:  As long as we're on board that

13     that is consistent, that's the testimony, I could move

14     on.

15             THE COURT:  Okay.  I think that is -- Mr.

16     Baldridge's description is accurate and there's not an

17     inconsistent statement for you to attempt to impeach or

18     refresh his recollection on.  So on that legal note, why

19     don't we take a lunch break.

20             Ladies and gentlemen of the jury, we'll be in

21     recess until 1:30.

22         (Recess 12:16 p.m.)

23                     AFTERNOON SESSION

24         (Jury was present at 1:32 p.m.)

25             THE COURT:  All right, Mr. Mueller, I remind you

457

REDIRECT - MUELLER

1    once again that you remain under oath.

2            Mr. McFarland, you may resume your redirect.

3            MR. McFARLAND:  Thank you, Your Honor.

4    BY MR. McFARLAND:

5    Q.   Mr. Mueller, do you recall Mr. Baldridge asking you

6    questions about certain KYGO people who somehow

7    participated in KYGO's so-called investigation?

8    A.   I do.

9    Q.   And those people included Ms. Marsh?

10   A.   Yes.

11   Q.   And Mr. Dimick?

12   A.   Yes.

13   Q.   And Mr. Benson?

14   A.   Yes.

15   Q.   And Mr. Panano --

16   A.   Yes.

17   Q.   Banano, with a B?  And Mr. Beckwith?

18   A.   Yes.

19   Q.   Were any of those people in the photo booth on June

20   2d, 2013, at the time of the alleged incident?

21   A.   No, they weren't.

22   Q.   So these people don't have any firsthand knowledge of

23   anything related to the alleged incident?

24   A.   They don't.

25   Q.   The only KYGO people, that you're aware of that had

458
                          REDIRECT - MUELLER

1    firsthand knowledge of the alleged incident, are you and

2    Ms. Melcher?

3    A.    That's correct.

4    Q.    And you deny the alleged incident happened.

5    A.    Absolutely.

6    Q.    And Ms. Melcher generally supports you.

7    A.    I believe so.

8    Q.    Mr. Baldridge also asked you questions about, you

9    know, three dozen or so people that you discussed the

10   alleged incident with after your termination.

11   A.    Yes.

12   Q.    How many of those people did you contact?

13   A.    Maybe half.

14   Q.    Who did you contact?

15   A.    I -- I contacted my family members and I let them know

16   what was going on in my life.  And I talked to some of my

17   closest radio friends, because I wanted them to know what

18   had happened to me, and I also wanted to get advice on what

19   I might do.

20         There were people calling me and leaving messages

21   or e-mailing me or texting me asking me why I wasn't on the

22   radio and if I was okay, so I responded to those.

23   Q.    And the people who you contacted, why -- why did you

24   contact -- why did you reach out to them?

25   A.    The people that I contacted?

459

REDIRECT - MUELLER

1    Q.    Yes.

2    A.    I wanted to let them know that I had been accused of

3    doing something wrong, something bad, and I lost my job

4    because of it, and I was not -- I wasn't working at KYGO

5    any longer.

6    Q.    After your termination, you weren't on the morning

7    show anymore, correct?

8    A.    That's right.

9    Q.    And what, generally, did you tell these people that

10   you were talking to, whether they called you or you called

11   them, about the incident?

12   A.    Told them that I was at a concert and I was accused of

13   doing something inappropriate with a female and that my

14   employer terminated me and they -- a lot of them asked me,

15   "Did you -- are you going to get arrested?"

16        And I said, "I don't know."

17   Q.    Okay.  Let's talk about damages for just one second as

18   well.

19        Mr. Baldridge asked you some questions about

20   damages and how much you're seeking in damages in this

21   case.  Let me ask you point-blank:  Are you asking the jury

22   to award you $3 million in damages?

23   A.    No, I am not.

24   Q.    What are you asking for?

25   A.    I'm asking for whatever they see -- whatever they find

REDIRECT - MUELLER

1   fair as far as compensation.

2   Q.   You're --

3   A.   I'll leave it up to them.

4   Q.   You're not specifically relying on Mr. Opp's report?

5   A.   I'm not relying on Mr. Opp's report at all.

6   Q.   You're not specifically relying on his calculation of

7   damages?

8   A.   No, I'm not.

9   Q.   Is there anything else you want from the jury in this

10  case?

11  A.   I would like -- well, I'm here to prove that I'm

12  innocent and I would like everyone to be open-minded and

13  listen to all the facts.  And, you know, my goal is to

14  clear my name --

15          MR. BALDRIDGE:  Your Honor, this isn't a

16  narrative.  "Is there anything else you want?"  He's going

17  to instruct the jury now?

18          THE COURT:  Overruled.

19  BY MR. McFARLAND:

20  Q.   You can continue.

21  A.   I -- the reason I'm here is because I want to clear my

22  name, first and foremost.  I had a good reputation in radio

23  and I would like to get that back.  That's the only chance

24  I have of working in radio again and that's what I really

25  truly want to do, and I'd like to clear my name.

461

Recross - Mueller

1        MR. McFARLAND:  Thank you, Mr. Mueller.

2        THE COURT:  All right.  Recross.

3                    RECROSS-EXAMINATION

4   BY MR. BALDRIDGE:

5   Q.   You just said that, sir, you want the jury to get all

6   the facts, right?

7   A.   Yes, sir.

8   Q.   Can't do that because you destroyed those devices,

9   right?

10  A.   I didn't destroy anything, sir.

11  Q.   Can't do that because we lost five electronic devices

12  with potentially relevant information on it, right?

13  A.   We lost some information, yes.

14  Q.   So they can't have all the facts.

15       Employment.  The -- looking for employment, you

16  have no idea whether the Minneapolis radio station spoke to

17  any of your potential employers, do you?

18  A.   Do I know if KTWN talked to any of my former

19  employers?

20  Q.   Yes, sir.  You said you went out and you looked for

21  some jobs.

22  A.   Yes.

23  Q.   You said you didn't get them.  Mr. --

24  A.   Right.

25  Q.   You have no idea whether your former employer in

462

Recross - Mueller

1  Minneapolis, whether or not someone from there spoke to

2  those stations?  The stations from which you sought

3  employment.

4  A.   Oh, I don't know if KDWB was talking to any

5  prospective employers.

6  Q.   That's right.

7  A.   I don't know that, no.

8  Q.   And you don't know whether the Kansas City employer

9  did -- I don't know the call numbers --

10  A.   KRBZ.

11  Q.   KRBZ spoke to these potential employers?

12  A.   I don't know that they didn't, no.

13  Q.   Now, you said that you looked through an agent, a

14  talent agent, for some other jobs, right?

15  A.   Well, I was under the impression that my talent agent

16  was looking for opportunities for me.

17  Q.   Well, was she or wasn't she?

18  A.   She told me she was.

19  Q.   Okay.  So that's where you got the impression from --

20  A.   Yes, that was her -- that's why she was my agent.

21  Q.   And that's Heather Cohen?

22  A.   Heather Cohen.

23  Q.   Are we going to hear from her in this trial?

24  A.   I don't believe so.

25  Q.   Now, I went back at lunch and I checked something, and

463

Recross - Mueller

1    in response to Mr. McFarland's questions yesterday about

2    whether you had an alcoholic drink, your direct answer was,

3    quote, I don't know because I didn't get to drink it,

4    closed quotes.

5            Do you recall that?

6    A.   Yes.

7    Q.   And then when he questioned you this morning, you

8    said, "I had a sip."  Do you recall that?

9    A.   Yeah.  I had a sip.

10   Q.   Which was it?

11   A.   Well, I didn't drink it, I had a sip.

12   Q.   A sip didn't tell you whether it was alcoholic or

13   not?

14   A.   I -- I don't know what she ordered me.  I really

15   don't.

16   Q.   Sip did not tell you whether --

17   A.   No --

18   Q.   -- it was alcoholic?

19   A.   It did not, sir.

20   Q.   Sir, you drank a lot that night, didn't you?

21   A.   I didn't drink anything that night.

22   Q.   And, sir, it was an unusual question.  Mr. McFarland

23   said Ms. Melcher generally supports you.  Do you recall

24   that?

25   A.   Yes, I do.

Recross - Mueller

1    Q.    And do you also recall her answer, quote, I could not

2    see what was going on behind me, so I was unaware of

3    anything that would have gone on?

4            Do you recall that?

5    A.    I -- I recall that being in her deposition, yes.

6    Q.    Okay.  And then Mr. Opp -- you're not relying on Mr.

7    Opp, correct?

8    A.    Not at all.

9    Q.    Okay.  You submitted an expert witness report in this

10   case stating that you're relying on him for an expert

11   opinion.  Are you aware of that?

12   A.    I was not happy with that decision.

13   Q.    You did it, didn't you?

14   A.    I talked to Mr. Opp --

15   Q.    Did you submit the report saying you are relying on

16   him?

17   A.    Mr. McFarland --

18   Q.    Did you submit the report -- it's yes -- explain.

19           Did you submit the report telling my side that you

20   are relying on Mr. Opp?

21   A.    If Mr. McFarland submitting it is the same as me

22   submitting it, then, yes, I did.

23   Q.    And when did you quit relying on him?

24   A.    I went through the results of his findings -- I talked

25   to him on the phone once, I saw the results, and I was not

1    happy to be connected with that.

2    Q.   Did you ever tell your counsel, "Withdraw that report

3    from this lawsuit in which I have stated to my opponent

4    that I did rely on" --

5         THE COURT:  Let's -- hold on.  Let's not go into

6    attorney-client privilege communications.

7    BY MR. BALDRIDGE:

8    Q.   Did you ever, yourself, consider withdrawing that

9    report --

10   A.   I had conversations with my attorney about the

11   situation.

12   Q.   It was never --

13        THE COURT:  Sir --

14        MR. BALDRIDGE:  I don't want --

15        THE COURT:  Hold on, hold on.

16        Mr. Mueller, I hope you're aware there's an

17   attorney-client privilege in this country, so any

18   communications between you and Mr. McFarland are privileged

19   and you don't -- you do not have to answer any questions

20   that would call into question whether you had any of those

21   sorts of types of discussions.  Do you understand?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  All right.

24   BY MR. BALDRIDGE:

25   Q.   Okay.  Mr. Mueller, until you got on the stand, had

Recross - Mueller

1    there been any statement to someone, other than your lawyer

2    in this lawsuit, that you withdrew your reliance on Mr.

3    Opp?

4    A.    Yes.

5    Q.    Anyone in this courtroom?

6    A.    Not in this courtroom, no.

7    Q.    Okay.  Anyone in this lawsuit?

8    A.    Not -- not in this lawsuit, no, sir.

9    Q.    Okay.  So that just -- my client just learned you no

10   longer want 3 million from your testimony here to this jury

11   for the first time; is that right?

12   A.    Are you saying today?

13   Q.    I said what I said, sir.

14   A.    I think --

15   Q.    While you were on the stand --

16   A.    I -- well, yeah, you -- you found out yesterday.

17   Q.    While you were on the stand, correct?

18   A.    Yes.

19   Q.    Now, when Mr. McFarland first redirected you, he

20   showed you a number of photographs of the people in line?

21   A.    Yes.

22   Q.    And he asked you questions about whether your hand was

23   behind those other people's waist, right?

24   A.    The photographs of other people posing with Ms. Swift?

25   Q.    Yes.

Recross - Mueller

1    A.    Yes.

2    Q.    And he said, Are they -- is that behind the waist, is

3    that behind the waist, things like that.  Do you recall

4    that?

5    A.    Yes, I do.

6    Q.    Your hand wasn't behind Ms. Swift's waist, was it?

7    A.    In the photograph?

8    Q.    Your hand was not behind Ms. Swift's waist in the

9    photograph, was it?

10   A.    No, I don't believe it was.

11   Q.    And, sir, the photographs he showed you were

12   predominantly little girls, weren't they?

13   A.    Seemed like it was predominantly females and they

14   were -- yeah, there were some younger females, yes, sir.

15   Q.    And you're a 51-year-old male, right?

16   A.    Yeah, I am -- well --

17   Q.    At the time?

18   A.    At the time, yeah.

19            MR. BALDRIDGE:  Thank you, sir.

20            THE COURT:  All right, Mr. Mueller, thank you for

21   your testimony.  You may step down.

22            The plaintiff may call his next witness.

23            MR. McFARLAND:  We call Andrea Swift.

24            COURTROOM DEPUTY:  Raise your right hand.

25            ANDREA SWIFT, PLAINTIFF'S WITNESS, SWORN

468
Direct - Andrea Swift

1              COURTROOM DEPUTY:  Please be seated.  State your

2      full name for the record and spell your first and last

3      name.

4              THE WITNESS:  My name is Andrea Swift.

5      A-n-d-r-e-a, Swift, S-w-i-f-t.

6              COURTROOM DEPUTY:  Thank you.

7              THE WITNESS:  Thank you.

8                       DIRECT EXAMINATION

9      BY MR. McFARLAND:

10     Q.   Good afternoon, Ms. Swift.

11     A.   Hello.

12     Q.   You are Ms. Taylor Swift's mother.

13     A.   I am.

14     Q.   And you're also formally employed by the Swifts?

15     A.   Formerly employed?  Formally employed.

16     Q.   Formally employed?

17     A.   I'm actually formally employed by 13 Management.

18     Q.   Okay.  You're part of Ms. Swift's -- Ms. Swift's

19     senior management team.

20     A.   Yes, I am.

21     Q.   I'd like to ask you to take a look at your deposition

22     transcript.  And while that's being located, I'll ask you

23     one quick question.

24              Do you remember your deposition that I took in

25     this case back in June of 2016?

Direct - Andrea Swift

1   A.    I do.

2   Q.    And you understand that you were under oath at the

3   time?

4   A.    Absolutely.

5   Q.    And to the best of your knowledge, information, and

6   belief, the answers you gave to my questions during that

7   deposition, were truthful?

8   A.    Yes.

9           COURTROOM DEPUTY:  June 28th, 2016?

10          MR. McFARLAND:  That's correct.

11  BY MR. McFARLAND:

12  Q.    Ms. Swift, would you please turn to page 8.  And look

13  at line 2.

14          MR. BALDRIDGE:  Your Honor, if I may, I don't know

15  a rule that permits someone to have a witness read their

16  deposition.  He could impeach her if she said something at

17  odds with her deposition or he could refresh her

18  recollection.  It appears that we're about to read the

19  deposition.

20          THE COURT:  Hold on.  What's going on here?

21          MR. SCHAUDIES:  She needs her glasses.

22          MS. TAYLOR SWIFT:  She needs her glasses.

23          THE WITNESS:  I need my glasses.

24          THE COURT:  Hand them to Ms. Hansen.  We had too

25  much going on here at one time.

Direct - Andrea Swift

1        Go ahead, Mr. Baldridge.  I didn't hear what you

2   were saying.

3        MR. BALDRIDGE:  I'm unfamiliar with the Federal

4   Rule of Evidence that permits counsel to have a witness

5   just read his or her deposition.  It's to impeach or to

6   refresh recollection or inconsistent statements, and here

7   he's just going to have her read something she said.

8        MR. McFARLAND:  I was --

9        THE COURT:  Hold on.  Weren't we just down this

10  road right before lunch?  I mean, you haven't set up any

11  foundation for the use of the deposition.  The deposition

12  can only be used, as you know, counsel, for certain limited

13  purposes at trial.

14       MR. McFARLAND:  Judge --

15       THE COURT:  You just asked her her name and who

16  she was employed by.

17       MR. McFARLAND:  Yes.  And she told me that she was

18  formally employed by 13 Management.

19       THE COURT:  Former?  Or formal?

20       MR. McFARLAND:  Formally employed -- formally

21  employed by 13 Management.  That's different from what she

22  said in her deposition --

23       THE COURT:  Okay.

24       MR. McFARLAND:  And --

25       THE COURT:  All right.

471

Direct - Andrea Swift

1          MR. McFARLAND:  That's where I was going.

2          THE WITNESS:  May I explain?

3     BY MR. McFARLAND:

4     Q.   Pardon?

5     A.   May I explain?

6     Q.   Let's frame the question.

7          On June 8th, at line 2 -- and I want you to make

8     sure I read this correctly.

9          Okay.  Do you -- are you formally employed by

10    Taylor Swift?

11         Answer:  Was I formally employed?

12    A.   Formerly.

13    Q.   Question.  Are you formally employed?

14         Answer:  I am.

15    A.   That's right, I am formally employed.

16    Q.   You are formally, f-o-r-m --

17    A.   I am formally employed.  You didn't --

18         THE COURT:  Folks, folks, folks.

19         THE WITNESS:  -- didn't specify with whom.

20         THE COURT:  Ms. Andrea Swift.

21         THE WITNESS:  Sorry.

22         THE COURT:  Please.

23         THE WITNESS:  Sorry.  I'll slow down.

24         THE COURT:  It's not a matter of your speed.  Ms.

25    George is an excellent court reporter, but she physically

472

Direct - Andrea Swift

1    cannot take down two voices at once.

2            THE WITNESS:  I'm sorry.

3            THE COURT:  Only one person can be speaking at the

4    same time, so please, listen -- wait until the question has

5    been completed, then you can give your answer, and I'm sure

6    Mr. McFarland will reciprocate.

7            THE WITNESS:  Okay.

8    BY MR. McFARLAND:

9    Q.    Let's -- let's -- I'll ask the questions and you give

10   the answers.

11           This is from your June 2016 deposition.

12   A.    Yes.

13   Q.    Okay.  Do you -- are you formally employed by Taylor

14   Swift?

15           Your answer?

16   A.    Yes.  You said that and then I said, was I formerly

17   employed?

18   Q.    And then I said formally.

19   A.    And you said:  Are you formally employed?

20   Q.    And you said?

21   A.    Yes, I am formally employed.

22   Q.    But not by Taylor Swift?

23   A.    But you didn't ask me that.

24   Q.    Your position is you -- during your deposition, you

25   did not testify that you were formally employed by Taylor

473
Direct - Andrea Swift

1    Swift --

2    A.    I was just trying to get you to clarify whether you

3    were trying to say was I formerly employed by her or am I

4    formally employed?  And I am formally employed, and I'm

5    formally employed by 13 Management.

6    Q.    Fair enough.  Thank you.

7    A.    Yes.

8    Q.    And you're part of Ms. Swift's senior management team.

9    A.    I am.

10   Q.    And the other members of that team include Mr.

11   Schaudies?

12   A.    Yes.

13   Q.    And Mr. Robert Allen?

14   A.    Yes.

15   Q.    And Mr. Scott Swift?

16   A.    Yes.

17   Q.    And Ms. Taylor Swift?

18   A.    Exactly.

19   Q.    Do you recall the -- Taylor's concert -- or Ms. Taylor

20   Swift's concert in Denver on June 2d, 2013?

21   A.    I do.

22   Q.    Did you attend that conference -- that concert?

23   A.    Yes, I did.

24   Q.    Did you attend the fan or the general meet-and-greet?

25   A.    No, I did not.

474

Direct - Andrea Swift

1    Q.    Were you in the photo booth at the time of the alleged

2    incident?

3    A.    No, I wasn't.

4    Q.    Did you see anybody inappropriately touch Ms. Swift on

5    that night?

6    A.    No.

7    Q.    But shortly before the concert, Ms. Taylor Swift told

8    you that somebody had grabbed her.

9    A.    Yes.

10   Q.    And you understandably were angry.

11   A.    I was very upset.  It's different than angry.

12   Q.    How is that different?

13   A.    I was upset to the extent of feeling like I wanted to

14   vomit and cry at the same time.  That's upset.

15   Q.    But you weren't angry at the person who allegedly did

16   that?

17   A.    Emotions move on over time; however, I was far, far

18   more upset and trying to be attentive to my daughter than I

19   was consumed with anger.

20   Q.    And after you learned about the alleged incident, you

21   met with Mr. Allen, Mr. Greg Dent, Mr. Greg Thomas, Ms.

22   Erica Worden, and Frank Bell to discuss things?

23   A.    We did.

24   Q.    And at that meeting, you learned from someone that Mr.

25   Mueller was affiliated with KYGO.

475
Direct - Andrea Swift

1    A.    Yes.

2    Q.    And to the best of your recollection, at least at the

3    time, you believed you learned that from Frank Bell?

4    A.    I'm sorry?  I didn't hear that.

5    Q.    And you believe you learned that Mr. Mueller was

6    affiliated with KYGO from Frank Bell?

7    A.    I don't recall.

8    Q.    Let's turn to page 19 of your deposition.  And let's

9    look at line 3.

10   A.    Uhm-hum.

11   Q.    The question was:  Was there any indication during

12   this meeting that Mr. Mueller was affiliated with KYGO?

13         Your answer was?

14   A.    Yes.

15   Q.    The next question was:  And do you know where that

16   information came from?

17         And your answer was?

18   A.    I believe it was Frank Bell.

19   Q.    Okay.  You believe that then and that's what you

20   believe now?

21   A.    It was a pretty complicated evening.  It very well may

22   have been Frank Bell.

23   Q.    Do you have any reason today to believe it was

24   somebody else?

25   A.    No.

476

Direct - Andrea Swift

1   Q.   At the meeting with Mr. Allen and Mr. Dent and Mr.

2   Thomas and Ms. Worden and Mr. Bell, you decided that Mr.

3   Mueller would be located and should be escorted from the

4   building.

5   A.   Yes.

6   Q.   And about that time, Ms. Taylor Swift went on stage

7   for the show.

8   A.   It was -- it was about a half an hour prior to the

9   beginning of the show, yes.

10  Q.   And during the concert, you learned that Mr. Mueller

11  had been escorted from the building.

12  A.   At some point, yes.

13  Q.   And after the concert, you got together with the same

14  group of people to discuss Mr. Mueller again.

15  A.   And to discuss a number of things, yes.

16  Q.   Including Mr. Mueller.

17  A.   Yes.

18  Q.   And it was at that meeting that you decided you wanted

19  to let Mr. Mueller's employer, KYGO, know about the alleged

20  incident.

21  A.   I personally did not decide that.  We decided as a

22  group that we felt it was important for his employers to

23  understand what took place and we also felt a

24  responsibility that this not happen to another young woman.

25  Q.   You -- you didn't call the police, right?

477

Direct - Andrea Swift

1    A.    No, we did not.  We -- we didn't know what to do.

2    We -- we had never found ourselves in this position before.

3    It was -- it was inconceivable to us that this could take

4    place, how it took place, and where it took place, and it

5    was shocking and we were shocked and we didn't know what --

6    really what to do, but we hadn't ruled it out.

7          We were considering -- we didn't know what to do.

8    Everything came up.

9    Q.    And you agreed with the group's decision that someone

10   should let KYGO know about the alleged incident.

11   A.    Yes, I did.

12   Q.    And Mr. Bell felt the same way.

13   A.    I -- yes.  We all agreed that as a group we felt this

14   was our responsibility.

15   Q.    And you wanted to make sure -- I think you just said

16   that this didn't happen to anyone else?

17   A.    Pardon?

18   Q.    It -- I think you just said:  And you wanted to make

19   sure that this type of thing didn't happen to anyone else.

20   A.    Yes.  Because of all the years that we've been going

21   into radio stations, since Taylor was 15 1/2 years old,

22   with her first single, Tim McGraw, and we went into these

23   radio stations and Taylor would play her music for them,

24   because you realize that it was not necessarily going to be

25   a -- something that country radio were going to embrace,

Direct - Andrea Swift

1    that a 15-year-old would be writing and playing her own

2    music legitimately.  So we -- we knew at that time what we

3    had to do was go into these radio stations and just let her

4    show them, and so we did that.

5          And we -- we took six months virtually covering

6    the country, sometimes three radio stations a day.  She was

7    young and these radio programmers and music directors, many

8    of them looked at her like their daughter, or their little

9    sister.  We trusted them.  But we also recognized that

10   there were many times we were only in the company of a

11   radio promotion person or an on-air talent person.  And

12   what could happen to a young woman if she didn't have a

13   companion or a -- like a -- someone to accompany her in

14   those situations?

15         Yes, we were -- we felt it was -- it was

16   imperative that we let his employers know that, what

17   happened.

18   Q.   The best way to make sure something like that doesn't

19   happen to somebody else would have been to call the police,

20   right?

21   A.   I did not want this event to define her life.  I did

22   not want every interview from that moment on to include --

23   to have to make her talk about what happened to her.  I did

24   not want her to have to live through the endless means and

25   gifts and anything else that tabloid media or trolls --

1     internet trolls would be able to come up with.  Doctoring

2     the picture or, you know, putting funny things in the

3     picture that weren't there, and -- and making her relive

4     this awful moment over and over and over again.

5              No.  I -- we absolutely wanted to keep it private,

6     but we did not want him to get away with it.

7     Q.   The truth is you weren't worried about this happening

8     to anybody else, right?

9     A.   I absolutely was.

10    Q.   But you weren't worried enough to contact the police?

11    A.   We contemplated it.  We felt this was the right thing

12    to do.  It was the workplace.  We wanted to see what

13    happened after this.  We weren't going to stop.

14    Q.   And during this time, were you keeping Ms. Taylor

15    Swift apprised of the things that you were doing?

16    A.   Before the show, the only thing that I wanted her to

17    know was that he would not be in the building and that he

18    would not be able to stare at her during her show after

19    what he had just done to her.  So that was the most

20    important thing.

21              But I also knew that she had to pull herself

22    together and go on to a stage and perform for close to two

23    hours for close to 20,000 people.  And I knew that was

24    going to take a great deal of focus because the stage, it

25    can be an extraordinarily dangerous place if the artist is

Direct - Andrea Swift

1    not focused.  There are trap doors, there are lifts that

2    are down that leave gaping holes in the stage during some

3    times.  There are -- there's pyro, there's all kind --

4    there are all kinds of things that could go wrong.  Artists

5    have walked off stages before and broken limbs.

6            So I didn't -- I didn't consult with her a great

7    deal before the show.  I wanted her to try to move forward

8    because she wanted to play the show.

9    Q.   How about after the show and after your second meeting

10   with the senior management team, where you talked about

11   letting Mr. Mueller's employer know about the alleged

12   incident, did you keep Ms. Taylor Swift apprised of those

13   decisions that were going on or that you were planning on?

14   A.   After the show was over, I told her that we had

15   gathered together as a group and that we felt that the most

16   important thing to do was to let KYGO know.

17   Q.   And -- and you relayed that information to Ms. Taylor

18   Swift.

19   A.   I did.

20   Q.   Did Ms. Taylor Swift voice any concern or objection

21   about that proposed course of action?

22   A.   No.

23   Q.   And you didn't know on June 2d, 2013, that security

24   personnel was in the photo booth at the time of the alleged

25   inappropriate touching?

481

Direct - Andrea Swift

1    A.    I didn't know who was in the booth.

2    Q.    Did you know whether security personnel was --

3    A.    I --

4    Q.    -- present?

5    A.    I -- I now do, but I assumed in the moment -- I mean,

6    I -- those weren't my concerns.  I wasn't going around like

7    checking things out, like, "What did you see and what do

8    you think?"  I knew what happened.  I heard it from her.  I

9    heard it from my daughter's mouth.  I knew exactly what

10   happened.  I didn't have to have people come up to me and

11   verify or tell me where they were standing.  I knew exactly

12   what happened.  He sexually assaulted her, right there,

13   that guy.

14   Q.    And -- at any time after June 2d, 2013, to the

15   present, had you talked to Greg Dent about the alleged

16   incident?

17   A.    No.

18   Q.    You -- you're not curious about what in the heck he

19   was doing, how this happened?

20         MR. BALDRIDGE:  Objection.  Form.

21         THE COURT:  Overruled.

22         THE WITNESS:  I knew that it happened so very

23   quickly and I knew that -- no, I -- I knew it happened

24   quickly, and I -- I am -- I don't look forward to talking

25   about this.  This isn't -- this isn't one of my favorite

482

Direct - Andrea Swift

1    topics of conversations.  I can't stand it.

2    BY MR. McFARLAND:

3    Q.    I understand that and I --

4    A.    Right.

5    Q.    -- I'm sorry --

6    A.    I'm glad you can, Gabe, seriously.

7    Q.    -- we have to talk about it.

8              How long did Greg Dent remain employed as a

9    personal bodyguard for Ms. Swift after the June 2d concert?

10   A.    I'm not sure.

11   Q.    Did he remain Ms. Taylor Swift's personal bodyguard

12   after the concert for some period of time?

13   A.    He did until we decided to restructure our security

14   department and offered him a job to come on board.

15   Q.    Weren't you concerned about Mr. Dent's ability to

16   protect Ms. Taylor Swift's person or body after the alleged

17   incident?

18   A.    No, I have no concerns about Greg Dent.

19   Q.    Mr. Dent was a fantastic bodyguard.

20   A.    Yes.

21   Q.    And he's really well-trained, correct?

22   A.    Yes.

23   Q.    And he was 5 or so feet away from Ms. Taylor Swift at

24   the time?

25   A.    I don't know how far away he was.

483
Direct - Andrea Swift

1    Q.   But you never asked him why he didn't do anything?

2    A.   No.

3    Q.   And you never asked him why he let Mr. Mueller waltz

4    out of the photo booth?

5    A.   No.

6    Q.   And you didn't ask him what he saw or didn't see?

7    A.   No.  I didn't feel the need to blame him for something

8    that Mr. Mueller did very spontaneously.

9    Q.   You -- you have a -- you have other children?

10   A.   I do.  I have a son.

11   Q.   And your son would never inappropriately touch a

12   woman --

13        MR. BALDRIDGE:  Objection, Your Honor.

14   Q.   -- correct?

15        THE COURT:  Sustained.  Next question.

16   BY MR. McFARLAND:

17   Q.   Has your son ever been falsely accused of anything

18   inappropriate?

19        MR. BALDRIDGE:  Objection, Your Honor.  Her son

20   has nothing to do with this.

21        MR. McFARLAND:  I just am trying --

22        MR. BALDRIDGE:  It's completely irrelevant.

23        THE COURT:  Wait.  One at a time.  Are you done

24   with your objection?

25        MR. BALDRIDGE:  Yes, sir.

484
Direct - Andrea Swift

1          THE COURT:  What is the relevance of this

2     question?

3          MR. McFARLAND:  I just wonder if Ms. Andrea Swift

4     would feel differently or act differently if, instead of

5     Ms. Taylor Swift saying, "I was inappropriately touched,"

6     it was her son who was claiming, "I was falsely accused of

7     inappropriate touching."

8          MR. BALDRIDGE:  Now we'll add relevance and

9     character under Rule 400 series of Federal Rules.  This is

10    completely off base.

11         THE COURT:  I agree.  This is sustained.  And I

12    think there's other ways to go about trying to elicit the

13    testimony you're trying to get, but I don't think this is

14    the way to do it.

15         MR. McFARLAND:  Fair enough.  Thank you, Your

16    Honor.

17    BY MR. McFARLAND:

18    Q.   At the -- you also knew on June 2d, 2013, or shortly

19    after that, that Ms. Worden was in the photo booth at the

20    time of the alleged incident, correct?

21    A.   Yes.

22    Q.   And you haven't had any conversation with her about

23    what she observed, correct?

24    A.   No.

25    Q.   Have you talked to anyone who -- who claimed -- other

Direct - Andrea Swift

1    than Ms. Taylor Swift, your daughter, who claimed to have

2    seen Mr. Mueller grab Ms. Swift in the way she's described?

3    A.    Stephanie said to me, "I knew exactly what had

4    happened.  I knew he grabbed her."

5    Q.    Anybody other than Ms. Simbeck?

6    A.    My daughter did.

7    Q.    Right.  Other than Ms. Simbeck and your daughter, did

8    you talk to anybody else about the alleged incident?

9    A.    No.

10   Q.    Who were the people who made the decision to notify

11   Mr. Mueller's employer, KYGO, about the alleged incident?

12   A.    Again, we met as a group.  We talked about -- I just

13   wanted to know who this person was.  When Taylor -- when I

14   first came into the dressing room and I said to Taylor -- I

15   saw her face, and I could tell that there was something

16   horribly wrong.  And I -- I said, "What's going on?"

17            And she said, "Mom, a guy just grabbed my ass

18   and -- in the meet-and-greet."

19            And I said, "What -- what are you talking about?

20   What's going on?"

21            And she said, "There -- there's a guy in the

22   meet-and-greet.  He said he was with the radio station.  I

23   don't know who he was."

24            And I said -- so -- so my main point in meeting

25   with these people was to figure out who on earth this

Direct - Andrea Swift

1    person was.  And that's when they told me that there was a

2    picture.  And I didn't want to see it.

3    Q.    So that evening, Ms. Taylor Swift relayed to you that

4    the person who had inappropriately touched her had just

5    previously identified himself as somebody who works with

6    KYGO?

7    A.    I'm sorry?  I don't -- I need you to repeat that.

8    Q.    So the evening of June 2d, 2013, Ms. Taylor Swift

9    conveyed to you that the person who inappropriately touched

10   her identified himself as a KYGO radio employee just prior

11   to the alleged touching?

12   A.    She seemed confused about it.  She said that he made

13   some comment to her that he was with the radio station and

14   she -- but she had never seen him before.  Never -- we've

15   met everyone in these radio stations.  I mean, we knew

16   them, and this was someone she didn't know.  He was a

17   stranger to her.

18   Q.    Who -- who made the decision to notify Mr. Mueller's

19   employer about the alleged incident?

20   A.    Who made the decision?  We as a group did.

21   Q.    And that was you and Mr. Allen and Mr. Frank Bell?

22   A.    It was everyone who was in that room.  It was Robert,

23   it was Frank, it was Erica, and Greg, Craig.  We were all

24   in the room.  We were all discussing.  They were trying to

25   fill me in on what they knew.

Direct - Andrea Swift

1           And the most important thing that we were talking

2    about was trying to locate him with a picture.

3    Q.   And you, again -- just to be clear -- were part of the

4    team that made that decision to notify KYGO --

5    A.   We collectively made a group decision.

6    Q.   And you wanted Mr. Mueller to be fired?

7    A.   I hoped they would come to that conclusion, but I knew

8    it was their call.

9    Q.   You absolutely wanted Mr. Mueller to be fired?

10   A.   I absolutely did.  He committed a sexual assault on my

11   daughter.  I absolutely did.

12   Q.   And you thought, when you reported it, that he would

13   be fired?

14   A.   I had no idea.

15   Q.   You know that your daughter is one of the most

16   influential and powerful people in music, right?

17   A.   And I also know there's due process in a corporation.

18   And I know that there's -- there are interviews that have

19   to happen and HR teams.  I know that, too.

20   Q.   But you didn't think that when the team for one of the

21   most powerful, influential people in music called KYGO,

22   that Mr. Mueller would be fired?

23   A.   I did not know for certain.  No, I did not.

24   Q.   Did you think he would be fired?

25   A.   I did not know anything.  And I already told you what

Cross -- Andrea Swift

1   I hoped would happen.

2   Q.   Did you expect him to be fired?

3   A.   I had no expectations whatsoever.  I wanted them to

4   make their own conclusion.

5   Q.   Can we agree that inappropriate touching is never

6   acceptable?

7   A.   Yes.

8   Q.   Can we agree that falsely or wrongfully accusing

9   someone of inappropriate touching is equally wrong?

10  A.   Absolutely.

11  Q.   Thank you very much.

12  A.   Thank you.

13          THE COURT:  All right.  Cross-examination.

14          MR. BALDRIDGE:  Thank you, sir.

15                      CROSS-EXAMINATION

16  BY MR. BALDRIDGE:

17  Q.   Hi, Andrea.

18  A.   Hi.

19  Q.   Are you all right?

20  A.   I'm good.

21  Q.   Sorry.  I heard something.

22          THE COURT:  Does someone have their cell phone on?

23          UNIDENTIFIED PERSON IN GALLERY:  It's a diabetes

24  thing.  I turned it off.

25          THE COURT:  I can't hear you.

489
Cross -- Andrea Swift

1           UNIDENTIFIED PERSON IN GALLERY:  It's a diabetes

2      meter.

3           MR. BALDRIDGE:  Sorry.

4           UNIDENTIFIED PERSON IN GALLERY:  Sorry.

5      BY MR. BALDRIDGE:

6      Q.   Are you ready?

7      A.   I am.

8      Q.   Ms. Swift, tell this jury a little bit about your

9      family, please.

10     A.   About my family?

11     Q.   Yeah.  Tell them about your family.

12     A.   Well, my family is my husband, Scott; my daughter,

13     Taylor; my son, Austin.  And we're a very close family.  We

14     love spending time together.  We love playing games.  We're

15     total Scrabble nuts.  And -- and we've been that way ever

16     since they were born.

17          We have -- we lived on a farm when the kids were

18     born, and -- in Reading, Pennsylvania.  It was a Christmas

19     tree farm.  We spent our days riding ponies and cleaning

20     out stalls and taking care of animals, and plus my husband

21     went to work every day.  So we had a very sweet existence

22     living on a farm.

23          It occurred to us that our daughter loved to sing

24     when she was little, very little, even though I wanted her

25     to ride horses.  So she started to become involved in

Cross -- Andrea Swift

1    children's theater and, meanwhile, our son was involved in

2    every kind of sport there was.  But we noticed that Taylor

3    had much more interest in performing than she did with

4    horseback riding, so that quickly separated out.

5           She began playing guitar at age 11; started to

6    write her own songs at age 12.  And we just thought that

7    was so cute.  And it never occurred to us that that was

8    anything more than a stage or phase.  But she was pretty

9    good at it and she kept doing it and kept going.

10          And so we found ourselves going into Nashville.

11   And when she was 11 years old, she pretty much insisted

12   that we had to go to Nashville because that was where

13   country music -- that was the home of country music and

14   this was where Faith Hill had gone to get her record deal.

15          And so she -- she kept up with it long enough to

16   finally -- I said, "Okay, it's spring break, Dad's busy

17   with work, let's -- let's convince your brother that going

18   to Nashville is going to be a really cool thing to do for

19   spring break," and we did.

20          And at age 11, Taylor had made these little demo

21   CDs, and she brought them with her.  And so we started to

22   drive around Nashville up and down Music Row and pointing

23   out that, "There's this record label.  There's this record

24   label."

25          And Taylor would jump out the car and run through

Cross -- Andrea Swift

1    the front door and hand off a CD to the receptionist to

2    say, "Hi, I'm Taylor, I'm 11, I want a record deal.  Call

3    me."

4         And -- but I think it became pretty apparent to

5    her that there was more to it than that.  And we came back

6    from that trip and she immediately decided to pick up

7    guitar.  And she would play, oh, six to eight hours a day,

8    sometimes, on weekends.  And as many hours as she could get

9    on weekdays after school.  And she wrote songs and wrote

10   songs and wrote songs.

11        And then the next time we went to Nashville, she

12   was 13 and she had written over a hundred songs.  And we

13   were able to make a few appointments at some record labels.

14   And she walked into RCA and sat down at the conference

15   table and played for them for an hour, and they signed her

16   to a development deal, which is when they like what they

17   see, but they're not quite ready to invest in a full record

18   deal for you.

19        So we, at that point, realized that it wasn't --

20   we weren't just proud parents, that there might actually be

21   something there that got the attention of a big record

22   label.  So we made the decision to move to Nashville and

23   give her the chance to be close to that songwriting

24   community so she could immerse herself in with the

25   songwriters and be able to see if this was going to

Cross -- Andrea Swift

1   continue to be her dream.

2           And so we moved to Nashville.  And she actually, a

3   year later, decided that she didn't want to -- it was a

4   development deal, so it was only for a year.  And they came

5   to us and they said to Taylor, "You know, we'd like to

6   develop you for another year."

7           And she said, "You know, I" -- she said to us,

8   Scott and I, she said, "I don't think they get my music and

9   I don't think they really want me to write my own songs, so

10  I'm -- I think we need to leave this record deal."

11          And we --

12          MR. McFARLAND:  Judge --

13          THE WITNESS:  Are you sure --

14          MR. McFARLAND:  -- I'm sorry to interrupt --

15          THE WITNESS:  And she did --

16          THE COURT:  Hold on.

17          THE WITNESS:  I'm sorry.  I'm sorry.

18          MR. McFARLAND:  It's a nice story.  I'm not

19  sure --

20          THE COURT:  Can you get closer to the mike so I

21  can hear your --

22          MR. McFARLAND:  It's an interesting story.  I'm

23  not sure that it's relevant and it's -- it's not a

24  question-and-answer, it's just a narrative, so I --

25          THE COURT:  This is --

Cross -- Andrea Swift

1          MR. McFARLAND:  I object on those grounds.

2          THE WITNESS:  I'm sorry, I didn't know how far

3     back to go.  I could go to her birth, but, you know.

4          MR. BALDRIDGE:  I could clear it up here, Your

5     Honor.

6          THE WITNESS:  I can go as long as you want me to

7     go.

8          THE COURT:  Hold on, Ms. Swift.

9          Maybe you could structure the answer a little bit

10    more, counsel, so that it will be okay.

11    BY MR. BALDRIDGE:

12    Q.   Let me ask you something --

13    A.   Okay.

14    Q.   -- a little different, Andrea.

15          You were with Taylor pretty much every step of the

16    way until she became an adult, right?

17    A.   Yes.

18    Q.   And in that period, how many radio stations, for

19    example, did you and Taylor visit together?

20    A.   Hundreds.

21    Q.   And how many people in the music industry did you and

22    Taylor visit together?

23    A.   Tens of thousands.

24    Q.   Record labels and things of that nature?

25    A.   Thousands upon thousands upon thousands.

494
Cross -- Andrea Swift

1    Q.    And within each of those thousands upon thousands of

2    organizations, you dealt with adults, right?

3    A.    All the time.

4    Q.    Did any adult ever inappropriately touch your daughter

5    in that time period prior to Mr. Mueller?

6    A.    Never.

7    Q.    And you made sure of that, didn't you?  You did your

8    best to protect your daughter, right?

9    A.    I did.

10   Q.    And that's why you're there, right?

11   A.    Yes.

12   Q.    Now, with that background in mind, please tell this

13   jury how you felt the night of June 2d, 2013, when your

14   daughter told you what Mr. Mueller had done.

15   A.    Well, one of the things I think that stuck with me was

16   that she -- she couldn't believe that she, after the

17   incident, after he grabbed her and -- that she thanked them

18   for being there.  She said, "Thank you."

19           And it was -- it was just -- it was just

20   destroying her that she said that after somebody did that

21   to her, and it just -- it -- as a parent, it made me

22   question why I taught her to be so polite in that moment.

23   Q.    And having spent every step of the way with your

24   daughter, had she ever lied to you about anything important

25   like this before?

495

Cross -- Andrea Swift

1    A.    Never.

2    Q.    Is there any doubt in your mind that what your

3    daughter told you that night was true?

4    A.    None.  None whatsoever.

5    Q.    I'm going to back up a little bit, if we can.  Are you

6    all right?

7    A.    Yes.

8    Q.    Tell this jury a little bit about yourself.  I know

9    you don't like to talk about yourself, but where did you

10   grow up?

11   A.    I was born in Venezuela and I grew up in Puerto Rico

12   and in Singapore, Thailand.  We moved a lot.  We grew up --

13   I grew up all over the world.  And then we moved back to

14   the states when I was about almost 13.

15   Q.    And --

16   A.    And I lived in Texas and then Pennsylvania.

17   Q.    Tell the jury a little bit about your educational

18   background, please.

19   A.    I graduated from the University of Houston.

20   Q.    Then what did you do?

21   A.    I went to work for a company in Houston called

22   American Capital Mutual Funds.

23   Q.    And what do they do?

24   A.    They are a mutual fund group and wholesale to

25   brokerage dealers, brokerage firms.

Cross -- Andrea Swift

1    Q.    And were you married at that time?

2    A.    I was not.

3    Q.    When did you get married?

4    A.    I got married when I was 30.

5    Q.    And you married Scott Swift?

6    A.    I did.

7    Q.    And that's this gentleman sitting right here with the

8    red tie?

9    A.    That guy right there.

10   Q.    And you've been married ever since, right?

11   A.    Yes, we have.

12   Q.    And what did you do after you were employed by

13   American Capital?

14   A.    I was at first working in the home office in Houston

15   as marketing support for the wholesalers who were out in

16   the territory going in and out of offices and talking about

17   which fund might be appropriate for their client.  And then

18   I was promoted to vice president and moved out into a

19   territory with five states, so I traveled quite a bit.

20   Q.    And now, just to clarify Mr. Mueller -- Mr.

21   McFarland's question, you were employed by 13 Management,

22   LLC --

23   A.    I am.

24   Q.    And that's a valid legal entity, correct?

25   A.    It is.

497

Cross -- Andrea Swift

1  Q.   And Taylor Swift does not sign your paycheck, does

2  she?

3  A.   No, she doesn't.

4  Q.   Your paychecks are issued by a valid entity, right?

5  A.   It is.

6  Q.   And that entity, 13 Management, LLC, operates through

7  the management committee or the management group you just

8  discussed, right?

9  A.   Yes.

10  Q.   And, generally speaking, what does the management team

11  that you told Mr. McFarland about, what do you guys do?

12  There's a lot going on, what is it?

13  A.   There's a lot going on.  And we -- you know, the

14  reason we have -- it's very different from a lot of

15  artists.  We don't have -- you know, a lot of artists are

16  managed by one manager and that manager, you know, has the

17  group and they -- they decide who's going to do what, I

18  suppose.

19         But in our case -- I think very early on her dad

20  and I knew that the best person to manage Taylor was

21  Taylor, and that that was the best thing we could probably

22  do was to try to help her establish her own management

23  company so that she would understand what these contracts

24  she was signing meant, so that she would know how to manage

25  her business and not let anyone take advantage of her in

Cross -- Andrea Swift

1    the business world.  That she would -- she would be

2    prepared for the time that we weren't there to help her.

3            And so, therefore, we decided to establish a

4    company and hire people who were really great at what they

5    do.  So we -- and the senior management team reflects that.

6    Q.   Approximate -- if I may, approximately when did you

7    organize Taylor's activities, if you will, around the

8    company?  What year, approximately?

9    A.   Did we organize 13 Management?

10   Q.   Did you decide to have a company, management company,

11   you said.

12   A.   It was when she was 17.

13   Q.   So from 17 on, can you tell the jury summarily, if you

14   will, in summary fashion, how did that company grow and

15   develop to where it is today?

16   A.   Well, it -- and obviously it started off pretty small.

17   And we -- we had our office personnel who would handle the

18   incoming calls, we -- we had a sort of a general manager

19   kind of thing who managed the office and people would come

20   in.  We had Frank Bell, who was -- who came on board to

21   help us manage sort of our radio relationships.

22            As it grew, we brought on Robert Allen, who was

23   expert with touring and can build any stage there is and

24   knows everyone to contact for lighting and sound.  We

25   brought on Jay Schaudies, who is -- has legal background,

1    and he's a lawyer, he's excellent with contracts.

2            And so it's -- it's not we're all trying to do all

3    of it, we -- we all have our area of expertise and then --

4    and then we float.

5            We -- it's just a -- if it needs to be done, just

6    get it done.  And we -- it's all hands on deck, sometimes.

7    So that's -- that's how we are -- our management team

8    works.

9    Q.    Does the organization, 13 Management organization,

10    does it have any particular focus on fans of your

11    daughters?

12    A.    A major focus on fans.  They're everything.

13    Q.    Tell the jury a little bit about that, please.

14    A.    Well, I mean, that -- you know, primarily when I go

15    out on tour with Taylor, it's -- I mean, yes, we love to

16    keep each other company, but she really wants to know that

17    her fans are being taken care of and that they are being

18    treated well and with respect and -- and also there's a

19    huge element of meeting them that she continues to want to

20    do for zero cost.  She doesn't charge anyone any money to

21    come to a meet-and-greet.

22            We -- we -- we do meet-and-greets through radio

23    because if we're coming into town, we want to help support

24    that radio station in giving tickets to some of their fans.

25    But we also do all kinds of meet-and-greets, whether it's a

500

Cross -- Andrea Swift

1    sick child, whether it's a fan who's been a fan for years

2    and years and years and has never had a chance to meet

3    Taylor.

4         So we really try to keep track of who our -- who

5    her fans are, and where -- you know, what they -- whether

6    they had an opportunity to meet or not.

7    Q.   Now, in her various concerts and tours over time, does

8    your daughter generally always stay on the stage or does

9    she sometimes go out in the crowd?

10   A.   Well, that was definitely the case on, you know, a few

11   of the tours leading up, but that -- we don't do that

12   anymore.  But there was a time when Taylor -- when Taylor

13   would walk from -- you know, if she was going to do an

14   acoustic set where she would just play her guitar, you've

15   got -- you know, she would have another stage.  Her -- her

16   feeling has always been, with touring, that she wants to

17   try to get as close to everyone in that arena so that

18   everyone feels that they had a great seat regardless of

19   where it is in the arena or the stadium.  And so she comes

20   up with a variety of ways that she can get out there.

21        And one of them was to literally walk right

22   through them, right down the aisle with people hugging her

23   and taking selfies and doing -- you know, just showing love

24   to all these people who came out for her that night.  And

25   then she would play an acoustic set and get -- walk right

Cross -- Andrea Swift

1    back through them.

2    Q.   And in all of these fan contacts over the years, had

3    any person ever inappropriately touched her?

4    A.   Not once.

5    Q.   Had she ever reported anyone ever inappropriately

6    touching her in all of these contexts?

7    A.   Never.

8    Q.   In any time, has she reported any person assaulting

9    her or inappropriately touching her, other than David

10   Mueller?

11   A.   No.

12   Q.   Have -- did you know David Mueller before June 2d,

13   2013?

14   A.   I had no idea who he was or anything about him until

15   after this happened.

16   Q.   Did anyone, to your knowledge, within -- I'll call it

17   the 13 Management organization, know David Mueller before

18   then?

19   A.   Not at all.

20   Q.   Can you envision, as you sit here today, any incentive

21   or motivation whatsoever for your daughter, or anyone at 13

22   Management, to accuse this man of grabbing her rear end?

23   A.   No.  None.

24   Q.   Now, you said in your answer about her going out in

25   the crowd, you said, "We don't do that anymore."  Can you

1    tell the jury why.

2    A.    Because of this incident.  It's -- it's absolutely

3    shattered our trust.  It -- it just -- it just made -- it

4    made us do a bunch of things differently.  Our

5    meet-and-greets are much smaller.  We now have metal

6    detectors.  We wand people.  We could -- we do background

7    checks.

8            It scared us.  It scared us really badly.

9    Q.    And you've spent money on that, right?

10   A.    Quite a bit.

11   Q.    And let's shift gears here.  Do you attend your

12   daughter's concerts?

13   A.    Pardon?

14   Q.    Do you attend Taylor's concerts?

15   A.    I do.

16   Q.    Why?

17   A.    Because I have a great time out there singing and

18   dancing with the fans.

19   Q.    And do you go backstage for various events that occur?

20   A.    Yes.  Yeah, I do.

21   Q.    And any folks ever charge anyone to come backstage?

22   A.    No, we don't.

23   Q.    And do you ever serve any alcohol backstage?

24   A.    No, we don't.  We --

25   Q.    Why not?

503
Cross -- Andrea Swift

1    A.   Well, there usually are underage kids.  There might

2    not be a lot of them sometimes, but if there's even one, we

3    don't.  We just never have.

4    Q.   Let's move on to June 2d, 2013.

5         You remember this concert, of course, right?

6    A.   Yes.

7    Q.   And this was the one in the Pepsi Center on the Red

8    Tour here in Denver, correct?

9    A.   Yes.

10   Q.   And do you remember pre-concert meetings between

11   Taylor and various groups of people at that concert?

12   A.   Yes.

13   Q.   And did she have one, two, or more -- you know, more

14   than one meeting backstage before the concert?

15   A.   Yes.  There usually are quite a few.  I -- a few, at

16   least, let's put it that way.  There are -- there are

17   usually -- there can be a couple of what we call

18   partnership or sponsorship meet-and-greet, where people who

19   might be sponsoring, might be a corporation might be

20   sponsoring a tour, and part of that would have been -- is

21   no longer -- some meet-and-greets for them to distribute

22   among their personnel or run a contest for, you know,

23   something that would be in their best interests.

24        Then we also have the radio program director,

25   music director, and it's a -- usually there can be some

Cross -- Andrea Swift

1    other people in there, but it's -- it's designed -- and

2    this actually -- I mean, it started way back when -- should

3    I go on, or do I need to keep it short?

4    Q.   I'm focusing.  That's all right.

5    A.   Okay.

6    Q.   I'm focusing on June 2d, 2013.  How many

7    meet-and-greets --

8    A.   So there was a program director, music director

9    meet-and-greet.  And that's governed by the radio station

10   and the record label.  We will say, "Okay, you guys have --

11   you guys have eight meet-and-greets.  You can put eight

12   people in that room."  Because there are -- in many cities

13   there are multiple radio stations, and so in order to be

14   fair, you say to each radio station here, "You can have

15   eight, you can have eight, you can have eight," and -- and

16   they are the ones who decide who -- who gets those and --

17   but we do also offer them a certain allotment in the

18   general meet-and-greet, which is designed for fans of the

19   radio stations.  And, like I said before, other places that

20   we are -- you know, are the allotment.

21          But they can -- the radio station can say, You

22   know, we have more personnel than eight, you know, and they

23   can put them in the general meet-and-greet, if they -- if

24   they decide to do that.  We -- it's up to them.  It's

25   totally up to them.

Cross -- Andrea Swift

1    Q.    That night of June 2d, 2013 -- you sat through this

2    trial.  You're aware that Mr. Mueller and his girlfriend,

3    Ms. Melcher, were in the -- what I'll call the general fan

4    line for a meet-and-greet; is that right?

5    A.    I know.  Yes.

6    Q.    And do you have any knowledge as to what group of

7    meet-and-greet, if any, Mr. Haskell and Ryno Kliesch and

8    his wife were in?

9    A.    They were all in the PDMD meet-and-greet, the one

10   prior to the general.

11   Q.    And did you have an opportunity to see Mr. Haskell

12   that night in the PDM radio meet-and-greet?

13   A.    I did.

14   Q.    Tell the jury about that.

15   A.    I came into the meet-and-greet.  I saw a bunch of

16   faces that I've recognized before.  Went and started to say

17   hello to them.  I said hello to Eddie Haskell.  I had met

18   him a few times before, but I don't know exactly how many

19   times before.

20         And then after Taylor's had a chance to go around

21   and say hello to everyone and take pictures, she turns them

22   over to me and I -- I took them on a backstage tour of the

23   set of -- of the entire backstage, which we do for many,

24   many groups each night.

25   Q.    And that included Mr. Haskell and that smaller

Cross -- Andrea Swift

1    group --

2    A.    Yes.  Yes.  Uh-huh.

3    Q.    Now, in the period of meeting Mr. Haskell -- I assume

4    your daughter was present part of that time, right, with

5    you?

6    A.    Yes, she was.  Well, I mean, we weren't -- she's

7    usually talking to someone and I'm talking to someone

8    else --

9    Q.    You're in the same room is what I meant.

10   A.    Yes.

11   Q.    And you took him along, Mr. Haskell and his group,

12   among others, on the tour of the stage?

13   A.    I did.

14   Q.    Did you ever once see any inappropriate conduct by

15   Eddie Haskell where your daughter was concerned?  Or at

16   all?

17   A.    No.

18   Q.    In the time you were with him, did you ever even see

19   an opportunity for him to assault your daughter by touching

20   her rear end?

21   A.    No.  They took a picture together.

22   Q.    And did your daughter ever mention that Eddie Haskell,

23   in this separate group, had ever done anything

24   inappropriate?

25   A.    No.

507
Cross -- Andrea Swift

1    Q.    And Mr. Haskell had known your daughter since she was

2    14 or so, right?

3    A.    Yes.

4    Q.    Known her through business functions, right?

5    A.    More like 15 1/2, 16, but yes, a long time.

6    Q.    And this was part of going to radio stations and

7    things of that nature?

8    A.    Yes.

9    Q.    The radio relationships -- in this instance, if you

10   could focus more on KYGO, but as an example, is that

11   important to Taylor and your organization, radio

12   relationships?

13   A.    All -- all radio relationships are important, yes.

14   Q.    Now, there's been a suggestion from the questions Mr.

15   McFarland asked that your daughter, because she's

16   influential and talented and powerful, my words, could kind

17   of get her way where the radio stations are concerned.  Did

18   you hear those questions?

19   A.    I did.

20   Q.    What do you have to say about that, ma'am?

21   A.    There's not a chance.

22   Q.    Why?

23   A.    Because they deal with too many artists and big

24   artists, and -- I mean, then why wouldn't an artist go in

25   and say, "Play my song?"  It's their call.  They're the

Cross -- Andrea Swift

1    ones in charge.

2    Q.    Who decides who puts the songs on the radio?

3    A.    The program director.

4    Q.    Ms. Swift doesn't?

5    A.    And the music director.

6    Q.    Ms. Swift doesn't, does she?

7    A.    No.

8    Q.    Now, God forbid this happens, but have you ever

9    thought about could KYGO country station in Denver survive

10   without Taylor Swift?  God forbid?

11   A.    Exactly.

12         MR. BALDRIDGE:  Yes.  Okay.  Are we at afternoon

13   break time yet, Your Honor, only because I think I could

14   very much shorten this if I had a few minutes, or I could

15   keep going.

16         THE COURT:  We're going to go to about 5 to 3:00.

17   You have about 20 minutes.

18         MR. BALDRIDGE:  Okay.  Yes, sir.

19   BY MR. BALDRIDGE:

20   Q.    When did you first learn of what occurred with Mr.

21   Mueller on June 2d, 2013?

22   A.    When I finished that backstage tour and walked into

23   her dressing room.

24   Q.    And that's the -- strike that.

25         Who was in the room?

509

Cross -- Andrea Swift

1    A.    Taylor.

2    Q.    Just the two of you?

3    A.    Yes.

4    Q.    And can you tell the jury, with as much memory and

5    clarity as you have, what she said to you exactly.

6    A.    She said, "Mom, a -- a guy just grabbed my ass."

7    Q.    And what was her demeanor?

8    A.    She was really shaken.  She was humiliated.  She was

9    em- -- horribly embarrassed because he grabbed her bare

10   ass.

11   Q.    And did your daughter, either then or at any other

12   time, tell you what she wanted to happen to Mr. Mueller?

13   A.    No.

14   Q.    Did she ever direct you or anyone else at 13

15   Management to call KYGO, for example?

16   A.    No.

17   Q.    Did your daughter ever direct you or anyone else at 13

18   Management to get Mr. Mueller terminated?

19   A.    No.

20   Q.    Did your daughter ever specify any specific or

21   particular action she wanted taken against Mr. Mueller?

22   A.    No.

23   Q.    And to be clear, the process that ensued as to Mr.

24   Mueller that Mr. McFarland asked you about, that was the

25   collective group decision of senior management, correct?

Cross -- Andrea Swift

1    A.    It was.

2    Q.    And your daughter wasn't even in that circle --

3    A.    She was not.

4    Q.    -- when the decision was made?

5          Now, I'd like to show you, if I could, Exhibit I,

6    I believe it is, the actual meet-and-greet photograph.

7          And you, of course, have seen this photograph

8    before, haven't you?

9    A.    I have.

10   Q.    And you saw it first the night of June 2d?

11   A.    I did.

12   Q.    Who showed it to you, if you remember?

13   A.    I don't -- I -- it's a blur.

14   Q.    What was your reaction to the photograph?  And what --

15   how did you interpret what you were seeing when you saw it?

16   A.    The reason I saw it was because they were using this

17   to find him, and the second I saw it, I knew there was

18   something horribly wrong, horribly wrong going on in that

19   picture.

20   Q.    How did you know something horribly wrong went on in

21   that picture?

22   A.    Because of her body and her -- this look in her eyes.

23   I -- I know those eyes better than anybody and I -- I can

24   tell by the way she's pulling over and her body is at an

25   awkward angle, because she's literally pulling as far away

511

Cross -- Andrea Swift

1    as she can.  She has a smile frozen on her face because --

2    I don't -- you know, she smiles for so many pictures, it's

3    but there's something going on in her eyes that just -- I

4    just looked at it and I thought it was -- sickened.

5    Q.   Now, how many photographs, approximately -- and I know

6    you don't know the exact number -- have you seen of your

7    daughter with any fans or radio people?

8    A.   Oh, I -- I mean, it's -- it's in the tens, if -- tens

9    of thousands, it has to be by now.

10   Q.   And based on your memory -- and I know it hasn't been

11   perfect -- have you ever seen a photograph with Taylor

12   Swift with any fan or radio personnel that looked like this

13   one?

14   A.   No.  No.  And in the very beginning days, I took them

15   all.

16   Q.   Have you ever seen a photograph of your daughter with

17   any person that had the look in the eyes that you just

18   described seeing as a mother?

19   A.   No.

20   Q.   Now, you told Mr. McFarland that, darn straight -- my

21   words -- you wanted Mr. Mueller -- you thought he should be

22   fired, right?

23   A.   I felt that he should.

24   Q.   Did you demand that Frank Bell get him fired?

25   A.   Absolutely not.

Cross -- Andrea Swift

1   Q.   What did you say to Frank Bell when you told him, or

2   the group told him, "Contact KYGO"?

3   A.   It -- it wasn't telling him.  It was all of us

4   conversing and it was coming to a consensus.  And we just

5   knew Frank would be the one to -- that's his job.  He's

6   radio.  Tag, you're it.  He's radio.

7         And so it was -- it was never even a consideration

8   that anyone else would contact the radio station.

9   Q.   And did he have directions on what to do or did you

10  leave it up to him to decide?

11  A.   I totally left it up to him.

12  Q.   And why would you do that?

13  A.   Because I am not the person who's in touch with radio

14  stations.

15  Q.   Does Mr. Bell have a background in radio?

16  A.   He has 30 years in radio.

17  Q.   And do you know whether or not Mr. Bell knew Bob Call

18  at KYGO?

19  A.   Yes, he knew them all.

20  Q.   And do you know whether they had a good relationship,

21  bad relationship --

22  A.   I have no idea.

23  Q.   But it was in Mr. Bell's hands, correct?

24  A.   It was.

25  Q.   And did Mr. Bell ever report back to you, or the

Cross -- Andrea Swift

1    management group, about his -- any discussions with Mr.

2    Call?

3    A.   No.  The only thing that Frank came up to me later --

4    I -- I believe it was after the show, he -- you know, I

5    am -- I would be making it up.  I don't -- I don't recall

6    the exact moment or -- I know after a couple of days I knew

7    that he had been -- I knew that his radio station had been

8    contacted, but that was all I knew.

9    Q.   Did you ever hear back whether or not Mr. Mueller had

10   been terminated?

11   A.   I did.

12   Q.   Approximately when did you hear that and who from?

13   A.   Prob- -- prob- -- a few days later.

14   Q.   And did Mr. Bell tell you that?

15   A.   Yes, he did.

16   Q.   Now, you had a number of questions about not

17   contacting the police.

18   A.   Uhm-hum.

19   Q.   And I think you probably largely covered this, but

20   have you ever rethought whether you should have contacted

21   the police?

22   A.   Absolutely.

23   Q.   And tell the jury your thinking about that.

24   A.   I think any time something this traumatic happens in

25   your life, you -- you kind of torture yourself.  You know,

514
Cross -- Andrea Swift

1    you are going back and you are saying, "Why didn't I" --

2    "Should we have done this?"  And I think, you know, there

3    are moments, but I still think that we did the right

4    thing.

5    Q.   And did you, or anyone to your knowledge, at 13

6    Management or the Swift organization, do anything to try to

7    make the incident of June 2d, 2013, public?

8    A.   Absolutely not.

9    Q.   Why not?

10   A.   We didn't want it to be public.  We -- even when we

11   were -- a great deal of discussion that night was about --

12   Frank told us that he had told Bob Call that he had the

13   photograph, and Bob wanted him to send the photograph.  And

14   we were -- I was scared to death about that.

15            I was like, "I -- how do we know that someone else

16   won't get it?  How do we know that someone won't leak it

17   to, you know, some press, some media site?"  Some -- we

18   just -- I -- I was scared to death of that photograph

19   getting out.

20   Q.   And we touched on this, Ms. Swift, but I want to

21   address it in just a little more detail.

22            The event of June 2d, 2013, when Mr. Mueller

23   assaulted your daughter, has had an effect on the way 13

24   Management does business, hasn't it?

25   A.   Yes.

Cross -- Andrea Swift

1    Q.    And can you explain to the jury what specific effect

2    this has had.

3    A.    Well, you know, we -- we just -- we don't trust like

4    we did.  We look at everything through a magnifying glass

5    now as to what could go wrong and how we can try to protect

6    her better and -- but I think we still want to believe that

7    we have a great relationship with the radio -- you don't

8    want to punish that entire community because of what one

9    person did.  You don't want to take things away from fans

10   because of what one person did.  And so we're trying very

11   hard to find some balance there.

12   Q.    Now, in the several years since Mr. Mueller sued

13   you -- and I don't want to talk about private

14   communications with us -- you've been familiar of the

15   public allegations and facts and things that have come up

16   in this lawsuit; is that right?

17   A.    Some of them.  I --

18   Q.    Have you heard a single thing in the entire length of

19   this lawsuit that has caused you to have any

20   second-guessing about whether your daughter was actually

21   assaulted that night?

22   A.    Absolutely not.

23   Q.    Who assaulted your daughter on June 2d, 2013?

24   A.    David Mueller did.

25   Q.    Thank you.

516
Redirect - Andrea Swift

1    A.    Thank you.

2              THE COURT:  Mr. McFarland, I want to get a sense

3    of how much redirect you have.  We might take our afternoon

4    break a little bit early.

5              MR. McFARLAND:  I will say I think I could be much

6    more efficient with just a few minutes break.

7              THE COURT:  You can do it -- you can be more

8    efficient with a break?

9              MR. McFARLAND:  I can be much more efficient with

10   a break.

11             THE COURT:  Now?

12             MR. McFARLAND:  Yes.

13             THE COURT:  Okay.  We'll do it.

14             MR. McFARLAND:  Thank you.

15             THE COURT:  We'll have our afternoon recess.

16   We'll be in recess for 20 minutes.

17         (Recess 2:55 p.m. to 3:20 p.m.)

18             THE COURT:  All right, Ms. Swift, I remind you you

19   remain under oath.

20             Mr. McFarland, you may resume your redirect.

21             MR. McFARLAND:  Thank you, Your Honor.

22                       REDIRECT EXAMINATION

23   BY MR. McFARLAND:

24   Q.   Ms. Swift, is there any possibility that it was

25   someone else other than Mr. Mueller?

517

Redirect - Andrea Swift

1    A.    None whatsoever.

2    Q.    Every guest who attended the fan or the radio

3    meet-and-greet on June 2d, 2013, took a photograph with Ms.

4    Swift, right?

5    A.    Yes.

6    Q.    Have you looked at those photographs?

7    A.    Yes.

8    Q.    You looked at all the photographs?

9    A.    All that we had left on our server.

10   Q.    Was that all of the photographs of the people or only

11   a portion of the photographs that were taken with other

12   guests that night from the regular fan meet-and-greet?

13   A.    I -- I don't know.

14   Q.    How many photographs did you look at?

15   A.    Everything that we seen here in court.

16   Q.    Any -- anything other than the ones we've seen here at

17   court?

18   A.    No.

19   Q.    Okay.  So you have seen what I'll call the photograph,

20   the photograph --

21   A.    Yes.

22   Q.    -- of Mr. Mueller, Ms. Taylor Swift, and Ms. Melcher,

23   correct?

24   A.    Yes.

25   Q.    And we've seen a photograph of Ms. Swift and Mr.

518
Redirect - Andrea Swift

1    Haskell --

2    A.    Yes.

3    Q.    -- correct?

4           Then we saw 10 or 12 additional photos of Ms.

5    Swift posing with other fans on that evening.

6    A.    Right.

7    Q.    Do you know how many fans participated in the fan

8    meet-and-greet on June 2d, 2013?

9    A.    No, I don't.

10   Q.    Do you know how many fans typically participate in the

11   fan meet-and-greets at your daughter's concerts?

12   A.    It -- there is no "typically."  It -- it can range.

13          MR. McFARLAND:  Judge, I would move for the

14   admission of Plaintiff's Exhibit 9, that has been

15   stipulated.

16          THE COURT:  One second.  All right, given the

17   stipulation, Exhibit 9 is admitted into evidence and may be

18   published to the jury.

19       (Plaintiff's Exhibit 9 received)

20          MR. McFARLAND:  Thank you, Your Honor.

21   BY MR. McFARLAND:

22   Q.    Ms. Swift, would you look at Plaintiff's Exhibit 9.

23          MR. BALDRIDGE:  Your Honor, I'm confused as to how

24   this is redirect as opposed to broadening the scope on

25   redirect.

519

Redirect - Andrea Swift

1          THE COURT:  All right.  Well, I don't know where

2     counsel's going with this, so I'll give him a couple of

3     questions and we'll see how he connects it to cross.

4     BY MR. McFARLAND:

5     Q.   And can you read that on your screen?  I'll try to

6     blow --

7     A.   I cannot.

8     Q.   -- the top part a little.

9          Can you read that?

10    A.   Yes, I can.

11    Q.   Do you know what this is?

12    A.   Well, it says that it is a guest list.

13    Q.   For the June 2d, 2013, concert at the Pepsi Center?

14    A.   Yes.

15    Q.   And if you look at the second page --

16    A.   Uhm-hum.

17    Q.   -- No. 33, do you see David Mueller's name there?

18    A.   I do.

19    Q.   Do you know if this is the guest list for the fan

20    meet-and-greet?

21    A.   This is Big Machine Record's form.

22    Q.   So you don't know?

23    A.   No.  It's not ours.

24    Q.   And you don't know whether this list represents the

25    people that attended the fan meet-and-greet?

Redirect - Andrea Swift

1   A.    I'm going to assume -- no, I'm not going to assume.

2   No, I don't know.

3   Q.    You don't know.  Okay.

4         Do you know whether Ms. Taylor Swift has looked at

5   all of the photographs that were taken during the fan

6   meet-and-greet on June 2d, 2013?

7   A.    I do not know.

8   Q.    Let's take a look at the photograph.

9         You understand that in this case, your daughter

10  contends that Mr. Mueller took his hand, put it under her

11  skirt, and grabbed her bare bottom.

12  A.    Yes.

13  Q.    And you understand that the allegation, further, is

14  that he remained latched on as she tried to move away?

15  A.    Yes.

16        MR. BALDRIDGE:  Beyond the scope of redirect.

17  This is way beyond direct now.

18        THE COURT:  You mean beyond the scope of cross?

19        MR. BALDRIDGE:  Yeah, I'm getting confused because

20  it's my client, called by him --

21        THE COURT:  I understand.

22        MR. BALDRIDGE:  But he's well beyond the scope of

23  cross.

24        THE COURT:  Mr. McFarland?

25        MR. McFARLAND:  I -- I think Mr. Baldridge had

Redirect - Andrea Swift

1    questions for Ms. Swift about this photograph and I just

2    want to follow up on a couple --

3           THE COURT:  I agree.  Overruled.

4    BY MR. McFARLAND:

5    Q.   So you understand that the allegation is that Mr.

6    Mueller took his hand and put it under her skirt, he

7    grabbed onto her bare bottom, and then stayed latched on as

8    she moved away from him?

9    A.   Yes.

10          THE COURT:  Mr. McFarland, can you please keep

11   your voice up?

12          MR. McFARLAND:  Thank you.

13          THE COURT:  You're really trailing.

14   BY MR. McFARLAND:

15   Q.   This picture, you would acknowledge -- in this

16   picture, you would acknowledge that Mr. Mueller's hand is

17   not under Ms. Taylor Swift's skirt, wouldn't you?

18   A.   I would not acknowledge that.

19   Q.   You would agree with me that Ms. Swift's skirt line,

20   the hem line at the bottom, is not ruffled or otherwise

21   disturbed, wouldn't you?

22   A.   I would not agree with that.

23   Q.   You think that this picture shows Mr. Mueller's hand

24   underneath Ms. Taylor Swift's skirt?

25   A.   Yes.

522
Recross - Andrea Swift

1    Q.    And you think her skirt is disturbed?

2    A.    Yes.

3    Q.    Okay.  On June 13, were you acting as a member of

4    Taylor's senior management team or as her mother or as both

5    when you decided, as part of the team, that it made sense

6    to contact KYGO about Mr. Mueller?

7              MR. BALDRIDGE:  Can you rephrase your date?  Can

8    he rephrase his date?

9    BY MR. McFARLAND:

10   Q.    I'm sorry, June -- June 2d, 2013.

11   A.    I thought you said June 13.  So June 2d, when I was

12   with that group of people, I was acting as an employee of

13   13 Management, along with the other employees of 13

14   Management in trying to come up with a solution -- or at

15   least a temporary solution to a very big problem.

16   Q.    You weren't acting as Taylor's mother --

17   A.    I'm always acting as her mother.

18   Q.    Fair enough.  Thank you.

19   A.    Sure.

20             THE COURT:  All right.  Any recross?

21             MR. BALDRIDGE:  Briefly, Your Honor.

22             THE COURT:  Okay.

23                     RECROSS-EXAMINATION

24   BY MR. BALDRIDGE:

25   Q.    You heard a number of questions from Mr. McFarland

Recross - Andrea Swift

1    about the photos and who was in that line, right?

2    A.    Yes.

3    Q.    And the questions started with the prospect of whether

4    it was possible Mr. Mueller had been misidentified in that

5    line.  Do you recall that?

6    A.    Yes.

7    Q.    And you're absolutely certain he was not, right?

8    A.    He was -- there's no possibility.

9    Q.    And you've been here for the entire trial, right?

10   A.    Yes, I have.

11   Q.    And you heard him testify that he thought he and

12   Shannon Melcher were the only adult couple in the entire

13   line, right?

14   A.    Yes.

15   Q.    And in all the photos you saw, did you see any

16   6-foot-4 man with a nice outfit on and a big moustache?

17   A.    No.

18   Q.    Do you think it's possible, Ms. Andrea Swift, that

19   your daughter confused Mr. Mueller with one of the children

20   in line?

21   A.    No.

22   Q.    Now, the photo.  Mr. McFarland asked you a few

23   questions about the photo and what it showed.  Do you

24   recall that generally?

25   A.    Yes.

524
Recross - Andrea Swift

1    Q.   And he asked a question to the effect:  You agree that

2    it doesn't show any rumpling of the skirt?  Do you recall

3    that question?

4    A.   Yes.

5    Q.   And you disagreed with him, right?

6    A.   That's right.

7    Q.   Can we put on the photo please?  Put it up.

8         Do you recall me, in opening statements, saying

9    there's a mystery about this photo?

10   A.   Yes, I do.

11   Q.   Can you please show the jury and tell me what you see

12   right there.

13   A.   Yes.  The dress is made of somewhat of a stiff fabric.

14   It -- it didn't -- it didn't fly with the wind, it didn't

15   in any way lose its shape.  It would have had to have been

16   pushed up for it to make that kind of curvature there

17   because, as you can tell by Taylor's body, she was doing

18   two-hour shows every night, there wasn't an ounce of fat on

19   her.  There are no hips there.

20        In order to make that piece pop out, it was being

21   lifted.

22   Q.   And stating the obvious, a photo is probably --

23   captures less than a second in time, right?

24   A.   Absolutely.

25   Q.   And she's already pulled away from him, right?

525
Direct - Bell

1    A.    Yes.

2    Q.    So we're somewhere after the act of the grab, right?

3    A.    I think it's hard to tell exactly whether -- I mean, I

4    think you could take milliseconds of photos and you would

5    find the entire action.  So I don't know if this is a

6    millisecond before or after, because I -- but what I do

7    know is that dress is being pushed up.

8    Q.    Thank you.

9    A.    Thank you.

10          THE COURT:  All right.  Ms. Swift, thank you for

11   your testimony.  You may step down.

12          THE WITNESS:  Thank you very much, Judge.

13          THE COURT:  The plaintiff may call his next

14   witness.

15          MR. McFARLAND:  Thank you, Your Honor.  We call

16   Frank Bell.

17          THE COURT:  All right.  Mr. Bell.

18           FRANK BELL, PLAINTIFF'S WITNESS, SWORN

19          COURTROOM DEPUTY:  Please be seated.  State your

20   full name for the record and spell your first and last

21   name.

22          THE WITNESS:  Frank Bell.  F-r-a-n-k, B-e-l-l.

23                    DIRECT EXAMINATION

24   BY MR. McFARLAND:

25   Q.    Good afternoon, Mr. Bell.  You're old friends with

526
                          Direct - Bell

1    Taylor Swift's dad?

2    A.    Yes.  He and I have been friends since 1977 when we

3    first worked together at a radio station in Reading,

4    Pennsylvania.

5    Q.    And you're currently employed by 13 Management?

6    A.    Yes.

7    Q.    And you're Taylor Swift's radio guy?

8    A.    Correct.

9    Q.    What do you do as Taylor Swift's radio guy?

10   A.    I serve as the primary interface between 13 Management

11   and radio stations literally all over the world, both

12   country and pop stations here in the U.S., and then

13   internationally in pretty much every territory that plays

14   her music.

15   Q.    And you've held that position since 2010?

16   A.    Yes, December 2010.

17   Q.    And you've spent basically your entire professional

18   career in radio.

19   A.    Yeah.  30 -- 37 years.

20   Q.    Let's talk about June 2d, 2013.  Do you remember

21   Taylor Swift's concert that evening?

22   A.    I do.

23   Q.    Did you attend that concert at the Pepsi Center?

24   A.    Yes.

25   Q.    At some point that evening, you learned that there was

527

Direct - Bell

1    an incident involving Ms. Swift and Mr. Mueller?

2    A.    That is correct.

3    Q.    And you first learned about that incident from Erica

4    Worden?

5    A.    Yes.

6    Q.    And that was shortly after the conclusion of the fan

7    or the regular meet-and-greet?

8    A.    Correct.

9    Q.    Who's Erica Worden?

10   A.    Erica -- I believe her title at that time was a tour

11   manager.

12   Q.    Ms. Swift's tour manager?

13   A.    Yes, uhm-hum.

14   Q.    And what is the regular meet-and-greet?

15   A.    The regular meet-and-greet is a collection of mostly

16   fans of Taylor, selected through radio contests, provided

17   maybe by brand partners perhaps, and the venue.  And

18   occasionally there are some radio station employees that

19   don't fit into the VIP room that are placed in the regular

20   meet-and-greet.

21   Q.    So it's not unusual to have some radio personalities

22   in the regular meet-and-greet?

23   A.    No, pretty much in every city, there's -- there's a

24   couple.

25   Q.    At the conclusion of the regular meet-and-greet, you

528
Direct - Bell

1    were in a larger VIP area just outside what we've called

2    the photo booth.

3    A.    Yes.

4    Q.    And you understand that the photo booth is the area 10

5    by 10, 12 by 12, fabric where the regular meet-and-greet

6    participants were having their photograph taken with Ms.

7    Swift.

8    A.    Yes.

9    Q.    And at the conclusion of the regular meet-and-greet,

10   Ms. Worden popped out of the photo booth and told you there

11   was a problem.

12   A.    Correct.

13   Q.    And you went into the booth to cooperate?

14   A.    Yes, I went --

15   Q.    I'm sorry, you went into the booth to investigate?

16   A.    Yes, correct.

17   Q.    You were not in the photo booth at any time during the

18   regular meet-and-greet.

19   A.    That is correct.

20   Q.    To the best of your knowledge, you didn't observe or

21   take any notice of Mr. Mueller during the regular

22   meet-and-greet?

23   A.    No.   I was not aware that he was in that line.

24   Q.    And you were not in the photo booth when Mr. Mueller

25   and his girlfriend, Ms. Melcher, took the photograph?

529

Direct - Bell

1     A.    Correct.

2     Q.    When you entered the photo booth at the conclusion of

3     the regular meet-and-greet, who was in there?

4     A.    As I recall, it was Erica Worden; it was Stephanie

5     Simbeck, the photographer; Gabby Liddicoat, who at the time

6     was Taylor's personal assistant, who also worked this room;

7     there was the security guy on duty there, Greg Dent; and,

8     of course, Taylor, herself.

9     Q.    And Ms. Simbeck was the photographer?

10    A.    Yes.

11    Q.    And after you entered the photo booth, you were told

12    that Ms. Swift had been groped.

13    A.    Yes.  Ms. Swift, herself, told me, "Some radio guy was

14    here and he stuck his hand up my skirt and grabbed my bare

15    ass."

16    Q.    So Ms. Swift identified the person as a radio guy?

17    A.    She said she was pretty sure it was a radio guy,

18    because they had talked about KYGO, but she did not

19    recognize him from prior meetings.

20    Q.    Okay.  Do you recall whether Ms. Swift described the

21    alleged inappropriate touching as, "I was groped, I was

22    grabbed"?  Do you remember what words she used?

23    A.    I'm pretty sure they were the words I just spoke,

24    which is, you know, "This guy from radio stuck his hand up

25    my skirt and grabbed my bare ass."

Direct - Bell

1    Q.   At that time, you didn't talk to the other people who

2    were in the photo booth about what they saw or didn't see.

3    A.   That's not true.  I did pretty much interact with

4    everyone there very briefly to see what their perceptions

5    were.  And then Stephanie, the photographer, said, "And

6    I -- I have a picture of it."  Which was also a surprise.

7    Q.   Did you talk to Mr. Dent about what he saw or didn't

8    see?

9    A.   I don't recall an actual conversation with Mr. Dent.

10   What I recall is me looking his way saying, "Did something

11   happen here?" and him nodding in the affirmative.

12   Q.   Did you ever ask Mr. Dent at any time what he was

13   looking at, what he saw, anything like that?

14   A.   I did not in any sort of in-depth way discuss

15   intricate movements of anything.

16   Q.   Did you ask Mr. Dent why he didn't confront Mr.

17   Mueller?

18   A.   I did not.

19   Q.   Did you ask him why he allowed Mr. Mueller to casually

20   stroll out of the photo booth?

21   A.   No, I did not ask.

22   Q.   Did you ask Mr. Dent whether there was anything

23   unusual about Mr. Mueller's behavior when he entered the

24   photo booth?

25   A.   No.

Direct - Bell

1    Q.    Were you angry at Mr. Dent that Ms. Swift was

2    apparently, or allegedly, inappropriately touched while he

3    was less than 5 feet away from her?

4    A.    The only anger I had at that point was directed at the

5    plaintiff.

6    Q.    So you were angry?

7    A.    I was shocked, I was completely horrified.  I was

8    appalled because this guy supposedly is a radio station

9    guy.  I'm the radio guy for the organization, I -- it was

10   just an awful experience.

11   Q.    And you were angry?

12   A.    Sure.

13   Q.    And after within just a few minutes after learning of

14   the alleged allegations, you left the photo booth.

15   A.    Yes.

16   Q.    And to the rest of your recollection, there was

17   another meet-and-greet after that in the VIP Club Red area?

18   A.    Correct.  We had a group of pop programmers coming in

19   at that time.

20   Q.    And you attended that VIP meet-and-greet?

21   A.    Yes.  Yes.

22   Q.    And Taylor Swift was also present?

23   A.    Yes.

24   Q.    And then you made a call to Kris Lamm to see if there

25   were any radio personnel on the guest list?

Direct - Bell

1    A.    Right.  Because it was not apparent to me prior to

2    the -- to the group that there were any KYGO people in

3    there.  I tried to track him down by telephone because he

4    was elsewhere in the venue.  And, you know, who are the

5    radio people, you know, from KYGO in the group?

6              And he -- and I said, "We have a picture."

7              And so we tried to get -- hook him up with a copy

8    of the photograph so he could help us identify the person.

9    Q.    And -- and who is Kris Lamm?

10   A.    Kris Lamm was the -- at the time, he was the

11   promotional rep for Big Machine Records for this particular

12   geographical territory.

13   Q.    Did you ever see the guest list for the regular fan

14   meet-and-greet for the June -- on June 2d, 2013?

15   A.    I probably had glanced at it, sure.  I always look at

16   the guest lists.

17   Q.    Did you ever match that up with the photographs that

18   were taken that evening?

19   A.    At some point I went back and did look at the names

20   that were on the guest list, yes.

21   Q.    Did you match those with photographs or the

22   photographs that were taken of each guest that evening?

23   A.    No.

24   Q.    Did you ever look at all of the photographs that were

25   taken that evening?

533

Direct - Bell

1    A.    In terms of the programmer photographs, yes, I

2    absolutely looked at every single one.  As far as the

3    regular meet-and-greet, I don't believe I looked at all

4    however many photographs there were.

5    Q.    Do you know how many people were in the regular fan

6    meet-and-greet on June 2d, 2013?

7    A.    Not exactly.  I could estimate, but I don't -- I don't

8    have an exact number for you.

9    Q.    What's your estimate?

10   A.    I'll say 50 or 60.

11   Q.    Significantly more than the 12 or 15 photographs we've

12   looked at so far in this case, right?

13   A.    Sure.

14   Q.    Did you ever ask anyone for copies of all of the

15   photographs that were taken during the regular fan

16   meet-and-greet on June 2d, 2013?

17   A.    I did not.

18   Q.    Shortly after you called Kris Lamm, do you recall that

19   Mr. Mueller was located somewhere backstage with -- and he

20   was with security, learning that?

21   A.    Yes.

22   Q.    And you went back to that area to see what was going

23   on.

24   A.    Right.  There was a group there already assembled,

25   yes.

534
Direct - Bell

1    Q.   And -- and at that time, did you see Mr. Mueller?

2    A.   Yes.  I saw Mr. Mueller; I saw Shannon, whose last

3    name escapes me, sorry -- and I believe Craig, the security

4    guy was there -- not Greg, but Craig, with a C; there was a

5    building security guard there whose identity I never did

6    learn; and I think Robert Allen was also there.

7    Q.   And Craig Thomas, he's another member of -- or was

8    another member of Ms. Swift's security team?

9    A.   Yes.

10   Q.   Do you recall any -- did you hear any of the

11   conversation at that point?

12   A.   I probably would have been part or heard part of the

13   conversation.  I don't recall everything that was said

14   other than I know it was resolved with the removal of Mr.

15   Mueller and Shannon.

16   Q.   Did you engage in any direct communication with Mr.

17   Mueller?

18   A.   I probably did, but I have no recollection, really, of

19   what was discussed at that time.

20   Q.   Do you recall whether you had any conversation with

21   Mr. Mueller's female friend?

22   A.   I do not.

23   Q.   Shortly after that, do you recall being summoned to

24   another meeting with Mr. Robert Allen and Ms. Andrea

25   Swift?

535

Direct - Bell

1    A.    Yes.

2    Q.    And where did that meeting take place?

3    A.    It was somewhere backstage, but in a different room

4    from any of the other rooms we've described thus far.

5    Q.    And Ms. Andrea Swift, she was very upset?

6    A.    Sure.  I -- it's fair to say everyone was very upset

7    at that time.

8    Q.    Was Ms. Andrea Swift angry?  Did she appear angry to

9    you?

10   A.    Sure.

11   Q.    And she expressed to you during that meeting that it

12   was important to her that you communicate with KYGO as soon

13   as possible.

14   A.    Yes.

15   Q.    And she told you why she wanted you to communicate

16   with the radio station, correct?

17   A.    Yes.  She wanted me to inform the station of what had

18   happened.

19   Q.    Anything else that you can recall?

20   A.    She wanted to make sure that the -- that Mr. Mueller,

21   you know, was fired, was no longer working there.

22   Q.    That's what she wanted, right?  She wanted to make

23   sure that Mr. Mueller was fired.

24   A.    Yes.

25   Q.    And you called Bob Call at KYGO radio the very next

536

Direct - Bell

1    morning.

2    A.    Yes.

3    Q.    Before 8:00 in the morning.

4    A.    Yeah, I had a plane to catch.  It was before flying

5    back.

6    Q.    And you've known Mr. Call for a long time.

7    A.    Yeah.  Probably 20, 25 years or so.

8    Q.    You guys go way back?

9    A.    He is a -- I mean, I know him to be a very stand-up

10   guy, a real Rotary Club sort of guy.  Very much high

11   performance, high integrity sort of guy.

12   Q.    And you knew he was the general manager at KYGO?

13   A.    Oh, yes, absolutely.

14   Q.    And you knew he trusted you because of your previous

15   relationship?

16   A.    Yes.

17   Q.    And you had a conversation with Mr. Call on June 3d,

18   2013, correct?

19   A.    Yes.

20   Q.    And during that conversation, you told him that Mr.

21   Mueller groped Ms. Taylor Swift.

22   A.    Actually, what I said was, "We had an incident at the

23   concert last night."

24            And he said, "Yes, Eddie told me that already."

25            And I basically reiterated the details of what

537

Direct - Bell

1    happened.

2    Q.    You told Mr. Call that Mr. Mueller had inappropriately

3    touched Ms. Swift?

4    A.    Yes.

5    Q.    You told him that he grabbed her butt?

6    A.    Yes.

7    Q.    You also told him that you were greatly disappointed

8    that this had -- that the incident had happened.

9    A.    Very much so.  Very disappointed.

10   Q.    And you were very disappointed that it had allegedly

11   been committed or done by someone affiliated with KYGO.

12   A.    Exactly.

13   Q.    And you told him that you and Ms. Taylor Swift's

14   mother and Ms. Taylor Swift, herself, and the entire

15   management team expected Mr. Call to take appropriate

16   action.

17   A.    No.  What I said was everyone was upset.  We were all

18   clearly upset at what had happened.  And I knew enough

19   about Mr. Call, and I know enough -- or knew enough about

20   Lincoln Financial Media, the insurance company that owned

21   the radio station at the time, to know that they had a very

22   intricate HR process and that they had -- any time anything

23   like this would happen, they would do a lot of due

24   diligence and do their own investigation.  And, in my mind,

25   the only thing I was asking Mr. Call to do was to

538
Direct - Bell

1    investigate what happened and please take the appropriate

2    action.

3    Q.    So you told Mr. Call that you and everybody on the

4    team and Ms. Swift expected him to take appropriate action?

5    A.    Yes.

6    Q.    And you told him there was photographic evidence of

7    the inappropriate action.

8    A.    Yes, I did.

9    Q.    And you told him that you couldn't, but you'd see if

10   you could get permission to send the photographic evidence

11   to him later?

12   A.    Exactly.  Because at that point in time, we did not

13   want to share that photograph with anyone.  We were very

14   concerned about the photograph getting out there.  We felt

15   it was just very embarrassing and humiliating.  And as

16   previously testified to by her mother, we just didn't want

17   that photograph following her around for the rest of her

18   career.

19   Q.    And you also told Mr. Call that the situation was

20   extremely serious.

21   A.    Sure.  Yes.

22   Q.    And you told him that -- that the team was considering

23   all their options.

24   A.    Okay.

25   Q.    You don't -- you don't dispute that?

Direct - Bell

1    A.    No.

2    Q.    I didn't hear you.

3    A.    No.  No, I do not.

4    Q.    And you conveyed that Ms. Swift's team relationship

5    with KYGO was important and could be gravely impacted?

6    A.    We've had a great relationship with KYGO up to that

7    point and I didn't want it to be derailed and I didn't

8    perceive Mr. Call wanting that also.

9    Q.    And you were telling Mr. Call that if the radio

10   station didn't take appropriate action, that relationship

11   could be gravely impacted?

12   A.    Sure.

13   Q.    You don't -- you don't dispute saying that.

14   A.    No.

15   Q.    And -- and you've known -- those words were used in

16   Mr. Call's -- some notes, and you know Mr. Call to be a

17   thorough and thoughtful and honest person.

18   A.    Sure.

19   Q.    So if he said you used the term "gravely impacted,"

20   you don't dispute that?

21   A.    Just clarification.  Are you saying that I used the

22   term "gravely impacted"?  Because I -- that doesn't sound

23   like something I would say.  That may be his

24   characterization of what I said, I would agree on that.

25   Q.    You don't dispute that you said something to that

540

Direct - Bell

1    effect?

2    A.    Right.

3    Q.    And that was true --

4    A.    Uhm-hum.

5    Q.    -- absent appropriate action, there could be damage

6    between the relationship between KYGO and Ms. Swift?

7    A.    (Nodded head)

8    Q.    Correct?

9    A.    Yes.

10   Q.    What -- what was appropriate action?

11   A.    In my mind, the appropriate action was to conduct an

12   investigation, to speak to all the parties involved, and to

13   take whatever action they felt was necessary for their

14   employee after they did their homework.

15   Q.    Appropriate action was his termination, right?

16   A.    No.  No, not at all.  Not in my mind.  I -- I've been

17   a corporate radio guy for a long time.  There were a couple

18   of different scenarios that could happen, in my mind.  One

19   of which was:  You know what, we want to go kind of younger

20   and bolder on our morning show and so this would be good

21   publicity for our station so we won't do anything.

22          The other is:  You know, this guy -- pardon me --

23   is a valued employee, he made a mistake, we're going to

24   suspend him either with or without pay.

25          And the third option in my mind was terminate him.

Direct - Bell

1    Q.    You didn't want the same thing that Ms. Andrea Swift

2    wanted?

3    A.    I wanted the station to do what it felt was correct.

4    I did not feel it was my place to tell Mr. Call or Lincoln

5    Financial Media how to treat their employee.

6    Q.    How did you convey to Mr. Call the sort of action you

7    expected from him to avoid gravely impacting the

8    relationship between Ms. Taylor Swift's team and the radio

9    station?

10   A.    All I ever asked him to do was to investigate and then

11   take some sort of action.  Don't just do nothing.

12   Q.    What -- what did you mean when you said that Taylor

13   Swift's team was exploring all of their options?

14   A.    What I meant was we felt that a sexual assault had

15   taken place backstage on Taylor, and that there had been

16   some discussion internally as to whether we should call the

17   police, and we had not yet at that time made our final

18   decision.

19   Q.    At the time you called -- well, are you surprised that

20   Mr. Mueller was fired?

21   A.    No.

22   Q.    At the time you called Mr. Call, you hadn't talked to

23   Gabby Liddicoat about what she saw or didn't see during the

24   allege incident, right?

25   A.    Gabby was in -- back in the photo booth area and I

542

Direct - Bell

1    believe I would have interacted with her briefly, just as I

2    talked to everybody else in this that -- that little --

3    Q.   You didn't talk to her specifically about what she saw

4    or didn't see during the alleged incident before you called

5    Mr. Bell -- I'm sorry, before you called Mr. Call?

6    A.   No.  I didn't need to.  Taylor, herself, told me what

7    had happened.

8    Q.   And -- and you assumed that what she told you was

9    accurate and truthful.

10   A.   Absolutely.

11   Q.   And for that reason, you didn't talk to Abby, who some

12   people have said was in the photo booth as well.

13   A.   Yeah, I have no recollection of Abby -- with an A --

14   being anywhere around there.

15   Q.   And you didn't talk to Greg Dent before making that

16   phone call?

17   A.   I talked to Taylor.  That's all I needed to know.

18   Q.   So you did not talk to her personal bodyguard to find

19   out what he saw before making the phone call to Mr. Call?

20   A.   I did communicate with him.  As I mentioned earlier,

21   that I looked at him and he nodded in the affirmative that

22   something had happened.

23   Q.   Did you have any specific conversation with him about

24   what he saw --

25   A.   Not to my recollection, any conversation.

                              Direct - Bell

1     Q.   And you didn't conduct any investigation, yourself,

2     before putting that call into Mr. Call?

3     A.   I talked to Erica Worden; I talked to Taylor Swift,

4     herself, the victim here; I talked to Stephanie; and then

5     to Gabby.

6     Q.   So let's take a look at your deposition, which was

7     also taken in June of 2016.

8              COURTROOM DEPUTY:  June 29th?

9              MR. McFARLAND:  June 29th, 2016.

10    BY MR. McFARLAND:

11    Q.   Let's look at page 29, line 20.  Let me know when

12    you're there.

13    A.   Got it.

14    Q.   My question to you:  What investigation did you

15    conduct, if any, before contacting Bob Call at KYGO?

16             Witness:  I did not conduct any investigation that

17    would have -- I did not conduct any investigation.

18    A.   I really appreciate you bringing this up; this gives

19    me a chance to clarify this.  As we got into it a little

20    bit during the deposition, I stumbled and tripped up on the

21    word "investigation."  My brain immediately went to like a

22    CSI type thing where you got forensics and all this other

23    stuff.

24             And I didn't realize -- I had had, in fact,

25    conducted an investigation by speaking to everyone in that

544

Direct - Bell

1    room.

2    Q.    The -- the fact of the matter is, when we talked in

3    June of 2016, you didn't consider that you had undertaken

4    any type of investigation.

5    A.    In the sense of gathering physical evidence and things

6    like that, I did not consider I had done an investigation.

7    But I had, in fact, spoken to every relevant person in that

8    room.

9    Q.    And you're not aware that any formal investigation was

10   ever conducted?

11   A.    To the best of my knowledge, we did not hire an

12   investigator, conduct formal investigation, or anything

13   like that.

14   Q.    Let's take another look at the photo.

15          When you sent this photo -- when you sent this

16   photo to Mr. Call, you understood that the allegation was

17   that Mr. Mueller put his hand up Ms. Taylor Swift's skirt

18   and grabbed her.

19   A.    Correct.

20   Q.    And you told Mr. Call that the photograph was evidence

21   of the groping?

22   A.    I said, "We have a photograph of them together with

23   his hand on her bottom."

24   Q.    You would agree that in this photograph, Mr. Mueller's

25   hand is not underneath Ms. Taylor Swift's skirt, right?

545

Direct - Bell

1    A.    I have no way of telling that.  The angle is from the

2    front.  I can't see what's not in the picture.

3    Q.    Do you know what kind of fabric that skirt was made

4    out of?

5    A.    I have no idea what fabric, no.

6    Q.    Would you agree that the hemline around that dress

7    doesn't appear to be rumpled or disturbed?

8    A.    I -- it looks a little ruffled here to the -- I guess

9    on Taylor's left, kind of where his arm is.  I do agree

10    that it looks a little pushed up.

11    Q.    What about -- what about the hemline at the bottom,

12    does it appear to be rumpled or disturbed?

13    A.    I -- it looks a little up on that side, that same

14    side.  I --

15    Q.    You think -- you think this skirt line looks

16    disturbed?

17    A.    I do a little bit, right -- oops.  Right there.

18    Q.    Okay.  You understand that Ms. Swift acknowledges that

19    Mr. Mueller never touched her inappropriately outside of

20    her clothing, right?

21    A.    I don't know.

22    Q.    You don't know?

23    A.    I don't -- I don't know.  It's a -- did she touch --

24    did he -- he touched her inappropriately.  The guy did it.

25    I mean, it's just a question at this point:  Does the

Direct - Bell

1    photograph show the instant of when it happened.

2    Q.    Well, you don't know whether he did it, right?  You

3    weren't there.

4    A.    No, I -- I'm afraid I do know.  I do know because I

5    was told by someone who, after thousands and thousands of

6    meet-and-greets with people, has never had anything like

7    this happen and who -- who I've known literally since she

8    was born, has never lied to me.  So I -- as far as I'm

9    concerned, I'm taking her at her word.

10   Q.    Would you agree that great people, even great people,

11   make mistakes --

12   A.    Of course.

13   Q.    -- right?

14              And -- and you weren't there.  You didn't see

15   anything, right?

16              MR. BALDRIDGE:  Objection.  Asked and answered,

17   Your Honor.

18              MR. McFARLAND:  I'll move on.

19              THE COURT:  Next question.

20   BY MR. McFARLAND:

21   Q.    And when you look at this photograph, do you believe

22   that the photograph shows that Ms. Taylor Swift has moved

23   away from Mr. Mueller?

24   A.    Yes, I do.

25   Q.    Do you think she's trying to get away at this point?

Direct - Bell

1    A.    I think she's skooching away from him, is the term I

2    would use.

3    Q.    And you never called the police?

4    A.    No.    I always saw it as a workplace sort of matter.

5    Q.    And you didn't suggest to anyone else that they call

6    the police?

7    A.    There was discussion about calling the police, there

8    was -- you know, part of the concern here is -- as I think

9    I mentioned earlier, is that you get law enforcement

10   involved, it becomes a big public issue at that point and

11   then the photograph becomes out there.

12           And like I say, we -- we treated this as a

13   workplace sort of thing.

14   Q.    You made the phone call to Mr. Call on behalf of Ms.

15   Swift and on behalf of her management team.

16   A.    Yes, on behalf of 13 Management, correct.

17   Q.    Has any -- has Ms. Swift or any member of her senior

18   management team ever told you that you should not have

19   contacted KYGO about the alleged incident?

20   A.    No.

21   Q.    Do you know anything about the -- what happened to

22   photographs that were taken the evening -- do you know

23   anything of what happens with the photographs of the

24   meet-and-greets?

25   A.    What the normal procedure is, is that what you're

Direct - Bell

1    asking?

2    Q.    Right.  Yes.

3    A.    Normally the photographs from that portion of the

4    meet-and-greet, I believe Stephanie loads them onto a

5    website somewhere, the attendees are given a little number

6    with an access code, they can go, then, after the show and

7    retrieve their photographs.

8    Q.    Do you know if those -- are they still available

9    today?

10   A.    I have no idea.

11   Q.    Okay.  Thank you very much.

12   A.    You bet.

13              THE COURT:  Cross-examination.

14              MR. BALDRIDGE:  May we approach briefly, Your

15   Honor?

16              THE COURT:  You may.

17          (Sidebar conference held)

18              THE COURT:  Go ahead.

19              MR. BALDRIDGE:  I have questions of Mr. Bell that

20   I could ask that would advance the process minimally, quite

21   frankly, which I intend to ask if we're unwilling to break

22   for the day, because I'm, quite frankly, not ready to

23   defend Ms. Swift and I don't have notice that she would be

24   today.  I have notice of the order, but I'm just not

25   prepared for her today.  I don't want to waste the jury's

Direct - Bell

1    time or your time if it's just incrementally touching upon

2    issues and pushing them all over with Mr. Bell, which I'll

3    be glad to do.

4           And I'm just trying to be straight with you.  I

5    don't want to run out the clock, to put it in simple terms.

6           THE COURT:  All right.  Do you have examination

7    you want to conduct with Mr. Bell?

8           MR. BALDRIDGE:  No, I could let him go as long as

9    we don't have to put on Ms. Swift now.

10          THE COURT:  Okay.

11          MR. BALDRIDGE:  I mean, I can let him go.  I have

12   examination that would advance the process, but I'm just

13   trying to be straight and candid and not want to be running

14   out the clock.

15          THE COURT:  I appreciate that, but I -- it's not

16   even 10 after 4:00.  I would prefer that you ask the

17   exam -- you conduct the examination that you're prepared to

18   do with Mr. Bell.  We have redirect and recross and

19   wherever we end at that point, to the extent you're asking

20   that we terminate early today -- recess early today and not

21   start with Ms. Swift, I can go along with that, but I don't

22   want to waste 50 minutes.

23          MR. BALDRIDGE:  I understand that.  We started

24   late today and I'm just trying to be frank with you.  We

25   all know sometimes people just aren't ready.

Direct - Bell

1              MR. McFARLAND:  I have no objection.

2              THE COURT:  We can start with that --

3              MR. McFARLAND:  That's just fine.

4              THE COURT:  Let's do that.

5         (End of discussion at sidebar)

6              MR. BALDRIDGE:  I'm sorry, Your Honor.  One more

7    thing, if we may.  I very much apologize.

8         (Discussion at sidebar)

9              MR. BALDRIDGE:  I just learned when I got back

10   that they are ready to go forward with Gabby Liddicoat's

11   deposition.  I can not ask the guy questions at all and

12   just send him on his way and we can go straight to Gabby

13   Liddicoat if we want to do that next.

14             MR. McFARLAND:  The problem that I have with that

15   is I don't have somebody here to read because I was

16   anticipating --

17             MR. BALDRIDGE:  What about Gillian?

18             MR. McFARLAND:  I don't like that idea.

19             THE COURT:  No, I don't allow attorneys to do

20   that.

21             MR. BALDRIDGE:  We could offer Katie.  She can do

22   it in a mild manner.

23             MR. McFARLAND:  I think it just creates --

24             THE COURT:  Let's stay with the game plan.

25        (End of discussion at sidebar)

                          Cross - Bell

1            THE COURT:  All right.  Cross-examination.

2                         CROSS-EXAMINATION

3    BY MR. BALDRIDGE:

4    Q.    Frank, how are you?

5    A.    Doing fine, thanks.

6    Q.    Currently you're employed by 13 Management, LLC,

7    correct?

8    A.    Correct.

9    Q.    And you're Taylor's radio guy, as Mr. McFarland

10   established, correct?

11   A.    Yes, absolutely.

12   Q.    Tell the jury a little bit more in-depthly about your

13   background, radio, the types of things you've done and who

14   you dealt with.

15   A.    Well, I pretty much have done everything you can do in

16   the radio business, starting out as a disk jockey back when

17   they actually had the disks.  Became a program director.

18   Worked for the National Association of Broadcasters.

19            Out of that, I bought my first radio station with

20   some friends when I was 25 years old.  Did that for a

21   number of years.  And then became a programming consultant

22   and a corporate programming executive for several

23   companies, both private and public.

24            And my career came -- radio career came to an

25   amicable end towards the end of 2010, and that's when I

Cross - Bell

1    joined 13 Management.

2    Q.    Now, in all your years in radio, have you ever had an

3    artist -- let's just put it this way -- have the power over

4    anyone at your stations?

5    A.    No.  It doesn't work like that.

6    Q.    Explain to the jury how it actually works in this

7    business.

8    A.    For better or for worse, the radio stations have the

9    power over the artist, because they're the people making

10   the decisions as to what songs get played.  And this

11   applies whether it's rock-and-roll or pop or country,

12   whatever, it's all pretty much there.

13          As a result, you have all these musical artists

14   and record labels, really since the 1950s, has spent

15   millions and millions of dollars trying to get their songs

16   played on these radio stations.

17          And as a result, the -- if you're looking at it

18   from a negotiating standpoint, the radio stations are

19   operating from a position of power and everybody's trying

20   to basically kiss their butts and be nice with them and

21   take them to dinner and everything else.

22   Q.    And in this situation, KYGO was owned by an even

23   bigger company, right?

24   A.    Sure.  They have a big country station in San Diego,

25   they have big pop stations in Atlanta.  They're in -- I

Cross - Bell

1    don't know where they were in 2013.  As of right now

2    they're the No. 1 station overall in the Denver market.

3    Q.    So when you're dealing with KYGO, you're dealing with

4    Lincoln Financial that owns a bunch of stations, right?

5    A.    You bet.

6    Q.    Knocking around Lincoln Financial, you might end up

7    not on the air, right?

8    A.    Well, programmers talk; they all do.  It's a very

9    small business in some regards.  So if something happens,

10   oh, I don't know, an artist -- let's say an artist comes

11   through to do an -- to do a conference of some type and the

12   artist is in a bad mood or does something to insult a fan

13   or something like that, that word could get around.

14   Q.    Now, let's back up a little bit.  How long have you

15   known Taylor Swift?

16   A.    Well, really, since she was born.  I have a copy of

17   her birth announcement in a filing cabinet at my house

18   because of my relationship with her dad.  He sent it when

19   she was born, and my wife and I had just gotten married, we

20   were going to plan to have a family within the near future.

21          I thought, wow, that's a really cool birth

22   announcement.  I'm going to save that thing.  And I

23   actually saved her brother, Austin's, birth announcement as

24   well.  Whatever.  So a long time.

25   Q.    Long before she was a famous person, right?

Cross - Bell

1    A.   Very much so, yes.

2    Q.   And either directly or through your friendship with

3    Scott Swift, you've watched her and heard about her growing

4    up, haven't you?

5    A.   Oh, absolutely.  We exchange Christmas cards.  And you

6    know how you get the little pictures of the kids growing up

7    each year to year.  I'm a big Christmas card guy, I send

8    out a couple hundred of them.  And I was always on the

9    Swift's Christmas card list, so I could watch the kids grow

10   old.

11   Q.   And you certainly interacted on a personal level with

12   Taylor Swift for some time now, right?

13   A.   Sure.  Certainly more so since she started writing

14   songs, performing, getting the development deal, you know,

15   all of that, yeah.

16   Q.   And understanding people, she's always been straight

17   with you, hasn't she?

18   A.   Always.  And I've always been straight with her.  I

19   think that's part of why I'm in my job is I think at some

20   level she knows if she asks my opinion, I'm going to give

21   her a straight answer.

22   Q.   And, sir, is there any doubt in your mind, as you sit

23   here today, that when she told you the plaintiff, David

24   Mueller, grabbed her rear end, any doubt in your mind

25   whether or not she's telling the truth?

555

Cross - Bell

1    A.    None whatsoever.

2    Q.    Now, at any point, did Taylor Swift even equivocate or

3    second-guess or seem uncertain at all about identifying Mr.

4    Mueller?

5    A.    No.  Not at all.

6    Q.    And are you, sir, aware of anyone in the defendants'

7    group here ever coming up with any story that anyone other

8    than David Mueller grabbed Taylor Swift's rear end that

9    night?

10   A.    No.

11   Q.    Now, do you attend Taylor Swift's concerts?

12   A.    About 90 percent of them, yes.

13   Q.    Why do you do that?  What do you do and why do you do

14   that?

15   A.    I help organize and set up the backstage activities

16   that involve the radio guys.  On this particular tour, we

17   would bring in a group of country programmers, say, around

18   6:00.  She would come through, meet them, break that up, do

19   the regular meet-and-greet, and that would be followed by a

20   group of pop program directors would come in, and we would

21   kind of go through the same process.

22   Q.    And we've heard a lot about the events of June 2,

23   2013.  What I want to ask you about is the next day when

24   you spoke to Eddie Haskell, do you recall those questions

25   about that?

Cross - Bell

1    A.   About calling me the next day or the 3d --

2    Q.   You spoke to Eddie Haskell at some point, right?

3    A.   Yes.  But I would have spoken to Eddie Haskell the

4    night prior, the night while we were trying to figure out

5    who's who and, you know, all that stuff.

6    Q.   Okay.  And forgive me.  When you spoke to Mr. Call --

7    A.   Yeah, that's why -- okay, yes.

8    Q.   That's my fault.

9         He immediately said, "Eddie Haskell already told

10   me about the incident," right?

11   A.   Yes.

12   Q.   So the information regarding what occurred the night

13   of June 2d, 2013, got to Mr. Call's attention initially

14   from a KYGO employee, right?

15   A.   Absolutely, correct.

16   Q.   It didn't come from you, right?

17   A.   No.

18   Q.   Now, you know Eddie Haskell, right?

19   A.   Yes.  I know him -- known him professionally for a

20   number of years.  We're not, quote, unquote, friends, but

21   we run into each other at conventions or record label, you

22   know, promotional events, things like that.

23   Q.   And have you dealt with him in your professional

24   environment at the radio stations?

25   A.   A little bit, yes.  He was not at KYGO all that long

Cross - Bell

1    before this incident.  I think he got hired maybe February

2    of that year.

3    Q.   And just to, probably, overly generalize it, have you

4    ever experienced any problems with Mr. Haskell over the

5    years in radio?

6    A.   Oh, no.  No, Eddie is a great personality, very

7    easy-going.

8    Q.   And did -- do you believe for a minute that Eddie

9    Haskell grabbed Taylor's rear end?

10   A.   No.  Not at all.

11   Q.   Okay.  Now, Mr. McFarland asked you some questions

12   about when Craig, the security guy, first confronted Mr.

13   Mueller and you walked -- you walked up on it, right?

14   A.   Did you say Craig or Greg?

15   Q.   Craig.  When we're outside and the group is about to

16   escort Mr. Mueller from the building, you walked up on it,

17   right?

18   A.   Yes.  It was a backstage meeting with Craig, the

19   British security guy, yes, yes, yes.  Robert Allen and --

20   Q.   I'm just trying to get your point of reference.

21   A.   Uhm-hum, yup.

22   Q.   Did you have an opportunity to observe Mr. Mueller at

23   that time?

24   A.   Yes.  Of course.

25   Q.   What did you observe?

1    A.    I think the word I used at the time was sheepish.  He

2    was staring down at the ground quite a bit.  And that was

3    really my only take-away from that.

4    Q.    Now, there's been discussions about the group meeting,

5    you heard Ms. Andrea Swift talk about the group.  I want to

6    clarify something.

7          In any of these groups that met the night of

8    January -- June 2d, 2013, Taylor Swift was never in one of

9    those groups --

10   A.    No, she was somewhere else.

11   Q.    And your job within the Swift organization, 13

12   Management, is to handle radio relationships, correct?

13   A.    Correct.

14   Q.    And that's what you did in this instance, right?

15   A.    Uhm-hum.

16         THE COURT:  You have to answer yes or no, sir.

17         THE WITNESS:  Oh.  Yes.

18   BY MR. BALDRIDGE:

19   Q.    Now, a lot of questions about your discussions with

20   Bob Call.  Did you tell Bob Call what to do?

21   A.    No.

22   Q.    Why not?

23   A.    Well, as a former radio station owner and someone

24   who's been in his position, I personally would find it very

25   offensive if some person from the outside of my

                          Cross - Bell

1    organization called and tried to tell me what to do with my

2    employees.

3           My only goal in that entire conversation was to

4    make sure he was aware of what had happened the night

5    before and to ask him to do an investigation and let -- and

6    then let the process lead where it may.

7    Q.   You -- did you threaten Mr. Call with anything?

8    A.   No.

9    Q.   Can you even come up with, as somewhat knowledgeable

10   with radio, any economic pressure that Taylor Swift and her

11   organization could impose upon Lincoln Financial and KYGO?

12   A.   No.  I cannot imagine any scenario.  I just don't know

13   what it would be.

14          MR. BALDRIDGE:  Now, Your Honor, I'd like to move

15   into evidence stipulated Exhibits D and E, please.

16          THE COURT:  Hold on.  One second.  All right,

17   given the stipulation, Defendants' Exhibits D and E are

18   admitted into evidence and may be published to the jury.

19          (Defendants' Exhibits D and E received)

20   BY MR. BALDRIDGE:

21   Q.   Could you first publish Exhibit D, please.

22          And, sir, can you identify this as an e-mail from

23   you to Bob Call June 3d, 2013 at 8:57 a.m.?

24   A.   Yes.  Yes.

25   Q.   And is this when you sent Bob Call the photograph that

560

Cross - Bell

1    we've been looking at in this case?

2    A.    That is correct.

3    Q.    And can I get you to read the short line there, you

4    know, the line across that you wrote "Mr. Call"?

5    A.    Sure.  Yup.  "Just for the record, please take care

6    that this photo is not displayed publicly or distributed

7    through any type of media."

8    Q.    So your purpose in that message was to make sure this

9    stayed confidential, right?

10   A.    Absolutely.

11   Q.    And can you tell the jury why.

12   A.    Sure.  I think -- I think I actually used the phrase

13   when I was talking to Bob, that we don't want this

14   photograph following her for the rest of her life.  It's

15   very embarrassing, you can even say it's humiliating.  And

16   it was never our intention that this would become public,

17   so we wanted to protect it.

18            MR. BALDRIDGE:  Sparkles, can you put up

19   Exhibit E, please.

20   BY MR. BALDRIDGE:

21   Q.    Sir, can you identify this as Bob Call responding to

22   your e-mail --

23   A.    You bet.

24   Q.    -- June 3d, 2013?

25   A.    Correct.  "You have my word, Frank, we are using it

Cross - Bell

1    simply to further our internal investigation."

2    Q.   And so this was Mr. Call telling you, "You have my

3    word, I'll keep it confidential," right?

4    A.   Uhm-hum.   Yes.

5    Q.   And he had more -- you had his word in writing, right?

6    You've got to speak with your mouth, sir --

7    A.   Yes.   Yes.

8    Q.   Did you have any doubt about whether Bob Call would

9    keep it confidential?

10   A.   No.   Never.   I -- he's such a button-down guy.   I

11   just -- I trusted him.

12   Q.   Now, we've heard a lot of testimony from a lot of

13   different witnesses about what they see and perceive in

14   that photo.   You've heard a lot of that over the last

15   couple of days, right?

16   A.   Yes.

17   Q.   Did you ever once tell Bob Call what he was supposed

18   to perceive or see in that photo?

19   A.   No.

20   Q.   Did you have any role in Mr. Call's decision to

21   actually terminate Mr. Mueller for what he saw in all these

22   events?

23   A.   None whatsoever.

24   Q.   You simply reported to him as you testified, correct?

25   A.   Correct.

562

Cross - Bell

1    Q.    And you're aware that he had the photo, right?

2    A.    Yes.

3    Q.    And he had a view of what the photo showed, right?

4    A.    Correct.

5    Q.    And you're aware that he interviewed Mr. Mueller,

6    right?

7    A.    Yes.

8    Q.    And you're aware that he made a -- reached a

9    conclusion that Mr. Mueller had changed his story in that

10   interview, correct?

11   A.    Yes.

12   Q.    And certainly Mr. Call did not call you in advance and

13   say, "Can I terminate Mueller"?

14   A.    No.

15   Q.    And he didn't even inform you he was going to

16   terminate Mueller until it was done, right?

17   A.    After the fact.

18   Q.    And just finally, sir, other than you, are you aware

19   of anyone among the defendants, Taylor, or Andrea Swift,

20   communicating with KYGO about this incident?

21   A.    No.

22              MR. BALDRIDGE:  Thank you very much, Mr. Bell.

23              THE COURT:  All right.  Redirect.

24              MR. McFARLAND:  None, Your Honor.

25              THE COURT:  All right.  Mr. Bell, thank you so

563

Cross - Bell

1   much for your testimony.  You may step down.

2        All right, members of the jury, I've had

3   discussions with counsel and for various reasons we've

4   decided that we are going to end the testimony for today

5   right now.  So we are going to let you folks go home early.

6        Please, again, and it's very critical, you see all

7   the media out there in front of the building, do not do any

8   independent research into, do not discuss any of the facts,

9   the issues, the lawyers, the parties, or the witnesses in

10   this case.

11        Someone will meet you at the back in the jury

12   deliberation room to accompany you out.

13        And we will be in recess until 8:45 tomorrow

14   morning.

15        (Proceedings concluded at 4:25 p.m.)

16                        **INDEX**

17   <u>Item</u>                                          <u>PAGE</u>

18                 <u>PLAINTIFF'S WITNESSES</u>

19   **DAVID MUELLER (Continued)**
     Cross-examination by Mr. Baldridge (Cont'd)   385
20   Redirect Examination by Mr. McFarland         450
     Recross-examination by Mr. Baldridge          463
21
     **ANDREA SWIFT**
22   Direct Examination by Mr. McFarland           470
     Cross-examination by Mr. Baldridge            491
23   Redirect Examination by Mr. McFarland         519
     Recross-examination by Mr. Baldridge          525
24
     **FRANK BELL**
25   Direct Examination by Mr. McFarland           528
     Cross-examination by Mr. Baldride             553

564

Cross - Bell

1                    PLAINTIFF'S EXHIBITS

2    EXHIBITS:        Offered    Received   Refused    Stipulated

3    9                521        521

4

5

6                    DEFENDANTS' EXHIBITS

7    EXHIBITS:        Offered    Received   Refused    Stipulated

8    D                562        562

9    E                562        562

10   J                411        411

11   K                398        398

12

13                   *      *      *      *      *

14                    REPORTER'S CERTIFICATE

15

16        I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled

18   matter.

19        Dated at Denver, Colorado, this 5th day of June, 2018.

20

21

22

23   _                                              _

24             MARY J. GEORGE, FCRR, CRR, RMR

25