565

<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 15-cv-1974-WJM
 3
      DAVID MUELLER,
 4
      Plaintiff and Counterclaim Defendant,
 5
      vs.
 6
      TAYLOR SWIFT,
 7
      Defendant and Counterclaimant,
 8
      and
 9
      FRANK BELL, and
10    ANDREA SWIFT, a/k/a ANDREA FINLAY,
11    Defendants.
12    ------------------------------------------------------------
13                     REPORTER'S TRANSCRIPT
                       (Jury Trial - Day 4)
14                        VOLUME X
15    ------------------------------------------------------------
16        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
17    Judge, United States District Court for the District of
18    Colorado, commencing at 8:48 a.m., on the 10th day of
19    August, 2017, in Courtroom A801, United States Courthouse,
20    Denver, Colorado.
21
22
23
24
25
</pre>

566

1                                    APPEARANCES

2        M. GABRIEL McFARLAND and NEIDE GILLIAN COOLEY
    MORRISON, Evans & McFarland, LLC-Golden, 910 13th Street,
3   Suite 200, Golden, Colorado 80401, appearing for the
    plaintiff and counterclaim defendant.
4
         J. DOUGLAS BALDRIDGE, KATHERINE M. WRIGHT, DANIELLE R.
5   FOLEY, Venable LLP-DC, 600 Massachusetts Avenue, NW,
    Washington, DC 20001       AND
6        JESSE P. SCHAUDIES, JR., 13 Management LLC, 718
    Thompson Lane, Suite 108526, Nashville, Tenessee 37204,
7   appearing for the defendants and counterclaimant.

8                    MARY J. GEORGE, FCRR, CRR, RMR
                  901 19th Street, Denver, Colorado 80294
9              Proceedings Reported by Mechanical Stenography
                    Transcription Produced via Computer
10

11              P R O C E E D I N G S

12       (In open court in the presence of the jury at 8:48

13   a.m.)

14          THE COURT:  Good morning, ladies and gentlemen of

15   the jury.  Welcome back to day 4 of our jury trial.  Before

16   we get started, let me tell you something:  Ms. Andrea

17   Smith -- Swift, rather, is not feeling well today and, per

18   her lawyer's request, I've granted her leave to not be in

19   attendance today.  It's just she's not feeling well.  Don't

20   attach any significance to the fact that she's not here.

21          All right.  The plaintiff may call his next

22   witness.

23          MR. McFARLAND:  Thank you, Your Honor.  We call

24   Taylor Swift.

25             TAYLOR SWIFT, PLAINTIFF'S WITNESS, SWORN

Direct - Taylor Swift

 1          COURTROOM DEPUTY:  Please be seated.  Please state

 2    your full name for the record and spell your first and last

 3    name.

 4          THE WITNESS:  Taylor Swift.  T-a-y-l-o-r,

 5    S-w-i-f-t.

 6          THE COURT:  Mr. McFarland.

 7          MR. McFARLAND:  Thank you, Your Honor.

 8                    DIRECT EXAMINATION

 9    BY MR. McFARLAND:

10    Q.  Good morning, Ms. Swift.

11    A.  Good morning.

12    Q.  I want to make sure that we understand your position

13    with respect to certain facts and circumstances related to

14    this case.  You contend that Mr. Mueller inappropriately

15    touched you on one occasion.

16    A.  Yes.

17    Q.  And on just one occasion.

18    A.  Yes.

19    Q.  And that occurred on June 2d, 2013.

20    A.  Yes.

21    Q.  And that was before your concert at the Pepsi Center

22    in Denver, on that date.

23    A.  Yes.

24    Q.  More specifically, you alleged that the inappropriate

25    touching took place during the general fan meet-and-greet.

Direct - Taylor Swift

1    A.    Yes.

2    Q.    And that took place, the meet-and-greet, or the fans

3    would come into a room that's been described as the photo

4    booth.

5    A.    Yes.

6    Q.    And the photo booth is a fabric-walled room?

7    A.    Correct.

8    Q.    About 10 by 10, maybe 12 by 12 --

9    A.    Yes.

10   Q.    -- correct?

11         And that's in or near this larger VIP

12   meet-and-greet group area.

13   A.    Yes.

14   Q.    And I've been using the term "inappropriate touching."

15   I think in your deposition you said it was more of a grab.

16   A.    It was a definite grab.  A very long grab.

17   Q.    How long do you think the grab lasted?

18   A.    I don't think it would be wise to estimate time in

19   court, but I know that it was long enough for me to be

20   completely sure that it was intentional.

21   Q.    Can you give any estimate at all?  Was it more than

22   three seconds?

23   A.    I just answered that question.

24   Q.    So the answer is no, you -- you don't have any

25   estimate?

Direct - Taylor Swift

1    A.    I would not estimate a time frame in court.

2    Q.    Okay.  More specifically with respect to the touching,

3    you contend that Mr. Mueller put his hand underneath your

4    skirt and grabbed your bare bottom.

5    A.    Yes.

6    Q.    And then he stayed latched on as you moved away from

7    him.

8    A.    Yes.  He stayed latched on to my bare ass cheek as I

9    lurched away from him, visibly uncomfortably.

10   Q.    Did you move slowly or -- you used the term "lurched."

11   Does that mean you moved slowly or quickly?  Can you

12   describe how you moved away from Mr. Mueller.

13   A.    The positions of the three of us, we were standing

14   exactly in a row, like you would pose for a photo.  And I

15   felt him grab onto my ass cheek underneath my skirt.  The

16   first couple of milliseconds, I thought it must be a

17   mistake, and so I moved to the side very quickly so that

18   his hand would be removed from my ass cheek, and it didn't

19   let go.

20   Q.    And you were trying to get away from Mr. Mueller as

21   quickly as you could?

22   A.    Yes.

23   Q.    And you were trying to get as far away from Mr.

24   Mueller as you could?

25   A.    Well, it was a very shocking thing that's never

Direct - Taylor Swift

1    happened to me before, and this was not something I'd ever
2    dealt with.  I got as far away from him as I possibly could
3    being that I was intertwined with these two people with my
4    hands on their upper backs.  So the most -- the biggest
5    range of movement that I could do in that moment was to
6    lurch to the side as far as I could.
7    Q.    You acknowledge that Mr. Mueller never grabbed your
8    butt outside of your clothing?
9    A.    He grabbed my ass underneath my skirt.
10   Q.    So he never grabbed -- I just want to make it clear.
11   A.    It was underneath my skirt, not above my skirt, that
12   he grabbed my ass.
13   Q.    So you acknowledge that Mr. Mueller never grabbed your
14   butt outside of your clothing, his hand wasn't outside of
15   your clothing.
16   A.    Rather than grabbing my ass outside of my clothing, he
17   grabbed my ass underneath my clothing.
18   Q.    And Mr. Mueller never otherwise touched your rear
19   outside of your clothing.
20   A.    He was busy grabbing my ass underneath my skirt so he
21   didn't grab it outside of my skirt.
22   Q.    And Mr. Mueller did not -- other than the time -- the
23   incident underneath the skirt, Mr. Mueller didn't otherwise
24   touch you inappropriately?
25   A.    Other than grabbing my ass underneath my skirt against

Direct - Taylor Swift

1    my will and refusing to let go, he did not otherwise touch

2    me inappropriately.

3    Q.   And very shortly after the alleged incident, Mr.

4    Mueller and Ms. Melcher exited the photo booth.

5    A.   They left very quickly.

6    Q.   And before they left, you said, Nice to meet you, or

7    Thanks for coming, or something to that effect.

8    A.   After this happened, it was like a light switched off

9    on my personality, completely.  My eyes were to the floor.

10   I couldn't make eye contact with either one of them.  And I

11   just said in a monotone voice, Thank you for coming.  And

12   then they were gone.

13   Q.   And are you sure that's -- those were the words that

14   you used, Thanks for coming?

15   A.   I do meet-and-greets every night of the tour and

16   things can become mechanical and I know that what I say as

17   people are leaving is, Thank you for coming.  That's what I

18   say as they're leaving.  And that was what I said to those

19   two and I'm positive of that.

20        MR. McFARLAND:  Sorry for the delay here, Judge,

21   I've got to find my -- the right page.

22        THE COURT:  That's fine.

23   BY MR. McFARLAND:

24   Q.   Ms. Swift, do you recall your deposition in July of

25   2016?

572

Direct - Taylor Swift

1    A.    Yes.

2    Q.    I'd like you to take a look at that deposition

3    transcript for me.  We'll get some help getting it.

4         COURTROOM DEPUTY:  July 26th, 2016?

5         MR. McFARLAND:  That's correct.

6    BY MR. McFARLAND:

7    Q.    And if you would turn to page 9 for me.  And if you

8    find line 18, I'll read the question.  Are you there?

9    Page 9, line 18.

10   A.    Are you talking about when you asked me how much time

11   elapsed?

12   Q.    Well, I'll read the question and then I'll have you

13   read the answer.

14         My question was:  Is it fair to say that you don't

15   recall how much time elapsed from the alleged touching to

16   the time Mr. Mueller exited the photo booth?

17         And would you read your response starting on line

18   22.

19   A.    Like I said before, I had enough time to very quickly

20   say, Nice to meet you, or Thanks for coming, it would have

21   been one of those two, but I wasn't looking at him, I was

22   looking at the floor and I just wanted him to be gone.

23   Q.    Okay.  So at the time of your deposition, it was --

24   you thought you said either, Nice to meet you, or Thanks

25   for coming, and now you're certain that you said, Thanks

Direct - Taylor Swift

1    for coming?

2    A.    You know, Gabe, it would have been one of those two.

3    Q.    Okay.  That's all I want to find out.  Thank you.

4          After Mr. Mueller exited the photo booth with Ms.

5    Melcher, you continued on with the meet-and-greet.

6    A.    Yes.

7    Q.    And you continued on as if nothing had happened?

8    A.    As soon as Mr. Mueller and Ms. Melcher exited the

9    meet-and-greet area, I turned and there was another group

10   of fans right in the photo booth and I would have had to

11   say to them, Excuse me, can you please leave while I talk

12   to my team about something, which I think would have made

13   their night incredibly uncomfortable.

14         And I knew that I only had a couple dozen, maybe

15   more, people in the meet-and-greet, so I figured that it

16   would only be a few minutes before I would be able to

17   report what had happened.  And that's what occurred.

18   Q.    Now, you -- you could have looked at Ms. Worden and

19   said, Erica, I need just one sec, and then you could have

20   stepped a few feet and talked to Mr. Dent, right?  I mean,

21   you could have done that.

22   A.    I could not have without the fans that were in the

23   booth already overhearing what I was saying.  And this was

24   not something that I wanted known.

25   Q.    Well, I mean, you could have asked Ms. Worden, I

                    Direct - Taylor Swift

1    need -- you could have told Ms. Worden, I need just a

2    second, and at which point Ms. Worden would have asked the

3    guests to step back out for just a minute?

4    A.   Which would have ruined their concert experience and

5    made them feel really awkward about the whole thing.

6    Q.   You think the fans would not have understood that you

7    needed just a couple seconds so they step back out for 30

8    seconds and then they step back in?  You think that would

9    have ruined their experience?

10   A.   I think that when people are excited like people are

11   sometimes in meet-and-greets and they've been waiting in

12   line for hours and they've shown up early for the concert

13   and they, I don't know, maybe got their tickets for

14   Christmas, I don't want to make anything awkward or

15   uncomfortable or make them feel insecure.  I want people to

16   have a good time at my meet-and-greets and my concerts.  I

17   do not want people to stick their hands up my skirt and

18   grab my ass at my meet-and-greets in concerts.

19   Q.   I know that.  You -- you could have looked at the next

20   guests indirectly and said, You know, I'm really excited to

21   meet you guys, I just need two seconds?

22   A.   Yes, and your client could have taken a normal photo

23   with me.

24   Q.   After Mr. Mueller and Ms. Melcher exited the photo

25   booth, you continued on with the meet-and-greet as if

                          Direct - Taylor Swift

 1    nothing had happened.

 2    A.    Yes.

 3    Q.    And to the best of your recollection, the

 4    meet-and-greet continued for 15 to 30 minutes.

 5    A.    That would be within the realm of the time frame,

 6    yes.

 7    Q.    That's your best estimate?

 8    A.    Yes.

 9    Q.    And you don't recall specifically how many fans or

10    persons you met with after Mr. Mueller and Ms. Melcher

11    exited the photo booth?

12    A.    No.

13    Q.    Your best estimate is there were a couple dozen?

14    A.    I don't want to say definitive estimates here today

15    under oath because I don't know the actual number, so I

16    think that would be unwise.

17    Q.    Okay.  And the only reason I mention it is because I

18    thought I heard you say earlier that at the time of the

19    alleged touching, you -- you thought there were just a

20    couple dozen people left.

21    A.    I assumed that maybe that would be the range of how

22    many people would be left.  It was an estimate at the time,

23    but I'm not estimating today in court.

24    Q.    Okay.  The -- the first time you told your team that

25    there had been inappropriate touching or an incident was

Direct - Taylor Swift

1    after the last person in the regular meet-and-greet had

2    left.

3    A.    Yes.

4    Q.    And that was 15 to 30 minutes after you met Mr.

5    Mueller?

6    A.    I'm not going to estimate time today for time frames

7    I'm not absolutely 100 percent certain of.

8    Q.    I thought you already said your best estimate was --

9    A.    At the time --

10   Q.    -- 15 to 30 minutes after Mr. Mueller and Ms. Melcher

11   left the photo booth, the meet-and-greet concluded.

12   A.    That's an estimate, yes.  But you're trying -- if

13   you're trying to get me to say 15 or 30, it's -- it's just

14   going to be into that general range.

15   Q.    Yeah, I -- no, I wasn't trying to do that and I

16   apologize for --

17   A.    Okay.

18   Q.    -- the confusion.

19          I just -- the first time you mentioned this to

20   your team was somewhere between 15 and 30 minutes after you

21   had met Mr. Mueller and Mr. Mueller and Mr. Melcher had

22   left the photo booth.

23   A.    The first moment I had without fans in front of me was

24   the first time that I reported this.

25   Q.    And at that point -- so the meet-and-greet is done,

Direct - Taylor Swift

1    the last guest has exited, you looked at your photographer,

2    Ms. Stephanie Simbeck, and you said something to the

3    effect, That dude grabbed my ass.

4    A.    Yes.  I said that dude just grabbed my ass.  And she

5    said, I know exactly which one you're talking about.  I saw

6    it.  I have a picture.

7    Q.    You -- you did not turn towards your security -- your

8    bodyguard, Mr. Dent, and tell him; you directed your

9    statement to Ms. Simbeck.

10   A.    Yes.

11   Q.    How long -- well, Mr. Dent, he -- he is your

12   personal -- or he was your personal bodyguard?

13   A.    Yes.

14   Q.    And his primary function was to make sure that you

15   weren't -- your body wasn't injured or touched or harmed in

16   any way.

17   A.    Yes.

18   Q.    How long did Mr. Dent work in that capacity for you?

19   A.    I'm sure we have that somewhere on record.  It would

20   have been a few years.

21   Q.    Did -- did you consider Mr. Dent the best personal

22   bodyguard that you've ever had?  Let me -- that's a bad

23   question.  I'm sorry.

24   A.    Yeah.

25   Q.    Do you consider Mr. Dent the best bodyguard that

578

Direct - Taylor Swift

1    you've ever had?

2    A.    I don't have a competition in my mind about best

3    bodyguards.  That's not nothing that I do in my brain.

4    Q.    He was very good at his job.

5    A.    Yes.

6    Q.    And you -- you trusted and respected him.

7    A.    Yes.  Still do.

8    Q.    And when he was working, he was working, he was paying

9    attention, he was focused on protecting you?

10   A.    Yes, and he saw your client reach his hand under my

11   skirt and grab onto my ass.

12   Q.    And then he did absolutely nothing?

13   A.    Yes.

14   Q.    He let Mr. Mueller walk right out of the photo booth,

15   didn't do a thing.

16   A.    That is correct.

17   Q.    He didn't -- the best of your knowledge, he didn't --

18   he didn't try to stop him.  Right?

19   A.    Is that a question?

20   Q.    Yeah.  Did Mr. Dent try to stop Mr. Mueller --

21   A.    No.

22   Q.    -- from leaving the photo booth?

23   A.    No.

24   Q.    Did he get on his microphone and -- and call other

25   security to keep an eye on him?

579

Direct - Taylor Swift

1    A.    No.

2    Q.    He -- in the photo booth, Mr. Dent -- where was he

3    positioned?

4    A.    He -- he would have been -- that would be guessing.  I

5    don't remember.  I was meeting people and taking pictures.

6    I saw Stephanie in front of me because she was in front of

7    me.

8    Q.    If Mr. Dent testifies that he was behind you and Mr.

9    Mueller and Mr. Melcher, you don't have any reason to

10   disagree with that?

11   A.    I would disagree with that because the reason this was

12   such a devious and sneaky act is because the only thing

13   behind me was a wall.

14   Q.    So your testimony is that Mr. Dent was not set up

15   behind you so that he could observe exactly what was going

16   on behind you.

17   A.    There was a wall behind me, so I think that in

18   reference to your questioning about eye line, the only

19   person who would have a direct eye line of your client's

20   hand grabbing onto my bare ass cheek would be somebody

21   lying directly underneath my skirt looking up and we didn't

22   have anyone positioned there.

23   Q.    So if Mr. Dent testifies that he was set up behind you

24   in such a way that he had a perfect angle to observe the

25   backsides of you and Mr. Mueller and Mr. Melcher, he's

580

Direct - Taylor Swift

1    mistaken or he's lying?

2              MR. BALDRIDGE:  Objection.  Form.

3              THE WITNESS:  He will testify --

4              THE COURT:  Hold on.  Hold on.  Your response.

5              MR. McFARLAND:  I think it's an appropriate

6    question.

7              THE COURT:  Is the objection compound?

8              MR. BALDRIDGE:  Yes, it's compound and in multiple

9    ways, both as to parties, both as to the "and/or" and both

10   as to -- and as to the argumentative nature of the first

11   part of it.

12             THE COURT:  Sustained.  Let's rephrase.

13   BY MR. McFARLAND:

14   Q.   So if Mr. Dent testifies that he was set up behind you

15   in such a way that he could clearly see the back sides of

16   you and Mr. Mueller and Miss Melcher, he's mistaken?

17   A.   He testified in his deposition that he saw your client

18   lift my skirt.  And you keep searching, so I think what

19   you're looking for is an angle of my direct ass cheek and

20   his hand, which is physically impossible for Greg to have

21   seen his hand on my ass cheek because it was under a skirt.

22             He saw your client lift my skirt and that's when

23   your client's hand went out of view for him because it was

24   grabbed onto my ass cheek.

25   Q.   Ms. Swift, all I'm trying to establish is that your

Direct - Taylor Swift

1   testimony is that Mr. Dent could not have been -- was not

2   behind you, and if Mr. Dent says he was behind you, he's

3   mistaken.

4           MR. BALDRIDGE:  Objection.  Same objection.

5   Multiply compound.

6           THE COURT:  Let's rephrase.  How much longer are

7   you going to stay on this point?

8           MR. McFARLAND:  I just want an answer.

9           THE COURT:  All right.  But let's parse it down

10  and stay away from the compound nature and then maybe we

11  can get through this.

12          MR. McFARLAND:  Thank you.

13  BY MR. McFARLAND:

14  Q.   If Mr. Dent testifies that he was behind you and Mr.

15  Mueller and Ms. Melcher such that he had an angle where he

16  could see your backsides clearly, is he mistaken?

17          MR. BALDRIDGE:  Objection, Your Honor.  More

18  compound than the prior question.

19          THE COURT:  I'll let it go this time.  Are you --

20  are you done with your question?

21          MR. McFARLAND:  Yes.

22          THE COURT:  Can you answer, Ms. Swift?

23          THE WITNESS:  Yes.  There are several ways that

24  someone can be behind someone.  What was directly behind me

25  was a wall.  Greg may testify that he was diagonally behind

582

Direct - Taylor Swift

1   me, which both are correct.

2   BY MR. McFARLAND:

3   Q.   So it's possible that Mr. Dent was in a position where

4   he could see the backsides of you, Mr. Mueller, and Ms.

5   Melcher?

6   A.   As he testified in his deposition, he saw your client

7   put his hand up my skirt, so it appears that he did have a

8   sight line.

9   Q.   During the time that Mr. Mueller was in the photo

10  booth with you, there were at least four other members of

11  your team, correct?

12  A.   Correct.

13  Q.   One of those we've talked about was Mr. Dent.  We've

14  already talked about him, right?

15  A.   Yes.

16  Q.   And when Mr. Mueller exited the photo booth with Ms.

17  Melcher, those four persons remained in the photo booth

18  with you.

19  A.   I would assume so.

20  Q.   You don't remember anybody else exiting the photo

21  booth or leaving the photo booth with Mr. Mueller and Ms.

22  Melcher?

23  A.   I don't remember that, but my focus was on the fans

24  that had entered the photo booth.

25  Q.   And Erica Worden, she was in the photo booth at the

Direct - Taylor Swift

1   time of the alleged incident.

2   A.   She was popping in and out.

3   Q.   And Ms. Worden was your tour manager?

4   A.   Yes.

5   Q.   And does she still work for you?

6   A.   Yes.

7   Q.   She's still the tour manager?

8   A.   Yes.

9   Q.   And Gabby Liddicoat -- Liddicoat?

10  A.   Liddicoat.

11  Q.   -- was in the photo booth.

12  A.   Yes.

13  Q.   And she was your personal assistant at the time.

14  A.   Yes.

15  Q.   And she does not work for you any longer?

16  A.   No, she doesn't.

17  Q.   And Ms. Stephanie Simbeck was in the photo booth.

18  A.   Yes.

19  Q.   And she was your photographer.

20  A.   Uhm-hum, yes.

21  Q.   Does she still work for you?

22  A.   Yes.

23  Q.   And there was an Abby present.

24  A.   Yes, but I don't have any specific memories concerning

25  Abby.

Direct - Taylor Swift

1    Q.   Do you remember Abby's last name?

2    A.   I do not.

3    Q.   Do you recall or do you know whether Abby was Erica

4    Worden's personal assistant?

5    A.   I don't have any specific memories, like I said, of

6    her.

7    Q.   And Mr. Dent does not work for you any longer.

8    A.   He does not.

9    Q.   When did he stop working as your personal bodyguard?

10   A.   It was quite some time after this incident.

11   Q.   Do you recall when, generally?  2015 or '16?

12   A.   I don't recall generally, but we were restructuring

13   our security team and we did offer him a position.

14   Q.   Which he declined?

15   A.   Yes.

16   Q.   And, again, Mr. Dent didn't say anything or do

17   anything to Mr. Mueller after the incident?

18   A.   No, he did not.

19   Q.   Did he -- did he check on you?

20   A.   No.

21   Q.   Did he give you any sort of, you know, special signal

22   that meant, are you okay, are you all right, anything like

23   that?

24   A.   We didn't have a signal like that.

25   Q.   Do you think -- well, you understand that Mr. Dent

585

Direct - Taylor Swift

1   thought Mr. Mueller was drunk when he entered the photo

2   booth?

3   A.   Yes, I had the same impression.

4   Q.   Okay.

5   A.   Of Ms. Melcher, too.

6   Q.   You thought they were both drunk.

7   A.   It appeared to me that the two of them had had a few

8   cocktails before the concert, which is totally normal.

9   Q.   Are there -- are there alcoholic drinks available to

10   people who are waiting in the meet-and-greet line -- the

11   general meet-and-greet line?

12   A.   No, we don't provide alcoholic drinks backstage.

13   Q.   Did you ever question Mr. Dent about -- well, let me

14   ask it this way:  Do you think it's odd that your personal

15   professionally trained bodyguard let this big drunk guy get

16   close to you, put his hand under your skirt, grab your

17   butt, stay latched on as you tried to get away, and --

18          MR. BALDRIDGE:  Object --

19   BY MR. McFARLAND:

20   Q.   -- not do anything?

21          MR. BALDRIDGE:  Objection, Your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  What Mr. Mueller did was, like I

24   said, very intentional, and the location was very

25   intentional, and it happened very quickly.  And I wasn't

                          Direct - Taylor Swift

 1    going to blame Greg Dent for something that Mr. Mueller

 2    did.   None of us could have expected this to happen.   It

 3    had never happened to us before.

 4    BY MR. McFARLAND:

 5    Q.   But if Mr. Dent was watching and paying attention,

 6    there's no way he -- do you agree that he had to see you

 7    lurch away from Mr. Mueller, try to get -- and try to get

 8    away from him, right?

 9    A.   I feel like these are questions for him, honestly.

10    Q.   Do you think it's odd that Mr. Dent didn't do

11    something --

12    A.   I'm not judging him for what happened in that

13    situation.   It was horrifying, shocking, and we had never

14    experienced it before.

15    Q.   So you're not critical of your bodyguard for allowing

16    Mr. Mueller to -- to grope you and then waltz out of the

17    photo booth?

18    A.   No, I'm critical of your client for sticking his hand

19    under my skirt and grabbing my ass.

20    Q.   Have you ever asked Mr. Dent, What the heck were you

21    doing?

22    A.   No.

23    Q.   Did you ever say, Why didn't you stop this guy from

24    leaving the photo booth?

25    A.   I did not say that, no.

Direct - Taylor Swift

1   Q.   Did you ever say, What -- you don't -- he was out, why

2   didn't you go out and get him or call security?

3   A.   I didn't.

4   Q.   Did you ever ask him those questions?

5   A.   I didn't.

6   Q.   Before the general meet-and-greet, you attended a

7   country radio VIP meet-and-greet.

8   A.   Yes.

9   Q.   And that took place in this bigger room, 30 by 30,

10  that we've described.

11  A.   Yes.

12  Q.   And you met Eddie Haskell there.

13  A.   Yes.

14  Q.   Do you remember whether you had any physical contact

15  with Mr. Haskell?

16  A.   I don't specifically remember, but his testimony says

17  we hugged, so I'm sure we did.

18  Q.   Okay.  But there was no inappropriate touching by Mr.

19  Haskell?

20  A.   Absolutely not.

21  Q.   And you've known Eddie for a long time?

22  A.   Yes, in a professional sense in that I would have

23  maybe seen him once a year since I was probably 15 years

24  old.

25  Q.   And you met a person that goes by the name of Ryno.

Direct - Taylor Swift

1    A.   I did see him in the VIP meet-and-greet, yes.

2    Q.   Did you have any physical contact with Ryno?

3    A.   I don't specifically remember.

4    Q.   Do you specifically -- sorry.  Do you specifically

5    recall your interactions with Mr. Haskell at the June 2d

6    meet-and-greet?

7    A.   I don't specifically remember.

8    Q.   And you don't remember any conversations with Mr.

9    Haskell?

10   A.   Not specifically.

11   Q.   Do you remember how long the general meet-and-greet

12   lasted, start to finish?

13   A.   I do not remember the exact time.

14   Q.   Do you remember -- do you recall where Mr. Mueller and

15   Ms. Melcher were in the queue?  Were they at the beginning

16   or the middle or the end?

17   A.   I don't recall exactly where they were in the line.

18   Q.   Do you recall how many people attended or how many

19   people you met with at the general meet-and-greet?

20   A.   Not specifically.

21   Q.   More than 50?

22   A.   I don't think it's fair for me to put numbers on

23   things I'm not sure of.

24   Q.   Can you give us any estimate of the number of people

25   who attended the general meet-and-greet?

589

                    Direct - Taylor Swift

1    A.    No.

2    Q.    Do you recall how many male guests you met with at the

3    general meet-and-greet on June 2d, 2013?

4    A.    I don't remember.

5    Q.    Mr. Mueller was not the only male at the June 2d,

6    2013, general meet-and-greet?

7    A.    We have seen photographic evidence that there were

8    other adult males in the meet-and-greet, but that's the

9    reason I know that.  I didn't have a log of it in my

10   head.

11   Q.    Okay.  And every person who you met with at the

12   general meet-and-greet on June 2d, 2013, had a photograph

13   taken.

14   A.    The reason people come to a meet-and-greet is to take

15   a photo, so I don't think I've ever had an experience where

16   someone walked in the meet-and-greet and said, No, I don't

17   want a picture.

18   Q.    And you've never taken the time to look at all of

19   those photographs or all of the photographs that were taken

20   during the general meet-and-greet on June 2d, 2013?

21   A.    I have not looked at all the meet-and-greet photos of

22   that meet-and-greet.

23   Q.    You've never seen the photographs -- or all of the

24   photographs that were taken of the people you met with

25   prior to visiting with Mr. Mueller that night.

                        Direct - Taylor Swift

1    A.    I have not.

2    Q.    And you haven't -- you've never seen the photographs

3    of the people that you met with before you met with Mr.

4    Mueller that night?

5    A.    I have only seen a photo of Eddie Haskell and me,

6    which is an unfortunate photo because my eyes are half

7    closed, but that's the only one that I've seen.

8    Q.    And to the best of your knowledge, all of the

9    photographs from the June 2d, 2013, meet-and-greet have not

10   been produced in this case, right?  Some of them have and

11   some of them haven't.

12   A.    Well, it took two years for you to file this lawsuit,

13   so we didn't have access to two-year-old meet-and-greet

14   photos.  We got all the ones that we could possibly find.

15   Q.    And the ones that you were able to find, those were

16   pictures of -- or photographs of people you met with after

17   Mr. Mueller and Ms. Melcher.

18   A.    I'm not aware if that's accurate.

19   Q.    You don't know whether the photographs that have been

20   produced are photographs of people just before your

21   meet-and-greet with Mr. Mueller or just after?

22   A.    I do not know the order of them.

23   Q.    And those photographs are not available any longer,

24   correct?

25   A.    Which photographs?

Direct - Taylor Swift

1          MR. BALDRIDGE:  It's confusing.  Which

2     photographs?

3          MR. McFARLAND:  You're absolutely right.  I'll

4     rephrase.

5     BY MR. McFARLAND:

6     Q.   The photographs that have not been produced can't be

7     produced at this time.

8     A.   I have no idea what -- which ones you're referring to,

9     which ones you -- I -- this isn't my department.

10    Q.   Fair enough.  You don't have any idea what the people

11    look like -- you don't have any recollection of what the

12    people look like that you met with prior to the

13    meet-and-greet with Mr. Mueller and Ms. Melcher?

14    A.   I know that none of them grabbed my ass under my

15    skirt.

16    Q.   Just back up half a step here.  When you first met Mr.

17    Mueller, he was with his girlfriend.

18    A.   I didn't know he -- that was his girlfriend.  I didn't

19    know what their relationship was.  I just assumed they were

20    on a date or something.

21    Q.   You -- he was with a female.

22    A.   He was with a woman, yes.

23    Q.   And either Mr. Mueller or Ms. Melcher indicated to you

24    early on or when they introduced themselves they worked for

25    KYGO Radio?

Direct - Taylor Swift

1    A.    Yes, I remember very clearly which one it was and it

2    was not Ms. Melcher, as your client testified, it was Mr.

3    Mueller.  He -- he came in and was very adamant that he was

4    with radio, and he was -- he was very insistent that I know

5    that.

6          If she said that she was with KYGO, I didn't hear

7    her because he was announcing it.

8    Q.    Do you recall -- I mean, how did this work?  Did he

9    say, you know, Hi, Ms. Swift, I'm David Mueller, I'm with

10   KYGO radio?  Or do you recall anything more specific than

11   what you just testified to?

12   A.    He -- like I said, he appeared to show signs of

13   somebody who had a few cocktails, he was very loud.  She

14   was laughing a lot.  He -- he showed signs to me that -- in

15   meet-and-greets I kind of -- I kind of can sort of get a

16   grasp of who's had some drinks and that's what he appeared

17   to me because he -- to paraphrase said, I'm with radio, I'm

18   on the morning show.  And the way he said it was very -- it

19   was filled with expectation as to how I would react to that

20   information.

21   Q.    And you didn't really care whether he was in radio or

22   not?

23   A.    I do care that he's in radio.  I care if anyone's in

24   radio and I gave him what I thought was the correct

25   reaction, which was, Thank you so much for everything you

Direct - Taylor Swift

1    do.

2    Q.   Okay.  And then what happened next?

3    A.   What happened next was they were very friendly.  Ms.

4    Melcher said something nice to me.  I didn't dislike them,

5    but it was then that we got into the normal photo

6    formation.

7         It's very easy, you just stand there and I lightly

8    place my hand on the -- their upper backs, and so then we

9    were in position for the photo.  I want to be very clear

10   about something.  There has been a lot of talk about

11   jostling and diving and sliding into the frame and I

12   touched her rib and our arms crossed.  And I have

13   experienced every single degree of an awkward first

14   encounter.  I've experienced endless amounts of jostling

15   and gliding in the picture and someone trips, and you think

16   it's a high 5 and they think it's a handshake.  And you

17   know what happens after those encounters, someone says, Oh,

18   sorry, and I go, Oh, it's fine.

19        This was not jostling.  This was not -- there was

20   no diving into the picture.  We were perfectly in position

21   for the photo to be taken.

22   Q.   And other than the alleged inappropriate touching,

23   there was no other contact between you and Mr. Mueller at

24   or around the time you were taking the photograph?

25   A.   When he walked in, I would have shook -- I would have

594
Direct - Taylor Swift

1   shaken -- given them a handshake or something.

2   Q.   Understood.  And then after that you get in position

3   for the photograph, and there -- at that time, there was no

4   other touching whatsoever other --

5   A.   He did not touch my rib, he did not touch my arm, he

6   did not touch my hand.  He grabbed my bare ass.

7   Q.   And you -- you didn't ignore Mr. Mueller at any

8   point -- I mean, how long was Mr. Mueller in the photo

9   booth?

10  A.   I -- you're asking me to estimate a time frame again,

11  which I'm just not going to do.

12  Q.   You didn't ignore Mr. Mueller, did you?

13  A.   No.

14  Q.   And he wasn't at any point just standing off by

15  himself while you and Ms. Melcher interacted?

16  A.   No.  I -- in his testimony he referred to me as cold,

17  which is actually a new one for me, but I have an uncanny

18  ability to elicit new kinds of criticism as time goes by.

19  So it's not very surprising that I would hear a new one.

20  Q.   And he didn't have to jump into the -- to the photo?

21  A.   No.  Absolutely not.

22  Q.   He didn't have to lean in or swing in at the last

23  minute?

24  A.   No.  We were in perfect position for a photo.  It's

25  very simple.  You just stand there and you take a photo.

595
Direct - Taylor Swift

1    This wasn't an action shot.

2    Q.   Let's look at page 26 of your deposition.  Let me know

3    when you're there.

4    A.   I'm there.

5    Q.   All right.  I'll read the question:  When you were

6    moving into position for the photograph --

7                MR. BALDRIDGE:  Can we have a line, please, sir?

8                MR. McFARLAND:  Sorry about that.

9                THE COURT:  Okay.  All right.

10   BY MR. McFARLAND:

11   Q.   Page 26, line 25.

12                Do you see that, Ms. Swift?

13   A.   Yes.

14   Q.   Question:  When you were moving into position for the

15   photograph, your hands did not touch.

16                Would you read your answer.

17   A.   I don't remember that.  I just remember him grabbing

18   my ass.

19   Q.   So you didn't remember whether there was, what I'll

20   call incidental touching back in July of 2016, but now you

21   know for certain that there wasn't?

22   A.   You're interpreting my answer the wrong way.

23   Q.   Okay.

24   A.   You said:  When you were moving into position for the

25   photograph, your hands did not touch?

596
Direct - Taylor Swift

1       I was assuming you were insinuating that our hands
2   did touch.  I said, I don't remember that, meaning to my
3   recollection, our hands did not touch.  And that is what
4   I'm stating today.
5   Q.   When you were moving into position for the photograph,
6   your hands did not touch?
7       I don't remember that.  I just remember him
8   grabbing my ass.
9       Your testimony here today is that that statement
10  is a hundred percent true?
11      MR. BALDRIDGE:  What -- objection.  What
12  statement?  I mean, he's tried to impeach her, he's --
13      THE COURT:  I'm a little confused what you're
14  trying to do with this deposition.
15      MR. McFARLAND:  Well, in response to my question:
16  Were you moving into position for the photograph -- when
17  you were moving into position for the photograph, your
18  hands did not touch?
19      Ms. Swift's answer was:  I don't remember that.  I
20  just remember him grabbing my ass.
21      THE COURT:  Okay.  So --
22      MR. McFARLAND:  And I thought the --
23      THE COURT:  Hold on, counsel.
24      MR. McFARLAND:  Sorry.
25      THE COURT:  The question and answer, you've had

Direct - Taylor Swift

1    the deposition question read -- or you read it, the witness

2    has read the answer.  I'm confused as to what you're doing

3    next.

4              MR. McFARLAND:  Well, I'm confused and I'm trying

5    to clarify that confusion.  What -- what I hear here is "I

6    don't remember" and what the testimony today was, there was

7    absolutely no --

8              THE COURT:  You can ask -- obviously you're

9    entitled to ask whatever questions you want -- appropriate

10   questions of this witness, but in terms of continuing to

11   make use of the deposition, you have to do it in the -- in

12   the ways that are recognized by the Rules of Evidence.

13             I don't -- I don't understand what you're trying

14   now to do with this deposition.

15             MR. McFARLAND:  This statement is inconsistent

16   with the testimony that she just --

17             THE COURT:  All right, well, then proceed with --

18             MR. BALDRIDGE:  Of course, Your Honor, I move to

19   strike that because she's now proven that it isn't

20   inconsistent and he's now telling the jury something that's

21   not the case.

22             THE COURT:  Okay.  Okay.  Settle down, folks.  I

23   think you've established what was in the deposition.  Let's

24   move on to questions that go beyond what -- the written

25   words on that page, and then you can attempt whatever

                         Direct - Taylor Swift

1    cross-examination you want.

2             MR. McFARLAND:  Thank you, Your Honor.

3    BY MR. McFARLAND:

4    Q.   Ms. Swift, you'd agree that the statement you made in

5    your deposition is inconsistent with the testimony you just

6    gave here in court.

7    A.   I would disagree with that.  Saying you have no memory

8    of something happening means to you, in your version of

9    events, it did not happen.  In my -- if that's confusing to

10   you, I apologize.

11   Q.   Do you remember when you learned that your management

12   team had contacted KYGO about the alleged incident?

13   A.   I don't remember.

14   Q.   But you know that they did apprise you at some point.

15   A.   They did at some point, yes.

16   Q.   Do you remember when you learned that Mr. Mueller had

17   been fired?

18   A.   I don't remember when.

19   Q.   But you know that you learned about that through your

20   management team.

21   A.   That sounds accurate.

22   Q.   What was your reaction when you learned that Mr.

23   Mueller had been fired from KYGO?

24   A.   I did not have a reaction.

25   Q.   You weren't surprised?

Direct - Taylor Swift

1   A.   I didn't have a reaction to a strange person I didn't

2   know suffering consequences for something that he did.  I'm

3   not going to allow you or your client to make me feel like

4   this is in any way my fault because it isn't.

5   Q.   You weren't surprised that Mr. Mueller was fired.

6   A.   I didn't have any feelings about a strange man that I

7   didn't know who grabbed my ass under my dress.  I just

8   wanted to never have to see him again and yet here we are

9   years later and he and you are suing me and I'm being

10  blamed for the unfortunate events of his life that are

11  of -- a product of his decisions, not mine.

12  Q.   You -- you didn't contact the police.

13  A.   No.

14  Q.   Instead, you talked to your management team, who you

15  trusted, to handle it appropriately.

16  A.   I did what your client would have referred to as the

17  equivalent in my industry to go into HR.

18  Q.   But you didn't go to HR, you -- you went to your

19  management team and you trusted them to handle it

20  appropriately?

21  A.   I don't have an HR department, and my management team,

22  I said an equivalent, it was a comparison.  It would be an

23  equal comparison in my company to HR, going to people who

24  make decisions and counsel each other.

25  Q.   So you went to your management team and you relied and

                          Direct - Taylor Swift

1    trusted on them to handle this situation appropriately.

2    A.   I did, yes.

3    Q.   And by "management team" here, you went -- you mean

4    your mother?  That's who you really went to.

5    A.   The first person that I told about this incident was

6    my mother, yes.

7    Q.   And you believe that your mother and the rest of your

8    management team handled this situation appropriately?

9    A.   I do believe that.

10   Q.   Do you think Mr. Mueller got what he deserved?

11   A.   I don't feel anything about Mr. Mueller.  I don't know

12   him.

13   Q.   Given what you believe Mr. Mueller did to you, you

14   don't care about Mr. Mueller.

15   A.   What Mr. Mueller did do to me.

16   Q.   You don't care about Mr. Mueller.

17        MR. BALDRIDGE:  Your Honor, argumentative.  You

18   don't care about him?

19        THE COURT:  Overruled.

20        THE WITNESS:  Am I answering this?

21        THE COURT:  Yes.

22        MR. BALDRIDGE:  Your Honor said yes.

23        THE WITNESS:  I don't have any feelings about a

24   person that I don't know.  I think what he did was

25   despicable and horrifying and shocking, but I don't know

Direct - Taylor Swift

1    him at all.

2    BY MR. McFARLAND:

3    Q.   And you're not open to the possibility that maybe he

4    didn't do it, maybe it was somebody else?

5    A.   I am not open to that possibility, Gabe.

6    Q.   Even though you never looked at the photographs of the

7    person who you met with just before Mr. Mueller.

8    A.   It happened to me.  I have a 3D re-creation of what

9    happened in my brain, as well as seeing photographic

10   evidence of it.  It happened to me.  He had a hand full of

11   my ass.  It happened to me.  I know it was him.

12   Q.   You didn't -- the way you identified Mr. Mueller in

13   the first place was Ms. Simbeck, your photographer, said,

14   Oh, I know who you're talking about, it's this guy, she

15   showed you a picture, right?

16   A.   I wouldn't have needed that photograph.  I could have

17   picked him out of a line of a thousand.

18   Q.   But the way it happened was Ms. Simbeck said, This is

19   the guy, and you said, Yes, that's him.

20   A.   Yes.  This is the guy -- in the photo of his hand up

21   my skirt on my ass is the guy who I believe and know for

22   certain had his hand up my skirt on my ass, yes.

23   Q.   You didn't pick his photograph out of a group of even

24   a handful --

25   A.   Of other people in the meet-and-greet who were

Direct - Taylor Swift

1   photographed grabbing my ass?

2   Q.   You didn't pick Mr. Mueller's photograph out of a

3   group of photographs of people you met with that night.

4   You were shown one picture and you said, That's it.

5   A.   I know exactly who did this.  This is not alleged.

6   This is a fact.  This is what happened to me.  And I don't

7   need you to grill me about tiny details of a photo and if I

8   did a proper police lineup.  This is what happened.  It

9   happened to me.  I know it was him.

10  Q.   Don't -- wouldn't you agree that the tiny details are

11  important?

12  A.   Absolutely.

13  Q.   So you understand why I have to ask you questions

14  about the details, right?

15  A.   You're just doing your job and I completely understand

16  that.

17  Q.   Let's talk about the photo for a minute.  You contend

18  that this photograph shows exactly what you described:  Mr.

19  Mueller's hand under your skirt grabbing your bare butt as

20  you're trying to get away.

21  A.   Yes.

22  Q.   And you think right in this area shows that your skirt

23  is lifted up as opposed to down like it normally would be.

24  A.   Yes.

25  Q.   And yesterday we heard from your mom that this dress

603

Direct - Taylor Swift

1   isn't like a normal dress, this -- at least the lower

2   portion of this dress is stiff like a lamp shade, or

3   something like that.

4   A.    Yes.

5   Q.    Okay.  So if someone were to give -- if you were to

6   take the bottom edge of your skirt there on one side and

7   start to lift it up, the whole thing would come up.

8   A.    He put his hand up my skirt.  You're aware he didn't

9   lift it with one hand and then put it underneath.  He put

10  it right up.

11  Q.    Okay.  So your skirt didn't really move.  The hemline

12  stayed just like we see it in this photograph where it was

13  supposed to be.

14  A.    Gabe, this is a photo of him with his hand up my skirt

15  with his hand on my ass.  You can ask me a million

16  questions about it, I'm never going to say something

17  different.  I never have said anything different.

18  Q.    So given the way you've described the skirt -- is

19  this -- is this a -- is this one piece?  Is this a dress or

20  is it a top and a bottom?

21  A.    I believe it was a top and a bottom.  But I -- I

22  believe it was a skirt because I've been thinking of it as

23  my skirt the entire time.

24  Q.    Okay.  And -- and can you explain to me how, given the

25  stiffness of this skirt, if Mr. Mueller's hand is actually

604

Direct - Taylor Swift

1    grabbing your bare cheek in this photograph, why isn't the

2    front of your skirt someplace else?

3    A.   Because my ass is located in the back of my body.

4    Q.   But the skirt is stiff, so we just talked about when

5    you lift up one side, the whole skirt comes up like a lamp

6    shade.

7    A.   He didn't lift up the front.  He put his hand

8    underneath the back of my skirt, latched on to my ass

9    cheek, and wouldn't let go.

10   Q.   Wouldn't you agree that -- I mean, in order to do what

11   you're describing, Mr. Mueller would have to be about a

12   foot lower with his elbow down at your skirt line with his

13   hand up.

14   A.   Absolutely not.  Absolutely not.  That is not correct

15   at all.

16   Q.   And in this picture, you're obviously closer to Ms.

17   Melcher than you are to Mr. Mueller.

18   A.   Yes.  She did not have her hand on my ass.

19   Q.   And that suggests that the inappropriate conduct in

20   your mind, it's happening now -- well, it's happening right

21   now according to your testimony?

22   A.   This is one of the moments in which it was happening.

23   It's not a video, so we can't see the whole thing unfold,

24   but this is capturing a moment in the process of him

25   grabbing my ass underneath my skirt.

                              Direct - Taylor Swift

1    Q.   Okay.  So when you start -- when you get in photo
2    position, right, you're right in the center of the frame
3    and you've got your hands on -- if you have two people like
4    in this, you've got an arm around both guests.
5    A.   It was -- when we got in the photo position, it was
6    equal distance between Ms. Melcher and I and Mr. Mueller
7    and I.
8    Q.   Okay.  So we've got a set-up where we've got the
9    photographer directly in front of you and then we've got
10   the guests on each side.  You've got Mr. Mueller and Ms.
11   Melcher, in this case, on each side of you.
12   A.   Yes.
13   Q.   And you're in the center of the frame.
14   A.   Yes.
15   Q.   And then Mr. Mueller grabbed your butt?
16   A.   Yes.
17   Q.   And you jumped over --
18   A.   Absolutely.
19   Q.   -- right?
20   A.   It wasn't a jump, it was a -- because I didn't move my
21   feet, it was moving my hips as far as I could.
22   Q.   So that's why you're still in the center of this
23   frame?
24   A.   I'm not in the center of the frame.
25   Q.   All right.  And we can't agree that your skirt is not

Direct - Taylor Swift

1  lifted in this picture?  You say that it is lifted.

2  A.   My skirt is lifted in that photo, yes.

3  Q.   And at the time of this picture, the alleged

4  inappropriate touching had occurred or was occurring.

5  A.   He was in the process of grabbing my ass, yes.

6         MR. McFARLAND:  Judge, if I may just for one

7  second.

8         THE COURT:  You may.

9  BY MR. McFARLAND:

10 Q.   Ms. Swift, have you ever watched police shows?

11 A.   Yes.  I named my cat after Detective Olivia Benson

12 from Law & Order SVU.

13 Q.   Have you ever wondered why they don't put just one

14 person in a lineup or in a photo shot?

15         MR. BALDRIDGE:  Objection, Your Honor.

16         THE COURT:  Overruled.

17         THE WITNESS:  Have I ever wondered what?

18 BY MR. McFARLAND:

19 Q.   Have you ever wondered why in the police shows, you

20 know, when they show a lineup, they include five or six

21 guys, they don't put just one in the lineup.

22 A.   In order to create an accurate lineup for this, we

23 would have had to have other men in meet-and-greet who had

24 stuck their hand up my skirt and grabbed onto my ass cheek,

25 but there was no one else like this.  That was the only

607
                        Direct - Taylor Swift

1    person who did that, in my whole career, in my whole life.

2    Q.   Have you ever thought about why in those police shows

3    and in real life they don't just show one picture of a

4    suspect, they show lots of photos, or there's several

5    people in the photo lineup?  Have you ever thought about

6    why they do that?

7    A.   Yes.

8    Q.   And it's because they want accurate IDs?

9    A.   This is an accurate ID.

10            MR. McFARLAND:  Thank you.

11            THE COURT:  Cross-examination.

12            MR. BALDRIDGE:  Absolutely no questions, Your

13   Honor.

14            THE COURT:  All right.  Ms. Swift, thank you for

15   your testimony.  You may step down.

16            All right.  The plaintiff may call his next

17   witness.

18            MR. McFARLAND:  Judge, our next witness is Robert

19   Call.  In talking to defense counsel, Mr. Call may not

20   quite be here yet.

21            THE COURT:  All right.  Did you not recall what I

22   said about having someone at the batter's box --

23            MR. McFARLAND:  I --

24            THE COURT:  -- or on-deck circle, rather?

25            MR. BALDRIDGE:  Just to be clear, we don't

1    represent him, Your Honor --

2           THE COURT:  I understand.  So what do you propose

3    to do with this valuable court time?

4           MR. McFARLAND:  Judge, to be clear, Mr. Baldridge

5    and I, defense counsel and I, spent a lot of time on a --

6    putting together a list of witnesses, as you know.  We,

7    consistent with your orders, talked about --

8           MR. BALDRIDGE:  Can we do this at sidebar, Your

9    Honor?  I don't know what he's going to say, so . . .

10          THE COURT:  Let's approach.

11      (Discussion at sidebar)

12          MR. McFARLAND:  Judge, I'm not necessarily being

13   critical of Mr. Baldridge, but, you know, we were going

14   through and we talked about proposed length of testimony.

15   We've got Taylor Swift, we've got an hour for direct and

16   two hours for cross.  I coordinated with Mr. Baldridge last

17   night.  I said, "Here's the order.  I'm going to do Taylor

18   first."  And then I said in my e-mail if we should have Mr.

19   Call here on the earlier side.  Mr. Baldridge was kind

20   enough to coordinate.  I think Mr. Call's supposed to be

21   here at 10:30.  I don't know what to do.

22          THE COURT:  Do we have a deposition we can read?

23          MR. McFARLAND:  If I could locate a reader.  I --

24   you know, Gabby Liddicoat is the only deposition we've got.

25   She's -- you know, we've got her set up for this afternoon.

1      I've got a person coming in to make sure we've got that

2      covered.

3             Can we take a mid-morning break and let's see if

4      we could round up Mr. Call and let him know we're waiting

5      on him?

6             THE COURT:  I may be willing to break with my

7      usual restriction on counsel being a reader would be an

8      option --

9             MR. McFARLAND:  Yeah, she would probably want to

10     do that.

11            THE COURT:  Is the deposition -- has it been

12     edited per my rulings on --

13            MR. McFARLAND:  It has.

14            MR. BALDRIDGE:  Yes, sir.  And we've conferred

15     with opposing counsel, we've got an accurate copy of the

16     deposition transcript.

17            THE COURT:  Okay.  And you have two copies so she

18     can have one to read at the witness stand?

19            MR. McFARLAND:  I do not have two copies.  I've

20     got my witness coming up with those copies.  Do you have --

21     you guys have one copy?

22            MS. FOLEY:  Let me check.  I believe we have

23     one.

24            MR. McFARLAND:  If we could get another copy of

25     that.  I guess two copies.

610

1          MR. BALDRIDGE:  I'm not following.  You don't have

2     copies of the --

3          MR. McFARLAND:  I have -- the witness --

4          MR. BALDRIDGE:  I'm not following.

5          MR. McFARLAND:  The witness who's coming in to

6     read this afternoon has three copies of the transcript.

7          THE COURT:  Why does the reader have three copies

8     and you only have one?

9          MR. McFARLAND:  She's my receptionist.

10         THE COURT:  Why does she have three copies and you

11    only have one?

12         MR. McFARLAND:  Because I asked her this morning,

13    "To make sure when you come to court this afternoon to

14    testify, make sure and bring three copies because I don't

15    have -- I don't have a copy of that deposition transcript

16    properly edited with me here this morning."

17         THE COURT:  Okay.  You have one copy of the edited

18    transcript?

19         MR. McFARLAND:   Mr. --

20         THE COURT:  Do you have one --

21         MR. McFARLAND:  I do not have one.

22         THE COURT:  You don't even have one.

23         MR. BALDRIDGE:  Your Honor, we may -- we can go

24    check, but do I need to explain the two hours in there?  I

25    will if I need to.

1          THE COURT:  Well, I mean, that is a point.  I'm

2     assuming the two hours came from you.

3          MR. BALDRIDGE:  It's very easily explainable, and

4     I don't mean to be glib, I had no idea that my --

5     everything I was going to achieve with this witness would

6     be achieved in his examination of this witness.

7          That's the bottomline from my standpoint, so . . .

8          THE COURT:  Okay.  Do you have a copy of the

9     edited --

10          MR. BALDRIDGE:  We can check.  Let me --

11          THE COURT:  Do you have a sense of how -- how many

12     pages it is?

13          MR. McFARLAND:  It's -- it's 20.

14          MS. FOLEY:  I don't have the exact page.

15          MR. McFARLAND:  It's a short deposition --

16          MS. FOLEY:  It's a short deposition.

17          MR. BALDRIDGE:  We have three.

18          THE COURT:  Okay.  So if you have three copies, if

19     you don't object, can you provide counsel with two of

20     them --

21          MR. BALDRIDGE:  We have no problem, Your Honor.

22          THE COURT:  Right.  And then we can read that

23     deposition and we'll take our break, and maybe we could

24     have Ms. Morrison leave the courtroom and get -- try to get

25     ahold of Mr. Call and make sure he gets here on time.

612

1              MR. McFARLAND:  Okay.

2              MR. BALDRIDGE:  Can we ask, I don't know how you

3    did it in this district, do you give a dispassionate

4    instruction?  Usually advise the jury what the situation

5    is?  Because it's kind of awkward, they can tell a witness

6    will read it in a dispassionate fashion.

7              THE COURT:  We don't give that instruction, but

8    you can tell Ms. Morrison that I'm expecting it will be a

9    dispassionate reading.

10             MR. McFARLAND:  You know --

11             MR. BALDRIDGE:  That's fair enough.

12             MR. McFARLAND:  I mean, she'll read it

13   dispassionately.  I guess I just don't want -- I mean,

14   saying something to the jury about --

15             THE COURT:  I'm not going to --

16             MR. McFARLAND:  You're not --

17             MR. BALDRIDGE:  I'm all right with that as long as

18   it's just level, because we could have videotaped this.  We

19   didn't take it.

20             THE COURT:  I'm not going to give that

21   instruction, so I just ask you to remind her to read it in

22   a dispassionate way.  So we'll hold tight while you give

23   him two copies of this deposition and then we'll take our

24   morning break.

25             MR. BALDRIDGE:  Yes, sir.

1         (End of discussion at sidebar)

2              THE COURT:  Are we ready to proceed, Mr.

3    McFarland?  Do you have the two copies?

4              MR. McFARLAND:  I do have the two copies, Your

5    Honor.

6              THE COURT:  All right.  So who is the plaintiff

7    calling next?

8              MR. McFARLAND:  We're going to call Ms. Gabby

9    Liddicoat.

10             THE COURT:  Okay.  By deposition.

11             MR. McFARLAND:  By deposition.

12             THE COURT:  Okay.  All right.

13             MS. MORRISON:  I don't have reading glasses.

14             THE COURT:  Let me explain what's going on,

15   members of the jury.  You recall I explained to you the

16   first day after you were impaneled -- or actually Tuesday

17   morning after you were impaneled, that some witnesses may

18   testify via deposition.  So that's what we're going to be

19   doing here right now.

20             Ms. Morrison is going to be reading the deposition

21   answers that Mr. McFarland is going to be asking of the

22   deposition taken by Gabby Liddicoat.

23             All right.  You don't get sworn in when you're

24   just reading.  Read the answers accurately.

25             MS. MORRISON:  I hope I can read.

```
 1              MR. McFARLAND:  Take a minute, please, and just
 2       look through -- can you read it okay?
 3              MS. MORRISON:  Yeah, I think so.
 4              MR. McFARLAND:  So starting on page 4.  This says
 5       Gabriel Corinne Liddicoat was called as a witness and after
 6       having been first duly sworn testified as follows.
 7          (Deposition was read and was not transcribed herein)
 8              MS. WRIGHT:  Objection, Your Honor, that line was
 9       not designated.
10              THE COURT:  That's a standing -- let's --
11              MR. McFARLAND:  I'll -- I'll just move forward.
12              THE COURT:  Okay.  Well, let's not repeat that.
13              MS. MORRISON:  So I'm not supposed to read
14       anything that's not highlighted?
15              MR. McFARLAND:  That's correct.
16              MS. MORRISON:  Okay, thank you.
17             (Deposition continued to be read)
18              MR. BALDRIDGE:  Your Honor.
19              THE COURT:  Yes.
20              MR. BALDRIDGE:  May we move in a stipulated
21       exhibit, Defendants' Exhibit L, which is the one just
22       referred to, and have a full display to the jury, please.
23              THE COURT:  One second.  It's Exhibit L for the
24       trial labeling?
25              MR. BALDRIDGE:  Yes, sir.  It's what was, I think,
```

1    referred to as Deposition Exhibit 4, is Defendants'

2    Exhibit L, and it's stipulated and I would ask that it be

3    moved into evidence and displayed to the jury, please.

4         THE COURT:  Well, I know it's stipulated to, but

5    this is the plaintiff's witness, so do you have any

6    objection?

7         MR. McFARLAND:  No objection, Judge.

8         THE COURT:  All right.  That makes it easy.  There

9    being no objection and the stipulation, Exhibit L is

10   admitted and may be published to the jury.

11      (Defendants' Exhibit L received)

12         THE COURT:  Do you want it blown up a little bit?

13         MR. BALDRIDGE:  Yes.  Maybe now that we've seen

14   it, we could show the writing.  Just --

15         THE COURT:  I can't read it, so I don't know if

16   the jury can read it.

17         MR. BALDRIDGE:  Yeah.  There we go.

18         THE COURT:  All right.  Are we done with Ms.

19   Liddicoat?

20         MR. McFARLAND:  We are, Your Honor.

21         THE COURT:  Members of the jury, we will take our

22   morning recess at this time.  We will be in recess for 20

23   minutes.

24      (Recess 10:12 a.m. to 10:41 a.m.)

25         THE COURT:  All right.  The plaintiff may call his

                              Direct - Call

1      next witness.

2                  MR. McFARLAND:  Plaintiff calls Robert Call.

3                  COURTROOM DEPUTY:  Raise your right hand, sir.

4                   ROBERT CALL, PLAINTIFF'S WITNESS, SWORN

5                  COURTROOM DEPUTY:  Please be seated.  State your

6      full name for the record and spell your first and last

7      name.

8                  THE WITNESS:  Robert B. Call.  R-o-b-e-r-t, last

9      name C-a-l-l.

10                         DIRECT EXAMINATION

11     BY MR. McFARLAND:

12     Q.   Good morning, Mr. Call.

13     A.   Good morning.

14     Q.   Do you still work for KYGO?

15     A.   Yes, I do.

16     Q.   And what is your position?

17     A.   My current position is vice president market

18     manager.

19     Q.   How long have you worked in that position?

20     A.   Through three separate ownerships, 30 -- 28 years.

21     Q.   What are your duties and responsibilities generally?

22     A.   I'm the senior market leader for our parent company.

23     At that time was Lincoln Financial Media, now it's

24     Bonneville International.  I'm responsible for sales,

25     marketing, promotions, engineering, the brand image in the

Direct - Call

1    community with our clients, with our listeners.

2    Q.    And you've held that position since 1989?

3    A.    1989, yes.

4    Q.    Did you hire Mr. Mueller and Mr. Ryan Kliesch?

5    A.    I did not personally hire them, but I was part of the

6    hiring process.

7    Q.    Do you know who hired Mr. Mueller and Mr. Kliesch?

8    A.    It was a process that included our departing program

9    director, John Thomas, our vice president of programming

10   operations, John Dimick, and I was part of that process.

11   Q.    Can you describe the process for us.

12   A.    Ryno and Jackson, as they were known, had done an

13   audition on a radio station in Nashville, I want to say the

14   summer of 2012, somewhere in there.  We were looking for a

15   new morning show on KYGO.  We liked what they were doing on

16   the radio station and started negotiations with them in the

17   fall of 2012.

18   Q.    Do you recall about how many interviews there were?

19   A.    No.

20   Q.    Were there any background checks done?

21   A.    Yes.  Lincoln Financial does the background check and

22   drug test.

23   Q.    And you wouldn't hire anybody who had anything

24   significant come up in a background check, right?

25   A.    No.

Direct - Call

1    Q.   And at the time you hired Mr. Mueller, you checked

2    into Mr. Mueller's prior employment?

3    A.   I didn't personally.

4    Q.   Do you have any reason to believe KYGO, as a group,

5    didn't check out Mr. Mueller's background?

6    A.   I think those in the programming department and HR did

7    that background process.

8    Q.   Do you know that Mr. Mueller was -- twice had

9    contracts terminated from prior employment -- radio

10   employment?

11   A.   I knew of -- I knew of one.  I believe KDWB in

12   Minneapolis.

13   Q.   Those terminations didn't stop KYGO from offering an

14   on-air morning show position to Mr. Mueller, correct?

15   A.   No.  I think that -- I may be mistaken on the time,

16   but I think that was in the early to mid 2000s, something

17   like that.

18   Q.   And how would you describe -- or would you describe

19   the nature of on-air radio personalities, little movement,

20   lots of movement?  How would you describe that?

21             MS. FOLEY:  Objection.  Compound and vague.

22             MR. McFARLAND:  I can rephrase it.

23             THE COURT:  Let's rephrase.

24   BY MR. McFARLAND:

25   Q.   Is it unusual for on-air radio personalities to move

Direct - Call

1    around quite a bit?

2    A.   It's probably more usual over the last five to eight

3    years than historically.

4    Q.   Okay.  Did you approve the hiring of Mr. Mueller?

5    A.   Yes.

6    Q.   Did you make the decision to fire Mr. Mueller?

7    A.   Yes, I did.

8    Q.   When did you terminate Mr. Mueller?

9    A.   The morning of June 4th, 2013.

10   Q.   Why did you fire Mr. Mueller?

11   A.   He, in our opinion, violated Section 16, paragraph b,

12   of our contract and created an embarrassing situation for

13   our company, our clients, and the brand of the radio

14   station by virtue of touching Taylor's rear end.

15        We had a picture to document that and through my

16   questioning of Mr. Mueller regarding the fact that it could

17   have happened at least incidentally or accidentally.

18   Q.   In your -- well, let me back up.

19        Section 16(b) of Mr. Mueller's employment

20   contract, is it fair to call that a morality clause?

21   A.   I -- I'm not sure I have the legal expertise to answer

22   that.

23   Q.   Do you understand that Section 16(b) of Mr. Mueller's

24   employment agreement allows KYGO to terminate him if he

25   does something immoral or if he's accused of something

Direct - Call

1    immoral?

2    A.    Yes.

3    Q.    And in your deposition, you talked about three

4    reasons -- specific reasons for Mr. Mueller's termination.

5    Do you recall that?

6    A.    Yes, I do.

7    Q.    And one of those reasons was the photograph --

8    A.    Yes.

9    Q.    -- correct?

10           And what was it about the photograph that

11   contributed to your decision to terminate Mr. Mueller?

12   A.    The photograph appears to have Taylor move very

13   closely to Shannon Melcher.  Clearly there's a gap between

14   Mueller and Taylor, and in that gap, his hand is, in my

15   mind, without question behind her rear end.

16   Q.    Can you tell from the photograph whether Mr. Mueller's

17   hand is on Ms. Swift's rear end?

18   A.    I cannot.

19   Q.    Based on your impression of the photograph, do you

20   believe Mr. -- do you believe it shows Mr. Mueller's hand

21   up and underneath Ms. Swift's skirt?

22   A.    I can't tell from the photograph.

23   Q.    Would you agree that a second reason that contributed

24   to your decision to terminate Mr. Mueller was your

25   communications with Frank Bell?

621

Direct - Call

1    A.   I would agree.

2    Q.   Can you tell us about those communications.

3    A.    The first communication with Frank occurred Monday

4    morning, the 3d, about 7:45 in the morning.  We talked on

5    the cell phone.  He had relayed the incident, although I

6    had known about the incident from the night before.  Gave

7    me more facts about what had occurred.  And that there was

8    a photograph that both he, and the prior evening, Eddie

9    Haskell, the program director, said was damning.  And that

10   he would send it to me.  He would e-mail me it as an

11   attachment.

12        He indicated that it was highly sensitive and that

13   he did not want me to share it.  And I told him I would

14   have to share it with HR and some of the appropriate

15   people, but that I understood the significance and the high

16   level of security of that photo and not letting it get out.

17   Q.   Do you recall -- well, do you recall anything else

18   from that conversation with Mr. Bell?

19   A.   Well, I recall his telling me the -- what happened.

20   And that is that in the short period of time that Mueller

21   and Shannon were in the -- the photographic tent, which was

22   inside the Pepsi Center, at some place, that he had come

23   in, that he posed for the picture, he lifted her skirt, and

24   he grabbed her rear end.

25   Q.   Do you know whether Mr. -- at the time you were -- you

Direct - Call

 1    conferred or talked to Mr. Bell, do you know whether Mr.

 2    Bell had talked to witnesses of the alleged incident?

 3    A.    I'm aware that Mr. Bell had talked to Taylor's mother.

 4    Q.    Do you know whether he talked to anyone who had

 5    firsthand knowledge of the alleged incident?

 6    A.    No, I don't.

 7    Q.    Did you ask him whether he had talked to anyone with

 8    firsthand knowledge about the incident?

 9    A.    No.

10    Q.    Why not?

11    A.    I've known Frank for a long time in the industry.

12    It's a relatively close business, particularly in country

13    radio.  Frank's been a part of that business for many

14    decades.  He has -- he worked with a former mentor and boss

15    of mine, and in later years worked with a former employee

16    of mine.  Both considered him of a highest professionalism,

17    capability, demeanor, honesty, great leader.  He was known

18    within the industry as a terrific person, so it made sense

19    to me why he was working as liaison with Taylor's team.

20    And I had no question -- no reason to disbelieve what he

21    was telling me.

22    Q.    The third reason that contributed to your decision to

23    terminate Mr. Mueller was based on your conversation with

24    Mr. Mueller; isn't that right?

25    A.    Right.

Direct - Call

1   Q.   What -- when did those conversations take place?

2   A.   We talked Monday afternoon, the 3d, at 2:00 in my

3   office.

4   Q.   And who was present for that meeting?

5   A.   Eddie Haskell, our program director.

6   Q.   And Mr. Mueller?

7   A.   Yes.

8   Q.   And did that take place in your office?

9   A.   Yes, it did.

10  Q.   How long did that meeting last?

11  A.   About an hour.

12  Q.   Tell us what you can recall about the conversation

13  during that one-hour meeting.

14  A.   Mueller indicated that the picture -- the whole

15  picture-taking process was awkward.  It seemed unnatural to

16  him.  That it seemed to be last-minute.

17       Shannon, his girlfriend at the time, had seemed to

18  hit it off with Taylor.  I believe that he did tell me that

19  at the very least, Shannon had made it clear that she

20  worked for KYGO.  And for some reason, and I'm not sure how

21  it was awkward, but it was just awkward, and it seemed

22  last-minute and the photograph indicates he was -- he was

23  struggling to be in the pose -- the right pose to be in the

24  photograph.

25  Q.   Do you -- did you understand -- well, what was your

624
Direct - Call

1    understanding on June 4th, 2013, about Ms. Swift's specific

2    allegations of wrongdoing?

3    A.    On Tuesday, the 4th?

4    Q.    Yes.

5    A.    My understanding was that he had put his hand under

6    her dress and grabbed her rear end.

7    Q.    Were you -- were you aware of any allegation that Mr.

8    Mueller had touched Ms. Swift inappropriately outside of

9    her clothing?

10   A.    No.

11   Q.    So your understanding was the only allegation -- your

12   understanding was as of June 4th, 2013, the inappropriate

13   conduct happened under the skirt and not over the skirt.

14   A.    Yes.

15   Q.    During your hour-long conversation on June 4th with

16   Mr. Mueller and Mr. Haskell and yourself, did you ask Mr.

17   Mueller about the alleged inappropriate touching?

18   A.    I did.

19   Q.    Do you recall his response?

20   A.    He said that it didn't happen.  We went through a

21   series of seemingly asking each other questions.  He would

22   ask me, "Why would I do this?"

23        I would -- "I can't answer that.  Why would Taylor

24   make such a claim?"

25        Then he would respond with the statement to the

Direct - Call

1    effect, "Well, if she'd known I was with KYGO, this never

2    would have happened."

3            I would then ask, "What impact does that have on

4    what occurred?"

5            And we would start through that questioning

6    process again.

7    Q.   Do you believe that Mr. Mueller was -- was adamant in

8    his denials that he did not put his hand under Ms. Swift's

9    skirt and grab her bottom?

10   A.   He was specifically telling me that it did not happen,

11   none of it happened, it was a mistake; however, if it did

12   happen, it was incidental or accidental.

13   Q.   Now, did you ask Mr. Mueller in your conversation,

14   whether he ever inappropriately touched Ms. Swift as

15   opposed to reaching under her skirt and grabbing her

16   buttock?

17   A.   Yes.

18   Q.   And is it possible that Mr. Mueller's -- what he told

19   you, that if it happened, it was incidental or accidental,

20   was referring to touching as opposed to actually going

21   under her skirt and grabbing her buttock?

22           MS. FOLEY:  Objection.  Speculation, form.

23           THE COURT:  Overruled.

24           THE WITNESS:  Yes.

25   BY MR. McFARLAND:

Direct - Call

1    Q.   That is possible?

2    A.   That is possible.

3    Q.   And but for the allegation of misconduct from Ms.

4    Swift and her team and the photograph that you received

5    from Frank Bell and your conversation with Frank Bell, KYGO

6    wouldn't have fired Mr. Mueller on June 4th, correct?

7    A.   That's correct.

8    Q.   As of June 4th, the radio station -- or, I'm sorry, as

9    of June 2d, at least, a couple of days before, the radio

10   station didn't have any intention of terminating Mr.

11   Mueller.

12   A.   Prior to June 2d, there were conversations about the

13   progress of the morning show and we were disappointed in

14   some of the aspects of that progress, but our attempt at

15   that time was to add a third person to the show and give

16   the show a fair amount of time for evaluation and,

17   hopefully, improvement.

18   Q.   Did you have any intention of terminating Mr. Mueller

19   prior to June 2d, 2013?

20   A.   Not at that time, no.

21   Q.   How was he doing as part of the KYGO morning show?

22   A.   I think it was a mixed evaluation.  I don't work

23   directly with the talent; his market manager, our program

24   director does.  I recall challenges on -- from Eddie's

25   standpoint, our consultant at the time, and John Dimick,

627

Direct - Call

1    and in terms of where the content was going, the balance of

2    the content on the show.

3          KYGO, being a country station, did not have a

4    morning show at that time with Ryno or Jackson that we

5    thought had a country sensibility.  We were missing that.

6          We were also in the process, four to five months

7    in, of trying to find this third partner for the show to

8    add that balance, and we hadn't completed that process at

9    the time.

10   Q.   And when you referred to "Eddie," you were referring

11   to Mr. Eddie Haskell?

12   A.   Eddie Haskell, correct.

13   Q.   And -- and when was Eddie Haskell hired?

14   A.   I hired Eddie in late fall 2012 and he started

15   February -- maybe around February 1st of '13.

16   Q.   Shortly after Mr. Mueller and Mr. Ryno?

17   A.   Yes.

18   Q.   I'm sorry, Mr. Kliesch?

19   A.   That's correct.

20   Q.   And what -- describe for us -- give us some context

21   for the morning show.  Was it a Howard Stern type of

22   outrageous sort of show or what -- how would you describe

23   it?

24   A.   Well, it was definitely not a Howard Stern type

25   morning show.  That's not the appropriate direction that

Direct - Call

1    our listeners would expect from KYGO.

2            We wanted a show that could be entertaining,

3    family-oriented.  A show that parents and their kids could

4    listen to in the car going to work and feel comfortable.

5    We certainly wanted humor, creativity, we wanted a

6    three-person show, we wanted that balance.  And that --

7    that was what we were looking for.

8    Q.   And, in general, that's the format that Mr. Mueller

9    and Mr. Kliesch were following for the KYGO morning show.

10   A.   That was the direction we were trying to give them.

11   I'm not confident that they were comfortable, once they

12   arrived, with the coaching and the direction that Eddie and

13   John Dimick were giving them.

14   Q.   Okay.  When KYGO hired Mr. Mueller and Mr. Kliesch, it

15   gave them two-year contracts.

16   A.   Two years, yes.

17   Q.   Okay.  What was the thinking behind that?

18   A.   It's a brand-new show with two people who had never

19   done a show together, and we felt that we would get a good

20   read from both ratings, listenership feedback, and clients,

21   at 18 to 24 months.

22   Q.   So KYGO wanted the show or wanted Mr. Mueller and Mr.

23   Kliesch to develop the show and their personalities slowly.

24   A.   That is correct.

25   Q.   When Mr. Mueller, Ms. Kliesch -- Mr. Kliesch were

Direct - Call

1    hired, were there any performance or rating benchmarks

2    that -- at a three-month or six months period?

3    A.    No.  We had ratings incentives as part of their

4    agreement and, as I recall, fairly liberal by industry

5    standards, because we knew this would take time and we were

6    trying to build a show.

7    Q.    As of -- well, in the five months or so that Mr.

8    Mueller and Mr. Kliesch did the morning show, how did --

9    how did -- how did the ratings do?

10   A.    Not well.  The -- I looked at a period in the Nielsen

11   from the summer of 2012 until the end of 2013, an 18-month

12   period.  Breaking that period down into six months prior to

13   when they started on the radio station, and they worked

14   together for six months, but approximately that six-month

15   period they were together from January through June, and

16   then July through December 30th -- 31st.  And of those

17   three distinct six-month periods, that was the lowest

18   rating.

19   Q.    And -- well, during -- during that period of time,

20   January through June of 2013, the -- the station's morning

21   show actually improved a couple of rank positions, correct?

22   A.    I misstated in my deposition.  I did not recall, when

23   I was asked that question, the data from that period.  I

24   have since refreshed and taken a look to be specific in

25   giving you that answer I gave you regarding the six-month

Direct - Call

1    period was the lowest rating.

2    Q.   It was the lowest rating, but were -- was the show

3    moving up in the rankings of the stations?

4    A.   No.  No, it was not.

5    Q.   So you were mistaken in your deposition --

6    A.   I was mistaken in my deposition.  I wasn't prepared

7    for the question.

8    Q.   But you weren't necessarily surprised by the slow

9    start because that was part of the plan.

10   A.   Our plan is never to go backwards in ratings.  We also

11   knew that this show would take time to develop.  We wanted

12   to add a third person.  And while we were disappointed with

13   the initial results, we continued to be hopeful as we add

14   this third person that the show would improve.

15   Q.   And as of June 2d, 2013, you didn't have an

16   understanding about whether the morning show ratings were

17   going up or down.

18   A.   I had an understanding they were going down.

19   Q.   But in your -- in the deposition you gave me, we -- in

20   your deposition, which was taken in July of 2016, you

21   thought it was going up?

22   A.   That is the statement I made in the deposition.  I

23   wasn't prepared for the question and I have since gone back

24   and reviewed Nielsen data from that period.

25   Q.   Prior to June 2d, 2013 -- let me ask you one other

Direct - Call

1    question.

2        As of June 2d, 2013, had you relayed to Mr.

3    Mueller that the ratings were falling and that that was a

4    concern of yours?

5    A.   I wouldn't have relayed that information.

6    Q.   Do you -- do you know whether anyone at KYGO relayed

7    that information to Mr. Mueller?

8    A.   We post the ratings for air talent to see and I -- I

9    don't know if anyone had that conversation with them or

10   not.

11   Q.   At any point did Mr. -- do you recall having

12   conversations with Mr. Eddie Haskell -- Mr. Eddie Haskell

13   was Mr. Mueller's direct supervisor.

14   A.   Yes.

15   Q.   Do you recall having -- between January and July of

16   2013, do you recall -- sorry, June 2013, do you recall

17   having conversations with Eddie Haskell about the ratings

18   for the morning show?

19       MS. FOLEY:  Objection.  Hearsay.

20       MR. McFARLAND:  I'm just asking whether he recalls

21   the conversation.

22       THE COURT:  All right.  For a preliminary

23   question, overruled.

24       THE WITNESS:  Eddie and I, and the program

25   directors I worked with before and after, we have open

Direct - Call

1   dialogue regularly about the performance of all of our

2   radio stations, and I'm confident we talked periodically

3   about the specific ratings.  I don't know a date and time,

4   but I'm confident we did.

5   BY MR. McFARLAND:

6   Q.   And you don't recall, as you sit here, any of the

7   specifics from those conversations?

8   A.   Regarding ratings, no.

9   Q.   Prior to June 2d, 2013, had Mr. Haskell voiced any

10  concerns to you about Mr. Mueller's performance as part of

11  the KYGO morning show?

12  A.   He did.

13  Q.   Let's take a look at your July 14th, 2016, deposition.

14        Would you please turn to page 11 and look at line

15  13.

16  A.   Sorry, what line is that?

17  Q.   Line 13.  I'll read you the question when you're

18  there.

19  A.   Okay.  I'm there.  Read question.

20  Q.   Prior to June 2d, 2013, had Mr. Haskell voiced any

21  concerns to you about Mr. Mueller's performance as part of

22  the KYGO morning show?

23        Do you want to read your answer?

24  A.   I see too many line 13s, I'm trying to figure out -- I

25  think I'm on page 11, but -- oh, maybe I'm not.  It says 11

633

Direct - Call

1    pages, 32 through 35.  All right.

2              COURTROOM DEPUTY:  Page 11?

3              MR. McFARLAND:  Page 11.

4              THE WITNESS:  Right here.  It's 13, 13, 13, and

5    13.  I'm trying to look for the question and the answer.

6              COURTROOM DEPUTY:  Have you got page 11?  I just

7    want to make sure that we're on the same page.

8    BY MR. McFARLAND:

9    Q.   At the very bottom right-hand corner, it's -- there's

10   some numbers, 5, paren, pages 8 to 11.  Do you see that?

11   A.   Right.  I do.

12   Q.   And then above that, there's -- there's four smaller

13   quarters on this page; do you see that?

14   A.   Yes.

15   Q.   And then you found the one quarter that says 11 in the

16   upper right-hand corner?

17   A.   Yes.

18   Q.   And then if you look down to line 13, I'll read the

19   question again.

20              Prior to June 2d, 2013, had Mr. Haskell voiced any

21   concerns to you about Mr. Mueller's performance as part of

22   the KYGO morning show?

23              Would you read your answer for me.

24   A.   I don't recall any specific performance issues there

25   from the time we hired both Mueller and Kliesch.  We

634

Direct - Call

1     indicated that we were going to bring on board a third

2     person.  The hope was to find some sort of counterbalanced

3     talent that we could put in there.  You know, we looked at

4     both men and women and they knew that there was a third

5     person going to come in to have a role.

6               Keep reading?

7     Q.    Yes.

8     A.    We were trying to figure out what that role would be.

9     Would be built around primary responsibilities of Ryno and

10    Jackson.  We had conversations.  They had chance to

11    interview people, and so I know we had conversations over

12    that, but nothing -- no specific performance issues or

13    disagreements or anything like that that I recall.

14    Q.    And that was a truthful answer on July --

15    A.    That was a truthful answer.  In reflecting back over

16    that period of time, I think that is where -- as I was

17    talking about the addition of a third person, where I think

18    there was some disagreement, and our -- our inability to

19    come to an agreement as to who we were going to hire.  And

20    I think that was probably what I was trying to convey

21    there.

22    Q.    But as of June 2d, 2013, Mr. Haskell hadn't voiced any

23    concerns to you about Mueller -- any specific concerns

24    about Mr. Mueller's performance as part of the morning

25    show.

635

Direct - Call

1   A.    No, nothing specific.

2   Q.    When did you first learn that there had been an

3   alleged incident between Mr. Mueller and Ms. Swift?

4   A.    That would be Sunday night, June 2d.

5   Q.    And how did you learn that?

6   A.    Eddie called me or texted me from the Pepsi Center.

7   Q.    Did you have a chance to speak with Mr. Haskell the

8   evening of June 2d?

9   A.    I did.  It was difficult getting communication out of

10  the Pepsi Center.  It took some effort to get a -- a full

11  phone -- cell phone call out of there.  And I think it was

12  a combination of text and trying to get him out of the

13  facility so we could get a clear cell connection.

14  Q.    Did have you a chance to speak to Mr. Haskell on the

15  evening of June 2d where you could effectively communicate

16  with him?

17  A.    I did.

18  Q.    And how long after the initial phone call was the --

19  that conversation?

20  A.    I think full -- the effort to get a full conversation

21  was probably 45 minutes or more.

22  Q.    What did Mr. Haskell convey to you?

23  A.    Once we were able to communicate?

24  Q.    Yes.

25  A.    We talked about the fact that there had been a major

636

Direct - Call

1   incident in the meet-and-greet between David Mueller and

2   Taylor.  He had been -- he had touched Taylor

3   inappropriately.  He had been asked to leave the Pepsi

4   Center.

5          And that I recall Eddie at one point did see the

6   photograph that evening and he told me the photograph was

7   damning.

8   Q.   After your initial communications with Mr. Haskell,

9   what did you understand the allegation to be?

10  A.   Mueller had touched or grabbed Taylor's rear end in

11  the photograph -- in the process of the photograph being

12  taken.

13  Q.   And did you have an understanding as to what part of

14  Ms. Swift's body was at issue?

15  A.   I do.

16  Q.   And that was her rear?

17  A.   Yes.

18  Q.   Did Mr. Haskell show you a copy of a photograph of Mr.

19  Mueller, Ms. Swift, and Ms. Melcher?

20  A.   No.

21  Q.   What -- what did you do after talking to Mr. Haskell?

22  A.   Well, I tried to process what had happened for the

23  evening.  And I called our vice president of programing,

24  John Dimick, to inform him.

25  Q.   And did you just generally relay to him what you had

Direct - Call

1    learned from Mr. Haskell?

2    A.    Yes.

3    Q.    Was there any action or course of action decided upon

4    with Mr. Dimick?

5    A.    Well, I don't know there was a specific course of

6    action immediately at that time other than we would need to

7    get together and talk about it the next morning.

8              Eddie and I decided to suspend Mr. Mueller with

9    pay for the next morning so he didn't have to be on the

10   air.

11   Q.    Did you have conversations with anyone else at that

12   time?

13   A.    Later that evening, my boss, the president of Lincoln

14   Financial Media, called me on the phone to hear what I

15   heard, understand what had happened.

16   Q.    And, again, you generally relayed what Mr. Haskell

17   told you?

18   A.    Yes.

19   Q.    Do you recall Mr. Benson's response?

20   A.    Appalled, shocked, embarrassed for the company, the

21   station, that something like this could happen.

22   Q.    Did Mr. Benson convey to you that he considered the

23   situation very serious in terms of the station and the

24   company and the parent company?

25   A.    Yes.

638

Direct - Call

1   Q.   And in those kind of conversations with Mr. Benson and
2   Mr. Dimick, that was the evening of June 2d?
3   A.   That's correct.
4   Q.   Did you talk to anybody else about the alleged
5   incident between Mr. Mueller and Ms. Swift on June 2d?
6   A.   No.
7   Q.   Did you take any other action with respect to the
8   alleged incident on June 2d, 2013?
9   A.   No.
10  Q.   What happened next?
11  A.   Talked to Frank Bell about 7:45 on Monday morning,
12  June 3d.
13  Q.   And what do you recall from that conversation?
14  A.   He indicated that he had a photograph that he
15  considered damning, as well.  And that he would send it to
16  me, that he would scan or e-mail an attachment, and that it
17  would come for my eyes only, please don't share.
18       I did tell him that we would share it with HR,
19  that there were a few people that I had to share that
20  photograph with.  And he told me about the instance, and
21  relayed what had happened.
22  Q.   Did -- in that conversation, did Mr. Bell tell you
23  that Ms. Swift's mother, Andrea, was very upset?
24  A.   He did.
25  Q.   And did he tell you that when you saw the picture, it

Direct - Call

1    would be clear as to what happened?

2    A.    Yes.

3    Q.    And did he convey to you that he knew, given his

4    relationship with you, that you would give the situation

5    fair consideration and do the right thing?

6    A.    He did.

7    Q.    And do the right thing meant fire Mr. Mueller?

8    A.    That's not what it meant.

9    Q.    That's not what it meant to you?

10   A.    Not to me.

11   Q.    What did you think Mr. Bell meant?

12   A.    That we would give all the facts fair consideration.

13   Q.    And you thought appropriate action would run the gamut

14   of suspension -- some sort of disciplinary action, up to a

15   suspension, and maybe including termination?

16   A.    I guess -- I guess that would be the range of

17   possibilities if we concluded that this had occurred.

18   Q.    Do you recall whether Mr. Bell told you that Mr.

19   Mueller had grabbed Ms. Swift's rear with his hand?

20   A.    He told me that he had lifted the dress and grabbed

21   her rear with his hand.

22   Q.    During that conversation, did Mr. Bell tell you that

23   there were other people in the photo booth at the time of

24   the alleged incident?

25   A.    He did.

Direct - Call

1     Q.    Did he indicate whether he talked to those people?

2     A.    No, he did not.

3     Q.    Did he relay to you whether he spoke with Ms. Swift

4     about the incident?

5     A.    I don't believe so.

6     Q.    Do you know where Mr. Bell was getting his information

7     with respect to the alleged incident?

8     A.    I knew Mr. Bell was part of the management team.  I

9     know specifically that he talked to Andrea.  I know that he

10    had some connection with the security guards there.  I had

11    no reason to believe that Mr. Bell was telling me anything

12    but what he heard that evening.  And I was not asking him

13    to source all that information at the time.

14    Q.    Do you know whether Ms. Andrea Swift was in the photo

15    booth at the time of the alleged incident?

16    A.    I don't believe that she was, from what I had been

17    told.

18    Q.    Do you recall anything else about your conversation

19    with Frank Bell about the alleged incident?

20    A.    That the family, the management team, label

21    executives, were outraged.  They were very upset; they were

22    angry.  They were considering all of their options,

23    including calling the police.  And were very, very -- very

24    upset, and my sense was as time was going by, getting

25    angrier.

641
Direct - Call

1    Q.   Did Mr. Bell ever convey to you that -- well, did you

2    understand at this point that shortly after the alleged

3    incident, Mr. Mueller and Ms. Melcher were confronted by

4    Ms. Swift's security?

5    A.   Yes, I did.

6    Q.   And -- and did you learn anything about the

7    conversation between security and Mr. Mueller?

8    A.   I learned from Frank that -- I believe they were on

9    their way back into the Pepsi Center and that the security

10   guard found them there.  I know that he made a comment to

11   me regarding Shannon being very upset and I think used the

12   words wanting to go legal on us.

13            And I recall that he -- he told me that the guard

14   had shown Mueller the picture; prior to showing the picture

15   Mueller had said he didn't touch her.  After he showed her

16   the picture -- this is one of the security people -- he

17   said, "Well, if it happened, it was an accident."

18   Q.   Again, is it -- do you think it's possible that when

19   he said, "If it happened," he was talking about if there

20   was any touching, it was incidental and accidental; is that

21   possible?

22   A.   I don't know.

23   Q.   Did Mr. Bell convey to you that during that

24   interaction with security that Mr. Mueller wanted to get

25   the police involved?

Direct - Call

1    A.    I don't recall.  I don't recall that.

2    Q.    Let's turn to -- well, reference the numbers in the

3    lower right-hand corner of the page.  Turn to page 8 of

4    your deposition.  It says 8, and page 23 -- to 23.  Let's

5    look at page 23.

6    A.    All right.

7    Q.    And --

8    A.    Page 23?

9    Q.    Let's actually start page 22, line 23.  And just take

10   a minute and read that question and then your answer.

11   A.    Do you recall anything else about your initial

12   conversation with Frank Bell about the alleged incident

13   between Mr. Mueller and Ms. Swift?

14         Answer:  Well, we talked quite a bit about the

15   fact that -- I asked the question:  Did Taylor say anything

16   about what happened when this occurred?  And she said that

17   Taylor did not want to make a big incident out of it.

18         And that as soon as Mueller had left the

19   meet-and-greet tent, she informed security.  That's when

20   the process started.  Security tracked Mueller and Melcher

21   down and I guess, according to Frank, there were words, and

22   David indicated that it's all wrong.  I think he made a

23   comment, of, well, let's let the police involved or

24   something like that, I remember.

25   Q.    Does that refresh your memory?

643
Direct - Call

1    A.   I -- I don't know.

2    Q.   When you -- when you close that page, you don't have

3    any real recollection of having that conversation with

4    Frank Bell at this point?

5              MS. FOLEY:  Objection.  Misstates his testimony.

6              THE COURT:  Let's rephrase it.

7    BY MR. McFARLAND:

8    Q.   When you close that deposition, you still don't

9    have -- you don't recall having that specific conversation

10   with Frank Bell.

11   A.   This occurred four years ago.

12   Q.   I'm not being critical.

13   A.   Right.  I understand.  And I am trying to remember the

14   facts and the truth as best I can.  And whether I completed

15   all of that information when asked in the deposition or

16   not, I -- I stand by what I just said.

17   Q.   You don't have any reason to believe that your

18   deposition testimony was -- is not accurate?

19   A.   No.  I have some reason to believe parts of it may not

20   be complete from my memory.

21   Q.   Fair enough.  When you received the photograph, did

22   you look at it carefully?

23   A.   Yes.

24   Q.   And it was your impression that it is -- Mr. Mueller's

25   hand was in an inappropriate place?

644

Direct - Call

1    A.   Yes.

2    Q.   But you couldn't conclude from the photograph whether

3    Mr. Mueller was touching or not touching Ms. Swift.

4    A.   I couldn't conclude that, correct.

5    Q.   Did you observe Mr. -- Ms. Melcher in the photograph

6    as well?

7    A.   Yes.

8    Q.   And did you note where her hands were in the

9    photograph?

10   A.   No.

11   Q.   What about Ms. Swift's hands?  Did you -- did you

12   observe where her hands were?

13   A.   No.

14   Q.   What -- what happened next with respect to the alleged

15   incident?

16   A.   I'm not sure I understand your question.  From the

17   photograph or what?

18   Q.   Well, I guess what I'm trying to say, after that, did

19   you have your meeting with Mr. Mueller and Mr. Haskell?

20   A.   That was the 2:00 Monday afternoon.

21   Q.   Okay.  And did you meet with anybody with KYGO prior

22   to meeting with Mr. Mueller on the afternoon of June 3d?

23   A.   In the afternoon, after -- prior to the meeting?

24   There was no afternoon meeting.

25   Q.   How about earlier in the day?

645
Direct - Call

1    A.    Earlier in the morning we had a conference call.

2    Q.    And who was on that call?

3    A.    John Dimick, our vice president of programming; Kercea

4    Beckwith, our VP of HR; Phil Bonomo, attorney; I -- there

5    may have been another attorney on that call, I'm not sure.

6    Jen Petruccelli from Lincoln National; I was on the call;

7    Eddie was on the call; and Maureen Marsh, our local HR

8    manager was there.

9    Q.    Do you remember how long that call lasted?

10   A.    I don't.

11   Q.    Were any decisions made as a result of that meeting?

12   A.    Yes.

13   Q.    And then that afternoon, you met with Mr. Mueller and

14   Mr. Haskell.

15   A.    Correct.

16   Q.    And nobody else participated in that meeting?

17   A.    No.

18   Q.    You understand now that Mr. Mueller recorded that

19   meeting.

20   A.    I understand that.

21   Q.    Have you ever listened to any of the audio from that

22   recording?

23   A.    I listened to a couple of clips from it several years

24   ago.

25   Q.    Did it -- did it seem to accurately capture at least a

646
Direct - Call

1   portion of the conversation?

2   A.   It was several years ago.  I -- I -- I don't remember,

3   really.

4   Q.   Tell us what you can recall specifically about the

5   communications at that meeting with Mr. Mueller.

6   A.   Well, the communications, or conversations, revolved

7   around what had occurred the night before.  As mentioned

8   earlier, Mr. Mueller stated -- asked questions, "Why would

9   I do this?  And had Taylor known I was in radio, with KYGO,

10  this wouldn't have happened."

11       I would ask him why Taylor would make such a

12  claim, and he would then respond.  We would go through this

13  series of asking each other questions again.

14       Throughout that process, he indicated that it

15  didn't happen, it's mistaken.  He did wish that the police

16  had become involved.  And that eventually he backtracked

17  and said, "Well, if it did happen, it was accidental, or

18  incidental."

19       He told me that if there were additional camera

20  angles that would most likely be there with a celebrity of

21  Taylor's status that those angles would show his hands were

22  never touching her.

23  Q.   Did you ask Mr. Mueller who else was in the room or

24  the photo booth at the time of the alleged touching?

25  A.   I did.

Direct - Call

1    Q.   Do you recall what he told you?

2    A.   Well, obviously Shannon was there; Taylor; the

3    photographer; and he believed a security person.

4    Q.   Did you make any efforts to talk to the photographer?

5    A.   No.

6    Q.   Did you make any efforts to talk to the security

7    person?

8    A.   No.

9    Q.   Did you talk to Ms. Melcher?

10   A.   I did not talk to Ms. Melcher.

11   Q.   But you understand that she spoke to somebody else at

12   KYGO about the incident?

13   A.   She spoke to our HR manager about the incident.

14   Q.   And the HR manager's Maureen Marsh?

15   A.   Yes.

16   Q.   And do you have a recollection of whether Ms. -- well,

17   do you have a recollection of what Ms. Melcher recalled

18   about the alleged incident?

19   A.   My recollection of that is that she did not see

20   anything.

21   Q.   Do you have a recollection about whether she sensed or

22   felt or noticed that there was anything wrong whatsoever?

23   A.   I don't recall.

24   Q.   Would you agree that it would have been wise to talk

25   to persons who had firsthand knowledge of the alleged

Direct - Call

1     incident in the photo booth on June 2d, 2013?

2     A.    I don't agree.

3     Q.    You don't think it would have been wise to talk to the

4     people who were in the room at the time of the alleged

5     incident?

6     A.    I talked to Mueller and we talked to Shannon.

7     Q.    You didn't think it would be wise to talk to other

8     people who observed the incident?

9     A.    I didn't feel I needed any further information.

10    Q.    You didn't think you needed to hear from those

11    witnesses what they saw or didn't see with respect to Mr.

12    Mueller's interactions with Ms. Swift?

13    A.    I felt comfortable with Mr. Bell's information that he

14    was giving me.  I felt comfortable with the photograph and

15    I felt comfortable that Mueller had in some way

16    incidentally, or otherwise, claimed to have touched her.

17    Q.    And you relied -- in making that decision, you relied

18    heavily on your conversations with Mr. Bell?

19    A.    I relied on all the facts, not just on Mr. Bell's

20    comments, but they were very important.

21    Q.    Did you take notes during your meeting with Mr.

22    Melcher -- I'm sorry, with Mr. Mueller?

23    A.    Yes, I did.

24    Q.    And how did you record those notes?

25    A.    I took the notes, they were handwritten.  I had

649

Direct - Call

1    questions and -- that I asked and then I jotted down the

2    answers.

3    Q.    And do you still have those notes?

4    A.    I don't have those notes.

5    Q.    Did you transcribe those notes from handwriting to

6    typewritten document?

7    A.    Yes, I did immediately after the meeting.

8    Q.    And what did you do with the handwritten version at

9    that point?

10   A.    I think I shredded them.

11   Q.    Why did you do that?

12   A.    Well, I certainly didn't want it to fall in the wrong

13   hands; not that you could probably have read my

14   handwriting.

15          MR. McFARLAND:  Judge, I'd like to move for the

16   admission of stipulated Exhibit H.

17          THE COURT:  One second.  All right, given the

18   stipulation, Exhibit H is admitted into evidence and may be

19   published to the jury.

20       (Defendants' Exhibit H received)

21   BY MR. McFARLAND:

22   Q.    So, Mr. Call, would you look in the notebook in front

23   of you, I believe, in the -- do we have Exhibit H?  You're

24   welcome to read it on the screen, too.

25   A.    I can see it on the screen.

650

Direct - Call

1    Q.   You can see it on the screen okay?

2         Do you recognize this as your notes that we just

3    talked about?

4    A.   Yes.

5    Q.   And to the best of your knowledge, information, and

6    belief, the notes here are true and accurate?

7    A.   To the best of my knowledge.

8    Q.   What is this first entry on June 2d?  What are you

9    capturing in your note under --

10   A.   I think this is -- this is from talking to Frank Bell

11   at 7:45 on the phone.

12   Q.   And you indicate here that Frank Bell reminded you

13   that you had been friends for a long time.

14   A.   Yes.

15   Q.   And that he wouldn't be calling you if it wasn't

16   extremely important?

17   A.   Yes.

18   Q.   And that it was an extremely serious situation?

19   A.   Yes.

20   Q.   And he told you that -- that they were considering all

21   of their options?

22   A.   He did.

23   Q.   And that unless you acted, your relationship -- or

24   KYGO's relationship with Ms. Swift could be gravely

25   impacted.

Direct - Call

1   A.    Yes.

2   Q.    What did -- what did -- what did that mean to you?

3   A.    Country radio and country music have a relationship

4   that's like no other.  No other music format has it where

5   the artists know the program directors, music directors in

6   some cases, the air talent by name when they go from

7   concert to concert.  And it's -- it's -- it's virtually

8   only known in the country music industry.

9           And I understood Frank's comments to mean simply

10  that that bond, that relationship, might well be broken.

11  Q.    And KYGO's relationship with Ms. Swift is really

12  important to KYGO.

13  A.    KYGO doesn't have artist relationships in the

14  traditional sense.  I don't know that any radio station

15  does.  We play a format of country music and have

16  relationships through the record labels with all of the

17  artists, all of the music.  There is not one special

18  relationship with an artist.

19  Q.    You didn't want to do anything that would gravely

20  impact KYGO's relationship with Ms. Swift, right?

21  A.    I wouldn't -- I would not want to gravely impact that.

22  That's correct.

23  Q.    Because your station's relationship with her is

24  important.

25  A.    As it is with all artists, yes.

652
Direct - Call

1  Q.   And the bigger the artist, the more important the
2  relationship.
3  A.   Not necessarily.  We work to build relationships with
4  all the artists.  There are a number of emerging artists
5  that we feel like we've had some help in developing their
6  career.  It isn't -- there is no measuring against the
7  star's popularity that these are the most important and
8  these are the least important.
9  Q.   No, but generally the bigger the star, the more
10  important the relationship, correct?
11          MS. FOLEY:  Objection.  Asked and answered.
12          THE COURT:  Overruled.
13          THE WITNESS:  No.
14  BY MR. McFARLAND:
15  Q.   You were the person at KYGO principally in charge of
16  KYGO's so-called investigation?
17  A.   Yes.
18  Q.   And was Mr. Haskell a part of that investigation as
19  well?
20  A.   Yes.
21  Q.   What was his role?  What was Mr. Haskell's role in the
22  investigation?
23  A.   Well, he had talked to Frank first the night before.
24  Q.   Was -- how would you describe what Mr. Haskell's role
25  was in the investigation?

653

Direct - Call

1    A.    I think Eddie's involvement in the role was to provide

2    me the information that he had based on being the only

3    person in the arena that night as our program director.

4    Q.    Have you previously met with Mr. Baldridge?

5    A.    Yes.

6    Q.    When did you meet with Mr. Baldridge -- when did you

7    first meet with Mr. Baldridge?

8    A.    It was sometime after Mueller filed the lawsuit.  I

9    don't recall whether it was in the fall -- maybe it was in

10   the fall of '15.

11   Q.    Who else attended that meeting?

12   A.    Katie did and -- there was -- there was one other

13   attorney there.  Courtney, maybe.

14   Q.    Was Mr. Eddie Haskell there for that meeting?

15   A.    Yes.

16   Q.    And Ms. Marsh as well?

17   A.    Yes.

18   Q.    Where did that meeting take place?

19   A.    In our office building in our conference room.

20   Q.    And how long did you meet?

21   A.    Maybe two hours.

22   Q.    What was the purpose of the meeting?

23   A.    I took the purpose of the meeting as they were

24   starting the process of trying to ascertain facts and what

25   had occurred.

654

Direct - Call

1    Q.    And you were cooperating with those efforts.

2    A.    Yes.

3    Q.    Did you review documents during that meeting?

4    A.    I believe so.

5    Q.    Do you have any subsequent meetings with Mr.

6    Baldridge?

7    A.    We met a few weeks ago when they were in town.  And I

8    don't recall if there was another meeting with the law firm

9    with Mr. Baldridge there.

10   Q.    Did you go --

11   A.    I --

12   Q.    I'm sorry, I cut you off.

13   A.    At least two times I recall.

14   Q.    Two other times?  Or just you met with him two times?

15   A.    I met with him two times that I recall.

16   Q.    Okay.  Did you meet with other lawyers for the

17   defendants in any meetings when Mr. Baldridge did not

18   participate?

19   A.    Yes.

20   Q.    Who did you meet with?

21   A.    It may have been -- I think it was Katie, may have

22   been Courtney, and Eddie was in that -- I'm not sure

23   whether Eddie -- we were both together in the meeting or it

24   was separately, I don't remember.

25   Q.    Was that prior to your July 14th, 2016, deposition?

655
Direct - Call

1    A.    Yes.

2    Q.    And one of the purposes of that meeting was to talk

3    about the questions and your answers?

4    A.    No.  It was -- the purpose was, once again, just to

5    discuss some of the -- some of the facts of the case.

6    They're all written right here.

7    Q.    And the more recent meeting that you had a couple of

8    weeks ago, that was to help -- or to discuss again the

9    facts and refresh your recollection for your testimony here

10   today?

11   A.    It wasn't a memory refresher at all, it was primarily

12   to walk me through what today and this week might be, what

13   to expect, where to meet, those kinds of things.

14         And all of those meetings that I recall, including

15   that one, was simply -- they focused on the easy part of

16   this, and that's to tell the truth.

17   Q.    Is there anything else that you did as part of what

18   you've called an investigation that we should know about?

19   A.    I can't think of anything.

20   Q.    Thank you very much.

21         THE COURT:  Cross-examination.

22                        CROSS-EXAMINATION

23   BY MS. FOLEY:

24   Q.    Good morning, Mr. Call.

25   A.    Good morning.

Cross - Call

1    Q.   We met before, correct?

2    A.   Yes, we have.

3    Q.   And I don't represent you, right?

4    A.   That is correct.

5    Q.   And you've got separate counsel here today with you.

6    A.   Yes, I do.

7    Q.   I want to focus on the time in 2013 before you fired

8    Mr. Mueller.

9         I think you described the show had some of the

10   lowest ratings in a six-month period.

11   A.   Yes.

12   Q.   I want to make sure I understand what you were

13   describing.  Is it accurate to say that the morning show

14   had higher ratings before Mr. Mueller joined it?

15   A.   Yes.

16   Q.   And that the morning show then had higher ratings

17   after Mr. Mueller was fired than when he was at the show?

18   A.   Yes.

19   Q.   How was Mr. Mueller as an employee?

20   A.   I didn't work with Mr. Mueller closely and he was not

21   there a long period of time.  I'm not sure if he had a huge

22   number of relationships in the building, or friends.

23   Clearly he had Shannon.  I think that through the process

24   that I tried to touch on earlier, there was a lot of

25   resistance to the addition of a third person, and the

657

Cross - Call

1    difficulty I think Eddie had, and at the time our vice

2    president of programming, was to try to get consensus.

3            We would bring in some people or have some tapes

4    or audition tapes of various talent we thought maybe would

5    be appropriate, and typically they disagreed with all of

6    them.  And their ideas might be a barrista at, Starbucks I

7    think was a suggestion.  We didn't think that was the

8    appropriate direction we wanted to go in this important

9    morning show.

10   Q.   So Mr. Mueller was suggesting a barrista at Starbucks

11   with no morning show radio experience to join their show?

12   A.   I recall that.

13   Q.   And that would have been over other possibly qualified

14   candidates that had been presented to him?

15   A.   Yes.

16   Q.   You mentioned Shannon.  Is that Shannon Melcher?

17   A.   Yes.

18   Q.   And Mr. Mueller dated Ms. Melcher for a period of

19   time, correct?

20   A.   Yes.

21   Q.   He started dating her shortly after he joined KYGO?

22   A.   I can't say that I followed those things closely.  I

23   think I became aware of it some time in the spring.

24   Q.   So you became aware of it before you fired Mr.

25   Mueller?

Cross - Call

1    A.    Yes.

2    Q.    Did the fact that Mr. Mueller and Ms. Melcher were

3    dating cause any issues at KYGO?

4    A.    Those kinds of situations can always create some

5    internal problems.  I think the only issues that I recall

6    came from the fact that Shannon was a sales rep for us, had

7    a couple of clients for endorsements, and those clients

8    were given to Mueller and Kliesch from an endorsement

9    standpoint, very early on, when they just joined the radio

10   station.

11         And I think some other talent felt they might have

12   had greater justification to have been able to do those

13   endorsements, had greater awareness in the marketplace,

14   more experience.

15         I think this would be natural, the first question

16   becomes, "Oh, I get it, that's Jackson's girlfriend and

17   that's how the money flows."

18   Q.    So there was tension in the station over that?

19   A.    I recall that.

20   Q.    Now, Mr. Mueller's contract had a two-year term,

21   right?

22   A.    Yes.

23   Q.    So that contract would have ended in January 2015.

24   A.    Yes.

25   Q.    Back in 2013, did you have any reason to think that

Cross - Call

1    Mr. Mueller's contract would be renewed?

2    A.   I didn't know at that point in time whether we would

3    renew the contract or not.

4    Q.   Was it too early to even think --

5    A.   Way too early.

6    Q.   At that time, did you have any plans to exercise the

7    one-year option in Mr. Mueller's contract?

8    A.   No.

9    Q.   And -- let's see -- Mr. Mueller had a partner on the

10    morning show, right?

11    A.   Yes.

12    Q.   That was Mr. Kliesch?

13    A.   Yes.

14    Q.   Or Ryno?

15    A.   Ryno.

16    Q.   And there was a provision in the contract that if you

17    fired one of the two of them, you could fire the other one.

18    A.   Yes.

19    Q.   Did you ever have any concerns about Mr. Kliesch as an

20    employee?

21    A.   At that time, again, we had only been together five

22    months.  I recall Ryan had maybe missed some appearances or

23    been late for some events.  I think it had been discussed

24    with him, but I think that's probably the extent of any

25    concerns we had at the time.

Cross - Call

1    Q.   And those were he had missed some events that were

2    KYGO --

3    A.   Yes.

4    Q.   -- related events?

5    A.   Or late.

6    Q.   Or late to them?

7         And Mr. Kliesch is no longer with KYGO, correct?

8    A.   Yes.

9    Q.   And you're the person who made the decision to fire

10   Mr. Mueller.

11   A.   Yes.

12   Q.   And tell us just clearly, what are the reasons that

13   you fired Mr. Mueller?

14   A.    I had what I considered to be very strong information

15   through Frank Bell that he had touched Taylor, lifted her

16   skirt, grabbed her rear end; had a picture that certainly

17   showed his hand in a place it shouldn't have been.  And I

18   had the constant changes of, "I didn't do it," "Well, if I

19   did, it was accidental.  But I didn't do it, but it was

20   accidental."

21   Q.   Now, the photo, you evaluated that photo on your own.

22   A.   Yes.

23   Q.   And you came to your conclusions about the photo and

24   Mr. Mueller looking inappropriate on it on your own, didn't

25   you?

Cross - Call

1   A.   Yes.

2   Q.   And your -- you concluded Mr. Mueller changed his

3   story about the incident, didn't you?

4   A.   Yes.

5   Q.   And you came to that conclusion on your own, didn't

6   you?

7   A.   Yes.

8   Q.   Mr. Bell didn't tell you to come to the conclusion

9   that Mr. Mueller changed his story, did he?

10  A.   No.  He gave me -- no.

11  Q.   I think you testified that you first heard about the

12  allegations against Mr. Mueller from Mr. Haskell on the

13  night of June 2d.

14  A.   Yes.

15  Q.   What was your reaction to hearing the allegation?

16  A.   Shocked, embarrassed.  Could not imagine what impact

17  this would have on our listeners and clients if they knew

18  we had an air talent who could possibly do something like

19  this.

20  Q.   Did you wonder why Ms. Taylor Swift would say this if

21  it wasn't true?

22  A.   Yes.

23  Q.   I think you said you suspended Mr. Mueller that night,

24  June 2d.

25  A.   Yes.

Cross - Call

1   Q.   And why did you suspend him that night?

2   A.   I felt given the -- what had happened the night before

3   and the fact that everyone was probably at an emotional

4   pitch, that to ask him to come in and do the morning show

5   just wouldn't be right.

6   Q.   You hadn't made a decision to fire him at that point,

7   right?

8   A.   No.

9   Q.   Because you wanted to do an investigation, right?

10  A.   Yes.

11  Q.   And you did an investigation.

12  A.   Yes.

13  Q.   Okay.  And I think I heard Mr. McFarland describe it

14  as a so-called investigation.  What did you do in the

15  investigation of this incident?

16  A.   I looked at the facts that were available to me.  And

17  that was I had this picture, I had what I felt was very

18  solid credible information from Mr. Bell.  I had a

19  situation where his story changed from, "It didn't happen.

20  It didn't happen," to, "Well, if it did, it was

21  incidental."

22       And a picture that clearly showed his hand was --

23  I couldn't tell what his hand was doing but it was a place

24  you don't see meet-and-greet pictures with artists or radio

25  people with their hands there.  That -- that was not --

Cross - Call

1   that was not normal.

2          And I knew very well that it made no sense for me

3   that Taylor would make such a claim.  And I had an

4   embarrassing situation that focused me on his contract,

5   Section 16(b).

6   Q.   Now, you mentioned that the photograph had Mr.

7   Mueller's hand in a place that you wouldn't normally see in

8   a meet-and-greet.  Did I hear you say that right?

9   A.   Yes.

10  Q.   About how many photos have you seen of an on-air

11  personality from a radio station with an artist?

12  A.   Hundreds.

13  Q.   Have you ever seen one where the picture looked like

14  Mr. Mueller's hand --

15  A.   Never.

16  Q.   -- on Ms. Swift's --

17  A.   Never.

18  Q.   Is there anybody that you wanted to talk to in the

19  investigation that you didn't get to talk to?

20  A.   No.

21  Q.   You testified earlier that Mr. Mueller said repeatedly

22  that this wouldn't have happened if Taylor had known he

23  worked for KYGO or if he was in radio.

24  A.   Yes.

25  Q.   Did you ever get an answer to that question?

Cross - Call

1    A.    No.

2    Q.    Do you have any understanding of what Mr. Mueller

3    might have meant by that?

4    A.    I have no understanding of what that question meant or

5    how it would change the outcome.

6    Q.    Would it have made a difference to you whether or not

7    he was in radio if he grabbed somebody's butt?

8    A.    No.  No, not at all.

9    Q.    Still would have been inappropriate, right?

10   A.    Inappropriate, yes.

11   Q.    The notes that Mr. McFarland showed you -- you took

12   notes in your meeting with Mr. Mueller --

13   A.    Yes.

14   Q.    -- correct?

15          Mr. McFarland didn't show you that portion of the

16   exhibit, but do your notes accurately reflect your meeting

17   with Mr. Mueller?

18   A.    In my opinion, they do.

19   Q.    And in that meeting, did Mr. Mueller ever say to you,

20   "Eddie Haskell grabbed Taylor Swift's bottom"?

21   A.    Never.

22   Q.    If he had said that, what would you have done?

23   A.    That would have changed the tenor of the meeting, for

24   sure.  I -- it's hard for me to go back and make a decision

25   on facts that didn't occur, but I -- I'm sure we would have

665

Redirect - Call

1    gone down a bit -- a different path in our investigation.

2    Q.   Would that have changed anything about your decision

3    where you decided that Mr. Mueller actually had done it?

4    A.   Yes.

5    Q.   You concluded that Mr. Mueller actually

6    inappropriately touched Taylor Swift, didn't you?

7    A.   I did.

8    Q.   Did you conclude that Mr. Mueller lied when he said he

9    didn't do it?

10   A.   I thought he was lying.

11   Q.   Is that why you fired him?

12   A.   Yes.

13        MS. FOLEY:  May I have a moment to confer with Mr.

14   Baldridge?

15        THE COURT:  You may.

16        MS. FOLEY:  No further questions.

17        THE COURT:  Okay.  Redirect.

18        MR. McFARLAND:  Just a few.

19                   REDIRECT EXAMINATION

20   BY MR. McFARLAND:

21   Q.   Mr. Call, did you ever listen to the on-air try-out

22   with Mr. Mueller, Mr. Kliesch, and the Starbucks

23   barrista?

24   A.   I don't believe so.

25   Q.   You don't know whether it was good or bad?

666

Redirect - Call

1    A.    I -- I don't know.  My reaction is from Eddie and our

2    vice president of programming who didn't care for it.

3    Q.    Do you know how cash giveaways affect on-air or impact

4    on-air ratings?

5              MS. FOLEY:  Objection.  Scope.

6              THE COURT:  Mr. McFarland?

7              MR. McFARLAND:  There were questions about the

8    performance of the radio station on cross-examination.  I'm

9    just --

10             MS. FOLEY:  There were questions about Mr. --

11             MR. McFARLAND:  -- asking questions --

12             MS. FOLEY:  There were questions about Mr.

13   Mueller's performance, not the performance of the radio

14   station.

15             MR. McFARLAND:  I will connect it very quickly.

16             THE COURT:  Go ahead.

17   BY MR. McFARLAND:

18   Q.    Do you understand how cash give-aways impact on-air

19   ratings?

20   A.    I believe I do.

21   Q.    The more cash you give away, the better your

22   ratings?

23   A.    Not necessarily.

24   Q.    Is that usually the case?

25   A.    No.

Redirect - Call

1    Q.   Do you know how Mr. Mueller's cash give-away budget

2    compared to the budgets before and after his employment?

3    A.   No.

4    Q.   You indicated that you -- you did ask yourself why

5    would Taylor Swift make this up; is that right?

6    A.   That's correct.

7    Q.   Did you ask yourself why Mr. Mueller would do

8    something like this?

9    A.   I didn't ask myself that question.  He asked me that

10   question.

11   Q.   And did you think about it?

12   A.   Not very long.

13   Q.   Is it -- is Eddie Haskell still with KYGO?

14   A.   No.

15   Q.   When was he let go?

16   A.   Eddie -- Eddie's contract ran out the end of last

17   year.

18   Q.   And it wasn't renewed.

19   A.   Correct.

20   Q.   Okay.  Thank you.

21           THE COURT:  Recross.

22           MS. FOLEY:  No further questions, Your Honor.

23           THE COURT:  All right.  May this witness be

24   excused?

25           MR. McFARLAND:  Yes, sir.

1              THE COURT:  For the defendants?

2              MS. FOLEY:  Yes, sir.

3              THE COURT:  All right.  Mr. Call, thank you so

4     much for joining us.  You're excused and you may step down.

5              Will counsel approach, please.

6          (Discussion at sidebar)

7              THE COURT:  Who do you have next?

8              MR. McFARLAND:  Eddie Haskell, assuming he is

9     here.  Do you know whether --

10             THE COURT:  Assuming he's here?

11             MR. BALDRIDGE:  You would have to ask Mr. Dash.  I

12    know we were -- Mr. Dash was asked to rush him here, based

13    on the timing, but I don't know.

14             MR. McFARLAND:  Would you like me to check with

15    him quickly, Your Honor?

16             THE COURT:  So you don't know if he's here, or --

17    are these estimates correct as to both of you, the

18    estimates of the direct and cross?

19             MR. McFARLAND:  Apart from Mr. Haskell?  Or just

20    generally?

21             THE COURT:  Yeah, just specifically Mr. Haskell.

22             MR. BALDRIDGE:  As I look down the estimates, they

23    are all accurate.  Haskell could be a little shorter, just

24    because Mr. Call covered a number of things about Mr.

25    Haskell.

669

1          THE COURT:  Do you still anticipate an hour --

2          MR. McFARLAND:  Probably a little less than that,

3     Your Honor.

4          THE COURT:  Okay.  All right.  Well, especially

5     given that you don't know if he's even here, believe it or

6     not this is not my only case, so I have a lot of other

7     things to attend to, so I could definitely use a little

8     longer lunch than usual.  So why don't we just call it a

9     morning here and come back at 1:30, then make sure that not

10    just Mr. Haskell, but whoever's coming after him --

11         MR. McFARLAND:  Yes.

12         THE COURT:  -- is going to be here in a timely

13    fashion.

14         MR. McFARLAND:  Yes, sir.

15         MR. BALDRIDGE:  We're moving him over right now,

16    and they're our people, so --

17         THE COURT:  Okay, great.

18         MR. BALDRIDGE:  I'm sorry.

19         MR. McFARLAND:  No, go ahead.

20         MR. BALDRIDGE:  I just wanted to remind you of one

21    thing.  Mr. Dent is set for a time certain tomorrow morning

22    for his -- first thing.  And we did -- we did that in the

23    pretrial and I think the Court approved that.

24         THE COURT:  Okay.  I don't have a memory of that,

25    but I'll take it as a --

1          MR. McFARLAND:  The idea is he'll testify first

2    thing Friday -- tomorrow morning.

3          THE COURT:  Okay.

4          MR. BALDRIDGE:  And if you have to -- if there's

5    some spill-over for a little bit, that's fine, you know,

6    we'll get him in after you finish one witness, but --

7          MR. McFARLAND:  Okay.

8          THE COURT:  Does he have to be out of here at a

9    certain time?

10          MR. BALDRIDGE:  Yes, sir, he's got to leave the

11    building by noon.  He's got like a 2:00 flight, some kind

12    of security engagement that I'm not aware of.

13          THE COURT:  Okay.  All right.  Thank you for

14    telling me.

15          MR. McFARLAND:  Thank you.

16       (End of discussion at side bar)

17          THE COURT:  All right, members of the jury, I've

18    decided, after discussing with counsel, that we're going to

19    take a slightly longer lunch break than usual.  Believe it

20    or not, I have other cases that I'm working on and I have

21    to attend to those.

22          So we will be in recess until 1:30.

23       (Recess at 12:01 p.m.)

24                      AFTERNOON SESSION

25       (Jury was present at 1:35 p.m.)

Direct - Coomer (Haskell)

 1           THE COURT:  All right.  The plaintiff may call his

 2      next witness.

 3           MR. McFARLAND:  Thank you.  Plaintiff calls

 4      Hershel Coomer.

 5           HERSHEL COOMER, PLAINTIFF'S WITNESS, SWORN

 6           COURTROOM DEPUTY:  Please be seated.

 7           THE WITNESS:  Thank you.

 8           COURTROOM DEPUTY:  State your full name for the

 9      record and spell your first and last name.

10           THE WITNESS:  Hershel Keith Coomer.  It's

11      H-e-r-s-h-e-l, C-o-o-m-e-r.

12                        DIRECT EXAMINATION

13      BY MR. McFARLAND:

14      Q.   Good afternoon, Mr. Haskell -- or Mr. Coomer.  You've

15      been referred to several times in the course of these

16      proceedings as Eddie Haskell or Mr. Haskell.  Is that an

17      alias that you use, or a radio name?

18      A.   Yes.

19      Q.   And do you mind if we use that name during your

20      examination here today?

21      A.   That would be great.

22      Q.   Thank you.  Where do you work, Mr. Haskell?

23      A.   I am currently consulting some stations and taking a

24      break.

25      Q.   You're not currently working at KYGO radio?

672

Direct - Coomer (Haskell)

1    A.    I am not.

2    Q.    When did you stop working at KYGO radio?

3    A.    My employment end date was February 10th.

4    Q.    So you worked at KYGO for about --

5    A.    Four years, to the day.

6    Q.    Did you resign or were you terminated?

7    A.    I have an employment agreement and it expired and they

8    chose not to renew.

9    Q.    Did they give you any particular reason for that?

10   A.    Not really, no.

11   Q.    As of June 2d, 2013, and the surrounding time frame,

12   were you employed by KYGO?

13   A.    I was.

14   Q.    And what was your position there?

15   A.    I was program director.

16   Q.    Just briefly, where did you go to high school?

17   A.    Excuse me?

18   Q.    Where did you go to high school?

19   A.    Shawnee, Oklahoma.

20   Q.    Did you graduate?

21   A.    I did.

22   Q.    What year was that?

23   A.    1978.

24   Q.    Did you go to college?

25   A.    No.

Direct - Coomer (Haskell)

1    Q.   Did you immediately get into the radio business?

2    A.   Yes.

3    Q.   And I apologize, because the court reporter's taking

4    down my questions and your answers.  If you could work hard

5    to let me finish my question before you start your answer,

6    that will make things a lot nicer for the court reporter,

7    and I'll try to extend the same courtesy.

8    A.   Sure.

9    Q.   Give us just a brief description of your background in

10   radio.

11   A.   I started in 1978 right after I graduated from high

12   school in my hometown station.  Was a DJ there.  Worked

13   various on-air positions in Oklahoma.  Did a night show

14   station at Oklahoma City.

15        Started my programming in Roanoke, Virginia, in

16   1987, and was there about six years.  And that was a Top 40

17   station.  Then worked in Buffalo as an assistant program

18   director.  Then program director in Detroit for six years,

19   Denver for two, Salt Lake City for two, and Albuquerque for

20   nine.  And then most recently KYGO for four.

21   Q.   When did you start your position with KYGO?

22   A.   February of 2013.

23   Q.   And you were a program manager for KYGO?

24   A.   Program director, yes.

25   Q.   Program director.  And based on what you just said,

674
Direct - Coomer (Haskell)

1    you've had several program director jobs in your career.

2    A.    I have.

3    Q.    Have you been terminated from any of your previous

4    jobs?

5    A.    The Roanoke radio station in 1992.

6    Q.    And why were you terminated from that position?

7    A.    That position was eliminated.  It was -- there are

8    program directors and operations managers that both do kind

9    of the same job.  I was operations manager and they

10   eliminated that position.

11   Q.    Would you agree that in the radio business, on-air

12   program directors, there's a good amount of movement?

13   A.    Yeah.

14   Q.    More than a lot of other professions?

15   A.    Yes.

16   Q.    And did you ever -- did you say you previously worked

17   in Denver?

18   A.    I did.

19   Q.    What -- what -- who did you -- what station did you

20   work for --

21   A.    I worked for a station called Jammin' 92.5.  That

22   would have been 1999 to 2001.

23   Q.    Was that a country station?

24   A.    No, that was a -- the format's called rhythmic oldies.

25   Basically a Motown dance-based oldies station.

675

Direct - Coomer (Haskell)

1    Q.    And you voluntarily left, resigned, or left that

2    position and all of the other positions that you've had,

3    except Roanoke?

4    A.    Yes.

5    Q.    And KYGO.

6    A.    Right.

7    Q.    Tell us about your duties and responsibilities as a

8    program director at KYGO.

9    A.    The program director is much like a movie director.

10   It's to take all of the talents that you have, promotions,

11   things like that, and create the sound of the radio

12   station.  So that would involve hiring and managing the

13   on-air personalities, overseeing the promotions department,

14   and selecting all the music.

15   Q.    Who owned KYGO when you began working for it in

16   February of 2013?

17   A.    Lincoln Financial Media.

18   Q.    And at some point did Lincoln Financial Media sell the

19   station?

20   A.    They did.

21   Q.    Who did they sell it to?

22   A.    The station -- the company, Lincoln Financial Media,

23   was sold to Entercom Communications.  But there was an

24   issue that Entercom owned radio stations in Denver already,

25   so those stations were, in turn, spun to a company called

                       Direct - Coomer (Haskell)

1    Bonneville.

2    Q.   And do you know whether Bonneville still owns or

3    controls KYGO?

4    A.   They do.

5    Q.   Did your duties and responsibilities as the program

6    director at KYGO significantly change from the time you

7    started through the time you left KYGO?

8    A.   No.

9    Q.   When you started the KYGO in February 2013, who did

10   you report to?

11   A.   Bob Call.

12   Q.   And did you continue to report to Mr. Call throughout

13   the tenure of your employment?

14   A.   I did.

15   Q.   Do you know who Bob Call reports to?

16   A.   He now reports to Darryl Brown, who's the president of

17   Bonneville.

18   Q.   As the program director at KYGO, when you started in

19   February of 2013, were you in charge of the morning show?

20   A.   Yes, I was.

21   Q.   And you -- you were essentially Mr. Mueller's and Mr.

22   Kliesch's boss?

23   A.   Yes.

24   Q.   Do you recall when Mr. Mueller and Mr. Kliesch were

25   hired by KYGO?

Direct - Coomer (Haskell)

1    A.    Yes.

2    Q.    When was that?

3    A.    Sometime, I believe, in January of 2013 is when it was

4    announced.  That's when I found out.

5    Q.    Was that before or after you started with the

6    company?

7    A.    Before.

8    Q.    So Mr. Mueller and Mr. Kliesch had been hired as the

9    on-air talent for the morning show when you started?

10   A.    Correct.

11   Q.    Were you aware of their hiring at the time you

12   accepted the position as program director for KYGO?

13   A.    I don't recall.  I know I was in negotiations with

14   them at the time, but --

15   Q.    You were in negotiations with KYGO?

16   A.    Exactly.

17   Q.    When you learned that Mr. Mueller and Mr. Kliesch had

18   been hired as the on-air personality?

19   A.    Correct.

20   Q.    When you started working for KYGO, did you know Mr.

21   Mueller?

22   A.    I did not.

23   Q.    Had you met him?

24   A.    I hadn't.

25   Q.    Did you know Mr. Kliesch?

Direct - Coomer (Haskell)

 1   A.   No.

 2   Q.   Had you ever met him?

 3   A.   No.

 4   Q.   Had you ever -- had you ever heard of either of them?

 5   A.   I had not.

 6   Q.   Had you ever talked to either of them?

 7   A.   No.

 8   Q.   Did you speak with Mr. Mueller and Mr. Kliesch via

 9   telephone before you formally started as the program

10   director for KYGO?

11   A.   I did.

12   Q.   What do you recall from that conversation?

13   A.    It was just an introduction call.  Just, you know,

14   "I'll be there in a couple of weeks."  I believe at that

15   time they were doing a couple of trial, kind of warmup

16   shows on the weekend, and we just talked about how those

17   had been going.

18   Q.    Before you arrived, before you formally started with

19   KYGO, did you make any inquiries with anybody else about

20   Mr. Mueller or Mr. Kliesch or their skills as on-air

21   personalities?

22   A.   No, I did not.

23   Q.   Let's talk a little bit about June 2d, 2013.  Do you

24   remember that day?

25   A.   I do.

Direct - Coomer (Haskell)

1    Q.    Before June 2d, 2013, did you want to fire Mr.

2    Mueller?

3    A.    No.

4    Q.    Did -- before June 2d, 2013, did you lobby the company

5    to fire Mr. Mueller?

6    A.    No.

7    Q.    Did you want -- prior to June 2d, 2013, did you want

8    to fire Mr. Kliesch?

9    A.    No.

10   Q.    Prior to June 2d, 2013, did you lobby the company to

11   fire Mr. Kliesch?

12   A.    No.

13   Q.    Prior to June 2d, 2013, did you document any problems

14   or issues with Mr. Mueller?

15   A.    No, I don't believe I did.

16   Q.    Prior to June 2d, 2013, did you document any problems

17   or issues with Mr. Kliesch?

18   A.    No.

19   Q.    Mr. Mueller was ultimately fired, correct?

20   A.    Correct.

21   Q.    Do you remember the date of his termination?

22   A.    I believe it was June 4th of 2013.

23   Q.    Did you deliver the -- did you tell Mr. Mueller that

24   he was terminated?

25   A.    I did not.

Direct - Coomer (Haskell)

1    Q.   Do you have understanding as to why Mr. Mueller was

2    terminated?

3    A.   Yes.

4    Q.   Did you make the decision to fire Mr. Mueller?

5    A.   I did not.

6    Q.   Did you participate in the decision to fire Mr.

7    Mueller?

8    A.   Yes.

9    Q.   If it was your decision to make, would you have fired

10   Mr. Mueller?

11   A.   Yes.

12   Q.   Who made the decision to fire Mr. Mueller?

13   A.   Ultimately, that would be Bob Call.

14   Q.   Tell me about the process that KYGO went through that

15   led to the termination of Mr. Mueller.

16   A.   We had a meeting on Monday morning -- actually, a

17   meeting in Bob's office with several others on a conference

18   call and discussed what had happened the night before.

19   Q.   What do you recall about the substance of that

20   telephone call?

21        MR. DASH:   Objection, Your Honor.   Privileged.

22   BY MR. McFARLAND:

23   Q.   Were there attorneys present --

24        THE COURT:   Hold on, hold on.   Let's identify

25   yourself for the record.   And have a clear record here.

681
Direct - Coomer (Haskell)

1              MR. DASH:  Yes, Your Honor, Michael Dash from

2      Entercom Communications Corp.

3              THE COURT:  All right, Mr. Dash.

4              Ladies and gentlemen of the jury, Mr. Dash had

5      previously entered his appearance in this case and he

6      represents the -- I guess it's now Entercom.  Is that

7      correct?

8              MR. DASH:  Yes, Your Honor.

9              THE COURT:  All right.  And so based on that

10     objection, let's -- let's be clear, Mr. Coomer, what you

11     can and can't go into.

12             THE WITNESS:  Okay.

13             THE COURT:  An objection's been made in terms of

14     privilege that attaches to attorney-client communications.

15     So to the extent you can answer the question without

16     referring to communications with lawyers for Entercom, then

17     you can do so.  If you cannot answer the question without

18     going into those communications, then you should not answer

19     the question.

20             THE WITNESS:  Yes, sir.

21     BY MR. McFARLAND:

22     Q.   Mr. Haskell, can you answer that question without

23     revealing your communications with lawyers?

24     A.   I cannot.  We had our legal counsel on that call.

25     Q.   Let's look at your deposition transcript for just a

Direct - Coomer (Haskell)

1  minute.  The date of that is July 14th, 2016.  And we'll

2  get a copy of that to you in just a second.

3             THE WITNESS:  Thank you.

4  BY MR. McFARLAND:

5  Q.   If you would turn to page 17.  And I'm looking at the

6  small numbers.  There's four little 1s on each page.

7  A.   Okay.

8  Q.   It's -- if you're looking at the number at the bottom

9  right-hand corner, it's page 7.

10 A.   Okay.  Perfect.  Thank you.

11 Q.   Page 7, this is down in the right-hand corner.

12            MR. BALDRIDGE:  Excuse me, it's just a mini script

13 that I've got --

14            MR. McFARLAND:  I'm just trying to help the

15 witness.

16 BY MR. McFARLAND:

17 Q.   So do you see page 17?

18 A.   Yes.

19 Q.   And the first question there is:  Tell me about the

20 process that KYGO went through.

21            Do you see that?

22 A.   Correct.

23 Q.   Okay.  I just want to make sure we're on the same page

24 there.

25 A.   Yup.

683

Direct - Coomer (Haskell)

1    Q.    Okay.  Down at the -- down at the -- towards the

2    bottom of page 17, we were talking at the deposition about

3    conversations that you had about Mr. Mueller and the

4    situation, right?

5    A.    Correct.

6    Q.    And I asked the question:  And was there any

7    commentary?  Well, tell me what you can recall about that.

8          Then you see there's some objections based on

9    privilege.  And then do you see your answer starting at

10   page 9?

11   A.    Yes.

12   Q.    I'm sorry, starting at page 18.

13   A.    18, yes, sir.

14   Q.    Would you please take a minute and read that to

15   yourself.

16   A.    Okay.

17   Q.    So that was information that you shared with me, I

18   think, at the deposition because you felt like you could

19   share without disclosing attorney-client confidences?  Do

20   you --

21   A.    My understanding at the depositions, I had to answer

22   anyway.

23   Q.    Okay.  So you believe that that information is -- was

24   communicated with your lawyers?

25   A.    Yeah -- oh, this information -- yes.

684

Direct - Coomer (Haskell)

1              THE COURT:  Does Mr. Dash have a copy of this

2      deposition so he knows what's -- what you're talking about?

3              MR. DASH:  I'm familiar with the section, Your

4      Honor.

5              THE COURT:  Okay.  Good.  Just wanted to make

6      sure.

7              MR. McFARLAND:  Is there any objection to Mr.

8      Haskell discussing the information on lines 9 through 15 on

9      page 18?

10             MR. DASH:  Do you mind if I --

11             MR. McFARLAND:  Yeah, please.

12             As I understand, Mr. Dash believes that Mr.

13     Haskell deviated from the instruction he gave.  And I'm not

14     going to ask him to repeat information that Mr. Dash

15     believes is protected by the attorney-client privilege.

16     I'll move on.

17             THE COURT:  Do you agree with what Mr. McFarland

18     just stated?

19             MR. BALDRIDGE:  Your Honor, I have no position --

20             THE COURT:  No, I'm talking to Mr. Dash.

21             MR. BALDRIDGE:  Oh, I'm sorry.  You're looking

22     right through me.

23             THE COURT:  Yeah, I know.  We've got a lot of

24     lawyers in the room.

25             Mr. Dash.

685
Direct - Coomer (Haskell)

1          MR. DASH:  Yes, Your Honor, I do agree with

2    that.

3          THE COURT:  Okay.

4          MR. DASH:  It was an instruction and the answer

5    that didn't follow the instruction.

6          THE COURT:  All right.

7    BY MR. McFARLAND:

8    Q.   Mr. Haskell, do you know who, with Taylor Swift's

9    management team, contacted KYGO?

10   A.   I was told that Frank Bell had been in contact with

11   Bob.

12   Q.   Did you have any conversations with Frank Bell on June

13   2d, 2013, about the alleged incident with Mr. Mueller?

14   A.   On the night of?

15   Q.   Yes.

16   A.   My recollection is that I did see him at one point,

17   but it wasn't an extended conversation, it was basically to

18   make me aware of what had happened.

19   Q.   Do you recall what Mr. Bell told you?

20   A.   That one of my morning guys had, during the

21   meet-and-greet, grabbed Taylor on the rear inappropriately,

22   and that he had been removed from the concert.

23   Q.   Did he show you a photograph of Mr. Mueller, Mr. --

24   Ms. Swift, and Ms. Melcher?

25   A.   I didn't see the entire photograph.  It was zoomed

Direct - Coomer (Haskell)

 1    just to Mueller's face for identification purposes, so I

 2    didn't see Taylor or Shannon in that picture.

 3    Q.    Did Mr. Bell indicate to you whether Ms. Mueller had

 4    touched Ms. Swift outside or inside of her clothing?

 5    A.    He did not.

 6    Q.    Do you recall anything else about your conversation

 7    with Mr. Bell on June 2d, 2013?

 8    A.    No.  Again, it was a very brief, hurried conversation.

 9    I could tell he was stressed and dealing with an issue, and

10    it was -- really, the only purpose of that conversation was

11    to make sure that -- that I knew and identified who that

12    person was.

13    Q.    Did Mr. Bell indicate to you how Mr. Mueller had been

14    identified as the person who allegedly committed the act?

15    A.    I don't believe he did.  I -- again, it was a very

16    brief conversation of holding up a phone, "Do you know this

17    guy?"  And we identified him.

18    Q.    Do you recall a time that conversation took place?

19    A.    It would have been before show time, and my

20    recollection is it was probably a 7:30 show, so 7:00, 7:15

21    would be a stab in the dark.

22    Q.    What did you do next?

23    A.    I called Bob Call and let him know what the situation

24    was.

25    Q.    What do you recall about your conversation with Mr.

Direct - Coomer (Haskell)

1    Call that evening?

2    A.    It was tough communicating.  We were in a lower level

3    of the Pepsi Center, which is all concrete and steel.  And

4    I had no cell service, so I had to go up to the plaza to

5    even get any cell service.  And I believe our initial phone

6    call got disconnected, and so we communicated via text for

7    probably the next couple of hours even.

8          But the initial call was that Frank Bell, who Bob

9    has knowledge of in the industry, so I -- I knew to call

10   him by name, I said, "Frank Bell just showed me a picture

11   of Jackson and they say that he touched Taylor

12   inappropriately in the meet-and-greet, and he's been

13   removed from the venue."

14   Q.    Did you -- did you reach out to Mr. Mueller at that

15   time?

16   A.    I didn't at that time.

17   Q.    And you -- you were at the June 2d, 2013, concert, but

18   you did not attend the general meet-and-greet that Mr.

19   Mueller and Mr. Melcher attended.

20   A.    Correct.

21   Q.    You attended a different meet-and-greet.

22   A.    Yes.

23   Q.    That was the -- the radio VIP meet-and-greet --

24   A.    Yes.

25   Q.    -- is that right?

688
Direct - Coomer (Haskell)

1          Do you recall anything else with respect to the

2     alleged incident involving Mr. Mueller doing -- doing

3     anything else with respect to the alleged incident

4     involving Mr. Mueller on the evening or the night of June

5     2d, 2013?

6     A.    No, I -- I didn't.  I informed Bob, who is the general

7     manager, and updated him on what I knew.  But that was the

8     only action that I took.

9     Q.    Do you recall deciding with Mr. Call to pull Mr.

10    Mueller off the air on Monday?

11    A.    Yes.

12    Q.    Did you communicate that to Mr. Mueller?

13    A.    Yes.  We -- I got some texts from him that basically

14    said, "They threw me out of the Pepsi Center and say I

15    touched Taylor inappropriately."

16          And so after Bob and I had talked and knew that I

17    would take him off the air on Monday, I called him and we

18    had a brief conversation.

19          My -- my intent for that call was to comfort him,

20    that we would get all the facts, and that I didn't want him

21    to have to do a show the next morning with that

22    distraction.  So that we would -- he would take the morning

23    off, but then we would meet with Bob later on Monday.

24    Q.    Do you recall Mr. Mueller's response?

25    A.    I don't recall exactly what it was.  I -- I just

Direct - Coomer (Haskell)

1    recall he was adamant that he hadn't done anything

2    inappropriate.

3    Q.   On the evening of June 2d, did you tell anyone else

4    Mr. Mueller had been accused of inappropriately touching

5    Miss Swift?

6    A.   I -- Kris Lamm, who was with her record label, and was

7    on-site, knew about it before I did, so we -- we had a

8    brief discussion.  And Scott Borchetta, the president of

9    her label, called me.  So I didn't make him aware of it,

10   but we did have a discussion that night.

11   Q.   Do you recall the substance of those conversations?

12   A.   The conversation with Kris Lamm was -- I mean, he --

13   he's the one who tracked me down when the news got to him,

14   so it was more, "Dude, I can't believe this guy did that."

15        And then the conversation with Scott Borchetta, I

16   remember he was at a wedding and had been made aware of it

17   through management somehow.  And Scott and I have a 20-plus

18   year relationship and he just wanted to reach out to me as

19   someone he knew and get the story.  And I told him, "The

20   story is what you heard, I -- I didn't witness it," so ...

21   Q.   And do you know whether Kris Lamm was in the photo

22   booth at the time of the alleged touching?

23   A.   I don't believe he was.  He was in the radio room with

24   us and, after that, there was a backstage tour and I -- I

25   don't recall him being on that tour, so I don't know

Direct - Coomer (Haskell)

1    where -- he had a lot of responsibilities that night of

2    making sure people got their passes and things like that.

3    Q.   Do you have any -- was there anything that Mr. Lamm

4    said or did to suggest to you that he was an eyewitness to

5    the alleged inappropriate touching?

6    A.   No.

7    Q.   After you learned about the alleged incident from Mr.

8    Bell on June 2d, did you talk to anybody else associated

9    with Ms. Swift's management team?

10   A.   I believe her head of security was with Frank when --

11   when he came up, but I didn't have a conversation with

12   anyone.

13   Q.   Okay.  So other than the security person being with

14   Frank on June 2d, after you learned of the incident, you

15   don't recall speaking with anybody else associated with Ms.

16   Swift's management team?

17   A.   I do not.

18   Q.   And after you learned of the incident on June 2d, you

19   don't remember texting or e-mailing anybody associated with

20   Ms. Swift's management team?

21   A.   No, I do not.

22   Q.   What, if anything, did you do with respect to the

23   alleged incident on Monday, June 3d?

24   A.   We had a meeting in Bob's office first thing in the

25   morning, probably 9:00 or 10:00 a.m.  And that was the --

Direct - Coomer (Haskell)

1    the conversation that we had, there were about seven of us

2    on that call, and including the legal counsel.  And that --

3    and then later that day called Mueller in to discuss it

4    with him.

5    Q.   Was the decision to fire Mr. Mueller made during that

6    Monday morning meeting?

7    A.   No, it was not.

8    Q.   Do you believe KYGO conducted an appropriate

9    investigation into Mr. Mueller's alleged inappropriate

10   touching?

11   A.   I believe we did.  There were -- were not a lot of

12   resources that we could go to at -- it was my understanding

13   that it was her claim, and there were people in the room,

14   and his claim that he didn't do it.  So we had a photograph

15   and sought out to see if there were other photographs or

16   video cameras at the Pepsi Center, and there were not.

17   Q.   Did -- did you seek other photographs or -- or video

18   based on Mr. Mueller's request that you do that?

19   A.   I -- I didn't.  Bob took care of that, so I don't

20   know.

21   Q.   At any point do you remember Mr. Mueller asking you if

22   there --

23   A.   Yes.

24   Q.   -- were video or other photographs?

25   A.   I do.

692

Direct - Coomer (Haskell)

1    Q.   Do you know why he was asking you to look for that

2    information?

3    A.   Yes.  Because there was a picture, a two-dimensional

4    picture from the front that showed his hand in a vertical

5    and lateral position that would validate, but you couldn't

6    see depth.  So his hope was that if there was video

7    cameras, some type of surveillance camera, you could see if

8    it was a foot behind or touching her.

9          So that was -- he did make that request in our

10   conversation, but I think we probably would have looked for

11   that anyway.

12   Q.   What was your role in this so-called investigation?

13   A.   Honestly, it was minimal.  Of the seven people that

14   were on the phone or in the room, job title wise, I was

15   probably seventh.  So while I was a party to it and -- and

16   almost a liaison to it, the CEO of the company was on that

17   call, so . . .

18   Q.   I want to make sure that I understand your

19   understanding of what the investigation included.

20         Did it -- did the investigation, or so-called

21   investigation, include hearing Frank Bell and Taylor

22   Swift's management's side of the story?

23   A.   That's my understanding.

24   Q.   That was one part.

25   A.   Yes.

693
Direct - Coomer (Haskell)

1   Q.   And another part was hearing Mr. Mueller's side of the

2   story?

3   A.   Yes.

4   Q.   And KYGO also considered what Ms. Melcher had to say?

5   A.   Yes.

6   Q.   And KYGO also looked at the photograph that was

7   provided by Frank Bell?

8   A.   Yes.

9   Q.   Is there anything else that you would consider part of

10  the investigation?

11  A.   Not to my knowledge.

12  Q.   Did you ever learn who was in the photo booth at the

13  time of the alleged touching?

14  A.   Personally, no, I did not.

15  Q.   Do you know -- did you ever learn the physical

16  location of where the alleged incident took place?

17  A.   I did not.

18  Q.   Did you learn who was in or around the location at the

19  time of the alleged inappropriate touching?

20  A.   No.

21  Q.   As of June 2d, 2013, you knew that Mr. Mueller and Ms.

22  Melcher were boyfriend and girlfriend?

23  A.   Yes.

24  Q.   And there's nothing at KYGO that you're aware of that

25  prohibited that kind of relationship among employees?

694

Direct - Coomer (Haskell)

1   A.   No.

2   Q.   And Mr. Mueller wasn't fired for having a relationship

3   with Ms. Melcher?

4   A.   No.

5   Q.   Did you see Mr. Mueller and Ms. Melcher interact

6   around the office?

7   A.   No more than, honestly, you would see any two people.

8   There was no physical or romantic -- just, you know, she

9   worked in the sales department and had clients that he did

10  remote broadcasts and things for, so nothing -- nothing

11  outside of business.

12  Q.   Is it fair to say that -- that at the office, they

13  were professional?

14  A.   Yes.

15  Q.   Did you -- did you ever make any efforts to find out

16  whether there were other people in the photo booth at the

17  time of the alleged inappropriate touching?

18  A.   Not personally, I didn't.

19  Q.   Do you know whether KYGO -- anyone else at KYGO ever

20  endeavored to find out who the other people -- whether

21  there were other people in the photo booth at the time of

22  the alleged touching?

23  A.   I don't know if they did.

24  Q.   Do you know whether there was security personnel in or

25  near the location of the alleged touching?

Direct - Coomer (Haskell)

1    A.    I don't know.  I can't imagine that she would be

2    anywhere with -- further than 3 feet from security

3    personnel ever, but . . .

4    Q.    On June 2d, did you -- did you meet Taylor Swift?

5    A.    Yes, I did.

6    Q.    Did you -- did you meet -- or did she have a personal

7    bodyguard with her at that time?

8    A.    I don't recall.  There are always people with her and

9    you don't know what those people are trained to do, but --

10   they may just look like a publicist or an agent, but I'm

11   certain that there's someone within earshot at all times.

12   Q.    Did you know Greg Dent?

13   A.    Not personally.  I know who he is.

14   Q.    You've never -- did you meet him --

15   A.    I believe he was with Frank when they walked out the

16   backstage, but I can't say for sure.  Although my

17   recollection is that there was a frightening bald guy, I

18   would assume that was him.

19            THE COURT:  You're not referring to Mr. Bell.

20            THE WITNESS:  He doesn't frighten me.  He's a

21   teddy bear.

22   BY MR. McFARLAND:

23   Q.    Did you ever speak to Ms. Melcher about the alleged

24   incident?

25   A.    I did not.

696

Direct - Coomer (Haskell)

1   Q.   Do you recall whether there was a photographer present
2   in the photo booth at the time of the alleged incident?
3   A.   Yeah, I would assume, it's a photo booth, that there
4   would be a photographer.
5   Q.   Did you ever make any efforts to speak to the
6   photographer?
7   A.   I did not.
8   Q.   Did you ever suggest to anyone at KYGO that KYGO ought
9   to find out who was around -- in or around the photo booth
10  at the time of the alleged incident?
11  A.   I didn't.
12  Q.   Did -- did you think that as part of its so-called
13  investigation, KYGO should determine whether there were
14  other witnesses to the alleged incident?
15  A.   Do I think that's something they should have done?
16  Q.   Yes.
17  A.   Yes.
18  Q.   That was -- would have been important for the
19  investigation.
20  A.   Correct.
21  Q.   Did you ask Mr. Bell whether he was present at the
22  time of the alleged incident?
23  A.   No, I didn't.
24  Q.   Do you know whether anyone at KYGO did?
25  A.   No, I -- no.

Direct - Coomer (Haskell)

 1   Q.   Do you know whether Frank Bell talked to other

 2   witnesses to determine what they saw in or around the time

 3   of the alleged incident?

 4   A.   I don't know.

 5   Q.   Can you tell us about the meeting -- well, let me back

 6   up.

 7        Did you have a meeting with Mr. Mueller and Mr.

 8   Call on the afternoon of June 3d, 2013?

 9   A.   Yes.

10   Q.   Can you tell us about what you recall from that

11   meeting.

12   A.   I believe it was just -- we went immediately -- the

13   purpose of that meeting was to -- to get his side of the

14   story.  And I believe we just went straight to, "Tell us

15   your side, what happened."

16        And discussed that obviously this would have a

17   huge negative impact on the radio station, if it were true;

18   and we have to get to the bottom of whether it was or not.

19   So he brought up that we should check for other cameras,

20   other angles.  He adamantly denied doing it.  And we asked

21   if, you know -- it was, "Absolutely I did not touch her.  I

22   did not touch her."

23        And so we continued to have the conversation.  We

24   asked, you know, "Are you sure that you didn't?"

25        And he said, "Well, if -- if I did, it was" -- I

Direct - Coomer (Haskell)

1    think "incidental" may be the word that he used -- "but it

2    was an accident.  But I didn't inappropriately touch her in

3    any way."

4    Q.   Okay.  At the -- at the -- when you looked back on the

5    entire conversation, do you feel like Mr. Mueller admitted

6    in any way that he intentionally inappropriately touched

7    Ms. Swift?

8    A.   No.

9    Q.   And he was steadfast in his denial that if there was

10   any touching at all, it was accidental or incidental, but

11   not inappropriate?

12   A.   Correct.

13   Q.   Do you recall how long the meeting lasted between you

14   and Mr. Mueller and Mr. Call on the afternoon of June 3d,

15   2013?

16   A.   I don't.  I know that we covered a lot, that we

17   listened more than we talked because we -- we wanted to --

18   the entire purpose of that meeting was to get his side of

19   the story.  I would say probably started early afternoon,

20   maybe an hour or two.

21   Q.   Now, I'll represent to you, in your deposition I asked

22   you:  Do you recall how long the meeting lasted?  And you

23   said probably 20 minutes.

24   A.   It felt like it.  And then in -- since the deposition,

25   as I've thought about it, we covered a lot, and there was a

Direct - Coomer (Haskell)

1    lot of quiet space and a lot of re- -- going over again

2    step-by-step what happened.  So it absolutely wasn't 20

3    minutes.  I don't know if it was two hours.  It was

4    somewhere in the middle.

5    Q.    Okay.  Did you take any notes of the meeting?

6    A.    I did not.  Bob was moderating that meeting, so he

7    took copious notes.

8    Q.    Do you know who at KYGO spoke with Ms. Melcher about

9    the alleged --

10   A.    Yes.

11   Q.    -- incident?

12   A.    Our HR manager, Maureen Marsh.

13   Q.    Did she report to you what she found as a result of

14   her conversations with Ms. Melcher?

15   A.    Yes.

16   Q.    And what were those?

17   A.    If I recall -- again, that wasn't a meeting I was in,

18   it -- and it was -- seemed a bit tertiary, it was very

19   brief.  It was that she didn't believe he would do anything

20   like that, and she didn't see him do anything like that.

21   And she also mentioned that she believed that he believed

22   that I was out to get him.

23   Q.    Was that true?

24   A.    No.

25   Q.    Did -- is it true that you didn't like Mr. Mueller?

700

Direct - Coomer (Haskell)

1   A.   No, not at all.  My job is to create a sound for the

2   radio station and I do that using the on-air talent.

3           We had a talent coach that we worked with, we had

4   a vice president of programming who we worked with, we had

5   a strategy for the show, and I -- I felt like that their

6   strategy and mine didn't mesh up and that caused some --

7   some business friction.  And maybe he took it personally,

8   but for me, it was coaching.

9   Q.   And how would you describe, as of June 2d, 2013, your

10  relationship with Mr. Mueller?

11  A.   It was strained.

12  Q.   As of June 2d, 2013, were there any -- I'll say real

13  problems between you and Mr. Mueller?

14  A.   I -- I don't know what you classify a real problem.

15  Q.   Serious, significant, meaningful.

16  A.   No.

17  Q.   As of June 2d, 2013, how was the morning show doing?

18  A.   Not well.  If I recall, the morning show and our

19  target age group, which is 25- to 54-year-olds, they were

20  15th.

21  Q.   Do you know where the radio station was when Mr.

22  Mueller and Mr. Kliesch were hired for the morning show?

23  A.   I know -- because I was a little disappointed, I know

24  that it -- it was not good.  My -- I was hired to come in

25  and fix the radio station.  And the station, itself, had

Direct - Coomer (Haskell)

1    dropped almost out of the top 10 and the morning show

2    wasn't top 15.

3           We had a little bit of growth in February, March,

4    and April, still peaking at 15, and then in May we --

5    actually, the morning show dropped.

6    Q.   Where was the KYGO morning show when you left KYGO?

7    Where was it in those rankings?

8           MR. BALDRIDGE:  Objection, Your Honor.  Relevance.

9    This is three years after Mr. Mueller left.

10          MR. McFARLAND:  I'm just curious if the show got

11   better after Mr. --

12          MR. BALDRIDGE:  It could be confused as this is

13   the before and after picture of Mr. Mueller's show when he

14   left many years after.

15          THE COURT:  Three years later is a lot later.  Do

16   you want to get a little closer in time?

17   BY MR. McFARLAND:

18   Q.   How did the morning show do after Mr. Mueller's

19   termination?

20   A.   In the first month he was gone, it went up a little,

21   but it was back to where it was before that stumble in May.

22   But it -- it was a slow grow, as new shows are.

23          But I -- I would -- I don't think we ever cracked

24   top 10.

25   Q.   And you understood when you took the job as the

Direct - Coomer (Haskell)

1    program director at KYGO, that the morning show was

2    intended to grow slowly with the idea of building something

3    that could be maintained during the long haul.

4    A.    Yes.

5    Q.    And you understood that Mr. Mueller and Mr. Kliesch

6    had been given guaranteed two-year contracts.

7    A.    Yes.

8    Q.    When you were hired, what was the period of time for

9    your contract?

10   A.    February 10th on a two-year.

11   Q.    Two-year guarantee?

12   A.    Yes.

13   Q.    In your words, why did KYGO fire Mr. Mueller?

14   A.    We felt he violated the morality clause of his

15   employment agreement.

16   Q.    And does that morality clause generally allow KYGO --

17   or did it generally allow KYGO to terminate Mr. Mueller if

18   he acted immorally or if he was accused of immoral

19   behavior?

20         MR. BALDRIDGE:  Objection.  Legal conclusion.

21         THE COURT:  Sustained.

22   BY MR. McFARLAND:

23   Q.    Do you have --

24         MR. BALDRIDGE:  Strike any answer that the jury

25   heard, Your Honor, that, then --

Direct - Coomer (Haskell)

1            MR. McFARLAND:  I can rephrase it, I think.

2            THE COURT:  Yeah.  I don't think that's necessary.

3       Go ahead and rephrase it.

4   BY MR. McFARLAND:

5   Q.   Do you have an understanding of what the -- the

6   morality clause allows KYGO -- the basis on which Mr.

7   Mueller could be terminated under the morality clause?

8   A.   Not specifically without looking at it today.

9   Q.   Generally.

10  A.   My understanding was, in very broad terms, if -- if a

11  talent did something that could cause the station to be

12  cast in a bad light.

13  Q.   And even the allegation of inappropriate conduct was

14  enough to terminate.

15           MR. BALDRIDGE:  Objection.  Asked and answered and

16  legal conclusion.  Same question.  No foundation --

17           MR. McFARLAND:  I'm just asking for his

18  understanding.

19           THE COURT:  Well, all right, let's just get --

20  let's just get an agreement here.  We're talking about a

21  layperson's understanding as opposed to any kind of legal

22  conclusion.

23           MR. McFARLAND:  Yes.

24           THE COURT:  All right.  With that clarification,

25  you may answer.

704
Direct - Coomer (Haskell)

1              THE WITNESS:  My understanding was that if someone

2      did something that made us look bad, guilty or innocent, it

3      made us look bad.

4      BY MR. McFARLAND:

5      Q.    And the -- the bad behavior, or the behavior that made

6      KYGO look bad here, was the alleged inappropriate touching

7      and the photograph.

8      A.    Correct.

9      Q.    As of the day of Mr. Mueller's termination, were you

10     aware of any other reason to terminate him?

11     A.    No.

12     Q.    Did you hug Ms. Swift on June 2d, 2013?

13     A.    Yes.

14     Q.    One -- just one time?

15     A.    Probably because we did a picture at the end.

16     Q.    Did you meet with Ms. Swift more than once on the

17     night of the concert, June 2d?

18     A.    No.

19     Q.    And your interaction with Ms. Swift was at the VIP

20     meet-and-greet?

21     A.    Yes.

22     Q.    Who attended the VIP meet-and-greet with you?

23     A.    Ryan Kliesch and his wife, Alecia.

24     Q.    Did you invite Mr. Mueller and Ms. Melcher to attend

25     the VIP meet-and-greet with you and Mr. Kliesch and his

Direct - Coomer (Haskell)

1   wife?

2   A.   I did not.

3   Q.   Why not?

4   A.   We get four passes.  For radio, it's for program

5   directors and music directors.  And the station didn't have

6   a music director at the time, so I thought I'll spif one of

7   our morning guys and let him take someone back.

8   Q.   Did your group have a fourth with you or --

9   A.   We did not.

10  Q.   And did -- did you ask Mr. Mueller to attend Ms.

11  Swift's concert and promote the KYGO radio station?

12  A.   Yes, I did.

13  Q.   And was that part of Mr. Mueller's typical job

14  responsibilities?

15  A.   Yes.

16  Q.   Do you -- do you recall Mr. Mueller's reaction when

17  you asked him to attend the concert to promote the radio

18  station?

19  A.   I don't.

20  Q.   Do you know whether he was excited or not to attend?

21  A.   I have no idea.

22  Q.   Were you trying to punish Mr. Mueller and Ms. Melcher

23  in any way by not asking them to attend the VIP

24  meet-and-greet with you?

25  A.   No, I wasn't trying to punish them by letting them

Direct - Coomer (Haskell)

1    meet Taylor Swift.  I don't know how we arrived at who

2    would go.  I, in my mind, believe I let them make that

3    decision.  I don't know why I would choose Ryno over

4    Jackson.  I -- normally I would say, "Hey, who wants to do

5    the radio room and who wants to do the meet-and-greet?"

6         I don't know if I did in that instance, but I

7    could have flipped a coin.

8    Q.   And there's no particular reason why you wanted Mr.

9    Mueller and Ms. Melcher to attend the second or the general

10   meet-and-greet rather than the --

11   A.   No, it was merely a matter of quantity of passes.

12   Q.   What do you recall from your meeting with Ms. Swift on

13   June 2d?

14   A.   We had had a radio room and there were probably 20

15   people in there, maybe.  Kind of a cocktail party vibe with

16   high tables and refreshments.  And we all go in and I was

17   socializing.  I know a lot of the -- and knew a lot of the

18   Colorado program directors but hadn't had a chance to meet

19   them recently since I moved up here, so it was a social

20   setting where we all talked.

21        And then at some point, Taylor came in and would

22   walk between groups of -- probably those four-pass-type

23   groups of people, chat for a minute, and then pose for a

24   picture, and then move to the next group.  And then

25   eventually work her way out, and we would stay in that

707

Direct - Coomer (Haskell)

1    room.

2    Q.    Did you have conversations with Ms. Swift in --

3    A.    Yes.

4    Q.    -- the VIP room?

5          How long did you visit?

6    A.    30 seconds, maybe.  It was a, "Hey, how are you

7    doing?"

8          I believe after being in Albuquerque for nine

9    years, which at that point was her career, I was the

10   Albuquerque guy, so I think we probably had a conversation

11   about how I liked Denver or something like that, but just

12   superficial social conversation.

13   Q.    Okay.  And then you didn't see Ms. Swift again that

14   evening --

15   A.    I did not.

16   Q.    -- other than on stage.

17   A.    Right.

18   Q.    Did you see Mr. Mueller on June 2d, 2013?

19   A.    After that?

20   Q.    At any time.

21   A.    At any time.  Yes.  I had to give them their passes

22   before the show.  And so I met with them probably about

23   6:00, maybe 5 -- between 5:30 and 6:00.  Gave them their

24   respective passes, and then went to the radio room with --

25   with Ryno.

Direct - Coomer  (Haskell)

1   Q.   When you met Mr. Mueller and Ms. Melcher before the

2   concert to give them their passes, did they appear to be

3   intoxicated?

4   A.   No.

5   Q.   Did you have any indication that they'd been drinking?

6   A.   There were drink referencing.  I believe he had a

7   drink in his hand when I saw him in the lobby of the Pepsi

8   Center, it's my recollection.

9   Q.   Was that before or after the general meet-and-greet?

10  A.   It would have had to have been after, because they had

11  been inside the Pepsi Center.

12  Q.   Did you see -- you didn't see Mr. Mueller with a drink

13  in his hand before the meet-and-greet?

14  A.   I did not.

15  Q.   Did you have any other interaction or meet-and-greet

16  with Mr. Mueller on June 2d?

17  A.   Yes.  After the backstage tour that we took, we met

18  back up -- I think everybody wanted to take their pictures

19  to the car because you get these big 8-by-10 cards and you

20  don't want to carry it the whole night.  So we met up out

21  front where our tent was set up and just kind of

22  reconvened, said, "Hey, how did -- did you get to meet her?

23  How was she?"  That kind of thing.

24  Q.   So where did this meeting that you're talking about

25  take place?

Direct - Coomer (Haskell)

1   A.   On the plaza outside the Pepsi Center.

2   Q.   Okay.  And was it just you and Mr. Mueller?

3   A.   I don't recall who was there.  I believe that Ryno was

4   there as well, but I don't know for sure.

5   Q.   Was there anything odd or unusual about Mr. Mueller's

6   behavior during that interaction -- during that brief

7   meeting?

8   A.   No.

9   Q.   Did you describe hugging Ms. Swift to Mr. Mueller?

10  A.   I don't recall, but probably.

11  Q.   Did you tell him that your hands were near her rear?

12  A.   No.

13  Q.   Did you tell him that your hands touched her rear?

14  A.   No.

15  Q.   For four or five months, you spent quite a bit of time

16  around Mr. Mueller?

17  A.   Yes.

18  Q.   And you observed his interactions with other people in

19  and around the office?

20  A.   Yes.

21  Q.   On a regular basis?

22  A.   Yes.

23  Q.   Including female employees?

24  A.   Yes.

25  Q.   And did you see any other -- did you see any

Cross - Coomer (Haskell)

1    inappropriate touching or behavior from Mr. Mueller?

2    A.    No.

3    Q.    Was there any instances that you can recall where Mr.

4    Mueller was not respectful of the female employees at KYGO?

5    A.    No, I don't recall any.

6              MR. McFARLAND:  Thank you very much.  I have no

7    further questions.

8              THE WITNESS:  Thank you.

9              THE COURT:  Cross-examination.

10             MR. BALDRIDGE:  Thank you, Your Honor.

11                         CROSS-EXAMINATION

12   BY MR. BALDRIDGE:

13   Q.    Hello, Mr. Haskell, how are you today?

14   A.    Good, thank you.

15   Q.    Let's clarify.  The judge told the jury earlier,

16   you're not from Leave it to Beaver, are you?

17   A.    I've aged well if I am.

18   Q.    Okay.  You are.

19             And how -- just for kicks, how did you come up

20   with the name Eddie Haskell?

21   A.    Well, this will be a shock:  Hershel Coomer isn't a

22   great radio name.  It's great -- it's a great name for my

23   dad, which he passed on to me.

24             When I first got into radio, I was using

25   variations of Keith, my middle name.  And I got a job on

Cross - Coomer (Haskell)

1    the big Top 40 station in Oklahoma City, which was like a

2    dream for the hometown boy, and the program director was

3    like, "Oh, by the way, we got to get you a name."

4           And I kept bugging him all day.  And I could never

5    catch him, he was always in a meeting.  So I went on the

6    air at 7:00 and my first break I said, "I'm the guy with no

7    name because the boss doesn't like my name."

8           He hot-lined me, and the red phone in the studio,

9    and I was like, I'm fired on my first day.  And he said,

10   "That's brilliant, let the listeners name you."  So for a

11   week we had people call in, and every night we'd vote.  And

12   thankfully you're not addressing Pete Moss today because

13   that was the number 2.  So Eddie Haskell hasn't been that

14   bad.

15   Q.   All right.  Well, let's get into some of the questions

16   Mr. McFarland asked.  He -- he kept calling it a so-called

17   investigation at KYGO.  There was actually an

18   investigation, wasn't there?

19   A.   Yeah, to the -- the best resources we had.  I mean, we

20   weren't -- we did check to see if there were cameras

21   backstage other than those.  We -- we did the investigation

22   that we could do with the access to the resources.  They --

23   we weren't there.

24   Q.   And you already testified that you had only a

25   minimum -- minimal role in that investigation, correct?

712
Cross - Coomer (Haskell)

1    A.    Yes.

2    Q.    In fact, Bob Call headed that investigation, correct?

3    A.    Correct.

4    Q.    So the various pieces of information regarding the

5    investigation filtered through Bob Call, correct?

6    A.    Correct.

7    Q.    So if I wanted to know most about the investigation,

8    I'd ask Bob Call, right?

9    A.    Yes.

10   Q.    Not you.

11   A.    Not me.

12   Q.    You were seventh in line in terms of title in that

13   call, weren't you?

14   A.    I was the definition of middle management:  It's all

15   your fault, but ask us first.

16   Q.    So to the extent you don't know about a particular

17   fact, that doesn't mean it's not a fact.

18   A.    Correct.

19   Q.    Now, KYGO's part of the investigation, Mr. Call spoke

20   to you, right?

21   A.    Yes.

22   Q.    And Mrs. Marsh, the HR director, spoke to Ms.

23   Mueller -- I mean Ms. Melcher, right?

24   A.    Correct.

25   Q.    And then the two of you interviewed Mr. Mueller,

713
Cross - Coomer (Haskell)

1   right?  The two of you:  You and Mr. Call?

2   A.    Yes.

3   Q.    So, in fact, every single person from KYGO that was in

4   the photo booth was, in fact, talked to by Mr. Call or Ms.

5   Marsh, right?

6   A.    Correct.

7   Q.    And you were there that night and you were spoken to.

8   A.    Yes.

9   Q.    Now, there were three reasons cited by Mr. Call for

10   making his decision to terminate Mr. Mueller.  Are you

11   familiar with those?

12   A.    Not specifically.

13   Q.    Let me see if I could refresh you.  There was the

14   photograph --

15   A.    Correct.

16   Q.    -- right?

17         There was the statements by Mr. Bell about what

18   Ms. Swift had experienced, right?

19   A.    Correct.

20   Q.    And that Mr. Call said that Mr. Mueller changed his

21   story in the interview that you two conducted of Mr.

22   Mueller?

23   A.    Yes.

24   Q.    Okay.  What was your understanding about Mr. Mueller

25   changing his story in that interview?

Cross - Coomer (Haskell)

1   A.   We -- Bob and I discussed it as soon as he left the

2   room.  It was -- you know, Bob kind of leaned over and

3   said, "Did you notice how it went from there's no possible

4   way I did it," to, "Well, if I did it, it was accidental"?

5        And we -- Bob, probably more than me -- but we

6   thought, yeah, that -- I mean, if -- if you go from,

7   "There's no possible way I did anything," to, "Well, if I

8   did, it was an accident," we felt like that that was not

9   good.

10  Q.   And to be clear, your respective views about Mr.

11  Mueller changing his story in that interview had nothing to

12  do with these defendants at this table, did it?

13  A.   No.

14  Q.   I mean, you decided he changed his story, right?

15  A.   Absolutely.

16  Q.   And you didn't call anyone at this table and say,

17  "Hey, what do you think?  Do you think he changed his

18  story?"

19  A.   No.

20  Q.   That was an independent decision of KYGO, correct?

21  A.   Correct.

22  Q.   And the various views of what the photo showed -- you

23  know everybody's got a little bit different view -- that

24  was your independent view of what the photo showed,

25  correct?

715
Cross - Coomer (Haskell)

1    A.    Correct.

2    Q.    And you found that photo damning, didn't you?  You

3    said in your deposition.

4    A.    Yes.

5    Q.    And no one at this table, none of these defendants,

6    told you what you're supposed to see in that photo, did

7    they?

8    A.    No.  I wasn't supposed to see the photo, but -- yeah.

9    Q.    But the views of you and Mr. Call about what that

10   photo showed were the independent views of KYGO, correct?

11   A.    Absolutely.

12   Q.    Now, Mr. McFarland asked you whether you're aware -- I

13   think that Shannon Melcher had told Ms. Marsh that she

14   believed you were out to get Mr. Mueller.  Do you recall

15   that question?

16   A.    Yes.

17   Q.    And you, of course, said, "That wasn't true," right?

18   A.    Correct.

19   Q.    Now, if it were true -- I understand you don't think

20   it was true -- but if it were true, that certainly had

21   nothing to do with these defendants, right?

22   A.    No, not at all.

23   Q.    And if it were true, that was something within KYGO,

24   right?

25   A.    Exactly.

Cross - Coomer (Haskell)

1    Q.    It's nothing that these defendants are responsible

2    for, right?

3    A.    No.

4    Q.    And Mr. Mueller never sued you, did he?

5    A.    No.

6    Q.    And he never sued Mr. Call, did he?

7    A.    No.

8    Q.    And to your knowledge, he's never sued KYGO or its

9    parent, has he?

10   A.    No.

11   Q.    Now, there were questions about the statement in this

12   case that you bragged or confessed that you had put your

13   hands on Ms. Swift's bottom.  Are you familiar with that?

14   A.    Very familiar.

15   Q.    And, in fact, Mr. Mueller made that allegation against

16   you in a federal lawsuit for everyone to see, correct?

17   A.    That is correct.

18   Q.    Is that a lie?

19   A.    It is an absolute lie.  And the fact it took two years

20   for him to make that story up showed that it's a lie.

21   Q.    And to explain to the jury, what do you mean by it

22   took him two years to make up that story?

23   A.    It was never mentioned in our two-hour conversation

24   with him, which I would think when you're lobbying to keep

25   your job you would turn and go, "Hey, wait, Eddie told me

717

Cross - Coomer (Haskell)

1    this."

2              It was never mentioned anywhere -- it wasn't

3    mentioned the night of, on the phone call or text messages

4    that I got from him, "Hey, wait, you told me that."  It

5    didn't happen.

6              And the first time I was made aware of it was when

7    I read it in a federal lawsuit that went to the entire

8    media world.

9    Q.   Two years after the incident, correct?

10   A.   It was the first time.

11   Q.   Now, sir, has that public allegation made by Mr.

12   Mueller had any impact on you?

13   A.   I believe it has.

14   Q.   Can you explain that.

15   A.   There have been a couple of jobs that I was up for

16   that I didn't get, and I know people in the company who --

17   well, one came right out and said -- I applied for a job

18   and I had a friend in the building and he said, "Well, when

19   I told him about you, he said, 'Hey, isn't that the guy

20   that grabbed Taylor Swift's butt?'"

21             And he said, "No, this was his boss."

22             And last week, a friend of mine who worked for

23   another company I had applied for said, "Well, I've talked

24   to people in the company and that -- that did come up."

25   Q.   Now, let me understand the sequence of events in the

718

Cross - Coomer (Haskell)

1    meet-and-greet as pertains to you.  You went to this media

2    VIP meet-and-greet and that's where you met Taylor,

3    right?

4    A.   Yes.

5    Q.   And then following that meet-and-greet, you went on a

6    backstage tour with Andrea Swift, Taylor's mother, correct?

7    A.   Correct.

8    Q.   And after you met Taylor, you never saw her again that

9    night, right?

10   A.   Never.

11   Q.   So the allegation is you assaulted Taylor Swift, then

12   hung out with her mom backstage, right?

13   A.   Well, assaulted her in a room of 20 people, then her

14   mother happily took me on a tour of the backstage.  Yes.

15   Q.   Just wanted to understand.  Thank you.

16   A.   Yes.

17   Q.   Does that make any sense to you, sir?

18   A.   Not a bit.

19   Q.   Might be why it took two hours -- or two years to

20   think it up?

21   A.   It was a good one.

22   Q.   Now, let's back up about the experience at KYGO before

23   the June 2d, 2013, event.  There had been some complaints

24   about Mr. Mueller's performance, hadn't there?

25   A.   Yes.

Cross - Coomer (Haskell)

1    Q.   And there were some issues around adding a third

2    person, in particular a woman, to his format, correct?

3    A.   Correct.

4    Q.   Tell the jury about that process.

5    A.   We, from the beginning of their tenure, had planned it

6    to be a three-person show.  And since they came together as

7    two guys, we began a search for a female on the show to

8    help -- you know, country radio targets female listeners,

9    and we wanted the women to have a representative on the

10   show.

11          So we did a nationwide search and I -- I had a

12   vision, again, for what I wanted the show to sound like

13   and -- but I wanted them to have input on it because

14   they're going to be working with them day in and day out.

15   So in kind of groups of three, I would give them choices

16   and they always seemed to choose the weakest.

17          I -- I would suggest someone from San Francisco

18   and they would say, "But there's a lady at a small town in

19   Minnesota."

20          And so it finally -- it got really frustrating for

21   me.  I felt like they were looking for someone weak that

22   would keep the show Ryno, Jackson, and the little lady,

23   which I didn't want.  I wanted Ryno, Jackson, and Tracy, or

24   whoever we put in.

25          So I flew into Canada to Tracy Dixon.  And I

Cross - Coomer (Haskell)

1    thought she was amazing, and they hated her.  She's been

2    doing the show since and is doing quite well.

3    Q.   She's still on the air?

4    A.   She's actually the star of the show now, and they've

5    hired a guy sidekick for her, so that's turned into a great

6    show.  They absolutely did not want her, so they came to me

7    one day and -- so excited, ran into my office and said,

8    "We've got it.  This lady that works at our Starbucks is so

9    funny, and she's 25, and she's right in the age group we're

10   targeting and she's very outgoing, very friendly."

11         And I said I -- that's awesome, but I'm not hiring

12   a barrista from Starbucks to do a morning show in the 18th

13   biggest market in America.  And they weren't happy about

14   it.  They said, "Would you at least meet with her?"

15         So I did.  And she came in and I interviewed her.

16   I thought she was as lovely as they thought she was.  But

17   my fear was that they -- one of them is on vacation, the

18   other one is sick, I've got a lady who ran a cash register

19   at Starbucks trying to run a radio station, so it wasn't

20   going to happen.

21         So when I told them that -- I vividly remember

22   that day -- and they came in and I said, "What are we going

23   to do about this morning show?"

24         And I remember Mueller specifically saying, "If

25   it's not her, we don't care."

721
Cross - Coomer (Haskell)

1          And I found that to be insubordination.  "I've --

2    I value your input as team members on this show, and when

3    you come in with, 'If it's not my choice, I don't care who

4    you hire,' I just feel like you've checked out of that show

5    at that point."

6    Q.   Now, in your answer, you mentioned the words "little

7    lady."  Do you recall saying of your impression Jackson and

8    Ryno wanted a little lady to giggle at their jokes?

9    A.   Yeah.

10   Q.   And that's an impression of --

11   A.   That's what I felt.  I felt like they were a team that

12   came in together and wanted to hold that camaraderie and

13   just have somebody else in to, "If we gotta."

14   Q.   Now you mentioned Tracy Dixon, who continues as an

15   on-air personality at KYGO, correct?

16   A.   Yes.

17   Q.   Do you recall talking to Tracy Dixon about

18   possibility -- of possibly coming to the show when Mr.

19   Mueller was still on the show?

20   A.   Yes, I did.

21   Q.   And did she have any views about Mr. Mueller at that

22   time?

23   A.   She did.  When I called her to offer her the job after

24   they told me, "Go ahead, make your decision" -- she had

25   been my first choice all along.  And so I called her to

722

Cross - Coomer (Haskell)

1    offer her the job.  And she said, "My only concern is I

2    feel like Jackson didn't like me at lunch.  I feel like

3    they would kind of team up against me and make it hard for

4    me to fit into the team."

5    Q.   And then she didn't take the job, right?  Didn't come

6    to the station.

7    A.   Exactly, correct.

8    Q.   And then after Mr. Mueller was terminated, she then

9    came to the station, right?

10   A.   Correct.

11   Q.   Now, you had some questions about the employment

12   situation, whether Mr. Mueller was possibly going to be

13   terminated before the June 2d, 2013, concert.  And I

14   believe -- and I'm paraphrasing -- you said something --

15   you were unaware of any reasons why or something --

16   A.   Correct.

17   Q.   -- like that.

18        Could I put on the screen, please, already

19   admitted Exhibit A-1.  And this is a set of notes.  And to

20   be perfectly clear with you Mr. Haskell, these aren't your

21   notes --

22   A.   Yeah.

23   Q.   I just want to see if I could refresh your

24   recollection.

25        In the middle of the page there, it's a note that

1    says, quote, Dimick -- and who's Dimick?

2    A.    John Dimick was the senior vice president of

3    programming for Lincoln Financial.

4    Q.    He was your boss?

5    A.    He was all programmers' boss -- he was at a corporate

6    level, my boss.

7    Q.    So he could make the call, right?

8    A.    Oh, without a doubt.

9    Q.    And this note, taken by Mr. Mueller says, quote,

10   Dimick told Heather -- that's Heather Cohen -- that he was

11   getting bad reports from Denver regarding Ryno and Jackson.

12   He suggested that they were being difficult.  He made it

13   clear to Heather that he was ready to terminate us with

14   cause for insubordination.

15        Did I read that correctly?

16   A.    Correct.

17   Q.    Were you aware that at this time, this document, dated

18   May 29th, 2013, that the ultimate decision to Baker, Mr.

19   Dimick, was considering terminating Mr. Mueller for cause?

20   A.    No.

21   Q.    And certainly terminating Mr. Mueller for cause had

22   nothing to do with any decision, act, thought, anything to

23   do with these defendants, right?

24   A.    No.

25   Q.    Kris Lamm.  You mentioned Kris Lamm was a friend of

Cross - Coomer (Haskell)

1    yours.  And he was the representative for Big Machine

2    Records, right?

3    A.    Correct.

4    Q.    And Big Machine Records is a -- for lack of a better

5    word -- record label, correct?

6    A.    Correct.

7    Q.    And Big Machine Records represents a number of stars,

8    correct?

9    A.    Yes.

10   Q.    And Big Machine Records is not owned by Taylor Swift,

11   is it?

12   A.    No.

13   Q.    So to the extent someone from Big Machine Records said

14   something about Mr. Mueller, they're not saying so on

15   behalf of Ms. Swift, are they?

16   A.    Not at all.

17   Q.    And Scott Borchetta you mentioned as well, do you

18   recall?

19   A.    Yes.

20   Q.    Borchetta's the head guy of Big Machine, right?

21   A.    Correct.

22   Q.    And, again, Big Machine's an independent company

23   separate from every defendant at this table, right?

24   A.    Yes.

25   Q.    And they're not in this court defending this lawsuit,

725

Cross - Coomer (Haskell)

 1   are they?

 2   A.   No.

 3   Q.   I'd like to put before Mr. Haskell, if I may,

 4   Sparkles, Exhibit K.

 5        What's this picture, sir?

 6   A.   That is a picture of me and Taylor Swift taken in the

 7   radio room at the Pepsi Center on June --

 8   Q.   And is this taken at the roughly, I think you said, 30

 9   seconds when you were with Ms. Swift?

10   A.   Yes.

11   Q.   And on her waist back there, is that your knuckles we

12   see over there?

13   A.   Yes.

14   Q.   Your hand's not on her bottom, is it?

15   A.   No.

16   Q.   So according to this man in his public lawsuit,

17   somewhere in the whatever was left, four seconds after your

18   knuckles were here, you apparently did something wrong to

19   Ms. Swift and then went off with her mother to the

20   backstage tour.

21   A.   That's what I read.

22   Q.   You didn't do it, did you?

23   A.   Of course not.

24   Q.   Have you ever talked to Taylor Swift about this

25   incident?

726

Cross - Coomer (Haskell)

1    A.    I have not.

2    Q.    To your knowledge, did Taylor Swift ever talk to

3    anyone at KYGO about it?

4    A.    No.

5    Q.    And to your knowledge, did Taylor Swift ever ask any

6    action be taken against Mr. Mueller?

7    A.    Not at all.

8    Q.    Same three questions for Andrea Swift.

9    A.    No.

10   Q.    No involvement at all, right?

11   A.    None.

12   Q.    And to your knowledge, did Frank Bell, radio guy, ever

13   tell Bob Call what to do to Mr. Mueller?

14   A.    No.  It was, actually, the opposite.  It was very

15   clear that we should be aware of this and -- I think his

16   comment was, "I trust that you'll make the right

17   decisions."

18   Q.    And after looking at the evidence we've talked about,

19   and doing some investigation, KYGO made its own independent

20   decision to terminate Mr. Mueller, correct?

21   A.    Absolutely.

22          MR. BALDRIDGE:  Thank you, sir.

23          THE WITNESS:  Thank you.

24          THE COURT:  Redirect.

25          MR. McFARLAND:  Just one second, if I may, Your

1    Honor.

2              THE COURT:  You may.

3              MR. McFARLAND:  No questions, Your Honor.

4              THE COURT:  All right.  May this witness be

5    excused for the plaintiff?

6              MR. McFARLAND:  Yes.

7              THE COURT:  For the defendants?  May he be

8    excused?

9              MR. BALDRIDGE:  Oh, yes, sir.  I'm sorry.

10             THE COURT:  All right.  All right.  Mr. Haskell,

11   Mr. Cooms, you are excused.  You may step down.  Thank you

12   for joining us.

13             THE WITNESS:  Thank you, sir.

14             THE COURT:  All right.  I think before we call our

15   next witness, we'll take our afternoon break.  We'll be in

16   recess for 20 minutes.

17        (Recess at 2:56 p.m. to 3:19 p.m.)

18             THE COURT:  The plaintiff may call his next

19   witness.

20             MR. McFARLAND:  Plaintiff calls Erica Worden.

21             THE COURT:  Okay.

22             COURTROOM DEPUTY:  Is somebody getting her, Mr.

23   McFarland?

24             MR. McFARLAND:  Yes.  Mr. Baldridge.

25             COURTROOM DEPUTY:  Oh, okay.

728

Direct - Worden

1          ERICA WORDEN, PLAINTIFF'S WITNESS, SWORN

2          COURTROOM DEPUTY:  Please be seated.  State your

3    name for the record and spell your first and last name.

4          THE WITNESS:  Erica Ann Worden.  E-r-i-c-a,

5    W-o-r-d-e-n.

6                    DIRECT EXAMINATION

7    BY MR. McFARLAND:

8    Q.   Good afternoon, Ms. Worden.  When we spoke at your

9    deposition in this case in June of 2016, you were living in

10   Nashville, do you still live in Nashville?

11   A.   Yes, sir.

12   Q.   And you were employed by Firefly Entertainment.  Are

13   you still employed by Firefly Entertainment?

14   A.   Yes.

15   Q.   And Firefly Entertainment is one of Taylor Swift's

16   companies?

17   A.   Yes.

18   Q.   And at the time we spoke in June of 2016, you were the

19   road manager for Ms. Swift.  Are you still the road

20   manager?

21   A.   Yes.

22   Q.   What do you do as Ms. Swift's road manager?

23   A.   Logistics.

24   Q.   What does that mean in -- can you give us just a

25   little more detail.

729

Direct - Worden

1    A.    Yes.   Travel.   And then on tour, I do guest lists and

2    liaison with our special guests that we have coming to the

3    shows.   I walk the venues so we know where we're going when

4    Taylor arrives.

5    Q.    And you've been Ms. Swift's road manager since October

6    of 2012?

7    A.    Yes.

8    Q.    And before that, you held other positions with Ms.

9    Swift.

10   A.    Yes.

11   Q.    You were her production assistant at one time.

12   A.    Yes.

13   Q.    You were her personal assistant at one time.

14   A.    Yes.

15   Q.    You've run her vibe room?

16   A.    Yes.

17   Q.    What is a vibe room?

18   A.    It's the meet-and-greet room.

19   Q.    Is it -- that's a general term for it, or --

20   A.    Yeah, that's what we call it.   It's the -- on the tour

21   that we're discussing today, it would be Club Red.

22   Q.    And you started working for Ms. Swift in 2009.

23   A.    Correct.

24   Q.    Did you attend Ms. Swift's concert in Denver in -- on

25   June 2d, 2013?

                           Direct - Worden

1    A.    Yes.

2    Q.    And that was at the Pepsi Center?

3    A.    Yes.

4    Q.    And you attended both the VIP meet-and-greet session

5    and the general meet-and-greet session?

6    A.    Yes.  I was in and out.

7    Q.    Do you recall seeing Mr. Mueller at one of the

8    meet-and-greet sessions?

9    A.    Yes.

10   Q.    Do you recall which meet-and-greet session you saw Mr.

11   Mueller?

12   A.    The general meet-and-greet session.

13   Q.    What's the difference?

14   A.    The general meet-and-greet session is for radio

15   winners, additional radio personnel, and other sponsorship

16   winners, et cetera.

17   Q.    Do you recall Mr. Mueller having his photograph taken

18   with Ms. Swift on the evening of June 2d, 2013?

19   A.    Yes.

20   Q.    And that photograph was taken in a room within the

21   Pepsi Center called the photo booth.

22   A.    Yes.

23   Q.    And the photo booth was a room that was about

24   10-by-10?

25   A.    Uhm-hum.  It's inside of a 30-by-30 room.

731
Direct - Worden

1    Q.    And it has fabric walls?

2    A.    Yes.

3    Q.    And I think you just mentioned, it's inside the larger

4    VIP room.

5    A.    Correct.

6    Q.    And the photo booth is where all of the people who

7    participate in the general meet-and-greet have their

8    photograph taken with Ms. Swift?

9    A.    Yes.

10   Q.    Can you describe the process generally.

11   A.    The general meet-and-greet?

12   Q.    Yes.

13   A.    So we line everybody up inside the bigger room, that's

14   connected to the smaller room, and then Taylor is always on

15   the other side.  And I'll say to the guests, "Taylor signed

16   a photo for you earlier today, so you'll get that as you

17   exit, along with instructions on how to download your

18   meet-and-greet photo."

19          And then I let them inside the room, they take the

20   photo with Taylor, and then they exit.

21   Q.    And at the June 2d, 2013, general meet-and-greet, you

22   were the person who was standing at the entrance to the

23   photo booth letting groups in.

24   A.    Yes.

25   Q.    And one group goes at a time.

732
Direct - Worden

1    A.    Yes.

2    Q.    On June 2d, 2013, do you know how many people were

3    with Mr. Mueller?

4    A.    One other person.

5    Q.    Male or female?

6    A.    Female.

7    Q.    Do you know who was in the photo booth when you

8    allowed Mr. Mueller and the female that he was with in?

9    A.    Taylor, Stephanie was just the photographer, Gabby,

10   Greg, and Abby.  And myself.

11   Q.    And Ms. Swift was in the room?

12   A.    Yes.

13   Q.    Who -- do you know Abby's last name?

14   A.    Abby?

15   Q.    Yes.

16   A.    Arnet.

17   Q.    And who -- who was Ms. Arnet?  What was her role --

18   A.    She was the tour assistant.

19   Q.    Was she your assistant?

20   A.    Yes.

21   Q.    Does she still work for Ms. Swift?

22   A.    No.

23   Q.    And Stephanie Simbeck was the person who was taking

24   photographs that evening?

25   A.    Correct.

Direct - Worden

1     Q.    And Ms. Simbeck was the typical photographer at the

2     meet-and-greets?

3     A.    Yes.

4     Q.    And Mr. Dent was Ms. Swift's personal bodyguard?

5     A.    Yes.

6     Q.    And you were going in and out of the photo booth?

7     A.    Yes.

8     Q.    Did you have any other role other than to bring people

9     into the photo booth at the appropriate time?

10    A.    For the meet-and-greet portion?

11    Q.    Yes.

12    A.    No.

13    Q.    No other role during the meet-and-greet portion?

14    A.    No.

15    Q.    How do you determine -- how did you determine that

16    evening when it was time for the next group to come in?

17    A.    After -- after Taylor snaps the photo with the people

18    that are previously in the room with her, we -- she usually

19    says, "Thank you," and I'll say, "Thank you," and then we

20    escort the next group in simultaneously.

21    Q.    So you typically remain in the photo booth until the

22    photograph is taken and then as those people are going out,

23    you bring the next group in?

24    A.    No.  So I'll let the next -- I'll let the group in and

25    then I'll pop out to see how many people are in the next

734
Direct - Worden

1    group, give them the little spiel about the autographs, and

2    then I will pop back into the photo booth.

3    Q.   Do you recall whether there was additional security at

4    the exit of the photo booth on June 2d, 2013?

5    A.   I do not recall.

6    Q.   Do you recall whether there was additional security in

7    the larger VIP room?

8    A.   Yes.

9    Q.   Do you know whether there was any video of the photo

10   booth?  Inside the photo booth?

11   A.   No.

12   Q.   Was there any video inside the larger VIP room?

13   A.   No.

14   Q.   Do you recall Mr. Mueller and his female friend --

15   who I will tell you is Ms. Melcher -- do you recall them

16   entering the photo booth on June 2d, 2013?

17   A.   Yes.

18   Q.   And when they approached, you had the impression that

19   Ms. Melcher was Mr. Mueller's girlfriend?

20   A.   Yes.

21   Q.   Do you recall what gave you that impression?

22   A.   I don't recall.

23   Q.   Do you recall how many people were at or attended the

24   general meet-and-greet on June 2d, 2013?

25   A.   No.

735

Direct - Worden

1     Q.    Can you estimate how many people attended that

2     meet-and-greet?

3     A.    Probably around 70.

4     Q.    Do you recall whether Mr. Mueller was at the

5     beginning, middle or end of that queue?

6     A.    I do not recall.

7     Q.    Do you remember what Mr. Mueller was wearing?

8     A.    No.

9     Q.    Do you remember what Mr. Mueller's girlfriend was

10    wearing?

11    A.    No.  I only remember her blond hair.

12    Q.    When you initially met Mr. Mueller and Ms. Melcher,

13    was there anything that suggested to you that they were

14    intoxicated?

15    A.    Not that I recall.

16    Q.    Did they have alcoholic beverages in their hand?

17    A.    We do not allow beverages to come through the

18    meet-and-greet.

19    Q.    Whether they're alcohol or not?

20    A.    Yeah.

21    Q.    And you don't allow -- do you allow purses or bags or

22    things likes that in the --

23    A.    No.

24    Q.    -- photo booth?

25    A.    We do not.

736
Direct - Worden

1    Q.    After you invited Mr. Mueller and his girlfriend into

2    the photo booth, you popped back out to talk to the next

3    group?

4    A.    Correct.

5    Q.    And then you popped back in?

6    A.    Yes.

7    Q.    And when you popped back in, Ms. Simbeck was in the

8    process of taking a photograph of Mr. Mueller, Mr.

9    Mueller's girlfriend, and Ms. Swift.

10   A.    Correct.

11   Q.    And when you popped back in, Ms. Swift was standing

12   closer to Mr. Mueller's girlfriend, to Ms. Melcher, than to

13   Mr. Mueller.

14   A.    Yes.  With a very uncomfortable look on her face.

15   Q.    And that looked odd to you?

16   A.    Extremely odd.

17   Q.    And shortly after that, Mr. Mueller and his girlfriend

18   left the photo booth.

19   A.    Yes.

20   Q.    Do you recall whether Ms. Swift shook Mr. Mueller's

21   hand on the way out?

22   A.    I don't recall, but she typically shakes everyone's

23   hands as they exit.

24   Q.    Do you recall Ms. Swift hugging Ms. Melcher on the way

25   out?

Direct - Worden

1   A.   I don't recall that.

2   Q.   Did you hear any conversation between Ms. Swift and

3   Mr. Mueller?

4   A.   No.

5   Q.   Did you hear any conversation between Ms. Swift and

6   Mr. Mueller's girlfriend?

7   A.   No.

8   Q.   At the time the photograph was taken, how far were you

9   from Mr. Mueller, his girlfriend, and Ms. Swift?

10   A.   How -- probably here from where he's sitting today.

11   Q.   After Mr. Mueller and his girlfriend left the photo

12   booth, did Ms. Swift give any indication to you that

13   something odd or inappropriate had happened?

14   A.   No, because I was escorting the next group in and she

15   wouldn't have had time.  She's very professional and

16   wouldn't want to upset the other fans.

17   Q.   Has -- during a meet-and-greet, has Ms. Swift ever

18   said anything like, "Erica, I need just one second.  Can

19   you give me -- give me one second to do something before

20   you bring in the next group?"

21   A.   No.

22   Q.   You would agree with me that she could say that and

23   that wouldn't significantly disrupt the meet-and-greet,

24   right?

25   A.   I move them fairly quickly through.

738
Direct - Worden

1    Q.   But if Ms. Swift said, "Erica, can I have just one

2    second?" that wouldn't be a big deal from your perspective,

3    would it?

4    A.   It wouldn't be, however, I already have the curtain

5    open letting the next group in as the other group is

6    exiting.

7    Q.   After Mr. Mueller and his girlfriend left the photo

8    booth, Ms. Swift acted completely normal.

9    A.   Yes, because there were other fans in the room.

10   Q.   Do you recall how many guests came into the photo

11   booth before Mr. Mueller and his girlfriend?

12   A.   No, but typically it's two to -- two, three, or four

13   people.

14   Q.   Do you recall how many total guests had been

15   photographed with Ms. -- or were photographed with Ms.

16   Swift before Mr. Mueller and his girlfriend took their

17   photograph with Ms. Swift?

18   A.   That night?

19   Q.   Right.

20   A.   No.

21   Q.   Do you know how many male guests came to the photo

22   booth before Mr. Mueller and his girlfriend?

23   A.   No.

24   Q.   Do you recall how many guests came into the photo

25   booth after Mr. Mueller and his girlfriend left the photo

739

Direct - Worden

1    booth?

2    A.    No.

3    Q.    Do you recall how much time passed between the time

4    when Mr. Mueller and his girlfriend left the photo booth

5    and the end of the general meet-and-greet?

6    A.    No.

7    Q.    At the end of the meet-and-greet, Ms. Swift said

8    something to the effect of, "That guy touched my butt."

9          Do you remember that?

10   A.    Correct.

11   Q.    You were there for that.

12   A.    Yup.

13   Q.    And was that comment directed to Ms. Simbeck?

14   A.    Everybody in the room.

15   Q.    Who was Ms. Swift looking at when she made that

16   comment?

17   A.    Ms. Simbeck, I believe.

18   Q.    She was the photographer?

19   A.    Yup.

20   Q.    Did Mr. -- did Ms. Swift ever tell you that Mr.

21   Mueller put his hand under her skirt?

22   A.    She said, "He touched my ass."

23   Q.    Did Ms. Swift ever tell you that Mr. Mueller put his

24   hand under her skirt?

25   A.    Nope.

                              Cross - Worden

1    Q.   Did you see Mr. Mueller put his hand under Ms. Swift's

2    skirt?

3    A.   Technically, no.

4    Q.   Did you see Mr. Mueller lift Ms. Swift's skirt in any

5    manner?

6    A.   No, he's -- a backdrop is behind them.

7    Q.   Did you see Mr. Mueller inappropriately touch Ms.

8    Swift?

9    A.   No.

10           MR. McFARLAND:  Thank you.  I don't have any

11   further questions.

12           THE COURT:  Cross-examination.

13                        CROSS-EXAMINATION

14   BY MS. WRIGHT:

15   Q.   Hi, Ms. Worden.

16   A.   Hello.

17   Q.   How are you?

18   A.   Good.

19   Q.   I just have a couple questions for you.

20   A.   Okay.

21   Q.   I believe you said you worked for Ms. Swift since

22   2009?

23   A.   Correct.

24   Q.   Would you say that you know her well?

25   A.   Very well.  She's my sister's age, so I can relate to

741
Cross - Worden

1    her very well, and you know how sisters are close, so . . .

2    We're close.

3    Q.   Is it your job to observe Ms. Swift?

4    A.   Yes.

5    Q.   Would you say you're good at your job?

6    A.   I would hope so.

7    Q.   And as part of your job, do you attend all of Ms.

8    Swift's concerts?

9    A.   Yes.

10   Q.   And all of her meet-and-greets?

11   A.   Yes.

12   Q.   And you attended her June 2d, 2013, meet-and-greet?

13   A.   Yes.

14   Q.   And you remember Mr. Mueller and Ms. Melcher coming to

15   that meet-and-greet?

16   A.   Yes.

17   Q.   And can you describe to us what you saw after you let

18   Mr. Mueller and Ms. Melcher into the meet-and-greet -- or

19   what you did.  I apologize.

20   A.   After I let them in?

21   Q.   Yes.

22   A.   I let the next group come into the meet-and-greet.

23   Q.   Sorry, that was a terrible question.

24        After you let Mr. Mueller and Ms. Melcher into the

25   meet-and-greet, what did you do?

Cross - Worden

1    A.    I popped back out to the other side of the curtain to

2    let the other groups know that, you know, the photos, the

3    autographs.  And then I popped back in and I saw Taylor

4    shifting towards Mr. Mueller's girlfriend and a very odd

5    look on her face.

6    Q.    And after you saw that look on her face and sort of

7    her shift over, what happened next?

8    A.    I looked to Stephanie and she snapped the photo and

9    Mr. Mueller exited.

10   Q.    And then I believe you said when Mr. Mueller and

11   Ms. -- or, excuse me, when the meet-and-greet finished

12   entirely, Ms. Swift said something to the effect of, "That

13   guy grabbed my ass"?

14   A.    Yes.

15   Q.    And she said it to everyone in the room?

16   A.    Yup.

17   Q.    And did anyone have a reaction to that statement?

18   A.    Stephanie said, "I knew it," and went directly to the

19   photo, and Taylor said, "That's him."

20   Q.    Was there any hesitation from Ms. Swift at that

21   point?

22   A.    None.

23   Q.    And had there ever been an incident like this before

24   at a meet-and-greet from Ms. Swift?

25   A.    Never.  And I've done nearly every meet-and-greet with

743
Redirect - Worden

1       her since 2009.

2               MS. WRIGHT:  Would Your Honor give me one minute

3       to confer with cocounsel?

4               THE COURT:  Sure.

5       BY MS. WRIGHT:

6       Q.   Ms. Worden, how many times have you seen Ms. Swift

7       photographed?

8       A.   Thousands.

9       Q.   And in those thousands of photographs, have you ever

10      seen a photo like the one in this case?

11      A.   No, she typically will hug and embrace anybody that

12      comes in to take a photo with her.

13              MS. WRIGHT:  Thank you.  I have nothing further.

14              THE COURT:  Redirect.

15              MR. McFARLAND:  Briefly.

16                        REDIRECT EXAMINATION

17      BY MR. McFARLAND:

18      Q.   Did you see the setup for the photograph?

19              MS. WRIGHT:  Objection, Your Honor.  Vague.

20              MR. McFARLAND:  I'll rephrase.

21              THE COURT:  Yeah.

22      BY MR. McFARLAND:

23      Q.   Did -- at any point, did you see Mr. Mueller, Ms.

24      Swift, and Ms. Melcher standing in what I would call

25      standard photograph position, Ms. Swift in the middle, and

744
Redirect - Worden

1   Mr. Mueller close on one side, and Ms. Melcher close on the
2   other?
3   A.   I don't recall seeing that, no.
4   Q.   Okay.  By the time you came back in, Ms. Swift had
5   moved away from Mr. Mueller and closer to Ms. Melcher?
6   A.   Yes.
7            MR. McFARLAND:  Okay.  Thank you.  That's all.
8            THE COURT:  All right.
9            MS. WRIGHT:  Nothing, Your Honor.
10           THE COURT:  All right.  May this witness be
11  excused?  For the plaintiff?
12           MR. McFARLAND:  Yes.
13           THE COURT:  For the defendants?
14           MR. BALDRIDGE:  Yes, sir.
15           MS. WRIGHT:  Yes.
16           MR. BALDRIDGE:  Sorry.
17           THE COURT:  Ms. Worden, thank you for joining us.
18  You're excused and you may step down.
19           The plaintiff may call his next witness.
20           MR. McFARLAND:  Plaintiff calls Stephanie Simbeck.
21           COURTROOM DEPUTY:  Raise your right hand.
22       STEPHANIE SIMBECK, PLAINTIFF'S WITNESS, SWORN
23           COURTROOM DEPUTY:  Please be seated.  State your
24  full name for the record and fell your first and last name.
25           THE WITNESS:  Stephanie Simbeck.

745

Direct - Simbeck

1     S-t-e-p-h-a-n-i-e.  Simbeck, S-i-m-b-e-c-k.

2                      DIRECT EXAMINATION

3     BY MR. McFARLAND:

4     Q.   Good afternoon, Ms. Simbeck.  You began working with

5     Ms. Swift in May of 2013?

6     A.   Correct.

7     Q.   And were you hired to run her Club Red?

8     A.   Yes.

9     Q.   What is that?

10    A.   It is her meet-and-greet.

11    Q.   And are you still employed with Ms. Swift?

12    A.   Yes.

13    Q.   Are you still working that same capacity?

14    A.   Yes.

15    Q.   Is this a full-time job for you?

16    A.   Yes.

17    Q.   And you're paid a salary?

18    A.   Yes.

19    Q.   And during your time -- well, when -- during your time

20    with Ms. Swift, you are the person that usually takes the

21    photographs at the meet-and-greets.

22    A.   I am the one that takes the photographs.

23    Q.   Do you recall the June 2d, 2013, concert in Denver?

24    A.   Yes.

25    Q.   Do you recall that concert was held at the Pepsi

746

Direct - Simbeck

 1   Center?

 2   A.    Yes.

 3   Q.    And did you attend both the VIP meet-and-greet and the

 4   general meet-and-greet?

 5   A.    Yes.

 6   Q.    And did you see Mr. Mueller at one of the

 7   meet-and-greet sessions?

 8   A.    Yes.

 9   Q.    Do you recall which one?

10   A.    The third meet-and-greet.

11   Q.    Was that the general or the fan meet-and-greet?

12   A.    It's the general, yes, the fan meet-and-greet.

13   Q.    Do you recall how many people attended that general

14   fan meet-and-greet on June 2d, 2013?

15   A.    I don't recall an exact number.

16   Q.    Do you recall -- do you have an estimate of the

17   number?

18   A.    80, if I had to guess.  I mean, various, depending on

19   the show and where we are.

20   Q.    Okay.  Do you recall Mr. Mueller having his photograph

21   taken with Ms. Swift on the evening of June 2d, 2013?

22   A.    Yes.

23   Q.    And the photograph was taken in the Pepsi Center in a

24   10-by-10 room that we've been calling the photo booth; does

25   that sound right?

747

Direct - Simbeck

1    A.    Yes.

2    Q.    Is there any place to get alcoholic beverages down in

3    the VIP area or anywhere near the photo booth?

4    A.    No, there's no alcohol.

5    Q.    And that was -- that's true -- generally that's true

6    in Denver on June 2d, 2013?

7    A.    Yes.

8    Q.    I'll put up -- I'm going to show you what we have been

9    calling the photograph.

10         Do you recognize this -- this photograph?

11   A.    Yes.

12   Q.    What is it?

13   A.    This is the photograph that I took -- that I took of

14   Mr. Mueller grabbing Taylor's butt.

15   Q.    You think in this picture Mr. Mueller is grabbing Ms.

16   Swift's butt?

17   A.    No, I know he is.

18   Q.    Okay.

19         THE COURT:  Use -- can you keep your voice up, Mr.

20   McFarland?

21         MR. McFARLAND:  Sorry.

22   BY MR. McFARLAND:

23   Q.    And in this photograph, Mr. Mueller's hand is

24   underneath Ms. Swift's skirt on her bottom.

25   A.    No.

748

Direct - Simbeck

1  Q.  That's not what you see?

2  A.  I -- no.  I don't.

3  Q.  You know that Mr. Mueller's hand is on Ms. Swift's

4  bottom outside of her clothing.

5  A.  I don't know if it was outside or under.  I just know

6  that it's on her butt.

7  Q.  So you don't know whether Mr. Mueller's hand is

8  outside of Ms. Swift's skirt or inside, but you know it's

9  touching her butt?

10  A.  Yes.

11  Q.  How's that?

12  A.  I can see the photograph.  I was there.  I saw it

13  happen.

14  Q.  You can't even see Mr. Mueller's hand in this picture,

15  can you?

16  A.  No, I can't.

17  Q.  Isn't it true you're assuming that it's on her butt

18  when, in fact, it could be 6 inches --

19  A.  I'm not assuming.  I know it was.

20       THE COURT:  Hold on, ma'am.  You have to wait for

21  the question to be completed --

22       THE WITNESS:  Oh, sorry.

23       THE COURT:  -- and then you can answer and Mr.

24  McFarland will reciprocate.

25       Do you want to re-ask your question?

749
Direct - Simbeck

1    BY MR. McFARLAND:

2    Q.   You can't tell from this photograph whether Mr.

3    Mueller's hand is under Ms. Swift's skirt, behind, over --

4    or over on the outside of Ms. Swift's skirt, right?

5    A.   No, I can't tell if it's under or over.

6    Q.   Let's talk for a moment about the setup of the room.

7    A.   Sure.

8    Q.   Erica Worden, she was in the photo booth.

9    A.   Yes.

10   Q.   And Abby Arnet was in the photo booth?

11   A.   Yes.

12   Q.   And Greg Dent was in the photo booth?

13   A.   Yes.

14   Q.   And you were taking the pictures in the photo booth.

15   A.   Correct.

16   Q.   And you were about 5 feet away from Ms. Swift?

17   A.   Yeah, give or take.

18   Q.   And to the best of your recollection, there was

19   additional security outside of the exit of the photo booth.

20   A.   Yes.

21   Q.   Can you generally describe for us the -- the photo

22   booth process.

23   A.   Sure.

24   Q.   What happens in there?

25   A.   Fans are brought into the main part of the room and

Direct - Simbeck

1    they're lined up single file.  And then they're brought in

2    either by themselves or whoever they came with.  And then

3    they're in that photo booth for a few minutes.  Taylor will

4    talk to them and then they'll take a photograph and then

5    they'll exit and get a signed autograph.

6    Q.   Do you recall Mr. Mueller entering the photo booth on

7    June 13th?

8    A.   Not specifically.

9    Q.   Are you sure he -- he was part of the third general

10   meet-and-greet?

11   A.   Yes.

12   Q.   Do you recall where Mr. Mueller was in the queue?  Was

13   he in the first third or the middle third or the last?  Can

14   you tell us or do you recall?

15   A.   He was in the middle, maybe towards the end.

16   Q.   Do you know how many people Ms. Swift met with before

17   Mr. Mueller?

18   A.   No.

19   Q.   Do you know how many men Ms. Swift took photographs

20   with before Mr. Mueller?

21   A.   Did you say men?

22   Q.   Men.  Male people.

23   A.   No.  No.

24   Q.   Do you know how many people Ms. Swift met with after

25   the meet-and-greet meeting with Mr. Mueller?

Direct - Simbeck

1    A.    No.

2    Q.    Do you know how many male guests she met with after

3    Mr. Mueller?

4    A.    No.

5    Q.    There were other men in the general meet-and-greet on

6    June 2d, 2013, right?

7    A.    I don't recall.

8    Q.    Did Mr. Mueller enter the photo booth with anyone?

9    A.    Yes.

10   Q.    Who did he enter with?

11   A.    A female.

12   Q.    Was there anything remarkable about Mr. Mueller?

13   A.    No.

14   Q.    Anything remarkable about his female companion?

15   A.    No.

16   Q.    Was there any indication to you that Mr. Mueller

17   and/or his female companion were intoxicated?

18   A.    No.

19   Q.    Do you remember what Mr. Mueller was wearing?

20   A.    No.

21   Q.    Do you remember what his girlfriend was wearing?

22   A.    No.

23   Q.    Did Mr. Mueller bring anything with him into the photo

24   booth that you saw?

25   A.    No.

Direct - Simbeck

1   Q.   Did his girlfriend?

2   A.   No.

3   Q.   And fans aren't allowed to bring phones and purses and

4   backpacks into the photo booth, right?

5   A.   Correct.  Nothing is allowed in the photo booth.

6   Q.   All of those items have to be left outside of the

7   photo booth?

8   A.   Outside the room, itself.

9   Q.   After Mr. Mueller and his girlfriend entered the photo

10  booth, did Ms. Swift greet them?

11  A.   Yes.

12  Q.   Did they engage in some brief conversation?

13  A.   Yes.

14  Q.   Do you recall what was said?

15  A.   No.

16  Q.   And then shortly after that, the three of them posed

17  for a photograph; is that right?

18  A.   Correct.

19  Q.   And you were about 5 feet away from the three of them

20  at that time?

21  A.   Yes.

22  Q.   And you were focused on the three of them that -- as

23  they set up for the photograph, correct?

24  A.   Yes.

25  Q.   And you were at all times either looking directly at

Direct - Simbeck

```
 1    the three of them or looking through the lens of your

 2    camera directly at the three of them?

 3    A.    Yes.

 4    Q.    What kind of camera were you using that evening?

 5    A.    It was a digital Canon.

 6    Q.    Did you have to look through the lens or did you kind

 7    of hold it and look through a screen?

 8    A.    I looked through the lens.

 9    Q.    And as you were looking through the lens, you saw Ms.

10    Swift move a little funny or odd.

11    A.    Yeah.

12    Q.    And you thought that maybe she had tripped.

13    A.    Tripped, yeah.

14    Q.    Did you see Mr. Mueller put his hand under Ms. Swift's

15    skirt?

16    A.    No.

17    Q.    Did you see Mr. Mueller lift Ms. Swift's skirt in any

18    manner?

19    A.    No.

20    Q.    Did you see Mr. Mueller inappropriately touch Ms.

21    Swift?

22    A.    Yes.

23    Q.    And that's based on -- when did you see that?

24    A.    As they were posing for the photo, I went to take it,

25    and I saw her fall into the female, and she had an
```

754
Direct - Simbeck

1    uncomfortable, shocked look on her face, and then I saw his

2    hand grab her ass.

3    Q.   When you saw Mr. Mueller's hand grab Ms. Swift's rear,

4    was his hand on top of her clothing or underneath her

5    skirt?

6    A.   I don't know.  I was in front of them.

7    Q.   So then you don't really know if his hand grabbed Ms.

8    Swift's rear.

9    A.   I do know.

10   Q.   How?  You just said you didn't -- you didn't see where

11   his hand was.

12   A.   I saw his hand on her butt.

13   Q.   Was it inside or outside of her skirt?

14           MS. FOLEY:  Objection.  Asked and answered.

15           THE COURT:  Overruled.

16   BY MR. McFARLAND:

17   Q.   When you saw Mr. Mueller's hand grab Ms. Swift's rear,

18   if you were -- if you saw his hand, it had to be outside of

19   her clothing, right?

20           MS. FOLEY:  Objection.  Argumentative.

21           THE COURT:  Overruled.  Ma'am, you need to answer.

22           THE WITNESS:  Oh.  No.

23   BY MR. McFARLAND:

24   Q.   Did -- did you see Mr. Mueller's hand, the flesh, the

25   skin on his hand, make contact with Ms. Swift's rear?

Direct - Simbeck

1    A.    Yes.

2    Q.    Was his hand underneath Ms. Swift's skirt at that time

3    or outside of her skirt?

4    A.    I don't know.

5    Q.    After the photograph was taken, Mr. Mueller and his

6    girlfriend were ushered out of the photo booth.

7    A.    Correct.

8    Q.    Do you recall Ms. Swift shaking Mr. Mueller's hand on

9    the way out?

10   A.    I don't recall.

11   Q.    Do you recall Ms. Swift hugging Mr. Mueller's

12   girlfriend on the way out?

13   A.    I don't recall.  I'm usually checking the photographs

14   to make sure that everyone's eyes are open.

15   Q.    Did Ms. Swift indicate to you that she was upset or

16   that anything was wrong after the photograph was taken?

17   A.    No.  By the time they exit, there's already more fans

18   entering the photo booth.

19   Q.    Did -- after Mr. Mueller and his girlfriend were

20   ushered out, did Ms. Swift indicate to you that she was

21   upset or that anything was wrong?

22   A.    No.

23   Q.    After Mr. Mueller and his girlfriend left the photo

24   booth, did the meet-and-greet continue as normal?

25   A.    Yes.

756

Direct - Simbeck

1    Q.   Do you recall how much time passed between when Mr.
2    Mueller and his girlfriend left the photo booth and the end
3    of the general meet-and-greet?
4    A.   15, maybe 20 minutes.
5    Q.   Between the time that Mr. Mueller and his girlfriend
6    left the photo booth and the end of the meet-and-greet, did
7    Mr. Dent indicate that there was any -- any problem or
8    incident?
9    A.   No.
10   Q.   Where was Mr. Dent set up in the photo booth at the
11   time that the photograph of Mr. Mueller and Ms. Swift and
12   Ms. Melcher was taken?
13   A.   He was either on the left or the right side.  I don't
14   recall which side, whether -- but they're always standing
15   next to her.
16   Q.   Was -- was he in a position -- or do you recall
17   whether he was in a position where he could see the
18   backsides of the people taking the photograph?
19   A.   I don't recall.
20   Q.   Do you know whether Ms. Swift, in this case, alleges
21   that Mr. Mueller touched her inappropriately inside or
22   outside of her clothing?
23   A.   I'm sorry, can you repeat that?
24   Q.   Yeah.  Do you know whether Ms. Swift alleges that Mr.
25   Mueller -- do you know whether Ms. Swift alleges that Mr.

Direct - Simbeck

1   Mueller inappropriately touched her inside or outside of

2   her clothing?

3            MS. FOLEY:  Objection.  Are we asking what she

4   said at the time in the meet-and-greet?

5            THE COURT:  Sustained.  Let's clarify those

6   points.

7   BY MR. McFARLAND:

8   Q.   Right now as you sit here, do you have an

9   understanding as to whether -- well, as you sit here, what

10  is your understanding of Ms. Swift's allegation in this

11  case?

12  A.   That Mr. Mueller inappropriately touched her.

13  Q.   Inside or outside of her clothing?

14  A.   I don't know.

15  Q.   After the photograph was taken, but before the end of

16  the meet-and-greet, did you indicate to anyone in the room

17  that you thought something might have happened during Mr.

18  Mueller's photograph?

19  A.   No.

20  Q.   Did you have any conversations with Mr. Dent?

21  A.   No.

22  Q.   Did you notice what Mr. Dent was doing at the time

23  that photograph was taken?

24  A.   No, I was looking through the lens of a camera.

25  Q.   Do you have any reason to think Mr. Dent was not

758

Direct - Simbeck

1    alert, observant, and focused on his job during that third

2    meet-and-greet?

3    A.    No.

4    Q.    Did Ms. Swift give any indication -- again, this is

5    after the photograph but before the end of the

6    meet-and-greet -- did Ms. Swift give any indication to Mr.

7    Dent there was a problem or an issue whatsoever?

8    A.    No.

9    Q.    During -- or after the photograph was taken but before

10   the end of the meet-and-greet, did Mr. Dent give any

11   indication to you that there was a problem or an issue or

12   anything unusual?

13   A.    No.

14   Q.    At the end of the general meet-and-greet, about 20

15   minutes or so after Mr. Mueller and his girlfriend had

16   their photograph taken with Ms. Swift, Ms. Swift said

17   something to the effect of, "That guy touched my butt,"

18   right?

19   A.    Yes.  She said, "Dude, that guy grabbed my ass."

20   Q.    And -- and she was looking at you when she said

21   that?

22   A.    She was -- I don't recall that she was looking right

23   at me, she just said it to everyone in the room.

24   Q.    And then you pulled up the photograph of Mr. Mueller,

25   you showed it to Ms. Swift, and she said, "That's him."

759
Direct - Simbeck

1    A.    Yes.

2    Q.    Did you look at any of the other photographs that were

3    taken before or after Mr. Mueller's photograph?

4    A.    Only after I took the photographs of those fans.

5    Q.    After Ms. Swift said, "That guy touched my butt," as

6    you were scrolling through the photos, did you look at any

7    of the photo -- other photographs of the people who had had

8    their picture taken before Mr. Mueller's picture with Ms.

9    Swift?

10   A.    No, I went directly to Mr. Mueller's photograph.

11   Q.    Because in your mind, you knew something had happened?

12   A.    Correct.

13   Q.    Did you show Ms. Swift any other photographs of

14   anyone -- of anybody else who had their picture taken

15   during that third meet-and-greet on June 2d, 2013?

16   A.    No.

17   Q.    And right after that, Ms. Swift was escorted to her

18   dressing room?

19   A.    Yes.

20   Q.    Going back to this picture for just a sec, you'd agree

21   with me that in this picture, Mr. Mueller's hand is not

22   underneath Ms. Swift's skirt.

23         MS. FOLEY:  Objection.  Argumentative.  Asked and

24   answered.

25         THE COURT:  Sustained as to the second objection.

760

Direct - Simbeck

1     BY MR. McFARLAND:

2     Q.   Okay.  Do you agree that in this photograph, Ms.

3     Swift's skirt doesn't appear to be ruffled in any way?

4           MS. FOLEY:  Objection.  This has been covered.

5     Asked and answered.

6           THE COURT:  Overruled.

7     BY MR. McFARLAND:

8     Q.   Do you agree that in this picture, Ms. Swift's skirt

9     doesn't appear to be ruffled in any manner?

10    A.   I agree it doesn't.

11    Q.   I want to show you a few other photographs that have

12    been produced in this case.  This is Exhibit J.

13          THE COURT:  Is this in evidence?

14          MR. McFARLAND:  This is already in evidence.

15          THE COURT:  All right.  Go ahead.

16    BY MR. McFARLAND:

17    Q.   I'm just going to kind of flip through these for you.

18    And the question I have is:  Do you -- you recognize these

19    as other photographs that were taken after Mr. Mueller's

20    photograph with Ms. Swift on June 2d, 2013?

21    A.   After?

22    Q.   Yes.

23    A.   I can't confirm.

24    Q.   You're not sure whether these photographs that I'm

25    showing you were taken before or after the photograph with

Direct - Simbeck

1    Mr. Mueller?

2    A.    Correct.

3    Q.    Were these photographs taken by you?

4    A.    Yes.

5    Q.    The photographs that you're taking, those are digital

6    pictures.

7    A.    Yes.

8    Q.    And what do you do -- how are those saved on the

9    digital camera that you're using?

10   A.    They're on an SD card.

11   Q.    And what do you -- what did you do with the SD card

12   after the third meet-and-greet on June 2d, 2013?

13   A.    I gave it to Gabby Liddicoat to upload.

14   Q.    And do you know whether she uploaded those?

15   A.    Yeah, she did.

16   Q.    Do you know whether those pictures were subsequently

17   deleted or some of them were deleted?

18   A.    I don't know.

19   Q.    Certainly in the third meet-and-greet, you took more

20   than 20 pictures, right?

21   A.    I can't recall how many photographs I took.

22   Q.    But your best estimate is there were 80 or so people

23   in that third meet-and-greet.

24   A.    Right.

25   Q.    So these -- do you recognize these as -- that I'm

762
Cross - Simbeck

1    putting on here, these are all pictures that you took on

2    June 2d?

3    A.   Yes.

4         MR. McFARLAND:   That's all the questions I have.

5    Thank you.

6         THE COURT:  Cross-examination.

7                   CROSS-EXAMINATION

8    BY MS. FOLEY:

9    Q.   Good afternoon, Ms. Simbeck.

10   A.   Hello.

11   Q.   How many pictures have you taken of Taylor Swift with

12   people at meet-and-greets?

13   A.   Over 20,000.

14   Q.   Now, at any of those 20,000 photos you've taken in

15   these meet-and-greets, has anything like what happened with

16   Mr. Mueller, ever happened?

17   A.   Not one.

18   Q.   You were describing how you took the picture of Mr.

19   Mueller and his girlfriend, Ms. Melcher, with Ms. Swift.

20   Did you have them all set and posed before you took the

21   picture?

22   A.   Yeah.  I mean, they get into position when they're

23   ready for the photograph.

24   Q.   Is that your standard practice of taking pictures of

25   Ms. Swift?

Cross - Simbeck

1   A.   Yes.

2   Q.   And you were standing directly in front of them when

3   you took the picture?

4   A.   Yes.

5   Q.   And you said you saw Mr. Mueller put his hand on Ms.

6   Swift's butt.  Did you have to look at the picture to know

7   that he'd done that?

8   A.   No.

9   Q.   Why not?

10  A.   Because I saw it happen.

11  Q.   And when you saw it happen, you saw Ms. Swift have an

12  uncomfortable look on her face; is that right?

13  A.   Yeah.  Shocked, uncomfortable look on her face.

14  Q.   Was that an unusual look for Ms. Swift to have in one

15  of the meet-and-greet pictures?

16  A.   Yes.  It made me uncomfortable as well.

17  Q.   Made you uncomfortable?

18  A.   Yes.

19  Q.   And you saw Ms. Swift, I think you said, fall into the

20  woman in the picture?

21  A.   Yes.

22  Q.   Was that an unusual thing to happen at a

23  meet-and-greet with Ms. Swift?

24  A.   Yes.

25  Q.   And does Ms. Swift usually in the pictures draw the

Cross - Simbeck

1    people close to her?

2    A.   Yeah, she is usually hugging.  Her arms are usually

3    around them.  And if they're small, she'll duck down and

4    get on their level.

5    Q.   And the picture with Mr. Mueller's a little different

6    than that, isn't it?

7    A.   Yes.

8    Q.   She's not pulling Mr. Mueller in, is she?

9    A.   No, she's trying to get away.

10   Q.   And you saw her trying to get away from Mr.

11   Mueller --

12   A.   Yes.  I remember it very clearly.

13   Q.   And Mr. McFarland showed you a number of other

14   pictures from the June 2, 2013 meet-and-greet, right?

15   A.   Yes.

16   Q.   And you took those pictures as well.

17   A.   I did.

18   Q.   And you were standing roughly the same distance away

19   from those groups with Ms. Swift as you were standing when

20   you took the picture of Mr. Mueller and Ms. Swift?

21   A.   Yes.

22   Q.   And those pictures don't look like the picture of Mr.

23   Mueller and Ms. Swift, do they?

24   A.   No, they do not.

25   Q.   Now, Mr. McFarland asked you if you alerted anyone in

765

Cross - Simbeck

1    the room about what you saw immediately after you took the

2    picture.  Do you remember that question?

3    A.    Yes.

4    Q.    And you said you didn't at that immediate moment.

5    A.    Correct.

6    Q.    Can you tell us why you didn't do that?

7    A.    Well, I was waiting for Taylor's lead, and it was an

8    inappropriate time.  There were fans already in the room.

9    Q.    So are there other people who would have heard it?

10   A.    Correct.  And there was a line of fans waiting to come

11   in and meet her.

12   Q.    But as soon as the last group was done, you heard Ms.

13   Swift say something --

14   A.    Yes.

15   Q.    -- didn't you?

16         And what did you hear her say?

17   A.    "Dude, that guy grabbed my ass."

18   Q.    And did you react to that?

19   A.    Yes.

20   Q.    How did you react?

21   A.    I said, "I knew it.  I have the photograph."

22   Q.    And you then pulled up a photograph?

23   A.    Yes.

24   Q.    And you pulled up a photograph of Mr. Mueller?

25   A.    Yes.

Cross - Simbeck

1    Q.   And did Ms. Swift react to the photograph you showed

2    her?

3    A.   Yes.

4    Q.   How did she react?

5    A.   She said, "That's him."

6    Q.   When she said it, did Ms. Swift express any doubt

7    about the person in the photograph?

8    A.   No.

9    Q.   Now, Mr. Mueller's testified that he sort of jumped

10   into the picture at the last minute and he wasn't really

11   set and posed when you took the picture.  Is that what you

12   remember?

13   A.   No.  That's ridiculous.

14   Q.   Why is it ridiculous?

15   A.   Because they always get in position.  And I saw her

16   trying to get away from him.

17   Q.   And Mr. Mueller testified that when it came time for

18   the picture, his hand and Ms. Swift's hands were kind of

19   jostling with one another, a lot of motion going on in the

20   back, it sounded like.  Did you see that happen?

21   A.   No jostling.

22   Q.   And I think you said you had taken about 20,000 plus

23   pictures of Ms. Swift with other people?

24   A.   Yes.

25   Q.   And anything like this has never happened before?

767
Cross - Simbeck

1    A.   Never.  It's the only one.

2    Q.   Do you have any doubt that Mr. Mueller inappropriately

3    touched Miss Swift at the June 2, 2013, meet-and-greet?

4    A.   No doubt Mr. Mueller touched her butt.

5           MS. FOLEY:  May I just have a moment to confer

6    with counsel?

7           THE COURT:  You may.

8           MS. FOLEY:  No further questions.  Thank you.

9           THE COURT:  Redirect?

10          MR. McFARLAND:  No, Your Honor.

11          THE COURT:  All right.  May this witness be

12    excused?

13          MR. McFARLAND:  Yes, Your Honor.

14          THE COURT:  For the defendants?

15          MS. FOLEY:  Yes, Your Honor.

16          THE COURT:  All right.  Ma'am, thank you so much

17    for joining us.  You may step down.  You're excused.

18          THE WITNESS:  Thank you.

19          MR. McFARLAND:  Judge, may we approach?

20          THE COURT:  Sure.

21       (Discussion at sidebar)

22          THE COURT:  Don't tell me you don't have any

23    witness.

24          MR. BALDRIDGE:  He's out there, I think.

25          MR. McFARLAND:  I do.

768

1           THE COURT:  Okay.  All right.  I just said what

2      you shouldn't tell me.  I'm glad you're going to tell me

3      something else.

4           MR. McFARLAND:  The question I had is:  I have

5      him -- I think with a little time I can significantly

6      streamline his testimony.  I'm not sure we can get done by

7      5:00 today.  I've also talked to Mr. Baldridge and I think

8      we're both very confident that we will be done by the

9      mid-afternoon.  And I don't -- I don't know if you have

10     any objection to that, but --

11          MR. BALDRIDGE:  I have no objection.  I do agree

12     that we will be done tomorrow based on what I know now.

13          THE COURT:  That's what you told Ms. Hansen before

14     and I think --

15          MR. BALDRIDGE:  It's a correct statement by Mr.

16     McFarland.

17          THE COURT:  All right.  Who do you have next?

18          MR. McFARLAND:  We have Ryan Kliesch, Greg Dent.

19     And we're not calling Jeffrey Opp.  And then Ms. Melcher

20     will be our last witness.

21          THE COURT:  So you have three more.  All right.

22     Who are you calling tomorrow?

23          MR. BALDRIDGE:  99 --

24          THE COURT:  Here's what --

25          MR. BALDRIDGE:  I can tell you 99 percent certain

1    is Dr. Lorraine Bayard de Volo.  I just call her Dr.

2    Lorraine.  And Taylor Swift for a short, I guess -- very

3    short --

4              THE COURT:  Are you calling any of your may-calls?

5              MR. BALDRIDGE:  I don't -- well, Briody can't get

6    here tomorrow.  If Mr. Briody gets here, we'll call him

7    tomorrow.  If not, no.  It will be first thing Monday

8    morning, really quickly, if he can't get here tomorrow, but

9    I think -- or not.

10             THE COURT:  Okay.  So Mr. Dent is here, but you

11   would prefer to have him tomorrow.

12             MR. McFARLAND:  Mr. Ryan Kliesch is here.

13             THE COURT:  Oh, Kliesch.  Okay.  But you would

14   prefer to call him tomorrow?

15             MR. McFARLAND:  I would prefer to call him

16   tomorrow because I think I could streamline his testimony.

17   And I'm not sure at this point we'll get him in and out in

18   one session.

19             THE COURT:  Okay.  Do you have an objection?

20             MR. BALDRIDGE:  I have no objection, but we're

21   starting with Mr. Dent tomorrow and then Kliesch --

22             MR. McFARLAND:  Right.

23             MR. BALDRIDGE:  I wanted to tell Your Honor I have

24   no objection to it.

25             THE COURT:  Kliesch and then Melcher and then

 1      you're going to rest.

 2              MR. McFARLAND:  And we're going to rest.

 3              THE COURT:  And then we're going to have

 4      motions.

 5              MR. BALDRIDGE:  I'm going to definitely have

 6      motions.

 7              THE COURT:  All right.  I'll agree with that.

 8              MR. McFARLAND:  Thank you, Your Honor.

 9          (End of discussion at sidebar)

10              THE COURT:  All right.  Ladies and gentlemen of

11      the jury, I had a discussion here with counsel and we've

12      decided the best and most efficient use of the courtroom

13      time is for us to recess at this time for today and we will

14      resume at our normal time tomorrow.

15              Please, again, do not do any independent research

16      into or have any discussion regarding the facts, the

17      issues, the parties, the lawyers, or the witnesses in this

18      case.

19              The parties and the lawyers, hold tight for a

20      couple of seconds.  And the jury is released for the day.

21          (Jury left the courtroom at 4:16 p.m.)

22              THE COURT:  I wanted to advise counsel that a few

23      minutes ago I entered on the court's docket an order

24      regarding the matters that were discussed in the closed

25      court session yesterday morning.  That order is sealed

771

1    until there is a verdict returned, but it's available to

2    counsel and the parties.  You can review it and schedule

3    your examinations accordingly and following that order.

4         I'll take some input now in terms of closing

5    arguments in terms of lengths that counsel is requesting.

6    Not that I'm going to give it to you, but I'll get -- I'll

7    take your input.

8         MR. McFARLAND:  I think we had 25 for our

9    openings, and I think an hour, hour and 15 minutes would be

10   sufficient for closing.

11        THE COURT:  All right.  For the defendants?

12        MR. BALDRIDGE:  I think the hour, hour 15, sounds

13   perfectly reasonable to me.

14        THE COURT:  All right.  I'll let you know

15   tomorrow, probably by tomorrow afternoon.

16        All right.  We will be in recess until 8:45

17   tomorrow morning.

18       (Proceedings concluded at 4:18 p.m.)

19                          **INDEX**

20   <u>Item</u>                                          <u>PAGE</u>

21                  PLAINTIFF'S WITNESSES

22       **TAYLOR SWIFT**
         Direct Examination by Mr. McFarland          567
23
         **ROBERT CALL**
24       Direct Examination by Mr. McFarland          616
         Cross-examination by Ms. Foley               655
25       Redirect Examination by Mr. McFarland        665

772

1                                     **INDEX**

2    Item                                                      PAGE

3                          PLAINTIFF'S WITNESSES

4        **HERSHEL COOMER (EDDIE HASKELL)**
         Direct Examination by Mr. McFarland              671
5        Cross-examination by Mr. Baldridge               710

6        **ERICA WORDEN**
         Direct Examination by Mr. McFarland              728
7        Cross-examination by Ms. Wright                  740
         Redirect Examination by Mr. McFarland            743

8
         **STEPHANIE SIMBECK**
9        Direct Examination by Mr. McFarland              745
         Cross-examination by Ms. Foley                   762

10

11                          DEFENDANTS' EXHIBITS

12   EXHIBITS:        Offered    Received   Refused    Stipulated

13   H                649        649

14   L                614        615

15                *       *       *       *       *

16                      REPORTER'S CERTIFICATE

17       I certify that the foregoing is a correct transcript

18   from the record of proceedings in the above-entitled

19   matter.

20       Dated at Denver, Colorado, this 5th day of July, 2018.

21

22

23

24   _                                              _

25                  MARY J. GEORGE, FCRR, CRR, RMR