1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 15-cv-1974-WJM
3
     DAVID MUELLER,
4
     Plaintiff and Counterclaim Defendant,
5
     vs.
6
     TAYLOR SWIFT,
7
     Defendant and Counterclaimant,
8
     and
9
     FRANK BELL, and
10   ANDREA SWIFT, a/k/a ANDREA FINLAY,
11   Defendants.
12   -----------------------------------------------------------
13                  REPORTER'S TRANSCRIPT
                    (Jury Trial - Day 5)
14                      VOLUME VI
15   -----------------------------------------------------------
16        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
17   Judge, United States District Court for the District of
18   Colorado, commencing at 8:46 a.m., on the 11th day of
19   August, 2017, in Courtroom A801, United States Courthouse,
20   Denver, Colorado.
21
22
23
24
25

774

1                              APPEARANCES

2          M. GABRIEL McFARLAND and NEIDE GILLIAN COOLEY
    MORRISON, Evans & McFarland, LLC-Golden, 910 13th Street,
3   Suite 200, Golden, Colorado 80401, appearing for the
    plaintiff and counterclaim defendant.
4
           J. DOUGLAS BALDRIDGE, KATHERINE M. WRIGHT, DANIELLE R.
5   FOLEY, Venable LLP-DC, 600 Massachusetts Avenue, NW,
    Washington, DC 20001      AND
6          JESSE P. SCHAUDIES, JR., 13 Management LLC, 718
    Thompson Lane, Suite 108526, Nashville, Tenessee 37204,
7   appearing for the defendants and counterclaimant.

8                    MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
9             Proceedings Reported by Mechanical Stenography
                  Transcription Produced via Computer
10

11                       P R O C E E D I N G S

12          (In open court in the presence of the jury at 8:46

13   a.m.)

14            THE COURT:  All right.  The plaintiff may call his

15   next witness.

16            MR. BALDRIDGE:  Your Honor, may I get --

17            THE COURT:  Yes.  Sure, of course.

18            MR. McFARLAND:  Your Honor, the plaintiff calls

19   Greg Dent.

20            THE COURT:  Okay.

21            COURTROOM DEPUTY:  Would you step in the stand,

22   please.  And raise your right hand.

23            GREG DENT, PLAINTIFF'S WITNESS, SWORN

24            COURTROOM DEPUTY:  Please be seated.

25            MR. McFARLAND:  Judge, very --

1            COURTROOM DEPUTY:  State your full name for the
2     record and spell your first and last name.
3            THE WITNESS:  Gregory Wesley Dent.  G-r-e-g-o-r-y.
4     D-e-n-t.
5            THE WITNESS:  Thank you.
6            MR. McFARLAND:  One quick housekeeping matter
7     before I question the witness, Your Honor.
8            THE COURT:  Okay.
9            MR. McFARLAND:  We were asked to mark the
10    deposition exhibit -- transcript that was read into
11    evidence yesterday for Gabby Liddicoat and it's been marked
12    as Exhibit 35.  And I would move for the admission of that
13    exhibit.
14            THE COURT:  All right.  Any objection?
15            MR. BALDRIDGE:  Subject to the -- what we
16    discussed at sidebar, I mean it goes into the record, but
17    not --
18            THE COURT:  Right.  It's for record purposes.  It
19    will not go back to the deliberation room.  All right.
20            MR. BALDRIDGE:  Then no objection.
21            THE COURT:  Okay.  So what's the exhibit -- oh,
22    35?
23            MR. McFARLAND:  Exhibit 35.
24            THE COURT:  Okay.  There being no objection,
25    Plaintiff's Exhibit 35 is admitted into evidence and will

776

Direct - Dent

1    be made a part of the public record but not go back with

2    the jury to the deliberation room.

3           As you will recall, ladies and gentlemen, I

4    mentioned that when individuals testify, they testify once

5    and you don't see a transcript of their testimony a second

6    time.

7           (Plaintiff's Exhibit 35 received)

8           THE COURT:  You may proceed, Mr. McFarland.

9           MR. McFARLAND:  Thank you, Your Honor.

10                        DIRECT EXAMINATION

11   BY MR. McFARLAND:

12   Q.    Good morning, Mr. Dent.

13   A.    Good morning.

14   Q.    You're a professionally trained bodyguard?

15   A.    Yes.

16   Q.    And you have a lot of experience working as a

17   bodyguard?

18   A.    Yes.

19           COURTROOM DEPUTY:  Sir, I'm going to ask you to

20   scoot up a little bit so that you can get closer to the

21   microphone.  And please raise your voice.

22   BY MR. McFARLAND:

23   Q.    In 1981, you applied to be a federal protective police

24   officer.

25   A.    Yes.

                          Direct - Dent

1      Q.   And you got the job.

2      A.   Yes.

3      Q.   And you worked for the National Security Agency.

4      A.   Yes.

5      Q.   And you trained at the police academy in Brunswick,

6      Georgia.

7      A.   Yes.

8      Q.   And you learned about federal and state laws.

9      A.   Yes.

10     Q.   Driving procedures.

11     A.   Yes.

12     Q.   Arrests.

13     A.   Yes.

14     Q.   Shooting.

15     A.   Yes.

16     Q.   Behavioral science.

17     A.   Yes.

18     Q.   Hostage situations.

19     A.   Yes.

20     Q.   Self-defense.

21     A.   Yes.

22     Q.   Anything else of import?

23     A.   I did some SWAT training also.

24     Q.   Anything else?

25     A.   As far as the police academy goes?

778
Direct - Dent

1    Q.    Yes.

2    A.    That's about it.

3    Q.    And then for the next 3 1/2 years, you worked as a

4    police officer.

5    A.    Yes.

6    Q.    You then moved to the Department of Defense and you

7    worked in their computer operations.

8    A.    Yes.

9    Q.    You left that position in 1989.

10   A.    Yes.

11   Q.    And from 1989 to 2000, you worked in sales and did

12   other things unrelated to police or security work.

13   A.    I did a little bit of security work, but not much.

14   Q.    From 1989 to 2000, you did a little bit of security

15   work, but you were primarily working in other areas.

16   A.    In corporate sales, yes.

17   Q.    And in January 2001, you started doing security work

18   again.

19   A.    Yes.

20   Q.    And at -- I should say initially, you served as a

21   personal bodyguard for a person in the entertainment

22   business.

23   A.    Initially?

24   Q.    In 2001, after you started working again in the

25   security field.

Direct - Dent

1    A.    Well, I was asked to help out one -- a play that was

2    traveling the country in 2001.  And because I knew the

3    actor, I agreed to it.  But it was something I thought I

4    would only do for about six months and then go back to a

5    regular job.

6    Q.    And you have been doing it ever since.

7    A.    And I've been doing it ever since.

8    Q.    And you've -- after 2001, you've worked for -- as a

9    bodyguard, for a lot of different well-known entertainers.

10   A.    Yes.

11   Q.    And we -- you talked to my colleague in your

12   deposition, you indicated that you didn't want to disclose

13   the names of those people because you felt like you had

14   confidentiality obligations to them.

15   A.    I do have confidentiality.  Not that I felt like, I do

16   have it.

17   Q.    Fair enough.  And I respect that.  And I'm not going

18   to ask you for those names.  But we -- can we agree that

19   you provided security for several of the biggest names in

20   the music and entertainment business?

21   A.    Yes.

22   Q.    And one of those persons was Taylor Swift.

23   A.    Yes.

24   Q.    You started working for Ms. Swift in 2008.

25   A.    Yes.

                              Direct - Dent

1    Q.    You started working for her full-time in 2009.

2    A.    Yes.

3    Q.    And when you started working for Ms. Swift full-time,

4    you were acting as one of her professional personal

5    bodyguards.

6    A.    Yes.

7    Q.    And when you were on duty, wherever Ms. Swift went,

8    you went.

9    A.    Yes.

10   Q.    And your job was to keep Ms. Swift safe.

11   A.    Yes.

12   Q.    And your job was to make sure that no one hurt or

13   harmed her.

14   A.    Yes.

15   Q.    And your job was to make sure that no one

16   inappropriately touched her or grabbed her or did anything

17   to her person that she didn't want.

18   A.    Correct.

19   Q.    You stopped working for Ms. Swift in 2013?

20   A.    Yes.

21   Q.    And since that time, you've worked for other people as

22   a personal professional bodyguard.

23   A.    Yes.

24   Q.    You took your job -- your duties to Ms. Swift very

25   seriously, right?

Direct - Dent

1    A.    Correct.

2    Q.    And you're good at your job?

3    A.    I definitely think so.

4    Q.    And you did a good job for Ms. Swift.

5    A.    Yes.

6    Q.    In fact, it's your opinion that you're the best

7    personal bodyguard she ever had.

8    A.    Yes.

9    Q.    Let's talk about June 2d, 2013.  Did you attend the

10   concert in Denver on that date?

11   A.    The -- attended or working the concert with her that

12   day.

13   Q.    Were you at the venue that day?

14   A.    Yes.

15   Q.    And you weren't there to watch the show, you --

16   A.    No.  Yeah, so I was there working, yes.

17   Q.    Okay.  Do you recall the venue?

18   A.    The Pepsi Center, I think.  Right here in Denver.

19   Q.    And at the venue, at the concert that night, you were

20   responsible for providing personal security for Ms. Swift.

21   A.    Yes.

22   Q.    That was your job, not the job of security personnel

23   associated with the venue or the Pepsi Center, itself.

24   A.    Correct.

25   Q.    And it was -- it's the job of the other security

782

Direct - Dent

1    provided by the venue to protect people other than Taylor

2    Swift.

3    A.    Well, I guess the main thing is order in the crowd.  I

4    wouldn't say that they would protect other people, but

5    they're there to maintain the crowd.

6    Q.    And -- and it's your job, not their job, to protect

7    Ms. Swift.

8    A.    Yes.

9    Q.    And on -- at the June 2d, 2013, concert, Ms. Swift was

10   accompanied by you or another member of your security team

11   at all times.

12   A.    Yes.

13   Q.    And Ms. Swift was accompanied by you during the

14   regular fan meet-and-greet that Mr. Mueller and his

15   girlfriend attended on June, 2013.

16   A.    At all meet-and-greets I was there.

17   Q.    Do you know -- do you recall how many meet-and-greets

18   there were the evening of June 2d, 2013?

19   A.    I don't know how many.  It was two or three.  Just

20   like it is just about at every concert --

21   Q.    Do you know --

22   A.    -- before the show.  And then probably one after the

23   show.

24   Q.    Do you recall which meet-and-greet Mr. Mueller

25   participated in?

Direct - Dent

1    A.    No.

2    Q.    The -- do you remember Mr. Mueller having his

3    photograph taken with Ms. Swift on June 2d, 2013?

4    A.    I definitely remember.

5    Q.    And that was taken in a room that we've called the

6    photo booth.  Does that make sense to you?

7    A.    Yeah.

8    Q.    And the photo booth was a 10-by-10 fabric-walled room

9    under the Pepsi Center?

10   A.    I don't know the measurements, but it was the same

11   size room we basically set up at every concert.

12   Q.    What's your best estimate of the size of that room?

13   A.    The room where she was in, I would go -- say from the

14   beginning of this table, maybe back to that table behind

15   her attorney.

16   Q.    Right here?

17   A.    And just like a square.  But in a square.  And we had

18   people come in on one side, they come to her, they go out

19   the other side.

20   Q.    Can you estimate, as you sit here today, the

21   dimensions of that room?

22   A.    No.  I -- it's not a huge room.

23   Q.    And -- and do you have a specific recollection of the

24   photo booth and the way it was set up at the Pepsi Center

25   on June 2d, 2013?

784

Direct - Dent

1    A.   Well, you are calling -- a photo booth is no more than

2    if the photographer is you, they have a banner set up for

3    whoever was the sponsor, the people walk up to her here,

4    she greets them, and then they line up to take a picture,

5    and then they go out on the other side.

6    Q.   But what do you call the room that people like Mr.

7    Mueller and his girlfriend, would come into to have their

8    photograph taken?

9    A.   It was based off of the theme of the show.  I think

10   that was like the Club Red room or something like that.

11   Q.   Okay.  So you -- you would call this smaller square

12   room where people were coming in to take photographs the

13   Club Red room?

14   A.   No, that was the room say on the other side of this

15   room.  It's -- it's like if we were in this room and this

16   big area here is Club Red.  Then it was partitioned and we

17   had this part of it set up for her to do the meet-and-greet

18   and take pictures.

19   Q.   Other witnesses have described this smaller room where

20   the photographs were being taken as the photo booth.  Can

21   you and I agree that we'll refer to that room as the photo

22   booth as well?  Or would you like to use a different --

23   A.   You can call it a photo booth, but to me, it's not a

24   photo booth.  It's just a different part of the room where,

25   like I say, we partitioned off a curtain so that the people

785
Direct - Dent

1   in the other part of the room really couldn't see in except

2   for the people lined up to go in and take their turn to

3   take a picture.

4          With a photo booth, no, I wouldn't call it a photo

5   booth.

6   Q.   You want -- what do you want to call it today?

7   A.   I mean, it's just a room -- a separate room off of the

8   Club Red where she would go in to meet the people and take

9   pictures.

10  Q.   That separate room off of the Club Red area was where

11  all of the people that were participating in the general

12  meet-and-greet would meet Ms. Swift and have their picture

13  taken.

14  A.   Yes.

15  Q.   And during the photograph session with Mr. Mueller,

16  Ms. Swift, and Ms. Melcher, you were 5 feet away from Ms.

17  Swift.

18  A.   Something like that.  I was very close.  I just stay

19  outside of the rim of the photographer.  I don't show up in

20  the picture, but I'm just steps away from that.  Like if I

21  took two steps, I would be in the picture, but I stay off

22  to the side.

23  Q.   Do you recall which -- on the evening of June 2d,

24  2013, do you recall which side visitors entered and which

25  side visitors exited the --

786
Direct - Dent

1    A.    No.

2    Q.    -- separate room off of the Club Red area?

3    A.    No, I don't.  I know I always stay on the side where

4    they would leave out.

5    Q.    And why did you do that?

6    A.    Because we have people to have them come in and then

7    once they take the picture, I would be there to try to

8    speed it up to get them to leave, because she had a

9    tendency to linger and talk to people and we were trying to

10   get through it.

11   Q.    To the best of your recollection, there was additional

12   security at the exit to the room or the separate room off

13   the Club Red area?

14   A.    Yeah.  Another -- another one of our guys was always

15   close, but I was the only one in the room.

16   Q.    So that -- that security was one -- a part of your

17   team as opposed to somebody associated with the venue.

18   A.    Yes.  The venue people would help maintain the line as

19   they came into the Club Red room; but once they came in

20   there, it was fully us that took care of everything.

21   Q.    Okay.  And what was your role during the photo

22   sessions in this separate room off of the Club Red area?

23   A.    I just told you.  I stand right off to the side from

24   where she is, and when they snap the picture, I tell

25   people, "Thanks for coming," and try to rush them out.

787

Direct - Dent

1   Q.   Why were you in the room during the photograph

2   session?

3   A.   Because I went everywhere she went.

4   Q.   And you were there in that room to make sure that

5   nothing happened to Ms. Swift?

6   A.   Right.  But this is a more controlled environment,

7   too, so it's not like, you know, just anybody could walk in

8   and take a picture.

9   Q.   Are the guests that come through to the

10  meet-and-greets, are there any background checks or

11  something like that performed?

12  A.   Background checks?  I wouldn't say we were conducting

13  background checks, no, but I'm not positive.  I wasn't in

14  on that end of the security.  My sole purpose was to make

15  sure she was fine.

16  Q.   Your sole purpose was what?

17  A.   To make sure she was okay.

18  Q.   Okay.  And you stood -- well, let me ask it this way:

19  Where did you stand in the room?  Were you in front of Ms.

20  Swift so that you were looking at her -- her front side, or

21  were you behind in a way that you could see her backside

22  while these photographs were being taken?

23  A.   I was off to the side.  And I had the complete view of

24  behind her because we had to put -- like I said, we had a

25  partition set up, and in some rooms it wasn't a wall there,

788

Direct - Dent

1    so sometimes people would try to sneak in and I wanted to

2    make sure nobody came up behind her.

3    Q.   So you set up -- you purposely set up behind Ms. Swift

4    so that you could see behind her.

5           MR. BALDRIDGE:   Objection.   Mischaracterizes what

6    he just said.

7           THE COURT:   Let's rephrase.

8    BY MR. McFARLAND:

9    Q.   Is that a fair characterization?

10   A.   Could you repeat that?

11   Q.   You purposely set up behind Ms. Swift so that you

12   could see whether somebody was coming behind her to grab

13   her.

14          MR. BALDRIDGE:   Same objection.   Mischaracterizes

15   the testimony.

16          THE COURT:   Overruled.

17          THE WITNESS:   I didn't set up behind her.   If she

18   was standing, say, the front of this desk, I was standing

19   here.   I could see the front of her and I could see the

20   back of her.

21   BY MR. McFARLAND:

22   Q.   Okay.   So when Mr. Mueller, Ms. Swift, and Mr.

23   Mueller's girlfriend took -- had their photograph taken on

24   June 2d, 2013, you could see their backsides.

25   A.   Yes.

Direct - Dent

1    Q.    The meet-and-greet in Denver had between, in your

2    estimation, 50 to 75 guests?

3    A.    Like I said, it was two or three of them, so it could

4    be 20 in one, 60 in another.  I didn't really pay attention

5    to the numbers or the amount of people that were in the

6    line.

7    Q.    Do you recall Mr. Mueller entering the photo booth on

8    June 2d, 2013?

9    A.    Yes.

10   Q.    And he was with a female, a woman.

11   A.    Yes.

12   Q.    Do you remember what Mr. Mueller was wearing?

13   A.    No.

14   Q.    Do you remember what Mr. Mueller's girlfriend was

15   wearing?

16   A.    No.

17   Q.    Did you hear Mr. Mueller speak while he was in the

18   photo booth?

19   A.    No.

20   Q.    Did you hear Mr. Mueller's girlfriend speak?

21   A.    No.

22   Q.    Did you hear any conversation between Mr. Mueller, his

23   girlfriend, and Ms. Swift?

24   A.    She greets everybody, so she says hello to them, but I

25   didn't pay any attention to what the response was.

Direct - Dent

1  Q.   Did you have any interaction with Mr. Mueller, his

2  girlfriend, and Ms. Swift?

3  A.   Any interaction with the girlfriend and Ms. Swift?

4  Q.   Well, did you have -- I'm sorry.  Did you have any

5  interaction with Mr. Mueller?

6  A.   No.

7  Q.   Did you have any interaction with Mr. Mueller's

8  girlfriend?

9  A.   No.

10  Q.   Do you recall where Mr. Mueller and his girlfriend

11  were in the queue?  Were they at the beginning of the

12  meet-and-greet --

13  A.   No.

14  Q.   -- or the end?

15  A.   No.

16  Q.   You don't recall?

17  A.   No.

18  Q.   You recall being present when the photograph was

19  taken.

20  A.   I was present when every photograph was taken.

21  Q.   But you don't recall how many photographs were taken?

22  A.   No.

23  Q.   I'd like to show you Plaintiff's Exhibit 31.  And I

24  think we'll get you a notebook with that.

25        Did you find Exhibit 31, sir?

Direct - Dent

1    A.    Yes.

2    Q.    What -- what is Exhibit 31?

3    A.    It's a rough diagram of the room setup.

4    Q.    And you're talking about the separate room off the Red

5    Club area where Mr. Mueller, his girlfriend, and Ms. Swift

6    had the photograph taken.

7    A.    ^ Yes.

8    Q.    Is -- in this -- this is something that you drew.

9    A.    Right.

10   Q.    Looking at it, to the best of your knowledge and

11   recollection, is this an accurate drawing?

12   A.    I mean, it's just a square I drew.  I'm not an artist,

13   so -- but yes, it's the general idea of how it's always set

14   up.

15   Q.    This is -- represents your best recollection of the

16   setup of the separate room off the red club at the time Mr.

17   Mueller had his photograph taken.

18   A.    Yes.

19   Q.    At this point, Your Honor, I would move for the

20   admission of Plaintiff's Exhibit 31.

21           THE COURT:  Is there an objection?

22           MR. BALDRIDGE:  No objection, sir.

23           THE COURT:  All right.  There being no objection,

24   Plaintiff's Exhibit 31 is admitted into evidence and may be

25   published to the jury.

792
Direct - Dent

1          (Plaintiff's Exhibit 31 received)

2              MR. McFARLAND:   Thank you, Your Honor.

3      BY MR. McFARLAND:

4      Q.   So let's -- let's take a look at this in a little bit

5      of detail.  The walls here that you've drawn, these roughly

6      represent the fabric walls of this separate room off of the

7      Club Red area?

8      A.   Yes.

9      Q.   What is -- what's that X represent?

10     A.   One of the other people that were in the room.

11     Q.   Is that -- is that a G next to the X?

12     A.   Yeah, G, S, and E:  Gabby, Stephanie and Erica.

13     Q.   Okay.  So where that little dot is, that's -- that's

14     where Gabby was set up.

15     A.   Yeah.

16     Q.   Gabby.  And Stephanie was set up right there.

17     A.   Yes.  Stephanie was taking the pictures, so she was

18     usually in the middle.

19     Q.   And that's -- that's the X with the S next to it.

20     A.   Yes.

21     Q.   And Erica was set up at the X with the E.

22     A.   Yes.  But like I told the lady at the deposition,

23     Erica would float in and out, depending on what was going

24     on.  She may have to go get another special guest or

25     something, but for the most part, she is always in the room

Direct - Dent

1    also.

2    Q.   Okay.  And then if we look towards the left-hand side

3    here, there's another X there.  Do you know what that

4    represents?

5    A.   That was probably -- well, it could have been me.

6    Like I said, I don't know which side was the in and which

7    side was the out.

8    Q.   So your recollection is at the time Mr. Mueller had

9    his photograph taken with Ms. Swift and his girlfriend, you

10   were either here or here.

11   A.   Right, depending on which side they would leave on.

12   That's the side I was on.

13   Q.   And the T with the X right there, that's -- that's

14   where Ms. Taylor Swift would set up.

15   A.   Yes.

16   Q.   What's that X represent?

17   A.   That's just the way people would either come in or go

18   out, I guess.  I don't really remember what this little X

19   is for but, like I said, they came in on one side, she

20   greeted them in the middle, they took the photo, they went

21   out on the other side.

22   Q.   Okay.  Do you recall whether at the time Mr. Mueller,

23   his girlfriend, and Ms. Melcher took the photograph -- or

24   had their photograph taken, do you remember whether you

25   were closer to Mr. Mueller or closer to Ms. Melcher?

794

Direct - Dent

1    A.    I was on the side where the girlfriend was.

2    Q.    Okay.  Let me show you what's been marked Exhibit I.

3    You've seen that photograph before.

4    A.    Yes.

5    Q.    Does that help you recall what side of the --

6    A.    Well --

7    Q.    -- the photo room you were on?

8    A.    Well, whatever the lady's name was, I was on the side

9    that she was on.

10   Q.    So you would have been to her right?

11   A.    Yes.

12   Q.    So if we go back to Exhibit 31, you were likely where

13   that X is.

14   A.    You know, like I told you, I don't know which side was

15   in, which side was out.  Where she was standing, I was on

16   the side of her, and that was the side that people would go

17   out of.

18   Q.    Okay.  And -- and from this position or that position,

19   you could see behind Ms. Swift and whoever she was taking a

20   photograph with?

21   A.    Yes.

22   Q.    Do you have an estimate of -- of how far Erica and

23   Stephanie and Gabby were from Ms. Swift when the

24   photographs were being taken?

25   A.    I guess 5, 6 feet in front of them.

Direct - Dent

1    Q.   Okay.  And -- and you were just a couple steps away

2    from Ms. Swift?

3    A.   Off to the side, yes.

4    Q.   And at the time Mr. Mueller, Ms. Swift, and Ms.

5    Melcher were having their photograph taken, you could see

6    their backsides the entire time?

7    A.   Yes.

8    Q.   And you were focused on their backsides while the

9    photograph was being taken.

10   A.   Yes.

11   Q.   And you were in that position, at least in part, to

12   make sure that nothing came up -- there were no surprises

13   from behind, nobody came up --

14   A.   Correct.

15   Q.   -- to do anything from behind.

16        And you believe that you saw Mr. Mueller's hand,

17   and Ms. Swift's skirt come up, and then Mr. Mueller place

18   his hand on Ms. Swift's back; is that right?

19   A.   No, I know I saw it.  I don't believe I saw it; I know

20   I saw it.

21   Q.   So you saw Mr. Mueller's hand and Ms. Swift's skirt

22   come up, and then Mr. Mueller place his hand on Ms. Swift's

23   back.

24   A.   When he went to put his arm around her, his hand went

25   under her skirt.  She jumped, pushed her skirt down, and

Direct - Dent

1    moved closer to the girl.

2    Q.   And that was the point where you jumped up and grabbed

3    Mr. Mueller.

4    A.   No.

5    Q.   That was the point where you jump up and got between

6    Mr. Mueller and Ms. Swift.

7    A.   I moved a little -- more to the front and looked at

8    Ms. Swift.  She continued on with the meet-and-greet, so

9    since she didn't give me any indication to do anything, I

10   stood off to the side.  But, you know, I know what I saw.

11   And I didn't do anything because sometimes she said I was a

12   little too mean.

13   Q.   And you saw Ms. Swift at the same time you saw Mr.

14   Mueller's hand come up and Ms. Swift's skirt come up, you

15   saw Ms. Swift jump towards Mr. Mueller's girlfriend?

16   A.   She pushed it -- she pushed it down, moved to the

17   side, jumped over closer to the girl, yes, I saw that.

18   Q.   Now, in this picture, Exhibit I, Ms. Swift's hand is

19   still behind Mr. Mueller, right?

20   A.   Yes.

21   Q.   So this had to be before the inappropriate touching

22   you --

23   A.   No.  The inappropriate touching happened before they

24   snapped the picture.

25   Q.   And how do you know that?

Direct - Dent

1    A.    Because I was standing right there.

2    Q.    When you saw Ms. Swift's skirt come up, did just the

3    back part of the skirt flip up or did the whole skirt move?

4    A.    The back part of the skirt.

5    Q.    And did the skirt seem to be made, to you, of any

6    stiff or anything other than normal fabric?

7    A.    I have no idea what the skirt was made out of.

8    Q.    When the back of the skirt moved, the front and the

9    side of the skirt didn't move?

10   A.    No.

11   Q.    In this picture, is Mr. Mueller's hand underneath Ms.

12   Swift's skirt?

13   A.    No, not when they took the picture.

14   Q.    So at the time of the picture, Mr. Mueller's hand was

15   not underneath Ms. Swift's skirt?

16   A.    No.

17   Q.    You're sure about that.

18   A.    Positive.

19   Q.    And if Ms. Swift testified otherwise, she's mistaken?

20   A.    I don't know what she testified to.  But in this

21   picture, she had already moved over, so he had already

22   touched her, so this is after the fact.  And she went ahead

23   and went through with the picture.

24   Q.    Did you see Mr. Mueller's hand on Ms. Swift's body

25   other than on her back?

798

Direct - Dent

1    A.    I saw his hand under her skirt and then I saw his hand

2    on her back as they took the picture, or low on her back.

3    Q.    Did you see any touching under Ms. Swift's skirt?

4    A.    Did I see under the skirt?  No, I wasn't underneath.

5    I was standing off to the side, so I couldn't see under her

6    skirt.

7    Q.    Did you see Mr. Mueller's hand on Ms. Swift's rear?

8    A.    No, I saw his hand under her skirt.

9    Q.    And his hand was coming up.

10   A.    Yes.

11   Q.    And it didn't stop and linger for any recognizable

12   period of time on her rear?

13   A.    I can't tell you how long his hand was there.  I can

14   only tell you when he put his hand behind her, it went

15   under her skirt, he touched her, she jumped, pushed her

16   skirt down, moved over closer to the woman, and she

17   proceeded to take the photo.

18   Q.    If Mr. Mueller's hand had lingered underneath Ms.

19   Swift's skirt, you would have jumped up and done something

20   about it, wouldn't you?

21   A.    I'm sure she would have said something if she wanted

22   me to intervene.  In certain situations, I go off of what

23   she wants me to do.

24   Q.    You couldn't possibly have thought that a man that Ms.

25   Swift apparently doesn't know, that she was okay with a man

799
Direct - Dent

1    that she doesn't know putting his hand under her skirt or

2    on her butt?

3    A.    I know she wasn't comfortable, that's why she moved --

4    pushed her skirt down and moved over closer to the woman.

5    Q.    But you didn't say anything to Mr. Mueller at that

6    time?

7    A.    No, I didn't.

8    Q.    You didn't say anything to Ms. Melcher at that time?

9    A.    No, I didn't.

10   Q.    You didn't do anything to Mr. Mueller.

11   A.    No.

12   Q.    In fact, you let him casually walk out of the photo

13   booth.

14   A.    Because she stayed there to finish the meet-and-greet,

15   she had more people in line, and she was going to finish.

16   Q.    Well, certainly given what you've described, you got

17   on the radio, you made some signal, or you called your

18   backup that was close by, right?

19   A.    No.  Not until the meet-and-greet was over.

20   Q.    You didn't call back up and say, "Hey, I just saw

21   something that looked inappropriate.  Keep an eye on that

22   guy"?

23   A.    No.

24   Q.    Nothing like that?

25   A.    No.

Direct - Dent

1  Q.   During the taking of the photograph, did you happen to

2  look at Mr. Mueller's face?

3  A.   No, I didn't.  I saw him before he came in to take the

4  picture.  I look at everyone that comes through the line

5  and I just kind of thought he had been drinking.

6  Q.   And you thought maybe he had a drink in his hand, too,

7  right?

8  A.   At first, yes, I thought I did see a drink in his

9  hand, but I was definitely sure that he had been drinking.

10 Q.   But you know now he didn't have a drink in his hand.

11 A.   Right.

12 Q.   But you thought he was -- he had been drinking, you

13 thought he was intoxicated?

14 A.   I can't tell you what level, you know, he was at, but

15 I did think he had been drinking.  He wasn't staggering or

16 falling down, so . . .

17 Q.   So big guy walks into the photo area, you think he's

18 been drinking, you think he's put his hand under Ms.

19 Swift's skirt -- or you know he's put his hand under her

20 skirt, you think he's touched her, she jumps out of the

21 way, and you don't do anything.

22 A.   No.  I played -- like I said, I take my cues from her

23 in certain situations.  And she continued with the photo.

24 So, no, I didn't go jump in front of the photo.

25 Q.   And then after the meet-and-greet was over, you didn't

Direct - Dent

1    do anything either until Ms. Swift said, "That dude grabbed

2    my ass"?

3    A.   Well, as soon as it was over, she brought it to the

4    attention of the other people.

5    Q.   She didn't turn to you and say, "That dude grabbed my

6    ass"?

7    A.   No, she went straight to the other people and told

8    them what happened, and then they started looking through

9    the camera for his picture.

10   Q.   And when you saw Mr. Mueller with the lifting of Ms.

11   Swift's skirt, you couldn't see Mr. Mueller's hand, itself;

12   you could just see the skirt move.

13   A.   I saw his hand go under her skirt.  And then I saw her

14   skirt lift up, his hand came out, she jumped to push her

15   skirt down, and moved over closer to the girl.

16   Q.   But you didn't see Mr. Mueller's hand, itself, during

17   that -- what you just described?

18   A.   Not until it came out from under her skirt.

19   Q.   Can you just move your hand in the fashion that you

20   saw Mr. Mueller's hand move.

21   A.   What do you mean?  At the same speed or something?

22   Q.   Yeah.

23   A.   I --

24   Q.   Give us your best recollection of what it was like.

25   A.   (Indicated) I don't know, he put his hand -- he

Direct - Dent

1    motioned to put his arm around her, his hand went under her

2    skirt, she jumped in an instant, it was -- I can't -- you

3    know, I didn't time it, so I can't tell you how long his

4    hand was under her skirt.

5    Q.   Now, if -- if you knew that Mr. Mueller was

6    intentionally groping Ms. Swift, you wouldn't allow that,

7    would you?

8    A.   I can't tell you what his intentions were.  I'm not

9    inside Mr. Mueller's mind.  I can only tell you what I saw

10   him do.

11   Q.   But you wouldn't -- you wouldn't allow someone to walk

12   up and -- and intentionally grab Ms. Swift's rear during

13   this concert, right?

14          MR. BALDRIDGE:  Objection.  Asked and answered a

15   dozen times maybe.

16          THE COURT:  Sustained.

17          MR. BALDRIDGE:  Thank you.

18   BY MR. McFARLAND:

19   Q.   After you saw Mr. Mueller's hand move, did you notice

20   anything about his demeanor that suggested any

21   inappropriate conduct -- inappropriate conduct to you?

22   A.   No.  My focus was on her.  I looked at her to see if

23   she was looking at me and wanted me to move in.  And, like

24   I said, she proceeded with the pictures, so I maintained

25   the position I was in.

Direct - Dent

1    Q.   You weren't focused on Mr. Mueller?  You weren't

2    looking at him to make sure that something worse --

3    something additional wasn't going to happen?

4    A.   When it happened and after she took the picture, I

5    focused on her.

6    Q.   So after the photograph, you were not paying attention

7    to Mr. Mueller?

8    A.   No, they left after the photograph.

9    Q.   I'm talking about right after the photograph.

10   A.   Right after the photograph, she usually says thank you

11   to everybody.  She seemed a little different.  And she

12   continued on with the meet-and-greet.  And he left the

13   room, him and the lady he was with.

14   Q.   After you -- after the photograph, you didn't -- you

15   looked at Ms. Swift, but you didn't say anything to her?

16   A.   I didn't say anything to her.

17   Q.   And you didn't say anything to any of the other people

18   in the photo booth?

19   A.   No.

20   Q.   And the photo session continued on as normal?

21   A.   Yes.

22   Q.   And the meet-and-greet continued for how long?

23   A.   I don't know.  I'd be guessing.  10, 15 minutes.

24   Q.   And during those 10 or 15 minutes, Ms. Swift didn't

25   give you any indication that anything was wrong.

804
Direct - Dent

1    A.    No.

2    Q.    And you didn't do anything with respect to Mr. Mueller

3    during that 10- or 15-minute period?

4    A.    No, I stayed in the room with Ms. Swift.

5    Q.    You had a way to call her people or contact other

6    people on your team from the -- from the room?

7    A.    Yes.

8    Q.    Do you know how many male guests had had their

9    photograph taken with Ms. Swift prior to Mr. Mueller?

10   A.    No.

11   Q.    Have you ever looked at the photographs of the people

12   who were photographed with Ms. Swift prior to Mr. Mueller

13   and his girlfriend?

14   A.    Did I look at the photographs of the people?

15   Q.    Yes.   The other people.

16   A.    No.

17   Q.    You don't have any idea what those people looked like

18   or what those photographs might show?

19   A.    No.

20   Q.    Did you ever suggest to anyone that those photographs

21   should be looked at?

22   A.    There was no reason to.   After the meet-and-greet, she

23   went up, told the other people what happened.   They looked

24   through the camera to find the picture.   Once they did

25   that, identified it, and called the other security guys,

Direct - Dent

1    they came, they looked at the picture.  I took Ms. Swift

2    back to her dressing room.

3    Q.   You have been in police work and security work a long

4    time.

5    A.   Yes.

6    Q.   When you ask for someone to identify someone who did

7    something to them, do you present just one picture?

8    A.   If you're doing a lineup, I mean, you wouldn't present

9    just one picture, but we weren't doing a police lineup.  I

10   was standing right there, I saw him.  I didn't need to go

11   look at the camera to see what he looked like or anyone

12   else looked like.  I knew what he looked like.  I was

13   standing there.

14   Q.   The police don't show just one picture because it's

15   not the most accurate way of identifying, right?  It's an

16   unfair way to identify someone who -- a person of

17   wrongdoing?

18        MR. BALDRIDGE:  Objection to the word "unfair" as

19   argumentative and an undefined term.

20        THE COURT:  Overruled.

21        THE WITNESS:  Do the police do it that way?  No,

22   they -- if they're going to a witness, they will show them

23   a photo array of probably five or six pictures to try to

24   find the closest matches to whoever they suspected the

25   person was of doing it.

Direct - Dent

1    BY MR. McFARLAND:

2    Q.   Why do you think they do that?

3    A.   Just to make sure the person is sure of what they saw.

4    But this wasn't a police lineup and I was standing less

5    than 5 feet from him and I could see pretty well.

6    Q.   You didn't talk to the photographer, Ms. Stephanie

7    Simbeck, about what she saw or didn't see, did you?

8    A.   No.

9    Q.   You didn't talk to Gabby or Erica about what they saw

10   or didn't see?

11   A.   No.

12   Q.   You didn't look at the photographs of all the people

13   that evening?

14   A.   No.

15   Q.   And in the photo booth, you didn't hear anybody

16   identify Mr. Mueller by name?

17   A.   No.

18   Q.   And you didn't have any further contact with Mr.

19   Mueller on June 3d, 2013.

20   A.   After she went back to her dressing room, two of our

21   guys was looking for him.  After a couple of minutes and

22   they hadn't found him, I radioed for another person to come

23   to the dressing room.  They stayed there.  I had an idea

24   and just a hunch that he was probably at the bar.  So I

25   went to the other end of the arena where they had a bar set

                                Direct - Dent

1      up and him and his girlfriend were coming out of the bar.

2              He walked back into the arena.  I called the other

3      guys on the radio and said, "He's just walking back onto

4      the arena floor."

5      Q.    So after exiting the photo booth, it's your

6      understanding that Mr. Mueller left the arena?

7      A.    No.  He is still in the arena, but we're still on the

8      bottom floor.  So when he left the photo booth, I can't

9      tell you how many stops he made or how -- what else he did.

10     But when I went to look for him, I went straight to the bar

11     area and there he was.

12     Q.    And did you make contact with him at that point?

13     A.    No, I didn't.

14     Q.    You didn't have any further contact with Mr.

15     Mueller --

16     A.    I never said a word to Mr. Mueller.

17     Q.    Did you subsequently discuss the alleged incident with

18     Ms. Swift?

19     A.    Never.

20     Q.    Over the -- your years as a personal professional

21     bodyguard, is it fair to say that you've developed an acute

22     eye for spotting problems and potential problems?

23     A.    In some situations, yes.

24     Q.    And do you think you've sort of also developed a -- an

25     instinct about whether something looks appropriate or

1      inappropriate?

2      A.   What do you mean when something looks appropriate or

3      inappropriate?

4      Q.   Well, you know, I think in your deposition you talked

5      a little bit about your -- Ms. Swift, at concerts, she'll

6      hug people, and sometimes they'll hold on too long and

7      you'll have to jump in.  And my question is:  Do you think

8      all of your training over all these years you sort of

9      developed an instinct as to when people are holding on a

10     little too long, when you need to intervene?

11     A.   Well, at the deposition, I said when she goes through

12     the crowd and she still is singing and people try to grab

13     her, I step in then.  I don't wait for her to say, "Get

14     this person off of me."

15          I immediately get them off of her, get their hand

16     off of if they try to grab and hug her.  I step in to make

17     sure that doesn't happen because the show is going on and

18     she has to proceed.

19     Q.   And you've trained your body and your mind to react

20     immediately to even the slightest danger that you see or

21     sense; is that fair?

22     A.   Yes.

23     Q.   And in the alleged incident with Mr. Mueller, if you

24     had seen or sensed even the slightest danger, you would

25     have done something?

809
Direct - Dent

1    A.   Well, like I told you, this is more of a controlled
2    environment.  The people that are down there were either
3    picked to be there, to meet her, or they're a Make a Wish
4    child, or they're local personalities from radio or
5    television.  So this is a little bit different when you
6    think about the threat to Ms. Swift.
7    Q.   You didn't see or sense any danger to Ms. Swift's body
8    on June 2d, 2013.
9    A.   It's -- you mean before he walked up to her?
10   Q.   Before he walked up to her and did what you claim he
11   did.
12   A.   No, what he did.  I only sense -- the biggest sense of
13   danger I have is when she deals with the general public in
14   this show going through the arena.
15        In that environment, I do perceive it to be a
16   little bit safer.
17   Q.   Did you or did you not sense or see anything that you
18   thought was dangerous to Ms. Swift's body at the June 2d,
19   2013, meet-and-greet?
20        MR. BALDRIDGE:  Objection.  Asked and answered
21   multiple times.
22        THE COURT:  I'll let it go one more time.
23        You may answer.
24        THE WITNESS:  Like I told you, I didn't sense --
25   did I get a feeling at this meet-and-greet that something

Direct - Dent

1    bad was going to happen to her?  No, I didn't.  But when

2    she's going through a crowd at a stadium or at an arena

3    doing the show, it is a different level of awareness, yes.

4    BY MR. McFARLAND:

5    Q.   That's -- that wasn't my question.  My question is:

6    Did you or did you not sense danger when Mr. Mueller was

7    taking the photograph with Ms. Swift and his girlfriend?

8            MR. BALDRIDGE:  Objection.  Asked and answered.

9            THE COURT:  All right.  The witness didn't answer

10   the last question specifically, so I'm going to let --

11           THE WITNESS:  I didn't sense danger.  And then I

12   saw him when he went up and after he touched her, then I

13   thought that was inappropriate.

14   BY MR. McFARLAND:

15   Q.   Did you at -- when he touched her, did you think that

16   was dangerous to Ms. Swift's body?

17           MR. BALDRIDGE:  Objection.  Asked and answered.

18   Just a different way of asking it.

19           THE COURT:  Overruled.

20           THE WITNESS:  I guess I wouldn't say it was

21   dangerous.  I thought it was a violation of her body.

22   BY MR. McFARLAND:

23   Q.   You didn't do anything because you didn't see or sense

24   anything that you thought might harm Ms. Swift.

25           MR. BALDRIDGE:  Objection.  Asked and answered.

                            Direct - Dent

 1              THE COURT:  Sustained.  Let's move on.
 2      BY MR. McFARLAND:
 3      Q.   How long, in your opinion, did the inappropriate
 4      touching last?
 5              MR. BALDRIDGE:  Objection.  Asked and answered.
 6              THE COURT:  Sustained.
 7      BY MR. McFARLAND:
 8      Q.   Just so that I'm clear -- and if you answer, this is
 9      my last question for you -- you did not see Mr. Mueller's
10      hand come in contact with Ms. Swift's rear.
11              MR. BALDRIDGE:  Objection.  Asked and answered
12      multiple times.
13              THE COURT:  Since it's -- he said since this is
14      his last question, I'll let it go.
15              You may answer, sir.
16              THE WITNESS:  I did not see his hand touch her
17      physically.  I saw his hand under her skirt.  She reacted.
18      Pushed her skirt down and moved over closer to the woman.
19      So I am -- in my opinion, I knew he touched her.
20              MR. McFARLAND:  Thank you.
21              THE COURT:  Cross-examination.
22              MR. BALDRIDGE:  Thank you, Your Honor.
23                            CROSS-EXAMINATION
24      BY MR. BALDRIDGE:
25      Q.   How are you, Mr. Dent?

Cross - Dent

1    A.    Okay.

2    Q.    You're a man of few words, aren't you?  You just had

3    had a lot of questions about dress fabric, lighting, hands,

4    timing, and all this.  But I want to ask you something very

5    directly.

6            Is there any doubt, sir, in your mind as to what

7    you saw happen the night of June 2d, 2013?

8    A.    None whatsoever.

9    Q.    Is there any doubt, sir, in your mind, after all of

10   those questions, that that man right there, David Mueller,

11   is the man that put his hand under Ms. Swift's skirt?

12   A.    I am positive that's the man.

13   Q.    Okay, sir.  Let's go to your background.  You were

14   with the NSA, correct?

15   A.    Correct.

16   Q.    Can you tell the jury what the NSA is.

17   A.    National Security Agency.

18   Q.    And to be part of the NSA, sir, you had to have a

19   background check, correct?

20   A.    They went all the way back to elementary school.

21   Q.    And they determined you were a man of integrity and

22   honesty, correct?

23   A.    I was -- I was granted a Top Secret security

24   clearance.

25   Q.    So you had the highest security clearance you could

813
Cross - Dent

1   have without, perhaps, being the president or somebody like

2   that, correct?

3   A.   Pretty much the same clearance.

4   Q.   And you were also a member of the police, weren't you,

5   sir?

6   A.   Yes.

7   Q.   And you had a background check when you were a

8   policeman, correct?

9   A.   Correct.

10  Q.   And, again, the police determined that you had the

11  highest credibility and integrity, correct?

12  A.   Correct.

13  Q.   Sir, you've had a number of questions, and I would

14  characterize it as this, in my words:  Like as -- when

15  you're in security and you're professionally trained like

16  yourself, that your only role is to dive on somebody.  Is

17  that what security is?

18  A.   No.  Not in my opinion.

19  Q.   Security involves intelligence, right?

20  A.   Yes.

21  Q.   Observation, right?

22  A.   Yes.

23  Q.   Knowing when to act and when not to act, correct?

24  A.   Correct.

25  Q.   Trying to avoid physical conflict, correct?

814

Cross - Dent

1    A.    Yes.

2    Q.    And taking cues from the person you're protecting,

3    correct?

4    A.    Correct.

5    Q.    And you have just described to this jury that you

6    acted off of cues in this situation on June 2d, correct?

7    A.    Correct.  In that situation, yes.  In other

8    situations, I would act without getting her permission.

9    Q.    And to take an example of that, you talked about in

10   crowds versus in a meet-and-greet, correct?

11   A.    Correct.

12   Q.    And a meet-and-greet includes a line of people whose

13   names you have in advance -- or at least security has in

14   advance, correct?

15   A.    Right.  Someone checks them.  I'm not a part of that

16   process, but someone checks them.

17   Q.    As a opposed to a crowd where Ms. Swift, prior to this

18   incident, used to walk out in the crowd, you don't know

19   who's there, right?

20   A.    No idea.

21   Q.    So in that scenario as a trained professional in the

22   crowd, you intervene, right?

23   A.    Yes.

24   Q.    And when you're in a meet-and-greet, you assume that

25   individuals have been checked and they likely know how to

815

Cross - Dent

1    behave, right?

2    A.    Yes.  Because in a meet-and-greet, we make sure they

3    don't bring any bags or boxes into it, so it's a much more

4    controlled environment.

5    Q.    And we have to agree, don't we, sir, that in any

6    profession, including security, actual experience is

7    important, right?

8    A.    I think so.

9    Q.    And is it fair to say, sir, that in your experience,

10   you had never before seen someone grab Ms. Swift's rear,

11   have you?

12   A.    Never.

13   Q.    It was a new one for you, wasn't it?

14   A.    Yes.

15   Q.    Now, you said your perception was that Mr. Mueller had

16   been drinking.  Do you recall that?

17   A.    Yes.

18   Q.    What did you perceive?  What happened?

19   A.    I thought I had seen him with a cup in his hand.  I

20   wasn't a hundred percent positive.  But it was because

21   before every meet-and-greet, we do, you know, kind of scan

22   the line -- I do, to see who's in there because I pay more

23   attention to the men or the young teenage boys than I do to

24   the girls.

25   Q.    And in this case, it was a perception, and I

Cross - Dent

1    understand that, that this gentleman had been drinking?

2    A.    Yes.

3    Q.    Now, you had a view and you testified to it, of

4    exactly what happened -- not a view, you saw it, right?

5    A.    I saw it.

6    Q.    And that happened June 2d, 2013, correct?

7    A.    Yes.

8    Q.    And we're here in August 2017, correct?

9    A.    Yes.

10   Q.    Has your account of the facts that this man's hand

11   went under Ms. Swift's skirt ever changed in that five-year

12   period?

13   A.    Never.

14   Q.    Now, in this meet-and-greet, what he calls the photo

15   booth, there's cloth walls, right?

16   A.    Yes, it's cloth.

17   Q.    And outside of that little square inside, there's a

18   greater area, right?

19   A.    Right.

20   Q.    There's people out there, right?

21   A.    Right.

22   Q.    Fair to say that people can hear and perceive through

23   cloth walls what's going on inside?

24   A.    Yes.

25   Q.    In fact, it's not a room, it's a clothed-off area,

817

Cross - Dent

1   right?

2   A.   Correct.

3   Q.   And there are multiple people in line being shuttled

4   in while other people are being shuttled out after their

5   opportunity to meet Ms. Swift, right?

6   A.   Yes.

7   Q.   And mainly fans and Make a Wish children and moms and

8   things of that nature, right?

9   A.   Yes.

10  Q.   You were with Ms. Swift for several years until the

11  end of the Red Tour, correct?

12  A.   Yes.

13  Q.   Can you tell the jury your perception of her view of

14  her fans and how to behave and act and react in front of

15  fans.

16  A.   Well, I was always of the opinion that she was too fan

17  friendly.  She would stop for them on -- under any

18  circumstances, where -- not at a concert, at a concert.

19  Too fan friendly for me.

20  Q.   And did she allow contact -- appropriate contact with

21  her fans in meetings over these years?

22  A.   Yes.

23  Q.   And she spoke to her fans, right?

24  A.   Yes.

25  Q.   And because no one appreciates where she is more than

Cross - Dent

1    this woman, she protects and appreciates those fans, right?

2    A.    Yes.

3    Q.    And in that line were little children, right?

4    A.    Yes.

5    Q.    And little children, perhaps, being shuttled in at the

6    very time Mr. Mueller put his hand under her skirt, right?

7    A.    Well, afterwards.

8    Q.    Right after.  In that process, correct?

9    A.    Yes.

10   Q.    And also in your experience, sir, do you have any view

11   as to whether a photo with this man's hand behind her rear

12   is something she would want public for the whole world to

13   see?

14   A.    No.  I doubt that very seriously.

15   Q.    Now, after Mr. Mueller put his hand under her skirt

16   and committed this assault, has there been any changes --

17   or were there any changes in the way you approached

18   security even in this controlled environment?

19   A.    Well, yeah.  I wouldn't let her hear me, but when guys

20   would come up, I would tell them, "Keep your hands up

21   high."

22   Q.    Because you have now had experienced with an assault

23   and you had to make changes, right?

24   A.    Yes.

25   Q.    I have no further questions.  Thank you, sir.

819

Redirect - Dent

1           THE COURT:  Redirect.

2               MR. McFARLAND:  Briefly.

3                        REDIRECT EXAMINATION

4   BY MR. McFARLAND:

5   Q.   Mr. Dent, is it your position that you didn't take

6   action towards Mr. Mueller during the photograph session

7   because you didn't want to disrupt the meet-and-greet?

8   A.   My position was I was playing off of how I think she

9   wanted me to act.  I looked at her, she was continuing on

10  with the meet-and-greets, so I stayed, maintained the

11  position I was in until it was over.

12  Q.   There was nothing preventing you from discretely

13  letting your team know that they should keep an eye on Mr.

14  Mueller?

15  A.   No.  There was nothing preventing me from calling

16  anybody on the radio.

17  Q.   Thank you.

18               THE COURT:  Any recross?

19               MR. BALDRIDGE:  Nothing further, Your Honor.

20               THE COURT:  All right.  May this witness be

21  excused?  For the plaintiff?

22               MR. McFARLAND:  Yes, Your Honor.

23               THE COURT:  For the defendants?  May he be

24  excused?

25               MR. BALDRIDGE:  Yes, sir.  I'm sorry.

820

                        Direct - Kliesch

 1              THE COURT:  All right.  Mr. Dent, thank you for

 2    joining us.  You're excused.  You may step down.

 3              Mr. McFarland, before you call your next witness,

 4    I need a moment.  Deb.

 5              Okay.  Got that fixed.

 6              Plaintiff may call his next witness.

 7              MR. McFARLAND:  Thank you, Your Honor.  The

 8    plaintiff calls Ryan Kliesch.

 9              THE COURT:  All right.

10               RYAN KLIESCH, PLAINTIFF'S WITNESS, SWORN

11              COURTROOM DEPUTY:  Please be seated.  State your

12    full name for the record and spell your first and last

13    name.

14              THE WITNESS:  Ryan Kliesch.

15              COURTROOM DEPUTY:  Spelling your first and last

16    name.

17              THE WITNESS:  R-y-a-n.  K-l-i-e-s-c-h.

18                        DIRECT EXAMINATION

19    BY MR. McFARLAND:

20    Q.   Good morning, Mr. Kliesch.

21    A.   Good morning.

22    Q.   Are you nervous?

23    A.   I am.

24    Q.   Take a couple of deep breaths.

25              You're good friends with Mr. Mueller?

821

Direct - Kliesch

1    A.    Yeah.

2    Q.    How long have you known Mr. Mueller?

3    A.    Dave and I met in '97 in San Diego, California.  We

4    were both employed by the same radio station KKLQ.

5    Q.    How long had you been in radio as of 1997 when you met

6    Mr. Mueller?

7    A.    First commercial station that I worked at, I was 15

8    years old, so do the math.  I was in my late 20s in '97,

9    so . . .

10            It had been a while.

11   Q.    Have you spent your entire professional career in

12   radio?

13   A.    Yes, I -- that's all I've done.  My dad was a

14   broadcaster and I started when I was in high school.  I

15   didn't go to college, I've worked at radio stations my

16   whole life.

17   Q.    How did you -- tell us a little bit about your working

18   relationship with Mr. Mueller at your first job in San

19   Diego.

20   A.    Well, Dave was a part of the morning show.  I was

21   doing evenings at first when I first started there, so I

22   was on in the evenings.  Dave worked with the morning guy

23   who I had known pretty well because I'd worked with him in

24   the past at radio station in Des Moines, Iowa.

25            So naturally we all kind of got together and would

Direct - Kliesch

1   hang out.  We would go to -- we would go to lunches.  We

2   enjoyed going to PF Chang's.  Would hang out at the radio

3   station.  I got to know him in the hallways.  And he and I

4   would -- we just hit it off.

5          We -- we laughed at the same jokes and, you know,

6   we -- from that moment on, we had always said, "You know,

7   we should -- we should do a show together some day."

8          And it was kind of just a real natural -- natural

9   thing.  I felt like I knew him for a long time.

10  Q.   Did you guys work together on-air in San Diego?

11  A.   No.

12  Q.   Did you ultimately live together for a period of time

13  there?

14  A.   No.

15  Q.   And -- and how often would you -- well, how long were

16  you in San Diego together?

17  A.   I was there for a year, so we worked together at that

18  station for a year.  They ultimately wound up changing

19  formats, changed formats to a -- I believe it was a

20  Hispanic format, and sold the station.  So I chose to

21  leave.

22         The company wanted to put me on another signal in

23  the market and I chose to -- to go work in another market.

24  Q.   Where -- where did you go from San Diego?

25  A.   I went to a radio station in Erie, Pennsylvania.

Direct - Kliesch

1    Q.   And how long were you there?

2    A.   I was -- it was a fairly short-lived stay in Erie.  I

3    was there less than a year.  And one of my former stations

4    in Tucson, Arizona, had contacted me and wanted me to come

5    back because they wanted me to -- to put me on in the

6    morning, which is really what I wanted to do.

7         I was doing mornings in Erie, and they said, "We

8    would like you to come back."

9         They had a guy that had been there for several

10   years who was planning on leaving to go to Detroit.  And I

11   had name recognition in the market, so they said, "Would

12   you mind coming back and doing an afternoon drive for a few

13   months until our morning guy takes off for Detroit.  We

14   want to slot you in there."

15   Q.   Okay.  What was your -- or when did you reconnect

16   with Mr. -- did you stay in touch with Mr. Mueller during

17   this time?

18   A.   Oh, yeah.  Yeah.  We -- we talked regularly.  As a

19   matter of fact, I -- when I took that job in Erie, I

20   immediately had him -- had a conversation with a bunch of

21   them and wanted to -- wanted to have him hired there so we

22   could team up in Erie.  And he flew out.  We met,

23   basically, you know, had an interview there in Erie.

24        Didn't wind up working out.  It was a really small

25   market.  The owner of the radio station was an in-house --

824

Direct - Kliesch

1   he had his hands on everything, he was a general manager,

2   did everything by a handshake.  No contracts.  And they

3   didn't have a lot of money in Erie.

4           And for those -- you know, for those reasons, Dave

5   decided to stay where he was at.

6   Q.   So is it fair to say that since you met Mr. Mueller in

7   1997 through today, you've had regular contact and

8   communication with him?

9   A.   All the time.  I mean, I -- he's one of my best

10  friends.

11  Q.   And -- and after San Diego, did you guys ever work

12  together again?

13  A.   Yeah.  We did a show together in Kansas City.

14  Q.   When was that?

15  A.   '01.

16  Q.   2001?

17  A.   Uhm-hum.

18  Q.   How long did you and Mr. Mueller work together in

19  Kansas City?

20  A.   We were there a little over a year, and that station

21  also decided to take another direction and changed their

22  format, so . . .

23  Q.   Were you working on the same show or just at the same

24  station?

25  A.   We did a morning show together there.  We were a team.

825

Direct - Kliesch

1    Q.    And -- and that was a five days a week --

2    A.    Monday through Friday.

3    Q.    Monday through Friday?

4    A.    Uhm-hum.

5    Q.    How many hours a day were you spending together at

6    that time?

7    A.    Well, we were on the air for five hours a day, but

8    that type of a job, it's not -- it's not an atypical job

9    where you go in, you spend your five hours.  We were with

10   each other all the time.

11         You know, we would get off the air, we would start

12   planning the next day's show.  Doing the morning show is --

13   I call it feeding the monster because as soon as you're

14   done with one show, you have to start preparing for the

15   next one.  You have to have stuff prepared for the next

16   day.

17         So we would talk about things and plan things

18   during the day.  We eat lunch.  We'd often -- in

19   Kansas City, I mean, we'd go to dinner almost -- almost

20   every night.  Then we'd talk before bed and we'd get up and

21   usually talk on the phone before we even got to work.  And

22   then we'd go on the air, and then repeat.

23   Q.    Okay.  So you became very familiar with Mr. Mueller?

24   A.    Oh, yeah.

25   Q.    And -- and after Kansas City, did you and Mr. Mueller

Direct - Kliesch

1    have a chance to work together again?

2    A.    Yeah.  We -- we worked together at KYGO.

3    Q.    And -- and when did you get the KYGO job?

4    A.    That was in '13, was it?  2013?

5    Q.    How did that opportunity come about?

6    A.    We had been looking for a job together since we left

7    Kansas City.  And it's very difficult in this business for

8    one person to get a job for themselves.  Once you add on

9    another person, it becomes extremely difficult to hire

10   teams.  We had looked diligently for 10 years.

11        That job at KYGO we found out about from a friend

12   of ours who was friends with a consultant who was in charge

13   of hiring that show.  So we kind of caught wind of that

14   before the general public, or before it was even

15   advertised.  And we thought, you know, well, this would be

16   great.  I mean, it's a great radio station, it's been

17   around for years, it was a thoroughbred.  You know, country

18   format.  It wasn't a hybrid trying to, you know, do, you

19   know, multiple -- multiple formats like -- I consider a

20   country station -- I mean, they focus on country.  An adult

21   contemporary station may play different genres or

22   different, you know, '80s and '90s and today; but country

23   was country.  And we just thought that this was just a

24   perfect scenario.

25   Q.    So there was some testimony -- there's been some

Direct - Kliesch

1    testimony that there was some sort of a promo or -- a promo

2    show done in Nashville.  Does that -- is that accurate?

3    A.   Yeah.  I was -- I worked in Nashville for the better

4    part of the decade and there, too, I kind of had had a

5    carrot dangled in front of me for my entire employment

6    there.  I did the afternoon drive and they had said, "Well,

7    we really want you to do mornings, stick around long

8    enough, you're going to do mornings."

9           That cluster of stations there, I worked for the

10   Top 40 station.  They also had an urban station, a country

11   station, the news talk station.  Country station had a guy

12   on the air there that had been on the air for years.  He

13   was just a mainstay, you know.  Real popular guy.

14          When he retired and that country opening came up,

15   I was gunning for that job.  And eventually they let Dave

16   come in and they put us on together for a week.  And we

17   hadn't been on the air together since Kansas City, you

18   know, a better part of a decade, like I said.  And that

19   week that we went on the air, it was like the two of us had

20   been on the air that whole time.  It's like our show had

21   been doing push-ups while we were -- while we were on

22   hiatus because we were -- it was magical.  It was really

23   something else.

24          And that week that we were on the air there, the

25   program director was really impressed.  He wanted to talk

828
Direct - Kliesch

1   to Dave about how -- you know, how much money it would take

2   to get him to come and take the job.  Unfortunately, the

3   authorities at a much higher level had already had

4   something planned.  They took a show that was already

5   established in Austin, put him on the air.

6          And we took that audio from that week to go look

7   for a job together.  And that was the golden egg, really,

8   that got us the job at KYGO.

9   Q.   Okay.  So when you applied and then when you -- you

10  got the KYGO job, you were living in Nashville?

11  A.   Yes.

12  Q.   And then you -- you trans- -- you moved yourself to --

13  from Nashville to Denver for that job?

14  A.   I did.

15  Q.   You -- do you have a family, Mr. Kliesch?

16  A.   I do.  I have a wife, one daughter, and a

17  stepdaughter.

18  Q.   So you moved your family to Denver to work on the KYGO

19  morning show with Mr. Mueller.

20  A.   I did.  It's a big decision.

21  Q.   Do you know where Mr. Mueller was coming from?  Was he

22  in Denver?

23  A.   He was in Minnesota.

24  Q.   So you both moved to Denver to take this job on the

25  morning show?

829

Direct - Kliesch

1    A.    We did.

2    Q.    Tell us just a little bit about the show itself.   What

3    was -- what was the vision for the morning show at KYGO

4    with Mr. Mueller?

5    A.    We, I like to think, had a sound that was very unique.

6    I always refer to it as planned spontaneity.   You know, we

7    would have things very specifically in mind that we would

8    want to do, and we always -- we always involved the

9    listeners.   It was really a listeners' show, and we were

10   just really the hosts of the party.

11   Q.    Was it appropriate for families, was it --

12   A.    Very much.

13   Q.    -- more edgy?   What --

14   A.    It was Seinfeldian in its design.

15   Q.    But appropriate for kids and --

16   A.    Very much.   Yeah.   KYGO was a -- was a family station.

17   Q.    It wasn't a shock type of --

18   A.    Not at all.

19   Q.    -- show?

20   A.    No.

21   Q.    And while working with Mr. Mueller at KYGO in Denver,

22   were you spending the same sort of time together, having

23   the same sort of interactions as you were in Kansas City?

24   A.    Oh, yeah.   Yeah.   We spent a lot of time together.

25   Had a really good time.

830

Direct - Kliesch

1    Q.   And you had a chance to observe him with coworkers and

2    colleagues?

3    A.   Absolutely.

4    Q.   And you had a chance to observe him at promotional

5    meetings and advertiser -- advertisement meetings and those

6    types of things?

7    A.   Sure.  Yeah.

8    Q.   And you spent a lot of time with him outside of the

9    radio station in social settings?

10   A.   Yeah.

11   Q.   Did -- and you had a chance to observe Mr. Mueller

12   interact with women at work and outside of work.

13   A.   Yeah.

14   Q.   How did he treat women generally?

15        MR. BALDRIDGE:  Your Honor, we're now getting into

16   starting questions in direct violation of Rule 404 about

17   evidence of a person's traits.  It's not admissible to

18   prove --

19        THE COURT:  Okay, let's -- let's approach.

20        (Discussion at sidebar.)

21        THE COURT:  Okay.

22        MR. BALDRIDGE:  Yes, Your Honor.  Since Mr.

23   McFarland will agree, it's undisputed this man wasn't in

24   the photo booth.  As I had feared, and I think this is

25   where we're going, is Mr. McFarland's going to elicit that

Direct - Kliesch

1    this gentleman observed Mr. Mueller with women over time,

2    and his behavior around women over time would -- was a

3    character trait that would prove that on the particular

4    occasion of the 6-2-13 assault, that he acted in conformity

5    with that character trait.  That is a straight-up violation

6    of Rule 404.

7              MR. McFARLAND:  Judge, I need to grab a

8    memorandum.  I'll be --

9              THE COURT:  Sure, go ahead.

10             MR. McFARLAND:  Judge, a person's character is

11   material when that person's character has been put into

12   issue by the pleadings and the evidence of the case.  And

13   when that happens, plaintiff -- or any party is allowed to

14   bring character evidence in.  *U.S. v. Paul Deno*, where the

15   prosecution was allowed to show that the defendant was in

16   the business of gambling.  If the character is directly at

17   issue, the plaintiff can give evidence of it, and it can be

18   done even when -- even before the person's character is

19   directly called into question.

20             MR. BALDRIDGE:  Your Honor, what he's referring to

21   I would assume is a criminal case; is that right?

22             MR. McFARLAND:  I believe Paul Deno is a criminal

23   case.

24             MR. BALDRIDGE:  Yes, it would be a different

25   issue.  That would be a 2(a) issue under Rule 404.  This is

Direct - Kliesch

1      a straight-up attempt to use evidence of this supposed

2      trait of Mr. Mueller to prove that on the occasion when he

3      assaulted Ms. Swift, he did not do so.  It is a straight-up

4      violation of Rule 404.

5              The examples in the rules, comments, the examples

6      of the law in the civil context, are very, very clear:

7      Sexual assault -- excuse me, sexual harassment cases, where

8      they try to bring in a lay witness to say, "Well, he was a

9      good guy, he's not the kind of guy that would do this," is

10     not permitted to say on the given occasion in the

11     workplace, a sexual assault or harassment was not

12     committed.  It's as clear as day under Rule 404 and it's

13     prohibited.

14             THE COURT:  The exceptions in the rule appear to

15     be -- what you quoted from appear to be limited to

16     criminal cases.  Do you have a cite to a case in the civil

17     context that says that when a party's character's called

18     into question --

19             MR. McFARLAND:  I do not.

20             THE COURT:  You just have the criminal one?

21             MR. McFARLAND:  Yup.

22             THE COURT:  Okay.  Well, 404(a) says:  Evidence of

23     a person's character or character trait is not admissible

24     to prove that on a particular occasion the person acted in

25     accordance with the character or trait.

Direct - Kliesch

 1          And the rule goes on to list exceptions that

 2     appear to be limited to the criminal context.

 3          MR. McFARLAND:  Yeah, I think I'm looking at it

 4     more as reputation and the type -- and that type of

 5     evidence, Your Honor.

 6          And, really, I can wrap this up with, you know, a

 7     single question to the effect:  Have you -- have you seen

 8     or observed his interactions with women?  And have you seen

 9     him act inappropriately to women?

10          MR. BALDRIDGE:  That's --

11          MR. McFARLAND:  That question's been asked and

12     answered by four or five witnesses by both sides at this

13     point.

14          THE COURT:  Well, response on that.

15          MR. BALDRIDGE:  First of all, I don't believe it's

16     been answered by four or five witnesses at this point.

17     Secondly, the fact that it's two questions does not make it

18     any less of a violation of Rule 404(a)(1).

19          The way he articulated the question is exactly

20     what Rule 404(a) prohibits in civil cases.  It is exactly

21     that.  And I fear, Your Honor, not only with this witness,

22     because he didn't see anything, and Ms. Melcher, who's

23     coming later, who didn't see anything, you know, actually

24     happen, that that's all we're doing is bringing in friends

25     to say, "I like him, he acted like a nice man, he acted

Direct - Kliesch

1    respectfully, so, therefore, he must have been acting

2    respectfully when he did it here."  That's exactly what's

3    prohibited.

4            THE COURT:  Okay.  However, I see a difference

5    between testimony about character, which is what this rule

6    goes to, and I agree with Mr. Baldridge on character.  So

7    to the extent you were thinking of going down that road

8    about his character, then I'm not going to let you go into

9    that.

10           If you want to ask has he ever seen him

11   inappropriately touch other women, I don't believe that

12   that's character.  I think that's outside of 404 and I'll

13   let you do that.

14           MR. McFARLAND:  Okay.  Thank you, Your Honor.

15           MR. BALDRIDGE:  And I just want to make the record

16   clear:  I believe that that is exactly what's prohibited by

17   Rule 404(a).

18           THE COURT:  You've made your objection.

19           MR. SCHAUDIES:  I'm sorry, Your Honor, but Mrs.

20   Swift -- not Taylor Swift -- is really feeling ill again

21   and if it's possible to have a break shortly and then allow

22   her -- excuse her for at least a time, perhaps a day.  We

23   would ask your permission.

24           THE COURT:  All right.  How long is she going to

25   need?

                              Direct - Kliesch

1            MR. SCHAUDIES:  I don't know, Your Honor.  I
2    didn't get a chance to -- she's had a recurring condition
3    for a long time.  Now, frankly, three weeks ago I took her
4    to the hospital for several days because of this.  It's
5    very hard to predict how long and how deeply it impacts --
6            THE COURT:  Okay.  What -- I will release her.
7    But what would you like me to say to the jury?
8            MR. SCHAUDIES:  Simply that she's not feeling well
9    and you excused her.
10           THE COURT:  Okay.
11           MR. SCHAUDIES:  If that's okay.
12           THE COURT:  Sure.  How much longer do you have
13   with this witness?  I'm not trying to rush you.
14           MR. McFARLAND:  No.  I -- 10 minutes -- five, 10
15   minutes.  We're closer to the end.
16           THE COURT:  Because she -- can she go another five
17   minutes?
18           MR. SCHAUDIES:  We'll do that, yes, sir.
19           THE COURT:  Let's finish up his direct and then
20   we'll take the morning break.  And then when we come back,
21   I'll tell them that she's continuing to feel -- not feel
22   well and I've excused her for the day.
23           MR. SCHAUDIES:  Thank you very much.
24           MR. McFARLAND:  Thank you, Judge.
25       (End of discussion at sidebar)

836

Direct - Kliesch

1  BY MR. McFARLAND:

2  Q.   Mr. Kliesch, you've had a lot of time and opportunity

3  to view or to see Mr. Mueller's interactions with women,

4  correct?

5  A.   Yes, sir.

6  Q.   Has Mr. Mueller ever -- have you ever seen him

7  inappropriately touch a woman?

8  A.   No.

9  Q.   Have you ever seen him, then, be disrespectful to a

10  woman?

11  A.   Never.

12  Q.   Have you ever seen him be demeaning?

13  A.   No.

14  Q.   Or condescending?

15  A.   No.

16  Q.   How would you describe how Mr. Mueller treats women,

17  generally?

18         MR. BALDRIDGE:  Your Honor, that's wheelhouse

19  404.

20         THE COURT:  Sustained.  Sustained.

21  BY MR. McFARLAND:

22  Q.   While you were working at KYGO, the station wanted to

23  bring on a third member to the team; is that right?

24  A.   Yes, it is.

25  Q.   What do you recall about that situation?

837
                            Direct - Kliesch

1     A.    That was agreed upon before we even took the -- our

2     job.  It was written in our contract that the show was also

3     going to involve a third-party female and that the two of

4     us would have a say in who that third person would be.

5     Q.    Did -- did you have an opinion on whether you wanted

6     that third person to be male or female?

7     A.    It was agreed that that was going to be a female

8     because, you know, there was already the two males, and we

9     wanted to have a female opinion on the show.

10    Q.    That was something that you wanted?

11    A.    That's something that everybody wanted.

12    Q.    Something that Mr. Mueller wanted?

13    A.    Yes.

14    Q.    And the radio station wanted that?

15    A.    Yes.

16    Q.    Did -- did the KYGO team, including you, identify

17    people who would -- potential people to fill that role?

18    A.    Yes, we did.  It was a pretty extensive process.  We

19    took several applications and had a long list of potential

20    people, and then we had to narrow it down to a short

21    list.

22    Q.    How many people made the short list?

23    A.    Four or five.

24    Q.    And all four or five of those people were female?

25    A.    Yes.

838
Direct - Kliesch

1    Q.   And Ms. Tracy Dixon was one of those four or five?

2    A.   She was; however, Tracy did not go through the process

3    that everybody else went through.  Tracy just sort of

4    appeared, based on a meeting that she had with Eddie.  And

5    apparently she had sent audio and a resume to our

6    consultant as well, and then she became a contender based

7    on what our management and consultant --

8    Q.   Who else was --

9         THE COURT:  You know, Mr. McFarland, let's --

10   based on the discussion we had at the sidebar, I think it

11   seems like you're going to take a few more minutes.  I'll

12   take our morning break at this time.

13        We will be in recess for 20 minutes.

14        (Jury left the courtroom at 10:20 a.m.)

15        THE COURT:  Mr. Kliesch, you're our first nonparty

16   witness that we took a break in between your -- or in the

17   middle of your testimony, so you're in the middle of your

18   testimony, I direct you not to speak with any of the

19   lawyers during the break.

20        THE WITNESS:  Yes, sir.

21        MR. BALDRIDGE:  Mr. McFarland -- with his

22   permission I would like to approach for something off the

23   record, very quick.

24        THE COURT:  All right.

25        (Discussion off the record)

839
Direct - Kliesch

1      (Recess at 10:23 a.m.)

2      (In open court outside the presence of the jury at

3   10:45 a.m.)

4          MR. BALDRIDGE:  Your Honor, one more time.  I

5   assure you it will be worth your time.

6          THE COURT:  On the record?

7          MR. BALDRIDGE:  Let's hold off for a minute and

8   then we'll see.

9      (Discussion off the record)

10      (Jury was present at 10:48 a.m.)

11          THE COURT:  Mr. McFarland -- ladies and gentlemen

12   of the jury, as you were able to see, Ms. Andrea Swift was

13   with us earlier today, but, unfortunately -- she made a

14   valiant effort, but is still not feeling well and so,

15   through her counsel, they've requested that she be released

16   for the day.  I have released her.  Please do not attach

17   any significance to the fact that she's not present for the

18   remainder of the day.

19          All right.  Mr. Kliesch, I remind you that you

20   remain under oath.

21          Mr. McFarland, you may resume your direct

22   examination.

23          MR. McFARLAND:  Thank you, Your Honor.

24   BY MR. McFARLAND:

25   Q.   Mr. Kliesch, before the break, we were talking about

Direct - Kliesch

1    adding a third member to the morning show team.

2    A.    Yes.

3    Q.    And I think you had told us that there was a search

4    and, ultimately, a short list of four or five female

5    cohosts -- or there were four or five female cohosts that

6    made the short list.

7    A.    That is correct.

8    Q.    Did you and Mr. Mueller have a chance to spend time

9    with those four or five potential -- or those four or five

10   applicants?

11   A.    Yes, we did.

12   Q.    And what -- what sort of interaction did you have with

13   them?

14   A.    Well, we -- we obviously met them at the radio

15   station.  Took each one of them to dinner.  We took them

16   all to the same place.  I believe it was Bonefish Grill,

17   with the exception of Tracy.  We went to lunch with Tracy,

18   Eddie, and Steve, our consultant.

19   Q.    Okay.  Is there any particular reason why you didn't

20   go to the same dinner with Tracy Dixon?

21   A.    You know, it was -- that -- I really don't know.

22   They -- we all went out that day.  It was suggested by

23   Eddie or Steve that we all go to lunch and we went to lunch

24   that day.

25   Q.    How did you feel -- how did Ms. Dixon compare with the

Direct - Kliesch

1    other applicants that made the short list?

2    A.    I didn't feel like Tracy was a good fit for our show.

3    And for the -- for the only reason, really, that we really

4    were looking for somebody that did not sound like they were

5    in radio.  We wanted somebody that just sounded like an

6    everyday person and, in my opinion, Tracy sounded more like

7    a DJ.  And that wasn't what Dave and I were looking for.

8    Q.    Do you know whether Mr. Mueller had the same feeling

9    as you did towards Ms. Dixon and how she would fit?

10   A.    Yeah.  We shared the same opinion.

11   Q.    Mr. Haskell, he was involved in this process of

12   looking for a third member of the team?

13   A.    Yes, he was.

14   Q.    And did he feel the same way as you and Mr. Mueller

15   about how Ms. Dixon might fit?

16   A.    No.  Eddie -- it was pretty obvious that Eddie was

17   really deadset on Tracy from the get-go.  The first time I

18   heard Tracy's name brought up was when Eddie came back from

19   a convention in Nashville where he had met her and he came

20   back to Denver and immediately said, "I've found the girl."

21            And we're like, "Really?  Who is it?"

22            And at that point, I mean, she -- I mean, I -- I

23   hadn't heard her name.

24   Q.    Did the disagreement between you and Mr. Mueller on

25   one hand and Mr. Haskell on the other hand, did it cause a

842
Direct - Kliesch

1    problem?

2    A.    Yeah.

3    Q.    How?

4    A.    Well, we had a -- we had an agreement between the four

5    of us, Dave, myself, Eddie and Steve, we worked as a team,

6    and the whole agreement was we have to be totally honest

7    with one another at all times otherwise, you know, this

8    isn't going to work.

9           So when they would ask our opinion on who we

10   thought we would be able to work with best, we just told

11   them.  And I just don't think that Eddie really liked that

12   we didn't like the person that he liked.

13   Q.    Did Mr. Haskell threaten your employment over anything

14   to do with the hiring of Ms. Dixon?

15   A.    Well, at one point, we got a call from our agent that

16   said that she had received a phone call from John Dimick,

17   who was ultimately Eddie's boss, he was the vice

18   president --

19           MR. BALDRIDGE:  Objection.  Now into double

20   hearsay.

21           THE COURT:  Sustained.

22   BY MR. McFARLAND:

23   Q.    The question that I had is:  Did Mr. Haskell threaten

24   your job as a result of having -- of anything having to do

25   with Ms. Dixon or the retention of Ms. Dixon?

843

Direct - Kliesch

1    A.   Well, at one point he did pull us into his office and

2    he said, "I've looked at your contracts, and I know it

3    would cost a lot of money to get rid of you guys, but if

4    you want to walk down to Bob Call's office and have that

5    conversation, I'd be more than happy to do that."

6    Q.   And you think that related to the disagreement about

7    who the third cohost should be?

8    A.   I would have to say that it had largely something to

9    do with it.

10   Q.   How did you get along with Mr. Haskell?

11   A.   I got along with him as best that I could.  I mean, I

12   treated him respectfully and did everything that he asked

13   of me to do.  We invited him out to lunch on several

14   occasions, every single one of which was declined.

15            When he was hired, we reached out to him and

16   called him to congratulate him and to welcome him, so I

17   think that, you know, we treated him as respectfully as you

18   would treat anybody that you work for.

19   Q.   Prior to June 2d, 2013, did you have any indication

20   that KYGO was considering terminating you?

21   A.   Other than the conversation that I just brought up, I

22   had no reason to -- to think that my job was in jeopardy,

23   no.

24   Q.   As of June 2d, 2013, did you think your job was in

25   jeopardy?

844
                              Direct - Kliesch

1    A.    No.  I was a little nervous.

2    Q.    Let's talk about June 2d, 2013.  Do you recall going

3    to Ms. Swift's concert at the Pepsi Center on that day?

4    A.    I do.

5    Q.    And you were doing that at the request of Mr. Haskell?

6    A.    Yes.

7    Q.    Did you have conversations with Mr. Mueller about

8    attending that concert?

9    A.    Yeah.

10   Q.    What do you recall about those conversations?

11   A.    Well, I -- we knew that we were going down to the

12   Pepsi Center that night for the show and that there was

13   going to be a meet-and-greet at the show, which is kind of

14   odd because we never did meet-and-greets.  The whole time

15   we were here, we never went backstage, with the exception

16   of -- well, with the exception of one time, we never went

17   backstage for anyone.  Eddie reserved those for -- for

18   people that he knew.

19   Q.    Were you required to go to the meet-and-greet -- to

20   Taylor Swift's pre-concert meet-and-greet?

21   A.    Yes.

22   Q.    And that was required by Mr. Haskell?

23   A.    Yes.

24   Q.    That was part of the job?

25   A.    Yes.

Direct - Kliesch

1    Q.    On the evening of June 2d, 2013, how did -- how did

2    you get to the Pepsi Center?

3    A.    I took the light rail.

4    Q.    And who did you go with?

5    A.    My wife.

6    Q.    Was Mr. Mueller or Ms. Melcher with you?

7    A.    No.

8    Q.    Did Mr. Haskell go with you?

9    A.    No.

10   Q.    Did -- what time did you -- do you recall arriving at

11   the Pepsi Center?

12   A.    We were supposed to be there at 5:00.  I pride myself

13   on being a little early, so it was a little before 5:00

14   when my wife and I met Eddie in front of the Pepsi Center.

15   Q.    Was Mr. Mueller and Ms. Melcher there at that time?

16   A.    No, they hadn't gotten there yet.

17   Q.    Did you wait for Mr. Mueller and Ms. Melcher?

18   A.    I wanted to, but as soon upon -- as soon as we got

19   there, Eddie was like, "You ready to go meet Taylor?"

20          And we were like, "Well, okay, should we -- should

21   we wait for Dave?"

22          And he's like, "Well, go ahead and give him a

23   call."

24          So I gave him a call and said we were heading

25   down, you know, to go meet Taylor.

                            Direct - Kliesch

1    Q.    Did you have any -- and then you met Taylor that --

2    A.    I did.  Before -- before we got in there, I'd asked

3    Eddie if we should wait for Dave and he said, "No, he's

4    going to go back with another group."

5    Q.    Okay.  How -- how long did you meet with Ms. Swift?

6    A.    I mean, it wasn't very long.  Just maybe a minute or

7    so, you know.  You say, "Hi."  And there's other people

8    back there that she's got to, you know, say "Hi" to and

9    take pictures with, that sort of thing.  So . . .

10   Q.    And -- and after you met with Ms. Swift, did you stick

11   around and watch some of the concert?

12   A.    After we met Taylor, we went on a tour of the

13   backstage area and what goes on behind the scenes.  And her

14   mother headed up that tour.  So the group that I was with

15   went on that -- on that little excursion.

16   Q.    Then did you stay for some or all of the concert?

17   A.    I went back to -- to where our seats were and that's

18   when everything started getting a little weird and I

19   ultimately wound up leaving.

20   Q.    What happened?

21   A.    Well, I had got a call from Eddie and Eddie said,

22   "Plan on doing the show by yourself tomorrow."

23              And I said, "Why?"

24              And he said, "Well, we'll" --

25              MR. BALDRIDGE:  Objection, Your Honor.  Hearsay.

Direct - Kliesch

1          MR. McFARLAND:  It's not being offered for the

2     truth of the matter asserted.

3          THE COURT:  Overruled.  Go ahead, sir.

4          THE WITNESS:  He said, "We'll talk about it

5     tomorrow.  You know, something happened."

6          And so I didn't know what was going on.  Tried to

7     call Dave and ultimately wound up getting in touch with him

8     when I was waiting for my train at the light rail.  And

9     that's when I got the story of what had happened.  It's

10    like, "You're not going to believe this."

11    Q.   And did you believe it once you heard the story?

12    A.   I thought it was a joke at first, to be honest with

13    you.

14    Q.   You thought Mr. Mueller was joking --

15    A.   I thought -- I thought, yeah, I thought, you know,

16    Ashton Kutcher was going to like pull up behind me and say

17    that I'm on some kind of Candid Camera show.  I did not

18    believe what was happening.

19          So we talked --

20          MR. BALDRIDGE:  Your Honor -- no question, Your

21    Honor.

22    BY MR. McFARLAND:

23    Q.   What happened next with respect to this incident?

24    A.   I talked to him while I was waiting for my train.  Got

25    on my train and then talked to him again when I got home.

Direct - Kliesch

1   Sat in the backyard lawn chair and went over what had

2   happened, and basically was just -- I just -- essentially I

3   was in shock.  I could not believe what had happened.

4   Q.   Did Mr. Mueller ever acknowledge to you that he

5   inappropriately touched Ms. Swift?

6   A.   No.

7   Q.   Did he consistently deny the inappropriate touching?

8   A.   He just said he didn't -- he didn't do anything.

9   Couldn't believe what had happened.

10  Q.   You and I met a couple of years ago; do you recall

11  that?

12  A.   Yeah.

13  Q.   And that was with respect to a separate legal issue,

14  correct?

15  A.   Yes, sir.

16  Q.   It didn't have anything to do with this lawsuit.

17  A.   No.

18  Q.   Do you recall how long we met for?

19  A.   I -- maybe 30 minutes.

20  Q.   Have you met at any time with any of the lawyers here

21  at defendants' counsel's table?

22  A.   Had a conversation with -- with Mr. Baldridge and

23  Entercom's attorney and Bonneville's attorney.

24  Q.   When was that?

25  A.   That was, you know, a month and a half ago, maybe.

849

Direct - Kliesch

1    Q.   And -- and why did you -- is that the only

2    conversation that you've had with defendants' counsel?

3    A.   Yes.  I was told -- notified by Entercom's attorney --

4    and I work for Entercom now -- that Taylor's attorneys

5    wanted to talk to me and wanted to know if I was going

6    to --

7              THE COURT:  Can you stay close to the mike, sir.

8              THE WITNESS:  That Taylor's attorneys wanted to

9    have a conversation to me, that it was off the record.

10   They just wanted to have --

11             MR. BALDRIDGE:  Your Honor.  Your Honor --

12             THE WITNESS:  -- an idea of what I would say.

13             MR. BALDRIDGE:  Let me interrupt, Your Honor.  I

14   know that Mr. Dash would perhaps want to be here about his

15   direct communications.  This gentleman's represented by

16   independent counsel.  I'm worried about privilege issues.

17             It's not my objection, I just know Entercom is not

18   here today.

19             THE COURT:  Right.  Mr. Kliesch, let's -- you

20   know, as you're probably aware, there's attorney-client

21   privilege to communications between counsel and clients.

22   So to the extent you can answer the question without going

23   into those discussions, you can do so.

24             But if you can't answer the question without doing

25   so, then do not.

Cross - Kliesch

1          THE WITNESS:  I understand.

2          I had a conversation about the night of June 2d.

3    BY MR. McFARLAND:

4    Q.   With Mr. Baldridge?

5    A.   Yes.

6    Q.   And in -- were you required to converse with Mr.

7    Baldridge by your employer?

8          MR. BALDRIDGE:  Objection, Your Honor.  That would

9    bring in hearsay, potentially privileged communications,

10   and certainly has nothing to do with my clients, so it's

11   irrelevant.

12         THE COURT:  To the extent you can answer without

13   going into discussions with your employer's lawyer, go

14   ahead.

15         THE WITNESS:  Being a new employee, I felt that it

16   was in my best interests to do what I was told.

17   BY MR. McFARLAND:

18   Q.   Okay.  Fair enough.  Thank you very much.

19         THE WITNESS:  Okay.

20         THE COURT:  Cross-examination.

21                    CROSS-EXAMINATION

22   BY MR. BALDRIDGE:

23   Q.   You know, I may not have been listening, but you're

24   Ryno as well, right?

25   A.   I am.

851

Cross - Kliesch

1    Q.   What do you prefer, Ryno or Mr. Kliesch?

2    A.   Mr. Kliesch.

3    Q.   We spoke on the phone for a few minutes a few months

4    ago, right?

5    A.   We did.

6    Q.   And you had two lawyers there from two different

7    organizations representing your interests, correct?

8    A.   Correct.

9    Q.   And I --

10   A.   Well --

11   Q.   Go ahead.

12   A.   I don't know that they were representing me.  It's

13   just that they work for the company that I work for

14   currently and that had worked for previously.

15   Q.   They certainly weren't representing me, were they?

16   A.   No, sir.  Not that I know of.

17   Q.   And to remove the mystery of all this, all I did was

18   ask you to tell me the facts as you knew them, right?

19   A.   That is correct.

20   Q.   In fact, I told you directly, "Tell me the truth,

21   because that's all we want."  Right?

22   A.   Yes, sir.

23   Q.   Now, you had some testimony about Mr. Haskell and the

24   hiring of the third host, Ms. Tracy Dixon, I believe, and

25   various other candidates.  Do you recall that generally?

852
Cross - Kliesch

1    A.    Yes.

2    Q.    That was happening before June 2d, 2013, correct?

3    A.    Yes.

4    Q.    And any of that tension or disagreement with Haskell

5    on one side and you and Mr. Mueller on the other had

6    nothing to do with the defendants in this lawsuit, right?

7    A.    Correct.

8    Q.    And do you remember, sir, when we spoke, you told me,

9    didn't you, that the real dispute here is between Mr.

10   Mueller and KYGO, didn't you?

11   A.    Could you rephrase that question?

12   Q.    When we spoke, you said to me that the real dispute

13   here is between Mr. Mueller and KYGO Lincoln, didn't you?

14   A.    What I said was the reason why Mr. Mueller was suing

15   Ms. Swift was because it was the alleged event which caused

16   KYGO to fire him.

17   Q.    Not my question.  Is it your testimony to this jury

18   that when we spoke, you did not tell me that a real

19   dispute -- the real dispute existed between Mr. Mueller and

20   KYGO?

21   A.    That's not what I said.

22   Q.    So you deny saying that?

23   A.    Yeah.  I --

24   Q.    Now, Mr. Mueller's your best friend, right?

25   A.    He is one of my best friends.

Cross - Kliesch

1    Q.    You're very loyal to him, right?

2    A.    Yeah.

3    Q.    And you care about him.

4    A.    I do.

5    Q.    And your team was on push-ups when the two of you were

6    together, right?

7    A.    We --

8    Q.    That's what you said, right?

9    A.    I did.  We were very good.

10   Q.    Something magical, I think you said, right?

11   A.    Yes.

12   Q.    You would love to get that team back together,

13   wouldn't you?

14   A.    It would be great.

15   Q.    And after Mr. Mueller grabbed Ms. Swift's rear end,

16   it's kind of hard to do that, right?

17   A.    It may be.

18   Q.    Now, the -- you talked about your history in radio.

19   Had you and Mr. Mueller ever worked together for a country

20   station prior to KYGO?

21   A.    No.

22   Q.    In fact, in San Diego, what was the format there?

23   A.    Top 40 station.

24   Q.    And you guys have worked in rock-and-roll, both of

25   you, right?

854
Cross - Kliesch

1   A.   A hybrid of rock station.

2   Q.   And prior to the engagement at KYGO, neither of you

3   had ever worked for a country station, right?

4   A.   I did.

5   Q.   Okay.  Mr. Mueller had not, right?

6   A.   No, sir.

7   Q.   His experience was different than the country music

8   station experience, right?

9   A.   He hadn't worked at a country station.

10   Q.   And you agree, don't you, that the country music

11   family, if you will, is a little different than the other

12   radio genres, isn't it?

13   A.   When you say "family," what do you mean.

14   Q.   Well, there's -- there's an interaction, for example,

15   between artists and radio in the country music industry

16   that doesn't necessarily exist in the pop industry, right?

17   A.   I wouldn't say that.  I -- I think that, you know,

18   whether you're a pop station or a country station, you're

19   going to be talking with artists and you're going to be

20   talking with listeners, and -- I mean, for the most part --

21   and a lot of those listeners cross over.  There are country

22   fans that listen to pop music.

23   Q.   So you and Mr. Mueller approached the country music

24   experiences the same way you approached any other radio

25   station.

855
                              Cross - Kliesch

1    A.    No, sir.

2    Q.    That's right.  Now, the night of June 2d, 2013, you

3    were not in the meet-and-greet with Mr. Mueller, right?

4    A.    Correct.

5    Q.    So you have nothing to tell this jury about what

6    actually happened there, right?  You didn't see it?

7    A.    Correct.

8    Q.    And you were not present when Mr. Mueller was

9    approached by security at the facility, were you?

10   A.    I wasn't.

11   Q.    So you have nothing to tell the jury about what

12   happened in that instance, right?

13   A.    Okay.

14   Q.    Is that fair?

15   A.    That's fair.

16   Q.    And you were not present when Mr. Mueller met Mr.

17   Haskell outside the facility that night of June 2d, 2013,

18   right?

19   A.    I wasn't.

20   Q.    So you have nothing to tell this jury about whether or

21   not Mr. Haskell, himself, confessed to the improper conduct

22   that night, right?

23   A.    This -- Mr. Haskell --

24   Q.    Sir, that's not what I asked you.  Listen to my

25   question.

856

Cross - Kliesch

1            You weren't present, right?

2    A.    I wasn't present when he said that --

3    Q.    You weren't present so you don't know that he said

4    that, correct?  Sir?  Did you --

5    A.    No, that's not correct.

6    Q.    Did you -- did you hear Mr. Haskell say it?

7    A.    Yes.

8    Q.    When?

9    A.    He said it to me after our meet-and-greet.

10   Q.    He said what?

11   A.    He said to me that when he hugged Taylor, he thought

12   that she had biker shorts on underneath her skirt.

13   Q.    Now, let me ask you this --

14   A.    And that's -- that's what he said.

15   Q.    Did that have anything to do with anything wrongful

16   done by Ms. Swift?

17   A.    Not that I would -- no.

18   Q.    So to the extent that Mr. Haskell did say that to you,

19   that's a KYGO issue, correct?

20   A.    Say that again.

21   Q.    Mr. Haskell's a KYGO employee, right?

22   A.    That is true, yes.

23   Q.    So to the extent Mr. Haskell said that, that is a KYGO

24   issue to deal with, right?

25   A.    Okay.  Yeah.

857
Cross - Kliesch

1    Q.    And did you report it to KYGO?

2    A.    No.

3    Q.    No?  It wasn't important?

4    A.    Eddie said --

5    Q.    Sir, I didn't say that --

6    A.    -- a lot of things.

7    Q.    -- was it important?

8          Was it important?

9    A.    I really just dismissed a lot of things that Eddie

10   said because, quite honestly, I didn't believe a lot of

11   things that Eddie said.

12   Q.    You didn't like Mr. Haskell, did you?

13   A.    I wouldn't say that I disliked him; it was challenging

14   to work with him a lot of the time.

15   Q.    Now, do you agree that if either Mr. Haskell or Mr.

16   Mueller inappropriately touched Ms. Swift, that she had a

17   right to report it?

18   A.    Absolutely.

19   Q.    And do you believe that if either Mr. Haskell or Mr.

20   Mueller touched Ms. Swift, that KYGO had a right to know?

21   A.    Yes.

22   Q.    And do you agree that if either Mr. Haskell or Mr.

23   Mueller inappropriately touched Ms. Swift, KYGO had the

24   right to investigate?

25   A.    Yes.

Cross - Kliesch

1  Q.   And do you agree that if either Mr. Haskell or Mr.

2  Mueller inappropriately touched Ms. Swift, as determined by

3  a KYGO investigation, they had the right to terminate the

4  one that did the bad act?

5  A.   If there was an investigation, yeah.

6  Q.   Now, you said that Mr. Mueller called you the night of

7  June 2d, 2013.  I think on two occasions; is that right?

8  A.   Yes.

9  Q.   And did you also say that he -- you've spoken to him

10  about the alleged incident of June 2d, 2013, several times

11  since?

12  A.   Yeah.

13  Q.   On how many occasions did you speak with Mr. Mueller

14  about it, approximately, from June 2d, 2013, all the way

15  until, let's say, 2015?  I'm looking for an estimate.

16  A.   I don't know.  A lot, probably.

17  Q.   A lot?

18  A.   It's a pretty big deal.

19  Q.   Yeah.  Did he -- did he tell you that he destroyed his

20  cell phone?

21  A.   I know that there was an incident where he spilled

22  coffee on a laptop.

23  Q.   Did he tell you that he threw his cell phone in the

24  garbage?

25  A.   I don't believe he did, no.

Cross - Kliesch

1   Q.   Did he or Mr. McFarland ever come to you, his best

2   friend, and say, "Sir, I'd like to look at your cell phone

3   and your laptop to see what messages and what

4   communications Mr. Mueller had with you between June 2d,

5   2013, and present"?

6   A.   No.

7   Q.   This jury will never know what's there, will they?

8   A.   What's -- with a phone conversation?

9           MR. BALDRIDGE:  Thank you.

10          THE COURT:  Redirect.

11          MR. McFARLAND:  No questions, Your Honor.

12          THE COURT:  All right.  May this witness be

13  excused?

14          MR. McFARLAND:  Yes.

15          THE COURT:  For the defendants?  Mr. Baldridge?

16          MR. BALDRIDGE:  No -- nothing further, Your Honor.

17  I'm sorry.

18          THE COURT:  All right.

19          MR. BALDRIDGE:  I'm forgetting the counterclaim

20  right to ask more.  I'm forgetting it, that's why.

21          THE COURT:  All right, Mr. Kliesch, you may step

22  down.  You're excused.

23          Plaintiff may call his next witness.

24          MR. McFARLAND:  Plaintiff calls Shannon Melcher.

25          COURTROOM DEPUTY:  Right here, ma'am.

860
Direct - Melcher

1           SHANNON MELCHER, PLAINTIFF'S WITNESS, SWORN

2              COURTROOM DEPUTY:  Please be seated.  State your

3    full name for the record and spell your first and last

4    name.

5              THE WITNESS:  Shannon, S-h-a-n-n-o-n, Frances,

6    Melcher.  M, as in Mary, e-l-c-h-e-r.

7                        DIRECT EXAMINATION

8    BY MR. McFARLAND:

9    Q.    Good morning, Ms. Melcher.

10   A.    Good morning.

11   Q.    How are you currently employed?

12   A.    I am the vice president of sales for iHeart Media,

13   southern Colorado.

14   Q.    Generally what do you do in that position?

15   A.    I manage a team of account executives for both

16   Colorado Springs and Pueblo for the eight radio stations

17   that we manage down there.  I work with clients to get them

18   on the air with advertising campaigns, work with the DJs

19   for endorsement opportunities.  I just basically manage the

20   sales and advertising department.

21   Q.    How long have you held that position?

22   A.    It will be two years in September of this year.

23   Q.    What did you do before working for iHeart Radio?

24   A.    I owned a marketing agency.

25   Q.    What's the name of that agency?

861

Direct - Melcher

1    A.    Right Angle Resource.

2    Q.    And what did Right Angle Resources do?

3    A.    Sure.  Right Angle Resource was a full service

4    marketing agency, so we bought advertising for clients:

5    TV, radio, print, digital.  Full service agency.

6    Q.    How long did you work for Right Angle Resource?

7    A.    I started Right Angle Resource in, I believe, July of

8    2013, approximately.

9    Q.    What did you do before then?

10   A.    I was employed at Lincoln Financial Media for KYGO.

11   Q.    And what were your -- what was your title at KYGO?

12   A.    I was an account executive.

13   Q.    And how long were you with Lincoln Financial?

14   A.    I started, I believe, January of 2006.

15   Q.    And left around July 2013?

16   A.    That's correct.

17   Q.    Why did you leave?

18   A.    I left because I was ready to -- for something new,

19   ready for growth.  I had been an account executive there

20   for many years and thought it was time for a change.

21   Q.    While you were working for Lincoln Financial, did you

22   meet Mr. David Mueller?

23   A.    I did, yes.

24   Q.    Do you remember when you met him?

25   A.    I recall meeting David -- goodness, I believe in

Direct - Melcher

1    January of 2013.

2    Q.   Do you know what his position was?

3    A.   David was our morning drive talent show.  He worked

4    with Ryno.  It was the Ryno and Jackson Morning Drive

5    Show.

6    Q.   Can you describe for us your initial interactions with

7    Mr. Mueller.

8    A.   If I recall, Mr. Mueller and Ryno, or Ryan, were

9    introduced to us in a sales meeting that we had in January.

10   So they came in and introduced themselves, gave us a little

11   background of their history and who they were, and then

12   began work on the morning show, so . . .

13   Q.   Your initial relationship with Mr. Mueller, was it any

14   more -- anything more than a business relationship?

15   A.   Sure.  Not at the beginning, no.  They came in and

16   were very excited about this job, I think -- I remember

17   them referring to it as their dream job.  So they were

18   excited to get to know all the account executives and make

19   sure that they were jumping right into -- you know, to

20   really just embrace the position and work with the clients

21   right away and all the account executives, yeah.

22   Q.   Eventually, did your relationship with Mr. Mueller

23   develop into something more than a business relationship?

24   A.   Yes, it did.

25   Q.   When did you guys start dating?

863

Direct - Melcher

1    A.    I believe -- I remember a Super Bowl party in

2    February, I guess that would be, of that year, so around

3    that time period.  We began talking more outside of the

4    business platform.

5    Q.    Did you know Mr. Mueller before he -- before he joined

6    Lincoln Financial?

7    A.    No.

8    Q.    When did you stop dating Mr. Mueller?

9    A.    If I recall, we did date throughout that year and then

10   ended things slowly towards the end of that year.

11   Q.    End of --

12   A.    2013.

13   Q.    Was there a particular reason or event that ended the

14   relationship?

15   A.    There wasn't.  We just -- we just grew apart as a

16   couple.  But still remained friendly and friends.

17   Q.    How was it working with Mr. Mueller?

18   A.    It was wonderful, to be honest.  I think the account

19   executives at KYGO would -- would second that.  I think we

20   were all excited to have a new morning show that was ready

21   to embrace the station and -- and work with clients and

22   grow share in revenue.  That was our job.  So it was nice

23   working with them.

24        They -- as when I speak of them, I mean Jackson

25   and Ryno as a team.  They were a great team.  They worked

864
Direct - Melcher

1    well with clients.  I was actually able to save quite a bit

2    of revenue, personally, as an account executive perspective

3    because of the endorsements I was able to pass on to them,

4    so . . .

5    Q.   How much -- after you started dating, through the time

6    Mr. Mueller was terminated from KYGO, how much time on a

7    daily basis were you spending with Mr. Mueller?

8    A.   After he was terminated you asked?

9    Q.   Between the time you started dating --

10   A.   Oh, I'm sorry.

11   Q.   -- and the time he was terminated?

12   A.   It was as any relationship, I would suspect.  It grew

13   slowly and we started spending time together.

14   Q.   Do you know, were you spending all day, every day,

15   together, a couple hours a day together?  Can you just give

16   us a sense of how much time you were together.

17   A.   Okay.  Sure.  No, it wasn't all day every day.  We

18   both had jobs that we took very seriously, so at most

19   during the week, it was evenings.

20        You know, Mr. Mueller had to get up early for the

21   morning show, so not late nights.  So after hours, dinner.

22   We would talk during the day, "How's the show," typical

23   relationship things, I suppose.

24   Q.   How did Mr. Mueller treat you?

25   A.   Very well.  We had a very nice relationship.  We had

                           Direct - Melcher

 1    nice memories from the relationship, uhm-hum.

 2    Q.   Was he -- was he disrespectful?

 3    A.   Not at all.  I did not experience anything like that,

 4    no.

 5            MS. FOLEY:  Objection, Your Honor.  We're getting

 6    to the 404 area.

 7            THE COURT:  Okay.  Let's recall our conversation

 8    at the sidebar.

 9    BY MR. McFARLAND:

10    Q.   Did you have observations to see Mr. Mueller interact

11    with your friends and family?

12    A.   Sure.  Mr. Mueller met my family --

13            MS. FOLEY:  Same objection, Your Honor.

14            THE COURT:  Overruled.

15    BY MR. McFARLAND:

16    Q.   You can continue.

17            THE COURT:  Go ahead.

18            THE WITNESS:  Yes.  He met my family, he met my

19    mother, my grandmother and my sister, my mom -- or my dad,

20    my brother.  So he was very well acquainted with my family

21    and my friends, yeah.

22    BY MR. McFARLAND:

23    Q.   Either in the workplace or outside of the workplace,

24    did you see Mr. Mueller act disrespectful to any woman?

25    A.   No.

866

Direct - Melcher

1          MS. FOLEY:  Same objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  No, I did not.

4     BY MR. McFARLAND:

5     Q.   Did you ever see Mr. Mueller inappropriately touch

6     another woman?

7     A.   No, I did not.

8     Q.   Did Mr. Mueller ever inappropriately touch you?

9     A.   No.

10    Q.   Have you ever been inappropriately touched by a man?

11         MS. FOLEY:  Objection, Your Honor.  Relevance.

12         THE COURT:  Let's see how -- where we're going

13    with this.  Overruled for now.

14         MR. McFARLAND:  Thank you.

15         THE WITNESS:  I take that term very seriously.  If

16    you're asking whether there has been a circumstance

17    throughout my life that there's been uncomfortable touching

18    by a male, yes.

19    BY MR. McFARLAND:

20    Q.   And that happened during your employment with Lincoln

21    Financial?

22    A.   It did.

23    Q.   When -- when did that happen?

24    A.   I do not recall the date.  I do recall we were at a

25    concert.

867

Direct - Melcher

1    Q.   Was it prior to June 2d, 2013?

2    A.   Yes, it was.

3    Q.   And, just briefly, can you tell us what happened.

4    A.   The event in question was a concert, I believe a

5    Miranda Lambert concert from what I can recall.  There was

6    a gentleman that was employed by Lincoln Financial who

7    grabbed my behind as he was walking through the concert.

8    Q.   This was a coworker?

9    A.   It was, yes.

10   Q.   And you -- did you eventually tell KYGO about that?

11   A.   I did.

12   Q.   And did they do an investigation?  Do you know whether

13   they did an investigation?

14   A.   From my knowledge, I know that HR discussed this with

15   that individual, yes.

16   Q.   And they talked to you about it?

17   A.   Yes.

18   Q.   Do you know whether they talked to anybody else about

19   it?

20   A.   I do not.

21   Q.   Do you know whether KYGO took any -- or Lincoln

22   Financial took any action against that individual based on

23   your report of what he did to you?

24   A.   From what I am aware, HR had a conversation.  And from

25   that point on, it was deemed over, as long as it was

868

Direct - Melcher

1    documented as such.

2    Q.   Other than documenting it, do you know whether there

3    was any disciplinary action?

4    A.   I don't know.

5    Q.   Was this individual fired or did he continue to work

6    for the station after you made that report?

7    A.   He continued to work there, yes.

8    Q.   Do you remember the June 2d, 2013, concert?

9    A.   Yes, I do.

10   Q.   Who asked you to attend that concert?

11   A.   Mr. Mueller.

12   Q.   Is that the sort of thing -- were you excited about

13   attending?

14   A.   It's part of my career, it's part of my job, so I do

15   get excited to meet artists and just be out and about as

16   part of what I do.  Yeah.

17   Q.   Do you recall how you got to the concert?

18   A.   Sure.  David drove us both to the show.

19   Q.   Do you remember about what time you arrived?

20   A.   I recall we were running a bit late and so I think we

21   did arrive -- it would have been a little after 5:00, I

22   would suspect.

23   Q.   Okay.  Upon arrival, did you meet with Mr. Haskell?

24   A.   Briefly.  If I recall, the KYGO setup was outside the

25   Pepsi Center as we came in.  But there was no conversation

Direct - Melcher

1    *per se.*

2    Q.   Did you -- do you remember how you got your tickets?

3    A.   I had a voucher, a lanyard, if you will, that -- and I

4    had actually multiple of those because I do go to a lot of

5    shows.  Some shows require a special voucher, most shows

6    just require that you have your KYGO lanyards on.  And so

7    that's what I had on that day, yeah.

8    Q.   Did you have to go to Will Call to get tickets or were

9    you able to just walk right in, or do you remember?

10   A.   I believe we were just able to walk right in that

11   show, uhm-hum.

12   Q.   And did you go straight to -- well, how did you figure

13   out where you were supposed to go?

14   A.   So, we went into the Pepsi Center.  Typically we are

15   with our team.  For that day, I'm not sure why Mr. Haskell

16   and Ryno were already -- or had already gone down to the

17   meet-and-greet area.

18           So David and I went down to where we were

19   instructed to go to meet Taylor Swift.  And we were

20   instructed to go into a line that was different than the

21   media line.  I suspect because we were tardy, but I'm not

22   sure why we were in that line.  It was a little strange.

23   Q.   Why was that strange?

24   A.   Because typically, especially for David, we -- he's

25   not separated from talent and programming.  So that's why

Direct - Melcher

1    it was strange.

2    Q.   And did it feel strange to you -- I think you

3    mentioned that you had gone to a lot of these concerts.

4    A.   Uhm-hum.  Yeah, it was.  Usually I'm with the team as

5    well.  You know, it's less likely for account executives to

6    be with programming, but in this situation, it seemed as if

7    we should have been with them, yes.

8    Q.   Were you bothered that you weren't with the other

9    group?

10   A.   Not bothered, no.  It was a thought.  And then we just

11   moved on and got in the line that we were told to be in,

12   so . . .

13   Q.   And did you and Mr. -- how long did you wait in line?

14   A.   Oh, I can't recall.  It was a good while because we

15   were with the public and -- I didn't clarify that.  So we

16   were with moms and kids and everyone who was going to meet

17   Ms. Swift.

18   Q.   Do you remember how many people were in that line with

19   you?

20   A.   Approximately maybe 40.  35, 40 people.  Yeah.

21   Q.   Did you and Mr. Mueller have an okay time in the line?

22   Were you having a good time, bad time?

23   A.   Yeah, it was a great setup, quite honestly.  We

24   were -- it was nice to see the things she had set up.  I

25   believe it was a -- her Coca Cola tour, perhaps.  It was

871

Direct - Melcher

1    red, and her dresses.  And it was kind of like a museum, if

2    I recall.  So it was a nice way to enter into a

3    meet-and-greet, uhm-hum.

4    Q.    And I take it eventually you made your way up to a

5    room where you were meeting with Ms. Swift.

6    A.    Yes.

7    Q.    Tell me what you recall about the process from that

8    point.

9    A.    At that point, it was pretty standard to what I've

10   experienced before.  There was a separate entrance into the

11   area where Taylor was with the photographer.

12   Q.    What -- was there some -- was there a member of Ms.

13   Swift's team there to usher you in?

14   A.    If I recall, yes.

15   Q.    What do you recall -- did you recall any conversation

16   with the person on Ms. Swift's team that ushered you in?

17   A.    Not particularly, no.

18   Q.    Do you -- what do you recall about the -- the setup of

19   the room where you're going to have your picture taken with

20   Ms. Swift?

21   A.    Sure.  From what I recall, we walked in.  Our backs

22   were facing the back side of the tent, if you will.  Taylor

23   and I started talking.  There were a couple of younger

24   girls that were just visiting with her that had left the

25   area.

872

Direct - Melcher

1      Taylor and I just started a conversation and just

2   chitchatting.  We mentioned that we were with KYGO, she saw

3   my credentials, and we had a nice conversation, so --

4   Q.   And then what happened?

5   A.   We were talking and then quite suddenly it was picture

6   time.  So I was on Taylor's right side and Dave was

7   standing a little bit distant because she and I were in

8   conversation.

9      And we took a picture pretty quickly.  I remember

10  her putting her arm around me and leaning in and -- and

11  Dave was trying to get in from the left side.

12  Q.   As -- as you were getting in to what I would call

13  photo position --

14  A.   Yes.

15  Q.   -- did you see Mr. Mueller moving into the frame or

16  into the -- into the photo?

17  A.   I would imagine so.  I wasn't paying attention

18  directly to what he was doing to get into the photo.  It

19  happened very quickly, to be honest.  So I was aware he was

20  trying to get into the frame, yes.

21  Q.   Did you recall whether, you know, getting into this

22  photo position, was there a time where Ms. Swift was in the

23  middle, you're on her right very close to her, and Mr.

24  Mueller is on her left, again right up tight against her?

25  A.   No.  That was not the case.

873
Direct - Melcher

1    Q.   Your recollection is that Mr. Mueller was some

2    distance away --

3    A.   Yes.

4    Q.   -- at the time Ms. Swift said, "Let's take the photo"?

5    A.   Yes, absolutely.

6    Q.   And did you -- did you -- did you see in any form or

7    fashion Mr. Mueller moving towards you and Ms. Swift to get

8    into the photo or is that something -- well, did you see

9    it?

10             MS. FOLEY:  Objection.  Compound.

11             THE WITNESS:  I did not --

12             THE COURT:  Sustained.

13   BY MR. McFARLAND:

14   Q.   Did you see Mr. Mueller moving into the picture?

15   A.   I did not see him moving into the picture.

16   Q.   Did you sense Mr. Mueller moving into the picture?

17   A.   Yes.

18             MS. FOLEY:  Objection.

19             THE COURT:  What --

20             MS. FOLEY:  What -- vague.  She can speak to what

21   she actually observed but what does it mean "to sense"?

22             THE COURT:  She can testify to what she sensed.

23   Overruled.

24   BY MR. McFARLAND:

25   Q.   You sensed Mr. Mueller moving into the picture?

874
Direct - Melcher

1    A.    Sure.  Yeah.

2    Q.    And then shortly after that, the photograph was taken?

3    A.    Uhm-hum.  Correct.

4    Q.    And how far was the photo -- the photographer away

5    from you?

6    A.    I don't recall exactly, but a few feet, I would

7    suppose.  At the other end of the tent, so -- the tent was

8    maybe a 10-by-10 or 20-by-20 area.  So we were at one side

9    of the tent and she was on the other -- or she or he.  I

10   believe it was a she.

11   Q.    Was she closer or further away from the trash can in

12   front of you?

13   A.    A little further away.  Thank you.

14   Q.    Do you recall who else was in the room at the time the

15   photograph was taken?

16   A.    I really don't.

17   Q.    Do you know whether there was a big black man in the

18   room?

19   A.    There could have been.  I remember someone of a nature

20   of part of her team.

21   Q.    Do you remember how many other people were in the

22   room?

23   A.    I don't.  I was really focused on -- I was talking

24   with Taylor and getting ready for the picture, so . . .

25   Q.    Now, as and when the photograph is -- is being taken,

Direct - Melcher

1    did you notice any unusual movement from Ms. Swift?

2    A.    No.

3    Q.    Did you notice her lurch or move quickly towards you

4    and away from Mr. Mueller?

5    A.    No.

6    Q.    Was there -- did you observe anything at all that made

7    you think something odd might have happened during the

8    photograph?

9    A.    I really don't.  Taylor and I were talking in closer

10   vicinity, so when the photo was taken, it wasn't odd that

11   we were standing closer together.

12   Q.    And to the best of your recollection, you don't

13   recall, during the photograph, Ms. Swift jumping into you

14   or bumping into you?

15   A.    Not that I recall, no.

16   Q.    What happened after the photograph was taken?

17   A.    We left the area.  I remember there was a purse table,

18   so I gathered my purse.  And after that, we started going

19   upstairs away from the backstage area in the Pepsi

20   Center.

21   Q.    Did you have any -- did you -- did you say -- did you

22   have any conversation with Ms. Swift after the photograph,

23   but before you left the room?

24   A.    No.

25   Q.    Were there any pleasantries exchanged on your way out?

Direct - Melcher

1   A.    No.   Nothing atypical -- or abnormal, hhm-uhm.

2   Q.    Did anybody else in Swift's team communicate with you

3   on the way out?

4   A.    Not that I can recall any specifically, no.   Just --

5   if anything, just gather your purse, and we were kind of on

6   our way.

7   Q.    Okay.

8   A.    Yeah.

9   Q.    After you left the photo booth, what did you do?

10  A.    We went upstairs and went near the front entrance of

11  the Pepsi Center area.

12  Q.    Let me back up half a step.

13        Did you see Mr. Mueller inappropriately touch Ms.

14  Swift at any time in the photo booth?

15  A.    I did not.   Of course, I was facing forward.   I don't

16  have eyes in the back of my head.   But I did not see

17  anything of that type, no.

18  Q.    Did you notice anything odd or unusual or different

19  about Mr. Mueller's demeanor after you left the photo

20  booth?

21  A.    Yes.   I think -- as I referenced before, it was an

22  awkward situation from the beginning when we arrived, just

23  because we weren't with our team.

24        I think once we got into the line and things

25  started moving, it was, okay, well, we're just in this

877
Direct - Melcher

1       line.  No big deal.

2              Went through the process.  I did recall having a

3       conversation with David after the photo that it was a

4       strange meet-and-greet situation, meaning that the photo

5       was taken quickly.  You know, it -- it just felt odd to

6       him.

7       Q.   Did it feel odd to you?

8       A.   It was -- it was different in the fact that, again,

9       for me, from my standpoint, it was more we were with the

10      public, so that was the odd part for me.

11             Talking to David about it, it was odd because he

12      did feel like he was removed from the conversation.  I, at

13      some point, felt a little bad that I kept -- I, you know,

14      was talking with Taylor and not giving him the chance to

15      visit.

16             And he did mention it was odd to have to kind of

17      try to dive into the photo quickly, and that's how I

18      remember him putting it.

19      Q.   After you left the photo booth, did Mr. Mueller leave

20      you at some point to go outside?

21      A.   Yes.

22      Q.   And do you recall about how long he was gone?

23      A.   I would say maybe 15 minutes at the most, yeah.

24      Q.   And after that 15 minutes, did he come back and rejoin

25      you?

878
Direct - Melcher

1    A.    Yes.

2    Q.    And what -- what did you guys do then?

3    A.    We had a conversation.  I was inside on my phone while

4    he went out and visited with the KYGO team.  At that time,

5    Eddie Haskell was part of the KYGO team outside and there

6    was a promo person, a couple other people out there,

7    listeners, and David came back inside and we had a

8    conversation about what occurred.

9    Q.    And what did he relay to you about what occurred

10   outside?

11         MS. FOLEY:  Objection.  Hearsay.

12         MR. McFARLAND:  This is just being offered for

13   context, not the truth.

14         THE COURT:  Overruled.  You may answer.

15         THE WITNESS:  Okay.  From what David relayed to me

16   about the conversation, he was disturbed about what he had

17   heard.  He had said that he and Eddie Haskell were talking

18   about his meet-and-greet and how it went, and Eddie Haskell

19   disclosed to him that when he hugged Taylor Swift, he felt

20   biker shorts under her skirt.

21   BY MR. McFARLAND:

22   Q.    That was before you had any indication that Mr.

23   Mueller was accused of inappropriately touching Ms. Swift?

24   A.    Correct.

25   Q.    What happened next?

879
Direct - Melcher

1    A.    We discussed that for a minute.  Again, adding to kind
2    of the odd evening.  And I do recall there was a small bar
3    area, we went and purchased a cocktail.
4          Went through the -- I guess the hallway to the
5    arena in the Pepsi Center area.  And literally a couple
6    minutes after that is when the night changed.
7    Q.    The -- the cocktail that you purchased, that was an
8    alcoholic beverage?
9    A.    It was.
10   Q.    Had you -- did you and Mr. Mueller have any other
11   alcoholic beverages previous to that time on June 2d?
12   A.    No.  And not that I recall David.
13   Q.    Did you begin drinking the Sunday afternoon before the
14   concert?
15   A.    No.
16   Q.    Did you go out for dinner and drinks before you
17   arrived at the concert?
18   A.    No.
19   Q.    To the best of your knowledge, had Mr. Mueller
20   consumed any alcohol that evening prior to when you went
21   and bought the cocktails?
22   A.    Not to my knowledge, no.
23   Q.    What -- when you said that's when things changed, what
24   happened?
25   A.    Sure.  We had literally just purchased a beverage,

Direct - Melcher

1    gone into the area, and someone came up to David and asked

2    him to come with him.  We put our drinks on the floor.  I

3    stayed where I was and that was that.

4    Q.   Okay.  Did you hear what was being said at that time

5    between --

6    A.   Not at the time, I could not hear, no.

7    Q.   At any point that evening, did you hear conversation

8    between Mr. Mueller and the security team?

9    A.   I did later that evening, yes.

10   Q.   What did you hear?

11   A.   It was after the fact that this person took David

12   away, I was then escorted away.  I was first asked, if I

13   recall, "Are you here with Mr. Mueller?"

14           Of which, of course, I answered, "Yes."

15           We were then -- I looked back to see David at that

16   point interacting with someone and did not look like it was

17   a good interaction.

18           At that point, we were taken back into a hallway

19   and into some room.  I do not really recall what room it

20   was.

21   Q.   Did you hear any conversation between Mr. Mueller and

22   security at that point?

23   A.   I did.

24   Q.   What did you hear?

25   A.   To be honest, it was a more of an interrogation type

881

                          Direct - Melcher

1    of -- versus a conversation.  There was a gentleman

2    stating, "Are you happy with what you've done?  Are you

3    happy with what you've done?"

4          And I remember David literally standing against

5    the wall just saying, "I don't know what you're talking

6    about."

7          And that's what I recall.

8    Q.   Shortly after that, you were escorted from the

9    premises?

10   A.   Yes.

11   Q.   Did you have any interaction with the security -- the

12   security team that night?

13   A.   I did.  I was trying to help David, or maybe speak up

14   to where I could.  And I was told very bluntly to close my

15   mouth.

16   Q.   Did you -- did you -- did you tell security that you

17   were going to sue them or --

18   A.   No.

19   Q.   -- go legal on them or --

20   A.   No.

21   Q.   -- you don't recall anything like that?

22   A.   I do not recall anything like that.  The only

23   conversation that was had besides that was a -- I do

24   remember David trying to call Eddie Haskell or asking her

25   team to call the police if this was something that needed

Direct - Melcher

1    police interaction.

2    Q.    What was the rest of that -- did you spend the rest of

3    that evening with Mr. Mueller?

4    A.    I did.

5    Q.    And what was that like?

6    A.    Not fun.  It was a stressful evening.

7    Q.    And how so or why?

8    A.    I think it was very surreal.  Kind of a -- what just

9    happened?  You know, being escorted out of a show in our

10   position is a very serious thing.

11   Q.    You understand that Mr. Mueller was fired just a

12   couple of days after that?

13   A.    I do.

14   Q.    And -- and you and Mr. Mueller remained a couple for

15   several months after his termination?

16   A.    That's correct.

17   Q.    How was Mr. Mueller after his termination?

18          MS. FOLEY:  Objection.  Relevance and improper --

19   opinion testimony and character.

20          THE COURT:  Overruled.  Overruled.

21   BY MR. McFARLAND:

22   Q.    You can answer.

23   A.    I'm sorry, what was the question?

24   Q.    After Mr. Mueller's termination, how was he?

25   A.    Devastated.  He was blown away, really.  Kind of in a

Direct - Melcher

1    shock, so . . .

2    Q.   And, you know, as time passed, did -- did his demeanor

3    and how he acted improve?

4              MS. FOLEY:  Same objection.  Relevance.

5              THE COURT:  Overruled.

6              THE WITNESS:  Did it improve?  Or stay the same?

7    David, after he was terminated, it was life-changing for

8    him.  As I mentioned before, this was a dream job for him,

9    very important to David.  So to have something like this

10   occur and have a very serious, serious accusation against

11   him, I think it's -- I think it would be devastating to

12   anybody.

13   BY MR. McFARLAND:

14   Q.   Did you and Mr. Mueller have detailed conversations

15   about the alleged incident?

16   A.   We discussed it more like just going over and over in

17   our heads, like what could have -- what went wrong?  What

18   could have happened?  Asking ourselves all the questions

19   that you would being in that situation.  We did, obviously.

20   It was the topic of conversation all the time.

21   Q.   Did Mr. Mueller ever tell you that he inappropriately

22   touched Ms. Swift?

23   A.   No.

24   Q.   Did he consistently maintain that he did not

25   inappropriately touch her?

Cross - Melcher

1    A.    Yes.

2    Q.    Did his story ever change?

3    A.    His story did not change.

4          MR. McFARLAND:   Thank you very much.  I have no

5    further questions.

6          THE COURT:  Cross-examination.

7                    CROSS-EXAMINATION

8    BY MS. FOLEY:

9    Q.    Good morning, Ms. Melcher.

10   A.    Good morning.

11   Q.    I want to get the timeline down a little bit about

12   your relationship with Mr. Mueller.

13   A.    Okay.

14   Q.    You met him the end of January, 2013?

15   A.    Yes, ma'am.

16   Q.    And then you started dating a few weeks later?

17   A.    Approximately, yeah.

18   Q.    And so by June 3d, 2013, you'd been dating only a few

19   months, right?

20   A.    Correct.

21   Q.    And you did not know Mr. Mueller previous to that time

22   when you started dating --

23   A.    Correct.

24   Q.    -- in January?

25         You didn't know him for the first 50 years of his

885

Cross - Melcher

1    life.

2    A.    That would be accurate.

3    Q.    And I believe you said you worked with Mr. Mueller on

4    some promotions and endorsements for his show?

5    A.    Yes.

6    Q.    And you passed on some endorsements to Mr. Mueller?

7    A.    Uhm-hum.

8    Q.    And there were complaints made to your sales manager,

9    Mr. Silver, about your relationship with Mr. Mueller and

10   whether it might be swaying some endorsements his way?

11   A.    There was one account executive that had an issue with

12   it, yes.

13   Q.    And with respect to the meet-and-greet on June 2d,

14   2013, you thought it was unusual that you were in the

15   public line rather than in the media line, right?

16   A.    I did.

17   Q.    And you were in the line with the moms and kids; is

18   that what you said?

19   A.    Uhm-hum.

20   Q.    A lot of little girls in that line?

21   A.    Yes, uh-huh.

22   Q.    They were pretty excited to meet Taylor Swift?

23   A.    Of course.

24   Q.    And at the time that you entered the room to meet Ms.

25   Swift, she was finishing up with a group of little girls?

Cross - Melcher

1    A.   She was.

2    Q.   There was -- sorry, don't mean to talk over you.

3    Sorry, doing it again.

4         I'll let you finish, you let me finish, okay?

5    A.   Yes.

6    Q.   So there was some overlap between you and Mr. Mueller

7    coming into the room and the group ahead of you leaving?

8    A.   Just slightly, yes, uhm-hum.

9    Q.   And they're moving you pretty quickly through the

10   process there, weren't they?

11   A.   Typically, yeah.

12   Q.   And when you met Ms. Swift, her demeanor towards you

13   was very sweet, wasn't it?

14   A.   Yes.

15   Q.   And you and Ms. Swift had a conversation.

16   A.   We did.

17   Q.   And you told Ms. Swift you thought she was a great

18   role model for girls.

19   A.   I did.

20   Q.   And when it came time for the photo, I want to be

21   crystal clear about what you saw and what you didn't see.

22   You and Mr. Mueller were on different sides of Ms. Swift,

23   right?

24   A.   Correct.

25   Q.   And you were not looking over at Mr. Mueller, were

Cross - Melcher

1    you?

2    A.    No, I wasn't.

3    Q.    And you could not see what was going on behind you,

4    could you?

5    A.    That is correct.

6    Q.    That's because you don't have eyes in the back of your

7    head; is that correct?

8    A.    That is right.

9    Q.    And you're unaware of what happened behind Ms. Swift's

10   back, aren't you?

11   A.    I am unaware just due to that fact, yeah, due to that

12   nature.

13   Q.    Because you stayed strictly on your side of Ms.

14   Swift?

15   A.    Uhm-hum.

16   Q.    And --

17           THE COURT:  Ma'am, you have to respond yes or no.

18           THE WITNESS:  Yes.

19   BY MS. FOLEY:

20   Q.    And she did gravitate towards you in the picture?

21   A.    She did.

22   Q.    She's definitely closer to you in the picture than she

23   is to Mr. Mueller.

24   A.    Yes.

25   Q.    And you didn't see where Mr. Mueller put his hands

Cross - Melcher

1    during that picture?

2    A.   No.

3    Q.   You relayed to us a little while ago what Mr. Mueller

4    told you Mr. Haskell told him after the meet-and-greet.

5    A.   Uhm-hum.  Yes.

6    Q.   I just want to be clear:  You were not present for the

7    conversation between Mr. Haskell and Mr. Mueller, right?

8    A.   I was not present.

9    Q.   So anything you know about that conversation came from

10    Mr. Mueller?

11    A.   Yes.

12    Q.   And you talked about after the meet-and-greet when the

13    security people came to find you and Mr. Mueller, do you

14    remember that?

15    A.   Yes.

16    Q.   I just want to be clear:  The security team never

17    touched Mr. Mueller, did they?  Didn't rough him up?

18    A.   They did not rough him up.

19    Q.   And you remember Mr. Mueller saying someone should

20    call the police?

21    A.   Yes.

22    Q.   Mr. Mueller didn't call the police that night, did he?

23    A.   No.

24    Q.   Okay.  You had your cell phone with you?

25    A.   We did, if I recall, yeah.

Cross - Melcher

1   Q.   You didn't call the police that night, did you?

2   A.   No, I did not.

3   Q.   And Mr. Mueller didn't ask to use your cell phone to

4   call the police, right?

5   A.   No.

6   Q.   And you and Mr. Mueller could have easily called the

7   police that night.

8   A.   I suppose he could have.

9   Q.   Now, you did ask Mr. Mueller at one point whether he'd

10  inappropriately touched Miss Swift, didn't you?

11  A.   Yes, I did.

12  Q.   And his response was a little odd, wasn't it?

13  A.   In what way?

14  Q.   His response was, "How could you ask me that?", wasn't

15  it?

16  A.   It was --

17  Q.   Did he say that to you, Ms. Melcher?

18  A.   If I recall, because --

19  Q.   Did he say that to you, yes or no?

20  A.   Yeah.

21  Q.   And Mr. Mueller told you that the photo was awkward,

22  right?

23  A.   Yes.

24  Q.   I heard you testify a little earlier today about an

25  incident where a male colleague at KYGO touched your rear

                              Cross - Melcher

 1    end.  And, I'm sorry, this is a little delicate to have to

 2    talk about.  That was uncomfortable, wasn't it?

 3    A.   It was.

 4    Q.   And that employee -- the first time it happened, it

 5    was at an NHL hockey game?

 6    A.   If I recall, yes, it was.

 7    Q.   And that was roughly March 2013?

 8    A.   I don't recall the date, but, it -- yes.  Around that

 9    time, I would imagine, uhm-hum.

10    Q.   And you didn't report it to KYGO right away, did you?

11    A.   I did not.

12    Q.   You waited about two months to report it to KYGO?

13    A.   I don't believe I ever reported that incident.

14    Q.   Okay.  You reported later on after there was an

15    incident at a Miranda Lambert concert?

16    A.   That's what I recall reporting.

17    Q.   With the same --

18    A.   Situation.

19    Q.   -- male?  And it made you uncomfortable because you

20    were in a public place, right?

21    A.   Sure.

22    Q.   You didn't want to -- to report it, right?

23    A.   I was reluctant to due to the fact that this

24    individual has a habit of doing that to women.  And by no

25    means is it a joke, is it dismissed.

Cross - Melcher

1           At that time, I didn't feel it was necessary to go

2    to HR over that.

3    Q.   You just wanted to move on, right?

4    A.   You could say that, yes.

5    Q.   And Mr. Mueller pushed you to report it to HR at KYGO,

6    right?

7    A.   It bothered Mr. Mueller that someone had touched me

8    inappropriately.  It bothered him very much.  And he did

9    want me to go to report that to HR.  I did not want to and

10   we had that conversation.  It meant a lot that I did that,

11   and so I heard what he was saying, agreed with what he was

12   saying after we discussed it further, and did end up

13   reporting it, yes.

14   Q.   And you agree it was the right thing to report it to

15   HR.

16   A.   I do.

17   Q.   You agree that KYGO had the right to know about that?

18   A.   I'm sorry?

19   Q.   You agree that KYGO had the right to know that one of

20   its male employees was inappropriately touching women

21   employees?

22   A.   Agreed, yes, I do.

23   Q.   And you agree that if Mr. Mueller inappropriately

24   touched Ms. Swift, she had the right to report that to KYGO

25   as well, don't you?

892
Redirect - Melcher

1   A.   If she was touched inappropriately, yes.

2   Q.   Okay.  And -- and if Ms. Swift believes she was

3   inappropriately touched, KYGO -- by one of the KYGO

4   employees, KYGO had the right to know that, didn't it?

5   A.   They have the right to know if that occurred, yes.

6   Q.   And if a KYGO employee inappropriately touched Ms.

7   Swift, KYGO had the right to fire that employee, didn't

8   they?

9   A.   They would have that right, I suppose.

10          MS. FOLEY:  I have no further questions, Your

11   Honor.

12          THE COURT:  All right.  Redirect.

13                      REDIRECT EXAMINATION

14   BY MR. McFARLAND:

15   Q.   Ms. Melcher, you were asked a question about whether

16   Ms. Swift gravitated towards you during the photograph.

17   And I just want to make sure I'm clear.

18          Did Ms. Swift, during the taking of the

19   photograph, move towards you or were you already closer

20   together when the photo started?

21          MS. FOLEY:  Objection.  Compound and leading.

22          THE COURT:  It is compound.  Let's rephrase it.

23   BY MR. McFARLAND:

24   Q.   During the taking of the photograph, did Ms. Swift

25   move towards you in any manner?

Redirect - Melcher

1    A.    It was prior to the photograph that we were closer in

2    contact, having a conversation.  That stance continued into

3    the photograph.

4    Q.    And you didn't notice any movement after you were set

5    up to take the photograph?

6    A.    Not --

7    Q.    From Ms. Swift?

8    A.    Not that I noticed, no.

9    Q.    Ms. Swift started closer to you than to Mr. Mueller at

10   the time you set up for the photograph?

11   A.    From what I recall, yes.

12   Q.    Defense counsel asked you about asking Mr. Mueller

13   about whether he inappropriately touched Ms. Swift.  Do you

14   remember that?

15   A.    Yes.

16   Q.    And Mr. Mueller's response was something to the effect

17   of, "How could you ask me that?"

18   A.    Uhm-hum.

19              THE COURT:  You have to say yes or no, ma'am.

20              THE WITNESS:  Yes.  I'm sorry.

21   BY MR. McFARLAND:

22   Q.    Did that strike you as odd or strange?

23   A.    No.

24   Q.    Looking back, does it feel like an appropriate

25   response?

894
Redirect - Melcher

1    A.   From someone who has been through something like

2    that -- or, excuse me, been accused of something of that

3    nature, I don't think it was an appropriate response, more

4    out of shock that maybe someone close to him would ask that

5    question.

6            But I honestly wanted to make sure that there

7    wasn't an accidental situation or -- trying to more figure

8    out just what went on.

9            MR. McFARLAND:  That's all I have.  Thank you.

10           THE COURT:  All right.  Recross.

11           MR. BALDRIDGE:  One second, Your Honor.

12           THE COURT:  Sure.

13           MS. FOLEY:  No further questions, Your Honor.

14           THE COURT:  All right.  May this witness be

15   excused for the plaintiff?

16           MR. McFARLAND:  Yes, Your Honor.

17           THE COURT:  For the defendants?

18           MS. FOLEY:  Yes, Your Honor.

19           THE COURT:  All right.  Ms. Melcher, thank you for

20   joining us.

21           You're excused.  You may step down.

22           THE WITNESS:  Thank you.

23           THE COURT:  Defendants may call his next

24   witness.

25           MR. McFARLAND:  Your Honor, the plaintiff rests.

1          THE COURT:  All right.  Is -- are the defendants

2     going to have a motion?

3          MR. BALDRIDGE:  Yes, Your Honor.  We will move for

4     judgment as a matter of law under Rule 50 of the Federal

5     Rules of Civil Procedure.

6          THE COURT:  All right.  So, ladies and gentlemen

7     of the jury, we're going to take our lunch break now.  The

8     lawyers and the parties and I will resume at 1:15, but you

9     good folks will have to remain outside the courtroom

10    because, at that point, we're going to have arguments on a

11    motion and these are arguments that have to be conducted

12    outside of your presence, and we will come back for you as

13    soon as we can after those arguments have concluded for the

14    defendants to begin their case in chief.

15         All right.  So the Court will be in recess until

16    1:15.

17         (Recess at 12:01 p.m.)

18                    AFTERNOON SESSION

19         (In open court outside the presence of the jury at

20    1:17 p.m.)

21         THE COURT:  All right.  I'll hear a motion from

22    the defendants.

23         MR. BALDRIDGE:  Good afternoon, Your Honor.

24    Forgive me in advance for doing the best I can here under

25    rushed circumstances, but I will try to make our positions

896

1    clear.

2            THE COURT:  Okay.

3            MR. BALDRIDGE:  At this time, I move for judgment

4    as a matter of law under Rule 50 of the Federal Rules of

5    Civil Procedure on all claims asserted by the plaintiff in

6    this case.  I do not feel the need to go through the

7    standard for Rule 50 as the Court's well acquainted with

8    it --

9            THE COURT:  Yeah.

10           MR. BALDRIDGE:  -- other than to say that in this

11   case, a reasonable jury here has no legally sufficient

12   basis to find for plaintiff as follows:

13           First, we start with Count 5, because I believe it

14   is the easiest.  Count 5 is a *respondeat superior* count

15   that is asserted solely against Ms. Taylor Swift based upon

16   her alleged employment of Frank Bell, thereby via

17   *respondeat superior* as an employee attributing Mr. Bell's

18   conduct to Ms. Taylor Swift.

19           It is undisputed at this point that Mr. Bell is

20   employed by 13 Management, LLC, a valid company, and is not

21   employed by Taylor Swift.  There's not only no evidence, it

22   is undisputed, and you have to treat the claim as pled, it

23   was pled as an employment relationship, and you cannot get

24   through a different vein of the law to attribute Mr. Bell's

25   conduct to Ms. Taylor Swift.

1          The second basis, as we move for judgment as a

2     matter of law on Count 1 of the plaintiff's complaint,

3     which is intentional interference with contractual

4     relations.  The Court is also likely familiar with the

5     elements, but under Colorado law, which applies here, there

6     are six such elements:

7          A contract existed; the defendant knew or

8     reasonably should have known of the contract; the defendant

9     intentionally interfered with the contract; the defendant

10    improperly interfered with the contract; defendant's

11    conduct caused the breach or nonperformance of the

12    contract; and plaintiff suffered damages as a result.

13         In this particular instance, we move under three

14    of these elements of intentional interference with

15    contractual relations.  Starting with the first:  Here the

16    defendants did not intentionally interfere with any

17    contract.  The standard for intentional interference in

18    Colorado and under the Tenth Circuit is that when a

19    defendant knows that the interference is certain or

20    substantially certain to achieve the result.

21         In other words, whatever they're allegedly to have

22    done to interfere, was certain or substantially certain to

23    cause breach of contract, in this case, KYGO terminating

24    Mr. Mueller.

25         They're -- as to Ms. Swift -- Ms. Taylor Swift,

1    there is simply no evidence.  There's no evidence.  The

2    only evidence in the record is that Ms. Swift reported what

3    happened at the June 2d, 2013, meet-and-greet to Ms. Andrea

4    Swift.  She did so to her mom, undeniably, but also to

5    senior management of 13 Management, LLC, a valid

6    corporation.  End of story as to Ms. Taylor Swift.

7         THE COURT:  Well, do you think that -- or do you

8    have any case law that addresses whether or not a

9    ratification type of theory of liability could apply here?

10   In other words, that were I to find that the evidence is at

11   least disputed as to when Ms. Taylor Swift was aware that

12   her senior management team had made communications with

13   KYGO, and I think her testimony, per my notes from

14   yesterday, was that she was not -- she could not recall

15   when she became aware of that communication.

16        MR. BALDRIDGE:  Your Honor --

17        THE COURT:  And so -- so my question is:  Are you

18   arguing -- are you arguing that ratification cannot -- does

19   not apply here, and do you have some authority for that?

20        MR. BALDRIDGE:  As the Court knows, ratification

21   would be after the fact.  And there is no case law that I

22   have seen that involves ratifying an improper act in this

23   context, in particular, tortious interference.

24        But what the Court is indeed asking me to do is

25   almost prove a negative.  There is no case supporting such

1     a theory either.  And if you go to the case law, you will

2     not find any case where a defendant reports something to

3     somebody else and steps out of the picture and then hears

4     about the end result later that they're held responsible

5     for tortious interference of a contract.  And that's all we

6     have on Ms. Swift.

7          I mean, he grabbed her rear end, she tells mom,

8     she performs a concert, hears about it later.  That's it.

9     You will not find a case.  There's not any evidence, much

10    less sufficient evidence, on the topics to hold her

11    responsible for tortious interference of contract.

12         Now, as to Ms. Andrea Swift, what we know about

13    Ms. Andrea Swift is that she had no contact whatsoever with

14    KYGO.  She never spoke to them, she never did anything with

15    respect to them.  She instructed Mr. Bell as an employee of

16    13 Management -- and when I say "instructed," I mean after

17    the committee met, absence of Ms. Taylor Swift, decided it

18    was time to inform KYGO of Mr. Mueller's conduct.  That is

19    the beginning and end of what Andrea Swift did.

20         And then as to Mr. Bell.  Mr. Bell did, indeed, go

21    to KYGO.  And the only evidence is he told them, "To do

22    your own investigation," he never told them specifically

23    what to do.  He never asked that this gentleman be fired.

24    And we have that both from Mr. Bell, Mr. Call, and Mr.

25    Haskell, both sides of the transaction.

1            THE COURT:  What about Mr. Call's transcribed

2    notes of that conversation, that phone call he received

3    from Mr. Bell, whereas Mr. Call memorialized it in his

4    notes that Mr. Bell told him that this -- the Swift

5    organization expected the company to do the right things --

6    do the right thing absent of which there could be a

7    significant -- what's the phrase --

8            MR. BALDRIDGE:  "Severely impacted" I think was

9    the issue.

10           THE COURT:  Yeah.  Well, there was a -- gravely

11   impacted.

12           MR. BALDRIDGE:  Gravely impacted.

13           THE COURT:  Gravely impacted.  What about that?

14           MR. BALDRIDGE:  Well, we still have to go to what

15   the evidence is, not what is guessed about what those words

16   mean.  And what --

17           THE COURT:  Well, but we -- but I have to -- I --

18   you know, the Rule 50 standard is one of the highest

19   standards there is in the law, at least on the civil side

20   of things.  Because what you're asking me to do is take

21   away a claim from the jury.  And you -- you're asking me to

22   find as a matter of law that no reasonable juror could

23   conclude -- or could infer from the facts that are on the

24   record in a manner that's favorable to the plaintiff on

25   this point.

1        So what you have to convince me is that no

2   reasonable juror could conclude that from those notes there

3   was not a -- an intentional action on the part of Mr. Bell

4   to attempt to interfere with Mr. Mueller's contract.

5        Now, I completely agree there's a lot of evidence

6   to the contrary, as you've been pointing out, but to take

7   it away from the jury, I have to conclude that no jury

8   could possibly conclude in the plaintiff's favor on this

9   point.

10       MR. BALDRIDGE:  And within the vein of that

11  standard, a scintilla of the evidence, as the Supreme Court

12  says, is not enough.  And how I would answer that question

13  is that Mr. Bell never discussed what the right thing to do

14  was.  And, secondly, this hinges into, really, almost a

15  separate argument:  Every single witness in this case that

16  approached the decision, the three reasons for Mr. Call's

17  decision to terminate Mr. Mueller, said that the decision

18  to terminate him hinged on their own independent, separate

19  perception of, A, what the photo showed; and, B, that Mr.

20  Mueller had changed his story, or in the words of Mr.

21  Haskell, lied in the interview.

22       There's a complete break there because that's

23  based on their perception of what they saw and what they

24  did in their investigation.  And even if Mr. Bell had

25  recommended termination or specific action -- which he did

1    not -- he left it up to Bob Call.

2         Bob Call, himself, and Eddie Haskell, says they

3    perceived that photo a certain way, and they perceived Mr.

4    Mueller to have lied in the interview.  Even Mr. Mueller

5    admitted that that perception, if it were indeed true, of

6    Mr. Call, has nothing to do with these defendants.  So I

7    think that gets Mr. Bell out of the case.

8         THE COURT:  Well -- well, not so fast.  Mr. Call

9    specifically testified that but for the photograph that Mr.

10   Bell provided to him and but for Mr. Bell's phone call and

11   what he communicated to him in that phone call, that Mr.

12   Mueller would not have been terminated.  He -- he stated

13   that.

14        And I think one of the things that came in this

15   morning that I think makes this issue even more difficult,

16   I think, for the defendants, is that you had Ms. Melcher

17   testify that she reported almost the exact same type of

18   sexual harassment, sexual conduct, the grabbing of her

19   bottom, not once but twice, to KYGO management, and they

20   didn't discharge that individual.

21        So, again, plenty of evidence on the defendants'

22   side for which -- upon which the jury could conclude in

23   favor of the defendants on this point, but you -- you're

24   asking me to conclude that no reasonable juror could infer

25   from those differences and facts that but for a perceived

1   economic pressure from the defendants that the plaintiff

2   would not have been terminated.

3            MR. BALDRIDGE:  Well, if you go to perceived

4   economic pressure, Your Honor, the only -- and I put in

5   quotes, evidence presented by the plaintiffs on that, is

6   that Ms. Swift is famous.

7            The -- the evidence in the case is that the radio

8   stations, which are the distribution channels here, have

9   the power.  And we may look at it differently, but that's

10   the evidence.  You can't just say, Well, she has power,

11   therefore, it must be.  And that's really all they've said.

12            So I still think Mr. Bell gets out, too.  I

13   understand Your Honor's view of the issue.  I took Ms.

14   Melcher's testimony more so to mean with respect to the

15   report that it was entirely reasonable for Ms. Swift to

16   have not reported the incident immediately just like Ms.

17   Melcher did.  That was the import I took from that

18   testimony.

19            But I think it also hinges on KYGO taking the

20   action, and it hinges on Mr. Mueller's allegation that

21   somehow the investigation at KYGO, which did not involve my

22   clients, was flawed.

23            And I do remind the Court that perhaps the biggest

24   flaw in that investigation, if there was one, was Mr.

25   Mueller's binding admission that he did not inform Mr. Call

1      of his alibi:  That Eddie Haskell had had, in fact,

2      confessed to doing it.

3              To me, any allegations that this investigation was

4      not independent and/or flawed, have to be cast aside

5      because he's admitted, admitted under oath, that that might

6      have changed the outcome in the investigation had he

7      revealed his alibi, as to Mr. Call.  So I think that gets

8      Mr. Bell out.

9              Second element of intentional interference with

10     contract would be whether the contact and/or interference,

11     forgive me, was improper.  And I think the Court is

12     probably well familiar with the six elements established by

13     *Jefferson County School*, which is Tenth Circuit 1999, it

14     basically cites the Restatement (Second) of Torts, 767, on

15     what you'll look at to see whether there was improper

16     conduct.

17             We start with Ms. Swift, again.  None.  None as to

18     KYGO.  She tells mom what happened.  She disappears from

19     the sequence of events.  She has zero motive.  There's no

20     evidence of any motive.  She didn't even know this man,

21     that she could ever have against this man.  You can't just

22     say, "Oh, she -- she must have had had a motive."

23             There isn't a shred of evidence.  And the actor's

24     motive is the second factor under *Jefferson County* for

25     looking at whether it was improper -- I can most assuredly

1    tell you there's zero evidence on any incentive or motive.

2    And Mr. Mueller's binding omission, both in deposition and

3    my cross-examination said, quote, I cannot imagine any

4    incentive of Ms. Swift, Ms. Taylor Swift here.  So the

5    motive's removed.

6           Mr. Mueller admitted that it is never improper to

7    report a belief of inappropriate touching.  He did it a

8    number of times.

9           THE COURT:  Right.

10          MR. BALDRIDGE:  And there is zero evidence that

11   Ms. Taylor Swift did not believe that she was improperly

12   touched.  There's been a lot of talk around edges, could it

13   have been an accident, could it have been incidental, could

14   she have misperceived it?  But there's nothing, nothing to

15   show she didn't believe it.

16          I suggest to you it's overwhelming that Mr.

17   Mueller, in fact, did do it, but for purposes of this legal

18   argument, the belief element is gone based on his

19   admission.  So I think Ms. Taylor Swift is out.

20          Then we get to Andrea Swift.  It's essentially the

21   same arguments as we've made on the first prong of tortious

22   interference.  We don't need to recover it, but, again, her

23   daughter reported to her as a senior manager at 13

24   Management.  She and others discussed with Mr. Bell and

25   took action.

906

1              Again, no one knew or ever heard of Mr. Mueller,

2        his show, or anything else.  There is simply zero evidence

3        of a motivation of Andrea Swift to do anything to Mr.

4        Mueller, and certainly not to get caught up in the last two

5        years' mess that this has created.

6              THE COURT:  She did testify that her words were,

7        "I absolutely wanted him terminated."

8              MR. BALDRIDGE:  Sir, there's a number of things I

9        want at this very moment that I hope you won't hold me

10       responsible for --

11             THE COURT:  But, is that --

12             MR. BALDRIDGE:  And --

13             THE COURT:  But isn't that some evidence of her

14       intent?

15             MR. BALDRIDGE:  Well, when the only evidence --

16       the only evidence is Mr. Bell didn't take that into

17       account.  I don't know how you convey what's -- it's no

18       different than it being in her mind.  It never got to KYGO.

19             THE COURT:  But as I already have instructed the

20       jury in the preliminary instructions, they're not limited

21       strictly to the evidence that has been introduced at trial

22       in terms of documents and testimony, but that they are

23       allowed to make reasonable inferences from the evidence.

24       And what you're telling me is that no reasonable juror

25       could infer that after the mother of Ms. Swift states that

1    she absolutely wants Mr. Mueller terminated, and Mr. Bell

2    acts on her and the senior management's decision and

3    communicates that to the radio station, that no juror could

4    infer that that -- that was her -- the senior management's

5    and Ms. Andrea Swift's personal intent was to have a

6    termination occur.

7            MR. BALDRIDGE:   What I would want to say, Your

8    Honor, is that an inference, obviously, is not a substitute

9    for the evidence, itself.  The evidence you -- you take the

10   inference from that evidence.

11           THE COURT:  Sure.

12           MR. BALDRIDGE:  And if you take her out of the

13   Tenth Circuit, of course the Court knows the standard is

14   not literally whether there's no evidence, it's whether the

15   evidence is sufficient at some level.  And all we have here

16   is Ms. Andrea Swift, a mother whose daughter had been

17   sexually assaulted, was hot, mad, and expressed that to Mr.

18   Bell.

19           There is no evidence after that point that it ever

20   came out of the neuro center of 13 Management because Mr.

21   Bell has testified exactly what he told KYGO, and Mr. Call,

22   Mr. Haskell, have testified exactly what they heard.

23   That's as to Andrea Swift.

24           Mr. Bell, same facts.  You know the facts, it

25   almost overlaps identically with tortious interference.

908

1          THE COURT:  Let me ask you this:  Is it your view

2     that in terms of the second element of impropriety,

3     improper motive, that no juror could conclude that the

4     motivation was improper because there was little to no

5     investigation done by the Swift management team before they

6     made the communication to the radio station?

7          MR. BALDRIDGE:  Well, is it my contention?  No,

8     it's not my contention.

9          THE COURT:  No, is it your contention that no

10    juror could come to that conclusion based on the evidence

11    in the record?

12         MR. BALDRIDGE:  Absolutely.  Because the, quote,

13    unquote, investigation by the Swift management team,

14    there's nothing to suggest what else they could have done.

15    They talked to the person it happened to:  Taylor Swift,

16    the person that it happened to.

17         And as we've heard from witness after witness

18    here, everyone, including David Mueller, saw something, at

19    a minimum, awkward that went on in that room.  Mueller's

20    words, awkward and weird, cold and stand-offish.  Others,

21    actual -- from Mr. Dent, who saw it happen, all the way to

22    everyone else's reaction.

23         So, yes, I think it's -- it's throwing stuff

24    against the wall to say that there was no investigation

25    when you talked to the person who it actually happened to.

1      There's nothing else they would have done.

2              The third part of intentional interference that I

3      think the Court should look at is causation.  I don't need

4      to repeat this, but I think the line might have been broken

5      by the testimony not just of Mr. Call and Mr. Haskell, but

6      Mr. Mueller.  In fact, it says, We made our own independent

7      decision based upon our own perceptions of David Mueller

8      changing his story and what the photograph showed at the

9      very time where Mr. Mueller, by his own admission, was on

10     the edge of being terminated for cause by John Dimick and

11     Lincoln Financial -- I don't --

12             THE COURT:  And you don't believe that testimony

13     of Ms. Melcher this morning in terms of the different

14     outcome with respect to the other male KYGO employee who

15     grabbed the bottom of another woman, that that is not

16     testimony and evidence that the jurors could conclude to

17     the contrary?

18             MR. BALDRIDGE:  No, I don't think so.  And I think

19     that what -- the questions the Court is asking are exactly

20     the questions we've all asked over the two years of this

21     case.  And if you drill through the layers -- the legal

22     layers of the evidence, where do you end up?

23             And you end up with this:  Mr. Mueller's beef is

24     with KYGO; it's not with my client.  That's -- that's the

25     problem with this case and that's why it's turned on its

1    head.  And the evidence here, the evidence presented by

2    these plaintiffs, is KYGO did this man wrong.  That --

3    that's really what we're talking about here, and he didn't

4    sue KYGO.

5         Now, we get to perspective business relationships,

6    which is Count 2.  As the Court knows, it is a complete

7    overlap elementally with tortious interference with

8    contract.  The only thing I would say is that he -- being

9    Mr. Mueller -- and his legal team has failed to identify a

10   single prospective, identifiable with any form of

11   certainty, with any business relationship that was

12   interfered with.  He wandered around the country and

13   applied to a few Top 20 radio stations, and there's zero

14   evidence of any contact by any defendant at this table,

15   much less anyone else, or any communication, or any

16   improper motive, or any incentive as to those radio

17   stations whatsoever.  That has -- that has to go clearly as

18   to all defendants.

19   THE COURT:  Let me ask you this:  I'm not looking at Count

20   1 -- to the extent you just said that there are legally

21   duplicative counts to a certain extent, just to let you

22   know, we're not looking at it that way.  That Count 1 is a

23   count that goes to the tortious interference with

24   contract -- with the contract that he had, which was the

25   two-year contract.

1               Count 2, the intentional interference with

2       prospective business relations, in part -- or in addition

3       to the promotions -- the theoretical promotions and income

4       from those promotions that he may have been eligible for.

5       I would tend to agree with you, there's very little if no

6       evidence on that.

7               What about -- what's your view on would or would

8       not the option -- the third-year option of the contract

9       come within Count 2?  And if you agree that it does come

10      within Count 2, is it your argument that there's no

11      evidence in support of an interference with the exercise of

12      that third-year option?

13              MR. BALDRIDGE:  Yeah.  The answer there, sir,

14      is -- is, first of all, the contract, itself, as to the

15      additional year, the third year, says right in its express

16      language that it is up to the sole and absolute discretion

17      of KYGO whether to extend the contract for that third year.

18              Secondly, Mr. Call said, "When we terminated him,

19      we had no reason to believe either way whether we would

20      extend because it just -- we weren't there."

21              And Mr. Mueller admitted under oath that he had no

22      factual basis to suggest that that contract would have been

23      extended for a third year.  So, to me, a very simple

24      Rule 50, there's no evidence at all admission from the

25      defendants --

1                 THE COURT:  All right.  I just wanted to clarify

2      that because I didn't hear you argue or include in your

3      argument with respect to Count 2 the option --

4                 MR. BALDRIDGE:  Yes, sir, I considered that --

5                 THE COURT:  -- restricting it to promote -- the

6      theoretical promotions.

7                 MR. BALDRIDGE:  And then there's, sir, a fourth

8      basis that goes to all counts of the complaint.  And as the

9      Court knows in a civil lawsuit, Mr. Mueller is suing for

10     damages in this case, understandably.  That has altered

11     itself substantially since the first day of trial.  We

12     rejected our expert and now we're telling the jury

13     specifically, "I don't have a specific amount" -- this is

14     what Mr. Mueller said, "I just want them to be fair.  I

15     want them to do the fair thing.  I want them to do right --

16     the right thing."

17                 Well, the *Denny* construction case, which is

18     Colorado 2009 is very clear that, quote, A plaintiff

19     seeking future damages -- which is this case here, lost

20     profits -- must provide the trier of fact with, one, proof

21     of the fact of damages that will accrue in the future; and,

22     two, sufficient admissible evidence which would enable the

23     trier of fact to compute a fair approximation of the loss.

24                 Now, Mr. Mueller, arguably for purposes of

25     Rule 50, has presented a -- the fact of damages, which is

1    prong one, although he's produced no evidence of what it

2    would be in the future, because it's a fact of damages in

3    the future.

4         But, secondly, and most importantly, when he

5    withdrew from his $3 million number and put Mr. Opp to side

6    and didn't call him, didn't put in that evidence, and

7    decided to say, "I don't have any number.  Just do what's

8    fair," that is a crystal clear example of where a trier of

9    fact here, the jury, cannot compute a fair approximation of

10   damages.  Damages is an element of each claim.  He has now,

11   by his admission, and his withdrawal or retraction of any

12   reliance on Opp, presented a record to the trier of fact

13   that calls for purely rank speculation on damages.  It is a

14   complete failure of proof and it applies to all counts.

15        If the Court has no further questions, those are

16   my arguments, sir.

17             THE COURT:  All right.  I don't.  Thank you.

18             Mr. McFarland, I'll hear you in response.

19             MR. McFARLAND:   Thank you.

20             THE COURT:  Let me help you structure your

21   argument by asking you where I'd like you to start.

22        How do you respond to the defendants' argument

23   that *respondeat superior* has to go?  Because you have put

24   on no evidence of -- well, first of all, you've not named

25   13 Management, LLC, as a defendant.  And the evidence shows

914

that 13 Management, LLC, was Mr. Bell's employer.  And so,
therefore, without the employer of the person against whom
you're trying to assert a *respondeat superior* theory, your
claim necessarily fails.

MR. McFARLAND:  Judge, what I -- what I would say
is as an initial matter, *respondeat superior*, vicarious
liability, other agency principles are not necessarily
claims.  I know I structured mine in this case as a -- my
complaint, I included a separate section for *respondeat
superior*, I mentioned vicarious liability --

THE COURT:  Could you speak --

MR. McFARLAND:  -- there as well.

THE COURT:  Please keep your voice up.

MR. McFARLAND:  And my position would be that to
the extent Ms. Swift and Mr. Bell were not -- did not have
an employer-employee relationship, they were certainly
acting as Ms. Swift's agent with actual and/or apparent
authority.  And to the extent that requires a formal
amendment, I would ask the Court to conform the pleadings
to the evidence.  Under Rule 15 that should be done freely
when justice requires.  Rule 15 specifically contemplates
doing that in trial.  It could even be done after trial.

THE COURT:  Yeah, but doesn't it -- don't the
cases that discuss that, aren't they built on surprise --
undue surprise, unfair surprise at trial where you couldn't

1    have anticipated the need to have amended your pleadings to

2    have put yourself in a safer -- at least with respect to

3    this motion, at this point, safer grounds?

4              I mean, what -- why didn't you name 13 Management,

5    LLC, as a defendant?

6              MR. McFARLAND:  Judge, I felt that based on

7    everything that I knew, the distinction between whether

8    Ms. -- Ms. Andrea Swift and Mr. Bell were acting as -- in

9    some role as an employee or as an agent, was not the

10   critical factor.  They were working as either an employee

11   and/or -- and her agent when they were making these phone

12   calls for her.

13             THE COURT:  I --

14             MR. McFARLAND:  Mr. Bell is a long-time friend --

15             THE COURT:  Hold on.  Please don't talk over me.

16             MR. McFARLAND:  Sorry.

17             THE COURT:  I'm not understanding what you're

18   saying.  Was it not possible for you to do discovery to

19   determine who's the employer of the individuals that you

20   sued?

21             MR. McFARLAND:  Yes, it was, Your Honor.

22             THE COURT:  All right.  So I think it would have

23   been a pretty simple matter to determine that Mr. Bell's

24   employed by 13 Management, Inc., or LLC, and that if you're

25   going to pursue a claim of *respondeat superior* as to him

1       and others -- Andrea Swift as the other -- you would sue

2       the employer against whom -- or as to whom you want to hold

3       vicariously liable for the actions of its employees.

4               MR. McFARLAND:  Your Honor, based on what I

5       understood then, and based on what I understood now, Ms.

6       Andrea Swift and Mr. Bell were acting on behalf of Ms.

7       Taylor Swift.  They weren't necessarily --

8               THE COURT:  What -- what does that mean legally,

9       "working on behalf of"?  They're -- they're employees of a

10      business entity that you failed to name as a defendant.

11              MR. McFARLAND:  They were acting for Ms. Swift

12      directly.  Ms. --

13              THE COURT:  In what -- what is the capacity that

14      you claim that they were working -- if not -- I mean, you

15      can concede they were not working as -- they were not going

16      about their activities, at least as they're relevant to

17      this lawsuit, as employees.  You've conceded that

18      effectively.  They were not her employees --

19              MR. McFARLAND:  They were -- that's correct.

20              THE COURT:  Okay.  So in what other form were they

21      acting on her -- what is the legal relationship between

22      them and Taylor Swift?

23              MR. McFARLAND:  Principal-agent.

24              THE COURT:  What --

25              MR. McFARLAND:  As opposed to employer --

917

1              THE COURT:  Hold on.  A, what are the facts in

2     evidence that supports that?  And, B, do you have any case

3     law that supports that contention, that individuals that

4     are not in an employee-employer relationship and a

5     contractual relationship, there's no agency agreement

6     between them, what is it that forms the legal basis such

7     that their actions can be attributable to Ms. Taylor Swift

8     and that she could be individually held responsible for

9     what they did?

10             MR. McFARLAND:  I believe that in addition to

11    acting as employees, representatives of 13 Management, Ms.

12    Andrea Swift was acting as Taylor's mom; Mr. Bell was

13    acting as her long-time friend --

14             THE COURT:  But a parent-child relationship gives

15    rise to an agency relationship?

16             MR. McFARLAND:  No.  I think -- I think the facts

17    here suggest that Ms. Taylor Swift authorized her mother

18    and Mr. Bell to act on her behalf under general agency

19    principles and --

20             THE COURT:  What is the evidence of any such

21    authorization?

22             MR. McFARLAND:  Ms. Swift testified that she was

23    getting regular -- or she was apprised of what Mr. Bell and

24    what Ms. -- what her mother were doing, and she approved of

25    it, and thought they were handling it appropriately.

1                THE COURT:  What evidence came in at trial that

2      she came to that conclusion that what was done by her

3      codefendants were appropriate actions?

4                MR. McFARLAND:  She -- she testified that she

5      thought that her management team, i.e., her mother and Mr.

6      Bell, had handled the situation appropriately.

7                THE COURT:  All right.  Let me ask you a couple

8      more questions on this point, and we have to move on

9      because there's a lot of other things you have to respond

10     to from Mr. Baldridge's motion.

11               But you have submitted -- this is a little bit of

12     a different point and has to do with jury instructions, but

13     they're intertwined with the legal theories and elements

14     we're addressing here on the Rule 50.  You have submitted

15     jury instructions that appear to ask me to instruct the

16     jury as to the relationship -- as to an agency

17     relationship, or vicarious liability, theory of liability

18     other than *respondeat superior*.

19               So my first question is:  Is that your intent --

20     is that how you want me to instruct the jury?

21               MR. McFARLAND:  Yes, Your Honor.

22               THE COURT:  Okay.  And what specifically is that

23     theory of vicarious liability?

24               MR. McFARLAND:  It's what we were just talking

25     about, that it -- setting aside any employer-employee

919

1      relationship, Ms. Andrea Swift and Mr. Bell were acting

2      with the authority for Ms. Swift as her agents, and their

3      communications with KYGO were authorized and approved by

4      her and, after the fact, ratified.

5                  THE COURT:  All right.  I think we've spent enough

6      time on that point.

7                  What about with respect to your second claim,

8      intentional interference with prospective business

9      relations?  I do not recall hearing any evidence that any

10     of the defendants were aware of this third-year option in

11     Mr. Mueller's contract.

12                 And if you agree with my recollection of the

13     evidence on that point, how does your -- how is it that

14     your claim can survive the lack of knowledge on the part of

15     the defendants of this prospective business relationship?

16     Because knowledge is an element of that claim.  You can't

17     interfere -- a defendant can't interfere -- intentionally

18     and tortiously interfere with the prospective business

19     relationship they have no knowledge of.

20                 MR. McFARLAND:  Judge, the -- the standard on that

21     piece I think is whether the defendants knew or should have

22     known.  And, in addition --

23                 THE COURT:  Well -- okay.  Well, that's -- that's

24     true with respect to Count 1 -- or claim 1, tortious

25     interference with an existing contract.  And you know from

1   my summary judgment ruling that I did find that, based on
2   the fact that the plaintiff and his girlfriend introduced
3   themselves to Ms. Swift as KYGO employees and that related
4   discussion, that Ms. Swift should have known that there was
5   an employment agreement of some type, whether it was a
6   written contract or an unwritten employment-at-will
7   agreement, but there was some kind of employment agreement.
8          So I think that gets you past on -- that gets you
9   to the line on knowledge with respect to claim 1, but claim
10  2, as you heard in the colloquy I had with Mr. Baldridge,
11  I'm viewing very differently.  We're talking about future
12  prospective business relations.  And your claim 2 is that
13  the defendants tortiously interfered with those future
14  business prospects.
15         The -- one of the elements of that claim, the case
16  law is crystal clear, is knowledge of that.  How is it --
17  what evidence is there that they had knowledge?  And if you
18  concede that there is no such evidence, how is it that
19  they -- why should they have known, or should have known
20  that there was such a third-year option?
21         For example, if there was evidence -- if there had
22  been testimony by someone that says, It's standard in the
23  industry for on-air talent to have written employment
24  contracts with options, I think you would be -- you would
25  be on firmer ground.  But there was no such testimony, at

1    least I didn't hear it.

2          MR. McFARLAND:  Yeah --

3          THE COURT:  So how can you -- so what would be

4    your basis -- because it seems like you're conceding that

5    there is no evidence that they had direct knowledge of this

6    third-year option, but that you're now falling back on that

7    they should have known that there was a third-year option.

8          What -- on what basis can I conclude that a

9    reasonable juror could rule that they should have known

10   that Mr. Mueller had a third-year option and that by doing

11   what they did, they were going to interfere with his

12   ability to be employed for a third year?

13         MR. McFARLAND:  I'm just reviewing something.  One

14   second, Your Honor.

15         Judge, my understanding of prospective business

16   relations -- let me start off by saying:  I'm not arguing

17   the lack of evidence with respect to knowledge of the

18   option year.  There hasn't been any evidence; I don't have

19   evidence that Ms. Swift or the defendants knew that Mr.

20   Mueller had an option year.

21         THE COURT:  Right.  So how -- and so what is the

22   evidence that could support an inference by a reasonable

23   juror that they should have known that there was a

24   third-year option?

25         MR. McFARLAND:  I -- my understanding of the

1    prospective business relations claim is that the plaintiff

2    must show intentional improper interference such that a

3    particular contract is prevented from being formed.  It --

4    to me, it's -- they -- the way that claim works is that if

5    it's reasonably -- if the defendants should reasonably

6    expect the -- that there is a contract -- and I think that

7    was established here -- the fact that that contract turns

8    out to have an option provides the evidence for the

9    prospective business relations claim.

10              THE COURT:  Just the fact that it turns out to be

11   the case?

12              MR. McFARLAND:  Well, if there's a reasonable

13   likelihood or probability that Mueller would have formed

14   the third contract, my understanding of the business

15   relations claim is that you don't have to prove that they

16   knew that there was that piece in the contract; you just --

17              THE COURT:  You, yourself, conceded that an

18   element of the claim is actual knowledge, or a finding by

19   the jury that they reasonably should have known.  In other

20   words, they can't just close their eyes and shut their

21   senses from the evidence surrounding them that there was,

22   in fact, this option and they can claim ignorance of that

23   option and, therefore, say, "We didn't know about it."

24              And the law makes provision for that.  That's why

25   the law says actual knowledge -- that they knew or they

1    should have known.  What I'm saying is there's -- you tell

2    me, you point to me to the witness that testified to this,

3    but I didn't hear it, a witness testify that it's standard

4    or customary in the radio industry -- radio-station

5    industry for on-air talent to have one- or multi-year

6    options in their employment contracts.

7              MR. McFARLAND:  There wasn't any testimony, and I

8    can't -- to be candid, I can't point you to it.

9              THE COURT:  So isn't that fatal to your claim 2?

10             MR. McFARLAND:  If Your Honor believes that the

11   "know or should have known" isn't satisfied by a -- an

12   understanding that there was a contract as opposed to a

13   specific option or something else attached to that

14   contract, then I would agree with the Court.

15             THE COURT:  Okay.  Let's move on.

16             What's your response to the *Denny* construction

17   argument that by pulling Mr. Opp, you no longer have the

18   requisite proof on damages necessary to have this claim

19   go -- any of your claims go forward to the jury, given that

20   your remaining claims has as -- have, as an element of

21   those claims, damages.

22             MR. McFARLAND:  Mr. Mueller testified very

23   directly that he had an employment contract with KYGO; that

24   contract is evidence.  He indicated what he was -- what he

25   was making.  There was testimony about what he lost on --

1    on that contract.  And based on that, the jury very easily

2    can calculate what fair damages would be in this

3    situation.

4             THE COURT:  Don't the cases make a distinction

5    between that kind of lay evidence being sufficient for past

6    damages, and distinguishing that from an opinion -- which

7    usually comes in under expert opinion -- an opinion as to

8    what future damages might be?  And I believe that --

9    correct me if I'm wrong -- your client is seeking future

10   damages.

11            MR. MCFARLAND:  Well, I think what Mr. --

12            THE COURT:  Did I miss a part?

13            MR. MCFARLAND:  What Mr. Mueller is seeking is

14   what he lost pursuant to his employment contract, which was

15   discussed in detail on the stand, and is $150,000 a year

16   for the year and a half that he lost out on that contract.

17   That -- that doesn't require expert testimony, in my

18   opinion.

19            THE COURT:  Okay.  Well, I may agree with you on

20   that.  So are you -- are you conceding the point that I

21   think Mr. Baldridge was making with Mr. Mueller, which is

22   really, then, the totality or the aggregate damages the

23   plaintiff is seeking in this case is the 150,000 times two

24   minus the 10 -- or plus the 10,000 signing bonus and the

25   potential for 10,000 per year in promotional -- additional

1    promotional income, which sums, I believe, to 330,000,

2    minus the five-year -- the five months of income he did

3    receive?

4          Is that -- is that what you're representing to me

5    now is the totality of the damages your client is seeking

6    in this case?

7          MR. McFARLAND:  Judge, as Mr. Mueller testified,

8    he wants what the jury thinks is -- is fair and reasonable,

9    based on his testimony that he's looked for other work, he

10   hasn't been able to find other work.  I think it's also

11   reasonable for the jury to award him additional damages --

12         THE COURT:  Okay.  So, all right, I'm just trying

13   to get you to directly answer my questions.  So you --

14   you're not just looking for past damages, your client is

15   still seeking from the jury future damages.

16         MR. McFARLAND:  That's correct.

17         THE COURT:  All right.  So what is your response

18   to the argument that, at least insofar -- maybe I'll grant

19   you on the past damages, because I think there is case law

20   in the Tenth Circuit about lay opinion being sufficient on

21   that -- what is -- what's your response, given the *Denny*

22   construction case, to the evidentiary support for your

23   request under all of your claims for future economic

24   damages?

25         MR. McFARLAND:  Judge, I don't have that case in

1    front of me.  Can you help me with the standard?  I know

2    Mr. Baldridge mentioned it.

3              THE COURT:  I don't think we need to know much

4    more than what he -- I don't have it in front of me either,

5    but I'm familiar with the case.  And it's -- the point that

6    I think is in contention here is whether the evidence you

7    have -- you have put on evidence from which the trier of

8    fact can reasonably calculate, as opposed to just

9    speculating a number out of the air, calculate future

10   damages.

11             And you're seeking future economic damages because

12   your -- as I understand it, you're not seeking any

13   noneconomic damages in this case.

14             MR. McFARLAND:  Based on all of the facts and

15   circumstances that -- and all of the evidence, I think it's

16   fair and reasonable that the jury in this case can conclude

17   that absent the wrongful conduct by the defendants, Mr.

18   Mueller would have continued to earn at least what he was

19   earning at KYGO.

20             THE COURT:  All right.  Let's move on.

21             My last point I want you to address is the

22   defendants are arguing with respect to Ms. Taylor Swift

23   that the law requires with respect to the -- your claim 1,

24   tortious interference with contract, that there be

25   individual affirmative actions -- acts by a defendant to

1      give rise to any finding of liability or culpability as to

2      that defendant.  And that while the evidence is

3      contested -- strongly contested -- with respect to Mr. Bell

4      and Ms. Andrea Swift, the defendants are contending that

5      there is no evidence that Ms. Taylor Swift, herself,

6      individually, took any individual affirmative acts -- I

7      guess in theory it could be acts or omissions, although I

8      don't know quite -- I can't think of what an omission -- or

9      how an omission would apply in these facts, so let's just

10     stay with an affirmative act -- that there's no evidence

11     that she individually took an affirmative act to cause the

12     interference -- the tortious interference with the

13     employment contract of your client.

14             MR. McFARLAND:  I think we're in -- with respect

15     to that point, we're in similar territory that we were in

16     during the summary judgment portion of this case.  And the

17     facts with respect to that issue have come in as we

18     suspected in the summary judgment motion --

19             THE COURT:  But we're in trial.  We're in a very

20     different posture.  We're not in summary judgment any more.

21             MR. McFARLAND:  I understand.

22             THE COURT:  Right.  Okay.  So, you know, your --

23     to survive the motion and have the claim go to the jury, at

24     least as to Taylor Swift, I need to find that there is --

25     has been sufficient evidence put on the record such that a

1    reasonable juror could conclude that, individually

2    speaking, Ms. Taylor Swift took actions that caused the

3    tortious interference with the employment contract that

4    your client had with KYGO.

5              MR. McFARLAND:  Your Honor, she made --

6              THE COURT:  So my question -- so my question is:

7    What are those acts?  What is the evidence -- what did the

8    evidence in the trial establish with respect to acts by

9    her, as opposed to her mother and her radio manager?

10             MR. McFARLAND:  She falsely accused Mr. Mueller of

11   inappropriate touching.  And then she conveyed that to her

12   management team with the knowledge and understanding that

13   they would take, according to her, appropriate action.

14             THE COURT:  Is that what the evidence shows or was

15   it the evidence that -- did the evidence show that she told

16   her mother, "I've been -- I've been grabbed on my bare

17   bottom by this man I don't know," and responded emotionally

18   to that fact?

19             MR. McFARLAND:  I think that's part of the

20   evidence as well, but it's --

21             THE COURT:  Okay.  So you -- I think we can all

22   agree, everybody's been watching, sitting in on the trial,

23   we know that.  Where does the evidence go that she did

24   anything beyond that?

25             MR. McFARLAND:  I think the primary evidence is --

1        is that she made the false allegation.  In making that kind

2        of false allegation, and then later confirming that that --

3        that she -- and then learning about Mr. Mueller's

4        termination, and accepting that as appropriate, I think

5        that -- that's the bad conduct that she's responsible for.

6                THE COURT:  What evidence has come into the trial

7        that -- let's say she was just completely wrong with

8        respect to the identity of the person who did that; somehow

9        there had been two or three other men before or after Mr.

10       Mueller that had done a similar thing and she just got

11       mixed up and she was just factually wrong as to the

12       identity of who did it.

13               What evidence has come in in the trial that she

14       did not actually believe it to be Mr. Mueller?  Whether --

15       whether or not she was wrong in making that identification.

16               MR. McFARLAND:  I think the -- to be, again,

17       candid, I don't -- I don't think there is evidence that she

18       didn't believe that Mr. Mueller inappropriately touched

19       her.

20               THE COURT:  All right.  So you're conceding that

21       she -- she actually -- your client denies it happened, but

22       that you're conceding that she honestly believed, truly

23       believed, that David Mueller had grabbed her bare bottom?

24               MR. McFARLAND:  I don't understand -- I don't

25       understand, and I think it's -- the jury can infer that she

1    had to know that it wasn't Mr. Mueller because Mr. Mueller

2    didn't do it.

3              THE COURT:  But that's -- that's exactly what I'm

4    asking you.  What evidence do you have that, even if she

5    was mistaken, that she knew she was mistaken, and proceeded

6    with falsely accusing the wrong person, knowing that it was

7    not him?

8              MR. McFARLAND:  There's no evidence of that.

9              THE COURT:  All right.  What about an argument

10   that I think the defendants would make is that when the

11   jury is deliberating and they're trying to conclude with

12   inferences to draw from the facts, one of the questions

13   they're asking themselves would be:  What possible

14   motivation would she have to make this up and accuse

15   someone she had never met before in her life?

16             MR. McFARLAND:  Judge, I think the motive factor

17   sort of goes both ways.  Why would Taylor Swift make this

18   up?  Why would Mr. Mueller throw away his dream job?

19   What's Mr. Mueller's motive in inappropriately touching

20   Ms. Swift?

21             THE COURT:  Well, but that's -- I think that's Mr.

22   Baldridge's point in terms of:  Your client's real problem

23   I think here is -- I agree -- is with the radio station and

24   what they had done.  But you're -- in this lawsuit, you're

25   the plaintiff, so your -- you have the burden of proof of

1    establishing the claim against the defendants.  And the

2    claim that you are alleging on claim 1 has, as a necessary

3    predicate, that there was a false accusation of your client

4    because your client, himself, admitted on the stand that to

5    the extent it is a true allegation, that, in fact, it

6    happened, he agreed that she had every right to make the

7    complaint that she made.

8         So the only way it becomes tortious is if she

9    knows it to be false and makes that complaint anyway.

10        MR. McFARLAND:  Well, I -- I think the way it

11   becomes tortious is if it didn't happen and the -- and she

12   accuses Mr. Mueller of it happening, nonetheless.

13        THE COURT:  All right.  Okay.

14        MR. McFARLAND:  Thank you.

15        THE COURT:  Thank you very much.  It's the

16   defendants' motion, I'll give Mr. Baldridge an opportunity

17   for brief reply.

18        MR. BALDRIDGE:  Your Honor, based on what Mr.

19   McFarland said, we would ask that Ms. Taylor Swift be

20   completely removed from this case right now so we can

21   proceed, if we need to, with respect to the other

22   defendants.

23        I start with the Court's summary judgment ruling,

24   page 22, document 137.  The Court says:  To be clear, the

25   Court views this as a close question.  There would appear

1      to be nothing improper about Swift, or any other person,

2      making an honest report to an entity with which she does

3      business that one of its employees assaulted or harassed

4      her.  Indeed in the undersigned's view, the policy of law

5      should encourage the reporting of actual assaults, not

6      attach liability to it.

7            That arises out of *Arapahoe Surgery*, which is the

8      law of this jurisdiction.

9            THE COURT:  And my -- and my case.

10           MR. BALDRIDGE:  Yes, sir.  You made some law up

11     there.  And if --

12           THE COURT:  And, for the record, I absolutely

13     definitely -- I continue to believe that strongly.

14           MR. BALDRIDGE:  Well, it is the law of this land

15     and the land of Colorado, and Mr. McFarland's admission is

16     exactly right:  There is no evidence of -- that Ms. Swift

17     believed anything other than what she said.  Mr. Mueller

18     admitted it.  Mr. McFarland admitted it.  That means the

19     conduct could not be improper as a matter of law.

20           Addressing his comment that, "Well, it cuts both

21     ways, Judge, it cuts both ways, why would Mr. Mueller do

22     it?"  Well, he has the burden of proof.  I'm a defendant in

23     this case.  That's his burden of proof; it's not my burden

24     of proof.  So it isn't even a close call anymore.  Miss

25     Taylor Swift is out of this case.

1           The *respondeat superior* claim is the second claim.

2      Very easy:  Paragraph 65 of the complaint alleges the basis

3      for *respondeat superior* is an employment relationship.

4      There is zero evidence she employed anyone.

5           The new theory of vicarious liability I heard,

6      there is no such thing as a parent-child-agency

7      relationship, and there's no such thing as a

8      friend-friend-agency relationship.  It was a valid legal

9      entity.  The law of Colorado is absolutely clear in this

10     setting -- in this scenario.

11          So I would ask you right now, please, after this

12     ordeal, release Ms. Taylor Swift from this case.  There's

13     zero evidence to keep her in.

14          THE COURT:  All right.  Thank you.

15          I'm going to take the defendants' motion under

16     advisement.  We will be in recess for 10 minutes.

17        (Recess at 2:19 p.m. to 2:42 p.m.)

18          THE COURT:  All right.  Before we brought out the

19     jury, I just want to be clear on the record where -- what

20     we're doing.  So it's my understanding the defendants do

21     not plan on calling any witnesses.

22          MR. BALDRIDGE:  Your Honor, we believe that the

23     defendants have fully met their burden through the witness

24     examination and exhibits so far, and will not be calling

25     any additional witnesses as part of its case.  And since a

1     Rule 50 motion may be made at any time under Rule 50(a)(2),

2     we renew that Rule 50 motion we just made on the identical

3     bases with no need for further argument.

4             THE COURT:  All right.  So you -- just to be

5     clear, for purposes of Ms. Taylor Swift's counterclaims,

6     you are standing on the evidence that came in during the

7     plaintiff's case in chief?

8             MR. BALDRIDGE:  Yes, sir.

9             THE COURT:  All right.  Based on the fact that the

10    defendants are not calling any witnesses, there will not be

11    any rebuttal witnesses from the plaintiff and, obviously,

12    no surrebuttal witnesses from the defendants.

13            The defendants have renewed their Rule 50 motion.

14    Is there any motion from the plaintiff?

15            MR. McFARLAND:  No, Your Honor.

16            THE COURT:  All right.  All right.  This is what

17    we're going to do.  I'm going to bring out the jury to tell

18    them that we are done with the evidentiary portion of the

19    trial, that they can -- that they are released for the day.

20            We are going to have -- we will then take a recess

21    until I've completed my ruling on the Rule 50 motion and

22    I'll come back on the record and I will make that ruling

23    this afternoon.

24            We will have our jury charging conference Monday

25    morning.  We'll go into some more details after I've

935

1    excused the jury, and I'm going to have the jury come back
2    at 9:30 on Monday morning and I will read the final set of
3    jury instructions and then we'll go into closing arguments
4    and the case will be with the jury.
5         Any questions about how we're going to proceed
6    before I bring in the jury?
7              MR. McFARLAND:  No, Your Honor.
8              THE COURT:  All right.
9              MR. BALDRIDGE:  No, sir.
10             THE COURT:  All right.  Let's bring in the jury.
11        (Jury was present at 2:44 p.m.)
12             THE COURT:  Ladies and gentlemen of the jury,
13   thank you so much for your patience.  You are a very
14   patient jury.  I really appreciate it.  I know I speak on
15   behalf of the parties and the lawyers when I say that.
16        This may come as a little bit of a surprise to
17   you, but based on the developments that have occurred
18   outside of your presence, the testimonial portion of the
19   trial has concluded, so I am going to be releasing you in a
20   couple moments for the day.  I ask you to be back here in
21   the Arraj building by 9:30 on Monday morning.
22        At that time, I will read to you the final set of
23   the Court's jury instructions that will govern your
24   deliberations, we will then go into closing arguments by
25   the lawyers, and then the case will be in your hands.

1          So until that time, and especially because we're

2     going to have a weekend in between us -- which I hope you

3     enjoy -- please do not do any independent research into the

4     facts or issues of the case or into the parties, the

5     lawyers, or the witnesses.

6          The jury is released until 9:30 Monday morning.

7          (Jury left the courtroom at 2:46 p.m.)

8          THE COURT:  We will be in recess until I have

9     completed my ruling on the defendants' motion.

10         (Recess at 2:47 p.m. to 5:30 p.m.)

11         THE COURT:  All right, I'm prepared to rule on the

12    defendants' motion.

13         This matter's before me on the defendants'

14    mid-trial motion for judgment as a matter of law under

15    Federal Rule of Evidence 50(a), docketed as ECF No. 120,

16    and orally renewed at the close of all evidence.

17         Trial in this case commenced with jury selection

18    on Monday, August 7th, 2017, with plaintiff's case in chief

19    beginning on Tuesday, August 8th.  Plaintiff rested his

20    case in chief today, Friday, August 11.  At that time, the

21    defendants brought their oral motion for judgment as a

22    matter of law and the Court took it under advisement.

23    Defendants and counterclaimant Taylor Swift then opened and

24    rested their case today, and have now renewed their oral

25    motion for judgment as a matter of law.

937

1          In considering the defendants' Rule 50(a) motion,

2     the Court's required to consider all the evidence presented

3     at trial, must review the record as a whole, and must draw

4     all reasonable inferences in favor of the nonmoving party.

5     Quote, Credibility determinations, the weighing of the

6     evidence, and the drawing of legitimate inferences from the

7     facts are jury functions and not those of the judge, end

8     quote.  *Reeves v. Sanderson*, 530 United States 133, 150,

9     2000 decision from the Supreme Court.

10          The Court may grant the motion only if the

11     evidence points but one way and is susceptible to no

12     reasonable inferences which may support the opposite

13     party's position.  This from *Bristol v. Board of County*

14     *Commissioners of County of Clear Creek*, 281 F.3d 1148,

15     1161, Tenth Circuit, 2002.

16          Similar to the Court's observations at the summary

17     judgment phase, the starkness of the parties' factual

18     dispute makes the standard of review under Rule 50

19     particularly significant in this case.  Given the parties'

20     irreconcilable testimony regarding the essential factual

21     dispute, it bears special emphasis that the Court's role

22     here is not to resolve that dispute and, in ruling on the

23     defendants' motion, the Court must view all the evidence in

24     the light most favorable to the plaintiff as the nonmoving

25     party, reserving all credibility determinations for the

938

1    jury.

2           I will begin with plaintiff's claim for *respondeat*

3    *superior* liability against defendant Taylor Swift based on

4    the actions of Mr. Bell, who plaintiff alleges was acting

5    as Ms. Taylor Swift's employee when he allegedly committed

6    the tort of intentional interference with contract.

7           Per paragraph 65 of the plaintiff's second amended

8    complaint, docketed as ECF No. 72, plaintiff brings this

9    claim of liability only as to Mr. Bell's claimed employment

10   with Ms. Taylor Swift, and not as to Ms. Andrea Swift.

11          To establish liability on this claim, plaintiff

12   must establish that Mr. Bell was Ms. Swift's employee and

13   that the alleged tort was committed during the service of

14   Ms. Swift's business.  The problem with plaintiff's claim

15   is that the only evidence in this case on this issue

16   establishes that Mr. Bell was, in fact, an employee of the

17   business entity 13 Management, LLC, and not an employee of

18   Ms. Swift, personally.  No pay stubs or other documentary

19   or testimonial evidence has been introduced at trial that

20   could show that Mr. Bell was an employee of Ms. Swift

21   personally.

22          In addition, no trial evidence has been introduced

23   establishing who owns or controls 13 Management.  Plaintiff

24   has not named 13 Management as a party in this lawsuit and

25   there's no pending equitable claim of alter-ego liability

1       or veil piercing that might make Ms. Swift personally

2       liable as an owner of the company, even if such evidence

3       had been introduced.

4               Therefore, plaintiff has not carried his burden as

5       to the necessary predicates for making Ms. Swift liable for

6       Mr. Bell's actions under a *respondeat superior* doctrine, so

7       the defendants' motion is granted as against this claim.

8               In addition, plaintiff now has moved orally and,

9       to some degree, by implication through his submissions of

10      requested jury instructions, for the Court to permit

11      amendment of his *respondeat superior* claim to allow him to

12      proceed on the basis of some alternative theory of

13      vicarious liability based on an alleged principal-agent

14      relationship of some form allegedly existing between Ms.

15      Taylor Swift as a principal and Ms. Andrea Swift and Mr.

16      Frank Bell as her agents.

17              It is true that the Federal Rules of Civil

18      Procedure 15(b) permits the amendment of claims during

19      trial, but only in certain circumstances that do not obtain

20      here.  In any event, the decision whether or not to permit

21      such amendment rests in the Court's discretion, and the

22      Court will not permit amendment at this time in the present

23      circumstances.  Amending the claims now, after the close of

24      all evidence, would be excessively prejudicial to the

25      defendants, in my view.

1          Plaintiff's *respondeat superior* claim has been

2     pending in its current form since February of 2016.  Since

3     then, the parties have engaged in extensive discovery and

4     trial preparations leading to this trial, requiring

5     substantial expense and effort by all involved.  At any

6     point in the discovery, plaintiff should have discovered

7     the relevant facts and sought leave to amend his claims to

8     add 13 Management as a party, and he would likely have been

9     permitted to do so at a time when defendants were still

10    preparing their defense.  However, plaintiff never made

11    such a motion before today.

12          There is simply no way defendants can fairly be

13    expected to defend against a new and still poorly

14    articulated theory of vicarious liability at this time,

15    after all the evidence has been submitted.

16          Moreover, the requested amendment is not based on

17    evidence that was unexpected at trial, it is based on facts

18    that have, for the most part, long been known, or at least

19    long been available.  Simply put, it is far too late for

20    plaintiff to have determined that he named the wrong

21    parties or filed the wrong claims.

22          Equally important, the alternative theory of

23    vicarious liability, which plaintiff has tried to

24    articulate, is not viable as presented.  The trial record

25    does not contain sufficient evidence to establish any

1          principal-agent relationship between Taylor Swift,

2          individually, and her mother or Mr. Bell, and plaintiff has

3          not cited any legal authorities which would recognize or

4          support the theory that he is advancing.

5                  For these reasons, the defendants' [sic] oral

6          motion to amend his vicarious liability theory to conform

7          to the evidence is denied.

8                  Next, I will move to plaintiff's pending claim for

9          tortious interference with prospective business

10         opportunities, a tort which is recognized in Colorado law.

11         See, for example, *Amoco Oil Company v. Ervin*, 908 P.2d 493,

12         at 501, Colorado Supreme Court, 1995.

13                 The elements plaintiff must prove on this claim

14         include proving that the defendants knew or reasonably

15         should have known of the prospective business relationship

16         with which they allegedly interfered, as the parties' own

17         stipulated jury instructions acknowledge.  See ECF No. 166

18         at page 11.  See also, for example, *Harris Group, Inc. v.*

19         *Robinson*, 209 P.3d 1188 at 1196, Colorado Court of Appeals,

20         2009.

21                 Here, plaintiff alleges that the defendants

22         tortiously caused KYGO not to execute the option for a

23         third year of employment under his employment contract,

24         but, as plaintiff now concedes, there is simply no evidence

25         in the record from which the jury could find or infer that

1    at any time any of the three defendants were aware that any

2    such option existed in plaintiff's employment contract, or

3    that any defendant had knowledge of any other specific

4    contract that their actions might prevent from being

5    formed.

6         Therefore, even viewing the evidence in the light

7    most favorable to plaintiff, he has not carried his burden

8    of proof on the elements of this cause of action, so the

9    plaintiff's [sic] motion is granted with regard to

10   plaintiff's claim for tortious interference with

11   prospective business relationships.

12        Next, I will move to defendants' argument that the

13   plaintiff's evidence supporting his claimed damages is

14   insufficient as a matter of law.  Under controlling

15   Colorado law, including *Denny Construction* -- including the

16   *Denny Construction* case, 199 P.3d 742, at 746, Colorado

17   Supreme Court case from 2009, as well as *Pomeranz v.*

18   *McDonald's*, 843 P.2d 1378, at pages 1381 through 1383, a

19   Colorado Supreme Court decision from 1993, lost profits,

20   quote, are recoverable only if they can be proven with

21   reasonable certainty, end quote.

22        The amount to be awarded may be an approximation

23   and may not be proven with mathematical certainty, but,

24   quote, a plaintiff seeking future damages must provide the

25   trier of fact, one, with proof of the fact that the damages

1    will accrue in the future, and, two, sufficient admissible

2    evidence which would enable the trier of fact to compute a

3    fair approximation of the losses, end quote.  That from

4    *Denny Construction* at page 746.

5            Documentary evidence of profit loss is preferred,

6    when practical, and the damages request cannot be based

7    solely on speculations, guesses, or estimates.  *Gibbons v.*

8    *Ludlow*, 304 P.3d 239 at 246, Colorado Supreme Court from

9    2013.  Lost profits are not recoverable if either the

10   amount of the profit that would have been earned or the

11   fact that the plaintiff would have earned them is too

12   speculative, remote, imaginary, or impossible to ascertain.

13   This is from the case of *Master Palletizer,*

14   P-a-l-l-e-t-i-z-e-r, 725 F. Supp 1525 at 1535, District of

15   Colorado case from 1989, citing *Republic National Life*

16   *Insurance,* 704 F.2d 484, a Tenth Circuit decision from

17   1983.

18           Defendants argue that plaintiff has not met the

19   standard, in part because he chose not to call his

20   anticipated expert witness regarding damages and, in part,

21   because plaintiff, himself, has testified to the effect

22   that he is seeking an indeterminate amount, or whatever

23   amount that the jury concludes is fair.  Defendants argue

24   that all plaintiff's claims must fail as a result.

25           The Court finds that the plaintiff's two-year

1  employment contract with KYGO, admitted into evidence as

2  Exhibit A, provides a sufficient evidentiary basis to

3  support his claim for damages as to the remainder of the

4  two-year term of that contract.  Plaintiff thus has

5  sufficient evidence to survive defendants' Rule 50(a)

6  motion on the issue of damages as to those two years.

7  However, plaintiff has not come forward with additional

8  evidence as to any future lost profits beyond the term of

9  his two-year contract with KYGO from which the jury could

10  compute a fair approximation of any losses.  At most, the

11  jury would be asked to speculate as to whether KYGO would

12  have exercised its sole right to extend plaintiff's

13  contract, and how long he might have been continued -- how

14  long he might have continued working there, or not, and as

15  to what salary he might have earned in the future years at

16  KYGO, or in any other position.

17       The Court finds this evidence insufficient as a

18  matter of law to support a damages claim beyond the

19  two-year period of the KYGO contract and, therefore,

20  defendants' motion is granted in part against plaintiff's

21  claim for lost future profits beyond the two-year contract

22  term, and the Court will instruct the jury accordingly.

23       Finally, I will address plaintiff's claim for

24  tortious interference with his employment contract with

25  Lincoln Financial Media, which is pled against all three

1    defendants.

2         The elements plaintiff must prove to prevail in

3    this claim are, one, the existence of a contractual

4    relationship between plaintiff and Lincoln Financial Media;

5    two, that defendants knew or reasonably should have known

6    of this contract; three, that defendants intentionally and

7    improperly interfered with the contract; four, that

8    defendants' conduct caused a breach or nonperformance of

9    the contract by Lincoln Financial Media; and, five, that

10   plaintiff suffered damages as a result.

11        See, for example, *Warne v. Hall*, 373 P.3d 588, at

12   595 and 596, Colorado Supreme Court, 2016, and *Trimble v.*

13   *City & County of Denver*, 697 P.2d 716 at 726, Colorado

14   Supreme Court decision from 1985.

15        The defendants' motion challenges whether

16   defendants' conduct was intentional, whether it was

17   improper, and whether it caused plaintiff to be terminated.

18   I will first address Andrea Swift and Frank Bell, since the

19   jury may reasonably find their conduct was closely related.

20        Both Andrea Swift and Mr. Bell participated in a

21   meeting where the Swift senior management group decided to

22   contact KYGO and they later also agreed to provide KYGO

23   with the photograph which has been at the center of this

24   trial.  The evidence also shows that Mr. Bell acted largely

25   at the direction of Ms. Andrea Swift, and acting alone or

1    with the group when he contacted KYGO.

2           Regarding the element of acting intentionally in

3    this context, the law provides that the conduct is

4    intentional if it is done with the purpose, in whole or in

5    part, of bringing about a particular result or with the

6    knowledge that the actor knows his actions or words are

7    likely to bring about that result.  *Watson v. Settlemeyer*,

8    372 P.2d 453, Colorado Supreme Court from 1962, citing the

9    Restatement (Second) of Torts, Section 766.

10          Ms. Andrea Swift's own testimony was that she,

11   quote, absolutely, end quote, wanted Mr. Mueller to be

12   terminated, and conveyed as much to Mr. Bell.  The jury

13   could reasonably infer that Mr. Bell, at the very least,

14   knew plaintiff's termination was a likely result of his

15   communications with KYGO.  The Court, therefore, finds that

16   evidence in the record could support a jury finding that

17   both Andrea Swift and Frank Bell acted intentionally.

18          Regarding whether the alleged interference was

19   improper, as the Court explained in some detail in its

20   summary judgment order, Colorado law has adopted Section

21   767 of the Restatement (Second) of Torts which sets out

22   seven considerations which may show a defendants'

23   interference with another party's contract was improper.

24   See *Warne*, 373 P.3d at pages 595 and 596.

25          These considerations, which include consideration

1    of the alleged tort feasor's motive, permit a finding of

2    improper interference where an alleged tort feasor applies

3    economic pressure or economic duress on the third party to

4    induce them to breach or not perform the contract.  See

5    *Amoco Oil*, 908 P.2d at 501.

6            Here, the jury could reasonably infer from the

7    testimony of Mr. Call and Mr. Bell, and from Ms. Andrea

8    Swift's involvement in the decision to contact KYGO, and

9    her stated desire that plaintiff be terminated, that they

10   acted to apply economic pressure on Lincoln Financial Media

11   to induce plaintiff's termination.

12           Mr. Call's contemporaneous notes of these

13   conversations, in particular, could support such a finding

14   since they stated that KYGO's relationship with Taylor

15   Swift and her team -- one of the most successful musical

16   performers at work today -- could be gravely impacted if

17   KYGO failed to take action against the plaintiff.  Thus, in

18   the Court's view, the critical evidence on which the jury

19   might rely on the issue of whether Mr. Bell's and Ms.

20   Andrea Swift's conduct was improper is the evidence from

21   which the jury might conclude, not simply that Mr. Bell

22   reported to KYGO that one of its employees was -- had

23   assaulted Ms. Taylor Swift, but that this communication was

24   made in a threatening or coercive manner.

25           In addition, the record includes Ms. Melcher's

testimony that in response to her previous reports of very

similar conduct, KYGO did not terminate another of its

employees, and the jury could reasonably infer from this

testimony that KYGO, in fact, did act in this case

precisely because of Taylor Swift's status and because of

what the jury might be -- might find to be thinly veiled

threats of potential retaliation if Lincoln Financial Media

did not act against plaintiff.

As to causation, Mr. Call's testimony acknowledged

that but for the reports from Mr. Bell and the photograph

which defendants sent to KYGO, he would not have terminated

plaintiff.  The jury may therefore reasonably conclude that

the defendants -- that defendant Bell's and defendant

Andrea Swift's conduct caused plaintiff's termination.

And, again, Ms. Melcher's testimony regarding a

prior incident that did not lead to termination could lead

to a reasonable inference by the jury that it was the

combination of who defendants were and the nature of their

communication that caused KYGO to terminate plaintiff,

rather than only the underlying allegation.

While the defendants argue that KYGO's own

investigation and determination terminates any chain of

causation arising from defendants' communications, the

Court finds that sufficient evidence remains from which the

jury could disagree and find that KYGO acted as a direct

1     result of the defendants' actions and not in a truly

2     independent fashion.

3          Accordingly, the Court finds that there is

4     sufficient evidence in the record from which the jury could

5     reasonably conclude that plaintiff has carried his burden

6     of proof on all elements of his claim of tortious

7     interference with contract against defendants Andrea Swift

8     and Frank Bell.

9          As for defendant Taylor Swift, the analysis must

10    be separate.  The evidence shows that she reported the

11    alleged assault to her mother and later became aware that

12    KYGO had been contacted, but that she did not, herself,

13    communicate with KYGO or Lincoln Financial Media regarding

14    her allegations, did not participate in the decision to

15    contact Mr. Call, and only found out that it had occurred

16    sometime afterwards.

17         More significantly, plaintiff concedes that no

18    evidence has been introduced at trial which could support a

19    finding or an inference that when Ms. Taylor Swift reported

20    the alleged assault to her mother, she did not, herself,

21    truly believe that -- both, that she had been wrongfully

22    touched, and that it was Mr. Mueller who had done it.

23    Thus, even if the jury were to conclude that she was

24    mistaken, for example, mistaken that Mr. Mueller touched

25    her intentionally, or mistaken as to the identity of the

1       person who touched her, plaintiff concedes that there's no

2       evidence in this case from which the jury could find or

3       reasonably infer that Ms. Swift reported to her mother --

4       that Ms. Smith's report to her mother and to her staff was

5       dishonest or insincere at the time it was made.

6               Thus, under the factors set out in Section 767 of

7       the Restatement, the Court finds there is insufficient

8       evidence from which a reasonable jury could conclude that

9       Ms. Taylor Swift acted improperly when she reported an

10      assault that she truly believed had occurred.

11              On this point, plaintiff's counsel has cited no

12      authority establishing how it would be improper for Ms.

13      Taylor Swift to report in good faith an assault which she

14      truly believed had occurred.  Plaintiff, himself, also

15      testified on cross-examination that it is never

16      inappropriate for a person to report her or his belief that

17      she or he has been touched in an inappropriate way.  The

18      Court agrees.

19              As stated in the Court's ruling on summary

20      judgment, the Court sees nothing improper about Ms. Taylor

21      Swift, or any person, making an honest report to an entity

22      with which she does business that one of its employees

23      assaulted or harassed her.

24              Since plaintiff has now conceded that there's no

25      evidence that has been admitted at trial from which the

1    jury could find her report was dishonest, made in bad

2    faith, or offered with the motivation of making a false

3    accusation, the Court finds as a matter of law that Taylor

4    Swift did not act improperly.

5           Accordingly, because a showing of improper

6    interference is a necessary element of plaintiff's claim,

7    the defendants' motion is granted in part to dismiss

8    plaintiff's claim for intentional interference with

9    contract as against defendant Taylor Swift.

10          Accordingly, it is ordered that defendants'

11   mid-trial oral motion made under Rule 50(a)(1) for entry of

12   judgment as a matter of law is granted in part, to enter

13   judgment as a matter of law against plaintiff's claims for

14   tortious interference with prospective business

15   opportunities, against plaintiff's claim for liability

16   against Ms. Swift under the -- Ms. Taylor Swift under the

17   doctrine of *respondeat superior*, as well as plaintiff's

18   claim for tortious interference with contract as against

19   defendant Taylor Swift.

20          The defendants' motion is denied as to its claim

21   of tortious interference -- the defendants' motion is

22   denied as to plaintiff's claim of tortious interference

23   with contract as against defendants' Andrea Smith and Frank

24   Bell.

25          The result of these rulings is that the case will

1    be submitted to the jury on Monday, but only on the

2    remaining claim of intentional interference with contract

3    brought by plaintiff against Ms. Andrea Smith and Mr. Bell,

4    and on Ms. Taylor Swift's counterclaim for assault and

5    battery.

6         All right.  I've decided that I will allow the

7    parties 60 minutes for closing arguments.  As we stated

8    before, I will allow each party to have both an opening and

9    rebuttal portion of their closing arguments.  Per my

10   practice standards, no more than one-third or, in this

11   case, 20 minutes can be used for the rebuttal portions of

12   the closing arguments.

13        I won't require you now to tell me how much you

14   want to -- counsel, how much you want to apportion between

15   your opening and rebuttal portions of your closing, but, of

16   course, be prepared to discuss that when I take the bench

17   Monday morning.

18        Also, be prepared to tell me how much of a warning

19   you would want for the opening and rebuttal portion of your

20   closing arguments.

21        And let me anticipate a question that might be in

22   your mind, because it's been asked of me by other counsel.

23   Say, for example, you decide 40 minutes for your opening

24   section -- segment of your closing argument and 20 minutes

25   for your rebuttal.  If, for example, you take only 35

1    minutes, that does not mean you then get 25 minutes for

2    your rebuttal.  You will always have no more than

3    one-third, or 20 minutes, for your rebuttal portion.

4           Given the lateness of the hour, I'm going to leave

5    for Monday morning, Ms. Hansen, the exercise we go through

6    of running through all the exhibits to make sure that we

7    are all on the same page and our records are in accord with

8    respect to which exhibits have been admitted into evidence.

9           All right.  Is there anything that we need to

10   attend to today before we recess for the day?  For the

11   plaintiff?

12          MR. McFARLAND:  No, Your Honor.  Thank you.

13          THE COURT:  All right.  For the defendants.

14          MR. BALDRIDGE:  Nothing, Your Honor.  Thank you.

15          THE COURT:  All right.  Let me just clarify one

16   point.  I'm sorry I missed this.  At 8:30 Monday morning,

17   my law clerk, Mr. Foster, will bring out to counsel copies

18   of the Court's final set of jury instructions.  I will give

19   counsel 15 minutes to review those instructions, collect

20   your thoughts, prepare yourself for the charging

21   conference.  I will take the bench and we'll go on the

22   record at 8:45 for the charging conference.

23          When the charging conference is concluded, we'll

24   make any revisions that are called for by any objections

25   that have been made to the Court's final set of

1    instructions as to which I've sustained an objection.

2            I will then read the jury instructions first, so

3    counsel knows which instructions will be read to the jury.

4    So counsel are free to use any jury instruction in their

5    final -- in their closing arguments.

6            At the conclusion of the reading of the jury

7    instructions by me, we will then turn to the plaintiff to

8    begin closing arguments.

9            All right.  We will be in recess until 8:45 Monday

10   morning.

11       (Proceedings concluded at 5:57 p.m.)

12

13                            **INDEX**

14   Item                                                   PAGE

15                  PLAINTIFF'S WITNESSES

16       **GREG DENT**
         Direct Examination by Mr. McFarland           776
17       Cross-examination by Mr. Baldridge            812
         Redirect Examination by Mr. McFarland         819
18
         **RYAN KLIESCH**
19       Direct Examination by Mr. McFarland           820
         Cross-examination by Mr. Baldridge            850
20
         **SHANNON MELCHER**
21       Direct Examination by Mr. McFarland           860
         Cross-examination by Ms. Foley                884
22       Redirect Examination by Mr. McFarland         892

23

24   ARGUMENT ON RULE 50 MOTION:                        895

25   FINDING BY THE COURT:                              936

955

1                          PLAINTIFF'S EXHIBITS

2    EXHIBITS:          Offered     Received   Refused    Stipulated

3    35                 775         775

4

5

6                    *      *      *      *      *

7                      REPORTER'S CERTIFICATE

8

9        I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled

11   matter.

12       Dated at Denver, Colorado, this 6th day of July, 2018.

13

14

15

16   _                                              _

17                    MARY J. GEORGE, FCRR, CRR, RMR

18

19

20

21

22

23

24

25