956

                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLORADO

     Civil Action No. 15-cv-1974-WJM

     DAVID MUELLER,

     Plaintiff and Counterclaim Defendant,

     vs.

     TAYLOR SWIFT,

     Defendant and Counterclaimant,

     and

     FRANK BELL, and
     ANDREA SWIFT, a/k/a ANDREA FINLAY,

     Defendants.

     ------------------------------------------------------------

                        REPORTER'S TRANSCRIPT
                        (Jury Trial - Day 6)
                           VOLUME VII

     ------------------------------------------------------------

         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

     Judge, United States District Court for the District of

     Colorado, commencing at 8:53 a.m., on the 14th day of

     August, 2017, in Courtroom A801, United States Courthouse,

     Denver, Colorado.

1                           APPEARANCES

2          M. GABRIEL McFARLAND and NEIDE GILLIAN COOLEY
    MORRISON, Evans & McFarland, LLC-Golden, 910 13th Street,
3   Suite 200, Golden, Colorado 80401, appearing for the
    plaintiff and counterclaim defendant.
4
           J. DOUGLAS BALDRIDGE, KATHERINE M. WRIGHT, DANIELLE R.
5   FOLEY, Venable LLP-DC, 600 Massachusetts Avenue, NW,
    Washington, DC 20001       AND
6        JESSE P. SCHAUDIES, JR., 13 Management LLC, 718
    Thompson Lane, Suite 108526, Nashville, Tenessee 37204,
7   appearing for the defendants and counterclaimant.

8                 MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
9           Proceedings Reported by Mechanical Stenography
                 Transcription Produced via Computer
10

11                   P R O C E E D I N G S

12         (In open court outside the presence of the jury at

13   8:53 a.m.)

14         THE COURT:  All right.  We are going to go through

15   the jury instruction charging conference at this time.  All

16   right.  The way I handle these things is I'm going to read

17   a summary of how I've treated each of the proposed

18   instructions, and then I'll give each side the opportunity

19   to make their record with respect to any individual

20   instruction that was given or not given.

21         All right.  With respect to the parties'

22   stipulated instructions, stipulated instruction 1 through 5

23   was adopted; 6 was modified; 7 was adopted; 8 was

24   recorrected; 9 was adopted; 10 and 11 and 12 were rejected;

25   13 through 17 were adopted; 18 through 20 were modified; 21

958

1    through 23 were adopted; 24 was rejected; 25 was adopted;

2    and 26 was adopted.

3            With respect to the plaintiff's disputed

4    instructions, they -- they weren't numbered, so I'll just

5    refer to them by ECF number pages, pages 2 through 10 were

6    rejected; ECF 168 at page 11 was -- and 12 were adopted;

7    and at pages 13 and 14 were modified.

8            The defendants' disputed instructions A through C

9    were rejected; D was modified; E, F -- E through H was

10   rejected; I was modified; and J was rejected.

11           All right.  The record will also reflect that

12   counsel has been given approximately 20 minutes to review

13   the Court's final set of jury instructions.  For the

14   record, any instructions that were submitted by the parties

15   that were not included in the Court's final set were either

16   rejected in part or in whole as -- or modified as I've just

17   summarized.

18           All right.  Let's go to the plaintiff first.  Mr.

19   McFarland, are there any objections to the Court's final

20   set of jury instructions?

21           MR. McFARLAND:  Judge, there are no particular

22   objections.  I did want to note, I'm sure Your Honor is

23   aware, but there are two multiple defendant instructions.

24           THE COURT:  Right.  And?

25           MR. McFARLAND:  And I just wanted to make sure

1    that that was intentional.

2         THE COURT:  We have multiple -- we have more than

3    one defendant.

4         MR. McFARLAND:  But there's two multiple defendant

5    instructions.  And I just wanted to make sure --

6         THE COURT:  Oh, I see what you're saying.

7         MR. McFARLAND:  There's one on page 15 and another

8    one on page 25.

9         THE COURT:  Okay.  Hold on.  All right.  Well, the

10   reason there's two is that 15 is a general one generally

11   dealing with liability that the jury should assess each

12   defendant separately for purposes of liability; and

13   page 25, it separates out specifically the damages that --

14   how the jury can ascertain and apportion damages as between

15   one or both of the defendants should the jury find in favor

16   of the plaintiff on behalf of one of those two.

17        Let me just point out to both counsel that since

18   we brought out the final set, we -- my law clerk and I

19   caught something on page 23 that we're going to make a

20   change, and so I want to get it on the record if you object

21   to it.  I think it's been established pretty clearly that

22   the contract between the plaintiff was with Lincoln

23   Financial.  So we're going to -- page 23, terminable

24   contract, we're going to insert "Lincoln Financial" in lieu

25   of "KYGO."

1          Do you have any objection to that, Mr. McFarland?

2          MR. McFARLAND:  No, Your Honor.

3          THE COURT:  Is there any objection from the

4    plaintiff to the Court's proposed final verdict form?

5          MR. McFARLAND:  There's not.

6          THE COURT:  All right.  Okay.  I'll hear from the

7    defendants.  Ms. Foley, let's begin with the jury

8    instructions.  Are there any objections to the Court's

9    final set of jury instructions from the defendants?

10         MS. FOLEY:  Yes, Your Honor.

11         THE COURT:  All right.

12         MS. FOLEY:  Starting on page 20, Intentional

13   Conduct Defined.  The standard set forth in the Court's

14   instruction, we object to the language on the third line

15   that says that "the act or words are likely to bring about

16   that result."  Under *Ryskin v. Banner Health*, the

17   restatement Section 8(a) under statement Section 766,

18   specifically comment J, we believe the proper standard is

19   "certain or substantially certain to bring about the

20   result."

21         THE COURT:  I'm aware of that.  And I believe that

22   the Colorado jury instruction, the standard CJA

23   instruction, I think more accurately reflects the law in

24   this state with respect to "likely result" as opposed to

25   "certain or nearly certain results."  So that objection is

1    overruled.

2            MS. FOLEY:  Okay.  On page 21, improper conduct

3    defined.  We would add to this "that reporting truthful

4    information is not improper."  Also under the restatement

5    Section 772.  And we would also add to this that "reporting

6    an assault is not improper conduct and should not have

7    liability attached to it," under both the Court's summary

8    judgment opinion and Rule 50 standard articulated last

9    week.

10           THE COURT:  All right.  I gave that point

11   considerable thought.  I think that's adequately dealt with

12   in other instructions and, accordingly, the defendants'

13   objection's overruled.

14           MS. FOLEY:  On page 22, the causation instruction.

15   We think that to make this instruction clear, a sentence

16   should be added to the end that, "Specifically, if Mr.

17   Mueller was fired for some reason other than the

18   defendants' conduct, then the defendants cannot be held

19   liable for that reason."

20           There was plenty of evidence produced in the trial

21   that there were -- Mr. Mueller was -- some of his superiors

22   found him to be insubordinate; that he had been told they

23   were ready to fire him for insubordination.  And to be

24   clear, in this instruction the jury should be instructed

25   that if there was another reason that had nothing to do

1    with the defendants, then the defendants are not the cause

2    of his being fired.

3              THE COURT:  But isn't that already implicit in the

4    instruction that to find liability against the defendants,

5    the jury has to find the causation element as to the

6    defendants?  It's -- I think it's implicit and also

7    repetitive to say -- and I think we're bringing too much

8    emphasis on the point to say, "In order to find for the

9    plaintiff on -- on this tort, you need to find that one or

10   both of the defendants caused the injury," and then to say,

11   "And if you find that someone else caused the injury,

12   then -- and not the defendants -- then you shouldn't find

13   for the plaintiff."

14             I think it's -- it's the mirror -- it's the exact

15   mirror of what we're saying here.  I don't believe that has

16   to be said twice, and I think it would unduly emphasize

17   this point to the detriment of the plaintiff.  So I'm going

18   to overrule that objection.

19             MS. FOLEY:  On instruction Terminable Contract, on

20   page 23, we think this instruction is not necessary; that

21   it's confusing to the jury.  If -- again, if the point is

22   if Lincoln Financial or KYGO fired Mr. Mueller for a reason

23   other than defendants' conduct, obviously that has nothing

24   to do with the defendants.  And this instruction,

25   terminable contract, puts undue emphasis on the idea that,

1    well, Lincoln Financial could have terminated him and so

2    just ignore what the defendants did here, and the fact that

3    Mr. Mueller may have been fired for some other reason.

4         We think it also -- the fact that Mr. Mueller

5    could have been terminated by KYGO for another reason goes

6    to damages.  It could possibly limit, if not eliminate, all

7    his damages claims.  So we think that this instruction

8    should be stricken.

9         THE COURT:  Mr. McFarland, let me hear from you.

10   You can stay there, Ms. Foley.  Why don't you grab the

11   mike.  I don't know how it ended up on that side of the

12   table again, but bring it to where you are at.

13        MR. McFARLAND:  Thank you, Your Honor.

14        The terminable contract jury instruction comes

15   right out of the Colorado model jury instructions, 24:5, in

16   particular.  And the framers of the Colorado Jury

17   Instructions, based on Colorado law, thought that it was

18   important generally -- and I would agree, applies here --

19   to let jurors know that the fact that a contract is --

20   could have been terminated, or is terminable at will, is

21   fair and reasonable, all things considered.  And I think

22   that's all we're doing with this particular instruction.

23        THE COURT:  I agree with the plaintiff.  I think

24   the terminable instruction is from the CJA pattern

25   instruction and is supported by Colorado case law with

1    respect to the fact that the tort is actionable even in

2    cases of terminable at-will employment contracts.  So that

3    objection's overruled as well.

4             Any other objection?

5             MS. FOLEY:  Yes, sir.  With respect to the damages

6    instructions --

7             THE COURT:  What page are you --

8             MS. FOLEY:  26.  We would add to the end of the

9    second paragraph a statement that, "The plaintiff must

10   prove his damages with reasonable certainty,"  under the

11   *Denny Construction* case.  That statement does not appear in

12   this instruction anywhere.  We think that's important given

13   the law, the ruling of the Supreme Court of Colorado.

14            THE COURT:  Mr. McFarland.

15            MR. McFARLAND:  I think that principle is -- is

16   appropriately addressed in the second paragraph, itself,

17   which specifically tells the jury that they should not

18   consider lost future income.

19            MS. FOLEY:  But --

20            THE COURT:  I think Ms. Foley's making a different

21   objection.

22            MS. FOLEY:  That's right.  The next sentence

23   doesn't say to the jury, "You have to prove the damages

24   with reasonable certainty."  It says, "You can't speculate

25   as to an impossible" -- if it's impossible to ascertain,

1    that's clear we all agree can't be awarded those damages.

2    But also under the *Denny Construction* case, the plaintiff

3    has the burden to prove his damages with reasonable

4    certainty and that should be instructed in this case.

5            THE COURT:  Mr. McFarland.

6            MR. McFARLAND:   Judge, I don't think it's

7    necessary.  I think the way that you have it set forth here

8    accurately frames the law.  David Mueller has the burden of

9    proving by a preponderance of the evidence the nature and

10   extent of his damages.  We go on to say, "However, you may

11   not award speculative damages for future lost income -- or

12   damages for lost future income in an amount that is

13   impossible to ascertain.  You should not consider any

14   future lost income that Mr. Mueller may have suffered

15   beyond the two-year term of his contract."

16           I don't know -- I don't know how it could be any

17   more clear than that last sentence of paragraph 2.

18           THE COURT:  So are you concerned, Ms. Foley, that

19   given all these restrictions that already are in page -- in

20   paragraph 2, rather, that there's still some kind of wiggle

21   room for the -- that shouldn't be there for the jury in

22   terms of the precise ascertainability of the permitted

23   damages?

24           MS. FOLEY:  Yes, the ascertainability at all of

25   what the damages are within the two-year -- remaining

1    two-year period of the contract.

2          THE COURT:  What is your proposed additional

3    sentence?

4          MS. FOLEY:  "Plaintiff must prove his damages with

5    reasonable certainty."

6          THE COURT:  That's from the *Denny Construction*

7    case?

8          MS. FOLEY:  Yes, sir.

9          THE COURT:  All right.  I'm going to sustain that

10   objection.  I think that is a valid point.  I think the

11   other issues that Mr. McFarland raises are -- are different

12   from the point -- the precise point that Ms. Foley is

13   stating, so we're going to sustain that.  We're going to

14   add that paragraph -- that sentence to the end of that

15   paragraph before we bring you out your final sets.

16         MS. FOLEY:  Okay.  One last objection, Your Honor,

17   is the compensatory damages instruction on page 27. I think

18   the instruction on page 26 with the language the Court has

19   added is sufficient to properly instruct the jury as to

20   what the possible damages are in this case.

21         The instruction on page 27 is confusing and it

22   could be read by the jury to open the door to some damages

23   beyond the two-year contract.  You know, it doesn't limit

24   it.  We don't believe this is necessary to add to it and

25   that the damages instruction on page 26, as amended, is

1    sufficient in this case.

2              THE COURT:  Okay.  Mr. McFarland -- well, first of

3    all, while you're collecting your thoughts -- Ms. Foley,

4    isn't this a stipulated instruction that -- instruction the

5    defendants have stipulated to?

6              MS. FOLEY:  It states -- Your Honor, but that was

7    before the Rule 50 ruling last week that limited it --

8    limited his possible damages to only the two-year period of

9    time.  So we believe that 26 is the appropriate

10   instruction, and that 27 is unnecessary at this point.

11   It's just simply duplicative and the language is not as

12   precise as in 26.

13             THE COURT:  Mr. McFarland.

14             MR. McFARLAND:  Judge, this was stipulated to and

15   I maintain that it makes sense to keep this in here.

16   It's -- there's a lot of language on page 27 that is not on

17   page 26 that helps the jury understand what the purpose of

18   damages is for and what they must do under certain

19   circumstances to fairly compensate Mr. Mueller.

20             THE COURT:  I agree.  I think that the -- not only

21   is it a correct statement of the law, I don't think it

22   misstates anything based on the factual record that's going

23   to go to the jury, and on that basis the objection's

24   overruled.

25             Any other objections to the jury instructions?

1          MS. FOLEY:  Your Honor, we just want to preserve

2     for the record the instructions that we previously

3     submitted.  We understand you have rejected some of

4     those --

5          THE COURT:  Right.  Yeah.  You have --

6          MS. FOLEY:  Those --

7          THE COURT:  You have made your record.  Any

8     instruction that the defendants, or either side, have

9     proposed that have not been adopted, in whole or in part,

10    or modified, have been rejected, and you've made your

11    record on that.

12         Is there any objection to the Court's proposed

13    verdict form from the defendants?

14         MS. FOLEY:  No objection.

15         THE COURT:  All right.  Thank you.  A couple of

16    housekeeping matters.  We decided on 50 minutes and 10

17    minutes, Mr. McFarland, for the plaintiff in terms of the

18    apportioning of your closing argument?

19         MR. McFARLAND:  Yes, Your Honor.

20         THE COURT:  Five-minute warning for your opening

21    segment and two-minute warnings for your rebuttal?

22         MR. McFARLAND:  That is correct.

23         THE COURT:  And, Mr. Baldridge, Ms. Hansen tells

24    me that you also have apportioned at 50 minutes and 10

25    minutes.

1          MR. BALDRIDGE:  Yes, sir.

2          THE COURT:  And five-minute warning for both.

3          MR. BALDRIDGE:  Yes, sir.

4          THE COURT:  All right.  At this time, because we

5    didn't do this on Friday because we were all tired and it

6    was after 6:00 -- we would have normally have handled it on

7    Friday -- but now Ms. Hansen's going to run through the

8    exhibits that have been admitted into evidence per her

9    records.  She's the official recordkeeper for the Court.

10   Sometimes we don't catch it all, so we're going to run

11   through those, plaintiff's exhibits first and make sure

12   that we're all on the same page.  Deb.

13         COURTROOM DEPUTY:  I'm just going to read what has

14   been admitted.

15         Plaintiff's Exhibit 9, Plaintiff's Exhibit 31, and

16   35, although 35 will not go back to the jury.

17         THE COURT:  All right.  Mr. McFarland, does that

18   comport with the plaintiff's records?

19         MR. McFARLAND:  It does.

20         THE COURT:  All right.  For the defendants, does

21   that comport with the defendants' records?

22         MS. WRIGHT:  Yes, Your Honor.

23         THE COURT:  Thank you.  All right.  Let's go

24   through the defendants' exhibits.

25         COURTROOM DEPUTY:  Admitted Defendants' Exhibits

1    A, C, D, E, H, I, J, K, L, A-1, and that's it.

2            THE COURT:  All right.  Does that comport with the

3    plaintiff's records?

4            MR. McFARLAND:  It does, Your Honor.

5            THE COURT:  With the defendants'?

6            MS. WRIGHT:  Yes, Your Honor.

7            THE COURT:  All right.  Thank you.

8            One last thing I need to get agreement from

9    counsel:  Do counsel agree that, as I read the instructions

10   to the jury this morning, that I may make any amendments to

11   those instructions that are necessary because of any

12   typographical or clerical or syntactical error?  I like

13   that word.

14           MR. McFARLAND:  Yes, Your Honor.

15           MR. BALDRIDGE:  Yes, sir.

16           THE COURT:  Okay.  Very well.  All right.  We will

17   be in recess until 9:30.

18        (Recess at 9:14 a.m. to 9:35 a.m.)

19           THE COURT:  One second.  I neglected to tell the

20   lawyers that we're going to take a recess after Mr.

21   McFarland's opening segment of his closing argument.  That

22   will be our morning recess.

23           All right, let's bring in the jury.

24        (Jury was present at 9:35 a.m.)

25           THE COURT:  Good morning, ladies and gentlemen of

1    the jury.  Welcome back to day 6 of our jury trial.  I hope

2    you had a pleasant weekend.

3            So as I told you on Friday, what we're going to do

4    now is I'm going to read to you the final set of the

5    Court's jury instructions that will govern your

6    deliberations of your verdict in this case.  When you go

7    back to deliberate, you'll see eight sets of these

8    instructions, one for each of you.  You don't need to --

9    you can take whatever notes you want at this time, but I'll

10   have all these in writing.  After that, we will have the

11   closing arguments of the lawyers.

12   All right.  Members of the jury, in any jury trial, there

13   are, in effect, two judges.  I am one of the judges and you

14   are the other.  I am the judge of the law and you, as

15   jurors, are the judges of the facts.  I presided over the

16   trial and decided what evidence was proper for your

17   consideration and it is also my duty at the end of the

18   trial to explain to you the rules of law that you must

19   follow and apply in arriving at your verdict.

20           In explaining the rules of the law that you must

21   follow, first, I will give you some general instructions

22   which apply in every civil case.  For example, instructions

23   about the burden of proof and insight that might help you

24   to judge the believability of witnesses.  Then I will give

25   you some specific rules of law that apply to this

1   particular case.  And, finally, I will explain the

2   procedures you should follow in your deliberations and the

3   possible verdicts that you may return.

4          These instructions will be given to you for your

5   use in the jury room, so you need not take notes at this

6   time.

7          In reaching your decision as to the facts, it is

8   your sworn duty to follow all the rules of law as I explain

9   them to you.  You have no right to disregard or give

10  special attention to any one instruction or to question the

11  wisdom or correctness of any rule I may state to you.

12         You must not substitute or follow your own notion

13  or opinion as to what the law is or ought to be.  It is

14  your duty to apply the law as I explain it to you

15  regardless of the consequences.  However, you should not

16  read into these instructions or anything else I may have

17  said or done during the trial, any suggestion as to what

18  your verdict should be as that is entirely up to you.

19         You are not to be concerned with the wisdom of any

20  rule of law stated by me.  It would be a violation of your

21  oath to base your verdict on anything other than the law as

22  presented in these instructions and the facts as you find

23  them.  Counsel may properly refer to some of the governing

24  rules of law in their closing arguments.  If there's any

25  difference between the law as stated by counsel or in the

1    exhibits, and that is stated by me in these instructions,

2    my instructions prevail.  The law contained in these

3    instructions is the law that must govern your deliberations

4    in this case.

5         Finally, it is your duty to base your verdict

6    solely upon the evidence without prejudice, bias or

7    sympathy for or against any party in this case.  That was

8    the promise you made and the oath that you took.

9         You must make your decision based solely on the

10   evidence that you saw and heard here in court.  Do not let

11   rumors, suspicions, or anything else that you may have seen

12   or heard outside of court influence your decision in any

13   way.  The evidence in this case includes only what the

14   witnesses said while they were testifying under oath, the

15   exhibits that I allowed into evidence, and the stipulations

16   that the lawyers agreed to.  Nothing else is evidence.  The

17   lawyers' statements and arguments are not evidence, their

18   questions and their objections are not evidence.  My legal

19   rulings are not evidence.  And my comments and questions

20   are not evidence.

21        During the trial, I did not let you hear the

22   answers to some of the questions that the lawyers asked.  I

23   also ruled that you could not see some of the exhibits that

24   the lawyers wanted you to see.  You must completely ignore

25   all of these things.  Do not even think about them.  Do not

1    speculate about what a witness might have said or what an

2    exhibit might have shown.  These things are not evidence

3    and you're bound by your oath not to let them influence

4    your decision in any way.

5         There are, generally speaking, two types of

6    evidence from which a jury may properly determine the facts

7    of a case.  One is direct evidence, such as the testimony

8    of an eyewitness.  The other is indirect, or

9    circumstantial, evidence, that is, the proof of a chain of

10   facts which point to the existence or nonexistence of

11   certain other facts.  As a general rule, the law makes no

12   distinction between direct and circumstantial evidence.

13   The law simply requires that you find the facts in

14   accordance with all the evidence in the case, both direct

15   and circumstantial.

16        While you must consider only the evidence in this

17   case, you are permitted to draw reasonable inferences from

18   the testimony and the exhibits, inferences you feel are

19   justified in light of common experience.  An inference is a

20   conclusion that reason and common sense may lead you to

21   draw from facts which have been proved.  By permitting such

22   reasonable inferences, you may make deductions and reach

23   conclusions that reason and common sense lead you to draw

24   from the facts which have been established by the testimony

25   and the evidence in this case.

1          At the beginning of this case, I talked to you

2    about the difference between a criminal and a civil case

3    with respect to the burden of proof.  At least some of you

4    have heard the term "proof beyond a reasonable doubt."

5    Proof beyond a reasonable doubt is a stricter standard that

6    applies in criminal cases, it does not generally apply in

7    civil cases such as this.  You should, therefore, put it

8    out of your minds.

9          In a civil case such as this one, the burden of

10   proof is "preponderance of the evidence."  To prove

11   something by a preponderance of the evidence means to prove

12   that it is more probably true than not.  The standard does

13   not require proof to an absolute certainty since proof to

14   an absolute certainty is seldom possible in any case.

15         In determining whether any fact in issue has been

16   proved by a preponderance of the evidence, you may, unless

17   otherwise instructed, consider the testimony of all

18   witnesses regardless of who may have called them, and all

19   exhibits received into evidence regardless of who may have

20   produced them.

21         Any finding of fact you make must be based on

22   probabilities and not possibilities.  You should not guess

23   or speculate about a fact.

24         As I previously instructed you, you must consider

25   all the evidence.  This does not mean, however, that you

1       must accept all the evidence as true or accurate.  You are

2       the sole judges of the credibility or believability of each

3       witness and the weight to be given to each witness'

4       testimony.

5             An important part of your job will be making

6       judgments about the testimony of the witnesses who

7       testified in this case.  You should think about the

8       testimony of each witness that you have heard and decide

9       whether you believe all or part of what each witness had to

10      say, and how important that testimony was.  In making that

11      decision, I suggest that you ask yourself the following

12      questions:

13            Did the witness impress you as honest?

14            Did the witness have any particular reason not to

15      tell the truth?

16            Did the witness have a personal interest in the

17      outcome of the case?

18            Did the witness have any relationship with either

19      party?

20            Did the witnesses -- did the witness seem to have

21      a good memory?

22            Did the witness clearly see or hear the things

23      about which he or she testified?

24            Did the witness have the opportunity and ability

25      to understand the questions clearly and answer them

1   directly?

2          And did the witness' testimony differ from the

3   testimony of other witnesses?

4          When weighing the conflicting testimony, you

5   should consider whether the discrepancy has to do with a

6   material fact or an unimportant detail.  And you should

7   keep in mind that innocent misrecollection, like failure of

8   recollection, is not uncommon.

9          In reaching a conclusion on a particular point, or

10  ultimately in reaching a verdict in this case, do not make

11  any decisions simply because there were more witnesses on

12  one side than another.

13         During the trial, you heard the testimony of Ms.

14  Gabby Liddicoat and was presented by way of deposition.

15  The deposition consisted of sworn recorded answers to

16  questions asked of the witness in advance of the trial by

17  one or more of the attorneys for the parties to the case.

18  The testimony of a witness who, for some reason is not

19  present to testify from the witness stand, may be presented

20  in writing under oath.  Such testimony is entitled to the

21  same consideration and is to be judged as to credibility

22  and weighed and otherwise considered by you insofar as

23  possible in the same way as if the witness had been present

24  and had testified from the witness stand.

25         The lawyers for both sides objected to some of the

1    things that were said or done during the trial.  Do not

2    hold that against either side.  Lawyers have a duty to

3    object whenever they think that something's not permitted

4    by the Rules of Evidence.  These rules are designed to make

5    sure that both sides receive a fair trial.

6            Please do not interpret my rulings on their

7    objections as any indication of how I think the case should

8    be decided.  My rulings were based on the Rules of Evidence

9    and not about -- on how I feel about this case.

10           You've heard me say that the parties have

11   stipulated to certain facts.  This agreement makes the

12   presentation of any evidence to prove this fact

13   unnecessary.  This agreement means that you must accept the

14   following stipulated facts as true:

15           No. 1:  David Mueller was employed by Lincoln

16   Financial Media Group of Colorado -- which I will hereafter

17   refer to as Lincoln Financial -- in January of 2013.

18           No. 2:  As of June 2d, 2013, KYGO was owned by

19   Lincoln Financial.

20           No. 3:  As of June 2d, 2013, David Mueller was

21   working at Denver, Colorado, based -- at the Denver,

22   Colorado, based country radio station KYGO.

23           No. 4:  David Mueller's employment contract with

24   Lincoln Financial, dated January 4, 2013, was for a term of

25   two years with a base salary of $150,000.

1            No. 5:  Lincoln Financial had the option, at its

2    sole discretion, to extend David Mueller's contract for one

3    additional year.

4            No. 6:  Eddie Haskell was the program director of

5    KYGO on June 2d, 2013, and was David Mueller's immediate

6    supervisor.

7            No. 7:  Robert "Bob" Call is the vice president

8    market manager of KYGO and was one of David Mueller's

9    bosses.

10           No. 8:  As of June 2d, 2013, David Mueller was

11   known by the professional pseudonym "Jackson."

12           No. 9:  Lincoln Financial terminated David Mueller

13   June 4, 2013.

14           No. 10:  At the time of David Mueller's

15   termination, Lincoln Financial had the legal right to

16   terminate his contract.

17           No. 11:  Taylor Swift was 23 years old on June 2d,

18   2013.

19           No. 12:  Dave was 51 years old on June 2d, 2013.

20           No. 13:  On Sunday, June 2d, 2013, Taylor Swift

21   had a concert at the Pepsi Center in Denver, Colorado.

22           No. 14:  David Mueller and his coworker/girlfriend

23   at the time, Shannon Melcher, attended Taylor Swift's fan

24   meet-and-greet prior to her June 2d, 2013, concert at the

25   Pepsi Center.

1              No. 15:  During the fan pre-concert

2    meet-and-greet, a photograph was taken of David Mueller,

3    Shannon Melcher, and Taylor Swift.

4              And finally, No. 16:  On June 3d, 2013, Frank

5    Bell, at Bob Call's request, sent KYGO/Lincoln Financial

6    the photograph of Taylor Swift, David Mueller, and Shannon

7    Melcher, taken in Taylor Swift's pre-concert

8    meet-and-greet.

9              You should consider and decide this case as a

10   dispute of persons of equal standing in the community, of

11   equal worth, and holding the same or similar stations in

12   life.

13             Although there's more than one defendant in this

14   case, it does not follow from the fact -- from that fact

15   alone that if one defendant is liable to the plaintiff,

16   that both defendants are liable.  Each defendant is

17   entitled to a fair consideration of the evidence.  No

18   defendant is to be prejudiced should you find against the

19   other.  All instructions I give you govern this case as to

20   each defendant.

21             There's been publicity about this case in the

22   newspapers and on radio, television, and the internet.

23   Some of this publicity may have come to the attention of

24   some of you.  The person who reported the story may not

25   have heard all the testimony as you have, may be getting

1    information from people whom you will not see here under

2    oath, and subject to cross-examination, and may emphasize

3    an unimportant point or may simply be wrong.  You must

4    disregard anything that you may have heard about this case

5    outside the courtroom.  Your verdict must be based solely

6    on the evidence admitted at trial.

7         Now, that concludes the part of my instructions

8    explaining your duties and the general rules that apply in

9    every civil case.  Now I will explain the elements of the

10   claims at issue here.

11        For the plaintiff, David Mueller, to recover from

12   either defendant on his claim of potential interference of

13   contractual obligations, you must find that all of the

14   following have been proved by a preponderance of the

15   evidence as to each defendant.

16        No. 1:  David Mueller had a contract with Lincoln

17   Financial in which Lincoln Financial agreed to employ him

18   as an on-air radio personality at radio station KYGO in

19   Denver, Colorado.

20        No. 2:  The defendant knew or reasonably should

21   have known of David Mueller's contract with Lincoln

22   Financial.

23        No. 3:  The defendant, by words or conduct, or

24   both, intentionally caused Lincoln Financial to terminate

25   its contract with David Mueller.

1              No. 4:  The defendants' interference with the
2    contract was improper.
3              And, 5:  The defendants' interference with the
4    contract caused injury and damages to David Mueller.
5              If you find that any one or more of these
6    statements has not been proved as to either defendant then
7    your verdict must be for that defendant.
8              On the other hand, if you find that all of these
9    statements have been proved as to each defendant, then your
10   verdict must be for David Mueller against that defendant.
11             Interference means intentional conduct that causes
12   another to terminate or not to perform a contract.
13             Conduct is intentional if a person acts or speaks
14   for the purpose, in whole or in part, of bringing about a
15   particular result, or if a person knows his or her acts or
16   words are likely to bring about that result.  It is not
17   necessary that a person act or speak with malice or ill
18   will, but the presence of or absence of malice or ill will
19   may be considered by you in considering if the conduct is
20   intentional.
21             In addition to determining whether defendants
22   acted intentionally, you must determine whether any conduct
23   interfering with David Mueller's conduct was improper.
24   Even if any interference was intentional, liability does
25   not attach unless you conclude that the defendants' conduct

1      was also improper.

2              In your determination of whether any defendants'

3      conduct was or was not improper, you are to consider all

4      the facts and circumstances of the case.  In doing so, you

5      should consider the following factors:

6              The nature of the defendants' conduct;

7              the defendants' motive;

8              the interests of the plaintiff with which the

9      defendants' conduct interferes;

10             the interest sought to be advanced by the

11     defendant;

12             the social interest in protecting the freedom of

13     action of the defendant and the contractual interest of

14     plaintiff;

15             the proximity or remoteness of the defendants'

16     conduct to the interference, recognizing that remote

17     conduct is rarely improper, and, finally,

18             the relations between the parties.

19             In balancing these factors, you should answer the

20     question of whether a defendant's conduct was fair and

21     reasonable under the circumstances.

22             The word "cause" as used in these instructions

23     means an act or failure to act that in natural and probable

24     sequence produce the claimed injury.  It is a cause without

25     which the claimed injury would not have happened.

1      If more than one act or failure to act contributed

2  to the claimed injury, then each act or failure to act may

3  have been a cause of the injury.  A cause -- a cause does

4  not have to be the only cause or the last or nearest cause.

5  It is enough if the act or failure to act joins in a

6  natural and probable way with some other act or failure to

7  act to cause some or all of the claimed injury.

8      One's conduct is not a cause of another's injury

9  --injuries, however, if, in order to bring about such

10  injuries, it was necessary that his or her conduct combined

11  or joined with an intervening cause that also contributed

12  to cause the injuries.

13      An intervening cause is a cause that would not

14  have been reasonably foreseen by a reasonably careful

15  person under the same or similar circumstances.

16      It is not a defense to the plaintiff's claim of

17  intentional interference with contract that the contract

18  between the plaintiff and Lincoln Financial could have been

19  terminated by Lincoln Financial.

20      The fact that I am instructing you as to the

21  proper measure of damages should not be considered as

22  indicating any view of mine as to which party's entitled to

23  a verdict in this case.  It is exclusively your function to

24  decide upon liability, and I'm instructing you on damages

25  only so that you will have guidance should you decide that

1    any party is entitled to recovery.

2            You must be careful to impose any damages that you

3    may award on a claim solely upon the defendant or

4    defendants who you find to be liable on that claim.

5    Although there are two defendants in this case, it does not

6    follow that if one is liable, the other must be liable as

7    well.

8            Each defendant is entitled to fair, separate and

9    individual consideration of the case without regard to your

10   decision as to the other defendant.  If you find that only

11   one defendant is responsible for a particular injury, then

12   you must impose damages for that injury only upon that

13   defendant.

14           Nevertheless, you might find that both defendants

15   are liable for a particular injury.  If two persons unite

16   in an intentional act that violates another person's right,

17   then both of those persons are jointly liable for the acts

18   of each other -- of each of them.  The law does not require

19   that -- the law does not require the injured party to

20   establish how much of the injury was done by each

21   particular defendant that you find liable.  Thus, if you

22   find that both defendants are liable and acted jointly,

23   then you may treat them jointly for purposes of deciding

24   damages.  If you decide that both defendants are jointly

25   liable, then you may simply determine the overall amount of

1    damages for which they are liable without breaking that

2    figure down into individual percentages.

3         David Mueller has the burden of proving by a

4    preponderance of the evidence the natural -- the nature and

5    extent of his damages.  If you find in favor of David

6    Mueller, you must determine the total dollar amount of his

7    damages, if any, that were caused by the interference by

8    the defendants, Andrea Swift, and/or Frank Bell, with David

9    Mueller's contract with Lincoln Financial.

10         In determining damages, you may consider the terms

11   and duration of David Mueller's contract with Lincoln

12   Financial.  However, you may not award speculative damages

13   for lost future income or damages for lost future income in

14   an amount that is impossible to ascertain.  Lost profits

15   are recoverable only if they can be proven with reasonable

16   certainty.

17         In this case, you, therefore, should not consider

18   any future lost income that David Mueller may have suffered

19   beyond the two-year term of his contract with Lincoln

20   Financial.  Plaintiff must prove his damages with

21   reasonable certainty.

22         As I have already instructed you, David Mueller

23   must prove that he suffered some amount of actual damages

24   as an element of his claim.  However, if you find that he

25   has proved he suffered some damages but has produced

1    insufficient evidence for you to determine the amount, then

2    you may find in favor of David Mueller but shall award him

3    nominal damages of $1.

4            The purpose of the law of damages is to award, as

5    far as possible, just and fair compensation for the loss,

6    if any, which resulted from a defendant's violation of a

7    plaintiff's rights.  If you find that a defendant is liable

8    on a claim as I have explained them, then you must award

9    David Mueller sufficient damages to compensate him for any

10   injury caused by defendant's conduct.  These are known as

11   compensatory damages.

12           Compensatory damages seek to make the plaintiff

13   whole, that is, to compensate him for the damage he

14   suffered.

15           I remind you that you may award compensatory

16   damage only for injuries that a plaintiff proves were

17   caused by defendants' alleged wrongful conduct.  The

18   damages that you award must be fair and reasonable, neither

19   inadequate nor excessive.  You should not award

20   compensatory damages for speculative injuries, but only for

21   those injuries that a plaintiff has actually suffered.

22           In awarding compensatory damages, if you decide to

23   award them, you must be guided by dispassionate common

24   sense.  Computing damages may be difficult, but you must

25   not let that difficulty lead you to engage in arbitrary

1  guesswork.  In all instances, you are to use sound

2  discretion in fixing an amount of the damages, drawing

3  reasonable inferences where you deem appropriate from the

4  facts and circumstances in evidence.

5      If you find that David Mueller has proven actual

6  damages, then you must consider whether David Mueller

7  failed to mitigate or minimize his damages.  David Mueller

8  has the duty to take reasonable steps under the

9  circumstances to mitigate or minimize his damages.

10     Damages, if any, caused by David Mueller's failure

11 to take such reasonable steps cannot be awarded to him and

12 must not be included in your award of compensatory damages.

13     For Taylor Swift to recover from David Mueller on

14 her claim of assault, you must find that all the following

15 have been proved by a preponderance of the evidence:

16     No. 1:  David Mueller intended to cause an

17 offensive or harmful physical contact with Taylor Swift or

18 intended to place her in apprehension of such conduct; and.

19     No. 2:  David Mueller placed Taylor Swift in

20 apprehension of immediate physical conduct; and

21     3:  That contact was harmful or offensive.

22     If you find that any one or more of these

23 statements has not been proved, then your verdict must be

24 for David Mueller.  On the other hand, if you find that all

25 these statements have been proved, then your verdict must

1    be for Taylor Swift.

2         Apprehension is a state of mind experienced when a

3    person anticipates immediate harmful or offensive physical

4    contact.

5         For Taylor Swift to recover from David Mueller on

6    her claim of battery, you must find that all the following

7    have been proved by a preponderance of the evidence:

8         First:  David Mueller's act resulted in physical

9    contact with Taylor Swift; and

10         Two:  David Mueller intended to make harmful or

11    offensive physical contact with Taylor Swift; and

12         Three:  The contact was harmful or offensive.

13         If you find that any one or more of these

14    statements has not been proved, then your verdict must be

15    for David Mueller.  On the other hand, if you find that all

16    of these statements have been proved, then your verdict

17    must be for Taylor Swift.

18         A contact is the physical touching of another

19    person.  A harmful contact is one that causes injury or

20    emotional distress.  An offensive contact is one that would

21    offend another's reasonable sense of personal dignity.

22         A person intends to place another in apprehension

23    of physical contact, or to make harmful or offensive

24    physical contact with another, if he acts with a purpose of

25    causing such contact even if he did not intend to cause the

990

1       specific harm that actually occurred.

2               Taylor Swift has the burden of proving the nature

3       and extent of her damages by a preponderance of the

4       evidence.  Taylor Swift is only requesting nominal damages,

5       therefore, if you find in favor of Taylor Swift, you shall

6       award her not -- nominal damages of $1.

7               Now, that concludes the part of my instructions

8       explaining the law that applies in this case.  Now, let me

9       finish up by explaining some things about your

10      deliberations in the jury room and your possible verdicts.

11              After the parties' closing argument, the bailiff

12      will escort you to the jury room and provide each of you

13      with a copy of the instructions that I've just read.  Any

14      exhibits admitted into evidence will also be placed in the

15      jury room for your review.  When you go to the jury room,

16      you should first select a foreperson who will help to guide

17      your deliberations and will speak for you here in the

18      courtroom.

19              The second thing you should do is review these

20      instructions.  Not only will your deliberations be more

21      productive if you understand the legal principles upon

22      which your verdict must be based, but for your verdict to

23      be valid, you must follow the instructions throughout your

24      deliberations.

25              To reach a verdict, whether for David Mueller on

1    his claim against Andrea Swift and/or Frank Bell, or for

2    Taylor Swift on her counterclaim against David Mueller, all

3    of you must agree.  Your verdict must be unanimous.

4         Your deliberations will be secret, you will never

5    have to explain your verdict to anyone.  You must consult

6    with one another and deliberate in an effort to reach

7    agreement if you can do so.

8         Each of you must decide the case for yourself, but

9    only after an impartial consideration of the evidence with

10   your fellow jurors.  During your deliberations, do not

11   hesitate to re-examine your own opinions and change your

12   mind if you are convinced that you were wrong, but do not

13   give up your honest belief solely because of the opinion of

14   your fellow jurors or for the mere purpose of returning a

15   verdict.

16        The Court has prepared a verdict form for your

17   convenience.  After you have deliberated and consulted with

18   each other, the foreperson will write the unanimous answers

19   of the jury in response to each question on the verdict

20   form.  At the conclusion of your deliberations, the

21   foreperson should date and sign the verdict form.  The

22   foreperson must also include his or her three-digit juror

23   number, since his or her name will be redacted from the

24   verdict form in the public record.

25        The verdict form reads as follows:

1          Civil action No. 15-cv-1974-WJM-KLM.  David

2     Mueller, plaintiff and counterclaim defendant versus Frank

3     Bell and Andrea Swift, also known as Andrea Finlay,

4     defendants, and Taylor Swift, counterclaimant.

5          Verdict form:  Plaintiff, David Mueller's, claim.

6          Question No. 1:  Do you find by a preponderance of

7     the evidence that Frank Bell intentionally interfered with

8     David Mueller's contract with Lincoln Financial?  Space for

9     the jury to indicate yes or no.

10         Question No. 2:  Do you find by a preponderance of

11    the evidence that Andrea Swift intentionally interfered

12    with David Mueller's contract with Lincoln Financial?

13    Space for the jury to indicate yes or no.

14         Only if you answered yes to either question No. 1

15    and/or question No. 2, then answer question No. 3.  If you

16    answered no to both questions 1 and 2, then do not answer

17    question No. 3.

18         Question No. 3:  If you found for David Mueller on

19    his claim of intentional interference with contractual

20    relations, what amount is David Mueller entitled to receive

21    in damages?

22         Counterclaimant Taylor Swift's claims.

23         Question No. 4:  Do you find by a preponderance of

24    the evidence that David Mueller assaulted Taylor Swift?

25    Space for the jury to indicates yes or no.

1          Question No. 5:  Do you find by a preponderance of

2     the evidence that David Mueller battered Taylor Swift?

3     Answer -- or question for -- lines for the jury to indicate

4     yes or no.

5          Only if you answered yes to either question 4

6     and/or question 5, then answer question 6.  If you answered

7     no to both questions 4 and 5, then do not answer question

8     No. 6.

9          Question No. 6:  If you found for Taylor Swift on

10    her counterclaim of assault and/or counterclaim of battery,

11    do you award her $1 in nominal damages?  Space for the jury

12    to indicate yes or no.

13         And then the space for the foreperson to indicate

14    his or her three-digit juror number and print his or her

15    name, sign his or her name, and date the form.

16         Only one copy of this verdict form will be

17    provided to you.  If you make an error on the form, please

18    tell the bailiff.  The bailiff will destroy the erroneous

19    form and a blank form will be provided to you.

20         If you want to communicate with me at any time

21    during your deliberations, please write down your message

22    or question and give it to the bailiff who will bring it to

23    my attention.  The jury foreperson should be identified in

24    any such communication only by his or her three-digit juror

25    number.

1              I will respond as promptly as possible either in

2      writing or by having you return to the courtroom so that I

3      can address you orally.  I caution you, however, that with

4      any message or question that you might send to me, that you

5      should not tell me any details of your deliberations or

6      indicate how you -- how many of you are voting on any

7      particular way on any issue.

8              Let me remind you again that nothing that I have

9      said in these instructions nor anything that I have said or

10     done during the trial was meant to suggest what I think

11     your decision should be.  That is your exclusive

12     responsibility.

13             Okay, members of the jury, at this point, we're

14     going to hear opening -- or closing, rather -- closing

15     arguments of counsel.  Just so you know, both sides are

16     going to have the equal amount of time, 60 minutes.  They

17     both are going to be allowed to apportion their 60 minutes

18     into an opening segment and a rebuttal segment.  We're

19     going to hear from Mr. McFarland first on behalf of the

20     plaintiff as to his -- the opening segment of his closing

21     argument.  We will then take our morning recess.  We will

22     then hear from Mr. Baldridge, his opening segment of his

23     closing argument on behalf of the defendants, and

24     counterclaimant, and then you'll hear the rebuttal portions

25     from both attorneys and at that point, the case will be

1    submitted to you.

2              Okay.  Closing argument for the plaintiff.

3              MR. McFARLAND:  Thank you, Your Honor.

4              THE COURT:  Mr. McFarland.

5              MR. McFARLAND:  Ladies and gentlemen, the

6    defendants want you to believe that Mr. Mueller, at 51

7    years old, and with a 20-year career in radio, went to a

8    meet-and-greet at the request of his employer.  That he

9    entered what we've called the photo booth that had Ms.

10   Swift in it and a number of her people; that he introduced

11   himself by name; that he announced that he was with KYGO,

12   he was part of the morning show.  And then almost

13   immediately after that, and at the precise moment a

14   photograph was going to be taken, that he reached under the

15   skirt of one of the country's -- one of the planet's

16   biggest music superstars, and grabbed her rear.  All the

17   while his girlfriend, the woman that he adores, is standing

18   right next to him.  And two steps away, there's a 300-pound

19   bodyguard.

20             I don't know what kind of person grabs or gropes a

21   music superstar, or other women, for that matter, but it's

22   not that guy.  It's not the guy who walks into a room,

23   introduces himself, and announces who he's employed by just

24   seconds before the alleged inappropriate touching.

25             It's not the guy who spent 20 years in radio and

1    he loves his career and loves his profession.  It's not the

2    guy who is standing next to the woman that he loves.  It's

3    not the guy who just a few months earlier landed his dream

4    job working in Denver, on air, with his best friend.

5              It's not the guy whose employment opportunities is

6    paying him $150,000 a year, a little bit more than that.

7    It's not the guy who, by all accounts, has been respectful

8    of women and treated them appropriately.  It's not the guy

9    who, when confronted with a really offensive accusation,

10   says, "Call the police, please."

11             And it's not the guy who files a lawsuit and

12   pursues a claim to clear his name for over two years.

13   That's not the type of guy who grabs or gropes a superstar,

14   apparently out of the blue.

15             Let's talk about it for a minute, the underlying

16   allegation here.  This isn't a case where Ms. Swift alleges

17   there was accidental or incidental touching.  She made

18   quite clear over and over from the stand that there was no

19   accidental or incidental touching.  She claims that on June

20   2d, 2013, Mr. Mueller walked in, introduced himself, said

21   he worked for KYGO, and then put his hand under her skirt,

22   grabbed her rear, and hung on as she tried to get away.

23             Your question, the question for you, thus, is not

24   whether there was incidental touching or whether there was

25   accidental touching or whether there could have been some

1    mistake.  The question is:  Did Mr. Mueller do what Ms.

2    Swift accuses him of?  Did he get his hand -- his hand

3    under her skirt and grab her rear and hang on as she tried

4    to get away?

5         Last Thursday in court, Ms. Swift elaborated on

6    things and she told us three very important facts.  She

7    said the grab lasted a long time.  This wasn't something

8    quick, this wasn't something that you could miss if you

9    were paying attention.  According to Ms. Swift, it lasted a

10   long time.

11        We also heard from Ms. Swift, as well as her

12   mother, that this wasn't an ordinary skirt.  This skirt was

13   made of a stiff material, a lamp shade-like material that

14   could not be -- well, it -- if the back was lifted, the

15   front and sides would move, and that it was the type of

16   material that you couldn't really lift up.  Ms. Swift

17   testified that for Mr. Mueller to put his hand under her

18   skirt and on her butt, he had to get down and under the

19   skirt and come up under the hemline to get up to where her

20   bottom was.

21        And, most remarkably, Ms. Swift took the position

22   that the photograph is the proof.  That the photograph

23   shows, without any doubt, Mr. Mueller's hand under her

24   skirt on her bottom, grabbing her rear.

25        Let's take a look at the photo.  Each of you is

1    ultimately going to have to determine what you see in this

2    photograph and what it shows, but I submit to you that

3    there is no way in this picture that Mr. Mueller's hand is

4    under Ms. Swift's skirt and on her bottom.

5          Mr. Mueller, in this picture, he's not lifting up

6    her skirt, her skirt's not disturbed, and the line of her

7    skirt is straight.  It's not -- it's not bent or ruffled at

8    the side or in front.  It's perfectly aligned.  And I think

9    if you look closely at the bottom, you can see a front

10   hemline of that skirt and you can see just a little bit of

11   the back hemline of that skirt.

12          And that's especially true if, like Ms. Swift and

13   her mother testified, this is a lamp shade-like material.

14   This is a stiff material where the front moves when the

15   back moves.  It's impossible that Mr. Mueller has his hand

16   under her skirt and on her rear.  If that were the case,

17   we'd see a bend on the side or on the front, or the side

18   would be slanted up, but it's perfectly straight.

19          In addition, given Ms. Swift's description of this

20   lamp shade-like material, Mr. Mueller's hand isn't low

21   enough to be up and under her skirt.  He would have had to

22   bend -- he would have had to bend down like this, or bend

23   way at the waist, to get under the skirt that Ms. Swift

24   describes.

25          And, interestingly, not a single witness who was

1    there gave any indication whatsoever that they saw Mr.

2    Mueller bend over or lean down or get low enough to get his

3    hand under Ms. Swift's skirt.

4          In addition, look at Ms. Swift's face and ask

5    yourself:  Is that the face of someone who just had a

6    strange man grab their butt?  Is that the face of someone

7    who's in shock, who can't believe what happened, who's

8    upset?  That's the face of someone who's taking a nice

9    photograph.  That's the face of -- of someone who's

10   participating in a meet-and-greet.  There's nothing to

11   suggest in Ms. Swift's face that anything inappropriate has

12   happened, that there's any shock, that there's anything

13   wrong whatsoever.

14         And I would submit that it's not possible, it's

15   not plausible that someone who is -- even someone who's had

16   their photograph taken as often as Ms. Swift, can resist

17   sort of that natural surprise or -- or shocked look when

18   something surprising happens, something you're not

19   expecting happens, like a big man putting his hand under

20   your skirt and grabbing a bear bottom.  It just doesn't

21   make sense.

22         In addition, we heard from several witnesses.

23   When we talked early on, witness testimony, we agreed, was

24   important.  So let's talk about the witness testimony.

25         Mr. Mueller steadfastly consistently denies that

1   he put his hand under Ms. Swift's skirt, that he grabbed

2   her rear, that he grabbed her butt outside her clothing, or

3   that he otherwise touched her inappropriately.  He also

4   described that he was taken a little bit off guard by the

5   photograph and, at the time Ms. Swift said, "Let's take a

6   photo," he was a little ways away from her.

7        Erica Worden, Ms. Swift's tour manager, said she

8   might have seen something, but she did not see Mr.

9   Mueller's hand under Ms. Swift's skirt or any inappropriate

10  touching.  She also didn't describe seeing Mr. Mueller bend

11  down or squat down, as he would have had to, to get

12  underneath Ms. Swift's skirt.

13       Gabby Liddicoat, she didn't see Mr. Mueller's hand

14  under Miss Swift's skirt or any inappropriate touching.

15       Stephanie Simbeck, the photographer, and the least

16  credible witness that we heard from, and the person who

17  started it all by incorrectly fingering Mr. Mueller 15 to

18  30 minutes after he had left the photo booth on June 2d,

19  2013, her testimony makes no sense whatsoever.

20       She says, "I saw" -- well, first she says, "I -- I

21  saw something and I thought maybe Ms. Swift tripped over

22  her heels."

23       Then she indicates that she saw Mr. Mueller grab

24  Ms. Swift's rear.  Then in response to the question:  Was

25  Mr. Mueller's hand outside or inside of Ms. Swift's

clothing, she is a deer in the headlights.  She can't

answer that question.  She has no idea.  And of course she

has no idea, she was standing directly in front.  She was

taking the picture.  She was directly in front of Ms. Swift

and Mr. Mueller and Ms. Melcher.

        And as Ms. Swift told me during her testimony, you

know, her rear is on her -- the back of her body, not the

front of her body, so there's no way that Stephanie Simbeck

actually saw any inappropriate touching.

        Now I cut her a little bit of slack because she

still works for Ms. Swift and I assume that she wants to

remain in that position.  That's the only explanation that

I can come up with for her testimony.

        Then things get more confusing when we hear from

Mr. Dent, the self-proclaimed best bodyguard Ms. Swift has

ever had, acknowledges -- or I guess asks you to believe

that he allowed Mr. Mueller, who he thought he was -- who

he thought was drunk, get close to Ms. Swift, grab her

rear, and then walk out.

        And he can say what he wants to say in terms of an

explanation, but you don't have to buy it.  After observing

Mr. Dent's demeanor, there is no doubt if he saw what he

thought was someone doing anything inappropriate to Ms.

Swift, do you really think he'd sit there and do nothing?

He'd let that person waltz out of the room and then not

1    even -- not even get on his radio and make a phone call?

2            You know, this explanation from him that, you

3    know, there's a time to act and there's a time not to act,

4    it doesn't make any sense, but it particularly doesn't make

5    sense when you can do something without causing any

6    disruption whatsoever in the photo booth.  He's got a

7    phone.  He's got a headset.  You know, "Hey, team, keep an

8    eye on this guy.  See where he goes.  I think something

9    might have happened."

10           He could have done that and he didn't.  And the

11   reason he didn't do it is because he didn't see anything

12   that caused him concern.  He didn't see anything that made

13   him think there'd been any inappropriate touching.

14           His description of what he saw is interesting,

15   too, because it directly contradicts what Ms. Swift has

16   said.

17           All right.  Ms. Swift's position is that Mr.

18   Mueller got low enough, got under her skirt, grabbed her

19   rear, hung on for a very long time, as she lurched or moved

20   quickly away.  Mr. Dent says he saw this.  When I asked him

21   to describe what you saw, he went like this (indicating).

22           His position is he saw Mr. Mueller starting with

23   his hand low, come up, catch part of Ms. Swift's skirt and

24   then lightly put his hand on Ms. Swift's back.  That is far

25   different than what Ms. Taylor Swift described.  And you

1    can't reconcile those two stories.  They can't both be

2    correct.

3            The other thing that Mr. Dent made clear is that

4    the photograph isn't proof of anything.  Mr. Dent told you

5    that he was certain that what he saw happened before the

6    photograph was taken.  The photograph is after the fact,

7    after Ms. Swift has moved away, or tried to move away, from

8    Mr. Mueller.

9            This photograph is also curious in the position of

10   the three participants.  You look at this photograph and --

11   and Ms. Swift is right in the middle.  She's right in the

12   middle of the frame.  Is she closer to Ms. Melcher?  Yeah,

13   absolutely, but she started in the middle, she started in

14   that position, and she is still right in the middle of the

15   frame.

16           And if you look at the other photographs that we

17   saw, she's right in the same spot, right in the middle of

18   the frame.  If she had lurched over or moved quickly over

19   and tried to get away from Mr. Mueller, she would be off

20   center.  She would be further to the left side of that

21   photograph as we look at it.

22           There is simply no way that a guy with Mr. Dent's

23   training doesn't do something.  That guy jumps up and grabs

24   Mr. Mueller or gets between Mr. Mueller and Ms. Swift, or

25   says something, or calls for backup as soon as Mr. Mueller

1    has exited the photo booth.

2              There is simply no way that a professionally

3    trained personal bodyguard whose sole job is to protect Ms.

4    Swift's body allows a big guy, who he thinks has been

5    drinking, to come up, grope Ms. Swift, and then walk out of

6    the photo booth.  It's not believable.  It's not credible.

7              Then we get to the final eyewitness, Shannon

8    Melcher.  The most credible of the witnesses that we heard

9    from.  She's got no reason to lie.  She dated Mr. Mueller

10   for several months several years ago.  They broke up years

11   ago.  And she says she didn't see any inappropriate

12   touching.  And then, again, I think, you know, candidly

13   said, "But I was really looking at the photographer.  I was

14   focused on the photographer."

15             More importantly, she testified, again credibly,

16   that at the time Ms. Swift said, "Let's take a photo," Mr.

17   Mueller was a ways away.  She was engaged in conversation

18   with Ms. Swift, they were very close, Mr. Mueller was

19   standing a ways off, and she sensed him move into the frame

20   right after Ms. Swift said, "Let's take a photograph."

21             Moreover, she testified, again credibly, that

22   during the taking of the photograph, she didn't feel Ms.

23   Swift lurch towards her, she didn't feel Ms. Swift move

24   quickly.  It was a photograph.  She didn't notice anything

25   unusual or odd or anything that suggested something

1    inappropriate had happened.

2            When you add up what we see in the photograph and

3    what we've heard from the witnesses, there's a few

4    take-aways.  Take-away 1 is that Mr. Mueller and Ms.

5    Melcher's recollection of events, they match, they're

6    consistent.  Nothing happened.  Regular meet-and-greet.

7    Mr. Mueller was a ways off, he moved quickly into the

8    picture, and they left.

9            Ms. Swift's version of events, as it turns out, is

10    inconsistent with every other member of her team in one way

11    or another.  It's particularly inconsistent with Mr. Dent.

12    And it's also inconsistent with the photograph.

13            The photograph doesn't show Mr. Mueller with his

14    hand underneath Ms. Swift's skirt on her rear.  There's no

15    way to draw that conclusion from that picture.

16            That raises the question:  Well, why is there all

17    this inconsistency?  Well, there's inconsistency -- and

18    nobody else saw what Ms. Swift says happened because it

19    didn't happen.  That's the only logical conclusion that you

20    can draw from the photograph and from listening to all of

21    the witness testimony.

22            I mentioned it before, but I want to mention it

23    again:  This all started with Ms. Simbeck.  And, again, her

24    story, her version, what she claims to have seen makes no

25    sense whatsoever.  She's not a credible witness.  She is

1    still working for Ms. Swift.  She wants to keep that job.

2         The testimony was that Ms. Simbeck fingered Mr.

3    Mueller 15 to 30 minutes after the alleged touching, and

4    that's after she initially thought that Ms. Swift might

5    have tripped on her heels as the picture was being taken.

6         And she flips through her photos and she comes to

7    the photograph of Mr. Mueller and she shows that to Ms.

8    Swift, and Ms. Swift, with nothing else to compare it to,

9    says, "That's the guy."  And then we are off to the races.

10        Stephanie Simbeck, she didn't look at any of the

11   other photographs.  Erica Worden, she didn't look at any of

12   the other photographs.  Gabby Liddicoat, she didn't look at

13   any of the other photographs.  Mr. Dent, he didn't bother

14   to look at any of the photographs.  And, most importantly,

15   Ms. Swift didn't bother to look at any of the other

16   photographs.

17        Now I assume her position will be, "I didn't need

18   to look at anything else; I knew."

19        Well, we know that people make mistakes, and if

20   something shocking and hurtful and inappropriate happens,

21   people want answers.  They want to be able to point and,

22   "Hey, that was it."  But there are mistakes made every day,

23   and the idea that Ms. Swift would make the allegation and

24   Ms. Andrea Swift would relay that and Mr. Frank Bell would

25   relay that type of serious allegation, an allegation of

1    sexual assault, without doing even the bare minimum to try

2    to find out what really happened, it's not right, it's not

3    fair, it's not reasonable, and we're now in a spot where

4    they've never seen what the person looks like who came into

5    that photo booth right before Mr. Mueller.  They have no

6    idea what that person looks like.  They have no idea what

7    the person, you know -- the person who came in three times

8    or four times or, you know, before Mr. Mueller, what those

9    people looked like.  We don't know what they look like.

10   We've never seen them.  We've got some pictures from that

11   meet-and-greet, we don't have all of them; we don't have

12   most of them.

13            There was testimony that there may have been as

14   many as 80 people in that general fan meet-and-greet line.

15   We've seen 15, 18 photographs.  There are a lot more

16   photos, there are a lot more people through there, and any

17   one of them could be the guy that Ms. Swift thinks Mr.

18   Mueller is.

19            So what do you do when the evidence, the

20   photograph, and witness testimony doesn't support your

21   position?  You do what the defendants have done in this

22   case:  You deflect and you distract.

23            Let's talk about all of the different things that

24   defendants have tried to sell you on during this trial.

25   First we heard that Mr. Mueller did it for money.  Does

1    that really make sense?  Mr. Mueller's making $150,000 in

2    his dream job at the time of the alleged incident.  The

3    idea that he would throw that away with the foresight to

4    think that Ms. Swift would tell her mother, and then her

5    mother would talk to Frank Bell, and Frank Bell would call

6    the radio station, and then the radio station would fire

7    him, and then he could file a lawsuit, and, after three or

8    four years, get here, that doesn't make any sense.  He

9    didn't do it for the money.

10         There's the related argument or -- that's been

11   brought up that Mr. Mueller wants $3 million.  He's looking

12   for $3 million.  It's a money grab.  He's going to ask you

13   for $3 million.

14         Think about it.  You didn't hear that from me and

15   you didn't hear it from Mr. Mueller once.  The only place

16   that came from was defendants.  And they want you to think

17   that this is for money because, again, the facts,

18   themselves, don't support their position.

19         We also heard -- or speculation that Mr. Mueller

20   wanted to transform himself into a Howard Stern type shock

21   jock and that's why he did it.  That's really a stretch.

22   There's no evidence whatsoever that Mr. Mueller has ever

23   been a shock type radio morning show host.  There's no

24   evidence that he had any desire to be a shock jock.  And if

25   you think about it, that doesn't make any sense.  A shock

1       jock, if he decides he's going to grope or grab one of the

2       world's biggest music superstars after the fact, wouldn't

3       deny it; the shock jock would say, "Yeah, I grabbed her,

4       and now let's talk about it."

5               Obviously Mr. Mueller didn't do that.

6               One of the other things we've heard is that Mr.

7       Mueller claims that Mr. Haskell did it.  Again, you didn't

8       hear that from me, you didn't hear that from Mr. Mueller,

9       you heard that from the defendants.  "Mr. Haskell did it.

10      You blame Mr. Haskell.  You said he did it."

11              Just to be clear, Mr. Mueller didn't and does not

12      contend that Mr. Haskell was in the photo booth on the

13      night of June 2d and he's the one who Ms. Swift -- he's the

14      one who grabbed Ms. Swift's rear, not Mr. Mueller.  That's

15      never been Mr. Mueller's position.

16              I don't know quite what to make of Eddie Haskell.

17      He's an interesting person.  He's a character.  And it is

18      curious that that night he was talking about, to at least

19      Mr. Mueller and to Ryno, Mr. Kliesch, about Ms. Swift's

20      bike shorts and whether she wears bike shorts during her

21      performance.  That's odd, but, again, I'm not, and Mr.

22      Mueller's not, claiming that it was Eddie Haskell that

23      grabbed or groped Ms. Swift on June 2d, 2013.

24              We also heard the position that Mr. Mueller, he's

25      changing his story, he's changed it seven times.  It

1    started out as a denial, then it was, "If I did it, it was

2    accidental"; then, "Eddie Haskell did it."  "And I couldn't

3    have done it because my hand was in a fist."  And then it

4    was, "We jostled arms."  And then it's, "Our arms crossed."

5    And then it was touched a rib.

6          Mr. Mueller's testimony made it clear that he's

7    never changed his story.  His stories always been, "Was

8    there some incidental touching, some contact?  Did our arms

9    touch?  Did our hands kind of jostle?  You know, might I

10   have touched her rib?"

11         That's been the story from the get-go.  He's also

12   been equally adamant that there was no inappropriate

13   touching.  He didn't put his hand under her skirt, he

14   didn't grab her rear, he didn't stay latched on.  He didn't

15   grab her butt outside of her clothing.  That's been his

16   position from the get-go, and it was his position here in

17   court.

18         We've also heard -- you also heard a lot about the

19   destruction of critical evidence.  And the defendants were

20   really hard on Mr. Mueller for spilling coffee on his

21   laptop.  And, in fairness, there were audio files of Mr.

22   Mueller's conversations on June 3d with Mr. Call and Mr.

23   Haskell on that computer at the time that he spilt coffee

24   on it.  But those conversations, they didn't have anything

25   to do with June 2d, they wouldn't answer questions about

1    what happened in the photo booth on that day.  That's the

2    photograph and that's the witnesses.  And Mr. Call and Mr.

3    Haskell, in their testimony, acknowledged that they

4    acknowledged two things:  Mr. Mueller steadfastly,

5    consistently denied that he put his hand up Ms. Swift's

6    skirt and grabbed her rear or grabbed her rear over her

7    clothing or otherwise touched her inappropriately.

8         Mr. Call, upon my examination, acknowledged that

9    it's possible that when Mr. Mueller told him or he thought

10   he heard Mr. Mueller say, "If I did it, it was accidental,"

11   he was talking about touching.  "If I touched her, the

12   touching was accidental.  I never inappropriately touched

13   Ms. Swift."

14        So even the audio files, there's no real question

15   about what happened at -- those audio files, they only

16   relate to the June 3d meeting between Mr. Mueller, Mr.

17   Call, and Mr. Haskell.  And there's no real dispute about

18   what went on at that meeting.  Mr. Mueller denied it, KYGO,

19   Lincoln Financial, decided they didn't care about his

20   denial, they didn't care what Ms. Melcher had to say,

21   because of the allegation, because of Mr. Call's

22   conversation with Frank Bell, based on the photograph that

23   Mr. Bell told him was damning evidence -- and, again, that

24   was done at a -- at a time where Mr. Bell knew that the

25   allegation by Ms. Swift was Mr. Mueller grabbed her under

1   her skirt.  And, again, this photograph doesn't show that.

2           The -- the other electronic devices, the phone and

3   the iPad and the SuperDrive, there's no evidence that there

4   was anything of any import on those devices, the other

5   laptop, the fifth electronic device that was destroyed

6   before the June 2d, 2013 meet-and-greet.  It's just an

7   effort to distract.  Text messages, e-mail messages, to the

8   extent there was any text or e-mail messages that were

9   important, those were available through other people, even

10  if they were on Mr. Mueller's phone, right?  Every e-mail,

11  every text message, there's a sender and there's a

12  receiver.

13          If the defendants thought that Mr. Haskell, or

14  anybody else, had sent an important text message, they

15  could have grabbed it from Mr. Mueller's phone or they

16  could have got it from Mr. Haskell's phone.  Same thing

17  with e-mails.  Weren't any e-mails destroyed.  Mr. Mueller

18  had a gmail account.  There's a sender, there's a receiver.

19  Everyone knows who the players are.  You can get it from

20  one or two sources.  There were no important e-mails, there

21  were no important text messages that change anything.

22          Again, the whole electronic device piece is just a

23  red herring.  And we know that things happen.  Mr. Mueller

24  spilled coffee on his laptop.  The defendants lost or

25  didn't preserve photographs of the meet-and-greet.  Mr.

1    Call, who everybody seemed to agree is one of the most

2    honest and trustworthy people ever, he took handwritten

3    notes of the meeting with Mr. Mueller and Mr. Haskell, and

4    then he shredded those after he typed them up.

5          Why did he do that?  He didn't think there was

6    anything wrong with doing that.  Why didn't I beat him up

7    with that, or try to?  Because it's not unreasonable;

8    things happen.

9          We also heard that the real case is against KYGO.

10   "Your real beef should be with KYGO."

11         Well, that's not true.  KYGO's contract with Mr.

12   Mueller contained what I refer to as a morality clause, and

13   basically what that clause says is:  If you do something

14   immoral, or if you're accused of doing something immoral,

15   we can fire you.

16         Mr. Mueller was accused by Ms. Swift -- Ms. Taylor

17   Swift, Ms. Andrea Swift, and Mr. Frank Bell, of doing

18   something that's clearly immoral.  KYGO had the right to

19   fire him.  Mr. Mueller didn't have a breach of contract

20   claim against KYGO, he didn't have any other claim against

21   KYGO because the contract allowed KYGO to do just what it

22   did.

23         This is the first page of Mr. Mueller's employment

24   contract.  We saw this during the -- during the trial.

25   This is the ninth page.  And I'm not going to read it to

1014

1  you, but 16(b), on page 9, that's the morality provision.
2  That provision allowed KYGO to fire Mr. Mueller if someone
3  like Ms. Swift and her team accused him of sexual assault.
4  There's no doubt about that.
5      Moreover, it's the defendants, it's the defendants
6  who made the false allegation.  It's the defendants who
7  felt compelled, without doing any investigation into the
8  facts, they had to get Mr. Mueller fired.  They didn't want
9  to call the police, they didn't want to do any
10  investigation, but they thought it's serious enough that
11  they should immediately call his employer to get him fired.
12  And they knew when they called that he would be fired based
13  on the allegation.
14      We've also heard talk about motive, right?  We
15  don't like -- we don't like the evidence, we don't like the
16  photographs, we don't like what the witnesses have said, so
17  let's talk about things like motive.  And the question is,
18  why would Ms. Swift lie?  I don't know.  Why would she come
19  into this court and look at you guys and say, "The
20  photograph is proof"?
21      "In that photograph, Mr. Mueller has his hand
22  under my skirt and he's grabbing my rear, as I move away
23  and he's staying latched on."
24      I'm sure she thinks it's true, but the photograph
25  shows otherwise.

1           I'd also submit that you need to consider Mr.

2      Mueller's motive.  Why would he do it?  Why would he throw

3      away his dream job?  Why would he throw away his 20-year

4      career in radio working with one of his best friends?

5      There's no good answer for that question.

6           Moreover, if you determine that Ms. Swift's

7      allegations of inappropriate touchings are false -- and I

8      think based on the photograph and the witness testimony,

9      you must find that those allegations are false -- Ms.

10     Andrea Swift and Mr. Bell are liable to the plaintiff for

11     intentionally interfering with his employment contract with

12     Lincoln Financial slash KYGO.

13          There's five elements that you have to find in

14     order to find in favor of Mr. Mueller and against the

15     defendants on that claim.  One is the existence of a

16     contractual relationship between the plaintiff and Lincoln

17     Financial slash KYGO.  We just looked at the contract.

18     There's no doubt -- there's really no dispute that Mr.

19     Mueller had an employment contract with Lincoln Financial

20     as of June 2d, 2013.  That's element 1.

21          Element 2:  We have to prove, the plaintiff has to

22     prove, that defendants knew or should have known of Mr.

23     Mueller's employment contract.  We've satisfied that

24     element as well.  Mr. Mueller and Ms. Melcher told Ms.

25     Swift that they worked for KYGO.  Swift's management team,

1    including Ms. Andrea Swift and Mr. Bell, they were familiar

2    with KYGO, they wanted to get Mr. Mueller fired.  And at

3    the time Mr. Bell called KYGO, he and Ms. Andrea Swift

4    obviously knew that Mr. Mueller was working for the radio

5    station, thus, they knew he had a contract and they wanted

6    him fired from his job.

7         The third element plaintiff has to prove is that

8    the defendants intentionally and improperly interfered with

9    the contract.  There's really no question that the

10   defendants acted intentionally.  They wanted Mr. Mueller to

11   be fired.  They testified that they wanted him fired.  And

12   they knew that KYGO was likely to fire Mr. Mueller based on

13   the allegation that he went under Ms. Swift's skirt and

14   grabbed her rear.

15        Ms. Andrea Swift testified that she spoke with Mr.

16   Bell before Mr. Bell called KYGO and, according to Mr. Bell

17   and Ms. Swift's testimony, Andrea wanted Mr. Bell to call

18   KYGO because she wanted Mueller fired.  Mr. Bell, he wanted

19   Mr. Mueller fired, too.  He said so.

20        He called KYGO on June 3d, 2013, and less than 24

21   hours later, Mr. Mueller was fired.  In his conversations

22   with Mr. Call, Mr. Bell made it clear that he and Ms.

23   Swift's management team expected KYGO to fire Mr. Mueller.

24   He said, "Mr. Mueller groped Ms. Swift."  He said, "Ms.

25   Swift's team was greatly disappointed that this had

1    happened by a representative of KYGO."  He said that he,

2    Taylor's mom, and Swift's team, expected Mr. Call to take

3    appropriate action.  He said there was photographic

4    evidence.  He said, "We expect you to do the right thing."

5         All of those terms are code for, "We want you to

6    fire this guy."  There's no other way to read that.  And

7    that's reflected in Mr. Call's notes.

8         Mr. Call says, "He called me," talking about Frank

9    Bell, "to convey the fact he was disappointed.  Taylor's

10   family was upset and they were looking for us to do the

11   right thing."  Mr. Call says, "He," again Frank Bell, "told

12   me Taylor's mom and dad were extremely upset, especially

13   mom, who was at the show."

14        Mr. Call relayed that Mr. Bell again indicated how

15   upset Taylor, her parents, security, and two other people

16   were and what we might do.  He indicated that the picture

17   was pretty damning.  He indicated -- or he reminded Mr.

18   Call of the fact that they have known each other for a long

19   time --

20        COURTROOM DEPUTY:  You have five minutes.

21        MR. McFARLAND:  Thank you.  He pulled upon his

22   long-standing relationship with Mr. Call because he knew

23   that would result in Mr. Mueller's termination.  He

24   indicated that he wouldn't be calling if it were not

25   extremely serious, and that they, Swift's team, were

1    considering all their options.  That's a threat.  "We're

2    going to do something.  We might sue you.  We might do

3    something else.  We might pull Taylor's music.  We're

4    considering all our options unless you do the right thing."

5              He also says flat-out, "The relationship with KYGO

6    is important and unless we act -- unless the radio station

7    acts -- that relationship would be gravely impacted."

8              There's no other way to take all of those things

9    and suggest anything but Ms. Swift's management team,

10   including Mr. Bell and Ms. Swift, they wanted Mr. Mueller

11   fired.

12             Plaintiffs also have to show that defendants acted

13   improperly, we just talked about this.  This is improper.

14   It's improper economic pressure, it's improper legal

15   pressure.  "You do what we want to do or our relationship

16   will be gravely impacted.  We're considering all of our

17   options.  We will sue you.  We will yank Taylor's music.

18   We won't have a good relationship."  That's -- that is

19   important to both sides in this.

20             Plaintiffs also have to show that defendants'

21   conduct caused KYGO to terminate Mr. Mueller's employment

22   contract.  Mr. Call was crystal clear on this point.  As of

23   June 2d, he had no intention of firing Mr. Mueller.  But

24   for his conversation with Mr. Frank Bell, but for the

25   photograph, and but for the resulting conversation with Mr.

1    Mueller, he would not have fired Mr. Mueller.  There's no

2    doubt.

3            And then you look at the timing as well.  Mr.

4    Frank Bell calls on the 3d, less than 24 hours David

5    Mueller's fired.  If there's any lingering doubt, though,

6    Ms. Melcher answered that doubt or put that doubt to rest

7    when she told you that she had been involved in an incident

8    where a KYGO employee grabbed her.  When she reported it,

9    kYGO talked to the guy.  They didn't suspend him, they

10    didn't terminate him, they didn't even reprimand him,

11    according to Ms. Melcher.  There were conversations about

12    that kind of behavior not being appropriate and he went on

13    with his job, he continued to work at KYGO.

14            The only difference between what Ms. Melcher

15    experienced and what Ms. -- and what Ms. Swift claims that

16    she experienced, the only difference in that scenario is

17    that Ms. Swift and her team of powerful music people were

18    on or involved in one scenario, and it was just Ms. Melcher

19    on the other scenario.

20            Lastly, plaintiff has to prove damages.  The

21    testimony on damages is straightforward.  Mr. Mueller was

22    making $150,000 a year.  He was guaranteed an additional

23    $10,000 a year for endorsements, and he received five

24    months of compensation in 2013.  When you run those

25    numbers, the total is $257,500.  If you believe Mr.

1020

1    Mueller, if you disbelieve what Ms. Swift has been trying

2    to sell you, that's the amount that I submit you should

3    find in favor of Mr. Mueller.

4            Mr. Mueller did not inappropriately touch Ms.

5    Swift and we ask you to find in his favor and against the

6    defendants.  Thank you very much.

7            THE COURT:  Thank you, Mr. McFarland.  We're going

8    to take our morning break at this time.  We will be in

9    recess for 20 minutes.

10           (Jury left the courtroom at 11:00 a.m.)

11           THE COURT:  One thing I wanted to mention to the

12    lawyers, please do not make any reference to my Rule 50

13    ruling Friday evening or any of the dismissed claims in

14    what remains of your closing arguments.

15           (Recess at 11:00 a.m.)

16           (In the presence of the jury at 11:22 a.m.)

17           THE COURT:  Closing argument for the defendants

18    and counterclaimant.

19           MR. BALDRIDGE:  May I proceed, Your Honor?

20           THE COURT:  You may, Mr. Baldridge.

21           MR. BALDRIDGE:  August 10th, 2017, at

22    approximately 10:00 a.m., you heard these words out of the

23    mouth of Taylor Swift, quote, I am not going to allow you,

24    Mr. McFarland, or your client, to make me feel like this is

25    in any way my fault, because it isn't.

1           "I'm not going to allow you or your client to make
2     me feel like this is my fault, because it isn't."
3           Isn't that really the issue before you?  That's
4     the real issue, isn't it?  The issue that confronts every
5     woman, wife, mother, daughter, somewhere, somehow every day
6     of their life.  Will aggressors like David Mueller be
7     allowed to victimize their victims is what the question is.
8     Will they be allowed to shame them, humiliate them, assault
9     them?
10          And to use the words of Andrea Swift, I don't know
11    whether to vomit or cry when I hear a fellow member of the
12    bar joined that victimization like you just heard, by
13    ignoring the actual evidence and ignoring the mandatory
14    instructions of Judge Martinez on what is before you.
15          Will aggressors like David Mueller be allowed to
16    sue their victims in a game of chicken, realizing that
17    victims are prone to blink rather than relive the pain and
18    the humiliation and the shame of the event that took place.
19          Will aggressors like David Muller -- Mueller be
20    allowed to realize the payday for their own wrongful
21    conduct just because they know they can get away with it
22    because people walk away?
23          In response to each of those questions, what
24    you've heard over the last week is this:  Taylor Swift said
25    no and she says no; Frank Bell said no, and he says no; and

1     Andrea Swift said no, and she says no.

2          At great risk and cost, they did so with no

3     reason, none, other than it was the right thing to do.  And

4     given the overwhelming evidence against David Mueller you

5     heard this past week, I have every single faith that you

6     will join them and say no as well.

7          You say no by returning a verdict rejecting

8     Mueller's claims, attempting to victimize those who took on

9     the responsibility to society and made this public, that

10    being the three defendants who reported it to KYGO.

11         You will say no by returning a verdict on Ms.

12    Swift's counterclaim for a single dollar, a single symbolic

13    dollar, the value of which is immeasurable to all women in

14    this situation.  And by doing so, you won't join Mr.

15    Mueller and his counsel in victimizing the victim, and you

16    will tell every woman, rich or poor, famous or not, large

17    or small, that no means no and you will embrace the lines

18    between what will and what will not be tolerated where a

19    woman's body's concerned.

20         I said in it my opening statement that an opening

21    is a set of promises.  I told you to hold me accountable

22    for my promises.  Today is my day of reckoning and I am

23    beyond confident that every promise was met.  You were

24    insulted, quite frankly -- and I don't say that lightly --

25    in the last hour by being told about a record, a record

1    that does not exist.  And I will actually do my best to use

2    actual evidence and actual quotes of what was said and done

3    during this trial.

4           The only plaintiff before you is David Mueller.  I

5    promised you that.  The only defendants before you are

6    Andrea Swift and Frank Bell.  There are no other

7    defendants.  The general allegation from this man who has

8    the burden of proof -- remember that from the

9    instructions -- are that that man made two calls to a

10   friend and said Taylor had been grabbed, and then that

11   friend, Mr. Call, did his own independent investigation and

12   decided to terminate that man because he lied.

13          That's the entire case from Mr. Mueller's

14   standpoint.  It is beyond overwhelming in the evidence that

15   on June 2d, 2013, David Mueller, a 51-year-old disk jockey,

16   grabbed a 23-year-old woman's rear, Ms. Taylor Swift.  And

17   I promise you there was no motivation.

18          Well, Ms. Swift had never heard of Mr. Mueller.

19   She had never met Mr. Mueller.  She had never heard of his

20   radio show.  She had been involved in thousands of

21   photographs and gone into audiences without a single

22   incident.  She had no motivation whatsoever, so much so

23   that counsel had to concede, if you heard it in his

24   opening, that, "I can't think of any reason why she didn't

25   believe what she said happened."

1       Critically, and consistent with what counsel said,

2   David Mueller on cross-examination on August 8th, 2013,

3   admitted the following, and I quote -- I don't

4   paraphrase -- quote, I cannot imagine why Ms. Swift would

5   fabricate a story that I grabbed her rear.

6       Quote, I know of no facts to suggest that Ms.

7   Swift would fabricate a story that I inappropriately

8   touched her.

9       Quote, I know of no incentive for Ms. Swift to

10  fabricate a story that I touched her.

11      Every single solitary witness in this case agrees,

12  including Mr. Mueller, that there is no facts, incentive,

13  or reason whatsoever for the woman whose rear end was

14  touched to make up this story.  There's not a single

15  witness that in any way, including the plaintiff, David

16  Mueller.

17      And it is undisputed that there is no evidence,

18  not even a shred, that Ms. Swift had anything but a sincere

19  belief that that man grabbed her rear.  An honest and

20  sincere belief, as admitted by Mr. McFarland in his

21  opening -- I mean his closing.

22      Mr. Mueller closed the case against himself in an

23  automatic loss on August 8th when he was forced to admit

24  the following under cross-examination:

25      Quote, If Ms. Swift believed I touched her on her

1    rear end without her permission, my employer, KYGO, had a

2    right to know.

3            It's undisputed that she had an honest and sincere

4    belief.  He just said it, he said it.  So KYG had a right

5    to know.

6            Second, Mueller said:  And upon knowing, KYGO had

7    a right to look into and investigate what occurred.

8            Which is what happened.

9            And, three, quote:  If KYGO concluded that a KYGO

10   employee had, in fact, touched Ms. Swift in an

11   inappropriate manner, they had the right to fire that

12   employee.

13           Those are the quotes from the actual testimony.

14   Not paraphrasing, not argument, that's what he admitted

15   under cross-examination.

16           You will go to the interference instruction that

17   Judge Martinez gave you, and you will see that

18   automatically under that situation with those three

19   admissions, it is impossible for him to meet his burden of

20   proof to show intent or motive, which are material elements

21   of his claim.  Gone.  The case was over when he did that.

22           Now, how can it be that if Ms. Swift lacked motive

23   and intent and had a sincere belief that she had been

24   grabbed in her rear end -- which she had -- that two people

25   remote from the situation, her mother and her radio guy,

1    Frank Bell, are liable as defendants for reporting it?  It
2    absolutely makes no sense.
3            And you don't have to take my word for it.  Look
4    at the instruction on what "motive" and what "improper"
5    means.  There's no way Mr. Mueller can meet his standard
6    against the two defendants that are in this case.
7            What else did I promise you?  I said absolute
8    certainty.  I said that Ms. Swift was absolutely certain
9    about what happened and is absolutely certain about who did
10   it.  In fact, David Mueller did grab her rear end on June
11   2d, 2013.
12           The standard says -- as Judge Martinez read to
13   you -- was there offensive physical contact?  Well, that's
14   physical contact to have your rear end touched by a
15   51-year-old person you don't know without your permission.
16   And Ms. Swift testified, quote, He did not touch my rib, he
17   didn't touch my arm, he didn't touch my hand, he grabbed my
18   bare ass.
19           Quote, This was not jostling, there was no diving
20   into the picture, we were perfectly posed in position for a
21   photo to be taken.
22           Quote, It happened to me, I know it was him.
23           And Ms. Swift's story never changed, ever, for
24   four years, from June 2d, 2013, to this moment.
25           And the same is true of Greg Dent, Stephanie

1    Simbeck, Erica Worden, Gabby Liddicoat, Bob Call, Eddie

2    Haskell, Andrea Swift, Frank Bell.  Depending where they

3    were situated at the time, what they saw has been written

4    in granite since the day they saw it four years ago.  The

5    variations and perception, picked apart by counsel, that,

6    "Oh, there must be a problem."

7         And you know what?  What he is saying is there

8    must be a problem and an inconsistency apparently because

9    no one was laying on the ground behind Ms. Smith -- I mean

10   Ms. Swift, excuse me, and able to look right up and see

11   what was going on.

12        The issue is consistency.  Everything is

13   consistent, whether it's the reaction of her face, the

14   movement of the skirt, the pulling away in the photo.

15   People told you what they saw.  And it is all consistent.

16        And what about Mr. Mueller's two friends they

17   brought in here, Ms. Melcher and Ryno?  Nothing wrong with

18   either one of them.  I am not going to impugn them the way

19   he impugned Stephanie Simbeck, by the way one of the most

20   credible people I've ever seen on the stand.

21        Melcher said, I wasn't paying attention -- and

22   this is a quote -- directly to what he was doing to get

23   into the photo.  That's the quote.

24        Quote:  I was facing forward.  I don't have eyes

25   in the back of my head.

1          Question:  And you didn't see where Mueller put

2     his hands during that picture?

3          Answer:  No.

4          There's nothing wrong with Ms. Melcher or Ryno.

5     The fact of the matter is, they have nothing to say other

6     than he's their friend.  There's nothing to do with the

7     instructions before you or the task before you.

8          Now, Mueller's stories.  Well, here we go again.

9     We say, oh, these weren't different versions.  Mr.

10    McFarland just said it, Mr. Mueller spent a long time on

11    the stand explaining why he thought they weren't different

12    versions.  Well, let me ask you this, is, "I did not do it"

13    consistent with, "If I did do it, it was an accident"?  Bob

14    Call's testimony.

15         Well, guess what, Bob Call and Eddie Haskell,

16    themselves, found independently of anything these

17    defendants ever said and did, that that was a lie.

18    Inconsistent.

19         Is "I did not do it," consistent with Mueller's

20    story that came up two years after the fact that Eddie

21    Haskell had bragged to him the night of June 2d, 2013, that

22    he, Haskell, had touched Ms. Swift's rear bottom?  Well,

23    like I said, the remarkable story didn't surface until two

24    years after the assault had occurred when he filed his

25    lawsuit in a federal document for the whole world to see.

1  And Haskell summed it up, summed up the 20 seconds he spent

2  with Ms. Swift.  What he testified, it would be like,

3  quote, I assaulted Taylor in a room of 20 people, then her

4  mother happily took me on a tour of the back stage.

5          Question:  Does that make any sense to you, sir?

6          Answer:  Not a bit.

7          It's a complete made-up story to stick it to his

8  boss two years after the fact.

9          Interestingly, though, Mueller admits he never

10 told Bob Call or Eddie Haskell about the alleged confession

11 of Eddie Haskell when he was interviewed on June 3, 2013.

12 Mueller told no one on June 3d that could actually impact

13 the situation at KYGO about this alibi or this story,

14 whether or not he believed it.  He said it was silly or

15 goofy.  Just a silly or goofy assault by a fellow employee

16 on Ms. Swift.  Silly or goofy.

17         Well, was it silly or goofy?  Someone said a

18 minute ago in closing that they didn't bring up the Haskell

19 story.  Well, you know what, paragraph 18 of the complaint

20 that I read to that man on cross-examination is where that

21 story comes from.  His complaint.  So the story was no

22 longer silly or goofy two years later when he put it in a

23 federal lawsuit, thereby destroying, or attempting to

24 destroy, the reputation of Eddie Haskell, his boss.

25         They put it in play.  He put it in a federal

1    lawsuit.  And the attack two years later on his boss, quite

2    frankly, is shameful and it's cowardly.  And that's what it

3    is.

4            And what we know from this is he has only himself

5    to blame.  If his wild story that he forgot about for two

6    years, it was silly and goofy, that wasn't worthy of saying

7    anything about when his butt was on the line -- forgive

8    me -- at KYGO, what did Call have to say about all that?

9    Well, Bob Call said, If I had known, I, quote, would have

10   gone down a different path in the investigation.

11           That doesn't mean he would have cleared Mueller,

12   but it would have changed the entire scope of events in the

13   way he looked at this investigation, notwithstanding the

14   fact that we all know that guy did it.

15           That, my friends, in the instruction is what you

16   call an intervening cause that breaks the chain that either

17   one of these people, remaining two defendants, could have

18   caused Mr. Mueller's termination.  He didn't tell the

19   events to his boss to investigate the situation.

20           And I asked him on cross:  Tell us, tell this

21   jury, how was Mr. Call's investigation flawed?  How was it

22   flawed?

23           And, you know, he could only identify one thing in

24   the repeated and, admittedly, aggressive questioning that I

25   gave him.  And you know what he said?  He didn't want the

1    woman HR director Maureen Marsh to interview Shannon

2    Melcher; he wanted Bob Call to.  That's the sum total of

3    the flaw in the KYGO investigation right out of his mouth.

4    It's right out of his mouth that that's the only thing he

5    could find wrong with that investigation.

6              The destruction of five different computers or

7    cell phones.  I think I just heard Mr. McFarland say,

8    "Things happen."  And they were really hard, really hard,

9    on the victimizer for spilling coffee.  It's an insult to

10   me and an insult to you, and I can't call it any other way.

11             Mueller admitted that neither he nor his lawyer

12   engaged a computer expert to attempt to recover any of the

13   missing information.  Mueller admitted that my clients had

14   been completely deprived of their ability to do so and try

15   to recover that information.

16             Mueller admitted that he destroyed one hour and 45

17   minutes of relevant recorded information -- a "things

18   happen" issue, apparently, to the plaintiffs -- involving

19   the critical events in this case including the meeting

20   between Haskell and Bob Call and himself.  And, most

21   interestingly, it was so important to him, you know,

22   five -- five gone computer devices and cell phones, that he

23   never asked Ms. Melcher or Ms. Ryno -- or Ryno, excuse me,

24   for their copies of e-mails and texts that he admittedly

25   sent frequently to them about these events.

1    Now, Mr. McFarland said, there's no evidence about

2   what he destroyed.  Of course there's not.  He destroyed

3   it.  It makes no sense.

4    They said, "The defendants didn't tell you what

5   was there."  Of course we didn't.  He destroyed it.  Five

6   times over, all since the June 2d, 2013, event.  And now

7   they're asking you to hold us accountable for not

8   resurrecting that which he destroyed, admittedly, and for

9   you to take his word for it that there was nothing there to

10   look at.

11    I promise you, use your common sense, as you're

12   sworn to do, that if that information helped them, if it

13   helped them, it wouldn't be gone.  He wouldn't have lost

14   multiple $3,000 computers, and thrown cell phones in

15   garbage, and done all -- everything he could to avoid the

16   resurrection of what he was writing at the time.

17    Finally, I promised you, in a general manner, that

18   Mueller is the plaintiff.  Well, we have seen that Mueller

19   is the plaintiff, and that gives him the burden of proof.

20   It doesn't require my client to disprove his false

21   allegations, which is the way the closing was set up here.

22   He has to prove it.  And in the most twisted of

23   circumstances, Mr. Mueller was seeking millions of dollars

24   in damages against these people at this table based upon

25   his wrongful contact.

1033

1          Now, was he seeking millions?  He was until he got

2     on the stand.  And on cross-examination, to say there was

3     nothing put forward, nothing, his expert, Mr. Opp, was put

4     forward in front of him, and the amount of damages he was

5     seeking until he was sitting right there, was $2.98

6     million, 15 times that which he could have ever recovered

7     under the contract.  And what did he say when I pushed him

8     on it?  Well, he blamed it on his lawyer.  "Well, I didn't

9     really like Opp."

10         That's the man who can't take responsibility for

11    what he's doing.

12         But, more importantly, the retraction of his $3

13    million number on the stand probably wasn't the fault of

14    his lawyer for putting Mr. Opp there, it was probably his

15    judgment at the time that you might be offended -- like I

16    was offended -- that somebody would try to make a

17    multi-million dollar payday off of this.

18         In any event, as you've seen in the instructions

19    and heard Judge Martinez's now said:  Even if he were

20    damaged -- which he was not, and make no mistake about

21    it -- he's limited to a couple hundred thousand dollars of

22    what was left on his contract.  But he hasn't been damaged.

23    We'll get to that.

24         Now, as we go through the evidence, as I said in

25    the beginning of this little opening to what we're talking

1    about here, every single shred of evidence and every

2    question is glossed with this overriding question.  And the

3    overriding question is:  Is the victimization going to stop

4    here or is it going to go on?  Is the victimization going

5    to result in that guy getting a payday from Taylor Swift's

6    mother and her uncle-equivalent, Frank Bell, for doing the

7    right thing and reporting the incident?  That glosses every

8    shred of evidence in this case and it glosses every issue

9    you look at.

10         Okay.  We have to frame this up a little bit

11   before we get to some of the more specific issues.  And the

12   first thing I would say, as I have already said, it is the

13   plaintiff's burden of proof.  And as Judge Martinez said,

14   he has to prove every single element of that interference

15   claim, of which there are five, that they were more

16   probably true than not to prevail.  Five elements, three of

17   which he can't come close to:

18         That the conduct of these two -- and it isn't Ms.

19   Swift -- but these two right here, Mr. Bell and Ms. Andrea

20   Swift, was wrongful, that they had some kind of bad motive,

21   and that they intended to achieve the result that happened

22   to this man.

23         There is no possible way the evidence supports the

24   elements of the legal claim and you are bound to follow

25   those elements as Judge Martinez has showed you.  It is

1    open, shut, case over.

2         And keep in mind, as you do that, the bad act here

3    is reporting it.  The bad act is reporting the sincere and

4    honest belief.  Try to fit that into Judge Martinez's

5    instructions and try to figure out whether he made it more

6    probable than not through his evidence that every one of

7    those elements were met, such that the reporting, itself,

8    through two phone calls is the offense.

9         Now, let's go to some basic parts of the evidence

10   that I really want to focus on.  Credibility.  You had an

11   instruction on credibility of witnesses.  What we have here

12   is we have one person against 12.  In particular, we have

13   Mr. Mueller's ever changing story against eight people who

14   saw various parts of it, the act being committed, all the

15   way to Mr. Dent who saw the hand come out from under the

16   skirt.

17        And we have his two friends, perfectly nice

18   people, who were either not there, in the case of Ryno, or

19   Ms. Melcher who said she doesn't know what was going on

20   behind his back.  So if you're keeping score, it's nine to

21   two to one.  And when we take those people and we look at

22   how Mr. McFarland trashed the credibility of witness after

23   witness, think about it.  Were we in the same room?  Did

24   you see Stephanie Simbeck and will you look her in the eyes

25   and say, that woman is, as he said, the least credible

1    witness he'd ever seen?

2          She was the photographer.  She knew immediately

3    when Ms. Swift said, "That man grabbed my rear," she knew

4    immediately who it was because she had seen it happen, and

5    she saw Ms. Swift pull away, and there's nothing

6    inconsistent with her doing so.  And to attack her

7    credibility, I don't see it.

8          They attacked the credibility -- the credibility

9    of Mr. Dent.  Mr. Dent, NSA-approved Top Secret clearance,

10   as high as the president, police officer, not employed by

11   Ms. Swift, not at all, no incentives whatsoever, as Mr.

12   McFarland suggested about Ms. Simbeck.  And when he was

13   asked the question:  Do you believe you saw this?  He said,

14   "I don't believe anything."

15         Remember Mr. Dent?  He said, "I saw what happened.

16   And I saw this man's hand come out from under her skirt."

17   No incentive, no motivation whatsoever to do anything other

18   than tell the truth.  That's credibility.

19         Now, the question on the other side of the

20   credibility coin is this:  Will you believe one witness,

21   Mr. Mueller, with every incentive to lie, over the other

22   witnesses?  Will you believe the guy who destroyed five

23   computer devices containing critical evidence over the

24   other witness?  Are you going to believe the guy that

25   changed his story multiple times?  He quibbles with that.

1    But clearly, "I didn't do it" isn't, "if I did it, it's an

2    accident," isn't "Haskell did it."

3           Are you going to believe him over the multiple

4    people who have never changed their stories in four years?

5    Are you going to believe the guy who, two years later for

6    the first time, found it important enough to relay what he

7    called the silly and goofy story that Eddie Haskell had

8    confessed to the assault?  Eddie Haskell being the boss

9    that wanted to fire him at the time.

10          Are you going to believe Bob Call?  Bob Call who

11   Mr. McFarland said, by all accounts, is incredibly -- of

12   high integrity and in -- the highest standing person in

13   this industry?  Are you going to believe that he lied when

14   he said, "I thought Mueller lied"?

15          Are you going to believe he lied in fulfilling his

16   duties to investigate the situation?

17          Folks, it's not even a close call on credibility.

18   The witnesses saw all various parts of this assault and the

19   picture fits together in a number of pieces.  And I can

20   tell you, no credibility goes with a story-changing,

21   evidence-destroying aggressor like David Mueller.  He's got

22   no credibility.

23          Second point in the evidence I'd like to address,

24   the so-called waiting to report the incident or the alleged

25   failure to take immediate action by Mr. Dent.  Keep in

1    mind, it was from anywhere from, I think, 10 to 20 minutes

2    after the assault where that meet-and-greet ended.  People

3    had different estimates of how long it was.  And then Ms.

4    Swift immediately said, quote, That dude grabbed my ass.

5    And for four years, that's been her story.  Never changed.

6           Now, Greg Dent, the security guard, why no

7    immediate action by Mr. Dent?  Well, every bit of that was

8    explained.  You just heard there was no evidence.

9           No. 1, there were fans already in the room.  No.

10   2, some of those fans were children.  Ms. Swift made it

11   very clear, as did the other witnesses in the room, that no

12   one wanted a media event about any person grabbing her rear

13   end to spread virally through the media sources in a

14   photograph of this man, somewhere in the act -- you pick

15   out yourself where he was -- but somewhere in the act.

16          That's a perfectly good explanation.  And Taylor

17   Swift, from the stand, quoted, quote, I could not have,

18   without the fans that were in the booth already overhearing

19   what I was saying.  And this was not something I wanted to

20   be known.

21          Women who are attacked, women who are mistreated,

22   generally don't want people to know.  Women who are

23   reported on worldwide definitely don't want people to know.

24          What else did Dent say?  There were rules of

25   engagement.  Dent said, "I take my cues from Ms. Swift."

1    He said, "She thinks I'm too mean."

2            And repeated questions from Mr. McFarland showing

3    a simply elementary understanding of security suggesting

4    that Greg Dent is nothing but muscle, an animal that would

5    just jump on anybody that did anything.  He's an NSA

6    trained security expert.  He said there's a big difference

7    between being in crowds versus pre-cleared backstage

8    situations like where this man committed the assault.

9            He said it is a central part of security to know

10   when to act and when not to act.  And then Mr. McFarland

11   pounded him with questions that:  You did not perceive

12   danger.  Like danger is the standard for a woman's right to

13   say no.

14           And he pounded him and pounded him and pounded

15   him.  And finally Greg Dent said, quote, I guess I wouldn't

16   say it was dangerous.  I thought it was a violation of her

17   body.

18           Darn straight it was.  And Greg Dent acted like a

19   true professional in the situation and Greg Dent was

20   crystal clear in his testimony.  Mr. McFarland says:  And

21   you believe that you saw Mr. Mueller's hand and Ms. Swift's

22   skirt come up, and then Mr. Mueller placed his hand on Ms.

23   Swift's back?  Is that right?

24           Answer:  No.  I know I saw it.  I don't believe I

25   saw it, I know I saw it.

1          Question:  So you saw Mr. Mueller's hand and Ms.

2    Swift's skirt come up and then Mueller place his hand on

3    Ms. Swift's back?

4          Answer:  When he went to put his arm around her,

5    his hand went under the skirt.  She jumped, pushed her

6    skirt down, and moved closer to the girl.

7          Dent said that over and over again.  He said it

8    over and over again since June 2d, 2013.  They provided no

9    impeachment of that story.  And all Mr. McFarland wants you

10   to do is believe that immaterial differences in what people

11   saw from different angles in the room somehow undermines a

12   guy with top security clearance and what he is certain he

13   saw, as certain as Taylor Swift is that this man grabbed

14   her rear.

15         Now, another timing issue.  Ms. Swift waited 15

16   minutes to report it.  With good reasons.  Mr. McFarland

17   brought up Ms. Melcher and her own sexual assault situation

18   at KYGO.  She waited months to report it.  If you'll

19   recall, she didn't even report the first instance.

20         That is the norm.  That is the norm if you've ever

21   been grabbed or ever been touched.  What goes on in your

22   mind?  "What did I do to -- boy, I'm ashamed of it.  I

23   don't want anybody else to know it."

24         I guess that's probably why Ms. Melcher waited a

25   lot longer than Taylor Swift.

1    The next thing.  The evidence of what I call the

2    pain, the reaction.  Taylor's reaction, in her own words,

3    quote, After this happened, it was like a light switched

4    off on my personality completely.  My eyes went to the

5    floor.  I couldn't make eye contact with either one of

6    them.  Being Mueller and Melcher.  And I just said, in a

7    monotone voice, thank you for coming, and they were gone.

8    After the assault, Ms. Swift, as we know, was

9    ushered to her dressing room and that was the end of her

10   involvement.  At that point, she had a private moment with

11   her mother, Andrea Swift.  No one disputes that.  And a

12   mother's worse thought, nightmare, finally come true.  Year

13   after year, protecting her daughter in an adult world,

14   someone had finally crossed the line with her.

15   As Andrea Swift said -- you already heard me

16   say -- quote, I wanted to vomit and cry at the same time.

17   I wanted to vomit and cry at the same time.

18   And darn straight, she wasn't happy.  And darn

19   straight, that man deserved consequences for what he did

20   and the pain that he put on mother and daughter.

21   The evidence about Bell's investigation.  Let's

22   start with what Bob Call said about Frank Bell, the man

23   right there looking right at you.  Not looking down, but

24   looking you in the eye.  Bob Call said, Frank had a

25   reputation of professionalism, capability, demeanor,

1    honesty, great leader.  That's a quote.

2         What did Mr. Bell say?  And it's undisputed.  He

3    spoke to everyone in the meet-and-greet room.  He spoke to

4    Taylor.  She was unequivocal.  He had the photograph, which

5    every single witness, including Mr. Mueller, testified

6    something doesn't look right.  Mueller called it weird and

7    awkward.  Haskell called it damning.  Everything in

8    between.  Something's going on in that photo.

9         What more would Bell do?  Well, Mr. McFarland

10    suggested a police lineup should have been conducted.  A

11    police lineup of what?  Who was in that line, put them

12    side-by-side, and figure out whether David Mueller was

13    misidentified by a woman who they could see had a

14    legitimate and innocent belief that this man did it.

15         Well, Bell knew this was senseless given that he'd

16    already heard from Ms. Swift and others about what

17    happened.  But I think you're entitled to see:  What would

18    that police lineup look like?  Let's see that.  Well, here

19    we have it.  We have all the photos.  Aha.

20         Clearly, clearly, Mr. Mueller, the guy in the

21    middle, was misidentified with one of these little girls or

22    one of these little boys.  Clearly Taylor Swift had no idea

23    that this guy -- and that's the same man as this man right

24    here -- the guy with the smile, boy, she must have confused

25    Mr. Mueller with one of these little girls or one of these

1     women.  It is an insult, an insult, to suggest that, given

2     these photos.

3             So what does he say?  "Well, they don't have

4     the -- all the photos.  They must have done something

5     wrong."

6             No, I don't know that there's any proof whatsoever

7     that we don't have all the photos.  But if we don't have

8     all the photos, Ms. Swift knocked that aside by saying,

9     "Well, your client waited two years to sue me.  I wasn't

10    sitting there holding the meet-and-greet photos for two

11    years waiting for him to try to come forward with a

12    audacious and ridiculous lawsuit to victimize the victim."

13            That's what we have.  And what do we know about

14    those missing photos, if there are any at all?  We know

15    from Mr. Mueller, himself, on my cross-examination, "We

16    were the only adult couple I saw in the entire line."

17            So I think we're going to be pretty certain that

18    if there are other photos -- and I was able to put them up

19    in this lineup for you -- we're not going to see a bunch of

20    burly guys with moustaches with their girlfriends, because

21    Mr. Mueller took care of that himself.

22            Now, there is one other adult couple in this

23    lineup.

24            If you could show that for us, Sparkles.

25            There they are.  First of all, is it possible that

1044

1    Ms. Swift confused this adult male with that adult male?

2    That's silly.  But, most of all, look where that adult

3    male's hands are going.  Look where his arm goes.  It's

4    where my arm goes when I give a hug to my daughter's good

5    friends.  I'm not going anywhere near their rear end.  I'm

6    not going to take a chance on anything inappropriate or

7    dishonest or illegal or, quite frankly, as Gabby Liddicoat

8    said, creepy.  And look where Mr. Mueller's hand is.

9         There's your police lineup.  No, Mr. Bell didn't

10   conduct a police lineup at the time, but we did it just

11   now.  And I think it's crystal clear that there's not a

12   chance she misidentified this man in the line.

13        All right.  What is the evidence about

14   management's decision -- that being 13 Management's

15   decision to inform KYGO?  To be clear -- and I'm going to

16   repeat it -- Mr. Mueller has admitted his case away by

17   saying, "I can't imagine, there's no facts, there's no

18   incentive to make up anything.  It's an honest belief."

19        So once that honest belief, which is undisputed,

20   went to management, what is management's responsibility?

21   Well, they're armed with what Mueller concedes was an

22   actual and honest belief of Taylor Swift.  And management

23   decided that Mueller's employer needed to know.

24        Now, they decided -- and apparently they made

25   threats.  As we already heard, they made threats.  And what

1   was the threat?  Quote:  We might pull Taylor's music is
2   what Mr. McFarland said.  Well, that's interesting, because
3   Ms. Swift was in pop music at the time.  This was a country
4   music station, and they weren't playing her music.  So
5   that's the beginning and end of the threat that Taylor
6   Swift made to country music station KYGO.
7          Why did Mr. Bell, Ms. Swift, and the management
8   team decide to inform KYGO?  Well, the evidence is
9   undisputed.  It was an on-the-job workplace assault.  Which
10  Mr. Mueller said, when on-the-job workplace assaults occur,
11  the employer has the right to know if somebody has an
12  honest belief about them.  Well, the honest belief
13  element's admitted away.  They said that happened.
14         And what was the second reason?  To protect
15  others.  Andrea Swift knew all too well, having walked
16  through a world of adults, most of them well-attended but
17  not all, with a young, incredibly talented daughter, that
18  there's a chance for abuse.  What did Andrea Swift testify?
19         Quote, I personally did not decide that.  We
20  decided as a group that we felt it was important for his
21  employers to understand what took place and so we felt a
22  responsibility that this not happen to another young woman.
23         Those are the only reasons in the record for Mr.
24  Bell and Ms. Swift reporting this to KYGO.  And if you look
25  at the instruction that Judge Martinez read you on improper

1046

1    conduct and what that means, there's not a chance, not a

2    chance, that that rationale for reporting was improper

3    conduct and, therefore, his case fails.

4            I draw your attention to a couple of the elements

5    to look at:  The interests sought to be advanced.  The

6    interest sought to be advanced here was the protection of

7    others.

8            The societal interests at issue.  Same answer.

9            The motive.  Look at it.  There's no way the

10   element can be met of tortious interference given this is

11   the only evidence of why KYGO was called.  So Frank Bell in

12   a confidential manner -- and I stress "confidential" -- it

13   was this man that made everything public when he filed the

14   lawsuit -- called Bob Call.  His entire contact and these

15   defendants' entire contact with KYGO and indirectly, I

16   suppose, Lincoln Financial, were the two calls.

17           Calls filtered by a radio professional, filtered

18   in the sense that he had heard what Andrea Swift had said

19   and, darn straight, she was mad.  But he handled it as he

20   is charged to do with 13 Management, in a professional

21   manner, and filtered the conversation to say, "Bob, do the

22   right thing.  This is what we know."

23           He did not tell Bob Call what to do.  He didn't

24   tell him what to do.  Now, Mr. McFarland says, "It was a

25   wink, fire him," based on this threat that Taylor might

1    pull her pop music from a country music station, or that

2    she was some kind of powerhouse that was going to run over

3    Lincoln Financial, a big insurance company.

4         But the reality is there's not a shred of evidence

5    to that effect.  That's all argument.  Mr. Bell respected

6    Mr. Call.  No one disputes that.  And he put it in Bob

7    Call's prerogative to decide what to do.

8         COURTROOM DEPUTY:  You have five minutes.

9         MR. BALDRIDGE:  And you know what, sure, this guy

10   deserved to be fired.  He didn't say it, but he deserved to

11   be fired.

12        Now, KYGO's investigation.  Look at the causation

13   instruction here.  Bob Call interviewed every KYGO employee

14   that was present in the meet-and-greet.  He spoke to a half

15   a dozen folks at Lincoln, he talked to Frank Bell.  He --

16   he acknowledged the absolute lack of incentive for Taylor

17   Swift to make this public or to do anything about this if

18   it didn't happen.

19        And then Bob Call testified, quote, I looked at

20   the facts that were available to me and that was, "I had

21   this picture, I had what I felt was a very solid credible

22   information from Mr. Bell, I had a situation where he had

23   changed his story from, 'It didn't happen' to, 'Well, if it

24   did, it was incidental,' and the picture clearly showed his

25   hand was in a place you don't see at meet-and-greet

1    pictures.  And I knew very well that it made no sense for

2    me that Taylor Swift would make up such a claim."

3              And that's darn straight.  It made no sense.

4              Eddie Haskell was asked:  Did KYGO make its own

5    independent decision to terminate Mr. Mueller?

6              And Haskell said, Absolutely.

7              That's where causation comes in.  End of story.

8    The causation chain has been broken.  These fellows

9    conducted an investigation inside.  KYGO made their own

10   decision.  The questions of the photo, the interview,

11   everything else Mr. Call and Mr. Haskell said were there

12   own impressions.  They decided what they saw and they

13   decided what to do.

14             Now, I want to go to the photograph, if I may.

15   The photograph that Mr. McFarland tells you proves nothing.

16   Well, the only way it does that is this:  He tries to

17   convince you that a nano second frozen in time, like every

18   photo, doesn't show every single element of the assault.

19             That's ridiculous.  That's -- something's

20   happening in the chain of events there and it is strange.

21   And as Ms. Swift was very clear, making my argument for me,

22   in fact, quote, It's not a video, so we can't see the whole

23   thing unfold, but this is capturing a moment in the process

24   of him grabbing my ass underneath my skirt.

25             Well, Mueller says it's weird and awkward.  Bob

1    Call and Eddie Haskell made an independent judgment that it

2    was really a problem.  Everyone is clear that they saw

3    something weird there are.  Mr. Mueller said, "My fist was

4    palmed down."

5            Take a look at that wrist.  Does that look like a

6    palm-down fist to you?  Taylor was clear and Greg Dent was

7    clear that she slid away from him, as was Stephanie

8    Simbeck.  And Andrea Swift said, "The eyes of Taylor told

9    it all."  Quote, I know those eyes better than anybody.

10   She has a smile frozen on her face, because she smiles for

11   so many pictures.  I was sickened.

12           That's the words of a mother looking at her

13   daughter's eyes.  And, finally, Mr. McFarland said, "Look

14   at Taylor's smile.  Look at Mr. Mueller's smile.  I don't

15   know any way to characterize it other than the way my mom

16   used to characterize it, and I'm not going to say that

17   word, but that is an S-eating grin right there.  That is a

18   man that is very proud at the moment of what he's doing.

19           And the only reason you can see his hand in the

20   act of committing this assault is because she slid away.

21   He tried to hide it behind her rear end and the back wall.

22   She moved and there it is.

23           It doesn't matter what nano second within the act

24   this occurred.  What does that show you?  How many assaults

25   every day in every court, you don't have photographic

1   evidence.  We have photographic evidence that shows a part

2   of the puzzle.  And they say it's not good enough because

3   it isn't a video.  That's what you're hearing.  Put it all

4   together and figure it out.

5          Mueller's termination.  Evaluated the photo on his

6   own, Bob Call; he evaluated on his own that Mueller lied,

7   and then, most importantly, question:  Did you conclude

8   that Mueller lied when he said I didn't do it?

9          Answer:  I thought he was lying.

10          That's Bob Call.

11          Is that why you fired him?

12          Yes.

13          Bob Call, the man beyond reproach, as Mr.

14   McFarland said, determined he was lying.

15          Motivation?  Taylor has none.  It's conceded.  She

16   has no motivation to make this up.  But what about David

17   Mueller?  I think we saw a man of fragile ego on the stand,

18   two meet-and-greets, his boss -- and let's call it like it

19   is -- enemy, Eddie Haskell, was in the VIP group.

20          He was there with his new girlfriend.  He was

21   confused and not understand why he, a member of the

22   prominent morning show, wasn't in the VIP group, and it had

23   never happened.  And what came from his own mouth, "I

24   deserved some professional respect from Ms. Swift."

25          That's what they said.  They repeatedly tried to

1    get out of the kiddy line and get into the VIP group.

2          So when he gets there, in a 50-second encounter

3    with Ms. Swift, "She was cold and stand-offish to me," he

4    said.  Cold and stand-offish.  "She gave all the attention

5    to my girlfriend."  And, in his own words, he felt

6    invisible, though he denied that until I impeached him, and

7    on his own, though he denied that until I impeached him

8    with his deposition.

9          This man, the self-proclaimed prominent on-air

10   personality, was embarrassed.

11         It's a sad story, but you are not supposed to

12   reach your conclusions here based on emotion.  It is sad.

13   And revenge -- a revenge story couldn't be more clear.

14         Bob Call testified the ratings were better before

15   Mueller got there and better after he left.  Look at

16   Exhibit A-1 -- and I'll spare you, unless Sparkles can put

17   it up right away -- the guy was about to get fired for

18   insubordination.  He admitted it.

19         THE COURT:  Mr. Baldridge, excuse me, you are past

20   your 50 minutes.  You can continue going, but it will be

21   taken from your rebuttal.

22         MR. BALDRIDGE:  Yes, sir.  I'm going to keep

23   eating it, sir, if I may.

24         THE COURT:  All right.

25         MR. BALDRIDGE:  He was on thin ice.  He was on

1    thin ice with his job.  He was clear that Haskell had

2    threatened him with termination and he stuck it to his boss

3    when he put it in a public lawsuit.  That's the other

4    motive.  Greed.

5         We already talked about the $2.8 million shift.

6    The big change on the stand, we're no longer looking for a

7    big payday because it looks bad, in my view.  And, finally,

8    when we talked about failure to mitigation, you had a

9    mitigation damage.  In other words, he can't make his

10   damages worse.  That makes his damages zero.  And you know

11   why?  Because on June 3d, 2013, he didn't tell Haskell and

12   Call -- I mean that Haskell had claimed he committed the

13   assault.  Right there, he did something that could have cut

14   off his damages and he didn't reveal it, so he failed to

15   mitigate altogether.  He clearly failed to mitigate.

16        Otherwise, though, he testified he only looked at

17   Top 20 market jobs.  He didn't show you any applications.

18   He showed you no effort to work anywhere other than

19   big-time radio.  He did nothing to try to get another job

20   of any true legitimacy, or that's been proven.

21        Now, finally, the counterclaim:  Harmful or

22   offensive conduct and contact.  No doubt about it.  Taylor

23   Swift was the subject of offensive contact.  She has no

24   desire to bankrupt this man.  And I tell you the single

25   dollar that I ask you to award her, the single dollar on

1   her counterclaim, is of immeasurable value in the scheme of

2   things.  It is of immeasurable value.  It means no means

3   no, and it tells every woman that they will determine

4   what's to be tolerated with their body.

5           The verdict form, very quickly, if I may, this is

6   what the -- the Judge read to you.  And all I'm going to

7   tell you is question 1 -- it takes a minute -- the answer's

8   no.  Question 2, the answer's no.  And there's no damages.

9   Question 4, this is the counterclaim.  And, 5, the answer's

10  yes.  And the question 6, for the $1.

11          I'm beyond thankful for your time.  You're the

12  only people not getting paid in some capacity for your

13  time.  You've done your civic duty.  Thank you on behalf of

14  my client and myself.

15          THE COURT:  Thank you, counsel.

16          Rebuttal closing argument for the plaintiff.  Mr.

17  McFarland, you have 10 minutes.

18          MR. McFARLAND:  Thank you, Your Honor.

19          We know that there were 60 to 80 people in the

20  general meet-and-greet.  Mr. Baldridge's *ad hoc* photo

21  lineup, although kind of fun to look at, obviously didn't

22  include all of the people at the meet-and-greet.  It

23  takes -- it just takes one.  There's misidentifications all

24  the time.  And maybe there was one person in front of Mr.

25  Mueller that had some resemblance.  And if Ms. Swift had

1    looked at it, she would have said, "Oh, you know, that's

2    the guy.  That's it, I'm mistaken."

3            But, again, we won't know because nobody on Ms.

4    Swift's side decided it might be a good idea, before

5    ruining Mr. Mueller's life, before making sure he was

6    fired, that maybe we should check that out.

7            And Ms. -- this photograph is interesting.

8    Compare it to the photograph of Mr. Mueller and Ms.

9    Melcher.  Is it really -- is it really different?  Look at

10   Ms. Swift's face.  She looks good in both pictures.  She

11   looks happy in both pictures.  And this picture up on your

12   screen here, she's right in the middle of the frame.  In

13   that picture, she's right in the middle of the frame.

14           In this picture on the screen, she's a little

15   closer to the female.  There's a little more room.  But

16   she's in a similar position.  There's nothing to suggest in

17   that picture on that easel anything different is happening

18   than in this picture.

19           There's also something -- you know, Mr. Baldridge

20   in his opening said the photograph -- there was something

21   mysterious.  And the only thing that I could find

22   mysterious was the little bump on Ms. Swift's skirt that he

23   was showing you didn't look like anything to me.  That was

24   all that I saw that I thought was mysterious.  But having

25   studied that picture a lot during the course of this case

1    and this trial, something else popped out at me over the

2    weekend that I think is critical to your deliberations.

3    Look at where Ms. Swift's arm is.  Look at her arm.  It's

4    behind Mr. Mueller.  In what world do you lurch away, do

5    you try to get away from somebody who is under your skirt

6    with a handful of your behind, in what world do you leave

7    your hand behind that person as you move away?  It's

8    against human nature.  If she wanted to get away from Mr.

9    Mueller, if what she says was actually happening, she would

10   have removed her hand and her body and she would have moved

11   away from him.  She's not going to keep her arm behind the

12   guy that's got himself a handful.  There's no way that's

13   her reaction if what she says happened actually happened.

14          Let's also talk about the so-called investigation.

15   Nobody did an investigation.  Ms. Swift, 15 to 30 minutes

16   after the alleged incident, "That dude grabbed my ass."

17   And she runs off to her dressing room and on with the

18   concert.

19          Her mother and Mr. Bell, they -- they then decide

20   on their own that the best course of action, even though

21   Ms. Swift didn't say anything to them, is they better

22   contact Mr. Mueller's employer.  And it's so serious in

23   their mind they've got an obligation to, you know, everyone

24   out there that they need to contact Mr. Mueller's employer

25   and they want to make sure he gets fired.

1          What they should have done is take half a step

2    back.  They're acting as her management team.  They should

3    have done something.  They should have done anything, talk

4    to the people in the room.  Grab Mr. Dent, talk to him.

5    See what he saw.  See why he didn't do anything.  They

6    never even asked Mr. Dent that question.  "How did this

7    happen?  How did you allow this person to walk out?  Why

8    didn't you call for help?"

9          At least that's what they claim.  That doesn't

10   make any sense to me.  Once the information about the

11   alleged incident is relayed to Mr. Call, he doesn't do any

12   investigation either.  He talks to Mr. Mueller, who says,

13   "I didn't do it.  I don't know what you're talking about."

14         He talks to Ms. Melcher.  She supports Mr.

15   Mueller's version.  And then he decides, We're going to

16   fire him.

17         And, again, according to him, the basis for the

18   firing was what Frank Bell told him, the photograph, and

19   his impression of what Mr. Mueller relayed over the course

20   of many, many questions about the incident.  On

21   cross-examination, Mr. Call directly acknowledged that when

22   Mr. Mueller said, "I didn't do it," he could have been

23   talking about touching.  "If I -- if I touched her, it was

24   incidental, it was accidental," which is consistent with

25   everything that Mr. Mueller has said here.

1     Mr. Mueller lost a dream job because Andrea Swift

2  and Frank Bell decided that he had to be fired, and they

3  didn't bother to do a fair, reasonable investigation.  They

4  didn't bother to tell Mr. Call that, "Well, no, I actually

5  haven't talked to any of the eyewitnesses, but I'm going to

6  present this to you as fact."

7     Mr. Call decided -- well, Mr. Bell decided that he

8  would contact his old friend and pull upon those old

9  relationships to make sure that Mr. Mueller was fired.  And

10 they didn't do anything to get to the truth.  They didn't

11 talk to any of the people there either.  And it wouldn't

12 have been hard.  You could have asked Mr. Dent.  "Hey, Mr.

13 Dent, would you make sure that we understand what these

14 other people saw?  Would you make sure that this is the

15 guy, that we got the right guy?"

16     It would have been very easy to do.  It's not fair

17 and it's not reasonable to relay or to make an allegation

18 of inappropriate touching of sexual assault without doing a

19 reasonable investigation.  In fact, it's reckless.

20     I don't disagree.  I have a 13-year-old daughter.

21 I don't disagree that the law should encourage the truthful

22 reporting of sexual assault.  There's no doubt.  But the

23 law should also discourage the false and reckless reporting

24 of sexual assault because people lose their jobs, they lose

25 their livelihoods, they lose their identities, they lose

1058

1    their reputations.

2            It is an incredibly serious act and it's an

3    incredibly serious allegation and the defendants didn't

4    take it seriously.

5            COURTROOM DEPUTY:  You have two minutes.

6            MR. McFARLAND:  They said, "We are angry, we're

7    going to get this guy fired, and we're going to use our

8    position to make sure that Mr. Call, Lincoln Financial, and

9    KYGO, know that we're going to be angry and upset if the

10   right action isn't taken, if Mr. Mueller isn't fired."

11           Please think through the evidence.  Obviously Mr.

12   Baldridge and I disagree as to what happened here, but,

13   ultimately, you guys get to decide.  And carefully overlay

14   your experiences and your common sense to figure out what

15   makes sense, to figure out who's telling the truth, and

16   who's right and who's wrong.

17           And I'm confident that when you do that, you will

18   find in favor of Mr. Mueller and you will find against the

19   defendants, and you will award damages to Mr. Mueller.

20           That's all that I have.  I, too, want to thank you

21   for your time and your attention.  We appreciate it.  Thank

22   you.

23           THE COURT:  Thank you, Mr. McFarland.

24           Mr. Baldridge, you have six minutes left.  Do you

25   want to change your five-minute warning request to a

1    different time?

2              MR. BALDRIDGE:  I'll just run to the end, how's

3    that?

4              THE COURT:  No warning?

5              MR. BALDRIDGE:  Okay.  We'll make it because I

6    think we can do this in six.

7              THE COURT:  Okay.  Why don't you give Mr.

8    McFarland a chance to sit down, please.

9              MR. BALDRIDGE:  In my closing, I suggested to you

10   that what's before you has been turned on its head and he

11   just proved it again.

12             It is not their burden of proof to show that this

13   happened.

14             That man is the plaintiff.  The only defendants

15   are Andrea Swift and Frank Bell accused of reporting what

16   they concede is a sincere belief by Ms. Swift that her rear

17   was grabbed.  Open and shut.  That's it.

18             If you look at the instructions and consider the

19   burden of proof, you must rule against Mr. Mueller and you

20   must rule in favor of Ms. Swift on her counterclaim.

21             Second thing I'd like to say:  Are we looking at

22   the same photo?  Take a look at that photo and look at the

23   one of the other adult couple, if we can get it up there.

24   I'm not going to go through it, but it's like the Emperor's

25   clothing in comparison.  Is that the same photo?  Do I see

1   the adult on the left with his hand right behind her rear?

2   Of course not.  Is that the same photo?

3         And, again, the only way they, quote, unquote, win

4   this battle is by saying that photo shows everything.  No

5   one ever said that photo shows everything.  It is a nano

6   second in time.  A part of the puzzle.  A puzzle supported

7   by eight witnesses who saw part of this assault in some

8   stage being committed.  And, you know what, it is absurd to

9   suggest that all eight of them are lying and that that man,

10  the guy who spills coffee on laptops and water on laptops

11  and throws cell phones away, is the guy you should believe

12  about what happened as opposed to eight different people,

13  two who said it happened, absolutely, Taylor Swift who will

14  look at you right now.  And look her in the face, and see

15  whether she meant it.  And Greg Dent, who saw it happen,

16  and all the others saw events consistent with it happening

17  at various stages depending on their angle.

18        Now, finally, Mr. McFarland said that Mr. Mueller

19  lost his dream job -- remember he had not been a radio

20  personality for seven years before that, remember that? --

21  his dream job at KYGO because of this incident.  Well, he

22  lost his job because he grabbed her butt and he got caught.

23  And now he's trying to get you to victimize her again by

24  saying he didn't do it because he wants to save his butt.

25        I want to leave you with the words of my friend

1061

1    and another credible man that will look you right in the

2    eyes, Frank Bell, when he said, quote, "The guy did it."

3            Mr. McFarland said:  Well, you don't know whether

4    he did it, right?  You weren't there?

5            He said:  No, I'm afraid I do know.  I do know

6    because I was told by someone who, after thousands and

7    thousands of meet-and-greets with people, has never had

8    anything like this happen and who -- who I've known

9    literally since she was born, has never lied to me.

10           The guy did it.  Don't be fooled.  Don't be

11   snookered.  This is his burden of proof.  It's time to stop

12   the victimization of victims in this country and in this

13   courtroom.  Thank you.

14           THE COURT:  Thank you, counsel.  All right.

15   Ladies and gentlemen of the jury, in a few moments you're

16   going to be escorted to the jury room to begin your

17   deliberations.  You're now finally able to begin to discuss

18   this case among yourselves, but only when all eight of you

19   are present at the same time.

20           To ensure that your deliberations are private, a

21   court security officer will serve as a bailiff and will be

22   present outside the jury deliberation room to assure that

23   you are not interrupted or disrupted by anyone.  Also the

24   bailiff will collect your cell phones during the time that

25   you are deliberating.

1062

1          Also today, finally, you will be able to take your

2    notes that you have been taking during the trial.  You will

3    be able to take those notes back with you to the

4    deliberation rooms for your review and consideration during

5    your deliberations.

6          When you return to the deliberation room,

7    you'll -- you should see the eight sets of jury

8    instructions that I mentioned earlier.  And in a few

9    minutes -- because the lawyers have to go through with Ms.

10   Hansen the actual physical binders of the exhibits to make

11   sure we have exactly the right pages that will be going

12   back to you, in a few minutes the exhibits that have been

13   admitted into evidence will also be brought back to you.

14         All right.  Will the court security officer please

15   come forward.  Security officers.  All right.

16       (Court security officers sworn)

17         THE COURT:  All right, members of the jury, if

18   you'll accompany the bailiffs.

19       (Jury left the courtroom at 12:34 p.m.)

20         THE COURT:  All right, counsel, please give Ms.

21   Hansen your cell phone numbers so she can contact you in

22   the event we have a question from the jury or when we

23   receive the verdict from them.

24         Please remain within 15 minutes of this courtroom

25   so that we don't delay matters too much if we do have a

question.

          This is my procedure:  If we don't have a verdict
by 5:00 p.m., we will release the jury for the evening and
they will be requested to come back tomorrow at 8:35.  At
8:45 we will bring them out to the courtroom to ensure that
all eight are present and accounted for and then they will
be released back to the deliberation room to continue their
deliberations.

          If that is the case, Ms. Hansen will call you and
let you know that the jury has not reached a verdict by
5:00.  There will be no need for you to return to the
courtroom to put any of that on the record.  She'll just
notify you to that effect.

          All right.  I want to thank counsel for the very
professional and zealous representation of their clients.
It's obvious that you both very much believe in the cause
of your clients.

          All right.  We will -- well, before I say that, is
there anything that we need to address before we recess for
now?

          MR. McFARLAND:  No, Your Honor.

          THE COURT:  For the defendants?

          MR. BALDRDIGE:  Nothing, Your Honor.  Thank you.

          THE COURT:  All right.  We'll be in recess until
there's a question from the jury or a verdict.

1    (Recess 12:36 p.m.)

2                    AFTERNOON SESSION

3    (In open court out of the presence of the jury at 3:39

4    p.m.)

5            THE COURT:  All right.  The record will reflect

6    that all parties and all counsel are -- all parties -- yes,

7    there -- all parties and all counsel are present.

8            All right.  At 3:18 this afternoon, I received a

9    note from the jury signed by the foreperson 313.

10            Question is as follows:  On page 29, paren,

11    elements of liability-assault, unparen, we are confused

12    about the word apprehension.  Does claim No. 2 require that

13    Ms. Swift felt apprehension prior to the contact, question

14    mark, or does her feeling of apprehension apply at any time

15    during the alleged assault, question mark.

16            We'll take input from counsel as to how we should

17    respond.  For the plaintiff first.

18            MR. McFARLAND:  Judge, I -- I don't have my copy

19    of that instruction with me and I don't have any particular

20    opinion at this point as to what the response should be.

21            THE COURT:  Okay.  That's an honest answer.  For

22    the defendants.

23            MR. BALDRIDGE:  Yes, Your Honor.  It is the -- the

24    answer is that it applies at any time during the alleged

25    assault.  It is the reaction and feeling of the victim as

1   the -- in this case, crime, you know, I mean, in another

2   court, is occurring or the act is occurring.  Apprehension

3   prior to the contact would be such that the victim would

4   have to have anticipated something wrong was about to

5   happen, and that's clearly not the law of assault.

6           So it's -- it's definitely answered:  Any time

7   during the alleged assault.

8           THE COURT:  All right.  Let me tell you how I

9   generally handle these kind of questions.  When a question

10  comes back with something as substantive a legal point like

11  this, my general response is to tell the jury that I can't

12  at this point supplement the jury instructions any further

13  and they have to do the best job they can in applying the

14  instructions that they already have, except for when there

15  is a stipulation by counsel on -- for all parties as to a

16  response that we can give to the jury which I believe

17  complies with the applicable case law.

18          So what we can do is we can take a brief recess

19  and see if you folks can come up to an agreement as to how

20  to respond and, if not, then the response will be as I've

21  set forth -- or Mr. McFarland, unless you're prepared to

22  tell me right now that you will not agree to that -- and

23  which lets me know that we don't have a stipulation.

24          MR. McFARLAND:  Judge, I think a short recess

25  would be appropriate.

1066

1          THE COURT:  All right.  Why don't we take a recess

2     up to 10 minutes.  If you have an agreement or an impasse

3     before then, let Ms. Hansen know and then she can get me.

4     Yes, sir.

5          MR. BALDRIDGE:  Will we have the opportunity to be

6     heard again in the event we don't reach a stipulation?

7     Because I would like to make one more thing clear for the

8     record.

9          THE COURT:  Sure.  Yeah.

10          MR. BALDRIDGE:  And if I may, if the apprehension

11     had to be felt before the assault, it shows that the jury

12     is laboring under a clear mistake of law.  And I want to

13     put that on the record, because the assault is, in fact,

14     the offensive contact by definition.  And if the jury were

15     left to believe that apprehension of the victim had to

16     occur in advance of the actual violation occurring, that's

17     suggesting that the victim had to anticipate it was coming.

18     That is a clear mistake of law, without -- even if there is

19     no stipulation, I think we're at a point where the Court

20     needs to instruct them accordingly under the law.

21          THE COURT:  All right, good enough.  We will be in

22     recess until you have a stipulation or an impasse or 10

23     minutes has gone by.

24          (Recess at 3:44 p.m. to 4:05 p.m.)

25          THE COURT:  All right.  It is my understanding

1067

1    that the parties have not reached a stipulation as to an
2    answer to the jury's question; is that correct?
3            MR. McFARLAND:  That is correct.
4            THE COURT:  All right.  So this is the answer that
5    I propose giving the jury:  The Court is not permitted to
6    answer your question at this time.  You are instructed to
7    continue to apply the Court's instructions to the facts as
8    you find them to the best of your abilities.
9            Is there an objection from the plaintiff to that
10   response?
11           MR. McFARLAND:  No, Your Honor.
12           THE COURT:  Any objection from the defendants?
13           MR. BALDRIDGE:  No objection, Your Honor.
14           THE COURT:  All right.  We'll give this response
15   to the jury, and we'll be in recess until we have a further
16   question from the jury or a verdict.
17       (Recess 4:06 p.m. to 4:40 p.m.)
18           THE COURT:  All right.  The record will reflect
19   that all parties and all counsel are present.  I've
20   received a note from the jury:  We, the jury, have reached
21   a verdict.  Dated today, August 14, 2017, at 4:26 p.m.,
22   signed by the foreperson, 313.
23           All right.  Let's bring in the jury.
24       (In open court in the presence of the jury at 4:42
25   p.m.)

1    THE COURT:  All right.  I've been informed by a

2    note from the jury foreperson that the jury has reached a

3    verdict in this case.  Will the jury foreperson please

4    stand.

5    All right, Juror 313, you are the foreperson?

6    THE FOREPERSON:  Yes.  Can you hear me?

7    THE COURT:  There you go.  Has the jury reached a

8    unanimous verdict in this case?

9    THE FOREPERSON:  Yes, we have.

10   THE COURT:  Have you, as the jury foreperson,

11   signed and dated the verdict form?

12   THE FOREPERSON:  Yes.

13   THE COURT:  All right.  Will you please hand the

14   verdict form to the bailiff, who will hand it to me.

15   All right, sir, you may sit down.  Thank you.

16   All right.  I will now read the verdict.

17   In the matter of civil action No.

18   15-cv-1974-WJM-KLM, David Mueller, plaintiff and

19   counterclaim defendant, versus Frank Bell and Andrea Swift,

20   also known as Andrea Finlay, defendants, and Taylor Swift,

21   counterclaimant.

22   Plaintiff David Mueller's claim.  Question No. 1:

23   Do you find by a preponderance of the evidence that Frank

24   Bell intentionally interfered with David Mueller's contract

25   with Lincoln Financial?

1    Answer:  No.

2    Question No. 2:  Do you find by a preponderance of

3    the evidence that Andrea Swift intentionally interfered

4    with David Mueller's contract with Lincoln Financial?

5    Answer:  No.

6    Question 3 has been appropriately left blank.

7    Counterclaimant Taylor Swift's claims.  Question

8    No. 4:  Do you find by a preponderance of the evidence that

9    David Mueller assaulted Taylor Swift?

10    Answer:  Yes.

11    Question No. 5:  Do you find by a preponderance of

12    the evidence that David Mueller battered Taylor Swift?

13    Answer:  Yes.

14    Question No. 6:  If you found for Taylor Swift on

15    her counterclaim of assault and/or her counterclaim of

16    battery, do you award her $1 in nominal damages?

17    Answer:  Yes.

18    Signed by the foreperson, 313, dated August 14th,

19    2017.

20    All right.  Is there a request from the plaintiff

21    for me to poll the jury?

22    MR. McFARLAND:  No, Your Honor.

23    THE COURT:  All right.  Is there a request by the

24    defendants for me to poll the jury?

25    MR. BALDRIDGE:  No, sir.

1           THE COURT:  All right.  Thank you.

2           All right, ladies and gentlemen of the jury, you

3    have now completed your duties as jurors in this case and

4    you are discharged with the considerable thanks of the

5    Court.  And I know I speak on behalf of all the lawyers and

6    all the parties when we say we are sincerely appreciative

7    of the time and the effort and the service that you have

8    expended on this case and in this trial, and for doing your

9    contribution to help maintain our system of justice in this

10   country.

11          Now, I hope you're not in too hurry -- too much of

12   a hurry to leave us because I would like to meet with all

13   eight of you back in the deliberation room.  We have the

14   Court's certificate of appreciation that we'd like to hand

15   out to each one of you and also chat with you for a few

16   minutes about your service in this case.

17          You may be wondering now whether you can finally

18   discuss this case with others.  I should tell you that the

19   local rules of this Court prohibit the parties from

20   discussing this case with you.  I have, however, given the

21   lawyers in this case permission to speak with you, and only

22   those of you who agree to come back into the courtroom

23   after you have discussed and chatted with me and my law

24   clerk.

25          If you choose to come in back to the courtroom,

1071

1    you can discuss this case with the lawyers and give them

2    your feedback in terms of their trial.  With respect to

3    anyone else, it's entirely up to you how much you want or

4    do not want to share your deliberations on this jury and

5    your verdict.  The thing to keep in mind is if members of

6    the media, or anyone else, any member of the public,

7    persists in attempting to speak with you and you do not

8    wish to speak to them about your service on this jury, then

9    please inform Ms. Hansen who will inform me and I will make

10   sure that we bring that to a halt as soon as possible.

11          All right.  Very well.  The jury is now

12   discharged.

13          (Jury left the courtroom at 4:48 p.m.)

14          THE COURT:  All right.  Counsel, if you wish to

15   speak with the jurors, I'll let you know that it's been --

16   I usually take about 30 minutes or so with the jurors to

17   talk with them and chat with them.  I once had had a case

18   where the lawyers wanted to speak with the jurors and they

19   didn't wait around long enough.  The jury came out here and

20   the lawyers were gone.

21          So don't do that if you want -- if you want to

22   speak with them, have the patience to wait for them to

23   return to the courtroom.  It will be about 30 minutes or

24   so.

25          I wanted to remind the lawyers that there can be

1072

1    no discussion with the jurors regarding any facts or

2    evidence -- or any facts or information that was not

3    admitted into evidence.  Please do not discuss with the

4    jurors their deliberations or the reasons that they

5    returned the verdict that they did.

6            All right.  Is there any further matter requiring

7    the Court's attention at this time?  From the plaintiff?

8            MR. McFARLAND:  No, Your Honor.

9            THE COURT:  From the defendants?

10           MR. BALDRIDGE:  None, Your Honor.  Thank you.

11           THE COURT:  All right.  Thanks to all of you.

12           Thank you.  The trial is concluded.

13        (Proceedings concluded at 4:50 p.m.)

14

15                        **INDEX**

16   Item                                          PAGE

17      JURY CHARGING CONFERENCE:                  957

18      READING JURY INSTRUCTIONS TO JURY:         971

19      CLOSING ARGUMENTS:
        By Mr. McFarland                           995
20      By Mr. Baldridge                           1020
        By Mr. McFarland                           1053
21      By Mr. Baldridge                           1059

22      QUESTION FROM THE JURY:                    1064

23      VERDICT:                                   1067

24

25                *      *      *      *      *

1073

1                  REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4  from the record of proceedings in the above-entitled

5  matter.

6        Dated at Denver, Colorado, this 9th day of July, 2018.

7

8

9

10

11                    MARY J. GEORGE, FCRR, CRR, RMR

12

13

14

15

16

17

18

19

20

21

22

23

24

25